## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.:  21-11507 (   ) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS AND (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO**

Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware"), debtors and debtors in possession in the above-captioned cases (together, the "Debtors"), hereby submit this motion (the "Motion") for the entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Proposed Interim Order" and the "Proposed Final Order"), pursuant to sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain prepetition claims of critical vendors and service providers (the "Critical Vendors" whose claims shall be collectively identified herein as the "Critical Vendor Claims"); and (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors'

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

Chapter 11 Cases (as defined herein), is set forth in the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief sought herein are sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

### Background

4.      On November 17, 2021 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (this "Court").  As of the Petition Date, the Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107

---

[2]      Capitalized terms used but not defined herein shall have the meaning given to them in the First Day Declaration.

and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no committees have been appointed or designated at this time.

5.      Alto Maipo is a special purpose company, incorporated under Chilean law for the purpose of developing, constructing, and operating a run-of-river hydroelectric energy project in the Santiago Metropolitan Region of Chile, approximately 30 miles southeast of the city of Santiago.  The hydroelectric energy project that is presently under construction (the "Project") will consist of two run-of-river hydroelectric plants (the "Hydroelectric Plants") which, once completed, will provide significant zero-emissions energy to Chile's electric grid.

6.      As set forth more fully in the First Day Declaration, which is incorporated herein by reference, the energy market that Alto Maipo will enter into next year is not the same energy market that Alto Maipo projected would exist upon its initial Commercial Operation Date (the "COD") when construction began in 2013.  Since that time, increased generation capacity has driven down electricity prices in Chile, such that spot prices at which Alto Maipo could sell power are now less than half of what they were in 2013.  Meanwhile, climate change has significantly impacted the hydrology of the Maipo Valley, where the Project is being constructed, and lower precipitation levels reduce in turn the amount of power that the Project can produce.  As a result, Alto Maipo can no longer rely on its prior revenue projections, which assumed economic and environmental factors that are no longer in place.  In order to right-size their capital structure to meet these market challenges, and in light of a looming liquidity shortfall, the Debtors commenced these Chapter 11 Cases to ensure that they can complete construction of this hydroelectric project and generate renewable energy for many years to come.

**Vendor Claims**

7.     The Debtors have determined, in an exercise of their business judgment, that their continued receipt of certain goods and services is necessary to ensure that there are no unexpected or inopportune interruptions in the Debtors' business operations, and to preserve and maximize the value of the Debtors' estates.  Accordingly, without the relief requested herein, many of the Critical Vendors (the "Vendors") may cease delivering goods and providing services to the Debtors, which could be detrimental to the success of these Chapter 11 Cases.

8.     The Debtors respectfully submit that payment of the Critical Vendor Claims should be authorized by the Court on the terms set forth herein.  The Debtors have determined, in the sound exercise of their business judgment, that the critical goods and services provided by the vendors are vital to the operation of the Debtors' power facility and are essential to the Debtors' overall continuing business operations.  If the Vendors are unwilling to provide such goods and services because of their outstanding prepetition claims, the Debtors' operations would suffer dramatically, complicating the Debtors' simultaneous efforts to restructure and to complete construction on the Project, compromising the value of the Debtors' estates to the detriment of all creditors.  This relief is particularly necessary where all of the Debtors' operations are located outside of the United States and local vendors or suppliers may be unfamiliar with the protections of the automatic stay or may assert that they are not subject to the jurisdiction of this Court.

9.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Critical Vendor Claims is approximately  $466,000.

### The Critical Vendors

10.     The Project operations and businesses and, in turn, the success of these Chapter 11 Cases depends on the Debtors' ability to retain their Critical Vendors.  The Critical Vendors supply the Debtors with essential, specialized goods and services, including contractors, supplies, development plans, and specialized resources for the Debtors' businesses.  These goods and services form the mainstay of the Debtors' power plant development, and if access to these goods and services were cut off or disrupted, even for a limited amount of time, the Debtors and all parties in interest would experience further delays in their progress towards the COD and would therefore suffer irreparable harm.

11.     To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those vendors and suppliers most essential to the Debtors' operations pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue operations without disruption; (b) the Debtors' ability to find timely alternative sources of supply and the potential disruption while sourcing a new supplier; (c) which suppliers would be prohibitively expensive to replace; (d) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide; and (e) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Debtors or provide services postpetition if their prepetition balances are not paid.

12.     To the best of the Debtors' knowledge, the vast majority of Critical Vendors are foreign vendors, who may lack minimum contacts with the United States and, thus, may assert that they are not subject to the jurisdiction of the Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the automatic

stay.   Based on the knowledge of the Debtors' personnel regarding the Critical Vendors, the Debtors believe there is a material risk that these vendors holding Critical Vendor Claims against the Debtors may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay, and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.   Notably, Critical Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could result in significant disruption and delay in meeting milestones for completion of the Project.

13.     Given the importance the Critical Vendors play in the Debtors' supply chain, even a temporary disruption in the goods and services provided would have a devastating effect on the operation of the Debtors' businesses.   Accordingly, the Debtors need the ability to pay the Critical Vendor Claims on an uninterrupted basis.

### Relief Requested

14.     The Debtors request that the Court enter the Proposed Orders authorizing the Debtors to pay, in their discretion, the Critical Vendor Claims in an amount not to exceed (i) $288,000 on an interim basis, and (ii) $466,000 on a final basis.  The Debtors further request that they be authorized, in their discretion, to condition the payment of Critical Vendor Claims on the agreement of the applicable vendors to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors than the most favorable trade terms, practices, and programs in effect between the applicable vendors and the Debtors in the six months prior to the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the applicable vendors to the extent the Debtors determine, in their

reasonable business judgment, that such terms are necessary to procure essential services or are otherwise in the best interest of the Debtors' estates.

15.    To the extent that the Debtors determine, in their business judgment, to condition the payment of a Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, the Debtors propose that a letter (a "Vendor Letter"), in a form substantially similar to the one attached hereto as **Exhibit C**, be sent to the Vendor, along with a copy of any order granting this Motion (the "Vendor Order"), including, without limitation, the following terms:

a.    The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of the Vendor Order and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

b.    The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions as set forth in the Proposed Interim Order and Proposed Final Order;

c.    The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

d.    The Vendor's agreement not to file or otherwise assert against the Debtors, their estates, or any of their assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

e.      The Vendor's acknowledgment that it has reviewed the terms and provisions of the Vendor Order and consents to be bound thereby;

f.      The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

g.      If a Vendor that has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for any further order of the Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then-outstanding postpetition obligations owed to such Vendor.  The Debtors may then take any and all appropriate steps to cause such Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Vendor.

16.      Any such Vendor Letter, once agreed to by the Debtors and a Vendor, shall be the agreement between the parties that governs their postpetition trade relationship (the "Trade Agreement").  The Debtors request that they be authorized, but not required, in their discretion, to enter into Trade Agreements with the Vendors.

### Basis for Relief

**A.      The Court Should Authorize, But Not Direct, the Debtors, in their Discretion, To Pay the Critical Vendor Claims**

17.      The goods and services provided by the Vendors are necessary to ensure the Debtors' continued operations and the success of these Chapter 11 Cases.  The Vendors are the most cost-efficient and, in many cases, the only source from which the Debtors can procure critical goods and services within a timeframe that would permit the Debtors to avoid delays or shutdowns in their operations.  Any failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Vendors refusing to provide necessary goods and services to the Debtors.  Any unexpected delay or shutdown in the Debtors' operations resulting from a refusal by the Vendors to do business with the Debtors on a postpetition basis would have

significant deleterious effects on the Debtors' businesses, and undermine the Debtors' restructuring efforts and the ability to preserve and maximize the value of their estates.

18.     With respect to the Critical Vendor Claims, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors that are essential to avoid any disruption to their operations.  The Debtors have further developed certain procedures that, if and when implemented, in their discretion and business judgment, will ensure that the Vendors receiving payment of their Critical Vendor Claims will continue to provide goods and services to the Debtors based upon the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendors.

19.     The authority to pay the Critical Vendor Claims is vital to the Debtors' efforts to preserve and maximize the value of their estates.  If the Proposed Interim and Final Orders are not entered, many of the Vendors will likely refuse to do business with the Debtors.  Such a result would be damaging to the Debtors' sale and restructuring efforts to the detriment of the Debtors' estates and creditors.  Moreover, the continued availability of trade credit in amounts and on terms consistent with the Debtors' prepetition trade terms is important to the Debtors' efforts to stabilize their liquidity.  The retention or reinstatement of the Customary Trade Terms will enable the Debtors to maximize the value of their business.  Conversely, a deterioration in postpetition trade credit available to the Debtors, together with a disruption in the Debtors' receipt of necessary goods and services, would, among other things, increase the amount of liquidity needed by the Debtors postpetition, and impede the Debtors' chapter 11 efforts.

20.     For the foregoing reasons, the Debtors respectfully submit that entry of the Proposed Interim and Final Orders is in the best interests of the Debtors, their estates, and creditors.

**B.     The Court Should Authorize Payment of the Critical Vendor Claims under the "Doctrine of Necessity"**

21.     Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business. property of the estate . . . ." 11 U.S.C. § 363(b)(1).

22.     Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy courts have invoked the equitable power of section 105 of the Bankruptcy Code to authorize the postpetition payment of prepetition claims where such payment is necessary to preserve the value of a debtor's estate. *See, e.g.*, *Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M. D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."). Courts have likewise acknowledged that "[u]nder [section] 105, the court can permit pre-plan payment of a prepetition obligation[s] when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989)); *see In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (citing *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972)) (holding that the court is authorized under section 105(a) of the Bankruptcy Code to allow immediate payment of prepetition claims of vendors found to be critical to the debtor's continued operation).

23.     In a long line of well-established cases, federal courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport, C. & S. W. Ry. Co.*, 106 U.S. 286, 312 (1882) (holding that payment of pre-receivership claim permitted

to prevent "stoppage of [crucial] business relations"); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to [the commencement of the bankruptcy case] is essential to the continued operation of the . . . [business] during [the bankruptcy case], payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending the doctrine for payment of prepetition claims beyond railroad reorganization cases).

24.     This legal principle—known as the "doctrine of necessity"—functions in chapter 11 cases as a mechanism by which a bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *Just for Feet*, 242 B.R. at 826 (finding that "to invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's [continued operation].");  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim is essential to the continued operation of [the debtor], payment may be authorized"); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to a debtor's continued operation).  The doctrine is frequently invoked early in a bankruptcy case, particularly in connection with those Bankruptcy Code sections that relate to payment of prepetition claims.  In one case, the court indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of . . . payment of creditors in full or at least proportionately.'"  *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S. D. Ohio 1988).

25.     As explained above, the goods and services provided by the Vendors are essential to ensure that there is no delay or disruption to the operation of the Debtors' businesses. The Debtors submit that the total amount to be paid to the Vendors is minimal compared to the importance and necessity of the Debtors' uninterrupted receipt of the necessary goods and services. Moreover, the Debtors' analysis indicates that there are no cost-effective or readily accessible alternatives to paying the Vendors.

26.     Accordingly, the Debtors submit that the Court should exercise its equitable power to grant the relief requested herein.

### C. The Court Should Authorize Payment of the Critical Vendor Claims as a Valid Exercise of the Debtors' Fiduciary Duty

27.     Authority for satisfying the Critical Vendor Claims also may be found in sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108, is a fiduciary "holding the bankruptcy estate and operating the business for the benefit of creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

28.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id*. The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *Id*., and also when the payment was to "sole suppliers of a given product." *Id*. at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

29.     Payment of the Critical Vendor Claims meets each element of the *CoServ* court's standard.  As described above, the Critical Vendor Claims encompass the claims of those Vendors that would otherwise refuse, or would be unable to, provide goods and services to the Debtors on a postpetition basis if their prepetition balances are not paid, thereby creating significant risk that the Debtors will experience delay and disruption to their operations.  Any such disruption would diminish estate value and frustrate the Debtors' chapter 11 efforts.  The harm and economic disadvantage that would stem from the failure of any of the Vendors to perform is disproportionate to the amount of the Critical Vendor Claims.

30.     Finally, the Debtors have examined other options short of payment of the Critical Vendor Claims and have determined that, to avoid an unexpected or inopportune interruption to their business operations, there exists no practical alternative to their payment of the Critical Vendor Claims.  Therefore, the Debtors can only meet their fiduciary duty as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Critical Vendor Claims.

31.     As explained above, it is critical to the Debtors' chapter 11 efforts that they continue to receive goods and services, as applicable, from the Vendors on an uninterrupted basis throughout the chapter 11 process.  Without the relief requested herein, many of the Vendors may cease delivering goods and providing services to the Debtors, which would prevent the

Debtors from operating, complicate the Debtors' restructuring efforts and could have devastating consequences for the Debtors, their estates, and stakeholders.

32.     Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

**D.     The Court Should Authorize the Banks to Honor and Process the Debtors' Payments in Accordance with the Motion**

33.     The Debtors also request that the Court authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

34.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."   Fed. R. Bankr. P. 6003.   For the reasons discussed above and in the First Day Declaration, authorizing the Debtors to pay the Critical Vendor Claims and granting the other relief requested herein is critical to the Debtors' ability to continue operating with the least amount of disruption as possible following the Petition Date.   Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtor's restructuring. The relief requested is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of the Debtors' operations and maximize the value of their

estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

35.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserves their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

## Waiver Of Bankruptcy Rule 6004(H)

36.     As provided herein, and to implement the foregoing successfully, the Debtors request that the Proposed Interim Order and the Proposed Final Order include a finding that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

37.     Notice of the Motion will be given by facsimile, electronic transmission, hand delivery or overnight mail to: (i) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy

(Jane.M.Leamy@usdoj.gov); (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (iii) counsel to the administrative agent for the secured loan facility, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Christy Rivera (christy.rivera@nortonrosefulbright.com), Andrew Rosenblatt (andrew.rosenblatt@nortonrosefulbright.com); and 799 9th Street NW, Suite 1000, Washington, DC 20001, Attn: Marissa Alcala (marissa.alcala@nortonrosefulbright.com); (iv) counsel to the DIP Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St. #1600, Wilmington, DE, 19801, Attn: Derek C. Abbott (DAbbott@morrisnichols.com), Curtis S. Miller (CMiller@morrisnichols.com), and R. Jason Russell (JRussell@morrisnichols.com); and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders, granting the relief requested herein and such other and further relief as is just and proper.

*[Remainder of the page intentionally left blank.]*

Dated:  November 17, 2021
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Fax:    (302) 571-1253
Email:    pmorgan@ycst.com
    sgreecher@ycst.com
    afaris@ycst.com

- and -

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper (*pro hac vice* admission pending)
Luke A. Barefoot (*pro hac vice* admission pending)
Jack Massey (*pro hac vice* admission pending)
One Liberty Plaza
New York, New York 10006
Telephone:    (212) 225-2000
Fax:    (212) 225-3999
Email:    rcooper@cgsh.com
    lbarefoot@cgsh.com
    jamassey@cgsh.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1]<br>Debtors. | Case No. 21-11507 (   ) |
| | **(**Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS AND
(II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND
ELECTRONIC TRANSFER REQUESTS RELATED THERETO**

     1.     Upon consideration of the motion (the "<u>Motion</u>")[2] of the debtors in possession in the above-captioned case (the "<u>Debtors</u>") for the entry of an interim order (this "<u>Interim Order</u>"): (i) authorizing, but not directing, the Debtors, in their discretion, to pay Critical Vendor Claims in the ordinary course of business; and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having reviewed the Motion and the First Day Declaration and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and this Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

2.      The Motion is granted on an interim basis as set forth herein.

3.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2021, at __:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2021, and shall be served on: (a) the Debtors, Alto Maipo SpA, Los Conquistadores 1730, Piso 10, Santiago, Chile Attn: Javier Dib (javier.dib@aes.com); (b) proposed counsel to the Debtors, (i) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Richard J. Cooper (rcooper@cgsh.com), Luke A. Barefoot (lbarefoot@cgsh.com) and Jack Massey (jamassey@cgsh.com), and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Pauline K. Morgan (pmorgan@ycst.com), Sean T. Greecher (sgreecher@ycst.com), and S. Alexander Faris (afaris@ycst.com); (c) the Office of the United States Trustee for the District of Delaware, Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov); (d) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (e) counsel to the administrative agent for the secured loan facility, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Christy Rivera (christy.rivera@nortonrosefulbright.com), Andrew Rosenblatt

(andrew.rosenblatt@nortonrosefulbright.com); and 799 9th Street NW, Suite 1000, Washington, DC 20001, Attn: Marissa Alcala (marissa.alcala@nortonrosefulbright.com); (f) counsel to the DIP Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St. #1600, Wilmington, DE, 19801, Attn: Derek C. Abbott (DAbbott@morrisnichols.com), Curtis S. Miller (CMiller@morrisnichols.com), and R. Jason Russell (JRussell@morrisnichols.com); and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

4.      The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Critical Vendor Claims in the ordinary course of their business, pending entry of a final order on the Motion, up to the aggregate amount of $288,000.

5.      The Debtors are authorized, but not directed, in their discretion, to condition the payment of a Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendor.

6.      Neither the Debtors nor any other party in interest concedes that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve the right to contest the extent, validity or perfection or seek the avoidance of all such liens.

7.      The Debtors are authorized, but not directed, in their discretion, to enter into Trade Agreements with the Vendors, including, without limitation, on the following terms:

> a.      The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of this Interim Order and shall not be

deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

b.      The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions as set forth in this Interim Order;

c.      The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

d.      The Vendor's agreement not to file or otherwise assert against the Debtors, their estates or any of their assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

e.      The Vendor's acknowledgment that it has reviewed the terms and provisions of this Interim Order and consents to be bound thereby;

f.      The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

g.      If a Vendor that has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for any further order of the Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then-outstanding postpetition obligations owed to such Vendor. The Debtors may then take any and all appropriate steps to cause such Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Vendor.

8.      The form trade agreement attached to the Motion as Exhibit C is hereby approved

and the Debtors are authorized, but not required, to utilize the form trade agreement.

9.     The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

10.     Any payments with respect to prepetition claims hereunder shall first be used to satisfy any allowed claim of the applicable Vendor that is entitled to priority under section 503(b)(9) of the Bankruptcy Code, and thereafter to satisfy the applicable Vendor's general unsecured claim(s).

11.     Notwithstanding anything to the contrary in this Interim Order, the Motion or its attachments, the priority status of a creditor's claim, including that of claims arising under § 503(b)(9) of the Bankruptcy Code, shall not be affected by whether such creditor executes a Vendor Agreement, or provides services or goods to the Debtors under Customary Trade Terms, or otherwise, unless the claimant otherwise agrees through the Vendor Agreement.

12.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the

Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

13.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

14.     Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims.

15.     The Debtors are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

17.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

18.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## **EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1]<br>Debtors. | Case No. 21-11507 (   ) |
| | (Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS AND
(II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND
ELECTRONIC TRANSFER REQUESTS RELATED THERETO**

1.     Upon consideration of the motion (the "<u>Motion</u>")[2] of the debtors in possession in the above-captioned case (the "<u>Debtors</u>") for the entry of a final order (this "<u>Final Order</u>"): (i) authorizing, but not directing, the Debtors, in their discretion, to pay Critical Vendor Claims in the ordinary course of business; and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and the First Day Declaration and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and this Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:The Motion is granted on an final basis as set forth herein.

2.     The Debtors are authorized, but not directed, in their discretion, to pay, honor or otherwise satisfy Critical Vendor Claims in the ordinary course of their business up to the aggregate amount of $466,000.

3.     The Debtors are authorized, but not directed, in their discretion, to condition the payment of a Vendor Claim on the agreement of the Vendor to continue supplying goods and services to the Debtors on the Customary Trade Terms, or such other trade terms as are agreed to by the Debtors and the Vendor.

4.     Neither the Debtors nor any other party in interest concedes that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve the right to contest the extent, validity or perfection or seek the avoidance of all such liens.

5.     The Debtors are authorized, but not directed, in their discretion, to enter into Trade Agreements with the Vendors, including, without limitation, on the following terms:

   h. The amount of the Vendor's estimated prepetition claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually

determined in good faith by the Vendor and the Debtors (but such amount shall be used only for purposes of this Interim Order and shall not be deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

i.  The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions as set forth in this Interim Order;

j.  The Vendor's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), or such other trade terms as are agreed to by the Debtors and the Vendor, and the Debtors' agreement to pay the Vendor in accordance with such terms;

k.  The Vendor's agreement not to file or otherwise assert against the Debtors, their estates or any of their assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Vendor has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

l.  The Vendor's acknowledgment that it has reviewed the terms and provisions of this Interim Order and consents to be bound thereby;

m.  The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

n.  If a Vendor that has received payment of a prepetition claim subsequently refuses to provide goods and services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor, then, without the need for any further order of the Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then-outstanding postpetition obligations owed to such Vendor. The Debtors may then take any and all appropriate steps to cause such Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Vendor.

6.      The form trade agreement attached to the Motion as Exhibit C is hereby approved and the Debtors are authorized, but not required, to utilize the form trade agreement.

7.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

8.      Any payments with respect to prepetition claims hereunder shall first be used to satisfy any allowed claim of the applicable Vendor that is entitled to priority under section 503(b)(9) of the Bankruptcy Code, and thereafter to satisfy the applicable Vendor's general unsecured claim(s).

9.      Notwithstanding anything to the contrary in this Final Order, the Motion or its attachments, the priority status of a creditor's claim, including that of claims arising under § 503(b)(9) of the Bankruptcy Code, shall not be affected by whether such creditor executes a Vendor Agreement, or provides services or goods to the Debtors under Customary Trade Terms, or otherwise, unless the claimant otherwise agrees through the Vendor Agreement.

10.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any

claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

11.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

12.     Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims.

13.     The Debtors are authorized to take any and all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

14.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

15.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

## EXHIBIT C

**Vendor Letter**

**Vendor Letter**

[_____], 2021

[Valued Supplier/Service Provider]:

Alto Maipo SpA ("Alto Maipo") filed a voluntary petition for relief (the "Bankruptcy Case") under chapter 11 of the title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") on November 17, 2021 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  As part of the chapter 11 filing, Alto Maipo has created a special program (the "Program") for critical providers of goods and services, which was approved by the Bankruptcy Court.  Under the Program, vendors who contractually commit to continue doing business with Alto Maipo may be eligible to receive immediate payment for goods and services that were provided before the commencement of the Bankruptcy Case, but for which the vendor has not yet been paid.

The Program is described in greater detail in the motion filed with the Bankruptcy Court on the Petition Date (the "Motion"), and the [interim order/final order] approving it (the "Order") entered on [●], 2021.  Alto Maipo encourages you to read and understand the additional terms and conditions reflected in the Motion and Order, which are incorporated by reference in this Trade Agreement.

To receive payment on your pre-bankruptcy claim, you must agree to continue to provide goods and services to Alto Maipo based on "Customary Trade Terms."  Customary Trade Terms are the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) favorable to Alto Maipo and in effect between you and Alto Maipo on a historical basis within the six (6) month period prior to the Petition Date.  You must continue providing those goods or services until the earlier of the effective date of a chapter 11 plan, the sale of substantially all of Alto Maipo's assets pursuant to section 363 of title 11 of the Bankruptcy Code, the conversion of Alto Maipo's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or the dismissal of the Bankruptcy Case.  In addition, you must provide supporting documents to substantiate the amount of your pre-bankruptcy claim.  In exchange, if your Trade Agreement is accepted by Alto Maipo, you will receive payment of $[__] for your pre-bankruptcy claims (the "Vendor Amount").

In order to participate in the Program, please fill in the information below, sign this Trade Agreement, and return it by email, with the appropriate supporting documentation for the amount of your pre-bankruptcy claim, to Alto Maipo SpA, Los Conquistadores 1730, Piso 10, Santiago, Chile, Attn: Javier Dib (Javier.dib@aes.com), with a copy to bankruptcy counsel for Alto Maipo, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Richard J. Cooper, Esq. (rcooper@cgsh.com), Luke A. Barefoot, Esq. (lbarefooot@cgsh.com) and Jack Massey, Esq. (jamassey@cgsh.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Pauline K. Morgan, Esq. (pmorgan@ycst.com) and Sean Greecher, Esq. (sgreecher@ycst.com).  For purposes of administering this Program, and in accordance with the terms of the Order, you agree to be bound by the following terms:

**Vendor's Commitment.**  The undersigned (the "<u>Vendor</u>") agrees to the following terms and conditions:

(a)    Alto Maipo will pay to Vendor the Vendor Amount.

(b)    Vendor agrees to be bound by the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) favorable to Alto Maipo and in effect between Vendor and Alto Maipo on a historical basis within six (6) months of the Petition Date.

(c)    Alto Maipo agrees to provide goods and/or services to Alto Maipo based upon Customary Trade Terms, and Alto Maipo will pay Vendor in accordance with such terms.

(d)    Vendor agrees not to file or otherwise assert against the Debtors or their estates, or any of their respective assets or property (real or personal) any lien (a "**<u>Lien</u>**") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to Vendor by Alto Maipo arising from goods and/or services provided to Alto Maipo prior to the Petition Date.  To the extent the Vendor has previously obtained such a Lien, Vendor shall immediately take all necessary actions to release such Lien.

(e)    Vendor has reviewed the terms and provisions of the Order, and consents to be bound thereby.

(f)    The Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims.

(g)    Vendor agrees that any funds received shall be used first to satisfy any claim Vendor may have under section 503(b)(9) of the Bankruptcy Code, and only after any 503(b)(9) Claim is satisfied in full, to satisfy any general unsecured claim held by Vendor.

(h)    Vendor agrees that nothing in this Agreement grants an allowed claim with respect to any unpaid amounts, and that Vendor retains responsibility to file a timely proof of claim with respect to any amounts that are alleged to remain unpaid.

(i)    Vendor acknowledges that, if it subsequently refuses to supply goods and/or services to Alto Maipo on Customary Trade Terms, then, without the need for any further order of the Court, any payments received by the Vendor on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor.  Alto Maipo may then take any and all appropriate steps to cause such Vendor to

repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Vendor.

Vendor agrees to keep the existence of this Trade Agreement and the terms hereof confidential and shall not disclose either the existence of this Trade Agreement or the terms hereof to any person or entity, except to the extent required by applicable law or for financial reporting purposes, and except that the Vendor may disclose such information to its employees, accountants, attorneys, advisors, and other representatives as necessary in connection with the ordinary conduct of their business (so long as such employees, accountants, attorneys, advisors, and other representatives agree to or are bound by contract to keep such information confidential).

_____
[Vendor's Name]

_____
Date

                                          _____
                                          _____
Vendor's Address
**ACCEPTED BY:**

Alto Maipo SpA
_____
 Date

3

**Carta para Proveedores**

[_____] de 2021

[Estimado proveedor/prestador de servicios]:

Alto Maipo SpA ("Alto Maipo") presentó una petición voluntaria de concurso preventivo (los "Casos de Quiebra") conforme al capítulo 11 del título 11 del Código de los Estados Unidos, 11 U.S.C. §§ 101–1532 (el "Código de Quiebras") el [●] de 2021 (la "Fecha de Petición") ante el Juzgado Federal de Quiebras del Distrito de Delaware (el "Juzgado de Quiebras"). Como parte de la presentación conforme al capítulo 11, Alto Maipo creó un programa especial (el "Programa") para los proveedores de bienes y prestadores de servicios esenciales, que fue homologado por el Juzgado de Quiebras. Conforme al Programa, los proveedores y prestadores que se comprometan contractualmente a seguir operando con Alto Maipo podrán calificar para recibir pagos inmediatos por los bienes y servicios que se hubieran entregado o prestado antes del inicio del Caso de Quiebra, pero respecto de los cuales el proveedor o prestador aún no haya cobrado.

El Programa está descrito con mayor precisión en la presentación hecha ante el Juzgado de Quiebras a la Fecha de la Petición (la "Presentación"), y la [orden provisoria/orden definitiva] por la que se aprueba (la "Orden") dictada el [●] de 2021. Alto Maipo le recomienda leer y entender los términos de la Presentación y la Orden, que quedan incorporados por referencia al presente Convenio Comercial.

Para cobrar un crédito anterior a la quiebra, debe prestar su conformidad para seguir proveyendo bienes y prestando servicios a Alto Maipo conforme a los "términos comerciales habituales". Se entiende por "términos comerciales habituales" a las prácticas y programas normales (por ejemplo, límites de crédito, precios, descuentos en efectivo, plazos de pago, descuentos generales, reembolsos, presentación de cupones, combinación y disponibilidad de productos normales y otros términos y programas aplicables) favorables para Alto Maipo y que rijan entre usted y Alto Maipo de manera histórica dentro del período de seis (6) meses anterior a la Fecha de Petición. Debe seguir proveyendo los bienes o prestando los servicios hasta lo que ocurra primero entre la fecha de entrada en vigencia de un plan conforme al capítulo 11, la venta de casi todos los bienes de Alto Maipo conforme a la sección 363 del título 11 del Código de Quiebras, la conversión del concurso de Alto Maipo a una quiebra conforme al capítulo 7 del Código de Quiebras o la desestimación del concurso. Además, debe presentar documentación respaldatoria para probar el monto de su crédito previo al concurso. A cambio, si Alto Maipo acepta su Convenio Comercial, recibirá un pago de $[__] por sus créditos previos al concurso (el "Monto del Proveedor").

Para participar en el Programa, le rogamos que complete la información que aparece más abajo, firme este Convenio Comercial y lo envíe por correo electrónico, con la correspondiente documentación respaldatoria por el monto de su crédito previo al concurso, a Alto Maipo SpA, Los Conquistadores 1730, Piso 10, Santiago, Chile, dirigido a Javier Dib (Javier.dib@aes.com), con copia a los abogados del concurso de Alto Maipo, Cleary Gottlieb Steen & Hamilton LLP,

One Liberty Plaza, New York, NY 10006, dirigido a Richard J. Cooper, Esq. (rcooper@cgsh.com), Luke A. Barefoot, Esq. (lbarefooot@cgsh.com) y Jack Massey, Esq. (jamassey@cgsh.com) y Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, dirigido a Pauline K. Morgan, Esq. (pmorgan@ycst.com) y Sean Greecher, Esq. (sgreecher@ycst.com). A los efectos de administrar este Programa, y de acuerdo con los términos de este Programa, y de acuerdo con los términos de la Orden, usted presta su conformidad para quedar obligado por las siguientes cláusulas:

**Obligaciones del Proveedor.** El abajo firmante (el "Proveedor") acuerda quedar obligado por los siguientes términos y condiciones:

(a)    Alto Maipo pagará al Proveedor el Monto del Proveedor.

(b)    El Proveedor acuerda quedar obligado por los términos comerciales habituales (por ejemplo, límites de crédito, precios, descuentos en efectivo, plazos de pago, descuentos generales, reembolsos, presentación de cupones, combinación y disponibilidad de productos normales y otros términos y programas aplicables) favorables para Alto Maipo y que rijan entre usted y Alto Maipo de manera histórica dentro del período de seis (6) meses anterior a la Fecha de Petición.

(c)    Alto Maipo acuerda proveer bienes o prestar servicios a Alto Maipo conforme a los términos comerciales habituales, y Alto Maipo pagará al Proveedor conforme a dichos términos.

(d)    El Proveedor acuerda no presentar ni hacer valer contra Alto Maipo o su patrimonio, o cualquiera de sus respectivos bienes (ya sean muebles o inmuebles) un gravamen (un "Gravamen") (con independencia de la ley u otra fuente normativa a partir de la cual se invoque el Gravamen) que esté relacionado de algún modo con los eventuales montos previos a la petición supuestamente debidos al Proveedor por Alto Maipo derivados de bienes o servicios provistos o prestados a Alto Maipo antes de la Fecha de Petición. En caso de haber obtenido tal Gravamen con anterioridad, el Proveedor debe tomar inmediatamente todas las medidas que sean necesarias para levantar tal Gravamen.

(e)    El Proveedor ha revisado los términos y las disposiciones de la Orden y presta su consentimiento para quedar obligado por ellos.

(f)    El Proveedor acuerda que no reclamará por separado ni de otro modo sus créditos.

(g)    El Proveedor acuerda que los fondos que obtenga se usarán primero para pagar los créditos que pueda tener conforme a la sección 503(b)(9) del Código de Quiebras, y solo después de que se haya pagado íntegramente todo crédito conforme a la sección 503(b)(9), para pagar todo crédito quirografario general del Proveedor.

(h)      El Proveedor acuerda que ninguna de las disposiciones del presente otorga derecho a cobrar un crédito respecto de montos impagos, y que conserva la carga de verificar oportunamente los créditos por montos que supuestamente estén impagos.

(i)      El Proveedor reconoce que, si posteriormente se niega a proveer bienes o prestar servicios a Alto Maipo conforme a los términos comerciales habituales, sin necesidad de otra orden del Juzgado, los pagos recibidos por el Proveedor a cuenta de tales créditos anteriores a la petición se considerarán cancelatorios de las eventuales obligaciones posteriores a la petición pendientes de pago y debidas al Proveedor. Alto Maipo luego podrá tomar las medidas correspondientes para que el Proveedor devuelva los pagos recibidos a cuenta de sus créditos previos a la petición en caso de que tales pagos superen los montos posteriores a la petición entonces debidos al Proveedor.

(j)      El Proveedor acuerda mantener la confidencialidad respecto de la vigencia de este Convenio Comercial y sus términos y no divulgará ni la existencia ni sus términos a ninguna persona física o jurídica, excepto que lo exija el derecho aplicable o con fines de información financiera, y con la salvedad de que el Prestador podrá divulgar la información a sus empleados, contadores, abogados, asesores y otros representantes según sea necesario en relación con el giro habitual de sus negocios (en tanto los empleados, contadores, abogados, asesores y otros representantes presten su conformidad o estén obligados contractualmente a mantener la confidencialidad de esa información).

_____
[Nombre del Proveedor]

_____
Fecha

 

_____
_____

Domicilio del Proveedor
**ACEPTADO POR:**

Alto Maipo SpA
_____
  Fecha: