**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.:  21-11507 (   ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JAVIER DIB IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Javier Dib, hereby declare under penalty of perjury:

1.      I am the Board President and Chief Restructuring Officer ("CRO") of Alto Maipo

SpA ("Alto Maipo", and, together with Alto Maipo Delaware LLC ("Alto Maipo Delaware"), the

"Debtors").  In my capacity as Board President and CRO of Alto Maipo, I am familiar with the

Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration

(this "Declaration") to assist the Court (as defined herein) and parties in interest in gaining an

understanding of the circumstances that led to the commencement of these chapter 11 cases (the

"Chapter 11 Cases") and in support of the Debtors' petitions and motions requesting various types

of "first day" relief (collectively, the "First Day Motions").  I am authorized by the Debtors to

submit this Declaration.

2.      I have served as Board President of Alto Maipo since September 27, 2021, and as

CRO since September 30, 2021.  Alto Maipo's board is composed of myself, Roberto Salazar

Esperante, and Alfredo Manuel Del Carril.  Since 2015, I have served as Controller of the Andes

Strategic Business Unit of AES Andes S.A. (f/k/a AES Gener S.A.) ("AES Andes").  In my

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification
number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC
(•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los
Conquistadores 1730, Piso 10, Santiago, Chile.

capacity as Controller of the Andes Strategic Business Unit, I also serve as General Manager of AES Andes's subsidiaries Guacolda Energía S.A. and Empresa Eléctrica Cochrane SpA, among others.  Prior to my role as Controller of the Andes Strategic Business Unit, I served as Controller of the Strategic Business Unit for Mexico, Central America, and the Caribbean from 2008 to 2015. I hold a degree in Public Accounting from the Universidad Nacional de Tucumán in Argentina, a postgraduate degree in Finance from the Fundación Magíster in Argentina, and a Certificate in Management from the University of Virginia Darden School of Business in Virginia.

3.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and professional advisors, my review of relevant documents or my opinion, based upon my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, at my direction, or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**Commencement of the Chapter 11 Proceedings**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (this "Court").  As set forth in detail herein, the Debtors commenced these Chapter 11 Cases to preserve and maximize Alto Maipo's enterprise value for the benefit of its stakeholders in the face of an impending liquidity shortfall and an unsustainable capital structure.

5.      Alto Maipo was incorporated as a special purpose company under the laws of Chile in 2011.  Alto Maipo's primary business purpose is the construction and eventual operation of a

large run-of-river hydroelectric project (the "Project") in the Andes Mountains, approximately 30 miles southeast of Santiago, Chile.  Construction of the Project is currently expected to reach commercial operation in the first half of 2022, after which Alto Maipo will provide clean, renewable energy to power Chile's economy.

6.      Unfortunately, the energy market that Alto Maipo will enter into next year is not the same energy market that Alto Maipo projected would exist upon its initial Commercial Operation Date (the "COD") when construction began in 2013.  Since that time, there have been significant shifts both on the supply and demand side that have rendered Alto Maipo's existing capital structure unsustainable.  On the demand side, increased generation capacity has driven down electricity prices in Chile, such that spot prices at which Alto Maipo could sell power are now less than half of what they were in 2013.  On the supply side, climate change has significantly impacted the hydrology of the Maipo Valley, where the Project is being constructed, and lower precipitation levels reduce in turn the amount of power that the Project can produce.  As a result, Alto Maipo can no longer rely on its prior revenue projections, which assumed economic and environmental factors that are no longer in place.

7.      Additionally, the cost of construction for the Project has increased by approximately 70% from Alto Maipo's initial projections, due to unexpectedly difficult geological conditions as well as delays caused by certain of Alto Maipo's contractors.  These increased construction costs necessitated two prior restructurings that significantly increased the amount of debt owed by Alto Maipo to its creditors.  These prior restructurings, however, were based on revenue projections that did not take into account the worsening hydrology and market conditions that have become apparent in the years since.  As a result, the capital structure created through these prior restructurings is no longer sustainable.  In order to right-size their capital structure to

meet these market challenges, the Debtors engaged in constructive negotiations with their creditors and, having reached agreement on terms for a pre-arranged restructuring with creditors holding a majority of the Debtors' senior secured debt (as described below), commenced these Chapter 11 Cases to ensure that they can complete construction of the Project and generate renewable energy for many years to come.

8.      Part I of this Declaration provides an overview of the Debtors' businesses, history, and capital structure.  Part II provides a discussion of the events that compelled the commencement of these Chapter 11 Cases and a summary of the Debtors' prepetition negotiation efforts to date. Part III provides an overview of the debtor-in-possession financing obtained by the Debtors to ensure their continued liquidity during the pendency of these Chapter 11 Cases.  Part IV affirms the facts set forth in the First Day Motions that the Debtors believe are necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.

## I.      The Debtors' Businesses

### A.      History and Purpose of the Debtors' Businesses

9.      Alto Maipo SpA is a special purpose company, incorporated under Chilean law in 2011 for the purpose of developing, constructing, and operating a run-of-river hydroelectric energy project in the Santiago Metropolitan Region of Chile, approximately 30 miles southeast of the city of Santiago.

10.      The hydroelectric energy project being constructed by Alto Maipo will consist of two run-of river hydroelectric plants:  Alfalfal II, with a peak capacity of 264 MW, and Las Lajas, with a capacity of 267 MW (together, the "Hydroelectric Plants").  The Project will also be connected with the existing Alfalfal I and Maitenes hydroelectric plants.  Once it becomes

operational, the Project is currently expected to provide approximately 1,711 GWh per year of renewable, zero-emissions energy to Chile's electric grid, based on the average hydrology in the area for the past 10 years.

11.    The Project will capture water flow from several tributaries of the Maipo River that arise in the Andes Mountains: the Volcán River, the Yeso River, the Aucayes Stream, and the Colorado River (via the Alfalfal I and Maitenes plants).  This water flow will be used to power the Hydroelectric Plants in series, after which all collected water will be discharged directly into the Maipo River.

12.    In order to feed water flow to the Hydroelectric Plants, the Project requires the construction of approximately 42 miles of underground tunnels, in addition to two underground caverns that will house the Hydroelectric Plants, along with various associated structures and facilities.  The majority of the construction required for the Project is underground.  Water collected from the high-elevation tributaries of the Maipo River will be gravity-fed through the tunnels to the Hydroelectric Plants, and ultimately discharged into the Maipo River at a lower elevation.  Construction on the Project began in 2013, and each of the Hydroelectric Plants was originally expected to reach COD in 2018.

13.    The following schematic diagram shows the approximate location of the Project's tunnels and Hydroelectric Plants in relation to the Colorado, Maipo, and Yeso Rivers.



### B.    Corporate Structure and Prior Restructurings

14.    At the time of its incorporation in 2011, Alto Maipo's sponsors were AES Andes, a subsidiary of AES Corporation, and Antofagasta plc ("Antofagasta").  Alto Maipo's initial shareholders were Norgener Renovables SpA ("Norgener"), an affiliate of AES Andes which held 60% of Alto Maipo's equity interests, and Minera Los Pelambres S.A. (f/k/a Antofagasta Minerals S.A.) ("MLP"), an affiliate of Antofagasta which held the remaining 40% of Alto Maipo's equity interests.

15.    The Project was originally budgeted at $2.1 billion, and construction began in 2013. However, by 2016, the Project began to encounter technical difficulties in construction due to unexpectedly difficult geological conditions.  This led to an increase in projected costs of up to 19% over the original budget.  As a result, Alto Maipo engaged in a series of negotiations with its partners, contractors, and lenders, ultimately resulting in a legal and financial restructuring process, which was completed on March 17, 2017 (the "2017 Restructuring").

16.     As part of this restructuring process, and influenced by the Project's cost overruns, Antofagasta dropped out of the Project.  At this time, AES Andes, via Norgener, assumed MLP's equity stake.  Simultaneously, AES Andes awarded a 6.7% equity stake in Alto Maipo to Strabag SpA ("Strabag"), one of Alto Maipo's construction contractors.  Strabag SpA is a subsidiary of Strabag SE, which holds 100% of Strabag's equity interests.

17.     In addition to the change in its corporate structure, Alto Maipo obtained $460 million in additional financing in the 2017 Restructuring.  This included additional equity contributions from AES Andes in the amount of $117 million, from MLP in the amount of $12 million, and from Strabag in the amount of $140 million.  Alto Maipo also incurred additional debt in the amount of $99 million, and other financing sources in the amount of $61 million.  These additional contributions increased Alto Maipo's overall financing sources from $2.05 billion to $2.51 billion.

18.     Following this restructuring, the Project continued to face construction difficulties, including higher-than-expected costs and lower-than-expected productivity by the Project's contractors.  In June 2017, as a result of the failure to perform by one of Alto Maipo's construction contractors, Constructora Nuevo Maipo S.A. ("CNM"), Alto Maipo terminated CNM's contract. Alto Maipo subsequently began arbitration proceedings against CNM to recover costs and other damages relating to CNM's breaches of the contract between Alto Maipo and CNM.  CNM alleged that its termination was wrongful and made submissions to the arbitral court seeking its own damages.  These arbitral proceedings are discussed in further detail below, in Section II.B.

19.     Following the termination of CNM's construction contract, Alto Maipo replaced CNM's contract with a new construction contract with Strabag in February 2018.  This new contract with Strabag included approximately $868.5 million in incremental payments owed to

Strabag during the course of construction, as well as a payment of up to $392 million that, if and when it becomes due, is payable in installments under a supplier financing agreement with Strabag. In May 2018, Alto Maipo executed a second financial restructuring of the Project with its lenders (the "2018 Restructuring").  As part of the 2018 Restructuring, Alto Maipo obtained an additional $400 million equity contribution from AES Andes.  Alto Maipo also incurred additional debt to its lenders in the amount of $135 million, in addition to the newly-incurred debt to Strabag of up to $392 million.

20.     As of the Petition Date, Norgener holds 93% of Alto Maipo's equity interests, and Strabag holds the remaining approximately 7% of Alto Maipo's equity interests.  Debtor entity Alto Maipo Delaware is a wholly-owned subsidiary of Alto Maipo.  The following diagram illustrates the current corporate structure of the Debtors.



**C.    Prepetition Capital Structure**

21.    The Debtors fund their operations through both secured and unsecured debt.

i.    *Prepetition Secured Debt*

22.    <u>*First Lien Indebtedness*</u>.  Alto Maipo is the borrower under a series of prepetition

term loans (the "<u>Term Loans</u>" and the lenders thereunder, the "<u>Term Lenders</u>"), all of which are

secured by substantially all assets of Alto Maipo (the "<u>Prepetition Collateral</u>") and rank *pari passu*

as between each other, from certain international development banks, local and international

commercial banks (the "<u>Bank Lenders</u>"), and syndicated lenders, including (i) the U.S.

International Development Finance Corporation, (ii) the Inter-American Development Bank, (iii)

Banco de Crédito e Inversiones, (iv) Itaú Corpbanca SA, (v) DNB ASA, (vi) Deutsche Bank AG,

(vii) UBS Group AG, (viii) Moneda Asset Management, (ix) Finepoint Capital (Warbler Run I

and Warbler Run II), (x) Santana Capital Group, (xi) Clover Capital, Ltd., and (xii) Regera

Sàrl.  The Term Lenders collectively hold approximately $1.5 billion in outstanding senior secured term loan debt as of October 15, 2021.  Itaú CorpBanca S.A. serves as administrative agent and onshore collateral agent for the Term Loans, with Itaú CorpBanca New York Branch serving as offshore collateral agent.

23.     _Interest Rate Swaps_: Certain of the Term Loans are also subject to interest rate swaps (the "Swaps") held by the originating banks as well as KfW IPEX-Bank GmbH (the "Swap Counterparties").  The total mark-to-market value of the Swaps, in the event of their termination, is approximately $184 million as of November 16, 2021.  The Swaps are also secured by the Prepetition Collateral and rank _pari passu_ with the Term Loans.

24.     The Term Lenders and the Swap counterparties are governed by the terms of an intercreditor agreement. Strabag is also a party thereto.

25.     Alto Maipo is party to a construction agreement with Strabag (the "Strabag Construction Agreement"), under which Strabag holds a claim of up to $392 million against Alto Maipo, which accrues over time.  Payment of the accrued amount is contingent on the occurrence of: (a) (i) a bankruptcy or insolvency of Alto Maipo and the acceleration of debt by the parties financing the Project (which includes the Term Lenders and the Swap Counterparties, but not Strabag or any of its affiliates) (the "Financing Parties"), or (ii) the acceleration of debt by the Financing Parties for any other reason; or (b) the requirements of Section 6.3.4.4 under the Strabag Construction Agreement are met.[2]  If these conditions are satisfied, then any payment is made in installments pursuant to a supplier financing with Strabag.

---

[2]     Requirements under Section 6.3.4.4 are (i) the achievement of commercial operation date and (ii) Debtors' issuance of all the critical milestone substantial completion certificates (in each case, as defined in the Strabag Construction Agreement).

ii. *Prepetition Unsecured Debt*

26.     As discussed below in Section II.B, Alto Maipo is party to agreements with several contractors, including Strabag, as well as Voith Hydro Ltda. and Voith Hydro S.A. (together, "Voith"), and those contractors have asserted contingent unsecured claims against Alto Maipo.  Alto Maipo also holds contingent claims against each of those contractors.  All such claims are, subject to court approval and other conditions precedent, proposed to be resolved on the terms described herein.

27.     As described more fully below in Section II.C, in the weeks leading up to the Petition Date, the Debtors engaged in thorough good-faith negotiations with their creditors in an attempt to reach pre-arranged terms for a chapter 11 restructuring plan.  These negotiations ultimately resulted in an agreement on terms for a pre-arranged restructuring with six of the Debtors' secured creditors, including Strabag, who collectively hold approximately 55% of the claims under the Term Loans, and, in the case of Strabag, under the Strabag Construction Agreement, paving the way for an orderly restructuring process for these Chapter 11 Cases.

## II.    Events Leading to these Chapter 11 Cases

### A.    Climate Change and Shifting Market Demand

28.     Upon the completion of the 2018 Restructuring, Alto Maipo was optimistic that its newly-adjusted capital structure would be sufficient to carry construction of the Project to COD. Indeed, by late 2020 substantial construction progress had been made, including the complete excavation of all 42 miles of tunnels, which represent the bulk of required construction.  An estimated 99% of the Project's required construction has been completed as of the Petition Date, and Alto Maipo expects that both Hydroelectric Plants will reach COD in March 2022.  Reaching COD in a timely manner is crucial to protecting the value of the Debtors' estates and maximizing their creditors' recoveries.

29.     Unfortunately, while construction on the Project is continuing apace, the energy market that the Project will enter into upon COD is not the same market that existed when the Project began construction in 2013, nor even the same market that existed when Alto Maipo completed the 2018 Restructuring.  While reaching COD remains a vital goal for Alto Maipo and its creditors, bringing the Hydroelectric Plants online will no longer generate the level of revenue that Alto Maipo and its creditors once expected.  Because of this, it is crucial that the Debtors right-size their capital structure now to protect the Project's long-term future.

30.     The first factor impacting the Project's long-term revenue projections is a marked decrease in the market price for spot energy.  Since the launch of the Project, long-term spot prices for electricity in Chile have dropped significantly, largely due to increased energy generation capacity that has come online in the intervening years.  In 2013, long-term spot prices for electricity averaged $116 per MWh.  As more generation capacity has come online in recent years in Chile, however, long-term prices have dropped.  By the time of the 2018 Restructuring, long-term spot prices had halved to $58 per MWh.  By 2021, long-term spot prices had dropped even further, to $50 or less per MWh.

31.     Alto Maipo has a committed power purchase agreement with MLP (the "PPA"), under which Alto Maipo will sell energy to MLP at favorable rates.  The commitment under the PPA is expected to cover approximately 46% of the Project's energy output for every year until 2040, when the PPA terminates, while the remaining 54% of the Project's energy output, unless otherwise contracted, will be sold to merchants at market price.  As a result of the size and favorable terms of MLP's commitment, the PPA is one of Alto Maipo's most crucial assets.  As discussed further below in Section II.D, Alto Maipo's desire to preserve the value of the PPA for the benefit of its creditors is one of the primary drivers of these Chapter 11 Cases, as alternate

restructuring solutions would jeopardize Alto Maipo's ability to retain the PPA.  Even with the PPA in place, however, the drop in energy prices has had a significant impact on Alto Maipo's projected revenues for energy sold into the marketplace.

32.     Even more problematic for the Project's estimated revenue, however, is the significant impact that climate change has had on the energy supply available to the Project.  The tributary rivers whose flow will power the Hydroelectric Plants begin at the peaks of the Andes Mountains, and are primarily fed by seasonal snowmelt from the glaciers on these peaks. Unfortunately, in recent years, climate change has had a devastating impact on precipitation in the Andes Mountains, with the result that the rivers that will supply the Project have experienced a steep decline in overall water flow.

33.     In order to assess the impact that climate change and the attendant decrease in precipitation will have on the Project, Alto Maipo commissioned a report by Systep to evaluate the long-term projections for expected generation and energy market prices (the "Market Report"). The Market Report compared expected generation through the Project's source rivers across two time periods: across the past 59 years, and across the past 10 years.  Across the past 59 years, the Project would have generated an average of 2,218 GWh of energy per year.  In contrast, across the past 10 years, precipitation and water flow through those same rivers would have generated an average of only 1,711 GWh of energy per year.  The Market Report identified even further decreases in water flow in recent years, resulting in approximately 1,390 GWh of energy in 2019; 1,303 GWh of energy in 2020; and 1,100 GWh of energy projected for 2021, based on annualized figures.

34.     The combination of lower prices and less precipitation mean that when the Project goes online, it will be operating in a dramatically different economic and environmental reality

than Alto Maipo originally forecasted.  In the face of this reality, Alto Maipo's current capital structure is simply not sustainable.

### B.    Impending Liquidity Challenges and Contingent Claims

35.    In addition to economic and environmental factors that render Alto Maipo's current capital structure unsustainable in the long term, the Debtors expect that they will face a liquidity shortfall as soon as December 2021.  Additionally, the Debtors face a number of contingent claims that may vest in the near future, potentially adding further strain to their short-term finances.

36.    Alto Maipo is expected to exhaust its available liquidity at some point in December 2021.  At the time of the 2018 Restructuring, Alto Maipo estimated that COD would be reached in December 2020, with liquidated damages dates in December 2022.  Unfortunately, the COVID-19 pandemic led to further unexpected delays in construction, straining the Project's construction budget.  As a result, Alto Maipo is facing an imminent liquidity shortfall, jeopardizing its ability to reach COD despite the fact that the majority of construction work has already been completed. It is clear to all stakeholders that the value of the Project to the Debtors and their creditors will be far greater once it reaches operational status and begins generating revenue, and that any further delays resulting from financial constraints would impose unnecessary costs on all parties in interest.

37.    Further complicating Alto Maipo's short-term finances, one of Alto Maipo's contractors, Strabag, has alleged unsecured claims against Alto Maipo of up to $131 million, primarily relating to the COVID-19 pandemic; the Debtor believes these asserted claims are not in fact owed, and asserts claims against Strabag in excess of $36 million.  Following extensive negotiations with Strabag, the Debtors propose to resolves these disputes pursuant to the pre-arranged terms of the restructuring support agreement between the Debtors, Strabag, and certain of the Debtors' other creditors, as described below in Section II.C.

38.     Another of Alto Maipo's contractors, Voith, has alleged claims against Alto Maipo relating to the COVID-19 pandemic, among other alleged issues, of as much as $20 million. Shortly before the Petition Date, Alto Maipo and Voith signed an amendment to their existing construction contract (the "Voith Contract Amendment") resolving certain disputes between them Among other things, the Voith Contract Amendment: (i) waives all claims the parties have based on facts existing on or before the November 15, 2021 effective date, including Voith's claims arising out of various change order requests and requests for cost and schedule relief, and Alto Maipo's claims for delay liquidated damages arising out of Voith's failure to achieve substantial completion of four hydroelectric generating units by the applicable guaranteed substantial completion dates; (ii) sets new guaranteed substantial completion dates for the four hydroelectric generating units, subject to extensions based on the availability of testing water; and (iii) provides for additional aggregate payments of up to $8 million to Voith, subject to Voith's achievement of certain milestones.  The Voith Contract Amendment is subject to the approval of Alto Maipo's lenders, shareholders, board, and this Court, by January 7, 2022.

39.     Further, as discussed above in Section I.B, in 2017, one of Alto Maipo's contractors, CNM, stopped construction work on the Project, breaching its contract with Alto Maipo and forcing a termination of the contract.  Since this termination, Alto Maipo and CNM have been engaged in arbitral proceedings before the International Court of Arbitration of the International Chamber of Commerce (the "ICC Court").  These arbitral proceedings have covered a number of disputes between the parties, including the validity of the termination itself and the amount of costs or damages, if any, that are owed to Alto Maipo as a result of CNM's breaches of the contract.

40.    In addition to contesting the validity of the termination and seeking damages allegedly resulting from that termination, CNM argued to the ICC Court that Alto Maipo improperly drew $73 million under letters of credit in connection with its termination of CNM. Thus, while Alto Maipo alleged that it experienced damages totaling $236 million due to CNM's breaches, CNM argued that it experienced damages totaling up to $166 million due to the termination and Alto Maipo's draw on the letters of credit.

41.    On November 5, 2021, Alto Maipo received a partial award from the ICC Court for damages in Alto Maipo's favor in the amount of approximately $106 million, before interest and legal and other costs.  At this time, Alto Maipo does not have funds available to cover legal costs and expenses necessary to enforce the award or defend against potential appeals or challenges to its confirmation.

42.    As a result of these looming liquidity challenges, and because many of the Debtors' proposed solutions to these challenges rest on agreements with their creditors to pursue an orderly chapter 11 restructuring process, I believe that the immediate commencement of these Chapter 11 Cases and the worldwide protections provided by the automatic stay are necessary to protect the value of the Debtors' estates for their creditors.

**C.    Discussions with Key Stakeholders Prior to the Petition Date**

43.    Realizing that its current capital structure is unsustainable in the face of changing economic and environmental conditions, and anticipating that certain contingent claims may accelerate the need to right-size that capital structure, Alto Maipo has sought over the past several months to engage its key stakeholders, including Strabag and the Bank Lenders, in productive discussions regarding Alto Maipo's options for moving towards a workable restructuring solution for all parties.

44. Beginning in July 2021 and thereafter, Alto Maipo began to consult with various advisors, including employing Lazard Fréres & Co. LLC and Lazard Chile SpA (together, "Lazard"), Cleary Gottlieb Steen & Hamilton LLP, and others, to assess its financial situation and develop a restructuring proposal. On August 27, 2021, Alto Maipo presented its revised construction budget, as well as its revised long-term business plan, to the Bank Lenders and to Strabag. At this time, Alto Maipo explained to its creditors the need for restructuring due to increased construction costs and delays, as well as changes to market prices and environmental factors. In the following weeks, Alto Maipo engaged in one-on-one discussions its major creditors to discuss terms of a potential restructuring.

45. On September 10, 2021, Alto Maipo's advisor Lazard presented an initial restructuring proposal and target timeline to the Bank Lenders and to Strabag. Following this proposal, Alto Maipo continued to engage in one-on-one conversations with many of its lenders. A follow-up call on the proposal was held on October 1, and further meetings were held in the week of October 12, and on multiple occasions thereafter. Since initiating restructuring conversations in August, Alto Maipo has stressed the need for a restructuring to ensure the long-term viability of the Project and protect the Bank Lenders' investments, and has continued to engage with the Bank Lenders and other creditors with the goal of reaching pre-arranged terms for a restructuring plan. The Debtors and their creditors have conducted extensive, good-faith negotiations on potential terms for a restructuring plan, and these negotiations continue as of the Petition Date.

46. On November 17, 2021, the Debtors and certain of their creditors reached an agreement on the terms of a Restructuring Support Agreement (the "RSA"), which memorialized the terms of a pre-arranged restructuring of the Debtors through a chapter 11 process. In addition

to the Debtors, the parties to the RSA are Strabag and five of the Bank Lenders: Itaú Corpbanca SA, Banco de Crédito e Inversiones, DNB ASA, Warbler Run I, and Warbler Run II (collectively, the "RSA Counterparties").  In the aggregate, the RSA Counterparties hold approximately 55% of the Debtors' outstanding senior secured prepetition debt: Strabag holds approximately 19%, Itaú Corpbanca SA holds approximately 13%, Banco de Crédito e Inversiones holds approximately 11%, , DNB ASA holds approximately 7%, Warbler Run I holds approximately 2%, and Warbler Run II holds approximately 2%.  The RSA is attached hereto as **Exhibit A**.

47.     Discussions with several of the Debtors' other secured creditors are ongoing, and the Debtors expect that additional creditors will join the RSA in the coming weeks.  I believe that the terms of the RSA represent a viable path forward for the Debtors that will permit the Debtors to right-size their capital structure, maximize the value of their estates for the benefit all creditors, and allow the Debtors to continue their efforts to complete construction of the Project during the pendency of these Chapter 11 Cases.

### D.     Goals of these Chapter 11 Cases

48.     The Debtors have three primary objectives they hope to achieve through their restructuring process.  First, the Debtors hope to create a sustainable capital structure that will permit them to finish construction and begin generating revenue.  Second, the Debtors hope to secure sufficient liquidity to facilitate the final phase of construction and the commencement of operations of the Project.  Third, the Debtors hope to maximize recoveries for all of their creditors. I believe that these Chapter 11 Cases will allow the Debtors to achieve all of these objectives efficiently and effectively.

49.     As discussed above, the primary drivers of the Debtors' need for restructuring are the economic and environmental factors that have made the Debtors' current capital structure unsustainable in the long term.  While the two prior restructuring processes Alto Maipo completed

enabled it to adjust its capital structure to cover higher-than-expected construction costs, the Debtors will need additional tools to craft a workable solution in the face of the long-term challenges posed by the fundamental changes to Chile's energy landscape over the eight years since the Project broke ground. The Debtors hope to use these Chapter 11 Cases to right-size their capital structure to match these challenges.

50.     In order to maximize the value of the Debtors' estates for their creditors, it is essential that the Debtors make every effort to complete construction and reach COD on the most expedited timeline possible. Until the Hydroelectric Plants reach the commissioning period (currently expected to occur in December 2021), the Debtors are unable to generate revenue. Furthermore, the COD of the first Hydroelectric Plant will trigger the commencement of the MLP PPA, which will greatly increase the value the Debtors are able to deliver to creditors. While the Debtors expect that COD is within reach, they face an imminent liquidity shortfall that could jeopardize their ability to pay their contractors and facilitate the completion of construction. As a result, the Debtors have sought and obtained debtor-in-possession financing, described in further detail in Part III below, to fund their most critical expenses and facilitate COD of the Hydroelectric Plants in Q1 2022.

51.     Finally, the Debtors believe that these Chapter 11 Cases, as compared to other potential restructuring processes, are the solution that will ensure the maximum possible recoveries for the Debtors' creditors. As discussed above, in Section II.A, the MLP PPA is one of the Debtors' most important assets. In the absence of the PPA, the Debtors' revenue projections would be adjusted even further downward. Therefore, protecting the PPA and the Debtors' other assets is essential to maximizing the value of the estates. The PPA contains a provision allowing MLP to terminate the agreement (following the passage of extended cure periods) if Alto Maipo is

declared to be in liquidation or requests its own liquidation, or if Alto Maipo files a reorganization proceeding in Chile. Notably, this clause is not triggered by the filing of a chapter 11 proceeding. Facing imminent liquidity issues, the Debtors must take all steps necessary to avoid a declaration of their liquidation in Chile. Therefore, in order to retain the value of the PPA for their creditors, the protections afforded by these Chapter 11 Cases are necessary.

### III.   Debtor-In-Possession Financing[3]

52.      In order to ensure that it has sufficient liquidity to reach COD and therefore maximize the value of their estates, the Debtors have received a proposal for debtor-in-possession financing (the "DIP Facility") with the DIP Lender, AES Andes, as described in greater detail in the DIP Motion also filed on the Petition Date. The DIP Facility and Cash Collateral[4] will, among other things, permit the Debtors to continue to fund their operations during the pendency of these Chapter 11 Cases, and ensure that the Debtors will have sufficient liquidity to successfully complete construction of the Project while pursuing their reorganization efforts.

### A.   DIP Facility

53.      The DIP Facility provides for the following key terms:

i.      *DIP Loans*

54.      The DIP Facility is a revolving loan facility, in an aggregate original principal amount of $50 million, with up to $20 million of the DIP Loans available upon the entry of an order of this Court approving the DIP Motion on an interim basis (the "Interim DIP Order"). Upon the entry of an order of this Court approving the DIP Motion on a final basis (the "Final DIP

---

[3]      Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion (as defined below).

[4]      The term "Cash Collateral" shall have the meaning ascribed to it in the Cash Collateral Motion (as defined below).

Order"), the DIP Credit Agreement also provides that the undrawn portion of the DIP Facility will be available in a single draw or in multiple draws in minimum amounts of $1 million each.

ii.     *Conditions Precedent*

55.     The DIP Credit Agreement provides that as a condition precedent to any draw on the DIP Facility, the Debtors' available cash must be less than $10 million.  For this reason, entry of an Interim DIP Order alone will not likely satisfy the Debtors' immediate cash needs.  Instead, as described below, the Debtors also require immediate access to Cash Collateral.

iii.    *Covenants*

56.     The DIP Credit Agreement includes certain affirmative and negative covenants and events of default that are usual and customary for debtor-in-possession financings of this type. The DIP Credit Agreement also requires compliance with the DIP Budget and monthly reporting to the DIP Lender and the Required Consenting Lenders in accordance with that budget.

iv.    *Interest and Fees*

57.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Lender.  Specifically, the Debtors have agreed to an interest rate of 4.0% per annum, payable in kind.  In addition, the Debtors have agreed to pay an upfront fee of 1.0% on the principal amount of the DIP Commitments (the "Upfront Fee"), and an unused commitment fee of 0.75% per annum on the undrawn portion of the DIP Commitments (the "Unused Commitment Fee").  The Upfront Fee shall be divided into two payments: (i) 1.0% of the portion of the DIP Commitments available upon entry of the Interim DIP Order, payable in kind on the date of entry of the Interim DIP Order, and (ii) 1.0% of the remaining portion of the DIP Commitments,  payable in kind on the date of entry of the Final DIP Order.  The Unused Commitment Fee shall be approved upon entry of the Interim Order and shall be due monthly in arrears and payable in kind.

v.    *Milestones*

58.    The DIP Credit Agreement establishes the following milestones, which may be

waived by the consent of the Majority DIP Lenders:

| Event | Due Date |
|---|---|
| A restructuring support agreement with relevant case constituents and acceptable to the DIP Lender approved by the Bankruptcy Court | January 31, 2022 |
| Filing of an Acceptable Plan | No later than three (3) months following the Petition Date |
| Plan confirmation by the Bankruptcy Court | No later than six (6) months following the Petition Date |
| The effective date of the Plan and emergence of the Debtors from chapter 11 | No later than eight (8) months following the Petition Date |
| Synchronization of Las Lajas Units 1 and 2 and Alfalfal 2 | January 30, 2022 |
| Substantial Completion of Critical Milestones D, E and F has been reached | March 31, 2022 |
| Las Lajas and Alfalfal 2 Commercial Operation Date | April 30, 2022 |

**B.    The Necessity of the DIP Facility**

59.    The Debtors require an immediate infusion of liquidity to ensure sufficient working

capital to operate its business and administer their estates.  The necessary payments include

payments to employees, third party vendors, taxing authorities, and insurance companies, among

others, who provide the essential services needed to operate, maintain, and insure the Debtors'

assets.  The DIP Facility is also necessary to provide a positive message to the market that these

Chapter 11 Cases are sufficiently funded, which is critical to address any concerns raised by the

Debtors' lenders, employees, and vendors.  Thus, immediate access to the DIP Facility and the

continued use of Cash Collateral is necessary to avoid immediate and irreparable harm to the

Debtors and is crucial to the Debtors' efforts to maximize and preserve value for their stakeholders

during these Chapter 11 Cases.

60.    Access to the DIP Facility will provide the Debtors with capital that is essential to

operate throughout these Chapter 11 Cases and avoid immediate and irreparable harm to the

Debtors' estates.  In anticipation of the immediate need for the DIP Facility and the continued use

of Cash Collateral, the Debtors' senior management, with the assistance of their investment

banker, Lazard, prepared the DIP Budget (as defined in the DIP Credit Agreement), which process

I oversaw.  I am familiar with the DIP Budget and its contents.  I believe the DIP Budget is fair,

reasonable, and appropriate under the circumstances.

61.     The Debtors, with the assistance of their advisors, including Lazard, have

determined that the DIP Facility, together with access to its Cash Collateral, should be sufficient

to support the Debtors' operations through the pendency of these Chapter 11 Cases and should be

adequate, considering all available assets, to pay administrative expenses due or accruing during

the period covered by the DIP Budget.  I believe the DIP Documents reflect good faith, vigorous

negotiation between the Debtors and the DIP Lender.  Without access to the DIP Facility and the

continued use of Cash Collateral, the Debtors would suffer immediate and irreparable harm, and

the Debtors would be forced to liquidate.  I believe that the use of Cash Collateral alone would be

insufficient to meet the Debtors' postpetition liquidity needs.

### C.     The DIP Facility Is the Best Financing Available

62.     As described more fully in the *Declaration of Ari Lefkovits in Support of Debtors'*

*Motion for Interim and Final Orders (i) Approving Postpetition Financing, (ii) Providing*

*Superpriority Administrative Expense Claim Status Pursuant to 11 U.S.C. §§ 363 And 364, (iii)*

*Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362, (iv) Scheduling a Final Hearing and*

*(v) Granting Related Relief*, the Debtors have been unable to obtain financing on better terms than

those offered by the DIP Lender.  Following Lazard's market research and advice, I do not believe

that the Debtors would be able to obtain financing on terms more favorable than those of the DIP

Facility.  Moreover, the proposed DIP Facility serves as an important component of the Debtors'

overall chapter 11 efforts, providing the stability of adequate liquidity and the resources to emerge from the chapter 11 process in a timely and expeditious manner.

## IV.    **First Day Motions**

63.    Concurrently with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions seeking relief that the Debtors believe are necessary to enable them to maximize the value of their estates while these Chapter 11 Cases are pending.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring that value is preserved as the Debtors transition into chapter 11.  For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interest of the Debtors, their creditors, and other parties-in-interest.

### A.    Administrative and Procedural Motions

i.    *Debtors' Motion for Order Authorizing the Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion")

64.    By the Joint Administration Motion, the Debtors, Alto Maipo SpA and Alto Maipo Delaware LLC, seek the entry of an order directing the joint administration of these Chapter 11 Cases.

65.    The joint administration of the Debtors' respective estates will ease the administrative burden on the Court and all parties in interest in these Chapter 11 Cases.  The joint administration of these Chapter 11 Cases will permit the Clerk of the Court to utilize a single docket for each of these Chapter 11 Cases and to combine notices to creditors and other parties in interest in the Debtors' respective cases.  In addition, there likely will be numerous motions, applications, and other pleadings filed in these Chapter 11 Cases that will affect most or all of the Debtors.  Joint administration will permit counsel for all parties in interest to include all of these Chapter 11 Cases in a single caption for the numerous documents that are likely to be filed and

served in these Chapter 11 Cases.  Joint administration also will enable parties in interest in each

of these Chapter 11 Cases to stay apprised of all of the various matters before the Court.

ii.  *Motion to Authorize Alto Maipo SpA to Act as Foreign Representative of the Debtors* (the "<u>Foreign Representative Motion</u>")

66.    By the Foreign Representative Motion, the Debtors seek to appoint Alto Maipo

SpA as foreign representative of the Debtors' estates pursuant to section 1505 of the Bankruptcy

Code so that Alto Maipo has the power and ability to seek recognition of these Chapter 11 Cases

and other orders of this court in any additional court it deems necessary and beneficial.

67.    It is my understanding that in order for the Debtors to seek the cooperation and

assistance of foreign courts in achieving the objectives of these Chapter 11 Cases, it is necessary

for a duly appointed foreign representative to seek recognition in those courts.  Given the

international nature of the Debtors' creditor base and the uncertainties inherent in this early stage

of the proceedings, entry of the proposed order will enable Alto Maipo to have necessary

authorization to seek recognition in such jurisdictions as may be required based on developments

or adverse creditor action going forward.

iii.  *Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent* (the "<u>Prime Clerk § 156(c) Application</u>")

68.    By the Prime Clerk § 156(c) Application, the Debtors seek appointment of Prime

Clerk LLC ("<u>Prime Clerk</u>") as claims and noticing agent pursuant to § 156(c) of the Bankruptcy

Code and Local Rule 2002-1(f).  I am aware that the Debtors anticipate that there will be in excess

of 300 creditors and parties-in-interest to be noticed in these Chapter 11 Cases.  I am also aware

that the Debtors selected Prime Clerk following a competitive process in which the Debtors

obtained and reviewed engagement proposals from two other court-approved claims and noticing

agents.  The Debtors selected Prime Clerk because it is an industry leader with significant

experience in both the legal and administrative aspects of large, complex chapter 11 cases.  I

25

believe that Prime Clerk is well-qualified to perform the services contemplated in the Prime Clerk § 156(c) Application.

**B.    Operational Motions Requiring Immediate Relief**

    i.    *Debtors' Motion for Interim and Final Orders (i) Approving Postpetition Financing, (ii) Providing Superpriority Administrative Expense Claim Status Pursuant to 11 U.S.C. §§ 363 And 364, (iii) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362, (iv) Scheduling a Final Hearing and (v) Granting Related Relief* (the "DIP Motion")

69.    By the DIP Motion, the Debtors seek the entry of interim and final orders authorizing the Debtors to obtain postpetition financing in the form of a superpriority revolving loan facility (the "DIP Facility") with AES Andes (the "DIP Lender").  The facts underlying the DIP Motion are set forth above, in Part III of this Declaration.  For the reasons outlined in Part III of this Declaration, I believe that the terms and conditions of the DIP Facility are fair and reasonable, and that the Debtors' entry into the DIP Facility is in the best interests of their estates and their creditors.

    ii.    *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Use of Cash Collateral; (ii) Granting Adequate Protection; and (iii) Modifying the Automatic Stay* (the "Cash Collateral Motion")

70.    By the Cash Collateral Motion, the Debtors seek the entry of interim and final orders (i) authorizing the Debtors' use of Cash Collateral (as defined below) pursuant to sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code, Bankruptcy Rule 4001(b), and Local Rule 4001-2, (ii) granting and affirming the adequate protection proposed to be provided to the term loan and supplier financing lender Strabag SpA (collectively, the "Prepetition Lenders") and agent (in its capacity as such, the "Agent") under the Debtors' prepetition secured term loan and Supplier Deferred Payment (as defined below) (collectively, the "Prepetition Secured Loans"), in connection with the Prepetition Loan Documents (as defined below), and (iii) modifying the

automatic stay as set forth in the Proposed Interim Order and waiving the fourteen (14) day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h).

71.     As discussed above in Section I.C, Alto Maipo is the borrower under a series of prepetition term loans (the "Prepetition Term Loans" and the lenders thereunder, the "Prepetition Term Lenders"), all of which are secured by all assets of Alto Maipo (the "Prepetition Collateral") and rank *pari passu* as between each other, from certain international development banks, local and international commercial banks, and syndicated lenders.  Certain of the Prepetition Term Loans are also subject to interest rate swaps (the "Swaps") held by the originating banks as well as KfW IPEX-Bank GmbH (the "Swap Counterparties," together with the Prepetition Term Lenders and Strabag, the "Prepetition Secured Parties," the documents governing agreements therewith, the "Prepetition Loan Documents," and all obligations of Alto Maipo thereunder, the "Prepetition Obligations").  The Debtors' obligations under the Swaps are also secured by secured by substantially all assets of Alto Maipo (the "Prepetition Collateral") and rank *pari passu* with the Prepetition Term Loans.

72.     Additionally, Alto Maipo and Strabag are parties to an Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract, dated as of February 19, 2018 (the "Tunneling Construction Contract").  Pursuant to the Tunneling Construction Contract, among other things, Strabag provided to Alto Maipo, and Alto Maipo remains obligated to Strabag for, $391.5 million in secured deferred supplier financing (the "Supplier Deferred Payment"). The Prepetition Secured Loans and Supplier Deferred Payment rank *pari passu* and are secured by the Prepetition Collateral.

73.     It is essential to the Debtors' efforts to preserve and maximize the value of their assets that they obtain the authority to access the cash presently in the Debtors' approximately

twenty (20) accounts (the "Bank Accounts"), of which four (4) are actively utilized by the Debtors in their current cash management system, all of which are held at Itaú Corpbanca S.A. in its New York, New York and Santiago, Chile branches (the "Cash Collateral").

74.     As described above, these Chapter 11 Cases are filed under unique circumstances. The Debtors, whose primary asset is the nearly-completed hydroelectric Project, have sought bankruptcy relief in order to stave off what could be a disorderly and extended restructuring process in the event that it fails to meet payments to prepetition creditors, which would be hugely disruptive to the construction process, and thus value-destructive to the Debtors' estates as a whole and potential recoveries to creditors. The Debtors intend to use Cash Collateral for expenditures related not only to construction costs and wages to employees and contractors presently engaged in completing the project, but also to compensation for the restructuring professionals that have been retained by the Debtors to ensure an orderly restructuring and minimal disruption to the construction process.

75.     Furthermore, as discussed above in Part III, the Debtors' attempt to obtain postpetition financing have yielded only one proposal. Despite the fact that no other proposals were received, the DIP Facility is highly favorable to the Debtors: it is offered on an unsecured, non-priming basis, with a low interest rate and limited covenants. However, the DIP Facility, as negotiated with the proposed lender thereunder, effectively requires the Debtors to first use certain of their existing cash reserves (*i.e.*, the Cash Collateral) to fund construction costs and other operating costs prior to drawing on the DIP. Specifically, the DIP Facility includes a condition precedent to any draw that the Debtors' available cash must be less than $10 million.

76.     As a result, and in order to ensure that the Debtors will have access to their postpetition financing and will suffer no interruption in their efforts to complete the Project, it is

imperative that the Debtors be able to immediately access the Cash Collateral to fund construction and other costs in the immediate post-petition period until the conditions precedent to the first draw on the DIP Facility are met. Therefore, interim authorization to use Cash Collateral is in the best interests of both the Debtors' estates and the creditors.

77.     To compensate the Prepetition Secured Parties for the diminution in value, if any, of the collateral securing the Prepetition Obligations, the Debtors propose to provide adequate protection in the form of payment of the fees and expenses of the Prepetition Secured Parties' professionals retained in conjunction with these Chapter 11 Cases, given that it is indisputable that an orderly restructuring of the Debtors' capital structure is critical to the Debtors' ability to continue apace with construction of the Project and begin operating as expeditiously as possible.

78.     Finally, the Debtors propose a modification of the automatic stay solely to permit the Prepetition Secured Parties to deliver written notice by electronic mail stating that the Prepetition Secured Parties elect to commence the exercise of rights and remedies on the terms set forth in the Proposed Interim Order including, without limitation, with respect to their Prepetition Collateral. Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

iii.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System; (II) Authorizing Use of Prepetition Bank Accounts and Certain Payment Methods; (III) Authorizing Postpetition Affiliate Transactions; (IV) Waiving Compliance with Restrictions Imposed by Section 345 of the Bankruptcy Code; (V) Authorizing the Opening of New Bank Accounts; and (VI) Granting Related Relief* (the "Cash Management Motion")

79.     By the Cash Management Motion, the Debtors seek the entry of interim and final orders pursuant to sections 105, 363, 364(b), and 503(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2, (i) authorizing the Debtors' continued use of their existing cash management system; (ii) authorizing the Debtors to continue using prepetition bank

accounts and payment methods, including debit, wire, and ACH payments; (iii) authorizing the continuation of affiliate transactions; (iv) extending by 60 days the time for the Debtors to come into compliance or obtain waivers with respect to the restrictions imposed by section 345 of the Bankruptcy Code; (v) and authorizing the opening of new bank accounts.

80.     In the ordinary course of its business, the Debtors utilize an integrated, centralized cash management operational process (the "Cash Management System"), in which the Debtors' cash is transferred to centralized accounts and which includes all activities necessary and pertinent to the collection, concentration and disbursement of the Debtors' cash assets.   The Cash Management System allows the Debtors to facilitate their cash forecasting and reporting, monitor the collection and disbursement of funds, maintain control over the administration of its bank accounts, and transfer cash needed to respond to these requirements.   Financial and treasury personnel located in the Debtors' and their service provider's office's in Santiago and San Jose de Maipo, Chile administer the Cash Management System and implement cash management controls on behalf of the Debtors' businesses.

81.     The Cash Management System is structured to meet the Debtors' operating needs, enabling the Debtors to centrally control and monitor funds, ensure cash availability and liquidity, and reduce administrative costs by facilitating the movement of funds and enhancing the development of accurate account balances.   The Cash Management System is essential to the efficient execution and achievement of the Debtors' strategic business objectives and, ultimately, to maximizing the value of the Debtors' estates.   Any disruption of the Cash Management System would therefore be extremely detrimental and costly to the Debtors' operations, as their businesses require prompt access to cash to operate.

82.     As of the Petition Date, the Debtors maintain approximately 20 bank accounts (the "Bank Accounts") all held in its name with Itaú Corpbanca S.A. ("Itaú" or the "Bank") in either its New York branch ("Itaú NY") or Chilean branch (Chile) ("Itaú Chile"), including, without limitation, those set forth in Exhibit D to the Cash Management Motion.  Although the Debtors maintains 20 Bank Accounts, at present, only four are actively utilized by the Debtors in their current Cash Management System.  Generally, the Bank Accounts consist of: (i) general operating accounts that are used to fund the construction of the Project (the "Construction Accounts"), which include, *inter alia*, onshore and offshore multi-purpose accounts, (ii) disbursement-only accounts (the "Disbursement Accounts"); and (iii) receipt-only accounts (the "Receipt Accounts").  In the ordinary course of business, the Debtors make payments and transfers through automated clearinghouse ("ACH") payments, wires, account debits and other similar methods.

83.     As part of its utilization of a centralized cash management system, the Debtors conduct transactions in the ordinary course of business with their non-Debtor affiliates ("Affiliate Transactions").  These non-Debtor affiliates have valuable business operations that enhance the Debtors' enterprise value, and the Affiliate Transactions are essential to their functioning.  The non-Debtor affiliates provide numerous services and contributions to the Debtors during the construction of the plant, including, *inter alia*, (i) selling power to the Debtors during construction of the project, (ii) providing technical support and advisory services to the Debtors, and (iii) granting the Debtors access to certain shared facilities, including office and warehouse space.  The Debtors seek the authority to continue the Affiliate Transactions in the ordinary course of business during the pendency of these Chapter 11 Cases.  If the Affiliate Transactions were to be discontinued, the Cash Management System, the Debtors' operations and prosecution of these

Chapter 11 Cases would be disrupted, to the detriment of the Debtors, their creditors and the Debtors' estates.

84.     Finally, in connection with the DIP Motion, the Debtors determined that it was in their best interest to have two new bank accounts (the "New Accounts") available to them in order to, *inter alia*, ensure that no pre-existing liens will attach to the proceeds of the DIP Facility, and to hold funds pursuant to the Carve Out (as defined in the DIP Motion).  Out of an abundance of caution, through the Cash Management Motion the Debtors seek an order of the Court confirming the Debtors' ability to open two new bank accounts, to be used in connection with the DIP Facility, at M&T Bank Corporation ("M&T"), which is an Authorized Depository pursuant to section 345(b) of the Bankruptcy Code and the United States Trustee Guidelines regarding authorized depositories.

85.     The Debtors maintain the Cash Management System in the ordinary course of their business operations, which allows them to effectively and efficiently administer their cash and financial affairs.  In addition, the Cash Management System is consistent with those utilized by corporate enterprises comparable to the Debtors in size and complexity.  Absent the relief sought in the Cash Management Motion, the Debtors' Cash Management System will grind to a halt, compromising the Debtors' ability to pay taxes to government entities, make payments to their vendors and to pay their employees, among other adverse effects.  Any disruption to the Cash Management System would have an immediate adverse impact on the Debtors' business and would impair the Debtors' ability to successfully administer these Chapter 11 Cases.

   iv.     *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Pay Prepetition Wages, Salaries, Other Compensation, and*

*Reimbursable Expenses, and (b) Continue Employee Benefits Programs; and (ii) Granting Related Relief* (the "Wages Motion")

86.     By the Wages Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

87.     As of the Petition Date, the Debtors' workforce comprises 48 full-time salaried employees (the "Employees"), as well as Independent Contractors (as defined below). In general, the Employees consist of two groups for the purposes of Employee salaries and benefits programs: Employees who are classified as managerial or supervisory Employees in roles of high strategic importance for the project ("Managerial Employees"), and Employees who are not managerial or supervisory Employees in professional or technical positions (the "General Employees"). As of the Petition Date, the Debtors employ 22 Managerial Employees and 22 General Employees. The Debtors also employ 4 "expat" Employees, who largely serve in high-level supervisory or technical positions (the "Expat Employees"). The Debtors also rely on workers employed by R y Q Ingenieria S.A., an independent construction contractor, as well as Gepys Empresa de Servicios Transitorios SPA, Miguel Rodriguez y CIA Ltda, Hayde Lidia Lopez Ortega, Vector Servicios y Asesorias SA, and VIP Asesorias y Servicios Integrales SPA (the "Independent Contractors") to provide services and support in the ordinary course of their businesses.

88.     The Debtors seek to minimize the personal hardship that the Employees and Independent Contractors would suffer if Employee obligations are not paid when due or as expected, and the immediate and irreparable harm that would be caused to the Debtors by the lack of motivation of the Employees and Independent Contractors and the prospect that they might seek employment elsewhere. The Debtors, therefore, seek authority to pay and honor certain prepetition

claims relating to, among other things, wages, salaries, commissions, expense reimbursements, and other compensation (including compensation related to Independent Contractors), payroll withholding taxes and other amounts withheld, unemployment contributions, health insurance, life insurance, worker's compensation contributions and related potential liabilities, paid time off, and bonus programs, scholarships, and other benefits that the Debtors have historically directly or indirectly provided to the Employees, in the ordinary course of business (all such payments, benefits, and compensation collectively, the "Employee Compensation & Benefits").

89. Subject to the Court's approval, the Debtors intend to continue their prepetition Employee Compensation & Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request authority to modify, change, and discontinue any of its Employee Compensation & Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these Chapter 11 Cases and without the need for further Court approval, subject to applicable law.

90. The Employees and Independent Contractors provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation & Benefits, the Debtors may experience turnover and instability at this critical time in its efforts to bring the Project to completion and in these Chapter 11 Cases. This is particularly detrimental given the unique circumstances the Debtors face currently, as any delay in construction of the Project will necessitate a delay in the Debtors' ability to bring the Project online and ultimately generate revenue, creating additional value in the collateral pledged to the senior secured lenders. Additionally, construction of this nature requires unique engineering skills, which cannot be replaced without significant efforts, which efforts may not be successful given the overhang of these Chapter 11 Cases, particularly in a scenario where local Employees

may be reluctant to join an entity that has not satisfied its employee obligations.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation & Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of the Employees and Independent Contractors as the Debtors seek to operate their businesses in these Chapter 11 Cases.

        v.        *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with their Insurance Program, and (b) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* (the "<u>Insurance Motion</u>")

91.      By the Insurance Motion, the Debtors seek the entry of interim and final orders (i) authorizing the Debtors to continue and, to the extent necessary, renew its insurance program and pay policy premiums and broker fees arising thereunder or in connection therewith, and (ii) authorizing banks and other financial institutions at which the Debtors hold accounts (collectively, the "<u>Banks</u>") to honor and process check and electronic transfer requests related thereto.

92.      In the ordinary course of business, the Debtors maintain a comprehensive insurance program.  This program includes multiple insurance policies (each a "<u>Policy</u>" and, collectively, the "<u>Policies</u>").  The Policies vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations.  The Policies include:  (i) construction; (ii) general liability; (iii) excess general liability, (iv) terrorism and sabotage, and (v) automobile.

93.      With the exception of the Debtors' policy covering automobile liability (the "<u>Automobile Policy</u>"), the Debtors do not pay annual premiums.  Rather, the Debtors pay a variable premium upon the renewal or extension of each Policy (the "<u>Premiums</u>"), along with other obligations, including fees to the Debtors' brokers (the "<u>Broker Fees</u>", and, together with the

Premiums, the "Insurance Obligations"). The Debtors' Policies, with the exception of the Automobile Policy, are for multiyear terms, and the Premiums paid by the Debtors with respect to these Policies ensure coverage for the full term of each Policy. The Debtors' Automobile Policy is for an annual term. The Debtors make all Premium payments, whether for annual or multiyear terms, upfront and in full. As of the Petition Date, the Debtors believe that they are current on all Premium payments under the Policies. The Debtors seek authority to continue the Policies in the ordinary course of business. The Debtors also seek authority to renew the Policies as necessary.

94.     The Policies are essential to the preservation of the value of the Debtors' businesses, property, and assets during these Chapter 11 Cases. Additionally, some of the Policies are required by the various regulations, laws, and contracts that govern the Debtors' commercial activities. Therefore, continuation of the Policies is essential to preserve the value of the Debtors' assets and minimize exposure to risk.

> vi.     *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (ii) Granting Related Relief* (the "Taxes Motion")

95.     By the Taxes Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these Chapter 11 Cases in the ordinary course of business.

96.     In the ordinary course of business, the Debtors collect, withhold, or incur a variety of taxes, including, without limitation, sales, use, franchise, property, income, foreign, and various other similar taxes, fees, charges, and assessments (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities") in accordance with applicable law. Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that

36

are processed through their banks and other financial institutions. The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually, and annually, depending on the nature and incurrence of the particular Tax or Fee. Out of an abundance of caution, the Debtors seek authority pursuant to this Motion to make such payments where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; or (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities.

97.    Failing to pay the Taxes and Fees would materially disrupt the Debtors' business operations in several ways. First, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their reorganization process. Second, failing to pay the Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key employees from their duties related to the Debtors' restructuring. Third, failing to pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions. Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses. Fifth, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates. Accordingly, the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations.

      vii.    *Debtors' Motion for Entry of an Order (i) Restating and Enforcing Protections of 11 U.S.C. §§ 105(a), 362, 365, 525 and 541(c) and (ii) Granting Related Relief* (the "Automatic Stay Motion")

98.      By the Automatic Stay Motion, the Debtors seek a clarifying order confirming the application of the following key protections provided by the Bankruptcy Code: (i) the automatic stay provisions of section 362 of the Bankruptcy Code; (ii) the anti-*ipso facto* provisions of section 365 of the Bankruptcy Code; (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code; and (iv) the anti-*ipso facto* provisions of section 541(c) of the Bankruptcy Code.

99.      As discussed above, Alto Maipo is a Chilean company with operations in Chile and an international creditor base. I believe that the foreign entities with which the Debtors regularly interact may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code or their extraterritorial application. I also believe that the "automatic" and self-executing nature of the protections afforded by the Bankruptcy Code may not be readily understood by foreign creditors or tribunals unless embodied in an order of this Court. Accordingly, out of an abundance of caution, the Debtors request the entry of an order restating and affirming these protections to aid in its discussions and interactions with its creditors and to limit the extent to which it requires intervention of this Court in disputes concerning the application and enforcement of the automatic stay.

      viii.    *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Pay Certain Prepetition Claims of (a) Critical Vendors and Service Providers, (b) Lien Claimants, and (c) Certain Vendors Entitled to Administrative Expense Priority Under Section 503(b)(9) of the Bankruptcy Code; and (ii) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* (the "Critical Vendors Motion")

100.    By the Critical Vendors Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain

prepetition claims of critical vendors and service providers (the "Critical Vendors" whose claims shall be collectively identified as the "Critical Vendor Claims").

101.    The Debtors have determined, in an exercise of their business judgment, that their continued receipt of certain goods and services is necessary to ensure that there are no unexpected or inopportune interruptions in the Debtors' business operations, and to preserve and maximize the value of the Debtors' estates.  Accordingly, without the relief requested in the Critical Vendor Motion, many of the Critical Vendors may cease delivering goods and providing services to the Debtors, which could be detrimental to the success of the Chapter 11 Cases.

102.    The Critical Vendors supply the Debtors with essential, specialized goods and services, including contractors, supplies, development plans, and specialized resources for the Debtors' businesses.  These goods and services form the mainstay of the Debtors' power plant development, and if access to these goods and services were cut off or disrupted, even for a limited amount of time, the Debtors and all parties in interest would experience further delays in their progress towards the COD and would therefore suffer irreparable harm.  To the best of my knowledge, the vast majority of Critical Vendors are foreign vendors.  These vendors may lack minimum contacts with the United States and, thus, may assert that they are not subject to the jurisdiction of the Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the automatic stay.  Given the importance the Critical Vendors play in the Debtors' supply chain, even a temporary disruption in the goods and services provided would have a devastating effect on the operation of the Debtors' businesses. Accordingly, the Debtors need the ability to pay the Critical Vendor Claims on an uninterrupted basis.

ix.    *Debtors' Motion for Entry of an Order (i) Granting Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and*

*Received Postpetition and Authority to Satisfy Such Obligations in the Ordinary Course of Business, and (ii) Granting Related Relief* (the "Goods in Transit Motion")

103.    By the Goods in Transit Motion, the Debtors seek the entry of an order granting administrative expense priority to all undisputed obligations for goods ordered prepetition and received postpetition and authority to satisfy such obligations in the ordinary course of business.

104.    The Debtors rely heavily on the receipt of various goods and other materials in the operation of their businesses, a majority of which ship from non-U.S. vendors.  These goods include, but are not limited to, materials critical for the continued development and construction of the Project.  Prior to the Petition Date, the Debtors ordered goods in the ordinary course of business that are essential to the conduct of their businesses but will not be received until after the Petition Date (the "Outstanding Prepetition Orders").

105.    Certain suppliers and vendors may refuse to ship or transport such goods (or may attempt to recall such shipments) unless the Debtors issue substitute purchase orders or agreements postpetition, in an effort to avoid a risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods.  To prevent any disruption to the Debtors' business operations, and given that goods necessary to the ordinary course operation of the Debtors' business that were ordered prepetition may not be received until after the Petition Date, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Prepetition Orders and should authorize the Debtors to pay the Outstanding Prepetition Orders in the ordinary course of business

\*       \*       \*

106.    The First Day Motions request authority to, among other things, enter into the Postpetition Financing, honor workforce-related compensation and benefits obligations, pay claims of certain critical vendors, suppliers, and taxing authorities, and continue the Debtors' cash

management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Chapter 11 Cases. For the avoidance of doubt, the Debtors request authority, but not direction, to incur indebtedness, pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

107.    The Debtors have tailored the requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations, and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

108.    I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts. I believe that the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these Chapter 11 Cases, (b) is critical to ensure the maximization of value of the Debtors' estates through preserving vendor, supplier and other partner relationships, among other things, and (c) serves the best interests of the Debtors' stakeholders.

## Conclusion

109.    The Debtors' ultimate goal in these Chapter 11 Cases is to achieve an orderly, efficient, consensual, and successful recapitalization to maximize the value of the Debtors' estates for their stakeholders. These Chapter 11 Cases will allow the Debtors to achieve a long-term sustainable solution to their capital structure, ensure the Debtors' liquidity as they approach COD, and maximize creditor recoveries by protecting the value of the Debtors' estates. I believe that if

the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

[*Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: November 17, 2021

*/s/ Javier Dib*
Javier Dib
Board President & Chief Restructuring Officer

## Exhibit A

**RSA**

*Execution Version*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits, schedules and other attachments hereto, and as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of November 16, 2021 (the "Effective Date"), is entered into by and among:

a) Alto Maipo S.p.A. a *sociedad por acciones* organized and existing under the laws of Chile ("Alto Maipo" or the "Company");

b) Norgener Renovables SpA a *sociedad por acciones* organized and existing under the laws of Chile (the "Norgener");

c) AES Andes S.A. a *sociedad anónima* organized and existing under the laws of Chile (the "Sponsor");

d) the (i) Banco De Crédito e Inversiones, (ii) DNB Bank ASA, (iii) Itaú Corpbanca, (iv) Warbler Run I LLC, and (v) Warbler Run II LLC (collectively, and together with any subsequent lender that executes and delivers counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement (as defined below) to counsel to the Company from time to time agreeing to be bound hereby, the "Supporting Senior Lenders"), in their capacity as lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, Overseas Private Investment Corporation, Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutsche Bank AG, London Branch, and Santana S.A., as Senior Lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (the "Administrative Agent") (as further amended and supplemented, the "Common Terms Agreement"); and

e) Strabag SpA ("Strabag" and, together with Norgener, the "Shareholders"), as (i) contractor under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (the "Tunneling Construction Contract"), (ii) shareholder under the Shareholders' Agreement of Alto Maipo SpA among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time, the "Shareholders' Agreement"), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered into prior to the date hereof, and (iv) secured creditor with respect to the Supplier Deferred Payment (as defined in the Common Terms Agreement).

The Company, Norgener, the Sponsor and the Consenting Creditors may each be referred to herein as a "Party" and, collectively, as the "Parties." As used herein, (i) "Alto Maipo Obligations" means (i) an amount equal to US$1,652,472,639 due to all Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms

Agreement), and (ii) an amount equal to US$391,500,000 due to Strabag S.p.A. under the Tunneling Contract (as defined in the Common Terms Agreement)[1], without duplication, and (ii) "Consenting Creditors" means the Supporting Senior Lenders, Strabag and any hedge counterparty that executes and delivers counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company from time to time agreeing to be bound hereby.  Capitalized terms used but not defined in this Agreement have the meanings ascribed to them in the Plan Term Sheet (as defined below).

## RECITALS

**WHEREAS**, the Consenting Creditors, the Company, the Shareholders, the Sponsor, and their respective counsel and other advisors have engaged in negotiations regarding a comprehensive restructuring of the Company's obligations and indebtedness (the "Restructuring") pursuant to a consensual pre-negotiated restructuring plan (the "Plan") in accordance with a term sheet attached as Exhibit A hereto (as amended and supplemented in accordance with the terms of this Agreement), the "Plan Term Sheet");

**WHEREAS**, the Company intends to implement the Restructuring in accordance with the terms and conditions set forth in the Plan Term Sheet and this Agreement (the "Restructuring Documents") by (i) commencing a voluntary case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to effect the Restructuring as set forth in the Plan Term Sheet, including (A) the entering into of the DIP Credit Facility (as defined below), to be funded by AES Andes S.A. as debtor-in-possession lender (together with such other entities as may from time to time become party to the DIP Credit Facility (as defined below), the "DIP Lender")  in cash, (B) the entering into of a first priority tranche of secured notes or bank instruments (the "New 1L Secured Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, (C) the entering into of a second priority secured loan (the "New 2L Secured Loan" and together with the New 1L Secured Obligations, the "New Secured Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, and (D) the issuance of common equity in reorganized Alto Maipo (the "New Common Equity" and, collectively with the DIP Credit Facility and the New Secured Obligations, the "New Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, (ii) obtaining consents from the Senior Lenders (as defined in the Common Terms Agreement) and Strabag to amend the liens on all collateral pledged under the Financing Documents to provide that such liens will secure the Company's obligations, from and after the Effective Date, under the New Secured Obligations, as set forth in the Restructuring Documents (the "Proposed Amendments"), and (iii) the consummation of the other transactions contemplated in the Restructuring Documents (clauses (i) through (iii), collectively, the "Restructuring Transactions");

**WHEREAS**, the DIP Lender has agreed to provide the Company with an unsecured administrative super-priority debtor in possession revolving credit facility (the "DIP Credit

---

[1] In addition to the Alto Maipo Obligations, certain other amounts are or will be due from the Company to Strabag under the Tunneling Construction Contract, as set forth in the term sheet attached as Annex III to the Plan Term Sheet.

Facility"), subject to the applicable terms and conditions set forth herein and in the term sheet attached as Schedule II to Exhibit A (the "<u>DIP Term Sheet</u>") with DIP Lender serving as administrative agent (in such capacity, the "<u>DIP Agent</u>"), pursuant to definitive documentation (which documentation shall include a motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Company to obtain post-petition unsecured financing (the "<u>DIP Financing Motion</u>"), the orders approving the DIP Financing Motion on an interim and final basis (the "<u>Interim DIP Order</u>" and the "<u>Final DIP Order</u>" and together, the "<u>DIP Orders</u>") and a post-petition credit agreement (the "<u>DIP Credit Agreement</u>", and together with certain related loan documents, the "<u>DIP Loan Documents</u>") in each case, (i) on the terms and subject to the consent rights set forth in the DIP Term Sheet and (ii) in consultation with the Required Consenting Creditors;

**WHEREAS**, each Party and its respective counsel and other advisors (i) have reviewed or have had the opportunity to review the Restructuring Documents and (ii) acknowledge and agree that the Plan Term Sheet is a summary of the material terms of the proposed Restructuring and that implementation of the Restructuring will require the negotiation and agreement of terms not covered by the Plan Term Sheet; and

**WHEREAS,** each Party has agreed, subject to the conditions contained in the Restructuring Documents, to participate in the Restructuring in accordance with this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     Commitments Regarding the Restructuring.

1.01.     <u>Effectiveness of Agreement</u>.  This Agreement shall be effective from the date all of the following conditions precedent have been satisfied to the satisfaction of the Company and the Sponsor, on the one hand, and (i) Supporting Senior Lenders that hold no less than 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Supporting Senior Lenders and (ii) Consenting Creditors that hold no less than 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Consenting Creditors ((i) and (ii) collectively, "<u>Required Consenting Creditors</u>"), on the other hand:

(a)     Receipt by counsel to the Company and counsel to the Consenting Creditors of an electronic copy of this Agreement, duly authorized, executed and delivered by each of the Parties hereto;

(b)     All of the representations and warranties contained in this Agreement shall be true and correct in all respects; and

(c)     The Company shall have paid (i) all outstanding fees and expenses of ASSET Chile S.A. and FTI Consulting Canada ULC; (ii) $210,000 to Troutman Pepper Hamilton Sanders LLP for legal services to Strabag; (iii) $600,000 to Norton Rose Fulbright US LLP as a retainer for legal services to the Senior Lenders; and (iv) $35,000 to Carey y Cia Ltda. as a retainer for legal services to the Senior Lenders.

1.02.   <u>Strabag's Approval</u>: During the effectiveness of this Agreement, any terms of the Restructuring Term Sheet that expressly supplement or vary the terms of the Tunneling Construction Contract shall apply.

1.03.   <u>Agreement to Support</u>.  As long as (x) this Agreement has not been terminated in accordance with the terms of Section 3 hereof, (y) no circumstances exist which would (1) cause this Agreement to terminate automatically, or (2) give the Required Consenting Creditors or Strabag, as applicable, the right to deliver a written notice of termination of this Agreement, in each case under the terms of Section 3.01(a) to (r) and notwithstanding any cure periods that would be otherwise applicable, and (z) the Company is pursuing the Restructuring in a manner that is both (1) consistent in all respects with the Restructuring Documents and (2) in form and substance reasonably acceptable to the Required Consenting Creditors, each Consenting Creditor agrees, severally and not jointly, that it shall:

(a)   with respect to all Alto Maipo Obligations and any other claims and all interests held by such Consenting Creditor and inclusive of any claims acquired pursuant to Section 1.06 hereof (the "<u>Consenting Creditor Claims and Interests</u>"):

A.   following the commencement of any solicitation in accordance with this Agreement and section 1126(b) of the Bankruptcy Code and subject to its actual receipt of the Plan and related disclosure statement and other solicitation materials (the "<u>Solicitation Materials</u>"), support the Restructuring Transactions as contemplated by, and within the timeframes outlined in, this Agreement and in the Plan Term Sheet and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate, including, without limitation, confirmation of the Plan) in each case in favor of any matter requiring approval to the extent necessary to implement and give effect to the Restructuring Transactions;

B.   not change or withdraw (or cause to be changed or withdrawn) such vote or exercise of powers; *provided that* if, prior to consummation of the Plan, the Plan is modified without the consent of the Consenting Creditors or this Agreement is terminated in accordance with the terms of Section 3 hereof, each Consenting Creditor shall have the right to revoke its vote in favor of the Plan, and the Company shall take all steps necessary to assist in such revocation, and upon such revocation any such vote shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions or this Agreement, and the ballots casting such vote may be changed and resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

C.   provide its consent in favor of, and execute and deliver, such reasonable and customary documents as may be requested by Alto Maipo to implement the Proposed Amendments; provided that, if this Agreement is terminated in accordance with the terms of Section 3 hereof at any time prior to the Plan Effective Date, the Consenting Creditors shall have the right to revoke all (or, at their election, any portion) of their consents given to effect the Proposed Amendments and the Company shall take all steps necessary to assist in such revocation and upon such revocation any such consents shall automatically be deemed, for all

purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring or this Agreement, and any ballots or other documents providing such consents may be changed or resubmitted regardless of whether the deadline to resubmit or revoke such consents has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(b)     consent to the use of cash collateral during the pendency of the Chapter 11 Case subject to the terms and conditions set forth in the order approving the cash collateral motion, which shall be in form and substance acceptable to the Required Consenting Creditors, if and when entered by the Bankruptcy Court;

(c)     consider in good faith any reasonable request from the Company to amend or supplement the DIP Loan Documents or the Plan that is necessary or advisable to preserve the expected rights and benefits contemplated under the Plan or that would not otherwise adversely affect the rights or interests of the Consenting Creditors; *provided, however*, that no Consenting Creditor shall be under any obligation to consent or agree to any such amendment or supplement;

(d)     not, in any capacity, (i) object to, delay, impede or take any other action, including initiating any legal proceedings or enforcing rights as a holder of the Consenting Creditor Claims and Interests, that would have the effect of preventing the acceptance, approval or implementation of the Restructuring or the Plan; (ii) propose, file, vote for or enter into any letter of intent or other agreement regarding any restructuring, workout, liquidation or plan of reorganization for the Company under any applicable bankruptcy or insolvency laws other than the Restructuring or the Plan; (iii) take any action to accelerate any Consenting Creditor Claims and Interests or to enforce or foreclose on, or otherwise exercise remedies in respect of, the collateral securing the Alto Maipo Obligations; or (iv) solicit, direct or encourage any person, including, without limitation, the Administrative Agent, to undertake any action prohibited by the foregoing clauses (i)-(iii) of this Section 1.03(d);

(e)     (i) negotiate in good faith the terms of (A) the Proposed Amendments, (B) any amendments to the constitutive documents and agreements governing the equity of Alto Maipo that are required for the issuance of the New Obligations or are necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, if applicable, and (C) any shareholder resolutions required for the entering into or issuance of the New Obligations or necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, if applicable, and (ii) execute and deliver such reasonable and customary documents as may be requested by Alto Maipo to evidence such consent before the date on which votes on the Plan are required to be submitted in accordance with the Solicitation Materials (the "Voting Deadline"), to be effective on the Plan Effective Date in accordance with the terms and subject to the conditions set forth herein and in the Restructuring Documents;

(f)     negotiate in good faith with the goal of reaching agreement regarding the definitive amendments to any collateral documents securing the Alto Maipo Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, including the Plan, the Disclosure Statement and the documentation relating to the New Obligations (collectively, the "Definitive

<u>Documentation</u>"), as applicable, which shall be both (i) consistent in all material respects with the Restructuring Documents and this Agreement and (ii) in form and substance reasonably acceptable to the Required Consenting Creditors; and

(g)     (i) not, directly or indirectly, (A) seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding or participate in the formulation or preparation of any restructuring proposal other than the Restructuring set forth in the Restructuring Documents or (B) take any action to interfere with or that would materially adversely affect (i) the business relationship that any supplier, creditor or customer has with Alto Maipo or any direct or indirect subsidiary thereof, or (ii) the relationship of Alto Maipo with any applicable regulator or authority, including any Chilean authorities (*provided, however,* that nothing herein shall restrict Strabag's performance of its obligations under the Tunneling Construction Contract).

Notwithstanding the foregoing, this Agreement shall not limit any of the following Consenting Creditor's rights: (i) to enforce any rights under this Agreement, including the right to terminate this Agreement in accordance with the provisions hereof; (ii) under any applicable credit agreement, other loan document, contract or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code or under the laws of any other applicable jurisdiction concerning the Company in any forum, so long as such appearance and the positions advocated in connection therewith are not inconsistent with the Plan Term Sheet, the Plan, this Agreement and the Restructuring and do not hinder, delay or prevent the date that the Plan becomes effective (the "<u>Plan Effective Date</u>"); (iii) to take or direct any action relating to maintenance, protection or preservation of any collateral, the perfection or priority of any security interest or other lien, or the proof, allowance, or enforcement of any claim against any Debtor or non-Debtor person; or (iv) or otherwise limit any claims against any parties other than the Company.

Notwithstanding anything to the contrary in this Agreement, the Restructuring Term Sheet or the Plan Term Sheet, in the event that the Company issues a draw request with respect to any letter of credit related to the Tunneling Construction Contract, all rights, claims and defenses of each of Strabag and the Company arising from or related to such draw request or draw are fully preserved and nothing herein or in the Restructuring Term Sheet or Plan Term Sheet shall prevent the exercise or assertion of any such rights, or the assertion of any such claims or defenses thereto.

Notwithstanding anything to the contrary herein or otherwise, (A) the Alto Maipo Obligations held by a Consenting Creditor shall not include any Alto Maipo Obligation for which such Consenting Creditor does not have the right to control voting or is not permitted by a preexisting contractual obligation or operation of law to vote in favor of the Restructuring (the "<u>Non-Controlled Obligations</u>") until such times as the Consenting Creditor acquires the right to control voting or the preexisting contractual obligations or provisions of law no longer restrict the ability of the creditor to vote such Non-Controlled Obligations in favor of the Restructuring and (B) the failure of any Consenting Creditor to vote any of its Alto Maipo Obligations or deliver any consents in accordance with the Restructuring Documents in each case due to any change in law that prohibits or limits such vote or delivery shall not be a breach of this Agreement.

1.04.   <u>Covenants of the Company</u>.

(a)      <u>Consummation of the Restructuring</u>.  The Company shall: (i) not, directly or indirectly, seek, solicit, encourage, propose or assist in the formulation or preparation of any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company, or the appointment of a receiver, other than the Restructuring (as the terms of which may be modified by written agreement of the Company and the Consenting Creditors); *provided* that the Company may engage in negotiations in connection with or regarding any unsolicited restructuring proposal (other than a restructuring proposal made by the Shareholders, the Sponsor, or any entity affiliated with the Shareholders or the Sponsor), to the extent required by the fiduciary duties of its directors under applicable law in the written opinion of its counsel, provided, further, that the Company shall promptly upon (and in any event no later than two (2) business days after) receiving any unsolicited restructuring proposal, inform the Consenting Creditors of its receipt of such proposal and, subject to the Consenting Creditors entering into confidentiality agreements with the Company, provide a summary of the terms thereof and share with the Consenting Creditors copies of all materials delivered in connection therewith, (ii) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, entering into any agreements, documents, contracts or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions and (iii) take all actions reasonably necessary or reasonably requested by the Required Consenting Creditors to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents, including:

A.      providing draft copies to the Consenting Creditors of (i) the Plan, the related disclosure statement and the Solicitation Materials at least ten (10) business days prior to the earlier of (y) date on which the Company commences solicitation of acceptance of the Plan or (z) the date on which the Plan is filed with the Bankruptcy Court, (ii) the Confirmation Order, the plan supplement (including all Definitive Documentation included in that supplement) and the corporate governance documents for the reorganized Company at least ten (10) business days prior to the date on which the Company intends to file any such documents; and (iv) any other material pleadings or court documents at least two (2) business days prior to the date when the Company intends to file any such pleadings or documents with the Bankruptcy Court, which pleadings or documents shall be in form and substance reasonably acceptable to the Required Consenting Creditors; provided, however, that the Company shall be entitled to treat the failure of any Consenting Creditor to provide a response to such a draft filing within the two (2) business day period as such Consenting Creditor's consent to the filing of such pleading; provided, further, that such Consenting Creditor's failure to provide a response to the Company (i) shall not prejudice such Consenting Creditor's right to object or otherwise respond to such pleading or request for relief after it is filed and (ii) shall not be cited or relied on in any pleading or document filed by the Company in response to any objection or response filed by such Consenting Creditor;

B.      commencing the Chapter 11 Case on or before November 17, 2021 (the "<u>Outside Petition Date</u>," and the actual commencement date, the "<u>Petition Date</u>");

C.      filing on the Petition Date the following pleadings and documents: (i) cash management motion and proposed order, (ii) first day declaration, (iii) cash collateral motion

and proposed order, (iv) automatic stay motion and proposed order, (v) DIP Financing Motion and proposed Interim DIP Order, (vi) wages and benefits motion and proposed order, (vii) critical/foreign vendor motion and proposed order, (viii) lienholder motion and proposed order, (ix) taxes/fees motion and proposed order and (x) motion to assume this Agreement and proposed order (collectively, the "First Day Pleadings"), each in form and substance reasonably satisfactory to the Required Consenting Creditors.

        D.        filing within 10 business days of the Petition Date a motion and a proposed order (which order shall be in form and substance reasonably acceptable to the Consenting Creditors) to assume this Agreement pursuant to sections 363 and 365 of the Bankruptcy Code or otherwise to approve the Agreement.

        E.        taking no actions to propose or otherwise consent to, and timely filing a formal objection to any motion filed with the Bankruptcy Court by a third party seeking, the entry of an order (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Case; (iii) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement, the Plan, or the DIP Loan Documents;

        F.        taking all steps reasonably necessary or desirable to obtain an order of the Bankruptcy Court, which shall be satisfactory in form and substance to the Required Consenting Creditors in their sole and absolute discretion, confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") in a manner that is consistent in all respects with the terms and conditions set forth in the Plan and the Plan Term Sheet, on or before the deadline set forth in this Agreement;

        G.        taking all steps reasonably necessary to cause the Restructuring Transactions to occur on or before the milestones set forth in the DIP Term Sheet; and

        H.        taking no actions, directly or indirectly, and not encouraging any other person to take any actions, that are inconsistent with or are reasonably likely to interfere with, frustrate, delay or prevent the timely approval, confirmation and consummation of the Plan in accordance with the terms and conditions of the Plan and this Agreement, subject to Section 3.02 hereof in all respects.

        (b)      Payment of Fees and Expenses.  The Company shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by (i) ASSET Chile S.A. and FTI Consulting Canada ULC, financial advisors selected by the Required Consenting Creditors, and (ii) Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., U.S., local Delaware and Chilean counsel, respectively, selected by the Required Consenting Creditors, and any other counsel reasonably necessary to advise the Required Consenting Creditors in connection with the Restructuring Transactions (collectively, the "Ad Hoc Group Advisors"), set forth on summary statements that provide general descriptions of the work performed during the relevant

period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements are delivered to the Company and/or Cleary Gottlieb Steen & Hamilton LLP, whether incurred before or after the date hereof and regardless of whether the Restructuring contemplated herein is actually consummated or the documentation related to the Restructuring is executed; *provided*, *however*, that to the extent this Agreement is terminated in accordance with the terms hereof, the Company shall have no such obligation to pay such fees and expenses pursuant to this Section 1.04(b) with respect to any fees or expenses incurred after the date of such termination; *provided further,* that the Company's obligation to pay any such fees and expenses which are incurred after the Petition Date shall be subject to reasonableness review by the Office of the United States Trustee and such other conditions as may be imposed in orders of the Bankruptcy Court.

(c)     Agreement to Negotiate.  The Company shall negotiate in good faith with the goal of reaching agreement regarding the Definitive Documentation, which shall be consistent in all material respects with the Restructuring Documents and this Agreement and in form and substance reasonably acceptable to the Company and the Required Consenting Creditors.

(d)     Notice.  The Company shall promptly provide written notice to the Consenting Creditors in accordance with Section 5.09 hereof of: (1) the occurrence, or failure to occur, of any event, change, effect, occurrence, development, circumstance or change of fact of which the Company has knowledge, which occurrence or failure to occur would reasonably likely cause, or has caused, (a) any representation or warranty of the Company contained in this Agreement or the Restructuring Documents to be untrue or inaccurate in any material respect, (b) any covenant of the Company contained in this Agreement or the Restructuring Documents not to be satisfied in any material respect, (c) any occurrence that would cause any condition precedent to the Plan Effective Date (i) not to be satisfied or (ii) become materially less likely to be satisfied or (d) a material adverse impact on the ability of the Company to initiate solicitation of acceptance of the Plan, file the Chapter 11 Case as contemplated herein, or consummate any other Restructuring Transaction; (2) receipt of any written notice from any third party whose consent or agreement the Company reasonably believes may be required in connection with the Restructuring Transactions (a) indicating that such consent or agreement will not be provided by such party, (b) requesting consideration in exchange for such consent, or (c) conditioning such consent on terms that are inconsistent with the terms hereof; (3) receipt by the Company of any written notice from any governmental body in connection with this Agreement, the Chapter 11 Case, the Plan, or any of the other Restructuring Transactions; (4) receipt by the Company of any written notice of any proceeding commenced against the Company relating to or involving or otherwise adversely affecting in any material respect this Agreement, the Chapter 11 Case, the PPA (as defined below), the Plan, or any of the other Restructuring Transactions; and (5) receipt by the Company of any notice or communication from Minera Los Pelambres S.A. in connection with or relating to the Power Purchase Agreement between Minera Los Pelambres SA. (originally Antofagasta Minerals S.A.) and the Company, dated as of June 28, 2013 and amended on March 17, 2017 (the "PPA").

(e)     Continuation of Business.  The Company shall continue to conduct the Company's business as currently conducted (subject to the other provisions of this Section 1.04 and as required to facilitate the Restructuring Transactions in accordance with this Agreement) and to keep intact the material assets, operations, contracts, and relationships of the Company's business, shall perform its post-petition administrative obligations under the Tunneling Construction Contract

when and as they arise unless they are subject to *bona fide* dispute, and shall promptly inform the Consenting Creditors about all occurrences that would reasonably be expected to have a material adverse effect on the assets, operations, conditions (financial or otherwise), liquidity, or relationships of the Company's business, in each case taken as a whole.

(f)     Maintenance of the PPA.  The Company (i) shall take any and all actions necessary to remain in compliance with and avoid the termination of the PPA pursuant to its terms and (ii) shall not agree to amend, modify or waive any  provisions of the PPA without the prior written consent of the Consenting Creditors.

(g)     Limitations on Actions.  Absent the prior written consent of the Required Consenting Creditors or as provided in the Plan Term Sheet, the Company shall refrain from: (i) issuing any new equity interest or any securities or instruments convertible or exchangeable or exercisable into equity interests; (2) engaging in any transactions that would violate the covenants in the Common Terms Agreement; (3) making any payments (including through redemptions or acquisitions or by way of distributions of assets) to holders of equity interests of the Company (except as to payment to Strabag in respect of non-subordinated administrative obligations under the Tunneling Construction Contract that are not subject to *bona fide* dispute) or making any declarations for payments of dividends, including payments on account of equity interests issued to any employee or directors of the Company pursuant to any compensation or benefit plans under any agreement in effect as of the date hereof; and (4) except as otherwise provided or contemplated in this Agreement, granting liens or suffering any liens to exist on any assets, in each case to secure debt or derivatives or other financing arrangements, other than in respect of the Alto Maipo Obligations.

1.05.   Covenants of the Shareholders and the Sponsor.

(a)     The Shareholders and the Sponsor shall (i) not, directly or indirectly, seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding or participate in the formulation or preparation of, any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company, or the appointment of a receiver or, without the consent of the Company, the appointment of any official or ad-hoc creditor or equity committee, other than the Restructuring (as the terms of which may be modified by written agreement of the Company and the Consenting Creditors), (ii) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, (x) taking any action in contravention of the Required Amendments or taking any action intending to reverse, undo, negate or limit the effect of the Required Amendments, or (y) entering into any agreements, documents, contracts, or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions (provided, however, that nothing herein shall restrict Strabag from performing its obligations under the Tunneling Construction Contract), (iii) (x) in its capacity as a creditor of the Company, vote in favor of the Plan, (y) not contest the treatment of any claims or interests held by the Shareholders or the Sponsor under the Plan, and (z) be bound in all respects by the Confirmation Order, (iv) in the case of the Sponsor, not directly or indirectly, take any action, or encourage, propose, or assist the Company to take any action, that would result in any amendment or termination of the PPA in contravention of the terms of this

Agreement; and (v) in the case of the Sponsor, take all actions reasonably necessary or reasonably requested by the Required Consenting Creditors to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents, including, without limitation, taking any necessary actions or obtaining necessary consents to effectuate the Restructuring Transaction in compliance with Chilean law; *provided,* however, that this Section 1.05(a) shall be binding on Strabag only as long as (x) this Agreement has not been terminated as to Strabag in accordance with the terms of Section 3 hereof, (y) no circumstances exist which would (1) cause this Agreement to terminate automatically, or (2) give Strabag the right to deliver a written notice of termination of this Agreement as to Strabag, in each case under the terms of Section 3.01 and notwithstanding any cure periods that would be otherwise applicable, and (z) the Company is pursuing the Restructuring in a manner consistent in all respect with the Restructuring Documents; *provided further* that nothing herein shall limit in any manner any transfer or assignment of equity interests in Alto Maipo solely as between Norgener and the Sponsor.

(b)      the Sponsor shall, subject to the terms and conditions set forth herein, in the DIP Term Sheet, and in the DIP Loan Documents, perform any obligations set forth in the DIP Loan Documents.

1.06.    <u>Transfer of Interests</u>.

(a)      Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Creditor to sell, use, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, any or all of its Alto Maipo Obligations; *provided, however*, that for the period commencing as of the Effective Date until termination of this Agreement pursuant to the terms hereof (such period, the "<u>Restricted Period</u>"), no Consenting Creditor shall sell, assign, loan, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, in whole or in part ("<u>Transfer</u>") any Alto Maipo Obligations and any purported Transfer of any Alto Maipo Obligations shall be void and without effect, *unless* (i) the transferee is a Consenting Creditor that has not been notified by the Company that it is in breach of this Agreement or (ii) if the transferee is not a Consenting Creditor prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of the transfer agreement (each, a "<u>Transfer Agreement</u>") in the form attached as <u>Exhibit B</u> hereto pursuant to which such transferee shall assume all obligations of the Consenting Creditor transferor hereunder in respect of the Alto Maipo Obligations being Transferred; *provided* that no Consenting Creditor shall Transfer any or all of its Alto Maipo Obligations to any person or entity that the Consenting Creditor has actual knowledge of the identity of such counterparty and actual knowledge that such counterparty is an adverse party to any pending litigation or arbitration involving the Company; *provided, further*, that the Consenting Creditors shall have no duty to inquire or determine the identity of the counterparty to the Transfer or whether such counterparty is an adverse party to any pending litigation against the Company.

(b)      Upon consummation of any Transfer in compliance with Section 1.06(a), (i) any person or entity that is a transferee shall be fully bound by this Agreement as a "Consenting Creditor" and shall be a "Party" hereunder and (ii) the transferor shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any Alto Maipo Obligations that have been Transferred. This Agreement shall in no way be construed to preclude

11

the Consenting Creditors from acquiring additional Alto Maipo Obligations; *provided*, *however*, that any additional claims and interests acquired by any Consenting Creditor after executing this Agreement shall automatically and immediately upon acquisition by such Consenting Creditor be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company and counsel to the Consenting Creditors of such acquisition. Each Consenting Creditor shall notify Alto Maipo of the total principal amount of claims and interests held by such Consenting Creditor upon execution of this Agreement (on its signature pages hereto) and, thereafter, promptly upon a change in such total principal amounts; *provided* that the Company shall keep such information confidential, which obligation shall survive termination of this Agreement.

(c) This Section 1.06 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Alto Maipo Obligations.

**Section 2.** <u>Representations and Warranties</u>.

2.01. <u>Representations and Warranties of the Company</u>. The Company represents and warrants to each of the Consenting Creditors as of the date hereof to the best of its knowledge after due inquiry and as of the Petition Date, the Voting Deadline, the date of entry of the Confirmation Order and the Plan Effective Date, to the best of their knowledge, that:

(a) the information, reports, financial statements, certificates, memoranda and schedules furnished (or to be furnished) in writing by or on behalf of the Company in connection with the negotiation, preparation, or delivery and performance of this Agreement, the Restructuring Transactions, and the Solicitation Materials do not, and will not as of the time they shall be made or furnished, (i) contain any untrue statement of any material fact, (ii) omit to state any material fact necessary to make such statements, information, reports, financial statements, certificates, memoranda and schedules, taken as a whole and in light of the circumstances under which they were made and as of the time at which they were made, not materially misleading, or (iii) fail to disclose any material facts, occurrences, circumstances, or events including without limitation any contingent or non-contingent liabilities of the Company the value of which liabilities individually would reasonably be expected to exceed $500,000; and

(b) as of the date hereof, no draw request has been issued with respect to any letter of credit related to the Tunneling Construction Contract.

2.02. <u>Representations and Warranties of the Consenting Creditors</u>. Each of the Consenting Creditors, severally and not jointly, represents and warrants to the Company (and not to each other) that:

(a) <u>Securities Law Representations</u>. Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a Chapter 11 plan of reorganization or an offering of securities, each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (a) is a Qualified Institutional Buyer (as defined in Rule 144A of the Securities Act of 1933 (the "<u>Securities Act</u>")), "institutional accredited investor" (within the meaning of Rule 501(a) of the Securities Act), U.S. government agency or Non-"U.S. Person" (as defined in Regulation S of the Securities Act), (b)

understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (c) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with respect to such investment.

(b)   Beneficial Ownership; No Transfer.  (i) Such Consenting Creditor (A) has full power and authority to act on behalf of and consent to matters concerning the Alto Maipo Obligations for which it is the sole legal or beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer such Alto Maipo Obligations, (B) holds no other Alto Maipo Obligations and (C) has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title, or interests in any of the Alto Maipo Obligations that is inconsistent or conflicts with the representations and warranties of such Consenting Creditor set forth in this Section 2.02(b), would otherwise render it unable to comply with this Agreement and perform its obligations hereunder or would breach Section 1.06(a); and (ii) other than pursuant to this Agreement, such Alto Maipo Obligations are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

2.03.   Representations and Warranties of the Shareholders.  Strabag represents and warrants to the Company and the Consenting Creditors that Strabag holds 6.88% of the common equity interests in Alto Maipo. The remaining Shareholders other than Strabag represent and warrant to the Company and the Consenting Creditors that such Shareholders hold, in the aggregate, 93.12% of the common equity interests in Alto Maipo. Each Shareholder represents and warrants, severally and not jointly, that (i) each Shareholder (A) has full power and authority to act on behalf of and consent to matters concerning the equity interests in the Company of which it is the sole beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer, such equity interests, (B) holds no other equity interests in the Company, and (C) except as provided herein, has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title, or interests in any of the equity interests in the Company that would render it unable to comply with this Agreement and perform its obligations hereunder; and (ii) other than pursuant to the Financing Documents (as defined in the Common Terms Agreement), the Shareholders' Agreement and this Agreement, such equity interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way the Shareholders' performance of their obligations contained in this Agreement at the time such obligations are required to be performed.

2.04.   Mutual Representations and Warranties.  The Company represents and warrants, and each of the Consenting Creditors represents and warrants, severally and not jointly, and the

Shareholders and the Sponsor represent and warrant, severally and not jointly, to each of the other Parties that the following statements are true and correct as of the date hereof (each of which is a continuing representation and warranty) and as of the Plan Effective Date:

(a)    Existence; Enforceability.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms.

(b)    No Consent or Approval.  Except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(c)    Power and Authority.  It has, or will have, all requisite corporate, partnership, limited liability company or similar power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(d)    Authorization; Execution.  The execution, delivery and performance of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or similar action on its part.  This Agreement has been duly executed and delivered by it.

(e)    No Conflicts. The execution, delivery and performance of this Agreement by it do not and will not violate (i) any provision of law, rule or regulation applicable to it, (ii) its certificate of incorporation or by-laws (or other organizational documents), (iii) any order of any court or other governmental authority or regulatory body applicable to it, or (iv) any of the Company's material contracts or agreements except as would be waived, consented to or cured, if curable, prior to the consummation of the Restructuring.

(f)    Governmental Consents.  The execution, delivery and performance by it of this Agreement do not and will not require any registration or filing with, consent or approval of, or notice to, or any other action to, with, or by, any federal, state or other governmental authority or regulatory body, except, solely in the case of the Company, any filings in connection with the Chapter 11 Case, including the approval of the Solicitation Materials and the confirmation of the Plan and any filings with Chilean regulatory authorities as required by applicable law or regulation.

(g)    Representation by Counsel.  It has been represented by counsel in connection with this Agreement and the Restructuring Transactions contemplated by this Agreement.

(h)    Proceedings.  Other than the Chapter 11 Case filed pursuant to the terms of this Agreement, no litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would materially adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

**Section 3.**     Termination Events.

3.01.     Consenting Creditor Termination Events.  The Consenting Creditors or Strabag, as applicable, may terminate this Agreement with respect to the Parties upon the occurrence of any of the following events other than as set forth in Section 3.01(s) and Section 3.01(t) (each, a "Consenting Party Termination Event"), and this Agreement shall automatically terminate upon the occurrence of an event set forth in Section 3.01(s) and Section 3.01(t):

(a)     the breach in any material respect by the Company, Norgener or the Sponsor of any of the covenants, undertakings or any other obligation of the Company, Norgener or the Sponsor set forth in this Agreement, the Plan Term Sheet or the DIP Loan Documents and such breach, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Alto Maipo, Norgener or the Sponsor of written notice of the breach from the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, from Strabag) in accordance with Section 5.09 hereof or (B) if notice of the breach has been provided by either the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, by Strabag) or the Company, the day immediately prior to the Voting Deadline, in each case, which termination shall be effective automatically unless the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, Strabag) provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(b)     any representation or warranty in this Agreement made by the Company, Norgener or the Sponsor shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Alto Maipo and the Sponsor of written notice of the breach from the Required Consenting Creditors in accordance with Section 5.09 hereof or (B) if notice of the breach has been provided by either the Required Consenting Creditors or the Company, the day immediately prior to the Voting Deadline, which termination shall be effective automatically unless the Required Consenting Creditors provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(c)     the issuance by any governmental authority having jurisdiction over the Company, Norgener, the Sponsor or their assets, including any regulatory authority or court of competent jurisdiction, of any ruling, order or any other document or official record (i) enjoining the substantial consummation of the Restructuring, (ii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or compliance with any term or condition of the Restructuring or (iii) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring, and such ruling, order, or other document is not dismissed, stayed, reversed or lifted by the earliest of (x) five (5) business days following the issuance thereof or (y) the day immediately prior to the Voting Deadline, in each case, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(d)      the Company has filed, propounded, solicited votes upon, sought confirmation of or otherwise supported an alternative restructuring transaction relating to any of the Alto Maipo Obligations other than the Plan, including without limitation, the filing of any other chapter 11 plan or any other plan of reorganization under any applicable law, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(e)      the Company has filed with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, whether in the ordinary court of its business or otherwise, which motion or application is in a form not acceptable to the Required Consenting Creditors in their reasonable discretion, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof; *provided, however*, that the filing by the Company of any motion or application seeking authority to sell all, or substantially all, of the Company's assets shall result in the automatic termination of this Agreement;

(f)      an examiner with expanded powers (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) or a trustee shall have been appointed in the Chapter 11 Case, the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code, or the Chapter 11 Case shall have been dismissed by an order of the Bankruptcy Court or converted to a case under chapter 7 of the Bankruptcy Code, or the Company, Norgener or the Sponsor file or encourage a motion seeking any of the foregoing, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(g)      the Company announces its intention to withdraw or revoke the Plan, dismiss the Chapter 11 Case, terminate the Restructuring or otherwise not to consummate the Restructuring on terms and conditions consistent in all material respects with this Agreement and the Plan, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(h)      the Company shall be declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding (other than the Chapter 11 Case contemplated herein) under the laws of any jurisdiction that prevents the implementation of the Restructuring and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within sixty (60) days of such declaration, which termination shall be effective automatically unless the Required Consenting Creditors provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(i)      the amendment, modification or filing of a pleading by the Company seeking to amend or modify the Restructuring Documents (or, with respect to Strabag, reject the Tunneling Construction Contract), or any documents related to the foregoing, including motions, notices, exhibits, appendices and orders, in respect of which the consent of the Required Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag) is required under this Agreement, without the prior consent of the Required Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag), and such pleading or related document has not been withdrawn prior to the earliest of (i) three (3) business days of the

Company's or Sponsor's receiving written notice in accordance with Section 5.09 hereof from counsel to the Required Consenting Lenders (or, with respect to rejection of the Tunneling Construction Contract, counsel to Strabag) that such motion or pleading violates this Section 3.01(i), and (ii) entry of an order of the Bankruptcy Court approving such motion, which termination shall be effective upon the Required Consenting Creditors' (or, with respect to rejection of the Tunneling Construction Contract, Strabag's) delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(j)    the Bankruptcy Court or any court with requisite jurisdiction grants relief that is (i) materially inconsistent with this Agreement or the Plan, (ii) in a form materially different than a Restructuring Document or other Definitive Documentation approved by the Required Consenting Creditors or (iii) materially and adversely affects the rights of the Consenting Creditors under this Agreement, without the consent of the Required Consenting Creditors, or the Company requests or encourages any of the foregoing, and the Company has not obtained an order amending or modifying the relief in form and substance reasonably acceptable to the Required Consenting Creditors within five (5) business days following entry of an order granting such relief, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(k)    either the order approving the Solicitation Materials and the disclosure statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not acceptable to the Required Consenting Creditors in their reasonable discretion, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(l)    the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Credit Facility without the Plan having been substantially consummated, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(m)    the Plan Effective Date shall not have occurred on or prior to the date that is ten (10) months following the date of the Petition Date, provided, that, the date included in this Section 3.01(m) shall automatically be increased by the same number of calendar days that any milestone set forth in the DIP Term Sheet is extended at the request of the Company with the consent of the Required Consenting Creditors, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(n)    a custodian or receiver or similar entity is appointed with respect to the Company or any substantial part of the property of the Company, and such appointment is not revoked, dismissed, reversed or lifted within five (5) business days of such appointment, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(o)    the failure by the Company to pay any fee in accordance with Section 1.04(b) hereof when due and such failure is not cured within thirty (30) business days after receipt by Alto

17

Maipo and the Sponsor of written notice of such failure from the Required Consenting Creditors in accordance with Section 5.09 hereof

(p)    the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or with respect to the PPA by any person other than a Consenting Creditor or any person acting on its behalf or at the instruction, behest or with the encouragement of any Consenting Creditor (other than a litigation, action, lawsuit or adverse proceeding by the Company to enforce this Agreement) naming the Company, the Sponsor, Norgener or any Consenting Creditors as a party and such litigation, action, lawsuit or adverse proceeding results in an adverse ruling (i) enjoining the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or (ii) a final and non-appealable judgment, order or arbitral award (or series thereof) against the Company for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed within sixty (60) days, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(q)    the Company loses the exclusive right to file and solicit acceptances of a plan of reorganization, or the Company files or actively encourages the filing of a motion seeking the termination of exclusivity, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(r)    the occurrence of any material change, effect, event, circumstance or development (collectively, "Material Changes") that individually or in the aggregate and taken together with all other Material Changes, has had or would reasonably be expected to have, a materially adverse effect on (i) the business, operations, financial condition or results of operations of the Company or (ii) the ability of the Company to consummate the Plan or any of the other Restructuring Transactions, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(s)    (1) the Company (x) files a motion to reject the PPA or (y) amends the PPA in violation of **Section 1.04(f)**, (2) an order is entered by the Bankruptcy Court authorizing termination of the PPA or (3) the PPA is otherwise terminated; or

(t)    the failure of the Bankruptcy Court to enter an order by January 31, 2022 authorizing and directing the Company to assume the RSA or otherwise approving the RSA.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.01 shall not be available to any Consenting Creditor based on a Consenting Party Termination Event if a breach of this Agreement by any of the Consenting Creditors has resulted in such Consenting Party Termination Event.

3.02.    Company Termination Events.  The Company or Sponsor, as applicable, may terminate this Agreement with respect to the Parties as specified herein upon prior written notice,

delivered to all Parties in accordance with Section 5.09 hereof, upon the occurrence of any of the following events (each, a "Company Termination Event"):

(a)    prior to the occurrence of the Voting Deadline, the breach by one or more Consenting Creditors of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement, such that the non-breaching Consenting Creditors, at any time, hold or control less than 75% of the principal amount of the Alto Maipo Obligations held by all of the Consenting Creditors, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Creditor(s) of written notice of such breach from the Company or Sponsor in accordance with Section 5.09 hereof;

(b)    after the occurrence of the Voting Deadline, the material breach by one or more Consenting Creditors of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement, such that the non-breaching Consenting Creditors, at any time, together with all other holders of the Alto Maipo Obligations who vote in favor of the Plan, in the aggregate, hold or control less than 66 2/3% of the principal amount of the Alto Maipo Obligations or constitute less than one-half in number of such creditors who voted in favor of the Plan, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Creditor(s) of written notice of such breach from the Company or Sponsor;

(c)    the issuance by any governmental authority having jurisdiction over the Company or its assets, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring;

(d)    the Plan Effective Date shall not have occurred on or prior to the date that is seven (7) months following the date of the Petition Date; *provided* that the date included in this Section 3.02(e) shall automatically be increased by the same number of calendar days that any milestone set forth in the DIP Term Sheet is extended at the request of the Company and with the consent of the Required Consenting Creditors and Sponsor;

(e)    the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents by any person other than the Company, Norgener, the Sponsor, or any person acting on behalf of or at the instruction, behest or with the encouragement of the Company, Norgener or the Sponsor (other than a litigation, action, lawsuit or adversary proceeding by the Consenting Creditors to enforce this Agreement) naming any of the Consenting Creditors, Norgener, the Sponsor or the Company as a party and such litigation, action, lawsuit or adverse proceeding results in an adverse ruling (i) enjoining the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or (ii) a final and non-appealable judgment, order or arbitral award (or series thereof) against the Company for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed within sixty (60) days, and Alto Maipo delivers to the Consenting Creditors a written notice of termination in accordance with Section 5.09 hereof; or

(f)      the Company reasonably determines, based on the advice of outside advisors (after consultation with outside counsel), that termination of this Agreement is required under any fiduciary duties the Company owes to creditors or other stakeholders and Alto Maipo delivers to the Consenting Creditors a written notice of termination in accordance with Section 5.09 hereof.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.02 shall not be available to the Company based on a Company Termination Event if a breach of this Agreement by the Company has resulted in such Company Termination Event.

3.03.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Company and the Required Consenting Creditors.

3.04.   Effect of Termination.

(a)      Upon termination of this Agreement under Sections 3.01, 3.02 or 3.03 hereof, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided, however*, that no such termination shall relieve any Party of its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all consents given or votes of Consenting Creditor Claims and Interests occurring prior to such termination by the Consenting Creditors shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

3.05.   Automatic Termination Upon Plan Effective Date.  This Agreement shall terminate automatically, without any further required action or notice by any Party, immediately following the effectiveness of the Plan on the Plan Effective Date.

**Section 4.**      Amendments.  This Agreement may not be modified, amended, or supplemented (except as expressly provided herein) except in writing signed by the Company, the Shareholders, the Sponsor and each Consenting Creditor bound by such modification, amendment or supplement; *provided* that a writing transmitted by electronic mail shall be sufficient for the purposes of this provision.

**Section 5.**      Miscellaneous.

5.01.   Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms and conditions set forth in the Restructuring Documents.

5.02.   Complete Agreement.  This Agreement and the exhibits, schedules and other attachments hereto represent the entire agreement between the Parties with respect to the subject

matter hereof and supersede all prior agreements, oral or written, among the Parties with respect thereto; *provided*, *however*, that upon the Plan Effective Date, the Plan, the Confirmation Order and the Definitive Documentation executed in accordance therewith shall survive and supersede this Agreement and shall continue to be in full force and effect in accordance with its terms irrespective of this Agreement.   No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party or as may be carried out in accordance with Section 4 hereof.   Notwithstanding anything herein to the contrary, the provisions of Section 1.04(b) shall survive termination of this Agreement.

5.03.    <u>Parties; Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 1.06 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

5.04.    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

5.05.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA WITHOUT TAKING INTO ACCOUNT ITS CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    All actions and claims pursuant to this Agreement shall be heard and determined in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan (the "Chosen Courts"). Consistent with the preceding sentence and to the fullest extent permitted by applicable law, the Parties hereby (i) irrevocably submit to the exclusive jurisdiction of the Chosen Courts in any such action or proceeding, (ii) waive any objection to laying of venue in any such action or proceeding in the Chosen Courts, and (iii) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party; *provided, however*, that each of the Parties hereby agrees that, for the duration of any Chapter 11 Case, (y) the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with, and that the Bankruptcy Code shall govern, the Plan and (z) the Bankruptcy Court shall have exclusive jurisdiction of all actions and claims arising out of or in connection with this Agreement. If the Bankruptcy Court abstains from exercising or determines its lack of jurisdiction, the Chosen Courts shall have exclusive jurisdiction of all actions and claims pursuant to this Agreement.  The foregoing shall not limit the rights of any Party to introduce this Agreement in any court in any jurisdiction in order to defend against a cause of action that has been brought against it or any of its affiliates or representatives in such court.

(c)      TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(d)      The Company appoints C T Corporation System (the "New York Process Agent"), with an office at 28 Liberty Street, New York, NY 10005, as its agent to receive on behalf of itself and its property, service of copies of all writs, claims, process, complaint, summonses and any other process that may be served in any legal or other proceeding with respect to matters arising out of, based upon or in connection with this Agreement or the transactions contemplated hereby, and agrees to promptly appoint a successor New York Process Agent in the City of New York (which appointment the successor New York Process Agent shall accept in writing prior to the termination for any reason of the appointment of the initial New York Process Agent).  In any such legal or other proceeding, such service may be made on the Company by delivering a copy of such process to it in care of the appropriate New York Process Agent at such New York Process Agent's address.  Nothing in this Agreement shall in any way be deemed to limit the ability to serve any writs, process or summonses in any other manner permitted by applicable law.

5.06.    <u>Execution of Agreement</u>.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

5.07.    <u>Interpretation</u>.  This Agreement is the product of negotiations between the Company, the Shareholders, the Sponsor and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

5.08.    <u>Severability</u>.  If the whole or any part of a provision of this Agreement is declared void, unenforceable or illegal in any jurisdiction, it is severed for the purposes of that jurisdiction and the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect in such jurisdiction.  In this event, the remainder of this Agreement will have full force and effect and the validity or enforceability of the relevant provision in any other jurisdiction is not affected.

5.09.    <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the Company, to:

Alto Maipo SpA
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Javier Dib

Telephone: +56 22686-8910
Email: javier.dib@aes.com

with copies (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Richard J. Cooper
            Luke A. Barefoot
E-mail addresses:  rcooper@cgsh.com; lbarefoot@cgsh.com

(a)    if to the Sponsor, to:

AES Andes S.A.
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Ricardo Roizen and Felix Gomez
Telephone: +56 22686-8900
Email: ricardo.roizen@aes.com; felix.gomez@aes.com
with copies to (which shall not constitute notice):

AES Andes S.A.
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Maria Paz Cerda and Andrea Sougarret
Telephone: +56 22686-8900
Email: mariapaz.cerda@aes.com; andrea.sougarret@aes.com

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention: Derek Abbott
Telephone: +1 (302) 351-9357
E-mail: DAbbott@morrisnichols.com

(b)    if to a Consenting Creditor or a transferee thereof, to the addresses set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: Marissa Alcala
            Christy Rivera

23

Email addresses:  marissa.alcala@nortonrosefulbright.com;
christy.rivera@nortonrosefulbright.com

(c)     if to Strabag or a transferee thereof, to the address set forth below following Strabag's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Troutman Pepper Hamilton Sanders LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Attention: Robert S. Hertzberg
Email address: robert.hertzberg@troutman.com

-and-

Troutman Pepper Hamilton Sanders LLP
Hercules Plaza
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Attention: David M. Fournier
Email address: david.fournier@troutman.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice that is required to or may be delivered on behalf of the Company hereunder shall be deemed delivered on behalf of the Company when delivered by the Company.

5.10.    Reservation of Rights; Waiver.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Creditors or the ability of each of the Consenting Creditors to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Company under the Alto Maipo Obligations and other agreements and documents relating thereto, as well as under applicable law.  If the Restructuring is not consummated in accordance with the terms of the Restructuring Documents (including this Agreement), or if this Agreement is terminated for any reason (other than under Section 3.05 hereof), the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

5.11.    Specific Performance.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement remedy by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

5.12.    Several, Not Joint, Obligations.    Unless otherwise provided herein, the agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

5.13.   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

5.14.   <u>No Third-Party Beneficiaries</u>.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

5.15.   <u>Automatic Stay</u>.   The Parties acknowledge that the giving of notice or the disclosure of information, including under Section 5.19 hereof, or termination by any Party, including under Section 3 hereof, shall not be stayed by section 362 of the Bankruptcy Code or other similar applicable law, to the extent applicable, and to the extent the Bankruptcy Court determines otherwise, the delivering Party shall not be subject to any damages on account of the giving of such notice or disclosure or with respect to termination.

5.16.   <u>Acknowledgement</u>.   Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.   Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.   The Company will not solicit acceptances of the Plan from the holders at Alto Maipo Obligations in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law, and no obligation by any Consenting Creditor to vote to accept the Plan will be enforceable unless and until the Solicitation Materials are approved by the Bankruptcy Court in accordance with the terms herein.

5.17.   <u>Survival</u>.   Notwithstanding anything contained herein to the contrary, upon any termination of this Agreement (whether as a result of the consummation of the Restructuring, or its termination pursuant to Section 3 hereof or otherwise), the agreements and obligations of the Parties set forth in Section 1.04(b) (*provided* that Section 1.04(b) is not intended to supersede, or provide rights in addition to, those set forth in the agreements set forth with the firms named therein), the proviso to the last sentence of Section 1.06(b), Section 2.01, Section 2.02, Section 2.03, Section 2.04, Section 3.04 and Section 5 hereof shall survive the termination of this Agreement.

5.18.   <u>Relationship Among Parties; Consents</u>.

(a)   It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any form with any other Consenting Creditor, and, except as provided in this Agreement, there are no commitments among or between them.   In this regard, it is understood and agreed that any Consenting Creditor may transfer or trade in the New Obligations without the consent of the Company or any other Consenting Creditor, subject to applicable securities laws and the terms of this Agreement, including, specifically, Section 1.06; *provided*, *further*, that no Consenting Creditor shall have any responsibility for any such trading by any other entity by virtue of this Agreement.   No prior history, pattern or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

(b)      As used in this Agreement, any consent, waiver or other form of approval by or from the Consenting Creditors shall be exercised or withheld in the sole discretion, exercised in good faith, of such Parties.  The Company shall be permitted to rely upon any written confirmation (including by email) from Norton Rose Fulbright US LLP expressly confirming a consent, waiver or other form of approval by the Consenting Creditors.  The Company shall be permitted to rely upon any written confirmation (including by email) from Troutman Pepper Hamilton Sanders LLP expressly confirming a consent, waiver or other form of approval by Strabag.

5.19.   <u>Publicity</u>.

(a)      The Consenting Creditors shall not (i) use the name of the Company in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the Restructuring Transactions and any amendments thereof without first (A) submitting such press releases, public filings, public announcements or other communications to counsel for the Company for review and potential suggestions and (B) receiving the prior written consent of the Company.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Consenting Creditor.

(b)      At least one (1) business day prior to making any public disclosure that (i) constitutes disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, (ii) makes any other disclosure that includes descriptions of the Restructuring or any Consenting Creditors or (iii) constitutes disclosure of the aggregate amount or percentage of claims held by the Consenting Creditors, the Company shall submit drafts to Norton Rose Fulbright US LLP of any press releases or public documents, shall negotiate any proposed changes thereto in good faith and shall not publish such documents unless they are satisfactory to the Required Consenting Creditors in their sole and absolute discretion.

[*Signature pages to follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Effective Date.

ALTO MAIPO SPA                                    AES ANDES S.A.

By: _____                      By: _____
    Name: A. CARMIL                                   Name: Ricardo Falú
    Title:                                            Title: CEO

NORGENER SPA

By: _____
    Name: MPCerda
    Title: Authorized signatory

**STRABAG SpA**

Name: Edgar Paul SCHÖMIG
Title: Aboderado Génerales

Name: Philipp RAINER
Title: Aboderado Clase A

Address:
Alonso de Cordoba 4355, Of 901
Vitacura, Santiago de Chile

Attention: Dirk Pförtner
Telephone:+56 9 91595890

**WARBLER RUN I LLC**

_____

**Name: S. Vezina**
**Title:   Authorized Signatory**

**Address:  500 Boylston St, 24th Fl.**
                 Boston, MA  02116


**Attention:  Tim Caflisch;**
**tcaflisch@finepointcap.com**
Ops@finepointcap.com
**Telephone:  617-336-2200**
**Facsimile:  617-336-2276**

DNB Confidential

**DNB BANK ASA**

**Name: Eivind Hildre**          **Nils Fykse**
**Title:  SVP**                        **SVP**

**Address: Dronning Eufemias gt 30**
            **0191 Oslo, Norway**


**Attention:**
**Eivind Hildre (eivind.hildre@dnb.no)**
**Nils Fykse (nils.fykse@dnb.no)**

**Telephone: +4791504800**
**Facsimile: n/a**

**ITAÚ CORPBANCA**



**Name: Sebastián Romero Evans**
**Title: Officer**
**Telephone: 56283406213**
**Address: Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**

**ITAÚ CORPBANCA**

**Name: Carlos Irarrázaval Cruzat**
**Title: Officer**
**Telephone: 56283406277**
**Address: Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**

**BANCO DE CRÉDITO E INVERSIONES**

Name: CRISTIAN DEL RIO

Title: GERENTE COMERCIAL BANCA CORPORATIVA

Address: EL GOLF 125, Stgo, Chile.

**Attention:**
**Telephone:**
**Facsimile:**

*Execution Version*

## EXHIBIT A TO RESTRUCTURING SUPPORT AGREEMENT

### ALTO MAIPO S.P.A.

### PLAN TERM SHEET

*The terms set out in this indicative term sheet (this "**Plan Term Sheet**") are preliminary and indicative solely for discussion purposes, and are not intended to describe or include all of the terms and conditions of the restructuring of indebtedness issued by Alto Maipo S.p.A. (the "**Company**" or "**Alto Maipo**") or to set forth the definitive contractual language of any provisions summarized below. This Plan Term Sheet is not binding on any party, is subject to, among other things, ongoing diligence and negotiation and is solely for the purpose of promoting discussion of the structure and other terms applicable to the restructuring.*

***This Plan Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable laws, and provisions of the Bankruptcy Code. No party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.***

*Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in **Annex I** attached hereto.*

*This Plan Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by the Company and the Consenting Creditors (as defined below), and it is entitled to the protections from use or disclosure afforded by New York C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Chilean state, federal or other applicable rule that restricts or prohibits use. All statements made in this Plan Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Plan Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Implementation** | The Company will file a voluntary Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware. The following is a summary of a proposed pre-arranged plan of reorganization for the Company (the "**Plan**") to be filed in the Bankruptcy Case as soon as reasonably practicable |

| | |
|---|---|
| | following the date on which the petitions are filed (the "**Petition Date**").<br><br>On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Plan Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Company, the Required Consenting Creditors and the holder of such Allowed Claim or Interest, as applicable.<br><br>For the avoidance of doubt, any action required to be taken by the Company on the Plan Effective Date pursuant to this Plan Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter.<br><br>The Restructuring will be subject to the terms and conditions of this Plan Term Sheet and the Definitive Documentation. |
| **DIP Credit Facility** | Subject to the terms and conditions set forth in the Restructuring Support Agreement and the DIP Term Sheet (as defined below), the DIP Lender shall, subject to Bankruptcy Court approvals, provide up to $50 million of financing (the "**Commitments**") in the form of a unsecured, administrative super-priority debtor-in-possession revolving credit facility (the "**DIP Credit Facility**").<br><br>The DIP Credit Facility shall have the terms specified in the term sheet attached hereto as **Annex II** (the "**DIP Term Sheet**") and be documented by a unsecured administrative super-priority debtor in possession revolving credit agreement in form and substance acceptable to the Agent and the lenders party thereto, in consultation with the Required Consenting Creditors (the "**DIP Credit Agreement**"). |
| **New Obligations** | On the Plan Effective Date, the Reorganized Company shall enter into or issue, as applicable: (i) a super-senior first-lien secured financing facility which shall be provided by the DIP Lender as provided for in **Annex III** of this Plan Term Sheet (the "**Restructuring Term Sheet**") and the Plan (the "**New Secured Exit Financing Facility**"), (ii) first priority tranche of secured notes or bank instruments which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**New 1L Secured Obligations**"), (iii) a first/second priority secured loan (as described in Restructuring Term Sheet) which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**New 2L Secured Loan**", and collectively with the New Secured Exit Financing Facility and the New 1L Secured Obligations, the "**New Secured Obligations**"), and (iv) the issuance of common equity in the Reorganized Company to be provided to AES Andes or its designees (the "**New Common Equity**" and, together |

| | |
|---|---|
| | with the New Secured Obligations, the "**New Obligations**"). The New Obligations shall have terms consistent with the Restructuring Term Sheet. The New Secured Exit Financing Facility, New 1L Secured Obligations and the New 2L Secured Loan shall benefit from the same collateral provided, however, that (i) the New 1L Secured Obligations and New 2L Secured Loan and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Secured Exit Financing Facility, and (ii) the New 2L Secured Loan and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the New 1L Secured Obligations pursuant to a New Secured Obligations Intercreditor Agreement. |
| **Tax Matters** | The Company will seek to effectuate the terms and conditions of the Restructuring in a tax efficient manner. |
| **Amendment of Pledges** | The Consenting Creditors will enter into any amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the Alto Maipo Obligations (the "**Pledge Amendments**") to thereafter secure the Reorganized Company's obligations under the New Secured Obligations from and after the Plan Effective Date in a manner consistent with the RSA and Annex II thereto. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE COMPANY UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **DIP Claims** | On the Plan Effective Date, all Allowed DIP Claims shall be exchanged for, or paid off with the proceeds of, the New Secured Exit Financing Facility, as provided for in the DIP Term Sheet. | Impaired |
| N/A | **Administrative Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | Unimpaired/ Deemed to Accept |

| Classified Claims and Interests of the Company | | | |
|---|---|---|---|
| Class 1 | **Alto Maipo Obligations** | On the Plan Effective Date, each holder of an Allowed Alto Maipo Obligation shall receive its Pro Rata Share of the New 1L Secured Obligations and New 2L Secured Loan. | Impaired |
| Class 2 | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 3 | **General Unsecured Claims** | On the Plan Effective Date, each holder of a General Unsecured Claim, whether subordinated or unsubordinated, shall have its Claim cancelled, released, and discharged and without any distribution. | Impaired / Deemed to Reject |
| Class 4 | **Voith's Claims** | On or before the Plan Effective Date, Voith Hydro Ltda. and Voith Hydro S.A. shall have their Allowed Claims under that certain Lump Sum, Turnkey, Engineering, Procurement and Construction Contract among Alto Maipo S.p.A., Voith Hydro Ltda. and Voith Hydro S.A. dated August 10, 2012 (as amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**) assumed as amended pursuant to Sections 363 and 365 | N/A |
| Class 5 | **Strabag's Other Claims** | All Claims of Strabag, other than Claims that constitute Alto Maipo Obligations, under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo S.p.A. and Strabag S.p.A. dated February 19, 2018 (as further amended from time to time, including pursuant to the terms described in the term sheet attached hereto as **Annex III**), shall be treated in accordance with the terms set forth in the term sheet attached hereto as **Annex III**. | Impaired |
| Class 6 | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |

| Class 7 | Existing Equity Interests | On the Plan Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law; provided, however, that AES Andes or its designee shall receive 100% of the New Common Equity, subject to the conversion of the New 2L Secured Loan and Shared Services Loan, if applicable, as provided for in the term sheet attached hereto as **Annex III.** | N/A |
|---|---|---|---|

## GENERAL PROVISIONS REGARDING THE PLAN

| | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Plan Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, shall be canceled and discharged, and the Company's obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | Voith's Claims and Strabag's Other Claims will be treated as described above and all other executory contracts and unexpired leases that are not assumed as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | Consummation of the Plan will be subject to approval by the Bankruptcy Court of customary release provisions for the benefit of the Released Parties and exculpation provisions for Exculpated Parties, in each case other than claims arising from gross negligence, willful misconduct, or fraud. Such provisions shall include (i) mutual releases among the Company and the Released Parties; and (ii) consensual third party releases from and to the |

| | |
|---|---|
| | Releasing Parties in favor of each of the parties identified in the foregoing clause (i). |
| **Governance** | The identities of directors on the board of the Reorganized Company shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for the Reorganized Company including charters, bylaws, operating agreements, or other organization documents, as applicable, shall (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) be acceptable to the Required Consenting Creditors in their sole and absolute discretion.. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable. |
| **Treatment of the Non-Qualified Creditors** | All New Obligations under the Plan that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "**Selling Agent**"). The Selling Agent shall offer such New Obligations in one or more sale transactions within 180 days following the Plan Effective Date (the "**Sale Period**"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Creditors at the end of the Sale Period (the "**Substitute Consideration**").  In the event that a sale of such New Obligations is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such New Obligations shall be cancelled for no consideration.  None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities. |
| | For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any New Obligations under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other |

| | |
|---|---|
| | professionals of the Company than the indemnification provisions in place as of the date hereof, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. |
| **Retained Causes of Action** | The Reorganized Company shall retain all rights to commence and pursue any causes of action, other than any causes of action that the Company has released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"):<br><br>  a.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors;<br><br>  b.  the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time;<br><br>  c.  the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;<br><br>  d.  the final version of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance consistent in all respects with this Plan Term Sheet and the Plan and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) in their sole and absolute discretion;<br><br>  e.  the New Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New Obligations Documents and the issuance of each of the New Obligations shall have occurred;<br><br>  f.  the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder; |

| | |
|---|---|
| | g. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
| | h. the payment in cash in full of all Restructuring Expenses. |

## Annex I

## DEFINITIONS

"**AES Andes**" means AES Andes S.A.

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Company's businesses; (b) Allowed Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (d) DIP Claims.

"**Affiliate**" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a debtor, the term "Affiliate" shall apply to such Person as if the Person were a debtor.

"**Agreement Effective Date**" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

"**Allowed**" means, with respect to any Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors and approved by the Bankruptcy Court, (iii) by Final Order of the Bankruptcy Court or (iv) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Company or Reorganized Company, as applicable.

"**Alto Maipo**" means Alto Maipo S.p.A. or any successor or assign, by merger, consolidation, or otherwise, prior to the Plan Effective Date.

"**Alto Maipo Obligations**" means (i) an amount equal to US$1,652,472,639 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (iii) an amount equal to US$391,500,000 due to Strabag S.p.A under the Tunneling Contract (as defined in the Common Terms Agreement), without duplication.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Case**" means the Company's voluntary case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Company.

"**Class**" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

"**Common Terms Agreement**" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, Overseas Private Investment Corporation, Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutsche Bank AG, London Branch, and Santana S.A., as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

"**Company**" means Alto Maipo.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Company seeks entry of the Confirmation Order.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Creditors**" means such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the Restructuring Support Agreement) to counsel to the Company from time to time agreeing to be bound thereby.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Definitive Documentation**" means the definitive amendments to any collateral documents securing the Alto Maipo Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and this Plan Term Sheet, including the Plan, the Disclosure Statement and the documentation relating to the New Obligations. The Definitive Documentation and any modifications thereto will be (i) consistent with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

"**DIP Agent**" means AES Andes in its capacity as administrative agent under the DIP Credit Agreement.

"**DIP Claims**" means all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"**DIP Credit Facility**" means the credit facility provided to the Company by the DIP Lender in accordance with the DIP Orders.

"**DIP Expenses**" all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement the DIP

Credit Facility and the transactions contemplated thereby.

"**DIP Lender**" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"**DIP Orders**" means, together, the Interim DIP Order and the Final DIP Order.

"**Entity**" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

"**Estate**" means the estate of any Company created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Company's Chapter 11 Case.

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) any official committees appointed in the Chapter 11 Case and each of their respective members; (c) to the maximum extent permitted by applicable law, Norgener Renovables S.p.A., (d) to the maximum extent permitted by applicable law, AES Andes, (e) to the maximum extent permitted by applicable law, Strabag, in its capacity as shareholder, (f) to the maximum extent permitted by applicable law, the Consenting Creditors; (g) to the maximum extent permitted by applicable law, the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); and (h) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former Related Parties.

"**Existing Equity Interest**" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Plan Effective Date.

"**Final DIP Order**" means a final order by the Bankruptcy Court approving the Company's use of the DIP Credit Facility provided pursuant to the DIP Credit Agreement, and related relief.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**General Unsecured Claim**" means any Claim other than an Administrative Claim, an Other Priority Claim, an Alto Maipo Obligation or an Intercompany Claim.

"**Governmental Unit**" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

"**Impaired**" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Intercompany Claim**" means a Claim held by the Company against an Affiliate of the Company and *vice versa*. For the avoidance of doubt, the term "Intercompany Claim" does not include any Claim held by Strabag against the Company.

"**Interim DIP Order**" means an order by the Bankruptcy Court approving the Company's use of the DIP Credit Facility provided pursuant to the DIP Credit Agreement, and related relief on an interim basis.

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Company.

"**Joinder**" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the Agreement Effective Date may become a Consenting Creditor by executing such joinder agreement.

"**New 1L Secured Obligations**" means a first priority secured note or bank instrument which shall be distributed to the Senior Lenders and Strabag in exchange for their Alto Maipo Obligations as provided in this Plan Term Sheet and the Plan.

"**New 2L Secured Loan**" means a first/second priority secured loan, as further described in the Restructuring Term Sheet, which shall be distributed to the Senior Lenders and Strabag in exchange for their Alto Maipo Obligations as provided in this Plan Term Sheet and the Plan.

"**New Common Equity**" means the common Interest in the Company to be issued by the Company on or about the Plan Effective Date pursuant to the terms and conditions of this Plan Term Sheet.

"**New Obligations**" means the New Secured Exit Financing Facility, New 1L Secured Obligations, New 2L Secured Loan and New Common Equity.

"**New Obligations Documents**" means collectively, any indenture, loan agreement or other agreement governing the New Obligations, the New Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Company and the Required Consenting Creditors.

"**New Secured Exit Financing Facility**" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for or in satisfaction of the Claims under the DIP Facility, as provided for in the Plan Term Sheet and the Plan.

"**New Secured Obligations**" means the New Secured Exit Financing Facility, New 1L Secured Obligations and New 2L Secured Loan.

"**New Secured Obligations Intercreditor Agreement**" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors by which (i) the New 1L Secured Obligations and New 2L Secured Loan and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full

of the New Secured Exit Financing Facility, and (ii) the New 2L Secured Loan and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the New 1L Secured Obligations.

"**Non-Qualified Creditor**" means any creditor of the Alto Maipo Obligations other than a Qualified Creditor.

"**Other Priority Claim**" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Person**" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Company as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with this Plan Term Sheet, and to the extent not consistent with this Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

"**Plan Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

"**Plan Supplement**" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, attached as Exhibit A to the Restructuring Support Agreement, where applicable; the New Obligations Documents; the schedule of executory contracts and unexpired leases to be assumed pursuant to the Plan and the list of directors and officers of the Reorganized Company.

"**Priority Tax Claims**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, with respect to any holder of Claims in a Class receiving any distribution under the Plan, such holder's pro rata share of such distribution measured by reference to the aggregate amount of all Allowed Claims in such Class in each case as of the date of such distribution.

"**Professional Claim**" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"**Qualified Creditor**" means a creditor of the Alto Maipo Obligations who provides either one of the following certifications: (i) a certification that it is located in the United States, and is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act, U.S. government agency or an "accredited investor" as defined in Regulation D under the Securities Act, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or (ii) a certification that it is located or resident outside the United States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

"**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

"**Related Party**" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder; (f) the DIP Agent, and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party" and any Related Party of such person or Entity that opts out of the releases (other than the Company and the Reorganized Company) shall also not be a "Released Party."

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder; (f) the DIP Agent and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (j) all holders of Claims or Interests that are deemed to accept the Plan; (k) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (l) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l), and (n) each Related Party of each Entity in clause (a) through (m).

"**Reorganized Company**" means the Company, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

"**Required Consenting Creditors**" means, as of the relevant date, the holders of 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

"**Restructuring**" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet and the Plan.

"**Restructuring Expenses**" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses of the Consenting Lenders' advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby, and (ii) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent.

"**Restructuring Support Agreement**" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors to which this Plan Term Sheet has been attached as Exhibit A.

"**Restructuring Transactions**" means those certain restructuring and recapitalization transactions with respect to the Company's capital structure required to effect the Restructuring on the terms and conditions set forth in the Restructuring Support Agreement, this Plan Term Sheet, and the Plan.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective date.

"**Senior Lenders**" means the (i) Inter-American Development Bank, (ii) U.S. International Development Finance Corporation, (iii) Banco De Crédito e Inversiones, (iv) DNB Bank ASA, (v) Itaú Corpbanca, (vi) Itaú Corpbanca New York Branch, (vii) Deutsche Bank AG, London Branch, (viii) Santana S.A., (ix) Nineteen 77 Capital Solutions LP, (x) Moneda Deuda Latinoamericana Fondo de Inversión, (xi) Moneda Alturas II Fondo de Inversión, (xii) Regera Sarl, (xiii) Warbler Run I LP, (xiv) Warbler Run II LP and (xv) Clover Private Credit Opportunities Secondary II LP  in their capacity as lenders under the Common Terms Agreement.

"**Strabag's Other Claims**" means Strabag's unsecured claims under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo S.p.A. and Strabag S.p.A. dated February 19, 2018 (as further amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**), other than such Claims that are part of the Alto Maipo Obligations, that are payable in cash for construction costs and insurance proceeds pursuant to the terms described in the in the term sheet attached hereto as **Annex III**.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

"**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

"**United States Trustee**" means the United States Trustee for the jurisdiction in which the Chapter 11 Case are commenced.

"**Voith's Claims**" means the Claims of Voith Hydro Ltda. and Voith Hydro S.A. under that certain Lump Sum, Turnkey, Engineering, Procurement and Construction Contract among Alto Maipo S.p.A., Voith Hydro Ltda. and Voith Hydro S.A. dated August 10, 2012 (as amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**).

<u>ANNEX II</u>

DIP TERM SHEET

ALTO MAIPO

US$50,000,000 DEBTOR IN POSSESSION CREDIT FACILITY
SUMMARY OF TERMS AND CONDITIONS[2]

*This summary of terms and conditions (the "**DIP Term Sheet**") of a proposed debtor-in-possession credit facility (the "**DIP Facility**") is intended for discussion purposes only and does not constitute a commitment to lend. Only execution and delivery of definitive documentation relating to the DIP Facility shall result in any binding or enforceable obligations of any party relating to the DIP Facility. This DIP Term Sheet does not purport to summarize all of the terms, conditions, representations warranties and other provisions with respect to the transactions referred to herein.*

| Material Provision | Summary Description |
|---|---|
| **Parties** | |
| **Borrower:** | Alto Maipo Delaware LLC, a limited liability company, organized under the laws of the state of Delaware (the "**Company**" or the "**Borrower**") as debtor in possession in a case (the "**Chapter 11 Case**") filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Debtor:** | The Borrower. <br><br> The Borrower is also referred to herein at the "**Debtor**," and together with the Guarantor, the "**Obligors**." The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantor:** | Alto Maipo SpA, a *sociedad por acciones*, organized under the laws of Chile, as debtor in possession in the Chapter 11 Case. |
| **DIP Facility:** | The DIP Facility shall be in an aggregate principal amount of US$50 million (the "**DIP Commitments**," and the loans made thereunder, as increased by capitalized interest and fees, the "**DIP Loans**"). The DIP Loans, together with all related obligations incurred under the DIP Facility, are referred to herein as the "**DIP Obligations**". The DIP Facility shall be an unsecured, super priority revolving loan (with no |

---

[2]    This DIP Financing Term Sheet is attached to and is incorporated by reference into the Restructuring Support Agreement (the "<u>RSA</u>"), dated November 16, 2021, entered into by and among the Debtor, Norgener Renovables SpA ("<u>Norgener</u>"); AES Gener, S.A. (the "<u>Sponsor</u>"), Strabag SpA ("<u>Strabag</u>"), and the lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "<u>Senior Lenders</u>") that have executed the RSA (the "<u>Supporting Senior Lenders</u>").

| | |
|---|---|
| | additional draws permitted after the Commitment Period (as defined below)). |
| **Lenders:** | AES ANDES S.A. (the "**DIP Lenders**" or "**DIP Lender**", as applicable) |
| **Administrative Agent:** | AES ANDES S.A. (in such capacity and together with its successors, the "**Administrative Agent**"). |
| **Amount of Loan:** | A debtor-in-possession revolving loan facility, in an aggregate original principal amount of US$50 million (the "**DIP Facility**"). |
| **DIP Loan Documents:** | The Borrower will execute a definitive NY law governed loan agreement and other documents in furtherance or in connection therewith (collectively, the "**DIP Loan Documents**"), to evidence the DIP Facility, in form and substance customary for transactions of this type, but acceptable to the Borrower, the Administrative Agent and the DIP Lenders, acting reasonably, and in consultation with the Required Consenting Lenders (as defined in the RSA) including, without limitation, a promissory note governed by Chilean law. |
| **Purpose/Use of Proceeds:** | The Borrower shall use the proceeds ("**DIP Loan Proceeds**") of the DIP Facility in a manner consistent with the DIP Budget (as defined below) and only for the purpose of (i) certain working capital and general corporate purposes of the Borrower; (ii) restructuring costs and professional fees relating to the Chapter 11 Case, including to fund amounts in the Carve-Out Account, in the aggregate amount set out in the "Restructuring Professional Fees" line item in the DIP Budget which, for the avoidance of doubt, shall not be subject to the monthly limits set out in the DIP Budget; (iii) interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the Administrative Agent as provided under the DIP Loan Documents and the DIP Orders; (iv) any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors (as defined under the RSA); (v) other items agreed to by the parties in the DIP Loan Documents; and (vi) as approved by the Bankruptcy Court in the DIP Orders or other order (collectively "**Permitted Uses**"). |
| **Availability:** | Subject in each case to satisfaction of the conditions set forth below under the headings "*Conditions Precedent to Initial Draw*", "*Conditions Precedent to Subsequent Draws*" and "*Conditions Precedent to Each Draw*", as applicable: |
| | (i) upon the date of entry of an order by the Bankruptcy Court granting interim approval of the DIP Facility that is in form and |

|  | substance acceptable to the Majority DIP Lenders (as defined below), the Borrower, and in consultation with the Required Consenting Creditors (as defined in the RSA) (the "**Interim Order**"), up to US$20 million of the DIP Loans will be made available in a single draw minus the applicable stamp tax (the "**Initial Availability**"); and |
|---|---|
|  | (ii)  upon the date of entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is substantially in the form of the Interim Order with such changes as are acceptable to the Majority DIP Lenders and in consultation with the Required Consenting Creditors (the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"), the undrawn portion of the DIP Facility will be available in a single draw or in multiple draws in minimum amounts of US$1 million each minus the applicable stamp tax (the "**Subsequent Availability**"). |
|  | Notwithstanding the foregoing, the DIP Facility shall only be accessed and made available if the Obligors' available cash is less than $10 million at the time of the requested draw. |
|  | Subject to the above, amounts available under the DIP Commitments that have been drawn and subsequently repaid may thereafter be re-borrowed but only within six (6) months following the Petition Date (the "**Commitment Period**"), subject in each case to satisfaction of the conditions set forth below under "Conditions Precedent to each Draw". |
|  | Any then undrawn Subsequent Availability shall terminate and no longer be available upon expiration of the Commitment Period.  All DIP Loans and other amounts owed hereunder with respect thereto shall be due and payable in full no later than the Maturity Date (as defined below). |
| **Maturity Date:** | The DIP Facility will mature (the "**Maturity Date**") and will be immediately due and payable on the earliest to occur of any of the following: (a) twelve (12) months after entry by the Bankruptcy Court of the Final Order ("**Scheduled Maturity Date**"); (b) 35 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 35-day period; (c) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default (as defined below); (d) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders; (e) the date of the appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders, (f) |

|  | filing of a motion by any Debtor which seeks the dismissal, or the entry of an order granting any party's request for the dismissal, of the Chapter 11 Case, unless otherwise consented to in writing by the Majority DIP Lenders; (g) the occurrence of a change of control (to be defined in a mutually agreed upon manner, but it shall include, without limitation, any changes with respect to beneficial ownership of 50% of total voting shares, a 363 sale and any other sale of all or substantially all of the assets of the Borrower in a single or series of transactions; hereinafter referred to as a "**Change of Control**"); (h) the effective date (the "**Effective Date**") of the plan of reorganization (the "**Plan**") confirmed in the Chapter 11 Case.<br><br>Upon the Maturity Date, the DIP Facility and the DIP Commitments thereunder shall terminate and all outstanding DIP Obligations shall become automatically due and payable in full in cash.<br><br>"**Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks are open for domestic and foreign exchange business in New York City and Santiago, Chile. |
|---|---|
| **Amortization:** | None. |
| **Interest Rate and Fees:** | As set forth in <u>Annex I</u>. |
| **Closing Date:** | The date on which the conditions precedent set forth below under "Conditions Precedent to Initial Draw" are satisfied (the "**Closing Date**"). |
| **Conditions Precedent to Initial Draw:** | The Initial Availability on the Closing Date shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:<br><br>(a)    the Bankruptcy Court shall have entered the Interim Order (which order is not subject to any stay of effectiveness) no later than 14 days after the filing of a motion seeking entry of the Interim Order, approving and authorizing the DIP Facility on an interim basis, all provisions thereof and the priorities granted under Bankruptcy Code section 364(c)(1) in form and substance acceptable to the Majority DIP Lenders, and in consultation with the Required Consenting Creditors;<br><br>(b)    the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as |

<table>
<tr><td></td><td>

otherwise agreed to in writing by the Majority DIP Lenders and in consultation with the Required Consenting Creditors;

(c)  the Administrative Agent and the DIP Lenders shall have received executed copies of [the duly executed commitment letter to which this term sheet is enclosed as an annex] / [each of the DIP Loan Documents];

(d)  the Administrative Agent and the Consenting Creditors shall have received the Initial DIP Budget (as defined below), acceptable to the Majority DIP Lenders; and

(e)  all reasonable and documented transaction costs, fees, expenses, consisting of reasonable and documented (i) legal fees of one counsel in each applicable jurisdiction (the "**Legal Fees**") and (ii) fees of financial and other advisors[3] (together, the "**Specified Advisors**" and their fees, together with the Legal Fees, the "**Transaction and Advisor Expenses**"), in each case, invoiced at least two (2) Business Days prior to the Closing Date incurred by the DIP Lenders in their capacity as such solely in connection with the preparation, negotiation and execution of the DIP Loan Documents, and all compensation owed to the DIP Lenders under the terms of the DIP Loan Documents shall have been paid to the extent due.

</td></tr>
<tr><td>

**Conditions Precedent to Subsequent Draws:**

</td><td>

The Subsequent Availability is subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:

(a)  the Bankruptcy Court shall have entered the Final Order (which order is not subject to any stay of effectiveness) approving the DIP Facility on a final basis, no later than 35 calendar days following the date of entry of the Interim Order;

(b)  the Final Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal in any manner except as otherwise agreed to in writing by the Majority DIP Lenders, in consultation with the Required Consenting Creditors; and

(c)  the Administrative Agent shall have received customary closing deliverables and officer's certificates, including customary legal opinions from NY and Chilean counsel.

</td></tr>
</table>

---

[3] Note to NRS: AES advisors are Morris Nichols, Arsht & Tunnell LLP and Claro & Cia.

| Conditions Precedent to Each Draw: | The Initial Availability and each subsequent draw under the DIP Facility shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the following additional conditions: |
|---|---|
| | (a) accuracy of representations and warranties in all material respects, as set forth in the DIP Loan Documents; |
| | (b) absence of any default or Event of Default, as set forth in the DIP Loan Documents; |
| | (c) except as expressly provided with respect to the Initial Availability, all compensation owed to the DIP Lenders due and payable under the terms of the DIP Loan Documents, including any fees due and payable, as applicable, and the Transaction and Advisor Expenses, shall have been paid to the extent due and invoiced at least two (2) Business Days prior to the applicable borrowing date; and |
| | (d) the Administrative Agent shall have received, (i) in the case of the first draw, a Borrowing Notice (as defined below) one (1) Business Days prior to funding and (ii) in the case of all subsequent draws, a Borrowing Notice (as defined below) three (3) Business Days prior to funding.  Each such borrowing notice shall, among other things, include a certification that the Borrower's liquidity is less than the Excess Cash Threshold and the DIP Loan draw requested is required to meet the Borrower's anticipated liquidity needs and shall be in substantially the form of the borrowing notice agreed between the parties in the DIP Loan Documents (each, a "**Borrowing Notice**"). |
| **Funding Protection:** | Customary for DIP financing of this type, including breakage costs, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Superpriority Claims:** | All DIP Obligations shall at all times be entitled to a super-priority administrative expense claim against the Debtor ("**DIP Superpriority Claim**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to the Interim Order, subject only to the Carve-Out. |

| | |
|---|---|
| | The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Case. |
| **Carve-Out:** | The "Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, (iii) all unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtor is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code and Committee Professionals (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice and (iv) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $500,000 for Debtor Professionals and $50,000 for Committee Professionals ("**Trigger Cap**"), but in each case only to the extent that payment of such fees and expenses is subsequently allowed on a final basis by the Bankruptcy Court.<br><br>"**Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtor, their lead restructuring counsel, the U.S. Trustee, and counsel to any committee of unsecured creditors, which notice may be delivered following the occurrence and during the continuation of an event of default and acceleration of the DIP Obligations under the DIP Facility, stating that the Trigger Cap has been invoked.<br><br>Upon entry of the Final Order, the Debtor shall establish and fund a segregated escrow account (the "**Carve-Out Account**") not subject to control of the DIP Lenders, for purposes of funding the Carve-Out. The Carve-Out Account and the proceeds on deposit therein shall be available only to satisfy any obligations benefitting from the Carve-Out. Carve-Out Account terms and conditions to be mutually agreed and set forth in the DIP Orders. |
| **Voluntary Prepayments:** | The Borrower may prepay any DIP Obligations in whole or in part in an aggregate minimum amount of US$1,000,000 and integral multiples of US$500,000 in excess thereof.<br><br>The Borrower may terminate in whole or permanently reduce in part, any DIP commitments that remain undrawn at the time of such termination or reduction, provided that such partial reduction shall be in an aggregate minimum amount of US$1,000,000 and integral multiples of US$100,000 in excess thereof. |

| | |
|---|---|
| **Mandatory Prepayments:** | Prior to the Maturity Date, the Borrower shall make mandatory prepayments of DIP Obligations (and the DIP Commitments shall be permanently reduced in a corresponding aggregate amount) upon receipt by the Borrower of net proceeds from the following (in each case, subject to certain customary baskets to be negotiated in the definitive DIP Loan Documents and customary reinvestment rights, as applicable): |

i. *Incurrence of Indebtedness*: Prepayments in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower that is not otherwise explicitly permitted under the DIP Facility.

ii. *Asset Dispositions; Extraordinary Receipts*: Prepayments in an amount equal to 100% of the net cash proceeds received from the sale of any asset outside of the ordinary course of business or from any other receipts outside of the ordinary course of the business (including insurance proceeds).

iii. *Excess Cash*. Prepayments in an amount equal to 100% of excess cash (to be defined, in a mutually agreed upon manner, as available cash in excess of US$10,000,000 (but deducting amounts required to be paid by the Borrower in the next calendar month according to the DIP Budget); hereinafter referred to as the "**Excess Cash Threshold**") at the end of each calendar month period;

iv. *CNM* Arbitration. Prepayments in an amount equal to 100% of net proceeds paid pursuant to CNM award or any disposition of the rights under that award

provided, that, in each case (except with respect to paragraph (iv)), any such prepayment shall be subject to any priority of any other creditor with a properly secured lien existing immediately prior to the Petition Date.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents shall contain representations and warranties customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, and shall be limited to the following: organization; powers; authorization; enforceability; financial statements; subsidiaries; ownership of property; licenses and permits; litigation; compliance with laws and regulations; no conflict with laws; material contractual obligations; governmental and third-party approvals, use of proceeds; insurance; taxes; no material misstatements; employee benefit plans; environmental matters; labor |

| | |
|---|---|
| | matters; no default; USA PATRIOT ACT; OFAC; FCPA; certain bankruptcy matters; absence of Material Adverse Effect (to be defined) since the Petition Date; absence of defaults under material agreements entered into after the date of commencement of the Chapter 11 Cases; and the Final Order shall continue to be in full force and effect and not amended, modified or supplemented in a manner adverse to the DIP Lenders; and other bankruptcy matters as agreed upon. |
| **Affirmative Covenants:** | The DIP Loan Documents shall contain affirmative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions qualifications and carve-outs, and shall be limited to the following: <br><br> (a) Preservation and maintenance of existence, business and properties; <br> (b) Maintenance of cash management system; <br> (c) Payment of income taxes and other material taxes and other claims; <br> (d) Payment of reasonable and duly documented Transaction and Advisor Expenses; <br> (e) Delivery of quarterly and annual financial statements; <br> (f) Material Litigation and other notices; <br> (g) Compliance with laws and regulations; <br> (h) Maintenance of records; <br> (i) Use of proceeds; <br> (j) Compliance with environmental laws; <br> (k) Payment of post-petition obligations; <br> (l) Notification to the Administrative Agent of any Event of Default and certain other customary material events; and <br> (m) Certain bankruptcy matters. |
| **Negative Covenants:** | The DIP Loan Documents shall contain negative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, including, without limitation, the following: <br><br> (a) Limitation on incurrence of indebtedness, other than customary exceptions to be agreed based on the DIP Budget, including DIP sub-facility or a separate DIP financing to finance VAT taxes payable in connection with invoices issued by Strabag pursuant to the Tunneling Contract with Strabag dated as of February 19, 2018 (as amended, restated, modified, supplemented, extended or amended and restated from time to |

|  | time) (which may be secured by a first-priority lien on tax refunds) ("**DIP Tax Financing Facility**"); |
|  | (b) Limitation on liens, other than customary permitted liens and first- priority liens on tax refunds to secure the DIP Tax Financing Facility; |
|  | (c) Restriction on creation of any other super-priority claim which is *pari passu* with or senior to the DIP Superpriority Claims, except for the Carve-Out and other exceptions to be agreed; |
|  | (d) Limitation on investments and restricted payments, subject to customary exceptions to be agreed in the DIP Loan Documents; |
|  | (e) Prohibition on payment of pre-petition indebtedness, including any debt service, other than, to the extent constituting indebtedness, any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors; |
|  | (f) Business activities other than those engaged in on the Petition Date; |
|  | (g) Prohibition on mergers or a sale, lease or other disposition of all or substantially all of the assets of the Borrower (including a Change of Control) and other fundamental changes; |
|  | (h) Prohibition on the sales of any material asset or any other asset outside of the ordinary course of business; |
|  | (i) No use of proceeds in violation of customary anti-corruption laws, anti-money laundering, and sanctions laws; |
|  | (j) Adequate protection payments shall be made using the proceeds of the DIP Financing consistent with the DIP Budget or as otherwise consented to by the DIP Lenders, which consent shall not be unreasonably withheld; and |
|  | (k) Bankruptcy related matters. |
| **DIP Budget and other Financial Reporting:** | Prior to or on the Closing Date, the Borrower shall deliver: *DIP Budget*: An initial DIP budget to the Administrative Agent, with a copy to the Consenting Creditors, with monthly cash flow forecast for the period from the Closing Date through the end of September 2022, form acceptable to the Majority DIP Lenders and Required Consenting Creditors (the "**Initial DIP Budget**")[4], and thereafter, within an agreed |

---

[4]   The Initial DIP Budget is anticipated to be the same as the DIP Budget that has been distributed and agreed between the parties as of the date hereof, a copy of which is attached hereto, and the Majority DIP Lenders shall approve such DIP Budget as the Initial DIP Budget.

|  | number of days[5] following the end of each calendar month (starting with the calendar month immediately following the Closing Date), an updated budget in form substantially similar to the Initial DIP Budget and approved by the Majority DIP Lenders and Required Consenting Creditors (the "**Updated DIP Budget**" and, the Initial Approved DIP Budget and thereafter, each Updated DIP Budget, the "**DIP Budget**"). Each Updated DIP Budget shall include a reconciliation of the actual results for the months that are covered in the DIP Budget and have already elapsed.[6]<br><br>*Monthly Reporting*:  Commencing on the fourth Thursday after the Closing Date, and on the Thursday of each fourth calendar week thereafter, the Borrower shall provide customary reporting to be agreed. |
|---|---|
| **Milestones:** | The Borrower shall comply with following deadlines (unless waived by the Majority DIP Lenders) (the "**Milestones**"):<br><br>• A restructuring support agreement with relevant case constituents and acceptable to the DIP Lenders approved by the Bankruptcy Court by January 31, 2022.<br><br>• The Debtor shall file an Acceptable Plan (as defined below) no later than three (3) months following the Petition Date.<br><br>• The Bankruptcy Court shall have entered an order confirming the Plan no later than six (6) months following the Petition Date.<br><br>• The effective date of the Plan confirmed in the Chapter 11 Case and emergence of the Debtor from Chapter 11 no later than eight (8) months following the Petition Date.<br><br>• Synchronization of Las Lajas Units 1 and 2 and Alfalfal 2 by January 30, 2022.<br><br>• Substantial Completion of Critical Milestones D, E and F has been reached by March 31, 2022.<br><br>• Las Lajas and Alfalfal 2 Commercial Operation Date by April 30, 2022. |
| **Events of Default:** | The credit agreement for the DIP Facility will include events of default ("**Events of Default**") (and, as appropriate, grace periods) usual and customary for debtor-in-possession financings of this kind, including failure to make payments when due, failure to meet Milestones, defaults under post-petition indebtedness, noncompliance with affirmative and negative covenants (certain of which shall be subject to grace periods |

---

[5]    Date to be not later than 10th day after end of each calendar month.
[6]    Budgets need to be prepared with FTI input and Required Creditor Consent.

| | |
|---|---|
| | to be agreed); breaches of representations and warranties; an order shall be entered by the Bankruptcy Court terminating the Debtor's exclusive periods for proposing a Plan; dismissal or conversion of the Chapter 11 Case to a case under Chapter 7; an order shall be entered by the Bankruptcy Court changing the venue of the Chapter 11 Case; the filing of or confirmation of a Plan that is not an Acceptable Plan; unstayed judgments in excess of specified amounts; a Change of Control; the Final Order ceases to be in full force and effect; appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, or appointment under the Chapter 11 Cases of a custodian, receiver, liquidator, administrator, administrative receiver or other similar official for the Borrower or a substantial part of its assets; and the commencement of a Chilean liquidation or other such proceeding in Chile without the prior written consent of the Majority DIP Lenders, which proceeding has not been stayed, suspended or dismissed within 90 days.  In addition, an Event of Default shall also occur upon a termination of the Power Purchase Agreement between the Borrower and Minera Los Pelambres dated June 28, 2013 (as amended, restated, modified, supplemented, extended or amended and restated from time to time). |
| | "**Acceptable Plan**" means a Plan that, unless otherwise agreed in writing by the DIP Lenders, provides for repayment in full in cash of all DIP Obligations on the effective date of such Plan (excluding payment of contingent indemnity obligations). |
| | Upon an Event of Default, the DIP Lenders shall have all customary remedies and rights and any and all of the DIP Obligations shall accelerate and become immediately due and payable and any remaining Subsequent Availability shall terminate and no longer be available. |
| **Assignments and Participations:** | The DIP Lenders shall not be permitted to assign any portion of the DIP Facility to any other person (other than affiliates of the DIP Lender), without the consent of the Borrower and the Required Consenting Creditors, such consent not to be unreasonably withheld or delayed; <u>provided</u>, however, that no consent of the Borrower shall be required for an assignment if an Event of Default has occurred and is continuing. Upon a permitted assignment, such assignee will become a DIP Lender for all purposes of the DIP Loan Documents. |
| **Majority DIP Lenders:** | "**Majority DIP Lenders**" shall mean the DIP Lenders holding more than 50% of total commitments or exposure under the DIP Facility; *except that* with respect to such matters relating to the reduction of principal or fees, changes in interest rates, changes in maturity, changes in the pro rata sharing clause, the Majority DIP Lenders shall consist of each affected DIP Lender.  Notwithstanding the foregoing, in the event |

| | |
|---|---|
| | there is a single DIP Lender, all references herein to the Majority DIP Lenders shall be deemed to refer to such DIP Lender. |
| **Taxes:** | Any and all payments under the DIP Facility shall be made free and clear of and without deduction or withholding for any taxes, other than Excluded Taxes. "**Excluded Taxes**" shall include (a) in the case of a Foreign Lender (as defined below), any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender in excess of the Chilean Preferential Withholding Rate (as defined below)[, other than any withholding Tax imposed as a result of a Change in Law (to be defined) after the date on which such DIP Lender becomes a DIP Lender under the DIP Facility]; and (b) any tax (other than any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender at or below the Chilean Preferential Withholding Rate) that is imposed on an amount payable to the Administrative Agent or DIP Lender that is attributable to the Administrative Agent's or DIP Lender's failure to comply with the applicable tax covenant in the DIP Facility requiring the Administrative Agent and each DIP Lender to use reasonable efforts to comply in a timely manner with any certification, identification, information, documentation or other reporting requirements if such compliance is reasonably requested by the Borrower in writing and if such compliance is required by applicable law as a precondition to exemption from, or reduction in the rate of, deduction or withholding of any taxes for which the Borrower is required to pay any additional amounts pursuant to the DIP Facility. <br><br> "**Foreign Lender**" means any Lender that is organized under the Applicable Laws of a jurisdiction other than Chile and which is not domiciled or resident in Chile for purposes of Chilean taxation. <br><br> "**Chilean Preferential Withholding Rate**" means the reduced withholding tax rate imposed under Chilean law on payments of interest in accordance with Article 59 No. 1 letter (b) of Chilean income tax law (*Artículo 59 No. 1 (b) de la Ley de Impuesto a la Renta de Chile*). |
| **Indemnity/ Release/ Waiver; Expense:** | The Borrower will indemnify the Administrative Agent and the DIP Lenders (each, only in their capacity as such) and each of their affiliates and respective related parties (each an "**Indemnitee**"), and hold each of them harmless from and against any and all losses, claims, damages, liabilities, taxes, penalties and related expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee), or asserted against any Indemnitee by the Borrower or by any other person arising out of the DIP Facility and the financing contemplated thereby; provided that no Indemnitee will be indemnified for any such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from any |

|  | Indemnitee's gross negligence, bad faith or willful misconduct or material breach of any Indemnitee's obligations under this term sheet, the DIP Facility or the DIP Loan Documents

The Borrower will reimburse (a) the DIP Lenders for their reasonable and documented out-of-pocket transaction expenses in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents, including any amendment or waiver thereof, and (ii) enforcement of the DIP Loans Documents, in each case, limited in the case of counsel to the fees and expenses of one counsel in each jurisdiction) and the Specified Advisors; and (b) all reasonable and documents out-of-pocket expenses of the Administrative Agent associated with the administration of the DIP Facility. |
| **Governing Law / Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code) |

**Annex I**

| Interest Rate: | 4% payable in kind.<br><br>Interest will capitalize in arrears on the basis of a 360-day year, calculated on the basis of the actual number of days elapsed.  Interest will capitalize quarterly. |
|---|---|
| **Default Interest Rate:** | Automatically after the occurrence of any Event of Default, the applicable interest rate ("**Default Interest Rate**") shall be the applicable interest rate plus 2%, which shall accrue on all overdue principal and other DIP Obligations and which shall be due immediately and payable on demand; <u>provided</u>, <u>however</u>, that the Default Interest Rate shall not exceed the maximum interest rate permitted by applicable law |
| **Upfront Fee:** | 1.00% of (i) the portion of the DIP Commitments available upon entry of the Interim Order, payable in kind on the date of entry of the Interim Order, and (ii) the remaining portion of the DIP Commitments, payable in kind on the date of entry of the Final Order. |
| **Unused Commitment Fee:** | 0.75% *per annum* on the undrawn portion of the DIP Commitments, commencing upon entry of the Interim Order and due monthly in arrears and payable in kind. |

**ANNEX III**

**Restructuring Term Sheet –** terms to be effective immediately upon bankruptcy exit

| | |
|---|---|
| **New Senior First Lien Debt** | <ul><li>Borrower:  Alto Maipo SpA</li><li>Aggregate Amount: $1,050,000,000.<ul><li>To be structured as a combination of (i) notes with documentation customary for an Investment Grade corporate credit ("<u>1L Notes</u>") and (ii) project-finance style loans with documentation similar, except as the parties may otherwise agree, to the existing Second Amended & Restated Common Terms Agreement (the "<u>CTA</u>") dated as of May 8, 2018 (the "<u>1L Loans</u>" and, together with the 1L Notes, the "<u>New 1L Debt</u>").  Holders of the 1L Notes and lenders under the 1L Loans are together referred to as the "<u>New 1L Lenders</u>". The existing senior secured parties will elect (in their discretion) whether their New 1L Debt is documented as 1L Notes or 1L Debt.</li><li>All New 1L Debt will share the same economic terms and will rank pari passu with respect to repayment, prepayment, collateral sharing, and all other similar matters.</li></ul></li><li>Borrower will be required to go-to-market within 6 months after COD[7] to seek refinancing of the New 1L Debt.  At the option of the New 1L Lenders, the deadline for completing this mandatory go-to-market may be extended by an additional 6 months.<ul><li>Borrower will use commercially reasonable efforts to secure full refinancing of 100% of the New 1L Debt with this go-to-market, with additional details on process to be included in the definitive documentation.  Borrower will engage qualified third party professionals to support and facilitate the go-to-market effort.  Regular updates and disclosures will be made to the New 1L Lenders and the New 2L Lenders with respect to the timeline and process for the go-to market, with detailed terms and conditions to be agreed in definitive documents, including access to and copies of material documentation, projections and presentations, subject to limitations and non-disclosure restrictions customary for these type of transactions to be agreed.</li><li>The refinancing instrument must include the following terms:<ul><li>100% of the New 1L Debt then outstanding</li><li>first lien debt of the Borrower</li><li>scheduled amortization that will result in outstanding principal being reduced to $500 million by June 2040</li><li>all other terms equal or better for Alto Maipo when compared to the terms of the New 1L Debt</li><li>if interest rate is lower than 4%, refinancing instrument will be sized, and proceeds will be applied, so that proceeds prepay part of the New 2L Debt</li></ul></li></ul></li></ul> |

---

[7] COD to be defined in definitive documents by parties acting in good faith.

- – To the extent this go-to-market is unable to achieve a full refinancing of the New 1L Debt on the required terms specified above, any refinancing of the New 1L Debt must be on terms acceptable to the New 1L Lenders

- Collateral: same as existing collateral package under the CTA (including first priority perfected lien on all assets of Borrower, all shares in Borrower, and all shareholder/affiliate loans (other than Shared Services Loan) made to Borrower).

- Maturity: June 2040

- Payment Dates: January 15, April 15, July 15 and October 15, commencing on the first such date following the date that is the later of (x) Borrower's exit from bankruptcy and (y) the earlier of (i) COD or (ii) a date certain to be agreed.

- Interest rate: 4.0% per annum fixed, paid in cash on each Payment Date.  Interest begins to accrue on the date the Borrower exits bankruptcy.
- Default interest rate: additional 2%.

- Mandatory annual debt service: annual debt service (including scheduled amortization and cash payments of interest) in an aggregate amount of $62.4 million per calendar year, and which will reduce the outstanding principal amount of the New 1L Debt to $500 million no later than June 2040.  Scheduled amortization in 2022 will be pro-rated based on the number of months remaining in 2022 after the later of (x) Borrower's exit from bankruptcy and (y) the earlier of (i) COD or (ii) a date certain to be agreed.  Any prepayment of the New 1L Debt with proceeds of the CNM arbitration award will be in addition to the mandatory scheduled amortization.
- Mandatory Prepayments: proceeds of CNM Arbitration (as specified below); expropriation; total loss or other significant insured event where insurance proceeds are not applied to repair/restore; significant asset dispositions outside of the ordinary course.

- Cash sweep:  subject to (1) Exit Financing and New 2L Debt having been repaid in full and (2) cash on hand of the Borrower in the amount of $25 million; all excess cash will be applied to prepay the New 1L Debt.  Cash sweep will be paid April 15 and October 15. Cash sweep will be calculated on the same terms agreed for the New 2L Debt.

- No prepayment penalties.

- At the request of the New 1L Lenders holding 1L Notes, the Borrower will cause a rating to be obtained for the 1L Notes, with further details to be included in the definitive documentation.

- Covenants and Events of Default for 1L Notes: similar to investment grade corporate credits of this type.

- Covenants and Events of Default for 1L Loans: similar to CTA, except as the parties may otherwise agree. Obligations under Share Retention Agreement (as defined in CTA) will apply.
- Subject to U.S. bankruptcy rules, New 1L Debt will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Deferred Payment Agreement (as defined in the CTA).
- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 1L Lenders.

- Assignment:

  – For 1L Loans - same as in existing documentation unless otherwise agreed.
  – For 1L Notes – restrictions in existing documentation will not apply.
- Voting Rights: to be addressed in Intercreditor Agreement.  Any New 1L Debt acquired or held by a Borrower affiliate will not have any voting rights.

---

- Borrower:  Alto Maipo SpA

- Amount: estimated at $995,314,442 (equal to the amount of prepetition secured claims, including the liquidated amount of the interest rate swaps, <u>less</u> the aggregate principal amount of the New 1L Debt)[8] (the "<u>New 2L Debt</u>"). Lenders under the New 2L Debt are referred to as the "<u>New 2L Lenders</u>".

- Collateral: second lien on all assets included in the collateral package for the New 1L Debt.
- Prior to the earliest of (such date, the "Applicable Date") (i) the go-to-market on the New 1L Debt, (ii) the New 1L Debt being otherwise refinanced in accordance with the definitive documents, (iii) a credit rating being obtained in respect of the New 1L Debt, following a request of the New 1L Lenders for such credit rating, (iii) twelve months after COD, and (iv) a calendar date to be agreed, the New 2L Debt will be secured by a first priority lien (ranking pari passu with the lien securing the New 1L Debt) on all physical assets of the Borrower.  This first priority lien benefiting the New 2L Debt will be automatically released on the Applicable Date.

- Maturity: October 15, 2042, extendable at each New 2L Lender's individual option to October 2052.

- Payment Dates same as cash sweep dates.

- Interest rate: 2% per annum fixed, paid in cash or capitalized (PIK) based on available cash flow, subject to increase by the Upside Fee.  Interest begins to accrue on the date the Borrower exits bankruptcy.
- Default interest rate: additional 2%.

---

...ted to include the total amount of prepetition claims after the interest rate swaps have been liquidated, and to reflect accrued interest

- Upside Fee: after each calendar year end, 50% of the difference (if positive), between actual Cash Flow Available for Debt Service[9] as defined in the CTA with necessary conforming changes ("<u>CFADS</u>") and projected CFADS (per the Borrower's base case financial model dated October 26, 2021, attached as Exhibit A to this Term sheet) will be payable to the New 2L Lenders as additional interest until the New 2L Debt has been fully repaid or is converted to shares in the Borrower.

  - Payment of Upside Fee is uncapped, but may never be less than zero.
  - Upside Fee for each calendar year will be earned on December 31st (or, if New 2L Debt matures in 2052, on the maturity date), such that if the New 2L Debt is fully repaid on or prior to December 30th of any calendar year (or the maturity date in 2052), no Upside Fee would be payable for that year.
  - Commencing in January 2043, any Upside Fee is reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042.

- Scheduled Amortization: None.

- Cash Sweep: 100% of excess cash flow, reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042. Excess cash flow will be calculated as all cash of the Borrower after (i) payment of all operation and maintenance expenses, permitted capital expenditures, and other permitted Project-related expenses to be agreed in accordance with the then-effective annual budget, (ii) payment of all scheduled debt service and mandatory prepayment on the Exit Financing and New 1L Debt (or any refinancing of the Exit Financing and New 1L Debt), and (iii) cash on hand of the Borrower in the amount of $25 million. Cash sweep will be paid April 15 and October 15. When cash sweep is paid, an estimated amount will be reserved (and excluded from the cash sweep) based on the projected Upside Fee calculation for the then-current calendar year.

- No prepayment penalty

- Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid), subject to a cap of 20% of total outstanding shares in the Borrower (after giving effect to this debt-to-equity conversion) in October 2042 and no cap in October 2052. The converted shares will have rights to be agreed in the definitive documents.

  - For each New 2L Lender who does not elect to extend the maturity of its New 2L Debt to 2052, the percentage of shares in the Borrower that it will receive will be calculated as follows: (i) the percentage of shares (subject to a 20% cap) that would have corresponded to all New 2L Lenders if 100% of New 2L Debt matured at October 2042 and the Shared Services Loan was converted to shares at October 2042, <u>multiplied by</u> (ii) the percentage of

similar to the CTA, unless otherwise agreed, with changes to capture all revenue of Borrower other than (x) proceeds of the CNM

| | |
|---|---|
| | the outstanding principal amount of New 2L Debt held by such New 2L Lender who did not extend its New 2L Debt maturity date over the total outstanding principal amount of all New 2L Debt.<br>– The definitive documents will include provisions to equitably address the value of shares held by New 2L Lenders whose New 2L Debt converts in 2042 in the scenario where remaining New 2L Debt converts to shares in 2052.<br><br>• Covenants and Events of Default for New 2L Debt: similar to CTA, except as the parties may otherwise agree.<br>• Subject to U.S. bankruptcy rules, New 2L Debt will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Financing Agreement (as defined in the CTA).<br>• All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 2L Lenders.<br>• Assignment: same as in existing documentation unless otherwise agreed.[10]<br>• Voting Rights: to be addressed in Intercreditor Agreement.  Any New 2L Debt acquired or held by a Borrower affiliate will not have any voting rights. |
| **Shared Services Loan** | • All intercompany payments due to AES Andes (or any permitted transferee) by the Borrower pursuant to the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the CTA), and that are currently deferred under the terms of those contracts until the existing senior debt discharge date, will be paid in the form of a loan (the "Shared Services Loan").  Those intercompany payments will be paid in the form of a disbursement under the Shared Services Loan.<br>• Interest Rate: same as New 2L Debt (including any Upside Fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.<br>• Maturity: latest date of scheduled maturity for any New 2L Debt.<br>• Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid).<br><br>– If the maturity of all New 2L Debt is extended to 2052, the Shared Services Loan shall mature in 2052 and convert into a percentage of the shares equal to the ratable share of the New 2L Debt balance plus the Shared Services Loan balance, in each case outstanding at the time.  If all New 2L Debt converts to equity in 2042, the |

---

[10] Borrower would not have a consent right on transfers of New 2L Debt for any New 2L Lenders who elect to have their New 2L Debt documented in the form of notes with the same covenants as the 1L Notes. .If any New 2L Lender elects  the notes option, this debt will be documented in separate instruments, each of which will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters. Assignment restrictions in existing documentation will not apply to New 2L Debt that takes the form of notes with the same covenants as the 1L Notes.

| | |
|---|---|
| | Shared Services Loan will mature in 2042 and its pro rata share of shares in the Borrower will be subject to an 80% equity floor.<br>– The definitive documents will include provisions to equitably address the conversion of the Shared Services Loan to shares in the Borrower where a portion of the New 2L Debt converts to shares in 2042 and the remainder of New 2L Debt converts to shares in 2052. |
| **Hedge Agreements** | • All Hedging Agreements with Hedging Counterparties (in each case, as defined in the CTA) shall be terminated, and any amounts due thereunder shall be converted into New 1L Debt and New 2L Debt on a pro rata basis, based on the mark-to-market value on the date of termination as determined in accordance with the terms of the Hedging Agreements. |
| **Strabag** | • To receive (a) an allowed, secured, perfected $391.5 million "Supplier Deferred Payment" claim entitled to *pari passu* treatment with other prepetition first-lien claims pursuant and subject to confirmation of the Plan of Reorganization contemplated hereby, allocated to New 1L Debt and New 2L Debt in the same proportion as the other prepetition first-lien claims, irrespective of whether the condition(s) to payment of the Supplier Deferred Payment under the Tunneling Contract have been satisfied as of the Plan Effective Date, *provided, however*, that if such condition(s) to payment have not been satisfied as of the Plan Effective Date, Strabag's pro rata share of the New 1L Debt and New 2L Debt shall be held in escrow pending satisfaction of such condition(s); (b) the following amounts to be paid in cash as trade payables for construction costs (less any payments on account of these items made to date): (i) December installment (i.e., final installment due to Strabag) of $5 million due on December 1st, (ii) (A) $761,030 upon completion of  signed Change Order 1, (B) $326,240 upon completion of signed Change Order 2, and (C) $53,827 upon completion of signed Change Order 4, and (iii) $10 million upon substantial completion of Volcan (Milestone F); and (c) upon receipt, $6,268,020.99 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152).<br>• Notwithstanding anything to the contrary herein, Strabag shall continue to be obligated to pay Alto Maipo in cash for power purchased by Strabag pursuant to Section 2.13.2 of the Tunneling Contract, including any amounts accrued but unpaid pre-petition.<br>• All other claims and counterclaims existing as of the date of execution of this term sheet (including construction claims, change order claims, future bonuses, etc.) to be mutually waived.<br>• All subordinated debt and common equity held and to be earned by Strabag through COD to be discharged.<br>• Tunneling Contract to be assumed, subject to mutual waiver of all other claims (except as agreed) and agreement to the restructuring term sheet<br>• Any future Changes initiated by the Borrower must be approved by the New 1L Lenders and New 2L Lenders (provided that any New 1L Debt and New 2L Debt held by Strabag will be excluded from voting on such approval). All future Changes that are within scope of the Tunneling Contract shall be performed by Strabag without further |

|  | compensation in cash or otherwise. Subject to receiving approval from the New 1L Lenders and New 2L Lenders as specified above, Borrower shall issue a Change Order and pay Strabag in cash for all future Changes that are outside the scope of the Tunneling Contract.  The Borrower and Strabag shall work together in good faith to negotiate a streamlined process for resolving Change Disputes.  Pending agreement on such streamlined process, in the event that Strabag disputes whether a Change is within or outside of the scope of the Tunneling Contract (a "<u>Change Dispute</u>"), the Borrower and Strabag shall follow the procedures set forth in the Tunneling Contract to resolve such dispute.<br>– Strabag agrees that existing change orders shall be compensated only through the consideration described herein.<br>• Borrower shall pay to Strabag, as adequate protection, $210,000 for Strabag's attorneys' fees incurred in connection with its secured claim.<br>• Strabag shall have the same rights as Senior Lenders under the amended and restated Intercreditor Agreement (other than on matters related to the Tunneling Contract, where Strabag will not have voting rights). |
|---|---|
| **Other Unsecured Claims** | • Subordinated debt (including all Subordinated Loans as defined in the CTA): to be discharged.<br>• Voith: contract to be assumed as amended pursuant to settlement agreement, subject to court approval.<br>• Other unsecured claims: to be discharged. |
| **Equity** | • Existing shares in Borrower to be cancelled.<br>• AES Andes will receive 100% of the reorganized shares in the Borrower, subject to conversion of New 2L Debt and Shared Services Loan (if applicable).<br>• No dividends or distributions until Exit Financing, VAT Financing, New 1L Debt and New 2L Debt have been repaid in full. |
| **CNM Arbitration** | • Application of proceeds:<br><br>– First, to repay any DIP or Exit Financing amount outstanding<br>– Second, to repay $50 million of New 1L Debt (inverse order of maturity); after payment, New 1L Debt balance will amortize to $450 million at maturity.<br>– Third, to repay New 2L Debt |
| **Battery Business / Related Party Transactions** | • Undertakings to ensure that any development of battery storage or similar business with energy generated by Alto Maipo, using water rights, land rights or other infrastructure of Alto Maipo, or otherwise associated with the Alto Maipo project (i) must be approved by the New 1L Lenders and the New 2L Lenders, and (ii) will only be undertaken with the objective of increasing value to the Borrower. |

| | |
|---|---|
| | • Any transaction (including any modification to existing contract terms) with related companies of the Borrower must be approved by the New 1L Lenders and the New 2L Lenders. |
| **VAT Financing Backstop** | • Lenders will use their commercially reasonable efforts to arrange a committed VAT financing within 30 days from the Chapter 11 filing date to pay the full amount of the VAT due upon issuance of the invoice for the Supplier Deferred Payment (as defined in the CTA) by Strabag.  It is expected that some (but not all) of the existing senior lenders will provide commitments for VAT financing. Lenders' financial advisors have been informed that certain lenders have approvals for commitments, subject to customary conditions, as of the date hereof in an aggregate total amount of $[33] million.<br>• Terms substantially similar to those contemplated for VAT Loan under and as defined in the CTA.<br>• Tenor: 12 months.<br>• No Up-Front Fee.<br>• Interest Rate: 5% per annum, calculated over the outstanding amount of the VAT Loan in US Dollars.<br>• Definitive documents will address mechanics around currency exchange risk related to funding and repayment of the VAT Loan. |
| **DIP Financing** | • Size: $50 million Revolving Credit Facility<br><br>• Separate debt basket to address VAT expenses<br><br>• Available to the extent required to maintain minimum cash on hand of Borrower during bankruptcy case of $10 million<br><br>• Rate and fees accrue through separate account and shall not impact availability<br><br>• Interest Rate: 4.0%, payable in kind<br><br>• Unused Fee: 0.75% on undrawn portion, payable in kind<br><br>• Fees: 1.00% origination fee, payable in kind<br><br>• Maturity: 12 months from Chapter 11 filing date<br><br>• Milestones and other terms are included in separate DIP Financing term sheet |

| | |
|---|---|
| **Exit Financing** | • Purpose: repay DIP Financing as a condition to Borrower exiting bankruptcy<br><br>• Lenders: DIP Financing provider<br><br>• Maturity: 2 years post-emergence<br><br>• Scheduled Amortization: equal quarterly installments<br><br>• Payment Dates: Quarterly, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.<br><br>• Rank: super-senior first-lien on all assets (ranks senior to New 1L Debt), other than proceeds of reimbursement of VAT that was financed with the VAT Financing.<br><br>• Interest rate: 4.0%, cash pay on Payment Dates.<br><br>• Cure Periods: Exit Financing lender will not be entitled to exercise any remedies following an event of default on the Exit Financing until a cure period of at least 120 days has elapsed.<br><br>• New 1L Lender & New 2L Lender Rights:<br>   – New 1L Lenders and New 2L Lenders will have a right (but not an obligation) to cure or cause to be cured on behalf of Borrower.<br>   – New 1L Lenders and New 2L Lenders will have a right to purchase (directly or through an affiliate) their pro rata share of the Exit Financing at par at any time.  If any New 1L Lender or New 2L Lender declines to purchase its pro rata share of Exit Financing, other New 1L Lenders and New 2L Lenders may increase their share.<br>• No cash fee for roll-over<br>• Concessions on exit financing commitment considered as part of AES Andes new value contribution |

## Exhibit A
## CFADS Calculation from October 26, 2021 Borrower Base Case Financial Model

| USD million | 2022 [a] | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 57,225,230 | 130,495,469 | 102,893,412 | 103,967,235 | 104,927,608 | 107,900,969 | 110,722,532 | 111,020,930 | 112,498,092 | 115,652,187 | 117,802,122 | 120,261,569 |

| USD million | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 122,452,323 | 125,069,008 | 131,138,009 | 132,889,488 | 135,477,295 | 139,494,182 | 110,274,347 | 73,426,163 | 75,388,676 | 77,151,354 | 78,690,780 | 80,340,910 |

| USD million | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 [b] |
|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 82,024,812 | 83,752,525 | 85,454,217 | 87,074,358 | 88,809,930 | 91,576,476 | 89,410,564 |

## <u>EXHIBIT B TO STRUCTURING SUPPORT AGREEMENT</u>

## FORM OF TRANSFER AGREEMENT

     The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of November 16, 2021, by and among the Company, the Shareholders, the Sponsor and Consenting Creditors, including the transferor (the "<u>Transferor</u>") to the Transferee of any Alto Maipo Obligations, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed: _____

_____
Print name of Transferee

_____
Name:
Title:
Address:
_____

_____

_____
Attention:
_____
Telephone:
_____
Facsimile:
_____

## Transferor's Principal Amount Held

| *Alto Maipo Obligation* | *Amount* |
|---|---|
| | US$ |