## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.:  21-11507 (    ) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM STATUS PURSUANT TO 11 U.S.C. §§ 363 AND 364, (III) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Alto Maipo SpA ("Alto Maipo" or the "Company") and Alto Maipo Delaware LLC ("Alto Maipo Delaware"), as debtors and debtors in possession (together, the "Debtors") by and through their undersigned counsel, submit this motion (the "Motion"),[2] for the entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order")[3] pursuant to sections 105, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):[4]

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration (as defined below).

[3]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined below).

[4]    All descriptions of the terms of the proposed debtor-in-possession financing in this Motion are provided for convenience only and are qualified in their entirety by reference to the definitive DIP Loan Documents, which shall

i.      authorizing the Debtors to obtain postpetition financing in the form of a superpriority revolving loan (the "<u>DIP Facility</u>") in the aggregate principal amount of up to $50 million (the "<u>DIP Commitments</u>" and all amounts extended thereunder, as increased by capitalized interest and fees, the "<u>DIP Loans</u>") pursuant to the terms and conditions of that certain Super-Priority Debtor-in-Possession Revolving Loan Agreement dated as of [•], 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"),[5] by and among Alto Maipo Delaware, as borrower (the "<u>Borrower</u>"), Alto Maipo, as guarantor (the "Guarantor"), AES Andes S.A., as lender ("<u>AES Andes</u>" or the "<u>Lender</u>"), and AES Andes S.A., as administrative agent (the "<u>DIP Agent</u>") for and on behalf of itself and the other lenders party thereto (collectively, including the DIP Agent, the "<u>DIP Lenders</u>");

ii.     authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Credit Agreement and the DIP Budget (as defined below), the "<u>DIP Loan Documents</u>"), by and among the Borrower, the DIP Agent, and the DIP Lenders, and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

iii.    granting the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents to the DIP Agent and the DIP Lenders (collectively, and including all "DIP Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>") allowed superpriority administrative expense claim status in these Chapter 11 Cases and any successor case;

iv.    authorizing the Debtors to use proceeds of the DIP Facility (the "<u>DIP Loan Proceeds</u>") solely in accordance with the Interim Order, the DIP Loan Documents and the DIP Budget (as defined in the DIP Credit Agreement);

v.     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such become due, including the reasonable and documented fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Loan Documents;

vi.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

vii.   scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in this Motion and approving the form of notice with respect to the Final Hearing; and

---

control in the event of any inconsistency. Capitalized terms used in this summary, unless otherwise defined in the Motion, have the meanings used in the applicable DIP Loan Documents.

[5]     In accordance with the requirements of the DIP Term Sheet, the Debtors will consult with the Required Consenting Lenders as to the form and substance of the DIP Credit Agreement. The Debtors intend to file the DIP Credit Agreement with the Court prior to the hearing on this Motion.

vii.      scheduling a final hearing (the "Final Hearing") to consider the relief requested in this Motion and approving the form of notice with respect to the Final Hearing; and

viii.     granting related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").

## Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested in this Motion are sections 105, 362, 363, 364, 503, and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 4001-2.

## General Background

3.      On November 17, 2021 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (this "Court").  As of the Petition Date, the Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no committees have been appointed or designated at this time.

4.      Alto Maipo is a special purpose company, incorporated under Chilean law for the purpose of developing, constructing, and operating a run-of-river hydroelectric energy project in the Santiago Metropolitan Region of Chile, approximately 30 miles southeast of the city of Santiago. The hydroelectric energy project that is presently under construction (the "Project") will consist of two run-of-river hydroelectric plants (the "Hydroelectric Plants") which, once completed, will provide significant zero-emissions energy to Chile's electric grid.

5.      As set forth more fully in the First Day Declaration, which is incorporated herein by reference, the energy market that Alto Maipo will enter into next year is not the same energy market that Alto Maipo projected would exist upon its initial Commercial Operation Date (the "COD") when construction began in 2013. Since that time, increased generation capacity has driven down electricity prices in Chile, such that spot prices at which Alto Maipo could sell power are now less than half of what they were in 2013. Meanwhile, climate change has significantly impacted the hydrology of the Maipo Valley, where the Project is being constructed, and lower precipitation levels reduce in turn the amount of power that the Project can produce. As a result, Alto Maipo can no longer rely on its prior revenue projections, which assumed economic and environmental factors that are no longer in place. In order to right-size their capital structure to meet these market challenges, and in light of a looming liquidity shortfall, the Debtors commenced these Chapter 11 Cases to ensure that they can complete construction of this hydroelectric project and generate renewable energy for many years to come.

**The Debtors' Prepetition Secured Debt**

6.      _First Lien Indebtedness_. Alto Maipo is the borrower under a series of prepetition term loans (the "Term Loans" and the lenders thereunder, the "Term Lenders"), all of which are secured by substantially all assets of the Company (the "Prepetition Collateral") and rank *pari passu* as between each other. Itaú Corpbanca S.A. serves as administrative agent for the Term

Loans. The Term Lenders include certain international development banks, local and international commercial banks, and syndicated lenders, including (i) the U.S. International Development Finance Corporation, (ii) the Inter-American Development Bank, (iii) Banco de Crédito e Inversiones, (iv) Banco Itaú, (v) DNB ASA, (vi) Deutsche Bank AG, (vii) UBS Group AG, (viii) Moneda Asset Management, (ix) Finepoint Capital, (x) Santana Capital Group, (xi) Clover Capital, Ltd., and (xii) Regera Sàrl. The Term Lenders collectively hold $1.471 billion in outstanding senior secured term loan debt.

7.     _Strabag Construction Agreement_.   Alto Maipo is party to a construction agreement with Strabag (the "Strabag Construction Agreement"), under which:

a.   Strabag holds a secured claim of up to $392 million against the Debtors, payable upon the fulfilment of certain contractual conditions.

b.   To date, Strabag has asserted secured claims of no less than $131 million against the Debtors (the majority of which is payable in shares of Alto Maipo), and the Debtors hold claims of up to approximately $36 million against Strabag.

8.     _Interest Rate Swaps_.   Certain of the Term Loans are also subject to interest rate swaps (the "Swaps" and together with the Term Loans, the "Prepetition Secured Debt") held by the originating banks as well as KfW IPEX-Bank GmbH (the "Swap Counterparties" and together with the Term Lenders, the "Prepetition Secured Parties"). The total mark-to-market value of the Swaps, in the event of their termination, is approximately $164 million (as of October 25, 2021). The Swaps are also secured by the Prepetition Collateral and rank _pari passu_ with the Term Loans.

**The Debtors' Prepetition Unsecured Debt**

9.     Alto Maipo is party to an agreement with Voith Hydro Ltda. and Voith Hydro S.A. (together, "Voith"), under which Voith has to date asserted contingent unsecured claims of no less than $20 million against the Debtors, and the Debtors hold contingent claims of approximately $29 million against Voith.

10.     As described in the First Day Declaration, Alto Maipo was party to an agreement with CNM under which CNM had asserted contingent unsecured claims of up to $166 million (exclusive of legal fees and expenses) against Alto Maipo.  Alto Maipo, in turn, held contingent claims of up to $236 million against CNM.  The CNM claims were in arbitration proceedings in Chile until October 2021.  On November 5, 2021, the Company received the decision of the arbitral panel, which awarded net damages of $106,889,431.86 to the Company.

11.     The Debtors are party to certain unsecured and subordinated debt instruments which are held by AES Andes and Strabag (total amounts owed thereunder, the "Subordinated Debt"), and which is pledged as security for the Prepetition Secured Debt.  The Subordinated Debt is subordinated and junior in right of payment to the repayment in full of the Prepetition Secured Debt and other amounts payable under the Project's financing documents.  As of the Petition Date, the total principal amount of Subordinated Debt currently outstanding as of COD is $960 million, of which AES Andes currently holds $867 million and Strabag holds $94 million.

**Terms of the DIP Facility[6]**

12.     In accordance with the disclosure required by Bankruptcy Rule 4001(b) and (c) and Local Rule 4001-2(a), the principal terms of the DIP Facility are as follows:

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
| --- | --- |
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Borrower, Alto Maipo Delaware LLC, a limited liability company, organized under the laws of the state of Delaware, as debtor in possession in these Chapter 11 Cases. |

---

[6]     The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Loan Documents, which shall control in the event of any inconsistency.  Capitalized terms used in this summary, unless otherwise defined in the Motion, have the meanings used in the applicable DIP Loan Documents.

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Alto Maipo SpA. a *sociedad por acciones* duly organized and validly existing under the laws of Chile, a Chapter 11 debtor-in-possession, as debtor in possession in these Chapter 11 Cases.<br><br>The Borrower together with the Guarantors are collectively referred hereto as the "Obligors." |
| **Administrative Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | AES Andes S.A. |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | DIP Lender, AES Andes S.A., as Lender. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>**Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B) | *DIP Budget:* Within five (5) Business Days following the end of each calendar month, the Borrower shall deliver to the Administrative Agent the Updated DIP Budget subject to the approval of the Majority DIP. Each Updated DIP Budget shall include a reconciliation of the actual results for the months that are covered in the DIP Budget and have already elapsed.<br><br>*Monthly Reporting*: Within five (5) Business Days following the end of each calendar month, the Obligors shall deliver to the DIP Agent a report detailing the estimated administrative claims in respect of the Obligors' activity and operations on an ongoing basis, which shall report payments due for the prior months' utilization.<br><br>Variance Covenant:  None. |
| **Term**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M) | The DIP Facility shall mature (the "Maturity Date") and will be immediately due and payable on the earliest to occur of any of the following: (a) twelve (12) months after entry by the Bankruptcy Court of the Final Order; (b) 35 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 35-day period; (c) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default (as defined in the DIP Term Sheet); (d) the effective date (the "Effective Date") of the plan of reorganization (the "Plan") confirmed in these Chapter 11 Cases. |

| Bankruptcy Code/<br>Local Rule | Summary of Material Terms |
|---|---|
| | Upon the Maturity Date, the DIP Facility and the DIP Commitments thereunder shall terminate and all outstanding DIP Obligations shall become automatically due and payable in full in cash. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order provides for lifting of the automatic stay to allow the DIP Lenders to exercise to exercise all rights and remedies provided for in the DIP Loan Documents and the Interim Order.<br><br>Interim Order ¶ 14. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | Notwithstanding anything in the Interim Order, any DIP Loan Document, or any other order of this Court to the contrary, the rights and claims of the DIP Lender(s), including the DIP Superpriority Claims, shall be subject and subordinate in all respects to the payment of the Carve Out.  As used in this Interim Order, "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, as set forth in section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by the Debtors' Professionals (such fees the "Allowed Debtors' Professional Fees") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by the Committee Professionals (such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtors' Professional Fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) Allowed Debtors Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $500,000; and (v) Allowed Committee Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| | whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $50,000 (the amounts set forth in clause (iv) and (v), the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Borrower, its lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Loan Documents, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>Interim Order ¶ 8(a). |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A) | The DIP Facility will provide for a revolving loan facility in an aggregate original principal amount of US$50 million.<br><br>Borrowings under the DIP Facility shall be available: (i) on the date of entry by the Court of the Interim Order, up to US$20 million (minus the applicable stamp tax); and (ii) on the date of entry by the Court of the Final Order, the undrawn portion of the DIP Facility will be available in a single draw or in multiple draws in minimum amounts of US$1 million each minus the applicable stamp tax.<br><br>Interim Order pmbl. ¶(i) and ¶ 1(b). |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | A per annum rate of 4.0% due quarterly and payable in kind, as the Borrower shall elect in its sole discretion, which shall accrue on the outstanding principal amount of the DIP Loans from the date of issuance thereof.<br><br>*See* DIP Term Sheet, Annex I |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(H) | The Borrower shall comply with the following deadlines (unless waived by the Majority DIP Lenders):<br><br>• A restructuring support agreement with relevant case constituents and acceptable to the DIP Lenders approved by the Bankruptcy Court by January 31, 2022. |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
|  | • The Debtors shall file an Acceptable Plan (as defined in the DIP Term Sheet) no later than three (3) months following the Petition Date.<br><br>• The Court shall have entered an order confirming the Plan no later than six (6) months following the Petition Date.<br><br>• The effective date of the Plan confirmed in these Chapter 11 Cases and emergence of the Debtors from Chapter 11 no later than eight (8) months following the Petition Date.<br><br>• Certain construction milestones.<br><br>*See* DIP Term Sheet, "**Milestones**" |
| **Repayment Features**<br><br>Local Rule 4001-2(a)(i)(I) | **Voluntary Prepayment**<br><br>The Borrower may prepay any DIP Obligations in whole or in part in an aggregate minimum amount of US$1 million and integral multiples of US$500,000 in excess thereof.<br><br>The Borrower may terminate in whole or permanently reduce in part, any DIP commitments that remain undrawn at the time of such termination or reduction, provided that such partial reduction shall be in an aggregate minimum amount of US$1 million and integral multiples of US$100,000 in excess thereof.<br><br>**Mandatory Prepayment**<br><br>Prior to the Maturity Date, the Borrower shall make mandatory prepayments of DIP Obligations (and the DIP Commitments shall be permanently reduced in a corresponding aggregate amount) upon receipt by the Borrower of net proceeds from the following (in each case, subject to certain customary baskets to be negotiated in the definitive DIP Loan Documents and customary reinvestment rights, as applicable):<br><br>i.  *Incurrence of Indebtedness*: Prepayments in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower that is not otherwise explicitly permitted under the DIP Facility.<br><br>ii.  *Asset Dispositions; Extraordinary Receipts*: Prepayments in an amount equal to 100% of the net cash proceeds received from the sale of any asset outside of the ordinary course of |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| | business or from any other receipts outside of the ordinary course of the business (including insurance proceeds). |
| | iii. *Excess Cash*. Prepayments in an amount equal to 100% of excess cash (to be defined, in a mutually agreed upon manner, as available cash in excess of US$10,000,000 (but deducting amounts required to be paid by the Borrower in the next calendar month according to the DIP Budget); hereinafter referred to as the "**Excess Cash Threshold**") at the end of each calendar month period; |
| | iv. *CNM* Arbitration. Prepayments in an amount equal to 100% of net proceeds paid pursuant to CNM award or any disposition of the rights under that award; and |
| | <u>provided</u>, that, in each case (except with respect to paragraph (iv)), any such prepayment shall be subject to any priority of any other creditor with a properly secured lien existing immediately prior to the Petition Date, as applicable. |
| | *See* DIP Term Sheet, "**Voluntary Prepayments**," "**Mandatory Prepayments**." |
| **Fees** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K) | **Upfront Fee** 1.0% of (i) the portion of the DIP Commitments available upon entry of the Interim Order, payable in kind on the date of entry of the Interim Order, and (ii) the remaining portion of the DIP Commitments, payable in kind on the date of entry of the Final Order. **Unused Commitment Fee** 0.75% *per annum* on the undrawn portion of the DIP Commitments, commencing upon entry of the Interim Order and due monthly in arrears and payable in kind. **Professional Fees of DIP Lender(s)** The Debtors shall timely pay and otherwise reimburse the DIP Lender(s) for (a) their reasonable and documented costs, fees, and expenses in connection with the preparation, negotiation, execution and administration of the DIP Loan Documents, including any amendment or waiver thereof, which shall include, without limitation, any fees of the DIP Agent's attorneys and advisors (and separate from the DIP Lender), and (b) all reasonable and documented out-of-pocket expenses of the DIP Agent (if appointed, |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(iii) | all disbursements shall be consistent with the provisions of the DIP Budget.  The DIP Budget is attached hereto as Exhibit C.<br><br>The Debtors have reason to believe that the DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the DIP Budget.<br><br>*See* DIP Term Sheet, "**DIP Budget and Other Financial Reporting**" |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(G) | All DIP Obligations shall at all times be entitled to a super-priority administrative expense claim against the Debtors ("**DIP Superpriority Claim**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to the Interim Order, subject only to the Carve-Out.<br><br>The DIP Superpriority Claims shall survive any conversion of any of these Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of these Chapter 11 Cases.<br><br>Subject only to the Carve-Out, the DIP Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors (excluding Avoidance Actions (to be defined) but including any proceeds or property recovered from Avoidance Actions). |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(M) | Usual and customary for financings of this type.  *See* "Term" above.<br><br>*See* DIP Term Sheet, "**Events of Default**." |
| **Indemnification**<br><br>Bankruptcy Rule | The Final Order shall include customary releases and exculpation of the DIP Lenders (only in their capacity as such) and their representatives (only in their capacity as such). |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(M) | |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | The Final Order shall include customary releases and exculpation of the DIP Lenders (only in their capacity as such) and their representatives (only in their capacity as such).<br><br>*See* DIP Term Sheet, "**Indemnity/Release/Waiver; Expenses**." |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | Conditions Precedent to Initial Draw.<br>The DIP Term Sheet includes conditions to initial borrowing that are customary and appropriate for similar debtor-in-possession financings of this type.  In addition, the DIP Credit Agreement includes a condition to the initial draw that minimum cash available to the Debtors must be less than $10 million.<br><br>Conditions Precedent to Subsequent Draws.<br>The DIP Term Sheet includes conditions to full availability that are customary and appropriate for similar debtor-in-possession financings of this type.  In addition, the DIP Credit Agreement includes a condition to subsequent draws that minimum cash available to the Debtors must be less than $10 million.\<br><br>Conditions Precedent to Each Draw.<br>The DIP Term Sheet includes conditions to each draw that are customary and appropriate for similar debtor-in-possession financings of this type.  In addition, the DIP Term Sheet includes a condition to each draw borrowing that minimum cash available to the Debtors must be less than $10 million.<br><br>*See* DIP Term Sheet, "**Conditions Precedent to Initial Draw**," "**Conditions Precedent to Subsequent Draws**," and "**Conditions Precedent to Each Draw**." |
| **Adequate Protection/Identity of Each Entity with Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii), (b)(1)(B)(i), (iv) | None. |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| **Waiver or Modification of Right to File a Plan**<br><br>Bankruptcy Rule 4001(c)(1)(B)(v) | None. |
| **Section 506(c) and 552(b) Waivers**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(V) 4001-2(a)(i)(X) | All payments or proceeds remitted to the DIP Agent on behalf of any DIP Lender(s) pursuant to the DIP Loan Documents, the provisions of the Interim Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).<br><br>Interim Order ¶ 6. |
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | Upon the occurrence of an Event of Default and during the continuance thereof: (i) the DIP Lender(s) shall be authorized to discontinue honoring any pending or future request for DIP Loan Proceeds; (ii) the DIP Agent may in its discretion file with the Court and serve upon counsel for the Borrower, counsel for the Creditors' Committee, if any, and the U.S. Trustee a written notice (a "<u>Default Notice</u>") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) effective five (5) business days after the Default Notice (the "<u>Remedies Notice Period</u>") is filed, the DIP Agent shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Borrower or any other interested party, to (A) demand payment and enforce collection of all DIP Obligations, as applicable, and (B) otherwise exercise all rights and remedies available to it under the DIP Credit Agreement or the DIP Loan Documents, as applicable, on account of such Event of Default.<br><br>Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph, the DIP Agent may, in its discretion, take all other actions and exercise all other rights and remedies under the DIP Loan Documents, this Interim Order and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations and otherwise enforce any of the provisions of this Interim Order. |

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
|  | Interim Order ¶ 13(a). |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(U) | <u>Proceeds of Avoidance Claims</u>.  For the avoidance of doubt, the DIP Superpriority Claims shall have recourse to all proceeds (the "<u>Avoidance Proceeds</u>") of all of the Borrower's claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in the following sentence), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code (the "<u>Avoidance Claims</u>").  Following the entry of the Interim Order, the DIP Superpriority Claims shall have recourse to the Avoidance Proceeds of all of the Borrower's claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Loan Proceeds..<br><br>Interim Order ¶ 4(b). |

### Local Rule 4001-2 Disclosures

13.    In accordance with Local Rule 4001-2(a)(i), the Debtors disclose the below provisions:

a.  Local Rule 4001-2(a)(i)(C), Local Rule 4001-2(a)(i)(X)—Limitation on Power or Obligations of the Court or Other Parties.  There are no such provisions.

b.  Local Rule 4001-2(a)(i)(N)—Cross-Collateralization Provision.  There is no such provision.

c.  Local Rule 4001-2(a)(i)(O)—Rollup Provision.  There is no such provision.

d.  Local Rule 4001-2(a)(i)(P)—Priming Liens.  The DIP Facility is non-priming.

e.  Local Rule 4001-2(a)(i)(Q)—Provision Binding Estate and Other Parties Regarding Validity of Prepetition Lien.  There is no such provision.

f.  Local Rule 4001-2(a)(i)(R)—Immediate Approval.  There is no such provision.

g.  Local Rule 4001-2(a)(i)(T)—Limitation on Topics Raised at Remedies Hearing.  There is no such provision.

h.  Local Rule 4001-2(a)(i)(X)—Marshalling Shield.  There is no such provision.

## **Basis for Relief Requested**

**I.     Approval of the DIP Facility is Appropriate Under Section 364 of the Bankruptcy Code.**

14.     Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for chapter 11 debtors in possession.  To the extent debtors require credit, but are unable to obtain such credit on unsecured terms or without administrative priority status, the Bankruptcy Code offers debtors in possession flexibility to provide various protections to induce a postpetition lender to extend credit to debtors in possession.  Specifically, a postpetition lender can be granted a super-priority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).  *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd*, 146 B.R. 312 (B.A.P. 9th Cir. 1992) (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.*), 834 F.2d 599, 603 (6th Cir. 1987)) ("Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'").

15.     Courts have articulated a three-part test to determine whether debtors are entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

   a.  debtors are unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

   b.  the credit transaction is necessary to preserve the assets of the estates; and

   c.  the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor-borrowers and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y 1990); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) that the debtors needed postpetition financing "to preserve [their] assets and continue their operations"; and (c) that the terms and conditions of the DIP documents had been negotiated in good faith).

16.    The Credit Agreement satisfies applicable standards for approval under section 364 of the Bankruptcy Code.  The DIP Facility is being provided by AES Andes, the Debtors' ultimate parent company.  Given the substantial amount of the Debtors' prepetition indebtedness, the lack of unencumbered collateral, among other considerations, the Debtors believe that no other party would be willing to provide the Debtors with access to credit on a post-petition basis without a super-senior security interest, or on better terms than those offered by AES Andes.  Indeed, the Debtors' efforts to market test the terms of the DIP Facility confirm this.

17.    As described in this Motion and in the First Day Declaration, the Debtors require the DIP Facility to allow for a steady transition into chapter 11 protection and to ensure that the Debtors are able to meet their business needs during these Chapter 11 Cases.  The DIP Facility provides the Debtors with access to approximately $50 million of liquidity during their Chapter 11 Cases, with up to $20 million to be made available immediately upon entry of the Interim Order, to satisfy the Debtors' immediate working capital and capital expenditure needs.  Given that the Debtors are not presently generating cash in the ordinary course, such financing is crucial to ensuring an orderly restructuring, as well as the Debtors' ability to continue apace on construction of the Project, the completion of which is the Debtors' only potential source of long-term value to stakeholders, and which is presently slated for March 2022.

18.     The Debtors submit that the terms and conditions of the DIP Facility are highly favorable to the Debtors, fair, reasonable, better than market terms, and reflect a robust marketing process conducted by the Debtors' investment banker.  The DIP Facility was negotiated with the Debtors and the DIP Lenders represented by separate counsel.  The interest rates and fees payable under the DIP Facility are lower than prevailing market rates for debtor-in-possession facilities of a similar type and nature.  The DIP Lenders were also only willing to extend funding with super-priority claims status, and no other financial institution was prepared to lend either with or without such protections.  However, these types of protections are commonplace in debtor-in-possession financing facilities, particularly where Debtors' valuation is less than the amount of their prepetition secured indebtedness, and the Debtors' market test proved that lenders are unwilling to take the financial risk of lending to the debtors without additional protections.

**II.     The Debtors Should be Authorized to Enter into the DIP Facility, the Terms of Which are Supported by the Debtors' Sound Business Judgment.**

19.     Generally, courts give broad deference to business decisions of debtors in possession.  *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, a bankruptcy court generally will respect debtors in possession's business judgment regarding the need for and the proposed use of funds.  As the court noted in *In re Ames Dep't Stores, Inc.*:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in-interest.

115 B.R. 34, 40 (Bankr. S.D.N.Y 1990).

Without the ability to incur debt with super-priority administrative status, the debtors in possession would be placed at a competitive disadvantage and their efforts to reorganize could be seriously impaired.

20.     As described above, the terms and conditions of the DIP Facility are reasonable and highly favorable to the Debtors.  The Debtors' decision to obtain financing pursuant to the terms of the DIP Facility thus represents an exercise of sound business judgment in the Debtors' continued effort to maximize the value of their estates as a going concern for all their stakeholders. Absent such postpetition financing, the Debtors' ability to continue business operations and ultimately increase the value of their assets by completing construction on the Project would be severely compromised.

21.     The terms of the DIP Facility are also the result of a thorough marketing and negotiation process that took place over a period of months.  After initial negotiations regarding terms for potential postpetition financing with AES Andes, the Debtors' investment banker, Lazard Frères & Co. LLC and Lazard Chile S.p.A. (together, "Lazard"), shared a proposed DIP budget and DIP term sheet with the Term Lenders and inquired as to whether the Term Lenders intended to offer debtor-in-possession financing to the Debtors.  On October 14, 2021, and on several following occasions, Lazard inquired whether the Term Lenders had interest in offering debtor-in-possession financing to the Debtors, but as of the date of the filing of this Motion, the Term Lenders have not offered a competing proposal for DIP financing to the Debtors. Thereafter, Lazard approached fifteen (15) financial institutions with teaser materials and offered to provide further financial information to those institutions that executed non-disclosure agreements in connection with the potential financing.  None of the institutions approached by Lazard indicated interest in providing financing, and the Debtors continued to negotiate the terms of the DIP Financing with

AES Andes.  The marketing process is described in further detail in the *Declaration of Ari Lefkovits in Support of the Debtors' Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Providing Superpriority Administrative Expense Claim Status Pursuant to 11 U.S.C. §§ 363 and 364, (III) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* (the "Lefkovits Declaration"), which is being filed substantially simultaneously herewith.

22.     The negotiations with the DIP Lenders were carried out with the advice and assistance of sophisticated external counsel on the part of both the Debtors and AES Andes.  All material terms and underlying economics were thoroughly negotiated, including the sizing of the facility, the DIP budget, milestones, and covenants.

23.     The marketing process conducted by Lazard amply demonstrates that no superior alternatives (and indeed, no alternatives at all) were available to the Debtors.  After approaching both the existing senior lenders and fifteen (15) third-party institutions active in lending in the DIP credit markets, none were prepared to offer financing on terms the same or superior to those offered by the proposed DIP Lenders.  Furthermore, based on a review of recent comparable debtor-in-possession financing facilities, Lazard concluded that the DIP Facility reflects superior economic terms to the terms obtained by similarly situated debtors for loans of the same size and profile of the DIP Facility.  Lefkovits Declaration at ¶ 15.

24.     Throughout the process, the members of the Debtors' board of directors were consulted about the process of marketing and negotiating the terms of the financing, and had ample opportunity to ask questions, provide feedback, and explore other potential sources of financing before the terms of the DIP Financing were presented.  On the basis of this and all of the above-mentioned steps that were taken to ensure that the terms of the DIP Facility were the best available

to the Debtors, the Debtors submit that it more than meets the business judgment standard for postpetition financing.

### III.   The DIP Lenders and Prepetition Secured Parties are Entitled to the Protections of Section 364(e) of the Bankruptcy Code.

25.     Section 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith." 11 U.S.C. § 364(e).  As previously discussed, the terms of the DIP Facility and Interim Order were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders. Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Facility is in the best interests of their estates and their creditors.  Accordingly, the DIP Lenders and Prepetition Secured Parties should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any Court, the DIP Lenders and Prepetition Secured Parties will be fully protected with respect to any amounts previously disbursed.

### IV.   Immediate Relief is Justified.

26.     Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to obtain postpetition financing may not be commenced earlier than fourteen days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtors to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtors' estates.  The Debtors are seeking interim authority only to the extent necessary to fund their cash needs in the immediate post-petition period, and it has limited the amount of funds that are made available to draw under the Interim

Order accordingly.  Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain and use financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing no later than 30 days from the Petition Date to consider approval of the Debtors' request to obtain and use financing on a final basis pursuant to the terms of the Final Order.

27.     As described above and in the First Day Declaration, the Debtors submit that without access to the DIP Facility, the Debtors may have difficulty maintaining ongoing operations and may face immediate and irreparable harm to their estates.  By contrast, immediate access to the DIP Facility will permit the Debtors to continue the progress on construction of the Project, with increases in the value of the Debtors' operations and the value of the collateral offered to the senior lenders.  In light of the foregoing, the Debtors submit that the requirements of Bankruptcy Rule 4001(b) and (c) have been satisfied and the immediate availability of the DIP Facility pending the entry of the Final Order is appropriate.  Accordingly, the Debtors respectfully request that the Court grant the relief requested.

**V.     Notice Procedures and Final Hearing.**

28.     The Debtors propose to promptly mail copies of the Interim Order and notice of the Final Hearing, which sets the time, date, and manner for the filing of objections, to any known party affected by the terms of the Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.

29.     Any objection to the relief sought at the Final Hearing shall (A) be made in writing setting forth with particularity the grounds thereof, and (B) filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. Eastern by the following: (i) proposed counsel to the Debtors, (a) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Richard J. Cooper (rcooper@cgsh.com), Luke A.

Barefoot (lbarefoot@cgsh.com) and Jack Massey (jamassey@cgsh.com) and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Pauline K. Morgan (pmorgan@ycst.com), Sean T. Greecher (sgreecher@ycst.com), and S. Alexander Faris (afaris@ycst.com); (ii) counsel to the Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St. #1600, Wilmington, DE, 19801, Attn: Derek C. Abbott, Curtis S. Miller, and R. Jason Russell; (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov); (iv) counsel to the administrative agent for the secured loan facility, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Christy Rivera (christy.rivera@nortonrosefulbright.com), Andrew Rosenblatt (andrew.rosenblatt@nortonrosefulbright.com); and 799 9th Street NW, Suite 1000, Washington, DC 20001, Attn: Marissa Alcala (marissa.alcala@nortonrosefulbright.com); and (v) counsel to the Committee (if appointed).

### Reservation of Rights

30.    Nothing in this Motion: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or

continue any applicable payments postpetition, which decision shall be in the discretion of the Debtors in accordance with orders of this Court.

**Notice**

31.     Notice of the Motion will be given by facsimile, electronic transmission, hand delivery or overnight mail to: (i) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov); (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (iii) counsel to the administrative agent for the secured loan facility, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Christy Rivera (christy.rivera@nortonrosefulbright.com), Andrew Rosenblatt (andrew.rosenblatt@nortonrosefulbright.com); and 799 9th Street NW, Suite 1000, Washington, DC 20001, Attn: Marissa Alcala (marissa.alcala@nortonrosefulbright.com); (iv) counsel to the DIP Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St. #1600, Wilmington, DE, 19801, Attn: Derek C. Abbott (DAbbott@morrisnichols.com), Curtis S. Miller (CMiller@morrisnichols.com), and R. Jason Russell (JRussell@morrisnichols.com); and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

*[Remainder of this page is intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and granting such other relief as the Court deems just and proper.

| | |
|---|---|
| Dated:  November 17, 2021<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP |

/s/ *Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Fax:             (302) 571-1253
Email:          pmorgan@ycst.com
                    sgreecher@ycst.com
                    afaris@ycst.com

- and -

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper (*pro hac vice* admission pending)
Luke A. Barefoot (*pro hac vice* admission pending)
Jack Massey (*pro hac vice* admission pending)
One Liberty Plaza
New York, New York 10006
Telephone:    (212) 225-2000
Fax:             (212) 225-3999
Email:          rcooper@cgsh.com
                    lbarefoot@cgsh.com
                    jamassey@cgsh.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.:  21-11507 (   ) |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER GRANTING DEBTORS' MOTION TO (I) AUTHORIZE DEBTORS IN POSSESSION TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) GRANT SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO DIP LENDER(S) PURSUANT TO 11 U.S.C. §§ 364 AND 507; (III) MODIFY AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507; (IV) SCHEDULE FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C); AND (V) GRANT RELATED RELIEF**

This matter is before the Court on the motion (the "Motion")[2] of Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware"), debtors and debtors in possession in the above-captioned cases (together, the "Debtors,"), requesting entry of an interim order (this "Interim Order") and a final order (such order, the "Final Order") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"):

(i)     authorizing Alto Maipo Delaware (the "Borrower"), on the terms set forth in the DIP Credit Agreement, to obtain unsecured post-petition financing, consisting of a debtor in possession credit facility (the "DIP Facility") by and among the Borrower,

---

1     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (•) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

2     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the ALTO MAIPO US$50,000,000 Debtor in Possession Credit Facility attached to this Interim Order (as defined herein) as **Annex A** (the "DIP Credit Agreement") or, if not defined in the DIP Credit Agreement, in the Motion.

as borrower, Alto Maipo SpA, as guarantor (the "Guarantor"), and AES Andes, S.A., in an aggregate original principal amount of up to $50 million (the "DIP Commitments" and the loans made thereunder, as increased by capitalized interest and fees, the "DIP Loans") with an initial availability of $20 million upon entry of the Interim Order and the remainder available upon entry of a Final Order and satisfaction of the conditions precedent set forth in the DIP Credit Agreement, from AES Andes, S.A., on behalf of itself ("AES" or the "DIP Lender") or, in the event there are other potential or actual participants in the financing (any such participants together with the AES, the "DIP Lenders"), any agent that may be appointed to act on behalf of the DIP Lenders (any such agent as may be appointed, the "DIP Agent")[3];

(ii)     authorizing the Debtors to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Credit Agreement and the other DIP Loan Documents (as defined below), and to perform all such other and further acts as may be required under or in connection with the DIP Loan Documents, including executing and delivering the DIP Loan Documents, which final documents shall be consistent with the DIP Credit Agreement and otherwise in form and substance reasonably acceptable to the Borrower, the DIP Agent, and the DIP Lender(s), acting reasonably, and in consultation with the Required Consenting Lenders (as defined in the Restructuring Support Agreement (the "RSA"), dated November 16, 2021, entered into by and among the Debtors, Norgener Renovables SpA ("Norgener"); AES Andes, S.A. (the "Sponsor"), Strabag SpA ("Strabag"), and the lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "Senior Lenders") that have executed the RSA (the "Supporting Senior Lenders")), and which shall be filed with the Court prior to the hearing on the Final Order;

(iii)    authorizing the Borrower to use proceeds of loans made by the DIP Lender(s) (collectively, the "DIP Loan Proceeds") as permitted in the DIP Loan Documents and in accordance with this Interim Order, the DIP Budget (as defined below), and in consultation with the Required Consenting Creditors;

(iv)    granting superpriority administrative expense status to the DIP Loans and all related obligations incurred under the DIP Facility (collectively, the "DIP Obligations"), in each case subject to the Carve Out (as defined below) and on the terms and subject to the relative priorities set forth in the DIP Credit Documents (as defined below);

(v)     authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as and when such amounts become due and payable without other or further notice or order;

---

[3]     If there is only one actual participant in the financing, any reference to the DIP Agent herein shall refer to the DIP Lender.

(vi)     vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents;

(vii)    scheduling a final hearing to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion;

(viii)   waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including, without limitation, under Bankruptcy Rule 6004); and

(ix)     granting the Debtors such other and further relief as is just and proper.

Upon consideration of (a) the Motion and the exhibits attached thereto, (b) the evidentiary record made at the Interim Hearing through the Lefkovits Declaration, (c) the arguments and statements of counsel, and (d) all matters brought to the Court's attention at the interim hearing, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS:[4]**

A.     Petition Date.  On November 17, 2021 (the "Petition Date"), the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and is continuing to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for the Debtors.

B.     Need for Financing.  An immediate and ongoing need exists for the Borrower to obtain the DIP Loans (as defined below) to permit, among other things, the Debtors to meet their obligations arising during the Debtors' Chapter 11 Cases, including, without limitation, the administration of the Debtors' Chapter 11 Cases, so as to maximize the value of their business and assets as a debtor in possession under chapter 11 of the Bankruptcy Code.  The Debtors do not have sufficient available sources of working capital to operate their business without access

---

[4]     To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

to the DIP Facility and their existing liquidity is deteriorating at a rate that requires access to the DIP Loan Proceeds on an immediate basis, and warrants expedited consideration of the Motion and entry of this Interim Order.  The Debtors' ability to preserve and maintain their assets, to pay employees, and otherwise to fund operations, their administrative expenses and an orderly reorganization process, is essential to the Debtors' viability and the preservation and maximization of the going-concern value of their businesses and the value of their assets.

C.      <u>Proposed DIP Facility</u>.   The Debtors have requested that the DIP Lender(s) establish the DIP Facility pursuant to which the Borrower may obtain loans from time to time in accordance with the DIP Credit Documents (each loan made pursuant to the DIP Credit Documents will be a "<u>DIP Loan</u>").  The DIP Lender(s) are willing to establish the DIP Facility upon the terms and conditions set forth herein and in the DIP Credit Agreement.

D.      <u>No Credit Available on More Favorable Terms</u>.   Despite diligent efforts and a sufficient marketing process, the Debtors have been unable to obtain post-petition financing on terms more favorable than those offered by the DIP Lender(s) under the DIP Loan Documents.

E.      <u>DIP Budget</u>.   The Debtors have delivered to the DIP Agent a DIP Budget, which is included in Schedule 5.01(c) to the DIP Credit Agreement (the "<u>DIP Budget</u>"), which is acceptable to the DIP Agent and the DIP Lenders, acting reasonably, and in consultation with the Required Consenting Lenders (as defined in the RSA).

F.      <u>Certain Conditions to DIP Facility</u>.   The DIP Lender(s)' willingness to make the DIP Loans is conditioned upon, among other things, (i) the Debtors obtaining Court approval to enter into the DIP Credit Agreement and Court approval to enter into the DIP Loan Documents and to incur all of the obligations of the Borrower thereunder, and to confer upon the DIP

Lender(s) all rights, powers and remedies thereunder and (ii) the DIP Lender(s) being granted administrative expense priorities set forth herein.

G.    <u>Interim Hearing</u>.  Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors have requested in the Motion that the Court hold the Interim Hearing to authorize the Debtors to enter into the DIP Facility during the period (the "<u>Interim Period</u>") from the date of entry of this Interim Order through the date of the entry of the Final Order following the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to Paragraph 20 of this Interim Order (the "<u>Final Hearing</u>"), for the purposes specified in the DIP Credit Agreement and the DIP Budget.

H.    <u>Service of Motion and Notice of Interim Hearing</u>. The affidavits and declaration of service on file with the Court demonstrate that the Debtors have served copies of the Motion (together with the copies of the proposed DIP Credit Agreement and DIP Budget annexed thereto), and notice of the Interim Hearing by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon (i) the U.S. Trustee; (ii) holders of the 30 largest unsecured claims against the Debtors; (iii) the Debtors' secured creditors; (iv) the Debtors' equity holders; (v) the Internal Revenue Service; (vi) the United States Attorney's Office for the District of Delaware; (vii) Minera Los Pelambres; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Court finds that the foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due and sufficient for all purposes under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

I.      <u>Finding of Good Cause</u>. Good cause has been shown for the entry of this Interim Order and authorization for: (i) the DIP Lender(s) to provide the Borrower with the DIP Loans and (ii) the Borrower to accept, incur and undertake the DIP Obligations pursuant to the DIP Credit Agreement as hereinafter provided during the Interim Period.  The Borrower's need for financing of the type afforded by the DIP Credit Agreement is immediate and critical.  Entry of this Interim Order will preserve the assets of the Debtors' estates and their value and is in the best interests of the Debtors, their creditors and their estates.  The terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of their business judgment, and are supported by reasonably equivalent value and fair consideration.

J.      <u>Finding of Good Faith</u>.  Based upon the record presented at the Interim Hearing, the DIP Facility has been negotiated in good faith and at arm's length between the Debtors, on the one hand, and the DIP Lender(s), on the other.  All of the DIP Obligations, including, without limitation, all DIP Loans made pursuant to the DIP Credit Agreement and all other liabilities and obligations of the Borrower under this Interim Order, owing to the DIP Lender(s) shall be deemed to have been extended by the DIP Lender(s) in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Lender(s) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

K.      <u>Jurisdiction; Core Proceeding</u>.  This Court has jurisdiction over these Chapter 11 Cases, the Motion, this Interim Order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

L.    <u>Immediate Entry</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent the immediate grant by the Court of the interim relief sought by the Motion, the Debtors' estates will be immediately and irreparably harmed pending the Final Hearing.  The Borrower's consummation of the DIP Facility in accordance with the terms of this Interim Order and the DIP Loan Documents (as defined below) is in the best interests of the Debtors' estates and is consistent with the Debtors' exercise of their fiduciary duties.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.    <u>Grant of Motion; Authorization of Interim Financing; Use of Proceeds</u>.

(a)    The Motion is hereby **GRANTED** as and to the extent provided herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Credit Agreement in substantially the form annexed hereto and the Debtors' execution and delivery of all instruments, guaranties, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender(s), to give effect to the terms thereof and as will be drafted and executed as contemplated therein, each in final form and substance reasonably acceptable to the Borrower, the DIP Agent, and the DIP Lender(s), and in consultation with the Required Consenting Lenders (as defined in the RSA) (the DIP Credit Agreement, the DIP Budget and all such other instruments, and documents, including, without limitation, a definitive loan agreement, financing statements, assignments, trust

agreements, amendments, waivers, consents, other modifications, and all other documents, as at any time amended, collectively the "DIP Loan Documents" and the DIP Loan Documents together with the Interim Order and the Final Order, the "DIP Credit Documents"), which final documents shall be consistent with the DIP Credit Agreement and otherwise in form and substance reasonably acceptable to the Borrower, the DIP Agent, and the DIP Lenders, and in consultation with the Required Consenting Lenders (as defined in the RSA) and filed with the Court before the hearing on the Final Order.

(b)     The Borrower is hereby authorized to borrow under the DIP Credit Agreement and the other DIP Loan Documents contemplated to be entered thereunder and this Interim Order, up to an interim aggregate principal amount not to exceed at any time prior to entry of the Final Order $20,000,000 in each case subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents; to incur any and all liabilities and obligations under the DIP Loan Documents; and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Loan Documents including, without limitation, the DIP Budget (including, without limitation, the obligations under the DIP Loan Documents to indemnify the Indemnitees (as defined in the DIP Credit Agreement)).

(c)     No DIP Lender(s) shall have any obligation or responsibility to monitor use of the DIP Loans, and the DIP Lender(s) may rely upon the Borrower's representations that the amount of the DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Budget, the DIP Loan Documents, the Bankruptcy Code and the Bankruptcy Rules.

(d)　　The Borrower may obtain and use the DIP Loan Proceeds only for the Permitted Uses specified in the DIP Credit Agreement and other DIP Loan Documents.  For the avoidance of doubt, no DIP Loan Proceeds shall be used to (i) make any payment in settlement or satisfaction of any pre-petition claim or administrative claim (other than the DIP Obligations), unless (x) in compliance with the DIP Budget or (y) as separately approved by the Court and consistent with the DIP Budget; (ii) except as expressly provided or permitted hereunder, under the DIP Credit Agreement or in the DIP Budget or as otherwise approved by the DIP Lender(s) (and approved by the Court, if necessary), make any payment or distribution to or for the benefit of any non-Borrower affiliate or insider of the Borrower, and in no event shall any management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not the Borrower; (iii) make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement; or (iv) make any payment otherwise prohibited by this Interim Order.

2.　　<u>DIP Budget</u>.  At the end of each four-week period following entry of this Interim Order, the Borrower shall deliver to the DIP Agent an updated budget ("<u>Updated DIP Budget</u>") in form and substance reasonably acceptable to the Borrower, the DIP Agent, and the DIP Lenders, and in consultation with the Required Consenting Lenders (as defined in the RSA).  Each Updated DIP Budget shall include a reconciliation of the prior period's actual results to the corresponding period in the Updated DIP Budget.  The term "DIP Budget" shall mean the Initial Approved DIP Budget until such time as an Updated DIP Budget is approved, following which such Updated DIP Budget shall constitute the DIP Budget until a subsequent Updated DIP Budget is so approved. Commencing on the fourth Thursday after the Closing Date, the Borrower shall provide (i) a "Variance Report" to the DIP Agent certified by the chief financial officer of the Borrower

containing a report showing actual cash receipts and disbursements for the immediately preceding three weeks, noting all variances on a line item basis from amounts set forth in the DIP Budget for such period, and explanations for all material variances and (ii) additional customary reporting to be agreed by the Borrower and the DIP Lenders.

3.      <u>Entry into, Execution, Delivery and Performance of DIP Loan Documents</u>.  The Debtors are hereby authorized to enter into the DIP Credit Agreement and the other DIP Loan Documents and to incur and perform the DIP Obligations arising from and after the date of this Interim Order under the DIP Facility, on the terms set forth in this Interim Order, the DIP Loan Documents and such additional documents, instruments and agreements as may reasonably be required by the DIP Lender(s) to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Loan Documents.  The DIP Loan Documents and any amendments thereto may be executed and delivered on behalf of the Borrower by any officer, director or agent of the Borrower, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents and amendments for and on behalf of the Borrower; the DIP Lender(s) shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents and any amendments thereto as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Loan Documents or any amendments thereto by any such person on behalf of the Borrower shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company or other entity action (as applicable) of the Borrower.  Upon execution and delivery thereof, each of the DIP Loan Documents and any amendments thereto shall constitute valid and binding obligations of the Debtors, enforceable against such Debtors to the extent and in accordance with their terms for all purposes during these Chapter 11 Cases, any subsequently

converted case under chapter 7 of the Bankruptcy Code (a "<u>Successor Case</u>"), and after the dismissal of these Chapter 11 Cases.  No obligation, payment, transfer or grant under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under sections 502(d), 544, 547, 548, 549 or 550 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.  In furtherance of the provisions of Paragraph 1 of this Interim Order, the Borrower is authorized: (i) to do and perform all acts; (ii) to make, execute and deliver all DIP Loan Documents; and (iii) to pay all fees, costs and expenses, in each case as may be necessary or, at the request of DIP Agent or the DIP Lender(s), desirable to give effect to any of the terms and conditions of the DIP Loan Documents and any amendments thereto or as may otherwise be required or contemplated by the DIP Loan Documents and any amendments thereto.

1.      <u>Superpriority Claims</u>.

(a)      <u>Allowed Claims</u>.  All DIP Obligations shall at all times be entitled to a super-priority administrative expense claim against the Debtors ("<u>DIP Superpriority Claim</u>") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to this Interim Order, subject only to the Carve Out.  The DIP Superpriority Claims shall survive any conversion

of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the dismissal of these Chapter 11 Cases.  To the extent any intercompany claims are created as a result of payments made by Alto Maipo Delaware on behalf of Alto Maipo, such intercompany claims shall be superpriority administrative claims subject to the DIP Superpriority Claim.

(b)     Proceeds of Avoidance Claims.  For the avoidance of doubt the DIP Superpriority Claims shall have recourse to all proceeds (the "Avoidance Proceeds") of all of the Borrower's claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in the following sentence), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code (the "Avoidance Claims") and proceeds of the CNM Arbitration (as described in the DIP Credit Agreement, § 2.10(d)).  Following the entry of this Interim Order, the DIP Superpriority Claims shall have recourse to the Avoidance Proceeds of all of the Borrower's claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Loan Proceeds.

2.     Repayment of DIP Obligations.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without defense, offset or counterclaim.  Without limiting the generality of the foregoing, in no event shall the Borrower be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Lender(s) to any Borrower or any of its respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of any DIP Lender(s) that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Lender(s).

3.     Payments Free and Clear.  All payments or proceeds remitted to the DIP Agent on behalf of any DIP Lender(s) pursuant to the DIP Loan Documents, the provisions of this Interim

Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

4.      Fees and Expenses of Estate Professionals.  Subject to the Carve Out below, the Borrower is authorized to use DIP Loan Proceeds to pay such compensation and expense reimbursement (collectively, "Professional Fees") of professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants, in each case to the extent such professional person's retention is subject to court approval) retained pursuant to section 327, 330, 331 or 1103 of the Bankruptcy Code, as applicable, by the Borrower (such retained professionals, the "Debtors' Professionals") or by any official committee of unsecured creditors (the "Creditors' Committee") appointed in these Chapter 11 Cases (such retained professionals, the "Committee Professionals" and, collectively with the Debtors' Professionals, the "Professionals"), to the extent that such compensation and expense reimbursement is authorized and approved by the Court, subject to the terms and conditions of this Interim Order, the DIP Budget, and the DIP Credit Documents, as applicable; provided, however, that, notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Loan Proceeds shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).

5.      Carve Out.

(a)      Notwithstanding anything in this Interim Order, any DIP Loan Document, or any other order of this Court to the contrary, the rights and claims of the DIP Lender(s), including the DIP Superpriority Claims, shall be subject and subordinate in all respects to the

payment of the Carve Out.  As used in this Interim Order, "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, as set forth in section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by the Debtors' Professionals (such fees the "Allowed Debtors' Professional Fees") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice solely to the extent set forth in the DIP Budget; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by the Committee Professionals (such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtors' Professional Fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice solely to the extent set forth in the DIP Budget; (iv) Allowed Debtors' Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $500,000; and (v) Allowed Committee Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $50,000 (the amounts set forth in clause (iv) and (v), the "Post-Carve Out Trigger Notice Cap").  For purposes

of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Borrower, its lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Loan Documents, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     The Borrower shall establish and fund a segregated account (the "Carve Out Account") for purposes of funding the Carve Out.  Upon entry of this Interim Order, the Carve Out Account will be funded from the Borrower's operating account.  Commencing upon the earlier of (A) the first last day of the month or (B) the first 15th day of the month, in each case after the Closing Date, the Borrower shall deposit in the Carve Out Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following two-week period in the DIP Budget (the "Bi-Weekly Funded Reserve Amount").  Each Professional shall deliver to the Borrower a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding two-week period (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Bi-Weekly Funded Reserve Amount for the applicable periods, respectively, and such fees and expenses have otherwise not been paid by the Borrower, the Borrower shall, within one business day, fund additional amounts into the Carve Out Account equal to the difference between the Bi-Weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top-Up Amount").  At any time, if the Borrower in good faith believes a restructuring, sale, financing, or other success fee previously approved by the Court has been earned by a

Professional and is then due and payable, the Borrower shall deposit in the Carve Out Account an amount equal to such fee.  Upon entry of the Final Order, the Borrower shall deposit into the Carve Out Account an amount equal to (i) the Post-Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under paragraph 8(i) above. The Carve Out Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of the Professionals.  Any and all amounts in the Carve Out Account shall not be subject to any cash sweep and/or foreclosure provisions in the DIP Loan Documents and the DIP Agent shall not be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the DIP Loan Documents.  Notwithstanding the foregoing, any and all payments to Professionals allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Carve Out Account.  At no time shall the aggregate Allowed Professional Fees exceed the aggregate amounts provided for payment of professional fees in the DIP Budget and at no time shall the aggregate amounts funded into the Carve Out Account exceed the aggregate amounts provided for payment of professional fees in the DIP Budget.

(c)     On the day on which a Carve Out Trigger Notice is delivered by the DIP Agent in accordance with this Interim Order (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Borrower to utilize all cash on hand as of such date and any available cash thereafter held by the Borrower to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount only to the extent set forth in the aggregate in the DIP Budget.  The Borrower shall deposit and hold such amounts in the Carve Out Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand

to the Borrower to utilize all cash on hand as of such date and any available cash thereafter held by the Borrower, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of this Interim Order as set forth above). The Borrower shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent (if appointed, and separate from the DIP Lender) for the benefit of itself and for the benefit of the DIP Lender(s), in accordance with their pro rata funding of the Carve Out Reserves. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (iv) and (v) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent (if appointed, and separate from the DIP Lender) for the benefit of themselves and for the benefit of the DIP Lender(s), unless the DIP Obligations have been indefeasibly paid in full and all DIP Commitments have been terminated. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph, then any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve

Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve

Out Reserve, up to the applicable amount set forth in this paragraph prior to making any payments

to the DIP Agent (if appointed, and separate from the DIP Lender (for the benefit of itself and the

DIP Lender(s)).

(d)    None of the DIP Lender(s) shall be responsible for the payment of

reimbursement of any fees or disbursements of any Professional Fees incurred in connection with

these Chapter 11 Cases or any successor case under any chapter of the Bankruptcy Code. Nothing

in this Interim Order or otherwise shall be construed to obligate the DIP Lender(s), in any way,

to pay compensation to, or to reimburse expenses of, any Professional or to guarantee that the

Borrower has sufficient funds to pay such compensation or reimbursement.  Notwithstanding

anything to the contrary in the DIP Loan Documents or this Interim Order, the DIP Lender(s)

reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to

be approved by any of the Professionals.

(e)    Any payment or reimbursement made on or after the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall permanently

reduce the Carve Out on a dollar-for-dollar basis.

6.    DIP Proceeds Restrictions.  Notwithstanding anything to the contrary in this Interim

Order, neither the Carve Out nor any proceeds of any DIP Loans shall be used to, among other

things (any of the following each a "Prohibited Purpose"): (i) object to, seek subordination of, or

contest the validity, extent, perfection, priority or enforceability of the DIP Facility or the amount

due thereunder and the priority granted thereby; (ii) investigate, initiate, assert or prosecute any

claim, defense, demand or cause of action against any DIP Agent or the DIP Lender(s), or any of

their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries,

affiliates acting in such capacities or; (iii) seek to modify any of the rights granted under this Interim Order to any DIP Lender(s) or any DIP Agent; (iv) assert any defense, counterclaim or offset to this Interim Order or any DIP Obligations; or (v) object to, contest, delay, prevent or interfere in any way with the exercise of rights or remedies by any DIP Lender(s), after the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement).

       7.    <u>Preservation of Rights</u>.

       (a)    <u>Protection from Subsequent Financing Order</u>.  Prior to the payment in full of all DIP Obligations and the termination of funding commitments under the DIP Facility in accordance with the terms of the DIP Loan Documents, there shall not be entered in the Debtors' Chapter 11 Cases or in any Successor Case any order other than with the consent of the DIP Agent and the requisite DIP Lender(s) (as provided for in the DIP Loan Documents), that authorizes the obtaining of credit or the incurrence of indebtedness by the Debtors (or any trustee or examiner) that is: (i) secured by a security interest, mortgage or collateral interest or other lien on all or any part of the Debtors' assets or (ii) entitled to claims with priority administrative status that is equal or senior to the DIP Superpriority Claims granted herein to DIP Lender(s); <u>provided</u>, <u>however</u>, that nothing herein shall prevent the entry of an order that specifically provides for, as a condition to the granting of the benefits of clauses (i) or (ii) above, (1) the payment in full of all of the DIP Obligations at closing from the cash proceeds of such credit or indebtedness, and (2) the termination of any funding commitments under the DIP Facility; provided, further, however, that nothing in this Subparagraph 10(a) shall prohibit the Debtors from entering into financing to finance VAT taxes payable in connection with certain invoices to be issued pursuant to the Strabag Tunneling Contract (as defined in the DIP Credit Agreement and as amended, restated, modified,

supplemented, extended or amended and restated from time to time), which may be secured by a first-priority lien on tax refunds notwithstanding this subparagraph 10(a) ("DIP Tax Financing Facility").

(b)     Rights Upon Dismissal, Conversion or Consolidation.  If these Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the rights or remedies of any DIP Lender under the DIP Loan Documents or the rights or remedies of any DIP Lender under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Lender shall remain in full force and effect as if these Chapter 11 Cases have not been dismissed, converted or substantively consolidated.  Until payment in full of all DIP Obligations has occurred, it shall constitute an Event of Default if the Borrower seeks or supports, or if there is entered, any order dismissing or converting these Chapter 11 Cases.

(c)     Survival of Interim Order.  This Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall not be modified, superseded, impaired, discharged or in any way altered by any order that may be entered: (a) confirming any plan of reorganization or liquidation in the Debtors' Chapter 11 Cases; (b) converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the Debtors' Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Court abstains from hearing the Debtors' Chapter 11 Cases or any Successor Case.  The terms and provisions of this Interim Order, including the claims, priorities, and other protections granted to the DIP Lender(s) pursuant to this Interim Order and/or the DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of any such order, and such rights and claims shall maintain their

20

priority as provided by this Interim Order and the DIP Loan Documents until all of the DIP

Obligations are indefeasibly paid in full in accordance with the DIP Loan Documents.

(d)     No Discharge.  None of the DIP Obligations shall be discharged by the

entry of any order confirming a plan of reorganization or liquidation in these Chapter 11 Cases

and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such

discharge.

(e)     No Requirement to File Claim for DIP Obligations or Prepetition

Unsecured Obligations.  Notwithstanding anything to the contrary contained in any prior or

subsequent order of the Court, including, without limitation, any order establishing a deadline for

the filing of proofs of claim or requests for payment of administrative expenses under section

503(b) of the Bankruptcy Code, the DIP Lender(s) shall not be required to file any proof of claim

or request for payment of administrative expenses with respect to any of the DIP Obligations, all

of which shall be due and payable in accordance with the DIP Credit Agreement and the other

DIP Loan Documents applicable thereto without the necessity of filing any such proof of claim

or request for payment of administrative expenses; and the failure to file any such proof of claim

or request for payment of administrative expenses shall not affect the validity, priority or

enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities or obligations

arising at any time thereunder or prejudice or otherwise adversely affect the DIP Lender(s)' rights,

remedies, powers or privileges under any of the DIP Loan Documents, this Interim Order or

applicable law.  Notwithstanding anything to the contrary contained in any prior or subsequent

order of the Court, including, without limitation, any order establishing a deadline for the filing

of proofs of claim or requests for payment of administrative expenses under section 503(b) of the

Bankruptcy Code, AES Andes, S.A. shall not be required to file any proof of claim or request for

payment of administrative expenses with respect to any of the Prepetition Unsecured Obligations or prepetition unsecured claims, all of which shall be due and payable in accordance with the Prepetition Unsecured Loan Documents applicable thereto without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the Prepetition Unsecured Loan Documents or of any indebtedness, liabilities or obligations arising at any time thereunder or prejudice or otherwise adversely affect AES Andes, S.A.'s rights, remedies, powers or privileges under any of the Prepetition Unsecured Loan Documents, this Interim Order or applicable law.

8.      <u>Reimbursement of Fees, Costs and Expenses of DIP Lender(s)</u>.  The Borrower shall be obligated to reimburse the DIP Lender(s) for (a) their reasonable and documented costs, fees, and expenses in connection with the preparation, negotiation, execution and administration of the DIP Loan Documents, including any amendment or waiver thereof, which shall include, without limitation, any fees of the DIP Agent's attorneys and advisors (if a DIP Agent is appointed, and separate from the DIP Lender), and (b) all reasonable and documented out-of-pocket expenses of the DIP Agent (if appointed, and separate from the DIP Lender) associated with the administration of the DIP Facility, in each case as provided in the DIP Loan Documents.  Each professional or party shall provide copies of applicable invoices (which invoices may be redacted or summarized for protection of an applicable privilege or the work product doctrine) (the fees thereunder, the "<u>Invoiced Fees</u>") to counsel to the Debtors, counsel to the Creditors' Committee, if any, and the U.S. Trustee.  Any objections raised by the Debtors, the U.S. Trustee or the Creditors' Committee challenging the reasonableness of any portion of the Invoiced Fees (such portion, the "<u>Disputed Invoiced Fees</u>") must be in writing and state with particularity the grounds therefor and must be

submitted to the applicable professional or party within ten (10) Business Days of receipt (the "Review Period") and, if after the Review Period an objection remains unresolved, such objection will be subject to resolution by the Court.  After the Review Period, the undisputed portion of Invoiced Fees will be paid promptly by the Debtors, without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date.  The Borrower shall pay any Disputed Invoiced Fees promptly upon resolution of the objection, including to the extent resolved through approval by the Court, to the extent of such approval.  In no event shall any invoice or other statement submitted by any DIP Lender(s) to the Debtors, the Creditors' Committee, the U.S. Trustee or any other interested person (or any of their respective Professionals) with respect to fees or expenses incurred by any professional retained by such DIP Lender(s) operate to waive the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law.

9.    <u>Amendments and Waivers</u>.  The Debtors and the DIP Lender(s) are hereby authorized to enter into agreements, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such DIP Loan Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions: (i) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Loan Document; and (ii) copies of the amendment, modification, or waiver must be served upon counsel for the Creditors' Committee, if any, and the U.S. Trustee.  Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "material change" shall mean a change to a DIP Loan Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the

aggregate amount of the commitments of the DIP Lender(s) under the DIP Facility, to increase the rate of interest other than as currently provided in or contemplated by such DIP Loan Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Agent following the occurrence of an Event of Default.  Without limiting the generality of the foregoing, no amendment of a DIP Loan Document that postpones or extends any date or deadline therein or herein (including, without limitation, the expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment may be effectuated by the Debtors and the DIP Lender(s) without the need for further approval of the Court.

10.    Events of Default; Remedies.

(a)    Notice of Default.  The occurrence of any "Event of Default" under (and as defined in) the DIP Credit Agreement or any other DIP Loan Document shall constitute an Event of Default under this Interim Order.  Upon the occurrence of an Event of Default and during the continuance thereof: (i) the DIP Lender(s) shall be authorized to discontinue honoring any pending or future request for DIP Loan Proceeds; (ii) the DIP Agent may in its discretion file with the Court and serve upon counsel for the Borrower, counsel for the Creditors' Committee, if any, and the U.S. Trustee a written notice (a "Default Notice") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) effective five (5) business days after the Default Notice (the "Remedies Notice Period") is filed, the DIP Agent shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Borrower or any other interested party, to (A) demand payment and enforce collection of all DIP Obligations, as applicable, and (B) otherwise exercise all rights and remedies

available to it under the DIP Credit Agreement or the DIP Loan Documents, as applicable, on account of such Event of Default.  During the Remedies Notice Period, the Debtors and/or the Creditors' Committee, if any, shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court (such hearing, a "Remedies Hearing").  Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph, the DIP Agent may, in its discretion, take all other actions and exercise all other rights and remedies under the DIP Loan Documents, this Interim Order and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations and otherwise enforce any of the provisions of this Interim Order.  The DIP Agent's delay or failure to exercise rights and remedies under any DIP Loan Documents, this Interim Order or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Agent.

(b)     Rights Cumulative.  The rights, remedies, powers and privileges conferred upon any DIP Lender pursuant to this Interim Order shall be in addition to and cumulative with those contained in the applicable DIP Loan Documents and created under applicable law

11.     Modification of Automatic Stay.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified and lifted to the extent necessary to implement the provisions of this Interim Order and the DIP Loan Documents, thereby permitting the DIP Agent to receive payments for application to the DIP Obligations.

12.     Effect of Appeal.  Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified or reversed: such modification or reversal on appeal shall not affect the validity of any debt so incurred, or priorities granted by the Borrower to the DIP Lender(s) prior to the effective date of such modification or reversal

whether or not any such entity knew of the appeal, unless the authorization and incurring of such debt, or the granting of such priority, were stayed pending appeal; and all DIP Loans under the DIP Loan Documents are deemed to have been made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP Loans prior to the effective date of any modification or reversal of this Interim Order cannot as a result of any subsequent order in any of the Debtors' Chapter 11 Cases, or any Successor Case, (i) be subordinated or (ii) be deprived of the benefit or priority of the DIP Superpriority Claims granted to DIP Lender(s) under this Interim Order or the DIP Loan Documents.

13.     <u>Service of Interim Order</u>.   Promptly after the entry of this Interim Order, the Debtors shall serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to (i) the parties having been given notice of the Interim Hearing and (ii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

14.     <u>No Deemed Control; Exculpation; Release.</u>

(a)     Subject to entry of a Final Order, in determining to make any DIP Loans under the DIP Credit Agreement, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, no DIP Lender(s) shall be deemed to be in control of the Debtors or their operations with respect to the operation or management of the Debtors, nor shall the DIP Lender(s) owe any fiduciary duty to the Borrower, their respective creditors or estates.

(b)     Subject to entry of a Final Order, nothing in this Interim Order, the DIP Loan Documents, or any other document related to the DIP Facility shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Lender any liability for any claims

arising from the pre-petition or post-petition activities of the Debtors in the operation of their business or in connection with their restructuring efforts.

(c)       Subject to entry of the Final Order, the Debtors for themselves and on behalf of their subsidiaries, successors and assigns (collectively, the "Releasors" and, individually, a "Releasor") hereby forever, unconditionally and irrevocably releases, discharges and acquits the DIP Lender(s), the DIP Agent (subject to appointment pursuant to the terms of the DIP Credit Agreement), and any of their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates or shareholders (collectively, the "Releasees") and from any and all liabilities, claims, controversies, disputes, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, solely arising out of or relating to transactions or circumstances that have occurred or been consummated on or before the Closing Date (as defined in the DIP Credit Agreement) and solely that relate to the DIP Credit Documents and/or the transactions contemplated hereunder or thereunder (collectively the "Claims") including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the DIP Obligations.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction with respect to the payment of the DIP Obligations that it now has or may claim to have against the Releasees, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court entering this Interim Order.  The provisions of this paragraph shall survive the

termination of the DIP Facility, any other DIP Loan Document, the Interim Order, and the Final Order, and payment in full of any indebtedness thereunder.

15.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Interim Order shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the Debtors and their successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estates of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, the Creditors' Committee, if any, or any other fiduciary appointed as a legal representative of the Debtors or with respect to any property of the estates of the Debtors), and shall inure to the benefit of DIP Lender(s) and their respective successors and assigns.  In no event shall any DIP Lender have any obligation to make DIP Loans to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed or elected for the estates of the Debtors.

16.    <u>Objections Overruled</u>.  Any and all objections to the relief requested in the Motion, to the extent such objections are to entry of this Interim Order and that are not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby **OVERRULED** and **DENIED**.

17.    <u>Final Hearing</u>.  The Final Hearing shall be held on [[ ]], 2021 at [[ ]] (Prevailing Eastern Time).  If any or all of the provisions of this Interim Order are modified, vacated or stayed by the Final Order, then any DIP Obligations incurred prior to the effective date of such modification, vacatur or stay shall be governed in all respects by the provisions of this Interim Order, and the DIP Lender(s) shall be entitled to the protections afforded under section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Superpriority Claims granted herein and pursuant to the DIP Loan Documents with respect to all such DIP Obligations.

18. <u>Objection Deadline</u>.   If any party in interest shall have an objection to any of the provisions of this Interim Order, such party may assert such objection at the Final Hearing, if a written statement setting forth the basis for such objection is filed with the Court and concurrently served upon and actually received by (i) counsel to the Debtors, (a) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Richard J. Cooper (rcooper@cgsh.com), Luke A. Barefoot (lbarefoot@cgsh.com) and Jack Massey (jamassey@cgsh.com), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Pauline K. Morgan (pmorgan@ycst.com), Sean T. Greecher (sgreecher@ycst.com) and S. Alexander Faris (afaris@ycst.com); (ii) counsel to the DIP Agent (if appointed, and separate from the DIP Lender); (iii) counsel to the Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St. #1600, Wilmington, DE, 19801, Attn: Derek C. Abbott (DAbbott@morrisnichols.com), Curtis S. Miller (CMiller@morrisnichols.com); (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov); (v) counsel to the administrative agent for the Term Loans, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019 Attn: Christy Rivera (Christy.rivera@nortonrosefulbright.com), Andrew Rosenblatt (Andrew.rosenblatt@nortonrosefulbright.com), and Marissa Alcala (marissa.alcala@nortonrosefulbright.com); and (vi) counsel to the Committee (if appointed), in each case so that such objections and responses are filed no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Prevailing Eastern Time).   If an objecting party shall fail to appear at the Final Hearing and assert the basis for such

objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

19.    Conditions Precedent.  No DIP Lender(s) shall have any obligation to make any DIP Loans under the DIP Loan Documents, or otherwise fulfill any obligation of such DIP Lender(s) set forth in the DIP Loan Documents, unless the conditions precedent to making such extensions of credit or fulfilling any such obligation under the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

20.    No Impact on Certain Contracts or Transactions.  No rights of any person or entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever such rights might or might not be, are affected by the provisions of this Interim Order.

21.    Effectiveness; Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

22.    Inconsistencies.  To the extent that any provisions in the DIP Loan Documents are expressly inconsistent with any of the provisions of this Interim Order, the provisions of this Interim Order shall govern and control.

23.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

**Exhibit B**

**DIP Term Sheet**

## ANNEX II

### DIP TERM SHEET

### ALTO MAIPO

#### US$50,000,000 DEBTOR IN POSSESSION CREDIT FACILITY
#### SUMMARY OF TERMS AND CONDITIONS[2]

*This summary of terms and conditions (the "**DIP Term Sheet**") of a proposed debtor-in-possession credit facility (the "**DIP Facility**") is intended for discussion purposes only and does not constitute a commitment to lend. Only execution and delivery of definitive documentation relating to the DIP Facility shall result in any binding or enforceable obligations of any party relating to the DIP Facility. This DIP Term Sheet does not purport to summarize all of the terms, conditions, representations warranties and other provisions with respect to the transactions referred to herein.*

| Material Provision | Summary Description |
|---|---|
| **Parties** | |
| **Borrower:** | Alto Maipo Delaware LLC, a limited liability company, organized under the laws of the state of Delaware (the "**Company**" or the "**Borrower**") as debtor in possession in a case (the "**Chapter 11 Case**") filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Debtor:** | The Borrower.<br><br>The Borrower is also referred to herein at the "**Debtor**," and together with the Guarantor, the "**Obligors**." The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantor:** | Alto Maipo SpA, a *sociedad por acciones*, organized under the laws of Chile, as debtor in possession in the Chapter 11 Case. |
| **DIP Facility:** | The DIP Facility shall be in an aggregate principal amount of US$50 million (the "**DIP Commitments**," and the loans made thereunder, as increased by capitalized interest and fees, the "**DIP Loans**"). The DIP Loans, together with all related obligations incurred under the DIP Facility, are referred to herein as the "**DIP Obligations**". The DIP Facility shall be an unsecured, super priority revolving loan (with no |

---

[2]    This DIP Financing Term Sheet is attached to and is incorporated by reference into the Restructuring Support Agreement (the "RSA"), dated November 16, 2021, entered into by and among the Debtor, Norgener Renovables SpA ("Norgener"); AES Gener, S.A. (the "Sponsor"), Strabag SpA ("Strabag"), and the lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "Senior Lenders") that have executed the RSA (the "Supporting Senior Lenders").

| | |
|---|---|
| | additional draws permitted after the Commitment Period (as defined below)). |
| **Lenders:** | AES ANDES S.A. (the "**DIP Lenders**" or "**DIP Lender**", as applicable) |
| **Administrative Agent:** | AES ANDES S.A. (in such capacity and together with its successors, the "**Administrative Agent**"). |
| **Amount of Loan:** | A debtor-in-possession revolving loan facility, in an aggregate original principal amount of US$50 million (the "**DIP Facility**"). |
| **DIP Loan Documents:** | The Borrower will execute a definitive NY law governed loan agreement and other documents in furtherance or in connection therewith (collectively, the "**DIP Loan Documents**"), to evidence the DIP Facility, in form and substance customary for transactions of this type, but acceptable to the Borrower, the Administrative Agent and the DIP Lenders, acting reasonably, and in consultation with the Required Consenting Lenders (as defined in the RSA) including, without limitation, a promissory note governed by Chilean law. |
| **Purpose/Use of Proceeds:** | The Borrower shall use the proceeds ("**DIP Loan Proceeds**") of the DIP Facility in a manner consistent with the DIP Budget (as defined below) and only for the purpose of (i) certain working capital and general corporate purposes of the Borrower; (ii) restructuring costs and professional fees relating to the Chapter 11 Case, including to fund amounts in the Carve-Out Account, in the aggregate amount set out in the "Restructuring Professional Fees" line item in the DIP Budget which, for the avoidance of doubt, shall not be subject to the monthly limits set out in the DIP Budget; (iii) interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the Administrative Agent as provided under the DIP Loan Documents and the DIP Orders; (iv) any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors (as defined under the RSA); (v) other items agreed to by the parties in the DIP Loan Documents; and (vi) as approved by the Bankruptcy Court in the DIP Orders or other order (collectively "**Permitted Uses**"). |
| **Availability:** | Subject in each case to satisfaction of the conditions set forth below under the headings "*Conditions Precedent to Initial Draw*", "*Conditions Precedent to Subsequent Draws*" and "*Conditions Precedent to Each Draw*", as applicable:<br><br>(i) upon the date of entry of an order by the Bankruptcy Court granting interim approval of the DIP Facility that is in form and |

substance acceptable to the Majority DIP Lenders (as defined below), the Borrower, and in consultation with the Required Consenting Creditors (as defined in the RSA) (the "**Interim Order**"), up to US$20 million of the DIP Loans will be made available in a single draw minus the applicable stamp tax (the "**Initial Availability**"); and

(ii)  upon the date of entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is substantially in the form of the Interim Order with such changes as are acceptable to the Majority DIP Lenders and in consultation with the Required Consenting Creditors (the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"), the undrawn portion of the DIP Facility will be available in a single draw or in multiple draws in minimum amounts of US$1 million each minus the applicable stamp tax (the "**Subsequent Availability**").

Notwithstanding the foregoing, the DIP Facility shall only be accessed and made available if the Obligors' available cash is less than $10 million at the time of the requested draw.

Subject to the above, amounts available under the DIP Commitments that have been drawn and subsequently repaid may thereafter be re-borrowed but only within six (6) months following the Petition Date (the "**Commitment Period**"), subject in each case to satisfaction of the conditions set forth below under "Conditions Precedent to each Draw".

Any then undrawn Subsequent Availability shall terminate and no longer be available upon expiration of the Commitment Period.  All DIP Loans and other amounts owed hereunder with respect thereto shall be due and payable in full no later than the Maturity Date (as defined below).

| | |
|---|---|
| **Maturity Date:** | The DIP Facility will mature (the "**Maturity Date**") and will be immediately due and payable on the earliest to occur of any of the following: (a) twelve (12) months after entry by the Bankruptcy Court of the Final Order ("**Scheduled Maturity Date**"); (b) 35 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 35-day period; (c) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default (as defined below); (d) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders; (e) the date of the appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders, (f) |

<table>
<tr><td></td><td>filing of a motion by any Debtor which seeks the dismissal, or the entry of an order granting any party's request for the dismissal, of the Chapter 11 Case, unless otherwise consented to in writing by the Majority DIP Lenders; (g) the occurrence of a change of control (to be defined in a mutually agreed upon manner, but it shall include, without limitation, any changes with respect to beneficial ownership of 50% of total voting shares, a 363 sale and any other sale of all or substantially all of the assets of the Borrower in a single or series of transactions; hereinafter referred to as a "**Change of Control**"); (h) the effective date (the "**Effective Date**") of the plan of reorganization (the "**Plan**") confirmed in the Chapter 11 Case.<br><br>Upon the Maturity Date, the DIP Facility and the DIP Commitments thereunder shall terminate and all outstanding DIP Obligations shall become automatically due and payable in full in cash.<br><br>"**Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks are open for domestic and foreign exchange business in New York City and Santiago, Chile.</td></tr>
<tr><td>**Amortization:**</td><td>None.</td></tr>
<tr><td>**Interest Rate and Fees:**</td><td>As set forth in <u>Annex I</u>.</td></tr>
<tr><td>**Closing Date:**</td><td>The date on which the conditions precedent set forth below under "Conditions Precedent to Initial Draw" are satisfied (the "**Closing Date**").</td></tr>
<tr><td>**Conditions Precedent to Initial Draw:**</td><td>The Initial Availability on the Closing Date shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:<br><br>(a)    the Bankruptcy Court shall have entered the Interim Order (which order is not subject to any stay of effectiveness) no later than 14 days after the filing of a motion seeking entry of the Interim Order, approving and authorizing the DIP Facility on an interim basis, all provisions thereof and the priorities granted under Bankruptcy Code section 364(c)(1) in form and substance acceptable to the Majority DIP Lenders, and in consultation with the Required Consenting Creditors;<br><br>(b)    the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as</td></tr>
</table>

|  | otherwise agreed to in writing by the Majority DIP Lenders and in consultation with the Required Consenting Creditors; |
|--|--|
|  | (c) the Administrative Agent and the DIP Lenders shall have received executed copies of [the duly executed commitment letter to which this term sheet is enclosed as an annex] / [each of the DIP Loan Documents]; |
|  | (d) the Administrative Agent and the Consenting Creditors shall have received the Initial DIP Budget (as defined below), acceptable to the Majority DIP Lenders; and |
|  | (e) all reasonable and documented transaction costs, fees, expenses, consisting of reasonable and documented (i) legal fees of one counsel in each applicable jurisdiction (the "**Legal Fees**") and (ii) fees of financial and other advisors[3] (together, the "**Specified Advisors**" and their fees, together with the Legal Fees, the "**Transaction and Advisor Expenses**"), in each case, invoiced at least two (2) Business Days prior to the Closing Date incurred by the DIP Lenders in their capacity as such solely in connection with the preparation, negotiation and execution of the DIP Loan Documents, and all compensation owed to the DIP Lenders under the terms of the DIP Loan Documents shall have been paid to the extent due. |
| **Conditions Precedent to Subsequent Draws:** | The Subsequent Availability is subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:<br><br>(a) the Bankruptcy Court shall have entered the Final Order (which order is not subject to any stay of effectiveness) approving the DIP Facility on a final basis, no later than 35 calendar days following the date of entry of the Interim Order;<br><br>(b) the Final Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal in any manner except as otherwise agreed to in writing by the Majority DIP Lenders, in consultation with the Required Consenting Creditors; and<br><br>(c) the Administrative Agent shall have received customary closing deliverables and officer's certificates, including customary legal opinions from NY and Chilean counsel. |

---

[3] Note to NRS: AES advisors are Morris Nichols, Arsht & Tunnell LLP and Claro & Cia.

| | |
|---|---|
| **Conditions Precedent to Each Draw:** | The Initial Availability and each subsequent draw under the DIP Facility shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the following additional conditions:<br><br>(a) accuracy of representations and warranties in all material respects, as set forth in the DIP Loan Documents;<br><br>(b) absence of any default or Event of Default, as set forth in the DIP Loan Documents;<br><br>(c) except as expressly provided with respect to the Initial Availability, all compensation owed to the DIP Lenders due and payable under the terms of the DIP Loan Documents, including any fees due and payable, as applicable, and the Transaction and Advisor Expenses, shall have been paid to the extent due and invoiced at least two (2) Business Days prior to the applicable borrowing date; and<br><br>(d) the Administrative Agent shall have received, (i) in the case of the first draw, a Borrowing Notice (as defined below) one (1) Business Days prior to funding and (ii) in the case of all subsequent draws, a Borrowing Notice (as defined below) three (3) Business Days prior to funding.  Each such borrowing notice shall, among other things, include a certification that the Borrower's liquidity is less than the Excess Cash Threshold and the DIP Loan draw requested is required to meet the Borrower's anticipated liquidity needs and shall be in substantially the form of the borrowing notice agreed between the parties in the DIP Loan Documents (each, a "**Borrowing Notice**"). |
| **Funding Protection:** | Customary for DIP financing of this type, including breakage costs, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Superpriority Claims:** | All DIP Obligations shall at all times be entitled to a super-priority administrative expense claim against the Debtor ("**DIP Superpriority Claim**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to the Interim Order, subject only to the Carve-Out. |

| | |
|---|---|
| | The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Case. |
| **Carve-Out:** | The "Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, (iii) all unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtor is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code and Committee Professionals (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice and (iv) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $500,000 for Debtor Professionals and $50,000 for Committee Professionals ("**Trigger Cap**"), but in each case only to the extent that payment of such fees and expenses is subsequently allowed on a final basis by the Bankruptcy Court. <br><br> "**Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtor, their lead restructuring counsel, the U.S. Trustee, and counsel to any committee of unsecured creditors, which notice may be delivered following the occurrence and during the continuation of an event of default and acceleration of the DIP Obligations under the DIP Facility, stating that the Trigger Cap has been invoked. <br><br> Upon entry of the Final Order, the Debtor shall establish and fund a segregated escrow account (the "**Carve-Out Account**") not subject to control of the DIP Lenders, for purposes of funding the Carve-Out. The Carve-Out Account and the proceeds on deposit therein shall be available only to satisfy any obligations benefitting from the Carve-Out. Carve-Out Account terms and conditions to be mutually agreed and set forth in the DIP Orders. |
| **Voluntary Prepayments:** | The Borrower may prepay any DIP Obligations in whole or in part in an aggregate minimum amount of US$1,000,000 and integral multiples of US$500,000 in excess thereof. <br><br> The Borrower may terminate in whole or permanently reduce in part, any DIP commitments that remain undrawn at the time of such termination or reduction, provided that such partial reduction shall be in an aggregate minimum amount of US$1,000,000 and integral multiples of US$100,000 in excess thereof. |

| | |
|---|---|
| **Mandatory Prepayments:** | Prior to the Maturity Date, the Borrower shall make mandatory prepayments of DIP Obligations (and the DIP Commitments shall be permanently reduced in a corresponding aggregate amount) upon receipt by the Borrower of net proceeds from the following (in each case, subject to certain customary baskets to be negotiated in the definitive DIP Loan Documents and customary reinvestment rights, as applicable): |
| | i. *Incurrence of Indebtedness*: Prepayments in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower that is not otherwise explicitly permitted under the DIP Facility. |
| | ii. *Asset Dispositions; Extraordinary Receipts*: Prepayments in an amount equal to 100% of the net cash proceeds received from the sale of any asset outside of the ordinary course of business or from any other receipts outside of the ordinary course of the business (including insurance proceeds). |
| | iii. *Excess Cash*. Prepayments in an amount equal to 100% of excess cash (to be defined, in a mutually agreed upon manner, as available cash in excess of US$10,000,000 (but deducting amounts required to be paid by the Borrower in the next calendar month according to the DIP Budget); hereinafter referred to as the "**Excess Cash Threshold**") at the end of each calendar month period; |
| | iv. *CNM* Arbitration. Prepayments in an amount equal to 100% of net proceeds paid pursuant to CNM award or any disposition of the rights under that award |
| | <u>provided</u>, that, in each case (except with respect to paragraph (iv)), any such prepayment shall be subject to any priority of any other creditor with a properly secured lien existing immediately prior to the Petition Date. |
| **Representations and Warranties:** | The DIP Loan Documents shall contain representations and warranties customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, and shall be limited to the following: organization; powers; authorization; enforceability; financial statements; subsidiaries; ownership of property; licenses and permits; litigation; compliance with laws and regulations; no conflict with laws; material contractual obligations; governmental and third-party approvals, use of proceeds; insurance; taxes; no material misstatements; employee benefit plans; environmental matters; labor |

| | |
|---|---|
| | matters; no default; USA PATRIOT ACT; OFAC; FCPA; certain bankruptcy matters; absence of Material Adverse Effect (to be defined) since the Petition Date; absence of defaults under material agreements entered into after the date of commencement of the Chapter 11 Cases; and the Final Order shall continue to be in full force and effect and not amended, modified or supplemented in a manner adverse to the DIP Lenders; and other bankruptcy matters as agreed upon. |
| **Affirmative Covenants:** | The DIP Loan Documents shall contain affirmative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions qualifications and carve-outs, and shall be limited to the following: <br><br> (a) Preservation and maintenance of existence, business and properties; <br> (b) Maintenance of cash management system; <br> (c) Payment of income taxes and other material taxes and other claims; <br> (d) Payment of reasonable and duly documented Transaction and Advisor Expenses; <br> (e) Delivery of quarterly and annual financial statements; <br> (f) Material Litigation and other notices; <br> (g) Compliance with laws and regulations; <br> (h) Maintenance of records; <br> (i) Use of proceeds; <br> (j) Compliance with environmental laws; <br> (k) Payment of post-petition obligations; <br> (l) Notification to the Administrative Agent of any Event of Default and certain other customary material events; and <br> (m) Certain bankruptcy matters. |
| **Negative Covenants:** | The DIP Loan Documents shall contain negative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, including, without limitation, the following: <br><br> (a) Limitation on incurrence of indebtedness, other than customary exceptions to be agreed based on the DIP Budget, including DIP sub-facility or a separate DIP financing to finance VAT taxes payable in connection with invoices issued by Strabag pursuant to the Tunneling Contract with Strabag dated as of February 19, 2018 (as amended, restated, modified, supplemented, extended or amended and restated from time to |

<table>
<tr><td></td><td>time) (which may be secured by a first-priority lien on tax refunds) ("<strong>DIP Tax Financing Facility</strong>");</td></tr>
</table>

|  |  |
|---|---|
|  | (b) Limitation on liens, other than customary permitted liens and first- priority liens on tax refunds to secure the DIP Tax Financing Facility; |
|  | (c) Restriction on creation of any other super-priority claim which is *pari passu* with or senior to the DIP Superpriority Claims, except for the Carve-Out and other exceptions to be agreed; |
|  | (d) Limitation on investments and restricted payments, subject to customary exceptions to be agreed in the DIP Loan Documents; |
|  | (e) Prohibition on payment of pre-petition indebtedness, including any debt service, other than, to the extent constituting indebtedness, any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors; |
|  | (f) Business activities other than those engaged in on the Petition Date; |
|  | (g) Prohibition on mergers or a sale, lease or other disposition of all or substantially all of the assets of the Borrower (including a Change of Control) and other fundamental changes; |
|  | (h) Prohibition on the sales of any material asset or any other asset outside of the ordinary course of business; |
|  | (i) No use of proceeds in violation of customary anti-corruption laws, anti-money laundering, and sanctions laws; |
|  | (j) Adequate protection payments shall be made using the proceeds of the DIP Financing consistent with the DIP Budget or as otherwise consented to by the DIP Lenders, which consent shall not be unreasonably withheld; and |
|  | (k) Bankruptcy related matters. |
| **DIP Budget and other Financial Reporting:** | Prior to or on the Closing Date, the Borrower shall deliver: *DIP Budget*: An initial DIP budget to the Administrative Agent, with a copy to the Consenting Creditors, with monthly cash flow forecast for the period from the Closing Date through the end of September 2022, form acceptable to the Majority DIP Lenders and Required Consenting Creditors (the "**Initial DIP Budget**")[4], and thereafter, within an agreed |

---

[4]   The Initial DIP Budget is anticipated to be the same as the DIP Budget that has been distributed and agreed between the parties as of the date hereof, a copy of which is attached hereto, and the Majority DIP Lenders shall approve such DIP Budget as the Initial DIP Budget.

|  | number of days[5] following the end of each calendar month (starting with the calendar month immediately following the Closing Date), an updated budget in form substantially similar to the Initial DIP Budget and approved by the Majority DIP Lenders and Required Consenting Creditors (the "**Updated DIP Budget**" and, the Initial Approved DIP Budget and thereafter, each Updated DIP Budget, the "**DIP Budget**"). Each Updated DIP Budget shall include a reconciliation of the actual results for the months that are covered in the DIP Budget and have already elapsed.[6]<br><br>*Monthly Reporting*:  Commencing on the fourth Thursday after the Closing Date, and on the Thursday of each fourth calendar week thereafter, the Borrower shall provide customary reporting to be agreed. |
|---|---|
| **Milestones:** | The Borrower shall comply with following deadlines (unless waived by the Majority DIP Lenders) (the "**Milestones**"):<br><br>• A restructuring support agreement with relevant case constituents and acceptable to the DIP Lenders approved by the Bankruptcy Court by January 31, 2022.<br><br>• The Debtor shall file an Acceptable Plan (as defined below) no later than three (3) months following the Petition Date.<br><br>• The Bankruptcy Court shall have entered an order confirming the Plan no later than six (6) months following the Petition Date.<br><br>• The effective date of the Plan confirmed in the Chapter 11 Case and emergence of the Debtor from Chapter 11 no later than eight (8) months following the Petition Date.<br><br>• Synchronization of Las Lajas Units 1 and 2 and Alfalfal 2 by January 30, 2022.<br><br>• Substantial Completion of Critical Milestones D, E and F has been reached by March 31, 2022.<br><br>• Las Lajas and Alfalal 2 Commercial Operation Date by April 30, 2022. |
| **Events of Default:** | The credit agreement for the DIP Facility will include events of default ("**Events of Default**") (and, as appropriate, grace periods) usual and customary for debtor-in-possession financings of this kind, including failure to make payments when due, failure to meet Milestones, defaults under post-petition indebtedness, noncompliance with affirmative and negative covenants (certain of which shall be subject to grace periods |

---

[5]    Date to be not later than 10th day after end of each calendar month.
[6]    Budgets need to be prepared with FTI input and Required Creditor Consent.

| | |
|---|---|
| | to be agreed); breaches of representations and warranties; an order shall be entered by the Bankruptcy Court terminating the Debtor's exclusive periods for proposing a Plan; dismissal or conversion of the Chapter 11 Case to a case under Chapter 7; an order shall be entered by the Bankruptcy Court changing the venue of the Chapter 11 Case; the filing of or confirmation of a Plan that is not an Acceptable Plan; unstayed judgments in excess of specified amounts; a Change of Control; the Final Order ceases to be in full force and effect; appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, or appointment under the Chapter 11 Cases of a custodian, receiver, liquidator, administrator, administrative receiver or other similar official for the Borrower or a substantial part of its assets; and the commencement of a Chilean liquidation or other such proceeding in Chile without the prior written consent of the Majority DIP Lenders, which proceeding has not been stayed, suspended or dismissed within 90 days.  In addition, an Event of Default shall also occur upon a termination of the Power Purchase Agreement between the Borrower and Minera Los Pelambres dated June 28, 2013 (as amended, restated, modified, supplemented, extended or amended and restated from time to time).<br><br>"**Acceptable Plan**" means a Plan that, unless otherwise agreed in writing by the DIP Lenders, provides for repayment in full in cash of all DIP Obligations on the effective date of such Plan (excluding payment of contingent indemnity obligations).<br><br>Upon an Event of Default, the DIP Lenders shall have all customary remedies and rights and any and all of the DIP Obligations shall accelerate and become immediately due and payable and any remaining Subsequent Availability shall terminate and no longer be available. |
| **Assignments and Participations:** | The DIP Lenders shall not be permitted to assign any portion of the DIP Facility to any other person (other than affiliates of the DIP Lender), without the consent of the Borrower and the Required Consenting Creditors, such consent not to be unreasonably withheld or delayed; provided, however, that no consent of the Borrower shall be required for an assignment if an Event of Default has occurred and is continuing. Upon a permitted assignment, such assignee will become a DIP Lender for all purposes of the DIP Loan Documents. |
| **Majority DIP Lenders:** | "**Majority DIP Lenders**" shall mean the DIP Lenders holding more than 50% of total commitments or exposure under the DIP Facility; *except that* with respect to such matters relating to the reduction of principal or fees, changes in interest rates, changes in maturity, changes in the pro rata sharing clause, the Majority DIP Lenders shall consist of each affected DIP Lender.  Notwithstanding the foregoing, in the event |

| | |
|---|---|
| | there is a single DIP Lender, all references herein to the Majority DIP Lenders shall be deemed to refer to such DIP Lender. |
| **Taxes:** | Any and all payments under the DIP Facility shall be made free and clear of and without deduction or withholding for any taxes, other than Excluded Taxes. "**Excluded Taxes**" shall include (a) in the case of a Foreign Lender (as defined below), any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender in excess of the Chilean Preferential Withholding Rate (as defined below)[, other than any withholding Tax imposed as a result of a Change in Law (to be defined) after the date on which such DIP Lender becomes a DIP Lender under the DIP Facility]; and (b) any tax (other than any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender at or below the Chilean Preferential Withholding Rate) that is imposed on an amount payable to the Administrative Agent or DIP Lender that is attributable to the Administrative Agent's or DIP Lender's failure to comply with the applicable tax covenant in the DIP Facility requiring the Administrative Agent and each DIP Lender to use reasonable efforts to comply in a timely manner with any certification, identification, information, documentation or other reporting requirements if such compliance is reasonably requested by the Borrower in writing and if such compliance is required by applicable law as a precondition to exemption from, or reduction in the rate of, deduction or withholding of any taxes for which the Borrower is required to pay any additional amounts pursuant to the DIP Facility. <br><br> "**Foreign Lender**" means any Lender that is organized under the Applicable Laws of a jurisdiction other than Chile and which is not domiciled or resident in Chile for purposes of Chilean taxation. <br><br> "**Chilean Preferential Withholding Rate**" means the reduced withholding tax rate imposed under Chilean law on payments of interest in accordance with Article 59 No. 1 letter (b) of Chilean income tax law (*Artículo 59 No. 1 (b) de la Ley de Impuesto a la Renta de Chile*). |
| **Indemnity/ Release/ Waiver; Expense:** | The Borrower will indemnify the Administrative Agent and the DIP Lenders (each, only in their capacity as such) and each of their affiliates and respective related parties (each an "**Indemnitee**") and hold each of them harmless from and against any and all losses, claims, damages, liabilities, taxes, penalties and related expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee), or asserted against any Indemnitee by the Borrower or by any other person arising out of the DIP Facility and the financing contemplated thereby; provided that no Indemnitee will be indemnified for any such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from any |

| | |
|---|---|
| | Indemnitee's gross negligence, bad faith or willful misconduct or material breach of any Indemnitee's obligations under this term sheet, the DIP Facility or the DIP Loan Documents<br><br>The Borrower will reimburse (a) the DIP Lenders for their reasonable and documented out-of-pocket transaction expenses in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents, including any amendment or waiver thereof, and (ii) enforcement of the DIP Loans Documents, in each case, limited in the case of counsel to the fees and expenses of one counsel in each jurisdiction) and the Specified Advisors; and (b) all reasonable and documents out-of-pocket expenses of the Administrative Agent associated with the administration of the DIP Facility. |
| **Governing Law / Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code) |

**Annex I**

| | |
|---|---|
| **Interest Rate:** | 4% payable in kind.<br><br>Interest will capitalize in arrears on the basis of a 360-day year, calculated on the basis of the actual number of days elapsed.  Interest will capitalize quarterly. |
| **Default Interest Rate:** | Automatically after the occurrence of any Event of Default, the applicable interest rate ("**Default Interest Rate**") shall be the applicable interest rate plus 2%, which shall accrue on all overdue principal and other DIP Obligations and which shall be due immediately and payable on demand; provided, however, that the Default Interest Rate shall not exceed the maximum interest rate permitted by applicable law |
| **Upfront Fee:** | 1.00% of (i) the portion of the DIP Commitments available upon entry of the Interim Order, payable in kind on the date of entry of the Interim Order, and (ii) the remaining portion of the DIP Commitments, payable in kind on the date of entry of the Final Order. |
| **Unused Commitment Fee:** | 0.75% *per annum* on the undrawn portion of the DIP Commitments, commencing upon entry of the Interim Order and due monthly in arrears and payable in kind. |

**<u>Exhibit C</u>**

**DIP Budget**

*Privileged & Confidential – Attorney Work Product*
*For Internal Discussion Only – Draft Subject to Material Change*

# ILLUSTRATIVE DIP BUDGET

**ALTO MAIPO**

Lazard

# Disclaimer

The information herein has been prepared by Lazard based upon information supplied by the Company or publicly available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Company with respect to the anticipated future performance of the Company. We have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for any independent verification of such information or any independent valuation or appraisal of any of the assets or liabilities of the Company, or any other entity, or concerning solvency or fair value of the Company or any other entity. With respect to financial forecasts, we have assumed that they have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of management of the Company as to the future financial performance of the Company. We assume no responsibility for and express no view as to such forecasts or the assumptions on which they are based. The information set forth herein is based upon economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof, unless indicated otherwise. These materials and the information contained herein are confidential and may not be disclosed publicly or made available to third parties without the prior written consent of Lazard; provided, however, that you may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the transaction described herein and the portions of these materials that relate to such tax treatment or structure. These materials are preliminary and summary in nature and do not include all of the information that the Company should evaluate in considering a possible transaction. Nothing herein shall constitute a commitment or undertaking on the part of Lazard or any related party to provide any service. These materials do not constitute tax, accounting, actuarial, legal or other specialist advice, and Lazard shall have no duties or obligations to you in respect of these materials or other advice provided to you, except to the extent specifically set forth in an engagement or other written agreement, if any, that is entered into by Lazard and you.



*Privileged & Confidential – Attorney Work Product*
*For Internal Discussion Only – Draft Subject to Material Change*

ILLUSTRATIVE DIP BUDGET

# DIP Budget Assumptions

| | |
|---|---|
| **Timing** | • File for Ch. 11: November 1, 2021 (Target date: November 15, 2021)[1] |
| **Cash Flows** | • Operating Cash Flow: Alto Maipo forecast delivered via Intralinks in September 2021<br><br>• VAT Items:<br>  – No recovery of $31 million in December<br>  – Assumes separate facility for $74 million VAT associated with supplier financing<br><br>• AES Andes Equity Contributions: remaining $46 million commitments accelerated to October<br><br>• Critical Vendors and Other First Day Items: [TBD] |
| **Restructuring Costs** | • Includes professional fees for debtor, secured lenders, UCC, and DIP lender |
| **DIP Facility** | • Structure: Revolving Credit Facility<br>  – Separate debt basket to address VAT expenses<br><br>• Amount: $50 million<br><br>• Minimum Cash: $10 million<br><br>• Rate: [TBD]% PIK on drawn portion<br><br>• Unused Fee: [TBD]% PIK on undrawn portion<br><br>• Fees: [TBD]% PIK origination fee |
| **Adequate Protection** | • Limited to payment of secured lender professional fees |
| **Max Funding Need** | • $[42] million |

*Privileged & Confidential – Attorney Work Product*
*For Internal Discussion Only – Draft Subject to Material Change*

ILLUSTRATIVE DIP BUDGET

# Illustrative DIP Budget

($ in millions)

| DIP Monthly Detail | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre- or Post-Petition: | Pre | Pre | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | |
| Month | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
| **EBITDA** | **$0** | **$0** | **$0** | **$1** | **$5** | **$10** | **$13** | **$8** | **$6** | **$5** | **$5** | **$4** | **$5** | **$61** |
| (+/-) Working Capital | -- | -- | -- | (1) | (4) | (5) | (4) | 5 | 2 | 1 | 0 | 0 | (0) | (5) |
| (+/-) VAT Recovery / (Payment) | 11 | (1) | 1 | (0) | 3 | (0) | 3 | 1 | 3 | 1 | 1 | 1 | 1 | 26 |
| (-) Capex[1] | -- | (22) | (14) | (20) | (6) | (4) | (17) | (5) | (4) | (0) | (0) | (1) | (0) | (92) |
| (+/-) Intercompany Deferral / (Payment)[2] | -- | -- | -- | -- | -- | -- | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 6 |
| (+/-) Misc. Financing Costs | (0) | (1) | (0) | (0) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (3) |
| (+) Shareholder Contributions | -- | 46 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 46 |
| **Total Cash Flow, Pre-Rx and Debt Service** | **$11** | **$22** | **($13)** | **($20)** | **($2)** | **($0)** | **($4)** | **$10** | **$8** | **$8** | **$7** | **$5** | **$6** | **$37** |
| *Restructuring Activities:* | | | | | | | | | | | | | | |
| (-) Restructuring Professional Fees[3] | (2) | (3) | (4) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (43) |
| (-) First Day Authorized Payments | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Cash Flow, Pre-Debt Service** | **$9** | **$19** | **($17)** | **($24)** | **($6)** | **($4)** | **($7)** | **$7** | **$4** | **$4** | **$3** | **$2** | **$3** | **($6)** |
| *Debt Service:* | | | | | | | | | | | | | | |
| (-) Pre-Petition Debt Service | -- | (21) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (21) |
| (+/-) DIP Funding / (Repayment)[4] | -- | -- | 2 | 24 | 6 | 4 | 7 | (7) | (4) | (4) | (3) | (2) | (3) | 20 |
| **Net Cash Flow** | **$9** | **($2)** | **($15)** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **($8)** |
| **Cash Schedule:** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 18 | 27 | 25 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 18 |
| (+/-) Net Cash Flow | 9 | (2) | (15) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (8) |
| **Ending Cash Balance / (Deficit)** | **$27** | **$25** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** | **$10** |
| **DIP Financing** | | | | | | | | | | | | | | |
| **DIP Commitment** | **$--** | **$--** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | **$50** | |
| (-) Beginning Balance | | | -- | (2) | (26) | (31) | (35) | (42) | (36) | (31) | (27) | (24) | (22) | |
| (+/-) Repayment / (Drawdown) | | | (2) | (24) | (6) | (4) | (7) | 7 | 4 | 4 | 3 | 2 | 3 | |
| **Ending Balance** | | | **2** | **26** | **31** | **35** | **42** | **36** | **31** | **27** | **24** | **22** | **20** | |
| **Availability** | | | **$48** | **$24** | **$19** | **$15** | **$8** | **$14** | **$19** | **$23** | **$26** | **$28** | **$30** | |
| PIK Origination Fee[5] | -- | -- | TBD | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 0 |
| PIK Interest[5] | -- | -- | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | 0 |
| PIK Unused Fee[5] | -- | -- | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | 0 |
| **Total PIK DIP Interest / Fees** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** | **$--** |
| **Memo: Cash + DIP Availability** | **$27** | **$25** | **$58** | **$34** | **$29** | **$25** | **$18** | **$24** | **$29** | **$33** | **$36** | **$38** | **$40** | **NA** |

1. Excludes potential $391.5mm Strabag invoice, to be addressed separately. Includes the payment of Accounts Payables related to the following Intercompany Agreements: Construction Power Agreement, Construction Management Agreement, TSSA, Shared Facilities Agreement.
2. Corresponds to the Intercompany Agreements during Operations that are deferred/subordinated - specifically, Energy and Capacity Losses compensated to AES Andes and Transmission Line Annuity of Investment
3. Excludes success fees.
4. Does not include repayment of principal or accumulated interest / fees at emergence.
5. PIK amounts are additive to facility and to be agreed.

LAZARD  CLEARY GOTTLIEB

3

C O N F I D E N T I A L



# Appendix

*Privileged & Confidential – Attorney Work Product*
*For Internal Discussion Only – Draft Subject to Material Change*

ILLUSTRATIVE DIP BUDGET                                                                                                    APPENDIX

# Illustrative Professional Fee Schedule

($ in thousands)

**The following provides an estimate of professional fees that may be incurred by Alto Maipo during a free-fall Chapter 11 proceeding**

- **Analysis is highly preliminary and subject to change based on duration of the case and potential for higher litigation costs**

| Professional Fee Schedule | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre- or Post-Petition: | Pre | Pre | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | |
| | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
| Alto Maipo | $1,507 | $1,981 | $1,806 | $1,631 | $1,631 | $1,601 | $1,601 | $1,601 | $1,601 | $1,601 | $1,601 | $1,601 | $1,601 | $21,368 |
| Lenders | - | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 841 | 10,089 |
| UCC / UST | - | - | 937 | 937 | 937 | 937 | 937 | 937 | 937 | 937 | 937 | 937 | 937 | 10,304 |
| Other | - | 169 | 169 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 119 | 119 | 1,131 |
| **Subtotal** | **$1,507** | **$2,991** | **$3,753** | **$3,478** | **$3,478** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,498** | **$3,498** | **$42,892** |
| Memo: Transaction Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | $12,609 |
| **Total Fees** | **$1,507** | **$2,991** | **$3,753** | **$3,478** | **$3,478** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,448** | **$3,498** | **$3,498** | **$55,500** |

LAZARD  **CLEARY GOTTLIEB**                                                                                                      4