## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.: 21-11507 (KBO) |
| Debtors. | (Jointly Administered) |

### JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Fax:             (302) 571-1253
Email:         pmorgan@ycst.com
                    sgreecher@ycst.com
                    afaris@ycst.com

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
Richard J. Cooper (admitted *pro hac vice*)
Luke A. Barefoot (admitted *pro hac vice*)
Jack Massey (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:    (212) 225-2000
Fax:             (212) 225-3999
Email:         rcooper@cgsh.com
                    lbarefoot@cgsh.com
                    jamassey@cgsh.com

*Counsel for Debtors and Debtors in Possession*

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND
         COMPUTATION OF TIME ................................................................................. 1

Section 1.1    Defined Terms. ....................................................................................... 1
Section 1.2    Rules of Interpretation and Computation of Time. ................................ 18

ARTICLE II. UNCLASSIFIED CLAIMS ................................................................................ 19

Section 2.1    Administrative Claims. .......................................................................... 19
Section 2.2    Professional Fee Claims. ....................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
         INTERESTS ................................................................................................. 21

Section 3.1    Classification of Claims. ........................................................................ 21
Section 3.2    Class Identification. ............................................................................... 22
Section 3.3    Treatment and Voting Rights of Claims and Interests. ........................... 22
Section 3.4    Special Provision Governing Unimpaired Claims. .................................. 26
Section 3.5    Voting; Presumptions; Solicitation. ....................................................... 26
Section 3.6    Elimination of Vacant Classes. .............................................................. 26
Section 3.7    Nonconsensual Confirmation. ................................................................ 27
Section 3.8    Subordinated Claims. ............................................................................. 27
Section 3.9    No Waiver. ............................................................................................. 27

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 27

Section 4.1    Compromise of Controversies. .............................................................. 27
Section 4.2    Sources of Consideration for Plan Distribution. ..................................... 28
Section 4.3    Restructuring Transactions. ................................................................... 28
Section 4.4    Lien Priority for Amended & Restated Secured Obligations .................. 30
Section 4.5    Continued Corporate Existence. ............................................................. 31
Section 4.6    Corporate Action. .................................................................................. 31
Section 4.7    Vesting of Assets. .................................................................................. 32
Section 4.8    Cancellation of Existing Securities and Agreements. ............................. 32
Section 4.9    Issuance of New Common Equity. .......................................................... 33
Section 4.10   Exemption from Registration Requirements. .......................................... 33
Section 4.11   Organizational Documents. .................................................................... 33
Section 4.12   Treatment of Non-Qualified Creditors. ................................................... 33
Section 4.13   Exemption from Certain Transfer Taxes and Recording Fees. ................ 34
Section 4.14   Directors and Officers of the Reorganized Debtors. ............................... 34
Section 4.15   Effectuating Documents; Further Transactions. ...................................... 35
Section 4.16   Restructuring Expenses. ......................................................................... 35
Section 4.17   Retained Causes of Action. .................................................................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................ 36

Section 5.1    Assumption and Rejection of Executory Contracts and Unexpired Leases. ........ 36
Section 5.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....... 37
Section 5.3    Indemnification and Reimbursement Obligations. ................................................ 38
Section 5.4    Claims Based on Rejection of Executory Contracts and Unexpired Leases (if Any)................................................................................................................... 39
Section 5.5    Contracts and Leases Entered Into After the Petition Date. ................................ 39
Section 5.6    Employee Compensation and Benefit Programs. ................................................. 39
Section 5.7    Insurance Policies. ............................................................................................... 40
Section 5.8    Reservation of Rights............................................................................................ 40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 40

Section 6.1    Distribution on Account of Claims and Interests Allowed as of the Effective Date. ...................................................................................................... 40
Section 6.2    Distribution on Account of Claims and Interests Allowed After the Effective Date. ...................................................................................................... 41
Section 6.3    Timing and Calculation of Amounts to Be Distributed. ...................................... 41
Section 6.4    Delivery of Distributions. .................................................................................... 41
Section 6.5    Distributions by Distribution Agent (if any)........................................................ 42
Section 6.6    Minimum Distributions. ...................................................................................... 42
Section 6.7    Undeliverable Distributions. ................................................................................ 43
Section 6.8    Compliance with Tax Requirements/Allocations. ............................................... 43
Section 6.9    Surrender of Cancelled Instruments or Securities. .............................................. 44
Section 6.10   Claims Paid or Payable by Third Parties. ............................................................ 44

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS ...................................................................................................... 44

Section 7.1    Allowance of Claims and Interests. ...................................................................... 44
Section 7.2    Prosecution of Objections to Claims..................................................................... 45
Section 7.3    Estimation of Claims and Interests. ...................................................................... 45
Section 7.4    [Reserved]. ........................................................................................................... 46
Section 7.5    Disallowance of Certain Claims. .......................................................................... 46
Section 7.6    Offer of Judgment. ............................................................................................... 46
Section 7.7    Amendments to Claims.......................................................................................... 46

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .......................... 47

Section 8.1    Conditions Precedent to the Effective Date. ......................................................... 47
Section 8.2    Waiver of Conditions Precedent. ........................................................................... 48
Section 8.3    Effect of Failure of Conditions Precedent. ........................................................... 48
Section 8.4    Reservation of Rights............................................................................................ 49
Section 8.5    Substantial Consummation of Plan........................................................................ 49

ARTICLE IX. EFFECT OF PLAN CONFIRMATION.................................................................... 49

Section 9.1    Binding Effect............................................................................................... 49
Section 9.2    Discharge of Claims and Termination of Interests; Compromise and
                Settlement of Claims, Interests, and Controversies. ............................... 49
Section 9.3    Releases......................................................................................................... 50
Section 9.4    Exculpation and Limitation of Liability. ...................................................... 54
Section 9.5    Injunction. .................................................................................................... 55
Section 9.6    Setoffs and Recoupment. ............................................................................. 55
Section 9.7    Release of Liens. .......................................................................................... 56

ARTICLE X. RETENTION OF JURISDICTION ........................................................................ 56

ARTICLE XI. MISCELLANEOUS PROVISIONS..................................................................... 58

Section 11.1    Immediate Binding Effect.................................................................................. 58
Section 11.2    Payment of Statutory Fees. ............................................................................... 58
Section 11.3    Amendments. .................................................................................................... 58
Section 11.4    Revocation or Withdrawal of Plan..................................................................... 59
Section 11.5    Governing Law. ................................................................................................ 59
Section 11.6    Successors and Assigns...................................................................................... 59
Section 11.7    Severability. ...................................................................................................... 60
Section 11.8    Controlling Document. ...................................................................................... 60
Section 11.9    Filing of Additional Documents. ....................................................................... 60
Section 11.10   Reservation of Rights......................................................................................... 60
Section 11.11   Service of Documents. ....................................................................................... 61
Section 11.12   Tax Reporting and Compliance. ......................................................................... 64
Section 11.13   Exhibits, Schedules, and Supplements............................................................... 64
Section 11.14   Entire Agreement. .............................................................................................. 64
Section 11.15   Allocation of Payments....................................................................................... 64
Section 11.16   Dissolution of the Committee. ............................................................................ 65

## <u>ANNEXES</u>

<u>Annex A</u>        Claims to be Paid in Full

<u>Annex B</u>        Claims to Pass Through Unimpaired

<u>Annex C</u>        Claims to Which Debtors Will (i) Object and Seek Disallowance, Expungement, or Reduction, (ii) Estimate at $0 for Distribution Purposes, or (iii) Assume the Relevant Contract at $0 Cure Cost

<u>Annex D</u>        Claims Satisfied/Released Pursuant to Plan / Assumed with $0 Cure

### JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware") (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY AND TO CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1    *Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in the Plan:

1. "*1L Secured Notes*" means any 1L Secured Obligations that may be issued in the form of secured notes.

2. "*1L Secured Obligations*" means a first priority tranche of secured notes or secured bank instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement, *provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective

Date, Strabag's Pro Rata Share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

3.      "*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses and to the extent not disallowed under a Final Order.

4.      "*Adequate Protection Claim*" means that superpriority Claim granted to the Senior Lenders and Strabag pursuant to the Final Cash Collateral Order, which Claim shall not be Allowed so long as the Restructuring Support Agreement remains valid and in full force, and is limited to the extent of any diminution in value of the Prepetition Collateral (as defined in the Final Cash Collateral Order).

5.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28; (d) DIP Claims; and (e) the Adequate Protection Claim.

6.      "*AES Andes*" means AES Andes S.A., f/k/a AES Gener S.A.

7.      "*AES Andes Shared Services Contracts*"  means the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the Common Terms Agreement).

8.      "*AES Andes Shared Services Payments*" means certain intercompany payments due to AES Andes (or any permitted transferee) by Alto Maipo pursuant to the AES Andes Shared Services Contracts, which are currently deferred under the terms of the AES Andes Shared Services Contracts until the existing senior debt discharge date.

9.      "*Affiliate*" means an affiliate as defined in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

10.      "*Agreement Effective Date*" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

11.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Claims Bar Date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) the Claims of the Senior Lenders and Strabag on account of the Alto Maipo Senior Secured Obligations; or (d) a

Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that, with respect to a Claim described in clauses (a), (b), and (c) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that is listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court, and Holders of such Claims shall not receive any distributions under the Plan on account of such Claims or Interests. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "***Allow***" and "***Allowing***" shall have correlative meanings.

12. "***Alto Maipo***" means Alto Maipo SpA or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

13. "***Alto Maipo Delaware***" means Alto Maipo Delaware LLC or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

14. "***Alto Maipo Senior Secured Obligations***" means (i) an amount equal to $1,652,218,290 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (ii) an amount equal to $391,500,000 due to Strabag as the Supplier Deferred Payment under the Tunneling Contract, without duplication.

15. "***Amended & Restated 2L Secured Obligations***" means a second priority tranche of amended and restated secured debt instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement, *provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective Date, Strabag's pro rata share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

16. "***Amended & Restated Secured Exit Financing Facility***" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for and in satisfaction of the Claims under the DIP Credit Facility, as provided for in the Plan Term Sheet, documentation of which shall be included in the Plan Supplement, or as otherwise agreed between the Required Consenting Creditors, the Debtors, and the DIP Lender.

17. "***Amended & Restated Secured Obligations Intercreditor Agreement***" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors, which shall be included in the Plan

Supplement, by which (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations.

18.    "*Amended & Restated Secured Obligations*" means the Working Capital Facility, Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations, documentation of which shall be included in the Plan Supplement.

19.    "*Assets*" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, including as specified in section 541 of the Bankruptcy Code.

20.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule (as may be amended), if any, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Debtors pursuant to the Plan and which will be included in the Plan Supplement; *provided* that the Required Consenting Creditors shall have approved any assumptions, rejections or modifications of material Executory Contracts and Unexpired Leases.

21.    "*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

22.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended.

23.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

24.    "*Bankruptcy Fees*" means any and all fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

25.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

26.    "*Blue Sky Laws*" means any state securities laws.

27.    "**_Business Day_**" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

28.    "**_Carve-Out Account_**" means the segregated account established pursuant to the DIP Credit Facility Documents for purposes of funding the Carve-Out (as defined in the DIP Credit Facility Documents), provided that, on and following the Effective Date, the Carve-Out Account shall be used as the account to maintain an amount equal to the Professional Fee Reserve Amount solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

29.    "**_Cash_**" means the legal tender of the United States of America or the equivalent thereof.

30.    "**_Causes of Action_**" means any and all actions, causes of action, suits, claims, Claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises and trespasses of any kind or character whatsoever of, or belonging to, the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity or otherwise.  For the avoidance of doubt, "Causes of Action" includes, but is not limited to, (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar Claim.

31.    "**_Cerberus_**" means certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

32.    "**_Chapter 11 Cases_**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to both Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

33.    "**_Claim_**" means any claim, as defined in section 101(5) of the Bankruptcy Code against any Debtor, including Administrative Claims and DIP Claims, in each case whether or not asserted.

34.    "**_Claims Bar Date_**" means, as applicable, the General Bar Date, the Governmental Bar Date, the Amended Schedule Bar Date, the Rejection Bar Date, and any other date or dates

established or to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed.

35.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

36.    "*Class*" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

37.    "*CNM Arbitral Award*" means any proceeds that may be collected by the Debtors in connection with any award issued in the CNM Arbitration, including, without limitation, any amounts collected under that certain Co-Obligor Undertaking as between Alto Maipo, SpA as Owner, Hochtief Solutions AG as Co-Obligor, and Cooperativa Muratori & Cementisti – C.M.C. di Ravenna as Co-Obligor.

38.    "*CNM Arbitration*" means the arbitration captioned *ICC Case No. 22867/JPA (C-22923/JPA) (C-23845/JPA) – Alto Maipo SpA v. Constructora Nuevo Maipo S.A. v. The AES Corporation and AES Gener S.A.*

39.    "*Committee of Unsecured Creditors*" or "*Committee*" means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* (D.I. 231).

40.    "*Common Terms Agreement*" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, United States International Development Finance Corporation (as successor in interest to Overseas Private Investment Corporation), Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutche Bank AG, London Branch, and Santana S.A., and each of their successors and assigns as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

41.    "*Company*" means, together, Alto Maipo and Alto Maipo Delaware.

42.    "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

43.    "*Confirmation Date*" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rules 5003 and 9021.

44.    "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

45.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

46.    "*Consenting Creditors*" means, at any point in time, such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby.

47.    "*Consummation*" means the occurrence of the Effective Date.

48.    "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

49.    "*Debt Service Reserve Account*" or "*DSRA*" means an account to be established in the name of one or more of the Reorganized Debtors in accordance with the Plan Term Sheet and funded up to a balance of $20 million, which would otherwise be payable to Amended & Restated 2L Secured Obligations through the proceeds of the CNM Arbitral Award and/or the excess cash flow entitlement, in favor of the 1L Secured Obligations.

50.    "*Debtor*" has the meaning set forth in the introductory paragraph of the Plan.

51.    "*Deferred 1L Interest*" means, together, the Deferred 2022 1L Interest and the Deferred 2023 1L Interest.

52.    "*Deferred 2022 1L Interest*" means interest payable by the Reorganized Debtors as of July 15, 2022 and October 15, 2022 on the 1L Secured Obligations which shall be paid in kind.

53.    "*Deferred 2023 1L Interest*" means interest payable by the Reorganized Debtors as of January 15, 2023 on the 1L Secured Obligations which shall be paid in kind.

54.    "*Definitive Documentation*" means the definitive amendments to any financing and collateral documents securing the Alto Maipo Senior Secured Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and the Plan Term Sheet, including the Plan, the Disclosure Statement and the documentation relating to the New and A&R Obligations.  The Definitive Documentation and any modifications thereto will be (i) consistent with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

55.    "*DIP Agent*" means AES Andes S.A., as sole agent under the DIP Credit Facility, or any successor agents thereunder.

56.     "*DIP Budget*" means the most recently approved budget at such time of: (a) the Initial DIP Budget (as defined in the DIP Credit Agreement) in substantially the form set forth in Schedule 5.01(c) of the DIP Credit Agreement, setting forth projected monthly cash flows for the period from the closing date through the end of September 2022, and (b) the updated budget in form substantially similar to the Initial DIP Budget and approved by the DIP Lender.

57.     "*DIP Claims*" means any and all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interests, fees, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

58.     "*DIP Credit Agreement*" means that certain Super-Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, as borrower, Alto Maipo SpA, as guarantor, the DIP Agent, and the DIP Lender, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as may be amended, modified or supplemented from time to time, in accordance with the terms thereof.

59.     "*DIP Credit Facility*" means that superpriority, debtor-in-possession revolving loan facility provided pursuant to the DIP Credit Agreement in an aggregate original principal amount of up to $50 million, consisting of the DIP Loans.

60.     "*DIP Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement of the DIP Credit Facility and the transactions contemplated thereby.

61.     "*DIP Credit Facility Documents*" means the DIP Credit Agreement together with all documentation executed or delivered in connection therewith as may be amended, modified or supplemented from time to time, in accordance with the terms and conditions set forth therein.

62.     "*DIP Lender*" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

63.     "*DIP Loans*" means the revolving loan of up to $50 million to be provided pursuant to the DIP Credit Agreement.

64.     "*DIP Orders*" means, together, the *Interim Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (IV) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C); and (V) Grant Related Relief* (D.I. 70, the "**Interim DIP Order**"), the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing*

*Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (IV) Grant Related Relief* (D.I. 166, the "**Final DIP Order**").

65.      "***Disclosure Statement***" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

66.      "***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement.

67.      "***Disputed***" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed.

68.      "***Distribution Agent***" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors, in the capacity as distribution agent under the Plan.

69.      "***Distribution Date***" means the date on which Holders of Claims are eligible to receive distributions under the Plan.

70.      "***Effective Date***" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

71.      "***Entity***" means an "entity" as defined in section 101(15) of the Bankruptcy Code, and includes, for the avoidance of doubt, a Person.

72.      "***Existing Equity Interest***" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Effective Date.

73.      "***Estates***" means, as to each Debtor, the estate created for the Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

74.      "***Exculpated Parties***" means, collectively, (i) the Debtors; (ii) the directors and officers of the Debtors who served during any portion of the cases; (iii) the Committee; (iv) the members of the Committee in their capacity as such; and (v) the professionals retained in these Chapter 11 Cases by the Debtors and the Committee.

75.      "***Executory Contract***" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under sections 365 or 1123 of the Bankruptcy Code.

76.     "***Final Cash Collateral Order***" means the *Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (D.I. 164).

77.     "***Final Order***" means, as applicable, an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

78.     "***General Bar Date***" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all entities, except for governmental units, must file Proofs of Claim and shall apply to all claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, Section 503(b)(9) Claims, unsecured priority claims, and unsecured nonpriority claims.

79.     "***General Unsecured Claims***" means all Claims other than Administrative Claims, Professional Fee Claims, Alto Maipo Senior Secured Obligations, Secured Claims, Priority Claims, DIP Claims, the Adequate Protection Claim, Strabag's Other Claims, Intercompany Claims, and Existing Equity Interests.

80.     "***Governmental Bar Date"*** means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all Governmental Units holding a Claim under Section 502(b)(9) of the Bankruptcy Code against the Debtors is required to file Proofs of Claim.

81.     "***Governmental Unit***" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

82.     "***Holder***" means the beneficial holder of any Claim or Interest.

83.     "***Impaired***" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

84.     "***Indemnification Obligations***" means a Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of

any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, by-laws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

85. "***Indemnified Parties***" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' by-laws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

86. "***Intercompany Claims***" means a claim held by the Company against an Affiliate of the Company and *vice versa*. For the avoidance of doubt, the term "Intercompany Claim" does not include (x) any Claim held by Strabag against the Company or (y) any Claim held by AES Andes against the Company in connection with the AES Andes Shared Services Payments.

87. "***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the company.

88. "***Joinder***" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as <u>Exhibit B</u>, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the effective date of such Restructuring Support Agreement may become a Consenting Creditor by executing such joinder agreement.

89. "***Law***" means any federal, state, local, or foreign "law" (including common Law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

90. "***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

91. "***New and A&R Obligations Documents***" means collectively, any capital increase, indenture, loan agreement or other agreement governing the New and A&R Obligations, the Amended & Restated Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendment to the by-laws, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Company and the Required Consenting Creditors, and which documents shall be included in the Plan Supplement.

92. "***New and A&R Obligations***" means the Amended & Restated Secured Obligations and New Common Equity.

11

93.    "***New Common Equity***" means the common Interests in the Company to be issued by the Company on or about the Effective Date pursuant to the terms and conditions of the Plan Term Sheet.

94.    "***New Organizational Documents***" means, on or after the Effective Date, the amended and restated certificates of incorporation or similar governing document of each Reorganized Debtor and any other documents required to govern each Reorganized Debtor, which documents shall be included in the Plan Supplement.

95.    "***Non-Qualified Creditors***" means any creditor under the Alto Maipo Senior Secured Obligations other than a Qualified Creditor.

96.    "***Notice and Claims Agent***" means Prime Clerk LLC ("<u>Prime Clerk</u>") in its capacity as noticing, claims, and solicitation agent for the Debtors.

97.    "***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

98.    "***Petition Date***" means November 17, 2021.

99.    "***Plan***" means this joint chapter 11 plan of reorganization filed by the Company, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Term Sheet, and to the extent not consistent with the Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

100.    "***Plan Documents***" means any and all of the documents, other than the Plan, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, including, without limitation, insofar as such documents are not incorporated into the Plan through inclusion in the DIP Credit Facility Documents, and the New and A&R Obligations Documents, subject to any consent rights set forth in the Plan.

101.    "***Plan Supplement***" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents that may be filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, where applicable; which shall include the New and A&R Obligations Documents, the New Organization Documents, the Assumed Executory Contracts and Unexpired Leases Schedule, and such other Plan Documents as have not been previously filed with the Bankruptcy Court, and which shall be in form and substance acceptable to the Company and the Required Consenting Creditors.

102.    "***Plan Supplement Filing Date***" means the date that is 14 calendar days prior to the Confirmation Hearing, or such later date as is authorized by the Court.

103.    "***Plan Term Sheet***" means the Plan Term Sheet attached to the Restructuring Support Agreement.

104.    "***PPA***" means the agreement entitled "Contrato de Suministro de Electricidad" (Power Supply Agreement) dated as of June 28, 2013, by and between Alto Maipo and Antofagasta Minerals S.A., as assigned by Antofagasta Minerals S.A. to Minera Los Pelambres on June 20, 2014 (as further amended and supplemented prior to the Petition Date).

105.    "***Priority Claims***" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims.

106.    "***Professionals***" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

107.    "***Professional Fee Claims***" means any Claim of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

108.    "***Professional Fee Reserve Amount***" means the aggregate Accrued Professional Compensation through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of the Plan; *provided* that the Professional Fee Reserve Amount shall not exceed the unused portion of the amounts set forth in the DIP Budget unless consented to by the Consenting Creditors.

109.    "***Project***" means the run-of-river hydroelectric project constructed by Alto Maipo in the Andes Mountains.

110.    "***Proof of Claim***" means a "proof of claim" as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Debtors' Chapter 11 Cases.

111.    "***Pro Rata Share***" means, with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

112.    "***Qualified Creditor***" means a creditor of the Alto Maipo Senior Secured Obligations who provides either one of the following certifications: (i) a certification that it is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act or U.S. government agency, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or (ii) a certification that it is a non-U.S. person (as such term is defined in Rule 902(k) under the Securities Act) located or resident outside the United

States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

113.   "*Reinstated*" or "*Reinstatement*" mean, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

114.   "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

115.   "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and, if separate, the DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i).  For the avoidance of doubt, no claims or causes of action of either of the Debtors against (x) Constructora Nuevo Maipo S.A., (y) Hochtief Solutions AG, or (z) Cooperativa Muratori & Cementisti – C.M.C. di Ravenna, nor any of the respective Affiliates of each entity listed in clauses (x) through (z), shall be released pursuant to this Plan.

116.   "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) Norgener Renovables S.p.A.; (b) AES Andes; (c) Strabag, in its capacity as shareholder and subordinated lender; (d) the DIP Agent and each DIP Lender; (e) the Administrative Agent and the Collateral Agents (in each case as defined in the Common Terms Agreement); (f) each Consenting Creditor; (g) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (h) all holders of Claims or Interests that are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt in to grant the releases provided in the Plan; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that either vote to reject the Plan or abstain from voting on the Plan for all Classes in which they are eligible to vote and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt in to grant the releases provided in the Plan; (j) each current and former Affiliate of each Entity in clause (a) through (i), and (k) each Related Party of each Entity in clause (a) through (j).

117. "***Reorganized Board***" means the board of directors of Alto Maipo, as determined in accordance with the New Organizational Documents.

118. "***Reorganized Company***" means the Company, or any successor or assign thereto, by merger consolidation, or otherwise, on and after the Effective Date.

119. "***Reorganized Debtors***" means collectively, each of the Debtors and any successors thereto, by merger, consolidation or otherwise, as reorganized on or after the Effective Date, in accordance with the Plan.

120. "***Required Consenting Creditors***" means, as of the relevant date, the holders of no less than 2/3 of the aggregate principal amount of the Alto Maipo Senior Secured Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

121. "***Restructuring***" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan.

122. "***Restructuring Documents***" means the Plan Term Sheet and the Restructuring Term Sheet.

123. "***Restructuring Expenses***" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses (including success fees) of (x) the Consenting Creditors' advisors (excluding advisors to Strabag and Cerberus), including ASSET Chile S.A., FTI Consulting Canada ULC, Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., (y) Troutman Pepper Sanders Hamilton LLP, as advisors to Strabag, and (z) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus, *provided that* any fees paid under subclauses (y) and (z), shall be subject to such caps as have been agreed pursuant to the Restructuring Support Agreement, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby, and (ii) the Administrative Agent and the Collateral Agents (each as defined in the Common Terms Agreement).

124. "***Restructuring Support Agreement***" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors, which was filed as Exhibit A to the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (D.I. 13), as amended on November 23, 2021, January 31, 2022, and February 28, 2022, and as may be further amended or become effective as between the Debtors and the Consenting Creditors.

125. "***Restructuring Term Sheet***" means the restructuring term sheet attached to the Restructuring Support Agreement.

126.    "*Restructuring Transactions*" means, collectively, the Chapter 11 Cases, the New and A&R Obligations and the consummation of the other transactions contemplated in the Restructuring Documents.

127.    "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

129.    "*SEC*" means the United States Securities and Exchange Commission.

130.    "*Secured Claims*" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

131.    "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

132.    "*Security*" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

133.    "*Senior Lenders*" means the lenders and interest rate swap providers under the Common Terms Agreement, each in their capacity as such.

134.    "*Sponsor*" means AES Andes.

135.    "*Sponsor Deferrals*" means those certain intercompany amounts payable by Alto Maipo to AES Andes under the O&M Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of the applicable intercompany agreements, and which the Sponsor shall, subject to occurrence of the Effective Date, defer for 12 months beginning May 2022, in an amount of $600,000 per month, for a total deferred amount of approximately $7.2 million).

136.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction

privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

137.    "*Strabag*" means Strabag SpA, as (i) contractor under the Tunneling Contract, (ii) shareholder under the Shareholders' Agreement of Alto Maipo among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered prior to the date of the Restructuring Support Agreement, and (iv) secured creditor with respect to the Supplier Deferred Payment.

138.    "*Strabag Change Order Deferral*" means the $1,141,097 payable upon completion of Change Order Nos. 1, 2 and 4 (as such term is defined in the Tunneling Contract), which shall be deferred until December 31, 2022.

139.    "*Strabag Construction Deferral*" means the $10 million payable upon substantial completion of Critical Milestone F (as such term is defined in the Tunneling Contract), which shall be deferred until it is paid pursuant to the excess cash flow sweep.

140.    "*Strabag Deferrals*" means, collectively, the Strabag Change Order Deferral, Strabag Construction Deferral and Strabag Insurance Deferral.

141.    "*Strabag Insurance Deferral*" means, upon receipt, the approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which shall be deferred until December 31, 2022.

142.    "*Strabag's Other Claims*" means Strabag's claims under the Tunneling Contract (as further amended from time to time, including pursuant to the terms described in the Restructuring Term Sheet), other than such Claims that are part of the Alto Maipo Senior Secured Obligations, that are payable in Cash for construction costs and insurance proceeds pursuant to the terms described in Section 3.3(f).

143.    "*Subordinated Claim*" means any Claim that is subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.  For the avoidance of doubt, Subordinated Claim shall not include any Claim in Classes 1, 5 or 6.

144.    "*Supplier Deferred Payment*" shall have the meaning given to it in the Common Terms Agreement.

145.    "*Transfer Agreement*" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

146.    "*Tunneling Contract*" means that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (as further amended, and restated, and/or supplemented, including in connection with the Restructuring Transactions).

147.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

148.    "*Unimpaired*" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

149.    "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

150.    "*VAT*" means value-added tax.

151.    "*VAT Financing Facility*" means a financing facility secured by the Debtors to pay the full amount of VAT that will be due upon issuance of the invoice for the Supplier Deferred Payment by Strabag.

152.    "*Working Capital Facility*" means a super-senior first-lien secured working capital facility, documentation of which shall be included in the Plan Supplement, in an aggregate maximum principal amount of up to $15 million, with a maturity date of January 15, 2024, to be provided by AES Andes on the Effective Date.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of the Plan; (v) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (vii) references to "shareholders," "directors," and/or "officers" shall also include

"members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (xi) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

(b)　　The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)　　All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)　　In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article II of the Plan.

Section 2.1    *Administrative Claims.*

(a)　　Unless otherwise agreed by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases and except as otherwise provided in this Article II, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim as follows: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  The Debtors and Senior Lenders have agreed that so long as the RSA remains in full force and effect, and the Senior Lenders have not delivered notice of an RSA Termination (as defined in the Final Cash Collateral Order), they will not seek any recovery on account of any Adequate Protection Claim they may have.

(b)      All requests for payment of Administrative Claims must be filed no later than the first Business Day that is 30 days after the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than 45 days after the deadline for parties to file Administrative Claims as set forth in the service of notice of the Effective Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

Section 2.2      *Professional Fee Claims.*

(a)      All final requests for payment of Professional Fee Claims must be filed no later than the first Business Day that is 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      On the Effective Date, the Reorganized Debtors shall fund the Carve-Out Account with Cash equal to the Professional Fee Reserve Amount; *provided* that any amounts remaining in the Carve-Out Account immediately prior to the Effective Date shall be applied toward the Professional Fee Reserve Amount on the Effective Date.  The Carve-Out Account shall be maintained in trust solely for the benefit of the Retained Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  No Liens, Claims, or Interests shall encumber the Carve-Out Account in any way.  The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Carve-Out Account promptly after such Professional Fee Claims are Allowed by an Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, (x) if applicable, each Retained Professional shall receive its portion of the Carve-Out Account, allocated on the basis of the unused amounts set forth in the DIP Budget for such Retained Professional, from the Carve-Out Account and (y) the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.  When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Carve-Out Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

(c)      The Retained Professionals shall reasonably estimate in good faith their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Consenting Creditors no later than five Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  If a Retained Professional does

not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Carve-Out Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Carve-Out Account based on such estimates.

(d)      Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Debtors shall promptly pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors. From and after the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.1      *Classification of Claims.*[2]

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims or Professional Fee Claims, as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including for purposes of voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest shall be deemed classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

---

[2]      The Debtors reserve the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable Law.

The classification and the manner of satisfying all Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan.

Section 3.2    *Class Identification.*

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| **Class** | **Claims and Interests** | **Impairment / Voting Rights** |
|---|---|---|
| Class 1 | Alto Maipo Senior Secured Obligations | Impaired |
| Class 2 | Secured Claims | Unimpaired / Deemed to Accept |
| Class 3 | Priority Claims | Unimpaired / Deemed to Accept |
| Class 4 | General Unsecured Claims | Unimpaired / Deemed to Accept |
| Class 5 | DIP Claims | Impaired |
| Class 6 | Strabag's Other Claims | Impaired |
| Class 7 | Intercompany Claims | Unimpaired / Deemed to Accept OR Impaired / Deemed to Reject |
| Class 8 | Existing Equity Interests | Impaired / Deemed to Reject |

Section 3.3    *Treatment and Voting Rights of Claims and Interests.*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not due, in accordance with its terms in the ordinary course.

(a)    *Class 1—Alto Maipo Senior Secured Obligations.*

(i)    *Classification*: Class 1 consists of all Alto Maipo Senior Secured Obligations.  Subject to entry of the Confirmation Order, the Alto Maipo Senior Secured Obligations are hereby Allowed.

(ii)    *Treatment:* On the Effective Date, each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive, without setoff or recoupment by any Debtor or Reorganized Debtor, its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations, which shall, in the aggregate, represent a 60.0–66.8% recovery on the total face amount of the total Allowed Alto Maipo Senior Secured Obligations.

(iii)   *Impairment and Voting:* Class 1 is Impaired and Holders of Alto Maipo Senior Secured Obligations are entitled to vote to accept or reject the Plan.

(b)   *Class 2—Secured Claims.*

  (i)   *Classification*: Class 2 consists of all Secured Claims.

  (ii)   *Treatment:* Each Holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date.

  (iii)   *Impairment and Voting:* Class 2 is Unimpaired and Holders of Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

(c)   *Class 3—Priority Claims.*

  (i)   *Classification*: Class 3 consists of all Priority Claims.

  (ii)   *Treatment:* Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

  (iii)   *Impairment and Voting*: Class 3 is Unimpaired and Holders of Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Priority Claims.

(d)   *Class 4—General Unsecured Claims.*

  (i)   *Classification*: Class 4 consists of General Unsecured Claims.

  (ii)   *Treatment*: On the Effective Date, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in cash, funded by a cash contribution by AES Andes of up to $300,000.00 as set forth in Annex A hereto. That certain contingent and unliquidated General Unsecured Claim set forth in Annex B to the Plan shall survive unimpaired.  Remaining General Unsecured Claims shall be disallowed and expunged and/or estimated at zero for distribution purposes, or be resolved and released pursuant to the terms of the Plan, as detailed on Annexes C and D hereto.

  (iii)   *Impairment and Voting*:  Class 4 is Unimpaired and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such General Unsecured Claims.

(e)    *Class 5—DIP Claims*.

    (i)    *Classification*: Class 5 consists of all DIP Claims.

    (ii)    *Treatment:* On the Effective Date, all Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility.  Additionally, in consideration for, inter alia, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims, and AES Andes' agreement to contribute up to $10M to satisfy obligations in connection with certain other claims, AES Andes or its designee shall receive the New Common Equity, as provided in the Restructuring Term Sheet.

    (iii)    *Impairment and Voting:* Class 5 is Impaired and Holders of DIP Claims are entitled to vote to accept or reject the Plan.

(f)    *Class 6—Strabag's Other Claims.*

    (i)    *Classification*: Class 6 consists of Strabag's Other Claims.

    (ii)    *Treatment*: In consideration of Strabag's Other Claims, which are hereby Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all capitalized terms used in subsections 1-5 below and not otherwise defined herein are as defined in the Tunneling Contract):

        (1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum starting from the date that the Company accepts the completion of relevant Change Order (the "Strabag Change Order Deferral"); (4) $112,000 in the aggregate upon completion of an eco-flow monitoring system for all intakes; (5) $10,000,000 upon Substantial Completion of Critical Milestone F, which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep (as described in the Restructuring Term Sheet), shall bear interest at a  rate of 4.0% per annum starting from the date of Substantial Completion of said Critical Milestone

F, and shall be payable pursuant to the excess cash flow sweep (the "Strabag Construction Deferral"); and (6) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag (the "Strabag Insurance Deferral" and, together with the Strabag Change Order Deferral and Strabag Construction Deferral, the "Strabag Deferrals"). The Strabag Deferrals shall be secured, *pari passu* with the 1L Secured Obligations, until paid in full.

    (iii)    *Impairment and Voting*: Class 6 is Impaired and Holders of Strabag's Other Claims are entitled to vote to accept or reject the Plan.

  (g)    *Class 7—Intercompany Claims.*

    (i)    *Classification*: Class 7 consists of all Intercompany Claims.

    (ii)    *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors.

    (iii)    *Impairment and Voting*:  Intercompany Claims that are cancelled, released, and extinguished are Impaired and Holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims that are cancelled, released, or extinguished are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.   Intercompany Claims that are Reinstated are Unimpaired and Holders of such Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

  (h)    *Class 8—Existing Equity Interests*.

    (i)    *Classification*: Class 8 consists of all Existing Equity Interests.

    (ii)    *Treatment*:  On the Plan Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent

permitted under local law.  In order to effectuate such cancellation, release and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or the Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

(iii)    Impairment and Voting: Class 8 is Impaired and Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such Existing Equity Interests.

Section 3.4    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, the DIP Orders, or the DIP Credit Facility Documents, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

Section 3.5    *Voting; Presumptions; Solicitation.*

(a)    *Acceptance by Certain Impaired Classes*.  Only Holders of Claims in Classes 1, 5, and 6 are entitled to vote to accept or reject the applicable Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least 66.6% in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims in Classes 1, 5, and 6 have received Ballots containing detailed voting instructions.

(b)    *Conclusively Presumed Acceptance by Unimpaired Classes*.  Holders of Claims in Classes 2, 3, and 4, and certain Holders of Claims in Class 7, are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(c)    *Deemed to Reject by Certain Impaired Classes*.  Holders of Claims and Interests in Class 8, and certain Holders of Claims in Class 7, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(d)    *Controversy Concerning Impairment*.  If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

Section 3.6    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all

purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

Section 3.7    *Nonconsensual Confirmation.*

Because certain Class of Claims or Interests entitled to vote on an applicable Plan are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

Section 3.8    *Subordinated Claims.*

The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the plan.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 3.9    *No Waiver.*

Nothing contained in the Plan shall be construed to waive the right of any Debtor, Reorganized Debtor, or other Entity to object on any basis to any Claim, including after the Effective Date.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1    *Compromise of Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Other than as specifically set forth herein, the Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Section 4.2     *Sources of Consideration for Plan Distribution.*

The Debtors shall fund distributions under the Plan with (1) Cash on hand, including Cash from operations; (2) the Amended & Restated Secured Obligations; and (3) contributions made by AES Andes to the extent set forth in this Plan.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  Subject to the terms of the Definitive Documents, the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

Section 4.3     *Restructuring Transactions.*

(a)     *Effectuation of the Restructuring Transactions.*  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan and the Plan Supplement, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, including Strabag's re-delivery of its shares to AES Andes or such other entity as is designated by AES Andes (consistent with Section 3.3(h)(ii) herein); (c) the filing of appropriate certificates of formation or incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable Law; and (d) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate. For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors.

(b)     *Working Capital Facility.*  On the Effective Date, subject to the effectiveness of the Restructuring Transactions, including, without limitation, distribution of the New Common Equity to AES Andes, AES Andes will provide a super-senior first-lien secured working capital facility in an aggregate maximum principal amount of $15 million, with a commitment to fund through, and with a maturity date of, January 15, 2024, which shall be used to fund general corporate purposes and any costs to the Debtors or the reorganized Debtors associated with emergence from these Chapter 11 Cases. The Working Capital Facility shall bear an interest rate of 4.0% per annum and will rank *pari passu* with the Amended & Restated Secured Exit Financing Facility.  The repayment of the Working Capital Facility shall occur prior to any excess cash flow sweep.

(c)     *1L Secured Obligations.*   The 1L Secured Obligations shall be issued in the aggregate amount of $1,050,000,000 in the form of investment-grade style corporate notes and project-finance style loans, with the form of each Senior Lender's allocation to be in accordance with that Senior Lender's election.  All 1L Secured Obligations will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters.

(d)     *Amended & Restated 2L Secured Obligations.*   The Amended & Restated 2L Secured Obligations shall be issued in the aggregate amount of approximately $993,718,290 (equal to the amount of the Alto Maipo Senior Secured Obligations as of the Petition Date, plus the liquidated amount of the interest rate swaps, less the aggregate principal amount of the 1L Secured Obligations), and shall be structured as project finance-style loans or notes with documentation customary for investment-grade corporate credit, at the discretion of the Senior Lenders.  The Amended & Restated 2L Secured Obligations shall have a maturity of October 15, 2042, extendable to October 2052 at the individual option of each lender thereunder.

(e)     *AES Andes Shared Services Payments.*   All AES Andes Shared Services Payments will continue to be deferred in the form of disbursements under a new loan (the "Shared Services Loan"), and such deferral will be subject to the terms set forth as follows and be documented as an amendment to each of the AES Andes Shared Services Contracts.  The Shared Services Loan shall bear interest at the same rate as the Amended & Restated 2L Secured Obligations (including any upside fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.  The maturity of the Shared Services Loan shall be the same as the latest date of scheduled maturity for any Amended & Restated 2L Secured Obligations.

(f)     *Subordinated Debt.*   All Subordinated Debt (as defined in the Common Terms Agreement) shall be discharged.  At the request of the Debtors, all holders of Subordinated Debt shall execute the necessary agreements as the Debtors or Reorganized Debtors may deem necessary to effectuate and document the re-delivery of all Subordinated Debt to AES Andes or such other entity as is designated by AES Andes.

(g)     *Equity.*   On the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws.  In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.  As part of, *inter alia*, the proposed global resolution of the Class 5 DIP Claims and Intercompany Claims held by AES Andes, and in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; and the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims; and AES Andes' contribution to satisfy any amounts that the Borrower is required to pay up to a maximum amount of $10 million to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the

Parque Arenas Unsecured Claim (as defined in the Restructuring Support Agreement) and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D to the Restructuring Support Agreement); AES Andes shall receive 100% of the reorganized shares in Alto Maipo, which shares shall, in the future, be diluted subject to the conversion of the Amended & Restated 2L Secured Obligations and Shared Services Loan on the terms and subject to the conditions described in the governing documentation for such instruments. Holders of New Common Equity shall receive no dividends or distributions until the Amended & Restated Secured Exit Financing Facility, Working Capital Facility, VAT Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations have been repaid, restructured, or refinanced in full in accordance with the terms of the Plan and the Definitive Documentation.

(h)      *CNM Arbitral Award.*  Unless otherwise agreed to by the Company, the Senior Lenders and Strabag, all proceeds of any CNM Arbitral Award shall be applied in the following order as and when such proceeds may be collected by Alto Maipo: (1) to repay the Working Capital Facility; (2) to repay the Strabag Construction Deferral; (3) to repay the Deferred 1L Interest; (4) 50% to repay any DIP Loans or the Amended & Restated Secured Exit Financing Facility amount outstanding, and 50% to repay the Amended & Restated 2L Secured Obligations (provided that, to the extent the DSRA is not fully funded, the Amended & Restated 2L Secured Obligations allocation shall go instead to fund DSRA up to a $20 million balance); (5) to the extent the DSRA is not fully funded, to fund the DSRA up to a $20 million balance; and (6) to repay the Amended & Restated 2L Secured Obligations.

(i)      *Amended & Restated Secured Exit Financing Facility.*  The DIP Lender shall provide an Amended & Restated Secured Exit Financing Facility.  The Amended & Restated Secured Exit Financing Facility shall have a maturity date that is three years after the Effective Date, shall be granted a super-senior first lien on all assets (*pari passu* with the Working Capital Facility), other than proceeds of reimbursement of VAT that was financed with the proceeds of the VAT Financing Facility, and shall bear an interest rate of 4.0% per annum (subject to the deferral of interest payable in 2022 and in January 2023, which shall accrue interest at 4.0% per annum). The deferred interest of the Amended & Restated Secured Exit Financing Facility and the Sponsor Deferrals shall be added to the balance of the Amended & Restated Secured Exit Financing Facility and shall be repaid through the amortization of the Amended & Restated Secured Exit Financing Facility, which shall begin on July 15, 2023.

(j)      *VAT Financing Facility.*  A VAT Financing Facility shall be arranged in an aggregate total amount of $68.875 million, with a maturity that is 12 months from the date of issuance, with an interest rate as provided in the Definitive Documentation, and will rank *pari passu* with the 1L Secured Obligations.  The VAT Financing Facility shall be granted a super-senior first lien on the full amount of VAT refund that may due to Alto Maipo in connection with the Supplier Deferred Payment.

Section 4.4    *Lien Priority for Amended & Restated Secured Obligations*

The Amended & Restated Secured Exit Financing Facility, the Working Capital Facility, the 1L Secured Obligations and the Amended & Restated 2L Secured Obligations shall benefit from the same collateral, *provided, however*, that (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in

both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility and the Working Capital Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations pursuant to an Amended & Restated Secured Obligations Intercreditor Agreement.

Section 4.5    *Continued Corporate Existence.*

Except as otherwise provided in the Plan, or as otherwise may be agreed between the Debtors and the Consenting Creditors, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

Section 4.6    *Corporate Action.*

(a)    On the Effective Date, the Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions as contemplated by the Plan, the Plan Supplement, the Restructuring Support Agreement, and the Restructuring Term Sheet, including: (i) the selection of the directors and officers of each of the Reorganized Debtors; (ii) the distribution of the New Common Equity as provided herein or in the Plan Supplement Documents, or as otherwise agreed between the Required Consenting Creditors and the Debtors; (iii) the execution and entry into the New and A&R Obligations Documents; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

(b)    On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed,

to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan and the Plan Supplement (or necessary or desirable to effect the transactions contemplated by the Plan and the Plan Supplement) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New and A&R Obligations Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

(c)     The authorizations and approvals contemplated by this Section 4.6 shall be effective notwithstanding any requirements under non-bankruptcy Law.

Section 4.7    *Vesting of Assets.*

Except as otherwise provided in the Plan or the Plan Documents, on the Effective Date, all Assets, including all Claims, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Section 4.8    *Cancellation of Existing Securities and Agreements.*

(a)     On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest, including the Restructuring Support Agreement (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged. For the avoidance of doubt, and as provided in Section 4.3 herein, on the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws. In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

Section 4.9    *Issuance of New Common Equity.*

(a)    On the Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring.  All of the New Common Equity issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Equity is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

(b)    On the Effective Date, the Reorganized Debtors and the Holders of New Common Equity shall enter into the New Organizational Documents in substantially the form included in the Plan Supplement.  The New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

Section 4.10    *Exemption from Registration Requirements.*

The issuance of the 1L Secured Notes under the Plan and/or the Plan Supplement shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing the 1L Secured Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The issuance of the New Common Equity under the Plan and/or the Plan Supplement shall be exempt from registration under section 1145 of the Bankruptcy Code. The New Common Equity may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such Securities generally may be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states.

Section 4.11    *Organizational Documents.*

Subject to Article V of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

Section 4.12    *Treatment of Non-Qualified Creditors*

All 1L Secured Notes under the Plan and/or Plan Supplement that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such 1L Secured Notes in one or more sale transactions within 180 days following the Effective Date (the "Sale Period"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a

transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a pro rata basis, to such Non-Qualified Creditors at the end of the Sale Period (the "Substitute Consideration"). In the event that a sale of such 1L Secured Notes is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such 1L Secured Notes shall be cancelled for no consideration. None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities.  For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any 1L Secured Notes under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof.

Section 4.13    *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

Section 4.14    *Directors and Officers of the Reorganized Debtors.*

The members of the Reorganized Board will be designated in accordance with the Plan Supplement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the

applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced or removed in accordance with such New Organizational Documents.

Section 4.15  *Effectuating Documents; Further Transactions.*

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the DIP Credit Facility Documents, the New and A&R Obligations Documents, the New Organizational Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

As provided in the Restructuring Term Sheet, the Confirmation Order shall expressly affirm Alto Maipo's obligation to exchange the debt instruments to be issued in satisfaction of the Amended & Restated 2L Secured Obligations for investment grade corporate credit in the form of notes, pursuant to the terms of the Restructuring Term Sheet, and shall provide that Alto Maipo's failure to perform shall entitle the holders of all such debt instruments in connection with the Amended & Restated 2L Secured Obligations subsequent to the Effective Date to all available remedies, including, without limitation, specific performance.

Section 4.16  *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, but not paid pursuant to the DIP Orders, DIP Credit Facility Documents, or Cash Collateral Order, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the Plan and the DIP Orders, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

Section 4.17    *Retained Causes of Action.*

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, Cash Collateral Order, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith, including, without limitation, any Causes of Action or Claims related to the CNM Arbitral Award and/or collection thereof by Alto Maipo. For the avoidance of doubt, except as expressly set forth herein or in the Plan Supplement, in no instance will any Cause of Action preserved pursuant to this Section 4.18 include any Claim or Cause of Action with respect to, or against, a Released Party.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

(a)    Subject to entry of the Confirmation Order, the Tunneling Contract is hereby assumed as amended. The Cure Cost for the Tunneling Contract consists of Strabag's Other Claims, which will be treated as described above in Article III, Classification and Treatment of Claims and Interests, Section 3.3, Treatment and Voting Rights of Claims and Interests, Subsection (d).

(b)    All other Executory Contracts and Unexpired Leases of the Debtors that are not otherwise assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than (i) those that are identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (ii) those that have been previously assumed or rejected pursuant to a Final Order by the Debtors prior to the Effective Date; and (iii) those that are the subject of a motion seeking assumption or rejection as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V but not assigned to a third party shall be deemed to be assigned to a Reorganized Debtor, and be fully enforceable by, the applicable contracting Reorganized Debtor(s)

in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

(c)    The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts or Unexpired Leases, as described in the Plan and Plan Supplement, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

(d)    Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Section 5.2    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)    Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date, subject to the limitation described in the following paragraph, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  No later than the Plan Supplement Filing Date, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs to be filed and served upon applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. The Debtors shall provide for such notices to be sent via overnight mail to creditors outside the United States.  Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or related Cure Cost must be filed, served, and actually received by the Debtors within twenty-one (21) days of such assumption or assumption and assignment.

(b)     Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost shall be deemed to have assented to such assumption or Cure Cost.  In the event of a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (iii) any other matter pertaining to assumption and/or assignment, then the Bankruptcy Court shall hear such dispute prior to the assumption and/or assignment becoming effective, and the applicable Cure Costs associated therewith (if any) shall be paid following entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment and shall not prevent or delay implementation of the Plan or Effective Date; *provided* that the Debtors may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided, further,* that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject, any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)     Except as otherwise provided herein or as agreed to by the Debtors and the applicable counterparty, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Cost, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, and the Cure Cost paid, shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

Section 5.3     *Indemnification and Reimbursement Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date of the Plan, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of actions arising out of or relating to any act or omission that is a criminal act or constitutes, intentional fraud, gross negligence or willful misconduct.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized

Debtors.  Any Claim based on the Debtors' obligations in this Section 5.3 herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

Section 5.4     *Claims Based on Rejection of Executory Contracts and Unexpired Leases (if Any).*

Unless otherwise provided by a Bankruptcy Court order, Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases, if any, pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts and Unexpired Leases, if any, that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contract and Unexpired Leases, if any, shall constitute General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Section 5.5     *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that are not otherwise assumed or rejected will be deemed assumed by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code.

Section 5.6     *Employee Compensation and Benefit Programs.*

(a)     Except as otherwise provided herein or in the Plan Supplement and except for any equity-based compensation or incentive plans, on and after the Effective Date, the Reorganized Debtors may, but are not required to, honor in the ordinary course of business: (i) any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees and other service providers of any of the Debtors who served in such capacity at any time. Nothing contained herein shall entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or

restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

(b)     Except as otherwise provided herein, none of (i) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (ii) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Restructuring Transactions and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, will (A) entitle any current or former director, officer, employee or other service provider of any of the Debtors to any payment or benefit, (B) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or Expired benefit plan or (C) limit or restrict the right of the Debtors or Reorganized Debtors to merge, amend or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any person to terminate his or her service with the Debtors or Reorganized Debtors for "good reason" or similar provision.

Section 5.7     *Insurance Policies.*

All insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed and assumed and assigned to the respective Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

Section 5.8     *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1     *Distribution on Account of Claims and Interests Allowed as of the Effective Date.*

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Section 6.2     *Distribution on Account of Claims and Interests Allowed After the Effective Date.*

(a)     *Payments and Distributions on Disputed Claims*.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is 30 Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

(b)     *Special Rules for Distributions to Holders of Disputed Claims*.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

Section 6.3     *Timing and Calculation of Amounts to Be Distributed*.

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Section 6.4     *Delivery of Distributions*.

(a)     *Record Date for Distributions*.  On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)     *Delivery of Distributions in General*.  Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

(c)     *Delivery of Distributions on Account of DIP Claims*.  The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as

practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Credit Facility, subject to any modifications to such distributions in accordance with the terms of the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

Section 6.5   *Distributions by Distribution Agent (if any).*

(a)     The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (i) affirm its obligation to facilitate the prompt distribution of any documents; (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (iv) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

(b)     The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

Section 6.6   *Minimum Distributions.*

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than US$50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of applicable equity interests under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share

of applicable equity interests (up or down), with half dollars and half shares of applicable equity interests or less being rounded down.

Section 6.7    *Undeliverable Distributions.*

(a)    *Holders of Certain Undeliverable Distributions*.  If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Section 6.7(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b)    *Failure to Claim Undeliverable Distributions*.  No later than 60 days after a distribution has been made to each Holder of an Allowed Claim entitled to receive a distribution under the Plan, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 60 days after the filing of the list of Holders of undeliverable distributions shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)    *Failure to Present Checks*.  Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

Section 6.8    *Compliance with Tax Requirements/Allocations.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a

portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

Section 6.9    *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors.  Except as otherwise expressly provided in the Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

Section 6.10    *Claims Paid or Payable by Third Parties.*

(a)    *Claims Payable by Insurance*. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies.  To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    *Applicability of Insurance Policies*. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

Section 7.1    *Allowance of Claims and Interests.*

(a)    Except as provided in Article IX of the Plan, each of the Reorganized Debtors after the Effective Date shall have and retain any and all rights and defenses the Debtors had with respect

to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.

(b)      Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.  For the avoidance of doubt, from and after the Effective Date, the Debtors may allow any Claims without order of the Bankruptcy Court and without other or further notice.

Section 7.2      *Prosecution of Objections to Claims.*

Except as otherwise specifically provided in the Plan or order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Section 7.3      *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim or Interest pursuant to section 502(c) of the Bankruptcy Code or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Each of the foregoing Claims and Interests objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Section 7.4    *[Reserved].*

Section 7.5    *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to the Reorganized Debtors. All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, and unless a party receives permission from the Bankruptcy Court to file a late-filed Proof of Claim, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless the Bankruptcy Court, for cause, after notice and a hearing, orders otherwise.**

Section 7.6    *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.7    *Amendments to Claims.*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1   *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless and until each of the following conditions (the "**Conditions Precedent**") have occurred or been waived in accordance with the terms herein:

(a)   the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors, which shall be in force and effect and not subject to any stay of effectiveness;

(b)   the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time after April 1, 2022;

(c)   the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(d)   the final versions of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance acceptable to the Required Consenting Creditors and the DIP Lender in all respects and consistent in all respects with the Plan Term Sheet (as defined in and attached to the Restructuring Support Agreement), and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) and the DIP Lender in their sole and absolute discretion;

(e)   the New and A&R Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New and A&R Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each of the New and A&R Obligations Documents;

(f)   the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

(g)   all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Carve-Out Account pending the Bankruptcy Court's approval of such fees and expenses;

(h)     the payment in Cash in full of all Restructuring Expenses;

(i)     the PPA shall have been assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and shall be in full force and effect and shall not have been terminated at any time;

(j)     the documentation related to the VAT Financing Facility shall have been duly executed and delivered by all of the Entities that are party thereto;

(k)     with respect to the claims listed on Annex C hereto, the Bankruptcy Court shall have entered orders either (a) disallowing and expunging, (b) estimating at zero dollars for distribution purposes, (c) reducing and allowing, or (d) authorizing the assumption of the relevant contracts (with cure amount ordered to be zero dollars, with the exception of Claim No. 16, the cure or claim amount, which the Debtors may litigate as needed subsequent to the Effective Date provided that any disputed cure amount or claim amount be held in escrow by the Company pending the outcome of such litigation), in each case as set forth in Annex C hereto; and

(l)     the contributions from AES Andes in an amount of up to $300,000 for the payment in full in cash of the allowed General Unsecured Claims listed in Annex A hereto shall have been sufficient to pay in full in cash all such Allowed General Unsecured Claims.

Section 8.2     *Waiver of Conditions Precedent.*

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Creditors, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan. The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

Section 8.3     *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur, then, upon notice by the Debtors to the Bankruptcy Court, (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Section 8.4    *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Interests or any other matter.

Section 8.5    *Substantial Consummation of Plan.*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE IX.

## EFFECT OF PLAN CONFIRMATION

Section 9.1    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, the Consenting Creditors, and each Holder of a Claim against or Interest in any Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, the Consenting Creditors', and Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has accepted or rejected the Plan or is deemed to have accepted or rejected the Plan.

Section 9.2    *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies.*

(a)    Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is Allowed; or (iii) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be

a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(b)       Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

Section 9.3    *Releases.*

(a)       ***RELEASES BY THE DEBTORS.*** **PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AND ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY SHALL BE DEEMED FOREVER RELEASED AND DISCHARGED BY EACH AND ALL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE**

PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT FACILITY DOCUMENTS, OR THE NEW AND A&R OBLIGATIONS DOCUMENTS, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.  FOR THE AVOIDANCE OF DOUBT, NO CLAIMS OR CAUSES OF ACTION BASED ON, OR ARISING FROM, ANY RETAINED CAUSES OF ACTION (AS SET FORTH IN SECTION 4.18 HEREIN) SHALL BE RELEASED PURSUANT TO THIS PLAN, *INCLUDING, WITHOUT LIMITATION*, ACTIONS BASED ON, OR ARISING FROM, THE CNM ARBITRATION.

(b)    ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT EACH DEBTOR RELEASE IS (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF SUCH CLAIMS; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR PROPERTY.

(c)    *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS*.  AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER

**APPLICABLE LAW, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP CREDIT FACILITY DOCUMENTS, THE NEW AND A&R OBLIGATIONS DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.**

(d)    ***RELEASES BY ALTO MAIPO AND STRABAG.*** **SUBJECT TO AND EXCEPT FOR THE RIGHTS AND OBLIGATIONS SET FORTH IN THE RSA (AS AMENDED, RESTATED, OR SUPPLEMENTED), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, STRABAG AND ALTO MAIPO, ON BEHALF OF THEMSELVES AND THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS, FULLY AND FINALLY WAIVE,**

**DISCHARGE AND RELEASE ANY AND ALL PAST AND CURRENT CLAIMS, COUNTERCLAIMS, CHANGES (AS DEFINED IN THE TUNNELING CONTRACT), DISPUTES, DEMANDS, CAUSES OF ACTION, LIABILITIES, AND DAMAGES FOR ADDITIONAL TIME OR COMPENSATION OF WHATEVER NATURE, CAUSE OF ACTION OR THEORY, WHICH ARE EITHER KNOWN AS OF APRIL 5, 2022 (THE "CUT-OFF DATE"), OR SHOULD HAVE BEEN KNOWN AS OF THE CUT-OFF DATE IN THE EXERCISE OF REASONABLE DILIGENCE BY THE RESPECTIVE RELEASING PARTY (RECOGNIZING THE RELATIVE EXPERTISE, POSITION, AND ENGINEERING SOPHISTICATION OF EACH RESPECTIVE PARTY); INCLUDING WITHOUT LIMITATION CONSTRUCTION CLAIMS, INCLUDING CREDITS AND BACK-CHARGES, DESCOPE CLAIMS, OMITTED-SCOPE CLAIMS, CHANGE ORDER CLAIMS, FUTURE BONUSES, BREACH OF CONTRACT, LIQUIDATED DAMAGES, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO THE TUNNELING CONTRACT OR PROJECT THAT STRABAG AND ALTO MAIPO MAY HAVE AGAINST ONE ANOTHER, THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS THROUGH THE CUT-OFF DATE, *PROVIDED, HOWEVER,* THAT ANY CLAIMS BY ALTO MAIPO OR STRABAG, AS APPLICABLE, ARISING FROM (A) A WARRANTY (AS DEFINED IN THE TUNNELING CONTRACT); (B) A LATENT DEFECT (IN ACCORDANCE WITH SECTION 10.4.3 OF THE TUNNELING CONTRACT); (C) ANY DEFECT (I) DISCOVERED BY ALTO MAIPO DURING THE COMPLETION OF ACCEPTANCE TESTS (AS DEFINED IN THE TUNNELING CONTRACT) CONDUCTED AFTER THE CUT-OFF DATE, OR (II) IDENTIFIED AFTER FULL-LOAD TESTS HAVE BEEN COMPLETED, *PROVIDED THAT* STRABAG'S LIABILITY UNDER CLAUSE (II) ABOVE FOR ANY DEFECT RESULTING FROM ANY FAILURE BY STRABAG TO COMPLY WITH ITS OBLIGATIONS UNDER SECTIONS 2.3.1.1, 2.3.1.3, AND 2.3.1.4 OF THE TUNNELING CONTRACT AS THEY RELATE TO THE HYDRAULIC DESIGN (AS DEFINED IN THE TUNNELING CONTRACT), IF ANY, COMBINED WITH ANY LATE CRITICAL MILESTONE PAYMENTS (AS DEFINED IN THE TUNNELING CONTRACT) SHALL BE LIMITED TO A MAXIMUM OF $70,000,000; (D) THE AS-BUILT DELIVERABLES REQUIRED UNDER SECTION 7.6.1.4 OF THE TUNNELING CONTRACT, PROVIDED, HOWEVER, THAT NOTHING IN THIS CLAUSE (D) SHALL BE READ TO ENLARGE OR RESTRICT OWNER'S AND CONTRACTOR'S RESPECTIVE RIGHTS UNDER THE TUNNELING CONTRACT; (E) ANY FINES OR PENALTIES IMPOSED BY A GOVERNMENT ENVIRONMENTAL AUTHORITY AFTER THE CUT-OFF DATE THAT HAVE BEEN PROXIMATELY CAUSED BY SUCH RELEASED PARTY'S ACTIVITIES IN CONNECTION WITH THE PROJECT; AND (F) THE PUNCH LIST ITEMS AND ALL OTHER ITEMS LISTED IN ANNEX A TO ANNEX IV OF AMENDMENT NO. 5 TO THE RSA (EXCEPT FOR THOSE ITEMS IN ANNEX A TO ANNEX IV THAT ARE LABELLED AS "WAIVED ITEMS" OR "ADDITIONAL SCOPE", WHICH ITEMS ARE RELEASED OR OTHERWISE ADDRESSED ON THE TERMS DESCRIBED IN ANNEX A TO ANNEX IV); ARE NOT RELEASED AND ARE EXPRESSLY PRESERVED; AND *PROVIDED FURTHER*, THAT ALL OF THE RIGHTS AND DEFENSES OF EACH PARTY WITH RESPECT TO ANY CLAIMS ASSERTED BY THE OTHER PARTY PURSUANT TO SUBSECTIONS (A)-(F) ABOVE ARE EXPRESSLY**

PRESERVED. FOR THE AVOIDANCE OF DOUBT, NOTHING HEREIN SHALL RELEASE, WAIVE, OR MODIFY ANY PARTY'S RIGHT TO RECOVER ANY INSURANCE PROCEEDS, SEEK OR OPPOSE RELIEF FROM ANY LATE CRITICAL MILESTONE PAYMENTS, REQUIRE COMPLETION OF THE ACCEPTANCE TESTS (TO THE EXTENT THOSE ACCEPTANCE TESTS HAVE NOT BEEN COMPLETED PRIOR TO THE CUT-OFF DATE), OR PURSUE OR OPPOSE ANY OTHER CLAIMS RELATED TO STRABAG'S ENTITLEMENT TO A SUBSTANTIAL COMPLETION CERTIFICATE FOR ANY CRITICAL OR CONTRACT MILESTONE, OR ANY OTHER NON-MONETARY CLAIMS, IN EACH CASE TO THE EXTENT PROVIDED IN, AND PURSUANT TO THE TERMS OF, THE TUNNELING CONTRACT; *PROVIDED, HOWEVER,* THAT NEITHER PARTY MAY ASSERT ENTITLEMENT TO SPECIFIC PERFORMANCE FOR CLAIMS THAT ARE OTHERWISE RELEASED.

Section 9.4     *Exculpation and Limitation of Liability.*

(a)     UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

(b)     EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; *PROVIDED* THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; *PROVIDED FURTHER* THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT; *PROVIDED FURTHER* THAT THE FOREGOING SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS

(INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER.

(c)     THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF NEW COMMON EQUITY PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

Section 9.5     *Injunction.*

THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE IX OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY ENTITY BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.

Section 9.6     *Setoffs and Recoupment.*

(a)     Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.  The Holder of such allowed Claim may challenge such a setoff or recoupment in the Bankruptcy Court, or in any court outside the United States with jurisdiction to hear such a challenge.

(b)     In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff or recoupment in such Proof of Claim.

Section 9.7     *Release of Liens.*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, for the avoidance of doubt, the New and A&R Obligations Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all usual and customary matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

(b)     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) any dispute regarding whether a contract or lease is or was executory or expired; and (iv) any dispute regarding the occurrence of COD, (v) in case of each (i)-(iv) of this paragraph (c) herein, to the maximum extent consistent with applicable law.

(d)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     Adjudicate, decide or resolve any and all matters related to Causes of Action;

(g)     Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)      Resolve any and all avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

(i)      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(j)      Enter and implement such orders as may be necessary or appropriate to execute, implement, or Consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(k)      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

(m)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(n)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

(o)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(p)      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(q)      Enter an order or final decree concluding or closing the Chapter 11 Cases;

(r)      Adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(t)      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(u)      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v)     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(w)     Enforce all orders previously entered by the Bankruptcy Court;

(x)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to enforce the Debtors' assumption of the PPA; and

(y)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

Section 11.2   *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the U.S. Trustee and Reorganized Debtors, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

Section 11.3   *Amendments.*

(a)     *Plan Modifications*. Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided* further that any such amendments or modifications

shall require the consent of the Consenting Creditors; *provided* further that any amendments or modifications that affect the rights, obligations, liabilities and duties of the DIP Agent shall require the consent of the DIP Agent, as applicable.

(b)     *Effect of Confirmation on Modifications*.   Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)     *Certain Technical Amendments*.   Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided* that such technical adjustments and modifications do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

Section 11.4     *Revocation or Withdrawal of Plan.*

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or both Debtors, prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in the Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

Section 11.5     *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal Law, rule or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to the Plan (including, without limitation, the DIP Credit Facility Documents and the New and A&R Obligations Documents), provides otherwise, the Plan shall be governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to the principles of conflict of Laws thereof that would require application of the Law of another jurisdiction.

Section 11.6     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 11.7    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.8    *Controlling Document.*

In the event of an inconsistency between the Plan and Disclosure Statement, the terms of the Plan shall control in all respects.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

Section 11.9    *Filing of Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

Section 11.10   *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

Section 11.11  *Service of Documents.*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

a)      The Company

        Alto Maipo SpA
        Av. Los Conquistadores 1730, Piso 10
        Providencia, Santiago, Chile
        Attention: Javier Dib
        E-mail: javier.dib@aes.com

        with copies (which shall not constitute notice) to:

        Cleary Gottlieb Steen & Hamilton
        One Liberty Plaza
        New York, NY 10006
        Attention: Richard J. Cooper, Luke A. Barefoot, and Jack Massey
        E-mail: rcooper@cgsh.com, lbarefoot@cgsh.com and jamassey@cgsh.com
        *Co-Counsel for Debtors and Debtors in Possession*

        and

        Young Conaway Stargatt & Taylor, LLP
        Rodney Square, 1000 North King Street
        Wilmington, DE 19801
        Attention: Pauline K. Morgan, Sean T. Greecher, and S. Alexander Faris
        E-mail: pmorgan@ycst.com, sgreecher@ycst.com and afaris@ycst.com
        *Co-Counsel for Debtors and Debtors in Possession*

b)      DIP Lender

        AES Andes S.A.
        Av. Los Conquistadores 1730, piso 10
        Providencia, Santiago, Chile
        Attention: Ricardo Roizen, Felix Gomez, Maria Paz Cerda, and Andrea Sougarret
        E-mail: ricardo.roizen@aes.com, felix.gomez@aes.com,
        mariapaz.cerda@aes.com, andrea.sougarret@aes.com

        and

        Morris, Nichols, Arsht & Tunnell LLP
        1201 N. Market St., #1600
        Wilmington, DE 19801
        Attention: Derek C. Abbot, Curtis S. Miller, and R. Jason Russell

E-mail: DAbbott@morrisnichols.com, CMiller@morrisnichols.com and
JRussell@morrisnichols.com

c)      Senior Lenders

Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
Attention: Marissa Alcala
E-mail: Melissa.alcala@nortonrosefulbright.com

and

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: Christy Rivera and Andrew Rosenblatt
E-mail: christy.rivera@nortonrosefulbright.com and
andrew.rosenblatt@nortonrosefulbright.com

and

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
Attention: Matthew B. McGuire and Matthew R. Pierce
Email: mcguire@lrclaw.com and pierce@lrclaw.com

d)      Strabag

Troutman Pepper Hamilton Sanders LLP
400 Town Center, Suite 1800
Southfield, MI 48075
Attention: Robert S. Hertzberg and Deborah Kovsky-Apap
E-mail: robert.hertzberg@troutman.com
deborah.kovsky@troutman.com

and

Troutman Pepper Hamilton Sanders LLP
Hercules Plaza
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Attention: David M. Fournier
E-mail: david.fournier@troutman.com

e)      Cerberus

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention: Brian Resnick, Elliot Moskowitz, and Richard J. Steinberg
Email: brian.resnick@davispolk.com, elliot.moskowitz@davispolk.com and
richard.steinberg@davispolk.com

and

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Attention: Laura Davis Jones and Peter J. Keane
Email: ljones@pszjlaw.com and pkeane@pszjlaw.com

f)      The United States Trustee

Office of the United States Trustee
844 King Street, Suite 2207
Wilmington, DE 19801
Attention.: Jane M. Leamy
E-mail: Jane.M.Leamy@usdoj.gov

g)      Committee of Unsecured Creditors

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Sam J. Alberts and Lynn P. Harrison III
E-mail: sam.alberts@dentons.com and lynn.harrisoniii@dentons.com

and

Dentons Bingham Greenebaum LLP
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Attention: James R. Irving
E-mail: james.irving@dentons.com

and

Dentons Larraín Rencort SpA
Av. Apoquindo 3885, piso 18
Las Condes, Santiago, Chile

Attention: Carlos Urzúa and Gonzalo Varela
E-mail: carlos.urzua@dentons.com and gonzalo.varela@dentons.com

and

Benesch, Friedlander, Coplan & Aronoff LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Attention: Jennifer R. Hoover, Kevin M. Capuzzi and John C. Gentile
E-mail: jhoover@beneschlaw.com, kcapuzzi@beneschlaw.com and
jgentile@beneschlaw.com

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities informing them that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests, except that the U.S. Trustee shall continue to receive all documents pursuant to Bankruptcy Rule 2002 without any requirement that the U.S. Trustee file such a renewed request.

Section 11.12  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.13  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to the Plan are incorporated into and are a part of the Plan as if fully set forth herein.

Section 11.14  *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, the Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Section 11.15  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 11.16  *Dissolution of the Committee.*

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of, any applications for Professional Fee Claims or expense reimbursements for members of such Committee. The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition unsecured creditors, including, but not limited to, any cases, controversies, suits or disputes arising in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order that could affect the treatment of prepetition unsecured creditors. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have any Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

*[Remainder of Page Intentionally Left Blank]*

65

Dated:  April 4, 2022

Respectfully submitted,

Alto Maipo SpA
on behalf of itself and Alto Maipo Delaware LLC

By:     _/s/ Javier Dib_____
Name:    Javier Dib
Title:    Board President & Chief Restructuring
          Officer

## ANNEX A

### Claims to be Paid in Full

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 2 | Baker Botts L.L.P. | $24,084.24 | Pay in full. |
| 6 | Bradley Arant Boult Cummings LLP[3] | $3,000,000.00 | Assume contract / Pay in full. |
| Scheduled | Aguas Purificadas Continental SpA | $558.00 | Pay in full. |
| Scheduled | Comercializadora DH SpA | $1,091.00 | Pay in full. |
| Scheduled | Ferreteria y Materiales De Calle Comercio 20073 | $1,936.00 | Pay in full. |
| Scheduled | Joaquin Porfirio Costa Berrios | $190.00 | Pay in full. |
| Scheduled | Proveedores Integrales Prisa S.A. | $214.00 | Pay in full. |
| Scheduled | Supermercado del Neumatico Limitada | $786.00 | Pay in full. |

---

[3]    For the avoidance of doubt, this claim is not being treated as a General Unsecured Claim.  Negotiations regarding the timing for payment of the cure cost related to assumption of the relevant contract are ongoing.

## ANNEX B

### Claims to Pass Through Unimpaired

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 5 | Parque Arenas SpA (UCC) | $10,000,000.00 | Claim No. 5 to pass through; AES Andes to provide sufficient contribution to the Borrower to satisfy any amounts that the Borrower is required to pay, up to a maximum amount of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the Parque Arenas Unsecured Claim and (ii) the Volcan Cure/Claim Amount (as described in Annex C). |

### ANNEX C

**Claims to Which Debtors Will (i) Object and Seek Disallowance, Expungement, or Reduction, (ii) Estimate at $0 for Distribution Purposes, or (iii) Assume the Relevant Contract at $0 Cure Cost**

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 1 | Parque Arenas SpA (UCC) | $10,000,000.00 | Object – Duplicative of Claim No. 5. |
| 3 | Comunidad de Aguas Canal El Manzano (UCC) | $1,000,000,000.00 | Assume contracts / Estimate cure at $0 for each contract, and object to balance of claims asserted as part of Claim No. 3. |
| 7 | Contreras Bustamante, Gemma | $25,000,000.00 | Object / Estimate at $0. |
| 8 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 | Object / Estimate at $72,000 (will not come due until August 2022). |
| 9 | Compañía Industrial El Volcan S.A (UCC) | $1,946,556.00 | Object – Duplicative of Claim No. 16. |
| 10 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 | Object – Duplicative of Claim No. 8. |
| 12 | Christian Becker Matkovic | $80,000,000.00 | Object / Estimate at $0. |
| 13 | Maite Birke Abaroa | $2,000,000,000.00 | Object / Estimate at $0. |
| 14 | AP Asesorias en Gestion y Consultoria Ltda. | $140,000.00 | Object / Estimate at $48,000 (will not come due until August 2022). |
| 15 | Bruno Bercic | $80,000,000.00 | Object / Estimate at $0. |
| 16 | Compañía Industrial El Volcan S.A. | $1,501,521.00 | (a) Object / Estimate at $0 or (b) Assume contract / Estimate cure at $0[4] and object to balance of claims asserted as part of Claim No. 16. |

---

[4]    In the event the Debtors, after consultation with the Senior Lenders, seek to assume the contract related to Claim No. 16, to the extent the cure or allowed claim amount is greater than $0, any cure or claim amount that is determined to be due on account of the Volcan contract (any such amount, the "Volcan Cure/Claim Amount") shall be satisfied through a contribution by AES Andes.  The Debtors may defer litigation of the cure amount relating to the contract with Volcan until after the Plan Effective Date.  For the avoidance of doubt, the total amounts paid by AES Andes in satisfaction of the Volcan Cure/Claim Amount and the Parque Arenas Unsecured Claim shall not exceed $10 million in the aggregate.

| 18 | Comunidad de Aguas Canal El Manzano | $1,000,000,000.00 | Object / Duplicative of Claim No. 3. |
| 19 | AES Electric Ltd. | $0.00 | Claim Withdrawn. |
| 20 | Sara Larrain | $1,500,000.00 | Object / Estimate at $0. |

## ANNEX D

### Claims Satisfied/Released Pursuant to Plan / Assumed with $0 Cure

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 4 | Itaú CorpBanca S.A. | $1,652,218,290.14 | Satisfied pursuant to Plan. |
| 11 | Strabag SpA | $601,354,484.00 | Satisfied pursuant to Plan. |
| 17 | Strabag SpA | $598,763,578.00 | Satisfied pursuant to Plan. |
| 21 | AES Andes S.A. | $1,089,142,102.35 | Satisfied pursuant to Plan. |
| 22 | AES Electric Ltd. | $301,635.00 | Satisfied pursuant to Plan. |
| 23 | Cerberus South America Investments, LLC | $158,512,457.52 | Satisfied pursuant to Plan. |
| 24 | The AES Corporation | $6,138,048.00 | Satisfied pursuant to Plan. |
| 25 | Strabag SpA | $684,831,578.00 | Satisfied pursuant to Plan. |