**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.:  21-11507 (KBO) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

Error!

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE[2] SECTION 1125 OR WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE PLAN DOCUMENTS.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF ALTO MAIPO DELAWARE LLC AND ALTO MAIPO SPA PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 1** | **ALTO MAIPO SENIOR SECURED OBLIGATIONS** |
| **CLASS 5** | **DIP CLAIMS** |
| **CLASS 6** | **STRABAG'S OTHER CLAIMS** |

**IF YOU ARE IN CLASS 1, 5 OR 6, YOU ARE RECEIVING
THIS DOCUMENT AND THE ACCOMPANYING MATERIALS
BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms elsewhere in this disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "Disclosure Statement") or in the *Joint Chapter 11 Plan of Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

<div style="border:1px solid black; padding:1em;">

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 3:00 P.M. (PREVAILING EASTERN TIME) ON [•], 2022 VIA THE BALLOTING PORTAL USING THE LOGIN INFORMATION ON YOUR BALLOT AT:**

**<u>https://cases.primeclerk.com/altomaipo</u>**

**OR VIA FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY AT:**

**ALTO MAIPO BALLOT PROCESSING C/O PRIME CLERK LLC 850 THIRD AVENUE, SUITE 412 BROOKLYN, NY 11232**

**BALLOTS RECEIVED VIA MEANS OTHER THAN THE AFOREMENTIONED MEANS MAY NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT PRIME CLERK LLC (THE DEBTORS' SOLICITATION AGENT) AT:**

**(844) 216-8745 (US TOLL-FREE),**

**(646)795-6960 (US TOLL), OR**

**800 719 921 (IN CHILE),**

**OR EMAIL: <u>altomaipoinfo@primeclerk.com</u>; SUBJECT LINE: "ALTO MAIPO"**

</div>

This Disclosure Statement provides information regarding the Plan, which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as <u>**Exhibit A**</u>. The Debtors are providing the information in this Disclosure Statement to Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

The Plan is currently supported by the Debtors and Holders of approximately 75% of the amount of the Alto Maipo Senior Secured Obligations.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article VIII of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

You are encouraged to read this Disclosure Statement (including "Certain Factors to Be Considered" described in Article VII of this Disclosure Statement) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Classes 1, 5 and 6 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

### RECOMMENDATION BY THE DEBTORS

EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED (SUBJECT TO CONFIRMATION) THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>[•], 2022 AT 3:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.

---

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The securities to be issued on or after the Effective Date will not be issued pursuant to a registration statement filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") under the United States Securities Act of 1933 (as amended, the "<u>Securities Act</u>") or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense.

The Debtors are relying on section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Regulation S or other exemptions under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of the Securities described in this Disclosure Statement to be issued under the Plan and/or the Plan Supplement. Neither the solicitation of votes to accept or reject the Plan (the "<u>Solicitation</u>") nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

# DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information.  The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan.  All Holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety, and consult with their own advisors, before voting.  The Debtors believe that these summaries are fair and accurate.  The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan.  The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified.  Holders of Claims reviewing this Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement.  No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan.  This Disclosure Statement does not constitute legal, business, financial, or tax advice.  Any Person or Entity desiring any such advice should consult with their own advisors.  Additionally, this Disclosure Statement has not been approved or disapproved by any securities regulatory authority of any state under Blue Sky Laws.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules.  As such, this Disclosure Statement shall not be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to Holders of Claims against or Interests in the Debtors or any other party in interest.  Please refer to Article VII of this Disclosure Statement, entitled "Certain Factors to Be Considered" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors.  No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the

v

Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ......................................................................................................1

ARTICLE I:   INTRODUCTION ..........................................................................................1

ARTICLE II :  THE PLAN.....................................................................................................4
    2.1    Treatment of Claims and Interests ...............................................................4
    2.2    Unclassified Claims .....................................................................................5
    2.3    Liquidation Analysis ..................................................................................17
    2.4    Valuation Analysis .....................................................................................18

ARTICLE III :  VOTING PROCEDURES AND REQUIREMENTS .................................18
    3.1    Classes Entitled to Vote on the Plan ..........................................................18
    3.2    Votes Required for Acceptance by a Class..................................................19
    3.3    Certain Factors to Be Considered Prior to Voting ......................................19
    3.4    Classes Not Entitled To Vote on the Plan...................................................20
    3.5    Solicitation Procedures ...............................................................................20
    3.6    Voting Procedures ......................................................................................21

ARTICLE IV :  CORPORATE AND CAPITAL STRUCTURE........................................22
    4.1    Prepetition Corporate Structure ..................................................................22
    4.2    Prepetition Capital Structure ......................................................................22

ARTICLE V :   CIRCUMSTANCES LEADING TO AND
                DEVELOPMENTS IN THESE CHAPTER 11 CASES....................25
    5.1    Shifting Hydrological and Market Factors .................................................25
    5.2    Liquidity Challenges and Contingent Claims ............................................26
    5.3    Discussions with Key Stakeholders Prior to the Petition Date............................28
    5.4    Continued Negotiations Post-Petition ........................................................29
    5.5    First and Second Day Orders and Subsequent Developments............................29
    5.6    CNM Lift Stay Order ..................................................................................31
    5.7    Appointment of the Unsecured Creditors' Committee ................................32
    5.8    Committee Motion to Extend the General Bar Date....................................32
    5.9    Committee Motion to Extend the Challenge Period ....................................33
    5.10    MLP Power Purchase Agreement................................................................34
    5.11    Committee Rule 2004 Motion Regarding the MLP PPA .............................34
    5.12    Motion to Assume the Restructuring Support Agreement............................35
    5.13    Manzano Litigation.....................................................................................35

ARTICLE VI :  OTHER MATERIAL ASPECTS OF THE PLAN ....................................36
    6.1    Distributions................................................................................................36
    6.2    Distribution on Account of Claims and Interests Allowed as of the
                Effective Date .............................................................................................36
    6.3    Distribution on Account of Claims and Interests Allowed After the
                Effective Date .............................................................................................36
    6.4    Timing and Calculation of Amounts to Be Distributed ........................................36

6.5    No Substantive Consolidation................................................................40
6.6    Compromise of Controversies .............................................................40
6.7    Restructuring Transactions ..................................................................41
6.8    Lien Priority for Amended & Restated Secured Obligations ...............44
6.9    Continued Corporate Existence ...........................................................44
6.10   Vesting of Assets .................................................................................45
6.11   Indemnification and Reimbursement Obligations ...............................45
6.12   Sources of Consideration for Plan Distributions .................................46
6.13   Exemption from Registration Requirements .......................................46
6.14   Organizational Documents...................................................................46
6.15   Treatment of Non-Qualified Creditors.................................................46
6.16   Exemption from Certain Transfer Taxes and Recording Fees..............47
6.17   Directors and Officers of the Reorganized Debtors.............................47
6.18   Insurance Policies ...............................................................................48
6.19   Corporate Action.................................................................................48
6.20   Effectuating Documents; Further Transactions ...................................48
6.21   Restructuring Expenses.......................................................................49
6.22   Retained Causes of Action...................................................................49
6.23   Treatment of Executory Contracts and Unexpired Leases ..................50
6.24   Employee Compensation and Benefits ................................................53
6.25   Release, Injunction, and Related Provisions........................................54
6.26   Setoffs and Recoupment .....................................................................60
6.27   Release of Liens..................................................................................60
6.28   Plan Modifications...............................................................................60
6.29   Effect of Confirmation on Modifications .............................................61
6.30   Certain Technical Amendments...........................................................61
6.31   Revocation or Withdrawal of Plan.......................................................61
6.32   Reservation of Rights..........................................................................61
6.33   Conditions Precedent to the Effective Date .........................................61
6.34   Waiver of Conditions Precedent ..........................................................63
6.35   Effect of Failure of Conditions Precedent ..........................................63

**ARTICLE VII : CERTAIN FACTORS TO BE CONSIDERED............................................63**
7.1    General................................................................................................63
7.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations ...............64
7.3    Risks Relating to the Restructuring Transactions ................................69
7.4    Risks Relating to the Debtors' Business ..............................................71
7.5    Country-Specific Risk Factors ............................................................73
7.6    Certain Tax Implications of the Chapter 11 Cases and the Plan..........74
7.7    Disclosure Statement Disclaimer ........................................................75

**ARTICLE VIII : CONFIRMATION PROCEDURES .........................................................77**
8.1    The Confirmation Hearing...................................................................77
8.2    Confirmation Standards .......................................................................78
8.3    Best Interests Test/Liquidation Analysis .............................................78
8.4    Feasibility............................................................................................78

8.5    Confirmation Without Acceptance by All Impaired Classes.................................79

8.6    Alternatives to Confirmation and Consummation of the Plan.............................80

**ARTICLE IX : IMPORTANT SECURITIES LAW DISCLOSURE....................................80**

9.1    New and A&R Obligations.....................................................................................80

9.3    Issuance and Resales of the New Common Equity ..............................................81

**ARTICLE X CERTAIN UNITED STATES FEDERAL  INCOME TAX**

**CONSEQUENCES OF THE PLAN....................................................................82**

10.1    In General................................................................................................................82

10.2    U.S. Federal Income Tax Consequences to the Debtors........................................83

10.3    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of
Allowed Claims ....................................................................................................83

**ARTICLE XI CERTAIN CHILEAN  INCOME TAX CONSEQUENCES OF**

**THE PLAN ......................................................................................................94**

11.1    General....................................................................................................................94

11.2    Chilean Tax Consequences to Alto Maipo. ..........................................................94

11.3    Chilean Tax Consequences to Holders of Allowed Claims...................................95

**ARTICLE XII : CONCLUSION AND RECOMMENDATION.........................................101**

## **EXHIBITS**

Exhibit A        Joint Chapter 11 Plan of Reorganization

Exhibit B        Liquidation Analysis

Exhibit C        Valuation Analysis

Exhibit D        Corporate Organizational Chart

Exhibit E        Restructuring Support Agreement

Exhibit F        Financial Projections

**Error!**

# EXECUTIVE SUMMARY

The Plan reflects all material terms of a revised version of the pre-negotiated restructuring that was agreed among the Debtors and certain of their major stakeholders, evidenced by the Restructuring Support Agreement dated April 1, 2022, attached hereto as **Exhibit E**.

The anticipated benefits of the Plan include, without limitation:

- Approximately $2.1 billion in restructured obligations (the "New and A&R Obligations"), which shall include the Working Capital Facility, the Amended & Restated Secured Exit Financing Facility, the 1L Secured Obligations, the Amended & Restated 2L Secured Obligations and the New Common Equity;

- The exchange or payment of the up to $50 million DIP Credit Facility with the proceeds of an Amended & Restated Secured Exit Financing Facility;

- Unimpairment of general unsecured creditors, with allowed General Unsecured Claims to be satisfied by contributions from AES Andes; and

- The prospect of expeditious emergence from Chapter 11.

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business, and maximizes creditor recoveries.

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' business and certain historical events, (ii) the Chapter 11 Cases, (iii) the rights of Holders of Claims and Interests under the Plan, and (iv) other information necessary to enable each Holder of a Claim to make an informed judgment as to whether to vote to accept or reject the Plan.

# ARTICLE I:

## INTRODUCTION

The Debtors in these Chapter 11 Cases are Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware"). Alto Maipo was incorporated as a special purpose company under the laws of Chile in 2011. Its primary business purpose is the construction and eventual operation of a large run-of-river hydroelectric project (the "Project") in the Andes Mountains, approximately 30 miles southeast of Santiago, Chile. Three of the four units of the Project reached commercial operation on March 26, 2022, and the fourth unit is expected to reach commercial operation on April 20, 2022. As a result, Alto Maipo has begun to provide clean, renewable energy to power Chile's economy, and will play a critical role in accelerating the decarbonization of Chile.

Unfortunately, the energy market that Alto Maipo will enter upon reaching its final commercial operation date ("Commercial Operation Date" or "COD") is not the same energy market that Alto Maipo projected prior to beginning construction on the Project in 2013. Since that time, increased renewable energy generation capacity has driven down electricity prices in

Error!

Chile, such that spot prices at which Alto Maipo will be able to sell power into the grid are now less than half of what they were in 2013. Meanwhile, the hydrology of the Maipo Valley, where the Project is being constructed, has been significantly impacted by lower precipitation levels and higher temperatures that reduce in turn the amount of power that the Project can produce. As a result, Alto Maipo can no longer rely on its prior revenue projections, which assumed economic and environmental factors that are no longer in place.

Additionally, the cost of construction for the Project has increased by approximately 70% from Alto Maipo's initial projections, due to unexpectedly difficult geological conditions as well as delays caused by certain of Alto Maipo's prior contractors. These increased construction costs necessitated two prior restructurings that significantly increased Alto Maipo's debt load. These prior restructurings, however, were based on revenue projections that did not fully take into account the worsening hydrology and market conditions that have become apparent in the years since. As a result, the capital structure created through these prior restructurings is no longer sustainable.

In order to right-size their capital structure to meet these market challenges, the Debtors engaged in constructive negotiations with their creditors in an attempt to reach pre-arranged terms for a chapter 11 restructuring plan.

These negotiations resulted in a restructuring support agreement dated as of November 16, 2021 and executed prior to the filing of the Chapter 11 Cases (the "Original RSA", and as may be amended the "Restructuring Support Agreement" or "RSA"), between and among Alto Maipo; AES Andes S.A. (the "Sponsor"); Norgener Renovables SpA ("Norgener"); Strabag SpA ("Strabag" and together with Norgener, the "Shareholders"); Banco de Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Warbler Run I LLC, and Warbler Run II LLC (the "Supporting Senior Lenders" and together with Strabag, the "Consenting Creditors"). As of the Petition Date, the Original RSA was supported by the holders of approximately 55% of the Debtors' outstanding senior secured prepetition debt.

Following the commencement of these Chapter 11 Cases, the Debtors continued to engage in negotiations with its key stakeholders, resulting in an Amended Restructuring Support Agreement dated as of November 23, 2021 (the "Amended RSA"), and by which Deutsche Bank AG, London Branch, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and KfW IPEX-Bank GmbH became parties to the RSA (D.I. 100). On December 10, 2021, Regara Sarl executed a Joinder Agreement to the RSA as a Supporting Senior Lender and Consenting Creditor (D.I. 167). Furthermore, and as described in further detail herein, the Debtors were required to make updates to their financial projections to address a resulting near-term liquidity shortfall of approximately $60 million, approximately half of which was due to delays in the timeline of commissioning and changes to the predicted hydrology of the Maipo Valley, and approximately half of which was due to other aspects of the proposed reorganization required by the Senior Lenders. The parties undertook to make certain revisions to the agreed structure outlined in the Amended RSA. Accordingly, in connection with those discussions, the parties amended certain milestones under the RSA as of January 31, 2022 (the RSA as amended thereby, the "Second Amended RSA"). Thereafter, on February 7, 2022, Cerberus signed a joinder agreement to the Second Amended RSA.

The parties spent the majority of February 2022 in intense negotiations over a revised plan structure, and reached agreement on the terms of a further amended RSA (the "Third Amended RSA") and plan structure. The Third Amended RSA provided for certain necessary revisions to resolve the near-term liquidity shortfall (including certain deferrals from the Sponsor, Strabag, and the Senior Lenders; an increase in the size of the Amended & Restated Secured Exit Financing Facility; and an additional $15 million in working capital to be contributed by the Sponsor).

The parties subsequently agreed to certain further amendments to the RSA and plan structure (as memorialized in the plan term sheet attached to the RSA), resulting in the execution of a further revised RSA dated as of April 1, 2022 (the "Fifth Amended RSA").

As of the date hereof, the following parties have executed the current version of the Restructuring Support Agreement: Alto Maipo, AES Andes, Norgener Renovables SpA, Strabag SpA, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd., Carval CCF Cayman Securities Ltd., Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and Clover Private Credit Opportunities Secondary (Levered) II LP. The Restructuring Support Agreement is currently supported by holders of approximately 75% of the Debtors' senior secured debt. The Plan described herein, and as filed contemporaneously herewith, is consistent with the terms of the Fifth Amended RSA.

As provided in the Plan, AES Andes has agreed to make significant new money contributions to the Debtors' go-forward capital structure, which underscore its ongoing commitment to the Debtors' restructuring efforts and go-forward potential. Pursuant to the RSA, AES has agreed to provide both the Amended & Restated Secured Exit Financing Facility and the Working Capital Facility on terms that are substantially below market rates. Further, the Fifth Amended RSA obligates AES Andes to (i) roll its DIP Claims into an upsized Amended & Restated Secured Exit Financing Facility and (ii) waive its rights to repayment in cash at exit, agree to certain deferrals and fund up to $300,000.00 in satisfaction of Allowed General Unsecured Claims, and (iii) agree to make capital contributions of up to $10 million to fund any necessary payments relating to certain litigation claims that will ride through unimpaired. In total, the Debtors estimate that the value of these contributions range between approximately $4.5 to $28.8 million, with a midpoint estimate of $16.9 million.

The Debtors, having commenced these Chapter 11 Cases in order to pursue an orderly restructuring process under the terms of the Original RSA, now seek to implement the Plan on modified terms that have been agreed in the Restructuring Support Agreement attached as **Exhibit E**. The Debtors seek to (i) create a sustainable capital structure that will permit them to finish construction on the Project and fully transition into a revenue-generating enterprise; (ii) secure sufficient liquidity to facilitate the final phase of construction and the commencement of operations of the Project, as well as to support long-term operations; and (iii) maximize long-term value for all of their creditors.

## ARTICLE II:

## THE PLAN

**2.1** **Treatment of Claims and Interests**

The Plan provides for the treatment of Claims against and Interests in the Debtors through, among other things, the following:

- Each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim;

- Each Holder of an Allowed Professional Fee Claim shall receive payment in Cash of the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Debtor or Reorganized Debtor (as applicable);

- Each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive, without setoff or recoupment by any Debtor or Reorganized Debtor, its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations, *provided, however*, that Strabag's Pro Rata Share of such secured notes shall be held in escrow pending satisfaction of all conditions to payment of the Supplier Deferred Payment;

- Each Holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date;

- Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code;

- Each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in cash, funded by a cash contribution by AES Andes of up to $300,000.00 as set forth in Annex A to the Plan.  That certain contingent and unliquidated General Unsecured Claim set forth in Annex B to the Plan shall survive unimpaired. Remaining General Unsecured Claims shall be disallowed and expunged and/or estimated at zero for distribution purposes, or be resolved and released pursuant to the terms of the Plan, as detailed on Annexes C and D to the Plan;

- All Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility, and, in consideration for, *inter alia*, the impairment of the DIP Claims, certain contributions to the Borrower for the payment in full in cash of certain allowed unsecured claims, and for their agreement to pay up to $10 million to satisfy certain other claims to the extent set forth in the Plan

Term Sheet, AES Andes or its designee shall receive the New Common Equity, as provided for in the Restructuring Term Sheet;

- In consideration of Strabag's Other Claims that are Allowed, Strabag shall be entitled to payment as described in Section 3.3(f)(ii) of the Plan (less any payments on account of any such items made prior to the Effective Date);

- Each Holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors;

- Each Holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under applicable law. In order to effectuate such cancellation, release and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or the Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim. If you are entitled to vote to accept or reject the Plan, then prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety and to consult with your own advisors. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VII of this Disclosure Statement, entitled "Certain Factors To Be Considered."

## 2.2    **Unclassified Claims**

### (a)    **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

| Claim | Plan Treatment |
|---|---|
| Administrative Claims | Each holder of an Allowed Administrative Claim shall receive payment in full in cash. |
| Professional Fee Claims | Each holder of an Allowed Professional Fee Claim shall receive payment in full in cash. |

**(b)**     <u>Unclassified Claims</u>

**(1)**     **Administrative Claims**

Unless otherwise agreed by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases and except as otherwise provided in this Article II, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim as follows: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. The Debtors believe that there has been no diminution in the value of the Prepetition Collateral during the pendency of these Chapter 11 Cases. The Debtors and Senior Lenders have agreed that so long as the RSA remains in full force and effect, and the Senior Lenders have not delivered notice of an RSA Termination (as defined in the Final Cash Collateral Order), they will not seek any recovery on account of any Adequate Protection Claim they may have.

All requests for payment of Administrative Claims must be filed no later than the first Business Day that is 30 days after the Effective Date. The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than 45 days after the deadline for parties to file Administrative Claims as set forth in the service of notice of the Effective Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

**(2)**     **Professional Fee Claims**

All final requests for payment of Professional Fee Claims must be filed no later than the first Business Day that is 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

On the Effective Date, the Reorganized Debtors shall fund the Carve-Out Account with Cash equal to the Professional Fee Reserve Amount; *provided* that any amounts remaining in the Carve-Out Account immediately prior to the Effective Date shall be applied toward the

Professional Fee Reserve Amount on the Effective Date. The Carve-Out Account shall be maintained in trust solely for the benefit of the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. No Liens, Claims, or Interests shall encumber the Carve-Out Account in any way. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Carve-Out Account promptly after such Professional Fee Claims are Allowed by an Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, (x) if applicable, each Retained Professional shall receive its portion of the Carve-Out Account, allocated on the basis of the unused amounts set forth in the DIP Budget for such Retained Professional, from the Carve-Out Account and (y) the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Carve-Out Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

The Retained Professionals shall reasonably estimate in good faith their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Consenting Creditors no later than five Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Carve-Out Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Carve-Out Account based on such estimates.

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Debtors shall promptly pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors. From and after the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)**     **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Interests, by Class, under the Plan.

The projected recoveries are based on information available to the Debtors as of the date hereof, and reflect the Debtors' good-faith estimates as of the date hereof only.  In addition to the cautionary notes contained here and elsewhere in the Disclosure Statement, it is to be expressly understood that the Debtors make no representation as to the accuracy of these projected recovery estimates, and the Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereon on any basis (including new or different information received and/or errors discovered).

| Class No. | Type of Claim | Estimated Amount of Allowed Claims in Class | Estimated Percentage Recovery | Treatment | Impairment / Voting |
|---|---|---|---|---|---|
| **Class 1** | **Alto Maipo Senior Secured Obligations** | $2.04 billion | 60.0–66.8% | Each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive, without setoff or recoupment by any Debtor or Reorganized Debtor, its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations, which shall, in the aggregate, represent a 60.0–66.8% recovery on the total face amount of the total Allowed Alto Maipo Senior Secured Obligations. | Impaired |
| **Class 2** | **Secured Claims** | $0 | N/A | Each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date. | Unimpaired / Deemed to Accept |

8

| Class 3 | Priority Claims | $0 | N/A | Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
|---|---|---|---|---|---|
| Class 4 | General Unsecured Claims | $149,000 | 100% | On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in cash, funded by a cash contribution by AES Andes of up to $300,000.00 as set forth in Annex A to the Plan. That certain contingent and unliquidated General Unsecured Claim set forth in Annex B to the Plan shall survive unimpaired. Remaining General Unsecured Claims shall be disallowed and expunged and/or estimated at zero for distribution purposes, or be resolved and released pursuant to the terms of the Plan, as detailed on Annexes C and D to the Plan. | Unimpaired / Deemed to Accept |
| Class 5 | DIP Claims | $50 million | Up to 100%[3] | All Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility. Additionally, in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims, and AES Andes' | Impaired |

---

[3]    The Claims in Class 5 are impaired because they will not receive payment in full on account of the Claims at the time that payment is currently due, in accordance with the existing obligations.  However, with the application of a market rate of interest, these recoveries are in any event likely less than 100% on a time value basis.

| | | | | agreement to contribute up to $10M to satisfy obligations in connection with certain other claims, AES Andes or its designee shall receive the New Common Equity, as provided in the Restructuring Term Sheet. | |
| Class 6 | Strabag's Other Claims | $17.5 million | Up to 100%[4] | In consideration of Strabag's Other Claims, which are hereby Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all capitalized terms used in subsections 1-5 below and not otherwise defined herein are as defined in the Tunneling Contract): <br><br> (1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum starting from the date that the Company accepts the completion of relevant Change Order (the "Strabag Change Order Deferral"); (4) $112,000 in the aggregate upon completion of an eco-flow monitoring system for all intakes; (5) $10,000,000 upon Substantial Completion of Critical Milestone F, which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep | Impaired |

---

[4]     The Claims in Class 6 are impaired because they will not receive payment in full on account of the Claims at the time that payment is currently due, in accordance with the existing obligations.  However, with the application of a market rate of interest, these recoveries are in any event likely less than 100% on a time value basis.

| | | | | (as described in the Restructuring Term Sheet), shall bear interest at a rate of 4.0% per annum starting from the date of Substantial Completion of said Critical Milestone F, and shall be payable pursuant to the excess cash flow sweep (the "Strabag Construction Deferral"); and (6) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag (the "Strabag Insurance Deferral" and, together with the Strabag Change Order Deferral and Strabag Construction Deferral, the "Strabag Deferrals"). The Strabag Deferrals shall be secured, *pari passu* with the 1L Secured Obligations, until paid in full. | |
| Class 7 | Intercompany Claims | $1.1 billion | 100% / 0% | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |

| | | | | consent of the Required Consenting Creditors. | |
|---|---|---|---|---|---|
| **Class 8** | **Existing Equity Interests** | N/A | N/A | On the Plan Effective Date, to the maximum extent enforceable under applicable law, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law.  In order to effectuate such cancellation, release and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or the Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes. | Impaired / Deemed to Reject |

(d)    **Classified Claims and Interests Details**

(1)    *Class 1—Alto Maipo Senior Secured Obligations.*

(i)    *Classification*: Class 1 consists of all Alto Maipo Senior Secured Obligations.  Subject to occurrence of the Effective Date, the Alto Maipo Senior Secured Obligations are hereby Allowed.

(ii)    *Treatment:* On the Effective Date, each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive, without setoff or recoupment by any Debtor or Reorganized Debtor, its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations, which shall, in the aggregate, represent a 60.0–66.8% recovery on the total face amount of the total Allowed Alto Maipo Senior Secured Obligations.

(iii)    *Impairment and Voting:* Class 1 is Impaired and Holders of Alto Maipo Senior Secured Obligations are entitled to vote to accept or reject the Plan.

(2)    *Class 2—Secured Claims.*

(i)    *Classification*: Class 2 consists of all Secured Claims.

12

      (ii)    *Treatment:* Each Holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date.

      (iii)    *Impairment and Voting*: Class 2 is Unimpaired and Holders of Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

**(3)**    *Class 3—Priority Claims.*

      (iv)    *Classification*: Class 3 consists of all Priority Claims.

      (v)    *Treatment:* Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

      (vi)    *Impairment and Voting*: Class 3 is Unimpaired and Holders of Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Priority Claims.

**(4)**    *Class 4—General Unsecured Claims.*

      (i)    *Classification:* Class 4 consists of all General Unsecured Claims.

      (ii)    *Treatment:* On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in cash, funded by a cash contribution by AES Andes of up to $300,000.00 as set forth in Annex A to the Plan. That certain contingent and unliquidated General Unsecured Claim set forth in Annex B to the Plan shall survive unimpaired. Remaining General Unsecured Claims shall be disallowed and expunged and/or estimated at zero for distribution purposes, or be resolved and released pursuant to the terms of the Plan, as detailed on Annexes C and D to the Plan.

      (iii)    *Impairment and Voting:* Class 4 is Unimpaired and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not

13

entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such General Unsecured Claims.

**(5)** *Class 5—DIP Claims.*

(i)      *Classification*: Class 5 consists of DIP Claims.

(ii)     *Treatment*: On the Effective Date, all Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility.   Additionally, in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims, and AES Andes' agreement to contribute up to $10M to satisfy obligations in connection with certain other claims, AES Andes or its designee shall receive the New Common Equity, as provided in the Restructuring Term Sheet.

(iii)    *Impairment and Voting*: Class 5 is Impaired and Holders of DIP Claims are entitled to vote to accept or reject the Plan.

**(6)** *Class 6—Strabag's Other Claims.*

(i)      *Classification*: Class 6 consists of Strabag's Other Claims.

(ii)     *Treatment*: In consideration of Strabag's Other Claims, which are hereby Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all capitalized terms used in subsections 1-5 below and not otherwise defined herein are as defined in the Tunneling Contract):

> (1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum starting from the date that the Company accepts the completion of relevant Change Order (the "Strabag Change Order Deferral"); (4) $112,000 in the aggregate upon completion of an eco-flow monitoring system for all intakes; (5) $10,000,000 upon Substantial Completion of Critical Milestone F, which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep (as

14

described in the Restructuring Term Sheet), shall bear interest at a rate of 4.0% per annum starting from the date of Substantial Completion of said Critical Milestone F, and shall be payable pursuant to the excess cash flow sweep (the "<u>Strabag Construction Deferral</u>"); and (6) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag (the "<u>Strabag Insurance Deferral</u>" and, together with the Strabag Change Order Deferral and Strabag Construction Deferral, the "<u>Strabag Deferrals</u>"). The Strabag Deferrals shall be secured, *pari passu* with the 1L Secured Obligations, until paid in full.

(i)   *Impairment and Voting*: Class 6 is Impaired and Holders of Strabag's Other Claims are entitled to vote to accept or reject the Plan.

**(7)**   *Class 7—Intercompany Claims.*

(i)   *Classification*: Class 7 consists of all Intercompany Claims.

(ii)   *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors.

(iii)   *Impairment and Voting*: Intercompany Claims that are cancelled, released, and extinguished are Impaired and Holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims that are cancelled, released, or extinguished are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims. Intercompany Claims that are Reinstated are Unimpaired and Holders of such Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

15

**(8)**   *Class 8—Existing Equity Interests*.

(i)   *Classification*: Class 8 consists of all Existing Equity Interests.

(ii)   *Treatment*: On the Plan Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law.  In order to effectuate such cancellation, release and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or the Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

(iii)   *Impairment and Voting*: Class 8 is Impaired and Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such Existing Equity Interests.

**(e)**   <u>**Special Provision Governing Unimpaired Claims**</u>

Except as otherwise provided in the Plan, the DIP Orders, or the DIP Credit Facility Documents, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**(f)**   <u>**Voting, Presumptions, Solicitation**</u>

**(1)**   *Acceptance by Certain Impaired Classes.*  Only Holders of Claims in Classes 1, 5, and 6 are entitled to vote to accept or reject the applicable Plan. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least 66.6% in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 1, 5, and 6 have received Ballots containing detailed voting instructions.

**(2)**   *Conclusively Presumed Acceptance by Unimpaired Classes*.  Holders of Claims in Classes 2, 3, and 4, and certain Holders of Claims in Class 7, are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

**(3)**   *Deemed Not To Accept by Certain Impaired Classes*.  Holders of Claims and Interests in Class 8, and certain Holders of Claims in Class 7, are

16

deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

**(4)** *Controversy Concerning Impairment.* If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### (g) Elimination of Vacant Classes

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### (h) Nonconsensual Confirmation

Because certain Class of Claims or Interests entitled to vote on an applicable Plan are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

### (i) Subordinated Claims

The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the plan. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

### (j) No Waiver

Nothing contained in the Plan shall be construed to waive the right of any Debtor, Reorganized Debtor, or other Entity to object on any basis to any Claim, including after the Effective Date.

## 2.3 Liquidation Analysis

The Debtors, with the assistance of AlixPartners LLP, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit B** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the

Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis. As set forth in the Liquidation Analysis, the Plan provides a greater recovery for Holders of Allowed Claims than they would receive in liquidation under chapter 7 of the Bankruptcy Code.

## 2.4    Valuation Analysis

Lazard Frères & Co. LLC and Lazard Chile SpA (together, "Lazard"), at the request of the Debtors, have performed an analysis, which is attached hereto as **Exhibit C**, of the estimated implied value of the Debtors on a going-concern basis as of May 31, 2022 (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the Financial Projections attached to the Disclosure Statement as **Exhibit F** (the "Financial Projections"). The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article VII of this Disclosure Statement, entitled "Certain Factors To Be Considered." The Valuation Analysis is based on data and information as of March 22, 2022. Lazard makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESS. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

## ARTICLE III:

## VOTING PROCEDURES AND REQUIREMENTS

### 3.1    Classes Entitled to Vote on the Plan

The following Classes are entitled to vote to accept or reject the Plan (each a "Voting Class", and together the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Alto Maipo Senior Secured Obligations | Impaired |
| 5 | DIP Claims | Impaired |
| 6 | Strabag's Other Claims | Impaired |

If your Claim or Interest is not included in a Voting Class, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in

a Voting Class, you should read your ballot(s) and carefully follow the instructions included in the ballot(s). Please use only the ballot(s) that accompany the applicable Solicitation Package, if any, or the ballot(s) that the Debtors, or Prime Clerk LLC (the "Solicitation Agent") on behalf of the Debtors, otherwise provided to you.

## 3.2    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

## 3.3    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of a Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in a Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VII of this Disclosure Statement.

**3.4**    **Classes Not Entitled To Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are *not entitled to* vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|:-----:|-------------------|:------:|---------------|
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Priority Claims | Unimpaired | No (deemed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 7 | Intercompany Claims | Unimpaired/ Impaired | No (deemed to accept/ deemed to reject) |
| 8 | Existing Equity Interests | Impaired | No (deemed to reject) |

**3.5**    **Solicitation Procedures**

**(a)**    **Solicitation Agent**

The Debtors have retained Prime Clerk to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**(b)**    **Solicitation Package**

The following materials constitute the solicitation package (collectively, the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a Ballot and applicable voting instructions; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

**(c)**    **Distribution of the Solicitation Package**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on or about [•], 2022.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by: (i) calling the Solicitation Agent at (844) 216-8745 (US toll-free), (646) 795-6960 (US toll), or 800 719 921 (in Chile), (ii) emailing altomaipoinfo@primeclerk.com and referencing "Alto Maipo" in the subject line, or (iii) writing to the Solicitation Agent at: Alto Maipo Processing, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors'

restructuring website, https://cases.primeclerk.com/altomaipo/, or for a fee via PACER at https://www.pacer.gov/.

**3.6** **Voting Procedures**

[•], 2022 (the "Record Date") is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in a Voting Class to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and submitted via the balloting portal using the login information on the Holder's ballot at https://cases.primeclerk.com/altomaipo so that such Holder's ballot is actually received by the Solicitation Agent on or before the Voting Deadline, which is [•], 2022 at 3:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchasers of the Holder's Claim, and such purchasers shall be deemed to be the Holders thereof as of the Record Date for purposes of voting on the Plan.

You may receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan, as applicable. If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (a) treated as a single creditor for voting purposes and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM IN A VOTING CLASS MUST VOTE ALL OF ITS CLAIMS IN THE VOTING CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS,

SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN A VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

## ARTICLE IV:

## CORPORATE AND CAPITAL STRUCTURE

### 4.1   Prepetition Corporate Structure

The Debtors in these Chapter 11 Cases are Alto Maipo and Alto Maipo Delaware. Alto Maipo Delaware is a wholly-owned subsidiary of Alto Maipo. As of the Petition Date, non-debtor entity Norgener Renovables SpA held approximately 93% of Alto Maipo's equity interests, and Strabag SpA held the remaining 7% of Alto Maipo's equity interests. Norgener Renovables SpA is a wholly-owned subsidiary of AES Andes S.A. (f/k/a AES Gener S.A.), and Strabag SpA is a wholly-owned subsidiary of Strabag SE. An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit D**.

### 4.2   Prepetition Capital Structure

####   (a)   Prepetition Secured Debt

#####     (1)   First Lien Indebtedness

Alto Maipo is the borrower under a series of prepetition term loans (the "Term Loans" and the lenders thereunder, the "Term Lenders"), all of which are secured by substantially all assets of Alto Maipo (the "Prepetition Collateral") and rank *pari passu* as between each other, from certain international development banks, local and international commercial banks (the "Bank Lenders"), and syndicated lenders. The Term Lenders collectively held approximately $1.5 billion in outstanding senior secured term loan debt as of October 15, 2021. Itaú CorpBanca S.A. serves as administrative agent and onshore collateral agent for the Term Loans, with Itaú CorpBanca New York Branch serving as offshore collateral agent.

#####     (2)   Interest Rate Swaps

Certain of the Term Loans were also subject to interest rate swaps (the "Swaps") held by the originating banks as well as KfW IPEX-Bank GmbH (the "Swap Counterparties"). These swaps were terminated, and their total mark-to-market value, as asserted by the Swap Counterparties, was approximately $184 million as of November 16, 2021. The Swaps were also

secured by the Prepetition Collateral and ranked *pari passu* with the Term Loans.  The Term Lenders and the Swap counterparties were governed by the terms of an intercreditor agreement, to which Strabag was also party.  As of the date of the filing hereof, all of the Swaps have terminated.

### (3)    Strabag Construction Agreement

Alto Maipo is party to a construction agreement with Strabag (the "Strabag Construction Agreement"), under which Strabag holds a claim of up to $391.5 million against Alto Maipo, which accrues over time.  Payment of the accrued amount is contingent on the occurrence of: (a) (i) a bankruptcy or insolvency of Alto Maipo and the acceleration of debt by the parties financing the Project (which includes the Term Lenders and the Swap Counterparties, but not Strabag or any of its affiliates) (the "Financing Parties"), or (ii) the acceleration of debt by the Financing Parties for any other reason; or (b) the requirements of Section 6.3.4.4 under the Strabag Construction Agreement are met.[5]  If these conditions are satisfied, then any payment is made in installments pursuant to a supplier financing with Strabag.

### (4)    Other Prepetition Secured Debt

The only other asserted secured Claim that was timely filed is a Claim by Bradley Arant Boult Cummings LLP ("Bradley"), a U.S. law firm that represents Alto Maipo in the CNM Arbitration and asserts a $3 million success fee.  The Debtors intend to satisfy this Claim via assumption of the contract with Bradley and payment of the asserted success fee as cure cost.

### (b)    Prepetition Unsecured Debt

As of the Petition Date, Alto Maipo was party to agreements with several contractors, including Strabag, as well as Voith Hydro Ltda. and Voith Hydro S.A. (together, "Voith") and Andritz Hydro GmbH and Andritz Chile Ltda. (together, "Andritz"), which had asserted contingent unsecured claims against Alto Maipo.  Alto Maipo also held contingent claims against each of those contractors.

- With respect to Strabag, such claims are subject to court approval and other conditions precedent, proposed to be resolved under the Plan.  Strabag has filed a Proof of Claim for a purported priority claim that will be satisfied via the terms of Class 6, Strabag's Other Claims.

- With respect to Voith, pursuant to the *Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rule 9019 (I) Approving the Settlement Agreement with Voith and (II) Approving Assumption of the Construction Contract as Amended by Contract Amendment No. 7* (DI. 170, the "Voith Settlement Order"), Alto Maipo and Voith agreed to a settlement agreement resolving such claims, and Alto Maipo agreed to assume Voith's Construction Contract as amended by Amendment No. 7 (each term as defined in the Voith Settlement Order) pursuant to section 365 of the Bankruptcy Code.

---

[5]    Requirements under Section 6.3.4.4 are (i) the achievement of COD and (ii) the Debtors' issuance of all the critical milestone substantial completion certificates (in each case, as defined in the Strabag Construction Agreement).

- With respect to Andritz, pursuant to the *Order Pursuant to Sections 363 and 365 of the Bankruptcy Code Approving Assumption of the Andritz Contract as Amended by the Contract Amendment* (D.I. 198, the "Andritz Assumption Order"), Alto Maipo and Andritz agreed to a procedure for the global settlement of each party's claims against the other, and Alto Maipo agreed to assume the Andritz Contract (each term as defined in the Andritz Assumption Order).

Additionally, the Debtors are aware of the following significant contingent, unsecured Claims. Proposed treatment of these claims is detailed in the Annexes to the Plan.

- Compañía Industrial El Volcan S.A. ("Volcan") has asserted a Claim of approximately $1.5 million ostensibly related to a transport road easement agreement, though Alto Maipo has never formally or informally received any claim for such amount prior to the Proof of Claim filed in these Chapter 11 Cases. Volcan also asserts that Alto Maipo owes maintenance and repair costs related to the transport road. The Debtors do not believe that that these claims are valid or due and owing, but are working to resolve the dispute with Volcan as expeditiously as possible. Pursuant to the Plan and RSA, the Debtors reserve the right to defer litigation of the cure amount relating to the contract with Volcan until after the Effective Date.

- Parque Arenas SpA ("Parque Arenas") has asserted a litigation claim in a Chilean court for $10 million, alleging a breach of the easement contract between Alto Maipo and the previous owner of land now owned by Parque Arenas. Alto Maipo has also filed a counterclaim for damages in this matter. The case is currently in the evidentiary stage and there is not a clear timeline for the first ruling; however, both parties will have the opportunity to appeal the ruling when it does come, which is not likely to occur prior to the Effective Date.

- Gemma Contreras Bustamante, a purported Chilean homeowner, has asserted a $25 million contingent, unliquidated Claim relating to "water rights for human consumption, irrigation purposes and economic activity endangered" by the Project. The Debtors have no formal or contractual relationship with Ms. Contreras and do not believe she holds a valid Claim. Pursuant to Annex C to the Plan, the Debtors anticipate objecting to this claim and/or estimating it at zero for distribution purposes.

- Comunidad de Aguas Canal El Manzano ("Manzano"), a community group purporting to represent the interests of approximately 400 members who have individual surface water rights near the Colorado River in Chile, has asserted a $1 billion contingent, unliquidated Claim, purportedly in relation to the Project's effects on the group members' surface water rights (the "Manzano Proof of Claim"). The Debtors do not believe the claimant holds a valid Claim. Pursuant to Annex C to the Plan, the Debtors anticipate assuming the agreement with Manzano and obtaining a finding of a zero dollar cure cost.

24

- Maite Birke Abaroa, who purports to serve as a representative of a community in the San José de Maipo zone on behalf whom she has filed a Proof of Claim, asserts a contingent, unliquidated claim of $2 billion, alleging ongoing violations of the community's water rights under Chilean law and asserting vaguely that the Project will "cause irreparable damage to the area." The Debtors have no contractual relationship with Ms. Abaroa or the community which she purports to represent and do not believe she holds a valid Claim. Pursuant to Annex C to the Plan, the Debtors anticipate objecting to this claim and/or estimating it at zero for distribution purposes.

- Christian Becker Matkovic and Bruno Bercic have each asserted contingent, unliquidated claims of $80 million, respectively. Mr. Matkovic and Mr. Bercic each assert in their respective Proofs of Claim that the Project has caused usurpation of their water rights, in addition to causing related property damage. The Debtors have no contractual relationship with either Mr. Matkovic or Mr. Bercic, and do not believe either holds a valid Claim. Pursuant to Annex C to the Plan, the Debtors anticipate objecting to this claim and/or estimating it at zero for distribution purposes.

Pursuant to the Fifth Amended RSA, with respect to the Claims asserted by Volcan and Parque Arenas as described above, AES Andes has agreed to provide sufficient contribution to the Debtors to satisfy any amounts that the Debtors may be required to pay up to a maximum of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the Parque Arenas Unsecured Claim (as defined in the RSA) and (ii) the Volcan Cure/Claim Amount (as defined in the RSA).

## ARTICLE V:

## CIRCUMSTANCES LEADING TO AND DEVELOPMENTS IN THESE CHAPTER 11 CASES

As stated above, the Debtors filed these Chapter 11 Cases to implement the terms of the Original RSA, as amended through further negotiations with their creditors, as reflected in the Amended RSA. For the reasons described below, the Debtors have concluded in the exercise of their business judgment that these Chapter 11 Cases will allow the Debtors to achieve a sustainable capital structure and maximize the value of their business for all stakeholders.

### 5.1   Shifting Hydrological and Market Factors

By late 2020, Alto Maipo had made substantial construction progress on the Project, including the complete excavation of all 42 miles of tunnels, which represents the bulk of required construction. An estimated 99% of the Project's required construction had been completed as of the Petition Date. Three of the four units of the Project reached commercial operation on March 26, 2022, and the fourth unit is expected to reach commercial operation on April 20, 2022. Reaching COD of all four units in a timely manner is crucial to protecting the value of the Debtors' estates and maximizing their creditors' recoveries. Unfortunately, while construction on the

25

Project is nearing completion, the energy market that the Project is entering is not the same market that existed when the Project began construction in 2013, nor even the same market that existed when Alto Maipo completed its prior restructuring transactions.

The first factor impacting the Project's long-term revenue projections is a marked decrease in prices in the spot electricity market in Chile since the launch of the Project, largely due to the large volume of renewable energy generation capacity that has come online in the intervening years. In 2013, long-term spot prices for electricity averaged $116 per MWh. By 2021, long-term spot prices were less than half of what they were in 2013.

Equally problematic for the Project's estimated revenue is the changing hydrology in the Maipo Valley, where the Project is located. Across the past 59 years, a similar facility in the Maipo Valley could have generated an average of 2,218 GWh of energy per year. In contrast, across the past 10 years, the decreased precipitation and water flow through those same rivers would have generated an average of only 1,711 GWh of energy per year. Following even further decreases in water flow in recent years, Alto Maipo has projected that the Project would have generated approximately 1,390 GWh of energy in 2019; 1,303 GWh of energy in 2020; and 1,100 GWh of energy in 2021, based on annualized figures.[6]

The combination of lower prices and less precipitation mean that when the Project becomes operational, it will be operating in a dramatically different economic and hydrological reality than Alto Maipo originally forecast. In the face of this reality, Alto Maipo's current capital structure is simply not sustainable and requires a comprehensive restructuring.

## 5.2    Liquidity Challenges and Contingent Claims

In addition to changing economic and hydrological factors, the Debtors also faced an impending liquidity shortfall that necessitated the filing of these Chapter 11 Cases. As of the Petition Date, Alto Maipo expected to exhaust its available liquidity in December 2021. While Alto Maipo had previously estimated that the Project would reach COD in December 2020, the COVID-19 pandemic led to unexpected delays in construction, straining the Project's construction budget. As a result, by the time of the Petition Date, Alto Maipo faced a liquidity shortfall, jeopardizing its ability to reach COD despite the fact that the majority of construction work had already been completed.

Additionally, as of the Petition Date, Alto Maipo faced contingent litigation claims brought by a number of its construction contractors, including Strabag, Voith, and Constructora Nuevo Maipo S.A. ("CNM").

In June 2017, CNM stopped its tunneling works and failed to produce a completion or recovery plan, in breach of its obligations under its Tunnel Complex Construction Contract (the

---

[6]    In relation to the hydrology assumed in the Financial Projections attached hereto as Exhibit F, the Company is using a historical average as a predictor of the future. The Company, the lenders and their advisors had previously considered an average of the last 59-year period hydrology for projection purposes. However, due to recent environmental changes resulting in lower hydrology in recent years, projections have been updated to reflect, an average of the last 10-year period hydrology, which represents annual generation of 1711GWh. The Company and its advisors believe that the most recent ten years of hydrology reflect the best available estimate of hydrology going forward.

"CNM Contract").  As a result, Alto Maipo terminated the CNM Contract on June 7, 2017 and initiated arbitral proceedings before the International Court of Arbitration of the International Chamber of Commerce (the "ICC Court") and the arbitral tribunal of the ICC Court (the "Tribunal") sitting pursuant to the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules"), which arbitration is captioned ICC Case No. 22867/JPA (C-22923/JPA) (C-23845/JPA) – Alto Maipo SpA v. Constructora Nuevo Maipo S.A. v. The AES Corporation and AES Gener S.A. (the "CNM Arbitration"). Alto Maipo entered into a restated contract with another prime contractor, Strabag, in order to complete the Project. The additional costs, above the CNM Contract, were one of the expenses that sharpened the impact of the less than expected water availability and the lower energy prices.  On November 5, 2021, Alto Maipo received a partial award in which the Tribunal decided the issues of liability and quantum, found in Alto Maipo's favor, concluded that CNM had anticipatorily repudiated its obligations to Alto Maipo under the CNM Contract and that Alto Maipo had properly terminated the CNM Contract, and awarded Alto Maipo damages in the amount of approximately $106.7 million, before interest and legal fees and other costs (the "Partial Award").[7]  The Partial Award, plus any further award amounts that may be ordered by the ICC Court in connection with the CNM Arbitration, are expressly included in the package of Prepetition Collateral that secures the Debtors' obligations to the Term Lenders.  In order to collect the damages awarded to Alto Maipo in the Partial Award, a final and binding award by its own terms, plus any additional amounts that may be awarded as part of the Final Award, Alto Maipo may seek payment from one or more of CNM's parent entities, pursuant to that certain co-obligor undertaking (the "Co-Obligor Undertaking") as between Alto Maipo, SpA as owner, Hochtief Solutions AG as co-obligor, and Cooperativa Muratori & Cementisti – C.M.C. di Ravenna as co-obligor.  Any payment under either the Partial Award and/or the Final Award will be subject to the liens of the Term Lenders under the Term Loans.

As described in Section 5.6 herein, on December 17, 2021, the Bankruptcy Court entered an order partially lifting the automatic stay and authorizing the CNM Arbitration to proceed, which permitted the parties to file applications for correction or clarification within 20 days of the entry of such order (such that the parties were required to make any such submissions by January 6, 2022).  On January 6, 2022, CNM filed an Application for Correction of the Partial Award (the "Application for Correction"), asserting that the ICC Court had erred in its calculation of the damages owed to Alto Maipo in the Partial Award, and requesting a reduction of $197,746.00 in the amount of the Partial Award.  Alto Maipo did not oppose the proposed revisions to the calculations contained in the Application for Correction.  On January 25, 2022, CNM filed an Application for Revision of the Partial Award (the "Application for Revision"), alleging more fundamental flaws in the Tribunal's award of damages in the Partial Award, requesting that the damages awarded to Alto Maipo should be reduced from approximately $106.7 million to approximately $41.8 million (a reduction of approximately $65 million).  To the extent that the Tribunal accepts that the Award can be reopened, Alto Maipo would itself seek further damages. On February 25, 2022, Alto Maipo filed a reply in opposition to the Application for Revision, asserting its view that the arguments raised by CNM in the Application for Revision have no merit. On March 11, 2022, CNM filed a rebuttal to Alto Maipo's reply, raising the same points as in the Application for Revision.  Alto Maipo filed its reply to CNM's rebuttal on March 25, 2022. The Tribunal has not yet indicated whether it will allow a hearing on the Application for Revision.  To

---

[7]    The Partial Award was issued by the Tribunal on October 22, 2021.

the extent the Tribunal elects to reopen the record in response to the Application for Revision, or to the extent any arbitral or further judicial proceedings consider the issues raised in the CNM Arbitration, Alto Maipo has indicated that it may seek to have additional costs considered in connection with a potential revised Partial Award or future arbitral or judicial proceeding, including, without limitation, updated costs and other claims asserted by Strabag in connection with work on the Project pursuant to section 2.6.4 of the Tunneling Contract.

With respect to other contingent claims, Alto Maipo has reached a consensual settlement of all outstanding claims between Alto Maipo and each of Strabag and Voith. Alto Maipo has also reached a consensual settlement agreement with Andritz, under which certain claims have been resolved, and the parties will also seek to resolve their remaining disputed claims against one another (D.I. 184). Settlement of Strabag's Claims is subject to approval by the Bankruptcy Court and confirmation of a chapter 11 plan of reorganization on substantially similar terms as are described herein.

## 5.3    Discussions with Key Stakeholders Prior to the Petition Date

Realizing that its current capital structure is unsustainable in the face of changing economic and hydrological conditions, and anticipating that certain contingent claims may accelerate the need to right-size that capital structure, over the past several months Alto Maipo engaged extensively with its key stakeholders, including Strabag and the Term Lenders, in productive discussions regarding Alto Maipo's options for moving towards a workable restructuring solution for all parties.

Beginning in July 2021 and thereafter, Alto Maipo began to consult with various advisors, including employing Lazard, Cleary Gottlieb Steen & Hamilton LLP, and others, to assess its financial situation and develop a restructuring proposal. On August 27, 2021, Alto Maipo presented its revised construction budget, as well as its revised long-term business plan, to the Bank Lenders and to Strabag. At this time, Alto Maipo explained to its creditors the need for restructuring due to increased construction costs and delays, as well as changes to market prices and hydrological factors. In the following weeks, Alto Maipo engaged in one-on-one discussions with its major creditors to discuss terms of a potential restructuring.

On September 10, 2021, Lazard presented an initial restructuring proposal and target timeline to the Bank Lenders and to Strabag. Following this proposal, Alto Maipo continued to engage in one-on-one conversations with many of its lenders. The Debtors and their creditors have conducted extensive, good-faith negotiations on potential terms for a restructuring plan, and these negotiations continue as of the date herein.

On November 17, 2021, the Debtors and certain of their creditors reached an agreement on the terms of the Original RSA, which memorialized the terms of a pre-arranged restructuring of the Debtors through a chapter 11 process. In addition to the Debtors, the parties to the RSA were Strabag and five of the Bank Lenders: Itaú Corpbanca SA, Banco de Crédito e Inversiones, DNB ASA, Warbler Run I, and Warbler Run II. In the aggregate, these counterparties held approximately 55% of the Debtors' outstanding senior secured prepetition debt: Strabag held approximately 19%, Itaú Corpbanca SA held approximately 13%, Banco de Crédito e Inversiones held approximately 11%, DNB ASA held approximately 7%, Warbler Run I held approximately 2%, and Warbler Run II held approximately 2%.

28

Following agreement on the terms of the Original RSA, the Debtors filed these Chapter 11 Cases on November 17, 2021.

### 5.4    Continued Negotiations Post-Petition

Following the filing of these Chapter 11 Cases, the Debtors continued productive discussions with their secured creditors. These further negotiations resulted in certain amendments to the Original RSA, as reflected in the Amended RSA that was filed with the Bankruptcy Court on December 2, 2021. As of the date thereof, the Amended RSA had been executed by holders of approximately 78.4% of the Debtors' senior secured debt. In addition to the counterparties to the Original RSA, the secured creditors who executed the Amended RSA are: Deutsche Bank AG, London Branch, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP, KfW IPEX-Bank GmbH, and Regera Sarl.

Following the execution of the Amended RSA, routine updates to the Debtors' forecasting revealed near-term hydrology predictions for the Maipo Valley that were worse than anticipated, leading to a significant near-term liquidity gap that would affect the Debtors' ability to perform under the Original RSA upon emergence from these Chapter 11 Cases. As a result, the Debtors renegotiated a proposed restructuring deal and plan structure with the parties to the Amended RSA, the terms of which are reflected in this Disclosure Statement and the Plan attached hereto. The parties subsequently agreed to certain further amendments to the RSA and plan structure (as memorialized in the plan term sheet attached to the RSA), resulting in the execution of the Fifth Amended RSA. The Plan reflects all material terms of a revised version of the pre-negotiated restructuring that was agreed among the Debtors and certain of their major stakeholders, evidenced by the Restructuring Support Agreement dated as of April 1, 2022, attached as **Exhibit E**.

As of the date hereof, the following parties have executed the current version of the Restructuring Support Agreement: Alto Maipo, AES Andes, Norgener Renovables SpA, Strabag SpA, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd., Carval CCF Cayman Securities Ltd., Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and Clover Private Credit Opportunities Secondary (Levered) II LP. The Restructuring Support Agreement is currently supported by holders of approximately 75% of the Debtors' senior secured debt. The Plan described herein, and as filed contemporaneously herewith, is consistent with the terms of the Fifth Amended RSA.

### 5.5    First and Second Day Orders and Subsequent Developments

Upon the commencement of these Chapter 11 Cases, the Debtors filed numerous motions seeking a variety of initial relief. On November 18, 2021, the Court held a hearing (the "First Day Hearing") in which it considered these requests for relief. Following that hearing, the Court entered certain orders granting the relief requested by the Debtors (the "First Day Orders").

The First Day Orders included orders:

- Directing joint administration of these Chapter 11 cases (D.I. 46);

- Restating and enforcing the protections of Sections 105(a), 362, 365, and 525 of the Bankruptcy Code (D.I. 53);

- Authorizing the retention of Prime Clerk LLC as claims and noticing agent (D.I. 47);

- Authorizing the Debtors' continued use of its cash management system (D.I. 48);

- Authorizing the Debtors' payment of prepetition wages and continued payment of employee benefits (D.I. 49);

- Authorizing the Debtors' payment of certain prepetition taxes (D.I. 50);

- Authorizing the continuation of the Debtors' insurance program (D.I. 51);

- Authorizing payment of certain prepetition claims of critical vendors (D.I. 52);

- Granting administrative expense priority to all undisputed obligations for goods ordered prepetition and received postpetition (D.I. 54);

- Authorizing Alto Maipo to act as foreign representative of the Debtors (D.I. 55); and

- Authorizing the Debtors' use of cash collateral (D.I. 61).

Certain of the First Day Orders were entered on an interim basis and later approved on a final basis in the subsequent weeks.

Following the First Day Hearing, on November 22, 2021, the Court held a hearing to consider the Debtors' motion for an interim order approving postpetition debtor-in-possession financing. The Court entered an interim order approving this financing on November 23, 2021 (D.I. 70), and entered a final order approving this financing on December 17, 2021 (D.I. 166).

Shortly after the First Day Hearing, the Debtors filed a motion seeking authorization to amend, replace, and/or renew certain secured letters of credit (D.I. 80). The Court held a hearing to consider this motion on December 2, 2021, and entered an order granting the requested relief the same day (D.I. 103).

Additionally, following the commencement of these Chapter 11 Cases, the Debtors filed motions seeking additional relief, which were subsequently granted by the Court (the "Second Day Orders"). The Second Day Orders included orders extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (D.I. 157); establishing procedures for the interim compensation and reimbursement of professional expenses (D.I. 162); authorizing the employment and payment of professionals utilized in the ordinary course of business (D.I. 169);

The Second Day Orders also included orders authorizing the Debtors to retain, as of the Petition Date, the following professionals and advisors to assist the Debtors during these Chapter 11 Cases:

- Prime Clerk, LLC, as administrative advisor (D.I. 144);

- AlixPartners, LLP, as financial advisor (D.I. 146);

- Young Conaway Stargartt & Taylor, LLP, as co-counsel (D.I. 158);

- Cleary Gottlieb Steen & Hamilton LLP, as counsel (D.I. 161);

- Lazard Frères & Co. LLC and Lazard Chile SpA as investment banker (D.I. 163);

- Nelson Contador Abrogados & Consultores SpA, as special Chilean counsel (D.I. 219).

Additionally, the Debtors have obtained relief from the Court in the form of orders approving the Debtors' assumption of Alto Maipo's contract with Voith and a settlement agreement and amendment in connection therewith  (D.I. 170) and approving the Debtors' assumption of Alto Maipo's contract with Andritz (D.I. 197).

On January 5, 2022, the U.S. Trustee filed a limited objection to the Debtors' motion requesting authorization to continue using their cash management system (D.I. 193) (the "Section 345 Limited Objection").  In the Section 345 Limited Objection, the U.S. Trustee argued that the Debtors should not be permitted to waive the requirements of section 345(b) of the Bankruptcy Code, which requires that debtors hold their cash assets at bank accounts backed by certain types of securities.  On January 7, 2022, the Debtors filed a reply to the Section 345 Limited Objection (D.I. 202), arguing under that the circumstances of these Chapter 11 Cases, a waiver of section 345(b)'s requirements was appropriate.  The Term Lenders also filed a joinder to this reply (D.I. 204).  The Court held a hearing on the Section 345 Limited Objection on January 12, 2022, and entered an order authorizing a partial waiver of the requirements of section 345(b) on January 19, 2022 (D.I. 222).

## 5.6    CNM Lift Stay Order

On December 6, 2021, the Debtors filed a motion (D.I. 109, the "Lift Stay Motion") requesting an order (i) permitting the ICC Court and the Tribunal in the CNM Arbitration to engage in the proceedings and deliberations necessary with all other parties to issue a final award (the "Final Award"), and to issue such Final Award, further to the Partial Award; (ii) permitting both CNM and Alto Maipo (CNM and Alto Maipo, together with The AES Corporation and AES Andes S.A. (f/k/a AES Gener S.A.), the "CNM Arbitration Parties") to seek correction or clarification of the Partial Award under ICC Rule 36, (iii) providing that such Application for Corrections shall be filed no later than the date that is 20 days after the entry of the Proposed Order pursuant to section 108(c) of the Bankruptcy Code, (iv) permitting the Parties and the Tribunal to participate in the arbitral process necessary to determine the Final Award, (v) permitting the Parties to seek correction or clarification of the of Final Award by filing an Application for Corrections within the time limits prescribed by the ICC Rules, and (vi) permitting the Parties to participate in

potential annulment proceedings, if any, before Chilean courts of the Partial or Final Award ("Annulment Proceedings").

The Bankruptcy Court entered an order granting the Lift Stay Motion on December 17, 2021 (D.I. 160), which was shared with the Tribunal.  As detailed in Section 5.2 above, on January 6, 2022, CNM filed an Application for Correction with respect to the Partial Award, requesting minor corrections to calculation errors, which Alto Maipo did not oppose.  On January 25, 2022, CNM filed an Application for Revision with respect to the Partial Award, requesting a reduction by more than half to the amount of damages awarded in the Partial Award.  On February 25, 2022, Alto Maipo filed a reply in opposition to the Application for Revision.  On March 11, 2022, CNM filed a rebuttal to Alto Maipo's reply, raising the same points as in the Application for Revision. Alto Maipo filed its reply to CNM's rebuttal on March 25, 2022.  As of the date hereof, the Tribunal has yet to issue a decision on the Application for Revision or to issue the Final Award, which will address interest, costs, and fees.  Alto Maipo seeks an additional amount of approximately $21 million in pre-award interest with respect to the Final Award.  Alto Maipo has also requested that post-judgment interest and its costs/fees be awarded in the Final Award, but briefing on costs/fees has not yet taken place.  As detailed in Section 5.2 above, the Partial Award and the Final Award (once issued) are both pledged as Prepetition Collateral securing the Debtors' obligations to the Term Lenders.

## 5.7     Appointment of the Unsecured Creditors' Committee

On January 31, 2022, the U.S. Trustee appointed the Committee in these Chapter 11 Cases. As of the date of the filing hereof, the Committee comprised (1) Compañia Industrial El Volcan S.A., (2) Parque Arenas SpA, and (3) La Comunidad de Aguas Canal El Manzano.  (*See* D.I. 231.)

The Committee retained Dentons US, Dentons Bingham Greenbaum LLP and Dentons Larraín Rencoret SpA (collectively, "Dentons") as counsel, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch") as local counsel, and Alvarez & Marsal North America, LLC as financial advisor.  The Bankruptcy Court subsequently entered orders authorizing the employment and retention of these advisors by the Committee (D.I. 359, 360, 361).

## 5.8     Committee Motion to Extend the General Bar Date

On January 7, 2022, the Bankruptcy Court entered an order (D.I. 200, the "Bar Date Order") establishing February 16, 2022 at 4:00 p.m. (Eastern Time) as the last date and time for each person or entity to file Proofs of Claim based on prepetition Claims or section 503(b)(9) of the Bankruptcy Code (the "General Bar Date").  Additionally, the Bar Date Order establishes separate bar dates for Claims arising from Debtors' rejection of executory contracts and unexpired leases, for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Proofs of Claim, and Claims that the Debtors have amended in their Schedules (collectively, the "Bar Dates").

Pursuant to the Bar Date Order, the Debtors' claims and noticing agent, Prime Clerk LLC ("Prime Clerk"), served copies of the Bar Date Notice (the form of which was attached as Exhibit 1 to the Bar Date Order) on all known creditors by first class mail and/or email on January 12, 2022, thirty-five (35) days prior to the General Bar Date.  The Debtors also caused a copy of the

Publication Notice (the form of which was attached as Exhibit 3 to the Bar Date Order) to be published in English in the national edition of the New York Times on January 14, 2022 and in Spanish in *La Tercera*, a national publication in Chile, on January 22, 2022 (the "Publication Notice").

On February 10, 2022, the Committee filed the *Emergency Motion of Official Committee of Unsecured Creditors for Entry of an Order Extending the Claims Bar Date and Granting Related Relief* (D.I. 249, the "Committee Bar Date Extension Motion"), seeking to extend the General Bar Date for a period of at least an additional forty-five (45) days. The Debtors filed an objection to the Committee Bar Date Extension Motion (D.I. 273). Joinders to such objection were filed by the Senior Lenders and Strabag. Following a hearing on the Committee Bar Date Extension Motion on February 16, 2022, the Bankruptcy Court entered an order extending the General Bar Date through and including March 4, 2022 at 4:00 p.m. (Eastern Time) (the "New General Bar Date") (D.I. 292, the "Subsequent Bar Date Order").

Between the entry of the Subsequent Bar Date Order and the New General Bar Date, thirteen additional Proofs of Claim were filed, the majority of which were duplicative of claims already asserted prior to the passage of the original General Bar Date.

## 5.9   Committee Motion to Extend the Challenge Period

On December 17, 2021, the Bankruptcy Court entered the *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (D.I. 164, the "Final Cash Collateral Order"). Under the Cash Collateral Order, any Challenge[8] must be commenced by a party in interest by no later than the forty-fifth (45th) calendar day following the entry of the Cash Collateral Order (the "Challenge Period").

On February 3, 2022, the Committee filed an emergency motion seeking to extend the challenge period for an additional sixty (60) days until April 1, 2022 (D.I. 244, the "Committee Challenge Period Motion"). The Debtors filed an objection to the Committee Challenge Period Motion, arguing that, *inter alia*, the Committee had failed to show adequate cause to reopen the Challenge Period, which had already expired as of the date of the filing of the Committee Challenge Period Motion. At a hearing on February 16, 2022, the Bankruptcy Court denied the Committee Challenge Period Motion, and subsequently entered an order to that effect on February 23, 2022 (D.I. 299, the "Challenge Period Order"). The Committee has noticed an appeal of the Challenge Period Order (D.I. 316), pursuant to which the parties submitted an initial, joint written submission as to their positions on mediation of said appeal on March 24, 2022. On March 25, 2022, the United States District Court for the District of Delaware entered an order withdrawing the appeal of the Challenge Period Order from mandatory mediation and setting a briefing schedule

---

[8]    As defined in the Cash Collateral Order, a "Challenge" means an adversary proceeding or contested matter against any of the Prepetition Secured Parties (as defined in the Cash Collateral Order) challenging the admissions, stipulations, findings, or releases included in the Debtors' acknowledgements, stipulations and releases set forth therein which, *inter alia*, include an acknowledgement that the Debtors granted the Prepetition Secured Parties valid first priority liens upon and in all of the Debtors' assets, and all proceeds and products of such assets, including the cash held in the Bank Accounts as of the Petition Date (each term as defined in the Cash Collateral Order).

for the appeal, under which the Committee's opening brief will be due April 20, 2022, the Debtors' answering brief will be due May 20, 2022, and the Committee's reply brief will be due June 3, 2022.

## 5.10    MLP Power Purchase Agreement

Alto Maipo is party to a committed power purchase agreement (the "PPA"), dated as of June 28, 2013, with Minera Los Pelambres S.A. ("MLP") (to which Antofagasta Minerals S.A. was the original counterparty, one of Alto Maipo's former shareholders).  Under the PPA, MLP is committed to purchase power from Alto Maipo under what are, in the Debtors' business judgment, favorable terms, beginning at the commercial operation date and extending through 2040.  The MLP commitment under the PPA is expected to account for approximately 46% of the Project's energy output for every year until 2040.  Because of its scope and favorable terms, the PPA is one of Alto Maipo's most crucial assets.

As further described below in Section 7.2(l), on March 10, 2022 the Debtors filed a motion to assume the PPA, as well as a motion seeking enforcement by the Bankruptcy Court of the automatic stay with respect to certain actions taken by MLP during the pendency of the Chapter 11 Cases (the "MLP Motions").  There are no outstanding defaults under the PPA, and the Debtors detailed in the motion their performance to date (acknowledging that their most significant obligation under the PPA – to provide power to MLP after the Project reaches COD – had not yet been triggered) and their intention and ability to continue performing thereunder.

On March 17, 2022, MLP filed a limited objection to the MLP Motions solely for the purpose of objecting to the sufficiency of service and notice of the MLP Motions, and reserving its rights relating to or arising from the motions, including its rights to argue, *inter alia*, that the Court does not have personal jurisdiction over MLP (D.I. 378).

On March 21, 2022, the Debtors filed a reply to the limited objection filed by MLP (D.I. 395).  On March 23, 2022, MLP filed a sur-reply to the Debtors' reply (D.I. 409).  At a hearing on March 24, 2022, the Court held that MLP had actual notice of the MLP Motions, and instructed the Debtors and MLP to confer on scheduling for further briefing on the jurisdictional issues raised by MLP.

At a hearing on March 31, 2022, the Bankruptcy Court approved a schedule for further briefing on the question of whether personal jurisdiction over MLP is necessary in order to adjudicate the merits of the MLP Motions.  A hearing on the parties' briefing of the personal jurisdiction issue is scheduled for April 26, 2022.

## 5.11    Committee Rule 2004 Motion Regarding the MLP PPA

On February 24, 2022, the Committee filed a motion pursuant to Bankruptcy Rule 2004 requesting the Debtors' production of certain documents and discovery relating to the PPA, including, *inter alia*, a copy of the PPA, as well as any other documents or agreements respecting (i) the sale of the electric energy and capacity produced by the Project, including any renewable energy or environmental attributes, and (ii) the Debtors' current (and future) business plan that incorporate components of the PPA (D.I. 301, the "Rule 2004 Motion").  On March 4, 2022, the Debtors filed an objection to the motion on the grounds that the PPA and related documents were not to be disclosed, pursuant to the PPA's express terms, and that moreover, the PPA and related

documents contained highly sensitive commercial information that would be damaging to the Debtors' ability to negotiate similar contracts if it were to be made publicly (D.I. 324). The Committee filed a reply on the same day (D.I. 329).

The Rule 2004 Motion was heard on an expedited basis at a hearing on March 4, 2022, subsequent to which the Bankruptcy Court issued an order requiring the Debtors to share the PPA and certain related documents with the Committee on a professionals'-eyes-only basis (D.I. 331).

## 5.12   Motion to Assume the Restructuring Support Agreement

On March 7, 2022, the Debtors filed a motion requesting that the Bankruptcy Court enter an order authorizing the Debtors to assume the Restructuring Support Agreement and to perform their obligations thereunder (D.I. 341, the "RSA Assumption Motion"). The RSA Assumption Motion explained in detail the Debtors' belief, in their sound business judgment and exercise of their fiduciary duties, that the implementation of the agreed restructuring on the terms set forth in the Restructuring Support Agreement represents their best path to preservation of going concern value for their stakeholders.

On March 18, 2022, the Committee filed an objection to the RSA Assumption Motion, arguing that the RSA should be adjudged under the "entire fairness" standard rather than under the "business judgment" standard because it was influenced by insiders to the Debtors, and that the issues presented by the RSA should be adjudicated in connection with plan confirmation, rather than in connection with assumption of the RSA. (D.I. 387). On March 22, 2022, the Debtors filed a notice of adjournment as to the hearing on the RSA Assumption Motion (D.I. 398). The RSA Assumption Motion is set for hearing on April 6, 2022.

## 5.13   Manzano Litigation

In addition to the Manzano Proof of Claim described above, in March 2022, Manzano initiated an emergency action in Chile alleging that certain testing and commissioning activities of the Debtors violated their Colorado River water rights (the "Manzano Action"). In spite of Manzano's position as a member of the Committee, which obligates it to act as a fiduciary for all unsecured creditors, the Manzano Action seeks the extreme relief of the halting of testing, commissioning and/or operation of the Project, which would plainly result in substantial harm to the Debtors' estate, including the unsecured creditors represented by the Committee.

The Debtors dispute the allegations in the Manzano Action and believe the commencement of the Manzano Action constitutes a violation of the automatic stay as it, among other things, seeks to exercise control over the property of the estate. On March 29, the Chilean court rejected the injunctive relief that sought to halt the progress and operation of the Project. The Debtors reserve all of their rights and defenses in connection with the Manzano Action and sanctions for willful violations of the automatic stay.

## ARTICLE VI:

## OTHER MATERIAL ASPECTS OF THE PLAN

**6.1     Distributions**

Under the Bankruptcy Code, only claims and interests that are "Allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid Claim against or Interest in the Debtors.

**6.2     Distribution on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

**6.3     Distribution on Account of Claims and Interests Allowed After the Effective Date**

**(a)     Payments and Distributions on Disputed Claims**

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is 30 Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

**(b)     Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

**6.4     Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy

Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## (a)   Delivery of Distributions

### (1)   Record Date for Distributions

On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### (2)   Delivery of Distributions in General

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

### (3)   Delivery of Distributions on Account of DIP Claims

The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Credit Facility, subject to any modifications to such distributions in accordance with the terms of the Plan.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

### (4)   Distribution by Distribution Agent (if any)

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (i) affirm its obligation to facilitate the prompt distribution of any documents; (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (iv) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the

costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

### (5)    Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than US$50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of applicable equity interests under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share of applicable equity interests (up or down), with half dollars and half shares of applicable equity interests or less being rounded down.

### (b)    Undeliverable Distributions

### (1)    Holders of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Section 6.7(b) of the Plan, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

### (2)    Failure to Claim Undeliverable Distributions

No later than 60 days after a distribution has been made to each Holder of an Allowed Claim entitled to receive a distribution under the Plan, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the

Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 60 days after the filing of the list of Holders of undeliverable distributions shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### (3)    **Failure to Present Checks**

Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### (c)    <u>No Postpetition or Default Interest on Claims</u>

Unless otherwise specifically provided for in the Plan or the Confirmation Order and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition or default interest shall not accrue or be paid on any Claims, and (2) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim or (b) interest at the contract default rate, each as applicable.

### (d)    <u>Compliance with Tax Requirements/Allocations</u>

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

(e)     **Surrender of Cancelled Instruments or Securities**

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors. Except as otherwise expressly provided in the Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

(f)     **Claims Paid or Payable by Third Parties**

(1)     **Claims Payable by Insurance**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court

(2)     **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.5     No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan does not contemplate substantive consolidation of any of the Debtors.

**6.6     Compromise of Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Other than as specifically set forth herein, the Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**6.7    Restructuring Transactions**

*Effectuation of the Restructuring Transactions.*  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan and the Plan Supplement, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, including Strabag's re-delivery of its shares to AES Andes or such other entity as is designated by AES Andes (consistent with Section 3.3(h)(ii) of the Plan); (c) the filing of appropriate certificates of formation or incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable Law; and (d) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate. For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors.

*Working Capital Facility.*  On the Effective Date, subject to effectiveness of the Restructuring Transactions, including, without limitation, distribution of the New Common Equity to AES Andes, AES Andes will provide a super-senior first-lien secured working capital facility in an aggregate maximum principal amount of $15 million, with a maturity date of January 15, 2024, which shall be used to fund general corporate purposes and any costs to the Debtors or the reorganized Debtors associated with emergence from these Chapter 11 Cases. The Working Capital Facility will rank *pari passu* with the Amended & Restated Secured Exit Financing Facility. As of the date hereof, the Debtors, through Lazard, are preparing to market the Amended & Restated Working Capital Facility to confirm whether superior terms are available from third parties, which process will be completed well in advance of the Effective Date.

*1L Secured Obligations.*  The 1L Secured Obligations shall be issued in the aggregate amount of $1,050,000,000 in the form of investment-grade style corporate notes and project-finance style loans, with the form of each Senior Lender's allocation to be in accordance with that Senior Lender's election. All 1L Secured Obligations will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters.

*Amended & Restated 2L Secured Obligations.* The Amended & Restated 2L Secured Obligations shall be issued in the aggregate amount of approximately $993,718,290 (equal to the amount of the Alto Maipo Senior Secured Obligations as of the Petition Date, plus the liquidated amount of the interest rate swaps, <u>less</u> the aggregate principal amount of the 1L Secured Obligations), and shall be structured as project finance-style loans or notes with documentation customary for investment-grade corporate credit, at the discretion of the Senior Lenders. The Amended & Restated 2L Secured Obligations shall have a maturity of October 15, 2042, extendable to October 2052 at the individual option of each lender thereunder.

*AES Andes Shared Services Payments.* All AES Andes Shared Services Payments will continue to be deferred (the "<u>Shared Services Loan</u>"), and such deferral will be subject to the terms set forth as follows and be documented as an amendment to each of the AES Andes Shared Services Contracts. The Shared Services Loan shall bear interest at the same rate as the Amended & Restated 2L Secured Obligations (including any upside fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy. The maturity of the Shared Services Loan shall be the same as the latest date of scheduled maturity for any Amended & Restated 2L Secured Obligations.

*Subordinated Debt.* All Subordinated Debt (as defined in the Common Terms Agreement) shall be discharged. At the request of the Debtors, all holders of Subordinated Debt shall execute the necessary agreements as the Debtors or Reorganized Debtors may deem necessary to effectuate and document the re-delivery of all Subordinated Debt to AES Andes or such other entity as is designated by AES Andes.

*Equity.* On the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws. In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes. As part of, *inter alia*, the proposed global resolution of the Class 5 DIP Claims and Intercompany Claims held by AES Andes, and in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; and the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims; and AES Andes' contribution to satisfy any amounts that the Borrower is required to pay up to a maximum amount of $10 million to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the Parque Arenas Unsecured Claim (as defined in the Restructuring Support Agreement) and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D to the Restructuring Support Agreement), AES Andes shall receive 100% of the reorganized shares in Alto Maipo, which shares shall, in the future, be diluted subject to the conversion of the Amended & Restated 2L Secured Obligations and Shared Services Loan on the terms and subject to the conditions described in the governing documentation for such instruments. Holders of New Common Equity shall receive no dividends or distributions until the Amended & Restated Secured Exit Financing Facility, Working Capital Facility, VAT Financing Facility, 1L Secured Obligations and Amended & Restated 2L

Secured Obligations have been repaid, restructured, or refinanced in full in accordance with the terms of the Plan and the Definitive Documentation.

*CNM Arbitral Award.*  Unless otherwise agreed to by the Company, the Senior Lenders and Strabag, all proceeds of any CNM Arbitral Award shall be applied in the following order as and when such proceeds may be collected by Alto Maipo: (1) to repay the Working Capital Facility; (2) to repay the Strabag Construction Deferral; (3) to repay the Deferred 1L Interest; (4) 50% to repay any DIP Loans or the Amended & Restated Secured Exit Financing Facility amount outstanding, and 50% to repay the Amended & Restated 2L Secured Obligations (provided that, to the extent the DSRA is not fully funded, the Amended & Restated 2L Secured Obligations allocation shall go instead to fund DSRA up to a $20 million balance); (5) to the extent the DSRA is not fully funded, to fund the DSRA up to a $20 million balance; and (6) to repay the Amended & Restated 2L Secured Obligations.

*Amended & Restated Secured Exit Financing Facility.*  The DIP Lender shall provide an Amended & Restated Secured Exit Financing Facility.  The Amended & Restated Secured Exit Financing Facility shall have a maturity date that is three years after the Effective Date, shall be granted a super-senior first lien on all assets (*pari passu* with the Working Capital Facility), other than proceeds of reimbursement of VAT that was financed with the proceeds of the VAT Financing Facility, and shall bear an interest rate of 4.0% per annum (subject to the deferral of interest payable in 2022 and in January 2023, which shall accrue interest at 4.0% per annum).  The deferred interest of the Amended & Restated Secured Exit Financing Facility and the Sponsor Deferrals shall be added to the balance of the Amended & Restated Secured Exit Financing Facility and shall be repaid through the amortization of the Amended & Restated Secured Exit Financing Facility, which shall begin on July 15, 2023.  As of the date hereof, the Debtors, through Lazard, are preparing to market the Amended & Restated Secured Exit Financing Facility to confirm whether superior terms are available from third parties, which process will be completed well in advance of the Effective Date.

*VAT Financing Facility.*  A VAT Financing Facility shall be arranged in an aggregate total amount of $68.875 million, with a maturity that is 12 months from the date of issuance, with an interest rate as provided in the Definitive Documentation, and will rank *pari passu* with the 1L Secured Obligations.  The VAT Financing Facility shall be granted a super-senior first lien on the full amount of VAT refund that may due to Alto Maipo in connection with the Supplier Deferred Payment.

(a)    **Cancellation of Existing Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest, including the Restructuring Support Agreement (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant,

relating, or pertaining to any agreements, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged.  For the avoidance of doubt, and as provided in Section 4.3 of the Plan, on the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws.  In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

**(b)**     **Issuance of New Common Equity**

On the Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring.  All of the New Common Equity issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Equity is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

On the Effective Date, the Reorganized Debtors and the Holders of New Common Equity shall enter into the New Organizational Documents in substantially the form included in the Plan Supplement.  The New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

**6.8**     **Lien Priority for Amended & Restated Secured Obligations**

The Amended & Restated Secured Exit Financing Facility, the Working Capital Facility, the 1L Secured Obligations and the Amended & Restated 2L Secured Obligations shall benefit from the same collateral, *provided, however*, that (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility and the Working Capital Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations pursuant to an Amended & Restated Secured Obligations Intercreditor Agreement.

**6.9**     **Continued Corporate Existence**

Except as otherwise provided in the Plan, or as otherwise may be agreed between the Debtors and the Consenting Creditors, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents,

without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

## 6.10   <u>Vesting of Assets</u>

Except as otherwise provided in the Plan or the Plan Documents, on the Effective Date, all Assets, including all Claims, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

## 6.11   <u>Indemnification and Reimbursement Obligations</u>

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date of the Plan, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of actions arising out of or relating to any act or omission that is a criminal act or constitutes, intentional fraud, gross negligence or willful misconduct.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations in this Section 6.11 herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

**6.12    Sources of Consideration for Plan Distributions**

The Debtors shall fund distributions under the Plan with (1) Cash on hand, including Cash from operations; (2) the Amended & Restated Secured Obligations; and (3) contributions made by AES Andes to the extent set forth in the Plan.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  Subject to the terms of the Definitive Documents, the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

**6.13    Exemption from Registration Requirements**

The issuance of the 1L Secured Notes under the Plan and/or the Plan Supplement shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing the 1L Secured Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The issuance of the New Common Equity under the Plan and/or the Plan Supplement shall be exempt from registration under section 1145 of the Bankruptcy Code. The New Common Equity may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such Securities generally may be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states.

**6.14    Organizational Documents**

Subject to Article V of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

**6.15    Treatment of Non-Qualified Creditors**

All 1L Secured Notes under the Plan and/or Plan Supplement that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such 1L Secured Notes in one or more sale transactions within 180 days following the Effective Date (the "Sale Period"). The

price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a pro rata basis, to such Non-Qualified Creditors at the end of the Sale Period (the "Substitute Consideration"). In the event that a sale of such 1L Secured Notes is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such 1L Secured Notes shall be cancelled for no consideration. None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities. For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any 1L Secured Notes under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof.

**6.16   Exemption from Certain Transfer Taxes and Recording Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

**6.17   Directors and Officers of the Reorganized Debtors**

The members of the Reorganized Board will be designated in accordance with the Plan Supplement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the

applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced or removed in accordance with such New Organizational Documents.

## 6.18  Insurance Policies

All insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed and assumed and assigned to the respective Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

## 6.19  Corporate Action

On the Effective Date, the Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions as contemplated by the Plan, the Plan Supplement, the Restructuring Support Agreement, and the Restructuring Term Sheet, including: (i) the selection of the directors and officers of each of the Reorganized Debtors; (ii) the distribution of the New Common Equity as provided herein or in the Plan Supplement Documents, or as otherwise agreed between the Required Consenting Creditors and the Debtors; (iii) the execution and entry into the New and A&R Obligations Documents; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan and the Plan Supplement (or necessary or desirable to effect the transactions contemplated by the Plan and the Plan Supplement) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New and A&R Obligations Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

The authorizations and approvals contemplated by this Section 6.19 shall be effective notwithstanding any requirements under non-bankruptcy Law.

## 6.20  Effectuating Documents; Further Transactions

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such

actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the DIP Credit Facility Documents, the New and A&R Obligations Documents, the New Organizational Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

As provided in the Restructuring Term Sheet, the Confirmation Order shall expressly affirm Alto Maipo's obligation to exchange the debt instruments to be issued in satisfaction of the Amended & Restated 2L Secured Obligations for investment grade corporate credit in the form of notes, pursuant to the terms of the Restructuring Term Sheet, and shall provide that Alto Maipo's failure to perform shall entitle the holders of all such debt instruments in connection with the Amended & Restated 2L Secured Obligations subsequent to the Effective Date to all available remedies, including, without limitation, specific performance.

## 6.21    Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, but not paid pursuant to the DIP Orders, DIP Credit Facility Documents, or Cash Collateral Order, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the Plan and the DIP Orders, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

## 6.22    Retained Causes of Action

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, Cash Collateral Order, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be

preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith, including, without limitation, any Causes of Action or Claims related to the CNM Arbitral Award and/or collection thereof by Alto Maipo.  For the avoidance of doubt, except as expressly set forth herein or in the Plan Supplement, in no instance will any Cause of Action preserved pursuant to this Section 6.22 include any Claim or Cause of Action with respect to, or against, a Released Party.

**6.23    Treatment of Executory Contracts and Unexpired Leases**

**(a)    Assumption and Rejection of Executory Contracts and Unexpired Leases**

Subject to entry of the Confirmation Order, the Tunneling Contract is hereby assumed as amended. The Cure Cost for the Tunneling Contract consists of Strabag's Other Claims, which will be treated as described in the Plan in Article III, Classification and Treatment of Claims and Interests, Section 3.3, Treatment and Voting Rights of Claims and Interests, Subsection (d).

All other Executory Contracts and Unexpired Leases of the Debtors that are not otherwise assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than (i) those that are identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (ii) those that have been previously assumed or rejected pursuant to a Final Order by the Debtors prior to the Effective Date; and (iii) those that are the subject of a motion seeking assumption or rejection as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V but not assigned to a third party shall be deemed to be assigned to a Reorganized Debtor, and be fully enforceable by, the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts or Unexpired Leases, as described in the Plan and Plan Supplement, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached

50

or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**(b)** **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date, subject to the limitation described in the following paragraph, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. No later than the Plan Supplement Filing Date, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs to be filed and served upon applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. The Debtors shall provide for such notices to be sent via overnight mail to creditors outside the United States. Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or related Cure Cost must be filed, served, and actually received by the Debtors within twenty-one (21) days of such assumption or assumption and assignment.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost shall be deemed to have assented to such assumption or Cure Cost. In the event of a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (iii) any other matter pertaining to assumption and/or assignment, then the Bankruptcy Court shall hear such dispute prior to the assumption and/or assignment becoming effective, and the applicable Cure Costs associated therewith (if any) shall be paid following entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment and shall not prevent or delay implementation of the Plan or Effective Date; *provided* that the Debtors may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided, further,* that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject, any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Except as otherwise provided herein or as agreed to by the Debtors and the applicable counterparty, assumption or assumption and assignment of any Executory Contract or Unexpired

51

Lease pursuant to the Plan or otherwise, and the payment of the Cure Cost, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, and the Cure Cost paid, shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Indemnification and Reimbursement Obligations**

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date of the Plan, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of actions arising out of or relating to any act or omission that is a criminal act or constitutes, intentional fraud, gross negligence or willful misconduct. All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations in this Section 6.23(c) shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

(d)    **Claims Based on Rejection of Executory Contracts and Unexpired Leases (if Any)**

Unless otherwise provided by a Bankruptcy Court order, Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases, if any, pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts and Unexpired Leases, if any, that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contract and Unexpired Leases, if any, shall constitute General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**(e)**    **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that are not otherwise assumed or rejected will be deemed assumed by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code.

## 6.24    Employee Compensation and Benefits

Except as otherwise provided herein or in the Plan Supplement and except for any equity-based compensation or incentive plans, on and after the Effective Date, the Reorganized Debtors may, but are not required to, honor in the ordinary course of business: (i) any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees and other service providers of any of the Debtors who served in such capacity at any time. Nothing contained herein shall entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan.  Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

Except as otherwise provided herein, none of (i) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (ii) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Restructuring Transactions and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, will (A) entitle any current or former director, officer, employee or other service provider of any of the Debtors to any payment or benefit, (B) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or Expired benefit plan or (C) limit or restrict the right of the Debtors or Reorganized Debtors to merge, amend or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any person to terminate his or her service with the Debtors or Reorganized Debtors for "good reason" or similar provision.

**6.25** **Release, Injunction, and Related Provisions**

 **(a)**   **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies**

  Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is Allowed; or (iii) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

 **(b)**   **Releases by the Debtors**

  **PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER,**

**THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AND ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY SHALL BE DEEMED FOREVER RELEASED AND DISCHARGED BY EACH AND ALL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT FACILITY DOCUMENTS, OR THE NEW AND A&R OBLIGATIONS DOCUMENTS, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.  FOR THE AVOIDANCE OF DOUBT, NO CLAIMS OR CAUSES OF ACTION BASED ON, OR ARISING FROM, ANY RETAINED CAUSES OF ACTION (AS SET FORTH IN SECTION 4.18 HEREIN) SHALL BE RELEASED PURSUANT TO THIS PLAN,**

*INCLUDING, WITHOUT LIMITATION*, ACTIONS BASED ON, OR ARISING FROM, THE CNM ARBITRATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT EACH DEBTOR RELEASE IS (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF SUCH CLAIMS; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR PROPERTY.

(c)    <u>Releases by Holders of Claims and Interests</u>

AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE DISCLOSURE STATEMENT, THE

PLAN, THE PLAN SUPPLEMENT, THE DIP CREDIT FACILITY DOCUMENTS, THE NEW AND A&R OBLIGATIONS DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.

(d)    Releases by Alto Maipo and Strabag

SUBJECT TO AND EXCEPT FOR THE RIGHTS AND OBLIGATIONS SET FORTH IN THE RSA (AS AMENDED, RESTATED, OR SUPPLEMENTED), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, STRABAG AND ALTO MAIPO, ON BEHALF OF THEMSELVES AND THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS, FULLY AND FINALLY WAIVE, DISCHARGE AND RELEASE ANY AND ALL PAST AND CURRENT CLAIMS, COUNTERCLAIMS, CHANGES (AS DEFINED IN THE TUNNELING CONTRACT), DISPUTES, DEMANDS, CAUSES OF ACTION, LIABILITIES, AND DAMAGES FOR ADDITIONAL TIME OR COMPENSATION OF WHATEVER NATURE, CAUSE OF ACTION OR THEORY, WHICH ARE EITHER KNOWN AS OF APRIL 5, 2022 (THE "CUT-OFF DATE"), OR SHOULD HAVE BEEN KNOWN AS OF THE CUT-OFF DATE IN THE EXERCISE OF REASONABLE DILIGENCE BY THE RESPECTIVE RELEASING PARTY (RECOGNIZING THE RELATIVE EXPERTISE, POSITION, AND ENGINEERING SOPHISTICATION OF EACH RESPECTIVE PARTY); INCLUDING WITHOUT LIMITATION CONSTRUCTION CLAIMS, INCLUDING CREDITS AND BACK-CHARGES, DESCOPE CLAIMS, OMITTED-SCOPE CLAIMS, CHANGE ORDER CLAIMS, FUTURE BONUSES, BREACH OF CONTRACT, LIQUIDATED DAMAGES, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO THE TUNNELING CONTRACT OR PROJECT THAT STRABAG AND ALTO MAIPO MAY HAVE AGAINST ONE ANOTHER, THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS THROUGH THE CUT-OFF DATE, *PROVIDED, HOWEVER,* THAT ANY CLAIMS BY ALTO MAIPO OR STRABAG, AS APPLICABLE, ARISING FROM (A) A WARRANTY (AS DEFINED IN THE TUNNELING CONTRACT); (B) A LATENT DEFECT (IN ACCORDANCE WITH SECTION 10.4.3 OF THE TUNNELING CONTRACT); (C) ANY DEFECT (I) DISCOVERED BY ALTO MAIPO DURING THE COMPLETION OF ACCEPTANCE TESTS (AS DEFINED IN THE TUNNELING CONTRACT) CONDUCTED AFTER THE CUT-OFF DATE, OR (II) IDENTIFIED AFTER FULL-LOAD TESTS HAVE BEEN

COMPLETED, **PROVIDED THAT STRABAG'S LIABILITY UNDER CLAUSE (II) ABOVE FOR ANY DEFECT RESULTING FROM ANY FAILURE BY STRABAG TO COMPLY WITH ITS OBLIGATIONS UNDER SECTIONS 2.3.1.1, 2.3.1.3, AND 2.3.1.4 OF THE TUNNELING CONTRACT AS THEY RELATE TO THE HYDRAULIC DESIGN (AS DEFINED IN THE TUNNELING CONTRACT), IF ANY, COMBINED WITH ANY LATE CRITICAL MILESTONE PAYMENTS (AS DEFINED IN THE TUNNELING CONTRACT) SHALL BE LIMITED TO A MAXIMUM OF $70,000,000; (D) THE AS-BUILT DELIVERABLES REQUIRED UNDER SECTION 7.6.1.4 OF THE TUNNELING CONTRACT, PROVIDED, HOWEVER, THAT NOTHING IN THIS CLAUSE (D) SHALL BE READ TO ENLARGE OR RESTRICT OWNER'S AND CONTRACTOR'S RESPECTIVE RIGHTS UNDER THE TUNNELING CONTRACT; (E) ANY FINES OR PENALTIES IMPOSED BY A GOVERNMENT ENVIRONMENTAL AUTHORITY AFTER THE CUT-OFF DATE THAT HAVE BEEN PROXIMATELY CAUSED BY SUCH RELEASED PARTY'S ACTIVITIES IN CONNECTION WITH THE PROJECT; AND (F) THE PUNCH LIST ITEMS AND ALL OTHER ITEMS LISTED IN ANNEX A TO ANNEX IV OF AMENDMENT NO. 5 TO THE RSA (EXCEPT FOR THOSE ITEMS IN ANNEX A TO ANNEX IV THAT ARE LABELLED AS "WAIVED ITEMS" OR "ADDITIONAL SCOPE", WHICH ITEMS ARE RELEASED OR OTHERWISE ADDRESSED ON THE TERMS DESCRIBED IN ANNEX A TO ANNEX IV); ARE NOT RELEASED AND ARE EXPRESSLY PRESERVED; AND *PROVIDED FURTHER*, THAT ALL OF THE RIGHTS AND DEFENSES OF EACH PARTY WITH RESPECT TO ANY CLAIMS ASSERTED BY THE OTHER PARTY PURSUANT TO SUBSECTIONS (A)-(F) ABOVE ARE EXPRESSLY PRESERVED. FOR THE AVOIDANCE OF DOUBT, NOTHING HEREIN SHALL RELEASE, WAIVE, OR MODIFY ANY PARTY'S RIGHT TO RECOVER ANY INSURANCE PROCEEDS, SEEK OR OPPOSE RELIEF FROM ANY LATE CRITICAL MILESTONE PAYMENTS, REQUIRE COMPLETION OF THE ACCEPTANCE TESTS (TO THE EXTENT THOSE ACCEPTANCE TESTS HAVE NOT BEEN COMPLETED PRIOR TO THE CUT-OFF DATE), OR PURSUE OR OPPOSE ANY OTHER CLAIMS RELATED TO STRABAG'S ENTITLEMENT TO A SUBSTANTIAL COMPLETION CERTIFICATE FOR ANY CRITICAL OR CONTRACT MILESTONE, OR ANY OTHER NON-MONETARY CLAIMS, IN EACH CASE TO THE EXTENT PROVIDED IN, AND PURSUANT TO THE TERMS OF, THE TUNNELING CONTRACT; *PROVIDED, HOWEVER,* THAT NEITHER PARTY MAY ASSERT ENTITLEMENT TO SPECIFIC PERFORMANCE FOR CLAIMS THAT ARE OTHERWISE RELEASED.**

    (e)    <u>**Exculpation and Limitation of Liability**</u>

**UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.**

**EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR**

RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; *PROVIDED* THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; *PROVIDED FURTHER* THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT; *PROVIDED FURTHER* THAT THE FOREGOING SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF NEW COMMON EQUITY PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

(f)    Injunction

THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE IX OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY ENTITY BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.

**6.26    Setoffs and Recoupment**

Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.  The Holder of such allowed Claim may challenge such a setoff or recoupment in the Bankruptcy Court, or in any court outside the United States with jurisdiction to hear such a challenge.

In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff or recoupment in such Proof of Claim.

**6.27    Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, for the avoidance of doubt, the New and A&R Obligations Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.

**6.28    Plan Modifications**

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided* further that any such amendments or modifications shall require the consent of the Consenting Creditors; *provided* further that any amendments or modifications that affect the rights, obligations, liabilities and duties of the DIP Agent shall require the consent of the DIP Agent, as applicable.

**6.29    Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**6.30    Certain Technical Amendments**

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided* that such technical adjustments and modifications do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

**6.31    Revocation or Withdrawal of Plan**

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or both Debtors, prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in the Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**6.32    Reservation of Rights**

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**6.33    Conditions Precedent to the Effective Date**

The Effective Date shall not occur unless and until each of the following conditions (the "Conditions Precedent") have occurred or been waived in accordance with the terms herein:

1.    the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors, which shall be in force and effect and not subject to any stay of effectiveness;

2.      the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time after April 1, 2022;

3.      the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the final versions of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance acceptable to the Required Consenting Creditors and the DIP Lender in all respects and consistent in all respects with the Plan Term Sheet (as defined in and attached to the Restructuring Support Agreement), and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) DIP Lender in their sole and absolute discretion;

5.      the New and A&R Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New and A&R Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each of the New and A&R Obligations Documents;

6.      the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

7.      all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Carve-Out Account pending the Bankruptcy Court's approval of such fees and expenses;

8.      the payment in Cash in full of all Restructuring Expenses;

9.      the PPA shall have been assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and shall be in full force and effect and shall not have been terminated at any time;

10.      the documentation related to the VAT Financing Facility shall have been duly executed and delivered by all of the Entities that are party thereto;

11.      with respect to the claims listed on Annex C to the Plan, the Bankruptcy Court shall have entered orders either (a) disallowing and expunging, (b) estimating at zero dollars for distribution purposes, (c) reducing and allowing, or (d) authorizing the assumption of the relevant contracts (with cure amount ordered to be zero dollars, with the exception of Claim No. 16, the cure or claim amount, which the Debtors may litigate as needed subsequent to the Effective Date provided that any disputed cure amount or claim amount be held in escrow by the Company pending the outcome of such litigation), in each case as set forth in Annex C to the Plan; and

12.    the contributions from AES Andes in an amount of up to $300,000 for the payment in full in cash of the allowed General Unsecured Claims listed in Annex A to the Plan shall have been sufficient to pay in full in cash all such Allowed General Unsecured Claims.

## 6.34    Waiver of Conditions Precedent

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Creditors, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## 6.35    Effect of Failure of Conditions Precedent

If the Effective Date does not occur, then, upon notice by the Debtors to the Bankruptcy Court, (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE VII:

## CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH MANY RISK FACTORS ARE DISCUSSED IN THIS DISCLOSURE STATEMENT, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

## 7.1    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims should read and carefully consider the factors set forth below,

as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

## 7.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations

### (a)    Certain Holders of Claims or Interests May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created 8 Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, aside from those Consenting Creditors that have committed to support the Plan, another Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

### (b)    The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. While the Debtors have support for the Plan through a revised Restructuring Support Agreement with certain creditors in Classes 1, 5, and 6, which represent all Classes that are both Impaired and entitled to vote on the Plan, if the Plan nonetheless does not receive the required support from Classes 1, 5 or 6, with the requisite creditor majorities is not consummated, the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation. The Debtors do not believe that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as the Restructuring Transactions contemplated by the Plan.

### (c)    Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a debtor may place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests in the Plan complies with the Bankruptcy Code requirements because the Debtors classified Claims and Interests that are substantially similar to the other Claims and Interests, as applicable, in each such Class. Moreover, the Debtors have support for

64

the Plan through the RSA in Classes 1, 5, and 6.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (d)    **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors anticipate having support for the Plan through a revised RSA with certain creditors in Classes 1, 5, and 6, which represent all Classes that are both Impaired and entitled to vote on the Plan, with respect to any impaired Classes of Claims and Interests that do not accept the plan or are deemed not to accept the Plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation, with respect to the "absolute priority rule") and not discriminate unfairly with respect to such classes.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan.  There can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' analysis thereof are set forth in the unaudited Liquidation Analysis, attached hereto as **Exhibit B**.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner, affecting the business as a going concern;

- additional administrative expenses involved in the appointment of a chapter 7 trustee;

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation; and

- the PPA may terminate, by its terms, if the Chapter 11 Cases convert to a liquidation under chapter 7 of the Bankruptcy Code.

(e)     **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and Consummation of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.  If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not occur.  In the event that the Plan is not Confirmed or is not consummated, the Debtors may seek Confirmation of an alternative plan of reorganization.

(f)     **There is a Risk of Loss of Support for the Plan**

The Plan reflects all material terms of a revised version of the pre-negotiated restructuring that was agreed among the Debtors and certain of their major stakeholders, evidenced by a Restructuring Support Agreement dated as of February 28, 2022, attached as **Exhibit E**.  However, the RSA contains certain standard termination events, and there is a risk that one or more of these events could occur, which would result in the loss of support for the Plan by such stakeholders prior to Confirmation and could result in the loss of use of cash collateral and debtor-in-possession financing by the Debtors under certain circumstances.  Any such loss of support and funding could adversely affect the Debtors' ability to confirm and consummate the Plan.

(g)     **The Bankruptcy Court May Dismiss One or Both of the Chapter 11 Cases**

Certain parties in interest may contest the Debtors' authority to prosecute the Chapter 11 Cases.  If, pursuant to any such proceeding, the Bankruptcy Court finds that one or both of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Plan, and any parties providing exit financing may be unwilling to proceed with such funding.  If one or both of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding or seek to liquidate or restructure their business in another forum to the detriment of all parties in interest.

(h)     **The United States Trustee or Other Parties May Object to the Plan on Account of the Debtors' Releases, Third-Party Releases, or Injunction Provisions**

Any party in interest, including the U.S. Trustee, could object to the Plan on the grounds that, among other things, the (i) the debtor release contained Article IX of the Plan is to be given without adequate consideration, (ii) the third-party release contained in Article IX of the Plan is not given consensually or in a permissible non-consensual manner, or (iii) the injunction contained in Article IX of the Plan is overly broad.  In response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code.  If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying

the Plan to alter or remove the applicable provision.  This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

**(i)**      **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, consistent with the terms of the Plan, and with the consent of the Required Consenting Creditors to the extent required under the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan (which shall not be done without the consent of the Required Consenting Creditors to the extent required under the RSA), the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**(j)**      **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose a plan of reorganization for a period of 120 days from the Petition Date, and, once a plan of reorganization has been filed by the debtor in possession, no other party in interest may propose an alternate plan of reorganization unless and until a period of 180 days from the Petition Date has passed without such plan being accepted by each class of claims or interests that is impaired under the plan.  However, both the 120-day and 180-day exclusivity periods can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.  On March 16, 2022, the Debtors filed a motion to extend these exclusivity periods through and including June 1, 2022 (D.I. 373, the "Exclusivity Extension Motion").  On March 29, 2022, the Senior Lenders filed a reservation of rights with respect to the Exclusivity Extension Motion (D.I. 426).  No objections to the Exclusivity Extension Motion were timely filed.  The Exclusivity Extension Motion will be heard by the Court on April 6, 2022.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests.

67

**(k)**      **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arose prior to the Petition Date or will arise before confirmation of the plan of reorganization (a) would be subject to compromise or treatment under the plan of reorganization or (b) would be discharged in accordance with the terms of the plan of reorganization.  However, certain creditors could assert that they were not subject to the jurisdiction of the Bankruptcy Court and/or flout orders of the Bankruptcy Court to assert claims after confirmation, which would require the Debtors or Reorganized Debtors to pursue further enforcement actions.  Any Claims not ultimately or successfully discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**(l)**      **The Assumption of the MLP PPA Contract May Be Subject to Challenge or Litigation**

As described in Section 5.10 herein, due to its scope and what are, in the Debtors' business judgment, favorable terms, the PPA with MLP is one of Alto Maipo's most crucial assets.

On March 10, 2022, the Debtors filed a motion requesting an order approving the assumption of the PPA (D.I. 350, the "MLP Assumption Motion").   While the Debtors believe that they are entitled to exercise their business judgment to assume the PPA, MLP has signaled an intention to seek to exercise purported rights of termination under the PPA (which termination, in the Debtors' view, could not in any event take effect until the expiration of a lengthy cure period after the alleged default giving rise to the termination right).

By letter correspondence dated February 16, 2022, MLP informed the Debtors that it considers Alto Maipo's commencement of these Chapter 11 Cases on November 17, 2021 to constitute an "Insolvency Event" as defined in the PPA, giving rise to a right by MLP to terminate the PPA.  MLP has also argued that Alto Maipo initiated these Chapter 11 Cases in bad faith in order to deprive MLP of its rights in an event of insolvency.  In addition, MLP has asserted that it is not subject to the Court's jurisdiction and has delivered a notice to the collateral agent for the Term Loans purporting to shorten the otherwise applicable cure periods under the PPA.  The Debtors dispute the merits and positions in each of these purported notices, and the arguments underlying them, and in any event such notices constituting clear violations of the automatic stay that took effect upon the filing of the Chapter 11 Cases.

On March 10, 2022, the Debtors filed a motion seeking entry of an order enforcing the automatic stay against MLP and declaring *ab initio* any purported termination of the PPA (D.I. 352, the "MLP Automatic Stay Motion", together with the MLP Assumption Motion, the "MLP Motions"), explaining that the actions taken and/or threatened by MLP, including any efforts by MLP to terminate the PPA or shorten any applicable cure periods on the basis of a spurious interpretation of the term "Insolvency Event", represent willful violations of the automatic stay established by the Bankruptcy Court.  Through the MLP Automatic Stay Motion, the Debtors have requested that the Court declare MLP's actions in purporting to terminate the Agreement void *ab initio*.

On March 17, 2022, MLP filed a limited objection to the MLP Motions solely for the purpose of objecting to the sufficiency of service and notice of the MLP Motions, and reserving its rights relating to or arising from the motions, including its rights to argue, *inter alia*, that the Court does not have personal jurisdiction over MLP (D.I. 378).

Also on March 17, 2022, the Senior Lenders and Strabag, together, filed joinders to the MLP Assumption Motion (D.I. 375) and the MLP Automatic Stay Motion (D.I. 376), and the Committee filed a statement in support of the MLP Motions (D.I. 377).

On March 21, 2022, the Debtors filed a reply to the limited objection filed by MLP (D.I. 395). On March 23, 2022, MLP filed a sur-reply to the Debtors' reply (D.I. 409). At a hearing on March 24, 2022, the Court held that MLP had actual notice of the MLP Motions, and instructed the Debtors and MLP to confer on scheduling for further briefing on the jurisdictional issues raised by MLP.

At a hearing on March 31, 2022, the Bankruptcy Court approved a schedule for further briefing on the question of whether personal jurisdiction over MLP is necessary in order to adjudicate the merits of the MLP Motions. A hearing on the parties' briefing of the personal jurisdiction issue is scheduled for April 26, 2022.

**(m)** **Certain General Unsecured Claims that Are Included on Annex C to the Plan May Nevertheless Be Allowed**

The Plan contemplates that on the Plan Effective Date, each holder of an Allowed General Unsecured Claim scheduled on Annex A shall have its Claim paid in full in cash, or in the case of contingent and unliquidated General Unsecured Claims scheduled on Annex B, shall have its Claim survive unimpaired. General Unsecured Claims listed on Annex C to the Plan shall objected to by the Debtors in full or in part in accordance with the treatment indicated on Annex C, and/or estimated at zero for distribution purposes.

In order for the Plan to become effective, the Bankruptcy Court must enter one or more orders as to which there is no stay of effectiveness disallowing and expunging and/or estimating at zero for distribution purposes any timely asserted General Unsecured Claims not resolved through the Plan, and not otherwise resolved prior to the Effective Date. There is a risk that the Bankruptcy Court will determine that some or all of the General Unsecured Claims which the Debtors seek to have disallowed and expunged and/or estimated at zero for distribution purposes should instead be Allowed, which, absent a waiver from the Required Consenting Creditors, could adversely affect the Debtors' ability to confirm and consummate the Plan.

**7.3** **Risks Relating to the Restructuring Transactions**

**(a)** **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, the Debtors are highly dependent on the

efforts and performance of their senior management team.  If key employees depart because of uncertainty about their future roles and potential complexities of the Restructuring Transactions, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

**(b)** **Failure to Implement the Restructuring Transactions and Confirm and Consummate the Plan Could Negatively Impact the Debtors**

If the Restructuring Transactions are not implemented, the Debtors may consider other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

If the Plan is not confirmed and consummated, the ongoing business of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' business caused by the failure to pursue other beneficial opportunities due to the focus on the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the incurrence of substantial costs by the Debtors in connection with the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions; and

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable.

**(c)** **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks**

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic or hydrological conditions, changes in the Debtors' industry, changes in laws and regulations, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

### 7.4     Risks Relating to the Debtors' Business

#### (a)     The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Debtors' ability to make scheduled payments on or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence. Further, the COVID-19 pandemic could continue to have an adverse effect on the Debtors' business and results of operations.

#### (b)     Existing and Increased Competition in the Alternative Energy Industry or Decreasing Energy Demand May Adversely Affect the Debtors' Future Profitability

The Debtors compete with numerous other companies in the industry that provide similar energy services as those offered by the Debtors. Increased supply of renewable energy in Chile could drive energy prices down, as could decreased demand. The Debtors' current financial projections may be adjusted in the future to account for one or both of these events taking place in the energy markets in Chile.

#### (c)     The COD of the Project Could be Delayed, or Capacity Could be Diminished After COD is Achieved

While an estimated 99% of the required construction of the Project was completed as of the Petition Date, and three of the Project's four units reached COD on March 26, 2022, it is possible that the final COD of the Project may be delayed. The COD of the Project is dependent upon many factors, including performance by the Debtors' construction contractors and other suppliers, and the hydrology and geologic conditions of the Maipo Valley. Unforeseen issues in construction such as a collapses in tunnels or problems with turbines, among others, could delay COD substantially. Such issues, and costs associated with any delays they would cause, may not be covered by insurance or applicable warranties. Furthermore, even after COD, there could be incidents or defects discovered in the construction that may not be covered by insurance or applicable warranties, which could result in reduced capacity, increased costs, and other negative impacts on the Project's profitability. Additionally, after COD is achieved, it is possible that the Project may require additional time to reach full generation capacity, dependent upon hydrology conditions and the seasonality of precipitation in the Maipo Valley. Finally, both before and after COD, it is also possible that the Project's facilities could be damaged by natural disasters, such as earthquakes, floods, or mudslides.

#### (d)     Hydrology Trends Could Continue to Worsen

The hydrology of the Maipo Valley has been significantly impacted by lower precipitation levels and higher temperatures in recent years; these changing conditions reduce in turn the amount

of power that the Project can produce.  In particular, the tributary rivers whose flow will power the Hydroelectric Plants begin at the peaks of the Andes Mountains, and are primarily fed by seasonal snowmelt from the glaciers on these peaks.  Changing environmental conditions have resulted in a steep decline in water flow, affecting the Project's projected revenues.  To the extent environmental and hydrology conditions continue to change, this could continue to negatively impact the Debtors' business.

(e)     **The Debtors Must Continue to Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure To Do So Could Negatively Affect the Debtors' Business**

The Reorganized Debtors' success will depend, in part, on the efforts of their executive officers, their management team, and other key employees.  These individuals possess sales, marketing, financial, administrative, and technological skills that are critical to the operation of the Debtors' business.  If the Reorganized Debtors lose or suffer an extended interruption in the services of one or more of their executive officers, managers, or other key employees, the Reorganized Debtors' business, operational results, and financial condition may be negatively impacted.

(f)     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.   It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

(g)     **Environmental Regulations and Litigation**

The Debtors' business is subject to environmental laws and regulations which concern, *inter alia*, emissions into the air, effluents into the water, use of water, wetlands preservation, remediation of contamination, waste disposal, endangered species and noise regulation.  Failure to comply with such laws and regulations or to obtain or comply with any associated environmental permits could result in fines or other sanctions.

Furthermore, environmental groups may continue to challenge the Reorganized Debtors' operations.  Despite the fact that the Debtors have prevailed in all legal challenges that have been brought against the Project as of the date hereof, certain appellate processes have yet to be exhausted, and it is possible that the Debtors could face further environmental litigation in the future.

(h)      **Effect of Market Conditions on Debtors' Customers**

At present, approximately half of the Project's total contracted capacity is allocated in accordance with the MLP PPA.  MLP's financial condition and demand for power is dependent on a number of factors, including *inter alia,* the international market price of copper, the availability and supply of water, and the expected commercially useful life of its mining deposits (the "Relevant Factors").  Some proportion of the Debtors' future customers may be similarly affected by international market prices for mineral commodities.

Historically, the prices of mineral commodities have been subject to wide fluctuations and are affected by numerous factors beyond the control of the Debtors' customers, including international economic and political conditions, levels of supply and demand, the availability and cost of substitutes, inventory levels maintained by producers and others, and the actions of participants in the commodities markets. To a lesser extent, mineral commodity prices are also subject to the effects of inventory carrying costs and currency exchange rates. In addition, the market prices of mineral commodities has occasionally experienced rapid short-term changes.

A sustained deterioration of the Relevant Factors could have an adverse impact on the revenues and financial results of the Debtors' customers, who could be forced to curtail or suspend certain of their mining and processing operations.  This would have a material adverse effect on their demand for electricity and their ability to comply with their financial obligations under their power purchase agreements.

**7.5     Country-Specific Risk Factors**

(a)      **Political Instability and Social Unrest in Chile May Adversely Affect the Debtors' Business**

In October 2019, Chile saw significant protests associated with economic conditions resulting in the declaration of a state of emergency in several major cities.  In response to the social unrest, the Chilean government held a referendum in October 2020, which determined that a new constitution will be drafted by a constitutional convention.  The election for selecting the 155-member constitutional convention was held on May 15-16, 2021.  A third vote, which is expected to occur in 2022, would accept or reject the new constitution after it is drafted.  Other initiatives to address the concerns of the protesters are under consideration by Congress and could result in regulatory or policy changes that may affect the Debtors' business, including changes to the legal treatment of water and/or mineral rights.

(b)      **Changes in the Chilean Regulatory Environment May Adversely Affect the Debtors' Business**

The Debtors' business is highly regulated and depends substantially upon the regulatory environment in Chile.  High levels of government regulation may limit the scope of its operations and its growth plans.

The Debtors' business, financial condition, and results of operations may be adversely affected by changes in policy or regulations at the national, regional, provincial, or municipal level in Chile, involving or affecting factors such as:

73

- interest rates;
- currency fluctuations;
- monetary policies;
- inflation;
- liquidity of capital and lending markets;
- tax and social security policies;
- labor regulations;
- energy and water shortages, rationing, and price controls; and
- other political, social and economic development in Chile including relating to the development of a new constitution.

Uncertainty over whether the Chilean government will implement changes in policy or regulations affecting interests rates, taxes, social security, price controls, currency exchange and remittance controls, devaluations, capital controls and limits on imports or other factors may contribute to economic uncertainty in Chile.  It may also contribute to heightened volatility in the relevant securities markets and securities issued abroad.  These and other developments may adversely affect the Debtors and its business and results of operations.

**(c)      Spot Prices in Chilean Energy Markets Are Subject to Fluctuation**

The Debtors' business is dependent upon energy market conditions prevalent in Chile.  Spot prices in Chilean energy markets are subject to fluctuation, which could adversely impact the Debtors' business.

Since the launch of the Project, long-term spot prices for electricity in Chile have dropped significantly, largely due to increased energy generation capacity that has come online in the intervening years.  In 2013, long-term spot prices for electricity averaged $116 per MWh.  As more generation capacity has come online in recent years in Chile, however, long-term prices have dropped. In or around the first half of 2018, long-term spot prices had halved to $58 per MWh. By 2021, long-term spot prices had dropped to less than half of what they were in 2013.  Continued decline in long-term spot prices could adversely affect the Debtors' business.

**(d)      Enforcement of the Plan and Confirmation May Be Difficult with Respect to Foreign Creditors and Tax Authorities**

Many of the Debtors' creditors are located in Chile, and Alto Maipo is a Chilean taxpayer.  These foreign entities may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code or their extraterritorial application.  While any Confirmation Order would apply extraterritorially, foreign creditors may assert that they are not subject to U.S. jurisdiction and/or have minimal ties to the United States.  This may require the Debtors to commence additional actions and incur additional costs in order to enforce the Plan and Confirmation Order as to these creditors.

**7.6    Certain Tax Implications of the Chapter 11 Cases and the Plan**

Holders of Allowed Secured Claims should carefully review Article X of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences," to determine how the tax

74

implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Reorganized Debtors, and Holders of such Claims.

## 7.7   Disclosure Statement Disclaimer

### (a)   Information Contained Herein Is Solely for Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Specifically, this Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

### (b)   Disclosure Statement May Contain Forward-Looking Statements

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected dividends;
- projected price increases;
- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs;
- growth opportunities for existing products and services;
- results of litigation;
- disruption of operations;
- contractual obligations;
- projected general market conditions;
- plans and objectives of management for future operations;
- off-balance sheet arrangements;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and
- cash flows; and growth opportunities for existing products and services.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

 (c) **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

  **THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest.

 (d) **No Admissions Made**

  The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

 (e) **Failure to Identify Litigation Claims or Projected Objections**

  No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

 (f) **No Waiver of Right to Object or Right to Recover Transfers and Assets**

  The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that Holder's Claim, or to bring Causes of Action to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

 (g) **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

  Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence

in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)    **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(i)    **No Representations Outside of this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

<div align="center">

**ARTICLE VIII:**

**CONFIRMATION PROCEDURES**

</div>

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**8.1    The Confirmation Hearing**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. Following the approval of this Disclosure Statement and the solicitation of votes to accept or reject the Plan, the Debtors will ask the Court to approve the Plan at the Confirmation Hearing. The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 8.2    Confirmation Standards

Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are: (i) the Plan is in the "best interests" of holders of Claims; (ii) the Plan is feasible and (iii) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

## 8.3    Best Interests Test/Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the unaudited Liquidation Analysis attached hereto as **Exhibit B**, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE.   NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

## 8.4    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Based on such analysis, the Debtors believe that they will be able to make all payments required under the Plan while

conducting ongoing business operations.  Therefore, Consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## 8.5    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### (a)    No Unfair Discrimination

The no "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class.  As to the dissenting (or deemed rejecting) class, the test sets different standards depending upon the type of claims or equity interests in the class.  A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (a) for each holder of an interest included in the rejecting class to receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such interest holder is entitled, (ii) any fixed redemption price to which such interest holder is entitled, or (iii) the value of such interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors submit that Confirmation of the Plan pursuant to the "cramdown" provisions of Bankruptcy Code section 1129(b), if necessary, is proper, as the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**8.6**     **Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (a) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) liquidate their assets and business under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation of their assets and business in chapter 7, the Debtors would convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis attached hereto as **Exhibit B**.

## ARTICLE IX:

### IMPORTANT SECURITIES LAW DISCLOSURE

**9.1**     **New and A&R Obligations**

The Plan provides that each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations.  Further, the Plan provides that the Holders of Allowed DIP Claims shall receive the New Common Equity.

The Debtors believe that the 1L Secured Notes and the New Common Equity constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.

Further, the Debtors believe that the 1L Secured Notes shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing the 1L Secured Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof. The Debtors also believe that the issuance of the New Common Equity under the Plan and/or the Plan Supplement shall be exempt from registration under section 1145 of the Bankruptcy Code.

The Debtors believe that the offer and sale of the New and A&R Obligations pursuant to the Plan is exempt from registration under Chilean securities laws to the extent they are not offered or sold, directly or indirectly, by means of a "public offer" (as defined under Law No. 18.045, as amended (the "Chilean Securities Market Law") in Chile, or to any resident in Chile, except as permitted by applicable Chilean law.  The New and A&R Obligations will not be registered under the Chilean Securities Market Law with the Financial Market Commission (Comisión para el Mercado Financiero, the "CMF") and, accordingly, the New and A&R Obligations may not and will not be offered or sold to persons in Chile except in circumstances which have not resulted and will not result in a public offering under Chilean law, and in compliance with Rule (Norma de Carácter General) No. 336, dated June 27, 2012, as amended by Rule (Norma de Carácter General) No. 452 dated February 22, 2021 ("CMF Rule 452"), both issued by the CMF ("CMF Rule 336"). Pursuant to CMF Rule 336, the New and A&R Obligations may be privately offered in Chile to

certain "qualified investors," identified as such therein (which in turn are further described in Rule No. 216, dated June 12, 2008, of the CMF) and in compliance with regulations applicable to such investors.

## 9.2   Issuance and Resales of the Amended & Restated Secured Obligations

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including section 4(a)(2) and Regulation S under the Securities Act to exempt the issuance of the 1L Secured Notes under the Plan and/or the Plan Supplement from registration under the Securities Act. Further, the Debtors believe that any indentures governing the 1L Secured Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof. Section 4(a)(2) of the Securities Act exempts from registration the sale of securities by an issuer in a transaction not involving any public offering. Regulation S provides that offers and sales that occur outside the United States are not considered "offers" or "sales" under the Securities Act. Accordingly, the 1L Secured Notes will only be offered to (i) "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, and (ii) persons (other than U.S. Persons, as such term is defined in Rule 902(k) under the Securities Act) outside of the United States, as such terms are defined in Regulation S under the Securities Act.

Securities that are issued pursuant to section 4(a)(2) are restricted securities. 1L Secured Notes issued pursuant to section 4(a)(2) will therefore be restricted and recipients may resell such 1L Secured Notes subject to the provisions of Rule 144, absent registration or another appropriate exemption under the Securities Act, such as offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction and sales to qualified institutional buyers as defined under Rule 144A.

Recipients of 1L Secured Notes issued pursuant to Regulation S that are not "affiliates" of the Debtors will receive 1L Secured Notes that are not restricted and therefore may be sold without registration outside the United States in accordance with the exception on resale available pursuant to Regulation S. "Affiliates" of the Debtors may resell their 1L Secured Notes subject to the provisions of Rule 144, absent registration or another appropriate exemption.

Generally, Rule 144 of the Securities Act would permit the public sale of securities issued pursuant to section 4(a)(2), if current information regarding the issuer is publicly available, at least one year has passed since the securities were acquired from the issuer or one of its affiliates and certain other conditions are met. Whether any particular person would be deemed to be an "affiliate" would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "affiliate" with respect to the 1L Secured Notes and, in turn, whether any person may freely resell 1L Secured Notes.  The Debtors recommend that potential recipients of 1L Secured Notes consult their own counsel concerning their ability to freely trade such securities without compliance with the Securities Act and applicable state Blue Sky Laws.

## 9.3   Issuance and Resales of the New Common Equity

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including section 1145 of the Bankruptcy Code, to exempt the issuance of the New Common Equity under the Plan and/or the Plan Supplement from registration under the Securities Act.

The New Common Equity may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, New Common Equity generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The Debtors believe that the issuance of the New Common Equity pursuant to the Plan is exempt from registration under Chilean securities laws The New Common Equity may not be offered or sold, directly or indirectly, by means of a "public offer" (as defined under the Chilean Securities Market Law in Chile, or to any resident in Chile, except as permitted by applicable Chilean law.  The New Common Equity will not be registered under Chilean Securities Market Law with the CMF and, accordingly, the New Common Equity  may not and will not be offered or sold to persons in Chile except in circumstances which have not resulted and will not result in a public offering under Chilean law, and in compliance with CMF Rule 336 as amended by CMF Rule 452.  Pursuant to CMF Rule 336, the New Common Equity may be privately offered in Chile to certain "qualified investors," identified as such therein (which in turn are further described in Rule No. 216, dated June 12, 2008, of the CMF) and in compliance with regulations applicable to such investors.

**Accordingly, the Debtors recommend that potential recipients of the Securities described in this Disclosure Statement to be issued under the Plan and/or the Plan Supplement consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.  In addition, these securities will not be registered under the Exchange Act, the Chilean securities act or listed on any national securities exchange.  The Debtors make no representation concerning the ability of a person to dispose of the New and A&R Obligations.**

## ARTICLE X

## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

### 10.1    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Allowed Claims. The following summary does not address the U.S. federal income tax consequences to (i) Holders of Claims or Interests not entitled to vote to accept or reject the Plan, (ii) Holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan or (iii) Holders who are deemed to reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities and published administrative positions of the U.S. Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS, or any other authorities, as

to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts in the United States. This summary does not apply to Holders of Claims that are not "U.S. Holders" (as defined below for purposes of this summary).

The following summary is for general information only. The tax treatment of a beneficial owner of Claims (each a "Holder," and collectively, the "Holders") may vary depending upon such Holder's particular situation. This summary does not purport to address all of the tax consequences that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This summary does not address any tax consequences under the laws of any state, municipality or locality of the United States or the laws of any taxing jurisdiction other than the federal tax laws of the United States. This summary does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies and those holding, or who will hold, Alto Maipo Senior Secured Obligations or Amended & Restated Secured Obligations (as defined below), as part of a hedge, straddle, conversion, or other integrated transaction. In addition, this summary does not address the Medicare tax on investment income or the special timing rules prescribed under Section 451(b) of the IRC, nor does it address the Foreign Account Tax Compliance Act. Furthermore, this summary assumes that (i) the Claims are held by Holders as "capital assets" (as defined in the IRC), (ii) unless specifically stated otherwise, that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes and (iii) the various arrangements described in this Plan to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form. This disclosure does not address the U.S. federal income tax treatment of the cancellation of Equity Interests under the Plan or of the issuance of New Common Equity.

ACCORDINGLY, THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## 10.2    U.S. Federal Income Tax Consequences to the Debtors

The Debtors do not have a material income tax presence in the United States, and therefore any U.S. federal income tax consequences to the Debtors as a result of the Plan are expected to be immaterial.

## 10.3    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

As used in this Disclosure Statement, a "U.S. Holder" means a beneficial owner of an Allowed Claim, that is, for U.S. federal income tax purposes a citizen or resident of the United States or a domestic corporation or that is otherwise subject to U.S. federal income taxation on a net income basis in respect of the Allowed Claim.

(a)    **Generally**

Generally, and other than as specifically described below in respect of Alto Maipo Senior Secured Obligations, a U.S. Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for cash or other property, in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the U.S. Holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see below Section 10.3(c) (Interest Income with Respect to Allowed Claims). When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the U.S. Holder and is held for more than one year. Each U.S. Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. Holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. Holder.

(b)    **Consequences to U.S. Holders of Disputed Claims**

Although the matter is not free from doubt, U.S. Holders of Disputed Claims should recognize gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of any other property actually distributed to such U.S. Holder and (ii) the adjusted tax basis of its Claim.

(c)    **Interest Income with Respect to Allowed Claims**

Pursuant to Section 11.15 (Allocation of Payments) of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a U.S. Holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

(d)    **Limitation on Use of Capital Losses**

U.S. Holders who recognize capital losses may be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i)

$3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income, though losses from the sale or exchange of capital assets may only be used to offset capital gains. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year. Non-corporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

**(e)** **Consequences to U.S. Holders of Exchange of Alto Maipo Senior Secured Obligations for Amended & Restated Secured Obligations**

Pursuant to the Plan, each U.S. Holder of an Alto Maipo Senior Secured Obligation shall receive such U.S. Holder's Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations (the "Amended & Restated Secured Obligations").

(i)        Receipt of Amended & Restated Secured Obligations Pursuant to Plan

The treatment of the receipt of Amended & Restated Secured Obligations pursuant to the Plan is unclear and is dependent upon the final terms of such Amended & Restated Secured Obligations. The form of the transaction will be an exchange of Alto Maipo Senior Secured Obligations for Amended & Restated Secured Obligations (the "Exchange"). Whether a U.S. Holder of an Alto Maipo Senior Secured Obligation recognizes gain or loss as a result of the Exchange depends, in part, on whether the Exchange qualifies as a tax-free recapitalization, which in turn depends on whether the Alto Maipo Senior Secured Obligations and the Amended & Restated Secured Obligations are treated as "stock or securities" for purposes of the reorganization provisions of the IRC.

1.        *Treatment as "Securities"*

Whether a financial instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances. A "security" represents a continuing interest in the affairs of a business. A security is contrasted with cash payments or short-term debt instruments, which provide little exposure to the risks and rewards of a security. Many authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five (5) years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether an instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Alto Maipo Senior Secured Obligations had initial final maturity dates exceeding ten (10) years from their date of issuance. The Amended & Restated Secured Obligations have final maturity dates exceeding ten (10) years from their date of issuance. Accordingly, the Debtors intend to treat, the Alto Maipo Senior Secured Obligations and Amended

& Restated Secured Obligations as securities. We note, however, that there are no authorities directly addressing the treatment of an instrument like the Amended & Restated 2L Secured Obligations, and therefore the characterization of such loans in particular is not free from doubt, as discussed in more detail below.

Under applicable regulations related to "contingent payment debt instruments," a debt instrument is subject to special character and timing rules if the terms of the debt instrument provide for certain contingent payments, which are neither "incidental" nor "remote," as of the date of issuance. The Debtors have considered whether the Amended & Restated 2L Secured Obligations might qualify as a contingent payment debt instrument due to the potential payment of the Upside Fee as additional interest on the loans, and believe that the payment of the Upside Fee is a remote contingency.  Accordingly, we do not believe that the Amended & Restated 2L Secured Obligations should be treated as contingent payment debt instruments.

2.    *Treatment of a U.S. Holder of an Alto Maipo Senior Secured Obligation if the Exchange of a Portion of that Obligation for the Amended & Restated Secured Obligations is Treated as a Reorganization*

If the Alto Maipo Senior Secured Obligations and Amended & Restated Secured Obligations are all treated as "securities" for U.S. federal income tax purposes, the Exchange would be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a U.S. Holder would not recognize gain or loss with respect to the Exchange (except for amounts attributable to accrued interest). Such U.S. Holder's tax basis in its Amended & Restated Secured Obligations would be equal to the tax basis of the portion of the Alto Maipo Senior Secured Obligations surrendered therefor, plus any amounts attributable to accrued interest. A U.S. Holder's holding period for its Amended & Restated Secured Obligations would include the holding period for the Alto Maipo Senior Secured Obligations; provided that the tax basis of the Amended & Restated Secured Obligations treated as received in satisfaction of accrued interest would equal the amount of such accrued interest, and the holding period for any such Amended & Restated Secured Obligations would not include the holding period of the Alto Maipo Senior Secured Obligations.

3.    *Treatment of a U.S. Holder of an Alto Maipo Senior Secured Obligation if the Exchange of a Portion of that Obligation for the Amended & Restated Secured Obligations is not Treated as a Reorganization*

To the extent either the Alto Maipo Senior Secured Obligations or the 1L Secured Obligations are not treated as "securities" for U.S. federal income tax purposes, or the Amended & Restated 2L Secured Obligations are treated as debt obligations that are not a "securities" for such purposes, the reorganization rules discussed in the preceding section immediately above would not apply.  Specifically, the exchange of one debt instrument for another debt instrument, where one or both instrument fails to constitute a "security" for U.S. federal income tax purposes, would be treated as a fully taxable exchange. A U.S. Holder of an Alto Maipo Senior Secured Obligation who is subject to this treatment would recognize gain or loss equal to the difference between the issue price of the Amended & Restated Secured Obligations and the U.S. Holder's adjusted tax basis in its portion of the Alto Maipo Senior Secured Obligations exchanged. Subject to the discussions below of "Accrued Interest" and "Market Discount," such gain or loss will generally be capital gain or loss. A U.S. Holder's tax basis in the Amended & Restated Secured Obligations would equal their issue price. A U.S. Holder's holding period for the Amended &

Restated Secured Obligations received on the Effective Date would begin on the day following the Effective Date.

(ii)     Foreign Tax Credits

Any gain or loss recognized by a U.S. Holder on the Exchange (if the Exchange does not qualify as a recapitalization) generally should be treated as U.S.-source income or loss for U.S. foreign tax credit purposes. Accrued interest income with respect to the Alto Maipo Senior Secured Obligations that is treated as paid as a result of the Exchange (including accrued market discount not previously included in income by the U.S. Holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes. Subject to significant limitations, a U.S. Holder generally will be entitled to a foreign tax credit against its U.S. federal income tax liability in respect of any Chilean withholding taxes imposed on accrued interest. Alternatively, if a U.S. Holder does not claim the benefits of the foreign tax credit in respect of any foreign income taxes, a U.S. Holder is entitled to a deduction for Chilean withholding tax. The rules governing U.S. foreign tax credits are complex, and a U.S. Holder is urged to consult its tax advisor regarding the application of the rules to its particular circumstances.

(iii)     Stated Interest and Additional Amounts on the Amended & Restated Secured Obligations

Payments or accruals of "qualified stated interest" on the Amended & Restated Secured Obligations, but excluding any pre-issuance accrued but unpaid stated interest, and additional amounts thereon, if any, on account of non-U.S. withholding taxes (in each case, without reduction for any such taxes withheld), will be taxable to a U.S. Holder as ordinary interest income at the time it receives or accrues such amounts, in accordance with its regular method of tax accounting. For these purposes, "qualified stated interest" with respect to the Amended & Restated Secured Obligations generally means stated interest unconditionally payable in cash or property at least annually during the entire term of the Amended & Restated Secured Obligations at a single fixed rate of interest. Accordingly, stated interest on the Amended & Restated Secured Obligations generally will not be qualified stated interest to the extent it exceeds the lowest amount of interest that is unconditionally payable in cash on an annual basis, and therefore no "step up" interest, interest subject to capitalization (as described in Annex III to the RSA), or a premium payable upon capitalized interest will constitute qualified stated interest.

Because a U.S. Holder's stated interest income (including excess stated interest) will not be reduced by the non-U.S. taxes withheld, a U.S. Holder will generally be required to include more interest (or original issue discount ("OID")) in the U.S. Holder's gross income for U.S. federal income tax purposes than the U.S. Holder actually receives in cash interest.

However, a U.S. Holder may, subject to certain limitations, be eligible to claim the Chilean taxes withheld as a credit for purposes of computing its U.S. federal income tax liability, even though the payment of these taxes will be remitted by us. Alternatively, if a U.S. Holder does not claim the benefits of the foreign tax credit in respect of any foreign income taxes, a U.S. Holder is entitled to a deduction for Chilean withholding tax. Interest and additional amounts paid on the Amended & Restated Secured Obligations will constitute income from sources without the United States for U.S. foreign tax credit purposes. This foreign source income generally will constitute "passive category income" for U.S. foreign tax credit purposes. The rules relating to the calculation and timing of foreign tax credits and, in the case of a U.S. Holder that elects to deduct foreign

taxes, the availability of deductions, involves the application of complex rules that depend upon a U.S. Holder's particular circumstances. U.S. Holders should consult with their own tax advisors with regard to the availability of a credit or deduction in respect of foreign taxes and, in particular, the application of the foreign tax credit rules to their particular situations.

(iv)    Issue Price

The issue price of the Amended & Restated Secured Obligations will depend on whether the Alto Maipo Senior Secured Obligations or the Amended & Restated Secured Obligations are considered, for U.S. federal income tax purposes, to be traded on an established market. If the Amended & Restated Secured Obligations are considered to be traded on an established market, the issue price of the Amended & Restated Secured Obligations for U.S. federal income tax purposes would be the fair market value of the Amended & Restated Secured Obligations on the date of the Exchange. If the Amended & Restated Secured Obligations are not considered to be traded on an established market but the Alto Maipo Senior Secured Obligations are considered to be traded on an established market, the issue price of the Alto Maipo Senior Secured Obligations would be the fair market value, on the date of the Exchange, of the portion of the Alto Maipo Senior Secured Obligations exchanged for the Amended & Restated Secured Obligations. If neither the Alto Maipo Senior Secured Obligations or the Amended & Restated Secured Obligations are considered to be traded on an established market, the issue price of the Amended & Restated Secured Obligations would be their stated principal amount. Although not free from doubt, the Debtors believe that it is likely that neither the Alto Maipo Senior Secured Obligations nor the Amended & Restated 2L Secured Obligations will be considered to be traded on an established market at the time of the Exchange, and, therefore, that the issue price of the Amended & Restated 2L Secured Obligations will be their stated principal amount. Additionally, although not free from doubt, the Debtors believe that it is likely that the 1L Secured Notes will be considered to be traded on an established market at the time of the Exchange, and, therefore, that the issue price of the 1L Secured Obligations will be their fair market value on the date of the Exchange. The Debtors' determination whether the Amended & Restated Secured Obligations are considered to be traded on an established market and, if so, the issue price of the Amended & Restated Secured Obligations, is binding on each U.S. Holder unless it explicitly discloses to the IRS, on its timely filed U.S. federal income tax return for the taxable year that includes the date of the Exchange, that its determination is different from the Debtors', the reason for its different determination, and, if appropriate, how it determined the issue price. The Debtors will notify the Trustee of their determination of the issue price, and the Trustee will make such determination available to Holders within ninety (90) days of the Effective Date.

(v)    Original Issue Discount

The 1L Secured Obligations are not expected to be issued with OID for U.S. federal income tax purposes. However, because interest on the Amended & Restated 2L Secured Obligations may be capitalized, under the rules described below the Amended & Restated 2L Secured Obligations will be issued with OID and interest paid on the Amended & Restated 2L Secured Obligations will not be qualified stated interest as described above. To the degree Amended & Restated Secured Obligations are issued with OID, the amount of OID with respect to such Amended & Restated Secured Obligations will equal the excess of (i) its "stated redemption price at maturity" (which will equal the sum of all payments due under such Amended & Restated Secured Obligations other than qualified stated interest (including payments of stated interest other than qualified stated

interest), over (ii) its issue price (determined as discussed above). In addition, some or all of a U.S. Holder's market discount carried over from Alto Maipo Senior Secured Obligations to the Amended & Restated Secured Obligations may be converted into OID if the issue price of the Amended & Restated Secured Obligations is greater than the U.S. Holder's initial tax basis in the Amended & Restated Secured Obligations determined as described above (see discussion of "Market Discount" below).

A U.S. Holder (whether a cash or accrual method taxpayer) generally will be required to include in gross income (as ordinary income) any OID as the OID accrues (on a constant yield to maturity basis), before the U.S. Holder's receipt of cash payments attributable to such OID. Under this treatment, a U.S. Holder will include in ordinary gross income the sum of the "daily portions" of OID on the Amended & Restated Secured Obligations for all days during the taxable year that it owns the Amended & Restated Secured Obligations. The daily portions of OID on the Amended & Restated Secured Obligations are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the Amended & Restated Secured Obligations, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. The amount of OID allocable to each accrual period will be determined by multiplying the "adjusted issue price" (as defined below) of the Amended & Restated Secured Obligations at the beginning of the accrual period by the "yield to maturity" (as defined below) of such Amended & Restated Secured Obligations.

The "adjusted issue price" of the Amended & Restated Secured Obligations at the beginning of any accrual period will generally be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of payments made on such Amended & Restated Secured Obligations, including payments of stated interest other than qualified stated interest. The "yield to maturity" of the Amended & Restated Secured Obligations will be the discount rate (appropriately adjusted to reflect the length of accrual periods) that causes the present value of all payments on the Amended & Restated Secured Obligations, including any payments of stated interest, to equal the issue price of such Amended & Restated Secured Obligations.

If a U.S. Holder has "acquisition premium" with respect to the Amended & Restated Secured Obligations (i.e., if such U.S. Holder's adjusted tax basis immediately after the Exchange is greater than the Amended & Restated Secured Obligations' issue price, and less than the Amended & Restated Secured Obligations' stated redemption price at maturity), the amount of OID that such U.S. Holder would include in gross income would be reduced to reflect the acquisition premium. This situation could arise if the Exchange is treated as a recapitalization for U.S. federal income tax purposes and a U.S. Holder acquired its Alto Maipo Senior Secured Obligations for an amount greater than the issue price of the Amended & Restated Secured Obligations.

The rules regarding OID are complex. A U.S. Holder should consult its own tax advisors regarding the consequences of OID, including the amount of OID that such U.S. Holder would include in gross income for a taxable year.

(vi)    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging a portion of its Alto Maipo Senior Secured Obligations constituting its Allowed Claim may be treated as ordinary income (instead of capital

gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is or is treated as acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with OID (as described above), its adjusted issue price, by at least a de minimis amount.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described below) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

If a U.S. Holder held Alto Maipo Senior Secured Obligations with "market discount," the rules described above under "Issue Price" and "Original Issue Discount" generally will result in OID (and not market discount) with respect to the portion of such discount attributable to the difference between the issue price of such Amended & Restated Secured Obligations and the Amended & Restated Secured Obligations' stated redemption price at maturity. U.S. Holders should consult their own tax advisors to determine the U.S. federal income tax consequences of OID and market discount, if any, on their Amended & Restated Secured Obligations.

(vii)    Amortizable Bond Premium

If a U.S. Holder has an adjusted tax basis in its Amended & Restated Secured Obligations immediately after the Exchange which exceeds the stated redemption price at maturity of such Amended & Restated Secured Obligations, the U.S. Holder would be considered to have amortizable bond premium equal to such excess, and such U.S. Holder would not be required to include any OID in gross income in respect of the Amended & Restated Secured Obligations. In general, a U.S. Holder may elect to amortize this premium using a constant yield method over the term of the Amended & Restated Secured Obligations. U.S. Holders should consult their own tax advisor regarding the availability of an election to amortize bond premium for U.S. federal income tax purposes.

(viii)    Option to Exchange Amended & Restated 2L Secured Obligations

If a U.S. Holder exercises the option to exchange Amended & Restated 2L Secured Obligations issued as loans for notes with documentation customary for an investment grade corporate credit pursuant to the terms of the Amended & Restated 2L Secured Obligations, the Debtors expect that such exchange likely would constitute a mere change in the "accounting or financial covenants" of a debt instrument within the meaning of the relevant tax rules, and accordingly would not give rise to a realization event under Section 1001 of the IRC. In such case,

the exercise of the option would not give rise the recognition of taxable gain or loss, or to any change in the holding period or tax basis of the Amended & Restated 2L Secured Obligations.

If, however, the exercise of the option were to constitute a realization event, and if the Amended & Restated 2L Secured Obligations were treated as indebtedness for U.S. federal income tax purposes, then, we believe the exercise of the option likely would give rise to a deemed redemption and reissuance of the Amended & Restated 2L Secured Obligations that would constitute an exchange of securities of the issuer for other securities of the issuer pursuant to a nontaxable recapitalization. Under that treatment, the deemed exchange would be subject to the rules for such recapitalizations discussed above in Section 10.3(e)(i)(2).

If the exercise of the option were to constitute a realization event, and if the Amended & Restated 2L Secured Obligations were treated as equity for U.S. federal income tax purposes (see the discussion in Section 10.3(e)(x), below, then we believe that the realization event would constitute a deemed redemption of equity of the issuer in exchange for other equity of the issuer, which exchange in turn would constitute a nontaxable recapitalization for U.S. federal income tax purposes. Under this treatment, no gain or loss would be recognized by the U.S. Holder exercising the option, and the tax basis in the Amended & Restated 2L Secured Obligations deemed issued would be equal to the tax basis of the Amended & Restated 2L Secured Obligations deemed exchanged therefor. Also under this treatment, a U.S. Holder's holding period for its new Amended & Restated 2L Secured Obligations would include the holding period for the surrendered Amended & Restated 2L Secured Obligations.

(ix)    Sale, Exchange, or Other Taxable Disposition of Amended & Restated Secured Obligations

Unless a non-recognition provision applies and subject to the discussion above with respect to market discount, upon the sale, exchange or other taxable disposition of its Amended & Restated Secured Obligations, a U.S. Holder will generally recognize taxable gain or loss equal to the difference between the amount realized on the disposition (except amounts attributable to accrued but unpaid interest on Amended & Restated Secured Obligations, which amounts will be treated as ordinary interest income to the extent not previously included in the U.S. Holder's income) and the U.S. Holder's adjusted tax basis in the Amended & Restated Secured Obligations immediately before the disposition. The adjusted tax basis of the Amended & Restated Secured Obligations generally will equal the U.S. Holder's initial tax basis in the Amended & Restated Secured Obligations calculated as described above, increased by any market discount and OID includible in income by the U.S. Holder with respect to the Amended & Restated Secured Obligations, and reduced by any premium amortized by such U.S. Holder with respect to the Amended & Restated Secured Obligations. For these purposes, the amount realized does not include amounts attributable to accrued interest. Except to the extent of any accrued market discount on the Amended & Restated Secured Obligations not previously included in income by the U.S. Holder, with respect to which any gain will be treated as ordinary income, gain or loss realized on the sale, exchange or other taxable disposition of an Amended & Restated Secured Obligation will generally be capital gain or loss and will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition the Amended & Restated Secured Obligation has been held by the U.S. Holder for more than one (1) year. Certain non-corporate U.S. Holders (including individuals) are eligible for reduced rates of taxation on long-term capital gains under current law. There are limitations on the deductibility of capital losses.

      (x)      Holding Amended & Restated 2L Secured Obligations if They Are Treated as Equity for U.S. Federal Income Tax Purposes

The discussion above has generally assumed that the Amended & Restated 2L Secured Obligations will be treated as debt for U.S. federal income tax purposes. Because no provision of the IRC or the Treasury Regulations defines the terms "debt" or "equity," however, the determination of whether an instrument constitutes debt or equity for U.S. federal income tax purposes is made by weighing all of the facts and circumstances for and against characterization of the instrument as debt or equity. No one factor is considered determinative, although some factors may be more important than others. There are no authorities directly addressing the characterization of instruments such as the Amended & Restated 2L Secured Obligations, and we cannot be certain that the IRS would view the Amended & Restated 2L Secured Obligations as debt for U.S. federal income tax purposes. Accordingly, the discussion below addresses certain U.S. federal income tax consequence that would arise if the Amended & Restated 2L Secured Obligations in fact were treated as equity.

In the event the Amended & Restated 2L Secured Obligations were to be treated as equity for U.S. federal income tax purposes, and if the Alto Maipo Senior Secured Obligations are treated as "securities" for U.S. federal income tax purposes, then the exchange of the Alto Maipo Senior Secured Obligations for the Amended & Restated 2L Secured Obligations would be treated as a recapitalization in which securities are exchanged for stock, and therefore as a reorganization, under the IRC. In such case, a U.S. Holder would not recognize gain or loss with respect to the exchange of the Alto Maipo Senior Secured Obligations for the Amended & Restated 2L Secured Obligations (except for amounts attributable to accrued interest). Such U.S. Holder's tax basis in its Amended & Restated 2L Secured Obligations would be equal to the tax basis of the portion of the Alto Maipo Senior Secured Obligations surrendered therefor, plus any amounts attributable to accrued interest. A U.S. Holder's holding period for its Amended & Restated 2L Secured Obligations would include the holding period for the Alto Maipo Senior Secured Obligations; provided that the tax basis of the Amended & Restated 2L Secured Obligations treated as received in satisfaction of accrued interest would equal the amount of such accrued interest, and the holding period for any such Amended & Restated 2L Secured Obligations would not include the holding period of the Alto Maipo Senior Secured Obligations. In addition, as discussed above in Section 10.3(e)(vi), market discount in respect of an Alto Maipo Senior Secured Obligation could carry over to Amended & Restated 2L Secured Obligations. To the extent any Alto Maipo Senior Secured Obligation is not treated as a security, then the exchange of that Alto Maipo obligation for Amended & Restated 2L Secured Obligations would be a taxable exchange giving rise to the consequences of a taxable exchange discussed above in Section 10.3(e)(i)(3).

In addition, if the Amended & Restated 2L Secured Obligations were to be treated as equity, "interest" payments on the Amended & Restated 2L Secured Obligations will be treated as distributions in respect of equity for U.S. federal income tax purposes. Under that treatment, the gross amount of any distribution of cash or property with respect to the Amended & Restated 2L Secured Obligations [(including any amount withheld in respect of Chilean taxes)] that is paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) will generally be includible in the taxable income of a U.S. Holder as ordinary dividend income on the day on which they receive the dividend and will not be eligible for the dividends-received deduction allowed to corporations under the IRC and will not constitute "qualified dividend income" eligible for preferential treatment under the IRC.

We do not expect to maintain calculations of our earnings and profits in accordance with U.S. federal income tax principles. U.S. Holders therefore should expect that payments in respect of the Amended & Restated 2L Secured Obligations that are treated as equity distributions generally will be treated as dividends for U.S. federal income tax purposes.

Dividend distributions with respect to the Amended & Restated 2L Secured Obligations generally would be treated as "passive category" income from sources outside the United States for purposes of determining a U.S. Holder's U.S. foreign tax credit limitation.

Certain distributions of additional shares or rights to subscribe for shares, including adjustments of conversion features, could in certain circumstances give rise to deemed distributions for U.S. federal income tax purposes. U.S. Holders are urged to consult with their tax advisors regarding this issue.

The sale or other taxable disposition of an Amended & Restated 2L Secured Obligation generally will give rise to capital gain or loss, subject to the discussion above under "market discount." Long-term capital gains can benefit from preferential tax rates.

**(f)**     **Withholding and Reporting**

The Trustee and Paying Agent will withhold all amounts required by law to be withheld from payments of interest. The Trustee and Paying Agent will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a U.S. Holder of a Claim. Additionally, backup withholding, at a rate of 24%, will generally apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such U.S. Holder's U.S. federal income tax liability and may entitle such U.S. Holder to a refund from the IRS, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**ARTICLE XI**

# CERTAIN CHILEAN
# INCOME TAX CONSEQUENCES OF THE PLAN

**11.1** **General**

The following discussion summarizes certain anticipated Chilean tax consequences relating to the Plan. The information contained in this section is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions, and representations as described in the preceding sections. In preparing this section we have considered the relevant provisions of the Chilean Laws, as amended, the regulations thereunder, and the judicial and administrative interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in Chilean tax consequences different from those discussed below.

The following summary is for general information only. The tax treatment of a beneficial owner of Claims (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant, therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

ACCORDINGLY, THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN CHILEAN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE CHILEAN AND APPLICABLE NON-CHILEAN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**11.2** **Chilean Tax Consequences to Alto Maipo.**

   (a)    **Chilean income tax considerations**

If there is a discharge of a debt obligation by a debtor for a payment that is less than the full amount of the debt, such discharge generally would give rise to taxable income, which must be included in the debtor's gross income determination.

To the extent Alto Maipo satisfies an Allowed Claim with cash or other property and such cash or other property paid is less than the nominal value of the Allowed Claim (in most cases, the amount the debtor received on incurring the obligation, plus certain adjustments such as interest accrued but unpaid interest), such difference would generally be considered as a taxable income in Alto Maipo subject to a 27% corporate income tax (*impuesto de primera categoría* or "CIT"), which must be recognized by Alto Maipo in the calendar year in which such discharge of Allowed Claims occurs.

Note, however, that any available tax loss in Alto Maipo may be used to offset the amount of taxable income arising from this situation, subject to certain limitations and requirements contained in the Chilean income tax law (the "ITL").

**(b)**     **Chilean stamp tax considerations**

Unless an exception is applicable, a stamp tax ("Stamp Tax") is levied on the face value of documents containing "money credit operations" (e.g., loans, bills of exchange, promissory notes, letters of credit, bonds, etc.).

The Stamp Tax is equal to 0.066% over the principal amount per each month or fraction thereof between the granting or issuance of the document and its maturity, with a ceiling of 0.8% of the principal thereof. Instruments and documents payable on-demand or issued at sight, as well as documents evidencing credit operations with no specified maturity term are subject to a 0.332% of the principal thereof.

Where the document subject to Stamp Tax is issued in Chile, such tax applies by the time of that issuance. Conversely, if the document is issued outside of Chile the Stamp Tax is triggered when the document enters into national territory, or at the time it is incorporated in the protocol of a Notary Public in Chile, or upon registration of the transaction in the accounting records of the Chilean taxpayer.

If no document has been issued by reason of a foreign "credit operation", the Stamp Tax applies at the time that operation is registered in the accounting records of the Chilean debtor. If the lender is a foreign person, the Chilean debtor would be responsible for paying the Stamp Tax.

## 11.3     Chilean Tax Consequences to Holders of Allowed Claims

**(a)**     **Satisfaction of Allowed Claims in cash or other property**

     i)     *Income Tax Consequences to Chilean resident Holders of Allowed Claims*

In general, if the Chilean resident Holder has included interest on the Allowed Claim during its holding period on its gross income on an accrual basis, the receipt of cash or other property in satisfaction of accrued but unpaid interest would not derive in further tax implications as those interest have been already subject to CIT.

Conversely, if the Chilean resident Holder has not previously included the interest in its gross income, their satisfaction with cash or other property would result in the Chilean resident Holder having to recognize them as taxable income. In the case of CIT taxpayer, this income would be subject to a 27% CIT.

Likewise, a Chilean resident Holder who is a CIT taxpayer would generally recognize a deductible loss to the extent of any accrued interest claimed already included in its gross income determination and that is discharged without being paid in full under the Plan.

95

ii)     *Income Tax Consequences to Non-Chilean resident Holders of Allowed Claims*

A non-Chilean resident Holder's Allowed Claim satisfaction or payment of accrued but unpaid interest on the original Allowed Claims against Alto Maipo would generally be subject to a 35% withholding tax ("WHT") in Chile, unless reduced according to the provisions of a double tax treaty or pursuant to domestic law.  Also, pursuant to Article 74 No.4 of the ITL, Alto Maipo would be responsible of declaring and paying the relevant WHT in its capacity as withholding agent.

**(b)     Ownership of Alto Maipo shares**

i)     *Distributions on Alto Maipo shares to Chilean resident shareholders*

(i)     Distributions to Chilean resident individuals

Dividends on equity paid to a resident individual are subject to personal income tax which is progressive with a marginal top rate of 40%.  Dividends paid as a result of owning Alto Maipo shares carry an imputation credit deductible against the personal income tax of Chilean resident individual who owns the Alto Maipo shares.  Owners of Alto Maipo shares would have the obligation to repay to the government an amount equal to 35% of the imputation credit that was made available on dividends received on Alto Maipo shares.  Assuming an imputation credit of 27%, the reimbursement obligation results in a maximum effective tax rate of 44.45%.

Also, distributions could be made as Alto Maipo shares capital reductions.  To the extent Alto Maipo does not record financial or tax profits at year end when the return of capital is paid, such return would not be subject to tax.  In that case, the share capital return will be treated as such for tax purposes, and the tax basis that owners of Alto Maipo shares will be reduced for the same amount of the capital return.  Finally, in case Alto Maipo has financial or tax profits at year end when the return of capital is paid, such would be subject to tax in the same manner as a dividend and the tax cost that the owner of Alto Maipo shares, as the case may be, registers on Alto Maipo shares, will not be reduced.

(ii)     Distributions to Chilean resident entities

Dividends between two Chilean tax resident entities are exempt from tax in Chile.  Even though dividend payments between Chilean tax resident entities are not subject to tax, dividends, when paid out of retained earnings, will carry an imputation credit equal to the lesser of: (x) the dividend amount multiplied by a factor[9] equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (y) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same

---

[9]     Under these rules, for a dividend paid during a calendar year when the corporate tax rate is the 27% currently in effect, the factor under (i) above is equal to ((27 / (100 - 27)) = 0.36986.

calendar year.  Imputation credits on dividends received by a Chilean tax resident entity increase the amount of its balance of imputation credits to be carried forward.

Also, distributions could be made as capital reductions in Alto Maipo.  Returns of capital received by owners of Alto Maipo shares should not be subject to taxes.  Note, that the ITL and the instructions of the Chilean Internal Revenue Service (*Servicio de Impuestos Internos* or "SII") provide an imputation order of a capital reduction to the amounts recorded in the different tax records of Alto Maipo as well as with respect to the existence of excess financial profits, in order to determine the tax qualification of the reduction and whether it should be subject to taxes when received by a final taxpayer.  Finally, it should be noted that if a capital reduction is classified as a dividend for tax purposes, the tax cost that an owner of Alto Maipo shares registers on Alto Maipo shares, will not be reduced.

<p style="text-align:center"><em>ii)    Distributions on Alto Maipo shares to non-Chilean resident shareholders</em></p>

Dividends paid by Alto Maipo in respect of Alto Maipo shares are subject to WHT of 35% minus an imputation credit that will vary depending on whether or not the non-Chilean resident owner of Alto Maipo shares is a resident in a country with which Chile has a double tax treaty in force and provided that other legal requirements are met.

<p style="text-align:center">(i)    Dividends paid to non-treaty country resident shareholders</p>

Dividends paid from Chile to a non-resident shareholder that is not in a country that has a tax treaty in effect with Chile are subject to a WHT of 35% minus a "partial" imputation credit that is equal to 65% of the lesser of: (x) the dividend amount multiplied by a factor equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (y) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same calendar year.  An amount equal to 100% of the lesser of (i) and (ii) above shall be added to the dividend amount for the purposes of calculating the 35% WHT from which the "partial" imputation credit is deducted in determining the tax payable.

The table below shows the tax payable on a $1,000,000 dividend paid to a non-treaty resident shareholder:

| | |
|---|---|
| a) Dividend amount | 1,000,000 |
| (b) Lesser of (i) credit factor, and (ii) imputation credit carryforwards | 369,860 |
| (c) Taxable dividend amount | 1,369,860 |
| (d) Tax at 35% rate | 479,451 |
| (e) Partial imputation credit (b) x 65% | 240,409 |
| (f) Dividend tax payable (d) – (e) | 239,042 |
| **Effective tax rate (f) / (a)** | **23.9%** |

| | |
|---|---|
| **Total effective tax rate on the income generated (b) + (f) / (c)** | **44.45%** |

As a result of the partial imputation credit rules described above and the grossing-up of the dividend for the amount of imputation credit available, in a scenario where the amount of (i) is equal or greater than the amount of (ii), which for example would be the case if dividends are paid out of retained earnings that have paid the 27% CIT when earned, the dividend WHT will be payable at an effective rate of 23.9%. If the amount in (ii) is zero, which can be the case when dividends are paid out of financial retained profits that have not been subject to tax because of temporary or permanent book to tax differences (e.g. tax depreciation different than under IFRS, expensing rules, amortization, valuation methodologies, etc.), then no credit will be available and no grossing up of the dividend amount shall be made. As a consequence, the dividend WHT will be payable at an effective rate of 44.45% on the dividend amount with no gross-up.

<div align="right">

(ii)     Dividends paid to treaty country resident shareholders

</div>

Dividends paid from Chile to a shareholder resident in a country that has a tax treaty in effect with Chile (e.g. Brazil, Mexico, UK, Spain, Ireland, Switzerland, Belgium, etc.[10]) are subject to WHT of 35% minus a "full" imputation credit equal to the lesser of: (x) the dividend amount multiplied by a factor equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (y) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same calendar year. The amount of the imputation credit shall be added to the dividend amount for the purposes of calculating the 35% WHT from which the imputation credit is deducted in determining the tax liability payable. Furthermore, until December 31, 2026, this benefit will also apply to residents in countries with which Chile has signed a tax treaty before January 1, 2020, but which has not become effective yet. This is the case of the agreements with the United States and the United Arab Emirates.

The following table has an example calculation on the dividend tax calculation in case of a treaty resident shareholder:

| | |
|---|---|
| a) Dividend amount | 1,000,000 |
| (b) Lesser of (i) credit factor, and (ii) imputation credit carryforwards | 369,860 |
| (c) Taxable dividend amount | 1,369,860 |
| (d) Tax at 35% rate | 479,451 |
| (e) Full imputation credit (b) x 100% | 369,860 |

---

[10]     The Full list of Chile tax treaties in effect can be found at: http://www.sii.cl/normativa_legislacion/convenios_internacionales.html.

| | |
|---|---|
| (f) Dividend tax payable (d) – (e) | 109,591 |
| **Effective tax rate (f) / (a)** | **10.9%** |
| **Total effective tax rate on the income generated (b) + (f) / (c)** | **35%** |

As a result of the full imputation credit rules described above and the grossing-up of the dividend for the amount of imputation credit available, in a scenario where the amount of (i) is equal or greater than the amount of (ii), which for example would be the case if dividends are paid out of retained earnings that have paid the 27% corporate tax when earned, the dividend withholding tax will be payable at an effective rate of 10.9%.[11]  If the amount in (ii) is zero, which can be the case when dividends are paid out of financial retained profits that have not been subject to tax because of temporary or permanent book to tax differences (e.g. tax depreciation different than under IFRS, expensing rules, amortization, valuation methodologies, etc.), then no credit will be available and no grossing up of the dividend amount shall be made. As a consequence, the dividend WHT will be payable at an effective rate of 35% on the dividend amount with no gross-up.

**(c)** **Disposition of Alto Maipo shares**

*i)* *Disposition by a Chilean resident individuals*

Capital gains from a sale or transfer of shares of a Chilean stock corporation (*sociedad por acciones*) would be subject to personal income tax at progressive rates ranging from 0 to 40%. The capital gain in this scenario is determined by the difference between the sale price and what was effectively paid by the shareholder when acquired, plus any capital increase effectively paid, less any effective capital reduction, all the above duly adjusted by domestic inflation.

*ii)* *Disposition by a Chilean resident entities*

Capital gains from a sale or transfer of shares of a Chilean stock corporation (*sociedad por acciones*) would be subject to personal income tax at progressive rates ranging from 0 to 40%. The capital gain in this scenario is determined by the difference between the sale price and what was effectively paid by the Chilean resident owner of Alto Maipo shares when acquired, plus any capital increase effectively paid, less any effective capital reduction, all the above duly adjusted by domestic inflation.

---

[11]     For a full imputation credit to be deducted in determining the dividend WHT liability, the treaty resident shareholder must provide to Alto Maipo a tax residency certificate issued by the tax authority of the treaty country and a declaration signed by a legal representative of the shareholder, stating that it is the beneficiary of the dividend income.  The tax residency certificate is presumed to be valid for the calendar year in which it was issued unless the certificate or the laws of the country where issued provide for a different period for which it is valid.  If the tax residence certificate and declaration are not provided, Alto Maipo would be required to determine the withholding tax as applicable to non-tax treaty country residents, which as explained, requires considering an imputation credit limited to 65% of the full amount.

*iii)* *Disposition of Alto Maipo shares by non-Chilean resident shareholders*

As a general rule, gains from the sale of Alto Maipo shares by its owner will be taxable in Chile at a 35% rate unless the seller is a resident in a country that has a tax treaty with Chile that provides for a reduced tax rate.  In this case, the taxable gain is calculated, generally, as the difference between the amount realized on the disposition and the non-Chilean resident shareholder's tax basis in such Alto Maipo shares.  The acquirer of the shares, whether Chilean or non-Chilean, would have to comply with WHT obligations (i.e. 10% over the gross amount or 35% over the net gain amount, according to article 74 No. 4 of the ITL).

### (d) <u>Information reporting and withholding</u>

In general terms, information reporting requirements before the SII apply to distributions or payments under the Plan, including in connection with payments of dividends and the proceeds of a sale or other disposition of Alto Maipo shares.

Also, if not previously obtained, non-Chilean resident persons receiving Alto Maipo shares would need to obtain a Chilean Tax Identification Number that is issued by the SII, for which such non-Chilean resident person may have to appoint a local representative with authority to act before the SII for this purpose.

You are urged to consult its own tax advisor regarding the Chilean reporting and filing obligations based on its specific circumstances for properly and timely comply with them and avoid incurring in penalties and fines.

**ARTICLE XII:**

**CONCLUSION AND RECOMMENDATION**

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than [•] p.m. (prevailing Eastern Time) on [•], 2022.

Dated:  April 4, 2022

Respectfully submitted,

Alto Maipo SpA
on behalf of itself and Alto Maipo Delaware LLC

By:    _/s/ Javier Dib_
Name:    Javier Dib
Title:    Board President & Chief Restructuring Officer

Prepared by:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Fax:    (302) 571-1253
Email:    pmorgan@ycst.com
sgreecher@ycst.com
afaris@ycst.com

- and -

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper (admitted _pro hac vice_)
Luke A. Barefoot (admitted _pro hac vice_)
Jack Massey (admitted _pro hac vice_)
One Liberty Plaza
New York, New York 10006
Telephone:    (212) 225-2000
Fax:    (212) 225-3999

Email:      rcooper@cgsh.com
            lbarefoot@cgsh.com
            jamassey@cgsh.com

*Counsel for Debtors and Debtors in Possession*

## **EXHIBIT A**

**Joint Chapter 11 Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No.: 21-11507 (KBO) |
| Debtors. | (Jointly Administered) |

### JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Fax:    (302) 571-1253
Email:    pmorgan@ycst.com
    sgreecher@ycst.com
    afaris@ycst.com

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
Richard J. Cooper (admitted *pro hac vice*)
Luke A. Barefoot (admitted *pro hac vice*)
Jack Massey (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:    (212) 225-2000
Fax:    (212) 225-3999
Email:    rcooper@cgsh.com
    lbarefoot@cgsh.com
    jamassey@cgsh.com

*Counsel for Debtors and Debtors in Possession*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are: Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware). The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND
            COMPUTATION OF TIME ................................................................................. 1

Section 1.1      Defined Terms. ................................................................................... 1
Section 1.2      Rules of Interpretation and Computation of Time. ................................ 18

ARTICLE II. UNCLASSIFIED CLAIMS ............................................................................ 19

Section 2.1      Administrative Claims. ...................................................................... 19
Section 2.2      Professional Fee Claims. .................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
             INTERESTS ................................................................................................ 21

Section 3.1      Classification of Claims. ..................................................................... 21
Section 3.2      Class Identification. ........................................................................... 22
Section 3.3      Treatment and Voting Rights of Claims and Interests. ......................... 22
Section 3.4      Special Provision Governing Unimpaired Claims. ............................... 26
Section 3.5      Voting; Presumptions; Solicitation. .................................................... 26
Section 3.6      Elimination of Vacant Classes. ........................................................... 26
Section 3.7      Nonconsensual Confirmation. ............................................................. 27
Section 3.8      Subordinated Claims. ......................................................................... 27
Section 3.9      No Waiver. ........................................................................................ 27

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 27

Section 4.1      Compromise of Controversies. ............................................................ 27
Section 4.2      Sources of Consideration for Plan Distribution. ................................... 28
Section 4.3      Restructuring Transactions. ................................................................ 28
Section 4.4      Lien Priority for Amended & Restated Secured Obligations ................. 30
Section 4.5      Continued Corporate Existence. .......................................................... 31
Section 4.6      Corporate Action. .............................................................................. 31
Section 4.7      Vesting of Assets. .............................................................................. 32
Section 4.8      Cancellation of Existing Securities and Agreements. ........................... 32
Section 4.9      Issuance of New Common Equity. ....................................................... 33
Section 4.10     Exemption from Registration Requirements. ....................................... 33
Section 4.11     Organizational Documents. ................................................................ 33
Section 4.12     Treatment of Non-Qualified Creditors. ................................................ 33
Section 4.13     Exemption from Certain Transfer Taxes and Recording Fees. ............... 34
Section 4.14     Directors and Officers of the Reorganized Debtors. ............................. 34
Section 4.15     Effectuating Documents; Further Transactions. ................................... 35
Section 4.16     Restructuring Expenses. ..................................................................... 35
Section 4.17     Retained Causes of Action. ................................................................. 36

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ................................................................................ 36
Section 5.1   Assumption and Rejection of Executory Contracts and Unexpired Leases. ........ 36
Section 5.2   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....... 37
Section 5.3   Indemnification and Reimbursement Obligations. ................................................ 38
Section 5.4   Claims Based on Rejection of Executory Contracts and Unexpired Leases
              (if Any)............................................................................................................. 39
Section 5.5   Contracts and Leases Entered Into After the Petition Date. ................................ 39
Section 5.6   Employee Compensation and Benefit Programs. ................................................. 39
Section 5.7   Insurance Policies. .............................................................................................. 40
Section 5.8   Reservation of Rights.......................................................................................... 40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 40

Section 6.1   Distribution on Account of Claims and Interests Allowed as of the
              Effective Date. .................................................................................................. 40
Section 6.2   Distribution on Account of Claims and Interests Allowed After the
              Effective Date. .................................................................................................. 41
Section 6.3   Timing and Calculation of Amounts to Be Distributed. ...................................... 41
Section 6.4   Delivery of Distributions. ................................................................................... 41
Section 6.5   Distributions by Distribution Agent (if any)....................................................... 42
Section 6.6   Minimum Distributions. ...................................................................................... 42
Section 6.7   Undeliverable Distributions. ............................................................................... 43
Section 6.8   Compliance with Tax Requirements/Allocations. ............................................... 43
Section 6.9   Surrender of Cancelled Instruments or Securities. .............................................. 44
Section 6.10  Claims Paid or Payable by Third Parties. ............................................................ 44

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR
             INTERESTS ....................................................................... 44

Section 7.1   Allowance of Claims and Interests. ..................................................................... 44
Section 7.2   Prosecution of Objections to Claims.................................................................... 45
Section 7.3   Estimation of Claims and Interests. ..................................................................... 45
Section 7.4   [Reserved]. .......................................................................................................... 46
Section 7.5   Disallowance of Certain Claims. ......................................................................... 46
Section 7.6   Offer of Judgment. .............................................................................................. 46
Section 7.7   Amendments to Claims........................................................................................ 46

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................... 47

Section 8.1   Conditions Precedent to the Effective Date. ........................................................ 47
Section 8.2   Waiver of Conditions Precedent. ......................................................................... 48
Section 8.3   Effect of Failure of Conditions Precedent. .......................................................... 48
Section 8.4   Reservation of Rights........................................................................................... 49
Section 8.5   Substantial Consummation of Plan....................................................................... 49

ARTICLE IX. EFFECT OF PLAN CONFIRMATION .................................................................. 49

Section 9.1       Binding Effect. ................................................................................................ 49
Section 9.2       Discharge of Claims and Termination of Interests; Compromise and
                  Settlement of Claims, Interests, and Controversies. ................................ 49
Section 9.3       Releases .......................................................................................................... 50
Section 9.4       Exculpation and Limitation of Liability. ....................................................... 54
Section 9.5       Injunction. ...................................................................................................... 55
Section 9.6       Setoffs and Recoupment. .............................................................................. 55
Section 9.7       Release of Liens. ........................................................................................... 56

ARTICLE X. RETENTION OF JURISDICTION ......................................................................... 56

ARTICLE XI. MISCELLANEOUS PROVISIONS ....................................................................... 58

Section 11.1      Immediate Binding Effect. ............................................................................. 58
Section 11.2      Payment of Statutory Fees. ........................................................................... 58
Section 11.3      Amendments. ................................................................................................. 58
Section 11.4      Revocation or Withdrawal of Plan. ............................................................... 59
Section 11.5      Governing Law. ............................................................................................. 59
Section 11.6      Successors and Assigns .................................................................................. 59
Section 11.7      Severability. ................................................................................................... 60
Section 11.8      Controlling Document. .................................................................................. 60
Section 11.9      Filing of Additional Documents. ................................................................... 60
Section 11.10     Reservation of Rights. ................................................................................... 60
Section 11.11     Service of Documents. ................................................................................... 61
Section 11.12     Tax Reporting and Compliance. .................................................................... 64
Section 11.13     Exhibits, Schedules, and Supplements ........................................................... 64
Section 11.14     Entire Agreement. ......................................................................................... 64
Section 11.15     Allocation of Payments .................................................................................. 64
Section 11.16     Dissolution of the Committee. ....................................................................... 65

iii

## **ANNEXES**

Annex A          Claims to be Paid in Full

Annex B          Claims to Pass Through Unimpaired

Annex C          Claims to Which Debtors Will (i) Object and Seek Disallowance, Expungement, or Reduction, (ii) Estimate at $0 for Distribution Purposes, or (iii) Assume the Relevant Contract at $0 Cure Cost

Annex D          Claims Satisfied/Released Pursuant to Plan / Assumed with $0 Cure

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware") (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY AND TO CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1    *Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in the Plan:

1.    "*1L Secured Notes*" means any 1L Secured Obligations that may be issued in the form of secured notes.

2.    "*1L Secured Obligations*" means a first priority tranche of secured notes or secured bank instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement, *provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective

Date, Strabag's Pro Rata Share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

3. "***Accrued Professional Compensation***" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses and to the extent not disallowed under a Final Order.

4. "***Adequate Protection Claim***" means that superpriority Claim granted to the Senior Lenders and Strabag pursuant to the Final Cash Collateral Order, which Claim shall not be Allowed so long as the Restructuring Support Agreement remains valid and in full force, and is limited to the extent of any diminution in value of the Prepetition Collateral (as defined in the Final Cash Collateral Order).

5. "***Administrative Claim***" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28; (d) DIP Claims; and (e) the Adequate Protection Claim.

6. "***AES Andes***" means AES Andes S.A., f/k/a AES Gener S.A.

7. "***AES Andes Shared Services Contracts***" means the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the Common Terms Agreement).

8. "***AES Andes Shared Services Payments***" means certain intercompany payments due to AES Andes (or any permitted transferee) by Alto Maipo pursuant to the AES Andes Shared Services Contracts, which are currently deferred under the terms of the AES Andes Shared Services Contracts until the existing senior debt discharge date.

9. "***Affiliate***" means an affiliate as defined in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

10. "***Agreement Effective Date***" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

11. "***Allowed***" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Claims Bar Date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) the Claims of the Senior Lenders and Strabag on account of the Alto Maipo Senior Secured Obligations; or (d) a

Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that, with respect to a Claim described in clauses (a), (b), and (c) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that is listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court, and Holders of such Claims shall not receive any distributions under the Plan on account of such Claims or Interests.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "*Allow*" and "*Allowing*" shall have correlative meanings.

12.     "*Alto Maipo*" means Alto Maipo SpA or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

13.     "*Alto Maipo Delaware*" means Alto Maipo Delaware LLC or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

14.     "*Alto Maipo Senior Secured Obligations*" means (i) an amount equal to $1,652,218,290 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (ii) an amount equal to $391,500,000 due to Strabag as the Supplier Deferred Payment under the Tunneling Contract, without duplication.

15.      "*Amended & Restated 2L Secured Obligations*" means a second priority tranche of amended and restated secured debt instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement*, provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective Date, Strabag's pro rata share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

16.     "*Amended & Restated Secured Exit Financing Facility*" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for and in satisfaction of the Claims under the DIP Credit Facility, as provided for in the Plan Term Sheet, documentation of which shall be included in the Plan Supplement, or as otherwise agreed between the Required Consenting Creditors, the Debtors, and the DIP Lender.

17.     "*Amended & Restated Secured Obligations Intercreditor Agreement*" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors, which shall be included in the Plan

Supplement, by which (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations.

18.     "*Amended & Restated Secured Obligations*" means the Working Capital Facility, Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations, documentation of which shall be included in the Plan Supplement.

19.     "*Assets*" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, including as specified in section 541 of the Bankruptcy Code.

20.     "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule (as may be amended), if any, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Debtors pursuant to the Plan and which will be included in the Plan Supplement; *provided* that the Required Consenting Creditors shall have approved any assumptions, rejections or modifications of material Executory Contracts and Unexpired Leases.

21.     "*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

22.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended.

23.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

24.     "*Bankruptcy Fees*" means any and all fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

25.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

26.     "*Blue Sky Laws*" means any state securities laws.

27.    "***Business Day***" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

28.    "***Carve-Out Account***" means the segregated account established pursuant to the DIP Credit Facility Documents for purposes of funding the Carve-Out (as defined in the DIP Credit Facility Documents), provided that, on and following the Effective Date, the Carve-Out Account shall be used as the account to maintain an amount equal to the Professional Fee Reserve Amount solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

29.    "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

30.    "***Causes of Action***" means any and all actions, causes of action, suits, claims, Claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises and trespasses of any kind or character whatsoever of, or belonging to, the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity or otherwise. For the avoidance of doubt, "Causes of Action" includes, but is not limited to, (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar Claim.

31.    "***Cerberus***" means certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

32.    "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to both Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

33.    "***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code against any Debtor, including Administrative Claims and DIP Claims, in each case whether or not asserted.

34.    "***Claims Bar Date***" means, as applicable, the General Bar Date, the Governmental Bar Date, the Amended Schedule Bar Date, the Rejection Bar Date, and any other date or dates

established or to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed.

35.    "***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent.

36.    "***Class***" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

37.    "***CNM Arbitral Award***" means any proceeds that may be collected by the Debtors in connection with any award issued in the CNM Arbitration, including, without limitation, any amounts collected under that certain Co-Obligor Undertaking as between Alto Maipo, SpA as Owner, Hochtief Solutions AG as Co-Obligor, and Cooperativa Muratori & Cementisti – C.M.C. di Ravenna as Co-Obligor.

38.    "***CNM Arbitration***" means the arbitration captioned *ICC Case No. 22867/JPA (C-22923/JPA) (C-23845/JPA) – Alto Maipo SpA v. Constructora Nuevo Maipo S.A. v. The AES Corporation and AES Gener S.A.*

39.    "***Committee of Unsecured Creditors***" or "***Committee***" means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* (D.I. 231).

40.    "***Common Terms Agreement***" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, United States International Development Finance Corporation (as successor in interest to Overseas Private Investment Corporation), Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutche Bank AG, London Branch, and Santana S.A., and each of their successors and assigns as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

41.    "***Company***" means, together, Alto Maipo and Alto Maipo Delaware.

42.    "***Confirmation***" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

43.    "***Confirmation Date***" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rules 5003 and 9021.

44.    "***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

45.    "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

46.   "***Consenting Creditors***" means, at any point in time, such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby.

47.   "***Consummation***" means the occurrence of the Effective Date.

48.   "***Cure Cost***" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

49.   *"**Debt Service Reserve Account**"* or *"**DSRA**"* means an account to be established in the name of one or more of the Reorganized Debtors in accordance with the Plan Term Sheet and funded up to a balance of $20 million, which would otherwise be payable to Amended & Restated 2L Secured Obligations through the proceeds of the CNM Arbitral Award and/or the excess cash flow entitlement, in favor of the 1L Secured Obligations.

50.   "***Debtor***" has the meaning set forth in the introductory paragraph of the Plan.

51.   *"**Deferred 1L Interest**"* means, together, the Deferred 2022 1L Interest and the Deferred 2023 1L Interest.

52.   *"**Deferred 2022 1L Interest**"* means interest payable by the Reorganized Debtors as of July 15, 2022 and October 15, 2022 on the 1L Secured Obligations which shall be paid in kind.

53.   *"**Deferred 2023 1L Interest**"* means interest payable by the Reorganized Debtors as of January 15, 2023 on the 1L Secured Obligations which shall be paid in kind.

54.   "***Definitive Documentation***" means the definitive amendments to any financing and collateral documents securing the Alto Maipo Senior Secured Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and the Plan Term Sheet, including the Plan, the Disclosure Statement and the documentation relating to the New and A&R Obligations. The Definitive Documentation and any modifications thereto will be (i) consistent with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

55.   "***DIP Agent***" means AES Andes S.A., as sole agent under the DIP Credit Facility, or any successor agents thereunder.

56.     "***DIP Budget***" means the most recently approved budget at such time of: (a) the Initial DIP Budget (as defined in the DIP Credit Agreement) in substantially the form set forth in Schedule 5.01(c) of the DIP Credit Agreement, setting forth projected monthly cash flows for the period from the closing date through the end of September 2022, and (b) the updated budget in form substantially similar to the Initial DIP Budget and approved by the DIP Lender.

57.     "***DIP Claims***" means any and all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interests, fees, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

58.     "***DIP Credit Agreement***" means that certain Super-Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, as borrower, Alto Maipo SpA, as guarantor, the DIP Agent, and the DIP Lender, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as may be amended, modified or supplemented from time to time, in accordance with the terms thereof.

59.     "***DIP Credit Facility***" means that superpriority, debtor-in-possession revolving loan facility provided pursuant to the DIP Credit Agreement in an aggregate original principal amount of up to $50 million, consisting of the DIP Loans.

60.     "***DIP Expenses***" means all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement of the DIP Credit Facility and the transactions contemplated thereby.

61.     "***DIP Credit Facility Documents***" means the DIP Credit Agreement together with all documentation executed or delivered in connection therewith as may be amended, modified or supplemented from time to time, in accordance with the terms and conditions set forth therein.

62.     "***DIP Lender***" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

63.     "***DIP Loans***" means the revolving loan of up to $50 million to be provided pursuant to the DIP Credit Agreement.

64.     "***DIP Orders***" means, together, the *Interim Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superiority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (IV) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C); and (V) Grant Related Relief* (D.I. 70, the "**Interim DIP Order**"), the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing*

*Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (IV) Grant Related Relief* (D.I. 166, the "**Final DIP Order**").

65.    "***Disclosure Statement***" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

66.    "***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement.

67.    "***Disputed***" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed.

68.    "***Distribution Agent***" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors, in the capacity as distribution agent under the Plan.

69.    "***Distribution Date***" means the date on which Holders of Claims are eligible to receive distributions under the Plan.

70.    "***Effective Date***" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

71.    "***Entity***" means an "entity" as defined in section 101(15) of the Bankruptcy Code, and includes, for the avoidance of doubt, a Person.

72.    "***Existing Equity Interest***" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Effective Date.

73.    "***Estates***" means, as to each Debtor, the estate created for the Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

74.    "***Exculpated Parties***" means, collectively, (i) the Debtors; (ii) the directors and officers of the Debtors who served during any portion of the cases; (iii) the Committee; (iv) the members of the Committee in their capacity as such; and (v) the professionals retained in these Chapter 11 Cases by the Debtors and the Committee.

75.    "***Executory Contract***" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under sections 365 or 1123 of the Bankruptcy Code.

76.     "***Final Cash Collateral Order***" means the *Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (D.I. 164).

77.     "***Final Order***" means, as applicable, an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

78.     "***General Bar Date***" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all entities, except for governmental units, must file Proofs of Claim and shall apply to all claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, Section 503(b)(9) Claims, unsecured priority claims, and unsecured nonpriority claims.

79.     "***General Unsecured Claims***" means all Claims other than Administrative Claims, Professional Fee Claims, Alto Maipo Senior Secured Obligations, Secured Claims, Priority Claims, DIP Claims, the Adequate Protection Claim, Strabag's Other Claims, Intercompany Claims, and Existing Equity Interests.

80.     "***Governmental Bar Date***" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all Governmental Units holding a Claim under Section 502(b)(9) of the Bankruptcy Code against the Debtors is required to file Proofs of Claim.

81.     "***Governmental Unit***" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

82.     "***Holder***" means the beneficial holder of any Claim or Interest.

83.     "***Impaired***" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

84.     "***Indemnification Obligations***" means a Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of

any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, by-laws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

85.     "*Indemnified Parties*" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' by-laws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

86.     "*Intercompany Claims*" means a claim held by the Company against an Affiliate of the Company and *vice versa*. For the avoidance of doubt, the term "Intercompany Claim" does not include (x) any Claim held by Strabag against the Company or (y) any Claim held by AES Andes against the Company in connection with the AES Andes Shared Services Payments.

87.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the company.

88.     "*Joinder*" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the effective date of such Restructuring Support Agreement may become a Consenting Creditor by executing such joinder agreement.

89.     "*Law*" means any federal, state, local, or foreign "law" (including common Law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

90.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

91.     "*New and A&R Obligations Documents*" means collectively, any capital increase, indenture, loan agreement or other agreement governing the New and A&R Obligations, the Amended & Restated Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendment to the by-laws, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Company and the Required Consenting Creditors, and which documents shall be included in the Plan Supplement.

92.     "*New and A&R Obligations*" means the Amended & Restated Secured Obligations and New Common Equity.

93.    "***New Common Equity***" means the common Interests in the Company to be issued by the Company on or about the Effective Date pursuant to the terms and conditions of the Plan Term Sheet.

94.    "***New Organizational Documents***" means, on or after the Effective Date, the amended and restated certificates of incorporation or similar governing document of each Reorganized Debtor and any other documents required to govern each Reorganized Debtor, which documents shall be included in the Plan Supplement.

95.    "***Non-Qualified Creditors***" means any creditor under the Alto Maipo Senior Secured Obligations other than a Qualified Creditor.

96.    "***Notice and Claims Agent***" means Prime Clerk LLC ("Prime Clerk") in its capacity as noticing, claims, and solicitation agent for the Debtors.

97.    "***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

98.    "***Petition Date***" means November 17, 2021.

99.    "***Plan***" means this joint chapter 11 plan of reorganization filed by the Company, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Term Sheet, and to the extent not consistent with the Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

100.    "***Plan Documents***" means any and all of the documents, other than the Plan, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, including, without limitation, insofar as such documents are not incorporated into the Plan through inclusion in the DIP Credit Facility Documents, and the New and A&R Obligations Documents, subject to any consent rights set forth in the Plan.

101.    "***Plan Supplement***" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents that may be filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, where applicable; which shall include the New and A&R Obligations Documents, the New Organization Documents, the Assumed Executory Contracts and Unexpired Leases Schedule, and such other Plan Documents as have not been previously filed with the Bankruptcy Court, and which shall be in form and substance acceptable to the Company and the Required Consenting Creditors.

102.    "***Plan Supplement Filing Date***" means the date that is 14 calendar days prior to the Confirmation Hearing, or such later date as is authorized by the Court.

103.    "**_Plan Term Sheet_**" means the Plan Term Sheet attached to the Restructuring Support Agreement.

104.    "**_PPA_**" means the agreement entitled "Contrato de Suministro de Electricidad" (Power Supply Agreement) dated as of June 28, 2013, by and between Alto Maipo and Antofagasta Minerals S.A., as assigned by Antofagasta Minerals S.A. to Minera Los Pelambres on June 20, 2014 (as further amended and supplemented prior to the Petition Date).

105.    "**_Priority Claims_**" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims.

106.    "**_Professionals_**" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

107.    "**_Professional Fee Claims_**" means any Claim of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

108.    "**_Professional Fee Reserve Amount_**" means the aggregate Accrued Professional Compensation through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of the Plan; _provided_ that the Professional Fee Reserve Amount shall not exceed the unused portion of the amounts set forth in the DIP Budget unless consented to by the Consenting Creditors.

109.    "**_Project_**" means the run-of-river hydroelectric project constructed by Alto Maipo in the Andes Mountains.

110.    "**_Proof of Claim_**" means a "proof of claim" as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Debtors' Chapter 11 Cases.

111.    "**_Pro Rata Share_**" means, with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

112.    "**_Qualified Creditor_**" means a creditor of the Alto Maipo Senior Secured Obligations who provides either one of the following certifications: (i) a certification that it is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act or U.S. government agency, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or (ii) a certification that it is a non-U.S. person (as such term is defined in Rule 902(k) under the Securities Act) located or resident outside the United

States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

113.    "*Reinstated*" or "*Reinstatement*" mean, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

114.    "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

115.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and, if separate, the DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i).  For the avoidance of doubt, no claims or causes of action of either of the Debtors against (x) Constructora Nuevo Maipo S.A., (y) Hochtief Solutions AG, or (z) Cooperativa Muratori & Cementisti – C.M.C. di Ravenna, nor any of the respective Affiliates of each entity listed in clauses (x) through (z), shall be released pursuant to this Plan.

116.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) Norgener Renovables S.p.A.; (b) AES Andes; (c) Strabag, in its capacity as shareholder and subordinated lender; (d) the DIP Agent and each DIP Lender; (e) the Administrative Agent and the Collateral Agents (in each case as defined in the Common Terms Agreement); (f) each Consenting Creditor; (g) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (h) all holders of Claims or Interests that are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt in to grant the releases provided in the Plan; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that either vote to reject the Plan or abstain from voting on the Plan for all Classes in which they are eligible to vote and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt in to grant the releases provided in the Plan; (j) each current and former Affiliate of each Entity in clause (a) through (i), and (k) each Related Party of each Entity in clause (a) through (j).

117.    "*Reorganized Board*" means the board of directors of Alto Maipo, as determined in accordance with the New Organizational Documents.

118.    "*Reorganized Company*" means the Company, or any successor or assign thereto, by merger consolidation, or otherwise, on and after the Effective Date.

119.    "*Reorganized Debtors*" means collectively, each of the Debtors and any successors thereto, by merger, consolidation or otherwise, as reorganized on or after the Effective Date, in accordance with the Plan.

120.    "*Required Consenting Creditors*" means, as of the relevant date, the holders of no less than 2/3 of the aggregate principal amount of the Alto Maipo Senior Secured Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

121.    "*Restructuring*" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan.

122.    "*Restructuring Documents*" means the Plan Term Sheet and the Restructuring Term Sheet.

123.    "*Restructuring Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses (including success fees) of (x) the Consenting Creditors' advisors (excluding advisors to Strabag and Cerberus), including ASSET Chile S.A., FTI Consulting Canada ULC, Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., (y) Troutman Pepper Sanders Hamilton LLP, as advisors to Strabag, and (z) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus, *provided that* any fees paid under subclauses (y) and (z), shall be subject to such caps as have been agreed pursuant to the Restructuring Support Agreement, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby, and (ii) the Administrative Agent and the Collateral Agents (each as defined in the Common Terms Agreement).

124.    "*Restructuring Support Agreement*" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors, which was filed as Exhibit A to the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (D.I. 13), as amended on November 23, 2021, January 31, 2022, and February 28, 2022, and as may be further amended or become effective as between the Debtors and the Consenting Creditors.

125.    "*Restructuring Term Sheet*" means the restructuring term sheet attached to the Restructuring Support Agreement.

126. "***Restructuring Transactions***" means, collectively, the Chapter 11 Cases, the New and A&R Obligations and the consummation of the other transactions contemplated in the Restructuring Documents.

127. "***Retained Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128. "***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

129. "***SEC***" means the United States Securities and Exchange Commission.

130. "***Secured Claims***" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

131. "***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

132. "***Security***" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

133. "***Senior Lenders***" means the lenders and interest rate swap providers under the Common Terms Agreement, each in their capacity as such.

134. "*Sponsor*" means AES Andes.

135. "***Sponsor Deferrals***" means those certain intercompany amounts payable by Alto Maipo to AES Andes under the O&M Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of the applicable intercompany agreements, and which the Sponsor shall, subject to occurrence of the Effective Date, defer for 12 months beginning May 2022, in an amount of $600,000 per month, for a total deferred amount of approximately $7.2 million).

136. "***Stamp or Similar Tax***" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction

privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

137.    "**_Strabag_**" means Strabag SpA, as (i) contractor under the Tunneling Contract, (ii) shareholder under the Shareholders' Agreement of Alto Maipo among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered prior to the date of the Restructuring Support Agreement, and (iv) secured creditor with respect to the Supplier Deferred Payment.

138.    "**_Strabag Change Order Deferral_**" means the $1,141,097 payable upon completion of Change Order Nos. 1, 2 and 4 (as such term is defined in the Tunneling Contract), which shall be deferred until December 31, 2022.

139.    "**_Strabag Construction Deferral_**" means the $10 million payable upon substantial completion of Critical Milestone F (as such term is defined in the Tunneling Contract), which shall be deferred until it is paid pursuant to the excess cash flow sweep.

140.    "**_Strabag Deferrals_**" means, collectively, the Strabag Change Order Deferral, Strabag Construction Deferral and Strabag Insurance Deferral.

141.    "**_Strabag Insurance Deferral_**" means, upon receipt, the approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which shall be deferred until December 31, 2022.

142.    "**_Strabag's Other Claims_**" means Strabag's claims under the Tunneling Contract (as further amended from time to time, including pursuant to the terms described in the Restructuring Term Sheet), other than such Claims that are part of the Alto Maipo Senior Secured Obligations, that are payable in Cash for construction costs and insurance proceeds pursuant to the terms described in Section 3.3(f).

143.    "**_Subordinated Claim_**" means any Claim that is subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.  For the avoidance of doubt, Subordinated Claim shall not include any Claim in Classes 1, 5 or 6.

144.    "**_Supplier Deferred Payment_**" shall have the meaning given to it in the Common Terms Agreement.

145. "*Transfer Agreement*" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

146. "*Tunneling Contract*" means that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (as further amended, and restated, and/or supplemented, including in connection with the Restructuring Transactions).

147. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

148. "*Unimpaired*" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

149. "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

150. "*VAT*" means value-added tax.

151. "*VAT Financing Facility*" means a financing facility secured by the Debtors to pay the full amount of VAT that will be due upon issuance of the invoice for the Supplier Deferred Payment by Strabag.

152. "*Working Capital Facility*" means a super-senior first-lien secured working capital facility, documentation of which shall be included in the Plan Supplement, in an aggregate maximum principal amount of up to $15 million, with a maturity date of January 15, 2024, to be provided by AES Andes on the Effective Date.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of the Plan; (v) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (vii) references to "shareholders," "directors," and/or "officers" shall also include

"members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (xi) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

(b)     The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)     All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)     In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article II of the Plan.

Section 2.1     *Administrative Claims.*

(a)     Unless otherwise agreed by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases and except as otherwise provided in this Article II, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim as follows: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  The Debtors and Senior Lenders have agreed that so long as the RSA remains in full force and effect, and the Senior Lenders have not delivered notice of an RSA Termination (as defined in the Final Cash Collateral Order), they will not seek any recovery on account of any Adequate Protection Claim they may have.

(b)      All requests for payment of Administrative Claims must be filed no later than the first Business Day that is 30 days after the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.   The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than 45 days after the deadline for parties to file Administrative Claims as set forth in the service of notice of the Effective Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

Section 2.2      *Professional Fee Claims.*

(a)      All final requests for payment of Professional Fee Claims must be filed no later than the first Business Day that is 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      On the Effective Date, the Reorganized Debtors shall fund the Carve-Out Account with Cash equal to the Professional Fee Reserve Amount; *provided* that any amounts remaining in the Carve-Out Account immediately prior to the Effective Date shall be applied toward the Professional Fee Reserve Amount on the Effective Date.   The Carve-Out Account shall be maintained in trust solely for the benefit of the Retained Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  No Liens, Claims, or Interests shall encumber the Carve-Out Account in any way.  The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Carve-Out Account promptly after such Professional Fee Claims are Allowed by an Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, (x) if applicable, each Retained Professional shall receive its portion of the Carve-Out Account, allocated on the basis of the unused amounts set forth in the DIP Budget for such Retained Professional, from the Carve-Out Account and (y) the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.  When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Carve-Out Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

(c)      The Retained Professionals shall reasonably estimate in good faith their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Consenting Creditors no later than five Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  If a Retained Professional does

not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Carve-Out Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Carve-Out Account based on such estimates.

(d)        Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Debtors shall promptly pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors. From and after the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.1      *Classification of Claims.*[2]

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims or Professional Fee Claims, as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including for purposes of voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest shall be deemed classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

---

[2]        The Debtors reserve the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable Law.

The classification and the manner of satisfying all Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan.

Section 3.2     *Class Identification.*

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| **Class** | **Claims and Interests** | **Impairment / Voting Rights** |
|---|---|---|
| Class 1 | Alto Maipo Senior Secured Obligations | Impaired |
| Class 2 | Secured Claims | Unimpaired / Deemed to Accept |
| Class 3 | Priority Claims | Unimpaired / Deemed to Accept |
| Class 4 | General Unsecured Claims | Unimpaired / Deemed to Accept |
| Class 5 | DIP Claims | Impaired |
| Class 6 | Strabag's Other Claims | Impaired |
| Class 7 | Intercompany Claims | Unimpaired / Deemed to Accept OR Impaired / Deemed to Reject |
| Class 8 | Existing Equity Interests | Impaired / Deemed to Reject |

Section 3.3     *Treatment and Voting Rights of Claims and Interests.*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not due, in accordance with its terms in the ordinary course.

(a)     *Class 1—Alto Maipo Senior Secured Obligations.*

(i)     *Classification*: Class 1 consists of all Alto Maipo Senior Secured Obligations.  Subject to entry of the Confirmation Order, the Alto Maipo Senior Secured Obligations are hereby Allowed.

(ii)     *Treatment:* On the Effective Date, each Holder of an Allowed Alto Maipo Senior Secured Obligation shall receive, without setoff or recoupment by any Debtor or Reorganized Debtor, its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations, which shall, in the aggregate, represent a 60.0–66.8% recovery on the total face amount of the total Allowed Alto Maipo Senior Secured Obligations.

(iii)    *Impairment and Voting:* Class 1 is Impaired and Holders of Alto Maipo Senior Secured Obligations are entitled to vote to accept or reject the Plan.

(b)    *Class 2—Secured Claims*.

(i)    *Classification*: Class 2 consists of all Secured Claims.

(ii)    *Treatment:* Each Holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date.

(iii)    *Impairment and Voting:* Class 2 is Unimpaired and Holders of Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

(c)    *Class 3—Priority Claims.*

(i)    *Classification*: Class 3 consists of all Priority Claims.

(ii)    *Treatment:* Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(iii)    *Impairment and Voting*: Class 3 is Unimpaired and Holders of Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Priority Claims.

(d)    *Class 4—General Unsecured Claims.*

(i)    *Classification*: Class 4 consists of General Unsecured Claims.

(ii)    *Treatment*: On the Effective Date, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in cash, funded by a cash contribution by AES Andes of up to $300,000.00 as set forth in Annex A hereto. That certain contingent and unliquidated General Unsecured Claim set forth in Annex B to the Plan shall survive unimpaired.  Remaining General Unsecured Claims shall be disallowed and expunged and/or estimated at zero for distribution purposes, or be resolved and released pursuant to the terms of the Plan, as detailed on Annexes C and D hereto.

(iii)    *Impairment and Voting*:  Class 4 is Unimpaired and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan

23

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such General Unsecured Claims.

(e)    *Class 5—DIP Claims*.

    (i)    *Classification*: Class 5 consists of all DIP Claims.

    (ii)    *Treatment:* On the Effective Date, all Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility. Additionally, in consideration for, inter alia, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims, and AES Andes' agreement to contribute up to $10M to satisfy obligations in connection with certain other claims, AES Andes or its designee shall receive the New Common Equity, as provided in the Restructuring Term Sheet.

    (iii)    *Impairment and Voting:* Class 5 is Impaired and Holders of DIP Claims are entitled to vote to accept or reject the Plan.

(f)    *Class 6—Strabag's Other Claims.*

    (i)    *Classification*: Class 6 consists of Strabag's Other Claims.

    (ii)    *Treatment*: In consideration of Strabag's Other Claims, which are hereby Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all capitalized terms used in subsections 1-5 below and not otherwise defined herein are as defined in the Tunneling Contract):

        (1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum starting from the date that the Company accepts the completion of relevant Change Order (the "<u>Strabag Change Order Deferral</u>"); (4) $112,000 in the aggregate upon completion of an eco-flow monitoring system for all intakes; (5) $10,000,000 upon Substantial Completion of Critical Milestone F, which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep (as described in the Restructuring Term Sheet), shall bear interest at a rate of 4.0% per annum starting from the date of Substantial Completion of said Critical Milestone

F, and shall be payable pursuant to the excess cash flow sweep (the "Strabag Construction Deferral"); and (6) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag (the "Strabag Insurance Deferral" and, together with the Strabag Change Order Deferral and Strabag Construction Deferral, the "Strabag Deferrals"). The Strabag Deferrals shall be secured, *pari passu* with the 1L Secured Obligations, until paid in full.

(iii) *Impairment and Voting*: Class 6 is Impaired and Holders of Strabag's Other Claims are entitled to vote to accept or reject the Plan.

(g) *Class 7—Intercompany Claims.*

(i) *Classification*: Class 7 consists of all Intercompany Claims.

(ii) *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors.

(iii) *Impairment and Voting*: Intercompany Claims that are cancelled, released, and extinguished are Impaired and Holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims that are cancelled, released, or extinguished are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims. Intercompany Claims that are Reinstated are Unimpaired and Holders of such Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(h) *Class 8—Existing Equity Interests*.

(i) *Classification*: Class 8 consists of all Existing Equity Interests.

(ii) *Treatment*: On the Plan Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent

permitted under local law.  In order to effectuate such cancellation, release and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or the Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

(iii)    Impairment and Voting: Class 8 is Impaired and Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the plan, and the votes of such Holders will not be solicited with respect to such Existing Equity Interests.

Section 3.4    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, the DIP Orders, or the DIP Credit Facility Documents, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

Section 3.5    *Voting; Presumptions; Solicitation.*

(a)    *Acceptance by Certain Impaired Classes*.  Only Holders of Claims in Classes 1, 5, and 6 are entitled to vote to accept or reject the applicable Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least 66.6% in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims in Classes 1, 5, and 6 have received Ballots containing detailed voting instructions.

(b)    *Conclusively Presumed Acceptance by Unimpaired Classes*.  Holders of Claims in Classes 2, 3, and 4, and certain Holders of Claims in Class 7, are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(c)    *Deemed to Reject by Certain Impaired Classes*.  Holders of Claims and Interests in Class 8, and certain Holders of Claims in Class 7, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(d)    *Controversy Concerning Impairment*.  If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

Section 3.6    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all

purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

Section 3.7     *Nonconsensual Confirmation.*

Because certain Class of Claims or Interests entitled to vote on an applicable Plan are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

Section 3.8     *Subordinated Claims.*

The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the plan. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 3.9     *No Waiver.*

Nothing contained in the Plan shall be construed to waive the right of any Debtor, Reorganized Debtor, or other Entity to object on any basis to any Claim, including after the Effective Date.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1     *Compromise of Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Other than as specifically set forth herein, the Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Section 4.2    *Sources of Consideration for Plan Distribution.*

The Debtors shall fund distributions under the Plan with (1) Cash on hand, including Cash from operations; (2) the Amended & Restated Secured Obligations; and (3) contributions made by AES Andes to the extent set forth in this Plan.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  Subject to the terms of the Definitive Documents, the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

Section 4.3    *Restructuring Transactions.*

(a)    *Effectuation of the Restructuring Transactions.*  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan and the Plan Supplement, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, including Strabag's re-delivery of its shares to AES Andes or such other entity as is designated by AES Andes (consistent with Section 3.3(h)(ii) herein); (c) the filing of appropriate certificates of formation or incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable Law; and (d) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate. For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors.

(b)    *Working Capital Facility*.  On the Effective Date, subject to the effectiveness of the Restructuring Transactions, including, without limitation, distribution of the New Common Equity to AES Andes, AES Andes will provide a super-senior first-lien secured working capital facility in an aggregate maximum principal amount of $15 million, with a commitment to fund through, and with a maturity date of, January 15, 2024, which shall be used to fund general corporate purposes and any costs to the Debtors or the reorganized Debtors associated with emergence from these Chapter 11 Cases. The Working Capital Facility shall bear an interest rate of 4.0% per annum and will rank *pari passu* with the Amended & Restated Secured Exit Financing Facility.   The repayment of the Working Capital Facility shall occur prior to any excess cash flow sweep.

(c)     *1L Secured Obligations.*   The 1L Secured Obligations shall be issued in the aggregate amount of $1,050,000,000 in the form of investment-grade style corporate notes and project-finance style loans, with the form of each Senior Lender's allocation to be in accordance with that Senior Lender's election.  All 1L Secured Obligations will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters.

(d)     *Amended & Restated 2L Secured Obligations.*   The Amended & Restated 2L Secured Obligations shall be issued in the aggregate amount of approximately $993,718,290 (equal to the amount of the Alto Maipo Senior Secured Obligations as of the Petition Date, plus the liquidated amount of the interest rate swaps, less the aggregate principal amount of the 1L Secured Obligations), and shall be structured as project finance-style loans or notes with documentation customary for investment-grade corporate credit, at the discretion of the Senior Lenders.  The Amended & Restated 2L Secured Obligations shall have a maturity of October 15, 2042, extendable to October 2052 at the individual option of each lender thereunder.

(e)     *AES Andes Shared Services Payments.*  All AES Andes Shared Services Payments will continue to be deferred in the form of disbursements under a new loan (the "Shared Services Loan"), and such deferral will be subject to the terms set forth as follows and be documented as an amendment to each of the AES Andes Shared Services Contracts.  The Shared Services Loan shall bear interest at the same rate as the Amended & Restated 2L Secured Obligations (including any upside fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.  The maturity of the Shared Services Loan shall be the same as the latest date of scheduled maturity for any Amended & Restated 2L Secured Obligations.

(f)     *Subordinated Debt.*   All Subordinated Debt (as defined in the Common Terms Agreement) shall be discharged.  At the request of the Debtors, all holders of Subordinated Debt shall execute the necessary agreements as the Debtors or Reorganized Debtors may deem necessary to effectuate and document the re-delivery of all Subordinated Debt to AES Andes or such other entity as is designated by AES Andes.

(g)     *Equity.*   On the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws.   In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.  As part of, *inter alia*, the proposed global resolution of the Class 5 DIP Claims and Intercompany Claims held by AES Andes, and in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; and the impairment of the DIP Claims; AES Andes' contribution of up to $300,000.00 to satisfy Allowed General Unsecured Claims; and AES Andes' contribution to satisfy any amounts that the Borrower is required to pay up to a maximum amount of $10 million to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the

Parque Arenas Unsecured Claim (as defined in the Restructuring Support Agreement) and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D to the Restructuring Support Agreement); AES Andes shall receive 100% of the reorganized shares in Alto Maipo, which shares shall, in the future, be diluted subject to the conversion of the Amended & Restated 2L Secured Obligations and Shared Services Loan on the terms and subject to the conditions described in the governing documentation for such instruments. Holders of New Common Equity shall receive no dividends or distributions until the Amended & Restated Secured Exit Financing Facility, Working Capital Facility, VAT Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations have been repaid, restructured, or refinanced in full in accordance with the terms of the Plan and the Definitive Documentation.

(h)    *CNM Arbitral Award.*  Unless otherwise agreed to by the Company, the Senior Lenders and Strabag, all proceeds of any CNM Arbitral Award shall be applied in the following order as and when such proceeds may be collected by Alto Maipo: (1) to repay the Working Capital Facility; (2) to repay the Strabag Construction Deferral; (3) to repay the Deferred 1L Interest; (4) 50% to repay any DIP Loans or the Amended & Restated Secured Exit Financing Facility amount outstanding, and 50% to repay the Amended & Restated 2L Secured Obligations (provided that, to the extent the DSRA is not fully funded, the Amended & Restated 2L Secured Obligations allocation shall go instead to fund DSRA up to a $20 million balance); (5) to the extent the DSRA is not fully funded, to fund the DSRA up to a $20 million balance; and (6) to repay the Amended & Restated 2L Secured Obligations.

(i)    *Amended & Restated Secured Exit Financing Facility.*  The DIP Lender shall provide an Amended & Restated Secured Exit Financing Facility.  The Amended & Restated Secured Exit Financing Facility shall have a maturity date that is three years after the Effective Date, shall be granted a super-senior first lien on all assets (*pari passu* with the Working Capital Facility), other than proceeds of reimbursement of VAT that was financed with the proceeds of the VAT Financing Facility, and shall bear an interest rate of 4.0% per annum (subject to the deferral of interest payable in 2022 and in January 2023, which shall accrue interest at 4.0% per annum). The deferred interest of the Amended & Restated Secured Exit Financing Facility and the Sponsor Deferrals shall be added to the balance of the Amended & Restated Secured Exit Financing Facility and shall be repaid through the amortization of the Amended & Restated Secured Exit Financing Facility, which shall begin on July 15, 2023.

(j)    *VAT Financing Facility.*  A VAT Financing Facility shall be arranged in an aggregate total amount of $68.875 million, with a maturity that is 12 months from the date of issuance, with an interest rate as provided in the Definitive Documentation, and will rank *pari passu* with the 1L Secured Obligations.  The VAT Financing Facility shall be granted a super-senior first lien on the full amount of VAT refund that may due to Alto Maipo in connection with the Supplier Deferred Payment.

Section 4.4    *Lien Priority for Amended & Restated Secured Obligations*

The Amended & Restated Secured Exit Financing Facility, the Working Capital Facility, the 1L Secured Obligations and the Amended & Restated 2L Secured Obligations shall benefit from the same collateral, *provided, however*, that (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in

both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility and the Working Capital Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations pursuant to an Amended & Restated Secured Obligations Intercreditor Agreement.

Section 4.5    *Continued Corporate Existence.*

Except as otherwise provided in the Plan, or as otherwise may be agreed between the Debtors and the Consenting Creditors, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

Section 4.6    *Corporate Action.*

(a)    On the Effective Date, the Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions as contemplated by the Plan, the Plan Supplement, the Restructuring Support Agreement, and the Restructuring Term Sheet, including: (i) the selection of the directors and officers of each of the Reorganized Debtors; (ii) the distribution of the New Common Equity as provided herein or in the Plan Supplement Documents, or as otherwise agreed between the Required Consenting Creditors and the Debtors; (iii) the execution and entry into the New and A&R Obligations Documents; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

(b)    On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed,

to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan and the Plan Supplement (or necessary or desirable to effect the transactions contemplated by the Plan and the Plan Supplement) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New and A&R Obligations Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

(c)     The authorizations and approvals contemplated by this Section 4.6 shall be effective notwithstanding any requirements under non-bankruptcy Law.

Section 4.7     *Vesting of Assets.*

Except as otherwise provided in the Plan or the Plan Documents, on the Effective Date, all Assets, including all Claims, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Section 4.8     *Cancellation of Existing Securities and Agreements.*

(a)     On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest, including the Restructuring Support Agreement (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged. For the avoidance of doubt, and as provided in Section 4.3 herein, on the Effective Date, to the maximum extent enforceable under applicable law, each Holder of an Existing Equity Interest shall have such Existing Equity Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local laws. In order to effectuate such cancellation, release, and discharge, as of the Effective Date, Strabag shall, upon request and at the direction of the Debtors or Reorganized Debtors, re-deliver its shares to AES Andes or such other entity as is designated by AES Andes.

Section 4.9    *Issuance of New Common Equity.*

(a)    On the Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring.  All of the New Common Equity issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Equity is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

(b)    On the Effective Date, the Reorganized Debtors and the Holders of New Common Equity shall enter into the New Organizational Documents in substantially the form included in the Plan Supplement.  The New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

Section 4.10    *Exemption from Registration Requirements.*

The issuance of the 1L Secured Notes under the Plan and/or the Plan Supplement shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing the 1L Secured Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The issuance of the New Common Equity under the Plan and/or the Plan Supplement shall be exempt from registration under section 1145 of the Bankruptcy Code. The New Common Equity may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such Securities generally may be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states.

Section 4.11    *Organizational Documents.*

Subject to Article V of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

Section 4.12    *Treatment of Non-Qualified Creditors*

All 1L Secured Notes under the Plan and/or Plan Supplement that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such 1L Secured Notes in one or more sale transactions within 180 days following the Effective Date (the "Sale Period"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a

transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a pro rata basis, to such Non-Qualified Creditors at the end of the Sale Period (the "Substitute Consideration"). In the event that a sale of such 1L Secured Notes is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such 1L Secured Notes shall be cancelled for no consideration. None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities.  For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any 1L Secured Notes under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof.

Section 4.13    *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

Section 4.14    *Directors and Officers of the Reorganized Debtors.*

The members of the Reorganized Board will be designated in accordance with the Plan Supplement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the

applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced or removed in accordance with such New Organizational Documents.

Section 4.15    *Effectuating Documents; Further Transactions.*

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the DIP Credit Facility Documents, the New and A&R Obligations Documents, the New Organizational Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

As provided in the Restructuring Term Sheet, the Confirmation Order shall expressly affirm Alto Maipo's obligation to exchange the debt instruments to be issued in satisfaction of the Amended & Restated 2L Secured Obligations for investment grade corporate credit in the form of notes, pursuant to the terms of the Restructuring Term Sheet, and shall provide that Alto Maipo's failure to perform shall entitle the holders of all such debt instruments in connection with the Amended & Restated 2L Secured Obligations subsequent to the Effective Date to all available remedies, including, without limitation, specific performance.

Section 4.16    *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, but not paid pursuant to the DIP Orders, DIP Credit Facility Documents, or Cash Collateral Order, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the Plan and the DIP Orders, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

Section 4.17    *Retained Causes of Action.*

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, Cash Collateral Order, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith, including, without limitation, any Causes of Action or Claims related to the CNM Arbitral Award and/or collection thereof by Alto Maipo.  For the avoidance of doubt, except as expressly set forth herein or in the Plan Supplement, in no instance will any Cause of Action preserved pursuant to this Section 4.18 include any Claim or Cause of Action with respect to, or against, a Released Party.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

(a)    Subject to entry of the Confirmation Order, the Tunneling Contract is hereby assumed as amended. The Cure Cost for the Tunneling Contract consists of Strabag's Other Claims, which will be treated as described above in Article III, Classification and Treatment of Claims and Interests, Section 3.3, Treatment and Voting Rights of Claims and Interests, Subsection (d).

(b)    All other Executory Contracts and Unexpired Leases of the Debtors that are not otherwise assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than (i) those that are identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (ii) those that have been previously assumed or rejected pursuant to a Final Order by the Debtors prior to the Effective Date; and (iii) those that are the subject of a motion seeking assumption or rejection as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V but not assigned to a third party shall be deemed to be assigned to a Reorganized Debtor, and be fully enforceable by, the applicable contracting Reorganized Debtor(s)

in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

(c)     The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts or Unexpired Leases, as described in the Plan and Plan Supplement, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

(d)     Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Section 5.2     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)     Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date, subject to the limitation described in the following paragraph, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. No later than the Plan Supplement Filing Date, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs to be filed and served upon applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. The Debtors shall provide for such notices to be sent via overnight mail to creditors outside the United States. Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or related Cure Cost must be filed, served, and actually received by the Debtors within twenty-one (21) days of such assumption or assumption and assignment.

(b)     Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost shall be deemed to have assented to such assumption or Cure Cost.  In the event of a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (iii) any other matter pertaining to assumption and/or assignment, then the Bankruptcy Court shall hear such dispute prior to the assumption and/or assignment becoming effective, and the applicable Cure Costs associated therewith (if any) shall be paid following entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment and shall not prevent or delay implementation of the Plan or Effective Date; *provided* that the Debtors may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided, further,* that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject, any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)     Except as otherwise provided herein or as agreed to by the Debtors and the applicable counterparty, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Cost, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, and the Cure Cost paid, shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

Section 5.3     *Indemnification and Reimbursement Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date of the Plan, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of actions arising out of or relating to any act or omission that is a criminal act or constitutes, intentional fraud, gross negligence or willful misconduct.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized

Debtors.  Any Claim based on the Debtors' obligations in this Section 5.3 herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

> Section 5.4    *Claims Based on Rejection of Executory Contracts and Unexpired Leases (if Any).*

Unless otherwise provided by a Bankruptcy Court order, Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases, if any, pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts and Unexpired Leases, if any, that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contract and Unexpired Leases, if any, shall constitute General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

> Section 5.5    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that are not otherwise assumed or rejected will be deemed assumed by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code.

> Section 5.6    *Employee Compensation and Benefit Programs.*

(a)    Except as otherwise provided herein or in the Plan Supplement and except for any equity-based compensation or incentive plans, on and after the Effective Date, the Reorganized Debtors may, but are not required to, honor in the ordinary course of business: (i) any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees and other service providers of any of the Debtors who served in such capacity at any time. Nothing contained herein shall entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or

restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan.  Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

(b)    Except as otherwise provided herein, none of (i) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (ii) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Restructuring Transactions and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, will (A) entitle any current or former director, officer, employee or other service provider of any of the Debtors to any payment or benefit, (B) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or Expired benefit plan or (C) limit or restrict the right of the Debtors or Reorganized Debtors to merge, amend or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any person to terminate his or her service with the Debtors or Reorganized Debtors for "good reason" or similar provision.

Section 5.7    *Insurance Policies.*

All insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed and assumed and assigned to the respective Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

Section 5.8    *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1    *Distribution on Account of Claims and Interests Allowed as of the Effective Date.*

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Section 6.2    *Distribution on Account of Claims and Interests Allowed After the Effective Date.*

(a)    *Payments and Distributions on Disputed Claims.*  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is 30 Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

(b)    *Special Rules for Distributions to Holders of Disputed Claims.*  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

Section 6.3    *Timing and Calculation of Amounts to Be Distributed.*

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Section 6.4    *Delivery of Distributions.*

(a)    *Record Date for Distributions.*  On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    *Delivery of Distributions in General.*  Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

(c)    *Delivery of Distributions on Account of DIP Claims.*  The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as

practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Credit Facility, subject to any modifications to such distributions in accordance with the terms of the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

Section 6.5   *Distributions by Distribution Agent (if any).*

(a)      The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (i) affirm its obligation to facilitate the prompt distribution of any documents; (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (iv) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

(b)      The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

Section 6.6   *Minimum Distributions.*

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than US$50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of applicable equity interests under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share

of applicable equity interests (up or down), with half dollars and half shares of applicable equity interests or less being rounded down.

Section 6.7    *Undeliverable Distributions.*

(a)    *Holders of Certain Undeliverable Distributions*.  If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Section 6.7(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b)    *Failure to Claim Undeliverable Distributions*.  No later than 60 days after a distribution has been made to each Holder of an Allowed Claim entitled to receive a distribution under the Plan, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 60 days after the filing of the list of Holders of undeliverable distributions shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)    *Failure to Present Checks*.  Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

Section 6.8    *Compliance with Tax Requirements/Allocations.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a

portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

Section 6.9    *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors. Except as otherwise expressly provided in the Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

Section 6.10    *Claims Paid or Payable by Third Parties.*

(a)    *Claims Payable by Insurance*. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    *Applicability of Insurance Policies*. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

Section 7.1    *Allowance of Claims and Interests.*

(a)    Except as provided in Article IX of the Plan, each of the Reorganized Debtors after the Effective Date shall have and retain any and all rights and defenses the Debtors had with respect

to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.

(b)     Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.  For the avoidance of doubt, from and after the Effective Date, the Debtors may allow any Claims without order of the Bankruptcy Court and without other or further notice.

Section 7.2     *Prosecution of Objections to Claims.*

Except as otherwise specifically provided in the Plan or order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Section 7.3     *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim or Interest pursuant to section 502(c) of the Bankruptcy Code or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Each of the foregoing Claims and Interests objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Section 7.4     *[Reserved].*

Section 7.5     *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to the Reorganized Debtors.  All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, and unless a party receives permission from the Bankruptcy Court to file a late-filed Proof of Claim, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless the Bankruptcy Court, for cause, after notice and a hearing, orders otherwise.**

Section 7.6     *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.7     *Amendments to Claims.*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless and until each of the following conditions (the "**Conditions Precedent**") have occurred or been waived in accordance with the terms herein:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors, which shall be in force and effect and not subject to any stay of effectiveness;

(b)    the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time after April 1, 2022;

(c)    the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(d)    the final versions of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance acceptable to the Required Consenting Creditors and the DIP Lender in all respects and consistent in all respects with the Plan Term Sheet (as defined in and attached to the Restructuring Support Agreement), and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) and the DIP Lender in their sole and absolute discretion;

(e)    the New and A&R Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New and A&R Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each of the New and A&R Obligations Documents;

(f)    the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

(g)    all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Carve-Out Account pending the Bankruptcy Court's approval of such fees and expenses;

(h)    the payment in Cash in full of all Restructuring Expenses;

(i)    the PPA shall have been assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and shall be in full force and effect and shall not have been terminated at any time;

(j)    the documentation related to the VAT Financing Facility shall have been duly executed and delivered by all of the Entities that are party thereto;

(k)    with respect to the claims listed on Annex C hereto, the Bankruptcy Court shall have entered orders either (a) disallowing and expunging, (b) estimating at zero dollars for distribution purposes, (c) reducing and allowing, or (d) authorizing the assumption of the relevant contracts (with cure amount ordered to be zero dollars, with the exception of Claim No. 16, the cure or claim amount, which the Debtors may litigate as needed subsequent to the Effective Date provided that any disputed cure amount or claim amount be held in escrow by the Company pending the outcome of such litigation), in each case as set forth in Annex C hereto; and

(l)    the contributions from AES Andes in an amount of up to $300,000 for the payment in full in cash of the allowed General Unsecured Claims listed in Annex A hereto shall have been sufficient to pay in full in cash all such Allowed General Unsecured Claims.

Section 8.2    *Waiver of Conditions Precedent.*

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Creditors, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

Section 8.3    *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur, then, upon notice by the Debtors to the Bankruptcy Court, (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Section 8.4     *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Interests or any other matter.

Section 8.5     *Substantial Consummation of Plan.*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE IX.

## EFFECT OF PLAN CONFIRMATION

Section 9.1     *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, the Consenting Creditors, and each Holder of a Claim against or Interest in any Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, the Consenting Creditors', and Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has accepted or rejected the Plan or is deemed to have accepted or rejected the Plan.

Section 9.2     *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies.*

(a)     Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is Allowed; or (iii) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be

a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(b)    Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

Section 9.3    *Releases.*

(a)    ***RELEASES BY THE DEBTORS.*** **PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AND ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY SHALL BE DEEMED FOREVER RELEASED AND DISCHARGED BY EACH AND ALL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE**

PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT FACILITY DOCUMENTS, OR THE NEW AND A&R OBLIGATIONS DOCUMENTS, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED. FOR THE AVOIDANCE OF DOUBT, NO CLAIMS OR CAUSES OF ACTION BASED ON, OR ARISING FROM, ANY RETAINED CAUSES OF ACTION (AS SET FORTH IN SECTION 4.18 HEREIN) SHALL BE RELEASED PURSUANT TO THIS PLAN, *INCLUDING, WITHOUT LIMITATION*, ACTIONS BASED ON, OR ARISING FROM, THE CNM ARBITRATION.

(b)    ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT EACH DEBTOR RELEASE IS (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF SUCH CLAIMS; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR PROPERTY.

(c)    *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS*. AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER

**APPLICABLE LAW, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP CREDIT FACILITY DOCUMENTS, THE NEW AND A&R OBLIGATIONS DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; *PROVIDED* THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.**

(d)    ***RELEASES BY ALTO MAIPO AND STRABAG.*** **SUBJECT TO AND EXCEPT FOR THE RIGHTS AND OBLIGATIONS SET FORTH IN THE RSA (AS AMENDED, RESTATED, OR SUPPLEMENTED), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, STRABAG AND ALTO MAIPO, ON BEHALF OF THEMSELVES AND THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS, FULLY AND FINALLY WAIVE,**

**DISCHARGE AND RELEASE ANY AND ALL PAST AND CURRENT CLAIMS, COUNTERCLAIMS, CHANGES (AS DEFINED IN THE TUNNELING CONTRACT), DISPUTES, DEMANDS, CAUSES OF ACTION, LIABILITIES, AND DAMAGES FOR ADDITIONAL TIME OR COMPENSATION OF WHATEVER NATURE, CAUSE OF ACTION OR THEORY, WHICH ARE EITHER KNOWN AS OF APRIL 5, 2022 (THE "CUT-OFF DATE"), OR SHOULD HAVE BEEN KNOWN AS OF THE CUT-OFF DATE IN THE EXERCISE OF REASONABLE DILIGENCE BY THE RESPECTIVE RELEASING PARTY (RECOGNIZING THE RELATIVE EXPERTISE, POSITION, AND ENGINEERING SOPHISTICATION OF EACH RESPECTIVE PARTY); INCLUDING WITHOUT LIMITATION CONSTRUCTION CLAIMS, INCLUDING CREDITS AND BACK-CHARGES, DESCOPE CLAIMS, OMITTED-SCOPE CLAIMS, CHANGE ORDER CLAIMS, FUTURE BONUSES, BREACH OF CONTRACT, LIQUIDATED DAMAGES, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO THE TUNNELING CONTRACT OR PROJECT THAT STRABAG AND ALTO MAIPO MAY HAVE AGAINST ONE ANOTHER, THEIR SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, DIVISIONS, AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, INSURERS, SHAREHOLDERS AND ATTORNEYS THROUGH THE CUT-OFF DATE, *PROVIDED, HOWEVER,* THAT ANY CLAIMS BY ALTO MAIPO OR STRABAG, AS APPLICABLE, ARISING FROM (A) A WARRANTY (AS DEFINED IN THE TUNNELING CONTRACT); (B) A LATENT DEFECT (IN ACCORDANCE WITH SECTION 10.4.3 OF THE TUNNELING CONTRACT); (C) ANY DEFECT (I) DISCOVERED BY ALTO MAIPO DURING THE COMPLETION OF ACCEPTANCE TESTS (AS DEFINED IN THE TUNNELING CONTRACT) CONDUCTED AFTER THE CUT-OFF DATE, OR (II) IDENTIFIED AFTER FULL-LOAD TESTS HAVE BEEN COMPLETED, *PROVIDED THAT* STRABAG'S LIABILITY UNDER CLAUSE (II) ABOVE FOR ANY DEFECT RESULTING FROM ANY FAILURE BY STRABAG TO COMPLY WITH ITS OBLIGATIONS UNDER SECTIONS 2.3.1.1, 2.3.1.3, AND 2.3.1.4 OF THE TUNNELING CONTRACT AS THEY RELATE TO THE HYDRAULIC DESIGN (AS DEFINED IN THE TUNNELING CONTRACT), IF ANY, COMBINED WITH ANY LATE CRITICAL MILESTONE PAYMENTS (AS DEFINED IN THE TUNNELING CONTRACT) SHALL BE LIMITED TO A MAXIMUM OF $70,000,000; (D) THE AS-BUILT DELIVERABLES REQUIRED UNDER SECTION 7.6.1.4 OF THE TUNNELING CONTRACT, PROVIDED, HOWEVER, THAT NOTHING IN THIS CLAUSE (D) SHALL BE READ TO ENLARGE OR RESTRICT OWNER'S AND CONTRACTOR'S RESPECTIVE RIGHTS UNDER THE TUNNELING CONTRACT; (E) ANY FINES OR PENALTIES IMPOSED BY A GOVERNMENT ENVIRONMENTAL AUTHORITY AFTER THE CUT-OFF DATE THAT HAVE BEEN PROXIMATELY CAUSED BY SUCH RELEASED PARTY'S ACTIVITIES IN CONNECTION WITH THE PROJECT; AND (F) THE PUNCH LIST ITEMS AND ALL OTHER ITEMS LISTED IN ANNEX A TO ANNEX IV OF AMENDMENT NO. 5 TO THE RSA (EXCEPT FOR THOSE ITEMS IN ANNEX A TO ANNEX IV THAT ARE LABELLED AS "WAIVED ITEMS" OR "ADDITIONAL SCOPE", WHICH ITEMS ARE RELEASED OR OTHERWISE ADDRESSED ON THE TERMS DESCRIBED IN ANNEX A TO ANNEX IV); ARE NOT RELEASED AND ARE EXPRESSLY PRESERVED; AND *PROVIDED FURTHER*, THAT ALL OF THE RIGHTS AND DEFENSES OF EACH PARTY WITH RESPECT TO ANY CLAIMS ASSERTED BY THE OTHER PARTY PURSUANT TO SUBSECTIONS (A)-(F) ABOVE ARE EXPRESSLY**

**PRESERVED. FOR THE AVOIDANCE OF DOUBT, NOTHING HEREIN SHALL RELEASE, WAIVE, OR MODIFY ANY PARTY'S RIGHT TO RECOVER ANY INSURANCE PROCEEDS, SEEK OR OPPOSE RELIEF FROM ANY LATE CRITICAL MILESTONE PAYMENTS, REQUIRE COMPLETION OF THE ACCEPTANCE TESTS (TO THE EXTENT THOSE ACCEPTANCE TESTS HAVE NOT BEEN COMPLETED PRIOR TO THE CUT-OFF DATE), OR PURSUE OR OPPOSE ANY OTHER CLAIMS RELATED TO STRABAG'S ENTITLEMENT TO A SUBSTANTIAL COMPLETION CERTIFICATE FOR ANY CRITICAL OR CONTRACT MILESTONE, OR ANY OTHER NON-MONETARY CLAIMS, IN EACH CASE TO THE EXTENT PROVIDED IN, AND PURSUANT TO THE TERMS OF, THE TUNNELING CONTRACT; *PROVIDED, HOWEVER,* THAT NEITHER PARTY MAY ASSERT ENTITLEMENT TO SPECIFIC PERFORMANCE FOR CLAIMS THAT ARE OTHERWISE RELEASED.**

Section 9.4    *Exculpation and Limitation of Liability.*

(a)    **UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.**

(b)    **EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; *PROVIDED* THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; *PROVIDED FURTHER* THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT; *PROVIDED FURTHER* THAT THE FOREGOING SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS**

(INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER.

(c)      THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF NEW COMMON EQUITY PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

Section 9.5    *Injunction.*

THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE IX OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY ENTITY BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.

Section 9.6    *Setoffs and Recoupment.*

(a)      Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.  The Holder of such allowed Claim may challenge such a setoff or recoupment in the Bankruptcy Court, or in any court outside the United States with jurisdiction to hear such a challenge.

(b)      In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff or recoupment in such Proof of Claim.

Section 9.7    *Release of Liens.*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, for the avoidance of doubt, the New and A&R Obligations Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all usual and customary matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

(b)    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) any dispute regarding whether a contract or lease is or was executory or expired; and (iv) any dispute regarding the occurrence of COD, (v) in case of each (i)-(iv) of this paragraph (c) herein, to the maximum extent consistent with applicable law.

(d)    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)    Adjudicate, decide or resolve any and all matters related to Causes of Action;

(g)    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)     Resolve any and all avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

(i)     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(j)     Enter and implement such orders as may be necessary or appropriate to execute, implement, or Consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(k)     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

(m)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(n)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

(o)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(p)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(q)     Enter an order or final decree concluding or closing the Chapter 11 Cases;

(r)     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(t)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(u)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v)     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(w)     Enforce all orders previously entered by the Bankruptcy Court;

(x)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to enforce the Debtors' assumption of the PPA; and

(y)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

Section 11.2    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the U.S. Trustee and Reorganized Debtors, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

Section 11.3    *Amendments.*

(a)     *Plan Modifications*. Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided* further that any such amendments or modifications

shall require the consent of the Consenting Creditors; *provided* further that any amendments or modifications that affect the rights, obligations, liabilities and duties of the DIP Agent shall require the consent of the DIP Agent, as applicable.

(b)    *Effect of Confirmation on Modifications*.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)    *Certain Technical Amendments*.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided* that such technical adjustments and modifications do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

Section 11.4    *Revocation or Withdrawal of Plan.*

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or both Debtors, prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in the Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

Section 11.5    *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal Law, rule or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to the Plan (including, without limitation, the DIP Credit Facility Documents and the New and A&R Obligations Documents), provides otherwise, the Plan shall be governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to the principles of conflict of Laws thereof that would require application of the Law of another jurisdiction.

Section 11.6    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 11.7    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.8    *Controlling Document.*

In the event of an inconsistency between the Plan and Disclosure Statement, the terms of the Plan shall control in all respects.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

Section 11.9    *Filing of Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

Section 11.10   *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

Section 11.11  *Service of Documents.*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

a)      The Company

Alto Maipo SpA
Av. Los Conquistadores 1730, Piso 10
Providencia, Santiago, Chile
Attention: Javier Dib
E-mail: javier.dib@aes.com

with copies (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, NY 10006
Attention: Richard J. Cooper, Luke A. Barefoot, and Jack Massey
E-mail: rcooper@cgsh.com, lbarefoot@cgsh.com and jamassey@cgsh.com
*Co-Counsel for Debtors and Debtors in Possession*

and

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Attention: Pauline K. Morgan, Sean T. Greecher, and S. Alexander Faris
E-mail: pmorgan@ycst.com, sgreecher@ycst.com and afaris@ycst.com
*Co-Counsel for Debtors and Debtors in Possession*

b)      DIP Lender

AES Andes S.A.
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Ricardo Roizen, Felix Gomez, Maria Paz Cerda, and Andrea Sougarret
E-mail: ricardo.roizen@aes.com, felix.gomez@aes.com,
mariapaz.cerda@aes.com, andrea.sougarret@aes.com

and

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market St., #1600
Wilmington, DE 19801
Attention: Derek C. Abbot, Curtis S. Miller, and R. Jason Russell

E-mail: DAbbott@morrisnichols.com, CMiller@morrisnichols.com and
JRussell@morrisnichols.com

c)      Senior Lenders

Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
Attention: Marissa Alcala
E-mail: Melissa.alcala@nortonrosefulbright.com

and

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: Christy Rivera and Andrew Rosenblatt
E-mail: christy.rivera@nortonrosefulbright.com and
andrew.rosenblatt@nortonrosefulbright.com

and

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
Attention: Matthew B. McGuire and Matthew R. Pierce
Email: mcguire@lrclaw.com and pierce@lrclaw.com

d)      Strabag

Troutman Pepper Hamilton Sanders LLP
400 Town Center, Suite 1800
Southfield, MI 48075
Attention: Robert S. Hertzberg and Deborah Kovsky-Apap
E-mail: robert.hertzberg@troutman.com
deborah.kovsky@troutman.com

and

Troutman Pepper Hamilton Sanders LLP
Hercules Plaza
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Attention: David M. Fournier
E-mail: david.fournier@troutman.com

e)      Cerberus

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention: Brian Resnick, Elliot Moskowitz, and Richard J. Steinberg
Email: brian.resnick@davispolk.com, elliot.moskowitz@davispolk.com and
richard.steinberg@davispolk.com

and

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Attention: Laura Davis Jones and Peter J. Keane
Email: ljones@pszjlaw.com and pkeane@pszjlaw.com

f)      The United States Trustee

Office of the United States Trustee
844 King Street, Suite 2207
Wilmington, DE 19801
Attention.: Jane M. Leamy
E-mail: Jane.M.Leamy@usdoj.gov

g)      Committee of Unsecured Creditors

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Sam J. Alberts and Lynn P. Harrison III
E-mail: sam.alberts@dentons.com and lynn.harrisoniii@dentons.com

and

Dentons Bingham Greenebaum LLP
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Attention: James R. Irving
E-mail: james.irving@dentons.com

and

Dentons Larraín Rencort SpA
Av. Apoquindo 3885, piso 18
Las Condes, Santiago, Chile

Attention: Carlos Urzúa and Gonzalo Varela
E-mail: carlos.urzua@dentons.com and gonzalo.varela@dentons.com

and

Benesch, Friedlander, Coplan & Aronoff LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Attention: Jennifer R. Hoover, Kevin M. Capuzzi and John C. Gentile
E-mail: jhoover@beneschlaw.com, kcapuzzi@beneschlaw.com and
jgentile@beneschlaw.com

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities informing them that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests, except that the U.S. Trustee shall continue to receive all documents pursuant to Bankruptcy Rule 2002 without any requirement that the U.S. Trustee file such a renewed request.

Section 11.12  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.13  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to the Plan are incorporated into and are a part of the Plan as if fully set forth herein.

Section 11.14  *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, the Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Section 11.15  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 11.16  *Dissolution of the Committee.*

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of, any applications for Professional Fee Claims or expense reimbursements for members of such Committee. The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition unsecured creditors, including, but not limited to, any cases, controversies, suits or disputes arising in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order that could affect the treatment of prepetition unsecured creditors. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have any Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

*[Remainder of Page Intentionally Left Blank]*

Dated:  April 4, 2022

Respectfully submitted,

Alto Maipo SpA
on behalf of itself and Alto Maipo Delaware LLC

By:      */s/ Javier Dib*
Name:    Javier Dib
Title:    Board President & Chief Restructuring
         Officer

## ANNEX A

**Claims to be Paid in Full**

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 2 | Baker Botts L.L.P. | $24,084.24 | Pay in full. |
| 6 | Bradley Arant Boult Cummings LLP[3] | $3,000,000.00 | Assume contract / Pay in full. |
| Scheduled | Aguas Purificadas Continental SpA | $558.00 | Pay in full. |
| Scheduled | Comercializadora DH SpA | $1,091.00 | Pay in full. |
| Scheduled | Ferreteria y Materiales De Calle Comercio 20073 | $1,936.00 | Pay in full. |
| Scheduled | Joaquin Porfirio Costa Berrios | $190.00 | Pay in full. |
| Scheduled | Proveedores Integrales Prisa S.A. | $214.00 | Pay in full. |
| Scheduled | Supermercado del Neumatico Limitada | $786.00 | Pay in full. |

---

[3]    For the avoidance of doubt, this claim is not being treated as a General Unsecured Claim. Negotiations regarding the timing for payment of the cure cost related to assumption of the relevant contract are ongoing.

**ANNEX B**

**Claims to Pass Through Unimpaired**

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 5 | Parque Arenas SpA (UCC) | $10,000,000.00 | Claim No. 5 to pass through; AES Andes to provide sufficient contribution to the Borrower to satisfy any amounts that the Borrower is required to pay, up to a maximum amount of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the applicable Debtor and Parque Arenas, in connection with the Parque Arenas Unsecured Claim and (ii) the Volcan Cure/Claim Amount (as described in Annex C). |

## ANNEX C

**Claims to Which Debtors Will (i) Object and Seek Disallowance, Expungement, or Reduction, (ii) Estimate at $0 for Distribution Purposes, or (iii) Assume the Relevant Contract at $0 Cure Cost**

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 1 | Parque Arenas SpA (UCC) | $10,000,000.00 | Object – Duplicative of Claim No. 5. |
| 3 | Comunidad de Aguas Canal El Manzano (UCC) | $1,000,000,000.00 | Assume contracts / Estimate cure at $0 for each contract, and object to balance of claims asserted as part of Claim No. 3. |
| 7 | Contreras Bustamante, Gemma | $25,000,000.00 | Object / Estimate at $0. |
| 8 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 | Object / Estimate at $72,000 (will not come due until August 2022). |
| 9 | Compañía Industrial El Volcan S.A (UCC) | $1,946,556.00 | Object – Duplicative of Claim No. 16. |
| 10 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 | Object – Duplicative of Claim No. 8. |
| 12 | Christian Becker Matkovic | $80,000,000.00 | Object / Estimate at $0. |
| 13 | Maite Birke Abaroa | $2,000,000,000.00 | Object / Estimate at $0. |
| 14 | AP Asesorias en Gestion y Consultoria Ltda. | $140,000.00 | Object / Estimate at $48,000 (will not come due until August 2022). |
| 15 | Bruno Bercic | $80,000,000.00 | Object / Estimate at $0. |
| 16 | Compañía Industrial El Volcan S.A. | $1,501,521.00 | (a) Object / Estimate at $0 or (b) Assume contract / Estimate cure at $0[4] and object to balance of claims asserted as part of Claim No. 16. |

---

[4]     In the event the Debtors, after consultation with the Senior Lenders, seek to assume the contract related to Claim No. 16, to the extent the cure or allowed claim amount is greater than $0, any cure or claim amount that is determined to be due on account of the Volcan contract (any such amount, the "Volcan Cure/Claim Amount") shall be satisfied through a contribution by AES Andes.  The Debtors may defer litigation of the cure amount relating to the contract with Volcan until after the Plan Effective Date.  For the avoidance of doubt, the total amounts paid by AES Andes in satisfaction of the Volcan Cure/Claim Amount and the Parque Arenas Unsecured Claim shall not exceed $10 million in the aggregate.

| 18 | Comunidad de Aguas Canal El Manzano | $1,000,000,000.00 | Object / Duplicative of Claim No. 3. |
|----|-------------------------------------|-------------------|--------------------------------------|
| 19 | AES Electric Ltd. | $0.00 | Claim Withdrawn. |
| 20 | Sara Larrain | $1,500,000.00 | Object / Estimate at $0. |

## ANNEX D

**Claims Satisfied/Released Pursuant to Plan / Assumed with $0 Cure**

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 4 | Itaú CorpBanca S.A. | $1,652,218,290.14 | Satisfied pursuant to Plan. |
| 11 | Strabag SpA | $601,354,484.00 | Satisfied pursuant to Plan. |
| 17 | Strabag SpA | $598,763,578.00 | Satisfied pursuant to Plan. |
| 21 | AES Andes S.A. | $1,089,142,102.35 | Satisfied pursuant to Plan. |
| 22 | AES Electric Ltd. | $301,635.00 | Satisfied pursuant to Plan. |
| 23 | Cerberus South America Investments, LLC | $158,512,457.52 | Satisfied pursuant to Plan. |
| 24 | The AES Corporation | $6,138,048.00 | Satisfied pursuant to Plan. |
| 25 | Strabag SpA | $684,831,578.00 | Satisfied pursuant to Plan. |

**EXHIBIT B**

**Liquidation Analysis**

**Liquidation Analysis**

**Introduction**

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their advisors, have prepared the hypothetical liquidation analysis described herein (the "Liquidation Analysis"). The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by the Liquidation Analysis, impaired classes under the Plan. Additionally, holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation, as illustrated by the Liquidation Analysis. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Basis of Presentation**

The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtors' estates if the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code on May 30, 2022 (the "Liquidation Date") and a chapter 7 trustee (the "Trustee") was appointed to convert all assets into cash. In this hypothetical scenario, the Trustee would satisfy claims by selling the Debtors' assets as a going concern in a rapid, distressed sale. The cash amount (the "Gross Proceeds") that would be available for satisfaction of Allowed Claims and Interests would consist of the net proceeds resulting from the sale of the assets.

This Liquidation Analysis assumes that Gross Proceeds would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code. Such cash amount would be distributed, in accordance with, and as required by, applicable law: (i) first, for payment of administrative and chapter 7 fees including trustee fees, professional fees attributable to the sale of the asset, and other chapter 7 administrative fees, (ii) second, to pay the secured portions of all Allowed Secured Claims; and (iii) third, for the payment of the unsecured DIP Claims. Any remaining net cash would be distributed to creditors holding Unsecured Claims, including deficiency claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.

This Liquidation Analysis assumes the rapid, distressed sale of the Debtors' assets within six months post-conversion as an operating business. The sales process will take place under the direction of the Trustee, likely utilizing third-party advisors. We understand the operations commencement date will occur prior to the conversion date. The Liquidation Analysis is also

based on the assumptions that the Debtors have continued access to cash collateral during the course of the sale.  The Liquidation Analysis was prepared on a consolidated basis.

The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions, or (iii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code or contract rejection claims that may be triggered upon the liquation and sale of assets.  More specific assumptions are detailed in the notes below.

The preparation of a liquidation analysis, such as the Liquidation Analysis, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by management as and when made based on management's current expectations and beliefs, are inherently subject to business, economic and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors or the Trustee. The values stated herein have not been subject to any review, compilation or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of claims against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly form the values set forth in the Liquidation analysis.  ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

## Liquidation Analysis

The following Liquidation Analysis should be reviewed in conjunction with the associated notes:

| Liquidation Analysis Summary | | | | |
|---|---|---|---|---|
| | | Recovery $ | | |
| In $ Thousands | Note | Low | | High |
| Gross Proceeds from Asset Sale | [A] | $ 334,794 | $ | 376,702 |
| CNM Arbitral Award | [B] | 144,456 | | 162,169 |
| **Gross Proceeds** | | **$ 479,250** | **$** | **538,871** |
| | | | | |
| **Administrative and Chapter 7 Claims** | [C] | | | |
| Trustee Fees | | $ 5,022 | $ | 5,651 |
| Professional Fees | | 10,044 | | 11,301 |
| **Total Administrative Claims** | | **$ 15,066** | **$** | **16,952** |
| Recovery | | 15,066 | | 16,952 |
| *Recovery %* | | *100.0%* | | *100.0%* |
| **Senior Secured Claims** | [D] | | | |
| Senior Secured Claims | | $ 1,652,218 | $ | 1,652,218 |
| Supplier Financing | | 391,500 | | 391,500 |
| **Total Senior Secured Claims** | | **$ 2,043,718** | **$** | **2,043,718** |
| Recovery | | 464,184 | | 521,920 |
| *Recovery %* | | *22.7%* | | *25.5%* |
| **DIP Claims** | | | | |
| **Total DIP Claims** | [E] | **$ 32,000** | **$** | **32,000** |
| Recovery | | - | | - |
| *Recovery %* | | *0.0%* | | *0.0%* |
| **General Unsecured Claims** | | | | |
| **Total General Unsecured Claims** | [F] | **$ 1,163,470** | **$** | **1,163,470** |
| Recovery | | - | | - |
| *Recovery %* | | *0.0%* | | *0.0%* |

[A] The Gross Proceeds from the chapter 7 Asset Sale represents proceeds of the sale of the Alto Maipo operating entity, assuming a conversion to a chapter 7 on May 30, 2022. The value of Alto Maipo was estimated by conducting a Discounted Cash Flow valuation analysis under a chapter 7 context utilizing management projections prepared on January 28, 2022. Upon conversion to chapter 7, the existing PPA with MLP would be terminated under provisions in the agreement, with a 60-day deemed rejection date. Furthermore, we do not anticipate a buyer of this asset, in a chapter 7 sale, to be able to benefit from deferred cost benefits provided by AES Andes under the Plan but rather would pay for services as they are provided. The analysis utilizes a discount rate

range of 9.5% to 10.5%, which reflects the rapid, distressed sale of the business along with the loss of the PPA and the AES Andes relationship as contemplated under the Plan.

[B] CNM Arbitral Award: Pursuant to the outcome from the *Alto Maipo SpA v. Constructora Nuevo Maipo S.A. ("CNM") v. The AES Corporation and AES Gener S.A.* proceeding, Alto Maipo obtained a partial award of award of approximately $107 million. This award is currently being disputed by CNM.[1] For the purpose of the liquidation analysis, we have factored in the passage of time to receive the disputed award and post-judgement interest resulting in an estimated net judgement asset range of $144 million to $162 million.

[C] Administrative and Chapter 7 Claims:  In the event of a chapter 7 conversion, and the subsequent sale of the Debtors' assets in six months following the Liquidation Date, the estate would incur chapter 7 trustee fees and professional fees in connection with selling the assets. Trustee fees are assumed to be 1.5% of liquidation proceeds for non-cash assets and professional brokerage and legal fees to sell the assets are assumed to be equal to 3.0% of non-cash asset proceeds. Recoveries on administrative and chapter 7 claims are estimated at 100%.

[D] Secured Claims: This represents an estimate of the term loan, the interest rate swap, outstanding letters of credit, and supplier financing as of February 2, 2022. In the event of a chapter 7 liquidation, recovery on these claims is estimated at 22.7% to 25.5%.

[E] DIP Claims: The DIP Claims represent the expected draw on the DIP at the Liquidation Date according to the most recent DIP budget. In the event of a chapter 7 liquidation, recovery on DIP Claims is estimated at 0%.

[F] General Unsecured Claims: General Unsecured Claims includes estimated trade payables not subject to liens, an intercompany loan, a subordinated loan, and contract rejection claims as of February 2, 2022. This balance does not include the significant contingent, unsecured claims detailed in the Disclosure Statement.  Recoveries on unsecured claims are estimated at 0.0%.

---

[1] We understand CNM: a) has submitted an Application for Revision, as discussed in more detail in the Disclosure Statement; b) contests the application of pre-judgement interest, which will ultimately be decided by the Tribunal (the "Final Award"); and c) contests the interest rate of 9% stating Alto Maipo is only entitled to interest after the Final Award at a rate of 3.25%. The Application for Revision is conservatively not factored into our analysis as, if somehow successful, it would only point to a lower recovery to Alto Maipo creditors.

**<u>EXHIBIT C</u>**

**Valuation Analysis**

**Valuation Analysis**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

## A.    Estimated Valuation

Solely for the purposes of the Plan and the Disclosure Statement, Lazard Freres & Co. LLC ("Lazard"), as investment banker to the Debtors, has estimated a range of total enterprise value ("Enterprise Value") for Reorganized Alto Maipo on a consolidated going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the Financial Projections attached to the Disclosure Statement as **Exhibit F** (collectively the "Financial Projections"), and information provided by other sources. The Valuation Analysis assumes that the Effective Date will occur on May 31, 2022. The valuation estimates set forth herein represent valuation analyses of Reorganized Alto Maipo generally based on the application of customary valuation techniques deemed appropriate.

Based on the Financial Projections and solely for the purposes of the Plan, the value of Reorganized Alto Maipo's operations on a going concern basis (the "Enterprise Value") is estimated to be approximately $1,115 million to $1,236 million with a selected midpoint value of approximately $1,176 million. Separately, the value of the CNM Final Award payable to Alto Maipo is assumed, based on estimates provided by Counsel, to be approximately $144 million to $162 million with a selected midpoint value of approximately $153 million. Based upon the assumed range of Enterprise Value as of the Effective Date, the assumed range of the CNM Award as of the Effective Date, and the estimated Net Cash at emergence of $18 million, the imputed range of Total Value is estimated to be approximately $1,277 million to $1,416 million, with a selected midpoint value of approximately $1,347 million. The Valuation Analysis assumes that, between the date of filing of the Disclosure Statement and the assumed Effective Date, no material changes will occur that would affect estimated valuation.

The Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

B.    **Valuation Methodology**

The consolidated value of Reorganized Alto Maipo was estimated by primarily relying on the generally accepted valuation technique of Discounted Cash Flow ("DCF") Analysis. DCF Analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Financial Projections provided by management plus an estimate for the value of the firm beyond the Projection Period, known as the terminal value. The range of potential terminal values was calculated by deriving a value using an assumed perpetuity growth rate applied to the unlevered free cash flow in the final year of the Projection Period. The terminal value was then discounted back to the assumed Effective Date.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF MARCH 22, 2022. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

LAZARD DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD

IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of Reorganized Alto Maipo. The Valuation Analysis assumes that the actual performance of Reorganized Alto Maipo will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of Reorganized Alto Maipo; (e) considered certain economic and industry information that Lazard deemed generally relevant to Reorganized Alto Maipo; and (f) conducted such other studies, analyses, and inquiries as deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or Allowed Interests or any other person as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been requested to, and does not express any view as to, the potential value of Reorganized Alto Maipo's securities on issuance or at any other time.

Lazard did not estimate the value of any tax attributes, nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Alto Maipo's Projections. Such matters are subject to many uncertainties and contingencies that are difficult to predict. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Alto Maipo's Projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES; THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS. LAZARD HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

## EXHIBIT D

### Corporate Organizational Chart



# **EXHIBIT E**

**Restructuring Support Agreement**

*Execution Version*

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits, schedules and other attachments hereto, and as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of November 16, 2021 (the "Effective Date"), is entered into by and among:

a) Alto Maipo S.p.A. a *sociedad por acciones* organized and existing under the laws of Chile ("Alto Maipo" or the "Company");

b) Norgener Renovables SpA a *sociedad por acciones* organized and existing under the laws of Chile (the "Norgener");

c) AES Andes S.A. a *sociedad anónima* organized and existing under the laws of Chile (the "Sponsor");

d) the (i) Banco De Crédito e Inversiones, (ii) DNB Bank ASA, (iii) Itaú Corpbanca, (iv) Warbler Run I LLC, and (v) Warbler Run II LLC (collectively, and together with any subsequent lender that executes and delivers counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement (as defined below) to counsel to the Company from time to time agreeing to be bound hereby, the "Supporting Senior Lenders"), in their capacity as lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, Overseas Private Investment Corporation, Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutsche Bank AG, London Branch, and Santana S.A., as Senior Lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (the "Administrative Agent") (as further amended and supplemented, the "Common Terms Agreement"); and

e) Strabag SpA ("Strabag" and, together with Norgener, the "Shareholders"), as (i) contractor under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (the "Tunneling Construction Contract"), (ii) shareholder under the Shareholders' Agreement of Alto Maipo SpA among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time, the "Shareholders' Agreement"), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered into prior to the date hereof, and (iv) secured creditor with respect to the Supplier Deferred Payment (as defined in the Common Terms Agreement).

The Company, Norgener, the Sponsor and the Consenting Creditors may each be referred to herein as a "Party" and, collectively, as the "Parties." As used herein, (i) "Alto Maipo Obligations" means (i) an amount equal to US$1,652,472,639 due to all Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms

Agreement), and (ii) an amount equal to US$391,500,000 due to Strabag S.p.A. under the Tunneling Contract (as defined in the Common Terms Agreement)[1], without duplication, and (ii) "Consenting Creditors" means the Supporting Senior Lenders, Strabag and any hedge counterparty that executes and delivers counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company from time to time agreeing to be bound hereby. Capitalized terms used but not defined in this Agreement have the meanings ascribed to them in the Plan Term Sheet (as defined below).

## RECITALS

**WHEREAS**, the Consenting Creditors, the Company, the Shareholders, the Sponsor, and their respective counsel and other advisors have engaged in negotiations regarding a comprehensive restructuring of the Company's obligations and indebtedness (the "Restructuring") pursuant to a consensual pre-negotiated restructuring plan (the "Plan") in accordance with a term sheet attached as Exhibit A hereto (as amended and supplemented in accordance with the terms of this Agreement), the "Plan Term Sheet");

**WHEREAS**, the Company intends to implement the Restructuring in accordance with the terms and conditions set forth in the Plan Term Sheet and this Agreement (the "Restructuring Documents") by (i) commencing a voluntary case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to effect the Restructuring as set forth in the Plan Term Sheet, including (A) the entering into of the DIP Credit Facility (as defined below), to be funded by AES Andes S.A. as debtor-in-possession lender (together with such other entities as may from time to time become party to the DIP Credit Facility (as defined below), the "DIP Lender")  in cash, (B) the entering into of a first priority tranche of secured notes or bank instruments (the "New 1L Secured Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, (C) the entering into of a second priority secured loan (the "New 2L Secured Loan" and together with the New 1L Secured Obligations, the "New Secured Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, and (D) the issuance of common equity in reorganized Alto Maipo (the "New Common Equity" and, collectively with the DIP Credit Facility and the New Secured Obligations, the "New Obligations"), to be distributed as provided in the Plan Term Sheet and the Plan, (ii) obtaining consents from the Senior Lenders (as defined in the Common Terms Agreement) and Strabag to amend the liens on all collateral pledged under the Financing Documents to provide that such liens will secure the Company's obligations, from and after the Effective Date, under the New Secured Obligations, as set forth in the Restructuring Documents (the "Proposed Amendments"), and (iii) the consummation of the other transactions contemplated in the Restructuring Documents (clauses (i) through (iii), collectively, the "Restructuring Transactions");

**WHEREAS**, the DIP Lender has agreed to provide the Company with an unsecured administrative super-priority debtor in possession revolving credit facility (the "DIP Credit

---

[1] In addition to the Alto Maipo Obligations, certain other amounts are or will be due from the Company to Strabag under the Tunneling Construction Contract, as set forth in the term sheet attached as Annex III to the Plan Term Sheet.

Facility"), subject to the applicable terms and conditions set forth herein and in the term sheet attached as Schedule II to Exhibit A (the "<u>DIP Term Sheet</u>") with DIP Lender serving as administrative agent (in such capacity, the "<u>DIP Agent</u>"), pursuant to definitive documentation (which documentation shall include a motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Company to obtain post-petition unsecured financing (the "<u>DIP Financing Motion</u>"), the orders approving the DIP Financing Motion on an interim and final basis (the "<u>Interim DIP Order</u>" and the "<u>Final DIP Order</u>" and together, the "<u>DIP Orders</u>") and a post-petition credit agreement (the "<u>DIP Credit Agreement</u>", and together with certain related loan documents, the "<u>DIP Loan Documents</u>") in each case, (i) on the terms and subject to the consent rights set forth in the DIP Term Sheet and (ii) in consultation with the Required Consenting Creditors;

**WHEREAS**, each Party and its respective counsel and other advisors (i) have reviewed or have had the opportunity to review the Restructuring Documents and (ii) acknowledge and agree that the Plan Term Sheet is a summary of the material terms of the proposed Restructuring and that implementation of the Restructuring will require the negotiation and agreement of terms not covered by the Plan Term Sheet; and

**WHEREAS,** each Party has agreed, subject to the conditions contained in the Restructuring Documents, to participate in the Restructuring in accordance with this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**    Commitments Regarding the Restructuring.

1.01.    <u>Effectiveness of Agreement</u>.  This Agreement shall be effective from the date all of the following conditions precedent have been satisfied to the satisfaction of the Company and the Sponsor, on the one hand, and (i) Supporting Senior Lenders that hold no less than 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Supporting Senior Lenders and (ii) Consenting Creditors that hold no less than 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Consenting Creditors ((i) and (ii) collectively, "<u>Required Consenting Creditors</u>"), on the other hand:

(a)    Receipt by counsel to the Company and counsel to the Consenting Creditors of an electronic copy of this Agreement, duly authorized, executed and delivered by each of the Parties hereto;

(b)    All of the representations and warranties contained in this Agreement shall be true and correct in all respects; and

(c)    The Company shall have paid (i) all outstanding fees and expenses of ASSET Chile S.A. and FTI Consulting Canada ULC; (ii) $210,000 to Troutman Pepper Hamilton Sanders LLP for legal services to Strabag; (iii) $600,000 to Norton Rose Fulbright US LLP as a retainer for legal services to the Senior Lenders; and (iv) $35,000 to Carey y Cia Ltda. as a retainer for legal services to the Senior Lenders.

1.02.    Strabag's Approval: During the effectiveness of this Agreement, any terms of the Restructuring Term Sheet that expressly supplement or vary the terms of the Tunneling Construction Contract shall apply.

1.03.    Agreement to Support.  As long as (x) this Agreement has not been terminated in accordance with the terms of Section 3 hereof, (y) no circumstances exist which would (1) cause this Agreement to terminate automatically, or (2) give the Required Consenting Creditors or Strabag, as applicable, the right to deliver a written notice of termination of this Agreement, in each case under the terms of Section 3.01(a) to (r) and notwithstanding any cure periods that would be otherwise applicable, and (z) the Company is pursuing the Restructuring in a manner that is both (1) consistent in all respects with the Restructuring Documents and (2) in form and substance reasonably acceptable to the Required Consenting Creditors, each Consenting Creditor agrees, severally and not jointly, that it shall:

(a)     with respect to all Alto Maipo Obligations and any other claims and all interests held by such Consenting Creditor and inclusive of any claims acquired pursuant to Section 1.06 hereof (the "Consenting Creditor Claims and Interests"):

A.      following the commencement of any solicitation in accordance with this Agreement and section 1126(b) of the Bankruptcy Code and subject to its actual receipt of the Plan and related disclosure statement and other solicitation materials (the "Solicitation Materials"), support the Restructuring Transactions as contemplated by, and within the timeframes outlined in, this Agreement and in the Plan Term Sheet and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate, including, without limitation, confirmation of the Plan) in each case in favor of any matter requiring approval to the extent necessary to implement and give effect to the Restructuring Transactions;

B.      not change or withdraw (or cause to be changed or withdrawn) such vote or exercise of powers; *provided that* if, prior to consummation of the Plan, the Plan is modified without the consent of the Consenting Creditors or this Agreement is terminated in accordance with the terms of Section 3 hereof, each Consenting Creditor shall have the right to revoke its vote in favor of the Plan, and the Company shall take all steps necessary to assist in such revocation, and upon such revocation any such vote shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions or this Agreement, and the ballots casting such vote may be changed and resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

C.      provide its consent in favor of, and execute and deliver, such reasonable and customary documents as may be requested by Alto Maipo to implement the Proposed Amendments; provided that, if this Agreement is terminated in accordance with the terms of Section 3 hereof at any time prior to the Plan Effective Date, the Consenting Creditors shall have the right to revoke all (or, at their election, any portion) of their consents given to effect the Proposed Amendments and the Company shall take all steps necessary to assist in such revocation and upon such revocation any such consents shall automatically be deemed, for all

purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring or this Agreement, and any ballots or other documents providing such consents may be changed or resubmitted regardless of whether the deadline to resubmit or revoke such consents has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(b)    consent to the use of cash collateral during the pendency of the Chapter 11 Case subject to the terms and conditions set forth in the order approving the cash collateral motion, which shall be in form and substance acceptable to the Required Consenting Creditors, if and when entered by the Bankruptcy Court;

(c)    consider in good faith any reasonable request from the Company to amend or supplement the DIP Loan Documents or the Plan that is necessary or advisable to preserve the expected rights and benefits contemplated under the Plan or that would not otherwise adversely affect the rights or interests of the Consenting Creditors; *provided, however*, that no Consenting Creditor shall be under any obligation to consent or agree to any such amendment or supplement;

(d)    not, in any capacity, (i) object to, delay, impede or take any other action, including initiating any legal proceedings or enforcing rights as a holder of the Consenting Creditor Claims and Interests, that would have the effect of preventing the acceptance, approval or implementation of the Restructuring or the Plan; (ii) propose, file, vote for or enter into any letter of intent or other agreement regarding any restructuring, workout, liquidation or plan of reorganization for the Company under any applicable bankruptcy or insolvency laws other than the Restructuring or the Plan; (iii) take any action to accelerate any Consenting Creditor Claims and Interests or to enforce or foreclose on, or otherwise exercise remedies in respect of, the collateral securing the Alto Maipo Obligations; or (iv) solicit, direct or encourage any person, including, without limitation, the Administrative Agent, to undertake any action prohibited by the foregoing clauses (i)-(iii) of this Section 1.03(d);

(e)    (i) negotiate in good faith the terms of (A) the Proposed Amendments, (B) any amendments to the constitutive documents and agreements governing the equity of Alto Maipo that are required for the issuance of the New Obligations or are necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, if applicable, and (C) any shareholder resolutions required for the entering into or issuance of the New Obligations or necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, if applicable, and (ii) execute and deliver such reasonable and customary documents as may be requested by Alto Maipo to evidence such consent before the date on which votes on the Plan are required to be submitted in accordance with the Solicitation Materials (the "Voting Deadline"), to be effective on the Plan Effective Date in accordance with the terms and subject to the conditions set forth herein and in the Restructuring Documents;

(f)    negotiate in good faith with the goal of reaching agreement regarding the definitive amendments to any collateral documents securing the Alto Maipo Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Documents, including the Plan, the Disclosure Statement and the documentation relating to the New Obligations (collectively, the "Definitive

Documentation"), as applicable, which shall be both (i) consistent in all material respects with the Restructuring Documents and this Agreement and (ii) in form and substance reasonably acceptable to the Required Consenting Creditors; and

(g)     (i) not, directly or indirectly, (A) seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding or participate in the formulation or preparation of any restructuring proposal other than the Restructuring set forth in the Restructuring Documents or (B) take any action to interfere with or that would materially adversely affect (i) the business relationship that any supplier, creditor or customer has with Alto Maipo or any direct or indirect subsidiary thereof, or (ii) the relationship of Alto Maipo with any applicable regulator or authority, including any Chilean authorities (*provided, however*, that nothing herein shall restrict Strabag's performance of its obligations under the Tunneling Construction Contract).

Notwithstanding the foregoing, this Agreement shall not limit any of the following Consenting Creditor's rights: (i) to enforce any rights under this Agreement, including the right to terminate this Agreement in accordance with the provisions hereof; (ii) under any applicable credit agreement, other loan document, contract or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code or under the laws of any other applicable jurisdiction concerning the Company in any forum, so long as such appearance and the positions advocated in connection therewith are not inconsistent with the Plan Term Sheet, the Plan, this Agreement and the Restructuring and do not hinder, delay or prevent the date that the Plan becomes effective (the "Plan Effective Date"); (iii) to take or direct any action relating to maintenance, protection or preservation of any collateral, the perfection or priority of any security interest or other lien, or the proof, allowance, or enforcement of any claim against any Debtor or non-Debtor person; or (iv) or otherwise limit any claims against any parties other than the Company.

Notwithstanding anything to the contrary in this Agreement, the Restructuring Term Sheet or the Plan Term Sheet, in the event that the Company issues a draw request with respect to any letter of credit related to the Tunneling Construction Contract, all rights, claims and defenses of each of Strabag and the Company arising from or related to such draw request or draw are fully preserved and nothing herein or in the Restructuring Term Sheet or Plan Term Sheet shall prevent the exercise or assertion of any such rights, or the assertion of any such claims or defenses thereto.

Notwithstanding anything to the contrary herein or otherwise, (A) the Alto Maipo Obligations held by a Consenting Creditor shall not include any Alto Maipo Obligation for which such Consenting Creditor does not have the right to control voting or is not permitted by a preexisting contractual obligation or operation of law to vote in favor of the Restructuring (the "Non-Controlled Obligations") until such times as the Consenting Creditor acquires the right to control voting or the preexisting contractual obligations or provisions of law no longer restrict the ability of the creditor to vote such Non-Controlled Obligations in favor of the Restructuring and (B) the failure of any Consenting Creditor to vote any of its Alto Maipo Obligations or deliver any consents in accordance with the Restructuring Documents in each case due to any change in law that prohibits or limits such vote or delivery shall not be a breach of this Agreement.

1.04.    Covenants of the Company.

(a)     Consummation of the Restructuring.  The Company shall: (i) not, directly or indirectly, seek, solicit, encourage, propose or assist in the formulation or preparation of any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company, or the appointment of a receiver, other than the Restructuring (as the terms of which may be modified by written agreement of the Company and the Consenting Creditors); *provided* that the Company may engage in negotiations in connection with or regarding any unsolicited restructuring proposal (other than a restructuring proposal made by the Shareholders, the Sponsor, or any entity affiliated with the Shareholders or the Sponsor), to the extent required by the fiduciary duties of its directors under applicable law in the written opinion of its counsel, provided, further, that the Company shall promptly upon (and in any event no later than two (2) business days after) receiving any unsolicited restructuring proposal, inform the Consenting Creditors of its receipt of such proposal and, subject to the Consenting Creditors entering into confidentiality agreements with the Company, provide a summary of the terms thereof and share with the Consenting Creditors copies of all materials delivered in connection therewith, (ii) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, entering into any agreements, documents, contracts or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions and (iii) take all actions reasonably necessary or reasonably requested by the Required Consenting Creditors to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents, including:

A.          providing draft copies to the Consenting Creditors of (i) the Plan, the related disclosure statement and the Solicitation Materials at least ten (10) business days prior to the earlier of (y) date on which the Company commences solicitation of acceptance of the Plan or (z) the date on which the Plan is filed with the Bankruptcy Court, (ii) the Confirmation Order, the plan supplement (including all Definitive Documentation included in that supplement) and the corporate governance documents for the reorganized Company at least ten (10) business days prior to the date on which the Company intends to file any such documents; and (iv) any other material pleadings or court documents at least two (2) business days prior to the date when the Company intends to file any such pleadings or documents with the Bankruptcy Court, which pleadings or documents shall be in form and substance reasonably acceptable to the Required Consenting Creditors; provided, however, that the Company shall be entitled to treat the failure of any Consenting Creditor to provide a response to such a draft filing within the two (2) business day period as such Consenting Creditor's consent to the filing of such pleading; provided, further, that such Consenting Creditor's failure to provide a response to the Company (i) shall not prejudice such Consenting Creditor's right to object or otherwise respond to such pleading or request for relief after it is filed and (ii) shall not be cited or relied on in any pleading or document filed by the Company in response to any objection or response filed by such Consenting Creditor;

B.          commencing the Chapter 11 Case on or before November 17, 2021 (the "Outside Petition Date," and the actual commencement date, the "Petition Date");

C.          filing on the Petition Date the following pleadings and documents: (i) cash management motion and proposed order, (ii) first day declaration, (iii) cash collateral motion

and proposed order, (iv) automatic stay motion and proposed order, (v) DIP Financing Motion and proposed Interim DIP Order, (vi) wages and benefits motion and proposed order, (vii) critical/foreign vendor motion and proposed order, (viii) lienholder motion and proposed order, (ix) taxes/fees motion and proposed order and (x) motion to assume this Agreement and proposed order (collectively, the "First Day Pleadings"), each in form and substance reasonably satisfactory to the Required Consenting Creditors.

D.        filing within 10 business days of the Petition Date a motion and a proposed order (which order shall be in form and substance reasonably acceptable to the Consenting Creditors) to assume this Agreement pursuant to sections 363 and 365 of the Bankruptcy Code or otherwise to approve the Agreement.

E.        taking no actions to propose or otherwise consent to, and timely filing a formal objection to any motion filed with the Bankruptcy Court by a third party seeking, the entry of an order (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Case; (iii) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement, the Plan, or the DIP Loan Documents;

F.        taking all steps reasonably necessary or desirable to obtain an order of the Bankruptcy Court, which shall be satisfactory in form and substance to the Required Consenting Creditors in their sole and absolute discretion, confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") in a manner that is consistent in all respects with the terms and conditions set forth in the Plan and the Plan Term Sheet, on or before the deadline set forth in this Agreement;

G.        taking all steps reasonably necessary to cause the Restructuring Transactions to occur on or before the milestones set forth in the DIP Term Sheet; and

H.        taking no actions, directly or indirectly, and not encouraging any other person to take any actions, that are inconsistent with or are reasonably likely to interfere with, frustrate, delay or prevent the timely approval, confirmation and consummation of the Plan in accordance with the terms and conditions of the Plan and this Agreement, subject to Section 3.02 hereof in all respects.

(b)        Payment of Fees and Expenses.  The Company shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by (i) ASSET Chile S.A. and FTI Consulting Canada ULC, financial advisors selected by the Required Consenting Creditors, and (ii) Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., U.S., local Delaware and Chilean counsel, respectively, selected by the Required Consenting Creditors, and any other counsel reasonably necessary to advise the Required Consenting Creditors in connection with the Restructuring Transactions (collectively, the "Ad Hoc Group Advisors"), set forth on summary statements that provide general descriptions of the work performed during the relevant

period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements are delivered to the Company and/or Cleary Gottlieb Steen & Hamilton LLP, whether incurred before or after the date hereof and regardless of whether the Restructuring contemplated herein is actually consummated or the documentation related to the Restructuring is executed; *provided*, *however*, that to the extent this Agreement is terminated in accordance with the terms hereof, the Company shall have no such obligation to pay such fees and expenses pursuant to this Section 1.04(b) with respect to any fees or expenses incurred after the date of such termination; *provided further,* that the Company's obligation to pay any such fees and expenses which are incurred after the Petition Date shall be subject to reasonableness review by the Office of the United States Trustee and such other conditions as may be imposed in orders of the Bankruptcy Court.

(c)    <u>Agreement to Negotiate</u>.  The Company shall negotiate in good faith with the goal of reaching agreement regarding the Definitive Documentation, which shall be consistent in all material respects with the Restructuring Documents and this Agreement and in form and substance reasonably acceptable to the Company and the Required Consenting Creditors.

(d)    <u>Notice</u>.  The Company shall promptly provide written notice to the Consenting Creditors in accordance with Section 5.09 hereof of: (1) the occurrence, or failure to occur, of any event, change, effect, occurrence, development, circumstance or change of fact of which the Company has knowledge, which occurrence or failure to occur would reasonably likely cause, or has caused, (a) any representation or warranty of the Company contained in this Agreement or the Restructuring Documents to be untrue or inaccurate in any material respect, (b) any covenant of the Company contained in this Agreement or the Restructuring Documents not to be satisfied in any material respect, (c) any occurrence that would cause any condition precedent to the Plan Effective Date (i) not to be satisfied or (ii) become materially less likely to be satisfied or (d) a material adverse impact on the ability of the Company to initiate solicitation of acceptance of the Plan, file the Chapter 11 Case as contemplated herein, or consummate any other Restructuring Transaction; (2) receipt of any written notice from any third party whose consent or agreement the Company reasonably believes may be required in connection with the Restructuring Transactions (a) indicating that such consent or agreement will not be provided by such party, (b) requesting consideration in exchange for such consent, or (c) conditioning such consent on terms that are inconsistent with the terms hereof; (3) receipt by the Company of any written notice from any governmental body in connection with this Agreement, the Chapter 11 Case, the Plan, or any of the other Restructuring Transactions; (4) receipt by the Company of any written notice of any proceeding commenced against the Company relating to or involving or otherwise adversely affecting in any material respect this Agreement, the Chapter 11 Case, the PPA (as defined below), the Plan, or any of the other Restructuring Transactions; and (5) receipt by the Company of any notice or communication from Minera Los Pelambres S.A. in connection with or relating to the Power Purchase Agreement between Minera Los Pelambres SA. (originally Antofagasta Minerals S.A.) and the Company, dated as of June 28, 2013 and amended on March 17, 2017 (the "<u>PPA</u>").

(e)    <u>Continuation of Business</u>.  The Company shall continue to conduct the Company's business as currently conducted (subject to the other provisions of this Section 1.04 and as required to facilitate the Restructuring Transactions in accordance with this Agreement) and to keep intact the material assets, operations, contracts, and relationships of the Company's business, shall perform its post-petition administrative obligations under the Tunneling Construction Contract

when and as they arise unless they are subject to *bona fide* dispute, and shall promptly inform the Consenting Creditors about all occurrences that would reasonably be expected to have a material adverse effect on the assets, operations, conditions (financial or otherwise), liquidity, or relationships of the Company's business, in each case taken as a whole.

(f)  <u>Maintenance of the PPA</u>.  The Company (i) shall take any and all actions necessary to remain in compliance with and avoid the termination of the PPA pursuant to its terms and (ii) shall not agree to amend, modify or waive any  provisions of the PPA without the prior written consent of the Consenting Creditors.

(g)  <u>Limitations on Actions</u>.  Absent the prior written consent of the Required Consenting Creditors or as provided in the Plan Term Sheet, the Company shall refrain from: (i) issuing any new equity interest or any securities or instruments convertible or exchangeable or exercisable into equity interests; (2) engaging in any transactions that would violate the covenants in the Common Terms Agreement; (3) making any payments (including through redemptions or acquisitions or by way of distributions of assets) to holders of equity interests of the Company (except as to payment to Strabag in respect of non-subordinated administrative obligations under the Tunneling Construction Contract that are not subject to *bona fide* dispute) or making any declarations for payments of dividends, including payments on account of equity interests issued to any employee or directors of the Company pursuant to any compensation or benefit plans under any agreement in effect as of the date hereof; and (4) except as otherwise provided or contemplated in this Agreement, granting liens or suffering any liens to exist on any assets, in each case to secure debt or derivatives or other financing arrangements, other than in respect of the Alto Maipo Obligations.

1.05.  <u>Covenants of the Shareholders and the Sponsor</u>.

(a)  The Shareholders and the Sponsor shall (i) not, directly or indirectly, seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding or participate in the formulation or preparation of, any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company, or the appointment of a receiver or, without the consent of the Company, the appointment of any official or ad-hoc creditor or equity committee, other than the Restructuring (as the terms of which may be modified by written agreement of the Company and the Consenting Creditors), (ii) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, (x) taking any action in contravention of the Required Amendments or taking any action intending to reverse, undo, negate or limit the effect of the Required Amendments, or (y) entering into any agreements, documents, contracts, or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Case or the consummation of the Plan or any of the other Restructuring Transactions (provided, however, that nothing herein shall restrict Strabag from performing its obligations under the Tunneling Construction Contract), (iii) (x) in its capacity as a creditor of the Company, vote in favor of the Plan, (y) not contest the treatment of any claims or interests held by the Shareholders or the Sponsor under the Plan, and (z) be bound in all respects by the Confirmation Order, (iv) in the case of the Sponsor, not directly or indirectly, take any action, or encourage, propose, or assist the Company to take any action, that would result in any amendment or termination of the PPA in contravention of the terms of this

Agreement; and (v) in the case of the Sponsor, take all actions reasonably necessary or reasonably requested by the Required Consenting Creditors to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents, including, without limitation, taking any necessary actions or obtaining necessary consents to effectuate the Restructuring Transaction in compliance with Chilean law; *provided,* however, that this Section 1.05(a) shall be binding on Strabag only as long as (x) this Agreement has not been terminated as to Strabag in accordance with the terms of Section 3 hereof, (y) no circumstances exist which would (1) cause this Agreement to terminate automatically, or (2) give Strabag the right to deliver a written notice of termination of this Agreement as to Strabag, in each case under the terms of Section 3.01 and notwithstanding any cure periods that would be otherwise applicable, and (z) the Company is pursuing the Restructuring in a manner consistent in all respect with the Restructuring Documents; *provided further* that nothing herein shall limit in any manner any transfer or assignment of equity interests in Alto Maipo solely as between Norgener and the Sponsor.

(b)    the Sponsor shall, subject to the terms and conditions set forth herein, in the DIP Term Sheet, and in the DIP Loan Documents, perform any obligations set forth in the DIP Loan Documents.

1.06.    <u>Transfer of Interests</u>.

(a)    Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Creditor to sell, use, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, any or all of its Alto Maipo Obligations; *provided, however*, that for the period commencing as of the Effective Date until termination of this Agreement pursuant to the terms hereof (such period, the "<u>Restricted Period</u>"), no Consenting Creditor shall sell, assign, loan, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, in whole or in part ("<u>Transfer</u>") any Alto Maipo Obligations and any purported Transfer of any Alto Maipo Obligations shall be void and without effect, *unless* (i) the transferee is a Consenting Creditor that has not been notified by the Company that it is in breach of this Agreement or (ii) if the transferee is not a Consenting Creditor prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of the transfer agreement (each, a "<u>Transfer Agreement</u>") in the form attached as <u>Exhibit B</u> hereto pursuant to which such transferee shall assume all obligations of the Consenting Creditor transferor hereunder in respect of the Alto Maipo Obligations being Transferred; *provided* that no Consenting Creditor shall Transfer any or all of its Alto Maipo Obligations to any person or entity that the Consenting Creditor has actual knowledge of the identity of such counterparty and actual knowledge that such counterparty is an adverse party to any pending litigation or arbitration involving the Company; *provided, further*, that the Consenting Creditors shall have no duty to inquire or determine the identity of the counterparty to the Transfer or whether such counterparty is an adverse party to any pending litigation against the Company.

(b)    Upon consummation of any Transfer in compliance with Section 1.06(a), (i) any person or entity that is a transferee shall be fully bound by this Agreement as a "Consenting Creditor" and shall be a "Party" hereunder and (ii) the transferor shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any Alto Maipo Obligations that have been Transferred.  This Agreement shall in no way be construed to preclude

the Consenting Creditors from acquiring additional Alto Maipo Obligations; *provided*, *however*, that any additional claims and interests acquired by any Consenting Creditor after executing this Agreement shall automatically and immediately upon acquisition by such Consenting Creditor be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company and counsel to the Consenting Creditors of such acquisition. Each Consenting Creditor shall notify Alto Maipo of the total principal amount of claims and interests held by such Consenting Creditor upon execution of this Agreement (on its signature pages hereto) and, thereafter, promptly upon a change in such total principal amounts; *provided* that the Company shall keep such information confidential, which obligation shall survive termination of this Agreement.

(c)    This Section 1.06 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Alto Maipo Obligations.

**Section 2.**    Representations and Warranties.

2.01.    Representations and Warranties of the Company.  The Company represents and warrants to each of the Consenting Creditors as of the date hereof to the best of its knowledge after due inquiry and as of the Petition Date, the Voting Deadline, the date of entry of the Confirmation Order and the Plan Effective Date, to the best of their knowledge, that:

(a)    the information, reports, financial statements, certificates, memoranda and schedules furnished (or to be furnished) in writing by or on behalf of the Company in connection with the negotiation, preparation, or delivery and performance of this Agreement, the Restructuring Transactions, and the Solicitation Materials do not, and will not as of the time they shall be made or furnished, (i) contain any untrue statement of any material fact, (ii) omit to state any material fact necessary to make such statements, information, reports, financial statements, certificates, memoranda and schedules, taken as a whole and in light of the circumstances under which they were made and as of the time at which they were made, not materially misleading, or (iii) fail to disclose any material facts, occurrences, circumstances, or events including without limitation any contingent or non-contingent liabilities of the Company the value of which liabilities individually would reasonably be expected to exceed $500,000; and

(b)    as of the date hereof, no draw request has been issued with respect to any letter of credit related to the Tunneling Construction Contract.

2.02.    Representations and Warranties of the Consenting Creditors.  Each of the Consenting Creditors, severally and not jointly, represents and warrants to the Company (and not to each other) that:

(a)    Securities Law Representations.  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a Chapter 11 plan of reorganization or an offering of securities, each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (a) is a Qualified Institutional Buyer (as defined in Rule 144A of the Securities Act of 1933 (the "Securities Act")), "institutional accredited investor" (within the meaning of Rule 501(a) of the Securities Act), U.S. government agency or Non-"U.S. Person" (as defined in Regulation S of the Securities Act), (b)

12

understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (c) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with respect to such investment.

(b)    <u>Beneficial Ownership; No Transfer</u>.  (i) Such Consenting Creditor (A) has full power and authority to act on behalf of and consent to matters concerning the Alto Maipo Obligations for which it is the sole legal or beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer such Alto Maipo Obligations, (B) holds no other Alto Maipo Obligations and (C) has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title, or interests in any of the Alto Maipo Obligations that is inconsistent or conflicts with the representations and warranties of such Consenting Creditor set forth in this Section 2.02(b), would otherwise render it unable to comply with this Agreement and perform its obligations hereunder or would breach Section 1.06(a); and (ii) other than pursuant to this Agreement, such Alto Maipo Obligations are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

2.03.    <u>Representations and Warranties of the Shareholders</u>.  Strabag represents and warrants to the Company and the Consenting Creditors that Strabag holds 6.88% of the common equity interests in Alto Maipo. The remaining Shareholders other than Strabag represent and warrant to the Company and the Consenting Creditors that such Shareholders hold, in the aggregate, 93.12% of the common equity interests in Alto Maipo. Each Shareholder represents and warrants, severally and not jointly, that (i) each Shareholder (A) has full power and authority to act on behalf of and consent to matters concerning the equity interests in the Company of which it is the sole beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer, such equity interests, (B) holds no other equity interests in the Company, and (C) except as provided herein, has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title, or interests in any of the equity interests in the Company that would render it unable to comply with this Agreement and perform its obligations hereunder; and (ii) other than pursuant to the Financing Documents (as defined in the Common Terms Agreement), the Shareholders' Agreement and this Agreement, such equity interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way the Shareholders' performance of their obligations contained in this Agreement at the time such obligations are required to be performed.

2.04.    <u>Mutual Representations and Warranties</u>.  The Company represents and warrants, and each of the Consenting Creditors represents and warrants, severally and not jointly, and the

Shareholders and the Sponsor represent and warrant, severally and not jointly, to each of the other Parties that the following statements are true and correct as of the date hereof (each of which is a continuing representation and warranty) and as of the Plan Effective Date:

(a)    <u>Existence; Enforceability</u>.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms.

(b)    <u>No Consent or Approval</u>.  Except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(c)    <u>Power and Authority</u>.  It has, or will have, all requisite corporate, partnership, limited liability company or similar power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(d)    <u>Authorization; Execution</u>.  The execution, delivery and performance of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or similar action on its part.  This Agreement has been duly executed and delivered by it.

(e)    <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by it do not and will not violate (i) any provision of law, rule or regulation applicable to it, (ii) its certificate of incorporation or by-laws (or other organizational documents), (iii) any order of any court or other governmental authority or regulatory body applicable to it, or (iv) any of the Company's material contracts or agreements except as would be waived, consented to or cured, if curable, prior to the consummation of the Restructuring.

(f)    <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and will not require any registration or filing with, consent or approval of, or notice to, or any other action to, with, or by, any federal, state or other governmental authority or regulatory body, except, solely in the case of the Company, any filings in connection with the Chapter 11 Case, including the approval of the Solicitation Materials and the confirmation of the Plan and any filings with Chilean regulatory authorities as required by applicable law or regulation.

(g)    <u>Representation by Counsel</u>.  It has been represented by counsel in connection with this Agreement and the Restructuring Transactions contemplated by this Agreement.

(h)    <u>Proceedings</u>.  Other than the Chapter 11 Case filed pursuant to the terms of this Agreement, no litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would materially adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

**Section 3.**          Termination Events.

3.01.   Consenting Creditor Termination Events.  The Consenting Creditors or Strabag, as applicable, may terminate this Agreement with respect to the Parties upon the occurrence of any of the following events other than as set forth in Section 3.01(s) and Section 3.01(t) (each, a "Consenting Party Termination Event"), and this Agreement shall automatically terminate upon the occurrence of an event set forth in Section 3.01(s) and Section 3.01(t):

(a)      the breach in any material respect by the Company, Norgener or the Sponsor of any of the covenants, undertakings or any other obligation of the Company, Norgener or the Sponsor set forth in this Agreement, the Plan Term Sheet or the DIP Loan Documents and such breach, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Alto Maipo, Norgener or the Sponsor of written notice of the breach from the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, from Strabag) in accordance with Section 5.09 hereof or (B) if notice of the breach has been provided by either the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, by Strabag) or the Company, the day immediately prior to the Voting Deadline, in each case, which termination shall be effective automatically unless the Required Consenting Creditors (or, with respect to the breach of any term in the Plan Term Sheet related to the Tunneling Construction Contract or Supplier Deferred Payment, Strabag) provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(b)      any representation or warranty in this Agreement made by the Company, Norgener or the Sponsor shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Alto Maipo and the Sponsor of written notice of the breach from the Required Consenting Creditors in accordance with Section 5.09 hereof or (B) if notice of the breach has been provided by either the Required Consenting Creditors or the Company, the day immediately prior to the Voting Deadline, which termination shall be effective automatically unless the Required Consenting Creditors provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(c)      the issuance by any governmental authority having jurisdiction over the Company, Norgener, the Sponsor or their assets, including any regulatory authority or court of competent jurisdiction, of any ruling, order or any other document or official record (i) enjoining the substantial consummation of the Restructuring, (ii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or compliance with any term or condition of the Restructuring or (iii) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring, and such ruling, order, or other document is not dismissed, stayed, reversed or lifted by the earliest of (x) five (5) business days following the issuance thereof or (y) the day immediately prior to the Voting Deadline, in each case, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(d)        the Company has filed, propounded, solicited votes upon, sought confirmation of or otherwise supported an alternative restructuring transaction relating to any of the Alto Maipo Obligations other than the Plan, including without limitation, the filing of any other chapter 11 plan or any other plan of reorganization under any applicable law, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(e)        the Company has filed with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, whether in the ordinary court of its business or otherwise, which motion or application is in a form not acceptable to the Required Consenting Creditors in their reasonable discretion, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof; *provided, however*, that the filing by the Company of any motion or application seeking authority to sell all, or substantially all, of the Company's assets shall result in the automatic termination of this Agreement;

(f)        an examiner with expanded powers (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) or a trustee shall have been appointed in the Chapter 11 Case, the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code, or the Chapter 11 Case shall have been dismissed by an order of the Bankruptcy Court or converted to a case under chapter 7 of the Bankruptcy Code, or the Company, Norgener or the Sponsor file or encourage a motion seeking any of the foregoing, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(g)        the Company announces its intention to withdraw or revoke the Plan, dismiss the Chapter 11 Case, terminate the Restructuring or otherwise not to consummate the Restructuring on terms and conditions consistent in all material respects with this Agreement and the Plan, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(h)        the Company shall be declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding (other than the Chapter 11 Case contemplated herein) under the laws of any jurisdiction that prevents the implementation of the Restructuring and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within sixty (60) days of such declaration, which termination shall be effective automatically unless the Required Consenting Creditors provide a prior written waiver of such termination in accordance with Section 5.09 hereof;

(i)        the amendment, modification or filing of a pleading by the Company seeking to amend or modify the Restructuring Documents (or, with respect to Strabag, reject the Tunneling Construction Contract), or any documents related to the foregoing, including motions, notices, exhibits, appendices and orders, in respect of which the consent of the Required Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag) is required under this Agreement, without the prior consent of the Required Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag), and such pleading or related document has not been withdrawn prior to the earliest of (i) three (3) business days of the

Company's or Sponsor's receiving written notice in accordance with Section 5.09 hereof from counsel to the Required Consenting Lenders (or, with respect to rejection of the Tunneling Construction Contract, counsel to Strabag) that such motion or pleading violates this Section 3.01(i), and (ii) entry of an order of the Bankruptcy Court approving such motion, which termination shall be effective upon the Required Consenting Creditors' (or, with respect to rejection of the Tunneling Construction Contract, Strabag's) delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(j)    the Bankruptcy Court or any court with requisite jurisdiction grants relief that is (i) materially inconsistent with this Agreement or the Plan, (ii) in a form materially different than a Restructuring Document or other Definitive Documentation approved by the Required Consenting Creditors or (iii) materially and adversely affects the rights of the Consenting Creditors under this Agreement, without the consent of the Required Consenting Creditors, or the Company requests or encourages any of the foregoing, and the Company has not obtained an order amending or modifying the relief in form and substance reasonably acceptable to the Required Consenting Creditors within five (5) business days following entry of an order granting such relief, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(k)    either the order approving the Solicitation Materials and the disclosure statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not acceptable to the Required Consenting Creditors in their reasonable discretion, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(l)    the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Credit Facility without the Plan having been substantially consummated, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(m)    the Plan Effective Date shall not have occurred on or prior to the date that is ten (10) months following the date of the Petition Date, provided, that, the date included in this Section 3.01(m) shall automatically be increased by the same number of calendar days that any milestone set forth in the DIP Term Sheet is extended at the request of the Company with the consent of the Required Consenting Creditors, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(n)    a custodian or receiver or similar entity is appointed with respect to the Company or any substantial part of the property of the Company, and such appointment is not revoked, dismissed, reversed or lifted within five (5) business days of such appointment, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(o)    the failure by the Company to pay any fee in accordance with Section 1.04(b) hereof when due and such failure is not cured within thirty (30) business days after receipt by Alto

17

Maipo and the Sponsor of written notice of such failure from the Required Consenting Creditors in accordance with Section 5.09 hereof

(p)    the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or with respect to the PPA by any person other than a Consenting Creditor or any person acting on its behalf or at the instruction, behest or with the encouragement of any Consenting Creditor (other than a litigation, action, lawsuit or adverse proceeding by the Company to enforce this Agreement) naming the Company, the Sponsor, Norgener or any Consenting Creditors as a party and such litigation, action, lawsuit or adverse proceeding results in an adverse ruling (i) enjoining the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or (ii) a final and non-appealable judgment, order or arbitral award (or series thereof) against the Company for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed within sixty (60) days, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(q)    the Company loses the exclusive right to file and solicit acceptances of a plan of reorganization, or the Company files or actively encourages the filing of a motion seeking the termination of exclusivity, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(r)    the occurrence of any material change, effect, event, circumstance or development (collectively, "Material Changes") that individually or in the aggregate and taken together with all other Material Changes, has had or would reasonably be expected to have, a materially adverse effect on (i) the business, operations, financial condition or results of operations of the Company or (ii) the ability of the Company to consummate the Plan or any of the other Restructuring Transactions, which termination shall be effective upon the Required Consenting Creditors' delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

(s)    (1) the Company (x) files a motion to reject the PPA or (y) amends the PPA in violation of **Section 1.04(f)**, (2) an order is entered by the Bankruptcy Court authorizing termination of the PPA or (3) the PPA is otherwise terminated; or

(t)    the failure of the Bankruptcy Court to enter an order by January 31, 2022 authorizing and directing the Company to assume the RSA or otherwise approving the RSA.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.01 shall not be available to any Consenting Creditor based on a Consenting Party Termination Event if a breach of this Agreement by any of the Consenting Creditors has resulted in such Consenting Party Termination Event.

3.02.    Company Termination Events.  The Company or Sponsor, as applicable, may terminate this Agreement with respect to the Parties as specified herein upon prior written notice,

delivered to all Parties in accordance with Section 5.09 hereof, upon the occurrence of any of the following events (each, a "Company Termination Event"):

(a)     prior to the occurrence of the Voting Deadline, the breach by one or more Consenting Creditors of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement, such that the non-breaching Consenting Creditors, at any time, hold or control less than 75% of the principal amount of the Alto Maipo Obligations held by all of the Consenting Creditors, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Creditor(s) of written notice of such breach from the Company or Sponsor in accordance with Section 5.09 hereof;

(b)     after the occurrence of the Voting Deadline, the material breach by one or more Consenting Creditors of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement, such that the non-breaching Consenting Creditors, at any time, together with all other holders of the Alto Maipo Obligations who vote in favor of the Plan, in the aggregate, hold or control less than 66 2/3% of the principal amount of the Alto Maipo Obligations or constitute less than one-half in number of such creditors who voted in favor of the Plan, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Creditor(s) of written notice of such breach from the Company or Sponsor;

(c)     the issuance by any governmental authority having jurisdiction over the Company or its assets, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring;

(d)     the Plan Effective Date shall not have occurred on or prior to the date that is seven (7) months following the date of the Petition Date; *provided* that the date included in this Section 3.02(e) shall automatically be increased by the same number of calendar days that any milestone set forth in the DIP Term Sheet is extended at the request of the Company and with the consent of the Required Consenting Creditors and Sponsor;

(e)     the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents by any person other than the Company, Norgener, the Sponsor, or any person acting on behalf of or at the instruction, behest or with the encouragement of the Company, Norgener or the Sponsor (other than a litigation, action, lawsuit or adversary proceeding by the Consenting Creditors to enforce this Agreement) naming any of the Consenting Creditors, Norgener, the Sponsor or the Company as a party and such litigation, action, lawsuit or adverse proceeding results in an adverse ruling (i) enjoining the Restructuring or the transactions contemplated hereby or by the Restructuring Documents or (ii) a final and non-appealable judgment, order or arbitral award (or series thereof) against the Company for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed within sixty (60) days, and Alto Maipo delivers to the Consenting Creditors a written notice of termination in accordance with Section 5.09 hereof; or

(f)      the Company reasonably determines, based on the advice of outside advisors (after consultation with outside counsel), that termination of this Agreement is required under any fiduciary duties the Company owes to creditors or other stakeholders and Alto Maipo delivers to the Consenting Creditors a written notice of termination in accordance with Section 5.09 hereof.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.02 shall not be available to the Company based on a Company Termination Event if a breach of this Agreement by the Company has resulted in such Company Termination Event.

3.03.    Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Company and the Required Consenting Creditors.

3.04.    Effect of Termination.

(a)      Upon termination of this Agreement under Sections 3.01, 3.02 or 3.03 hereof, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided, however*, that no such termination shall relieve any Party of its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all consents given or votes of Consenting Creditor Claims and Interests occurring prior to such termination by the Consenting Creditors shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

3.05.    Automatic Termination Upon Plan Effective Date.  This Agreement shall terminate automatically, without any further required action or notice by any Party, immediately following the effectiveness of the Plan on the Plan Effective Date.

**Section 4.**      Amendments.  This Agreement may not be modified, amended, or supplemented (except as expressly provided herein) except in writing signed by the Company, the Shareholders, the Sponsor and each Consenting Creditor bound by such modification, amendment or supplement; *provided* that a writing transmitted by electronic mail shall be sufficient for the purposes of this provision.

**Section 5.**      Miscellaneous.

5.01.    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms and conditions set forth in the Restructuring Documents.

5.02.    Complete Agreement.  This Agreement and the exhibits, schedules and other attachments hereto represent the entire agreement between the Parties with respect to the subject

matter hereof and supersede all prior agreements, oral or written, among the Parties with respect thereto; *provided*, *however*, that upon the Plan Effective Date, the Plan, the Confirmation Order and the Definitive Documentation executed in accordance therewith shall survive and supersede this Agreement and shall continue to be in full force and effect in accordance with its terms irrespective of this Agreement.   No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party or as may be carried out in accordance with Section 4 hereof.   Notwithstanding anything herein to the contrary, the provisions of Section 1.04(b) shall survive termination of this Agreement.

5.03.    <u>Parties; Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 1.06 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

5.04.    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

5.05.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA WITHOUT TAKING INTO ACCOUNT ITS CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    All actions and claims pursuant to this Agreement shall be heard and determined in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan (the "Chosen Courts"). Consistent with the preceding sentence and to the fullest extent permitted by applicable law, the Parties hereby (i) irrevocably submit to the exclusive jurisdiction of the Chosen Courts in any such action or proceeding, (ii) waive any objection to laying of venue in any such action or proceeding in the Chosen Courts, and (iii) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party; *provided, however*, that each of the Parties hereby agrees that, for the duration of any Chapter 11 Case, (y) the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with, and that the Bankruptcy Code shall govern, the Plan and (z) the Bankruptcy Court shall have exclusive jurisdiction of all actions and claims arising out of or in connection with this Agreement. If the Bankruptcy Court abstains from exercising or determines its lack of jurisdiction, the Chosen Courts shall have exclusive jurisdiction of all actions and claims pursuant to this Agreement.  The foregoing shall not limit the rights of any Party to introduce this Agreement in any court in any jurisdiction in order to defend against a cause of action that has been brought against it or any of its affiliates or representatives in such court.

(c)      TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(d)      The Company appoints C T Corporation System (the "New York Process Agent"), with an office at 28 Liberty Street, New York, NY 10005, as its agent to receive on behalf of itself and its property, service of copies of all writs, claims, process, complaint, summonses and any other process that may be served in any legal or other proceeding with respect to matters arising out of, based upon or in connection with this Agreement or the transactions contemplated hereby, and agrees to promptly appoint a successor New York Process Agent in the City of New York (which appointment the successor New York Process Agent shall accept in writing prior to the termination for any reason of the appointment of the initial New York Process Agent). In any such legal or other proceeding, such service may be made on the Company by delivering a copy of such process to it in care of the appropriate New York Process Agent at such New York Process Agent's address. Nothing in this Agreement shall in any way be deemed to limit the ability to serve any writs, process or summonses in any other manner permitted by applicable law.

5.06.    Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

5.07.    Interpretation.  This Agreement is the product of negotiations between the Company, the Shareholders, the Sponsor and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

5.08.    Severability.  If the whole or any part of a provision of this Agreement is declared void, unenforceable or illegal in any jurisdiction, it is severed for the purposes of that jurisdiction and the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect in such jurisdiction. In this event, the remainder of this Agreement will have full force and effect and the validity or enforceability of the relevant provision in any other jurisdiction is not affected.

5.09.    Notices.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the Company, to:

Alto Maipo SpA
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Javier Dib

Telephone: +56 22686-8910
Email: javier.dib@aes.com

with copies (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Richard J. Cooper
         Luke A. Barefoot
E-mail addresses:  rcooper@cgsh.com; lbarefoot@cgsh.com

(a)      if to the Sponsor, to:

AES Andes S.A.
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Ricardo Roizen and Felix Gomez
Telephone: +56 22686-8900
Email: ricardo.roizen@aes.com; felix.gomez@aes.com
with copies to (which shall not constitute notice):

AES Andes S.A.
Av. Los Conquistadores 1730, piso 10
Providencia, Santiago, Chile
Attention: Maria Paz Cerda and Andrea Sougarret
Telephone: +56 22686-8900
Email: mariapaz.cerda@aes.com; andrea.sougarret@aes.com

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention: Derek Abbott
Telephone: +1 (302) 351-9357
E-mail: DAbbott@morrisnichols.com

(b)      if to a Consenting Creditor or a transferee thereof, to the addresses set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: Marissa Alcala
         Christy Rivera

23

Email addresses:  marissa.alcala@nortonrosefulbright.com;
christy.rivera@nortonrosefulbright.com

(c)    if to Strabag or a transferee thereof, to the address set forth below following Strabag's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Troutman Pepper Hamilton Sanders LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Attention: Robert S. Hertzberg
Email address: robert.hertzberg@troutman.com

-and-

Troutman Pepper Hamilton Sanders LLP
Hercules Plaza
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Attention: David M. Fournier
Email address: david.fournier@troutman.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice that is required to or may be delivered on behalf of the Company hereunder shall be deemed delivered on behalf of the Company when delivered by the Company.

5.10.    Reservation of Rights; Waiver.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Creditors or the ability of each of the Consenting Creditors to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Company under the Alto Maipo Obligations and other agreements and documents relating thereto, as well as under applicable law.  If the Restructuring is not consummated in accordance with the terms of the Restructuring Documents (including this Agreement), or if this Agreement is terminated for any reason (other than under Section 3.05 hereof), the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

5.11.    Specific Performance.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

5.12.    Several, Not Joint, Obligations.    Unless otherwise provided herein, the agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

5.13.   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

5.14.   <u>No Third-Party Beneficiaries</u>.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

5.15.   <u>Automatic Stay</u>.   The Parties acknowledge that the giving of notice or the disclosure of information, including under Section 5.19 hereof, or termination by any Party, including under Section 3 hereof, shall not be stayed by section 362 of the Bankruptcy Code or other similar applicable law, to the extent applicable, and to the extent the Bankruptcy Court determines otherwise, the delivering Party shall not be subject to any damages on account of the giving of such notice or disclosure or with respect to termination.

5.16.   <u>Acknowledgement</u>.   Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.   Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.   The Company will not solicit acceptances of the Plan from the holders of Alto Maipo Obligations in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law, and no obligation by any Consenting Creditor to vote to accept the Plan will be enforceable unless and until the Solicitation Materials are approved by the Bankruptcy Court in accordance with the terms herein.

5.17.   <u>Survival</u>.   Notwithstanding anything contained herein to the contrary, upon any termination of this Agreement (whether as a result of the consummation of the Restructuring, or its termination pursuant to Section 3 hereof or otherwise), the agreements and obligations of the Parties set forth in Section 1.04(b) (*provided* that Section 1.04(b) is not intended to supersede, or provide rights in addition to, those set forth in the agreements set forth with the firms named therein), the proviso to the last sentence of Section 1.06(b), Section 2.01, Section 2.02, Section 2.03, Section 2.04, Section 3.04 and Section 5 hereof shall survive the termination of this Agreement.

5.18.   <u>Relationship Among Parties; Consents</u>.

(a)   It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any form with any other Consenting Creditor, and, except as provided in this Agreement, there are no commitments among or between them.   In this regard, it is understood and agreed that any Consenting Creditor may transfer or trade in the New Obligations without the consent of the Company or any other Consenting Creditor, subject to applicable securities laws and the terms of this Agreement, including, specifically, Section 1.06; *provided*, *further*, that no Consenting Creditor shall have any responsibility for any such trading by any other entity by virtue of this Agreement.   No prior history, pattern or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

(b)     As used in this Agreement, any consent, waiver or other form of approval by or from the Consenting Creditors shall be exercised or withheld in the sole discretion, exercised in good faith, of such Parties.  The Company shall be permitted to rely upon any written confirmation (including by email) from Norton Rose Fulbright US LLP expressly confirming a consent, waiver or other form of approval by the Consenting Creditors.  The Company shall be permitted to rely upon any written confirmation (including by email) from Troutman Pepper Hamilton Sanders LLP expressly confirming a consent, waiver or other form of approval by Strabag.

5.19.   <u>Publicity</u>.

(a)     The Consenting Creditors shall not (i) use the name of the Company in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the Restructuring Transactions and any amendments thereof without first (A) submitting such press releases, public filings, public announcements or other communications to counsel for the Company for review and potential suggestions and (B) receiving the prior written consent of the Company.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Consenting Creditor.

(b)     At least one (1) business day prior to making any public disclosure that (i) constitutes disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, (ii) makes any other disclosure that includes descriptions of the Restructuring or any Consenting Creditors or (iii) constitutes disclosure of the aggregate amount or percentage of claims held by the Consenting Creditors, the Company shall submit drafts to Norton Rose Fulbright US LLP of any press releases or public documents, shall negotiate any proposed changes thereto in good faith and shall not publish such documents unless they are satisfactory to the Required Consenting Creditors in their sole and absolute discretion.

[*Signature pages to follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Effective Date.

ALTO MAIPO SPA

By: _____
Name: A. CARMIL
Title:

AES ANDES S.A.

By: _____
Name: Ricardo Falú
Title: CEO

NORGENER SPA

By: _____
Name: MPCarde
Title: Authorized signatory

**STRABAG SpA**

Name: Edgar Paul SCHÖMIG
Title: Aboderado Générales

Name: Philipp RAINER
Title: Aboderado Clase A

Address:
Alonso de Cordoba 4355, Of 901
Vitacura, Santiago de Chile

Attention: Dirk Pförtner
Telephone:+56 9 91595890

**WARBLER RUN I LLC**

_(signature)_

Name: **S. Vezina**
Title:   **Authorized Signatory**

Address:  **500 Boylston St, 24ᵗʰ Fl.**
                 Boston, MA  02116


Attention:  **Tim Caflisch;**
**tcaflisch@finepointcap.com**
Ops@finepointcap.com
Telephone:  **617-336-2200**
Facsimile:  **617-336-2276**

**DNB BANK ASA**

**Name: Eivind Hildre**        **Nils Fykse**
**Title:  SVP**                **SVP**

**Address: Dronning Eufemias gt 30**
**           0191 Oslo, Norway**


**Attention:**
**Eivind Hildre (eivind.hildre@dnb.no)**
**Nils Fykse (nils.fykse@dnb.no)**

**Telephone: +4791504800**
**Facsimile: n/a**

**ITAÚ CORPBANCA**



DocuSigned by:

*Sebastián Romero*

78EB2C9646F04A3...

**Name: Sebastián Romero Evans**
**Title: Officer**
**Telephone: 56283406213**
**Address: Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**

**ITAÚ CORPBANCA**

DocuSigned by:

*Carlos Irarrázaval Cruzat*

19146D5C05DF42F...

**Name: Carlos Irarrázaval Cruzat**
**Title: Officer**
**Telephone: 56283406277**
**Address: Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**

**BANCO DE CRÉDITO E INVERSIONES**

Name: CRISTIAN DEL RÍO

Title: GERENTE COMERCIAL BANCA CORP.97-A

Address: EL GOLF 125, Stjo, Chile.

Attention:
Telephone:
Facsimile:

## EXHIBIT A TO RESTRUCTURING SUPPORT AGREEMENT

### ALTO MAIPO S.P.A.

#### PLAN TERM SHEET

*The terms set out in this indicative term sheet (this "**Plan Term Sheet**") are preliminary and indicative solely for discussion purposes, and are not intended to describe or include all of the terms and conditions of the restructuring of indebtedness issued by Alto Maipo S.p.A. (the "**Company**" or "**Alto Maipo**") or to set forth the definitive contractual language of any provisions summarized below. This Plan Term Sheet is not binding on any party, is subject to, among other things, ongoing diligence and negotiation and is solely for the purpose of promoting discussion of the structure and other terms applicable to the restructuring.*

***This Plan Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable laws, and provisions of the Bankruptcy Code. No party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.***

*Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in **Annex I** attached hereto.*

*This Plan Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by the Company and the Consenting Creditors (as defined below), and it is entitled to the protections from use or disclosure afforded by New York C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Chilean state, federal or other applicable rule that restricts or prohibits use. All statements made in this Plan Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Plan Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Implementation** | The Company will file a voluntary Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware. The following is a summary of a proposed pre-arranged plan of reorganization for the Company (the "**Plan**") to be filed in the Bankruptcy Case as soon as reasonably practicable |

| | |
|---|---|
| | following the date on which the petitions are filed (the "**Petition Date**").<br><br>On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Plan Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Company, the Required Consenting Creditors and the holder of such Allowed Claim or Interest, as applicable.<br><br>For the avoidance of doubt, any action required to be taken by the Company on the Plan Effective Date pursuant to this Plan Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter.<br><br>The Restructuring will be subject to the terms and conditions of this Plan Term Sheet and the Definitive Documentation. |
| **DIP Credit Facility** | Subject to the terms and conditions set forth in the Restructuring Support Agreement and the DIP Term Sheet (as defined below), the DIP Lender shall, subject to Bankruptcy Court approvals, provide up to $50 million of financing (the "**Commitments**") in the form of a unsecured, administrative super-priority debtor-in-possession revolving credit facility (the "**DIP Credit Facility**").<br><br>The DIP Credit Facility shall have the terms specified in the term sheet attached hereto as **Annex II** (the "**DIP Term Sheet**") and be documented by a unsecured administrative super-priority debtor in possession revolving credit agreement in form and substance acceptable to the Agent and the lenders party thereto, in consultation with the Required Consenting Creditors (the "**DIP Credit Agreement**"). |
| **New Obligations** | On the Plan Effective Date, the Reorganized Company shall enter into or issue, as applicable: (i) a super-senior first-lien secured financing facility which shall be provided by the DIP Lender as provided for in **Annex III** of this Plan Term Sheet (the "**Restructuring Term Sheet**") and the Plan (the "**New Secured Exit Financing Facility**"), (ii) first priority tranche of secured notes or bank instruments which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**New 1L Secured Obligations**"), (iii) a first/second priority secured loan (as described in Restructuring Term Sheet) which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**New 2L Secured Loan**", and collectively with the New Secured Exit Financing Facility and the New 1L Secured Obligations, the "**New Secured Obligations**"), and (iv) the issuance of common equity in the Reorganized Company to be provided to AES Andes or its designees (the "**New Common Equity**" and, together |

|  | with the New Secured Obligations, the "**New Obligations**"). The New Obligations shall have terms consistent with the Restructuring Term Sheet. The New Secured Exit Financing Facility, New 1L Secured Obligations and the New 2L Secured Loan shall benefit from the same collateral provided, however, that (i) the New 1L Secured Obligations and New 2L Secured Loan and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Secured Exit Financing Facility, and (ii) the New 2L Secured Loan and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the New 1L Secured Obligations pursuant to a New Secured Obligations Intercreditor Agreement. |
|---|---|
| **Tax Matters** | The Company will seek to effectuate the terms and conditions of the Restructuring in a tax efficient manner. |
| **Amendment of Pledges** | The Consenting Creditors will enter into any amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the Alto Maipo Obligations (the "**Pledge Amendments**") to thereafter secure the Reorganized Company's obligations under the New Secured Obligations from and after the Plan Effective Date in a manner consistent with the RSA and Annex II thereto. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE COMPANY UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **DIP Claims** | On the Plan Effective Date, all Allowed DIP Claims shall be exchanged for, or paid off with the proceeds of, the New Secured Exit Financing Facility, as provided for in the DIP Term Sheet. | Impaired |
| N/A | **Administrative Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | Unimpaired/ Deemed to Accept |

| Classified Claims and Interests of the Company | | | |
|---|---|---|---|
| Class 1 | **Alto Maipo Obligations** | On the Plan Effective Date, each holder of an Allowed Alto Maipo Obligation shall receive its Pro Rata Share of the New 1L Secured Obligations and New 2L Secured Loan. | Impaired |
| Class 2 | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 3 | **General Unsecured Claims** | On the Plan Effective Date, each holder of a General Unsecured Claim, whether subordinated or unsubordinated, shall have its Claim cancelled, released, and discharged and without any distribution. | Impaired / Deemed to Reject |
| Class 4 | **Voith's Claims** | On or before the Plan Effective Date, Voith Hydro Ltda. and Voith Hydro S.A. shall have their Allowed Claims under that certain Lump Sum, Turnkey, Engineering, Procurement and Construction Contract among Alto Maipo S.p.A., Voith Hydro Ltda. and Voith Hydro S.A. dated August 10, 2012 (as amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**) assumed as amended pursuant to Sections 363 and 365 | N/A |
| Class 5 | **Strabag's Other Claims** | All Claims of Strabag, other than Claims that constitute Alto Maipo Obligations, under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo S.p.A. and Strabag S.p.A. dated February 19, 2018 (as further amended from time to time, including pursuant to the terms described in the term sheet attached hereto as **Annex III**), shall be treated in accordance with the terms set forth in the term sheet attached hereto as **Annex III**. | Impaired |
| Class 6 | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |

| | | | |
|---|---|---|---|
| **Class 7** | **Existing Equity Interests** | On the Plan Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law; provided, however, that AES Andes or its designee shall receive 100% of the New Common Equity, subject to the conversion of the New 2L Secured Loan and Shared Services Loan, if applicable, as provided for in the term sheet attached hereto as **Annex III.** | N/A |

| | |
|---|---|
| **GENERAL PROVISIONS REGARDING THE PLAN** ||
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Plan Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, shall be canceled and discharged, and the Company's obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | Voith's Claims and Strabag's Other Claims will be treated as described above and all other executory contracts and unexpired leases that are not assumed as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | Consummation of the Plan will be subject to approval by the Bankruptcy Court of customary release provisions for the benefit of the Released Parties and exculpation provisions for Exculpated Parties, in each case other than claims arising from gross negligence, willful misconduct, or fraud. Such provisions shall include (i) mutual releases among the Company and the Released Parties; and (ii) consensual third party releases from and to the |

| | |
|---|---|
| | Releasing Parties in favor of each of the parties identified in the foregoing clause (i). |
| **Governance** | The identities of directors on the board of the Reorganized Company shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for the Reorganized Company including charters, bylaws, operating agreements, or other organization documents, as applicable, shall (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) be acceptable to the Required Consenting Creditors in their sole and absolute discretion.. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable. |
| **Treatment of the Non-Qualified Creditors** | All New Obligations under the Plan that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "**Selling Agent**"). The Selling Agent shall offer such New Obligations in one or more sale transactions within 180 days following the Plan Effective Date (the "**Sale Period**"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Creditors at the end of the Sale Period (the "**Substitute Consideration**"). In the event that a sale of such New Obligations is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such New Obligations shall be cancelled for no consideration. None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities.<br><br>For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any New Obligations under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other |

| | |
|---|---|
| | professionals of the Company than the indemnification provisions in place as of the date hereof, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. |
| **Retained Causes of Action** | The Reorganized Company shall retain all rights to commence and pursue any causes of action, other than any causes of action that the Company has released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"): |

    a.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors;

    b.  the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time;

    c.  the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

    d.  the final version of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance consistent in all respects with this Plan Term Sheet and the Plan and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) in their sole and absolute discretion;

    e.  the New Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New Obligations Documents and the issuance of each of the New Obligations shall have occurred;

    f.  the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

|  | g. | all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | h. | the payment in cash in full of all Restructuring Expenses. |

## Annex I

## DEFINITIONS

"**AES Andes**" means AES Andes S.A.

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Company's businesses; (b) Allowed Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (d) DIP Claims.

"**Affiliate**" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a debtor, the term "Affiliate" shall apply to such Person as if the Person were a debtor.

"**Agreement Effective Date**" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

"**Allowed**" means, with respect to any Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors and approved by the Bankruptcy Court, (iii) by Final Order of the Bankruptcy Court or (iv) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Company or Reorganized Company, as applicable.

"**Alto Maipo**" means Alto Maipo S.p.A. or any successor or assign, by merger, consolidation, or otherwise, prior to the Plan Effective Date.

"**Alto Maipo Obligations**" means (i) an amount equal to US\$1,652,472,639 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (iii) an amount equal to US\$391,500,000 due to Strabag S.p.A under the Tunneling Contract (as defined in the Common Terms Agreement), without duplication.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Case**" means the Company's voluntary case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Company.

"**Class**" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

"**Common Terms Agreement**" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, Overseas Private Investment Corporation, Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutsche Bank AG, London Branch, and Santana S.A., as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

"**Company**" means Alto Maipo.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Company seeks entry of the Confirmation Order.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Creditors**" means such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the Restructuring Support Agreement) to counsel to the Company from time to time agreeing to be bound thereby.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Definitive Documentation**" means the definitive amendments to any collateral documents securing the Alto Maipo Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and this Plan Term Sheet, including the Plan, the Disclosure Statement and the documentation relating to the New Obligations. The Definitive Documentation and any modifications thereto will be (i) consistent with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

"**DIP Agent**" means AES Andes in its capacity as administrative agent under the DIP Credit Agreement.

"**DIP Claims**" means all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"**DIP Credit Facility**" means the credit facility provided to the Company by the DIP Lender in accordance with the DIP Orders.

"**DIP Expenses**" all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement the DIP

Credit Facility and the transactions contemplated thereby.

"**DIP Lender**" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"**DIP Orders**" means, together, the Interim DIP Order and the Final DIP Order.

"**Entity**" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

"**Estate**" means the estate of any Company created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Company's Chapter 11 Case.

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) any official committees appointed in the Chapter 11 Case and each of their respective members; (c) to the maximum extent permitted by applicable law, Norgener Renovables S.p.A., (d) to the maximum extent permitted by applicable law, AES Andes, (e) to the maximum extent permitted by applicable law, Strabag, in its capacity as shareholder, (f) to the maximum extent permitted by applicable law, the Consenting Creditors; (g) to the maximum extent permitted by applicable law, the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); and (h) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former Related Parties.

"**Existing Equity Interest**" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Plan Effective Date.

"**Final DIP Order**" means a final order by the Bankruptcy Court approving the Company's use of the DIP Credit Facility provided pursuant to the DIP Credit Agreement, and related relief.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**General Unsecured Claim**" means any Claim other than an Administrative Claim, an Other Priority Claim, an Alto Maipo Obligation or an Intercompany Claim.

"**Governmental Unit**" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

"**Impaired**" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Intercompany Claim**" means a Claim held by the Company against an Affiliate of the Company and *vice versa*. For the avoidance of doubt, the term "Intercompany Claim" does not include any Claim held by Strabag against the Company.

"**Interim DIP Order**" means an order by the Bankruptcy Court approving the Company's use of the DIP Credit Facility provided pursuant to the DIP Credit Agreement, and related relief on an interim basis.

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Company.

"**Joinder**" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the Agreement Effective Date may become a Consenting Creditor by executing such joinder agreement.

"**New 1L Secured Obligations**" means a first priority secured note or bank instrument which shall be distributed to the Senior Lenders and Strabag in exchange for their Alto Maipo Obligations as provided in this Plan Term Sheet and the Plan.

"**New 2L Secured Loan**" means a first/second priority secured loan, as further described in the Restructuring Term Sheet, which shall be distributed to the Senior Lenders and Strabag in exchange for their Alto Maipo Obligations as provided in this Plan Term Sheet and the Plan.

"**New Common Equity**" means the common Interest in the Company to be issued by the Company on or about the Plan Effective Date pursuant to the terms and conditions of this Plan Term Sheet.

"**New Obligations**" means the New Secured Exit Financing Facility, New 1L Secured Obligations, New 2L Secured Loan and New Common Equity.

"**New Obligations Documents**" means collectively, any indenture, loan agreement or other agreement governing the New Obligations, the New Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Company and the Required Consenting Creditors.

"**New Secured Exit Financing Facility**" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for or in satisfaction of the Claims under the DIP Facility, as provided for in the Plan Term Sheet and the Plan.

"**New Secured Obligations**" means the New Secured Exit Financing Facility, New 1L Secured Obligations and New 2L Secured Loan.

"**New Secured Obligations Intercreditor Agreement**" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors by which (i) the New 1L Secured Obligations and New 2L Secured Loan and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full

of the New Secured Exit Financing Facility, and (ii) the New 2L Secured Loan and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the New 1L Secured Obligations.

"**Non-Qualified Creditor**" means any creditor of the Alto Maipo Obligations other than a Qualified Creditor.

"**Other Priority Claim**" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Person**" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Company as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with this Plan Term Sheet, and to the extent not consistent with this Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

"**Plan Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

"**Plan Supplement**" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, attached as Exhibit A to the Restructuring Support Agreement, where applicable; the New Obligations Documents; the schedule of executory contracts and unexpired leases to be assumed pursuant to the Plan and the list of directors and officers of the Reorganized Company.

"**Priority Tax Claims**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, with respect to any holder of Claims in a Class receiving any distribution under the Plan, such holder's pro rata share of such distribution measured by reference to the aggregate amount of all Allowed Claims in such Class in each case as of the date of such distribution.

"**Professional Claim**" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"**Qualified Creditor**" means a creditor of the Alto Maipo Obligations who provides either one of the following certifications: (i) a certification that it is located in the United States, and is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act, U.S. government agency or an "accredited investor" as defined in Regulation D under the Securities Act, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or (ii) a certification that it is located or resident outside the United States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

"**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

"**Related Party**" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder; (f) the DIP Agent, and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party" and any Related Party of such person or Entity that opts out of the releases (other than the Company and the Reorganized Company) shall also not be a "Released Party."

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder; (f) the DIP Agent and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (j) all holders of Claims or Interests that are deemed to accept the Plan; (k) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (l) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l), and (n) each Related Party of each Entity in clause (a) through (m).

"**Reorganized Company**" means the Company, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

"**Required Consenting Creditors**" means, as of the relevant date, the holders of 2/3 of the aggregate principal amount of the Alto Maipo Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

"**Restructuring**" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet and the Plan.

"**Restructuring Expenses**" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses of the Consenting Lenders' advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby, and (ii) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent.

"**Restructuring Support Agreement**" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors to which this Plan Term Sheet has been attached as Exhibit A.

"**Restructuring Transactions**" means those certain restructuring and recapitalization transactions with respect to the Company's capital structure required to effect the Restructuring on the terms and conditions set forth in the Restructuring Support Agreement, this Plan Term Sheet, and the Plan.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective date.

"**Senior Lenders**" means the (i) Inter-American Development Bank, (ii) U.S. International Development Finance Corporation, (iii) Banco De Crédito e Inversiones, (iv) DNB Bank ASA, (v) Itaú Corpbanca, (vi) Itaú Corpbanca New York Branch, (vii) Deutsche Bank AG, London Branch, (viii) Santana S.A., (ix) Nineteen 77 Capital Solutions LP, (x) Moneda Deuda Latinoamericana Fondo de Inversión, (xi) Moneda Alturas II Fondo de Inversión, (xii) Regera Sarl, (xiii) Warbler Run I LP, (xiv) Warbler Run II LP and (xv) Clover Private Credit Opportunities Secondary II LP  in their capacity as lenders under the Common Terms Agreement.

"**Strabag's Other Claims**" means Strabag's unsecured claims under that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo S.p.A. and Strabag S.p.A. dated February 19, 2018 (as further amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**), other than such Claims that are part of the Alto Maipo Obligations, that are payable in cash for construction costs and insurance proceeds pursuant to the terms described in the in the term sheet attached hereto as **Annex III**.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

"**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

"**United States Trustee**" means the United States Trustee for the jurisdiction in which the Chapter 11 Case are commenced.

"**Voith's Claims**" means the Claims of Voith Hydro Ltda. and Voith Hydro S.A. under that certain Lump Sum, Turnkey, Engineering, Procurement and Construction Contract among Alto Maipo S.p.A., Voith Hydro Ltda. and Voith Hydro S.A. dated August 10, 2012 (as amended from time to time, including pursuant to the terms described in the in the term sheet attached hereto as **Annex III**).

<u>ANNEX II</u>

**DIP TERM SHEET**

**ALTO MAIPO**

**US$50,000,000 DEBTOR IN POSSESSION CREDIT FACILITY**
**SUMMARY OF TERMS AND CONDITIONS[2]**

*This summary of terms and conditions (the "**DIP Term Sheet**") of a proposed debtor-in-possession credit facility (the "**DIP Facility**") is intended for discussion purposes only and does not constitute a commitment to lend. Only execution and delivery of definitive documentation relating to the DIP Facility shall result in any binding or enforceable obligations of any party relating to the DIP Facility. This DIP Term Sheet does not purport to summarize all of the terms, conditions, representations warranties and other provisions with respect to the transactions referred to herein.*

| Material Provision | Summary Description |
|---|---|
| **Parties** | |
| **Borrower:** | Alto Maipo Delaware LLC, a limited liability company, organized under the laws of the state of Delaware (the "**Company**" or the "**Borrower**") as debtor in possession in a case (the "**Chapter 11 Case**") filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Debtor:** | The Borrower. <br><br> The Borrower is also referred to herein at the "**Debtor**," and together with the Guarantor, the "**Obligors**." The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantor:** | Alto Maipo SpA, a *sociedad por acciones*, organized under the laws of Chile, as debtor in possession in the Chapter 11 Case. |
| **DIP Facility:** | The DIP Facility shall be in an aggregate principal amount of US$50 million (the "**DIP Commitments**," and the loans made thereunder, as increased by capitalized interest and fees, the "**DIP Loans**"). The DIP Loans, together with all related obligations incurred under the DIP Facility, are referred to herein as the "**DIP Obligations**". The DIP Facility shall be an unsecured, super priority revolving loan (with no |

---

[2]    This DIP Financing Term Sheet is attached to and is incorporated by reference into the Restructuring Support Agreement (the "<u>RSA</u>"), dated November 16, 2021, entered into by and among the Debtor, Norgener Renovables SpA ("<u>Norgener</u>"); AES Gener, S.A. (the "<u>Sponsor</u>"), Strabag SpA ("<u>Strabag</u>"), and the lenders to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "<u>Senior Lenders</u>") that have executed the RSA (the "<u>Supporting Senior Lenders</u>").

| | |
|---|---|
| | additional draws permitted after the Commitment Period (as defined below)). |
| **Lenders:** | AES ANDES S.A. (the "**DIP Lenders**" or "**DIP Lender**", as applicable) |
| **Administrative Agent:** | AES ANDES S.A. (in such capacity and together with its successors, the "**Administrative Agent**"). |
| **Amount of Loan:** | A debtor-in-possession revolving loan facility, in an aggregate original principal amount of US$50 million (the "**DIP Facility**"). |
| **DIP Loan Documents:** | The Borrower will execute a definitive NY law governed loan agreement and other documents in furtherance or in connection therewith (collectively, the "**DIP Loan Documents**"), to evidence the DIP Facility, in form and substance customary for transactions of this type, but acceptable to the Borrower, the Administrative Agent and the DIP Lenders, acting reasonably, and in consultation with the Required Consenting Lenders (as defined in the RSA) including, without limitation, a promissory note governed by Chilean law. |
| **Purpose/Use of Proceeds:** | The Borrower shall use the proceeds ("**DIP Loan Proceeds**") of the DIP Facility in a manner consistent with the DIP Budget (as defined below) and only for the purpose of (i) certain working capital and general corporate purposes of the Borrower; (ii) restructuring costs and professional fees relating to the Chapter 11 Case, including to fund amounts in the Carve-Out Account, in the aggregate amount set out in the "Restructuring Professional Fees" line item in the DIP Budget which, for the avoidance of doubt, shall not be subject to the monthly limits set out in the DIP Budget; (iii) interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the Administrative Agent as provided under the DIP Loan Documents and the DIP Orders; (iv) any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors (as defined under the RSA); (v) other items agreed to by the parties in the DIP Loan Documents; and (vi) as approved by the Bankruptcy Court in the DIP Orders or other order (collectively "**Permitted Uses**"). |
| **Availability:** | Subject in each case to satisfaction of the conditions set forth below under the headings "*Conditions Precedent to Initial Draw*", "*Conditions Precedent to Subsequent Draws*" and "*Conditions Precedent to Each Draw*", as applicable: |
| | (i) upon the date of entry of an order by the Bankruptcy Court granting interim approval of the DIP Facility that is in form and |

substance acceptable to the Majority DIP Lenders (as defined below), the Borrower, and in consultation with the Required Consenting Creditors (as defined in the RSA) (the "**Interim Order**"), up to US$20 million of the DIP Loans will be made available in a single draw minus the applicable stamp tax (the "**Initial Availability**"); and

(ii)  upon the date of entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is substantially in the form of the Interim Order with such changes as are acceptable to the Majority DIP Lenders and in consultation with the Required Consenting Creditors (the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"), the undrawn portion of the DIP Facility will be available in a single draw or in multiple draws in minimum amounts of US$1 million each minus the applicable stamp tax (the "**Subsequent Availability**").

Notwithstanding the foregoing, the DIP Facility shall only be accessed and made available if the Obligors' available cash is less than $10 million at the time of the requested draw.

Subject to the above, amounts available under the DIP Commitments that have been drawn and subsequently repaid may thereafter be re-borrowed but only within six (6) months following the Petition Date (the "**Commitment Period**"), subject in each case to satisfaction of the conditions set forth below under "Conditions Precedent to each Draw".

Any then undrawn Subsequent Availability shall terminate and no longer be available upon expiration of the Commitment Period.  All DIP Loans and other amounts owed hereunder with respect thereto shall be due and payable in full no later than the Maturity Date (as defined below).

| | |
|---|---|
| **Maturity Date:** | The DIP Facility will mature (the "**Maturity Date**") and will be immediately due and payable on the earliest to occur of any of the following: (a) twelve (12) months after entry by the Bankruptcy Court of the Final Order ("**Scheduled Maturity Date**"); (b) 35 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 35-day period; (c) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default (as defined below); (d) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders; (e) the date of the appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, unless otherwise consented to in writing by the Majority DIP Lenders, (f) |

| | |
|---|---|
| | filing of a motion by any Debtor which seeks the dismissal, or the entry of an order granting any party's request for the dismissal, of the Chapter 11 Case, unless otherwise consented to in writing by the Majority DIP Lenders; (g) the occurrence of a change of control (to be defined in a mutually agreed upon manner, but it shall include, without limitation, any changes with respect to beneficial ownership of 50% of total voting shares, a 363 sale and any other sale of all or substantially all of the assets of the Borrower in a single or series of transactions; hereinafter referred to as a "**Change of Control**"); (h) the effective date (the "**Effective Date**") of the plan of reorganization (the "**Plan**") confirmed in the Chapter 11 Case.<br><br>Upon the Maturity Date, the DIP Facility and the DIP Commitments thereunder shall terminate and all outstanding DIP Obligations shall become automatically due and payable in full in cash.<br><br>"**Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks are open for domestic and foreign exchange business in New York City and Santiago, Chile. |
| **Amortization:** | None. |
| **Interest Rate and Fees:** | As set forth in <u>Annex I</u>. |
| **Closing Date:** | The date on which the conditions precedent set forth below under "Conditions Precedent to Initial Draw" are satisfied (the "**Closing Date**"). |
| **Conditions Precedent to Initial Draw:** | The Initial Availability on the Closing Date shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:<br><br>(a)  the Bankruptcy Court shall have entered the Interim Order (which order is not subject to any stay of effectiveness) no later than 14 days after the filing of a motion seeking entry of the Interim Order, approving and authorizing the DIP Facility on an interim basis, all provisions thereof and the priorities granted under Bankruptcy Code section 364(c)(1) in form and substance acceptable to the Majority DIP Lenders, and in consultation with the Required Consenting Creditors;<br><br>(b)  the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as |

<table>
<tr><td></td><td>otherwise agreed to in writing by the Majority DIP Lenders and in consultation with the Required Consenting Creditors;</td></tr>
<tr><td></td><td>(c)  the Administrative Agent and the DIP Lenders shall have received executed copies of [the duly executed commitment letter to which this term sheet is enclosed as an annex] / [each of the DIP Loan Documents];</td></tr>
<tr><td></td><td>(d)  the Administrative Agent and the Consenting Creditors shall have received the Initial DIP Budget (as defined below), acceptable to the Majority DIP Lenders; and</td></tr>
<tr><td></td><td>(e)  all reasonable and documented transaction costs, fees, expenses, consisting of reasonable and documented (i) legal fees of one counsel in each applicable jurisdiction (the "**Legal Fees**") and (ii) fees of financial and other advisors[3] (together, the "**Specified Advisors**" and their fees, together with the Legal Fees, the "**Transaction and Advisor Expenses**"), in each case, invoiced at least two (2) Business Days prior to the Closing Date incurred by the DIP Lenders in their capacity as such solely in connection with the preparation, negotiation and execution of the DIP Loan Documents, and all compensation owed to the DIP Lenders under the terms of the DIP Loan Documents shall have been paid to the extent due.</td></tr>
<tr><td>**Conditions Precedent to Subsequent Draws:**</td><td>The Subsequent Availability is subject to the satisfaction or waiver by the Majority DIP Lenders of the conditions set forth under "*Conditions Precedent to Each Draw*" below, and the following conditions:<br><br>(a)  the Bankruptcy Court shall have entered the Final Order (which order is not subject to any stay of effectiveness) approving the DIP Facility on a final basis, no later than 35 calendar days following the date of entry of the Interim Order;<br><br>(b)  the Final Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal in any manner except as otherwise agreed to in writing by the Majority DIP Lenders, in consultation with the Required Consenting Creditors; and<br><br>(c)  the Administrative Agent shall have received customary closing deliverables and officer's certificates, including customary legal opinions from NY and Chilean counsel.</td></tr>
</table>

---

[3] Note to NRS: AES advisors are Morris Nichols, Arsht & Tunnell LLP and Claro & Cia.

| Conditions Precedent to Each Draw: | The Initial Availability and each subsequent draw under the DIP Facility shall be subject to the satisfaction or waiver by the Majority DIP Lenders of the following additional conditions: |
|---|---|
| | (a)  accuracy of representations and warranties in all material respects, as set forth in the DIP Loan Documents; |
| | (b)  absence of any default or Event of Default, as set forth in the DIP Loan Documents; |
| | (c)  except as expressly provided with respect to the Initial Availability, all compensation owed to the DIP Lenders due and payable under the terms of the DIP Loan Documents, including any fees due and payable, as applicable, and the Transaction and Advisor Expenses, shall have been paid to the extent due and invoiced at least two (2) Business Days prior to the applicable borrowing date; and |
| | (d)  the Administrative Agent shall have received, (i) in the case of the first draw, a Borrowing Notice (as defined below) one (1) Business Days prior to funding and (ii) in the case of all subsequent draws, a Borrowing Notice (as defined below) three (3) Business Days prior to funding.  Each such borrowing notice shall, among other things, include a certification that the Borrower's liquidity is less than the Excess Cash Threshold and the DIP Loan draw requested is required to meet the Borrower's anticipated liquidity needs and shall be in substantially the form of the borrowing notice agreed between the parties in the DIP Loan Documents (each, a "**Borrowing Notice**"). |
| **Funding Protection:** | Customary for DIP financing of this type, including breakage costs, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Superpriority Claims:** | All DIP Obligations shall at all times be entitled to a super-priority administrative expense claim against the Debtor ("**DIP Superpriority Claim**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to the Interim Order, subject only to the Carve-Out. |

| | |
|---|---|
| | The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Case. |
| **Carve-Out:** | The "Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, (iii) all unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtor is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code and Committee Professionals (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice and (iv) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $500,000 for Debtor Professionals and $50,000 for Committee Professionals ("**Trigger Cap**"), but in each case only to the extent that payment of such fees and expenses is subsequently allowed on a final basis by the Bankruptcy Court. <br><br> "**Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtor, their lead restructuring counsel, the U.S. Trustee, and counsel to any committee of unsecured creditors, which notice may be delivered following the occurrence and during the continuation of an event of default and acceleration of the DIP Obligations under the DIP Facility, stating that the Trigger Cap has been invoked. <br><br> Upon entry of the Final Order, the Debtor shall establish and fund a segregated escrow account (the "**Carve-Out Account**") not subject to control of the DIP Lenders, for purposes of funding the Carve-Out. The Carve-Out Account and the proceeds on deposit therein shall be available only to satisfy any obligations benefitting from the Carve-Out. Carve-Out Account terms and conditions to be mutually agreed and set forth in the DIP Orders. |
| **Voluntary Prepayments:** | The Borrower may prepay any DIP Obligations in whole or in part in an aggregate minimum amount of US$1,000,000 and integral multiples of US$500,000 in excess thereof. <br><br> The Borrower may terminate in whole or permanently reduce in part, any DIP commitments that remain undrawn at the time of such termination or reduction, provided that such partial reduction shall be in an aggregate minimum amount of US$1,000,000 and integral multiples of US$100,000 in excess thereof. |

| | |
|---|---|
| **Mandatory Prepayments:** | Prior to the Maturity Date, the Borrower shall make mandatory prepayments of DIP Obligations (and the DIP Commitments shall be permanently reduced in a corresponding aggregate amount) upon receipt by the Borrower of net proceeds from the following (in each case, subject to certain customary baskets to be negotiated in the definitive DIP Loan Documents and customary reinvestment rights, as applicable): |

<blockquote>

i.    *Incurrence of Indebtedness*: Prepayments in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower that is not otherwise explicitly permitted under the DIP Facility.

ii.    *Asset Dispositions; Extraordinary Receipts*: Prepayments in an amount equal to 100% of the net cash proceeds received from the sale of any asset outside of the ordinary course of business or from any other receipts outside of the ordinary course of the business (including insurance proceeds).

iii.    *Excess Cash*. Prepayments in an amount equal to 100% of excess cash (to be defined, in a mutually agreed upon manner, as available cash in excess of US$10,000,000 (but deducting amounts required to be paid by the Borrower in the next calendar month according to the DIP Budget); hereinafter referred to as the "**Excess Cash Threshold**") at the end of each calendar month period;

iv.    *CNM* Arbitration. Prepayments in an amount equal to 100% of net proceeds paid pursuant to CNM award or any disposition of the rights under that award

<u>provided</u>, that, in each case (except with respect to paragraph (iv)), any such prepayment shall be subject to any priority of any other creditor with a properly secured lien existing immediately prior to the Petition Date.

</blockquote>

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents shall contain representations and warranties customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, and shall be limited to the following: organization; powers; authorization; enforceability; financial statements; subsidiaries; ownership of property; licenses and permits; litigation; compliance with laws and regulations; no conflict with laws; material contractual obligations; governmental and third-party approvals, use of proceeds; insurance; taxes; no material misstatements; employee benefit plans; environmental matters; labor |

| | |
|---|---|
| | matters; no default; USA PATRIOT ACT; OFAC; FCPA; certain bankruptcy matters; absence of Material Adverse Effect (to be defined) since the Petition Date; absence of defaults under material agreements entered into after the date of commencement of the Chapter 11 Cases; and the Final Order shall continue to be in full force and effect and not amended, modified or supplemented in a manner adverse to the DIP Lenders; and other bankruptcy matters as agreed upon. |
| **Affirmative Covenants:** | The DIP Loan Documents shall contain affirmative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions qualifications and carve-outs, and shall be limited to the following:<br><br>(a) Preservation and maintenance of existence, business and properties;<br>(b) Maintenance of cash management system;<br>(c) Payment of income taxes and other material taxes and other claims;<br>(d) Payment of reasonable and duly documented Transaction and Advisor Expenses;<br>(e) Delivery of quarterly and annual financial statements;<br>(f) Material Litigation and other notices;<br>(g) Compliance with laws and regulations;<br>(h) Maintenance of records;<br>(i) Use of proceeds;<br>(j) Compliance with environmental laws;<br>(k) Payment of post-petition obligations;<br>(l) Notification to the Administrative Agent of any Event of Default and certain other customary material events; and<br>(m) Certain bankruptcy matters. |
| **Negative Covenants:** | The DIP Loan Documents shall contain negative covenants customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications, including, without limitation, the following:<br><br>(a) Limitation on incurrence of indebtedness, other than customary exceptions to be agreed based on the DIP Budget, including DIP sub-facility or a separate DIP financing to finance VAT taxes payable in connection with invoices issued by Strabag pursuant to the Tunneling Contract with Strabag dated as of February 19, 2018 (as amended, restated, modified, supplemented, extended or amended and restated from time to |

<table>
<tr><td></td><td>

time) (which may be secured by a first-priority lien on tax refunds) ("**DIP Tax Financing Facility**");

(b) Limitation on liens, other than customary permitted liens and first- priority liens on tax refunds to secure the DIP Tax Financing Facility;

(c) Restriction on creation of any other super-priority claim which is *pari passu* with or senior to the DIP Superpriority Claims, except for the Carve-Out and other exceptions to be agreed;

(d) Limitation on investments and restricted payments, subject to customary exceptions to be agreed in the DIP Loan Documents;

(e) Prohibition on payment of pre-petition indebtedness, including any debt service, other than, to the extent constituting indebtedness, any other payments by the Borrower approved by the Bankruptcy Court and consistent with the DIP Budget or otherwise approved by the Majority DIP Lenders, and in consultation with the Required Consenting Creditors;

(f) Business activities other than those engaged in on the Petition Date;

(g) Prohibition on mergers or a sale, lease or other disposition of all or substantially all of the assets of the Borrower (including a Change of Control) and other fundamental changes;

(h) Prohibition on the sales of any material asset or any other asset outside of the ordinary course of business;

(i) No use of proceeds in violation of customary anti-corruption laws, anti-money laundering, and sanctions laws;

(j) Adequate protection payments shall be made using the proceeds of the DIP Financing consistent with the DIP Budget or as otherwise consented to by the DIP Lenders, which consent shall not be unreasonably withheld; and

(k) Bankruptcy related matters.

</td></tr>
<tr><td>

**DIP Budget and other Financial Reporting:**

</td><td>

Prior to or on the Closing Date, the Borrower shall deliver:

*DIP Budget*: An initial DIP budget to the Administrative Agent, with a copy to the Consenting Creditors, with monthly cash flow forecast for the period from the Closing Date through the end of September 2022, form acceptable to the Majority DIP Lenders and Required Consenting Creditors (the "**Initial DIP Budget**")[4], and thereafter, within an agreed

</td></tr>
</table>

---

[4]    The Initial DIP Budget is anticipated to be the same as the DIP Budget that has been distributed and agreed between the parties as of the date hereof, a copy of which is attached hereto, and the Majority DIP Lenders shall approve such DIP Budget as the Initial DIP Budget.

<table>
<tr>
<td></td>
<td>number of days[5] following the end of each calendar month (starting with the calendar month immediately following the Closing Date), an updated budget in form substantially similar to the Initial DIP Budget and approved by the Majority DIP Lenders and Required Consenting Creditors (the "**Updated DIP Budget**" and, the Initial Approved DIP Budget and thereafter, each Updated DIP Budget, the "**DIP Budget**"). Each Updated DIP Budget shall include a reconciliation of the actual results for the months that are covered in the DIP Budget and have already elapsed.[6]<br><br>*Monthly Reporting*:   Commencing on the fourth Thursday after the Closing Date, and on the Thursday of each fourth calendar week thereafter, the Borrower shall provide customary reporting to be agreed.</td>
</tr>
<tr>
<td>**Milestones:**</td>
<td>The Borrower shall comply with following deadlines (unless waived by the Majority DIP Lenders) (the "**Milestones**"):<br><br>• A restructuring support agreement with relevant case constituents and acceptable to the DIP Lenders approved by the Bankruptcy Court by January 31, 2022.<br><br>• The Debtor shall file an Acceptable Plan (as defined below) no later than three (3) months following the Petition Date.<br><br>• The Bankruptcy Court shall have entered an order confirming the Plan no later than six (6) months following the Petition Date.<br><br>• The effective date of the Plan confirmed in the Chapter 11 Case and emergence of the Debtor from Chapter 11 no later than eight (8) months following the Petition Date.<br><br>• Synchronization of Las Lajas Units 1 and 2 and Alfalfal 2 by January 30, 2022.<br><br>• Substantial Completion of Critical Milestones D, E and F has been reached by March 31, 2022.<br><br>• Las Lajas and Alfalfal 2 Commercial Operation Date by April 30, 2022.</td>
</tr>
<tr>
<td>**Events of Default:**</td>
<td>The credit agreement for the DIP Facility will include events of default ("**Events of Default**") (and, as appropriate, grace periods) usual and customary for debtor-in-possession financings of this kind, including failure to make payments when due, failure to meet Milestones, defaults under post-petition indebtedness, noncompliance with affirmative and negative covenants (certain of which shall be subject to grace periods</td>
</tr>
</table>

---

[5]    Date to be not later than 10th day after end of each calendar month.
[6]    Budgets need to be prepared with FTI input and Required Creditor Consent.

| | |
|---|---|
| | to be agreed); breaches of representations and warranties; an order shall be entered by the Bankruptcy Court terminating the Debtor's exclusive periods for proposing a Plan; dismissal or conversion of the Chapter 11 Case to a case under Chapter 7; an order shall be entered by the Bankruptcy Court changing the venue of the Chapter 11 Case; the filing of or confirmation of a Plan that is not an Acceptable Plan; unstayed judgments in excess of specified amounts; a Change of Control; the Final Order ceases to be in full force and effect; appointment of an examiner with expanded powers or a trustee under Section 1101 of the Bankruptcy Code, or appointment under the Chapter 11 Cases of a custodian, receiver, liquidator, administrator, administrative receiver or other similar official for the Borrower or a substantial part of its assets; and the commencement of a Chilean liquidation or other such proceeding in Chile without the prior written consent of the Majority DIP Lenders, which proceeding has not been stayed, suspended or dismissed within 90 days.  In addition, an Event of Default shall also occur upon a termination of the Power Purchase Agreement between the Borrower and Minera Los Pelambres dated June 28, 2013 (as amended, restated, modified, supplemented, extended or amended and restated from time to time). <br><br> "**Acceptable Plan**" means a Plan that, unless otherwise agreed in writing by the DIP Lenders, provides for repayment in full in cash of all DIP Obligations on the effective date of such Plan (excluding payment of contingent indemnity obligations). <br><br> Upon an Event of Default, the DIP Lenders shall have all customary remedies and rights and any and all of the DIP Obligations shall accelerate and become immediately due and payable and any remaining Subsequent Availability shall terminate and no longer be available. |
| **Assignments and Participations:** | The DIP Lenders shall not be permitted to assign any portion of the DIP Facility to any other person (other than affiliates of the DIP Lender), without the consent of the Borrower and the Required Consenting Creditors, such consent not to be unreasonably withheld or delayed; <u>provided</u>, however, that no consent of the Borrower shall be required for an assignment if an Event of Default has occurred and is continuing. Upon a permitted assignment, such assignee will become a DIP Lender for all purposes of the DIP Loan Documents. |
| **Majority DIP Lenders:** | "**Majority DIP Lenders**" shall mean the DIP Lenders holding more than 50% of total commitments or exposure under the DIP Facility; *except that* with respect to such matters relating to the reduction of principal or fees, changes in interest rates, changes in maturity, changes in the pro rata sharing clause, the Majority DIP Lenders shall consist of each affected DIP Lender.  Notwithstanding the foregoing, in the event |

| | there is a single DIP Lender, all references herein to the Majority DIP Lenders shall be deemed to refer to such DIP Lender. |
|---|---|
| **Taxes:** | Any and all payments under the DIP Facility shall be made free and clear of and without deduction or withholding for any taxes, other than Excluded Taxes. "**Excluded Taxes**" shall include (a) in the case of a Foreign Lender (as defined below), any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender in excess of the Chilean Preferential Withholding Rate (as defined below)[, other than any withholding Tax imposed as a result of a Change in Law (to be defined) after the date on which such DIP Lender becomes a DIP Lender under the DIP Facility]; and (b) any tax (other than any withholding tax that is imposed in Chile on any interest payable under the DIP Facility to such Foreign Lender at or below the Chilean Preferential Withholding Rate) that is imposed on an amount payable to the Administrative Agent or DIP Lender that is attributable to the Administrative Agent's or DIP Lender's failure to comply with the applicable tax covenant in the DIP Facility requiring the Administrative Agent and each DIP Lender to use reasonable efforts to comply in a timely manner with any certification, identification, information, documentation or other reporting requirements if such compliance is reasonably requested by the Borrower in writing and if such compliance is required by applicable law as a precondition to exemption from, or reduction in the rate of, deduction or withholding of any taxes for which the Borrower is required to pay any additional amounts pursuant to the DIP Facility.<br><br>"**Foreign Lender**" means any Lender that is organized under the Applicable Laws of a jurisdiction other than Chile and which is not domiciled or resident in Chile for purposes of Chilean taxation.<br><br>"**Chilean Preferential Withholding Rate**" means the reduced withholding tax rate imposed under Chilean law on payments of interest in accordance with Article 59 No. 1 letter (b) of Chilean income tax law (*Artículo 59 No. 1 (b) de la Ley de Impuesto a la Renta de Chile*). |
| **Indemnity/ Release/ Waiver; Expense:** | The Borrower will indemnify the Administrative Agent and the DIP Lenders (each, only in their capacity as such) and each of their affiliates and respective related parties (each an "**Indemnitee**"), and hold each of them harmless from and against any and all losses, claims, damages, liabilities, taxes, penalties and related expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee), or asserted against any Indemnitee by the Borrower or by any other person arising out of the DIP Facility and the financing contemplated thereby; provided that no Indemnitee will be indemnified for any such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from any |

| | |
|---|---|
| | Indemnitee's gross negligence, bad faith or willful misconduct or material breach of any Indemnitee's obligations under this term sheet, the DIP Facility or the DIP Loan Documents<br><br>The Borrower will reimburse (a) the DIP Lenders for their reasonable and documented out-of-pocket transaction expenses in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents, including any amendment or waiver thereof, and (ii) enforcement of the DIP Loans Documents, in each case, limited in the case of counsel to the fees and expenses of one counsel in each jurisdiction) and the Specified Advisors; and (b) all reasonable and documents out-of-pocket expenses of the Administrative Agent associated with the administration of the DIP Facility. |
| **Governing Law / Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code) |

**Annex I**

| | |
|---|---|
| **Interest Rate:** | 4% payable in kind.<br><br>Interest will capitalize in arrears on the basis of a 360-day year, calculated on the basis of the actual number of days elapsed. Interest will capitalize quarterly. |
| **Default Interest Rate:** | Automatically after the occurrence of any Event of Default, the applicable interest rate ("**Default Interest Rate**") shall be the applicable interest rate plus 2%, which shall accrue on all overdue principal and other DIP Obligations and which shall be due immediately and payable on demand; <u>provided</u>, <u>however</u>, that the Default Interest Rate shall not exceed the maximum interest rate permitted by applicable law |
| **Upfront Fee:** | 1.00% of (i) the portion of the DIP Commitments available upon entry of the Interim Order, payable in kind on the date of entry of the Interim Order, and (ii) the remaining portion of the DIP Commitments, payable in kind on the date of entry of the Final Order. |
| **Unused Commitment Fee:** | 0.75% *per annum* on the undrawn portion of the DIP Commitments, commencing upon entry of the Interim Order and due monthly in arrears and payable in kind. |

## ANNEX III

**Restructuring Term Sheet –** terms to be effective immediately upon bankruptcy exit

| | |
|---|---|
| **New Senior First Lien Debt** | <ul><li>Borrower:  Alto Maipo SpA</li><li>Aggregate Amount: $1,050,000,000.<ul><li>To be structured as a combination of (i) notes with documentation customary for an Investment Grade corporate credit ("<u>1L Notes</u>") and (ii) project-finance style loans with documentation similar, except as the parties may otherwise agree, to the existing Second Amended & Restated Common Terms Agreement (the "<u>CTA</u>") dated as of May 8, 2018 (the "<u>1L Loans</u>" and, together with the 1L Notes, the "<u>New 1L Debt</u>").  Holders of the 1L Notes and lenders under the 1L Loans are together referred to as the "<u>New 1L Lenders</u>". The existing senior secured parties will elect (in their discretion) whether their New 1L Debt is documented as 1L Notes or 1L Debt.</li><li>All New 1L Debt will share the same economic terms and will rank pari passu with respect to repayment, prepayment, collateral sharing, and all other similar matters.</li></ul></li><li>Borrower will be required to go-to-market within 6 months after COD[7] to seek refinancing of the New 1L Debt.  At the option of the New 1L Lenders, the deadline for completing this mandatory go-to-market may be extended by an additional 6 months.<ul><li>Borrower will use commercially reasonable efforts to secure full refinancing of 100% of the New 1L Debt with this go-to-market, with additional details on process to be included in the definitive documentation.  Borrower will engage qualified third party professionals to support and facilitate the go-to-market effort.  Regular updates and disclosures will be made to the New 1L Lenders and the New 2L Lenders with respect to the timeline and process for the go-to market, with detailed terms and conditions to be agreed in definitive documents, including access to and copies of material documentation, projections and presentations, subject to limitations and non-disclosure restrictions customary for these type of transactions to be agreed.</li><li>The refinancing instrument must include the following terms:<ul><li>100% of the New 1L Debt then outstanding</li><li>first lien debt of the Borrower</li><li>scheduled amortization that will result in outstanding principal being reduced to $500 million by June 2040</li><li>all other terms equal or better for Alto Maipo when compared to the terms of the New 1L Debt</li><li>if interest rate is lower than 4%, refinancing instrument will be sized, and proceeds will be applied, so that proceeds prepay part of the New 2L Debt</li></ul></li></ul></li></ul> |

---

[7] COD to be defined in definitive documents by parties acting in good faith.

- – To the extent this go-to-market is unable to achieve a full refinancing of the New 1L Debt on the required terms specified above, any refinancing of the New 1L Debt must be on terms acceptable to the New 1L Lenders

- Collateral: same as existing collateral package under the CTA (including first priority perfected lien on all assets of Borrower, all shares in Borrower, and all shareholder/affiliate loans (other than Shared Services Loan) made to Borrower).

- Maturity: June 2040

- Payment Dates: January 15, April 15, July 15 and October 15, commencing on the first such date following the date that is the later of (x) Borrower's exit from bankruptcy and (y) the earlier of (i) COD or (ii) a date certain to be agreed.

- Interest rate: 4.0% per annum fixed, paid in cash on each Payment Date.  Interest begins to accrue on the date the Borrower exits bankruptcy.
- Default interest rate: additional 2%.

- Mandatory annual debt service: annual debt service (including scheduled amortization and cash payments of interest) in an aggregate amount of $62.4 million per calendar year, and which will reduce the outstanding principal amount of the New 1L Debt to $500 million no later than June 2040.  Scheduled amortization in 2022 will be pro-rated based on the number of months remaining in 2022 after the later of (x) Borrower's exit from bankruptcy and (y) the earlier of (i) COD or (ii) a date certain to be agreed.  Any prepayment of the New 1L Debt with proceeds of the CNM arbitration award will be in addition to the mandatory scheduled amortization.
- Mandatory Prepayments: proceeds of CNM Arbitration (as specified below); expropriation; total loss or other significant insured event where insurance proceeds are not applied to repair/restore; significant asset dispositions outside of the ordinary course.

- Cash sweep:  subject to (1) Exit Financing and New 2L Debt having been repaid in full and (2) cash on hand of the Borrower in the amount of $25 million; all excess cash will be applied to prepay the New 1L Debt.  Cash sweep will be paid April 15 and October 15. Cash sweep will be calculated on the same terms agreed for the New 2L Debt.

- No prepayment penalties.

- At the request of the New 1L Lenders holding 1L Notes, the Borrower will cause a rating to be obtained for the 1L Notes, with further details to be included in the definitive documentation.

- Covenants and Events of Default for 1L Notes: similar to investment grade corporate credits of this type.

| | |
|---|---|
| | • Covenants and Events of Default for 1L Loans: similar to CTA, except as the parties may otherwise agree. Obligations under Share Retention Agreement (as defined in CTA) will apply.<br>• Subject to U.S. bankruptcy rules, New 1L Debt will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Deferred Payment Agreement (as defined in the CTA).<br>• All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 1L Lenders.<br>• Assignment:<br>   – For 1L Loans - same as in existing documentation unless otherwise agreed.<br>   – For 1L Notes – restrictions in existing documentation will not apply.<br>• Voting Rights: to be addressed in Intercreditor Agreement.  Any New 1L Debt acquired or held by a Borrower affiliate will not have any voting rights. |
| **New Senior Second Lien Debt** | • Borrower:  Alto Maipo SpA<br>• Amount: estimated at $995,314,442 (equal to the amount of prepetition secured claims, including the liquidated amount of the interest rate swaps, <u>less</u> the aggregate principal amount of the New 1L Debt)[2] (the "<u>New 2L Debt</u>"). Lenders under the New 2L Debt are referred to as the "<u>New 2L Lenders</u>".<br>• Collateral: second lien on all assets included in the collateral package for the New 1L Debt.<br>• Prior to the earliest of (such date, the "Applicable Date") (i) the go-to-market on the New 1L Debt, (ii) the New 1L Debt being otherwise refinanced in accordance with the definitive documents, (iii) a credit rating being obtained in respect of the New 1L Debt, following a request of the New 1L Lenders for such credit rating, (iii) twelve months after COD, and (iv) a calendar date to be agreed, the New 2L Debt will be secured by a first priority lien (ranking pari passu with the lien securing the New 1L Debt) on all physical assets of the Borrower.  This first priority lien benefiting the New 2L Debt will be automatically released on the Applicable Date.<br>• Maturity: October 15, 2042, extendable at each New 2L Lender's individual option to October 2052.<br>• Payment Dates same as cash sweep dates.<br>• Interest rate: 2% per annum fixed, paid in cash or capitalized (PIK) based on available cash flow, subject to increase by the Upside Fee.  Interest begins to accrue on the date the Borrower exits bankruptcy.<br>• Default interest rate: additional 2%. |

---

[2] This amount will be updated to include the total amount of prepetition claims after the interest rate swaps have been liquidated, and to reflect accrued interest through the date of the bankruptcy filing.

- Upside Fee: after each calendar year end, 50% of the difference (if positive), between actual Cash Flow Available for Debt Service[3] as defined in the CTA with necessary conforming changes ("CFADS") and projected CFADS (per the Borrower's base case financial model dated October 26, 2021, attached as Exhibit A to this Term sheet) will be payable to the New 2L Lenders as additional interest until the New 2L Debt has been fully repaid or is converted to shares in the Borrower.

  – Payment of Upside Fee is uncapped, but may never be less than zero.
  – Upside Fee for each calendar year will be earned on December 31st (or, if New 2L Debt matures in 2052, on the maturity date), such that if the New 2L Debt is fully repaid on or prior to December 30th of any calendar year (or the maturity date in 2052), no Upside Fee would be payable for that year.
  – Commencing in January 2043, any Upside Fee is reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042.

- Scheduled Amortization: None.

- Cash Sweep: 100% of excess cash flow, reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042. Excess cash flow will be calculated as all cash of the Borrower after (i) payment of all operation and maintenance expenses, permitted capital expenditures, and other permitted Project-related expenses to be agreed in accordance with the then-effective annual budget, (ii) payment of all scheduled debt service and mandatory prepayment on the Exit Financing and New 1L Debt (or any refinancing of the Exit Financing and New 1L Debt), and (iii) cash on hand of the Borrower in the amount of $25 million. Cash sweep will be paid April 15 and October 15. When cash sweep is paid, an estimated amount will be reserved (and excluded from the cash sweep) based on the projected Upside Fee calculation for the then-current calendar year.

- No prepayment penalty

- Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid), subject to a cap of 20% of total outstanding shares in the Borrower (after giving effect to this debt-to-equity conversion) in October 2042 and no cap in October 2052. The converted shares will have rights to be agreed in the definitive documents.

  – For each New 2L Lender who does not elect to extend the maturity of its New 2L Debt to 2052, the percentage of shares in the Borrower that it will receive will be calculated as follows: (i) the percentage of shares (subject to a 20% cap) that would have corresponded to all New 2L Lenders if 100% of New 2L Debt matured at October 2042 and the Shared Services Loan was converted to shares at October 2042, multiplied by (ii) the percentage of

---

[3] To be defined in a manner similar to the CTA, unless otherwise agreed, with changes to capture all revenue of Borrower other than (x) proceeds of the CNM Arbitration and (y) revenues required to be applied for mandatory prepayment of the New 1L Debt.

the outstanding principal amount of New 2L Debt held by such New 2L Lender who did not extend its New 2L Debt maturity date over the total outstanding principal amount of all New 2L Debt.

– The definitive documents will include provisions to equitably address the value of shares held by New 2L Lenders whose New 2L Debt converts in 2042 in the scenario where remaining New 2L Debt converts to shares in 2052.

- Covenants and Events of Default for New 2L Debt: similar to CTA, except as the parties may otherwise agree.
- Subject to U.S. bankruptcy rules, New 2L Debt will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Financing Agreement (as defined in the CTA).
- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 2L Lenders.
- Assignment: same as in existing documentation unless otherwise agreed.[4]
- Voting Rights: to be addressed in Intercreditor Agreement.  Any New 2L Debt acquired or held by a Borrower affiliate will not have any voting rights.

| **Shared Services Loan** | <ul><li>All intercompany payments due to AES Andes (or any permitted transferee) by the Borrower pursuant to the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the CTA), and that are currently deferred under the terms of those contracts until the existing senior debt discharge date, will be paid in the form of a loan (the "<u>Shared Services Loan</u>").  Those intercompany payments will be paid in the form of a disbursement under the Shared Services Loan.</li><li>Interest Rate: same as New 2L Debt (including any Upside Fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.</li><li>Maturity: latest date of scheduled maturity for any New 2L Debt.</li><li>Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid).<br><br>– If the maturity of all New 2L Debt is extended to 2052, the Shared Services Loan shall mature in 2052 and convert into a percentage of the shares equal to the ratable share of the New 2L Debt balance plus the Shared Services Loan balance, in each case outstanding at the time.  If all New 2L Debt converts to equity in 2042, the</li></ul> |
| --- | --- |

---

[4] Borrower would not have a consent right on transfers of New 2L Debt for any New 2L Lenders who elect to have their New 2L Debt documented in the form of notes with the same covenants as the 1L Notes. .If any New 2L Lender elects  the notes option, this debt will be documented in separate instruments, each of which will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters. Assignment restrictions in existing documentation will not apply to New 2L Debt that takes the form of notes with the same covenants as the 1L Notes.

| | |
|---|---|
| | Shared Services Loan will mature in 2042 and its pro rata share of shares in the Borrower will be subject to an 80% equity floor.<br>– The definitive documents will include provisions to equitably address the conversion of the Shared Services Loan to shares in the Borrower where a portion of the New 2L Debt converts to shares in 2042 and the remainder of New 2L Debt converts to shares in 2052. |
| **Hedge Agreements** | • All Hedging Agreements with Hedging Counterparties (in each case, as defined in the CTA) shall be terminated, and any amounts due thereunder shall be converted into New 1L Debt and New 2L Debt on a pro rata basis, based on the mark-to-market value on the date of termination as determined in accordance with the terms of the Hedging Agreements. |
| **Strabag** | • To receive (a) an allowed, secured, perfected $391.5 million "Supplier Deferred Payment" claim entitled to *pari passu* treatment with other prepetition first-lien claims pursuant to and subject to confirmation of the Plan of Reorganization contemplated hereby, allocated to New 1L Debt and New 2L Debt in the same proportion as the other prepetition first-lien claims, irrespective of whether the condition(s) to payment of the Supplier Deferred Payment under the Tunneling Contract have been satisfied as of the Plan Effective Date, *provided, however*, that if such condition(s) to payment have not been satisfied as of the Plan Effective Date, Strabag's pro rata share of the New 1L Debt and New 2L Debt shall be held in escrow pending satisfaction of such condition(s); (b) the following amounts to be paid in cash as trade payables for construction costs (less any payments on account of these items made to date): (i) December installment (i.e., final installment due to Strabag) of $5 million due on December 1st, (ii) (A) $761,030 upon completion of signed Change Order 1, (B) $326,240 upon completion of signed Change Order 2, and (C) $53,827 upon completion of signed Change Order 4, and (iii) $10 million upon substantial completion of Volcan (Milestone F); and (c) upon receipt, $6,268,020.99 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152).<br>• Notwithstanding anything to the contrary herein, Strabag shall continue to be obligated to pay Alto Maipo in cash for power purchased by Strabag pursuant to Section 2.13.2 of the Tunneling Contract, including any amounts accrued but unpaid pre-petition.<br>• All other claims and counterclaims existing as of the date of execution of this term sheet (including construction claims, change order claims, future bonuses, etc.) to be mutually waived.<br>• All subordinated debt and common equity held and to be earned by Strabag through COD to be discharged.<br>• Tunneling Contract to be assumed, subject to mutual waiver of all other claims (except as agreed) and agreement to the restructuring term sheet<br>• Any future Changes initiated by the Borrower must be approved by the New 1L Lenders and New 2L Lenders (provided that any New 1L Debt and New 2L Debt held by Strabag will be excluded from voting on such approval). All future Changes that are within scope of the Tunneling Contract shall be performed by Strabag without further |

|  | |
|---|---|
|  | compensation in cash or otherwise. Subject to receiving approval from the New 1L Lenders and New 2L Lenders as specified above, Borrower shall issue a Change Order and pay Strabag in cash for all future Changes that are outside the scope of the Tunneling Contract.  The Borrower and Strabag shall work together in good faith to negotiate a streamlined process for resolving Change Disputes.  Pending agreement on such streamlined process, in the event that Strabag disputes whether a Change is within or outside of the scope of the Tunneling Contract (a "<u>Change Dispute</u>"), the Borrower and Strabag shall follow the procedures set forth in the Tunneling Contract to resolve such dispute.<br>  – Strabag agrees that existing change orders shall be compensated only through the consideration described herein.<br>• Borrower shall pay to Strabag, as adequate protection, $210,000 for Strabag's attorneys' fees incurred in connection with its secured claim.<br>• Strabag shall have the same rights as Senior Lenders under the amended and restated Intercreditor Agreement (other than on matters related to the Tunneling Contract, where Strabag will not have voting rights). |
| **Other Unsecured Claims** | • Subordinated debt (including all Subordinated Loans as defined in the CTA): to be discharged.<br>• Voith: contract to be assumed as amended pursuant to settlement agreement, subject to court approval.<br>• Other unsecured claims: to be discharged. |
| **Equity** | • Existing shares in Borrower to be cancelled.<br>• AES Andes will receive 100% of the reorganized shares in the Borrower, subject to conversion of New 2L Debt and Shared Services Loan (if applicable).<br>• No dividends or distributions until Exit Financing, VAT Financing, New 1L Debt and New 2L Debt have been repaid in full. |
| **CNM Arbitration** | • Application of proceeds:<br>  – First, to repay any DIP or Exit Financing amount outstanding<br>  – Second, to repay $50 million of New 1L Debt (inverse order of maturity); after payment, New 1L Debt balance will amortize to $450 million at maturity.<br>  – Third, to repay New 2L Debt |
| **Battery Business / Related Party Transactions** | • Undertakings to ensure that any development of battery storage or similar business with energy generated by Alto Maipo, using water rights, land rights or other infrastructure of Alto Maipo, or otherwise associated with the Alto Maipo project (i) must be approved by the New 1L Lenders and the New 2L Lenders, and (ii) will only be undertaken with the objective of increasing value to the Borrower. |

| | |
|---|---|
| | • Any transaction (including any modification to existing contract terms) with related companies of the Borrower must be approved by the New 1L Lenders and the New 2L Lenders. |
| **VAT Financing Backstop** | • Lenders will use their commercially reasonable efforts to arrange a committed VAT financing within 30 days from the Chapter 11 filing date to pay the full amount of the VAT due upon issuance of the invoice for the Supplier Deferred Payment (as defined in the CTA) by Strabag.  It is expected that some (but not all) of the existing senior lenders will provide commitments for VAT financing. Lenders' financial advisors have been informed that certain lenders have approvals for commitments, subject to customary conditions, as of the date hereof in an aggregate total amount of $[33] million.<br>• Terms substantially similar to those contemplated for VAT Loan under and as defined in the CTA.<br>• Tenor: 12 months.<br>• No Up-Front Fee.<br>• Interest Rate: 5% per annum, calculated over the outstanding amount of the VAT Loan in US Dollars.<br>• Definitive documents will address mechanics around currency exchange risk related to funding and repayment of the VAT Loan. |
| **DIP Financing** | • Size: $50 million Revolving Credit Facility<br><br>• Separate debt basket to address VAT expenses<br><br>• Available to the extent required to maintain minimum cash on hand of Borrower during bankruptcy case of $10 million<br><br>• Rate and fees accrue through separate account and shall not impact availability<br><br>• Interest Rate: 4.0%, payable in kind<br><br>• Unused Fee: 0.75% on undrawn portion, payable in kind<br><br>• Fees: 1.00% origination fee, payable in kind<br><br>• Maturity: 12 months from Chapter 11 filing date<br><br>• Milestones and other terms are included in separate DIP Financing term sheet |

| | |
|---|---|
| **Exit Financing** | <ul><li>Purpose: repay DIP Financing as a condition to Borrower exiting bankruptcy</li><li>Lenders: DIP Financing provider</li><li>Maturity: 2 years post-emergence</li><li>Scheduled Amortization: equal quarterly installments</li><li>Payment Dates: Quarterly, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.</li><li>Rank: super-senior first-lien on all assets (ranks senior to New 1L Debt), other than proceeds of reimbursement of VAT that was financed with the VAT Financing.</li><li>Interest rate: 4.0%, cash pay on Payment Dates.</li><li>Cure Periods: Exit Financing lender will not be entitled to exercise any remedies following an event of default on the Exit Financing until a cure period of at least 120 days has elapsed.</li><li>New 1L Lender & New 2L Lender Rights:<ul><li>New 1L Lenders and New 2L Lenders will have a right (but not an obligation) to cure or cause to be cured on behalf of Borrower.</li><li>New 1L Lenders and New 2L Lenders will have a right to purchase (directly or through an affiliate) their pro rata share of the Exit Financing at par at any time. If any New 1L Lender or New 2L Lender declines to purchase its pro rata share of Exit Financing, other New 1L Lenders and New 2L Lenders may increase their share.</li></ul></li><li>No cash fee for roll-over</li><li>Concessions on exit financing commitment considered as part of AES Andes new value contribution</li></ul> |

**Exhibit A**
**CFADS Calculation from October 26, 2021 Borrower Base Case Financial Model**

| USD million | 2022 [a] | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 57,225,230 | 130,495,469 | 102,893,412 | 103,967,235 | 104,927,608 | 107,900,969 | 110,722,532 | 111,020,930 | 112,498,092 | 115,652,187 | 117,802,122 | 120,261,569 |

| USD million | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 122,452,323 | 125,069,008 | 131,138,009 | 132,889,488 | 135,477,295 | 139,494,182 | 110,274,347 | 73,426,163 | 75,388,676 | 77,151,354 | 78,690,780 | 80,340,910 |

| USD million | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 [b] |
|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | 82,024,812 | 83,752,525 | 85,454,217 | 87,074,358 | 88,809,930 | 91,576,476 | 89,410,564 |

## <u>EXHIBIT B TO STRUCTURING SUPPORT AGREEMENT</u>

## FORM OF TRANSFER AGREEMENT

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of November 16, 2021, by and among the Company, the Shareholders, the Sponsor and Consenting Creditors, including the transferor (the "<u>Transferor</u>") to the Transferee of any Alto Maipo Obligations, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed: _____

_____
Print name of Transferee

_____
Name:
Title:
Address:
_____

_____

_____
Attention:
_____
Telephone:
_____
Facsimile:
_____

## Transferor's Principal Amount Held

| *Alto Maipo Obligation* | *Amount* |
|---|---|
| | US$ |

# AMENDMENT NO. 1 TO THE RESTRUCTURING SUPPORT AGREEMENT

This Amendment No. 1, dated as of November 23, 2021 ("***Amendment No. 1***"), to the Restructuring Support Agreement, dated as of November 16, 2021 (as it may be amended, supplemented or otherwise modified from time to time, the "***RSA***"), is entered into by and among the Company, Norgener, AES Andes, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Deutsche Bank AG, London Branch, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP, Warbler Run I LLC, Warbler Run II LLC and KfW IPEX-Bank GmbH.  Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the RSA shall have the meanings ascribed to them in the RSA. Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Deutsche Bank AG, London Branch, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP, Warbler Run I LLC, Warbler Run II LLC and KfW IPEX-Bank GmbH will be referred to herein collectively as the "***Supporting Senior Lenders***" and the Supporting Senior Lenders together with Strabag will be referred to herein as the "***Consenting Creditors***."  The Consenting Creditors, collectively with the Company, Norgener and AES Andes will be referred to herein collectively as the "***Parties***."

## RECITALS

**WHEREAS,** the Parties entered into the RSA to implement a restructuring pursuant to the RSA;

**WHEREAS**, the Company commenced the Chapter 11 Cases in the Bankruptcy Court on November 17, 2021;

**WHEREAS**, Deutsche Bank AG, London Branch, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP, and KfW IPEX-Bank GmbH desire to become parties to the RSA, subject to the revisions to the RSA and to Annex III to the Plan Term Sheet (the "***Restructuring Term Sheet***"), included as Exhibit A to the RSA, as provided herein;

**WHEREAS**, the Parties desire to amend the RSA to clarify that the RSA and its exhibits may only be amended with the consent of each Consenting Creditor, as provided in Section 4 of the RSA.

**WHEREAS**, the Parties further desire to revise the Restructuring Term Sheet to provide that, when and if the Company goes to market to seek refinancing of the New 1L Debt, the Consenting Creditors will have the right and entitlement to exchange all or a portion of their New 1L Debt for the securities offered by the Company to refinance the New 1L Debt, subject to the terms and conditions of such refinancing;

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Conditions to Effectiveness</u>.  This Amendment No. 1 shall become effective as of the date (the "***Amendment No. 1 Effective Date***") that the Company and counsel to the

Consenting Creditors receives an electronic copy of this Amendment No.1, duly authorized, executed and delivered by each of the Parties hereto.

2. <u>Amendments</u>. The RSA is hereby amended as follows:

   a. Section 3.01(i) of the RSA is amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable))

      the amendment, modification or filing of a pleading by the Company seeking to amend or modify the Restructuring Documents (or, with respect to Strabag, reject the Tunneling Construction Contract), or any documents related to the foregoing, including motions, notices, exhibits, appendices and orders, in respect of which the consent of the ~~Required~~ Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag) is required under this Agreement, without the prior consent of the ~~Required~~ Consenting Creditors (or, with respect to rejection of the Tunneling Construction Contract, Strabag), and such pleading or related document has not been withdrawn prior to the earliest of (i) three (3) business days of the Company's or Sponsor's receiving written notice in accordance with Section 5.09 hereof from counsel to the ~~Required~~ Consenting ***Creditors*** ~~Lenders~~ (or, with respect to rejection of the Tunneling Construction Contract, counsel to Strabag) that such motion or pleading violates this Section 3.01(i), and (ii) entry of an order of the Bankruptcy Court approving such motion, which termination shall be effective upon ***any*** ~~the Required~~ Consenting Creditor***'s*** (or, with respect to rejection of the Tunneling Construction Contract, Strabag's) delivery of written notice of termination to all Parties in accordance with Section 5.09 hereof;

   b. The third bullet under the section "New Senior First Lien Debt" of the Restructuring Term Sheet is amended  as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

      - Borrower will be required to go-to-market within 6 months after COD[1] to seek refinancing of the New 1L Debt.  At the option of the New 1L Lenders, the deadline for completing this mandatory go-to-market may be extended by an additional 6 months.

         – Borrower will use commercially reasonable efforts to secure full refinancing of 100% of the New 1L Debt with this go-to-market, with additional details on process to be included in the definitive documentation.  Borrower will engage ~~qualified third party professionals~~***at least two international banks*** to support and facilitate the go-to-market effort.  Regular updates and disclosures will be made

---

[1] COD to be defined in definitive documents by parties acting in good faith.

to the New 1L Lenders and the New 2L Lenders with respect to the timeline and process for the go-to-market, with detailed terms and conditions to be agreed in definitive documents, including access to and copies of material documentation, projections and presentations, subject to limitations and non-disclosure restrictions customary for these type of transactions to be agreed.

– The refinancing instrument must include the following terms:

- 100% of the New 1L Debt then outstanding

- first lien debt of the Borrower *(same as New 1L Debt)*

- scheduled amortization that will result in outstanding principal being reduced to $500 million by June 2040

- ~~all other terms equal or better for Alto Maipo when compared to the terms of the New 1L Debt.~~*Notes will have market standard terms for investment grade bonds (i.e., two ratings, listing of the notes, covenants, call protection, etc) and will have an interest rate of 4% or lower and the same or longer weighted average life as the New 1L Debt.*

- if interest rate is lower than 4%, refinancing instrument will be ~~sized~~*upsized*, and proceeds will be applied, so that proceeds prepay part of the New 2L Debt

– To the extent this go-to-market is unable to achieve a full refinancing of the New 1L Debt on the required terms specified above, *but the go-to-market achieves a successful refinancing of the New 1L Debt with a minimum size of $600,000,000 (at least $300,000,000 of which is new money, and the remainder of which may be New 1L Lenders who elected to participate, as described in further detail below), the refinancing will close.*

– *In addition to the foregoing, the New 1L Lenders will have the right and entitlement to participate in the book building process for the go-to-market (and not thereafter) by exchanging all or a portion of their New 1L Debt for an amount of the securities offered by the Borrower to refinance the New 1L Debt equal to their pro rata share of the total order book, without any preference and subject to the terms and conditions of such refinancing. During the book building process the New 1L Lenders who elect to participate will specify the lowest interest rate at which they would be willing to participate in the refinancing. Any New 1L Debt exchanged by the New 1L Lenders pursuant to the foregoing will be extinguished and all obligations thereunder fully discharged as of the settlement of such exchange.*

– *To the extent this go-to-market is unable to achieve a refinancing of the New 1L Debt on either set of required terms specified above,* any

Case 21-11507-KBO   Doc 420   Filed 09/15/21   Page 5 of 18

refinancing of the New 1L Debt must be on terms acceptable to the New 1L Lenders.

3. <u>Creditor's Holdings</u>. Each Consenting Creditor represents that, as of the date hereof, it beneficially owns (and/or serves as the investment advisor or manager for the beneficial owner(s) with the power to vote and dispose of) the principal amount of Alto Maipo Obligations set forth next to such Consenting Creditor's name on Schedule 1 hereto.

4. <u>Reservation of Rights</u>: Nothing in this Amendment No.1 is intended to, or does, in any manner waive, limit, impair, or restrict any rights, objections and defenses of any Party hereto (i) to contest or seek allowance of the Hedge Agreement Termination Amounts listed in Schedule I hereto, which represent damages in respect of terminations of Hedging Agreements (as defined in the Common Terms Agreements) or (ii) to the extent the Alto Maipo Obligations listed in Schedule I hereto include any amounts on account of interest asserted to have accrued on or after the Petition Date, to contest or seek allowance of any such amounts.

5. <u>Effectiveness</u>. On or after the Amendment No. 1 Effective Date, each reference in the RSA to "Restructuring Support Agreement," "hereunder," "hereof," "herein," or words of like import referring to the RSA shall mean and be a reference to the RSA, as amended by this Amendment No. 1. Except as expressly amended by this Amendment No. 1, the provisions of the RSA, including, without limitation, all other terms provided for in the Restructuring Term Sheet, are and shall remain in full force and effect without modification.

6. <u>Governing Law</u>. This Amendment No. 1 shall be governed and construed and enforced in accordance with the laws of the State of New York, United States of America without taking into account its conflicts of laws principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

7. <u>Counterparts</u>. This Amendment No. 1 may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8. <u>Entire Agreement</u>. The RSA, as amended by this Amendment No. 1, constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature Pages Follow]

4

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No.1 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 1 Effective Date.

ALTO MAIPO SPA

By: _____
    Name: JAVIOR DIA
    Title: PRESIDENT

AES ANDES S.A.

By: _____
    Name: Ricardo Falù
    Title: CEO

NORGENER RENOVABLES SPA

By: _____
    Name:
    Title:

5

**BANCO DE CRÉDITO E INVERSIONES**

Name: CRISTIAN DEL RÍO
Title: GERENTE COMERCIAL BANCA CORPORAT-A
Address: EL GOLF 125, Stjo, Chile.

**Attention:**
**Telephone:**
**Facsimile:**

**DNB BANK ASA**

**Name: Eivind Hildre**      **Nils Fykse**
**Title:  SVP**                        **SVP**

**Address: Dronning Eufemias gt 30**
**0191 Oslo, Norway**


**Attention:**
**Eivind Hildre (eivind.hildre@dnb.no)**
**Nils Fykse (nils.fykse@dnb.no)**

**Telephone: +4791504800**
**Facsimile: n/a**

**ITAÚ CORPBANCA**



Name: **Sebastián Romero Evans**
Title: **Officer**
Telephone: **56283406213**
Address: **Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**


**ITAÚ CORPBANCA**

Name: **Carlos Irarrázaval Cruzat**
Title: **Officer**
Telephone: **56283406277**
Address: **Presidente Riesco 5537, Las Condes,**
**Santiago, Chile**

[SIGNATURE PAGE AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT]

**DEUTSCHE BANK AG, LONDON BRANCH**

_(signatures)_

| | | |
|---|---|---|
| **Name:** | Alex Williamson | Simon Glennie |
| **Title:** | Managing Director | Managing Director |

**Address:** Winchester House, 1 Great Winchester Street, EC2N 2DB London, United Kingdom

**Attention:** Alex Williamson/ Ignacio Guzman / Chris Ballantyne
**Telephone:** +44 20 7545 0276
**Facsimile:**
**Email:** Alex.williamson@db.com / ignacio.guzman-s@db.com / christopher.ballantyne@db.com

**SANTANA S.A.**

Name: Leonidas Vial
Title:   Chairman

Address: El Bosque Norte 0177, Piso 16
Las Condes
Santiago - Chile


Attention: Jeannette Saint Anne,
jsaint@santana.cl
Telephone: 22 9015520
Facsimile:

**Moneda S.A. Administradora General de Fondos**
**On behalf of**
**MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSIÓN**

_____
**Name:** Martin Cipriani
**Title:** C.O.O

_____
**Name:** Daniel Vargas
**Title:** Portfolio Manager

**Address: Isidora Goyenechea 3621, 8ᵗʰ Floor**

**Attention: Jose Kliksberg e-mail: jkliksberg@monedausa.com**
**Telephone: +56223377900**
**Facsimile: +56223377999**

**Moneda S.A. Administradora General de Fondos**
**On behalf of**
**MONEDA ALTURAS II FONDO DE INVERSIÓN**

**Name:**   Martin Cipriani
**Title:**    C.O.O

**Name:**   Daniel Vargas
**Title:**    Portfolio Manager

**Address:  Isidora Goyenechea 3621, 8th Floor**

**Attention:  Jose Kliksberg e-mail: jkliksberg@monedausa.com**
**Telephone: +56223377900**
**Facsimile: +56223377999**

**NINETEEN77 CAPITAL SOLUTIONS LP**
By, UBS O'Connor LLC, its investment manager

_____
**Name:** Rodrigo Trelles
**Title:** Managing Director

_____
**Name:** Baxter Wasson
**Title:** Managing Director


**Address:**
Nineteen77 Capital Solutions LP
c/o UBS O'Connor LLC
787 7th Avenue, 13th Floor
New York, NY, 10019

**Attention:** Rodrigo Trelles, Baxter Wasson, Joshua Mercado
**Telephone:** (1) 212-821-6455**,** (1) 212-821-5942, (1) 212-713-4040
**Email:** rodrigo.trelles@ubs.com, baxter.wasson@ubs.com, joshua.mercado@ubs.com, ol-ocs@ubs.com

**CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY II LP**
By, UBS O'Connor LLC, its investment manager

_____
**Name:** Rodrigo Trelles
**Title:** Managing Director

_____
**Name:** Baxter Wasson
**Title:** Managing Director


**Address:**
CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY II LP
c/o UBS O'Connor LLC
787 7th Avenue, 13th Floor
New York, NY, 10019

**Attention:** Rodrigo Trelles, Baxter Wasson, Joshua Mercado
**Telephone:** (1) 212-821-6455**,** (1) 212-821-5942, (1) 212-713-4040
**Email:** rodrigo.trelles@ubs.com, baxter.wasson@ubs.com, joshua.mercado@ubs.com, ol-ocs@ubs.com

**WARBLER RUN I LLC**

_[signature]_
_____
Name: **S. Vezina**
Title: **Authorized Signatory**

**Address: 500 Boylston St, 24th Fl.**
Boston, MA  02116


**Attention: Tim Caflisch;**
**tcaflisch@finepointcap.com**
Ops@finepointcap.com
**Telephone: 617-336-2200**
**Facsimile: 617-336-2276**

**WARBLER RUN II LLC**

___S. Vezina_____

**Name: S. Vezina**
**Title:   Authorized Signatory**

**Address: 500 Boylston St, 24th Fl.**
          Boston, MA  02116


**Attention:  Tim Caflisch**
**tcaflisch@finepointcap.com**
Ops@finepointcap.com
**Telephone:  617-336-2200**
**Facsimile:   617-336-2276**

**STRABAG SpA**

Name: Mario THEURL
Title: Authorized Signatory

Name: Philipp RAINER
Title: Authorized Signatory

**Address:**
Alonso de Cordova 4355, Of 901
Vitacura, Santiago de Chile

**Attention: Dirk Pförtner**
**Telephone:+56 919595890**

**KFW IPEX-BANK GMBH**

_____

**Name: Fanenbruck** / **Rausch**
**Title:   Director** / **Director**

**Address:**
**KfW-IPEX Bank GmbH,**
**Department X4c1**
**Palmengartenstrasse 5-9,**
**60325 Frankfurt am Main**
**Germany**


**Attention: Mr. Martin Fanenbruck / Mr. Michael Rausch**
**Telephone: 0049 69 7431 -2636 or -4888**
**Facsimile: n/a**
**Email: martin.fanenbruck@kfw.de / michael.rausch@kfw.de**

**Schedule I - Principal Amount of Alto Maipo Obligations Owned**

| Consenting Creditor | Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Termination Amount (in USD) |
|---|---|---|---|
| Banco De Crédito e Inversiones | $229,286,013.20 | $183,226,085.49 | $46,059,927.71 |
| DNB Bank ASA | $139,047,163.37 | $119,473,667.82 | $19,573,495.55 |
| Itaú Corpbanca | $269,444,996.76 | $171,387,562.76 | $98,057,434.00 |
| Deutsche Bank AG London Branch | $146,683,553.20 | $146,683,553.20 | |
| Santana S.A. | $95,489,054.86 | $95,489,054.86 | |
| Moneda Deuda Latinoamericana Fondo de Inversión | $59,126,349.22 | $59,126,349.22 | |
| Moneda Alturas II Fondo de Inversión | $23,650,539.65 | $23,650,539.65 | |
| Nineteen77 Capital Solutions LP | $78,408,915.68 | $78,408,915.68 | |
| Clover Private Credit Opportunities Secondary II LP | $43,378,054.05 | $43,378,054.05 | |
| Warbler Run I LLC | $46,058,780.48 | $46,058,780.48 | |
| Warbler Run II LLC | $48,066,436.81 | $48,066,436.81 | |
| Strabag | $391,500,000.00 | $391,500,000.00 | |
| KfW IPEX-Bank GmbH | $19,695,837.10 | | $19,695,837.10 |
| **Total** | **US$1,589,835,694.38** | **US$1,406,449,000.02** | **US$183,386,694.36** |

## JOINDER AGREEMENT

The undersigned hereby acknowledges that it has read and understands the Restructuring Support Agreement dated as of November 16, 2021, as amended as of November 23, 2021 (the "Agreement"), by and among the Company, the Shareholders, the Sponsor and Consenting Creditors, and agrees to be bound by the terms and conditions thereof to the extent the Supporting Senior Lenders are thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The undersigned hereby makes the representations and warranties of the Consenting Creditors set forth in Section 2 of the Agreement to the other Parties. This joinder shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law).

Date Executed: 10/12/2021

Regera Sarl

Name: William Jones    Pamela Valasuo
Title:   Manager          Manager

Address:
  1, place d'Armes

  L-1336 Luxembourg

  Luxembourg

Attention:
  Naumaan Amjed
Telephone:
  +44 20 3023 8611
Facsimile:

### Principal Amount Held by Regera Sarl

| Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Termination Amount (in USD) |
|---|---|---|
| $11,785,148.87 | $11,785,148.87 | $0.00 |

## AMENDMENT NO. 2 TO RESTRUCURING SUPPORT AGREEMENT

**WHEREAS**, the Company, the Supporting Senior Lenders,[1] Strabag, Norgener, the Consenting Creditors, and the other parties thereto (collectively, the "<u>Parties</u>") entered into the Restructuring Support Agreement (as subsequently amended and supplemented, including by RSA Amendment No. 1, as defined below, the "<u>RSA</u>"), dated as of November 16, 2021;

**WHEREAS**, the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on November 17, 2021;

**WHEREAS**, on November 17, 2021, the Debtors filed the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 13] with the Bankruptcy Court, to which the RSA was attached as Exhibit A;

**WHEREAS**, on November 23, 2021, the Parties entered into Amendment No. 1 to the Restructuring Support Agreement ("<u>RSA Amendment No. 1</u>") modifying certain terms of the RSA, which RSA Amendment No. 1 was filed with the Bankruptcy Court as Exhibit A to the *Notice of Filing of Amended Restructuring Support Agreement* [Docket No. 100];

**WHEREAS**, on or about December 10, 2021, an additional Senior Lender executed a Joinder Agreement and became a party to the RSA, which Joinder Agreement was filed with the Bankruptcy Court as Exhibit A to the *Joinder Agreement to Restructuring Support Agreement* [Docket No.167];

**WHEREAS,** the Parties now wish to further amend the terms of the RSA;

**NOW, THEREFORE**, in consideration of in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

Case 21-11507-KBO    Doc 139-1    Filed 01/04/22    Page 5 of 180

I. <u>Conditions to Effectiveness.</u> This Amendment No. 2 shall become effective with respect to each Consenting Creditor as of the date (the "<u>Amendment No. 2 Effective Date</u>") that both the Company and counsel to such Consenting Creditor receive an electronic copy of this Amendment No. 2, duly authorized, executed and delivered by both the Company and such Consenting Creditor.

---

[1]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the RSA, including annexes and attachments thereto, as amended and supplemented from time to time.

2. <u>Amendment</u>.  The RSA is hereby amended as follows:

    a. Section 3.01(t) of the RSA is hereby amended and replaced by the following:

    (i) the failure of the Company to submit a motion to the Bankruptcy Court by February 16, 2022 requesting an order of the court authorizing and directing the Company to assume the RSA (as amended), or (ii) the failure of the Bankruptcy Court to enter an order by March 4, 2022 authorizing and directing the Company to assume the RSA (as amended).

3. <u>Effectiveness</u>. On or after the Amendment No. 2 Effective Date, each reference in the RSA to "Restructuring Support Agreement," "hereunder," "hereof," "herein," or words of like import referring to the RSA shall mean and be a reference to the RSA, as amended by this Amendment No. 2.  Except as expressly amended by this Amendment No. 2, the provisions of the RSA, including, without limitation, all other terms provided for in the Restructuring Term Sheet, are and shall remain in full force and effect without modification.

4. <u>Governing Law</u>. This Amendment No. 2 shall be governed and construed and enforced in accordance with the laws of the State of New York, United States of America without taking into account its conflicts of laws principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

5. <u>Counterparts</u>. This Amendment No. 2 may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

6. <u>Entire Agreement</u>. The RSA, as amended by this Amendment No. 2, constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature pages follow]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Amendment No. 2 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 2 Effective Date.

Date: January 31, 2022

ALTO MAIPO SPA

By: _____

Name: JAVER DIB

Title: PRESIDENT.

**SANTANA S.A.**

_____

Name:  Leonidas Vial
Title: Chairman

Address: El Bosque Norte 0177 Piso  16
,Las Condes, Santiago - Chile

Attention:  Jeannette Saint Anne
Telephone: 56 22 9015521
Email:jsaint@santana.cl

**BANCO DE CRÉDITO E INVERSIONES**

Name: JOSÉ LUIS FIGUERAS SEPÚLVEDA
Title: GERENTE BANCA CORPORATIVA BCI.

Address: EL GOLF 125. LAS CONDES

Attention:
Telephone:
Email:

Name: MARCELO SAAVEDRA GALAZ
Title: DIRECTOR CORPORATE BANK

Address: EL GOLF 125. PISO 14. LAS CONDES. SANTIAGO

Attention:
Telephone:
Email:

[SIGNATURE PAGE TO SECOND AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT]

**NINETEEN 77 CAPITAL SOLUTIONS LP**

By, UBS O Connor LLC, its investment manager

_____

**Name: Rodrigo Trelles**
**Title: Managing Director**

_____

**Name: Baxter Wasson**
**Title: Managing Director**

**Address: 787 7th Avenue**
13th Floor
New York, NY 10019
**Attention: O'Connor Capital Solutions**
**Telephone: +1-212-713-4040**
**Email: OL-OCS@ubs.com**

**CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY II LP**

By, UBS O Connor LLC, its investment manager

_____

**Name: Rodrigo Trelles**
**Title: Managing Director**

_____

**Name: Baxter Wasson**
**Title: Managing Director**

**Address: 787 7th Avenue**
13th Floor
New York, NY 10019
**Attention: O'Connor Capital Solutions**
**Telephone: +1-212-713-4040**
**Email: OL-OCS@ubs.com**

**CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY (Levered) II LP**
By, UBS O Connor LLC, its investment manager

_____
**Name: Rodrigo Trelles**
**Title: Managing Director**

_____
**Name: Baxter Wasson**
**Title: Managing Director**

**Address: 787 7th Avenue**
13th Floor
New York, NY 10019
**Attention: O'Connor Capital Solutions**
**Telephone: +1-212-713-4040**
**Email: OL-OCS@ubs.com**

**DNB BANK ASA**

_____

Name: Eivind Hildre
Title:   SVP

_____

Name: Nils Fykse
Title:   SVP

Address: Dronning Eufemias gt 30,
              0191 Oslo, Norway


Attention: Eivind Hildre / Nils Fykse
Telephone: +47 91504800
Email: eivind.hildre@dnb.no
          nils.fykse@dnb.no

**ITAÚ CORPBANCA**



_____

**Name: Carlos Irarrázaval Cruzat**
**Title: Officer**



_____

**Name: Juan Enrique Vial Correa**
**Title: Officer**

**Address: Presidente Riesco 5537, piso
19, Las Condes, Santiago de Chile**

**Attention: Marilyn Ahuad.
Telephone: (56-2) 2834 6200
Email: Marilyn.Ahuad@itau.cl**

[SIGNATURE PAGE TO SECOND AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT]

**KFW IPEX-BANK GMBH**

Name:    Michael Rausch
Title:    Director


Name:    Hartmut Troschel
Title:    Vice President

Address:

Palmengartenstrasse 5-9
60325 Frankfurt/Main
Germany


Attention:    Martin Fanenbruck
Telephone:    +49 69 7431 4888
Email:    martin.fanenbruck@kfw.de

**STRABAG SPA**

_____

Name: **Edgar Paul Schömig**
Title: **Authorized Signatory**

_____

Name: **Mario Theurl**
Title: **Authorized Signatory**

**Address:**
Alonso de Córdova #4355
Vitacura, Santiago de Chile

**Attention: Philipp Rainer**
**Telephone:+56 2 32036612**
**Email:philipp.rainer@strabag.com**

**Moneda S.A. Administradora General de Fondos**
**On behalf of**
**MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSIÓN**

_____

**Name:** Martin Cipriani
**Title:** C.O.O

_____

**Name:** Pablo Caamaño
**Title:** Associate Director, Funds Operations

**Address:** Isidora Goyenechea 3621, Las Condes Santiago, Chile

**Attention:** Jose Klicksberg
**Telephone:** +1212 584 0595
**Email:** jklicksberg@monedausa.com

**Moneda S.A. Administradora General de Fondos**
**On behalf of**
**MONEDA ALTURAS II FONDO DE INVERSIÓN**

**Name:** Martin Cipriani
**Title:** C.O.O.

**Name:** Pablo Caamaño
**Title:** Associate Director, Funds Operations

**Address:**

**Attention:** Jose Klicksberg
**Telephone:** +1212 584 0595
**Email:** jkliksberg@monedausa.com

## JOINDER AGREEMENT

The undersigned hereby acknowledges that it has read and understands the Restructuring Support Agreement dated as of November 16, 2021, as amended as of November 23, 2021 and as further amended by Amendment No. 2 to Restructuring Support Agreement (the "Agreement"), by and among the Company, the Shareholders, the Sponsor and Consenting Creditors, and agrees to be bound by the terms and conditions thereof to the extent the Supporting
Senior Lenders are thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The undersigned hereby makes the representations and warranties of the Consenting Creditors set forth in Section 2 of the Agreement to the other Parties.

This joinder shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law).

Date Signed: February _7_, 2022

**CERBERUS FSBA CORPORATE CREDIT FUND, L.P.**

By: Cerberus FSBA Corporate Credit GP, LLC,
    its general partner

By:_____
    Jeffrey L. Lomasky
    Senior Managing Director

Address for Notices:

Cerberus FSBA Corporate Credit Fund, L.P.
c/o Cerberus Capital Management, L.P.
11th Floor 875 Third Avenue
New York, New York, New York 10022
212-891-2100
Attention: Rob Milam and Julian Lautersztain
Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com, lautersztain@cerberus.com

| Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Terminations Amount (in USD) |
|---|---|---|
| $10,000,000 | $10,000,000 2018 Loan Agreement | |

C3378/3304
210782601.1

## AMENDMENT NO. 3 TO THE RESTRUCTURING SUPPORT AGREEMENT

This Amendment No. 3, dated as of February 28, 2022 ("***Amendment No. 3***"), to the Restructuring Support Agreement, dated as of November 16, 2021 (as it has been or may be amended, supplemented or otherwise modified from time to time, the "***RSA***"), is entered into by and among the Company, Norgener, AES Andes, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca and Cerberus.  Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the RSA shall have the meanings ascribed to them in the RSA. Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca and Cerberus will be referred to herein collectively as the "***Supporting Senior Lenders***" and the Supporting Senior Lenders together with Strabag (only if and when Strabag executes a joinder agreement agreeing to become bound by the terms of this Amendment No. 3.) will be referred to herein as the "***Consenting Creditors***."  The Consenting Creditors, collectively with the Company, Norgener and AES Andes will be referred to herein collectively as the "***Parties***."

### RECITALS

**WHEREAS,** the Parties entered into the RSA to implement a restructuring pursuant to the RSA;

**WHEREAS**, the Company commenced the Chapter 11 Cases in the Bankruptcy Court on November 17, 2021;

**WHEREAS**, the Parties wish to further amend the RSA, to take into consideration the current financial situation of the Company and other developments since entering into the RSA;

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Conditions to Effectiveness</u>.  This Amendment No. 3 shall become effective as to each Consenting Creditor as of the date (the "***Amendment No. 3 Effective Date***") that the Company and counsel to each such Consenting Creditor receives an electronic copy of this Amendment No. 3, duly authorized, executed and delivered by each of the Parties hereto.

2. <u>Amendments</u>.  The RSA is hereby amended as follows:

(a) Sections 1.04(a)G, 3.01(m) and 3.02(d) of the RSA are hereby amended to replace the references to "DIP Term Sheet" included therein with "DIP Credit Agreement, as amended."

(b) Section 1.04(b) of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):[1]

<u>Payment of Fees and Expenses</u>. The Company shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by (i) ASSET Chile S.A. and FTI Consulting Canada ULC, financial advisors selected by the Required Consenting Creditors, and (ii) Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., U.S., local Delaware and Chilean counsel, respectively, selected by the Required Consenting Creditors, and any other counsel reasonably necessary to advise the Required Consenting Creditors in connection with the Restructuring Transactions (collectively, the "Ad Hoc Group Advisors"), ***and (iii) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus***, set forth on summary statements that provide general descriptions of the work performed during the relevant period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements are delivered to the Company and/or Cleary Gottlieb Steen & Hamilton LLP, whether incurred before or after the date hereof and regardless of whether the Restructuring contemplated herein is actually consummated or the documentation related to the Restructuring is executed; provided, however, that to the extent this Agreement is terminated in accordance with the terms hereof, the Company shall have no such obligation to pay such fees and expenses pursuant to this Section 1.04(b) with respect to any fees or expenses incurred after the date of such termination; provided further, that the Company's obligation to pay any such fees and expenses which are incurred after the Petition Date shall be subject to reasonableness review by the Office of the United States Trustee and such other conditions as may be imposed in orders of the Bankruptcy Court.

---

[1] The order of the Bankruptcy Court approving the RSA shall provide that Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP shall submit invoices to counsel for the United States Trustee for reasonableness review in accordance with the provisions of the *Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (Docket No. 164) that apply to the professionals listed in Section 1.04(b)(i)-(ii).

(c)     Section 1.05(b) of the RSA is hereby amended as follows (strikethrough text denotes deletions):

"(b)     the Sponsor shall, subject to the terms and conditions set forth herein~~, in the DIP Term Sheet,~~ and in the DIP Loan Documents, perform any obligations set forth in the DIP Loan Documents."

(d)     Section 3.01(t) of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

"(i) the failure of the Company to submit a motion to the Bankruptcy Court by ~~February 16~~ *March 7*, 2022 requesting an order of the court authorizing and directing the Company to assume the RSA (as amended), or (ii) the failure of the Bankruptcy Court to enter an order by ~~March 4~~ *March 25*, 2022 authorizing and directing the Company to assume the RSA (as amended)."

(e)     The plan term sheet included as Exhibit A to the RSA (the "***Plan Term Sheet***") is hereby deleted in its entirety (including Annex I (*Definitions*)) and replaced by the term sheet included herein as Schedule I (including Annex I (*Definitions*)), which, following the effectiveness of this Amendment No. 3, will constitute the "Plan Term Sheet" for purposes of the RSA.

(f)     Annex III to the Plan Term Sheet (the "***Restructuring Term Sheet***"), included as Exhibit A to the RSA is hereby deleted in its entirety and replaced by the term sheet included herein as Schedule II, which, following the effectiveness of this Amendment No. 3, will constitute the "Restructuring Term Sheet" for purposes of the RSA.

3.   <u>Strabag's Rights</u>. Each Consenting Creditor acknowledges and agrees that the terms and provisions under the heading "Strabag" of the Restructuring Term Sheet (including Strabag's rights with respect to Strabag's Other Claims (as defined in the Restructuring Term Sheet), and the Debtors' obligations with respect thereto, will only become effective if and when Strabag executes a joinder agreement agreeing to become bound by the terms of this Amendment No. 3.

4.   <u>Creditor's Holdings</u>. Each Consenting Creditor represents that, as of the date hereof, it beneficially owns (and/or serves as the investment advisor or manager for the beneficial owner(s) with the power to vote and dispose of) the principal amount of Alto Maipo Obligations set forth next to such Consenting Creditor's name on Schedule III hereto.

5.   <u>Reservation of Rights</u>: Nothing in this Amendment No. 3 is intended to, or does, in any manner waive, limit, impair, or restrict any rights, objections and defenses of any Party hereto (i) to contest or seek allowance of the Hedge Agreement Termination Amounts listed in Schedule III hereto, which represent damages in respect of terminations of Hedging Agreements (as defined in the Common Terms Agreements) or (ii) to the extent the Alto Maipo Obligations listed in Schedule III hereto include any amounts on account of interest asserted to have accrued on or after the Petition Date, to contest or seek allowance of any such amounts.

6.     <u>Effectiveness</u>.  On or after the Amendment No. 3 Effective Date, each reference in the RSA to "Restructuring Support Agreement," "hereunder," "hereof," "herein," or words of like import referring to the RSA shall mean and be a reference to the RSA, as amended by this Amendment No. 3.  Except as expressly amended by this Amendment No. 3, the provisions of the RSA are and shall remain in full force and effect without modification.

7.     <u>Governing Law</u>.  This Amendment No. 3 shall be governed and construed and enforced in accordance with the laws of the State of New York, United States of America without taking into account its conflicts of laws principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

8.     <u>Counterparts</u>.  This Amendment No. 3 may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

9.     <u>Entire Agreement</u>.  The RSA, as amended by this Amendment No. 3, constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature Pages Follow]

4

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No. 3 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 3 Effective Date.

ALTO MAIPO SPA

By: _____

    Name:

    Title:

NORGENER RENOVABLES SPA

By: _____

    Name: Ricardo Roizen

    Title: Authorized Signatory

AES ANDES S.A.

By: _____

    Name: Ricardo Falú

    Title: CEO

BANCO DE CRÉDITO E INVERSIONES

Name: CRISTIAN DEL RIO

Title: MANAGING DIRECTOR CORPORATE BANKING.

Address: El Golf #125, SANTIAGO, Chile.

Attention: MARCELO SOLIS

Telephone: +562 2720 4624

Email: MARCELO.SOLIS@BCI.cl

DNB Confidential

DNB BANK ASA

_____

Name: ·  Eivind Hildre
Title: ·  SVP


_____

Name:   Nils Fykse
Title:    SVP


Address: Dronning Eufemias gt 30, 0021 Oslo, Norway


Attention: Eivind Hildre / Nils Fykse
Telephone: +47 91504800
Email: eivind.hildre@dnb.no / nils.fykse@dnb.no

ITAÚ CORPBANCA



_____
Name: Sebastián Romero Evans
Title: Officer

_____
Name: Carlos Irarrázaval Cruzat
Title: Officer


Address: Presidente Riesco 5537, Las
Condes, Santiago, Chile


Attention: Marilyn Ahuad N.
Telephone: 562 28346288
Email: Marilyn.Ahuad@itau.cl

CERBERUS FSBA CORPORATE CREDIT FUND, L.P.

_____

Name:    Jeffrey L. Lomasky
Title:    Senior Managing Director


_____

Name:    Jeffrey L. Lomasky
Title:    Senior Managing Director

Address:


Attention:
Telephone:
Email:


Address for Notices:
Cerberus FSBA Corporate Credit Fund, L.P.
c/o Cerberus Capital Management, L.P.
11th Floor 875 Third Avenue
New York, New York, New York 10022
212-891-2100
Attention: Rob Milam and Julian Lautersztain
Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com, jlautersztain@cerberus.com

**Schedule I – Plan Term Sheet**

## EXHIBIT A TO RESTRUCTURING SUPPORT AGREEMENT

## ALTO MAIPO S.P.A.

### PLAN TERM SHEET

*The terms set out in this indicative term sheet (this "**Plan Term Sheet**") are preliminary and indicative solely for discussion purposes, and are not intended to describe or include all of the terms and conditions of the restructuring of indebtedness issued by Alto Maipo S.p.A. (the "**Company**" or "**Alto Maipo**") or to set forth the definitive contractual language of any provisions summarized below. This Plan Term Sheet is not binding on any party, is subject to, among other things, ongoing diligence and negotiation and is solely for the purpose of promoting discussion of the structure and other terms applicable to the restructuring.*

**This Plan Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable laws, and provisions of the Bankruptcy Code. No party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.**

*Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in **Annex I** attached hereto.*

*This Plan Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by the Company and the Consenting Creditors (as defined below), and it is entitled to the protections from use or disclosure afforded by New York C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Chilean state, federal or other applicable rule that restricts or prohibits use. All statements made in this Plan Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Plan Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Implementation** | The Company filed voluntary Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on November 17, 2022 (the "**Petition Date**").  The following is a summary of a proposed pre-arranged plan of reorganization for the Company (the |

| | |
|---|---|
| | "**Plan**") to be filed in the Bankruptcy Case as soon as reasonably practicable. |
| | On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Plan Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Company, the Required Consenting Creditors and the holder of such Allowed Claim or Interest, as applicable. |
| | For the avoidance of doubt, any action required to be taken by the Company on the Plan Effective Date pursuant to this Plan Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| | The Restructuring  will be subject to the terms and conditions of this Plan Term Sheet and the Definitive Documentation. |
| **DIP Credit Facility** | The DIP Lender shall, provide up to $50 million of financing (the "**Commitments**") in the form of a unsecured, administrative super-priority debtor-in-possession revolving credit facility pursuant to the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364 and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (IV) Grant Related Relief* (D.I. 166) and that certain *Super Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, a debtor and debtor-in-possession as Borrower, Alto Maipo SpA, as Guarantor, the DIP Lenders party thereto, and AES Andes S.A. as Administrative Agent* (as amended, the "**DIP Credit Facility**"). |
| **New and Amended & Restated Obligations** | On the Plan Effective Date, the Reorganized Company shall enter into or issue, as applicable: (i) a super-senior first-lien secured working capital facility in an aggregate maximum principal amount of $15 million, with a maturity date of January 15, 2024, provided by the DIP Lender (the "**Working Capital Facility**" as provided for in **Annex III** of this Plan Term Sheet (the "**Restructuring Term Sheet**") and the Plan (ii) a super-senior first-lien secured financing facility which shall be provided by the DIP Lender as provided for in **Annex III** of this Plan Term Sheet and the Plan (the "**Amended & Restated Secured Exit Financing Facility**"), (iii) first priority tranche of secured notes or bank instruments which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**1L Secured Obligations**"), (iv) a first/second priority secured loan (as described in Restructuring Term Sheet) which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**Amended & Restated 2L Secured Obligations**", and collectively with the Working |

<table>
<tr><td></td><td>Capital Facility, the Amended & Restated Secured Exit Financing Facility and the 1L Secured Obligations, the "**Amended & Restated Secured Obligations**"), and (v) the issuance of common equity in the Reorganized Company to be provided to AES Andes or its designees (the "**New Common Equity**" and, together with the Amended & Restated Secured Obligations, the "**New and A&R Obligations**"). The New and A&R Obligations shall have terms consistent with the Restructuring Term Sheet. The Working Capital Facility, the Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and the Amended & Restated 2L Secured Obligations shall benefit from the same collateral provided, however, that (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of, first, the Working Capital Facility, and second, the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations pursuant in each case to an Amended & Restated Secured Obligations Intercreditor Agreement.</td></tr>
<tr><td>**Tax Matters**</td><td>The Company will seek to effectuate the terms and conditions of the Restructuring in a tax efficient manner.</td></tr>
<tr><td>**Amendment of Pledges**</td><td>The Consenting Creditors will enter into any amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the Alto Maipo Obligations (the "**Pledge Amendments**") to thereafter secure the Reorganized Company's obligations under the Amended & Restated Secured Obligations from and after the Plan Effective Date in a manner consistent with the RSA and Annex II thereto.</td></tr>
</table>

## TREATMENT OF CLAIMS AND INTERESTS OF THE COMPANY UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **Administrative Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |
| N/A | **Professional Fee Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Professional Fee Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |

| Classified Claims and Interests of the Company | | | |
|---|---|---|---|
| **Class 1** | **Alto Maipo Senior Secured Obligations** | On the Plan Effective Date, each holder of an Allowed Alto Maipo Senior Secured Obligation shall receive its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations. | Impaired |
| **Class 2** | **Secured Claims** | Each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date. | Unimpaired / Deemed to Accept |
| **Class 3** | **Priority Claims** | Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 4** | **General Unsecured Claims** | On the Plan Effective Date, each holder of a General Unsecured Claim, whether subordinated or unsubordinated, shall have its Claim cancelled, released, and discharged and without any distribution. | Impaired / Deemed to Reject |
| **Class 5** | **DIP Claims** | All Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility. Additionally, in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; and the impairment of the DIP Claims, AES Andes or its designee shall receive the New Common Equity, as provided for in the Restructuring Term Sheet. | Impaired |

| Class 6 | **Strabag's Other Claims** | In consideration of Strabag's Other Claims that are Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all terms used in subsections 1-5 below as defined in the Tunneling Contract):<br><br>(1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum; (4) $10,000,000 upon substantial completion of Volcan (Milestone F), which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep (as described in the Restructuring Term Sheet), shall bear interest at a rate of 4.0% per annum, and shall be payable pursuant to the excess cash flow sweep; and (5) approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag. | Impaired |
| Class 7 | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |
| Class 8 | **Existing Equity Interests** | On the Plan Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law. | Impaired / Deemed to Reject |

11

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Plan Term Sheet (including the Restructuring Term Sheet) or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, shall be canceled and discharged, and the Company's obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | Strabag's Other Claims will be treated as described above and all other executory contracts and unexpired leases that are not assumed as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | Consummation of the Plan will be subject to approval by the Bankruptcy Court of customary release provisions for the benefit of the Released Parties and exculpation provisions for Exculpated Parties, in each case other than claims arising from gross negligence, willful misconduct, or fraud. Such provisions shall include (i) mutual releases among the Company and the Released Parties; and (ii) consensual third party releases from and to the Releasing Parties in favor of each of the parties identified in the foregoing clause (i). |
| **Governance** | The identities of directors on the board of the Reorganized Company shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for the Reorganized Company including charters, bylaws, operating agreements, or other organization documents, as applicable, shall (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) be acceptable to the Required Consenting Creditors in their sole and absolute discretion. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable. |

| | |
|---|---|
| **Treatment of the Non-Qualified Creditors** | All New and A&R Obligations under the Plan that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "**Selling Agent**"). The Selling Agent shall offer such New and A&R Obligations in one or more sale transactions within 180 days following the Plan Effective Date (the "**Sale Period**"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Creditors at the end of the Sale Period (the "**Substitute Consideration**").  In the event that a sale of such New and A&R Obligations is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such New and A&R Obligations shall be cancelled for no consideration.  None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities.<br><br>For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any New and A&R Obligations under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date hereof, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. |
| **Retained Causes of Action** | The Reorganized Company shall retain all rights to commence and pursue any causes of action, other than any causes of action that the Company has released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan. |

| | |
|---|---|
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"): |
| | a.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors; |
| | b.  the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time; |
| | c.  the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; |
| | d.  the final version of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance consistent in all respects with this Plan Term Sheet and the Plan and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) in their sole and absolute discretion; |
| | e.  the New and A&R Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New and A&R Obligations Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New and A&R Obligations Documents; |
| | f.  the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder; |
| | g.  all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
| | h.  the payment in cash in full of all Restructuring Expenses. |

## Annex I

## DEFINITIONS

"*1L Secured Notes*" means any 1L Secured Obligations that may be issued in the form of secured notes.

"*1L Secured Obligations*" means a first priority tranche of secured notes or secured bank instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement*, provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective Date, Strabag's pro rata share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

"*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses and to the extent not disallowed under a Final Order.

"*Adequate Protection Claim*" means that superpriority Claim granted to the Senior Lenders and Strabag pursuant to the Final Cash Collateral Order, which Claim shall not be Allowed so long as the Restructuring Support Agreement remains valid and in full force, and is limited to the extent of any diminution in value of the Prepetition Collateral (as defined in the Final Cash Collateral Order).

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28; (d) DIP Claims; and (e) the Adequate Protection Claim.

"*AES Andes*" means AES Andes S.A., f/k/a AES Gener S.A.

"*AES Andes Shared Services Contracts*"  means the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the Common Terms Agreement).

"*AES Andes Shared Services Payments*" means certain intercompany payments due to AES Andes (or any permitted transferee) by Alto Maipo pursuant to the AES Andes Shared Services Contracts, which are currently deferred under the terms of the AES Andes Shared Services Contracts until the existing senior debt discharge date.

"*Affiliate*" means an affiliate as defined in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

"*Agreement Effective Date*" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

"*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Claims Bar Date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) the Claims of the Senior Lenders and Strabag on account of the Alto Maipo Senior Secured Obligations; or (d) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that, with respect to a Claim described in clauses (a), (b), and (c) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that is listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court, and Holders of such Claims shall not receive any distributions under the Plan on account of such Claims or Interests. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "*Allow*" and "*Allowing*" shall have correlative meanings.

"*Alto Maipo*" means Alto Maipo SpA or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*Alto Maipo Delaware*" means Alto Maipo Delaware LLC or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*Alto Maipo Senior Secured Obligations*" means (i) an amount equal to $1,652,218,290 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (ii) an amount equal to $391,500,000 due to Strabag as the Supplier Deferred Payment under the Tunneling Contract, without duplication.

"*Amended & Restated 2L Secured Obligations*" means a second priority tranche of amended and restated secured debt instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement*, provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not

satisfied prior to the Effective Date, Strabag's pro rata share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

"*Amended & Restated Secured Exit Financing Facility*" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for and in satisfaction of the Claims under the DIP Credit Facility, as provided for in the Plan Term Sheet, documentation of which shall be included in the Plan Supplement, or as otherwise agreed between the Required Consenting Creditors, the Debtors, and the DIP Lender.

"*Amended & Restated Secured Obligations Intercreditor Agreement*" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors, which shall be included in the Plan Supplement, by which (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations.

"*Amended & Restated Secured Obligations*" means the Working Capital Facility, Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations, documentation of which shall be included in the Plan Supplement.

"*Assets*" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, including as specified in section 541 of the Bankruptcy Code.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule (as may be amended), if any, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Debtors pursuant to the Plan and which will be included in the Plan Supplement; *provided* that the Required Consenting Creditors shall have approved any assumptions, rejections or modifications of material Executory Contracts and Unexpired Leases.

"*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"***Bankruptcy Fees***" means any and all fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

"***Blue Sky Laws***" means any state securities laws.

"***Business Day***" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"***Cash***" means the legal tender of the United States of America or the equivalent thereof.

"***Causes of Action***" means any and all actions, causes of action, suits, claims, Claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises and trespasses of any kind or character whatsoever of, or belonging to, the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity or otherwise.  For the avoidance of doubt, "Causes of Action" includes, but is not limited to, (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar Claim.

"***Cerberus***" means certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

"***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to both Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code against any Debtor, including Administrative Claims and DIP Claims, in each case whether or not asserted.

"***Claims Bar Date***" means, as applicable, the General Bar Date, the Governmental Bar Date, the Amended Schedule Bar Date, the Rejection Bar Date, and any other date or dates established or to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed.

"***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent.

"***Class***" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

"***CNM Arbitral Award***" means any proceeds that may be collected by the Debtors in connection with any award issued in the CNM Arbitration, including, without limitation, any amounts collected under that certain Co-Obligor Undertaking as between Alto Maipo, SpA as Owner, Hochtief Solutions AG as Co-Obligor, and Cooperativa Muratori & Cementisti – C.M.C. di Ravenna as Co-Obligor.

"***CNM Arbitration***"   means the arbitration captioned *ICC Case No. 22867/JPA (C-22923/JPA) (C-23845/JPA) – Alto Maipo SpA v. Constructora Nuevo Maipo S.A. v. The AES Corporation and AES Gener S.A.*

"***Commercial Operation Date***" or "***COD***" means the date on which each of the following conditions has been met: (i) the Coordinador Electrico Nacional ("CEN") accepts and declares that all of the units of Alfalfal II and Las Lajas are in commercial operation, including the water flow from Volcan System, and available for the CEN; (ii) Alto Maipo has issued all Critical Milestone Substantial Completion Certificates (as defined in the Tunneling Contract); and (iii) Alto Maipo has issued all Critical Milestone Work Transfer Notices (as defined in the Tunneling Contract).

"*Committee of Unsecured Creditors*" or "*Committee*" means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* (D.I. 231).

"***Common Terms Agreement***" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, United States International Development Finance Corporation (as successor in interest to Overseas Private Investment Corporation), Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutche Bank AG, London Branch, and Santana S.A., and each of their successors and assigns as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

"***Company***" means, together, Alto Maipo and Alto Maipo Delaware.

"***Confirmation***" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"***Confirmation Date***" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rules 5003 and 9021.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"***Consenting Creditors***" means, at any point in time, such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby.

"***Consummation***" means the occurrence of the Effective Date.

"***Cure Cost***" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

"***Debt Service Reserve Account***" or "***DSRA***" means an account to be established in the name of one or more of the Reorganized Debtors in accordance with the Plan Term Sheet and funded up to a balance of $20 million, which would otherwise be payable to Amended & Restated 2L Secured Obligations through the proceeds of the CNM Arbitral Award and/or the excess cash flow entitlement, in favor of the 1L Secured Obligations.

"***Debtor***" has the meaning set forth in the introductory paragraph of the Plan.

"***Deferred 1L Interest***" means, together, the Deferred 2022 1L Interest and the Deferred 2023 1L Interest.

"***Deferred 2022 1L Interest***" means interest payable by the Reorganized Debtors as of July 15, 2022 and October 15, 2022 on the 1L Secured Obligations which shall be paid in kind.

"***Deferred 2023 1L Interest***" means interest payable by the Reorganized Debtors as of January 15, 2023 on the 1L Secured Obligations which shall be paid in kind.

"***Definitive Documentation***" means the definitive amendments to any financing and collateral documents securing the Alto Maipo Senior Secured Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and the Plan Term Sheet,

including the Plan, the Disclosure Statement and the documentation relating to the New and A&R Obligations. The Definitive Documentation and any modifications thereto will be (i) consistent with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

"*DIP Agent*" means AES Andes S.A., as sole agent under the DIP Credit Facility, or any successor agents thereunder.

"*DIP Budget*" means the most recently approved budget at such time of: (a) the Initial DIP Budget (as defined in the DIP Credit Agreement) in substantially the form set forth in Schedule 5.01(c) of the DIP Credit Agreement, setting forth projected monthly cash flows for the period from the closing date through the end of September 2022, and (b) the updated budget in form substantially similar to the Initial DIP Budget and approved by the DIP Lender.

"*DIP Claims*" means any and all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interests, fees, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Credit Agreement*" means that certain Super-Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, as borrower, Alto Maipo SpA, as guarantor, the DIP Agent, and the DIP Lender, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as may be amended, modified or supplemented from time to time, in accordance with the terms thereof.

"*DIP Credit Facility*" means that superpriority, debtor-in-possession revolving loan facility provided pursuant to the DIP Credit Agreement in an aggregate original principal amount of up to $50 million, consisting of the DIP Loans.

"*DIP Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement of the DIP Credit Facility and the transactions contemplated thereby.

"*DIP Credit Facility Documents*" means the DIP Credit Agreement together with all documentation executed or delivered in connection therewith as may be amended, modified or supplemented from time to time, in accordance with the terms and conditions set forth therein.

"*DIP Lender*" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Loans*" means the a revolving loan of up to $50 million to be provided pursuant to the DIP Credit Agreement.

"***DIP Orders***" means, together, the *Interim Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (IV) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C); and (V) Grant Related Relief* (D.I. 70, the "***Interim DIP Order***"), the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (IV) Grant Related Relief* (D.I. 166, the "***Final DIP Order***").

"***Disclosure Statement***" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement.

"***Disputed***" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed.

"***Distribution Agent***" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors, in the capacity as distribution agent under the Plan.

"***Distribution Date***" means the date on which Holders of Claims are eligible to receive distributions under the Plan.

"***Effective Date***" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

"***Entity***" means an "entity" as defined in section 101(15) of the Bankruptcy Code, and includes, for the avoidance of doubt, a Person.

"***Existing Equity Interest***" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Effective Date.

"***Estates***" means, as to each Debtor, the estate created for the Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

"**_Exculpated Parties_**" means, collectively, the Company, its current and former Affiliates, and all current and former Related Parties of either the Company or its Affiliates, and the Committee.

"**_Executory Contract_**" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under sections 365 or 1123 of the Bankruptcy Code.

"**_Final Cash Collateral Order_**" means the _Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders_ (D.I. 164).

"**_Final Order_**" means, as applicable, an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; _provided, however_, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

"**_Carve-Out Account_**" means the segregated account established pursuant to the DIP Credit Facility Documents for purposes of funding the Carve-Out (as defined in the DIP Credit Facility Documents), provided that, on and following the Effective Date, the Carve-Out Account shall be used as the account to maintain an amount equal to the Professional Fee Reserve Amount solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

"**_General Bar Date_**" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all entities, except for governmental units, must file Proofs of Claim and shall apply to all claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, Section 503(b)(9) Claims, unsecured priority claims, and unsecured nonpriority claims.

"**_General Unsecured Claims_**" means all Claims other than Administrative Claims, Professional Fee Claims, Alto Maipo Senior Secured Obligations, Secured Claims, Priority Claims, DIP Claims, the Adequate Protection Claim, Strabag's Other Claims, Intercompany Claims, and Existing Equity Interests.

"**_Governmental Bar Date_**" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all Governmental Units holding a

Claim under Section 502(b)(9) of the Bankruptcy Code against the Debtors is required to file Proofs of Claim.

"*Governmental Unit*" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

"*Holder*" means the beneficial holder of any Claim or Interest.

"*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnification Obligations*" means a Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, by-laws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

"*Indemnified Parties*" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' by-laws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

"*Intercompany Claims*" means a claim held by the Company against an Affiliate of the Company and *vice versa*. For the avoidance of doubt, the term "Intercompany Claim" does not include (x) any Claim held by Strabag against the Company or (y) any Claim held by AES Andes against the Company in connection with the AES Andes Shared Services Payments.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the company.

"*Joinder*" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the effective date of such Restructuring Support Agreement may become a Consenting Creditor by executing such joinder agreement.

"*Law*" means any federal, state, local, or foreign "law" (including common Law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

"***New and A&R Obligations Documents***" means collectively, any capital increase, indenture, loan agreement or other agreement governing the New and A&R Obligations, the Amended & Restated Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendment to the by-laws, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Company and the Required Consenting Creditors, and which documents shall be included in the Plan Supplement.

"***New and A&R Obligations***" means the Amended & Restated Secured Obligations and New Common Equity.

"***New Common Equity***" means the common Interests in the Company to be issued by the Company on or about the Effective Date pursuant to the terms and conditions of the Plan Term Sheet.

"***New Organizational Documents***" means, on or after the Effective Date, the amended and restated certificates of incorporation or similar governing document of each Reorganized Debtor and any other documents required to govern each Reorganized Debtor, which documents shall be included in the Plan Supplement.

"***Non-Qualified Creditors***" means any creditor under the Alto Maipo Senior Secured Obligations other than a Qualified Creditor.

"***Notice and Claims Agent***" means Prime Clerk LLC ("Prime Clerk") in its capacity as noticing, claims, and solicitation agent for the Debtors.

"***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means November 17, 2021.

"***Plan***" means this joint chapter 11 plan of reorganization filed by the Company, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Term Sheet, and to the extent not consistent with the Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

"***Plan Documents***" means any and all of the documents, other than the Plan, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, including, without limitation, insofar as such documents are not incorporated into the Plan through inclusion in the DIP Credit Facility Documents, and the New and A&R Obligations Documents, subject to any consent rights set forth in the Plan.

"***Plan Supplement***" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents that may be filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, where applicable; which shall include the New and A&R Obligations Documents, the New Organization Documents, the Assumed Executory Contracts and Unexpired Leases Schedule, and such other Plan Documents as have not been previously filed with the Bankruptcy Court, and which shall be in form and substance acceptable to the Company and the Required Consenting Creditors.

"***Plan Supplement Filing Date***" means the date that is 14 calendar days prior to the Confirmation Hearing, or such later date as is authorized by the Court.

"***Plan Term Sheet***" means the Plan Term Sheet attached to the Restructuring Support Agreement.

"***PPA***" means the agreement entitled "Contrato de Suministro de Electricidad" (Power Supply Agreement) dated as of June 28, 2013, by and between Alto Maipo and Antofagasta Minerals S.A., as assigned by Antofagasta Minerals S.A. to Minera Los Pelambres on June 20, 2014 (as further amended and supplemented prior to the Petition Date).

"***Priority Claims***" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims.

"***Professionals***" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"***Professional Fee Claims***" means any Claim of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

"***Professional Fee Reserve Amount***" means the aggregate Accrued Professional Compensation through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of the Plan; *provided* that the Professional Fee Reserve Amount shall not exceed the unused portion of the amounts set forth in the DIP Budget unless consented to by the Consenting Creditors.

"***Project***" means the run-of-river hydroelectric project constructed by Alto Maipo in the Andes Mountains.

"*Proof of Claim*" means a "proof of claim" as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Debtors' Chapter 11 Cases.

"*Pro Rata Share*" means, with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

"*Qualified Creditor*" means a creditor of the Alto Maipo Senior Secured Obligations who provides either one of the following certifications: (i) a certification that it is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act or U.S. government agency, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or (ii) a certification that it is a non-U.S. person (as such term is defined in Rule 902(k) under the Securities Act) located or resident outside the United States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

"*Reinstated*" or "*Reinstatement*" mean, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and, if separate, the DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party" and any Related Party of such person or Entity that opts out of the releases (other than the Company and the Reorganized Company) shall also not be a "Released Party." For the avoidance of doubt, no claims or causes of action of either of the Debtors against (x) Constructora Nuevo Maipo S.A., (y) Hochtief Solutions AG, or (z) Cooperativa Muratori & Cementisti – C.M.C. di Ravenna, nor any of the respective Affiliates of each entity listed in clauses (x) through (z), shall be released pursuant to this Plan.

"***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (j) all holders of Claims or Interests that are deemed to accept the Plan; (k) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (l) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l), and (n) each Related Party of each Entity in clause (a) through (m).

"***Reorganized Board***" means the board of directors of Alto Maipo, as determined in accordance with the New Organizational Documents.

"***Reorganized Company***" means the Company, or any successor or assign thereto, by merger consolidation, or otherwise, on and after the Effective Date.

"***Reorganized Debtors***" means collectively, each of the Debtors and any successors thereto, by merger, consolidation or otherwise, as reorganized on or after the Effective Date, in accordance with the Plan.

"***Required Consenting Creditors***" means, as of the relevant date, the holders of no less than 2/3 of the aggregate principal amount of the Alto Maipo Senior Secured Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

"***Restructuring***" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan.

"***Restructuring Documents***" means the Plan Term Sheet and the Restructuring Term Sheet.

"***Restructuring Expenses***" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses (including success fees) of (x) the Consenting Creditors' advisors (excluding advisors to Cerberus), including ASSET Chile S.A., FTI Consulting Canada ULC, Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., and (y) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby,

and (ii) the Administrative Agent and the Collateral Agents (each as defined in the Common Terms Agreement).

"***Restructuring Support Agreement***" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors, which was filed as Exhibit A to the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (D.I. 13), as amended on November 23, 2021, January 31, 2022, and February 28, 2022, and as may be further amended or become effective as between the Debtors and the Consenting Creditors.

"***Restructuring Term Sheet***" means the restructuring term sheet attached to the Restructuring Support Agreement.

"***Restructuring Transactions***" means, collectively, the Chapter 11 Cases, the New and A&R Obligations and the consummation of the other transactions contemplated in the Restructuring Documents.

"***Retained Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

"***SEC***" means the United States Securities and Exchange Commission.

"***Secured Claims***" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Security***" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

"*Senior Lenders*" means the lenders and interest rate swap providers under the Common Terms Agreement, each in their capacity as such.

"*Sponsor*" means AES Andes.

"*Sponsor Deferrals*" means those certain intercompany amounts payable by Alto Maipo to AES Andes under the O&M Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of the applicable intercompany agreements, and which the Sponsor shall, subject to occurrence of the Effective Date, defer for 12 months beginning May 2022, in an amount of $600,000 per month, for a total deferred amount of approximately $7.2 million).

"*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"*Strabag*" means Strabag SpA, as (i) contractor under the Tunneling Contract, (ii) shareholder under the Shareholders' Agreement of Alto Maipo among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered prior to the date of the Restructuring Support Agreement, and (iv) secured creditor with respect to the Supplier Deferred Payment.

"*Strabag Construction Deferral*" means the $10 million payable upon substantial completion of Volcan (Milestone F) (as such term is defined in the Tunneling Contract), which shall be deferred until it is paid pursuant to the excess cash flow sweep.

"*Strabag's Other Claims*" means Strabag's unsecured claims under the Tunneling Contract (as further amended from time to time, including pursuant to the terms described in the Restructuring Term Sheet), other than such Claims that are part of the Alto Maipo Senior Secured Obligations, that are payable in Cash for construction costs and insurance proceeds pursuant to the terms described in Section 3.3(f).

"*Subordinated Claim*" means any Claim that is subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims. For the avoidance of doubt, Subordinated Claim shall not include any Claim in Classes 1, 5 or 6.

"*Supplier Deferred Payment*" shall have the meaning given to it in the Common Terms Agreement.

"**_Transfer Agreement_**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

"**_Tunneling Contract_**" means that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (as further amended, and restated, and/or supplemented, including in connection with the Restructuring Transactions).

"**_Unexpired Lease_**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

"**_Unimpaired_**" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

"**_U.S. Trustee_**" means the United States Trustee for the District of Delaware.

"**_VAT_**" means value-added tax.

"**_VAT Financing Facility_**" means a financing facility secured by the Debtors to pay the full amount of VAT that will be due upon issuance of the invoice for the Supplier Deferred Payment by Strabag.

"**_Working Capital Facility_**" means a super-senior first-lien secured working capital facility, documentation of which shall be included in the Plan Supplement, in an aggregate maximum principal amount of up to $15 million, with a maturity date of January 15, 2024, to be provided by AES Andes on the Effective Date.

## Schedule II – Restructuring Term Sheet

**Restructuring Term Sheet –** terms to be effective immediately upon bankruptcy exit

| | |
|---|---|
| **New Senior First Lien Debt** | • Borrower:  Alto Maipo SpA<br><br>• Aggregate Amount: $1,050,000,000.<br><br>   – To be structured as a combination of (i) notes with documentation customary for an investment grade corporate credit ("<u>1L Notes</u>") and (ii) project-finance style loans with documentation similar, except as the parties may otherwise agree, to the existing Second Amended & Restated Common Terms Agreement (the "<u>CTA</u>") dated as of May 8, 2018 (the "<u>1L Loans</u>" and, together with the 1L Notes, the "<u>New 1L Debt</u>").  Holders of the 1L Notes and lenders under the 1L Loans are together referred to as the "<u>New 1L Lenders</u>". The existing senior secured parties will elect (in their discretion) whether their New 1L Debt is documented as 1L Notes or 1L Debt.<br>   – All New 1L Debt will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters.<br><br>• Collateral: same as existing collateral package under the CTA dated as of May 8, 2018 (including first priority perfected lien on all assets of Borrower, all shares in Borrower, and all shareholder/affiliate loans (other than Shared Services Loan, the Exit Financing Facility and the Working Capital Facility) made to the Borrower).<br><br>• Maturity: June 2040<br><br>• Interest Payment Dates: January 15, April 15, July 15 and October 15.<br><br>• Principal Payment Dates: April 15 and October 15.<br><br>• Interest rate: 4.0% per annum fixed, from the Effective Date (as defined in Annex I to Schedule I to the RSA), and paid in cash on each Payment Date beginning on January 15, 2023 (subject to the Deferred 2023 1L Interest). Interest begins to accrue on the date the Borrower exits bankruptcy.<br><br>   – Interest payable on July 15, 2022 and October 15, 2022 ("<u>Deferred 2022 1L Interest</u>") shall be paid in-kind (PIK-ed).<br>   – Interest payable on January 15, 2023 may be PIK-ed (if so deferred, the "<u>Deferred 2023 1L Interest</u>" and, together with the Deferred 2022 1L Interest, "<u>Deferred 1L Interest</u>") if pro forma for the payment, and before |

any disbursement of the Working Capital Facility, cash on hand of the Borrower would fall below $10mm.  If the January 2023 interest payment on the New 1L Debt will be PIK-ed, Borrower will make a public disclosure of this information.

– Deferred 1L Interest will accrue interest until paid in full at 4.0% per annum.

– Deferred 1L Interest shall be repaid according to the terms of the "Excess Cash Flow Sweep" described below.

- Default interest rate: additional 2%.

- Mandatory annual debt service: annual debt service (including scheduled amortization and cash payments of interest) in an aggregate amount of $66.3 million per calendar year, and which will reduce the outstanding principal amount of the New 1L Debt to $500 million no later than June 2040.  Scheduled amortization will be paid semi-annually (April 15 and October 15), beginning on April 15, 2024.

- Excess Cash Flow Sweep applies according to the priority described under "Excess Cash Flow Sweep" herein. When applicable, Excess Cash Flow Sweep will be paid April 15 and October 15 and calculated on the same terms agreed for the New 2L Debt.

- 12.5-year make-whole at T+40 bps. No other prepayment penalties. For the avoidance of doubt, make-whole shall not apply to cash sweep or any other mandatory repayment.

- Covenants and Events of Default for 1L Notes: similar to investment grade corporate credits of this type

- Covenants and Events of Default for 1L Loans: similar to CTA, except as the parties may otherwise agree

- Obligations under Share Retention Agreement (as defined in CTA) will apply.

- Subject to U.S. bankruptcy rules, 1L Loans will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Deferred Payment Agreement (as defined in the CTA).

- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 1L Lenders.

- Assignment:

    – For 1L Loans – same as in existing documentation unless otherwise agreed.
    – For 1L Notes – restrictions in existing documentation will not apply.

<table>
<tr><td></td><td>

- Voting Rights: to be addressed in intercreditor agreement. Any New 1L Debt acquired or held by a Borrower affiliate will not have any voting rights.

- 1L Notes will have the following attributes and / or associated obligations:

  – Offering Memorandum will be prepared on a timeline agreed with the holders of the 1L Notes.
  – 3 ratings will be obtained, at least two to choose from, on a timeline agreed with the holders of the 1L Notes.
  – Listed in an international exchange (CUSIP and ISIN) and part of a clearing house (Euroclear, DTC, Clearstream Lux) on a timeline agreed with the holders of the 1L Notes.
  – Borrower will go on a roadshow, engaging the support of at least 2 international investment banking teams, to promote (in a combined roadshow) secondary trading of the 1L Notes and 2L Notes.
  – AES Andes (the "Sponsor") to use commercially reasonable efforts to facilitate initial secondary market making.
  – Borrower will establish an investor relations team.
  – 144A/Reg S format.
  – 1L Notes to be part of the CEMBI Index to the extent eligible.

</td></tr>
<tr><td>**New Senior Second Lien Debt**</td><td>

- Borrower:  Alto Maipo SpA

- Amount: estimated at $993,718,290 (equal to the amount of prepetition secured claims, including the liquidated amount of the interest rate swaps, <u>less</u> the aggregate principal amount of the New 1L Debt)[2] (the "<u>New 2L Debt</u>"). Lenders under the New 2L Debt are referred to as the "<u>New 2L Lenders</u>".

  – To be structured as project finance style loans with documentation similar, except as the parties may otherwise agree, to the existing CTA (the "<u>2L Loans</u>"). See Stamp Tax and Other Debt Issuance Costs" for further details.
  – New 2L Lenders will have the option to exchange 2L Loans during March 2023[3] for notes with documentation customary for an investment grade corporate credit (the "<u>2L Notes</u>"), except for any of the terms set forth herein and that there will be no make-whole.  Borrower will be obligated to take all steps necessary to cause the exchange of 2L Loans for 2L Notes during March 2023 on a definitive timeline to be agreed in the definitive documentation.  The Confirmation Order (as defined in Annex I to Schedule I to the RSA) shall contain a "So Ordered" paragraph expressly affirming the Borrower's obligation to exchange the 2L Loans for 2L Notes and shall provide that the Borrower's failure to perform shall entitle the New 2L Lenders to all available remedies, including, without limitation, specific performance and that the Bankruptcy Court shall retain jurisdiction over any dispute relating to such obligation.
    ▪ 2L Notes will share the same economic terms and will rank pari passu with 2L Loans with respect to repayment, prepayment, collateral sharing, and all other similar matters.

</td></tr>
</table>

---

[2] This amount will be updated to include the total amount of prepetition claims to reflect accrued interest through the date of the bankruptcy filing.
[3] The parties are discussing the potential for a longer or second window during which 2L Loans could be exchanged for 2L Notes.

- ▪ Covenants and Events of Default for 2L Notes will be similar to 1L Notes, with conforming changes to reflect different economic terms of the New 2L Debt.
- ▪ Transfer restrictions in existing documentation will not apply to 2L Notes.

- Collateral: second lien on all assets included in the collateral package for the New 1L Debt.

- Maturity: October 15, 2042, extendable at each New 2L Lender's individual option to October 15, 2052.

- Payment Dates same as Excess Cash Flow Sweep dates (April 15 and October 15).

- Interest rate: 2% per annum fixed, paid in cash or capitalized (PIK) based on available cash flow, subject to increase by the Upside Fee. Interest begins to accrue on the Effective Date (as defined in Annex I to Schedule I to the RSA).

- Default interest rate: additional 2%.

- Upside Fee: after each calendar year end, 50% of the difference (if positive), between actual Cash Flow Available for Debt Service[4] as defined in the CTA with necessary conforming changes ("CFADS") and projected CFADS (per the Borrower's base case financial model dated January 28, 2022, attached as Exhibit A to this Term sheet) will be payable to the New 2L Lenders as additional interest until the New 2L Debt has been fully repaid or is converted to shares in the Borrower.

  - – Payment of Upside Fee is uncapped, but may never be less than zero.
  - – Upside Fee for each calendar year will be earned on December 31st (or, if New 2L Debt matures in 2052, on the maturity date), such that if the New 2L Debt is fully repaid on or prior to December 30th of any calendar year (or the maturity date in 2052), no Upside Fee would be payable for that year.
  - – Commencing in January 2043, any Upside Fee is reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042.

- Scheduled Amortization: None.

- Excess Cash Flow Sweep: 100% of excess cash flow, reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042. Excess cash flow will be calculated as all cash of the Borrower after (i) payment of all operation and maintenance expenses, permitted capital expenditures, and other permitted Project-related expenses to be agreed in accordance with the then-effective annual budget, (ii) payment of all Working Capital Facility balances, the Strabag Construction Deferral, the Deferred 1L Interest, scheduled debt service and mandatory prepayment on the Exit Financing Facility and New 1L Debt (or any refinancing of the Exit Financing Facility and New 1L Debt), (iii) full funding of the Debt Service Reserve Account ("DSRA") up to $20mm balance, and (iv) cash on hand of the Borrower in the amount of $25 million (and pursuant

---

[4] To be defined in a manner similar to the CTA, unless otherwise agreed, with changes to capture all revenue of Borrower other than (x) proceeds of the CNM Arbitration and (y) revenues required to be applied for mandatory prepayment.

to the priorities described under "Excess Cash Flow Sweep" herein). Excess Cash Flow Sweep will be paid April 15 and October 15. When Excess Cash Flow Sweep is paid, an estimated amount will be reserved (and excluded from the Excess Cash Flow Sweep) based on the projected Upside Fee calculation for the then-current calendar year.

- Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid), subject to a cap of 20% of total outstanding shares in the Borrower (after giving effect to this debt-to-equity conversion) in October 2042 and no cap in October 2052. The converted shares will have rights to be agreed in the definitive documents.

  – For each New 2L Lender who does not elect to extend the maturity of its New 2L Debt to 2052, the percentage of shares in the Borrower that it will receive will be calculated as follows: (i) the percentage of shares (subject to a 20% cap) that would have corresponded to all New 2L Lenders if 100% of New 2L Debt matured at October 2042 and the Shared Services Loan was converted to shares at October 2042, <u>multiplied by</u> (ii) the percentage of the outstanding principal amount of New 2L Debt held by such New 2L Lender who did not extend its New 2L Debt maturity date over the total outstanding principal amount of all New 2L Debt.
  – The definitive documents will include provisions to equitably address the value of shares held by New 2L Lenders whose New 2L Debt converts in 2042 in the scenario where remaining New 2L Debt converts to shares in 2052.

- No prepayment penalties.
- Covenants and Events of Default for 2L Loans: similar to CTA, except as the parties may otherwise agree.
- Subject to U.S. bankruptcy rules, 2L Loans will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Financing Agreement (as defined in the CTA).
- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 2L Lenders.

- Assignment:

  – For 2L Loans – same as in existing documentation unless otherwise agreed.

  – For 2L Notes – restrictions in existing documentation will not apply.

- Voting Rights: to be addressed in intercreditor agreement. Any New 2L Debt acquired or held by a Borrower affiliate will not have any voting rights.
- Offering Memorandum for 2L Notes to be prepared on the same timeline as the Offering Memorandum for the 1L Notes (based on the form of the Offering Memorandum for the 1L Notes, with conforming changes to reflect the economics and other applicable terms of the 2L Notes).

36

| | |
|---|---|
| **Shared Services Loan** | • All intercompany payments due to AES Andes (or any permitted transferee) by the Borrower pursuant to the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the CTA), and that are currently deferred under the terms of those contracts until the existing senior debt discharge date, will be paid in the form of a loan (the "Shared Services Loan").  Those intercompany payments will be paid in the form of a disbursement under the Shared Services Loan.<br>• Interest Rate: same as New 2L Debt (including any Upside Fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.<br>• Maturity: latest date of scheduled maturity for any New 2L Debt.<br>• Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid).<br><br>– If the maturity of all New 2L Debt is extended to 2052, the Shared Services Loan shall mature in 2052 and convert into a percentage of the shares equal to the ratable share of the New 2L Debt balance plus the Shared Services Loan balance, in each case outstanding at the time.  If all New 2L Debt converts to equity in 2042, the Shared Services Loan will mature in 2042 and its pro rata share of shares in the Borrower will be subject to an 80% equity floor.<br>– The definitive documents will include provisions to equitably address the conversion of the Shared Services Loan to shares in the Borrower where a portion of the New 2L Debt converts to shares in 2042 and the remainder of New 2L Debt converts to shares in 2052. |
| **Hedge Agreements** | • All Hedging Agreements with Hedging Counterparties (in each case, as defined in the CTA) shall be terminated, and any amounts due thereunder shall be converted into New 1L Debt and New 2L Debt on a pro rata basis, based on the mark-to-market value on the date of termination as determined in accordance with the terms of the Hedging Agreements. |
| **Strabag**[5] | • To receive (a) an allowed, secured, perfected $391.5 million "Supplier Deferred Payment" claim entitled to *pari passu* treatment with other prepetition first-lien claims pursuant and subject to confirmation of the Plan of Reorganization contemplated hereby (the "Plan"), allocated to New 1L Debt and New 2L Debt in the same proportion as the other prepetition first-lien claims, irrespective of whether the condition(s) to payment of the Supplier Deferred Payment under the Tunneling Contract have been satisfied as of the Effective Date, *provided, however*, that if such condition(s) to payment have not been satisfied as of the Effective Date, Strabag's pro rata share of the New 1L Debt and New 2L Debt shall be held in escrow pending satisfaction of such condition(s). Please |

---

[5] Each Consenting Creditor acknowledges and agrees that the terms and provisions under this heading "Strabag" (including Strabag's rights with respect to Strabag's Other Claims (as defined in the RSA) , and the Debtors' obligations with respect thereto), will only become effective if and when Strabag executes a joinder agreement agreeing to become bound by the terms of this Amendment No. 3.

refer to the "Strabag Deferrals and Construction Invoice" section regarding treatment of the following amounts: (i) (A) $761,030 upon completion of signed Change Order 1, (B) $326,240 upon completion of signed Change Order 2, and (C) $53,827 upon completion of signed Change Order 4, (ii) $10 million upon substantial completion of Volcan (Milestone F), and (iii) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) (the "<u>Strabag Insurance Payable</u>").

- Notwithstanding anything to the contrary herein, Strabag shall continue to be obligated to pay Alto Maipo in cash for power purchased by Strabag pursuant to Section 2.13.2 of the Tunneling Contract, including any amounts accrued but unpaid pre-petition.

- All other claims and counterclaims existing as of the date of Amendment No. 3 to the RSA (including construction claims, change order claims, future bonuses, etc.) to be mutually waived.

- All subordinated debt and common equity held and to be earned by Strabag through COD (as defined in Annex I to Schedule I to the RSA) to be discharged.

- Tunneling Contract to be assumed, subject to mutual waiver of all other claims (except as agreed) and agreement to the restructuring term sheet

- Subject to Strabag's Specific Requirements (as defined below), any future change orders initiated by the Borrower must be approved by the New 1L Lenders and New 2L Lenders holding 1L Loans and 2L Loans, respectively (provided that any New 1L Debt and New 2L Debt held by Strabag will be excluded from voting on such approval). All future change orders that are within scope of the Tunneling Contract shall be performed by Strabag without further compensation in cash or otherwise. Subject to receiving approval from the New 1L Lenders and New 2L Lenders holding 1L Loans and 2L Loans, respectively, as specified above, Borrower shall issue a change order and pay Strabag in cash for all future changes that are outside the scope of the Tunneling Contract. The Borrower and Strabag shall work together in good faith to negotiate a streamlined process for resolving Change Disputes (as defined below). Pending agreement on such streamlined process, in the event that Strabag disputes whether a change is within or outside of the scope of the Tunneling Contract (a "<u>Change Dispute</u>"), the Borrower and Strabag shall follow the procedures set forth in the Tunneling Contract to resolve such dispute.
  - Strabag agrees that existing change orders shall be compensated only through the consideration described herein.

- Borrower shall pay to Strabag, as adequate protection, $210,000 for Strabag's attorneys' fees incurred in connection with its secured claim.

- Strabag shall have the same rights as Senior Lenders under the intercreditor agreement (other than on matters related to the Tunneling Contract, where Strabag will not have voting rights).

- Strabag invoice for the "Supplier Deferred Payment" under the Tunneling Contract to be issued 1 month after COD, but not earlier than ten days after emergence

| | |
|---|---|
| | • Strabag, in its role as contractor, has certain specific requirements that are being addressed through Alto Maipo construction team, and shall not constitute a condition precedent for execution of the RSA Amendment No. 3 ("Strabag's Specific Requirements")<br>  – Change orders and "fast track" dispute resolution procedures to be agreed by the parties in good faith as provided under the Original RSA<br>  – Punch list as per Tunneling Contract<br>  – Change order for Ecoflow environmental monitoring device will be paid as agreed, in an amount no greater than $110k, and will be effectuated through a change order procedure under the Tunneling Contract |
| **Other Unsecured Claims** | • Unsecured claims, whether subordinated or unsubordinated, other than Voith and unsecured AES Andes and Strabag claims: to be discharged. |
| **Equity** | • Existing shares in Borrower to be cancelled.<br>• AES Andes will receive 100% of the reorganized shares in the Borrower, subject to conversion of New 2L Debt and Shared Services Loan (if applicable).<br>• No dividends or distributions until Exit Financing Facility (including Sponsor Deferrals), Working Capital Facility, Strabag Deferrals, VAT Financing, New 1L Debt (including Deferred 1L Interest) and New 2L Debt have been repaid in full. |
| **CNM Arbitration** | • Application of proceeds:<br>  – First, to repay the Working Capital Facility<br>  – Second, to repay the Strabag Construction Deferral<br>  – Third, to repay Deferred 1L Interest<br>  – Fourth, 50% to repay any DIP Financing or Exit Financing Facility amount outstanding, and 50% to repay New 2L Debt (provided that, to the extent the DSRA is not fully funded, New 2L Debt allocation shall go instead to fund DSRA up to $20mm balance)<br>  – Fifth, to the extent the DSRA is not fully funded, to fund DSRA up to $20mm balance<br>  – Sixth to repay New 2L Debt<br>• Any settlement with CNM is subject to the approval of the required New 2L Lenders (to be agreed in the definitive documentation). |
| **Battery Business / Related Party Transactions** | • Undertakings to ensure that any development of battery storage or similar business with energy generated by the Borrower, using water rights, land rights or other infrastructure of the Borrower, or otherwise associated with the |

<table>
<tr>
<td></td>
<td>

Borrower project (i) must be approved by the New 1L Lenders and the New 2L Lenders, and (ii) will only be undertaken with the objective of increasing value to the Borrower.

- Any transaction (including any modification to existing contract terms) with related companies of the Borrower must be approved by the New 1L Lenders and the New 2L Lenders.

</td>
</tr>
<tr>
<td>**VAT Financing**</td>
<td>

- Fully committed facility in amount equal to $68.875mm, subject to a term sheet being executed between Borrower and VAT lenders within 30 days of the date hereof (which shall be in accordance with the terms set forth herein) (the "VAT Financing").
- Terms substantially similar to those contemplated for VAT Loan under and as defined in the CTA, including exclusive lien on VAT reimbursement owed to the Borrower with respect to VAT paid on Strabag's invoice for the "Supplier Deferred Payment" and over the VAT Escrow Account (defined below).
- Tenor: 12 months.
- No Up-Front Fee.
- Strabag invoice for the "Supplier Deferred Payment" under the Tunneling Contract to be issued as described under the heading "Strabag".
- Loan funded in CUF with lender hedging cost pass-through (subject to review of, and agreement on, costs). Definitive documents will address mechanics around currency exchange risk related to funding and repayment of the VAT Loan.
- Interest Rate / Fee:

  – Repaid in full prior to 75 days from disbursement, 3% fee on total commitment amount
  – Repaid in full from 76th day to 150 days, 5% fee on total commitment amount
  – Repaid in full from 151st day to 360th day – 1% additional interest accrues every 30 days
  – Count for these time periods begins on the day the VAT Financing proceeds are disbursed (whether deposited into the VAT Escrow Account (as defined below) or disbursed directly).

- To be drawn after Strabag's issuance of the invoice for the "Supplier Deferred Payment", or in the event that Strabag's invoice for the "Supplier Deferred Payment" has not been issued by July 31st, 2022 the VAT Financing commitment will be disbursed in full and the proceeds deposited into an escrow account (the "VAT Escrow Account").  Funds in the VAT Escrow Account would be available to fund the payment of the VAT after issuance of Strabag's invoice for the "Supplier Deferred Payment".
- VAT Financing lenders shall have security over the VAT Escrow Account until the VAT Financing proceeds are disbursed to the Borrower.
- For clarity, given that the VAT Financing must be disbursed as part of financing of the Plan, upon the commitment being signed the 3% fee will be earned, but payment of the fee shall be made when the VAT Financing is repaid.
- VAT Financing will rank pari passu with the New 1L Debt in the event of any enforcement proceeding.

</td>
</tr>
</table>

40

| | |
|---|---|
| | • Definitive documents will address, in certain scenarios, VAT Financing sharing in Mandatory Prepayments/CNM Arbitration proceeds/Excess Cash Flow Sweep otherwise available to the pay the New 2L Debt, and other related provisions. |
| **DIP Financing** | • Size: $50 million revolving credit facility (the "DIP Financing")<br><br>• Separate debt basket to address VAT expenses<br><br>• Available to the extent required to maintain minimum cash on hand of Borrower during bankruptcy case of $10 million<br><br>• Rate and fees accrue through separate account and shall not impact availability<br><br>• Interest Rate: 4.0%, payable in kind<br><br>• Unused Fee: 0.75% on undrawn portion, payable in kind<br><br>• Fees: 1.00% origination fee, payable in kind<br><br>• Maturity: 12 months from Chapter 11 filing date<br><br>• Milestones and other terms are included in separate DIP Financing credit agreement, as amended |
| **Exit Financing** | • Size: ~$60 million (inclusive of $50mm initial amount, ~$1mm in fees and interest payable on the DIP at emergence, Deferred Exit Financing Interest of ~$2mm and Sponsor Deferrals of ~$7mm) (the "Exit Financing Facility"). For the avoidance of doubt, the Deferred Exit Financing Interest and the Sponsor Deferrals will be part of the Exit Financing Facility, have the priority afforded to the Exit Financing Facility (i.e., will have a super-senior first-lien on all assets - other than proceeds of reimbursement of VAT that was financed with the VAT Financing and the VAT Escrow Account - and rank senior to all debt, other than the Working Capital Facility) and be paid on the same amortization schedule, and shall benefit from the same mandatory prepayments (including a mandatory prepayment as a result of the receipt of proceeds from the CNM arbitration, and in the same order), as the Exit Financing Facility even though such deferred interest and Sponsor Deferrals are not loans, but rather accounts payable.<br><br>• Lenders: DIP Financing provider |

- Maturity: 3 years post-emergence

- Scheduled Amortization: equal quarterly installments beginning July 15, 2023

- Rank: super-senior first-lien on all assets (ranks senior to all debt, other than the Working Capital Facility), other than proceeds of reimbursement of VAT that was financed with the VAT Financing.

- Interest Payment Dates: January 15, April 15, July 15, October 15.

- Interest rate: 4.0% per annum, cash pay on Payment Dates, beginning on April 15, 2023

  – Interest payable on July 15, 2022, October 15, 2022, and January 15, 2023 ("Deferred Exit Financing Interest") shall be deferred
    ▪ The Deferred Exit Financing Interest shall accrue interest at 4% and shall be added to the Exit Financing Facility balance and be repaid through amortization of the Exit Financing Facility

- Cure Periods: Exit Financing Facility lender will not be entitled to exercise any remedies following an event of default on the Exit Financing Facility until a cure period of at least 120 days has elapsed.

- New 1L Lender & New 2L Lender Rights:

  – New 1L Lenders and New 2L Lenders will have a right (but not an obligation) to cure or cause to be cured on behalf of Borrower.
  – New 1L Lenders and New 2L Lenders will have a right to purchase (directly or through an affiliate) their pro rata share of the Exit Financing at par at any time.  If any New 1L Lender or New 2L Lender declines to purchase its pro rata share of Exit Financing, other New 1L Lenders and New 2L Lenders may increase their share.

- No cash fee for roll-over
- Concessions on Exit Financing Facility commitment are dependent on consummation of the Plan on the terms herein, and considered as part of AES Andes new value contribution

---

**Working Capital Facility**

- Working Capital Facility provided by Sponsor of $15mm maturing January 15, 2024 (the "Working Capital Facility")

  – Sponsor will commit to fund the Working Capital Facility as needed through January 15, 2024, at any time that cash on hand of the Borrower would fall below $10mm
  – Interest rate: 4% per annum

| | |
|---|---|
| | – Repayment of Working Capital Facility will be at the first priority of cash available for the "Excess Cash Flow Sweep" and "Mandatory Prepayments" described below.<br>– Working Capital Facility may be used, as a revolving facility, for general corporate purposes and any emergence costs.<br>– Senior secured, *pari passu* with Exit Facility.<br><br>• Notwithstanding the above, starting from the maturity date of the Working Capital Facility, Permitted Financial Debt under the CTA shall include a separate $15mm unsecured working capital facility basket<br>• Working Capital Facility commitment provided by Sponsor is dependent on consummation of the Plan on the terms herein, and considered as part of Sponsor new value contribution. |
| **Sponsor Deferrals** | • Sponsor to defer 12 months of certain intercompany payments under the O&M Agreement, the Share Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of those contracts) beginning May 2022, in an amount of approximately $600,000 per month, for a total deferred amount of approximately $7.2 million (the "Sponsor Deferrals").<br><br>– The Sponsor Deferrals shall be added to the Exit Financing Facility balance, and be repaid through amortization of the Exit Financing Facility.<br>• Sponsor Deferrals are dependent on consummation of the Plan on the terms herein, and considered as part of the Sponsor new value contribution |
| **Strabag Deferrals and Construction Invoice** | • Strabag will defer the $10mm Milestone F payment, for substantial completion of Volcan (the "Strabag Construction Deferral")<br><br>– The Strabag Construction Deferral shall accrue interest at 4.0% per annum since the date on which that payment would have otherwise been payable. The Strabag Construction Deferral will be paid as an account payable pursuant to the Excess Cash Flow Sweep.<br><br>• Strabag will also defer an additional total of $7.6mm in 2022, consisting of $1.1mm payable under change orders 1, 2, and 4, and the Strabag Insurance Payable (the "Strabag Other Deferrals" and, together with the Strabag Construction Deferral, the "Strabag Deferrals").<br><br>– The Strabag Other Deferrals shall be repaid on December 31, 2022 (or, in the case of the Strabag Insurance Payable, if later the date when the applicable insurance proceeds are received). |

43

| | |
|---|---|
| | – All Strabag Deferrals shall accrue interest at 4.0% per annum, and share *pari passu* with the New 1L Debt in all collateral<br><br>• Strabag invoice to be issued 1 month (subject to Strabag's board approval) after COD, but no earlier than ten days after emergence |
| **Stamp Tax and Other Debt Issuance Costs** | • Stamp Tax<br><br>– Stamp Tax on 1L Notes will be paid upon the issuance of the 1L Notes at emergence<br>– At emergence, no new *pagare* (promissory note) will be issued for the 2L Loans. 2L Loans will be documented with existing *pagare* (promissory note) or acknowledgments of debt duly amended by allonges to the promissory notes or amendment to the acknowledgments of debt, as the case may be.<br>– Lenders will have the option to exchange 2L Loans, during March 2023, into 2L Notes and the Borrower will pay Stamp Tax on all 2L Notes at that time. All 2L Notes will be evidenced by a *pagare* (promissory note).<br>– Cap on total stamp tax payable by the Borrower for 1L Notes and 2L Notes of up to $16.4mm<br>– Exit Financing Facility to be documented as an Amendment & Restatement of the DIP Financing.<br>– Stamp Tax will not be paid on the Sponsor Deferrals nor on the Strabag Deferrals.<br><br>• Secondary Roadshow and Related Costs:<br><br>– Borrower will include in the budget the cost of the investment bankers in the secondary road show and rating agencies for the rating of the 1L Notes up to $3mm (for the avoidance of doubt, this cap is not applicable to any other related costs such as auditor costs, legal fees, registration of the 1L Notes, etc.) |
| **Mandatory Prepayments** | • Mandatory Prepayments: expropriation; total loss or other significant insured event where insurance proceeds are not applied to repair/restore; significant asset dispositions outside of the ordinary course.<br>• Proceeds distributed as follows:<br><br>– First, for so long as the Working Capital Facility is outstanding, $10 million to ensure that the Borrower has $10 million cash on hand after giving effect to any prepayment<br>– Second, to repay Working Capital Facility<br>– Third, to repay the Strabag Deferrals (first to the Strabag Other Deferrals, second to the Strabag Construction Deferral) |

| | |
|---|---|
| | – Fourth, to repay Deferred 1L Interest<br>– Fifth, to pay the Exit Financing Facility<br>– Sixth, to pay New 1L Debt<br>– Seventh, to pay New 2L Debt<br>• All mandatory pre-payments shall not incur any penalties, including without limitation the make-whole |
| **Excess Cash Flow Sweep** | • Cash in excess of $25 million as of every April 15 and October 15 shall be distributed as follows:<br><br>– First, to repay Working Capital Facility<br>– Second, to repay the Strabag Deferrals (first to the Strabag Other Deferrals, second to the Strabag Construction Deferral)<br>– Third, to repay Deferred 1L Interest<br>– Fourth, to fund the DSRA up to $20mm balance<br>– Fifth, to pay New 2L Debt<br>– Sixth, to pay New 1L Debt<br>– Seventh, to pay the Shared Services Loan<br>• All mandatory pre-payments shall not incur any penalties, including without limitation the make-whole<br>• For clarity, the Exit Financing Facility has no excess cash flow entitlement |
| **Debt Service Reserve Account** | • USD $20mm for the benefit of the New 1L Debt.<br>• DSRA will be funded at the priority specified under the headings "Excess Cash Flow Sweep" and "CNM Proceeds". This DSRA will be released if 1L Notes achieve IG rating without DSRA. |
| **Other** | The Sponsor and its affiliates shall be able to acquire New 1L Debt and New 2L Debt and to engage with any party soliciting the Sponsor to acquire such debt.<br><br>If the Sponsor or its affiliates actively solicit the acquisition of New 1L Debt or New 2L Debt, they may do so through either:<br><br>– a public tender open to holders of such debt, or<br>– a broker, provided that the Sponsor or its affiliate, as the case may be, discloses to the holders of such debt or the public generally that it is seeking to acquire such debt |

**Exhibit A**
**CFADS Calculation from January 28, 2022 Borrower Base Case Financial Model**

| USD million | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | ($12,997,175) | $125,989,976 | $104,414,911 | $97,041,807 | $96,588,621 | $91,661,615 | $101,759,205 | $104,150,515 | $104,168,198 | $108,474,190 | $109,225,042 | $112,658,745 |

| Cash Flow Available for Debt Service | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $113,552,844 | $117,143,134 | $121,750,787 | $124,519,202 | $125,445,289 | $130,546,507 | $100,169,716 | $63,398,920 | $65,139,585 | $66,667,365 | $68,059,348 | $69,453,582 |

| Cash Flow Available for Debt Service | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 |
|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $70,909,646 | $72,352,863 | $73,838,086 | $75,275,050 | $76,774,969 | $78,258,994 | $79,330,149 |

46

**Schedule III - Principal Amount of Alto Maipo Obligations Owned**

| Consenting Creditor | Total Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Termination Amount (in USD) |
|---|---|---|---|
| Banco De Crédito e Inversiones | $229,286,013.20 | $183,226,085.49 | $46,059,927.71 |
| DNB Bank ASA | $139,047,163.37 | $119,473,667.82 | $19,573,495.55 |
| Itaú Corpbanca | $269,444,996.76 | $171,387,562.76 | $98,057,434.00 |
| Deutsche Bank AG London Branch | $85,679,736.39 | $85,679,736.39 | $0.00 |
| Santana S.A. | $95,489,054.86 | $95,489,054.86 | $0.00 |
| Moneda Deuda Latinoamericana Fondo de Inversión | $59,126,349.22 | $59,126,349.22 | $0.00 |
| Moneda Alturas II Fondo de Inversión | $23,650,539.65 | $23,650,539.65 | $0.00 |
| Nineteen77 Capital Solutions LP | $78,408,915.68 | $78,408,915.68 | $0.00 |
| Clover Private Credit Opportunities Secondary II LP | $23,549,945.55 | $23,549,945.55 | $0.00 |
| Clover Private Credit Opportunities Secondary (Levered) II LP | $19,828,108.52 | $19,828,108.52 | |
| Warbler Run I LLC | $46,058,780.48 | $46,058,780.48 | $0.00 |
| Warbler Run II LLC | $48,066,436.81 | $48,066,436.81 | $0.00 |
| Strabag | $391,500,000.00 | $391,500,000.00 | $0.00 |
| KfW IPEX-Bank GmbH | $19,695,837.10 | $0.00 | $19,695,837.10 |
| Regera Sarl | $11,824,655.64 | $11,824,655.64 | $0.00 |
| United States International Development Finance Corporation | $293,545,482.60 | $293,545,482.60 | $0.00 |
| King Street Capital Management, L.P. | $10,033,522.50 | $10,033,522.50 | $0.00 |
| CVI AA Cayman Securities LP | $4,113,744.22 | $4,113,744.22 | $0.00 |
| CVI AV Cayman Securities LP | $802,681.80 | $802,681.80 | $0.00 |
| CarVal CCF Cayman Securities Ltd | $1,555,195.98 | $1,555,195.98 | $0.00 |
| CVI CVF IV Cayman Securities Ltd | $23,127,269.36 | $23,127,269.36 | $0.00 |
| CVIC Cayman Securities Ltd | $1,806,034.05 | $1,806,034.05 | $0.00 |
| CVI EMCOF Cayman Securities Ltd | $8,980,002,63 | $8,980,002,63 | $0.00 |
| CarVal GCF Cayman Securities Ltd | $551,843.74 | $551,843.74 | $0.00 |
| Cerberus FSBA Corporate Credit Fund, L.P | $10,000,000.00 | $10,000,000.00 | $0.00 |
| Cerberus Global NPL Fund, L.P. | $148,512,457.52 | $148,512,457.52 | $0.00 |
| **Total** | **US$2,043,718,290.13** | **US$1,860,331,595.77** | **US$183,386,694.36** |

## JOINDER AGREEMENT

The undersigned hereby acknowledges that it has read and understands the Restructuring Support Agreement dated as of November 16, 2021, as amended as of November 23, 2021, as further amended by Amendment No. 2 to the Restructuring Support Agreement, and further amended by Amendment No. 3 to the Restructuring Support Agreement (the "Agreement"), by and among the Company, the Shareholders, the Sponsor and Consenting Creditors, and agrees to be bound by the terms and conditions thereof to the extent the Supporting Senior Lenders are thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The undersigned hereby makes the representations and warranties of the Consenting Creditors set forth in Section 2 of the Agreement to the other Parties.

This joinder shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law).

Date Signed: February 28        , 2022

**CERBERUS GLOBAL NPL FUND, L.P.**

By: Cerberus Global NPL Associates, L.L.C.,
    its general partner

By: _____
    Jeffrey L. Lomasky
    Senior Managing Director

Address for Notices:

Cerberus Global NPL Fund, L.P.
c/o Cerberus Capital Management, L.P.
11th Floor 875 Third Avenue
New York, New York, New York 10022
212-891-2100
Attention: Rob Milam and Julian Lautersztain
Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com, lautersztain@cerberus.com

| Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Terminations Amount (in USD) |
|---|---|---|
| $125,000,000 Tranche A Loans $23,515,457.52 Tranche B Loans | $125,000,000 Tranche A Loans $23,515,457.52 Tranche B Loans | |

*Execution Version*

## AMENDMENT NO. 4 TO THE RESTRUCTURING SUPPORT AGREEMENT

This Amendment No. 4, dated as of March 24, 2022 ("***Amendment No. 4***"), to the Restructuring Support Agreement, dated as of November 16, 2021 (as it has been or may be amended, supplemented or otherwise modified from time to time, the "***RSA***"), is entered into by and among the Company, Norgener, AES Andes, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus[1], Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities LP., Carval CCF Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and Clover Private Credit Opportunities Secondary (Levered) II LP.  Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the RSA shall have the meanings ascribed to them in the RSA. Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd., Carval CCF Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and Clover Private Credit Opportunities Secondary (Levered) II LP will be referred to herein collectively as the "***Supporting Senior Lenders***" and the Supporting Senior Lenders together with Strabag (only if and when Strabag executes a joinder agreement agreeing to become bound by the terms of the RSA, as amended hereby) will be referred to herein as the "***Consenting Creditors***," which term shall also mean and include, at any point in time, such creditors that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby. The Consenting Creditors, collectively with the Company, Norgener and AES Andes will be referred to herein collectively as the "***Parties***."

### RECITALS

**WHEREAS,** the Parties entered into the RSA to implement a restructuring pursuant to the RSA;

**WHEREAS**, the Company commenced the Chapter 11 Cases in the Bankruptcy Court on November 17, 2021;

**WHEREAS**, on February 28, 2022, the Company, Norgener, AES Andes, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd. and Carval CCF Cayman Securities Ltd., entered into Amendment No. 3 to the RSA to take into consideration the financial situation of the Company and other developments since entering into the RSA;

---

[1] As used herein, "***Cerberus***" shall mean certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

**WHEREAS**, the Parties wish to further amend the RSA;

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   <u>Conditions to Effectiveness</u>.  This Amendment No. 4 shall become effective as to each Consenting Creditor as of the date (the "***Amendment No. 4 Effective Date***") that the Company and counsel to each such Consenting Creditor receives an electronic copy of this Amendment No. 4, duly authorized, executed and delivered by each of the Parties hereto.

2.   <u>Amendments</u>. The RSA is hereby amended as follows:

(a)   Section 3.01(t) of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

"(i) the failure of the Company to submit a motion to the Bankruptcy Court by March 7, 2022 requesting an order of the court authorizing and directing the Company to assume the RSA (as amended), or (ii) the failure of the Bankruptcy Court to enter an order by ~~March 25~~ ***April 6***, 2022 authorizing and directing the Company to assume the RSA (as amended)."

(b)   Annex III to the Plan Term Sheet (the "***Restructuring Term Sheet***"), included as Exhibit A to the RSA is amended by adding the following bullet to the section "VAT Financing":

"The Borrower and the VAT lenders believe, and the Borrower has assumed in its financial model, that Chilean tax withholding in respect of interest paid to all foreign lenders under the VAT facility shall apply at a rate equal to 4% (the "VAT withholding rate"), and the Borrower and the VAT lenders will work together in good faith to develop a VAT financing structure that achieves such a VAT withholding rate, such structure to be satisfactory to the VAT lenders in their reasonable discretion. For clarity, the withholding tax structuring will not alter any other terms of the VAT Financing as specified in the Restructuring Term Sheet. In the event that the VAT withholding rate in respect of amounts paid under the VAT facility attributable to VAT Loans for up to $25 million made by any foreign VAT lenders who are funds or accounts managed by UBS O'Connor LLC (together with any withholding rate approved assignees, the "UBS VAT Lenders") exceeds 4%, the Borrower will pay all such withholding tax to the applicable governmental authority when and as due, and increase the amounts payable to the UBS VAT Lenders so that the UBS VAT Lenders receive the full amount that they would have received without application of that withholding tax. A withholding rate approved assignee is any VAT Loan transferee that is an affiliate of a UBS VAT Lender approved by the Borrower, such consent not to be unreasonably withheld or delayed and provided that the Borrower may not withhold such consent if the Chilean tax treatment of the transferee would be no worse than the Chilean tax treatment of the UBS VAT Lender assignor.  For the

2

avoidance of doubt, in addition to the forgoing, the Borrower will be responsible for withholding tax at the 4% VAT withholding rate on all VAT loans made by foreign lenders."

(c) The first bullet under the section "VAT Financing" of Annex III to the Plan Term Sheet (the "**Restructuring Term Sheet**"), included as Exhibit A to the RSA is amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

"Fully committed facility in amount equal to $68.875mm, subject to a term sheet being executed between Borrower and VAT lenders **by no later than April 15, 2022** ~~within 30 days of the date hereof~~ (which shall be in accordance with the terms set forth herein) (the "VAT Financing")."

3.    Amendment No. 4. By entering into this Amendment No. 4, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II, Clover Private Credit Opportunities Secondary (Levered) II LP and CVI CVF V Cayman Securities Ltd join the other Consenting Creditors as parties to the RSA, as amended hereby.

4.    Creditor's Holdings. Each Consenting Creditor represents that, as of the date hereof, it beneficially owns (and/or serves as the investment advisor or manager for the beneficial owner(s) with the power to vote and dispose of) the principal amount of Alto Maipo Obligations set forth next to such Consenting Creditor's name on Schedule I hereto.

5.    Reservation of Rights: Nothing in this Amendment No. 4 is intended to, or does, in any manner waive, limit, impair, or restrict any rights, objections and defenses of any Party hereto (i) to contest or seek allowance of the Hedge Agreement Termination Amounts listed in Schedule I hereto, which represent damages in respect of terminations of Hedging Agreements (as defined in the Common Terms Agreements) or (ii) to the extent the Alto Maipo Obligations listed in Schedule I hereto include any amounts on account of interest asserted to have accrued on or after the Petition Date, to contest or seek allowance of any such amounts.

6.    Effectiveness. On or after the Amendment No. 4 Effective Date, each reference in the RSA to "Restructuring Support Agreement," "hereunder," "hereof," "herein," or words of like import referring to the RSA shall mean and be a reference to the RSA, as amended by this Amendment No. 4.  Except as expressly amended by this Amendment No. 4, the provisions of the RSA are and shall remain in full force and effect without modification.

7.    Governing Law.  This Amendment No. 4 shall be governed and construed and enforced in accordance with the laws of the State of New York, United States of America without taking into account its conflicts of laws principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

8.    Counterparts.  This Amendment No. 4 may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

3

9.    <u>Entire Agreement</u>.  The RSA, as amended by this Amendment No. 4, constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No. 4 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 4 Effective Date.

ALTO MAIPO SPA

By: _____
        Name: Javier Dib
        Title: President

AES ANDES S.A.

By: _____
        Name: Ricardo Falú
        Title: CEO

NORGENER RENOVABLES SPA

By: _____
        Name: Ricardo Roizen
        Title: Authorized Signatory

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No. 4 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 4 Effective Date.

ALTO MAIPO SPA

By: _____

      Name: Javier Dib
      Title: President

AES ANDES S.A.

By: _____

      Name: Ricardo Falú
      Title: CEO

NORGENER RENOVABLES SPA

By: _____

      Name: Ricardo Roizen
      Title: Authorized Signatory

BANCO DE CRÉDITO E INVERSIONES

Name: Cristian Del Río Godoy
Title: Managing Director

Address:  El Golf 125, Las Condes - Santiago


Attention:
Telephone: 56 2 27204624
Email: cristian.delrio@bci.cl

DNB BANK ASA

_____
Name: Eivind Hildre
Title: SVP

_____
Name: Nils Fykse
Title:  SVP

Address: Dronning Eufemias gt 30, 0021 Oslo, Norway

Attention: Eivind Hildre / Nils Fykse
Telephone: +47 915048000
Email: eivind.hildre@dnb.no / nils.fykse@dnb.no

CERBERUS GLOBAL NPL FUND, L.P.

Name:       Jeffrey Lomasky
Title:       CFO

Address:      Cerberus Global NPL Fund, L.P.
              c/o Cerberus Capital Management, L.P.
              11th Floor 875 Third Avenue
Attention:    New York, New York, New York 10022
Telephone:    212-891-2100
Email:        Attention: Rob Milam and Julian Lautersztain
              Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com,
              jlautersztain@cerberus.com

CERBERUS FSBA CORPORATE CREDIT FUND, L.P.

_____

Name:     Jeffrey Lomasky
Title:      CFO

|            |                                                              |
|------------|--------------------------------------------------------------|
| Address:   | Cerberus FSBA Corporate Credit Fund, L.P.                    |
|            | c/o Cerberus Capital Management, L.P.                        |
|            | 11th Floor 875 Third Avenue                                  |
|            | New York, New York, New York 10022                          |
| Attention: |                                                              |
| Telephone: | 212-891-2100                                                 |
| Email:     | Attention: Rob Milam and Julian Lautersztain                |
|            | Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com, |
|            | jlautersztain@cerberus.com                                   |

SANTANA S.A.

_____

Name: Leonidas Vial
Title:  President

Address: El Bosque Sur 0177. Piso 16
Las Condes
Santiago
Chile


Attention: Jeannette Saint Anne
Telephone:  22 9015520
Email: jsaint@santana.cl

CVIC CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

_____
Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI EMCOF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI CVF IV CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI AV CAYMAN SECURITIES LP
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI AA CAYMAN SECURITIES LP
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CARVAL GCF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CARVAL CCF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

_____

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI CVF V CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

NINETEEN 77 CAPITAL SOLUTIONS LP
By UBS O'Connor LLC, its investment manager

_____
Name: Rodrigo Trelles
Title: Managing Director

_____
Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-OCS@ubs.com;
joshua.mercado@ubs.com

CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY II LP
By UBS O'Connor LLC, its investment manager

Name: Rodrigo Trelles
Title: Managing Director

Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-OCS@ubs.com;
joshua.mercado@ubs.com

CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY (LEVERED) II LP
By UBS O'Connor LLC, its investment manager

_____
Name: Rodrigo Trelles
Title: Managing Director


_____
Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-OCS@ubs.com;
joshua.mercado@ubs.com

Moneda S.A. Administradora General de Fondos
On behalf of
**MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSIÓN**

Name:  Martín Cipriani
Title:  C.O.O.

Name:  Daniel Vargas
Title:  Attorney Fact

Address:

Attention:  Jose Kliksberg
Telephone:  1-212-584-0595
Email:  Jkliksberg@monedausa.com

Moneda S.A. Administradora General de Fondos
On behalf of
**MONEDA ALTURAS II FONDO DE INVERSIÓN**

Name:     Martín Cipriani
Title:     C.O.O.

Name:     Daniel Vargas
Title:     Attorney in Fact

Address:

Attention:     Jose Kliksberg
Telephone:     1-212-584-0595
Email:     Jkliksberg@monedausa.com

ITAÚ CORPBANCA

DocuSigned by:

*Sebastián Romero*

78EB3C9846E04A42

Name: Sebastián Romero E.
Title: Officer

DocuSigned by:

*Carlos Irarrázaval Cruzat*

19146D5C05DF42F...

Name: Carlos Irarrázaval C
Title: Officer

Address: Presidente Riesco 5537, piso 20,
Las Condes, Santiago, Chile

Attention: Marilyn Ahuad N.
Telephone:562 28346288
Email: marilyn.ahuad@itau.cl

**Schedule I - Principal Amount of Alto Maipo Obligations Owned**

| Consenting Creditor | Total Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Termination Amount (in USD) |
|---|---|---|---|
| Banco De Crédito e Inversiones | $229,286,013.20 | $183,226,085.49 | $46,059,927.71 |
| DNB Bank ASA | $139,047,163.37 | $119,473,667.82 | $19,573,495.55 |
| Itaú Corpbanca | $269,444,996.76 | $171,387,562.76 | $98,057,434.00 |
| Deutsche Bank AG London Branch | $160,540,590.48 | $160,540,590.48 | $0.00 |
| Santana S.A. | $95,489,054.86 | $95,489,054.86 | $0.00 |
| Moneda Deuda Latinoamericana Fondo de Inversión | $59,126,349.22 | $59,126,349.22 | $0.00 |
| Moneda Alturas II Fondo de Inversión | $23,650,539.65 | $23,650,539.65 | $0.00 |
| Nineteen77 Capital Solutions LP | $78,408,915.68 | $78,408,915.68 | $0.00 |
| Clover Private Credit Opportunities Secondary II LP | $23,549,945.55 | $23,549,945.55 | $0.00 |
| Clover Private Credit Opportunities Secondary (Levered) II LP | $19,828,108.52 | $19,828,108.52 | |
| Strabag | $391,500,000.00 | $391,500,000.00 | $0.00 |
| KfW IPEX-Bank GmbH | $19,695,837.10 | $0.00 | $19,695,837.10 |
| Regera Sarl | $11,824,655.64 | $11,824,655.64 | $0.00 |
| United States International Development Finance Corporation | $293,545,482.60 | $293,545,482.60 | $0.00 |
| King Street Capital Management, L.P. | $10,033,522.50 | $10,033,522.50 | $0.00 |
| CVI AA Cayman Securities LP | $4,113,744.22 | $4,113,744.22 | $0.00 |
| CVI AV Cayman Securities LP | $802,681.80 | $802,681.80 | $0.00 |
| CarVal CCF Cayman Securities Ltd | $1,555,195.98 | $1,555,195.98 | $0.00 |
| CVI CVF IV Cayman Securities Ltd | $23,127,269.36 | $23,127,269.36 | $0.00 |
| CVIC Cayman Securities Ltd | $1,806,034.05 | $1,806,034.05 | $0.00 |
| CVI EMCOF Cayman Securities Ltd | $8,980,002.63 | $8,980,002.63 | $0.00 |
| CarVal GCF Cayman Securities Ltd | $551,843.74 | $551,843.74 | $0.00 |
| CVI CVF V Cayman Securities Ltd | $9,230,840.70 | $9,230,840.70 | $0.00 |
| Cerberus FSBA Corporate Credit Fund, L.P | $10,033,522.50 | $10,033,522.50 | $0.00 |
| Cerberus Global NPL Fund, L.P. | $148,512,457.52 | $148,512,457.52 | $0.00 |
| SC III-Flex Master Lux S.A.R.L. | $10,033,522.50 | $10,033,522.50 | $0.00 |
| **Total** | **US$2,043,718,290.13** | **US$1,860,331,595.77** | **US$183,386,694.36** |

*Execution Version*

## AMENDMENT NO. 5 TO THE RESTRUCTURING SUPPORT AGREEMENT

This Amendment No. 5, dated as of April 1, 2022 ("***Amendment No. 5***"), to the Restructuring Support Agreement, dated as of November 16, 2021 (as it has been or may be amended, supplemented or otherwise modified from time to time, the "***RSA***"), is entered into by and among the Company, Norgener, AES Andes, Strabag SpA, Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus[1], Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd., Carval CCF Cayman Securities Ltd., Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II LP and Clover Private Credit Opportunities Secondary (Levered) II LP.  Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the RSA shall have the meanings ascribed to them in the RSA. Banco De Crédito e Inversiones, DNB Bank ASA, Itaú Corpbanca, Cerberus, Santana S.A., Moneda Deuda Latinoamericana Fondo de Inversión, Moneda Alturas II Fondo de Inversión, CVIC Cayman Securities Ltd., CVI EMCOF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI AV Cayman Securities LP., CVI AA Cayman Securities LP., Carval GCF Cayman Securities Ltd., Carval CCF Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd, Nineteen77 Capital Solutions LP, Clover Private Credit Opportunities Secondary II, Clover Private Credit Opportunities Secondary (Levered) II LP and SC III-Flex Master Lux S.A.R.L. will be referred to herein collectively as the "***Supporting Senior Lenders***" and the Supporting Senior Lenders together with Strabag will be referred to herein as the "***Consenting Creditors***," which term shall also mean and include, at any point in time, such creditors that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby. The Consenting Creditors, collectively with the Company, Norgener and AES Andes will be referred to herein collectively as the "***Parties***."

## RECITALS

**WHEREAS,** the Parties entered into the RSA to implement a restructuring pursuant to the RSA;

**WHEREAS**, the Company commenced the Chapter 11 Cases in the Bankruptcy Court on November 17, 2021;

**WHEREAS**, the Parties wish to further amend the RSA, to take into consideration the current financial situation of the Company and other developments since entering into the RSA;

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Conditions to Effectiveness</u>.  This Amendment No. 5 shall become effective as to each Consenting Creditor as of the date (the "***Amendment No. 5 Effective Date***") that the

---

[1] As used herein, "***Cerberus***" shall mean certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

Company and counsel to each such Consenting Creditor receives an electronic copy of this Amendment No. 5, duly authorized, executed and delivered by each of the Parties hereto; *provided, however,* that Strabag shall have the right to terminate the RSA, only as to Strabag, if the Company fails to deliver the Critical Milestone Work Transfer Notice for Critical Milestone D to Strabag on or before May 2, 2022.

    2.   <u>Amendments</u>.  The RSA is hereby amended as follows:

    (a)    Section 1.04(b) of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):[2]

> <u>Payment of Fees and Expenses</u>. The Company shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by (i) ASSET Chile S.A. and FTI Consulting Canada ULC, financial advisors selected by the Required Consenting Creditors, (ii) Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., U.S., local Delaware and Chilean counsel, respectively, selected by the Required Consenting Creditors, and any other counsel reasonably necessary to advise the Required Consenting Creditors in connection with the Restructuring Transactions (collectively, the "Ad Hoc Group Advisors"); (iii) any Consultant (as defined in the CTA); (iv) Troutman Pepper Hamilton Sanders LLP, as advisors to Strabag, subject to a cap of $210,000 (exclusive of any amounts previously paid as adequate protection); and (v) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus, subject to a cap of $420,000, set forth on summary statements that provide general descriptions of the work performed during the relevant period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements are delivered to the Company and/or Cleary Gottlieb Steen & Hamilton LLP, whether incurred before or after the date hereof and regardless of whether the Restructuring contemplated herein is actually consummated or the documentation related to the Restructuring is executed; provided, however, that in the event this Agreement is terminated in accordance with the terms hereof, (a) the Company shall have no such obligation to pay such fees and expenses pursuant to this Section 1.04(b) with respect to any fees or expenses incurred after the date of such termination, (b) Strabag expressly reserves its right to assert claims on account of fees and expenses incurred in excess of the cap set forth in this Section 1.04(b) in accordance with Claim No. 25 filed in the Chapter 11 Cases or under 11 U.S.C. § 503(b), (c) Cerberus expressly reserves its right to assert claims on account of fees and expenses incurred in excess of the cap set forth in this Section 1.04(b) in accordance with Claim No. 23 filed in the Chapter

---

[2] The order of the Bankruptcy Court approving the RSA shall provide that Troutman Pepper Hamilton Sanders LLP, Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP shall submit invoices to counsel for the United States Trustee for reasonableness review in accordance with the provisions of the *Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (Docket No. 164) that apply to the professionals listed in Section 1.04(b)(i)-(ii).

11 Cases and (d) the rights and defenses of all parties are reserved with respect to any fees and expenses asserted as described in the foregoing sub-clauses (b) and (c); provided further, that the Company's obligation to pay any such fees and expenses which are incurred after the Petition Date shall be subject to reasonableness review by the Office of the United States Trustee and such other conditions as may be imposed in orders of the Bankruptcy Court.

(b)     Section 3.01(t) of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

"(i) the failure of the Company to submit a motion to the Bankruptcy Court by March 7, 2022 requesting an order of the court authorizing and directing the Company to assume the RSA (as amended), or (ii) the failure of the Bankruptcy Court to enter an order by ~~March 25~~ *April 22*, 2022 authorizing and directing the Company to assume the RSA (as amended)."

(c)     Section 4 of the RSA is hereby amended as follows (bolded and italicized text denotes additions or amended language and strikethrough text denotes deletions (as applicable)):

**Section 4.** Amendments. This Agreement may not be modified, amended, or supplemented ~~(except as expressly provided herein)~~ except in writing signed by the Company, the Shareholders, the Sponsor and each ***Supporting Senior Lender*** ~~Consenting Creditor~~ bound by such modification, amendment or supplement; *provided* that ***(i) any such modification, amendment or supplement that would be adverse to Strabag relative to the other Consenting Creditors or would modify, amend or supplement the terms of this Agreement relating to the Tunneling Contract and/or the "Strabag" or the "Strabag Deferrals and Construction Invoice" sections of the Restructuring Term Sheet annexed to this Agreement as Schedule II, will also require a writing signed by Strabag and (ii) prior to May 2, 2022 any such modification, amendment or supplement that would require re-solicitation of the Plan will also require a writing signed by Strabag; provided further that*** a writing transmitted by electronic mail shall be sufficient for the purposes of this provision.

(d)     The plan term sheet included as Exhibit A to the RSA (the "***Plan Term Sheet***") is hereby deleted in its entirety (including Annex I (*Definitions*)) and replaced by the term sheet included herein as Schedule I (including Annex I (*Definitions*)), which, following the effectiveness of this Amendment No. 5, will constitute the "Plan Term Sheet" for purposes of the RSA.

(e)     Annex III to the Plan Term Sheet (the "***Restructuring Term Sheet***"), included as Exhibit A to the RSA is hereby deleted in its entirety and replaced by the term sheet included herein as Schedule II, which, following the effectiveness of this

Amendment No. 5, will constitute the "Restructuring Term Sheet" for purposes of the RSA.

3.     Creditor's Holdings. Each Consenting Creditor represents that, as of the date hereof, it beneficially owns (and/or serves as the investment advisor or manager for the beneficial owner(s) with the power to vote and dispose of) the principal amount of Alto Maipo Obligations set forth next to such Consenting Creditor's name on Schedule III hereto.

4.     Reservation of Rights: Nothing in this Amendment No. 5 is intended to, or does, in any manner waive, limit, impair, or restrict any rights, objections and defenses of any Party hereto (i) to contest or seek allowance of the Hedge Agreement Termination Amounts listed in Schedule III hereto, which represent damages in respect of terminations of Hedging Agreements (as defined in the Common Terms Agreements) or (ii) to the extent the Alto Maipo Obligations listed in Schedule III hereto include any amounts on account of interest asserted to have accrued on or after the Petition Date, to contest or seek allowance of any such amounts.

5.     Effectiveness. On or after the Amendment No. 5 Effective Date, each reference in the RSA to "Restructuring Support Agreement," "hereunder," "hereof," "herein," or words of like import referring to the RSA shall mean and be a reference to the RSA, as amended by this Amendment No. 5. Except as expressly amended by this Amendment No. 5, the provisions of the RSA are and shall remain in full force and effect without modification.

6.     Governing Law. This Amendment No. 5 shall be governed and construed and enforced in accordance with the laws of the State of New York, United States of America without taking into account its conflicts of laws principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

7.     Counterparts. This Amendment No. 5 may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8.     Entire Agreement. The RSA, as amended by this Amendment No. 5, constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No. 5 to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Amendment No. 5 Effective Date.

ALTO MAIPO SPA

By: _____
    Name: Javier Dib
    Title: President

AES ANDES S.A.

By: _____
    Name: Ricardo Falú
    Title: CEO

NORGENER RENOVABLES SPA

By: _____
    Name: Ricardo Roizen
    Title: Authorized Signatory

[*Signature Page to Amendment No. 5 to RSA*]

CERBERUS FSBA CORPORATE CREDIT FUND, L.P.

Name:     Jeffrey Lomasky
Title:     CFO

Address:        Cerberus FSBA Corporate Credit Fund, L.P.
                c/o Cerberus Capital Management, L.P.
                11th Floor 875 Third Avenue
Attention:      New York, New York, New York 10022
Telephone:      212-891-2100
Email:          Attention: Rob Milam and Julian Lautersztain
                Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com,
                jlautersztain@cerberus.com

CERBERUS GLOBAL NPL FUND, L.P.

_____
Name:      Jeffrey Lomasky
Title:      CFO

Address:        Cerberus Global NPL Fund, L.P.
                c/o Cerberus Capital Management, L.P.
                11th Floor 875 Third Avenue
Attention:      New York, New York, New York 10022
Telephone:      212-891-2100
Email:          Attention: Rob Milam and Julian Lautersztain
                Email: DistressedSettlements@cerberus.com, rmilam@cerberus.com,
                jlautersztain@cerberus.com

ITAÚ CORPBANCA



Name: Sebastián Romero E.
Title: Officer

Name: Carlos Irarrázaval C.
Title: Officer


Attention: Marilyn Ahuad N.
Telephone:562 28346288
Email: marilyn.ahuad@itau.cl

[SIGNATURE PAGE TO FIFTH AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT]

Moneda S.A. Administradora General de Fondos
On behalf of
**MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSIÓN**

Name:      Martin Cipriani   /   Daniel Vargas
Title:       C.O.O                /   Attorney in Fact

Address:     Isidora Goyenechea 3621, 8th Floor, Las Condes, Santiago, Chile


Attention:   Jose Kliksberg
Telephone:  1-212-584-0595
Email:        Jkliksberg@monedausa.com

Moneda S.A. Administradora General de Fondos
On behalf of
**MONEDA ALTURAS II FONDO DE INVERSIÓN**

Name:    Martin Cipriani    /    Daniel Vargas
Title:    C.O.O    /    Attorney in Fact

Address:    Isidora Goyenechea 3621, 8th Floor, Las Condes, Santiago, Chile


Attention:    Jose Kliksberg
Telephone:    1-212-584-0595
Email:    Jkliksberg@monedausa.com

SANTANA S.A.

_____
Name: Leonidas Vial
Title: President

Address: El Bosque Sur 0177. Piso 16  Las
Condes
Santiago
Chile


Attention: Jeannette Saint Anne
Telephone:  22 9015520
Email: jsaint@santana.cl

BANCO DE CRÉDITO E INVERSIONES

Name: Cristian Del Rio Godoy
Title: Managing Director

Address:  El Golf 125, Las Condes - Santiago


Attention:
Telephone: 56 2 27204624
Email: cristian.delrio@bci.cl

[SIGNATURE PAGE TO FIFTH AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT]

DNB BANK ASA

Name:  Eivind Hildre    / Nils Fykse
Title:   SVP              / SVP

Address: Dronning Eufemias gt 30, 0021 Oslo, Norway

Attention: Eivind Hildre / Nils Fykse
Telephone: +47 915048000
Email: eivind.hildre@dnb.no / nils.fykse@dnb.no

NINETEEN77 CAPITAL SOLUTIONS LP
By UBS O'Connor LLC, its investment manager


_____
Name: Rodrigo Trelles
Title: Managing Director


_____
Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-ocs@ubs.com
joshua.mercado@ubs.com

CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY II LP
By UBS O'Connor LLC, its investment manager


---

Name: Rodrigo Trelles
Title: Managing Director


---

Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-ocs@ubs.com
joshua.mercado@ubs.com

CLOVER PRIVATE CREDIT OPPORTUNITIES SECONDARY (LEVERED) II LP
By UBS O'Connor LLC, its investment manager


_____

Name: Rodrigo Trelles
Title: Managing Director


_____

Name: Baxter Wasson
Title: Managing Director

Address: 787 7th Avenue, 13th Floor
New York, New York, 10019

Attention: O'Connor Capital Solutions
Telephone: +1-212-713-4040
Email: ol-ocs@ubs.com
joshua.mercado@ubs.com

CVI AA CAYMAN SECURITIES LP
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite
1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email:
carval_gcsadminmpls@carval.com

CVI AV CAYMAN SECURITIES LP
By: CarVal Investors, LP
Its: Attorney-in-fact

_____
Name: Jeremiah Gerhardson
Title: Authorized Signatory




Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite
1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email:
carval_gcsadminmpls@carval.com

CARVAL CCF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite
1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email:
carval_gcsadminmpls@carval.com

CVI CVF IV CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVIC CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI EMCOF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CARVAL GCF CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

CVI CVF V CAYMAN SECURITIES LTD
By: CarVal Investors, LP
Its: Attorney-in-fact

Name: Jeremiah Gerhardson
Title: Authorized Signatory

Address: c/o CarVal Investors, LP
1601 Utica Avenue South, Suite 1000
Minneapolis, MN 55416

Attention: GCS Operations
Telephone: +1.952.444.4915
Email: carval_gcsadminmpls@carval.com

STRABAG SpA

Name: Mario Theurl
Title: General Manager
Date: 01 Apr 2022

Name: Dirk Pförtner
Title: Commercial Manager
Date: 01 Apr 2022

Address:
Alonso de Cordova 4355, Of. 901
Vitacura, Santiago de Chile

Attention: Dirk Pförtner
Telephone: +56 919595890
e-mail: dirk.pfoertner@strabag.com

*Privileged & Confidential*
*Attorney Work Product*
*TPHS Draft 3.9.22*

**Schedule I – Plan Term Sheet**

## EXHIBIT A TO RESTRUCTURING SUPPORT AGREEMENT

## ALTO MAIPO S.P.A.

### PLAN TERM SHEET

*The terms set out in this indicative term sheet (this "**Plan Term Sheet**") are preliminary and indicative solely for discussion purposes, and are not intended to describe or include all of the terms and conditions of the restructuring of indebtedness issued by Alto Maipo S.p.A. (the "**Company**" or "**Alto Maipo**") or to set forth the definitive contractual language of any provisions summarized below. This Plan Term Sheet is not binding on any party, is subject to, among other things, ongoing diligence and negotiation and is solely for the purpose of promoting discussion of the structure and other terms applicable to the restructuring.*

**This Plan Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable laws, and provisions of the Bankruptcy Code. No party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.**

*Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in **Annex I** attached hereto.*

*This Plan Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by the Company and the Consenting Creditors (as defined below), and it is entitled to the protections from use or disclosure afforded by New York C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Chilean state, federal or other applicable rule that restricts or prohibits use. All statements made in this Plan Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Plan Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING |
|---|

| | |
|---|---|
| **Implementation** | The Company filed voluntary Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on November 17, 2022 (the "**Petition Date**"). The following is a summary of a proposed pre-arranged plan of reorganization for the Company (the |

| | |
|---|---|
| | "**Plan**") to be filed in the Bankruptcy Case as soon as reasonably practicable. |
| | On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Plan Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Company, the Required Consenting Creditors and the holder of such Allowed Claim or Interest, as applicable. |
| | For the avoidance of doubt, any action required to be taken by the Company on the Plan Effective Date pursuant to this Plan Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| | The Restructuring will be subject to the terms and conditions of this Plan Term Sheet and the Definitive Documentation. |
| **DIP Credit Facility** | The DIP Lender shall provide up to $50 million of financing (the "**Commitments**") in the form of an unsecured, administrative super-priority debtor-in-possession revolving credit facility pursuant to the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364 and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (IV) Grant Related Relief* (D.I. 166) and that certain *Super Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, a debtor and debtor-in-possession as Borrower, Alto Maipo SpA, as Guarantor, the DIP Lenders party thereto, and AES Andes S.A. as Administrative Agent* (as amended, the "**DIP Credit Facility**"). |
| **New and Amended & Restated Obligations** | On the Plan Effective Date, the Reorganized Company shall enter into or issue, as applicable: (i) a super-senior first-lien secured working capital facility in an aggregate maximum principal amount of $15 million, with a maturity date of January 15, 2024, provided by the DIP Lender (the "**Working Capital Facility**" as provided for in **Annex III** of this Plan Term Sheet (the "**Restructuring Term Sheet**") and the Plan (ii) a super-senior first-lien secured financing facility which shall be provided by the DIP Lender as provided for in **Annex III** of this Plan Term Sheet and the Plan (the "**Amended & Restated Secured Exit Financing Facility**"), (iii) first priority tranche of secured notes or bank instruments which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**1L Secured Obligations**"), (iv) a first/second priority secured loan (as described in Restructuring Term Sheet) which shall be distributed to the Senior Lenders and Strabag as provided in the Restructuring Term Sheet and the Plan (the "**Amended & Restated 2L Secured Obligations**", and collectively with the Working |

<table>
<tr><td></td><td>Capital Facility, the Amended & Restated Secured Exit Financing Facility and the 1L Secured Obligations, the "**Amended & Restated Secured Obligations**"), and (v) the issuance of common equity in the Reorganized Company to be provided to AES Andes or its designees (the "**New Common Equity**" and, together with the Amended & Restated Secured Obligations, the "**New and A&R Obligations**"). The New and A&R Obligations shall have terms consistent with the Restructuring Term Sheet. The Working Capital Facility, the Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and the Amended & Restated 2L Secured Obligations shall benefit from the same collateral provided, however, that (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of, first, the Working Capital Facility, and second, the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations pursuant in each case to an Amended & Restated Secured Obligations Intercreditor Agreement.</td></tr>
</table>

| | |
|---|---|
| **Tax Matters** | The Company will seek to effectuate the terms and conditions of the Restructuring in a tax efficient manner. |
| **Amendment of Pledges** | The Consenting Creditors will enter into any amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the Alto Maipo Obligations (the "**Pledge Amendments**") to thereafter secure the Reorganized Company's obligations under the Amended & Restated Secured Obligations from and after the Plan Effective Date in a manner consistent with the RSA and Annex II thereto. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE COMPANY UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **Administrative Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |
| N/A | **Professional Fee Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Professional Fee Claim shall receive payment in full in cash. | Unimpaired/ Deemed to Accept |

| Classified Claims and Interests of the Company | | | |
|---|---|---|---|
| **Class 1** | **Alto Maipo Senior Secured Obligations** | On the Plan Effective Date, each holder of an Allowed Alto Maipo Senior Secured Obligation shall receive its Pro Rata Share of the 1L Secured Obligations and Amended & Restated 2L Secured Obligations. | Impaired |
| **Class 2** | **Secured Claims** | Each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Secured Claim or (ii) the collateral securing such Allowed Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date. | Unimpaired / Deemed to Accept |
| **Class 3** | **Priority Claims** | Each Holder of an Allowed Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |

| Class 4 | **General Unsecured Claims** | On the Plan Effective Date, all General Unsecured Claims shall be unimpaired through a combination of (i) payment in full in cash of allowed unsecured claims (for General Unsecured Claims listed in Exhibit B to the Restructuring Term Sheet), (ii) deeming unliquidated/contingent claims to ride through unimpaired (subject to the Company's rights and defenses) (for General Unsecured Claims listed in Exhibit C to the Restructuring Term Sheet), and (iii) disallowing or expunging other asserted unsecured claims, estimating such claims at $0 for distribution purposes, or assuming the relevant contracts with a cure amount of $0 (for General Unsecured Claims listed in Exhibit D to the Restructuring Term Sheet).  Remaining General Unsecured Claims shall be satisfied as set forth on Exhibit E.<br><br>With respect to the General Unsecured Claims listed in Exhibit B to the Restructuring Term Sheet, the Definitive Documentation will include an obligation by AES Andes to contribute to the Borrower an amount of up to $300,000 for the payment in full in cash of those General Unsecured Claims.<br><br>With respect to litigation brought by Parque Arenas SpA ("<u>Parque Arenas</u>") against Alto Maipo before the 5th Civil Court of Santiago, case number (i.e. rol) C-18,215-2020, which is reflected in Proof of Claim No. 5 ("<u>Parque Arenas Unsecured Claim</u>"), the Definitive Documentation will include an obligation by AES Andes to provide sufficient contribution to the Borrower to satisfy any amounts that the Borrower is required to pay, up to a maximum amount of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the Borrower and Parque Arenas, in connection with the Parque Arenas Unsecured Claim and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D). | Unimpaired / Deemed to Accept |
|---|---|---|---|

| Class 5 | DIP Claims | All Allowed DIP Claims shall be exchanged for, or paid with the proceeds of, the Amended & Restated Secured Exit Financing Facility. Additionally, in consideration for, *inter alia*, certain deferrals from the Sponsor; an increase in the size of the Amended & Restated Secured Exit Financing Facility; the impairment of the DIP Claims; certain contributions to the Borrower for the payment in full in cash of certain allowed unsecured claims and for the payment of the Parque Arenas Unsecured Claim to the extent set forth in this Plan Term Sheet with respect to treatment of Class 4 General Unsecured Claims, AES Andes or its designee shall receive the New Common Equity, as provided for in the Restructuring Term Sheet. | Impaired |

| Class 6 | Strabag's Other Claims | In consideration of Strabag's Other Claims, which are hereby Allowed, Strabag shall be entitled to payment as follows (less any payments on account of any such items made prior to the Effective Date) (all capitalized terms used in subsections 1-5 below and not otherwise defined herein are as defined in the Tunneling Contract): <br><br> (1) $761,030 upon completion of signed Change Order 1; (2) $326,240 upon completion of signed Change Order 2; and (3) $53,827 upon completion of signed Change Order 4; provided that payments due to Strabag pursuant to (1), (2), and (3) above shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum starting from the date that the Company accepts the completion of relevant Change Order (the "**Strabag Change Order Deferral**"); (4) $112,000 in the aggregate upon completion of an eco-flow monitoring system for all intakes; (5) $10,000,000 upon Substantial Completion of Critical Milestone F, which payment shall be subject to deferral until it is paid pursuant to the excess cash flow sweep (as described in the Restructuring Term Sheet), shall bear interest at a rate of 4.0% per annum starting from the date of Substantial Completion of said Critical Milestone F, and shall be payable pursuant to the excess cash flow sweep (the "**Strabag Construction Deferral**"); and (6) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which amount shall be subject to deferral until December 31, 2022, and shall bear interest at a rate of 4.0% per annum from the date of receipt by the Company until payment to Strabag (the "**Strabag Insurance Deferral**" and, together with the Strabag Change Order Deferral and Strabag Construction Deferral, the "**Strabag Deferrals**"). The Strabag Deferrals shall be secured, *pari passu* with the 1L Secured Obligations, until paid in full. | Impaired |
|---|---|---|---|

| Class 7 | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Company's election with the consent of the Required Consenting Creditors. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |
|---|---|---|---|
| Class 8 | **Existing Equity Interests** | On the Plan Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and discharged and without any distribution, in each case, at the Company's election and to the extent permitted under local law. | Impaired / Deemed to Reject |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Company shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Plan Term Sheet (including the Restructuring Term Sheet) or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, shall be canceled and discharged, and the Company's obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | The Tunneling Contract, as amended pursuant to the Restructuring Term Sheet, shall be assumed; *provided that* the Cure Cost for such assumption shall be the payment of Strabag's Other Claims in accordance with the treatment described above. All other executory contracts and unexpired leases that are not assumed as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed rejected pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

14

| Releases and Exculpation | Consummation of the Plan will be subject to approval by the Bankruptcy Court of customary release provisions for the benefit of the Released Parties and exculpation provisions for Exculpated Parties, in each case other than claims arising from gross negligence, willful misconduct, or fraud. Such provisions shall include (i) mutual releases among the Company and the Released Parties; and (ii) consensual third party releases from and to the Releasing Parties in favor of each of the parties identified in the foregoing clause (i). |
|---|---|
| Governance | The identities of directors on the board of the Reorganized Company shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for the Reorganized Company including charters, bylaws, operating agreements, or other organization documents, as applicable, shall (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) be acceptable to the Required Consenting Creditors in their sole and absolute discretion. |
| Exemption from SEC Registration | The issuance of all securities under the Plan will be exempt from registration under Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable. |
| Treatment of the Non-Qualified Creditors | All New and A&R Obligations under the Plan that would have been issuable and deliverable to Non-Qualified Creditors if they had been Qualified Creditors will be deposited with an agent (the "**Selling Agent**"). The Selling Agent shall offer such New and A&R Obligations in one or more sale transactions within 180 days following the Plan Effective Date (the "**Sale Period**"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Creditors at the end of the Sale Period (the "**Substitute Consideration**").  In the event that a sale of such New and A&R Obligations is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such New and A&R Obligations shall be cancelled for no consideration.  None of the Company, any Consenting Creditor, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities. <br><br> For the avoidance of doubt, any Non-Qualified Creditors who would have been entitled to receive any New and A&R Obligations under the Plan if they had been Qualified Creditors shall only be entitled to receive the Substitute Consideration in respect thereof. |
| Indemnification Obligations | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for |

| | |
|---|---|
| | current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company than the indemnification provisions in place as of the date hereof, provided that the Reorganized Company shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Company for any claims or causes of action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. |
| **Retained Causes of Action** | The Reorganized Company shall retain all rights to commence and pursue any causes of action, other than any causes of action that the Company has released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"):<br><br>a.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Company and the Required Consenting Creditors, which shall be in force and effect and not subject to any stay of effectiveness;<br><br>b.  the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time after April 1, 2022;<br><br>c.  the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;<br><br>d.  the final version of each of the Plan, the Definitive Documentation, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance consistent in all respects with this Plan Term Sheet and the Plan and shall have not been modified in any manner without the consent of the Consenting Creditors (as described in the Restructuring Support Agreement) in their sole and absolute discretion;<br><br>e.  the New and A&R Obligations Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New and A&R Obligations Documents shall have been satisfied or |

duly waived in writing in accordance with the terms of each the New and A&R Obligations Documents;

f.   the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g.   all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

h.   the payment in cash in full of all Restructuring Expenses;

i.   the PPA shall have been assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and shall be in full force and effect and shall not have terminated at any time;

j.   the documentation related to the VAT Financing Facility shall have been duly executed and delivered by all of the Entities that are party thereto;

k.   with respect to the claims listed on Exhibit D to the Restructuring Term Sheet, the Bankruptcy Court shall have entered orders either (a) disallowing and expunging, (b) estimating at zero dollars for distribution purposes, (c) reducing and allowing, or (d) authorizing the assumption of the relevant contracts (with cure amount ordered to be zero dollars, with the exception of Claim No. 16, the cure amount for which the Debtors may litigate as needed subsequent to the Plan Effective Date provided that any disputed cure amount be held in escrow by the Company pending the outcome of such litigation); and

l.   the contributions from AES Andes in an amount of up to $300,000 for the payment in full in cash of the allowed General Unsecured Claims listed in Exhibit B to the Restructuring Term Sheet shall have been sufficient to pay in full in cash all such allowed General Unsecured Claims.

**Annex I**

## DEFINITIONS

"*1L Secured Notes*" means any 1L Secured Obligations that may be issued in the form of secured notes.

"*1L Secured Obligations*" means a first priority tranche of secured notes or secured bank instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement, *provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not satisfied prior to the Effective Date, Strabag's Pro Rata Share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

"*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses and to the extent not disallowed under a Final Order.

"*Adequate Protection Claim*" means that superpriority Claim granted to the Senior Lenders and Strabag pursuant to the Final Cash Collateral Order, which Claim shall not be Allowed so long as the Restructuring Support Agreement remains valid and in full force, and is limited to the extent of any diminution in value of the Prepetition Collateral (as defined in the Final Cash Collateral Order).

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28; (d) DIP Claims; and (e) the Adequate Protection Claim.

"*AES Andes*" means AES Andes S.A., f/k/a AES Gener S.A.

"*AES Andes Shared Services Contracts*" means the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the Common Terms Agreement).

"*AES Andes Shared Services Payments*" means certain intercompany payments due to AES Andes (or any permitted transferee) by Alto Maipo pursuant to the AES Andes Shared Services Contracts, which are currently deferred under the terms of the AES Andes Shared Services Contracts until the existing senior debt discharge date.

"*Affiliate*" means an affiliate as defined in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

"*Agreement Effective Date*" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

"*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Claims Bar Date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) the Claims of the Senior Lenders and Strabag on account of the Alto Maipo Senior Secured Obligations; or (d) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that, with respect to a Claim described in clauses (a), (b), and (c) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that is listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court, and Holders of such Claims shall not receive any distributions under the Plan on account of such Claims or Interests. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

"*Alto Maipo*" means Alto Maipo SpA or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*Alto Maipo Delaware*" means Alto Maipo Delaware LLC or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*Alto Maipo Senior Secured Obligations*" means (i) an amount equal to $1,652,218,290 due to the Senior Lenders as Secured Obligations under the Financing Documents (in each case, as defined in the Common Terms Agreement), and (ii) an amount equal to $391,500,000 due to Strabag as the Supplier Deferred Payment under the Tunneling Contract, without duplication.

"*Amended & Restated 2L Secured Obligations*" means a second priority tranche of amended and restated secured debt instruments which shall be distributed to the Senior Lenders and Strabag in exchange for a portion of their Alto Maipo Senior Secured Obligations, as provided for in the Plan Term Sheet or as otherwise agreed between the Required Consenting Creditors and the Debtors, documentation of which shall be included in the Plan Supplement, *provided, however*, that, solely in the event that all conditions to payment of the Supplier Deferred Payment are not

satisfied prior to the Effective Date, Strabag's Pro Rata Share of such amended and restated debt instruments shall be held in escrow pending satisfaction of such conditions.

"*Amended & Restated Secured Exit Financing Facility*" means a super-senior first-lien secured financing facility which shall be provided by the DIP Lender in exchange for and in satisfaction of the Claims under the DIP Credit Facility, as provided for in the Plan Term Sheet, documentation of which shall be included in the Plan Supplement, or as otherwise agreed between the Required Consenting Creditors, the Debtors, and the DIP Lender.

"*Amended & Restated Secured Obligations Intercreditor Agreement*" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the Consenting Creditors, which shall be included in the Plan Supplement, by which (i) the 1L Secured Obligations and Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the Amended & Restated Secured Exit Financing Facility, and (ii) the Amended & Restated 2L Secured Obligations and all liens related thereto shall be expressly subordinated in part (as described in the Restructuring Term Sheet), in both right of payment and lien priority, to the payment in full of the 1L Secured Obligations.

"*Amended & Restated Secured Obligations*" means the Working Capital Facility, Amended & Restated Secured Exit Financing Facility, 1L Secured Obligations and Amended & Restated 2L Secured Obligations, documentation of which shall be included in the Plan Supplement.

"*Assets*" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, including as specified in section 541 of the Bankruptcy Code.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule (as may be amended), if any, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Debtors pursuant to the Plan and which will be included in the Plan Supplement; *provided* that the Required Consenting Creditors shall have approved any assumptions, rejections or modifications of material Executory Contracts and Unexpired Leases.

"*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"***Bankruptcy Fees***" means any and all fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

"***Blue Sky Laws***" means any state securities laws.

"***Business Day***" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"***Carve-Out Account***" means the segregated account established pursuant to the DIP Credit Facility Documents for purposes of funding the Carve-Out (as defined in the DIP Credit Facility Documents), provided that, on and following the Effective Date, the Carve-Out Account shall be used as the account to maintain an amount equal to the Professional Fee Reserve Amount solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

"***Cash***" means the legal tender of the United States of America or the equivalent thereof.

"***Causes of Action***" means any and all actions, causes of action, suits, claims, Claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises and trespasses of any kind or character whatsoever of, or belonging to, the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity or otherwise. For the avoidance of doubt, "Causes of Action" includes, but is not limited to, (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar Claim.

"***Cerberus***" means certain funds and accounts managed or advised by Cerberus South American Investments, LLC and its affiliates and its and their respective direct and indirect subsidiaries.

"***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b)

when used with reference to both Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code against any Debtor, including Administrative Claims and DIP Claims, in each case whether or not asserted.

"***Claims Bar Date***" means, as applicable, the General Bar Date, the Governmental Bar Date, the Amended Schedule Bar Date, the Rejection Bar Date, and any other date or dates established or to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed.

"***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent.

"***Class***" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

"***CNM Arbitral Award***" means any proceeds that may be collected by the Debtors in connection with any award issued in the CNM Arbitration, including, without limitation, any amounts collected under that certain Co-Obligor Undertaking as between Alto Maipo, SpA as Owner, Hochtief Solutions AG as Co-Obligor, and Cooperativa Muratori & Cementisti – C.M.C. di Ravenna as Co-Obligor.

"***CNM Arbitration***" means the arbitration captioned *ICC Case No. 22867/JPA (C-22923/JPA) (C-23845/JPA) – Alto Maipo SpA v. Constructora Nuevo Maipo S.A. v. The AES Corporation and AES Gener S.A.*

"*Committee of Unsecured Creditors*" or "***Committee***" means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* (D.I. 231).

"***Common Terms Agreement***" means that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018, among Alto Maipo, as borrower, the Inter-American Development Bank, United States International Development Finance Corporation (as successor in interest to Overseas Private Investment Corporation), Banco De Crédito e Inversiones, Banco del Estado de Chile, DNB Bank ASA, Itaú Corpbanca, Itaú Corpbanca New York Branch, Deutsche Bank AG, London Branch, and Santana S.A., and each of their successors and assigns as senior lenders, DNB Bank ASA, as LC Issuing Bank, and Itaú Corpbanca, as administrative agent (as further amended and supplemented).

"***Company***" means, together, Alto Maipo and Alto Maipo Delaware.

"***Confirmation***" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"***Confirmation Date***" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rules 5003 and 9021.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"***Consenting Creditors***" means, at any point in time, such creditors, including Strabag, that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement to the Company or its counsel from time to time agreeing to be bound thereby.

"***Consummation***" means the occurrence of the Effective Date.

"***Cure Cost***" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

"***Debt Service Reserve Account***" or "***DSRA***" means an account to be established in the name of one or more of the Reorganized Debtors in accordance with the Plan Term Sheet and funded up to a balance of $20 million, which would otherwise be payable to Amended & Restated 2L Secured Obligations through the proceeds of the CNM Arbitral Award and/or the excess cash flow entitlement, in favor of the 1L Secured Obligations.

"***Debtor***" has the meaning set forth in the introductory paragraph of the Plan.

"***Deferred 1L Interest***" means, together, the Deferred 2022 1L Interest and the Deferred 2023 1L Interest.

"***Deferred 2022 1L Interest***" means interest payable by the Reorganized Debtors as of July 15, 2022 and October 15, 2022 on the 1L Secured Obligations which shall be paid in kind.

"***Deferred 2023 1L Interest***" means interest payable by the Reorganized Debtors as of January 15, 2023 on the 1L Secured Obligations which shall be paid in kind.

"***Definitive Documentation***" means the definitive amendments to any financing and collateral documents securing the Alto Maipo Senior Secured Obligations, shareholder agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions in accordance with the Restructuring Support Agreement and the Plan Term Sheet, including the Plan, the Disclosure Statement and the documentation relating to the New and A&R Obligations.  The Definitive Documentation and any modifications thereto will be (i) consistent

with the Plan Term Sheet in all material respects and (ii) in form and substance acceptable to the Company and the Required Consenting Creditors in each case, as set forth in the Restructuring Support Agreement.

"*DIP Agent*" means AES Andes S.A., as sole agent under the DIP Credit Facility, or any successor agents thereunder.

"*DIP Budget*" means the most recently approved budget at such time of: (a) the Initial DIP Budget (as defined in the DIP Credit Agreement) in substantially the form set forth in Schedule 5.01(c) of the DIP Credit Agreement, setting forth projected monthly cash flows for the period from the closing date through the end of September 2022, and (b) the updated budget in form substantially similar to the Initial DIP Budget and approved by the DIP Lender.

"*DIP Claims*" means any and all Claims arising under, derived from or based upon the DIP Credit Facility, including Claims for all principal amounts outstanding, interests, fees, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Credit Agreement*" means that certain Super-Priority Debtor-in-Possession Revolving Loan Agreement dated as of November 24, 2021 among Alto Maipo Delaware LLC, as borrower, Alto Maipo SpA, as guarantor, the DIP Agent, and the DIP Lender, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as may be amended, modified or supplemented from time to time, in accordance with the terms thereof.

"*DIP Credit Facility*" means that superpriority, debtor-in-possession revolving loan facility provided pursuant to the DIP Credit Agreement in an aggregate original principal amount of up to $50 million, consisting of the DIP Loans.

"*DIP Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of the DIP Lender, including any fees and expenses of any of its advisors, that are incurred in connection with the preparation, execution, delivery, implementation, consummation and enforcement of the DIP Credit Facility and the transactions contemplated thereby.

"*DIP Credit Facility Documents*" means the DIP Credit Agreement together with all documentation executed or delivered in connection therewith as may be amended, modified or supplemented from time to time, in accordance with the terms and conditions set forth therein.

"*DIP Lender*" means AES Andes, the lender party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Loans*" means the revolving loan of up to $50 million to be provided pursuant to the DIP Credit Agreement.

"*DIP Orders*" means, together, the *Interim Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105,*

*362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (IV) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C); and (V) Grant Related Relief* (D.I. 70, the "**Interim DIP Order**"), the *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Grant Superpriority Administrative Expense Claims to DIP Lender(s) Pursuant to 11 U.S.C. §§ 364, and 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (IV) Grant Related Relief* (D.I. 166, the "**Final DIP Order**").

"**Disclosure Statement**" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

"**Disputed**" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed.

"**Distribution Agent**" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors, in the capacity as distribution agent under the Plan.

"**Distribution Date**" means the date on which Holders of Claims are eligible to receive distributions under the Plan.

"**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Creditors) in accordance with the Plan.

"**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code, and includes, for the avoidance of doubt, a Person.

"**Existing Equity Interest**" means an Interest in the Company existing as of the Agreement Effective Date of the Restructuring Support Agreement or created after the execution of the Restructuring Support Agreement and prior to the Effective Date.

"**Estates**" means, as to each Debtor, the estate created for the Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

"**Exculpated Parties**" means, collectively, the Company, its current and former Affiliates, and all current and former Related Parties of either the Company or its Affiliates, and the Committee.

"***Executory Contract***" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under sections 365 or 1123 of the Bankruptcy Code.

"***Final Cash Collateral Order***" means the *Final Order Under U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lenders* (D.I. 164).

"***Final Order***" means, as applicable, an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

"***General Bar Date***" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all entities, except for governmental units, must file Proofs of Claim and shall apply to all claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, Section 503(b)(9) Claims, unsecured priority claims, and unsecured nonpriority claims.

"***General Unsecured Claims***" means all Claims other than Administrative Claims, Professional Fee Claims, Alto Maipo Senior Secured Obligations, Secured Claims, Priority Claims, DIP Claims, the Adequate Protection Claim, Strabag's Other Claims, Intercompany Claims, and Existing Equity Interests.

"***Governmental Bar Date***" means, as such date is approved and may be amended from time to time by the Bankruptcy Court, the deadline by which all Governmental Units holding a Claim under Section 502(b)(9) of the Bankruptcy Code against the Debtors is required to file Proofs of Claim.

"***Governmental Unit***" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

"***Holder***" means the beneficial holder of any Claim or Interest.

"***Impaired***" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

"***Indemnification Obligations***" means a Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, by-laws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

"***Indemnified Parties***" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' by-laws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

"***Intercompany Claims***" means a claim held by the Company against an Affiliate of the Company and *vice versa*.  For the avoidance of doubt, the term "Intercompany Claim" does not include (x) any Claim held by Strabag against the Company or (y) any Claim held by AES Andes against the Company in connection with the AES Andes Shared Services Payments.

"***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Company and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the company.

"***Joinder***" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the effective date of such Restructuring Support Agreement may become a Consenting Creditor by executing such joinder agreement.

"***Law***" means any federal, state, local, or foreign "law" (including common Law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

 "***New and A&R Obligations Documents***" means collectively, any capital increase, indenture, loan agreement or other agreement governing the New and A&R Obligations, the Amended & Restated Secured Obligations Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendment to the by-laws, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall

be acceptable to the Company and the Required Consenting Creditors, and which documents shall be included in the Plan Supplement.

"***New and A&R Obligations***" means the Amended & Restated Secured Obligations and New Common Equity.

"***New Common Equity***" means the common Interests in the Company to be issued by the Company on or about the Effective Date pursuant to the terms and conditions of the Plan Term Sheet.

"***New Organizational Documents***" means, on or after the Effective Date, the amended and restated certificates of incorporation or similar governing document of each Reorganized Debtor and any other documents required to govern each Reorganized Debtor, which documents shall be included in the Plan Supplement.

"***Non-Qualified Creditors***" means any creditor under the Alto Maipo Senior Secured Obligations other than a Qualified Creditor.

"***Notice and Claims Agent***" means Prime Clerk LLC ("Prime Clerk") in its capacity as noticing, claims, and solicitation agent for the Debtors.

"***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means November 17, 2021.

"***Plan***" means this joint chapter 11 plan of reorganization filed by the Company, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Term Sheet, and to the extent not consistent with the Plan Term Sheet in any material respect, in form and substance acceptable to the Company and the Required Consenting Creditors.

"***Plan Documents***" means any and all of the documents, other than the Plan, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, including, without limitation, insofar as such documents are not incorporated into the Plan through inclusion in the DIP Credit Facility Documents, and the New and A&R Obligations Documents, subject to any consent rights set forth in the Plan.

"***Plan Supplement***" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Company prior to the Confirmation Hearing, and additional documents that may be filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with the terms and conditions set forth in the Restructuring Support Agreement and the Plan Term Sheet, where applicable; which shall include the New and A&R Obligations Documents, the New Organization Documents, the Assumed Executory Contracts and Unexpired Leases Schedule, and such other Plan Documents as have not been previously filed with the Bankruptcy Court, and which shall be in form and substance acceptable to the Company and the Required Consenting Creditors.

"***Plan Supplement Filing Date***" means the date that is 14 calendar days prior to the Confirmation Hearing, or such later date as is authorized by the Court.

"***Plan Term Sheet***" means the Plan Term Sheet attached to the Restructuring Support Agreement.

"***PPA***" means the agreement entitled "Contrato de Suministro de Electricidad" (Power Supply Agreement) dated as of June 28, 2013, by and between Alto Maipo and Antofagasta Minerals S.A., as assigned by Antofagasta Minerals S.A. to Minera Los Pelambres on June 20, 2014 (as further amended and supplemented prior to the Petition Date).

"***Priority Claims***" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims.

"***Professionals***" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"***Professional Fee Claims***" means any Claim of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

"***Professional Fee Reserve Amount***" means the aggregate Accrued Professional Compensation through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of the Plan; *provided* that the Professional Fee Reserve Amount shall not exceed the unused portion of the amounts set forth in the DIP Budget unless consented to by the Consenting Creditors.

"***Project***" means the run-of-river hydroelectric project constructed by Alto Maipo in the Andes Mountains.

"***Proof of Claim***" means a "proof of claim" as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Debtors' Chapter 11 Cases.

"***Pro Rata Share***" means, with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

"***Qualified Creditor***" means a creditor of the Alto Maipo Senior Secured Obligations who provides either one of the following certifications: (i) a certification that it is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act or U.S. government agency, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144

under the Securities Act; or (ii) a certification that it is a non-U.S. person (as such term is defined in Rule 902(k) under the Securities Act) located or resident outside the United States and is qualified to participate in acquiring the securities offered to it under the Plan in accordance with applicable law.

"*Reinstated*" or "*Reinstatement*" mean, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Creditors in their sole and absolute discretion.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and, if separate, the DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case, as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (i); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party" and any Related Party of such person or Entity that opts out of the releases (other than the Company and the Reorganized Company) shall also not be a "Released Party." For the avoidance of doubt, no claims or causes of action of either of the Debtors against (x) Constructora Nuevo Maipo S.A., (y) Hochtief Solutions AG, or (z) Cooperativa Muratori & Cementisti – C.M.C. di Ravenna, nor any of the respective Affiliates of each entity listed in clauses (x) through (z), shall be released pursuant to this Plan.

"*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Company; (b) the Reorganized Company, and each direct or indirect subsidiary of the Company or Reorganized Company; (c) Norgener Renovables S.p.A.; (d) AES Andes; (e) Strabag, in its capacity as shareholder and subordinated lender; (f) the DIP Agent and each DIP Lender; (g) the Administrative Agent and the Collateral Agents (in each case as defined in the Common Terms Agreement); (h) each Consenting Creditor; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (j) all holders of Claims or Interests that are deemed to accept the Plan; (k) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases

provided in the Plan; (l) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l), and (n) each Related Party of each Entity in clause (a) through (m).

"***Reorganized Board***" means the board of directors of Alto Maipo, as determined in accordance with the New Organizational Documents.

"***Reorganized Company***" means the Company, or any successor or assign thereto, by merger consolidation, or otherwise, on and after the Effective Date.

"***Reorganized Debtors***" means collectively, each of the Debtors and any successors thereto, by merger, consolidation or otherwise, as reorganized on or after the Effective Date, in accordance with the Plan.

"***Required Consenting Creditors***" means, as of the relevant date, the holders of no less than 2/3 of the aggregate principal amount of the Alto Maipo Senior Secured Obligations held by all Consenting Creditors that are party to the Restructuring Support Agreement on such date.

"***Restructuring***" means the restructuring of Alto Maipo and Alto Maipo Delaware LLC, as contemplated by and described in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan.

"***Restructuring Documents***" means the Plan Term Sheet and the Restructuring Term Sheet.

"***Restructuring Expenses***" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Creditors in any way related to the Company or the Restructuring, including any fees and expenses (including success fees) of (x) the Consenting Creditors' advisors (excluding advisors to Strabag and Cerberus), including ASSET Chile S.A., FTI Consulting Canada ULC, Norton Rose Fulbright US LLP, Landis Rath & Cobb LLP, and Carey y Cía Ltda., (y) Troutman Pepper Sanders Hamilton LLP, as advisors to Strabag, and (z) Davis Polk & Wardwell LLP and Pachulski Stang Ziehl & Jones LLP, as advisors to Cerberus, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documentation, and the transactions contemplated thereby, and (ii) the Administrative Agent and the Collateral Agents (each as defined in the Common Terms Agreement).

"***Restructuring Support Agreement***" shall mean that certain support agreement for implementation of the Restructuring dated as of November 16, 2021 between Alto Maipo and the Consenting Creditors, which was filed as Exhibit A to the *Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (D.I. 13), as amended on November 23, 2021, January 31, 2022, and February 28, 2022, and as may be further amended or become effective as between the Debtors and the Consenting Creditors.

"***Restructuring Term Sheet***" means the restructuring term sheet attached to the Restructuring Support Agreement.

"***Restructuring Transactions***" means, collectively, the Chapter 11 Cases, the New and A&R Obligations and the consummation of the other transactions contemplated in the Restructuring Documents.

"***Retained Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

"***SEC***" means the United States Securities and Exchange Commission.

"***Secured Claims***" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Security***" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

"***Senior Lenders***" means the lenders and interest rate swap providers under the Common Terms Agreement, each in their capacity as such.

"*Sponsor*" means AES Andes.

"***Sponsor Deferrals***" means those certain intercompany amounts payable by Alto Maipo to AES Andes under the O&M Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of the applicable intercompany agreements, and which the Sponsor shall, subject to occurrence of the Effective Date, defer for 12 months beginning May 2022, in an amount of $600,000 per month, for a total deferred amount of approximately $7.2 million).

"**Stamp or Similar Tax**" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"**Strabag**" means Strabag SpA, as (i) contractor under the Tunneling Contract, (ii) shareholder under the Shareholders' Agreement of Alto Maipo among Norgener Renovables SpA, Strabag and Alto Maipo (as amended and restated from time to time), (iii) lender under certain subordinated and unsecured loan agreements among Strabag and Alto Maipo entered prior to the date of the Restructuring Support Agreement, and (iv) secured creditor with respect to the Supplier Deferred Payment.

"**Strabag Change Order Deferral**" means the $1,141,097 payable upon completion of Change Order Nos. 1, 2 and 4 (as such term is defined in the Tunneling Contract), which shall be deferred until December 31, 2022.

"**Strabag Construction Deferral**" means the $10 million payable upon substantial completion of Critical Milestone F (as such term is defined in the Tunneling Contract), which shall be deferred until it is paid pursuant to the excess cash flow sweep.

"**Strabag Deferrals**" means, collectively, the Strabag Change Order Deferral, Strabag Construction Deferral and Strabag Insurance Deferral.

"**Strabag Insurance Deferral**" means, upon receipt, the approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which shall be deferred until December 31, 2022.

"**Strabag's Other Claims**" means Strabag's claims under the Tunneling Contract (as further amended from time to time, including pursuant to the terms described in the Restructuring Term Sheet), other than such Claims that are part of the Alto Maipo Senior Secured Obligations, that are payable in Cash for construction costs and insurance proceeds pursuant to the terms described in Section 3.3(f).

"**Subordinated Claim**" means any Claim that is subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims. For the avoidance of doubt, Subordinated Claim shall not include any Claim in Classes 1, 5 or 6.

"***Supplier Deferred Payment***" shall have the meaning given to it in the Common Terms Agreement.

"***Transfer Agreement***" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

"***Tunneling Contract***" means that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract between Alto Maipo and Strabag, dated February 19, 2018 (as further amended, and restated, and/or supplemented, including in connection with the Restructuring Transactions).

"***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

"***Unimpaired***" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

"***U.S. Trustee***" means the United States Trustee for the District of Delaware.

"***VAT***" means value-added tax.

"***VAT Financing Facility***" means a financing facility secured by the Debtors to pay the full amount of VAT that will be due upon issuance of the invoice for the Supplier Deferred Payment by Strabag.

"***Working Capital Facility***" means a super-senior first-lien secured working capital facility, documentation of which shall be included in the Plan Supplement, in an aggregate maximum principal amount of up to $15 million, with a maturity date of January 15, 2024, to be provided by AES Andes on the Effective Date.

**Schedule II – Restructuring Term Sheet**

**Restructuring Term Sheet –** terms to be effective immediately upon bankruptcy exit

| | |
|---|---|
| **New Senior First Lien Debt** | • Borrower:  Alto Maipo SpA<br><br>• Aggregate Amount: $1,050,000,000.<br><br>    – To be structured as a combination of (i) notes with documentation customary for an investment grade corporate credit ("<u>1L Notes</u>") and (ii) project-finance style loans with documentation similar, except as the parties may otherwise agree, to the existing Second Amended & Restated Common Terms Agreement (the "<u>CTA</u>") dated as of May 8, 2018 (the "<u>1L Loans</u>" and, together with the 1L Notes, the "<u>New 1L Debt</u>").  Holders of the 1L Notes and lenders under the 1L Loans are together referred to as the "<u>New 1L Lenders</u>". The existing senior secured parties will elect (in their discretion) whether their New 1L Debt is documented as 1L Notes or 1L Debt.<br>    – All New 1L Debt will share the same economic terms and will rank *pari passu* with respect to repayment, prepayment, collateral sharing, and all other similar matters.<br><br>• Collateral: same as existing collateral package under the CTA dated as of May 8, 2018 (including first priority perfected lien on all assets of Borrower, all shares in Borrower, and all shareholder/affiliate loans (other than Shared Services Loan, the Exit Financing Facility and the Working Capital Facility) made to the Borrower).<br><br>• Maturity: June 2040<br><br>• Interest Payment Dates: January 15, April 15, July 15 and October 15.<br><br>• Principal Payment Dates: April 15 and October 15.<br><br>• Interest rate: 4.0% per annum fixed, from the Effective Date (as defined in Annex I to Schedule I to the RSA), and paid in cash on each Payment Date beginning on January 15, 2023 (subject to the Deferred 2023 1L Interest). Interest begins to accrue on the date the Borrower exits bankruptcy.<br><br>    – Interest payable on July 15, 2022 and October 15, 2022 ("<u>Deferred 2022 1L Interest</u>") shall be paid in-kind (PIK-ed).<br>    – Interest payable on January 15, 2023 may be PIK-ed (if so deferred, the "<u>Deferred 2023 1L Interest</u>" and, together with the Deferred 2022 1L Interest, "<u>Deferred 1L Interest</u>") if pro forma for the payment, and before |

any disbursement of the Working Capital Facility, cash on hand of the Borrower would fall below $10mm.  If the January 2023 interest payment on the New 1L Debt will be PIK-ed, Borrower will make a public disclosure of this information.

– Deferred 1L Interest will accrue interest until paid in full at 4.0% per annum.

– Deferred 1L Interest shall be repaid according to the terms of the "Excess Cash Flow Sweep" described below.

- Default interest rate: additional 2%.

- Mandatory annual debt service: annual debt service (including scheduled amortization and cash payments of interest) in an aggregate amount of $66.3 million per calendar year, and which will reduce the outstanding principal amount of the New 1L Debt to $500 million no later than June 2040.  Scheduled amortization will be paid semi-annually (April 15 and October 15), beginning on April 15, 2024.

- Excess Cash Flow Sweep applies according to the priority described under "Excess Cash Flow Sweep" herein. When applicable, Excess Cash Flow Sweep will be paid April 15 and October 15 and calculated on the same terms agreed for the New 2L Debt.

- 12.5-year make-whole at T+40 bps. No other prepayment penalties. For the avoidance of doubt, make-whole shall not apply to cash sweep or any other mandatory repayment.

- Covenants and Events of Default for 1L Notes: similar to investment grade corporate credits of this type

- Covenants and Events of Default for 1L Loans: similar to CTA, except as the parties may otherwise agree

- Obligations under Share Retention Agreement (as defined in CTA) will apply.

- Subject to U.S. bankruptcy rules, 1L Loans will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Deferred Payment Agreement (as defined in the CTA).

- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 1L Lenders.

- Assignment:

  – For 1L Loans – same as in existing documentation unless otherwise agreed.

  – For 1L Notes – restrictions in existing documentation will not apply.

|  | • Voting Rights: to be addressed in intercreditor agreement. Any New 1L Debt acquired or held by a Borrower affiliate will not have any voting rights. |
|--|--|

- Voting Rights: to be addressed in intercreditor agreement. Any New 1L Debt acquired or held by a Borrower affiliate will not have any voting rights.

- 1L Notes will have the following attributes and / or associated obligations:

  – Offering Memorandum will be prepared on a timeline agreed with the holders of the 1L Notes.
  – 3 ratings will be obtained, at least two to choose from, on a timeline agreed with the holders of the 1L Notes.
  – Listed in an international exchange (CUSIP and ISIN) and part of a clearing house (Euroclear, DTC, Clearstream Lux) on a timeline agreed with the holders of the 1L Notes.
  – Borrower will go on a roadshow, engaging the support of at least 2 international investment banking teams, to promote (in a combined roadshow) secondary trading of the 1L Notes and 2L Notes.
  – AES Andes (the "Sponsor") to use commercially reasonable efforts to facilitate initial secondary market making.
  – Borrower will establish an investor relations team.
  – 144A/Reg S format.
  – 1L Notes to be part of the CEMBI Index to the extent eligible.

**New Senior Second Lien Debt**

- Borrower: Alto Maipo SpA

- Amount: estimated at $993,718,290 (equal to the amount of prepetition secured claims, including the liquidated amount of the interest rate swaps, <u>less</u> the aggregate principal amount of the New 1L Debt)[3] (the "<u>New 2L Debt</u>"). Lenders under the New 2L Debt are referred to as the "<u>New 2L Lenders</u>".

  – To be structured as project finance style loans with documentation similar, except as the parties may otherwise agree, to the existing CTA (the "<u>2L Loans</u>"). See "Stamp Tax and Other Debt Issuance Costs" for further details.
  – New 2L Lenders will have the option to exchange 2L Loans during March 2023[4] for notes with documentation customary for an investment grade corporate credit (the "<u>2L Notes</u>"), except for any of the terms set forth herein and that there will be no make-whole. Borrower will be obligated to take all steps necessary to cause the exchange of 2L Loans for 2L Notes during March 2023 on a definitive timeline to be agreed in the definitive documentation. The Confirmation Order (as defined in Annex I to Schedule I to the RSA) shall contain a "So Ordered" paragraph expressly affirming the Borrower's obligation to exchange the 2L Loans for 2L Notes and shall provide that the Borrower's failure to perform shall entitle the New 2L Lenders to all available remedies, including, without limitation, specific performance and that the Bankruptcy Court shall retain jurisdiction over any dispute relating to such obligation.
    ▪ 2L Notes will share the same economic terms and will rank pari passu with 2L Loans with respect to repayment, prepayment, collateral sharing, and all other similar matters.

---

[3] This amount will be updated to include the total amount of prepetition claims to reflect accrued interest through the date of the bankruptcy filing.
[4] The parties are discussing the potential for a longer or second window during which 2L Loans could be exchanged for 2L Notes.

- ▪ Covenants and Events of Default for 2L Notes will be similar to 1L Notes, with conforming changes to reflect different economic terms of the New 2L Debt.
- ▪ Transfer restrictions in existing documentation will not apply to 2L Notes.

- Collateral: second lien on all assets included in the collateral package for the New 1L Debt.

- Maturity: October 15, 2042, extendable at each New 2L Lender's individual option to October 15, 2052.

- Payment Dates same as Excess Cash Flow Sweep dates (April 15 and October 15).

- Interest rate: 2% per annum fixed, paid in cash or capitalized (PIK) based on available cash flow, subject to increase by the Upside Fee. Interest begins to accrue on the Effective Date (as defined in Annex I to Schedule I to the RSA).

- Default interest rate: additional 2%.

- Upside Fee: after each calendar year end, 50% of the difference (if positive), between actual Cash Flow Available for Debt Service[5] as defined in the CTA with necessary conforming changes ("CFADS") and projected CFADS (per the Borrower's base case financial model dated January 28, 2022, attached as Exhibit A to this Term sheet) will be payable to the New 2L Lenders as additional interest until the New 2L Debt has been fully repaid or is converted to shares in the Borrower.

  - – Payment of Upside Fee is uncapped, but may never be less than zero.
  - – Upside Fee for each calendar year will be earned on December 31st (or, if New 2L Debt matures in 2052, on the maturity date), such that if the New 2L Debt is fully repaid on or prior to December 30th of any calendar year (or the maturity date in 2052), no Upside Fee would be payable for that year.
  - – Commencing in January 2043, any Upside Fee is reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042.

- Scheduled Amortization: None.

- Excess Cash Flow Sweep: 100% of excess cash flow, reduced pro rata based on the amount of New 2L Debt that converted to shares in the Borrower upon maturity in October 2042. Excess cash flow will be calculated as all cash of the Borrower after (i) payment of all operation and maintenance expenses, permitted capital expenditures, and other permitted Project-related expenses to be agreed in accordance with the then-effective annual budget, (ii) payment of all Working Capital Facility balances, the Strabag Construction Deferral, the Deferred 1L Interest, scheduled debt service and mandatory prepayment on the Exit Financing Facility and New 1L Debt (or any refinancing of the Exit Financing Facility and New 1L Debt), (iii) full funding of the Debt Service Reserve Account ("DSRA") up to $20mm balance, and (iv) cash on hand of the Borrower in the amount of $25 million (and pursuant

---

[5] To be defined in a manner similar to the CTA, unless otherwise agreed, with changes to capture all revenue of Borrower other than (x) proceeds of the CNM Arbitration and (y) revenues required to be applied for mandatory prepayment.

to the priorities described under "Excess Cash Flow Sweep" herein).  Excess Cash Flow Sweep will be paid April 15 and October 15.  When Excess Cash Flow Sweep is paid, an estimated amount will be reserved (and excluded from the Excess Cash Flow Sweep) based on the projected Upside Fee calculation for the then-current calendar year.

- Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid), subject to a cap of 20% of total outstanding shares in the Borrower (after giving effect to this debt-to-equity conversion) in October 2042 and no cap in October 2052.  The converted shares will have rights to be agreed in the definitive documents.

  – For each New 2L Lender who does not elect to extend the maturity of its New 2L Debt to 2052, the percentage of shares in the Borrower that it will receive will be calculated as follows: (i) the percentage of shares (subject to a 20% cap) that would have corresponded to all New 2L Lenders if 100% of New 2L Debt matured at October 2042 and the Shared Services Loan was converted to shares at October 2042, <u>multiplied by</u> (ii) the percentage of the outstanding principal amount of New 2L Debt held by such New 2L Lender who did not extend its New 2L Debt maturity date over the total outstanding principal amount of all New 2L Debt.

  – The definitive documents will include provisions to equitably address the value of shares held by New 2L Lenders whose New 2L Debt converts in 2042 in the scenario where remaining New 2L Debt converts to shares in 2052.

- No prepayment penalties.
- Covenants and Events of Default for 2L Loans: similar to CTA, except as the parties may otherwise agree.
- Subject to U.S. bankruptcy rules, 2L Loans will be an amendment and restatement of the existing senior debt subject to the CTA and the Supplier Financing Agreement (as defined in the CTA).
- All third party rights granted to the secured parties in connection with the CTA will survive for the benefit of the New 2L Lenders.

- Assignment:

  – For 2L Loans – same as in existing documentation unless otherwise agreed.

  – For 2L Notes – restrictions in existing documentation will not apply.

- Voting Rights: to be addressed in intercreditor agreement.  Any New 2L Debt acquired or held by a Borrower affiliate will not have any voting rights.
- Offering Memorandum for 2L Notes to be prepared on the same timeline as the Offering Memorandum for the 1L Notes (based on the form of the Offering Memorandum for the 1L Notes, with conforming changes to reflect the economics and other applicable terms of the 2L Notes).

| | |
|---|---|
| **Shared Services Loan** | - All intercompany payments due to AES Andes (or any permitted transferee) by the Borrower pursuant to the Energy & Capacity Losses Compensation Agreement and the Connection & Toll Agreement (each as defined in the CTA), and that are currently deferred under the terms of those contracts until the existing senior debt discharge date, will be paid in the form of a loan (the "<u>Shared Services Loan</u>").  Those intercompany payments will be paid in the form of a disbursement under the Shared Services Loan.<br>- Interest Rate: same as New 2L Debt (including any Upside Fee), capitalized (PIK) at the end of each calendar quarter, commencing at the end of the first calendar quarter following Borrower's exit from bankruptcy.<br>- Maturity: latest date of scheduled maturity for any New 2L Debt.<br>- Mandatory conversion at scheduled maturity into a percentage of the shares of Borrower equal to the pro rata share of the outstanding principal amount of the New 2L Debt plus the outstanding principal amount of the Shared Services Loan (in each case including any PIK interest that has not been paid).<br><br>   – If the maturity of all New 2L Debt is extended to 2052, the Shared Services Loan shall mature in 2052 and convert into a percentage of the shares equal to the ratable share of the New 2L Debt balance plus the Shared Services Loan balance, in each case outstanding at the time.  If all New 2L Debt converts to equity in 2042, the Shared Services Loan will mature in 2042 and its pro rata share of shares in the Borrower will be subject to an 80% equity floor.<br>   – The definitive documents will include provisions to equitably address the conversion of the Shared Services Loan to shares in the Borrower where a portion of the New 2L Debt converts to shares in 2042 and the remainder of New 2L Debt converts to shares in 2052. |
| **Hedge Agreements** | - All Hedging Agreements with Hedging Counterparties (in each case, as defined in the CTA) shall be terminated, and any amounts due thereunder shall be converted into New 1L Debt and New 2L Debt on a pro rata basis, based on the mark-to-market value on the date of termination as determined in accordance with the terms of the Hedging Agreements. |
| **Strabag** | - Capitalized terms not otherwise defined in this section have the meanings set forth in the Tunneling Contract.<br>- Strabag has an allowed, secured, perfected $391.5 million "Supplier Deferred Payment" claim that is entitled to, and will receive, *pari passu* treatment with other prepetition first-lien claims pursuant and subject to confirmation of the Plan of Reorganization contemplated hereby (the "Plan"), allocated to New 1L Debt and New 2L Debt in the same proportion as the other prepetition first-lien claims, irrespective of whether the condition(s) to payment of the Supplier Deferred Payment under the Tunneling Contract (or as permitted pursuant to the last bullet point of this "Strabag" section of this Term Sheet) have been satisfied as of the Effective Date, *provided, however*, that if such condition(s) to payment have not been satisfied as of the Effective Date, Strabag's Pro Rata Share of the New 1L Debt and New 2L Debt (including all related interest paid thereon) shall be held in escrow pending satisfaction of such condition(s). Please refer to the "Strabag Deferrals and Construction Invoice" section regarding treatment of the following amounts: (i) (A) $761,030 upon acceptance by the Company of completion of signed Change Order 1, |

(B) $326,240 upon acceptance by the Company of completion of signed Change Order 2, and (C) $53,827 upon acceptance by the Company of completion of signed Change Order 4, and (iii) upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) (the "Strabag Insurance Payable").

- Notwithstanding anything to the contrary herein, Strabag shall continue to be obligated to pay Alto Maipo in cash for power purchased by Strabag pursuant to Section 2.13.2 of the Tunneling Contract, including any amounts accrued but unpaid pre-petition.

- Strabag and the Borrower shall agree to certain waivers and releases pursuant to the language attached hereto as Annex IV which shall be included in the Plan.

- All subordinated debt and common equity held and earned by Strabag until Plan Effective Date to be discharged.

- Tunneling Contract to be assumed as amended hereby (including without limitation with respect to the waiver and releases and the FTDR Procedures, defined below).

- All future work that is within scope of the Tunneling Contract or otherwise subject to Section 11.3 of the Tunneling Contract shall be performed by Strabag without further compensation in cash, shares or otherwise. For the avoidance of doubt, nothing herein shall operate to waive or release any of Strabag's other applicable rights under the Tunneling Contract, including without limitation its rights to receive insurance proceeds (as provided in the Common Terms Agreement) or seek extensions of time under Section 11.3 of the Tunneling Contract. Subject to receiving approval from the New 1L Lenders and New 2L Lenders holding 1L Loans and 2L Loans, respectively (provided that any New 1L Debt and New 2L Debt held by Strabag will be excluded from voting on such approval), as specified above, Borrower shall issue a change order and pay Strabag in cash for all future changes that are outside the scope of the Tunneling Contract.

- No later than 30 days after the date of the entry of the order approving the assumption of the RSA, Borrower shall pay to Strabag, as adequate protection, $210,000 for Strabag's attorneys' fees incurred in connection with its secured claim.

- Strabag shall have the same rights as Senior Lenders under the intercreditor agreement (other than on matters related to the Tunneling Contract, where Strabag will not have voting rights).

- Strabag invoice for the "Supplier Deferred Payment" under the Tunneling Contract to be issued 1 month after the requirements in Section 6.3.4.4(a)-(b) of the Tunneling Contract have been met (or earlier if permitted pursuant to the last bullet point of this "Strabag" section of this Term Sheet), but not earlier than ten days after Borrower's emergence from bankruptcy.

- The Tunneling Contract shall be amended to reflect Annex V attached hereto (the "FTDR Procedures"), which shall become effective upon the date of the entry of the order approving assumption of the RSA; *provided that* prior to

41

such date, the Company and Strabag shall follow the procedures set forth in the Tunneling Contract to resolve any disputes.

- A single Change Order for Ecoflow environmental monitoring device at each intake will be issued in the aggregate total amount of $112,000.00, and paid upon Tunnel Complex Substantial Completion.

- To the extent that use of the FTDR Procedures results in a determination that the Borrower owes any additional amounts to Strabag, any such amounts will be paid and treated in accordance with the terms applicable to the Strabag Change Order Deferral.

- The Borrower and Strabag agree to include certain provisions in the proposed order to approve assumption of the RSA related to the use of letter of credit proceeds in accordance with Annex VI, which provisions shall become effective upon the assumption of the RSA and in addition shall be incorporated into the Definitive Documentation.

- The Borrower will deliver the Critical Milestone Work Transfer Notice with respect to Critical Milestone D upon the earliest to occur of (x) May 2, 2022, (y) immediately following confirmation from the Senior Lenders' insurance consultant that the Borrower will be in compliance with all insurance requirements under the CTA after giving effect to the Critical Milestone Work Transfer Notice, and (z) the Critical Milestone Substantial Completion Date for Critical Milestone D.

- If Substantial Completion of Critical Milestone E or Critical Milestone F has not yet occurred, the Critical Milestone Work Transfer Notices will be issued for each such Critical Milestone as follows:

  - Critical Milestone Work Transfer Notice will be issued for Critical Milestone E after both (i) COD and (ii) the ventilation system of the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II powerhouse, and the Alfalfal II transformer cavern is operational in accordance with the specifications used to design and construct the ventilation system so that the air quality inside the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II powerhouse, and the Alfalfal II transformer cavern meets the technical requirements for which the ventilation system is specified and that the ventilation system can be operated reliably, continuously, and safely for its intended purpose of providing for ventilation to the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II powerhouse, and the Alfalfal II transformer cavern.

  - Critical Milestone Work Transfer Notice will be issued for Critical Milestone F on May 2, 2022; provided that if the Works for Critical Milestone F have not been completed at that date the Basic Warranty Period for Critical Milestone F Works will not start on the delivery of the Critical Milestone Work Transfer Notice but will instead start when the Contractor has completed all of the work related to Critical Milestone F, and all portions of such Critical Milestone Work can be legally and safely operated or utilized for their intended purposes, including emergency operations.

- Section 7.5 of the Tunneling Contract will apply to all Work described in Annex A to Annex IV for any Critical Milestone where a Critical Milestone Work Transfer Notice is delivered prior to the Critical Milestone Substantial Completion Date for such Critical Milestone.
- Section 15.3.2 of the Tunneling Contract shall be amended as follows, with such amendments to become effective upon the date of the entry of the order approving assumption of the RSA:
  - On the date of delivery of the Critical Milestone Work Transfer Notice for Critical Milestone D (assuming that Substantial Completion of Critical Milestone D has not yet occurred), the Performance Security will be reduced by the amount of $45 million.  This reduction will count towards the decrease in Performance Security required in connection with Substantial Completion of Critical Milestone D.  As a result, the amount of $70 million in Section 15.3.2.1 of the Tunneling Contract is replaced with the amount $25 million.
  - On May 2, 2022, if Substantial Completion of Critical Milestone E has not yet been achieved, the Performance Security will be reduced by the amount of $25 million.  This reduction will count towards the decrease in Performance Security required in connection with Substantial Completion of Critical Milestone E.  As a result, if Substantial Completion of Critical Milestone E is not achieved by May 2, 2022, the amount of $50 million in Section 15.3.2.2 of the Tunneling Contract is replaced with the amount $25 million.
  - On May 2, 2022, if Substantial Completion of Critical Milestone F has not yet been achieved, the Performance Security will be reduced by the amount of $40 million.  This reduction will count towards the decrease in Performance Security required in connection with Substantial Completion of Critical Milestone F.  As a result, if Substantial Completion of Critical Milestone F is not achieved by May 2, 2022, the amount of $80 million in Section 15.3.2.3 of the Tunneling Contract is replaced with the amount $40 million.
- Strabag will perform all works associated with the Manzano Intake (included in Annex A to Annex IV), including the construction of the Intake in accordance with the designs provided by Strabag that have been submitted to the environmental authority. Strabag will perform such works as soon as practicable after the issuance of the relevant permit from the environmental authority. If the permit is issued prior to December 31, 2022, Strabag will perform such works at no additional cost; if the permit is issued after December 31, 2022, Strabag will perform such works and Strabag and the Borrower will negotiate in good faith the payment of additional costs (such as re-mobilization and price inflation), if any. Such works will not affect the Critical Milestone Dates.

- Provided that Strabag is granted access prior to December 31, 2023, Strabag will perform all works associated with the Maurino Intake, including the design of the Intake to be in compliance with Applicable Laws. Such works will not affect the Critical Milestone Dates.

- Strabag and the Borrower shall continue to negotiate in good faith concerning the impact, if any, on the matters set forth in the two foregoing bullet points if the Borrower is unable to obtain permit(s) that would enable Strabag to complete the works described by December 31, 2023.

- For the avoidance of doubt, the completion of the works associated with the Manzano Intake and Maurino Intake shall not be a required condition for Substantial Completion of the Project or any aspect thereof.

- Any not yet issued Substantial Completion Certificate shall be deemed to have been issued on March 31, 2023 (the "Long Stop Date"); *provided that* Strabag completes all Critical Pending Work (defined below), subject to Punch List items, by August 31, 2022; and *provided further* that if Strabag does not complete all Critical Pending Work (defined below), subject to Punch List items, by August 31, 2022, then the Long Stop Date shall be March 31, 2024. Any defects discovered through Acceptance Tests conducted after the Long Stop Date shall not entitle the Company to Late Critical Milestone Payments, but rather shall be subject to the warranty/latent defect provisions of the Tunneling Contract.

- "Critical Pending Work" as used herein means works in connection with the following:
    - La Engorda Intake
    - Colina Intake
    - Las Placas Intake
    - Morado Intake
    - Desander Volcan
    - Yeso Intake
    - VA1 Ventilation System
    - Maitenes Intake
    - Maitenes Desander
    - Maitenes Channel
    - Forebay Bottom Outlet
    - Delivery Works to Forebay
    - Alfalfal I Discharge Modification
    - Aucayes Intake
    - L1 Discharge

- Strabag shall be excused from any delay in achieving a Guaranteed Critical Milestone Date due to the unavailability of water necessary to perform the Company's testing or any other Acceptance Test, but such excused delay shall be without additional compensation to either Strabag or Company. For the avoidance of doubt, this does not in any way diminish or reduce Strabag's rights under footnote (***) to table 1 of Appendix A of the Tunneling Contract.

|  |  |
|---|---|
|  | • Contractor shall be entitled to a Day for Day extension of the Guaranteed Critical Milestone Dates for any delays caused by Owner (including due to any non-performance by Owner of the Owner obligations under Article 3) and for any delays attributable to the events identified in Section 11.3.1 of the Tunneling Contract. <br><br> • Nothing in the RSA, Plan or any ancillary agreement thereto shall release or waive any right or defense that any Party may have with respect to its alleged liability for, or entitlement to, Late Critical Milestone Payments, including without limitation any defense arising out of, or that may be asserted based upon, section 7.3.3 of the Tunneling Contract. <br><br> • If Substantial Completion for any of Critical Milestones D, E and F has not occurred by March 31, 2023 only as a result of Acceptance Tests for such Critical Milestone not having been completed, then on March 31, 2023 (i) all remaining Performance Security will be reduced pursuant to Section 15.3.2 of the Tunneling Contract as though Substantial Completion had occurred, (ii) the Punch List/Warranty Security required to be delivered pursuant to Section 15.7 of the Tunneling Contract upon Substantial Completion will be delivered, (iii) if COD has also occurred, Strabag will be entitled to issue its invoice for the Supplier Deferred Payment, (iv) Strabag will remain obligated to successfully complete the Acceptance Tests and achieve Substantial Completion for the applicable Critical Milestones in accordance with the Tunneling Contract, and (v) the Punch List/Warranty Security will thereafter be available for any claims relating to Acceptance Tests and achieving Substantial Completion for such Critical Milestones.  The Parties shall work together in good faith to agree on the details and procedures relating to the Acceptance Tests. |
| **Other Unsecured Claims** | • Unsecured claims shall be unimpaired through a combination of (i) payment in full in cash of allowed unsecured claims (for unsecured claims listed in Exhibit B to this Restructuring Term Sheet), (ii) deeming unliquidated/contingent claims to ride through unimpaired (subject to the Company's rights and defenses) (for unsecured claims listed in Exhibit C to this Restructuring Term Sheet), and (iii) disallowing or expunging other asserted unsecured claims, estimating such claims at $0 for distribution purposes, or assumption of the relevant contract at $0 cure cost (for unsecured claims listed in Exhibit D to this Restructuring Term Sheet). Remaining general unsecured claims shall be satisfied as set forth on Exhibit E. <br><br> • With respect to the unsecured claims listed in Exhibit B, the Definitive Documentation will include an obligation by AES Andes to contribute to the Borrower an amount of up to $300,000 for the payment in full in cash of those unsecured claims. <br><br> • With respect to the litigation brought by Parque Arenas SpA ("Parque Arenas") against Alto Maipo before the 5th Civil Court of Santiago, case number (i.e. rol) C-18,215-2020, which is reflected in Proof of Claim No. 5 (the "Parque Arenas Unsecured Claim") and Proof of Claim No. 16 (the "Volcan Unsecured Claim"), the Definitive Documentation will include an obligation by AES Andes to provide sufficient contribution to the Borrower to satisfy any amounts that the Borrower is required to pay, up to a maximum amount of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as |

| | |
|---|---|
| | agreed between the Borrower and Parque Arenas, in connection with the Parque Arenas Unsecured Claim and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D).<br>• AES Andes contributions set forth above are dependent on consummation of the Plan on the terms herein, and considered as part of AES Andes new value contribution. |
| **Equity** | • Existing shares in Borrower to be cancelled.<br>• AES Andes will receive 100% of the reorganized shares in the Borrower, subject to conversion of New 2L Debt and Shared Services Loan (if applicable).<br>• No dividends or distributions until Exit Financing Facility (including Sponsor Deferrals), Working Capital Facility, Strabag Deferrals, VAT Financing, New 1L Debt (including Deferred 1L Interest) and New 2L Debt have been repaid in full. |
| **CNM Arbitration** | • Application of proceeds:<br>   – First, to repay the Working Capital Facility<br>   – Second, to repay the Strabag Deferrals (first to the Strabag Insurance Deferral (to the extent received and not already paid when due, without prejudice to Strabag's rights in the event of such payment default), second to the Strabag Change Order Deferral (to the extent not already paid when due, without prejudice to Strabag's rights in the event of such payment default) and third to the Strabag Construction Deferral.<br>   – Third, to repay Deferred 1L Interest<br>   – Fourth, 50% to repay any DIP Financing or Exit Financing Facility amount outstanding, and 50% to repay New 2L Debt (provided that, to the extent the DSRA is not fully funded, New 2L Debt allocation shall go instead to fund DSRA up to $20mm balance)<br>   – Fifth, to the extent the DSRA is not fully funded, to fund DSRA up to $20mm balance<br>   – Sixth to repay New 2L Debt<br>• Any settlement with CNM is subject to the approval of the required New 2L Lenders (to be agreed in the definitive documentation). |
| **Battery Business / Related Party Transactions** | • Undertakings to ensure that any development of battery storage or similar business with energy generated by the Borrower, using water rights, land rights or other infrastructure of the Borrower, or otherwise associated with the Borrower project (i) must be approved by the New 1L Lenders and the New 2L Lenders, and (ii) will only be undertaken with the objective of increasing value to the Borrower.<br>• Any transaction (including any modification to existing contract terms) with related companies of the Borrower must be approved by the New 1L Lenders and the New 2L Lenders. |

| | |
|---|---|
| **VAT Financing** | • Fully committed facility in amount equal to $68.875mm, subject to a term sheet being executed between Borrower and VAT lenders no later than April 20, 2022 (which shall be in accordance with the terms set forth herein) (the "VAT Financing").<br>• Terms substantially similar to those contemplated for VAT Loan under and as defined in the CTA, including exclusive lien on VAT reimbursement owed to the Borrower with respect to VAT paid on Strabag's invoice for the "Supplier Deferred Payment" and over the VAT Escrow Account (defined below).<br>• Tenor: 12 months.<br>• No Up-Front Fee.<br>• Strabag invoice for the "Supplier Deferred Payment" under the Tunneling Contract to be issued as described under the heading "Strabag".<br>• Loan funded in CUF with lender hedging cost pass-through (subject to review of, and agreement on, costs). Definitive documents will address mechanics around currency exchange risk related to funding and repayment of the VAT Loan.<br>• Interest Rate / Fee:<br><br>  – Repaid in full prior to 75 days from disbursement, 3% fee on total commitment amount<br>  – Repaid in full from 76th day to 150 days, 5% fee on total commitment amount<br>  – Repaid in full from 151st day to 360th day – 1% additional interest accrues every 30 days<br>  – Count for these time periods begins on the day the VAT Financing proceeds are disbursed (whether deposited into the VAT Escrow Account (as defined below) or disbursed directly).<br><br>• To be drawn after Strabag's issuance of the invoice for the "Supplier Deferred Payment", or in the event that Strabag's invoice for the "Supplier Deferred Payment" has not been issued by July 31st, 2022 the VAT Financing commitment will be disbursed in full and the proceeds deposited into an escrow account (the "<u>VAT Escrow Account</u>"), which, for the avoidance of doubt, may not be used for any purpose other than repayment of the VAT Loan or release to Strabag for payment of VAT.  Funds in the VAT Escrow Account would be released to Strabag to fund the payment of the VAT promptly after Company's acceptance of Strabag's invoice for the "Supplier Deferred Payment".<br>• VAT Financing lenders shall have security over the VAT Escrow Account until the VAT Financing proceeds are disbursed to Strabag.<br>• For clarity, given that the VAT Financing must be disbursed as part of financing of the Plan, upon the commitment being signed the 3% fee will be earned, but payment of the fee shall be made when the VAT Financing is repaid.<br>• VAT Financing will rank pari passu with the New 1L Debt in the event of any enforcement proceeding.<br>• The Borrower and the VAT lenders believe, and the Borrower has assumed in its financial model, that Chilean tax withholding in respect of interest paid to all foreign lenders under the VAT facility shall apply at a rate equal to 4% (the "VAT withholding rate"), and the Borrower and the VAT lenders will work together in good faith to develop a |

47

|  | VAT financing structure that achieves such a VAT withholding rate, such structure to be satisfactory to the VAT lenders in their reasonable discretion. For clarity, the withholding tax structuring will not alter any other terms of the VAT Financing as specified in the Restructuring Term Sheet. In the event that the VAT withholding rate in respect of amounts paid under the VAT facility attributable to VAT Loans for up to $25 million made by any foreign VAT lenders who are funds or accounts managed by UBS O'Connor LLC (together with any withholding rate approved assignees, the "UBS VAT Lenders") exceeds 4%, the Borrower will pay all such withholding tax to the applicable governmental authority when and as due, and increase the amounts payable to the UBS VAT Lenders so that the UBS VAT Lenders receive the full amount that they would have received without application of that withholding tax.  A withholding rate approved assignee is any VAT Loan transferee that is an affiliate of a UBS VAT Lender approved by the Borrower, such consent not to be unreasonably withheld or delayed and provided that the Borrower may not withhold such consent if the Chilean tax treatment of the transferee would be no worse than the Chilean tax treatment of the UBS VAT Lender assignor.  For the avoidance of doubt, in addition to the forgoing, the Borrower will be responsible for withholding tax at the 4% VAT withholding rate on all VAT loans made by foreign lenders.<br><br>• Definitive documents will address, in certain scenarios, VAT Financing sharing in Mandatory Prepayments/CNM Arbitration proceeds/Excess Cash Flow Sweep otherwise available to the pay the New 2L Debt, and other related provisions. |
|---|---|
| **DIP Financing** | • Size: $50 million revolving credit facility (the "DIP Financing")<br><br>• Separate debt basket to address VAT expenses<br><br>• Available to the extent required to maintain minimum cash on hand of Borrower during bankruptcy case of $10 million<br><br>• Rate and fees accrue through separate account and shall not impact availability<br><br>• Interest Rate: 4.0%, payable in kind<br><br>• Unused Fee: 0.75% on undrawn portion, payable in kind<br><br>• Fees: 1.00% origination fee, payable in kind<br><br>• Maturity: 12 months from Chapter 11 filing date<br><br>• Milestones and other terms are included in separate DIP Financing credit agreement, as amended |

| | |
|---|---|
| **Exit Financing** | <ul><li>Size: ~$60 million (inclusive of $50mm initial amount, ~$1mm in fees and interest payable on the DIP at emergence, Deferred Exit Financing Interest of ~$2mm and Sponsor Deferrals of ~$7mm) (the "Exit Financing Facility"). For the avoidance of doubt, the Deferred Exit Financing Interest and the Sponsor Deferrals will be part of the Exit Financing Facility, have the priority afforded to the Exit Financing Facility (i.e., will have a super-senior first-lien on all assets - other than proceeds of reimbursement of VAT that was financed with the VAT Financing and the VAT Escrow Account - and rank senior to all debt, other than the Working Capital Facility) and be paid on the same amortization schedule, and shall benefit from the same mandatory prepayments (including a mandatory prepayment as a result of the receipt of proceeds from the CNM arbitration, and in the same order), as the Exit Financing Facility even though such deferred interest and Sponsor Deferrals are not loans, but rather accounts payable.</li><li>Lenders: DIP Financing provider</li><li>Maturity: 3 years post-emergence</li><li>Scheduled Amortization: equal quarterly installments beginning July 15, 2023</li><li>Rank: super-senior first-lien on all assets (ranks senior to all debt, other than the Working Capital Facility), other than proceeds of reimbursement of VAT that was financed with the VAT Financing.</li><li>Interest Payment Dates: January 15, April 15, July 15, October 15.</li><li>Interest rate: 4.0% per annum, cash pay on Payment Dates, beginning on April 15, 2023</li></ul> |

- Interest payable on July 15, 2022, October 15, 2022, and January 15, 2023 ("<u>Deferred Exit Financing Interest</u>") shall be deferred
  - The Deferred Exit Financing Interest shall accrue interest at 4% and shall be added to the Exit Financing Facility balance and be repaid through amortization of the Exit Financing Facility
- Cure Periods: Exit Financing Facility lender will not be entitled to exercise any remedies following an event of default on the Exit Financing Facility until a cure period of at least 120 days has elapsed.
- New 1L Lender & New 2L Lender Rights:

  - New 1L Lenders and New 2L Lenders will have a right (but not an obligation) to cure or cause to be cured on behalf of Borrower.
  - New 1L Lenders and New 2L Lenders will have a right to purchase (directly or through an affiliate) their pro rata share of the Exit Financing at par at any time.  If any New 1L Lender or New 2L Lender declines to

49

| | |
|---|---|
|  | purchase its pro rata share of Exit Financing, other New 1L Lenders and New 2L Lenders may increase their share.<br>• No cash fee for roll-over<br>• Concessions on Exit Financing Facility commitment are dependent on consummation of the Plan on the terms herein, and considered as part of AES Andes new value contribution |
| **Working Capital Facility** | • Working Capital Facility provided by Sponsor of $15mm maturing January 15, 2024 (the "Working Capital Facility")<br>  – Sponsor will commit to fund the Working Capital Facility as needed through January 15, 2024, at any time that cash on hand of the Borrower would fall below $10mm<br>  – Interest rate: 4% per annum<br>  – Repayment of Working Capital Facility will be at the first priority of cash available for the "Excess Cash Flow Sweep" and "Mandatory Prepayments" described below.<br>  – Working Capital Facility may be used, as a revolving facility, for general corporate purposes and any emergence costs.<br>  – Senior secured, *pari passu* with Exit Facility.<br><br>• Notwithstanding the above, starting from the maturity date of the Working Capital Facility, Permitted Financial Debt under the CTA shall include a separate $15mm unsecured working capital facility basket<br>• Working Capital Facility commitment provided by Sponsor is dependent on consummation of the Plan on the terms herein, and considered as part of Sponsor new value contribution. |
| **Sponsor Deferrals** | • Sponsor to defer 12 months of certain intercompany payments under the O&M Agreement, the Share Facilities Agreement and the Connection and Toll Agreement (as each term is defined in the CTA) (which are not currently deferred under the terms of those contracts) beginning May 2022, in an amount of approximately $600,000 per month, for a total deferred amount of approximately $7.2 million (the "Sponsor Deferrals").<br><br>  – The Sponsor Deferrals shall be added to the Exit Financing Facility balance, and be repaid through amortization of the Exit Financing Facility.<br>• Sponsor Deferrals are dependent on consummation of the Plan on the terms herein, and considered as part of the Sponsor new value contribution |
| **Strabag Deferrals and Construction Invoice** | • Strabag will defer the $10mm Critical Milestone F payment, for Substantial Completion of the Volcan System (the "Strabag Construction Deferral"). |

<table>
<tr>
<td></td>
<td>

– The Strabag Construction Deferral shall accrue interest at 4.0% per annum from the date of Substantial Completion (as defined in the Tunneling Contract) of Critical Milestone F. The Strabag Construction Deferral will be paid as an "account payable" pursuant to the Excess Cash Flow Sweep.

- Strabag will also defer an additional total of $7.6mm in 2022, consisting of approximately $1.1mm payable under change orders 1, 2, and 4, (the "<u>Strabag Change Order Deferral</u>") and the Strabag Insurance Payable (the "<u>Strabag Insurance Deferral</u>" and, together with the Strabag Construction Deferral, the "<u>Strabag Deferrals</u>").

– The Strabag Change Order Deferral shall be repaid on December 31, 2022, and the Strabag Insurance Deferral shall be repaid the later of December 31, 2022 or the date when the applicable insurance proceeds are received, both deferrals to accrue interest at 4% per annum.
– All Strabag Deferrals shall share *pari passu* with the New 1L Debt in all collateral. A payment default with respect to any of the Strabag Deferrals shall constitute a payment default with respect to the New 1L Debt.
– All Strabag Deferrals shall initially be structured as "accounts payable" evidenced by acknowledgements of debt.

- Strabag invoice to be issued 1 month after the requirements in <u>Section 6.3.4.4(a)-(b)</u> of the Tunneling Contract have been met or after Strabag is permitted to do so pursuant to the last bullet point of the above "Strabag" section of this Term Sheet), but no earlier than ten days after emergence.

</td>
</tr>
<tr>
<td><strong>Stamp Tax and Other Debt Issuance Costs</strong></td>
<td>

- Stamp Tax

– Stamp Tax on 1L Notes will be paid upon the issuance of the 1L Notes at emergence
– At emergence, no new *pagare* (promissory note) will be issued for the 2L Loans.  2L Loans will be documented with existing *pagare* (promissory note) or acknowledgments of debt duly amended by alonges to the promissory notes or amendment to the acknowledgments of debt, as the case may be. Strabag's portion of the New 2L Loans to be structured as an "account payable" evidenced by an acknowledgment of debt.
– New 2L Lenders will have the option to exchange 2L Loans, during March 2023, into 2L Notes and the Borrower will pay Stamp Tax on all 2L Notes at that time. All 2L Notes will be evidenced by a *pagare* (promissory note).
– Cap on total stamp tax payable by the Borrower for 1L Notes and 2L Notes of up to $16.4mm
– Exit Financing Facility to be documented as an Amendment &  Restatement of the DIP Financing.
– Stamp Tax will not be paid on the Sponsor Deferrals nor on the Strabag Deferrals.

</td>
</tr>
</table>

| | |
|---|---|
| | • Secondary Roadshow and Related Costs:<br><br>– Borrower will include in the budget the cost of the investment bankers in the secondary road show and rating agencies for the rating of the 1L Notes up to $3mm (for the avoidance of doubt, this cap is not applicable to any other related costs such as auditor costs, legal fees, registration of the 1L Notes, etc.) |
| **Mandatory Prepayments** | • Mandatory Prepayments: expropriation; total loss or other significant insured event where insurance proceeds are not applied to repair/restore; significant asset dispositions outside of the ordinary course.<br>• Proceeds distributed as follows:<br><br>– First, for so long as the Working Capital Facility is outstanding, $10 million to ensure that the Borrower has $10 million cash on hand after giving effect to any prepayment<br>– Second, to repay Working Capital Facility<br>– Third, to repay the Strabag Deferrals (first to the Strabag Insurance Deferral (to the extent received and not already paid when due, without prejudice to Strabag's rights in the event of such payment default), second to the Strabag Change Order Deferral (to the extent not already paid when due, without prejudice to Strabag's rights in the event of such payment default) and third to the Strabag Construction Deferral)<br>– Fourth, to repay Deferred 1L Interest<br>– Fifth, to pay the Exit Financing Facility<br>– Sixth, to pay New 1L Debt<br>– Seventh, to pay New 2L Debt<br>• All mandatory pre-payments shall not incur any penalties, including without limitation the make-whole |
| **Excess Cash Flow Sweep** | • Cash in excess of $25 million as of every April 15 and October 15 shall be distributed as follows:<br><br>– First, to repay Working Capital Facility<br>– Second, to repay the Strabag Deferrals (first to the Strabag Insurance Deferral (to the extent received and not already paid when due, without prejudice to Strabag's rights in the event of such payment default), second to the Strabag Change Order Deferral (to the extent not already paid when due, without prejudice to Strabag's rights in the event of such payment default) and third to the Strabag Construction Deferral)<br>– Third, to repay Deferred 1L Interest<br>– Fourth, to fund the DSRA up to $20mm balance<br>– Fifth, to pay New 2L Debt<br>– Sixth, to pay New 1L Debt<br>– Seventh, to pay the Shared Services Loan |

| | |
|---|---|
| | • All mandatory pre-payments shall not incur any penalties, including without limitation the make-whole<br>• For clarity, the Exit Financing Facility has no excess cash flow entitlement |
| **Debt Service Reserve Account** | • USD $20mm for the benefit of the New 1L Debt.<br>• DSRA will be funded at the priority specified under the headings "Excess Cash Flow Sweep" and "CNM Proceeds". This DSRA will be released if 1L Notes achieve IG rating without DSRA. |
| **Other** | The Sponsor and its affiliates shall be able to acquire New 1L Debt and New 2L Debt and to engage with any party soliciting the Sponsor to acquire such debt.<br><br>If the Sponsor or its affiliates actively solicit the acquisition of New 1L Debt or New 2L Debt, they may do so through either:<br><br>– a public tender open to holders of such debt, or<br>– a broker, provided that the Sponsor or its affiliate, as the case may be, discloses to the holders of such debt or the public generally that it is seeking to acquire such debt |

**Exhibit A**
**CFADS Calculation from January 28, 2022 Borrower Base Case Financial Model**

| USD million | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | ($12,997,175) | $125,989,976 | $104,414,911 | $97,041,807 | $96,588,621 | $91,661,615 | $101,759,205 | $104,150,515 | $104,168,198 | $108,474,190 | $109,225,042 | $112,658,745 |

| Cash Flow Available for Debt Service | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $113,552,844 | $117,143,134 | $121,750,787 | $124,519,202 | $125,445,289 | $130,546,507 | $100,169,716 | $63,398,920 | $65,139,585 | $66,667,365 | $68,059,348 | $69,453,582 |

| Cash Flow Available for Debt Service | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 |
|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $70,909,646 | $72,352,863 | $73,838,086 | $75,275,050 | $76,774,969 | $78,258,994 | $79,330,149 |

54

**Exhibit B**
Claims to be Paid in Full

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 2 | Baker Botts L.L.P. | $24,084.24 | Pay in full. |
| 6 | Bradley Arant Boult Cummings LLP[6] | $3,000,000.00 | Assume contract / Pay in full. |
| Scheduled | Aguas Purificadas Continental SpA | $558.00 | Pay in full. |
| Scheduled | Comercializadora DH SpA | $1,091.00 | Pay in full. |
| Scheduled | Ferreteria y Materiales De Calle Comercio 20073 | $1,936.00 | Pay in full. |
| Scheduled | Joaquin Porfirio Costa Berrios | $190.00 | Pay in full. |
| Scheduled | Proveedores Integrales Prisa S.A. | $214.00 | Pay in full. |
| Scheduled | Supermercado del Neumatico Limitada | $786.00 | Pay in full. |

---

[6]   For the avoidance of doubt, this claim is not being treated as a General Unsecured Claim. Negotiations regarding the timing for payment of the cure cost related to assumption of the relevant contract are ongoing.

**Exhibit C**

Claims to Pass Through Unimpaired

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 5 | Parque Arenas SpA (UCC) | $10,000,000.00 | Claim No. 5 to pass through; AES Andes to provide sufficient contribution to the Borrower to satisfy any amounts that the Borrower is required to pay, up to a maximum amount of $10 million, to (i) Parque Arenas pursuant to a judgment or order (as to which there is no stay of effectiveness) issued by the court, or a settlement as agreed between the Borrower and Parque Arenas, in connection with the Parque Arenas Unsecured Claim and (ii) the Volcan Cure/Claim Amount (as described in Exhibit D). |

**Exhibit D**

Claims to Which Debtors Will (i) Object and Seek Disallowance and Expungement,
(ii) Estimate at $0 for Distribution Purposes, or (iii) Assume the Relevant Contract at $0 Cure Cost

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 1 | Parque Arenas SpA (UCC) | $10,000,000.00 | Object – Duplicative of Claim No. 5. |
| 3 | Comunidad de Aguas Canal El Manzano (UCC) | $1,000,000,000.00 | Assume contracts / Estimate cure at $0 for each contract, and object to balance of claims asserted as part of Claim No. 3. |
| 7 | Contreras Bustamante, Gemma | $25,000,000.00 | Object / Estimate at $0. |
| 8 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 (object/reduce to 72k) | Object / Estimate at $72,000 (will not come due until August 2022). |
| 9 | Compañía Industrial El Volcan S.A (UCC) | $1,946,556.00 | Object – Duplicative of Claim No. 16. |
| 10 | Exploraciones, Inversiones y Asesorías Atlantic Hydro SpA | $85,223.43 | Object – Duplicative of Claim No. 8. |
| 12 | Christian Becker Matkovic | $80,000,000.00 | Object / Estimate at $0. |
| 13 | Maite Birke Abaroa | $2,000,000,000.00 | Object / Estimate at $0. |
| 14 | AP Asesorias en Gestion y Consultoria Ltda. | $140,000.00 | Object / Estimate at $48,000 (will not come due until August 2022). |
| 15 | Bruno Bercic | $80,000,000.00 | Object / Estimate at $0. |

| 16 | Compañía Industrial El Volcan S.A. | $1,501,521.00 | (a) Object / Estimate at $0 or (b) Assume contract / Estimate cure at $0[7] and object to balance of claims asserted as part of Claim No. 16. |
| 18 | Comunidad de Aguas Canal El Manzano | $1,000,000,000.00 | Object / Duplicative of Claim No. 3 . |
| 19 | AES Electric Ltd. | $0.00 | Claim Withdrawn. |
| 20 | Sara Larrain | $1,500,000.00 | Object / Estimate at $0. |

---

[7] In the event the Debtors, after consultation with the Senior Lenders, seek to assume the contract related to Claim No. 16, to the extent the cure or allowed claim amount is greater than $0, any cure or claim amount that is determined to be due on account of the Volcan contract (any such amount, the "Volcan Cure/Claim Amount") shall be satisfied through a contribution by AES Andes.  The Debtors may defer litigation of the cure amount relating to the contract with Volcan until after the Plan Effective Date.  For the avoidance of doubt, the total amounts paid by AES Andes in satisfaction of the Volcan Cure/Claim Amount and the Parque Arenas Unsecured Claim shall not exceed $10 million in the aggregate.

**Exhibit E**

Claims Satisfied/Released Pursuant to Plan / Assumed with $0 Cure

| Claim No. | Entity Name | Claim Amount | Treatment |
|---|---|---|---|
| 4 | Itaú CorpBanca S.A. | $1,652,218,290.14 | Paid pursuant to plan. |
| 11 | Strabag Spa | $601,354,484.00 | Paid pursuant to plan. |
| 17 | Strabag SpA | $598,763,578.00 | Paid pursuant to plan. |
| 21 | AES Andes S.A. | $1,089,142,102.35 | Paid pursuant to plan. |
| 22 | AES Electric Ltd. | $301,635.00 | Paid pursuant to plan. |
| 23 | Cerberus South America Investments, LLC | $158,512,457.52 | Paid pursuant to plan. |
| 24 | The AES Corporation | $6,138,048.00 | Paid pursuant to plan. |
| 25 | Strabag SpA | $684,831,578.00 | Paid pursuant to plan. |

**Schedule III - Principal Amount of Alto Maipo Obligations Owned**

| Term Lender (asterisk indicates Consenting Creditor) | Total Amount of Alto Maipo Obligations (in USD) | Debt Holdings (in USD) | Hedge Agreement Termination Amount (in USD) |
|---|---|---|---|
| Banco De Crédito e Inversiones* | $229,286,013.20 | $183,226,085.49 | $46,059,927.71 |
| DNB Bank ASA* | $139,047,163.37 | $119,473,667.82 | $19,573,495.55 |
| Itaú Corpbanca* | $269,444,996.76 | $171,387,562.76 | $98,057,434.00 |
| Deutsche Bank AG London Branch | $172,365,246.12 | $172,365,246.12 | $0.00 |
| Santana S.A.* | $95,489,054.86 | $95,489,054.86 | $0.00 |
| Moneda Deuda Latinoamericana Fondo de Inversión* | $59,126,349.22 | $59,126,349.22 | $0.00 |
| Moneda Alturas II Fondo de Inversión* | $23,650,539.65 | $23,650,539.65 | $0.00 |
| Nineteen77 Capital Solutions LP* | $78,408,915.68 | $78,408,915.68 | $0.00 |
| Clover Private Credit Opportunities Secondary II LP* | $23,549,945.55 | $23,549,945.55 | $0.00 |
| Clover Private Credit Opportunities Secondary (Levered) II LP* | $19,828,108.52 | $19,828,108.52 | |
| Strabag* | $391,500,000.00 | $391,500,000.00 | $0.00 |
| KfW IPEX-Bank GmbH | $19,695,837.10 | $0.00 | $19,695,837.10 |
| United States Int'l Development Finance Corp. | $293,545,482.60 | $293,545,482.60 | |
| King Street Capital Management, L.P. | $10,033,522.50 | $10,033,522.50 | $0.00 |
| CVI AA Cayman Securities LP* | $4,113,744.22 | $4,113,744.22 | $0.00 |
| CVI AV Cayman Securities LP* | $802,681.80 | $802,681.80 | $0.00 |
| CarVal CCF Cayman Securities Ltd* | $1,555,195.98 | $1,555,195.98 | $0.00 |
| CVI CVF IV Cayman Securities Ltd* | $23,127,269.36 | $23,127,269.36 | $0.00 |
| CVIC Cayman Securities Ltd* | $1,806,034.05 | $1,806,034.05 | $0.00 |
| CVI EMCOF Cayman Securities Ltd* | $8,980,002.63 | $8,980,002.63 | $0.00 |
| CarVal GCF Cayman Securities Ltd* | $551,843.74 | $551,843.74 | $0.00 |
| CVI CVF V Cayman Securities Ltd* | $9,230,840.70 | $9,230,840.70 | $0.00 |
| Cerberus FSBA Corporate Credit Fund, L.P* | $10,033,522.50 | $10,033,522.50 | $0.00 |
| Cerberus Global NPL Fund, L.P.* | $148,512,457.52 | $148,512,457.52 | $0.00 |
| SC III-Flex Master Lux S.A.R.L. | $10,033,522.50 | $10,033,522.50 | $0.00 |
| **Total** | **US$2,043,718,290.13** | **US$1,860,331,595.77** | **US$183,386,694.36** |

## Annex IV
## Strabag Plan Release Rider

Subject to and except for the rights and obligations set forth in the RSA (as amended, restated, or supplemented), and notwithstanding anything to the contrary in the Plan, Strabag and Alto Maipo, on behalf of themselves and their successors, assigns, parents, subsidiaries, divisions, affiliates, agents, directors, officers, employees, insurers, shareholders and attorneys, fully and finally waive, discharge and release any and all past and current claims, counterclaims, Changes (as defined in the Tunneling Contract), disputes, demands, causes of action, liabilities, and damages for additional time or compensation of whatever nature, cause of action or theory, which are either known as of April 5, 2022 (the  "Cut-Off Date"), or should have been known as of the Cut-Off Date in the exercise of reasonable diligence by the respective releasing party (recognizing the relative expertise, position, and engineering sophistication of each respective party); including without limitation construction claims, including credits and back-charges, descope claims, omitted-scope claims, change order claims, future bonuses, breach of contract, liquidated damages, tort or otherwise, arising out of or relating to the Tunneling Contract or Project that Strabag and Alto Maipo may have against one another, their successors, assigns, parents, subsidiaries, divisions, affiliates, agents, directors, officers, employees, insurers, shareholders and attorneys through the Cut-Off Date, *provided, however*, that any claims by Alto Maipo or Strabag, as applicable, arising from (a) a Warranty (as defined in the Tunneling Contract); (b) a latent defect (in accordance with Section 10.4.3 of the Tunneling Contract); (c) any defect (i) discovered by Alto Maipo during the completion of Acceptance Testing (as defined in the Tunneling Contract) conducted after the Cut-Off Date, or (ii) identified after full-load tests have been completed, *provided that* Strabag's liability under clause (ii) above for any defect resulting from any failure by Strabag to comply with its obligations under Sections 2.3.1.1, 2.3.1.3, and 2.3.1.4 of the Tunneling Contract as they relate to the Hydraulic Design (as defined in the Tunneling Contract), if any, combined with any Late Critical Milestone Payments (as defined in the Tunneling Contract) shall be limited to a maximum of $70,000,000; (e) any fines or penalties imposed by a government environmental authority after the Cut-Off Date that have been proximately caused by such released party's activities in connection with the Project; and (f) the Punch List items and all other items listed in Annex A (except for those items in Annex A that are labelled as "Waived Items" or "Additional Scope", which items are released or otherwise addressed on the terms described in Annex A); are not released and are expressly preserved; and *provided further*, that all of the rights and defenses of each party with respect to any claims asserted by the other party pursuant to subsections (a)-(f) above are expressly preserved. For the avoidance of doubt, nothing herein shall release, waive, or modify any party's right to recover any insurance proceeds, seek or oppose relief from any Late Critical Milestone Payments, require completion of the Acceptance Tests (to the extent those Acceptance Tests have not been completed prior to the Cut-Off Date), or pursue or oppose any other claims related to Strabag's entitlement to a substantial completion certificate for any Critical or Contract Milestone, or any other non-monetary claims, in each case to the extent provided in, and pursuant to the terms of, the Tunneling Contract; *provided*, *however* that neither party may assert entitlement to specific performance for claims that are otherwise released.

The Parties acknowledge and agree that Annex A contains all Punch List items and other remaining scope items that are known as of the Cut-Off Date or should have been known as of

the Cut-Off Date in the exercise of reasonable diligence by the parties (recognizing the relative expertise, position, and engineering sophistication of each respective party).

**<u>Annex A to Strabag Plan Release Rider</u>**
**Punch List and Other Items**



# Remaining Scope/Punch List - Draft

**Category A**       **Strabag Scope**
**Category B**       **Detailed Scope to be clarified**
**Category C**       **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | | | **Volcan Area** | | | | | | | | |
| **1** | **1** | | **La Engorda Intake** | | | | | | | | |
| 1 | 1 | 1 | La Engorda Intake | OPWA | Reinstallation of the vegetation | QEM-PLN-023 | In accordance with the existing environmental restoration plan. | x | | | |
| 1 | 1 | 2 | La Engorda Intake | OPWA | Environmental Fences and actions acc. Environmental Plan | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 1 | 3 | La Engorda Intake | OPWA | Observation List | 6105 La Engorda intake EM observations 2021 11 11 | Scope as s per  observation list already submitted list to STR. | x | | | |
| 1 | 1 | 4 | La Engorda Intake | HEM | Control System | 6105 La Engorda intake EM observations 2021 11 11 | Integrategted test to be performed which is not entirely STR scope. | | x | | x |
| 1 | 1 | 5 | La Engorda Intake | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Tested based on available conditions for substantial completion. | x | | | x |
| 1 | 1 | 6 | La Engorda Intake | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted to STR. | x | | | |
| 1 | 1 | 8 | La Engorda Intake | OPWA | Improvements on security of facilities. | | Concern related to hand rails and safety features not security fences. Some observations on safety parts are included on Dry / Wet Test Observation lists. Scope to be clarified | | x | | |
| 1 | 1 | 9 | La Engorda Intake | Pond | Material removal at intake pond | | From the 1st of May responsibility of Alto Maipo. | x | | | |
| 1 | 1 | 10 | La Engorda Intake | OPWA | Signs Installation | | As per  design | x | | | |
| **1** | **2** | | **WCS - Tramo 1** | | | | | | | | |
| 1 | 2 | 1 | WCS - Tramo 1 | OPWA | Reinstallation of the "Vega" | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 2 | 2 | WCS - Tramo 1 | OPWA | Avanzar con los trabajos definidor en la RCA del proyecto para la Restauración del camino a Bocatoma La Engorda, a espera de la definición de PHAM sobre esta materia. | ICE, item VII, punto 1.5, ICE, item VII, punto 1.6, RCA 256/09 punto 7.2.1.16, RCA 256/09, punto 7.2.1.22 | Practical solutions to be found to restoration activities between the parties. Alex and Peter to organize meetings with the environmental teams. | | x | | |
| **1** | **3** | | **Colina Intake** | | | | | | | | |
| 1 | 3 | 1 | Colina Intake | OPWA | Landscaping and application of natural soil | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 3 | 2 | Colina Intake | OPWA | Environmental Fences and actions acc. Environmental Plan | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 3 | 3 | Colina Intake | OPWA | Observation List | 6110 Colina intake EM observations 2021 12 07 | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 3 | 4 | Colina Intake | HEM | Control System | 6111 Colina intake EM observations 2021 12 07 | Integrategted test to be performed which is not entirely STR scope. | | x | | x |
| 1 | 3 | 5 | Colina Intake | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | x |
| 1 | 3 | 6 | Colina Intake | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted to STR. | x | | | |
| 1 | 3 | 8 | Colina Intake | OPWA | Improvements on security of facilities. | | Concern related to hand rails and safety features not security fences. Some observations on safety parts are included on Dry / Wet Test Observation lists. Scope to be clarified | | x | | |
| 1 | 3 | 9 | Colina Intake | OPWA | Removal of temporary crossing to La Engorda land | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 1 | 3 | 10 | Colina Intake | OPWA | Signs Installation | | As per  design | x | | | |
| 1 | 3 | 11 | Colina Intake | Pond | Material removal at intake pond | | From the 1st of May responsibility of Alto Maipo. | x | | | |
| **1** | **4** | | **Las Placas Intake** | | | | | | | | |
| 1 | 4 | 1 | Las Placas Intake | OPWA | Environmental Fences and actions acc. Environmental Plan | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 4 | 2 | Las Placas Intake | OPWA | Observation List | 6115 Las Placas Intake EM observations 2021 12 07 | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 4 | 3 | Las Placas Intake | HEM | Control System | 6116 Las Placas Intake EM observations 2021 12 07 | Integrategted test to be performed which is not entirely STR scope. | | x | | x |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4 | 4 | Las Placas Intake | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed Tested based on available conditions for substantial completion. | x | | | x |
| 1 | 4 | 5 | Las Placas Intake | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 4 | 7 | Las Placas Intake | OPWA | Improvements on security of facilities. | | Concern related to hand rails and safety features not security fences. Some observations on safety parts are included on Dry / Wet Test Observation lists. Scope to be clarified | | x | | |
| 1 | 4 | 8 | Las Placas Intake | Pond | Material removal at intake pond | | | x | | | |
| 1 | 4 | 9 | Las Placas Intake | OPWA | Signs Installation | | As per  design | x | | | |
| 1 | 4 | 10 | Aducción | Tramo Colina - Las Placas | Establecer áreas donde se podrá o no ocupar rocas como parámetro del paisaje en R. Mixta | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **1** | **5** | | **El Morado Intake** | | | | | | | | |
| 1 | 5 | 1 | Morado Intake | OPWA | Landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 5 | 2 | Morado Intake | OPWA | Environmental Fences and actions acc. Environmental Plan | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 5 | 3 | Morado Intake | Civil Works | Observation List | 6120 El Morado intake EM observations 2021 12 09 | Scope as s per  observation list already submitted to STR. | x | | | |
| 1 | 5 | 4 | Morado Intake | HEM | Control System | 6120 El Morado intake EM observations 2021 12 09 | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 1 | 5 | 5 | Morado Intake | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | x |
| 1 | 5 | 6 | Morado Intake | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 5 | 8 | Morado Intake | OPWA | Improvements on security of facilities. | | Concern related to hand rails and safety features not security fences. Some observations on safety parts are included on Dry / Wet Test Observation lists. Scope to be clarified | | x | | |
| 1 | 5 | 9 | Morado Intake | OPWA | Signs Installation | | As per  design | x | | | |
| 1 | 5 | 10 | Morado Intake | OPWA | Material removal at intake pond | | From the 1st of May responsibility of Alto Maipo. | x | | | |
| 1 | 5 | 11 | Aducción | Tramo Las Placas - Morado | Establecer áreas donde se podrá o no ocupar rocas como parámetro del paisaje en R. Mixta | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **1** | **6** | | **Desander Volcan** | | | | | | | | |
| 1 | 6 | 1 | Desander Volcan | OPWA | Environmental Fences and actions acc. Environmental Plan | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 1 | 6 | 2 | Desander Volcan | OPWA | Observation List | 6125 El Volcan Desander EM observations 2021 12 09 | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 6 | 3 | Desander Volcan | HEM | Control System | 6125 El Volcan Desander EM observations 2021 12 09 | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 1 | 6 | 4 | Desander Volcan | Sedicon | Observation List | 6125 El Volcan Desander Sedicon tests EM observations 2021 12 09 | Scope as s per  observation list already submitted  to STR. | x | | | |
| 1 | 6 | 5 | Desander Volcan | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | x |
| 1 | 6 | 6 | Desander Volcan | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted to STR. | x | | | |
| 1 | 6 | 7 | Desander Volcan | OPWA | Cover in ladder going to valve chamber. | | As per  design | | x | | |
| 1 | 6 | 8 | Desander Volcan | OPWA | Signs Installation | | As per  design | x | | | |
| 1 | 6 | 9 | Desander Volcan | Área de Apoyo | Establecer áreas donde se podrá o no ocupar rocas como parámetro del paisaje en R. Mixta | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 1 | 6 | 10 | Desander Volcan | Sifón El Morado | Definir tipo de restauración en Sifón, Area de apoyo y cruce El Morado. | no aparece en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **1** | **7** | | **Muck Deposit 1** | | | | | | | | |



# Remaining Scope/Punch List - Draft

**Category A**    **Strabag Scope**
**Category B**    **Detailed Scope to be clarified**
**Category C**    **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column "Agreed Approach and Responsibilties"**

| | | | Current List: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | No. | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
| 1 | 7 | 1 | MD1 | Muck Deposit | Sam 1: drainage, terraces, cleaning up the environmental zone | as indicated in the design/adjusted to the as build conditions | Drainage not part of restoration plan so to be completed in accordance with STR design. Terraces to be completed in accordance with resotration plan. | x | | |
| 1 | 7 | 2 | MD1 | Muck Deposit | Final Arrangement | as per draft send to AM | Will be shown in as built design | x | | |
| 1 | 7 | 3 | MD1 | Monitoring | Install Instruments | in accordance with currently approved design | As per design requirement (if design does not consider monitoring then there will be no monitoring) | x | | |
| 1 | 7 | 4 | MD1 | Platform | Platform including paleo signs | as per draft send to AM | | x | | |
| 2 | 7 | 5 | MD1 | Platform | Establecer las áreas de mantención y a restaurar | no aparece en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | |
| 1 | 8 | | Roads | | | | | | | |
| 1 | 8 | 1 | Roads | Access Road | Final Levelling | | one last and final levelling | x | | |
| 1 | 8 | 2 | Roads | Access Road | Obras de arte (app. 10) | | as per design provided for DGA approval | x | | |
| 1 | 8 | 3 | Roads | Access Road | Hydraulic works | | as per design provided for DGA approval | x | | |
| 1 | 8 | 4 | Roads | Access Road | Backfill of Bypass roads | in accordance with currently approved design | As per design | x | | |
| 1 | 8 | 5 | Roads | Access Road | Signs and nameplates, guardrails where required | | STR to define road signage. | x | | |
| 1 | 8 | 6 | Roads | Access Road | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x |
| 1 | 9 | | General Volcan Area | | | | | | | |
| 1 | 9 | 1 | Volcan Area | Roads | Repairing of the backfill for the final roads | | Levelling of road surface. | x | | |
| 1 | 9 | 2 | Volcan Area | La Engorda Bridge | La Engorda bridge | | as per design | x | | |
| 1 | 9 | 3 | Volcan Area | Camp | Demobilisation of the camp VOLCAN | | | x | | |
| 1 | 9 | 4 | Volcan Area | Camp & Polverin | Landscaping of the polverin and the camp | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | |
| 1 | 9 | 5 | Volcan Area | OPWA | Environmental Agreements | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | |
| 1 | 9 | 6 | Volcan Area | Signaling | Signs for H&S/Security, Access Control | | STR to define signage. | x | | |
| 1 | 9 | 7 | Volcan Area | Stretch 5 | Stretch 5: backfill CH 0+350 | | as per design | x | | |
| 1 | 9 | 8 | Volcan Area | Areas de apoyo, instalación de faena y campamentos | Pendiente descompactación durante la desmovilización, así como la definición de sus alcances en QEM-PLN-023 | Anexo 33 de EIA, Res N°202113101124 Resolución Pertinencia Optimización Plan de Restauración | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | |
| 2 | | | Volcan Tunnel | | | | | | | |
| 2 | 1 | | Tunnel V1 | | | | | | | |
| 2 | 1 | 1 | Tunnel V1 | Tunnel | Demobilisation of the tunnel site installation | | | x | | |
| 2 | 1 | 2 | Tunnel V1 | Tunnel | Solution for Gas | | STR to put access rules and signage in the operational manual but no additional construction / installations on site. Physcial warning signage to be defined and installed. | x | | |
| 2 | 1 | 3 | Tunnel V1 | Portal | Rip rap on lateral access | | As per design | x | | |
| 2 | 1 | 4 | Tunnel V1 | Portal | Establecer las áreas de mantención y a restaurar | no aparece en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | |
| 2 | 2 | | Tunnel V5 | | | | | | | |
| 2 | 2 | 1 | Tunnel V5 | Tunnel | Bolting of Seismic Stoppers | | Complete. Item no longer a remaining scope item. Can be removed | | | | |
| 2 | 2 | 2 | Tunnel V5 | Tunnel | False tunnel and ramp access (slab, backfill, RipRap and shotcrete) | | as per design | x | | |
| 2 | 2 | 3 | Tunnel V5 | Tunnel | Removing of the concrete slab of the site installation | | | x | | |
| 2 | 2 | 4 | Tunnel V5 | Tunnel | Demobilisation of the site installation | | | x | | |

Annex A to Strabag Release Provisions (4.3.22).xlsx
Rem. Scope_Punch List PHAM                                 Page 3 of 18                                            Author: TWe
4/3/2022



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

## Current List:

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 2 | 5 | Tunnel V5 | Tunnel | Landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 2 | 2 | 6 | Tunnel V5 | Tunnel | Bulkhead Grouting | | completed | x | | | |
| 2 | 2 | 7 | Bulkhead | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | as per procedure | x | | | x |
| 2 | 2 | 8 | Bulkhead | Observations | Observations after Acceptance Test | | Scope of observations open | | x | | |
| 2 | 2 | 9 | Tunnel | Dewatering | Dewatering of dry Stretch of V5 Tunnel including discharge solution | | Disagreement on general scope responsibility | | | x | |
| 2 | 2 | 10 | Portal | OPWA | Signs for H&S/Security, Access Control | | STR to define signage. | x | | | |
| 2 | 2 | 11 | Tunnel V5 | Platform Area | Ejecución del PM de la Vega EY5, incluyendo realizar trabajos de restauración del flujo de agua desde aguas arriba de la obra hasta la vega residual. Explicando la superficie final restaurada. | | Finalization in accordance with the PdC and existing environmental restoration plan. | x | | | |
| 3 | | | **Yeso Area** | | | | | | | | |
| 3 | 1 | | **Yeso Intake** | | | | | | | | |
| 3 | 1 | 1 | Yeso Intake | OPWA | Landscaping & Restoration | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 1 | 2 | Yeso Intake | Roads | Alto Maipo Access in accordance with MoP requirement | | as per design | x | | | |
| 3 | 1 | 3 | Yeso Intake | OPWA | Observation List | 6125 El Volcan Desander EM observations 2021 12 09 | Scope as s per  observation list already submitted  to STR. | x | | | |
| 3 | 1 | 4 | Yeso Intake | HEM | Control System | | Integregated test to be performed which is not entirely STR scope. | x | | | x |
| 3 | 1 | 5 | Yeso Intake | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | | x | | | x |
| 3 | 1 | 6 | Yeso Intake | Observations | Observations after Acceptance Test | | Scope as s per  observation list already submitted  to STR. | x | | | |
| 3 | 1 | 8 | Internal roads | G455 - Yeso Intake | Access Gate | | as per design | x | | | |
| 3 | 1 | 9 | Yeso Intake | OPWA | Signs Installation | | as per design | x | | | |
| 3 | 2 | | **Yeso Headrace** | | | | | | | | |
| 3 | 2 | 1 | Yeso Headrace | Culvert | Backfill (PK 1+137 to 1+263) | | as per design | x | | | |
| 3 | 2 | 2 | Yeso Headrace | OPWA | Gabions (PK 0+590 to 0+680) | | as per design | x | | | |
| 3 | 2 | 3 | Yeso Headrace | OPWA | Excavation and backfill of connection from the "T" to the tunnel V5 | | as per design | x | | | |
| 3 | 2 | 4 | Yeso Headrace | OPWA | Landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 2 | 5 | Yeso Headrace | OPWA | Sealing and grouting of cracks | | Complete. Item no longer a remaining scope item. Can be removed | x | | | |
| 3 | 3 | | **Yeso Siphon** | | | | | | | | |
| 3 | 3 | 1 | Yeso Siphon | Tramo 1 | Tramo 1: landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 3 | 2 | Yeso Siphon | River Crossing | landscaping (including Soil tunnel) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 3 | 3 | Yeso Siphon | Tramo 2 & 3 | Stretch 2 and 3: landscaping **and removal of temporary shotcrete at the slopes.** | in accordance with currently approved design/QEM-PLN-023 | In accordance with the existing environmental restoration Plan | | x | | |
| 3 | 3 | 4 | Yeso Siphon | Tramo 4 | Vertix 13: "obra de arte" | as per design provided for DGA approval | as per design | x | | | |
| 3 | 3 | 5 | Yeso Siphon | Tramo 4 | landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 3 | 6 | Yeso Siphon | Manzanito Bridge | Construction of Manzanito Bridge | | as per design | x | | | |
| 3 | 3 | 7 | Access Road | VA4 Road | 13 Obras de Arte | as per design provided for DGA approval | as per design | x | | | |
| 3 | 3 | 8 | Yeso Siphon | Yeso Bridge | Final Maintenance of bridge and fence | | Bridge to be cleaned according to usage and wear. | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column "Agreed Approach and Responsibilties"**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| colspan="13" | **Current List:** |
| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
| 3 | 3 | 9 | Yeso Siphon | Tunel en el Suelo | Avanzar con los trabajos definidor en la RCA del proyecto para la Restauración de taludes dentro de zanja en la zona del tunel a suelo. Lo anterior, mientras se espera la definición del PHAM sobre la materia. | Adenda 1 (p254) y Anexo 29 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 3 | 4 | | **Muck Deposit 2** | | | | | | | | |
| 3 | 4 | 1 | Yeso Siphon | MD2 | Sam 2: final structure (drainage, etc.) | as indicated in the design/adjusted to the as build conditions | as per design adjusted to as built | x | | | |
| 3 | 4 | 2 | Yeso Siphon | MD2 | Sam 2: fences, Access etc. | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 4 | 3 | Yeso Siphon | MD2 | Sam 2: removing of the wreckage | | | x | | | |
| 3 | 4 | 4 | Yeso Siphon | MD2 | Sam 2: landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 5 | | **Muck Deposit 3** | | | | | | | | |
| 3 | 5 | 1 | Yeso Siphon | MD3 | Sam 3: final backfill (terraces etc.) | as indicated in the design/adjusted to the as build conditions | as per design | x | | | |
| 3 | 5 | 2 | Yeso Siphon | MD3 | Sam 3: final structure (drainage, etc.) | as indicated in the design/adjusted to the as build conditions | as per design adjusted to as built | x | | | |
| 3 | 5 | 3 | Yeso Siphon | MD3 | Sam 3: Fences, access | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 5 | 4 | Yeso Siphon | MD3 | Sam 3: removing of the wreckage | | | x | | | |
| 3 | 5 | 5 | Yeso Siphon | MD3 | Sam 3: landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 6 | | **Muck Deposit 4** | | | | | | | | |
| 3 | 6 | 1 | Yeso Siphon | MD4 | Sam 4: finishing the discharge of the drainage | in accordance with currently approved design/QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 6 | 2 | Yeso Siphon | MD4 | Sam 4: final backfill (terraces etc.) | as indicated in the design/adjusted to the as build conditions | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 6 | 3 | Yeso Siphon | MD4 | Sam 4: masonry of the discharge | in accordance with currently approved design/QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 7 | | **Yeso General** | | | | | | | | |
| 3 | 7 | 1 | Site Installation | Yeso Camp | Demobilisation | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 7 | 2 | Site Installation | Yeso Camp | Restoration of Camp Area | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 3 | 7 | 3 | General | Talud y terraplen de caminos | Incorporar en PDR el tipo de restauración y lugares donde será aplicada la Hidrosiembra | PR-SSO-PTS-01 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 3 | 7 | 4 | General | Areas de apoyo, instalación de faena y campamentos | Pendiente descompactación durante la desmovilización, así como la definición de sus alcances en QEM-PLN-023 | Anexo 33 de EIA, Res N°202113101124 Resolución Pertinencia Optimización Plan de Restauración | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 3 | 7 | 5 | General | Vega EY1 | | | Finalization in accordance with the PdC and existing environmental restoration plan. | x | | | |
| 4 | | | **Headrace Tunnel Alfafal II** | | | | | | | | |
| 4 | 1 | | **VA4 Tunnel** | | | | | | | | |
| 4 | 1 | 1 | VA4 Tunnel | Tunnel | Cleaning up of the tunnel, from portal to Bulkhead, cables of low voltage etc. | | Demobilisation of equipment & site Intallation | x | | | |
| 4 | 1 | 2 | VA4 Tunnel | Tunnel | Demobilisation of the site installation | | | x | | | |
| 4 | 1 | 3 | VA4 Tunnel | Tunnel | Removing of the slab of the site installation | | | x | | | |
| 4 | 1 | 4 | Bulkhead | Wet/Acceptance Test | Wet/Acceptance Test | | as per procedure | x | | | x |
| 4 | 1 | 5 | Bulkhead | Observations | Observations after Acceptance Test | | Scope of observations open | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Current List:** | | | | | | |
| 4 | 1 | 6 | Tunnel | Dewatering | Dewatering of dry Stretch of VA4 Tunnel including discharge solution | | Disagreement on general scope responsibility | | | x | |
| 4 | 1 | 7 | Portal | OPWA | Signs for H&S/Security, Access Control | | STR to define signage. | x | | | |
| 4 | 2 | | BCC | | | | | | | | |
| 4 | 2 | 1 | BCC | Basin | Finishing of Perimeter Fence | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 4 | 2 | 2 | BCC | Electrical | Connection/Poles/Solar Panels | in accordance with currently approved design | as per design | x | | | |
| 4 | 2 | 3 | BCC | Electrical | Connection of Pressure Cell | in accordance with currently approved design | as per design | x | | | |
| 4 | 2 | 4 | BCC | Area de Apoyo BCC | Se debe avanzar con descompactación según los terminos establecidos en RCA del proyecto | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 4 | 3 | | VA2 | | | | | | | | |
| 4 | 3 | 1 | VA2 Tunnel | TBM Tunnel | Cleaning up of the tunnel, from portal to Plug, cables of low voltage etc. | | Demobilisation of equipment & site Intallation | x | | | |
| 4 | 3 | 2 | VA2 Tunnel | Logistic Tunnel | Levelling & Drainage of Logistic Tunnel | | one last and final levelling | x | | | |
| 4 | 3 | 3 | VA2 Portal | Platform | Platform Levelling | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 4 | 3 | 4 | VA2 Portal | Portal Structure & Backfill | Completion of Portal Structure and Backfill | in accordance with currently approved design | as per design | x | | | |
| 4 | 3 | 5 | VA2 Portal | All Tunnels | Levelling | | one last and final levelling | x | | | |
| 4 | 3 | 6 | VA2 Portal | All Tunnels | Dewatering of dry Stretch of VA2 Tunnel including discharge solution | | Disagreement on general scope responsibility | | | x | |
| 4 | 3 | 7 | VA2 Tunnel | Access, Logistic and By-pass Tunnel | Ventilation for Bulkhead and Penstock Area | | STR to put access rules and signage in the operational manual but no additional construction / installations on site. Phsycial warning signage to be defined and installed. | x | | | |
| 4 | 3 | 9 | VA2 Tunnel | TBM Tunnel | Permanent closure | | as per design | x | | | |
| 4 | 3 | 10 | VA2 Portal | Facilities at Portal | Demobilisation of the site installation | | STR Facilities only | x | | | |
| 4 | 3 | 11 | VA2 Portal | Facilities at Site Installation Area | Demobilisation of the site installation | | STR Facilities only | x | | | |
| 4 | 3 | 12 | VA2 Portal | Camino y acceso a plataforma VA2 | Establecer en PDR, el área de camino, considerando superficie de terraplen, de mantención y las áreas a restaurar. | no aparece en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 5 | | | Alfalfal II Tailrace Area | | | | | | | | |
| 5 | 1 | 1 | VA1 | AFII Power House | Architectural Works | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 2 | VA1 | AFII Power House | Long Term Monitoring (Optical Targets) | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 3 | VA1 | Access Tunnel | Ventilation Channel | | as per design | x | | x | |
| 5 | 1 | 4 | VA1 | Access Tunnel | Drainage Trench + Connection Tailrace | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 5 | VA1 | Access Tunnel | Invert Solution | | as per design | x | | | |
| 5 | 1 | 6 | VA1 | VA1-3 | Invert Missing | to be checked | Levelling of tunnel surface. | x | | | |
| 5 | 1 | 7 | VA1 | Portal Structure | Concrete Works | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 8 | VA1 | Portal Structure | Gate | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 9 | VA1 | Patio De Mufas | Finishing Works | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 10 | VA1 | Patio De Mufas | Emergency Generator | | | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current List: | | | | | | | | | | | |
| 5 | 1 | 11 | VA1 - tunnel camino | Portal Structure | Concrete Works | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 12 | VA1 - tunnel camino | Portal Structure | Gate | in accordance with currently approved design | as per design | x | | | |
| 5 | 1 | 13 | VA1 | Portal Area | Rockfall Protection | | Closure report needed to explain existing arrangements are safe for intended use. | x | | | |
| 5 | 1 | 14 | VA1 | VA1-1 | Invert Missing | | Levelling of tunnel surface. | x | | | |
| 5 | 1 | 15 | VA1 | VA1 and VA1-3 | Ventilation Solution for Gases | | Disagreement on general scope responsibility | | | x | |
| 5 | 1 | 16 | VA1 | VA1 | Cable Channel Cover Plate | | Solution to be in accordance with regulations and design requirements. | | x | | |
| 5 | 1 | 17 | VA1 | Portal | Dewatering of dry Stretch of VA1 Tunnel including discharge solution | | Disagreement on general scope responsibility | | | x | |
| 5 | 1 | 18 | VA1 | Patio De Mufas | Rockfall Protection | | | x | | | |
| 5 | 1 | 19 | VA1 | Bridge and Porta Areas | Site facilities removal | | Demobilisation of equipment & site Intallation | x | | | |
| 5 | 1 | 20 | VA1 | Area de Portal: Zona de transferencia de marinas, Planta de tratamiento de agua y Planta de riles. | Establecer trabajos de restauración para áreas adyacentes a la faja de camino. Plataforma es más grande que lo establecido en EIA. | no aparece en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 6 | | | Las Lajas Feeding System | | | | | | | | |
| 6 | 1 | | Maitenes Intake | | | | | | | | |
| 6 | 1 | 1 | Maitenes Intake | Lateral Spillway | Change Trash Racks | | completed | x | | | |
| 6 | 1 | 2 | Maitenes Intake | Lateral Spillway | Lifting Device For Trash Rack | | completed | x | | | |
| 6 | 1 | 3 | Maitenes Intake | Main River Gates | Refurbishment | | completed | x | | | |
| 6 | 1 | 4 | Maitenes Intake | Main River Gates | Eco-Flow Opening | | as executed | x | | | |
| 6 | 1 | 5 | Maitenes Intake | HEM Completion Works | HEM Completion Works | | as per design | x | | | |
| 6 | 1 | 6 | Maitenes Intake | OPWA | Extension of fence on left river bank | | as per design | x | | | |
| 6 | 1 | 7 | Maitenes Intake | OPWA | Observation Lists | | Scope of observations open | x | | | |
| 6 | 1 | 8 | Maitenes Intake | Dry Test | Dry Test | | as per procedure | x | | | |
| 6 | 1 | 9 | Maitenes Intake | Observations | Observation after dry Test | | Scope of observations open | x | | | |
| 6 | 1 | 10 | Maitenes Intake | Wet/Acceptance Test | Wet/Acceptance Test | | as per procedure | x | | | |
| 6 | 1 | 11 | Maitenes Intake | Observations | Observations after Acceptance Test | | Scope of observations open | x | | | |
| 6 | 1 | 13 | Maitenes Intake | Remote Control of Gates, CCTV, Sediment Sensor | | | Disputed in general and in disputed list. Should also not be required for substantial completion. | | | x | |
| 6 | 2 | | Maitenes Desander | | | | | | | | |
| 6 | 2 | 1 | Maitenes Desander | HEM Completion Works | HEM Completion Works | | as per design | x | | | |
| 6 | 2 | 2 | Maitenes Desander | DS53 | Level Sensor & Flow Meter | | as per design | x | | | |
| 6 | 3 | | Maitenes Channel | | | | | | | | |
| 6 | 3 | 1 | Maitenes Channel | Gate | Manual Level Control Gate | | as per design | x | | | |
| 6 | 3 | 2 | Maitenes Channel | Siphon | Lifting Device to be reinstalled | | as per design | x | | | |
| 7 | | | Forebay | | | | | | | | |
| 7 | 1 | | Alfalfal Village & Box Culvert | | | | | | | | |
| 7 | 1 | 1 | Alfalfal Village | Noise Barrier/Fence | Disassembly | | Demobilisation | x | | | |
| 7 | 1 | 2 | Alfalfal Village | Permanent Fence | Installation | | as per design | x | | | |
| 7 | 1 | 3 | Alfalfal Village | Village Fence | Install "Environmental Fence" around village | | as per agreement | x | | | |
| 7 | 2 | | Forebay | | | | | | | | |
| 7 | 2 | 1 | Forebay | Civils | Finishing Works | | as per design | x | | | |
| 7 | 2 | 2 | Forebay | Sedicon | Repair Works | | Complete. Item no longer a remaining scope item. Can be removed | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| \multicolumn{12}{c}{**Current List:**} |
| 7 | 2 | 3 | Forebay Area | Road repairs in old access area | repair of roads | to be reviewed | Road around the village. Level the gravel road. Construction access (where the temprary river crossing was) area KM´s to be confirmed. | x | | | |
| 7 | 2 | 4 | Forebay | Restauración Talud | Establecer el tipo de mitigación de impacto paisaje producto de talud de Forebay. | | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| **7** | **3** | | **Bottom Outlet** | | | | | | | | |
| 7 | 3 | 1 | Bottom Outlet | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| 7 | 3 | 2 | Bottom Outlet | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | x |
| 7 | 3 | 3 | Bottom Outlet | HEM | Control System | | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 7 | 3 | 4 | Bottom Outlet | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| 7 | 3 | 5 | Bottom Outlet | Protection of Maipo River | Owner concerned about erosion in the discharge to the river. | | OPWA to be checked for a solution but STR disagrees with scope of responsibility. | | | x | |
| **7** | **4** | | **Forebay Outlet** | | | | | | | | |
| 7 | 4 | 1 | Forebay Outlet | Observations | Observations after Dry Test | | Scope as per  observation list already submitted to STR. | x | | | |
| 7 | 4 | 2 | Forebay Outlet | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | |
| 7 | 4 | 3 | Forebay Outlet | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| **7** | **5** | | **Delivery Works to Forebay** | | | | | | | | |
| 7 | 5 | 1 | Delivery Works to Forebay | Observations | Observations after Dry Test | | Scope as per  observation list already submitted  to STR. | x | | | |
| 7 | 5 | 2 | Delivery Works to Forebay | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | as per procedure | x | | | x |
| 7 | 5 | 3 | Delivery Works to Forebay | HEM | Control System | | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 7 | 5 | 4 | Delivery Works to Forebay | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| **7** | **6** | | **Alfalfal I Discharge Modification** | | | | | | | | |
| 7 | 6 | 1 | Alfalfal I Discharge Modification | Observations | Observations after Dry Test | | Scope as per  observation list already submitted  to STR. | x | | | |
| 7 | 6 | 2 | Alfalfal I Discharge Modification | Wet/Acceptance Test | Wet/Acceptance Test | TAC-PCD-009 | Completed | x | | | x |
| 7 | 6 | 3 | Alfalfal I Discharge Modification | HEM | Control System | | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 7 | 6 | 4 | Alfalfal I Discharge Modification | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| **8** | **1** | | **LL Headrace Area** | | | | | | | | |
| **8** | **1** | | **LL Adduction** | | | | | | | | |
| 8 | 1 | 1 | LL Adduction | Stretch Syphon To Portal | Revegetation | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 8 | 1 | 2 | LL Adduction | Cleaning | Final Cleaning of baden, etc. | | | x | | | |
| 8 | 1 | 3 | LL Adduction | G345 | Road surface repair at siphon crossing area PK 21.500-21.780 | | Disputed | | | x | |
| **8** | **2** | | **VL8** | | | | | | | | |
| 8 | 2 | 1 | VL8 | Valve Chamber | Access Gate/Grating | | as per design | x | | | |
| 8 | 2 | 2 | VL8 | OPWA | Revegetation | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 8 | 2 | 3 | VL8 | Ventillation Valve | Lifting Device | | as per design | x | | | |

AM



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **8** | **3** | | **Las Lajas Headrace from VL7** | | | | | | | | |
| 8 | 3 | 1 | VL7 | Portal Structure | Gate | | completed | x | | | |
| 8 | 3 | 2 | VL7 | OPWA | Revegetation | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 8 | 3 | 3 | VL7 | OPWA | Fence + Gate | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 8 | 3 | 4 | VL7 | Bulkhead | Bulkhead Repair | | completed | x | | | |
| 8 | 3 | 5 | VL7 | Dewatering | Dewatering of dry Stretch of VL7 Tunnel including discharge solution if needed. | | Disagreement on general scope responsibility | | | x | |
| **8** | **4** | | **Aucayes Intake** | | | | | | | | |
| 8 | 4 | 1 | Aucayes intake | Intake | Manual Gate Refurbishment | | | x | | | |
| 8 | 4 | 2 | Aucayes intake | HEM Completion Works | HEM Completion Works | | | x | | | |
| 8 | 4 | 3 | Aucayes Intake | Eco Flow | to be checked if there is possibility | | not required | x | | | |
| 8 | 4 | 4 | Aucayes intake | Accessibility | Reparation | QEM-PLN-023 | Covered under 8.4.7 | | | | |
| 8 | 4 | 5 | Aucayes intake | Access Road | Final Levelling | | Covered under 8.4.7 | | | | |
| 8 | 4 | 6 | Aucayes intake | Communication | Control and Communication System to be installed | | as per design | x | | | |
| 8 | 4 | 7 | Aucayes intake | Access | Final Access/ Road condition incl. Bridges | | Written statement detailing recommendations for safe access. | x | | | |
| 8 | 4 | 8 | Aucayes Intake | Existing inlet | Stoplog completion including lifting device | | Covered under 8.4.2 | | | | |
| 8 | 4 | 9 | Aucayes Intake | Water channel | Owner concerned of operation due to open racks. | | Principle disagreement. To be checked if there is a solution possible to handle through O&M Manual | | | x | |
| 8 | 4 | 10 | Aucayes Intake | All areas | Lighting solution for 24/7 operation, CCTV | | To be addressed in O&M Manual. | x | | | |
| **8** | **5** | | **Las Lajas Headrace from VL5** | | | | | | | | |
| 8 | 5 | 1 | VL5 | Portal Structure | Concrete Works | | as per  design | x | | | |
| 8 | 5 | 2 | VL5 | Portal Structure | Gate | | as per design | x | | | |
| 8 | 5 | 3 | VL5 | OPWA | Revegetation + Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 8 | 5 | 4 | VL5 | Dewatering | Design & Construction Dewatering System | | Designer statement about impact on drainage concept on structural design. If no impact only as built documentation is needed. | x | | | |
| 8 | 5 | 5 | VL5 | Substation | Drainage Discharge | | Status to be verified on site. | | x | | |
| 8 | 5 | 6 | VL5-A | Tunnel | Ventilation for Bulkhead and Penstock Area | | STR to put access rules and signage in the operational manual but no additional construction / installations on site. Physcial warning signage to be defined and installed. | x | | | |
| 8 | 5 | 7 | Internal roads | G345 - VL5 | Access Gate and Guard House incl. Power Supply | | Lock, gate and key control considered in design. | x | | | |
| 8 | 5 | 8 | Internal roads | Tunnel | | | Finalization of existing roads as per design. | x | | | |
| **9** | | | **LL Tailrace Area** | | | | | | | | |
| **9** | **1** | | **VL4** | | | | | | | | |
| 9 | 1 | 1 | VL4 | LL Power House | Architectural Works | | as per design | x | | | |
| 9 | 1 | 2 | VL4 | Transformer Cavern/Cable Shaft | Separation Wall | | Complete. Item no longer a remaining scope item. Can be removed | x | | | |
| 9 | 1 | 3 | VL4 | Access Tunnel | Drainage Trench + Connection Tailrace | | as per design | x | | | |
| 9 | 1 | 4 | VL4 | Drainage System | Completion in Powerhouse Area | | as per design | x | | | |
| 9 | 1 | 5 | VL4 | Portal Structure | Concrete Works | | as per design | x | | | |
| 9 | 1 | 6 | VL4 | Portal Structure | Gate | | as per design | x | | | |
| 9 | 1 | 7 | VL4 | Muck Deposit MD14 | Final Arrangement | | Will be shown in as built design | x | | | |
| 9 | 1 | 8 | VL4 | OPWA | Demobilisation Site Installation | | | x | | | |
| 9 | 1 | 9 | VL4 | OPWA | Demobilisation WTPs | | | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**   **Strabag Scope**
**Category B**   **Detailed Scope to be clarified**
**Category C**   **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | Current List: | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
| 9 | 1 | 10 | VL4 | OPWA | Access Road | | Final levelling | x | | | |
| 9 | 1 | 12 | VL4 | OPWA | Revegetation + Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 9 | 1 | 13 | VL4 | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 9 | 1 | 14 | VL4 | Tunnel | Closing of Mucking Tunnel | | as per design | x | | | |
| 9 | 1 | 15 | VL4 | Tunnel | Access Road Tunnel | | as per design | x | | | |
| 9 | 1 | 16 | Internal roads | G345 - VL4 | Access Gate and Guard House incl. Power Supply | | Lock, gate and key control considered in design. | x | | | |
| 9 | 1 | 17 | VL4 | Access Road | Drainage solution for water creeck flood | | As per design | x | | | |
| 9 | 1 | 18 | VL4 | OPWA | Definir tipo de restauración en taludes de camino de acceso | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **9** | **2** | | **VL2** | | | | | | | | |
| 9 | 2 | 1 | VL2 | Portal | Transition between final and initial support/access control | | as per design | x | | | |
| 9 | 2 | 2 | VL2 | OPWA | Landscaping | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 9 | 2 | 3 | VL2 | OPWA | Demobilisation of Bridge | | Detailed Scope to be clarified | | | x | |
| 9 | 2 | 4 | VL2 | G345 Access | Permanent fence and gate solution | | As per design | x | | | |
| 9 | 2 | 5 | VL2 | OPWA | Removal of facilities | | Demobilisation | x | | | |
| 9 | 2 | 6 | VL2 | Tunnel | Complete the support solution | | as per design | x | | | |
| 9 | 2 | 7 | VL2 | OPWA | Definir tipo de restauración en taludes de camino de acceso | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **9** | **3** | | **L1** | | | | | | | | |
| 9 | 3 | 1 | L1 | Outlet Structure | HEM Completion Works | | | x | | | |
| 9 | 3 | 2 | L1 | OPWA | Demobilisation Site Installation | | | x | | | |
| 9 | 3 | 3 | L1 | OPWA | Demobilisation WTPs | | | x | | | |
| 9 | 3 | 4 | L1 | Civil Works | Finishing Works | | as per design | x | | | |
| 9 | 3 | 5 | L1 | Observations | Observation after dry Test | | Scope as per  observation list already submitted to STR. | x | | | |
| 9 | 3 | 6 | L1 | Wet/Acceptance Test | Wet/Acceptance Test | | Completed | x | | | x |
| 9 | 3 | 7 | L1 | HEM | Control System | | Integregated test to be performed which is not entirely STR scope. | | x | | x |
| 9 | 3 | 8 | L1 | Observations | Observations after Acceptance Test | | Scope as per  observation list already submitted to STR. | x | | | |
| 9 | 3 | 9 | L1 | G25-L1 | Access Gate and Guard House incl. Power Supply | | Lock, gate and key control considered in design. | x | | | |
| 9 | 3 | 10 | L1 | OPWA | Camino de acceso a portal, área de talleres y taludes de camino. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **10** | | | **General** | | | | | | | | |
| **10** | **1** | | **Area 6** | | | | | | | | |
| 10 | 1 | 1 | Area 6 | OPWA | Demobilisation Site Installation | | | x | | | |
| 10 | 1 | 2 | Area 6 | OPWA | Revegetation (Agriculture Area) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 1 | 3 | Area 6 | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| **10** | **2** | | **Aucayes** | | | | | | | | |
| 10 | 2 | 1 | Aucayes camp | OPWA | Demobilisation Site Installation | | | x | | | |
| 10 | 2 | 2 | Aucayes camp | OPWA | Revegetation + Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 2 | 3 | Aucayes camp | Aucayes Access - VA1 Portal | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 2 | 4 | Aucayes camp | Eco Wall | Chinese Wall Solution | | | | | x | |
| 10 | 2 | 5 | Aucayes camp | Platform | Provide and execute acceptable landscape solution for environmental regulation | QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |



# Remaining Scope/Punch List - Draft

**Category A**  **Strabag Scope**
**Category B**  **Detailed Scope to be clarified**
**Category C**  **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **10** | **3** | | **MD5** | | | | | | | | |
| 10 | 3 | 1 | MD5 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 3 | 2 | MD5 | OPWA | Vegetal Layer | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 3 | 3 | MD5 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 3 | 4 | MD5 | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |
| 10 | 3 | 5 | MD5 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| **10** | **4** | | **MD6** | | | | | | | | |
| 10 | 4 | 1 | MD6 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 4 | 2 | MD6 | OPWA | Backfill of Pool and restoring of area | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 4 | 3 | MD6 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 4 | 4 | MD6 | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |
| 10 | 4 | 5 | MD6 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 4 | 6 | MD6 | OPWA | Retiro y relleno de piscina de lixiviación | | Covered by 10.4.2 | | | | |
| **10** | **5** | | **MD7** | | | | | | | | |
| 10 | 5 | 1 | MD7 | OPWA | Demobilisation Site Installation | | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 5 | 2 | MD7 | OPWA | Revegetation + Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 5 | 3 | MD7 | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 5 | 4 | MD7 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with approved design | as per design | x | | | |
| 10 | 5 | 5 | MD7 | OPWA | Ditches & Pits | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 5 | 6 | MD7 | OPWA | VL7 falta descompactación | QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **10** | **6** | | **MD8** | | | | | | | | |
| 10 | 6 | 1 | MD8 | OPWA | Revegetation | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 6 | 2 | MD8 | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 6 | 3 | MD8 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 6 | 4 | MD8 | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |
| 10 | 6 | 5 | MD8 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| **10** | **7** | | **MD9** | | | | | | | | |
| 10 | 7 | 1 | MD9 | OPWA | Final Arrangement | | Will be shown in as built design | x | | | |
| 10 | 7 | 2 | MD9 | OPWA | Planting/Hydroseeding | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 7 | 3 | MD9 | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 7 | 4 | MD9 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 7 | 5 | MD8 | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |

AM



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | **Current List:** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **No.** | | **Location** | **Construction Part** | **Item Description** | **Reference** | **Agreed approach and responsibilities** | **Category A** | **Category B** | **Category C** | **Substantial Completion** |
| 10 | 7 | 6 | MD8 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 7 | 7 | MD9 | OPWA | Establecer en PDR el tipo de restauración en  terrazas de talud. | QEM-PLN-023 | Hydroseeing. Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **10** | **8** | | **MD10** | | | | | | | | |
| 10 | 8 | 1 | MD10 | OPWA | Planting/Hydroseeding | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 8 | 2 | MD10 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 8 | 3 | MD10 | OPWA | Flowmeter Access Stairs | in accordance with currently approved design | completed | x | | | |
| 10 | 8 | 4 | MD10 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 8 | 5 | MD10 | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |
| 10 | 8 | 6 | MD10 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 8 | 7 | MD10 | OPWA | Establecer en PDR el tipo de restauración en  terrazas de talud. | QEM-PLN-023 | Hydroseeing. Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **10** | **9** | | **MD11 (Colorado)** | | | | | | | | |
| 10 | 9 | 1 | MD11 (Colorado) | OPWA | Demobilisation Site Installation | | Demobilisation | x | | | |
| 10 | 9 | 2 | MD11 (Colorado) | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 9 | 3 | MD11 (Colorado) | OPWA | Fence (Vegetation Protection) | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 9 | 4 | MD11 (Colorado) | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 9 | 5 | MD11 (Colorado) | OPWA | Slope Repair | | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 9 | 6 | MD11 (Colorado) | OPWA | Planting/Hydroseeding | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 9 | 7 | MD11 (Colorado) | OPWA | Drainage Works | | as per design adjusted to as built | x | | | |
| **10** | **10** | | **MD12** | | | | | | | | |
| 10 | 10 | 1 | MD12 | OPWA | Hydro Seeding | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 10 | 2 | MD12 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 10 | 3 | MD12 | OPWA | Demobilisation | | | x | | | |
| 10 | 10 | 4 | MD12 | OPWA | Final Layout of Muck Deposit | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 10 | 5 | MD12 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 10 | 6 | MD12 | OPWA | Drainage Works Finishing | | as per design adjusted to as built | x | | | |
| 10 | 10 | 7 | MD12 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 10 | 8 | MD12 | OPWA | Lookout Installation | QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| **10** | **11** | | **MD13** | | | | | | | | |
| 10 | 11 | 1 | MD13 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 11 | 2 | MD13 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 11 | 3 | MD13 | OPWA | Drainage Works Finishing | | as per design adjusted to as built | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | | Current List: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
| 10 | 11 | 4 | MD13 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 11 | 5 | MD13 | OPWA | Access Repairation | | To be checked and clarified. | | | x | |
| 10 | 12 | | MD14 | OPWA | | | | | | | |
| 10 | 12 | 1 | MD14 | OPWA | Construction of Survey Points (Pillar & Control Monoliths) | in accordance with currently approved design | as per design | x | | | |
| 10 | 12 | 2 | MD14 | OPWA | Formation of Deposit | | | x | | | |
| 10 | 12 | 3 | MD14 | OPWA | Demobilisation / Vegetal Layer | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 12 | 4 | MD14 | OPWA | Planting / Hydroseeding | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 12 | 5 | MD14 | OPWA | Fencing | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 12 | 6 | MD14 | OPWA | Drainage Works Finishing | | as per design adjusted to as built | x | | | |
| 10 | 12 | 7 | MD14 | OPWA | Irrigation System | QEM-PLN-023 | In accordance with the existing environmental restoration Plan | x | | | |
| 10 | 13 | | Aucayes Access  - VA1 Road | | | | | | | | |
| 10 | 13 | 1 | Internal roads | Aucayes Access - VA1 | Final Levelling | | Final surface levelling | x | | | |
| 10 | 13 | 2 | Internal roads | Aucayes Access - VA1 | Maintenance of Obras de Arte | | as per design | x | | | |
| 10 | 13 | 3 | Internal roads | Aucayes Bridge at VA1 | Bridge to be cleaned according to usage and wear. | | | x | | | |
| 10 | 13 | 5 | Internal roads | G345 - VA1 | Access Gate and Guard House incl. Power Supply | | Lock, gate and key control considered in design. | x | | | |
| 10 | 13 | 6 | Internal roads | Aucayes Bridge - VA1 | Solution to road protection for rockfalls from slope | | Closure report needed stating safe for intended use. | x | | | |
| 10 | 13 | 7 | Internal roads | Aucayes Access - VA1 | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 14 | | VA1  - VA2 Road | | | | | | | | |
| 10 | 14 | 1 | Internal roads | VA1 - VA2 | Maintenance & Construction of Obras de Arte | | as per design | x | | | |
| 10 | 14 | 2 | Internal roads | VA1 - VA2 | Final Levelling | | as per design | x | | | |
| 10 | 14 | 3 | Internal roads | VA1 - VA2 | Installation of Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 14 | 4 | Internal roads | VA1 - VA2 | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 15 | | VA2 - BCC Road | | | | | | | | |
| 10 | 15 | 1 | Internal roads | VA2 - BCC | Maintenance & Construction of Obras de Arte | | As per design | x | | | |
| 10 | 15 | 2 | Internal roads | VA2 - BCC | Ditches & Pits | as per design provided for DGA approval | as per design | x | | | |
| 10 | 15 | 3 | Internal roads | VA2 - BCC | Final Levelling | | as per design | x | | | |
| 10 | 15 | 4 | Internal roads | VA2 - BCC | Installation of Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 15 | 5 | Internal roads | VA2 - BCC | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 16 | | Access to Reforestation | | | | | | | | |
| 10 | 16 | 1 | Internal roads | Access to reforestation | Construction of Obras de Arte | as per design provided for DGA approval | as per design | x | | | |
| 10 | 16 | 2 | Internal roads | Access to reforestation | Final Levelling | as per design provided for DGA approval | as per design | x | | | |
| 10 | 17 | | VL7 Access Road | | | | | | | | |



# Remaining Scope/Punch List - Draft

**Category A**      **Strabag Scope**
**Category B**      **Detailed Scope to be clarified**
**Category C**      **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | | | | | Current List: | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **No.** | | **Location** | **Construction Part** | **Item Description** | **Reference** | **Agreed approach and responsibilities** | **Category A** | **Category B** | **Category C** | **Substantial Completion** |
| 10 | 17 | 1 | Internal roads | VL7 Access | Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 18 | | **VL8 Access Road** | | | | | | | | |
| 10 | 18 | 1 | Internal roads | VL8 Access | Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 18 | 2 | Internal roads | VL8 Access | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 19 | | **MD7 Access Road** | | | | | | | | |
| 10 | 19 | 1 | Internal roads | MD7 Access | Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 20 | | **Mineria Colorado Access Road** | | | | | | | | |
| 10 | 20 | 1 | Internal roads | Mineria Rio Colorado | Road Signs | as per design provided for DGA approval | as per design | x | | | |
| 10 | 21 | | **MD9 Access Road** | | | | | | | | |
| 10 | 21 | 1 | Internal roads | Access MD9 | Final Levelling | | one last and final levelling | x | | | |
| 10 | 21 | 2 | Internal roads | Access MD9 | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | No está presente en QEM-PLN-023 | Item to be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 22 | | **Annex 1c works** | | | | | | | | |
| 10 | 22 | 1 | Manzano Intake | Upgrade | Design, permitting & Construction | as per design provided for DGA approval | as per design | x | | | |
| 10 | 22 | 2 | Manzano Intake | Access Road | Repair/Finishing | | As per design | x | | | |
| 10 | 22 | 3 | Aucayes intake | Upgrade | Operational Flow Measurement | as per design provided for DGA approval | as per design | x | | | |
| 10 | 22 | 4 | Aucayes Intake | Upgrade | Connection/Poles/Solar Panels | as per design provided for DGA approval | as per design | x | | | |
| 10 | 22 | 5 | Aucayes intake | Upgrade | CCTV in the existing inlet area | | As per design and O&M Manual | x | | | |
| 10 | 23 | | **AM Comments** | | | | | | | | |
| 10 | 23 | 1 | Vialidad | Permits | Approval of As-Built situation on the intersection between the public and access roads | | Related to intersections at site entrances. | x | | | |
| 10 | 23 | 2 | General | Maintenance | Road final Maintenance | | Internal Maitenes facilities. Final levelling | x | | | |
| 10 | 23 | 3 | TOP | Appendix D | Completion of the information | | Wet and Acceptance Testing Documentation | x | | | x |
| 10 | 23 | 6 | | Appendix H | Completion of the information | | Applicable only to acceptance test reports. | x | | | |
| 10 | 23 | 7 | Inspection Reports | Quality | Closure of the open issues, incl. Agreements to close NCRs | | as per approach used over the project duration, no excessive additional requirements | x | | | |
| 10 | 23 | 8 | Muck Deposits | Detail design | Seismic approval | | Submitted. | x | | | |
| 10 | 23 | 9 | Access tunnels | Final support | As needed, corrosion protection in bolts and accessories in access tunnels | | approved design with detailed corrosion report provided (see GDE) | x | | | |
| 10 | 23 | 10 | Maitenes storage yard | Storage yard | Removal of materials and area restoration and final clean-up | | | x | | | |
| 10 | 23 | 11 | Whole Project | Surface walk-down | Joint inspection for all surface works as soon as they are completed | | Managed through walkdowns | x | | | |
| 10 | 23 | 12 | General | OPWA | Tunnel Risk Matrix as per insurance requirements | | Risk matrix for construction period only. Not for operations. Not necessary for substantial completion. | x | | | |
| 10 | 23 | 13 | General | OPWA | Overall, project-wide, Design Procedure | | Further discussions on the content and required improvements. | x | | | |
| 10 | 23 | 14 | Volcan | Powerline | Provide missing documentation of the Volcan / Yeso Powerline related to STR scope. | | Detailed Scope to be clarified | | x | | |
| 10 | 23 | 15 | General | OPWA | Any documentation needed to fully permit the plant (if in Strabag scope) | | No additional action required. Covered by other items in this list. | x | | | |



# Remaining Scope/Punch List - Draft

**Category A     Strabag Scope**
**Category B     Detailed Scope to be clarified**
**Category C     Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column "Agreed Approach and Responsibilties"**

| Current List: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
| 10 | 23 | 16 | General | Medium Voltage Cables | Implement Comments provided if STR scope | | Detailed Scope to be clarified | | x | | |
| 10 | 23 | 17 | Maitenes Intake | Electrical | Supply and assembly of transformer from 75 kVA to 12 KV plus general panel of the sector | | | x | | | |
| 10 | 23 | 18 | VA4 | Electrical | Withdrawal of manzanito medium voltage line (to be discussed whether to keep it) | | No longer applicable. | x | | | |
| 10 | 23 | 19 | VL2 | Electrical | Withdrawal of medium voltage line 12 kV from VL4 to VL2 | | To be removed. | x | | | |
| 10 | 23 | 20 | General | Cartografía | Actualizar el KMZ de construcción y establecer las áreas que están fuera de lo establecido en el EIA | | Clarification required | | | x | |
| 10 | 23 | 21 | General | Restauración | En PDR establecer método para realizar siembra directa, que permita controlar su sobrevivencia en restauración Mixta | Anexo 33 de EIA, Res N°202113101124 Resolución Pertinencia Optimización Plan de Restauración | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 10 | 23 | 22 | General | Restauración | En base al uso de rocas como restauración a un costado de B. Colina, que reduce impacto visual, establecer los lugares donde se realizará dicho trabajo | Adenda 1 (p254) y Anexo 29 | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 10 | 23 | 23 | General | Restauración | Presentar propuesta de cerco para evitar el paso de animales a SAM 13 | QEM-PLN-023 | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 10 | 23 | 24 | General | Restauración | En base a resultados en SAM 4, establecer un método para mejorar incorporación de Mulch en talud efectivo para mitigar impacto al paisaje y contener la erosión. | Tabla 23 (adenda 2) y Adenda 1 (p254) | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 10 | 23 | 25 | General | Restauración | En PDR establecer obras de restauración para taludes y terraplenes de caminos y otras obras lineales con impacto al paisaje. | Adenda 1 (p254) y Anexo 29 | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | | x | |
| 10 | 23 | 26 | General | Restauración | En PDR definir alcances de Landscaping, Leveling, Disminución de la pendiente, Perfilado y Descompactación. En cuanto a obras que lo requieren y profundidad. | QEM-PLN-023, Anexo 33 | Item addressed in the PDR. To be addressed in environmental meeting between Alex, Peter and Environmental teams. | | x | | |
| 10 | 23 | 27 | General | | Desmantelamiento y retiro total de las instalaciones de faena y campamentos, donde se incluyen las oficinas de los contratistas, habitaciones del personal y los trabajadores, parque de maquinarias, bodegas, pañoles, talleres de mantención, servicios de agua potable y servicios higiénicos, estacionamientos para vehículos, recintos de acopio transitorio de materiales, etc. Se retirarán las instalaciones del agua potable, incluyendo cañerías y estanques de almacenamiento, así como también las instalaciones sanitarias, consistentes en cámaras modulares de las plantas de tratamiento por campamento más la red de alcantarillado y baños químicos. | EIA, Cap. 2, punto 2.3.2.4, letra C EIA, Anexo 33, punto 5 | Covered by other items. STR will demob as nesecary | | | | |
| 10 | 23 | 28 | General | | Retiro de las instalaciones eléctricas, procedimiento realizado por personal especializado, incluyendo los postes y cableado puestos por el proyecto en algunos sectores, salvo aquellos que abastecerán de energía eléctrica a las obras durante la operación del proyecto. También se retirarán los equipos generadores instalados en cada campamento. | EIA, Cap. 2, punto 2.3.2.4, letra C EIA, Anexo 33, punto 5 | Covered by other items. STR will demob as nesecary | | | | |



# Remaining Scope/Punch List - Draft

**Category A**     **Strabag Scope**
**Category B**     **Detailed Scope to be clarified**
**Category C**     **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | | | |
|---|---|---|---|---|---|
| **Current List:** | | | | | |

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 23 | 29 | General | | En cuanto a los residuos sólidos de la construcción, acopiados en recintos transitorios, serán retirados en su totalidad, así como también otros que pudieran estar dispersos en los campamentos, frentes de trabajo, o sectores aledaños. | EIA, Cap. 2, punto 2.3.2.4, letra C EIA, Anexo 33, punto 5 | Covered by other items. STR will demob as necesary | | x | | |
| 10 | 23 | 30 | General | | Luego del retiro de todos los elementos movibles, se procederá a sacar los cierres, anclajes y otras instalaciones menores, restos de hormigón por elaboración de mezclas, piscina de decantación, etc. | EIA, Cap. 2, punto 2.3.2.4, letra C EIA, Anexo 33, punto 5 | Covered by other items. STR will demob as necesary | | | | |
| 10 | 23 | 31 | General | | También se limpiará el suelo en caso que presente derrames de líquidos o alguna sustancia ajena al suelo, utilizada para la ejecución de los trabajos. El suelo será limpiado retirando toda la capa superficial afectada y transportada a un sitio autorizado para su tratamiento y disposición final. | EIA, Cap. 2, punto 2.3.2.4, letra C EIA, Anexo 33, punto 5 | Covered by other items. STR will demob as necesary | | | | |
| 10 | 23 | 32 | Depósitos de Marina | | Como se ha indicado precedentemente, se condicionará la forma final de cada depósito a la topografía del lugar. Cada terraza del sitio será emparejada hasta lograr una superficie plana, y los taludes que resulten del apilamiento y compactación del material serán perfilados hasta alcanzar pendientes no superiores al 30%, evitándose deslizamientos, desprendimiento o erosión de material por aguas lluvias. | EIA, Anexo 6, punto 4,3 EIA, Cap. 2, punto 2.3.2.6, letra D EIA, Cap. 10, punto 10.1 ICE, item VIII, punto 1.7.5 RCA 256/09 punto 7.2.7.4 | Built according to design, fulilling environmental requirements. | | x | | |
| 10 | 23 | 33 | Depósitos de Marina | | Se retirarán de los sitios todo tipo de estructuras o recintos provisorios del Contratista. También se retirará la señalética. | EIA, Anexo 6, punto 4,3 EIA, Cap. 2, punto 2.3.2.6, letra D EIA, Cap. 10, punto 10.1 ICE, item VIII, punto 1.7.5 | Covered by other items. STR will demob as necesary | | | | |
| 10 | 23 | 34 | Depósitos de Marina | | Los sitios de acopio próximos a caminos públicos no disminuirán o bloquearán las vistas laterales o panorámicas desde la calzada o berma, es decir, el acopio no consistirá en un elemento de obstrusibidad visual para los usuarios del camino. Lo anterior debido a que en todos los casos de acopios proyectados próximos a caminos, éstos tendrán una cota de cierre del relleno no superior a la cota del camino. | ICE, item VII, punto 1.10 | Built according to design, fulilling environmental requirements. | | x | | |
| 10 | 23 | 35 | Depósitos de Marina | | El emplazamiento de las marinas no podrá estar localizado interfiriendo cauces naturales, ni estar dentro de las fajas de restricción señaladas para cada caso. | ICE, item VII, punto 2.5, letra e) | To be ompleted in accordance with environmental requirements | x | | | |
| 10 | 23 | 36 | Depósitos de Marina | | La entrega de aguas de los contrafosos se hará en las laderas, puesto que para estos efectos no se considera obras en los cauces naturales. | ICE, item VII, punto 2.5, letra e) | Managed via design of muck deposit and through PdC | x | | | |



# Remaining Scope/Punch List - Draft

**Category A**    **Strabag Scope**
**Category B**    **Detailed Scope to be clarified**
**Category C**    **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

## Current List:

| | No. | | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 23 | 37 | Depósitos de Marina | | Se realiza entrega del informe topográfico. Se deberá contemplar un informe topográfico por cada sitio de acopio, una vez que estos vayan quedando concluidos, de acuerdo a lo planificado. Estos informes deberán ser entregados a la Conama – RM. En caso de detectarse algún tipo de corrimiento o inestabilidad que transgredan el distanciamiento a los cauces naturales comprometidos, se deberá informar inmediatamente a la autoridad ambiental y sectorial. | ICE, item VII, punto 2.5, letra e) RCA 256/09 punto 7.2.7.6 | To be completed in accordance with environmental requirements | x | | | |
| 10 | 23 | 38 | Depósitos de Marina | | Respecto de la localización de las marinas, se debe respetar la faja determinada para la crecida establecida por la DOH y considerar también la definida en los instrumentos de planificación territorial. | ICE, item VII, punto 2.5, letra e) | To be ompleted in accordance with environmental requirements | x | | | |
| 10 | 23 | 39 | General | Restauration | Donde sea necesario, se debe realizar Descompactación y perfilado, aplicación de tierra. Luego proceder con alguna de las tres técnicas de restauración que corresponda. Buscando cumplir con Anexo 33, 29 y adendas. | | To be completed in accordance with environmental requirements. Close in Environmental Meeting | x | | | |
| 10 | 23 | 40 | DGA | Permits | Final Receptions of projects aproved | | Related to final project permits. STR has documentation input but clear list must be defined of what STR must provide. Responsibility to obtain the permit is with AM | x | | | |
| 10 | 23 | 41 | General | Permits | Final declarations related to STR site facilties associated to SEREMI de Salud | | To be completed in accordance with environmental requirements | x | | | |
| 10 | 23 | 45 | | | Maurino intake | | Move to Category C | | | x | |

### Items covered by Waiver

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 23 | 42 | | | Emission compensation plan | | Items covered by waiver. | | | x |
| 10 | 23 | 43 | | | additional insurance for two TBMs | | Items covered by waiver. | | | x |
| 10 | 23 | 44 | | | Omission of ventilation shaft | | Items covered by waiver. | | | x |
| 10 | 23 | 46 | | | water seperation Yeso / Volcan | | Items covered by waiver. | | | x |
| 10 | 23 | 47 | | | Construction of VL2 Tunnel | | Items covered by waiver. | | | x |
| 3 | 3 | 8 | Yeso Siphon | Y-Junction -V5 Portal | Valve for Separation of Volcan and Yeso System | | Items covered by waiver. | | | x |

*Waived Items*

### Additional Scope

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 7 | La Engorda Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 1 | 3 | 7 | Colina Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 1 | 4 | 6 | Las Placas Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 1 | 5 | 7 | Morado Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 3 | 1 | 7 | Yeso Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 4 | 3 | 7 | VA2 Portal | Logistic Tunnel | Electrical Supply for TPS Valve | | Additional scope | | | x |
| 6 | 1 | 12 | Maitenes Intake | DS53 | Compliance with DS53 | DS53 | Change order totalling USD 112k. | | | x |
| 8 | 5 | 6 | VL5-A | Tunnel | Electrical Supply for TPS Valve | | Additional scope | | | x |
| 9 | 1 | 11 | VL4 | OPWA | Access Road Pavement | | Additional scope | | | x |
| 10 | 13 | 4 | Internal roads | Aucayes Bridge - VA1 | Pavement like in the Access Tunnel | | Additional scope | | | x |
| 10 | 23 | 4 | La Gloria | MD | Construction of Ditches | | Additional scope | | | x |
| 10 | 23 | 5 | Whole Project | Monitoring | Supply and Installation of additional Monitoring (Intakes | | Additional scope | | | x |

*Additional Scope*



# Remaining Scope/Punch List - Draft

**Category A**      **Strabag Scope**
**Category B**      **Detailed Scope to be clarified**
**Category C**      **Disagreement on scope description and responsibility.**
**Note: Selection of Categories A, B or C, are defined based on Column  "Agreed Approach and Responsibilties"**

| | | | | | Current List: | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. | Location | Construction Part | Item Description | Reference | Agreed approach and responsibilities | Category A | Category B | Category C | Substantial Completion | |

Comments / clarifications:
* debatable items means that Strabag claims it is not in their scope while PHAM argues that it is in Strabag's scope, as per the Contract
* particular "debateable items" are: item 23.43-48, which potentially will be removed from the scope of work in a future Amendment

<u>**Annex V**</u>
**Strabag Fast Track Dispute Resolution Procedures**

2.29  <u>Owner's Instructions</u>.  Contractor shall comply with and strictly adhere to Owner's instructions and directions given solely by Owner's Authorized Representative, except to the extent (a) prevented by any Applicable Law, or (b) Contractor reasonably believes that compliance with such instructions or directions would cause safety hazards to any Person or the environment.  Contractor shall take instructions and directions only from Owner in writing (except to the extent that such instruction is given under the circumstances discussed under Sections 2.17.7 and 4.4.1, in which case Contractor shall follow Owner's verbal instruction which shall be confirmed in writing within a reasonable time) as to the performance of the Work.

2.29.1 <u>Owner's Instructions or Other Work That May Constitute a Change; Dispute Resolution Procedures</u>.

2.29.1.1 If (a) Contractor believes that any work (including, without limitation, any work requested or directed to be performed in connection with a Punch List or in response to a Notice of Critical Milestone Substantial Completion or Notice of Tunnel Complex Substantial Completion) constitutes a Change, (b) Owner withholds any payment, back-charge, certificates, notices, or similar documents from Contractor in connection with a dispute over whether Contractor has executed Contractor's original work scope or Punch List work scope, (c) any other dispute concerning a modification to or interpretation of Contractor's work scope arises, or (d) any dispute arises over the value of any work included on a Punch List or Draft Punch List (any of (a)-(d) a "<u>Section 2.29 Dispute</u>"), Contractor shall, as soon as practicable, and in any case within fifteen (15) Days of the date the Section 2.29 Dispute arose, issue to Owner a notice (a "<u>Section 2.29 Notice</u>") specifying the applicable Section 2.29 Dispute and stating (i) the anticipated impact that the Section 2.29 Dispute is likely to have, if any, on the Contract Price and the timely achievement of any Guaranteed Critical Milestone Dates; and (ii) including sufficient background information on the nature of the Section 2.29 Dispute to permit the Owner to make an assessment of the situation in advance of the Section 2.29 Meeting (defined below herein). If Contractor fails to deliver to Owner a Section 2.29 Notice within fifteen (15) Days of the date the Section 2.29 Dispute arose, Contractor will be deemed to have waived any right to receive an adjustment to the Contract Price, Punch List, or Guaranteed Critical Milestone Dates.  For the avoidance of doubt, pending resolution of any Section 2.29 Dispute, Contractor and Owner shall retain full recourse to all rights and remedies otherwise available under the Contract.

2.29.1.2  No later than fifteen (15) Days after Contractor submits a Section 2.29 Notice, the Parties shall meet and discuss (a "<u>Section 2.29 Meeting</u>") the applicable Section 2.29 Dispute in a good faith effort to resolve any disagreements concerning Contractor's entitlement to, and the extent of, an adjustment to the Contract Price, Punch List, or Guaranteed Critical Milestone Dates, or any other relief, as appropriate.

2.29.1.3  If (i) the Parties fail to convene a Section 2.29 Meeting within fifteen (15) Days of Contractor's Section 2.29 Notice or (ii) if the Parties have not reached a mutually acceptable agreement within ten (10) Days of the Section 2.29 Meeting, then the Section 2.29 Dispute shall be submitted (the "<u>Submission</u>" and the date of the Submission, the "<u>Submission Date</u>") to Michael C. Loulakis of Capital Project Strategies, LLC (the "<u>Independent Adjudicator</u>")

for determination (a "Determination")[1]; *provided, however*, that if Michael C. Loulakis is or becomes unwilling or unable to serve as Independent Adjudicator, the Parties shall work together in good faith to select an alternative Independent Adjudicator with similar engineering and legal qualifications.  If the Parties are unable to select and agree upon an available Independent Adjudicator within forty-five (45) days of determining the unavailability of Mr. Loulakis, the Parties shall request that an Independent Adjudicator be appointed by the ICC. The Independent Adjudicator shall have the sole and exclusive authority to determine whether a submitted dispute constitutes a Section 2.29 Dispute subject to his adjudication; provided that if the Independent Adjudicator determines that a Submission is not a Section 2.29 Dispute, either Party may submit the dispute to resolution pursuant to Section 18.1 of the Contract. The Independent Adjudicator shall have complete authority to conduct the proceedings in the manner he deems necessary to fulfill his function as the Independent Adjudicator and shall issue a Determination following review of the Parties' written submissions (the "Party Submissions") (which Party Submissions shall not be required to be submitted fewer than twenty (20) days after the Submission Date) and any hearing as the Independent Adjudicator may deem necessary. The Independent Adjudicator shall have the authority to make any inquiries he or she believes are reasonably necessary to render his or her Determination. The Independent Adjudicator shall not be permitted to rule *ex aequo et bono*. The Independent Adjudicator shall issue his or her Determination as soon as practicable, but in no event later than thirty (30) Days after the date of the Party Submissions. The Parties agree that a Determination of the Independent Adjudicator shall be binding on the Parties, subject to Section 2.29.1.5. The Party deemed to be the non-prevailing Party, if any, by the Independent Adjudicator's Determination shall bear all costs and expenses of the Independent Adjudicator, as well as 100% of the reasonable costs and expenses borne by the Party deemed to be the prevailing Party, if any, by the Independent Adjudicator's Determination.  For the avoidance of doubt, the Independent Adjudicator shall not consider, and shall not issue a Determination with respect to, any dispute between the Parties relating to any draw on a letter of credit posted by the Contractor in favor of the Owner; any such dispute shall be adjudicated pursuant to the provisions of Section 18.1 of this Contract.

2.29.1.4  The terms of this Contract permitting the referral to, and resolution of, Section 2.29 Disputes by the Independent Adjudicator are exclusive and self-executing, and it is unnecessary for either Party to petition a court to compel the Parties to refer a Section 2.29 Dispute to the Independent Adjudicator to initiate a Determination proceeding. The Independent Adjudicator shall have the sole and exclusive authority to determine whether a submitted dispute constitutes a Section 2.29 Dispute subject to his or her adjudication.

2.29.1.5  Contractor shall be obligated to perform any work that is subject to a Section 2.29 Dispute pending a Determination by the Independent Adjudicator. Within one hundred twenty (120) Days of the issuance of any Determination by the Independent Adjudicator, either Owner or Contractor may challenge the Determination in whole or in part, with such dispute to be resolved *de novo and without regard to the Determination* in accordance with Section 18.1 of this Contract; provided that pending an order of the ICC, Contractor and Owner shall proceed in accordance with the Determination; and further provided that, in the event that any Work previously subject to a Section 2.29 Dispute or Determination is first required to be later tested or used more than one hundred twenty (120) Days from the Issuance Date, the one period of one hundred twenty (120) Days will be counted instead from the earliest date Owner reasonably was able to evaluate the sufficiency of the technical solution implemented by the Contractor.

---

[1]       Prior to the appointment of Michael C. Loulakis as Independent Adjudicator, Owner and Contractor shall contact Mr. Loulakis together to determine his willingness to serve as Independent Adjudicator.

Furthermore, in the event the Determination is issued in favor of the Contractor, Contractor's obligation to perform the work shall not be terminated, but shall entitle the Contractor to a Change Order entitling Contractor to payment as provided for in the Construction Contract.

2.29.1.6  If the Independent Adjudicator issues a Determination that Contractor has achieved Critical Milestone Substantial Completion or Tunnel Complex Substantial Completion, such Determination shall constitute and be deemed to be a Critical Milestone Substantial Completion Certificate or Tunnel Complex Substantial Completion Certificate, as applicable, provided, however, that Owner may submit such Determination to be resolved *de novo* and without regard to the Determination pursuant to Section 18.1 of this Contract.

\*              \*              \*

11.2.1 <u>Changes Initiated by Contractor</u>.

11.2.1.1  As soon as Contractor becomes aware, and in any event within fifteen (15) Days, of any circumstance that Contractor has reason to believe may constitute a Change, Contractor shall issue to Owner a "Change Order Notice". Each Change Order Notice shall include documentation sufficient to enable Owner to determine:

(a) the conditions creating the possibility of a Change;

(b) the impact that the Change is likely to have on the Contract Price, if any;

(c) the impact that the Change is likely to have on the timely achievement of the Project Schedule, if any;

(d) the actions that Contractor is taking and/or planning to take to mitigate the cause of the Change and impact to the Project Schedule and the Contract Price for the events described in Section 11.3; and

(e) any other information that Owner may request in connection with such Change.

11.2.1.2  As soon as reasonably practicable, and in any event within forty-five (45) Days, after the date Contractor becomes aware of any circumstance that Contractor has reason to believe may constitute a Change, Contractor shall deliver to Owner an updated Change Order Notice with respect to such circumstance.

11.2.1.3  If Contractor fails to deliver to Owner (a) a Change Order Notice within fifteen (15) Days after Contractor knew or should have known about the applicable circumstance or (b) an updated Change Order Notice in accordance with Section 11.2.1.2, then, in either case, notwithstanding anything in this Article 11 to the contrary, Contractor will be deemed to have waived any right to receive a Change Order based upon such circumstance.

11.2.1.4  No later than fifteen (15) Days after Contractor submits an updated Change Order Notice in accordance with Section 11.2.1.2, the Parties shall meet and discuss in good faith such Change Order Notice, including Contractor's initial estimate of the cost of the applicable Change.

11.2.1.5  Owner may, but except as provided in Section 11.3, shall not be

obligated to, issue a Change Order pursuant to a timely delivered Change Order Notice. In the event that Contractor fails to fulfill any of its obligations under Sections 11.2.1.1 or 11.2.1.2, Owner shall have no obligation to issue a Change Order. In the event that Contractor disputes Owner's decision not to issue a Change Order pursuant to a timely delivered Change Order Notice, such dispute shall be resolved in accordance with Section 2.29.1.

\*                    \*                    \*

11.6    <u>Continued Performance Pending Resolution of Disputes</u>.  Notwithstanding, and pending resolution of, any Dispute with respect to a Change, Contractor must proceed, upon written notice from Owner, with the performance of any Work associated with the disputed Change.

\*                    \*                    \*

18.1    <u>Generally</u>.  If a dispute arises between the Parties regarding the application, interpretation, enforceability, validity, performance or breach of this Contract or matters arising therefrom or relating thereto, whether sounding in contract, tort, unfair competition, law, equity, or any other legal form (a "<u>Dispute</u>") (but excluding any Section 2.29 Dispute as defined in Section 2.29.1, which shall be subject to Article 18 solely to the extent and in the manner set forth in Section 2.29.1.5), then each Party shall appoint a senior executive officer and each such senior executive officer shall confer or meet in person as soon as reasonably practicable and use commercially reasonable efforts to attempt to resolve such Dispute in good faith within thirty (30) Days. Notwithstanding the foregoing, either Party may, at any time, require that such Dispute be submitted to, resolved solely by, and be determined exclusively by, final binding arbitration that shall proceed in accordance with the rules and jurisdiction of the International Chamber of Commerce (the "<u>ICC</u>") then in effect.

\*                    \*                    \*

18.11   <u>Obligations Continue</u>.  Subject to the terms of this Contract, including but not limited to Section 2.29.1.5, notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Contract, unless the Parties otherwise mutually agree in writing.

## Annex VI
## Strabag Letter of Credit Provisions

The Debtors and Strabag agree to include provisions (the "Strabag LC Provisions") in the Definitive Documentation relating to the 1L Secured Obligations to be filed with the Plan Supplement (which, pursuant to the terms of this RSA, shall be negotiated and agreed as among the Debtors, the Senior Lenders, and Strabag as a condition to the Effective Date of the Plan), which provisions shall be reasonably acceptable to the Debtors, Strabag, and the Senior Lenders, and shall provide, *inter alia*, that any proceeds from draw(s) of any Strabag letter of credit, will be deposited and held exclusively in the insurance proceeds and compensation account, or a designated subaccount thereof (as set forth in the offshore accounts agreement). Moreover, the Strabag LC Provisions will stipulate that all such funds will be required to be used exclusively (i) to cure the alleged breach or rectify the alleged performance issue for which the funds were drawn or, in the case of liquidated damages, in accordance with the terms of the Offshore Accounts Agreement (as defined in the Common Terms Agreement), and (ii) with the prior consent of required Senior Lenders (which capitalized term will be agreed in the definitive documentation but in any event will exclude Strabag) in consultation with the Independent Engineer, and in accordance with other existing conditions regulated in the Common Terms Agreement. In case the draw is eventually held to be wrongful by a final and binding decision rendered in accordance with Section 18.1 of the Tunneling Contract, amounts still remaining in said account shall be promptly returned to the Contractor, without prejudice to any other rights or remedies of Contractor.

The Debtors shall also include the Strabag LC Provisions in any proposed order to be submitted to the Bankruptcy Court in connection with a request for authority to assume the RSA (the "RSA Assumption Proposed Order"). The RSA Assumption Proposed Order shall also provide that, in the event Strabag believes there has been a wrongful draw on an applicable Strabag letter of credit prior to effectiveness of the Plan, the automatic stay shall be lifted to the extent necessary to permit Strabag to pursue its rights under Section 18 of the Tunneling Agreement; provided, however, that any dispute shall be adjudicated exclusively pursuant to Section 18 of the Tunneling Agreement, without derogation from any existing right of Strabag to seek any relief consistent with the terms of the Tunneling Agreement.

The parties have also agreed to execute along with the other Definitive Documentation the amendments to Sections 2.29 and 11.2 of the Contract, which shall be consistent with the terms of this RSA and in the form attached as Annexes IV and V to the RSA . The Debtors further agree to assume the Tunneling Contract, as so amended, upon emergence from chapter 11, as provided for in the Plan.

## **EXHIBIT F**

**Financial Projections**

### **Financial Projections**

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to holders of Claims or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Financial Projections for the years 2022 through 2070 (the "Projection Period"). The Financial Projections are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Alto Maipo and Its Debtor Affiliates* (the "Disclosure Statement"), to which these Financial Projections are attached as **Exhibit F**.

AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to, (a) changes in hydrology resources in Chile; (b) short and long term energy spot prices in Chile, which are defined by the balance of supply and demand; (c) decarbonization of the Chilean energy matrix; (d) global oil, natural gas, and other commodity pricing; (e) applicable laws and regulations; (f) interest rates and inflation; (g) performance of the power purchase agreement with Minera Los Pelambres; (h) severe or unseasonable weather; and (i) technical and operating performance of the Debtor's operating assets. Additional information regarding these uncertainties are described in Article VI of the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the reorganized Debtors' future performance.

**A.** **General Assumptions**

**i.** **Overview**

Alto Maipo's primary business purpose is the construction and operation of a large run-of-river hydroelectric project (the "Project") in the Andes Mountains, approximately 30 miles southeast of Santiago, Chile. Construction of the Project is currently expected to reach commercial operation by March 31, 2022.

### ii.    Methodology

The Projections are prepared on a consolidated basis for the Reorganized Alto Maipo Debtors upon the Plan Effective Date and have been prepared using accounting policies that are materially consistent with those applied in the Alto Maipo Debtors' historical financial statements and projections.

The Projections incorporate assumptions related to certain economic and business conditions during the Projection Period. These assumptions are based on industry experience, projected industry supply, demand and capacity indicators and estimated movement of the market where Alto Maipo's operating assets reside. The Projections were prepared utilizing commodity prices, plant dispatch and generation assumptions, fuel costs, among other assumptions, developed by Alto Maipo's management.

### iii.    Plan Consummation

The Financial Projections are based on, and assume the successful implementation of, the Reorganized Debtors' business plan. The Financial Projections assume that the Plan will be consummated in May 2022.  Both the business plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, the assumptions may not fully account for the uncertainty and disruption of business that may accompany a restructuring in bankruptcy court. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the period of the Financial Projections will likely vary from the projected results. These variations may be material.  Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtors to achieve the projected results of operations.

In deciding whether to vote, to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

### B.    **Principal Assumptions for the Financial Projections**

### i.    Revenue

Alto Maipo's revenue includes contracted revenues, system balance and revenues during commissioning.

Contracted revenues are derived from the long-term power purchase agreement ("PPA") to sell energy to a Chilean mining company (Minera Los Pelambres) beginning with the commencement of operations date (the "COD"), which is expected to occur by March 31, 2022, and lasting until June 30, 2040. Contracted revenues include both energy and capacity charges, with energy and capacity prices and volumes considered as per the PPA's terms and conditions.

Alto Maipo's merchant revenue projections are based on Management's expectation of the evolution of the Chilean energy market, specially regarding to energy demand, hydrology scenarios, system expansion, decarbonization and long-term energy prices. Long-term energy prices are projected based on the estimated balance of supply and demand of energy in Chile, which will depend on several factors such as system demand, system expansion, decarbonization of the energy matrix, natural gas availability and coal, crude oil and LNG prices, among others. Total energy generation of the Project is estimated based on the average historical hydrology of the 10-year period between 2011 and 2020.

The Company's management projections are based on the assumption that COD occurs by March 31, 2022; however, Alto Maipo started generating revenues during the commissioning, starting in January 2022.

### ii.    Maintenance Cost

Maintenance Cost includes the major maintenance and inspections that are expected to be made to the tunnels of Alto Maipo periodically, which include a complete dewatering of the tunnels in 2027 and inspections every two years. It also includes the programmed and corrective maintenance program, which is projected on a monthly basis. The amounts of these costs are projected based on Management experience on other similar projects adjusted for inflationary expectations.

### iii.    Operating Expenses

Operating Expenses include plant operating expenses as well as the payment of water rights and transmission tolls (including transmission and sub-transmission systems' tolls). Plant operating expenses are composed of operating and maintenance ("O&M") materials, minor tools, instruments, personnel cleanliness, work clothing personnel protection and third-party services (mainly meltdown personnel). Plant operating expenses and transmission tolls amounts are projected based on Management experience on other similar projects and adjusted for inflationary expectations. Projected water rights are based on estimated volume of energy generation and energy prices.

### iv.    Administrative Expenses

Administrative Expenses are primarily composed of Alto Maipo's senior management expenses, social community programs, commercial licenses, property taxes and other administrative expenses. Projected Administrative Expenses are based primarily on Management experience on other similar projects adjusted for inflationary expectations.

### v.    Shared Service Agreements during Operation

Shared Service Agreements during Operation includes expenses related to services provided by the parent company, AES Andes, for the operation and maintenance of Alto Maipo following the completion of construction. Shared Service Agreements during Operation are based on the following contracts: Lease of Shared Facilities Agreement and Operation and Maintenance Agreement. The agreements consider the payment of O&M fees, commercial and administrative services fees, and technical support fees, among others. Projected expenses are based on contract terms adjusted for inflationary expectations.

### vi.    Insurance Expenses

Insurance Expenses include the cost of the insurance of the assets during the operation of Alto Maipo. The projected amount is based on standard market prices and adjusted for inflationary expectations.

### vii.    Income Tax

Income tax payable is forecast to be zero over the projection period due to large net operating losses at Alto Maipo.

### viii.    Depreciation

Depreciation of the property, plant and equipment includes the financial depreciation of the land and other fixed assets, including tunnels, civil works, power stations, transmission system and other fixed assets, depending on its expected life.

### ix.    VAT Recovery

VAT Recovery reflects the retrieval by Alto Maipo of a VAT credit accrued during the course of construction, amounting to $32 million over the period from 2022-2024.

### x.    Working Capital

Working capital assumptions are based on changes in accounts receivable, accounts payable, and other current assets and liabilities. Projected balances are based on the projected cash conversion cycle of the Company's specific assets and liabilities.

### xi.    Capital Expenditures

Capital Expenditures are related to investments in the property, plant and equipment of Alto Maipo during the construction of the project. Although the construction is complete and the Project will reach commercial operation by March 31, 2022, there are pending amounts of capital expenditures in 2022 and 2023. No Capital Expenditures are assumed thereafter, given maintenance costs are treated as expenses.

### xii.    AES Andes Shared Services

AES Andes Shared Services are expenses related to certain contributions by AES Andes

whose payment is deferred until the full repayment of the senior debt in 2052. AES Andes Shared Services includes: capacity compensated to AES Andes and energy compensated to AES Andes, as Alto Maipo will use part of the water flows that would otherwise be available to other AES Andes facilities (i.e. Maitenes, Maitenes Auxiliar, Volcán and Queltehues); and transmission line investment, as AES Andes authorizes Alto Maipo to use AES Andes' transmission system in connection with the Project, so it can inject the energy generated to the Sistema Eléctrico Nacional. Capacity compensated to AES Andes, energy compensated to AES Andes and transmission line investment are items included in the Contracted Revenues, System Balance and Shared Services Agreements lines of the income statement, respectively. Given that these expenses are not paid until the repayment of the senior debt, they are treated as an adjustment to the EBITDA of Alto Maipo until they become payable in 2053.

## Income Statement Detail

| (US$ in Millions) | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | (...) | 2050 | (...) | 2060 | (...) | 2070 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contracted Revenues | 68.0 | 95.7 | 97.0 | 100.2 | 102.2 | 98.5 | 107.8 | 110.9 | 113.0 | 116.4 | 117.6 | 121.4 | 123.7 | 127.0 | 129.3 | 133.2 | 134.5 | 138.9 | 80.0 | | 22.9 | | 28.0 | | 34.1 |
| System Balance | (2.9) | 32.0 | 25.4 | 25.4 | 23.5 | 24.0 | 23.6 | 24.0 | 22.6 | 23.8 | 24.4 | 24.2 | 23.9 | 24.5 | 27.1 | 26.9 | 27.0 | 28.5 | 47.4 | | 98.2 | | 119.7 | | 145.9 |
| Revenues During Constr. | 9.3 | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Revenues** | 74.4 | 127.7 | 122.4 | 125.6 | 125.8 | 122.5 | 131.4 | 134.9 | 135.7 | 140.3 | 142.0 | 145.6 | 147.6 | 151.5 | 156.4 | 160.1 | 161.5 | 167.4 | 127.5 | | 121.1 | | 147.7 | | 180.0 |
| Revenue Growth | n.a. | 72% | (4%) | 3% | 0% | (3%) | 7% | 3% | 1% | 3% | 1% | 3% | 1% | 3% | 3% | 2% | 1% | 4% | (24%) | | (5%) | | 22% | | 22% |
| Maintenance Costs | (4.3) | (5.8) | (6.0) | (6.2) | (6.3) | (6.3) | (5.9) | (6.1) | (6.2) | (6.3) | (6.5) | (6.6) | (6.7) | (6.9) | (7.0) | (7.2) | (7.3) | (7.5) | (7.7) | | (9.4) | | (11.5) | | (13.4) |
| Operating Expenses | (2.1) | (2.6) | (2.3) | (2.4) | (2.4) | (2.5) | (2.5) | (2.5) | (2.4) | (2.6) | (2.7) | (2.5) | (2.5) | (2.6) | (2.8) | (2.8) | (2.9) | (3.0) | (2.1) | | (1.4) | | (1.8) | | (2.1) |
| Administrative Expenses | (2.3) | (3.0) | (3.1) | (3.1) | (3.2) | (3.3) | (3.4) | (3.5) | (3.6) | (3.7) | (3.8) | (3.9) | (4.0) | (4.1) | (4.2) | (4.3) | (4.4) | (4.5) | (4.6) | | (6.0) | | (7.7) | | (10.0) |
| Shared Services Agr. | (7.5) | (10.1) | (10.3) | (10.6) | (10.8) | (11.0) | (11.3) | (11.5) | (11.8) | (12.0) | (12.3) | (12.6) | (12.8) | (13.1) | (13.4) | (13.7) | (14.0) | (14.3) | (14.6) | | (17.9) | | (21.9) | | (26.7) |
| Insurance Expense | (12.4) | (16.8) | (17.1) | (17.5) | (17.9) | (18.3) | (18.7) | (19.1) | (19.5) | (20.0) | (20.4) | (20.8) | (21.3) | (21.7) | (22.2) | (22.6) | (23.1) | (23.6) | (24.1) | | (29.7) | | (36.2) | | (44.2) |
| **Total O&M and SG&A** | (28.5) | (38.4) | (38.9) | (39.3) | (39.7) | (40.7) | (41.5) | (41.8) | (42.7) | (43.5) | (45.6) | (46.3) | (47.4) | (48.4) | (49.6) | (50.7) | (51.8) | (52.9) | (53.1) | | (64.5) | | (79.1) | | (96.4) |
| **EBITDA** | 45.8 | 89.3 | 83.6 | 85.8 | 85.1 | 81.0 | 89.6 | 92.2 | 92.1 | 95.7 | 96.4 | 99.3 | 100.2 | 103.0 | 106.9 | 109.5 | 109.7 | 114.4 | 74.4 | | 56.6 | | 68.6 | | 83.6 |
| *EBITDA Margin* | 62% | 70% | 68% | 68% | 68% | 66% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 58% | | 47% | | 46% | | 46% |

## Unlevered Free Cash Flow Bridge Detail

| (US$ in Millions) | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | (...) | 2050 | (...) | 2060 | (...) | 2070 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 45.8 | 89.3 | 83.6 | 85.8 | 85.1 | 81.0 | 89.6 | 92.2 | 92.1 | 95.7 | 96.4 | 99.3 | 100.2 | 103.0 | 106.9 | 109.5 | 109.7 | 114.4 | 74.4 | | 56.6 | | 68.6 | | 83.6 |
| AESA Shared Services[1] | 10.7 | 12.2 | 11.0 | 11.4 | 11.6 | 10.9 | 10.9 | 12.2 | 11.9 | 12.7 | 13.1 | 13.3 | 13.4 | 14.1 | 14.9 | 15.4 | 15.7 | 16.4 | 16.4 | | 20.2 | | — | | — |
| **Adjusted EBITDA** | 56.5 | 101.6 | 94.6 | 97.2 | 96.7 | 91.9 | 101.5 | 104.4 | 104.0 | 108.4 | 109.5 | 112.6 | 113.6 | 117.2 | 121.7 | 124.9 | 125.4 | 130.8 | 90.8 | | 76.8 | | 68.6 | | 83.6 |
| Depreciation | (37.8) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (50.5) | (48.7) | | (43.6) | | (43.6) | | (34.5) |
| **Adjusted EBIT** | 18.7 | 51.1 | 44.1 | 46.7 | 46.3 | 41.4 | 51.0 | 53.9 | 53.5 | 58.0 | 59.0 | 62.1 | 63.2 | 66.7 | 71.3 | 74.4 | 75.0 | 80.3 | 42.0 | | 33.2 | | 25.0 | | 49.1 |
| Marginal Tax Rate | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | | — | | — | | — |
| Income Tax | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | | — | | — | | — |
| **EBT** | 18.7 | 51.1 | 44.1 | 46.7 | 46.3 | 41.4 | 51.0 | 53.9 | 53.5 | 58.0 | 59.0 | 62.1 | 63.2 | 66.7 | 71.3 | 74.4 | 75.0 | 80.3 | 42.0 | | 33.2 | | 25.0 | | 49.1 |
| Depreciation | 37.8 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 50.5 | 48.7 | | 43.6 | | 43.6 | | 34.5 |
| VAT Recovery | 5.3 | 17.0 | 9.6 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | | — | | — | | — |
| Change in NWC | (9.5) | 8.5 | 0.3 | (0.2) | (0.1) | (0.2) | 0.3 | (0.3) | 0.2 | 0.0 | (0.3) | 0.1 | (0.1) | (0.0) | 0.0 | (0.3) | (0.0) | (0.3) | 9.4 | | 0.0 | | 0.0 | | (0.1) |
| Capital Expenditures[2] | (65.3) | (1.1) | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | | — | | — | | — |
| **Unlevered FCF** | (13.0) | 126.0 | 104.4 | 97.0 | 96.6 | 91.7 | 101.8 | 104.2 | 104.2 | 108.5 | 109.2 | 112.7 | 113.6 | 117.1 | 121.8 | 124.5 | 125.4 | 130.5 | 100.2 | | 76.8 | | 68.6 | | 83.4 |

*Source: Alto Maipo's management projections.*
Notes:
(1)  AESA Shared Services corresponds to expenses included in Contracted Revenues, System Balance and Shared Services Agreements expenses that are not payable until the full repayment of the senior debt.
(2)  No Capital Expenditures during operation because the maintenance costs are reflected in the O&M.