**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No. 21-11507 (KBO) |
| | (Jointly Administered) |
| Debtors. | **Hearing Date: April 6, 2022 at 12:30 p.m. (ET)** |
| | **Related Docket Nos.: 314, 369, 402, 427, 430** |

**DEBTORS' OMNIBUS REPLY**
**IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER**
**(I) APPROVING THE DISCLOSURE STATEMENT; (II) APPROVING**
**SOLICITATION AND VOTING PROCEDURES, INCLUDING (A) FIXING THE**
**RECORD DATE, (B) APPROVING THE SOLICITATION PACKAGES AND**
**PROCEDURES FOR DISTRIBUTION, (C) APPROVING THE FORM OF THE**
**BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING,**
**AND (D) APPROVING PROCEDURES FOR VOTE TABULATION; (III)**
**SCHEDULING A CONFIRMATION HEARING AND ESTABLISHING NOTICE**
**AND OBJECTION PROCEDURES; AND (IV) GRANTING RELATED RELIEF**

Alto Maipo SpA ("Alto Maipo") and Alto Maipo Delaware LLC ("Alto Maipo Delaware"),

debtors and debtors in possession (together, the "Debtors" or the "Company") in the above-

captioned chapter 11 cases (these "Chapter 11 Cases") hereby submit this reply (this "Reply") in

support of the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II)*

*Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B)*

*Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of*

*the Ballots and Establishing Procedures for Voting, and (D) Approving Procedures for Vote*

*Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection*

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

*Procedures; and (IV) Granting Related Relief* (D.I. 369) (the "<u>Motion</u>") pursuant to sections

105(a), 1125, 1126, and 1128 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules

2002, 3003, 3017, 3018, and 3020 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

<u>Rules</u>"), and Rules 3017-1(a) and 3017-1(b) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

for entry of an order (i) approving the *Disclosure Statement for the Joint Chapter 11 Plan of*

*Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC Pursuant to Chapter 11 of the*

*Bankruptcy Code* (D.I. 314) (as amended, revised, modified, or supplemented from time to time,

the "<u>Disclosure Statement</u>");[2] (ii) approving solicitation and voting procedures with respect to the

*Joint Chapter 11 Plan of Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC*

*Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 313) (as amended, revised, modified or

supplemented from time to time, the "<u>Plan</u>"), including (a) fixing the Record Date, (b) approving

the Solicitation Packages and procedures for distribution, (c) approving the form of the Ballots and

establishing procedures for voting, and (d) approving procedures for vote tabulation;

(iii) scheduling a Confirmation Hearing and establishing related notice and objection procedures;

and (iv) granting related relief, and in response to the objections filed by the United States Trustee

for Region 3 (the "<u>U.S. Trustee</u>") (D.I. 427) (the "<u>UST Objection</u>") and the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") (D.I. 430) (the "<u>Committee Objection</u>", and together with

the UST Objection, the "<u>Objections</u>").  In further support of the Motion, the Debtors respectfully

state as follows:

---

[2]     Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.      The Plan and Disclosure Statement are the result of months of hard-fought, arms'-length negotiations among the Debtors and their prepetition secured lenders, DIP Lender and key equity holders, and reflect the terms of the fifth amendment to the Restructuring Support Agreement ("RSA"), which is the product of those negotiations.  The transactions contemplated in the Plan would provide sufficient liquidity to allow the Debtors to operate their business during and after these Chapter 11 Cases and would effectuate a substantial de-leveraging of the Debtors' capital structure.

2.      The Debtors filed their initial Plan on February 28, 2022 (D.I. 313), and shortly thereafter filed their initial Disclosure Statement (D.I. 314).  On March 22, 2022, the Debtors filed revised versions of the Plan (D.I. 401) and Disclosure Statement (D.I. 402), which included the addition of the Liquidation Analysis, Valuation Analysis and Financial Projections as exhibits to the Disclosure Statement.  The Debtors have filed further revised versions of the Plan and Disclosure Statement contemporaneously herewith.

3.      While the Debtors respectfully submit that the Disclosure Statement contained adequate information as originally filed, they have nonetheless revised the Disclosure Statement in a good faith effort to resolve several of the arguments raised in the Objections and to reflect the terms of the fifth amendment to the RSA dated April 1, 2022 (the "Fifth Amended RSA").  Many of the issues raised in the UST Objection are well taken by the Debtors and have been incorporated into the Disclosure Statement and the Plan.  The bulk of the other issues raised in the Objections have been mooted by modifications reflected in the Plan and Disclosure Statement, pursuant to recent revisions to the compromise struck by the Debtors and the parties to the RSA.  Specifically, under the terms of the Fifth Amended RSA and Plan, the Claims of unsecured creditors will be

Unimpaired, and Allowed General Unsecured Claims will be paid in full as a result of additional contributions made by the Debtors' DIP Lender and majority equity holder. The remaining issues raised in the Objections are either addressed by supplemental disclosures or are confirmation issues that can be reserved for the Confirmation Hearing.

4.       As detailed in the Debtors' *Reply in Support of Debtors' Motion for Entry of an Order Authorizing Debtors to Assume Restructuring Support Agreement* (the "<u>RSA Reply</u>"), filed contemporaneously herewith, the RSA has been further amended since the filing of the third amended version of the RSA (which was filed as Exhibit B to the *Debtors' Motion for Entry of an Order Authorizing Debtors to Assume Restructuring Support Agreement* (D.I. 341) on March 7, 2022). The Debtors have also since secured the support of Strabag for the Plan. These revisions are memorialized in the Fifth Amended RSA. As of the date of this Reply, the lenders who have executed the Fifth Amended RSA represent approximately 75% of the Debtors' senior secured indebtedness.

5.       The Objections also raise certain arguments that the Disclosure Statement should not be approved because it contemplates a Plan which is patently unconfirmable. The chief version of this argument – that the Debtors lack sufficient support for their Plan to guarantee sufficient votes in its favor – is mooted by the support of lenders holding approximately 75% of the Debtors' prepetition secured debt. The balance of these arguments, as raised in both Objections, are resolved by certain revisions that the Debtors have reflected in the Plan, including (i) unimpairing Class 4 General Unsecured Claims; (ii) providing an opt-in mechanism for the third-party releases; (iii) carving the Debtors out from the third-party releases in Section 9.3(c) of the Plan so that the Debtors are only giving releases under Section 9.3(a) of the Plan, and (iv) clarifying the scope of exculpation of the Exculpated Parties (as defined in the Plan). The Debtors submit that with these

amendments, all of which inure to the benefit of creditors, there remains no bar to entry of an order

approving the Disclosure Statement.

## ARGUMENT

### A. The Adequacy of the Disclosure Statement Should be Evaluated in Accordance with Sections 1125 and 1129 of the Bankruptcy Code.

6.     Courts evaluate the sufficiency of disclosure statements in accordance with the

plain language of Sections 1125 and 1129 of the Bankruptcy Code.   In the face of this, the

Committee Objection contains an unprecedented argument that the Disclosure Statement should

be adjudged under a heightened standard of review, Committee Objection at ¶ 33-42, but fails to

cite any cases in which a court has applied such heightened scrutiny in the disclosure statement

context, and otherwise cites no authority for this requested deviation from sections 1125 and 1129

of the Bankruptcy Code, which, as discussed further herein below, articulate the standard of review

of disclosure statements.   Indeed, as the Committee Objection acknowledges, courts apply the

heightened entire fairness standard, as applicable, when considering the propriety of

"transactions".  Committee Objection at ¶ 34 (heightened scrutiny applies "when the transaction

[in] question is with an insider of the debtor…").  While it is true that the Disclosure Statement

*relates to* the Debtors' proposed Plan, which itself embodies the terms of the RSA, the Disclosure

Statement is obviously not itself a "transaction" or agreement.   The Committee Objection cites

only to cases involving consideration of an actual transaction or agreement.   For example, the *In

re Family Christian* case involved an objection to a sale process that resulted in the sale of

substantially all of the debtors' assets to an insider.  *See In re Family Christian, LLC, et al.*, 533

B.R. 600, 606 (Bankr. W.D. Mich. 2015); Committee Objection at ¶ 34.  The *In re Innkeepers* case

involved objections to a prepetition plan support agreement.  *See In re Innkeepers USA Trust, et

al.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *see also In re eToys, Inc.*, 331 B.R. 176, 200

(Bankr. D. Del. 2005) ("In this case, there was no transaction between the Debtors and ADA. Therefore, the Court need not determine if the dealings between the two were fair"); Committee Objection at ¶ 34.

7.     The Committee's assertion that the Court should use something other than the standard of review clearly prescribed by Sections 1125 and 1129 of the Bankruptcy Code in evaluating the adequacy of the Disclosure Statement is little more than a distraction, and should be disregarded.  To the extent that the Committee intends to request that the Court apply a heightened standard of review to the Debtors' motion seeking authority to assume the RSA, the Debtors have addressed that argument in their RSA Reply.

**B.  The Disclosure Statement Provides Adequate Information Regarding the Plan.**

8.     Section 1125 of the Bankruptcy Code requires that a chapter 11 plan proponent provide "adequate information" regarding the plan, *see* 11 U.S.C. § 1125(a), (b), which courts have glossed as information "of a kind and in sufficient detail that a reasonable and typical investor can make an informed judgment about the plan…" *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) (quoting 11 U.S.C. § 1125 Notes of Committee on the Judiciary, S.R. No. 95-989); *see also* 11 U.S.C. § 1125(a)(1) (containing a similar definition of "adequate information").

9.     Bankruptcy courts have broad discretion when determining what information is necessary based on the facts and circumstances of each case.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *see also Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) (observing that the "legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a)" (citing H.R. Rep. No. 95-595, at 408−09 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6365)); *see also Cadle Co. II v. PC Liquidation Corp. (In re PC Liquidation*

*Corp.)*, 383 B.R. 856, 865 (E.D.N.Y. 2008) (noting that the court has wide discretion to determine, on a case-by-case basis, what constitutes adequate information).  Courts should apply a "practical approach," *see Kirk*, 82 B.R. at 682 (quoting H.R. Rep. No. 95-595, at 408−09), and relevant factors include "the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information," 11 U.S.C. § 1125(a)(1), as well as "the need for relative speed in solicitation and confirmation [and] the need for investor protection."  H.R. Rep. No. 95-595 at 408−09.

10.     Courts also recognize that a hearing on the adequacy of the disclosure statement is not the appropriate venue for raising confirmation issues or objections related to the substance of a plan.  *See In re Cardinal Congregation I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("[T]he Court will not look behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement.").  Objections to confirmability of the Debtors' Plan may be raised in connection with confirmation; such arguments should, and will, receive a full hearing at the Confirmation Hearing.  *See, e.g., Phoenix Petroleum*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings.").  Accordingly, section 1125(a) does not require a plan proponent to include voluminous disclosures from a particular creditor that outline its forthcoming plan objections or call confirmation of the plan itself into question.  *See In re Stanley Hotel, Inc.*, 13 B.R. 926, 930 (Bankr. D. Colo. 1981) ("overburdening a proponent's disclosure statement with information . . . meaningful to lawyers alone may result ultimately in reducing [it] to an overlong, incomprehensible, ineffective collection of words to those whose interests are to be served by the disclosure.").

11.     With these parameters in mind, the Debtors respectfully submit that the Disclosure Statement, as amended, contains adequate information in respect of each category that is challenged by the Objections, including with respect to the third-party releases, the Debtors' relationship with AES Andes and AES Andes' proposed treatment under the Plan, litigation claims relating to water rights, the hydrology of the Maipo Valley, and the Debtors' ability to meet their debt obligations under the Plan.

i.  <u>The Disclosure Statement Contains Adequate Information Regarding the Plan Releases.</u>

12.     The U.S. Trustee has asserted that the Disclosure Statement does not identify parties who will provide or receive the third-party releases, and that the Disclosure Statement fails to "adequately disclose why the Debtors will be releasing the DIP Lenders and Strabag, if they vote to accept the Plan."  UST Objection ¶¶ 28-31.

13.     The Debtors submit that the Disclosure Statement provides ample information regarding the items with which the U.S. Trustee takes issue and that the UST Objection addresses the substance of the releases rather than whether adequate information was provided.  As such, these objections are premature and should be addressed at the Confirmation Hearing.  *See Phoenix Petroleum*, 278 B.R. at 394.

14.     In the Disclosure Statement, the Debtors have disclosed (i) the categories of parties to whom third-party releases will be provided, (ii) the categories of parties by whom they will be given, and (iii) the scope of such releases.  Disclosure Statement, Article VI; *see also* Exhibit A to the Disclosure Statement.  As is typical in the context of a chapter 11 plan, the Plan and the Disclosure Statement each identify the "Released Parties" as the beneficiaries of the third-party releases, which definition includes certain "Related Parties" of the entities listed therein.  Parties are on notice of the breadth of the releases and may brief at the Confirmation Hearing any

8

remaining objections related to such releases. Requiring the Debtors to somehow list every Related Party of the Released Parties in the Disclosure Statement, as the UST Objection appears to request, would be at odds with the generally accepted practice in this district, be unduly burdensome, would overcomplicate the Disclosure Statement, and would be of marginal benefit to the Holders of Claims entitled to opt into the releases.

15.     Additionally, the Disclosure Statement provides sufficient information regarding the nature of the disputes between the Debtors and Strabag, and the consideration being provided by Strabag and the DIP Lender in exchange for such releases, which warrant the release of such parties. The RSA, which is attached to the Disclosure Statement as Exhibit E, outlines the need for and direction of these Chapter 11 Cases. The Disclosure Statement identifies and describes the history and the nature of the Debtors' disputes with Strabag, and the RSA provides additional detail. Disclosure Statement, Article I and Article V; *see also* RSA, attached to the Disclosure Statement as Exhibit E. The Plan is intended to effectuate a resolution of Strabag's claims against the Debtors' estates, which resolution includes the releases contained in the Plan in favor of Strabag and the DIP Lenders. To include every detail of the resolution would require a complete recitation of the terms of the RSA, which would simply be redundant and would "compound [the] disclosure statement for the sake of a lawyer's notion of completeness." *Stanley Hotel*, 13 B.R. at 933.

           ii.   The Disclosure Statement Contains Adequate Information Regarding How the Debtors Intend to Satisfy the Absolute Priority Rule.

16.     The U.S. Trustee asserts that the Disclosure Statement should describe how the Plan complies with the absolute priority rule, asserting that "the Plan proposes that unsecured creditors will receive no distribution, while equity will be cancelled and reissued to AES Andes…" UST Objection at ¶ 38. The U.S. Trustee argues that "the Debtors have not adequately described how

the proposed new value contribution constitutes sufficient consideration in exchange for the new equity." *Id*. As the U.S. Trustee notes, the absolute priority rule provides "that senior classes of claims be fully satisfied before distributions may be made to the junior classes or interests retained by equity holders…" *Id.* at ¶ 37.

17.     Pursuant to the Fifth Amended RSA, the Plan and Disclosure Statement now provide that Class 4 General Unsecured Claims will be Unimpaired.  Plan, Article III, Section 3.3; Disclosure Statement, Article II, Section 2.2(c)-(d).  Therefore, the Debtors respectfully submit that this change to the treatment of Class 4 General Unsecured Claims resolves the U.S. Trustee's objection with respect to additional disclosures addressing compliance with the absolute priority rule.  In any event, the Disclosure Statement has been further amended to quantify the value of various contributions being provided by AES Andes pursuant to the RSA and in conjunction with the restructuring.  Disclosure Statement, Article I and Article II, Section 2.2(c)-(d).

iii.    The Debtors Have Provided Adequate Disclosure Concerning Issues Associated with the Cross-Border Nature of These Chapter 11 Cases.

18.     The Committee asserts that (1) the Disclosure Statement lacks adequate information about whether the Debtors intend to seek recognition of these Chapter 11 Cases in Chile and, if so, whether a Chilean court is likely to grant recognition; and (2) the "Debtors must commit now to whether they will seek recognition of the Plan in Chile in order to demonstrate that the Plan is feasible."  Committee Objection at ¶¶ 53, 55.  In furtherance of this argument, the Committee makes assertions that "[i]n the absence of recognition, the Plan may fail" because "certain provisions of the Plan, including the discharge of certain Chilean claims and the disposition of certain Chilean property, may be problematic, and lead to collection activities that potentially could threaten the feasibility of the plan."  *Id.* at ¶¶ 55–56.

19.     At the outset, these objections should be substantially, if not entirely, mooted by the revised treatment of General Unsecured Claims in the Debtors' Plan, which provides that all such Claims will either (i) be paid in full in cash, (ii) ride through Unimpaired (to boot, with the benefit of contribution support from the Debtors' DIP Lender, AES Andes), or (iii) be expunged and disallowed or estimated at zero for purposes of distribution (all of which creditors have submitted themselves to this Court's jurisdiction by filing Proofs of Claim). Disclosure Statement, Article II, Section 2.2(c)-(d). The nature of the obligations that the Debtors do seek to compromise, and the profile of those impaired creditors, are such that there is no significant risk that material claims or obligations will be asserted in contravention of this Court's orders, in Chile or anywhere else. Not only are a majority of the Holders of such obligations parties to the RSA who have agreed to the terms of the Debtors' Plan, but the Debtors believe that substantially all of the secured lenders are funds or international financial institutions with significant ties to the United States, and there is little concern that such institutions would willfully and knowingly violate an order of this Court.

20.     Further, the Debtors believe that the Proofs of Claim that the Committee appears to be primarily concerned with—largely Proofs of Claims filed by environmental activists in astronomical and wholly unsupported amounts—are meritless, and have added additional disclosures in the Disclosure Statement to this effect. Disclosure Statement, Article IV, Section 4.2(b). The allegations underlying several of these Claims have already been addressed in well-reasoned decisions from Chilean courts, and there is little reason to believe that, should these parties continue to pursue these Claims in Chile (and, in many instances, the Debtors believe the parties are not permitted to pursue claims of this nature as a matter of Chilean law), a subsequent Chilean court would rule differently than this Court or prior Chilean courts that have addressed

these Claims.  In any event, entry of orders expunging or estimating at zero the Claims of these parties—who again have submitted themselves to the Court's jurisdiction—is a condition precedent to effectiveness.  Plan, Article VIII, Section 8.1(k).

    iv. <u>The Disclosure Statement Contains Adequate Information about the Debtors' Relationship with AES Andes and AES Andes's Proposed Treatment Under the Plan.</u>

  21. The Committee asserts that the Disclosure Statement fails to provide adequate details about the Debtors' relationship with AES Andes or support for AES Andes's receipt of releases and new equity under the Plan.  Committee Objection at ¶ 61.  On the contrary, the Disclosure Statement is replete with information regarding the Debtors' corporate and capital structure.  Disclosure Statement, Article IV; *see also* Exhibit D to the Disclosure Statement.  The Disclosure Statement further contains significant detail about the value AES Andes has agreed to contribute to the Debtors' estates, including its agreement to forego repayment in full of the DIP Credit Facility at confirmation and instead to roll such obligations into an upsized and below-market Exit Financing Facility, to provide a $15 million Working Capital Facility on favorable terms, to make contributions of up to $300,000 to satisfy Allowed General Unsecured Claims, and to provide a contribution of up to $10 million to satisfy asserted claims by Parque Arenas SpA and Compañía Industrial El Volcan S.A.  Disclosure Statement, Article IV, Section 4.2(d), and Article VI.  All of this emphatically justifies the benefits to be received by the Debtors and their creditors from AES Andes under the Plan.   In any event, the Debtors have provided even further disclosure concerning the value of these contributions, which makes clear that such contributions range in value from $4.5 to $28.8 million.  Disclosure Statement, Article I.

  22. Further, the Committee makes the unsubstantiated suggestion that simply because AES Andes is a controlling shareholder and therefore an insider of Alto Maipo, it could somehow be liable for construction delays or project overruns.  Committee Objection at ¶¶ 62–63.  The

Committee has cited no basis—nor could it—for its assertion that AES Andes should or could be held liable for delays in construction of the Project or associated costs.  The reasons for these delays and costs, such as the need to replace the former contractor for the Project and unanticipated construction difficulties, are well documented in the Disclosure Statement and in the record of these Chapter 11 Cases.  *See* Disclosure Statement, Article V; *see also Declaration of Javier Dib in Support of Chapter 11 Petitions and First Day Motions* (D.I. 13) at ¶ 28 *et seq*.  The fact that the majority of the secured lenders, who collectively have the largest economic stake of the Debtors' stakeholders in these Chapter 11 Cases, have agreed to support the RSA and have never raised similar objections or concerns provides the strongest possible evidence for the fact that this argument lacks merit.  The Committee has provided no reasoned basis for its suggestion that any liabilities for the Debtors' project should be borne by other entities, and the Debtors respectfully submit that no further disclosure or revision on this point is necessary or appropriate.

> v.  The Disclosure Statement Contains Adequate Information With Respect to Litigation Claims and Water Rights.

23.     The Committee argues that the Disclosure Statement does not sufficiently address Proofs of Claim filed against the Debtors related to asserted water rights, which the Committee asserts "may be existential in nature to the reorganized Debtors' operations," and that the Debtors "should provide a schedule of all relevant litigation claims."  Committee Objection at ¶ 69.  As amply described in the Disclosure Statement, the Debtors vehemently disagree with this characterization of the litigation claims that certain entities have asserted in the past (all of which have been dismissed thus far), and threaten to assert in the future (none of which, in the Debtors' view, have any more merit than those already asserted and dismissed).  Even so, the Debtors have revised the Disclosure Statement to include descriptions of each of the most monetarily significant Proofs of Claim filed in these Chapter 11 Cases relating to water rights:  those filed by Maite Birke

Abaroa for $2 billion, Comunidad de Aguas Canal El Manzano for $1 billion, Christian Becker Matkovic and Bruno Bercic each for $80 million, respectively, and Gemma Contreras Bustamante for $25 million.  *See* Disclosure Statement, Article IV, Section 4.2(b).  As discussed in Section B(iii) above and as explained in the Disclosure Statement, the Debtors do not believe that any of these Proofs of Claim are meritorious or valid, and entry of orders expunging or estimating such Claims at zero is a condition precedent to effectiveness of the Plan, such that the Debtors do not believe they are likely to impact the feasibility of the Debtors' reorganization.

> vi.  The Disclosure Statement Contains Adequate Information Regarding the Hydrology of the Maipo Valley

24.     The Committee Objection asserts that the Debtors "fail to provide hydrology details" and must provide "hydrological details which will enable creditors to determine if the Debtors' plan is feasible."  Committee Objection at ¶¶ 4, 71.  The Debtors submit that Disclosure Statement contains sufficient detail regarding historic hydrological trends over the past 59 years, as well as predictions of future hydrological conditions.  Disclosure Statement, Sections 5.1, 7.4(d).  Nonetheless, in a good faith effort to respond to the Committee Objection, the Debtors have added additional explanations regarding the hydrology assumed in the Financial Projections to the Disclosure Statement. [3]  *See* Disclosure Statement, Article V, Section 5.1, note 5.

> vii.  The Disclosure Statement Contains Adequate Information Regarding the Debtors' Ability to Meet Their Debt Obligations Under the Plan

25.     The Committee argues that the Disclosure Statement lacks sufficient detail about the Debtors' ability to meet their debt obligations under the Plan in service of Section 1129(a)(11) of the Bankruptcy Code, which requires that a debtor demonstrate that confirmation of a plan will not be followed by liquidation or further financial reorganization.  Committee Objection at ¶ 73.

---

[3]     Further disclosures beyond those added to the Disclosure Statement would implicate commercially sensitive information and present competitive concerns.

Specifically, the Committee asserts that the Debtors do not provide *any* "analyses, illustration[s] or projection[s]" demonstrating the Debtors' ability to meet any payment obligations contemplated under the Plan, and noting that the Financial Projections attached as Exhibit F to the Disclosure Statement merely contain a projected income statement and cash flow bridge.   Committee Objection at ¶ 73; *see also* Disclosure Statement at D.I. 402, pg. 362.   However, the Committee fails to mention the preceding six pages of analysis of the Financial Projections, *see id.* at pg. 355–361, and makes no reference to the Liquidation Analysis attached to the Disclosure Statement at Exhibit B, *id.* at pg. 173, or the Valuation Analysis attached to the Disclosure Statement at Exhibit C, *id.* at pg. 179.   The Committee cites to no precedent where a higher level of detail than this was included, let alone required.   The terms and details of the Debtors' debt service obligations under the Plan are clearly described in the Restructuring Term Sheet, attached as Annex III to Exhibit A to the RSA, which in turn is attached to the Disclosure Statement as Exhibit E.   The Restructuring Term Sheet outlines in detail the amount and terms of such obligations.   *See* Disclosure Statement at D.I. 402, pg. 246–250, 254 (describing at length the terms for the New 1L Debt and the Exit Financing Facility, which will be the only hard debt service obligations of the reorganized Debtors).   These details, in conjunction with the Financial Projections, Liquidation Analysis, and Valuation Analysis, provide information more than sufficient to address the reorganized Debtors' ability to meet their debt obligations under the Plan.

26.   Relatedly, the Committee also requests that the Debtors' business plan, and accordingly the Financial Projections, be updated to reflect the terms of the third amendment to the RSA.   In light of the execution of the Fifth Amended RSA, the principal changes that could be made are relatively minor and would have a *de minimis* impact on the analysis and reporting in the Financial Projections.   These changes include unimpairment of Class 4 General Unsecured Claims

(which will require payments of up to $300,000.00 and are to be funded by AES Andes in any event) and the payment of certain professional fees.  The Committee Objection does not support a finding that updates on these points are sufficiently material to require further disclosure.

### C. The Arguments Raised in the Objections Regarding the Confirmability of the Plan Are Either Moot Or Fail to Meet the High Burden of Establishing that the Plan is Patently Unconfirmable.

27.     Both the U.S. Trustee and the Committee argue that the Disclosure Statement should not be approved because of concerns related to the confirmability of the Plan.  As detailed herein, the majority of these arguments are rendered moot by the execution of the Fifth Amended RSA and revisions to the Disclosure Statement and Plan.  With respect to the remaining such arguments, these arguments seek prematurely to litigate confirmation issues.

28.     A disclosure statement is subject to rejection only if a plan is patently unconfirmable or cannot be confirmed as a matter of law.  *In re Quigley Co.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007).  "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012).

29.     The Objections have failed to meet the high bar that, as a matter of law, the Plan violates the requirements for confirmation under the Bankruptcy Code, including feasibility and the absolute priority rule, because the factual record is disputed or undeveloped.  *See, e.g.*, *In re Quigley Co.*, 377 B.R. at 118–19 (overruling objections that a plan was patently unconfirmable because whether non-settling claimants were receiving unequal treatment was a confirmation issue that required an evidentiary hearing); *In re Annicott Excellence, LLC*, 258 B.R. 278, 283 (Bankr. M.D. Fla. 2001) (objection based on absolute priority rule was premature because the rule and its new value exception need not be considered "[u]ntil such time as an impaired, unsecured class

actually rejects the Plan, triggering a cramdown"); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 332-333 (E.D. Pa. 1987) (determining that it was not necessary to address absolute priority rule or best interests of creditors test other than to conclude that the disclosure statement properly explained those concepts, since debtors might not seek confirmation under § 1129(b)).

30.     In its objection, the Committee argues that the Disclosure Statement should not be confirmed because it reflects the terms of a Restructuring Support Agreement, as embodied in the Plan, that "fails by its own terms" as it lacks sufficient creditor support. Committee Objection at ¶ 46 ("Absent 2/3 support, the RSA and thus the Plan fails by its own terms."). As detailed herein, and since the filing of Committee Objection, the lenders who have executed the Fifth Amended RSA represent approximately 75% of the Debtors' indebtedness. Accordingly, the Debtors respectfully submit that the Committee's argument is moot or has otherwise been resolved. Similarly, the Debtors submit that the unimpairment of Class 4 General Unsecured Claims in the Plan and Disclosure Statement moots the Committee's argument that the Plan unfairly discriminates against General Unsecured Creditors and is therefore patently unconfirmable, Committee Objection ¶ 49.

31.     The Committee also argues that the assumption and enforceability of the MLP PPA pose a challenge to feasibility. Committee Objection at ¶ 31. The Debtors believe the PPA is clear that MLP has an ongoing obligation to continue to perform under the PPA absent a finding that there has been a breach, and there is no basis for any party or court to find otherwise. To the extent that MLP, as part of its efforts to evade this Court's jurisdiction, brings a subsequent action in Chile seeking a finding to the contrary, the Debtors will establish at the Confirmation Hearing that (i) any such action would take years to resolve (during the pendency of which MLP is required to continue performing under the express terms of the PPA), and (ii) there is little risk that a Chilean

court would issue such an order contrary to the findings of this Court that are conditions precedent to Plan effectiveness.  In any event, this feasibility challenge should be raised in connection with confirmation because, as the Committee acknowledges, the Debtors' motion to assume the PPA remains pending before this Court.  Committee Objection at ¶ 31.

32.     The U.S. Trustee, on the other hand, raises a number of arguments directed at confirmability of the Plan that relate to the Plan's compliance with the absolute priority rule, the permissibility of the third-party releases, potentially duplicative releases by the Debtors in Sections 9.3(a) and 9.3(c) of the Plan, and the scope of the exculpation provision.  While these arguments are plainly confirmation objections, the Debtors believe they have resolved these objections by revising the Plan and the Disclosure Statement to: (i) treat Class 4 General Unsecured Claims as an Unimpaired class; (ii) provide an opt-in mechanism for the Third Party Releases;[4] (iii) carve the Debtors out from the third-party releases in Section 9.3(c) of the Plan so that the Debtors are only giving releases under Section 9.3(a) of the Plan, and (iv) limit exculpation of the Exculpated Parties (as defined in the Plan) solely to the extent that the Exculpated Parties are acting in their capacity as fiduciaries of the Debtors' estates.

**D.   No Further Changes to the Solicitation Procedures Timeline Are Necessary.**

33.     The Committee has requested that the Debtors file the Plan Supplement at least 21 days prior to the Confirmation Hearing.  Pursuant to an informal objection received from the U.S. Trustee, the Debtors have agreed to propose April 27, 2022 as the deadline to file the Plan Supplement.  This date is at least 21 days prior to the proposed Confirmation Hearing date of May

---

[4]     The Committee asserts that the "Plan provides for releases of the Debtors and other interested parties . . . by claimants that, inter alia, are eligible to vote to accept or reject the Plan or have been deemed to accept the Plan." Committee Objection ¶ 75.  The Committee asserts that the Plan should clearly state that "Class 4 creditors are not bound by such releases." The Plan and the related solicitation materials have been revised to clarify that Class 4 creditors are Releasing Parties to the extent they opt to grant the third-party releases, which the Debtors submit resolves this objection.  Plan, Article I, Section 1.1.

12, 2022, rendering the Committee's request moot. Moreover, the Committee now has, pursuant to the terms of the RSA, a schedule of those General Unsecured Claims that will be addressed through assumption and cure. The Debtors' respectfully request that the Court establish **April 27, 2022** as the deadline to file the Plan Supplement in Annex I of the proposed Disclosure Statement Order.

34. The Committee also requests that the Court deny the Debtors' request to set the Confirmation Hearing for May 12, 2022 and instead asks the Court to delay the Confirmation Hearing to at least May 23, 2022. Committee Objection ¶ 77. As justification for its request, the Committee cites the "significant plan related discovery that will need to occur" and the "Dentons global partner meeting" which it notes is scheduled for mid-May. *Id.*

35. First, at the outset, the Debtors submit that much of the confirmation discovery that the Committee may have contemplated has been mooted by the revised structure of the Plan, which provides for unimpairment of General Unsecured Claims. Second, despite the fact that the Committee has had ample time and opportunity to do so, the Committee has failed to serve the Debtors with any formal confirmation-related discovery requests as of the filing of this Reply (with the exception of a request for the Committee's advisors to spend three days touring the Project, the relevance of which the Committee has not been able to articulate). The Plan has been on file and available to the Committee since February 28, 2022, and the Committee has apparently been preparing to serve the Debtors with its formal written discovery requests for nearly a month; during the hearing on the Committee's *Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order, Pursuant to Federal Bankruptcy Rule 2004, Directing the Production of Documents* (D.I. 301) on March 4, 2022, in response to the Court's inquiry as to when Committee intended to serve written discovery requests, the Committee's counsel responded

that "we are preparing to make those formal [requests] and to seek the court's authorization or order instructing the debtors to produce." *See* March 4, 2022 Hr'g Tr. at 26:10–12, attached hereto at Exhibit A.  Given the Committee's unexplained delay in serving its discovery requests despite having ample time to do so, a delay in the Confirmation Hearing is unwarranted.  Finally, the Debtors respectfully submit that the Court should not entertain the Committee's suggestion that the Court, the Debtors, and all other parties involved in this matter should bend the proposed Confirmation Hearing schedule to accommodate an internal meeting at Dentons, a purported conflict raised for the first time in the Committee Objection.

## **CONCLUSION**

For the reasons set forth herein, the Debtors therefore respectfully submit that the Objections should be overruled and the Motion should be granted.

Dated:  April 4, 2022          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                               */s/ Sean T. Greecher*
                               Pauline K. Morgan (No. 3650)
                               Sean T. Greecher (No. 4484)
                               S. Alexander Faris (No. 6278)
                               Rodney Square
                               1000 North King Street
                               Wilmington, Delaware 19801
                               Telephone:     (302) 571-6600
                               Fax:                (302) 571-1253
                               Email:             pmorgan@ycst.com
                                                 sgreecher@ycst.com
                                             afaris@ycst.com

                               - and -

                               CLEARY GOTTLIEB STEEN & HAMILTON LLP
                               Richard J. Cooper (admitted *pro hac vice*)
                               Luke A. Barefoot (admitted *pro hac vice*)
                               Jack Massey (admitted *pro hac vice*)
                               One Liberty Plaza
                               New York, New York 10006
                               Telephone:     (212) 225-2000

Fax:          (212) 225-3999
Email:        rcooper@cgsh.com
              lbarefoot@cgsh.com
              jamassey@cgsh.com

*Counsel for the Debtors and Debtors-in-Possession*

**Exhibit A**

**March 4, 2022 Hearing Transcript**

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 21-11507 (KBO)
 4   ALTO MAIPO DELAWARE, LLC,   .
     et al.,                     .  (Jointly Administered)
 5                               .
                                 .  Courtroom No. 3
 6                               .  824 Market Street
                     Debtors.    .  Wilmington, Delaware 19801
 7                               .
                                 .  Friday, March 4, 2022
 8   . . . . . . . . . . . . . . .  2:00 p.m.

 9                   TRANSCRIPT OF ZOOM HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
10                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Sean T. Greecher, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
13                             Rodney Square
                               1000 North King Street
14                             Wilmington, Delaware 19801

15                             -and-

16                             Luke A. Barefoot, Esquire
                               CLEARY GOTTLIEB STEEN
17                                & HAMILTON, LLP
                               One Liberty Plaza
18                             New York, New York 10006

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Lisa Brown, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Official
Committee of
Unsecured Creditors:          Kevin M. Capuzzi, Esquire
                              BENESCH, FRIEDLANDER, COPLAN
                                & ARONOFF, LLP
                              1313 North Market Street
                              Suite 1201
                              Wilmington, Delaware 19801

                              -and-

                              Sam J. Alberts, Esquire
                              DENTONS US, LLP
                              1900 K Street, NW
                              Washington, DC 20006

1                                   INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:    Emergency Motion of the Official Committee of      4
4               Unsecured Creditors for Entry of an Order,
                Pursuant to Federal Bankruptcy Rule 2004,
5               Directing the Production of Documents
                [D.I. 301, 2/24/22]
6
                Court's Ruling:                                   8
7

8    Transcriptionist's Certificate                             16

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings commenced at 2:00 p.m.)

2                THE COURT:  Good afternoon, everyone.

3                We are gathered for a hearing in the Alto Maipo

4    cases.  Hopefully, you can hear and see me okay.

5                Thank you for all gathering on an expedited basis.

6    It's the committee's motion, so I'll turn the podium over to

7    counsel for the committee.

8                MR. CAPUZZI:  Good afternoon, Your Honor.

9                For the record, Kevin Capuzzi, Benesch

10   Friedlander, proposed counsel for the committee, along with

11   the Dentons firm.

12               Your Honor, before I turn the podium over to Mr.

13   Alberts, who will be making the argument for the committee, I

14   just wanted to thank you for shortening notice and having

15   this expedited hearing for us.  And just as one matter of

16   housekeeping, shortly before noon today, the Committee did

17   file a reply, along with a motion for leave to file a reply.

18   I just wanted to make sure that that got to Your Honor.

19               THE COURT:  It did get to me by way of debtors'

20   counsel.  So, I appreciate debtors' counsel sending it over

21   to me.

22               Mr. Capuzzi, in the future, as soon as you file,

23   feel free to email it to Ms. Lopez and she'll ensure that it

24   gets to me quickly.

25               MR. CAPUZZI:  Of course, thank you.

1            THE COURT:  But thank you for brings that to my

2    attention.

3            MR. CAPUZZI:  Yes, and thank you, Mr. Greecher.

4            MR. GREECHER:  Yep.

5            MR. CAPUZZI:  Your Honor, Mr. Alberts will be

6    presenting.

7            THE COURT:  Okay.  Thank you.

8            Good afternoon --

9            MR. BAREFOOT:  Your Honor, I --

10           THE COURT:  -- Mr. Alberts.

11           MR. BAREFOOT:  I apologize.  I don't mean to

12   interrupt.  The debtors just wanted to provide at an

13   appropriate time, a brief, overall status update to Your

14   Honor and we'll take your direction on when you would like us

15   to do that.

16           THE COURT:  Okay.  We'll do that at the end, then.

17           MR. BAREFOOT:  Thank you, Your Honor.

18           THE COURT:  Great.  Thank you.

19           Mr. Alberts?

20           MR. ALBERTS:  Yes, good afternoon, Your Honor.

21           And thank you for hearing us on an expedited

22   basis.  With me today is Jeffrey Miller, my partner, who has

23   worked on this matter with us.

24           Somewhat good news to report, Your Honor.  I think

25   we have narrowed the issues.  Assuming the Court is to grant

 1  the order, I think that the parties have agreed to language

 2  as to the scope of the production and have agreed, also, that

 3  with respect to the issue of the information being shared

 4  with committee members, that at this time, it will be for

 5  professional-eyes only.  If the parties are able to reach an

 6  accord, we won't have a need for another hearing, but we

 7  would like to set another date in the future, the near future

 8  that we could be heard on that matter with the Court's

 9  indulgence.

10          So, really, the focus now is whether or not the

11  Court will issue an order, and what I would really define it

12  as, is a comfort order for the debtors to deliver what they

13  believe is perhaps their most valuable contract.  I think it

14  is, in their view, the most valuable contract for the

15  committee to review.  This is the power purchase agreement

16  that the debtors are a party to.

17          Purportedly it has a confidentiality provision in

18  it that restricts, or the debtor believes, restricts them

19  from producing it voluntarily to the committee.  They do

20  appreciate, and I appreciate their appreciation, that the

21  Committee really needs to understand this power purchase

22  agreement and its terms.  Not only for its own -- on its own

23  terms, but also, because apparently, the debtors built their

24  business model off of it.  And so, there are documents that

25  relate to the power purchase agreement that we have not

1  received, critical documents.

2          And I think, Your Honor, given the Committee's

3  duty, given the fact that there are bylaws in place that the

4  debtor has negotiated with the Committee, that apply to the

5  Committee, and at this point, it will be for professional-

6  eyes only, it don't see a valid basis to deny the Committee's

7  request to have this information turned over to it in the

8  manner that we've requested and, you know, pending a final,

9  you know, a subsequent hearing on whether or not it can be

10  shared beyond the Committee's professionals.

11          And just to be clear, the Committee's

12  professionals are Dentons, the Benesch firm, and Alvarez &

13  Marsal.

14          THE COURT:  Okay.

15          MR. ALBERTS:  And, Your Honor, I'm happy to

16  address any questions, but at this point, I think it's

17  probably best for me to turn it over to debtors' counsel to

18  respond.

19          THE COURT:  That would be great.  Thank you.

20          MR. BAREFOOT:  Good afternoon, Your Honor.  For

21  the record, again, Luke Barefoot from Cleary Gottlieb, for

22  the debtors-in-possession.

23          Your Honor, on the point of whether to grant the

24  motion, I will be very brief.  The debtors are between a rock

25  and a hard place.  On the one hand, they absolutely

1   understand the fiduciary duties of the Committee and their

2   professionals and their interests in reviewing the terms of

3   what is an important asset; on the other hand, given the

4   commercially sensitive terms of that power purchase

5   agreement, the power purchase agreement has requirements for

6   the debtors to oppose any action by any party to obtain

7   access to it, and the counterparty, Minola Los del Hombres

8   (phonetic) has declined to provide that consent.  At the same

9   time as we described in our disclosure statement, MLP has

10  taken other actions against the debtors that we believe to be

11  willful violations of the automatic stay and so we need to be

12  particularly vigilant to protect that asset.

13          So, in accordance with the requirements of the

14  contract, we have objected and we will take Your Honor's

15  guidance.

16          THE COURT:  Okay.  Well, listen, I think it's

17  abundantly clear that good cause has been established and

18  that the agreement needs to be produced to the Committee.

19  The real issue is to what level it needs to be produced to

20  the Committee and it seems as if you've reached an agreed-

21  upon interim solution, which is to provide it to the

22  Committee for, at the current time, at professional-eyes

23  only.  So, with that agreement in place, I certainly am

24  prepared to enter an order, ordering the production.

25          In terms of a follow-up hearing, Mr. Alberts, do

1   you just want a placeholder hearing because the debtors and

2   yourselves are in the process of negotiating something

3   further or is this going to be a contested matter?  What are

4   we looking at for a further hearing?

5           MR. ALBERTS:  If it goes to a further hearing, I

6   believe it will be contested.  There may be evidence.  I

7   would suspect that there would be evidence, so we would need,

8   probably, I would hazard to say 45 minutes, maybe an hour.

9   It could be shorter than that, but, you know, these things

10  tend to take more time.  I'm hopeful that that won't be

11  needed.

12          But I think in order to, given how compressed the

13  timeline already is, something towards the end of next week

14  or early the following week would probably be best for the

15  committee.  We have not had a chance to discuss a particular

16  date with the debtor, but I think, you know, we're all on the

17  phone or on the Zoom now and we can come up with something.

18          THE COURT:  Okay.  I am out of the office from

19  the 11th through the 21st.  We have an omnibus hearing on

20  the 24th, so we'll -- that's the option, okay.

21          If it's an emergency, I'm happy to ask one of my

22  colleagues to preside over the matter.  We are duty judges,

23  as you know, and there's one scheduled for this month, so he

24  or she can handle the matter, to the extent that it's

25  absolutely needed, although, I don't like to burden my

1  colleagues with my cases.  So, it really is up to your

2  judgment as to whether that would be necessary.  And we're

3  happy to entertain it and you can reach out to Ms. Lopez and

4  she can coordinate that to the extent that you need a hearing

5  while I am away.

6          MR. ALBERTS:  Okay, Your Honor.  And you said you

7  were out from the 11th, which is next Friday?

8          THE COURT:  Right.  Until the -- through the 21st.

9          MR. ALBERTS:  Your Honor, I would, if you do have

10 time on the 10th, I would like to set it for then; again, if

11 the Court has that time.  We have not had a chance to confer

12 further with our Committee members about the situation and we

13 think we can do that fairly quickly, and my hope is that we

14 can resolve things, one way or the other, fairly quickly, as

15 well.

16         MR. BAREFOOT:  Your Honor, I apologize, but

17 the 10th, I have a very lengthy evidentiary hearing before

18 Judge Garrity, here in New York, so I don't believe I can do

19 that day.

20         THE COURT:  Is the 9th too early, because I'm open

21 all day.

22         MR. BAREFOOT:  I'm afraid that's not going to give

23 us enough time to what otherwise might be resolving this and

24 is going to force everyone into proceeding to what would be a

25 contested matter.

1          THE COURT:  Okay.  Well, that's it.  Those are the

2    two options:  so, it's the 9th or the 10th, because I'm out.

3          So, do you have another colleague that could

4    handle the hearing, Mr. Barefoot?

5          MR. BAREFOOT:  If Your Honor wants to hear it on

6    the 10th, I'm sure I can arrange that.

7          THE COURT:  Okay.  It's really the only option if

8    you want to see me before vacation, okay.  I don't -- if you

9    feel like it's too quick, at that time, you can cancel the

10   hearing and we'll hear it on the 24th.

11         But why don't we schedule it for 11:00 a.m. on

12   the 10th and hopefully, a colleague of yours, Mr. Barefoot,

13   could handle the hearing and I'll take direction from the

14   parties, to the extent that the 10th needs to come off or can

15   come off the calendar.  Okay.

16         MR. ALBERTS:  Your Honor, I think we have a form

17   of order that we would like to upload and if the Court would

18   be -- with the Court's indulgence, we would appreciate it if

19   it could be entered as soon as practical because I understand

20   that once it is, that the Committee's professionals will be

21   able to receive that document today.

22         THE COURT:  Okay.  That's --

23         MR. BAREFOOT:  Your Honor, I just think we'll work

24   with Mr. Alberts as quickly as we can after this hearing on

25   just a few remaining points on the form of order, but we'll

1  do that as quickly as we can.

2          THE COURT:  Okay.  Well, I would appreciate if the

3  parties need to get it entered today, it needs to be uploaded

4  and sent to chambers no later than 4:00 today.  It's the last

5  possible time, okay.  So, I don't have staff after that to

6  enter the order.

7          MR. ALBERTS:  Thank you, Your Honor, for letting

8  us know that and for indulging us.

9          THE COURT:  I'm happy to do that.  And one thing

10 I'll note when looking at the Committee bylaws in connection

11 with getting prepared for this hearing, I'll note that the

12 confidentiality restrictions and the bylaws are limited, I

13 think, temporally; to six months or so after, perhaps, the

14 conclusion of this case.  And I imagine that if this document

15 is as confidential and sensitive as the parties, I think,

16 rightly say it is, and eventually the parties do agree that

17 the committee members should be able to see the document, I

18 think there needs to be some tweaking to that bylaw provision

19 to ensure that they can never reveal the contents of it.

20         Mr. Barefoot, you're shaking your head and

21 Mr. Alberts, you're shaking your head, so I think there is

22 some acknowledgment here that we might have to tweak that

23 confidentiality provision.

24         MR. BAREFOOT:  Your Honor, that is one of the

25 concerns that the debtors have with Committee member access

1  and hopefully we don't have to burden you with evidence on

2  the others, but we'll continue to discuss with Mr. Alberts.

3          THE COURT:  Okay.  Excellent.  Well, I will leave

4  it in your more capable hands.

5          I will look for the form of order under

6  certification of counsel.

7          Mr. Capuzzi, to speed things up, please email it

8  over to Ms. Lopez as soon as it gets filed and she will make

9  sure it gets to me so I can approve it and have it entered

10 today.

11         MR. CAPUZZI:  I'll do that.  Thanks, Your Honor.

12         THE COURT:  Okay.  Wonderful.

13         Well, we'll stand adjourned.  Thank you, all.

14 Have a great -- oh, I apologize, Mr. Barefoot.  Go ahead, you

15 have a status conference.

16         MR. BAREFOOT:  If you wouldn't mind, Your Honor,

17 I'll be brief.

18         THE COURT:  That's okay.

19         MR. BAREFOOT:  So, I just wanted to take the

20 opportunity of being before you to prove you a brief, overall

21 status update on the cases and the progress towards a plan of

22 reorganization.

23         As we described at the February 16th hearing, the

24 debtors have been in the process of negotiating with the

25 senior secured lenders to address amendments to the terms of

1  the restructuring support agreement in light of a near-term

2  liquidity hole that the debtors projected to begin later this

3  year.  Through a combination of deferrals of interest and

4  other payments and upsizing of the exit financing facility

5  and certain other tweaks, we now have solved that.  So, to

6  that end, I am pleased to report that on Monday, we filed a

7  plan and disclosure statement.

8         Attached to that plan and disclosure statement was

9  an amended restructuring support agreement.  At the time we

10  filed that, we only had signature pages in hand from holders

11  of approximately 39 percent of the senior secured claims.

12  Since that time, we've continued to receive additional

13  signature pages and we are now just shy of signatures from

14  holders of approximately 50 percent of the senior secured

15  claims.

16         We remain in discussions with additional senior

17  secured lenders and we expect to continue to increase that

18  percentage to where it was previously, if not more.

19         THE COURT:  And refresh my recollection of where

20  it was previously.  We were in, like, the 70s, 70 percents?

21         MR. BAREFOOT:  The high 70s -- 78.

22         THE COURT:  Okay.  All right.

23         MR. BAREFOOT:  And in terms of coming attractions,

24  Your Honor, the RSA has a milestone for the debtors to file a

25  motion to assume the RSA by Monday, March 7th.  So, expect

1  that Your Honor will see that on the docket next week and we

2  will set that down for a hearing on the March 24th omnibus.

3            THE COURT:  Okay.  Great.

4            MR. BAREFOOT:  That was all I wanted to provide,

5  Your Honor, by way of an update, so thank you for allowing

6  this.

7            THE COURT:  Okay.  Thank you very much.  I

8  appreciate that update.

9            Okay.  Well, I wish you all a nice weekend.  I

10  hope everyone is well, and I look forward to -- well, I don't

11  look forward to seeing you next week, because that would mean

12  that it's contested, but I do look forward to seeing you if

13  we do have a hearing.

14            So, with that, I will leave you be.  I'll look for

15  the order, as well.  Take care and we'll consider the hearing

16  adjourned.

17            COUNSEL:  Thank you, Your Honor.

18        (Recess taken at 2:15 p.m.)

19  (Proceedings resumed at 3:31 p.m.)

20            THE COURT:  Good afternoon, parties.  This is

21  Judge Owens.  We are back on the record in Alto Maipo.

22            I understand an issue has arisen -- oh, it doesn't

23  appear as if --

24            MR. ALBERTS:  Your Honor, I believe you're on

25  mute.

1          THE COURT:  Can you hear me now?

2          UNIDENTIFIED SPEAKER:  Yes.

3          THE COURT:  Good afternoon, everyone.  This is

4   Judge Owens.  We are back on the record in Alto Maipo.

5          My understanding is there has been a -- the

6   parties are at loggerheads on the terms of the order.  So you

7   have a few minutes with me.  Let's work it out.

8          MR. ALBERTS:  Thank you, Your Honor.  Your Honor,

9   the form of the order that we had submitted today -- other

10  than the language concerning professional eyes only we had

11  reached an agreement, or so we thought, with the debtors,

12  debtor's counsel.

13          In the event that the court were to grant to the

14  underlying relief, again, you know, what we were attempting

15  to do is if the court granted the relief have a form of order

16  that could be entered so documents could be exchanged.  The

17  timing is very sensitive, Your Honor.

18          The language actually that is at issue was

19  originally based on changes that the debtors made.  At

20  bottom, I think the debtors are concerned about using a

21  phrase documents and wish to limit it much more narrowly.  We

22  understood the issue had been resolved.

23          I can go through the chain of language that it

24  occurred starting with the debtor's proposed change and

25  working our way up, but I think that, Your Honor, at bottom,

1  our concern is that the limitation, as the debtors would like

2  to proceed, is limited just to the PPA and communications

3  between the PPA parties and business plans.

4         There is an instance just yesterday where we found

5  that our financial advisors had been waiting on a

6  presentation that the debtors had made to the lenders last

7  year that the meeting among the parties had been delayed by

8  days so that that presentation could be delivered and it

9  wasn't.  And the reason it wasn't is because somebody just

10 didn't do it.  So we had a meeting yesterday where a key

11 document could not be discussed because it wasn't delivered.

12 I feel like we are playing a game of whac-a-mole.

13        Let me get right to the language that is at issue

14 and then have Your Honor rule on it.  We had proposed

15 language and the debtor's suggested the following change,

16 this would be in Paragraph 2 of the order or what was then

17 the order, the debtors are directed to produce (A), they have

18 added (A), a copy of the PPA and (B) any other documents or

19 agreements related to the PPA or reflecting its terms that

20 the debtors would be, otherwise, precluded from producing in

21 connection with the confidentiality restrictions articulated

22 in Section 17 of the PPA.  That is the debtor's language.

23        MR. BAREFOOT:  Your Honor, would it be helpful if

24 we just showed the two competing versions of the language

25 because I don't want to take up a lot of Your Honor's time.

1      MR. ALBERTS:  Well I think its -- Your Honor, if I

2  might, I would like to go through the history a little bit

3  and then we can show the competing language.

4      THE COURT:  I actually have limited time.  So can

5  we just -- just walk me through what the dispute is.

6      MR. ALBERTS:  The dispute is the debtors would

7  like to strike the reference to the documents, to documents

8  and limit it to just communications between the PPA parties.

9      MR. BAREFOOT:  Your Honor, can I just read the two

10  versions just so you have it clear.

11      THE COURT:  That would be great because I think

12  the version I'm working off was -- I'm working off the order

13  that was attached to the reply.  So I see there's part A, B

14  and C.  So I am a little lost.

15      MR. BAREFOOT:  So the dispute, Your Honor, is in C

16  and the version that the committee would like to have entered

17  is the very broad any other documents or agreements related

18  to the PPA.  Then it goes on.

19      THE COURT:  Okay.

20      MR. BAREFOOT:  Our formulation is any other

21  agreements related to the PPA or communications between the

22  parties to the PPA.

23      THE COURT:  Okay.

24

25

1    MR. ALBERTS:  Your Honor, just so the record is

2  clear the language in C comes from the debtors.  They

3  produced that yesterday.

4    MR. BAREFOOT:  Your Honor, that was in the context

5  of a settlement communication that we don't think under 408

6  is appropriate to hold us to or to disclose, but I would just

7  like, when Your Honor would like, to have an opportunity to

8  just discuss the merits of the two approaches given the

9  context of the motion.

10    THE COURT:  I think that's fine.  Let me hear from

11  Mr. Alberts as to why you think it's necessary to have the

12  language that you would like and then I will hear from Mr.

13  Barefoot on that.

14    MR. ALBERT:  Okay. I think, Your Honor, the

15  language that we would like is that there are -- we know, at

16  least, of the business plans that have not been turned over

17  to the committee by virtue of the existence of references to

18  the PPA.  We also know that there were presentations made to

19  the lenders.  We don't know what other communications or

20  documents have been produced that are based upon the PPA's

21  that may be relevant to the debtor's restructuring.

22    The way that the debtor would like to limit the

23  documentation is to the PPA's themselves, any business plans

24  that reference it or communications between the PPA parties.

25  So if they communicated something to, say, the lenders that

1  reference the PPA or information about it that would not fall

2  into this production.

3           So one of the suggestions, frankly, I made after

4  the fact was if you're worried about confidential

5  information, privileged information, rather, we could limit

6  it that way.  We would like to see a privileged log, but if

7  you're concern is not privilege it's more, you know, broader

8  then that then that's a problem because this is your own

9  language.

10          We relied on that when we came to court today.

11  The only time -- we did not know that the debtors did not

12  have an issue with this language until after the hearing when

13  I saw an email that was sent at 2:17, so just prior to the

14  hearing, from debtor's counsel saying, you know, we have a

15  nit effectively.  You know, I did not see that before the

16  hearing.  If I had seen it before the hearing we would have

17  argued about it during the hearing.

18          Your Honor, I think that, you know, we are getting

19  asked to digest a tremendous amount of information in a very

20  limited time and every time, you know, it has been difficult

21  enough to get this key document.  We were patient.  We waited

22  for the debtors to try to resolve things with the

23  counterparty, more than a week waiting on that.  We finally -

24  - when we heard that it wasn't going to be resolved we filed

25  our motion on an expedited basis.

1          We have been trying to work with the debtor

2   consensually.  I am afraid though that, you know, we are

3   going to continue to go down this path. I hope not, but at

4   least with respect to this key document, the PPA, I think we

5   deserve simply more than the document itself, the business

6   plans and communications between those parties.

7          THE COURT:  May I ask, because we're here on 2004

8   which is good cause, I understand the basis for fact finding

9   at this point, but we're not in a litigation posture yet as

10  far as I understand.  As I mentioned at the last hearing it's

11  clear to me that we are going to be in a litigation posture.

12  I hope not, but it's clear to me that that is where we are

13  headed.

14         So why do the debtors have to give you,

15  essentially, everything that you -- anything and everything

16  that could pertain to the PPA at this point in time without

17  having a concrete understanding of, number one, what the

18  actual contested issues are and how they would need to

19  protect those documents.

20         MR. ALBERTS:  Your Honor, we have -- this is

21  their, by their own admission, key document to the

22  restructuring.  They have communicated with many parties.

23  They have set this plan up.  Let's remember how this case was

24  filed.  You know, it was filed the day after they created a

25

1  Delaware entity to put it in to this court; not in Chile.

2  And as --

3          THE COURT:  So move to dismiss.  I mean, I

4  certainly understand your positions and I'm not trying to

5  light a fire to those positions, but why do you need them?

6          MR. ALBERTS:  Because, Your Honor, there is -- the

7  debtor's restructuring is all predicated on this PPA.  There

8  are -- we don't know who else they have communicated with.

9  Are there alternative lenders, for example, that they have

10  communicated the PPA information with.  We don't know if

11  there were proposed negotiations or negotiations concerning

12  the PPA about modifications to it.  We don't know any of it

13  and so a 2004 is a broad -- I mean, it's broader than

14  traditional discovery, it's a fishing expedition.

15          We didn't intend to make this a request to get

16  every single document conceivable, it was limited to the PPA

17  and the impact of that PPA on the debtor's restructuring.  So

18  I don't think it is very broad and I think that our offer to

19  limit it to non-privileged information was something that the

20  debtors did not take us up on.

21          We're not trying to get at the debtor's privileged

22  information in terms of attorney/client work product, that is

23  not what this is about.  That is not what this dispute is

24  about.  It is about the PPA and what the debtors have done

25  with it, who they have shown it to and what negotiations may

1  have occurred as a result of this.  We understand that there

2  was delays in the RSA.  There have been changes to the RSA

3  and the PPA could be a factor in that.  We just don't know.

4      THE COURT:  Okay.  So it sounds as if -- I just

5  want to make sure I understand. It sounds as if your

6  targeting is not necessarily the PPA, but other related

7  conversations around the PPA or, excuse me, documents that go

8  to more than just the PPA.

9      MR. ALBERTS:  Well if something relates to the PPA

10 or refers to the PPA that is -- I can't imagine that there is

11 that many other documents.  The only example I can conceive

12 of at this point, because we know about it, was the

13 presentation made to the lenders which I don't know if it

14 contains information about the PPA, but we didn't get that

15 information like we should have.

16      I just don't want this language, which is intended

17 to really constrain what is produced to the PPA's, the

18 business plan and communications between the parties to the

19 PPA, to limit us from getting other documents that may be

20 relevant simply because they contain the PPA's information

21 and therefore can be used as a shield.

22      THE COURT:  Mr. Barefoot.

23      MR. BAREFOOT:  I will be very brief, Your Honor,

24 because I think much of what I said was covered by the

25 question you asked. I think you heard a lot of, in Mr.

1  Alberts's answers, we don't know. I think we don't know is

2  not cause shown under Rule 2004.  We understand Your Honor's

3  ruling on cause being shown for them to conduct this critical

4  analysis of the PPA, how it plays into the business plan and

5  we have also agreed, you know, any other agreements related

6  to the PPA or communications to the parties to the PPA.

7          This is not a traditional Rule 2004 order where

8  they're investing a claim or cause of action.  They were

9  simply trying to get access to these documents that the

10  debtors were hamstrung from getting to them.

11          A formulation that has any other documents related

12  to the PPA would be extremely burdensome for the debtors.  I

13  think it would, by its terms, require a full email file pull

14  and I'm sure this is a document that, you know, there have

15  been exchanges about or references to in emails over the past

16  decade.  It's really divorced that scope from the motivation

17  and the exercise that brought about the motion that is before

18  Your Honor.

19          I will just conclude by saying, obviously, this is

20  without prejudice to, in the future if there is cause shown,

21  them coming back and requesting more from Your Honor.

22          THE COURT:  Okay.

23          MR. ALBERTS:  Your Honor, I just have to reiterate

24  this is the debtor's language.  The debtor, you know,

25  provided that language to settle --

1          MR. BAREFOOT:  To settle.

2          MR. ALBERTS:  -- in preparation of resolving a

3    form of order if the court granted the relief.  We think that

4    it is important.  I mean, we have discussed -- the debtors

5    have filed their plan and disclosure statement.  We are in a

6    compressed period of time, this is the key document and there

7    have been negotiations with various parties.  We have seen

8    none of it.  I mean, I think that that is cause enough for

9    this court to grant the relief being requested.

10          THE COURT:  I feel like we're, essentially, here

11   on plan confirmation discovery, okay, disguised under Rule

12   2004. I'm not saying that's bad because we're on a compressed

13   timeframe and the plan has been filed.  I do think that that

14   also means that the parties have to work together and

15   typically this is atypical, okay.  I don't see 2004's. I see

16   informal document requests turned into then written formal

17   document requests and then we argue over the scope of it in

18   relation to the plan the committee's objection.

19          That is my problem here with the request because I

20   can't -- this request appears to be -- it's difficult for me

21   to determine the relevancy of the broad request and the

22   burden that it will put on the debtor.  So I am not willing

23   to authorize such a broad request at this point with no

24   context, and also just simply not enough information of what

25

1  exactly this request would entail for the debtors.  It sounds

2  as if it would be very broad in scope.

3         So I just feel as if parties need to work together

4  a little bit more.  I don't know what to tell you.  Do

5  informal document requests.  When do you imagine that you are

6  going to serve written discovery requests, Mr. Alberts?

7         MR. ALBERTS:  Well we have, Your Honor, done

8  informal written requests.  I mean there have been informal

9  requests since almost day two of this case.  A lot of

10  documents have not been produced and we are preparing to make

11  those formal and to seek the court's authorization or order

12  instructing the debtors to produce.  It's unfortunate that we

13  feel we are at that point, but we're getting there.

14         This was very narrow.  This was at to the PPA --

15         MR. BAREFOOT:  Yes.

16         MR. ALBERTS:  -- and documents related to the PPA

17  because this is their key asset, in their view, as to how

18  they are going to reorganize.  The compression of time is not

19  something that the committee has been the cause of, we are

20  reacting to it.  Recall that we filed the 2004 before the

21  debtors filed their motion.  So, you know, we did not have,

22  you know, a contested matter at that point.  We did it in a

23  way that, you know, the rules provided for.  Again, this was

24  the debtor's language.  They proposed this language as to

25  documents.

1        THE COURT:  Let's do this, because I feel like

2   this is going down an unproductive path, remove it from this

3   order, okay, keep it limited to what the debtors will agree

4   to so I can enter the order today.  I want you to talk

5   amongst yourselves in the upcoming days about a more

6   acceptable request for documents related to the PPA that is

7   perhaps more limited or has a proper scope, timeframe,

8   custodians -- I am not an expert in discovery, but try to

9   talk about what would be relevant and not as burdensome with

10  the debtor and then we will touch -- we will have the hearing

11  next week to talk about open issues with it because I fear

12  that if we don't decide this issue I am just going to get a

13  motion to compel and we will be right back here.

14       So give me the order today that is limited and

15  then talk amongst yourselves about whether you can come up

16  with something a little bit more narrow for the debtors and

17  then if there are disputes we can talk about those disputes

18  more concretely next week.

19       MR. ALBERTS:  Your Honor, with that in mind the

20  debtors did circulate a proposed order which, you know, given

21  Your Honor's ruling we would abide by.  There is additional

22  language that the U.S. Trustee requested to put in.  We will

23  have that done and also we would like there to be, at least,

24  a reference to the fact that, you know, the scope of

25  discovery will be heard.  We will come up with language, but

1  basically that the scope is not -- we're not precluded from

2  seeking broader scope and it could be heard on the next

3  hearing date which I believe is the 10th.

4       THE COURT:  Okay, that's fine.  We can even say

5  that we're having a continued hearing on the request for

6  documents related to the PPA and that hearing will be

7  scheduled next week.

8       MR. BAREFOOT:  Very good.

9       THE COURT:  Thank you all very much for this.  I

10  think it was helpful for me and for you.  Once you finalize

11  the order submit it under COC and have it promptly delivered

12  to Chambers by email and I look forward to seeing you all

13  next week and hopefully you will have a better understanding

14  what the scope of the disputes are, and the scope, quite

15  frankly, of the documents that are subject to the committee's

16  request.

17       (A chorus of "Thank you, Your Honor")

18       THE COURT:  Thank you all.  We will consider

19  ourselves adjourned.  Thank you.

20       (Proceedings concluded at 3:50 p.m.)

21

22

23

24

25

1                              CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 4, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25