## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alto Maipo Delaware LLC, *et al.*,[1] | Case No. 21-11507 (KBO) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF SECOND PLAN SUPPLEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ALTO MAIPO SPA AND ALTO MAIPO DELAWARE LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that, on March 1, 2022, the above-captioned debtors and debtors in possession (the "Debtors") filed the (i) *Joint Chapter 11 Plan of Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 313] (as revised at Docket Nos. 401 and 464, the "Plan") and (ii) *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 314] (as revised at Docket Nos. 402 and 465, the "Disclosure Statement") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that, on April 6, 2022, the Bankruptcy Court entered an order approving the adequacy of the Disclosure Statement [Docket No. 463].

**PLEASE TAKE FURTHER NOTICE** that, on April 21, 2022, the Debtors filed the plan supplement [Docket No. 523] (the "Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby submit this second plan supplement (the "Second Plan Supplement"), consisting of the following documents, each as may be amended, modified, or supplemented from time to time by the Debtor in accordance with the Plan as set forth below:

| Exhibit | Plan Supplement Document |
|---|---|
| C | Third Amended and Restated Common Terms Agreement |
| D | Secured 1L Indenture |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware).  The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

| E | Secured 2L Loan Agreement |
|---|---|
| F | Secured 2L Indenture |
| G | Third Amended and Restated Share Retention Agreement |
| H | Third Amended and Restated Offshore Accounts and Collateral Agency Agreement |
| I | Third Amended and Restated Onshore Accounts Agreement |
| J | Onshore Collateral Agency Agreement |
| K | VAT Loan Agreement |
| L | Secured Exit Loan Agreement |
| M | Secured Working Capital Facility Agreement |
| O | Amendment to Amended Strabag Tunneling Contract |
| P | Amendment to the Connection and Toll Agreement |
| Q | Amendment to the Energy and Capacity Losses Compensation Agreement |
| R | Amendment to the O&M Agreement |
| S | Amendment to the Share Facilities Agreement |
| T | Third Amended and Restated Offshore Security Agreement |
| U | Offshore Subsidiary Guaranty and Security Agreement |
| V | Amendment to Onshore Collateral Agency Agreement |
| W | Amendment to Asset Pledge |
| X | Amendment to Pledge of Electric Concession |
| Y | Amendment to Pledge of Project Documents |
| Z | Amendment to Pledge Over Future Project Documents |
| AA | Amendment to Pledge of Framework Agreement |
| BB | Amendment to Onshore Share Pledge Agreement |

| CC | Amendment to Conditional Assignment of Rights and Contracts |
|---|---|
| DD | Amendment to Conditional Assignment of Framework |
| FF | Amendment to Insurance Designation |
| HH | Release and Cancellation to Amendment to Strabag Share Pledge Agreement |
| II | Release and Cancellation of Pledge of Hedging Agreements |
| JJ | Amendment to Real Estate Mortgage, Present and Future |
| KK | Amendment to Mining Concessions Mortgages, Present and Future |
| LL | Amendment to Water Rights Mortgage |
| MM | Amendment to Usufruct of Water Rights Mortgage (Hipoteca sobre Usufructo de Derechos de Aprovechamiento de Aguas) |
| NN | Amendment to Promise of Commercial Pledge of Approved PPA's |
| OO | Amendment to Conditional Assignment Over Rights in Andritz Agreement |
| PP | Amendment to Pledge over Credits |
| QQ | Amendment to Pledge over Credits |
| RR | Deed of Declaration of Extinction of Subordinated Loans |
| SS | List of Directors and Officers of the Reorganized Debtors |

**PLEASE TAKE FURTHER NOTICE** that the Second Plan Supplement and the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. The documents included in the Plan Supplement and the Second Plan Supplement have not yet been approved by the Court and may be amended, modified, or supplemented from time to time.

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in this Second Plan Supplement remain subject to continuing negotiations among the Debtors and other interested parties. Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this Second Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided by the Plan or by order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "<u>Confirmation Hearing</u>") to consider, among other things, confirmation of the Plan, shall be held on May 13, 2022 at 10:30 a.m. (ET) before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

Dated: April 27, 2022
Wilmington, Delaware

/s/ *Sean T. Greecher*

Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
S. Alexander Faris (No. 6278)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: pmorgan@ycst.com
         sgreecher@ycst.com
         afaris@ycst.com

- and -

Richard J. Cooper (admitted *pro hac vice*)
Luke A. Barefoot (admitted *pro hac vice*)
Jack Massey (admitted *pro hac vice*)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone:     (212) 225-2000
Facsimile:     (212) 225-3999
Email: lbarefoot@cgsh.com
         rcooper@cgsh.com
         jamassey@cgsh.com

*Counsel to the Debtors and Debtors in Possession*

# EXHIBIT C

**Third Amended and Restated Common Terms Agreement**

**Working Draft April 27, 2022**

**DFC Loan Number 513-2014-949-IG & 9000042574**

# Third Amended and Restated Common Terms Agreement[1]

### among

## ALTO MAIPO SpA
(as Borrower),

## THE SECURED CREDITOR REPRESENTATIVES,
that are parties to this Agreement from time to time,

and

## ITAÚ CORPBANCA
(as Intercreditor Agent)

### Dated as of [●], 2022

---

[1] NTD: This draft Agreement is subject to ongoing discussions, final review and revision, including with respect to cross-references and conformity to other definitive documents and to the RSA.

# TABLE OF CONTENTS

ARTICLE I Definitions and Interpretation ................................................................2

    Section 1.01.  *Definitions* ...............................................................................2
    Section 1.02.  *Financial Calculations* .........................................................71
    Section 1.03.  *Interpretation* ......................................................................72
    Section 1.04.  *Business Day Adjustment* ....................................................72
    Section 1.05.  *Secured Debt Documents* .....................................................72
    Section 1.06.  *Rights and Obligations of Secured Parties* ..........................72

ARTICLE II Secured Debt ..................................................................................73

    Section 2.01.  *Secured Debt* .......................................................................73
    Section 2.02.  *Interest* ...............................................................................74
    Section 2.03.  *Default Interest Rate* ..........................................................74
    Section 2.04.  *Repayment* ..........................................................................74
    Section 2.05.  *Voluntary Prepayment* ........................................................74
    Section 2.06.  *Mandatory Prepayment* ......................................................74
    Section 2.07.  *Currency and Place of Payments* ........................................75
    Section 2.08.  *Expenses* .............................................................................76
    Section 2.09.  *Application of Payments; Sharing* .......................................79
    Section 2.10.  *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* .81

ARTICLE III Representations and Warranties .......................................................81

    Section 3.01.  *Representations and Warranties* ..........................................81
    Section 3.02.  *Reliance* ..............................................................................91

ARTICLE IV Conditions of Effectiveness ............................................................91

    Section 4.01.  *Conditions of Effectiveness* .................................................91
    Section 4.02.  *Conditions for Creditors' Benefit* .......................................95

ARTICLE V Particular Covenants .......................................................................95

    Section 5.01.  *Affirmative Covenants* .........................................................95
    Section 5.02.  *Negative Covenants* ...........................................................102
    Section 5.03.  *Reporting Requirements* ....................................................107
    Section 5.04.  *Insurance* ..........................................................................112
    Section 5.05.  *Environmental and Social Reporting Requirements* ............121

ARTICLE VI Events of Default ..........................................................................122

    Section 6.01.  *Acceleration after Default* .................................................122
    Section 6.02.  *Events of Default* ...............................................................123
    Section 6.03.  *Bankruptcy* ........................................................................129

ARTICLE VII Miscellaneous .............................................................................129

    Section 7.01.  *Saving of Rights* ................................................................129
    Section 7.02.  *Notices* ..............................................................................130
    Section 7.03.  *English Language* ..............................................................130
    Section 7.04.  *Term of Agreement* ............................................................130

i

Section 7.05. *Enforcement* .................................................................................131
Section 7.06. *Applicable Law and Jurisdiction* ...................................................131
Section 7.07. *Disclosure of Information* .............................................................133
Section 7.08. *Successors and Assignees* ............................................................133
Section 7.09. *Amendments, Waivers and Consents* ...........................................134
Section 7.10. *Counterparts* .................................................................................134
Section 7.11. *No Reliance* ...................................................................................134
Section 7.12. *Indemnification; No Consequential Damages* ..............................135
Section 7.13. *Survival* .........................................................................................136
Section 7.14. *Third Amendment and Restatement* ..............................................136

CPAM: 13327034.14
[AM_ACTIVE 403646503_3]

| ANNEX A | PROJECT COST AND FINANCIAL PLAN |
| ANNEX B | AUTHORIZATIONS |
| ANNEX C | INSURANCE REQUIREMENTS |
| ANNEX D | EXISTING FINANCIAL DEBT |
| ANNEX E | BASE CASE MODEL |
| ANNEX F | ENVIRONMENTAL, SOCIAL AND HEALTH AND SAFETY ACTION PLAN |
| SCHEDULE[2] 1 | FORM OF CERTIFICATE OF INCUMBENCY AND AUTHORITY |
| SCHEDULE 2 | FORM OF LETTER TO BORROWER'S AUDITORS |
| SCHEDULE 3 | INFORMATION TO BE INCLUDED IN QUARTERLY AND ANNUAL REVIEW OF OPERATIONS |
| SCHEDULE 4 | FORM OF CERTIFICATE FOR QUARTERLY AND ANNUAL FINANCIAL RATIO REPORTING |
| SCHEDULE 5 | INFORMATION TO BE INCLUDED IN ANNUAL REVIEW OF OPERATIONS |
| SCHEDULE 6 | FORM OF ACKNOWLEDGMENT OF DEBT FOR SUBORDINATED LOANS (*RECONOCIMIENTO DE DEUDA - DEUDA SUBORDINADA*) |
| SCHEDULE 7 | FORM OF AUDITORS' CERTIFICATE |
| SCHEDULE 8 | FORM OF IE CONSTRUCTION BUDGET CONFIRMATION CERTIFICATE |
| SCHEDULE 9 | FORM OF APPROVED PPA CRITERIA REQUEST |
| SCHEDULE 10 | FORM OF APPROVED PPA CRITERIA NOTICE |
| SCHEDULE 11 | FORM OF DISCO PPA |
| SCHEDULE 14 | FORM OF CONSTRUCTION PROGRESS REPORT |
| SCHEDULE 15 | FORM OF ACCESSION AGREEMENT |
| SCHEDULE 16 | DFC-SPECIFIC COVENANTS |

Disclosure Schedules

| Schedule 3.01(h) | Financial Condition |
| Schedule 3.01(j)(ii) | Real Estate Rights Agreements and Water Rights |
| Schedule 3.01(j)(iii) | Mining Concessions |
| Schedule 3.01(l) | Litigation |
| Schedule 3.01(n) | Environmental and Social Matters |
| Schedule 3.01(aa) | Affiliate Contracts |
| Schedule 5.02(i) | Profit Sharing Arrangements |
| Schedule 5.02(j) | Management Contracts |

---

[2] NTD: Schedules are under AM's review.

CPAM: 13327034.14
[AM_ACTIVE 403646503_3]

## THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

This THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT (this "Agreement") dated as of [●], 2022, is by and among **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower"), each **SECURED CREDITOR REPRESENTATIVE** that is a party to this Agreement from time to time in accordance with the terms of this Agreement, and **ITAÚ CORPBANCA** in its capacity as intercreditor agent for the Secured Creditors (the "Intercreditor Agent").

## RECITALS

**WHEREAS,** the Borrower is undertaking the development of the Project;

**WHEREAS**, the Borrower, DFC, International Finance Corporation ("IFC"), the Local Banks, Banco del Estado de Chile, New York Branch ("Banco Estado"), KfW IPEX-Bank GMBH ("KfW"), DNB, and Itaú Corpbanca (the "Original Administrative Agent") were parties to that certain Common Terms Agreement, dated as of December 9, 2013 (the "Original Common Terms Agreement");

**WHEREAS**, the Borrower, DFC, the Local Banks, Banco Estado, KfW, DNB, and the Original Administrative Agent were parties to that certain Amended and Restated Common Terms Agreement, dated as of March 17, 2017 (the "Amended and Restated Common Terms Agreement");

**WHEREAS**, the Borrower, DFC, IFC, the Local Banks, Banco del Estado de Chile, DNB, Deutsche Bank AG, London Branch, Santana, S.A., and the Original Administrative Agent were parties to that certain Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "Second Amended and Restated Common Terms Agreement");

**WHEREAS,** on November 17, 2021, each of the Borrower and Alto Maipo Delaware LLC commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the Borrower and the Secured Creditors wish to amend and restate the Second Amended and Restated Common Terms Agreement in its entirety as set forth herein;

**WHEREAS,** the Borrower has requested, and the Secured Creditors have provided the 1L/ 2L Secured Debt to finance the construction, completion, ownership and operation of the Project and certain other costs and expenditures associated with the development of the Project;

**WHEREAS,** the execution and delivery of this Agreement is a condition precedent to the effective date of a chapter 11 plan of reorganization of the Borrower approved by the Bankruptcy Court pursuant to which it will exit the Bankruptcy Cases (the "Plan Effective Date") and this Agreement sets forth, *inter alia*, certain common representations, warranties and covenants of the Borrower and common events of default to be incorporated by reference in each of the 1L/ 2L Secured Debt Documents to the extent set forth herein;

**NOW THEREFORE**, in consideration of the foregoing, the Secured Creditors entering into their respective 1L/ 2L Secured Debt Documents and other good and valid consideration, the receipt of which is hereby expressly acknowledged, the Secured Creditors are willing to maintain the 1L/ 2L Secured Debt upon the terms and conditions set forth in this Agreement and the 1L/ 2L Secured Debt Documents.

## ARTICLE I

### Definitions and Interpretation

Section 1.01.  *Definitions*.  Wherever used in this Agreement, the following terms have the meanings opposite them.

| | |
|---|---|
| "1L Maturity Date" | June 30, 2040. |
| "1L Principal Payment Date" | April 15 and October 15. |
| "1L Refinancing Debt" | debt incurred by the Borrower that is the result of an extension, renewal or refinancing of the Secured 1L Notes outstanding on Acceptable Refinancing Terms, and permitted any refinancing, refunding, renewal, replacement or extension thereof. |
| "1L Trustee" | the Trustee under and as defined in the Secured 1L Indenture. |
| "1L/ 2L Secured Debt" | the Secured 2L Loans, Secured Notes and any Refinancing Instrument. |
| "1L/ 2L Secured Debt Documents" | the Secured 1L Debt Documents, the Secured 2L Debt Documents and the Refinancing Instruments. |
| "2L Administrative Agent" | the 2L Administrative Agent under and as defined in the Secured 2L Loan Agreement. |
| "2L Debt Exchange" | the exchange, at the option of each of the Secured 2L Lenders, of their respective Secured 2L Loans for Secured 2L Notes, in accordance with Section [•] of the Secured 2L Loan Agreement. |
| "2L Maturity Date" | October 15, 2052. |
| "2L Payment Date" | means April 15 and October 15 in each year. |
| "2L Refinancing Debt" | [debt incurred by the Borrower that is the result of an extension, renewal or refinancing of the Secured 2L Loans or the Secured 2L Notes outstanding, and any permitted |

- 2 -

[AM_ACTIVE 403646503_3]

refinancing, refunding, renewal, replacement, or extension thereof.][3]

"2L Share Conversion Agreement"    means the [Share Conversion Agreement and Shareholders' Agreement among the Borrower, the Sponsor, the Shareholder and the Onshore Collateral Agent].

"2L Trustee"    the Trustee under, and as it will be defined in, the Secured 2L Indenture.

"Acceptable Accounting Firm"

   (i)     PriceWaterhouseCoopers;

   (ii)    Deloitte;

   (iii)   Ernst & Young;

   (iv)   KPMG;

   (v)    any successor (by merger or otherwise) of any of the foregoing; or

   (vi)   any other accounting firm of international repute acceptable to the Intercreditor Agent (acting on the instructions of the Required Creditors).

"Acceptable Credit Provider"    has the meaning set forth in the Strabag Tunneling Contract.

"Acceptable 1L Refinancing Terms"    shall mean the following terms, unless the Intercreditor Agent [(acting on instruction of the Required Creditors)][4] consents otherwise:

   (i)    the Refinancing Debt is in an aggregate principal amount that does not exceed the principal amount of the debt being extended, renewed or refinanced, plus the amount of any premiums required to be paid thereon, any paid-in-kind or other capitalized interest and any reasonable fees, costs and expenses associated therewith;

   (ii)   Refinancing Debt to be secured by a perfected first priority lien on the Collateral, on the same terms as

---

[3] NTD: Subject to further review.

[4] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

the then-existing Secured 1L Debt subject to Permitted Liens;

(iii)    scheduled payments of principal and interest on the Refinancing Debt of up to $66,000,000 per calendar year (excluding the "balloon" payable on the 1L Maturity Date and any mandatory prepayments under the Financing Documents) and that will result in the outstanding principal of the Refinancing Debt being reduced to five hundred million ($500,000,000) (or, if any prepayment has been made on the Secured 1L Debt prior to the date of determination, five hundred million ($500,000,000) minus the amount of principal prepaid) on June 30, 2040; and

(iv)    the Refinancing Debt has a maturity date of June 30, 2040 or later.

"Accounts Agreements"    collectively, the Offshore Accounts Agreement and the Onshore Accounts Agreement.

"Accounting Standards"    the International Financial Reporting Standards (IFRS) promulgated by the International Accounting Standards Board, which include standards and interpretations approved by the International Accounting Standards Board, together with its pronouncements thereon from time to time, applicable on a consistent basis, and with respect to the Borrower or any of its Chilean Affiliates, as applied by the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*), governed by Decree Law No. 21,000 of 2017 of Chile, or its successor.

"Additional Project Document"    any contract or agreement, or series of related contracts or agreements (other than a Financing Document) relating to the Project entered into by the Borrower subsequent to the date of this Agreement, [(x) with an Affiliate of the Borrower] or (y) providing for monetary obligations in excess of three million Dollars ($3,000,000), individually or in the aggregate, or its equivalent in any other currency in any Financial Year or revenues in excess of five million Dollars ($5,000,000) or its equivalent in any other currency in any Financial Year.

- 4 -

| | |
|---|---|
| "Additional Water" | the water rights included in the Aguas Andinas Agreement from Laguna Negra and Laguna Lo Encañado and in the RPG Water Rights Agreement. |
| "Adverse Judgment" | has the meaning assigned to such term in Section 6.02(u)(i)(*Loss of Authorizations*). |
| "AES Andes" | AES Andes S.A. (formerly AES Gener S.A.), a *sociedad anónima* organized and existing under the laws of the Country. |
| "Affected Financial Institution" | (a) any EEA Financial Institution or (b) any UK Financial Institution. |
| "Affected Secured Party" | has the meaning assigned to such term in Section 2.09(d) (*Application of Payments; Sharing*). |
| "Affiliate" | with respect to any Person, any other Person that is directly or indirectly controlling, controlled by or under common control with, such Person; provided that, for purposes of this definition, "control" means the power to direct the management or policies of a Person, directly or indirectly, whether through the ownership of shares or other securities, by contract or otherwise; and provided, further, that the direct or indirect ownership of twenty five percent (25%) or more of Voting Rights of a Person is deemed to constitute control of that Person, and "controlling" and "controlled" have corresponding meanings. |
| "Agents" | collectively, the 2L Administrative Agent, the Trustees, the Intercreditor Agent, and the Collateral Agents. |
| "Agreement" | has the meaning specified in the preamble of this Agreement. |
| "Aguas Andinas Agreement" | the agreement dated June 6, 2011, between Aguas Andinas S.A. and AES Andes, as assigned by AES Andes to the Borrower on January 6, 2014, as amended by Addendum No. 1, dated December 15, 2020, by and between the Borrower and Aguas Andinas S.A. |
| "Alfalfal II Power Station" | the 264MW hydro power station located in the Maipo River basin, approximately 60 kilometers to the east of Santiago, Chile. |

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Alto Maipo Substation" | the 110 kV GIS substation to be constructed by Voith Hydro Ltda. and Voith Hydro, S.A. pursuant to the Voith EPC Contract. |
| "Amended and Restated Common Terms Agreement" | has the meaning specified in the recitals of this Agreement. |
| "AM DE" | means Alto Maipo Delaware, LLC, a Delaware limited liability company. |
| "AM DE DACA" | means the Blocked Account Agreement dated as of [●], 2022, is by and among [●] and AM DE. [5] |
| "AMSA" | Antofagasta Minerals S.A., a *sociedad anónima* organized and existing under the laws of the Country. |
| "AMSA PPA" | the agreement entitled "*Contrato de Suministro de Electricidad*" (power supply agreement) dated as of June 28, 2013, by and between the Borrower and AMSA, as assigned by AMSA to MLP on June 20, 2014 and as amended by the Amendment No. 1 to the AMSA PPA, dated on or about March 17, 2017, by and between the Borrower and MLP (as successor-in-interest to AMSA) |
| "Andritz Contract" | means the Lump Sum Fixed Price Design, Fabrication, Supply, Transportation, Installation & Commissioning of Penstock Valves Contract between Alto Maipo SpA and Andritz Hydro GmbH and Andritz Chile Ltda., dated as of February 29, 2020, as amended on December 29, 2021. |
| "Annual Budget" | has the meaning assigned to such term in Section 5.03(h)(i) (*Annual Budget*). |
| "AP Gestión and Atlantic Hydro Water Rights Agreement" | [the agreement entered into by and among AES Andes and AP Asesorías en Gestión y Consultoría Limitada y Exploraciones, Inversiones y Asesorías Atlantic Hydro S.A., by means of private instrument dated January 14, 2013, as the same was assigned to the Borrower by means of private instrument dated November 29, 2013.][6] |

---

[5] NTD:  DACA under discussion.

[6] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Applicable Agent" | means the 2L Administrative Agent or Trustee with respect to the applicable Secured Debt Instrument as the context requires. |
| "Applicable Environmental and Social Law" | all applicable statutes, laws, ordinances, rules and regulations of the Country, imposing liability or setting standards of conduct concerning any environmental, social, labor, health and safety or security risks of the type contemplated by the Environmental and Social Requirements. |
| "Applicable Law" | any applicable law (excluding any Applicable Environmental and Social Law), constitutional law, any statute, regulation, resolution, rule, ordinance, communiqué, enactment, judgment, order, code, decree, directive, requirement or other governmental restriction and any form or decision of or determination by or interpretation of any of the foregoing by any Authority, now or hereafter in effect, in each case as amended, re-enacted or replaced. |
| "Applicable Priority" | [with respect to the Liens granted in the Collateral, as among themselves, the priority ranking of the Secured Parties and their Secured Obligations shall be as follows: |

(i)     *first*, to the Secured Exit Loan and the Secured Working Capital Facility, provided that for so long as any Secured Exit Loan and Secured Working Capital Facility are outstanding, *pari passu* between the Secured Obligations owing to the Secured Exit Lenders and the Secured Working Capital Facility Lender; <u>provided</u> that the Secured Obligations owing to the VAT Lenders shall have an exclusive *first* priority over the VAT Escrow Account (until proceeds are disbursed to Strabag), the VAT Holding Account and any Recoverable VAT pursuant to the VAT Money Pledge and the Pledge over VAT Refunds, respectively, until the VAT Loan is repaid in full, <u>provided</u> <u>further</u> that after the VAT Loan has been discharged, the Secured 2L Debt will be first priority with respect to the VAT Holding Account and the Recoverable VAT until the 2L VAT True-Up Date (as defined in the Onshore Accounts Agreement); <u>provided</u> <u>further</u> that the Secured Exit Loan and Secured Working Capital Facility will be first priority with respect to the VAT Holding Account and the Recoverable VAT after the 2L VAT

- 7 -

[AM_ACTIVE 403646503_3]

True-Up Date, and the priorities set forth below will follow;

(ii)   *second*, for so long any Secured 1L Debt, the Strabag Deferrals and the VAT Loan are outstanding, *pari passu* between the Secured Obligations owing to the Secured 1L Noteholders, Strabag and the VAT Lenders under the Secured 1L Debt, Strabag Deferrals and VAT Loan, respectively; <u>provided</u> that after the Secured Exit Loan and the Secured Working Capital Facility have been discharged, this will be priority first; and

(iii)   *third*, for so long as any Secured 2L Debt is outstanding, the Secured Obligations owing to the Secured 2L Creditors; <u>provided</u> that after the Secured 1L Debt, the Strabag Deferrals and the VAT Loan have been discharged, this will be priority second.][7]

| | |
|---|---|
| "Appraiser" | an appraiser appointed collectively by the Local Banks from time to time (or any successor thereto) to the extent (i) required to comply with Chilean banking law requirements and (ii) it is selected as the lowest bidder in a competitive bidding process with a minimum of three written bids. |
| "Approved PPAs" | collectively, the AMSA PPA and each power purchase agreement entered into, from time to time, by the Borrower with the approval of the Intercreditor Agent (acting on the instructions of the Required Creditors). |
| "Asset Pledge" | the *prenda sin desplazamiento sobre bienes presentes y futuros* (pledge without conveyance over present and future assets) in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower pledged in favor of the Onshore Collateral Agent, for the benefit of the Secured Parties, the totality of existing and future assets acquired or to be acquired in the future by the Borrower for the operation and development of the Project, as a whole, as amended by the relevant Security Documents Amendment. |

---

[7] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Auditors" | any Acceptable Accounting Firm that the Borrower appoints from time to time as its auditors pursuant to Section 5.01(e) (*Auditors*). |
| "Authority" | any national, supranational, regional or local government or governmental, administrative, fiscal, judicial, or government-owned body, department, commission, authority, tribunal, agency or entity, or central bank (or any Person, whether or not government owned and howsoever constituted or called, that exercises the functions of a central bank). |
| "Authorization" | any consent, authorization, registration, filing, agreement, notarization, certificate, license, approval, permit, authority or exemption from, by or with any Authority, whether given by express action or deemed given by failure to act within any specified time period. |
| "Authorized Representative" | with respect to any Person, any natural person who is duly authorized by that Person to act on its behalf for the purposes specified in, and whose name and a specimen of whose signature appear on, the Certificate of Incumbency and Authority most recently delivered by that Person to the Intercreditor Agent or any other Agent, as applicable. |
| "Bail-In Action" | the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution. |
| "Bail-In Legislation" | (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings). |
| "Banco Estado" | has the meaning specified in the recitals of this Agreement. |
| "Bankruptcy Cases" | has the meaning specified in the recitals of this Agreement. |

"Base Case Model"            [the financial projections for the Project prepared by an Authorized Representative of the Borrower,  delivered in electronic form with its corresponding computer model (in MS Excel format) and attached in summary form as <u>Annex E</u> (*Base Case Model*),] as such financial projections may be revised from time to time pursuant to this Agreement, in each case using a methodology and assumptions acceptable to the Intercreditor Agent (acting on instruction of the Required Creditors) and otherwise in accordance with Section 5.03(j) (*Reporting Requirements – Base Case Model*).][8]

"Battery Storage Project"    any battery storage project or similar business that uses energy generated by the Project, utilizes Real Estate Rights and/or water rights owned by the Borrower, or is otherwise associated with the Project.

"BCI"                        Banco de Crédito e Inversiones, a bank organized and existing under the laws of the Country.

"Borrower"                   has the meaning specified in the preamble of this Agreement.

"Borrower's Information"     has the meaning assigned to such term in clause (a) of Section 7.07 (*Disclosure of Information*).

"Business Day"               a day other than Saturday or Sunday when banks are open for business in (i) New York, New York, (ii) Washington, D.C., (iii) Santiago, Chile, (iv) Oslo, Norway, and (v) Vienna, Austria; [*provided, however,* that Washington, DC, Oslo and Vienna will only be included as long as Secured Creditors are based in such cities.]

"Casualty Proceeds"          all amounts paid by any insurer (or reinsurer) under any insurance policy relating to the Project as a result of the occurrence of a casualty event that causes all or any portion of the Project or any other asset of the Borrower [or AM DE] incorporated or intended to be incorporated into the Project to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever.

"CEN"                        shall mean *Coordinador Eléctrico Nacional*, the national electricity coordinator of Chile and the successor of CDEC-SIC (*Coordinador Independiente del Sistema Eléctrico*

---

[8] NTD: Subject to further review.

- 10 -

*Nacional*) pursuant to Law No. 20.936, or any other replacing or succeeding entity.

"Certificate of Incumbency and Authority"

a certificate provided to the Intercreditor Agent or any other Agent, in the form of <u>Schedule 1</u> (*Form of Certificate of Incumbency and Authority*).

"Change of Control"

(i) AES Andes ceases to own (legally and beneficially), directly or indirectly through its Affiliates or (ii) the Borrower ceases to own one hundred percent (100%) (legally and beneficially) of the total Share Capital of AM DE, other than as a result of a reorganization that results in the Borrower absorbing or dissolving AM DE.

"Charter"

with respect to (a) the Borrower, the *estatutos* (bylaws), which include the incorporation deed and all subsequent amendments, in each case with the corresponding excerpts duly registered in the applicable *Registro de Comercio* (Registry of Commerce) and published in the *Diario Oficial* (Official Gazette), (b) AM DE, its certificate of formation, limited liability company agreement, and all subsequent amendments, and (c) any other Person, the memorandum and articles of association or incorporation, *estatutos* or equivalent document.

"Chilean Law Note"

each promissory note (*pagaré*) governed by the laws of the Country in the form attached to the Secured 2L Loan Agreement, the Secured Exit Loan Agreement, the Secured Working Capital Facility, and the VAT Loan as duly endorsed or amended through applicable allonges (*hojas de prolongación*), as applicable.

"Chilean Preferential Withholding Rate"

[means the reduced withholding tax rate imposed under the Applicable Law of the Country on payments of interest by the Borrower to a Foreign Lender or foreign financial institution in accordance with Article 59 No. 1 letter (b) of the income tax law of the Country (*artículo 59 No. 1 letra b de la Ley sobre Impuesto a la Renta de Chile*), which, as of the date hereof is four percent (4%).]

"CNM Arbitral Award Proceeds"

any amounts received by the Borrower in connection with the arbitral award rendered by the arbitral tribunal in favor of the Borrower under the CNM Arbitration, net of any expected income tax payable by the Borrower, resulting from the receipt of such amounts.

- 11 -

"CNM Arbitration"

has the meaning assigned to such term in Section 5.01(m)(iv) (*Project Documents*).

"Coercive Practice"

the impairing or harming, or threatening to impair or harm, directly or indirectly, any party or the property of the party to influence improperly the actions of a party.

"Collateral Agents"

collectively, the Onshore Collateral Agent and the Offshore Collateral Agent.

"Collusive Practice"

an arrangement between two or more parties designed to achieve an improper purpose, including to influence improperly the actions of another party.

"Commercial Operation Date"

shall have the meaning ascribed to that term in the Tunneling Contract.

"Conditional Assignment of Framework Agreement"

the *cesión condicional de derechos* (conditional assignment of rights) in the form of Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower granted a conditional assignment of its rights and obligations under the Framework Agreement to the Onshore Collateral Agent for the benefit of the Secured Parties, and acknowledged and accepted by AES Chile Foundation, as amended by the relevant Security Documents Amendment.

"Conditional Assignment of Rights and Contracts"

the *cesión condicional y promesa de cesión condicional de derechos* (conditional assignment and promise of conditional assignment of rights), in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, (for the benefit of the Secured Parties) and the Borrower, pursuant to which the Borrower granted a conditional assignment of its rights and obligations under the Project Documents governed by Chilean law (excluding the Real Estate Rights Agreements, the Water Rights Usufruct Agreement, the Water Rights Usufruct Lease Agreement, the Contribution and Assignment of Bare Ownership of Water Rights Agreement, the Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement) to the Onshore Collateral Agent for the benefit of the Secured Parties, and acknowledged by the relevant counterparty, as amended by the relevant Security Documents Amendment.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement" | the *contrato de suscripción y pago de acciones y aporte y cesión condicional de nuda propiedad de derechos de aprovechamiento de aguas y constitución condicional de derecho de uso*, in the form of a Chilean public notarial deed, dated December 3, 2013, between AES Andes and the Borrower, pursuant to which (i) AES Andes contributed and assigned to the Borrower the bare ownership of the water rights subject to the Water Rights Usufruct Agreement subject to certain conditions precedent, as partial payment for the capital contribution made in the context of a capital increase and issuance of shares; and (ii) the Borrower conditionally grants a right of use (*derecho real de uso*) in favor of AES Andes in connection with such water rights. |
| "Confirmation Order" | means the order confirming the chapter 11 plan of reorganization filed by the Borrower, is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rules 5003 and 9021. |
| "Connection and Toll Agreement" | the *Contrato de Conexión y Peajes* dated July 1, 2013, between the Borrower and AES Andes, as amended on December 9, 2013, as further amended on March 17, 2017, and as further amended on May 8, 2018. |
| "Consolidated" or "Consolidated Basis" | with respect to any financial statements to be provided, or any financial calculation to be made, under or for the purposes of this Agreement and any other Financing Document, the method referred to in clause (c) of Section 1.02 (*Financial Calculations*). |
| "Construction Completion Date" | the date on which each of the following requirements have been satisfied: |

(i)    "Tunnel Complex Substantial Completion" (as defined in the Strabag Tunneling Contract) has occurred under the Strabag Tunneling Contract;

(ii)    "Substantial Completion" has occurred under the Voith EPC Contract;

(iii)    the Transmission Line has been completed in accordance with the Transmission Line EPC Contract;

(iv)    the Borrower has certified to the Intercreditor Agent in writing, and the Independent Engineer has

- 13 -

confirmed, that each of the requirements listed in clauses (i), (ii), and (iii) above has been met; and

(v)    the Borrower has certified to the Intercreditor Agent and the Applicable Agents in writing, and the Independent Engineer has confirmed, that, to its knowledge, no event has occurred since "Tunnel Complex Substantial Completion" under the Strabag Tunneling Contract and "Substantial Completion" under the Voith EPC Contract that would cause a material adverse impact on the capability of the Project to operate at the Project As-Tested Capacity, excluding any event (1) relating to hydrological conditions; (2) relating to any warranty claim made by the Borrower under any of the Construction Contracts that has been accepted by the relevant Construction Contractor or, if not accepted by such Construction Contractor, which warranty claim work the Borrower has caused to be performed to the satisfaction of the Intercreditor Agent (acting on the instruction of the Required Creditors and in consultation with the Independent Engineer), including through the use of funds available in the relevant Project Account or contributed by the Sponsor, or if not performed, the Borrower has demonstrated to the satisfaction of the Intercreditor Agent (acting on the instruction of the Required Creditors and in consultation with the Independent Engineer) that it has sufficient funds (including adequate reserves in accordance with Accounting Standards) to cause such warranty claim work to be performed; (3) covered by insurance, in respect of which a valid claim has been submitted by the Borrower and accepted by the relevant insurer and when paid will enable the Borrower to restore the Project to the state it was in prior to the occurrence of the claimed event or, if not accepted by the relevant insurer, which insurance claim work the Borrower has caused to be performed to the satisfaction of the Required Creditors, including through the use of funds available in the relevant Project Account or contributed by the Sponsor or, if not performed, the Borrower has demonstrated to the satisfaction of the Required Creditors that it has sufficient funds (including adequate reserves in accordance with Accounting Standards) to cause such insurance claim work to be performed and, in

- 14 -

each case, the result of which is to restore the Project to the state it was in prior to the occurrence of the claimed event; or (4) relating to either (*x*) the failure of the CEN to dispatch the Project (or any of the Project's Units (as defined in the Voith EPC Contract)) or (*y*) the CEN's imposing restrictions on the operation of the Project (or any of the Project's Units (as defined in the Voith EPC Contract)).

"Construction Contractor"    any counter-party to any Construction Contract, other than the Borrower.

"Construction Contracts"    collectively:

(i)    the Voith EPC Contract; and

(ii)    the Strabag Tunneling Contract.

"Construction Management Agreement"    the Construction Management Agreement dated July 1, 2013, as amended on December 9, 2013, between the Borrower and AES Andes.

"Construction Power Agreement"    the *Contrato de Suministro de Electricidad* dated as of December 9, 2013, between the Borrower and AES Andes, as amended as of May 8, 2018.

["Construction Progress Report"    has the meaning assigned to such term in Section 5.03(i) (*Construction Progress Report*).]

"Consultants"    collectively,

(i)    the Independent Engineer;

(ii)    the Environmental and Social Consultant;

(iii)    the Insurance Consultant;

(iv)    the Market Consultant;

(v)    the Project Model Auditor;

(vi)    the Economic Consultant;

(vii)    the Appraiser;

(viii)    the Hydrology Advisor;

(ix)    the Special Geology Advisor; and

- 15 -

(x)      the Financial Advisors.

"Contingency Plan"

means a plan prepared by the Borrower, in form and substance satisfactory to the Required Creditors, that conforms to the applicable description set forth in Annex F (*Environmental, Social and Health and Safety Action Plan*).

"Contingent Intercompany Payments"

the [Contingent Payments (as defined in the Energy and Capacity Losses Compensation Agreement) and the Contingent Payments (as defined in the Connection and Toll Agreement)][9].

"Contribution and Assignment of Bare Ownership of Water Rights Agreement"

the *contrato de suscripción y pago de acciones y aporte y cesión de derechos de aprovechamiento de aguas y constitución condicional de derecho de uso*, in the form of a Chilean public notarial deed, dated December 3, 2013, between AES Andes and the Borrower, pursuant to which (i) AES Andes contributed and assigned to the Borrower the bare ownership of certain water rights as partial payment for the capital contribution made pursuant to the notarial public deed dated December 3, 2013, granted at the Santiago Notary Office of Mr. Patricio Raby Benavente, evidencing the unanimous consent of the Shareholder of the Borrower approving, among other matters, a capital increase and issuance of Shares; and (ii) the Borrower conditionally granted a right of use (*derecho real de uso*) in favor of AES Andes in connection with such water rights.

"Convertible Currencies"

has the meaning assigned to such term in Section 2.09(c) (*Application of Payments; Sharing*).

"Corrective Action Plan"

a plan referred to in Section 5.05(b) (*Environmental and Social Reporting Requirements*) and prepared by the Borrower, in form and substance acceptable to the Required Creditors, to correct, and to remedy all damage and adverse consequences caused by, any failure by the Project or any Environmental Party to comply with any Environmental and Social Requirement relating to the Project, including those identified in any Environmental and Social Reports and Plans, which plan shall include:

---

[9] NTD: Terms used to be confirmed once documentation is finalized.

[AM_ACTIVE 403646503_3]

(a)     a brief description of such non-compliance, including the extent, magnitude, impact and cause thereof;

(b)     the proposed actions to correct, and to remedy all damage and adverse consequences caused by, the non-compliance;

(c)     the assignment of responsibility for implementing such proposed actions;

(d)     a time schedule for implementing such proposed actions, including the start date, the end date and key milestones;

(e)     an estimated cost of such proposed actions; and

(f)     the proposed actions to prevent similar non-compliance from occurring in the future.

| | |
|---|---|
| "Corrupt Practice" | the offering, giving, receiving or soliciting, directly or indirectly, of anything of value to influence improperly the actions of another party. |
| "Corrupt Practices Laws" | (i) the Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95-213, §§101-104), as amended, and (ii) any other Applicable Law relating to bribery, kick-backs or similar business practices. |
| "Country" | the Republic of Chile. |
| "Court" | has the meaning specified in the recitals of this Agreement. |
| "Debt Service Reserve Account" or "DSRA" | has the meaning assigned to such term in the Offshore Accounts Agreement. |
| "Deed of Assignment of Reinsurance"[10] | that certain Deed of Assignment of Reinsurance, dated as of February 14, 2014, by and among the Borrower, Deutsche Bank Trust Company Americas and the insurers party thereto, as modified by that certain Supplemental Deed of Assignment in respect of an Assignment of Reinsurance, dated as of May 8, 2018, by and among the Borrower and the Offshore Collateral Agent. |

---

[10]    NTD: Under review.

- 17 -

| | |
|---|---|
| "Deferred 1L Interest" | has the meaning assigned to such term in the Secured 1L Debt Documents. |
| "Deferred Exit Financing Interest" | has the meaning assigned to such term in the Secured Exit Loan. |
| "Deferred Legal Costs" | the reasonable and documented fees of outside legal counsel to the Borrower in connection with any litigation, arbitration, or similar dispute with respect to the Project, the payment of which the Borrower and such counsel have agreed to defer for a period in excess of ninety (90) days (or which have been paid by any Person on behalf of the Borrower and the reimbursement of which the Borrower and such Person have agreed to defer for a period in excess of ninety (90) days). |
| "Designated Contract Payments" | any payments by the Borrower pursuant to the AMSA PPA, the Aguas Andinas Agreement, the RPG Water Rights Agreement, the Connection and Toll Agreement, the AP Gestión and Atlantic Hydro Water Rights Agreement, the Los Almendros Hydro Water Rights Agreement and any Approved PPA. |
| "DFC" | United States International Development Finance Corporation, an agency of the United States of America (as successor in interest to Overseas Private Investment Corporation pursuant to the Better Utilization of Investments Leading to Development Act of 2018, 22 U.S.C. §§9601 *et seq*.).] |
| "DFC's Environmental and Social Policies" | (a) the following sections of IFC's Environmental, Health, and Safety General Guidelines (April 30, 2007): Environmental, Health and Safety Guidelines on Electric Power Transmission and Distribution, and Environmental, Health and Safety Guidelines on Toll Roads (2007); (b) IFC's Performance Standards, and (c) the Consolidated Environmental and Social Policy Statement/Labor and Human Rights Policy Statement dated as of October 15, 2010, posted on DFC's website at http://www.DFC.gov/environment; in each case, copies of which the Borrower has acknowledged to have obtained. |

- 18 -

| | |
|---|---|
| "DIP Financing Facility" | the super-priority debtor-in-possession revolving loan facility, entered into among AM DE, as borrower, Alto Maipo SpA, as guarantor, AES Andes as initial DIP lender and the administrative agent thereto, in an aggregate original principal amount of up to US$50 million (as amended prior to the date hereof). |
| "Direct Agreements" | each of the direct agreements entered into, or to be entered into, among the Borrower, the Onshore Collateral Agent or the Offshore Collateral Agent, as applicable, and each Material Project Participant (or any other Project Party identified by the Required Creditors), other than the counterparties to the Real Estate Rights Agreements and the Aguas Andinas Agreement. |
| "Disbursement Account" | has the meaning set forth in the Offshore Accounts Agreement. |
| "Disposition Proceeds" | all amounts received by or on behalf of the Sponsor, Norgener or any Affiliate of either of them that is a Shareholder as a result of any direct or indirect transfer by the Sponsor or Norgener of Share Capital in the Borrower, Subordinated Loans, or Shared Services Loans (or the issuance of Shares to or making of Subordinated Loans by any Person other than the Sponsor or the Shareholder). |
| "Dispute Resolution Proceeds" | has the meaning assigned to such term in the Offshore Accounts Agreement. |
| "DNB" | DNB Bank ASA, a bank organized and existing under the laws of Norway. |
| "Dollars" and "$" | the lawful currency of the United States of America. |
| "Double Taxation Treaty" | any convention for the avoidance of double taxation with respect to Taxes on income that is signed between the Country and any other country or contracting state. |
| "Economic Ownership Interest" | the percentage ownership interest in an entity (which must include the right to receive a proportionate share of dividends, profits and similar amounts distributed by such entity) held by a Person or Persons, directly or indirectly, on a fully diluted basis.  For example and by way of illustration, if company A were to hold fifty percent (50%) of such ownership interests in company B, and company B were to own sixty percent (60%) of such ownership interest in company C, then, for purposes of this definition, company |

- 19 -

A would own an Economic Ownership Interest in company C of thirty percent (30%).

"EEA Financial Institution"  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country"  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority"  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date"  the date of issuance by the Intercreditor Agent of a notice of confirmation of the satisfaction of the conditions listed in Section 4.01 (*Conditions of Effectiveness*).

"Electric Concession"  the definitive electric concession for the establishment of the Power Stations, electric substation and medium voltage power lines, granted by virtue of Executive Decree No. 73.

"Emergency"  an event which could reasonably be expected to result in loss or damage to life or material damage to the Project or its operation.

"End of Construction"  the date on which each of the following requirements has been satisfied to the extent applicable under the relevant Construction Contract:

(i)  the Construction Completion Date has occurred;

(ii)  each Construction Contractor has completely cleaned all "Owner-Provided Work Areas" (as defined in the relevant Construction Contract) in which such Construction Contractor has performed any work after Tunnel Complex Substantial Completion (in the case of the Strabag Tunneling Contract) and Substantial Completion (in the case of the Voith EPC Contract) of each unit of such Power Station and, in the case of the Voith EPC Contract,

- 20 -

performed all other obligations pursuant to Section 2.21.3 thereof;

(iii) each Construction Contractor has completed all construction activities and clean-up and restoration activities in accordance with the requirements of the Construction Contracts; and

(iv) each relevant Construction Contractor has arranged and paid to completely replenish all chemicals and lubricants, and arranged and paid for the disposal of all unused chemicals and consumables no longer needed by the Project as required pursuant to the relevant Construction Contract.

"Energy and Capacity Losses Compensation Agreement"

the agreement entitled "*Contrato de Pagos por Pérdidas de Energía y Capacidad*" dated July 1, 2013, between the Borrower and AES Andes as amended on March 17, 2017, and as further amended as of May 8, 2018.

"Environmental and Social Compliance Report"

[a report prepared periodically by the Borrower, in form and substance satisfactory to the Required Creditors, as set forth in Section 5.05 (*Environmental and Social Reporting Requirements*), to provide the necessary information required to assess compliance by the Project and, with respect to the Project, any Environmental Party with the Environmental and Social Requirements, and the implementation status and results of programs in Environmental and Social Reports and Plans.]

"Environmental and Social Construction Report"

a report prepared by the Borrower, in form and substance satisfactory to the Required Creditors, which shall include:

(a) a certification from an Authorized Representative of the Borrower to the effect that:

(i) the Project, as constructed, complies with all Environmental and Social Requirements;

(ii) during the construction of the Project, each Environmental Party complied with all Environmental and Social Requirements, except for any non-compliance that was resolved in compliance with the applicable Environmental and Social Requirements and this Agreement, indicating, when applicable,

- 21 -

the respective Corrective Action Plan implemented to that effect;

(iii)    in relation to the Project or, with respect to the Project, any Environmental Party there are no (A) past or existing risks or adverse impacts relating to Environmental and Social Matters that have not been adequately mitigated or compensated; (B) to the Borrower's knowledge after due inquiry, existing Environmental Claims; or (C) to the Borrower's knowledge after due inquiry, existing Environmental Claims, other than any failure to comply, risks, impacts, Environmental Claims of which the Intercreditor Agent and the Applicable Agents has been duly notified and where the Borrower is taking measures to address such Environmental Claims in accordance with the Environmental and Social Requirements; provided that, to the extent that the Borrower has knowledge of threatened Environmental Claims, it shall indicate so in the Environmental and Social Construction Report; and

(iv)    all of the documents and Environmental and Social Reports and Plans required under Annex F (*Environmental, Social and Health and Safety Action Plan*) to be delivered on or prior to the Project Completion Date pursuant thereto have been delivered in accordance with Annex F (*Environmental, Social and Health and Safety Action Plan*);

(b)    information concerning any and all substantial deviations from the original Project construction plans and specifications set forth in the Construction Contracts, and a description of any resulting adjustments made to the environmental, social and health and safety mitigation measures or monitoring programs;

(c)    information concerning any non-mitigated risks, impacts or liabilities relating to Environmental and

- 22 -

Social Matters pertaining to the Project or any Environmental Party with respect to the Project;

(d) to the Borrower's knowledge after due inquiry, information concerning any Environmental Claims pertaining to the Project or any Environmental Party; and

(e) copies of any materials, correspondence, documents or reports relating to any Environmental and Social Matter concerning the Project or any Environmental Party submitted to any Authority by or on behalf of the Borrower after the Original Closing Date.

"Environmental and Social Consultant"

Environmental Resources Management, Inc., or any other person appointed by the Required Creditors to act as the environmental, social and health and safety advisor to the Secured Creditors for purposes of this Agreement and the Environmental and Social Monitoring Agreement.

"Environmental and Social Management Plan"

a plan prepared by the Borrower, in form and substance satisfactory to the Required Creditors, that conforms to the applicable description set forth in Annex F (*Environmental, Social and Health and Safety Action Plan*).

"Environmental and Social Matter"

in each case, with respect to the activities of any Environmental Party relating to the Project, any: (a) Release into the air including the air within buildings and other natural or man-made structures above ground; (b) Release into water including into any river, watercourse, lake, or pond (whether natural or artificial or above ground or which joins or flows into any such water outlet above ground) or reservoir, or the surface of the riverbed or of other land supporting such waters, ground waters, sewer or the sea; (c) deposit, disposal, keeping, treatment, importation, exportation, production, transportation, handling, processing, carrying, manufacture, collection, sorting or presence of any hazardous substance (including in the case of waste, any substance that constitutes a scrap material or an effluent or other unwanted surplus substance arising from the application of any process or activity (including making it reusable or reclaiming substances from it)) and any substance or article that is required to be disposed of when broken, worn out, contaminated or otherwise spoiled; (d) nuisance, noise, defective premises, health and safety at work, industrial illness, industrial injury due to environmental factors, environmental health problems

- 23 -

(including asbestosis or any other illness or injury caused by exposure to asbestos) or genetically modified organisms; (e) conservation, preservation or protection of the natural or man-made environment or any living organisms supported by the natural or man-made environment; (f) conservation of archaeological and historical sites, rights-of-way, resettlement, expropriation, traffic, or any other matter whatsoever affecting social conditions; (g) labor, worker rights, or human rights; or (h) any other matter whatsoever relating to human, health, environment, social issues or health and safety.

"Environmental and Social Monitoring Agreement"

the Contract AM-CO328 dated as of June 11, 2012, entered into among the Borrower, the Original Administrative Agent and the Environmental and Social Consultant, as amended by Amendment No.1 dated February 11, 2013, Amendment No.2 dated November 28, 2013, and Amendment No.3 dated December 4, 2013, relating to the Environmental and Social Consultant's monitoring of Environmental and Social Matters with respect to the Project, including the compliance by the Project and, with respect to the Project, each Environmental Party with all Environmental and Social Requirements.

"Environmental and Social Monitoring Report"

a report prepared by the Environmental and Social Consultant, in form and substance satisfactory to the Required Creditors, which shall include: (a) an assessment that the Project and, with respect to the Project, each Environmental Party are in compliance with all Environmental and Social Requirements; (b) an assessment of the adequacy and accuracy of the Environmental and Social Compliance Report; (c) an assessment of the implementation status and results of programs and recommendations in the Environmental and Social Reports and Plans; and (d) a statement whether, in relation to the Project and, with respect to the Project, each Environmental Party, there are any: (i) past or existing risks or adverse impacts relating to Environmental and Social Matters that have not been adequately mitigated or compensated or (ii) known or threatened, past or existing, Environmental Claims.

"Environmental and Social Reports and Plans"

(i)     the Contingency Plan;

(ii)    each Corrective Action Plan, if any;

- 24 -

(iii)    the Environmental and Social Management Plan;

(iv)    the Environmental, Social and Health and Safety Action Plan;

(v)    the Health and Safety Management Plan; and

(vi)    the Environmental and Social Monitoring Reports.

"Environmental and Social Requirements"    all requirements, conditions, standards, protections, obligations or performance with respect to Environmental and Social Matters related to the Project required by:

(i)    any Applicable Environmental and Social Law;

(ii)    any Authorization under or in connection with any Applicable Environmental and Social Law;

(iii)    any Environmental and Social Reports and Plans;

(iv)    any Fundamental Principles and Rights at Work;

(v)    the IFC Performance Standards;

(vi)    [DFC's Environmental and Social Policies;] and

(vii)    the Equator Principles.

"Environmental Claim"    with respect to any Environmental Party, any written notice, claim, administrative, regulatory or judicial or equitable action, suit, judgment or demand by any other Person or any written communication by any Authority, in either case, alleging or asserting such Environmental Party's liability in connection with the Project for investigatory costs, cleanup costs, governmental response costs, damage to natural resources (including wetlands, wildlife, aquatic and terrestrial species and vegetation) or other property, personal injuries, fines or penalties or any other damages arising out of, based on or resulting from:

(i)    the presence or Release of any Hazardous Substance at any location, whether or not owned by such Environmental Party;

(ii)    circumstances forming the basis of any violation, or alleged violation, of any Environmental and Social Requirements; or

[AM_ACTIVE 403646503_3]

|  | (iii) | any other Environmental and Social Matter. |
| --- | --- | --- |
| "Environmental Party" | (i) | the Borrower and any officer, director, employee or agent of the Borrower; and |
|  | (ii) | in connection with their activities related to the Project, the Sponsor and Shareholder, the Construction Contractors and the Operator (and any subcontractor of each thereof), and any officer, director, employee or agent of each such Person. |

"Environmental, Social and Health and Safety Action Plan"    a plan attached hereto as <u>Annex F</u> (*Environmental, Social and Health and Safety Action Plan*), prepared by the Borrower, in form and substance satisfactory to the Required Creditors.

"Equator Principles"    a risk management framework, adopted by financial institutions, for determining, assessing and managing environmental and social risk in projects and is primarily intended to provide a minimum standard for due diligence to support responsible risk decision-making.

"Equity Contribution Agreement"    means the Contribution Agreement dated as of [●], 2022, by and among the Borrower, the Sponsor and the Intercreditor Agent.

"EU Bail-In Legislation Schedule"    the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"European Union Sanctions List"    any list of economic sanctions laws, regulations, embargoes or other similar restrictive measures administered, enacted or enforced by the European Union.

"Event of Default"    any one of the events specified in Section 6.02 (*Events of Default*).

"Exit Administrative Agent"    the Administrative Agent under and as defined in the Secured Exit Loan Agreement.

"Expropriation Proceeds"    all amounts paid by any Authority in compensation for or otherwise as a result of the occurrence of the circumstance specified in Section 6.02(d) (*Events of Default)*.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Facilities Construction Management and Lease Agreement" | the Facilities Construction Management and Lease Agreement dated as of December 9, 2013, between the Borrower and AES Andes. |
| "Fee Letter" | any letter between the Borrower and any Agent in connection with the services provided by such Agent in respect of the financing of the Project, in each case pursuant to which the Borrower agrees to pay to such Agent the fees set forth therein.[11] |
| "Financial Advisors" | FTI Consulting Canada ULC, Asset Chile S.A., or any other Person appointed by the Intercreditor Agent (acting on instructions of the Required Creditors) to act as a financial advisor to the Secured Creditors for purposes of this Agreement (for the avoidance of doubt, there shall not be more than one international financial advisor and one financial advisor in Chile to the Secured Creditors at any point in time). |
| "Financial Debt" | any indebtedness of the Borrower for or in respect of: |

(i)     borrowed money;

(ii)    the outstanding principal amount of any bonds, debentures, notes, loans, commercial paper, acceptance credits, bills or promissory notes drawn, accepted, endorsed or issued by the Borrower;

(iii)   the deferred purchase price of assets or services (except trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

(iv)   non-contingent obligations of the Borrower to reimburse any other Person for amounts paid by such Person under a letter of credit or similar instrument (excluding any letter of credit or similar instrument issued for the account of the Borrower with respect to trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

---

[11] NTD: VAT Lender Fee Letters to be added.

(v)     the amount of any obligation in respect of any Financial Lease;

(vi)    amounts raised under any other transaction having the financial effect of a borrowing and which would be classified as a borrowing under the Accounting Standards (and not as an off-balance sheet financing under the Accounting Standards);

(vii)   the amount of the Borrower's obligations under any Hedging Agreements entered into in connection with the protection against or benefit from fluctuation in any rate or price (but only the net amount owing by the Borrower after marking the relevant derivative transactions to market);

(viii)  any premium payable on a redemption or replacement of any of the foregoing items;

(ix)    without double counting, the amount of any obligation in respect of any guarantee or indemnity given by the Borrower for any of the foregoing items incurred by any other Person up to the amount guaranteed or agreed to be indemnified by the Borrower;

(x)     the net present value of any retirement defined benefit obligations less the market value of any marketable or available for sale securities that are set aside to meet these obligations; and

(xi)    any repurchase obligation or liability of any Person with respect to accounts or notes receivable sold by such Person, and, without duplication of any amounts in clause (v) above, any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, any obligation under a "synthetic lease" or any obligation arising with respect to any other transaction that is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Financial Lease"          any lease that would, under the Accounting Standards, be treated as a finance or capital lease.

- 28 -

| | |
|---|---|
| "Financial Quarter" | each period commencing on the day after a Financial Quarter Date and ending on the next succeeding Financial Quarter Date. |
| "Financial Quarter Date" | each March 31, June 30, September 30 and December 31. |
| "Financial Semester" | each period commencing on the day after a Financial Semester Date and ending on the next succeeding Financial Semester Date. |
| "Financial Semester Date" | each June 30 and December 31. |
| "Financial Year" | the accounting year of the Borrower commencing each year on January 1 and ending on the following December 31, or such other period as the Borrower, with the consent of the Intercreditor Agent (acting on the instructions of the Required Creditors), from time to time designates as its accounting year. |
| "Financing Documents" | collectively, |

(i)     this Agreement;

(ii)    the 1L/ 2L Secured Debt Documents;

(iii)   the Fee Letters;

(iv)    the Share Retention Agreement;

(v)     the Subordination Agreement;

(vi)    the Accounts Agreements;

(vii)   the Direct Agreements;

(viii)  the Chilean Law Notes;

(ix)    the allonges (*hojas de prolongación*) executed in respect of each Chilean Law Note in accordance with the terms and conditions of this Agreement and/or the Secured 2L Loan Agreement;

(x)     the Security Documents;

(xi)    the Onshore Collateral Agency Agreement;

(xii)   the VAT Documents;

- 29 -

     (xiii)   the Intercreditor Agreement;

     (xiv)   the Secured Exit Loan Agreement;

     (xv)    the Secured Working Capital Facility;

     (xvi)   the AM DE DACA;

     (xvii)  the Contribution Agreement;

     (xviii) the 2L Share Conversion Agreement;

     (xix)   all other documents evidencing or securing the Secured Obligations that are entered into after the Effective Date; and

     (xx)    all other documents (including waivers) delivered from time to time hereunder or under any other Financing Document that are designated as "Financing Documents" by the Borrower and the Intercreditor Agent.

"Force Majeure Event"

with respect to a Project Document, an event of force majeure as defined in or contemplated by such Project Document.

"Foreign Lender"

any Secured Creditor that is not domiciled or resident (and is not deemed to be domiciled or resident) in the Country.

"Framework Agreement"

the Framework Agreement dated as of March 17, 2017 between the Borrower and AES Chile Foundation.

"Fraudulent Practice"

any action or omission, including misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a benefit or to avoid an obligation.

"Fundamental Principles and Rights at Work"

collectively:

     (i)     freedom of association and the effective recognition of the right to collective bargaining;

     (ii)    prohibition of all forms of forced or compulsory labor;

     (iii)   prohibition of child labor, including the prohibition of persons under eighteen (18) years of age from working in hazardous conditions (which includes construction activities), prohibition of persons under

[AM_ACTIVE 403646503_3]

eighteen (18) years of age from working at night, and that persons under eighteen (18) years of age be found fit to work via medical examinations;

(iv) elimination of discrimination in respect of employment and occupation, where discrimination is defined as any distinction, exclusion or preference based on race, color, sex, religion, political opinion, national extraction or social origin;

(v) compliance with Applicable Law relating to labor; and

(vi) compliance with all International Labour Organization conventions and treaties that have been ratified by the Country.

"Hazardous Substance" any hazardous or toxic substances, materials or wastes defined, listed, classified or regulated as such in or under any Applicable Environmental and Social Law or any Authorization, including:

(a) any petroleum or petroleum products (including gasoline or crude or any fraction thereof, but excluding small quantities of lubricating greases), flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and polychlorinated biphenyl;

(b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any Applicable Environmental and Social Law; or

(c) any other chemical, material or substance, exposure to or Release of which is prohibited, limited or regulated by any Authority.

"Health and Safety Management Plan" a plan prepared by the Borrower, in form and substance satisfactory to the Required Creditors, that conforms to the applicable description set forth in <u>Annex F</u> (*Environmental, Social and Health and Safety Action Plan*).

- 31 -

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Hedging Agreement" | (a) any and all swap transactions, derivative transactions, forward transactions, options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement such as the *Condiciones Generales de Contratos de Derivados en el Mercado Local* acknowledged by the Central Bank of Chile (any such master agreement, together with any related schedules, an "<u>ISDA Master Agreement</u>"), including any such obligations or liabilities under any ISDA Master Agreement. |
| "Hochtief Tunneling Contract" | the Tunnel Complex Construction Contract dated November 6, 2012, between the Borrower and Constructora Nuevo Maipo S.A., as amended on June 10, 2013, July 26, 2013, September 12, 2013, December 2, 2013 and on December 2, 2013. |
| "Hydrology Advisor" | a hydrology advisor appointed by the Intercreditor Agent (acting on the instructions of the Required Creditors) from time to time. |
| "IFC" | has the meaning specified in the recitals of this Agreement. |
| "IFC Performance Standards" | IFC's Performance Standards on Social and Environmental Sustainability, dated January 1, 2012, copies of which the Borrower has acknowledged to have obtained. |
| "Inconvertibility Event" | has the meaning assigned to such term in Section 2.09(c) (*Application of Payments; Sharing*). |
| "Increased Costs" | has the meaning provided in the Secured 2L Loan Agreement. |
| "Indemnified Taxes" | has the meaning provided in the Secured 2L Loan Agreement. |
| "Indemnitee" | has the meaning assigned to such term in Section 7.12(a) (*Indemnification; No Consequential Damages*). |

- 32 -

| | |
|---|---|
| "Independent Engineer" | Leidos Engineering, LLC (formerly a part of SAIC Energy, Environment and Infrastructure, LLC), or any successor independent engineer appointed by the Intercreditor Agent (acting on the instructions of the Required Creditors) from time to time. |
| "Independent Engineer Annual Monitoring Report" | the annual report prepared by the Independent Engineer in respect of the Project and delivered pursuant to Section 5.03(o) (*Independent Engineer Monitoring Reports*), and any supplements thereof and amendments thereto. |
| "Independent Engineer Monitoring Agreement" | the [Fifth] Amended and Restated Professional Services Agreement dated on or about the date hereof, among the Independent Engineer, the Borrower and the Intercreditor Agent. |
| "Independent Engineer Quarterly Monitoring Report" | the quarterly report prepared by the Independent Engineer in respect of the Project and delivered pursuant to Section 5.03(o) (*Independent Engineer Monitoring Reports*), and any supplements thereof and amendments thereto. |
| "Insurance Consultant" | Willis Ltd., or any successor insurance consultant appointed by the Intercreditor Agent (acting on the instructions of the Required Creditors) from time to time. |
| "Insurance Designation" | the agreement entitled *designación de beneficiario y asegurados adicionales de pólizas de seguro*, in the form of a Chilean notarial public deed, dated December 9, 2013, and between the Borrower and the Offshore Collateral Agent, for the benefit of the Secured Parties, whereby the Offshore Collateral Agent accepted the provisions stated in its favor under the Chilean insurance policies contracted by the Borrower, and the latter agreed to designate the Offshore Collateral Agent as sole loss payee (*beneficiario exclusivo*) and all Secured Parties as additional insured, in case of renewal or replacement of each insurance policy of the Borrower, as amended by the relevant Security Documents Amendment. |
| "Insurance Monitoring Agreement" | the Insurance Consultant Monitoring Agreement among the Borrower, the Original Administrative Agent and the Insurance Consultant, dated as of December 9, 2013. |
| "Insurance Proceeds and Compensation Account" | has the meaning assigned to such term in the Offshore Accounts Agreement. |

- 33 -

[AM_ACTIVE 403646503_3]

"Intercreditor Agent"    has the meaning specified in the preamble of this Agreement.

"Intercreditor Agreement"    [the Third Amended and Restated Intercreditor and Security Sharing Agreement dated on or about the date of this Agreement among the Intercreditor Agent, the Offshore Collateral Agent, the Onshore Collateral Agent, the 2L Administrative Agent, the Trustees, the Secured Exit Lenders, and the Secured Creditors.]

"Interest Payment Date"    means January 15, April 15, July 15 and October 15 in each year (or, with respect to the Secured 2L Debt, the 2L Payment Dates).

"Interest Period"    has the meaning provided in each Secured Debt Document.

"Interest Rate"    has the meaning provided in each Secured Debt Document.

"KfW"    has the meaning specified in the recitals of this Agreement.

"Las Lajas Power Station"    the 267MW hydro power station located in the Maipo River basin, approximately 50 kilometers to the east of Santiago, Chile.

"Liabilities"    the aggregate of all obligations of the Borrower to pay or repay money, including:

(i)    Financial Debt;

(ii)    the amount of all liabilities of the Borrower (actual or contingent) under any conditional sale or a transfer with recourse or obligation to repurchase, including by way of discount or factoring of book debts or receivables;

(iii)    trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and which are not overdue (including letters of credit or similar instruments issued for the account of the Borrower with respect to such trade accounts);

(iv)    accrued expenses, including wages and other amounts due to employees and other services providers;

[AM_ACTIVE 403646503_3]

(v)    the amount of all liabilities of the Borrower howsoever arising to redeem any of its Shares; and

(vi)   to the extent (if any) not included in the definition of Financial Debt, the amount of all liabilities of any Person to the extent the Borrower guarantees them or otherwise obligates itself to pay them.

"Lien"    any mortgage, pledge, charge, assignment, hypothecation, security interest, title retention, preferential right, trust arrangement, right of set-off, counterclaim or banker's lien, privilege or priority of any kind having the effect of security, any designation of loss payees or beneficiaries or any similar arrangement under or with respect to any insurance policy or any preference of one creditor over another arising by operation of law.

"Liquidated Damages Proceeds"    all amounts relating to performance or other damages or penalties paid (other than delay liquidated damages under any of the Construction Contracts or the Transmission Line EPC Contract), if any, paid by any party under a Project Document to the Borrower.

"Loan Currency"    Dollars.

"Local Banks"    collectively:

(i)    BCI; and

(ii)   Itaú Corpbanca; and

(iii) any successor or permitted assignee of a Secured Creditor that is a bank qualified to do business in Chile subject to the supervision of the *Comisión para el Mercado Financiero*, successor of the *Superintendencia de Bancos e Instituciones Financieras* (Banks and Financial Institutions Commission).

"Long-term Debt"    that part of Financial Debt the final maturity of which, by its terms or the terms of any agreement relating to it, falls due more than one year after the date of its incurrence.

"Los Almendros Hydro Water Rights Agreement"    the agreement entered into by and between AES Andes and Hidroeléctrica Los Almendros S.A., by means of public deed dated July 29, 2008, as the same was conditionally assigned to the Borrower by means of private instrument dated November 29, 2013, subject to consent to such

- 35 -

|  | assignment by Hidroeléctrica Los Almendros S.A. which was obtained on January 16, 2014. |
|---|---|
| "Market Consultant" | [Synex Ingenieros Consultores, Valgesta Consultores Limitada] or any successor market consultant appointed by the Intercreditor Agent (acting on the instructions of the Required Creditors) from time to time. |
| "Material Adverse Effect" | a material adverse effect on: |

      (i)     the business, operations or financial condition of the Borrower;

      (ii)    the ability of the Borrower to implement the Project;

      (iii)   the ability of the Borrower or any Material Project Participant to comply with any of its respective material obligations under any of the Transaction Documents to which it is a party;

      (iv)   the legality, validity or enforceability of any material provision of any Financing Document;

      (v)    the rights and remedies of the Agents or any of the Secured Parties under any of the Financing Documents; or

      (vi)   the validity, enforceability or priority of the security interests and Liens purported to be granted to the Secured Creditors under any of the Security Documents in accordance with the Applicable Priority.

| "Material Authorizations" | (i) the Sectorial Environmental Permit (*Permiso Ambiental Sectorial, PAS*) for the construction of hydraulic works (PAS 101) and Sectorial Environmental Permit (*Permiso Ambiental Sectorial, PAS*) for works of restoration and protection of the riverbed of natural water bodies (PAS 106), issued by the *Dirección General de Aguas* (DGA) with respect to the hydraulic civil works Resolution 2860 for the Project; (ii) the *Resolución de Calificación Ambiental* (Environmental Approval Resolution) of the Project, evidenced by *Resolución Exenta* (Exempted Resolution) No. 256/09, as amended by *Resoluciones Exentas* (Exempted Resolutions) No. 723, dated August 26, 2009 and No. 896, dated October 26, 2009, issued by the *Comisión Regional del Medio Ambiente de la Región Metropolitana* (COREMA) and *Resoluciones Exentas* (Exempted |

[AM_ACTIVE 403646503_3]

Resolutions) No. 82, dated January 28, 2010, and No. 144, dated February 19, 2010, issued by the *Comisión Nacional de Medio Ambiente* (CONAMA); the Environmental Approval (*Resolución de Calificación Ambiental*) required to be obtained relative to the treatment and handling of mountain water in connection with the *Programa de Cumplimiento* approved by the *Superintendencia del Medio Ambiente* (SMA) on April 6, 2018; and the *Programa de Cumplimiento* approved by the *Superintendencia del Medio Ambiente* (SMA) on April 6, 2018; (iii) the *Resolución de Calificación Ambiental* (Environmental Approval Resolution) evidenced by *Resolución Exenta* (Exempted Resolution) No. 443, dated July 2, 2010, issued by the *Comisión Regional del Medio Ambiente de la Región Metropolitana* (COREMA) in respect of the project "*Líneas de Transmisión Eléctrica S/E Maitenes-S/E Alfalfal y Central Alfalfal II-S/E Alfalfal*"; and (iv) the Electric Concession or the definitive electric concession for the establishment of transmission lines to inject the energy produced by the Project to the SEN, granted by virtue of Executive Decree No. 25, published in the Official Gazette on April 12, 2012, and executed into a public deed on April 19, 2012.

"Material Project Documents"    collectively,

(i)     each Construction Contract, until the warranty period (excluding any latent defect warranty period) under such Construction Contract has expired and any written claims made before the end of such warranty period have been resolved in full;

(ii)    all Construction Contractor guaranties under the Construction Contracts (for so long as the applicable Construction Contract is a Material Project Document);

(iii)   the Andritz Contract;

(iv)   the AMSA PPA;

(v)    the O&M Agreement;

(vi)   each Real Estate Rights Agreement;

(vii)  the Construction Management Agreement;

- 37 -

(viii)    the Shared Facilities Agreement;

(ix)     the Technical Support and Services Agreement;

(x)      the Connection and Toll Agreement;

(xi)     the Energy and Capacity Losses Compensation Agreement;

(xii)    the Transmission Line EPC Contract, until the warranty period under Article Tenth of such contract has expired and any written claims made before the end of such warranty period have been resolved in full;

(xiii)   the Water Rights Usufruct Agreement;

(xiv)   the Water Rights Usufruct Lease Agreement;

(xv)    the Contribution and Assignment of Bare Ownership of Water Rights Agreement;

(xvi)   the Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement;

(xvii)  the Construction Power Agreement;

(xviii) the Facilities Construction Management and Lease Agreement;

(xix)   any Additional Project Document designated as a Material Project Document by the Borrower and the Intercreditor Agent; provided, however, that Approved PPAs (other than the AMSA PPA) are not Material Project Documents;

(xx)    and all renewals, extensions, modifications and amendments of the documents set forth above.

| | |
|---|---|
| "Material Project Participant" | any counterparty to a Material Project Document. |
| "Minimum Cash Balance" | [means, (a) on and prior to the Secured Working Capital Facility Discharge Date, $10,000,000 and (b) after the Secured Working Capital Facility Discharge Date, zero.] |
| "Mining Concessions" | the mining concessions required according to customary practices for the development, construction, ownership and operation of the Project. |

- 38 -

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "MLP" | Minera Los Pelambres, a *sociedad contractual minera* organized and existing under the laws of the Country. |
| "Monitoring Agreements"[12] | collectively: |

(i)     the Independent Engineer Monitoring Agreement;

(ii)    the Insurance Monitoring Agreement;

(iii)   the Environmental and Social Monitoring Agreement; and

(iv)    any other necessary agreements relating to the monitoring of the Project as mutually agreed from time to time between the Borrower and the Secured Creditors.

| | |
|---|---|
| "Mortgages" | collectively, the agreements entitled *hipoteca sobre bienes raíces presentes y futuros, hipoteca sobre concesiones mineras presentes y futuras, hipoteca sobre derechos de aprovechamiento de aguas futuros, hipoteca sobre nuda propiedad de derechos de aprovechamiento de aguas* and *hipoteca sobre usufructo de derechos de aprovechamiento de aguas* (mortgage over present and future real estate, mortgage over present and future mining concessions, mortgage over future water rights, mortgage over bare property of water rights and mortgage over usufruct of water rights), each in the form of a Chilean notarial public deed, entered into between (i) with the exception of the *hipoteca sobre nuda propiedad* (mortgage over bare property), the Borrower and the Onshore Collateral Agent, for the benefit of the Secured Parties, whereby the Borrower granted a mortgage in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over all its present and future real estate, water rights and mining concessions and (ii) with respect to the *hipoteca sobre nuda propiedad* (mortgage over bare property), the Borrower and AES Andes, whereby AES Andes granted a mortgage in favor of the Borrower over its bare property in all its water rights subject to the Water Rights Usufruct Agreement, as amended by the relevant Security Documents Amendment. |
| "Net Available Amount" | the aggregate amount of Casualty Proceeds, Expropriation Proceeds, Termination Proceeds, Liquidated Damages |

---

[12]   NTD: Amendments are being coordinated with consultants.

[AM_ACTIVE 403646503_3]

|  | Proceeds, Dispute Resolution Proceeds, Disposition Proceeds or CNM Arbitral Award Proceeds, as applicable, received by the Borrower (or in the case of Disposition Proceeds, the Borrower, the Sponsor or the Shareholder) in respect of a casualty event, expropriation event, termination event, event requiring a payment of liquidated damages, resolution of a dispute (including the CNM Arbitration), or Share or Subordinated Loan transfer or Share issuance, as applicable, net of the reasonable and documented third party costs and expenses and Taxes incurred by or on behalf of or paid by the Borrower (or in the case of Disposition Proceeds, the Borrower, the Sponsor or Shareholder) in connection with the collection and conversion, if in a currency other than Dollars, of such Casualty Proceeds, Expropriation Proceeds, Termination Proceeds, Liquidated Damages Proceeds, Dispute Resolution Proceeds, Disposition Proceeds and CNM Arbitral Award Proceeds as applicable, and, in each such case excluding such costs, expenses and Taxes previously paid by the Borrower from the proceeds set forth in the relevant Collateral Account under the Accounts Agreements. |
|---|---|
| "Norgener" | Norgener Renovables SpA a *sociedad por acciones* organized and existing under the laws of the Country and successor to Norgener SpA. |
| "Note Power of Attorney" | [a power of attorney in the form, and pursuant to the terms and conditions, set forth in the Secured 2L Loan Agreement][13]. |
| "O&M Agreement" | the Operation and Maintenance Agreement dated July 1, 2013, between the Borrower and the Operator. |
| "Obstructive Practice" | (i)  deliberately destroying, falsifying, altering or concealing of evidence material to the investigation or making of false statements to investigators, in order to materially impede a World Bank or Secured Creditor investigation into allegations of a Corrupt Practice, Fraudulent Practice, Coercive Practice or Collusive Practice, and/or threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to the investigation or from pursuing the investigation; or |

---

[13] NTD: Status of existing powers of attorney being confirmed.

[AM_ACTIVE 403646503_3]

|  | (ii) | acts intended to materially impede the exercise of any Secured Creditor's access to contractually required information in connection with a World Bank or Secured Creditor investigation into allegations of a Corrupt Practice, Fraudulent Practice, Coercive Practice or Collusive Practice. |

"OFAC"  the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Offshore Accounts Agreement"  the Third Amended and Restated Offshore Accounts and Collateral Agency Agreement dated on or about the date of this Agreement, among the Borrower, the Offshore Accounts Bank, the Offshore Collateral Agent, the Applicable Agents, and the Intercreditor Agent.

"Offshore Accounts Bank"  Itaú Corpbanca New York Branch as successor to Deutsche Bank Trust Company Americas and any successor accounts bank appointed from time to time pursuant to the Offshore Accounts Agreement.

"Offshore Collateral Agent"  Itaú Corpbanca New York Branch as successor to Deutsche Bank Trust Company Americas and any successor Offshore Collateral Agent appointed from time to time pursuant to the Offshore Security Agreement.

"Offshore Collateral Accounts"  has the meaning assigned to such term in the Offshore Accounts Agreement.

"Offshore Revenue Account"  has the meaning assigned to such term in the Offshore Accounts Agreement.

"Offshore Security Agreement"  the Third Amended and Restated Offshore Security Agreement, dated on or about the date of this Agreement, between the Borrower and the Offshore Collateral Agent.

"Offshore Security Documents"  collectively:

(i)     the Offshore Security Agreement;

(ii)    the Offshore Subsidiary Guaranty and Security Agreement;

(iii)   the Deed of Assignment of Reinsurance;

(iv)    the AM DE DACA; and

- 41 -

|  | (v)    the Offshore Accounts Agreement. |
|---|---|
| "Offshore Subsidiary Guaranty and Security Agreement" | the Subsidiary Guaranty and Security Agreement, dated on or about the date of this Agreement, between the Borrower, AM DE, and the Offshore Collateral Agent. |
| "Onshore Accounts Agreement" | the Third Amended and Restated Onshore Accounts Agreement dated on or about the date of this Agreement among the Borrower, the Onshore Accounts Bank, the Onshore Collateral Agent, the Applicable Agents, and the Intercreditor Agent. |
| "Onshore Accounts Bank" | Itaú Corpbanca, and any successor accounts bank appointed from time to time pursuant to the Onshore Accounts Agreement. |
| "Onshore Collateral Agency Agreement" | the agreement entitled "*contrato de agencia de garantías*", in the form of a Chilean notarial public deed, dated December 9, 2013, as amended on May 8, 2018, among the Onshore Collateral Agent, the other Secured Parties and the Borrower, pursuant to which the Onshore Collateral Agent was appointed as onshore collateral agent (*agente de garantías*) under Chilean law, as amended by public deed dated the date hereof. |
| "Onshore Collateral Agent" | Itaú Corpbanca, and any successor Onshore Collateral Agent appointed from time to time pursuant to the Onshore Collateral Agency Agreement. |
| "Onshore Pledge Agreements" | collectively, the (i) Asset Pledge; (ii) Pledge of Electric Concession; (iii) Pledge of Project Documents; (iv) Pledge of Future Project Documents; (v) Pledge of Subordinated Loans; (vi) Onshore Share Pledge Agreement; and (vii) Pledge of the Framework Agreement. |
| "Onshore Project Accounts" | the accounts opened and maintained pursuant to the Onshore Accounts Agreement. |
| "Onshore Security Documents" | collectively, |
|  | (i)    the Onshore Pledge Agreements; |
|  | (ii)    the Conditional Assignment of Rights and Contracts; |
|  | (iii)    Conditional Assignment of Framework Agreement; |
|  | (iv)    the Insurance Designation; |

- 42 -

|  | (v) | the Mortgages; |
|---|---|---|
|  | (vi) | the Promise of Conditional Assignment of Project Documents; |
|  | (vii) | the Promise of Commercial Pledge of Approved PPAs; |
|  | (viii) | the Security Documents Amendments; and |
|  | (ix) | all applicable declaration deeds (*escrituras de declaración*) required under or in connection to the documents referred to in (i) through (viii) above. |

"Onshore Share Pledge Agreement"

the *prenda sin desplazamiento sobre acciones* (pledge without conveyance over shares), in the form of a Chilean notarial public deed, among the Onshore Collateral Agent (for the benefit of the Secured Parties), the then current Shareholder and the Borrower, pursuant to which the then current Shareholder pledged to the Onshore Collateral Agent, for the benefit of the Secured Parties, one-hundred percent (100%) of its existing and future ownership interests (including Economic Ownership Interests and Voting Rights) in the Borrower, as amended by the relevant Security Documents Amendment.

"Operator"

AES Andes.

"Original Administrative Agent"

has the meaning specified in the recitals of this Agreement.

"Original Closing Date"

December 9, 2013.

"Original Common Terms Agreement"

has the meaning specified in the recitals of this Agreement.

"Participant"

with respect to any Secured 2L Lender, any Person who acquires a Participation in the Secured 2L Loan of such Secured 2L Lender.

"Participation"

the interest of any Participant in all or a portion of a Secured 2L Loan.

"Payment Date"

means any date that is a Principal Payment Date and/or an Interest Payment Date

- 43 -

| "Permitted Capital Expenditures" | after the Construction Completion Date, capital expenditures of the Borrower not exceeding three million Dollars ($3,000,000) (or its equivalent in any other currency or currencies) in any Financial Year or as approved in the Annual Budget, but excluding expenses in connection with or resulting from any major maintenance required for the Project. |

"Permitted Financial Debt"[14]    Financial Debt of the Borrower under or in respect of:

(i)     the 1L/ 2L Secured Debt;

(ii)    any Refinancing Debt;

(iii)   the deferred purchase price of assets or services included in the approved Annual Budget where payment for such asset or service is deferred for a period of no more than ninety (90) days;

(iv)    any Subordinated Loan;

(v)     any Financial Lease or purchase money indebtedness in respect of discrete items of equipment, in an aggregate amount not exceeding five million Dollars ($5,000,000) (or its equivalent in other currencies) at any time outstanding;

(vi)    one or more unsecured working capital facilities available on or following the Construction Completion Date, with a maximum tenor of eighteen (18) months and in the aggregate not exceeding fifteen million Dollars ($15,000,000) (or its equivalent in other currencies) at any time outstanding; provided that the Borrower shall not be permitted to incur into such working capital facilities until the Secured Working Capital Facility Commitment is terminated and any amounts outstanding thereof have been prepaid in full;

(vii)   surety bonds, performance bonds, bankers acceptances, letters of credit or similar instruments, in each case approved by the Intercreditor Agent (acting on the instructions of the Required Creditors), in an aggregate amount not exceeding

---

[14] NTD: Subject to further review.

- 44 -

twenty-five million Dollars ($25,000,000) (or its equivalent in other currencies) at any time outstanding; <u>provided</u> that, all letters of credit in an aggregate amount exceeding five million Dollars ($5,000,000) (or its equivalent in other currencies) shall require the prior approval of the Intercreditor Agent;

(viii)  surety bonds or letters of credit or similar instruments, in each case, to the extent required by the CEN to participate in the spot market;

(ix)  the Shared Services Loan;

(x)  the Sponsor Deferrals;

(xi)  the Secured Exit Loan;

(xii)  the Secured Working Capital Facility;

(xiii)  Deferred Legal Costs;

(xiv)  the VAT Loan;

(xv)  the Secured Strabag Deferrals; and

(xvi)  Permitted Intercompany Debt.

<u>provided</u> that, the aggregate amount of Financial Debt that may be incurred by the Borrower and be outstanding at any time under clauses (vi) and (vii) shall not exceed fifty million Dollars ($50,000,000) (or its equivalent in other currencies).

| | |
|---|---|
| "Permitted Intercompany Debt" | shall mean [TBD]. |
| "Permitted Investments" | has the meaning assigned to the term "Offshore Authorized Investments" in the Offshore Accounts Agreement and "Onshore Authorized Investments" in the Onshore Accounts Agreement. |
| "Permitted Liens"[15] | collectively: |

(i)  the Security;

---

[15] NTD: Subject to further review.

(ii) the naming of each Secured Party as loss payee or beneficiary, as applicable, under the Borrower's insurance policies;

(iii) any Lien arising from any Taxes if the obligation underlying any such Lien is not yet due or, if due, is being contested in good faith by appropriate proceedings so long as:

(A) those proceedings do not involve any substantial risk of the sale, forfeiture or loss of any part of the Project, title thereto or any interest therein, and do not interfere in any material respect with the use or disposition thereof or the implementation of the Project or the carrying on of the business of the Borrower; and

(B) the Borrower has set aside adequate reserves in accordance with the Accounting Standards;

(iv) pledges, deposits or other Liens under worker's compensation, unemployment insurance or other social security legislation;

(v) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business or in connection with the construction of the Project, either ($x$) for amounts not yet due or ($y$) for amounts being contested in good faith and by appropriate proceedings, so long as (A) enforcement of the contested item is effectively stayed, and (B) a bond, other security instrument or other adequate provision to assure that any contested amounts determined to be due will be promptly paid in full when such contest is resolved, has been provided;

(vi) minor defects, easements, irregularities, rights of way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in each such case, do not and will not give any Person the right to interfere with the construction or operation of the Project in accordance with the Transaction Documents and encumbrances consisting of zoning or planning restrictions, licenses

- 46 -

and restrictions on the use of property or imperfections in title that, in any such case, do not and will not give any Person the right to interfere, in a more than immaterial manner, with the construction or operation of the Project in accordance with the Transaction Documents;

(vii)    Liens consented to by the Required Creditors;

(viii)   Liens arising by operation of Applicable Law in favor of customs and revenue authorities to secure payment of custom duties in connection with the importation of goods for the Project, provided that any such custom duties are not ninety (90) or more days past due;

(ix)    Liens upon tangible personal property acquired after the Original Closing Date by the Borrower, each of which Liens was created solely for the purpose of securing Financial Leases or purchase money indebtedness permitted under clause (v) of the definition of Permitted Financial Debt;

(x)     Liens arising pursuant to a judgment that does not constitute an Event of Default;

(xi)    Liens consented to by the Borrower and the Secured Creditors under the Water Rights Usufruct Lease Agreement, the Contribution and Assignment of Bare Ownership of Water Rights Agreement and the Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement;

(xii)   Liens arising as a result of preferential rights, rights of set-off, privileges or priorities of any kind having the effect of security, as well as designations of loss payees or beneficiaries or any similar arrangement under or with respect to any insurance policy, in each case under any Project Document;

(xiii)  the rights of repurchase under Clause Eighth of the RPG Water Rights Agreement;

(xiv)   a Lien on cash or a time deposit (*depósito a plazo*) to be funded in the amount of 180,859 *Unidades de Fomento* for the benefit of the issuing bank providing the bank bond (*boleta bancaria de garantía*)

- 47 -

required to be delivered by the Borrower in favor of the *Ministerio de Obras Públicas, Dirección General de Aguas* to secure the Borrower's obligations in respect of the construction of the hydraulic works for the Alfalfal II and Las Lajas Power Stations for the Project;

(xv)   any Liens arising under any VAT Security Document;

(xvi)   any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Lien referred to in clauses (i) through (xv) above.

"Permitted Subordinated Lender"

each of the Sponsor, the Shareholder and Affiliates of the Shareholder.

"Person"

any natural person, corporation, company, partnership, firm, voluntary association, joint venture, trust, unincorporated organization, Authority or any other entity whether acting in an individual, fiduciary or other capacity.

"Plan Effective Date"

has the meaning ascribed to such term in the preamble of this Agreement.

"Pledge of Electric Concession"

the *prenda comercial sobre concesión eléctrica* (commercial pledge over electric concession), in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower pledged the Electric Concession to the Onshore Collateral Agent for the benefit of the Secured Parties, as amended by the relevant Security Documents Amendment.

"Pledge of Future Project Documents"

the *prenda sin desplazamiento sobre derechos futuros* (pledge without conveyance over future rights), in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower granted a pledge under the laws of the Country in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over the Borrower's rights under each Project Document (other than Approved PPAs and the Framework Agreement) entered into or acquired by the Borrower from time to time after the Effective Date, as amended by the relevant Security Documents Amendment.

- 48 -

| "Pledge of Hedging Agreements" | the *prenda sin desplazamiento sobre derechos* (pledge without conveyance over rights), in the form of a Chilean notarial public deed, dated December 9, 2013 granted at the Notary Office of Santiago of Mr. José Musalem Saffie under record number 15,482-2013, as amended. |
|---|---|
| "Pledge of Project Documents" | the *prenda comercial sobre derechos* (commercial pledge over rights) in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower granted a pledge in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over the Borrower's rights under each of the Project Documents (excluding the Real Estate Rights Agreements, the Water Rights Usufruct Agreement, the Water Rights Usufruct Lease Agreement, the Contribution and Assignment of Bare Ownership of Water Rights Agreement, the Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement), acknowledged and accepted by AES Andes or MLP (as successor-in-interest to AMSA), as applicable, as amended by the relevant Security Documents Amendment. |
| "Pledge of Subordinated Loans" | the *prenda sin desplazamiento sobre créditos futuros* (pledge without conveyance over future loans), in the form of a Chilean notarial public deed, among the Onshore Collateral Agent, for the benefit of the Secured Parties, the Borrower, and any Permitted Subordinated Lender pursuant to which the Permitted Subordinated Lenders stated therein granted a pledge under the laws of the Country in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over the Permitted Subordinated Lenders' interests under any future Subordinated Loan made to the Borrower, as amended by the relevant Security Documents Amendment. |
| "Pledge of the Framework Agreement" | the *prenda comercial sobre derechos* (commercial pledge over rights) in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower granted a pledge in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over the Borrower's rights under the Framework Agreement, acknowledged and accepted by [AES Andes Foundation], as amended by the relevant Security Documents Amendment. |

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Pledge over VAT Refunds" | the pledge without conveyance (*Prenda Sin Desplazamiento*) in the form of a Chilean notarial public deed, entered into between the Borrower and the VAT Lender, over the Borrower's rights to collect the VAT Refunds from the Chilean IRS or the Tesorería. |
| "Politically Exposed Person" | any individual who is or has been entrusted with prominent public functions in a country, including Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state-owned corporations, important political party officials and family members of such individuals. |
| "Potential Event of Default" | any event or circumstance that would, with notice, lapse of time, the making of a determination or any combination thereof, become an Event of Default. |
| "Power Stations" | collectively, (i) the Alfalfal II Power Station and (ii) the Las Lajas Power Station. |
| "Principal Payment Date" | means any date that is a 1L Principal Payment Date and/or a 2L Payment Date |
| "Prior Capitalization Loans" | shall have the meaning ascribed to such term in Section 2.01(a) hereof |
| "Prior Hedging Debt" | shall have the meaning ascribed to such term in Section 2.01(a) hereof |
| "Prior Senior Debt" | shall have the meaning ascribed to such term in Section 2.01(a) hereof |
| "Prior Senior Loans" | shall have the meaning ascribed to such term in Section 2.01(a) hereof |
| "Prior Supplier Financing" | shall have the meaning ascribed to such term in Section 2.01(a) hereof |
| "Prohibited Party" | any Person: |
| | (i)     who at the time being considered is listed in the UN Sanction List; or |
| | (ii)    who at the time being considered is listed in the World Bank Listing of Ineligible Firms and Individuals (see, http://web.worldbank.org/external/default/main?contentMDK=64069844&menuPK=116730&pagePK= |

- 50 -

64148989&piPK=64148984&querycontentMDK=6
4069700&theSitePK=84266); or

(iii)  who has not complied, as determined by the Secured
       Creditors, with the "Know Your Customer"
       requirements of the Secured Creditors pursuant to
       the Secured Creditors' policies relating to the
       prevention and deterrence of corruption, fraud,
       collusion, coercion, money laundering and the
       financing of terrorism; or

(iv)   who is (A) the subject of a public investigation,
       grand jury indictment or of a proceeding, an
       information, a complaint, or any other instrument or
       pleading filed or issued by any Authority charging
       corruption, fraud, collusion, coercion, money
       laundering or the financing of terrorism, or (B) found
       or adjudicated guilty, convicted or sentenced with
       respect to corruption, fraud, collusion, coercion,
       money laundering or the financing of terrorism,
       regardless of whether such determination of guilt,
       conviction or sentence results from a plea of guilty
       or *nolo contendere* or any other plea by such Person
       with respect to corruption, fraud, collusion, coercion,
       money laundering or the financing of terrorism; or

(v)    whose name is specified in, or pursuant to, any
       Executive Order issued by the President of the
       United States of America relating to the designation
       of such Person as a terrorist or terrorist organization
       or blocking any assets of such Person; or

(vi)   in respect of whom a notice has been issued by the
       government of the United States of America that all
       financial transactions involving the assets of such
       Person have been, or are to be, blocked; or

(vii)  who is designated, at the time being considered, in
       published lists issued by the government of the
       United States of America, including:

       (A)   the Denied Persons List, issued by the United
             States Commerce Department, Bureau of
             Industry and Security;

- 51 -

[AM_ACTIVE 403646503_3]

(B) the Unverified List, issued by the United States Commerce Department, Bureau of Industry and Security;

(C) the Entity List, issued by the United States Commerce Department, Bureau of Industry and Security;

(D) the List of Specifically Designated Nationals and Blocked Persons, issued by the United States Department of the Treasury, Office of Foreign Assets Control; and

(E) the List of Debarred Parties, issued by the United States Department of State, Defense Trade Controls;

(viii) who at the time being considered is listed in any European Union Sanctions List; or

(ix) who is a Politically Exposed Person or a Public Official.

"Prohibited Transferee" any Person that (i) has engaged in any Sanctionable Practices, or (ii) has threatened in writing and is otherwise a party to, any claim, action, suit, litigation or proceeding against any Secured 2L Lender, or (iv) does not satisfy any Secured 2L Lender's anti-money laundering requirements that are in effect at the time of a proposed assignment, or (v) is a Prohibited Party, or (vi) is not a Shareholder, or is not one hundred percent (100%) owned by the Sponsor or by the Shareholder and that acquires or proposes to acquire in the aggregate, when combined with the interests of any Affiliate, five percent (5%) or more of the Economic Ownership Interests and/or the direct or indirect Voting Rights in the Borrower, who is not satisfactory to DFC, in its reasonable discretion, the reasonable nature of the exercise of such discretion being determined in view of DFC's role as an agency of the United States of America, and based on DFC's policies, practices and procedures, and Applicable Law.

"Project" the design, construction, equipping, financing, placing into operation and maintenance of a 531MW hydropower plant, consisting of the Power Stations and related interconnection and transmission assets, the Site and all ancillary facilities related thereto, located in San José de Maipo, approximately

[AM_ACTIVE 403646503_3]

<table>
<tbody>
<tr>
<td></td>
<td>50 kilometers east of Santiago in the Country. If the Secured Creditors consent to the Battery Storage Project, it shall be included as part of the Project.</td>
</tr>
<tr>
<td>"Project Accounts"</td>
<td>collectively, the Offshore Collateral Accounts and the Onshore Project Accounts.</td>
</tr>
<tr>
<td>"Project As-Tested Capacity"</td>
<td>the sum of the As-Tested Capacity (as defined in the Voith EPC Contract) at a flow rate of one-hundred percent (100%) for each of the Units (as defined in the Voith EPC Contract), provided that, the As-Tested Capacity for any Unit may not exceed the Capacity Guarantee (as such terms are defined in the Voith EPC Contract) for such Unit.</td>
</tr>
<tr>
<td>"Project Completion Date"</td>
<td>the day on which each of the following requirements has been satisfied:</td>
</tr>
</tbody>
</table>

(i)    the Construction Completion Date has occurred and the facilities included in the Project are complete and have been accepted by the Borrower in accordance with the Construction Contracts;

(ii)    no Event of Default or Potential Event of Default has occurred and is continuing;

(iii)    there are (A) no undisputed amounts owed to any Construction Contractor, other contractor or supplier under any Material Project Document that remain unpaid, in each case for which Punchlist Holdback Amounts (as defined in the Offshore Accounts Agreement) have not been provided for, and (B) no material pending claims by any Construction Contractor, other contractor or supplier under any Material Project Document, in each case for which Disputed Project Costs Holdback Amounts (as defined in the Offshore Accounts Agreement) have not been provided for;

(iv)    all Authorizations required to be obtained by such date for the normal operation of the Project have been obtained and remain in full force and effect;

(v)    the sites, facilities, plants, and equipment comprising the Project have been constructed, completed, and operate in all material respects in accordance with the Environmental and Social Requirements, Applicable Law and the Environmental and Social Construction Report, unless a Corrective Action

- 53 -

[AM_ACTIVE 403646503_3]

Plan, in form and substance satisfactory to the Required Creditors, is in place with respect thereto and the Borrower is in compliance therewith;

(vi)     the Environmental and Social Construction Report has been delivered to the Intercreditor Agent and the Applicable Agents;

(vii)    all Environmental and Social Reports and Plans and all other applicable documents required to be delivered pursuant to Annex F (*Environmental, Social and Health and Safety Action Plan*) on or prior to the beginning of operations of the Project, have been delivered to the Intercreditor Agent and the Applicable Agents;

(viii)   all insurances in respect of the operational phase required under Section 5.04 (*Insurance*) and Annex C (*Insurance Requirements*) are in full force and effect;

(ix)     the Intercreditor Agent and the Applicable Agents have received:

(A)      an Environmental and Social Monitoring Report with respect to the achievement of the Project Completion Date; and

(B)      a certificate from the Environmental and Social Consultant stating that (I) the Project was constructed in compliance in all material respects with the Environmental and Social Requirements and (II) the Project and, with respect to the Project, each Environmental Party are in compliance in all material respects with all Environmental and Social Requirements, unless a Corrective Action Plan, in form and substance satisfactory to the Required Creditors, is in place with respect thereto and the Project and, to the extent applicable under such Corrective Action Plan, each Environmental Party is in compliance therewith.

(x)      the Borrower has certified to the Intercreditor Agent and the Applicable Agents in writing that each of the

- 54 -

|  | requirements listed in clauses (i) to (viii) above has been met; and |
|---|---|
|  | (xi)  the Independent Engineer has confirmed to the Intercreditor Agent and the Applicable Agents in writing that each of the requirements listed in clauses (i) and (iii) above has been met. |
| ["Project Costs" | the estimated costs for construction that the Independent Engineer confirms are required to complete construction of the Project, and start-up of the Project and other amounts set forth in Annex A (*Project Cost*).] |
| "Project Documents" | collectively: |
|  | (i)  the Material Project Documents; |
|  | (ii)  each Approved PPA; |
|  | (iii)  the Additional Project Documents; |
|  | (iv)  the Framework Agreement; and |
|  | (v)  all renewals, extensions, modifications or amendments of the documents specified above. |
| "Project Model Auditor" | KPMG or any other Project model auditor appointed by the Required Creditors. |
| "Project Party" | each Person party to a Project Document other than the Borrower and any Secured Party. |
| "Project Subcontractor" | each Person sub-contracted by a Material Project Participant to perform under a Material Project Document. |
| "Promise of Commercial Pledge of Approved PPAs" | the *promesa de prenda comercial sobre derechos* (promise of commercial pledge over rights), in the form of a Chilean notarial public deed, between the Onshore Collateral Agent, for the benefit of the Secured Parties, and the Borrower, pursuant to which the Borrower promised to grant a pledge under the laws of the Country in favor of the Onshore Collateral Agent for the benefit of the Secured Parties over the Borrower's rights under Approved PPAs entered into or acquired by the Borrower from time to time after the Effective Date, as amended by the relevant Security Documents Amendment. |

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Promise of Conditional Assignment of Project Documents" | the *promesa de cesión condicional de derechos* (promise of conditional assignment of rights), included in the Conditional Assignment of Rights and Contracts, pursuant to which the Borrower promised to conditionally assign to the Onshore Collateral Agent, for the benefit of the Secured Parties, its rights and obligations under Project Documents entered into from time to time after the date of the Conditional Assignment of Rights and Contracts, as amended by the relevant Security Documents Amendment. |

"Public Official"

(a)    any holder of legislative, executive, administrative or judicial office (in a state or subdivision thereof), appointed or elected, serving on a permanent basis or otherwise, paid or unpaid, regardless of rank;

(b)    any other person exercising a public function, including for a public agency or enterprise; or

(c)    any other person defined as a public official under Applicable Law or any Applicable Environmental and Social Law of the Country.

| | |
|---|---|
| "Public Registry" | with respect to any property or right, the competent public property registry of the country where such property or right is to be registered, if so required by contract or law, in accordance with Applicable Law (including any Applicable Environmental and Social Law). |
| "Real Estate Rights" | all leases, easements, rights of way or other real estate rights granted under the Real Estate Rights Agreements or Applicable Law (including any Applicable Environmental and Social Law). |
| "Real Estate Rights Agreements" | any and all real estate rights agreements, including easements, lease agreements, rights of way, usufructs and other real estate agreements, entered into by the Borrower or any other Person on behalf or for the benefit of the Borrower, including for the Project's transmission access and the Transmission Lines. |
| "Recoverable VAT" | any VAT paid or payable by the Borrower but only insofar as the Borrower can request its refund according to Article 27 bis of Decree Law 825 of 1974 (VAT Law) as amended, and any VAT Netted Amounts. |
| "Refinancing Debt" | means the 1L Refinancing Debt and the 2L Refinancing Debt. |

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Refinancing Instruments" | means a note, a loan or other similar debt instrument entered into by the Borrower in connection with the incurrence of any Refinancing Debt. |
| "Release" | with respect to any chemical, material or substance any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or other introduction into the environment of such chemical, material or substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance. |
| "Release Date" | has the meaning assigned to such term in Section 7.04 (*Term of Agreement*). |
| "Reorganization Plan" | a chapter 11 plan of reorganization of the Borrower and AM DE pursuant to which they will exit the Bankruptcy Cases. |
| "Required 2L Lenders" | has the meaning assigned to such term in the Intercreditor Agreement and which term shall not be modified or amended without the consent of the Borrower. |
| "Required Completion Date" | December 31, 2023. |
| "Required Creditors" | [has the meaning assigned to such term in the Intercreditor Agreement and which term shall not be modified or amended without the consent of the Borrower.][16] |
| "Resolution Authority" | an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority. |
| "Restoration Plan" | has the meaning assigned to such term in Section 5.04(d)(ii)(C)(1) (*Insurance*). |
| "Restricted Payments" | with respect to the Borrower: |

(i)     any declaration or payment of any dividend (in cash or in kind), or any cash distribution on its Share Capital, or other distribution on its equity;

(ii)    any redemption, retirement, purchase or other acquisition of, directly or indirectly, any shares of any class of its Share Capital outstanding on or after the Plan Effective Date (or of any options or warrants issued by the Borrower with respect to its Share

---

[16] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

Capital), other than, any Shares issued by the Borrower as a result of the conversion of Shared Services Loan into Shares pursuant to Section [•] of [•];

(iii)    any payment of principal of or interest on any Subordinated Loans, or any other payment under a Subordinated Loan Agreement;

(iv)    any other payment to any Affiliate other than (A) payments to the Sponsor or Shareholder, as applicable, pursuant to Section 4.02(c)(ii) (*Withdrawals from the Disbursement Account*) of the Offshore Accounts Agreement, (B) payments expressly contemplated under the Project Documents to which such Affiliate is a party and, in the case of this clause (B) except with respect to Designated Contract Payments made by the Borrower to any Affiliate, only in the amounts provided for under the Annual Budget (including the additional amounts permitted to be paid as set forth in Section 5.01(t) (*Compliance with Annual Budget*)), (C) payments to an Affiliate pursuant to Section 4.02(d) (*Withdrawals from the Disbursement Account*), Sections 5.02(a)(i)(D) (*Withdrawals from the Offshore Revenue Account*), and Sections 5.02(b)(i)(E) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement, (D) payments of Secured Obligations, the Secured Exit Loan (including the Sponsor Deferrals), the Secured Working Capital Facility and the Shared Services Loans in accordance with the Financing Documents, and (E) payments made to Affiliates following an instruction or determination by the CEN [in connection with spot market purchases or sales]; or

(v)    any intercompany loans granted by the Borrower to the Shareholder or the Sponsor.

"RPG Water Rights Agreement"    the agreement entered into by and between AES Andes and RP Global Chile Energías Renovables S.A., by means of a public deed dated July 29, 2011, as the same was assigned to the Borrower by means of private instrument dated November 29, 2013.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Sanctionable Practice" | any Corrupt Practice, Fraudulent Practice, Coercive Practice, Collusive Practice or Obstructive Practice. |
| "Sanctions" | means the economic sanctions laws, regulations, embargoes or restrictive measures administered or enacted by (i) the United States Government, (ii) the United Nations, (iii) the European Union, (iv) Her Majesty's Treasury or (v) the Country, and with regards to clauses (i) through (v) above, the respective governmental institutions and agencies of any of the foregoing, including the Office of Foreign Assets Control of the U.S. Department of Treasury and the United States Department of State. |
| "Second Amended and Restated Common Terms Agreement" | has the meaning specified in the recitals of this Agreement. |
| "Secured 1L Debt" | collectively, the Secured 1L Notes and any 1L Refinancing Debt. |
| "Secured 1L Debt Documents" | the Secured 1L Indenture, and any loan or note or other debt instrument representing 1L Refinancing Debt. |
| "Secured 1L Indenture" | the Indenture, dated on or about the date hereof, among the Borrower and the 1L Trustee thereto. |
| "Secured 1L Noteholders" | [to include list of lenders opting into tradeable instrument on closing date] and any their successors and permitted assigns. |
| "Secured 1L Notes" | the notes issued by the Borrower to the Secured 1L Noteholders in accordance with the Secured 1L Indenture. |
| "Secured 2L Creditors" | the Secured 2L Lenders and the Secured 2L Noteholders. |
| "Secured 2L Debt" | collectively, the Secured 2L Loans, the Secured 2L Notes and any 2L Refinancing Debt. |
| "Secured 2L Debt Documents" | the Secured 2L Loan Agreement, the Secured 2L Indenture and any loan or note or other debt instrument representing 2L Refinancing Debt. |
| "Secured 2L Indenture" | the Indenture, to be dated on or about the date of the settlement of the 2L Debt Exchange, among the Borrower and the 2L Trustee. |
| "Secured 2L Lenders" | the lenders under the Secured 2L Loan and any of their successors and permitted assigns. |

| | |
|---|---|
| "Secured 2L Loan Agreement" | the Loan Agreement, dated on or about the date hereof, among the Borrower and the Secured 2L Lenders party thereto from time to time. |
| "Secured 2L Loans" | the loans made by the Secured 2L Lenders to the Borrower in accordance with the Secured 2L Loan Agreement (including 2L Capitalizations (as defined in the Secured 2L Loan Agreement)) or, as the context requires, its principal amount from time to time outstanding. |
| "Secured 2L Noteholders" | [to include list of lenders Strabag, and hedge providers opting into tradeable instrument on closing date] and any their successors and permitted assigns. |
| "Secured 2L Notes" | the notes to be issued by the Borrower on the settlement date of the 2L Debt Exchange in accordance with the Secured 2L Indenture. |
| "Secured Creditor Representative" | means (i) the Exit Administrative Agent with respect to the Secured Exit Loan Agreement and the Secured Exit Lenders, (ii) the 2L Administrative Agent with respect to the Secured 2L Loan Agreement and the Secured 2L Lenders, (iii) the 1L Trustee with respect to the Secured 1L Indenture and the Secured 1L Noteholders, (iv) the 2L Trustee with respect to the Secured 2L Indenture and the Secured 2L Noteholders, and (v) the trustee or administrative agent, as applicable, with respect to the Refinancing Debt. |
| "Secured Creditors" | the Secured 2L Lenders, the Secured Noteholders and creditors of the Refinancing Debt. |
| "Secured Debt" | the 1L/ 2L Secured Debt, the Secured Exit Loans, the Secured Working Capital Facility, the VAT Loans and the Strabag Deferrals. |
| "Secured Debt Documents" | [the 1L/ 2L Secured Debt Documents, the Secured Exit Loan Agreement, the Secured Working Capital Facility Agreement, the VAT Loan Agreement and (to the extent it evidences the Strabag Deferrals) the Strabag Tunneling Contract.][17] |

---

[17] NTD: Subject to further review.

"Secured Exit Lender"

AES Andes and any of its successors and permitted assigns, acting in such capacity under the Secured Exit Loan Agreement.

"Secured Exit Loan Agreement"

the Loan Agreement, dated on or about the date hereof, among the Borrower and the Secured Exit Lenders party thereto from time to time.

"Secured Exit Loans"

the loans made by the Secured Exit Lenders to the Borrower in accordance with the Secured Exit Loan Agreement or, as the context requires, its principal amount from time to time outstanding [(inclusive of the Sponsor Deferrals and the Deferred Exit Financing Interest)].

"Secured Indentures"

the Secured 1L Indenture, the Secured 2L Indenture, and any Refinancing Instrument (to the extent structured in the form of an indenture).

"Secured Noteholders"

the Secured 1L Noteholders, the Secured 2L Noteholders, and the holders of the Refinancing Debt (if structured in the form of notes).

"Secured Notes"

the Secured 1L Note, the Secured 2L Note, and the notes issued by the Borrower to the noteholders upon incurrence of any Refinancing Debt (if structured in the form of notes).

"Secured Obligations"[18]

collectively:

(i)      the unpaid amount of principal of and interest on the Secured Debt, (including interest accruing at the then applicable rate provided in this Agreement after the maturity of such Secured Debt, and interest accruing at the then applicable rate after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post filing or post-petition interest is allowed in such proceeding); and

(ii)      all other obligations and liabilities of the Borrower to any Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which arise under, out of, or in connection with, this Agreement or the other

---

[18] NTD: Subject to further review.

|  | Financing Documents or any other document made, delivered or given in connection herewith or therewith, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, charges, expenses or otherwise (including all fees and expenses that are required to be paid by the Borrower pursuant to the terms of this Agreement or any other Financing Document). |
|---|---|
| "Secured Parties" | collectively: |

(i)     each Secured Creditor;

(ii)    Strabag, with respect to its right to receive the Strabag Deferrals;

(iii)   the 2L Administrative Agent;

(iv)    each Trustee;

(v)     the trustee or the administrative agent under any Refinancing Instrument, as applicable;

(vi)    the Intercreditor Agent;

(vii)   each Collateral Agent;

(viii)  the Offshore Accounts Bank;

(ix)    the Onshore Accounts Bank;

(x)     the Secured Exit Lender;

(xi)    the Secured Working Capital Facility Lender; and

(xii)   VAT Lender.

| "Secured Working Capital Facility" | a working capital facility provided by the Secured Working Capital Facility Lender pursuant to the Secured Working Capital Facility Agreement of up to $15 million maturing on January 15, 2024. |
|---|---|
| "Secured Working Capital Facility Agreement" | that certain working capital facility agreement entered into between the Borrower and the Secured Working Capital Facility Lender on [the date hereof]. |

- 62 -

| | |
|---|---|
| "Secured Working Capital Facility Commitment" | the Secured Working Capital Facility Lender's commitment to fund the Secured Working Capital Facility pursuant to the Secured Working Capital Facility Agreement. |
| "Secured Working Capital Facility Discharge Date" | means the date on which the Secured Working Capital Facility Commitment is terminated and any amounts outstanding under the Secured Working Capital Facility have been repaid in full. |
| "Secured Working Capital Facility Lender" | AES Andes and any of its successors and permitted assigns, acting in such capacity under the Secured Working Capital Facility "Agreement. |
| "Security" | each Lien, power of attorney, or rights to step in or cure breaches or novate created by, or pursuant to, or evidenced by, the Security Documents in relation to the Security Collateral to secure all amounts owing by the Borrower to the Secured Parties under this Agreement, the other Financing Documents, and all other Secured Obligations. |
| "Security Collateral" | (i) all rights, title, interest, and ownership in the Share Capital of the Borrower and AM DE (which, for the avoidance of doubt, shall not include the Shared Services Loans) and (ii) all rights, title, interest, ownership, assets (movable or immovable) and benefit of the Borrower and AM DE in the Project or any other assets of the Borrower and AM DE, including rights, title, ownership, assets and benefit of the Borrower and AM DE in the Project Documents, the Project Accounts, insurance and reinsurance policies, receivables, inventories, equipment, machinery and the Site. |
| "Security Documents" | collectively, the Onshore Security Documents (as amended by the Security Documents Amendments) and the Offshore Security Documents. |
| "Security Documents Cancellation and Release" | the release and cancellation made in the form of a Chilean notarial public deed, dated the date hereof, to each of the Strabag Subordinated Loans Pledge Agreement, the Strabag Share Pledge Agreement and the Pledge of Hedging Agreements, made by the relevant parties to each such security documents. |
| "Security Documents Amendments" | collectively, (i) the amendments made to the Onshore Security Documents prior to the date hereof, (ii) the amendments made in the form of a Chilean notarial public deed, dated the date hereof, to each of the Onshore Security |

- 63 -

|  | Documents, made by the relevant parties to each Onshore Security Documents and (iii) the amendments to be made in the form of a Chilean notarial public deed to each of the Onshore Security Documents, by the relevant parties to each Onshore Security Documents on or before the Plan Effective Date. |
|---|---|
| "SEN" | the *Sistema Eléctrico Nacional* (the National Electric System). |
| "Share" | a share in the Share Capital of the Borrower. |
| "Share Capital" | with respect to any Person (other than a natural person), all shares of any class or other ownership interests of any kind, however called, and including Economic Ownership Interests and Voting Rights, in such Person. |
| "Share Retention Agreement" | the Third Amended and Restated Share Retention Agreement dated on or about the date of this Agreement, among the Borrower, the Sponsor, the Shareholder and the 2L Administrative Agent. |
| "Shared Facilities Agreement" | the Shared Facilities Lease Agreement dated as of December 9, 2013, between the Borrower and AES Andes. |
| "Shared Services Loans" | the amounts deferred by AES Andes in accordance with the amendments to the Energy and Capacity Losses Compensation Agreement and the Connection and Toll Agreement on or before the date hereof, the principal amount of which will be equal, as of any date, to the Contingent Intercompany Payments as of such date. |
| "Shareholder" | Norgener and any other Person that becomes a shareholder of the Borrower from time to time in compliance with the Share Retention Agreement. |
| "Site" | the portions of the Real Estate Rights on which (i) the Underground Works will be excavated and constructed, (ii) the two Power Stations will be excavated and constructed and (iii) the Project's substations are or will be located. |
| "Special Geology Advisor" | a special geological advisor, selected by the Required Creditors, engaged as a subcontractor to the Independent Engineer or otherwise by or on behalf of the Secured Creditors who will perform a role that is complementary to the role of the Independent Engineer. |

- 64 -

| | |
|---|---|
| "Sponsor" | means AES Andes. |
| "Sponsor Deferrals" | the deferral of [Deferred Amounts payable to AES Andes under and as defined in each of the O&M Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement][19] in an aggregate amount of $7,200,000. |
| "Stamp Tax" | the stamp tax payable pursuant to Decree Law No. 3,475 of 1980 of the Country, as amended, in respect of the Secured Debt, any Financing Document or any Subordinated Loan. |
| "Strabag" | Strabag SpA, a *sociedad por acciones* organized and exiting under the laws of the Country. |
| "Strabag Change Order Deferral" | means the $1,141,097 payable upon completion of Change Order Nos. 1, 2 and 4 (as such term is defined in the Tunneling Contract), which shall be deferred until December 31, 2022. |
| "Strabag Construction Deferral" | an aggregate amount of $10 million payable to Strabag upon Substantial Completion of Milestone F (as such terms are defined in the Tunneling Contract), which shall be deferred until it is paid pursuant to Section [•][*excess cash flow sweep*] of this Agreement. |
| "Strabag Deferrals" | the Strabag Change Order Deferral, the Strabag Construction Deferral and the Strabag Insurance Deferral. |
| "Strabag Insurance Deferral" | means, upon receipt, the approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 19448014, and No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) which shall be deferred until December 31, 2022. |
| "Strabag Invoice" | shall have the meaning set forth in Section 5.02(aa) hereof. |
| "Strabag Letter(s) of Credit" | [•][20] |

---

[19] NTD: Definition to be revised in order to be more specific (i.e., pointing to the relevant sections) in identifying these deferrals once the underlying documentation is finalized.

[20] NTD: To be defined with reference to the Strabag Tunneling Contract.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Strabag Share Pledge Agreement" | the *prenda sin desplazamiento sobre acciones* (pledge without conveyance over shares), in the form of a Chilean notarial public deed, dated March 17, 2017 granted at the Notary Office of Santiago of Mr. Roberto Antonio Cifuentes Allel under record number 2,194-2017, as amended. |
| "Strabag Subordinated Loans Pledge Agreement" | the *prenda comercial sobre créditos* (commercial pledge over credits), in the form of a Chilean notarial public deed, dated March 17, 2017 granted at the Notary Office of Santiago of Mr. Roberto Antonio Cifuentes Allel under record number 2,195-2017, as amended. |
| "Strabag Tunneling Contract" | the Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract dated February 19, 2018, between the Borrower and Strabag, as amended on or about May 8, 2018 and as further amended on or about the date hereof. |
| "Subordination Agreement" | means an agreement substantially in the form of [Schedule [•] (*Form Subordination Agreement*)] to be entered into by and among the Borrower, the corresponding Permitted Subordinated Lender, and the Intercreditor Agent. |
| "Subordinated Loans" | each loan made by any Permitted Subordinated Lender to the Borrower (including equity contributions made to the Borrower by the Sponsor or the Shareholder in the form of Subordinated Loans evidenced by an acknowledgement of debt substantially in the form of Schedule 6 (*Form of Acknowledgment of Debt for Subordinated Loans*) hereto, pledged in favor of the Onshore Collateral Agent for the benefit of the Secured Parties in accordance with a Pledge of Subordinated Loans, the repayment of which, and the payment of interest, fees and any other charges in respect of which, are subordinated pursuant to the Subordination Agreement; provided, however, that in the event that the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) changes its criteria in respect of the exemption of acknowledgements of debt from the payment of Stamp Tax and considers those documents subject to payment of Stamp Tax, each loan made after such change of criteria by any Permitted Subordinated Lender to the Borrower, shall be evidenced by a promissory note endorsed in guaranty to the Onshore Collateral Agent for the benefit of the Secured Parties, the repayment of which, and the payment of interest, fees and any other charges in respect of which, shall be evidenced in an agreement in form and substance |

[AM_ACTIVE 403646503_3]

|  | satisfactory to the Required Creditors and subordinated pursuant to the Subordination Agreement. |
|---|---|
| "Subordinated Loan Agreement" | each loan agreement or other document or instrument providing for a Subordinated Loan, in form and substance satisfactory to the Required Creditors. |
| "Subsidiary" | with respect to the Borrower, an Affiliate over fifty percent (50%) of whose Share Capital is owned, directly or indirectly, by the Borrower. |
| "Supplier Deferred Payment" | has the meaning provided in the Second Amended and Restated Common Terms Agreement. |
| "Taxes" | any present or future taxes, withholding obligations, duties and other charges of whatever nature levied by any Authority. |
| "Technical Support and Services Agreement" | the Technical Support and Services Agreement between the Borrower and AES Andes, dated July 1, 2013. |
| "Termination Proceeds" | all amounts paid by or on behalf of any Project Party, under any Project Document, as a result of the termination of a Project Document. |
| "*Tesorería*" | the General Treasury of the Republic of Chile (*Tesorería General de la República de Chile*) or any other authority acting on behalf of such General Treasury. |
| "Transaction Documents" | collectively, the Financing Documents and the Project Documents. |
| "Transmission Line EPC Contract" | the Engineering, Supply, Construction, Assembly, Testing and Entry into Service of the Expansion to the Transmission System, dated December 9, 2013, as amended by Amendment No. 1 dated June 30, 2015, Amendment No. 2 dated October 30, 2015, Amendment No. 3 dated April 15, 2016, and Amendment No. 4 dated November 29, 2016, and as modified by Change Order No. 1 dated August 31, 2014, and Change Order No. 2 dated August 31, 2014, among AES Andes, Isolux Ingeniería Agencia Chile and the Borrower, as third party beneficiary, in respect of (A) the approximately 9.4 km above-ground portion of the Alfalfal II Power Station to Alfalfal I Substation double-circuit transmission line; and (B) the Maitenes Substation to Alfalfal I Substation transmission line (single circuit, approximately 6.8 km in above-ground length). |

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Transmission Lines" | collectively, the following five (5) transmission lines that will connect the Project to the relevant substations of the SIC: |

(i)     Alfalfal II Power Station to Alfalfal I Substation transmission line (double circuit, approximately 2.6 km in underground length and 9.4 km in above-ground length);

(ii)    Maitenes Substation to Alfalfal I Substation transmission line (single circuit, approximately 6.8 km in above-ground length);

(iii)   Las Lajas Power Station to Alto Maipo Substation (double circuit, approximately 0.93 km in underground length);

(iv)    Alto Maipo Substation to La Florida Substation transmission line (double circuit, approximately 12.8 km in above-ground length); and

(v)     Alfalfal I Substation to Los Almendros transmission line (double circuit, approximately 43.4 km in above-ground length).

| | |
|---|---|
| "Trustees" | collectively, the 1L Trustee and the 2L Trustee. |
| "UK Financial Institution" | any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms. |
| "UK Resolution Authority" | the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution. |
| "Underground Works" | has the meaning set forth in the Strabag Tunneling Contract. |
| "United States", "U.S.", or "US" | the United States of America. |
| "VAT" | value added tax and any other tax of a similar nature. |

- 68 -

| | |
|---|---|
| "VAT Holding Account" | has the meaning set forth in the Onshore Accounts Agreement. |
| "VAT Commitment Letter" | that certain commitment letter entered into by the Borrower and the VAT Lenders dated as of [•]. |
| "VAT Documents" | the VAT Loan Agreement, the VAT Commitment Letter and the VAT Security Documents. |
| "VAT Escrow Account" | has the meaning set forth in the Onshore Accounts Agreement. |
| "VAT Lender" | [•], acting in such capacity under the VAT Loan Agreement.. |
| "VAT Loan" | the loan made available under the VAT Loan Agreement. |
| "VAT Loan Agreement" | the VAT loan agreement between the VAT Lender and the Borrower entered into [on the date hereof]. |
| "VAT Loan Commitment" | an amount equal to [$68,875,000]. |
| "VAT Mandate" | the collection mandate (*Mandato Irrevocable de Cobro*) in respect of every amount payable to the Borrower arising from VAT Refunds, in the form of a Chilean notarial public deed, entered into between the Borrower and the VAT Lender. |
| "VAT Money Pledge" | the pledge without conveyance (*Prenda Sin Desplazamiento*) in the form of a Chilean notarial public deed, to be entered into between the Borrower and the VAT Lender, over the funds deposited in the VAT Holding Account and VAT Escrow Account and over permitted investments made with funds from the VAT Holding Account and VAT Escrow Account from time to time in accordance with the VAT Loan Agreement and the Onshore Accounts Agreement. |
| "VAT Netted Amounts" | the amount of VAT monthly collected and withheld by the Borrower, which has been netted against the VAT credit balance of the Borrower, as set forth on Form 29 (*Declaración Mensual y Pago Simultáneo de Impuestos*), Form 2,117 (*Solicitud*) or other any applicable form, filed by the Borrower with the relevant Chilean tax authority. |
| "VAT Refund" | the amount of any Recoverable VAT received by the Borrower from the relevant Tax authorities in respect of |

- 69 -

[AM_ACTIVE 403646503_3]

|  | Project Costs paid by the Borrower with proceeds from a VAT Loan. |
|---|---|
| "VAT First Lien Security Documents" | the documents creating a first ranking Lien that is pari passu to the Lien granted to the Secured 1L Noteholders, for the benefit of the VAT Lender, granted by (i) the Borrower in connection with the Security Collateral covered by the Mortgages, the Asset Pledge, and the Pledge of Future Project Documents; (ii) AM DE in connection with the Offshore Subsidiary Guaranty and Security Agreement, (iii) the Shareholder in connection with the Shares; and (iv) each Permitted Subordinated Lender in connection with the Subordinated Loans. |
| "VAT Security Documents" | (i) the VAT Mandate, (ii) the VAT Money Pledge, (iii) the Pledge over VAT Refunds and (iv) the VAT Second Lien Security Documents[21]. |
| "Voith EPC Contract"[22] | the Lump Sum, Turnkey, Engineering, Procurement and Construction Contract (AM-CO510) dated August 10, 2012, among the Borrower, Voith Hydro Ltda., and Voith Hydro, S.A., as amended on September 12, 2013, on December 2, 2013, on December 5, 2013, February 7, 2014, June 15, 2017 and [•], 2022[23]. |
| "Voting Rights" | the rights to vote on or cause the direction of the management and policies of the Borrower through the ownership of voting securities in ordinary and extraordinary matters; provided that, a Person shall not be deemed to hold Voting Rights if by contract or order, by decree or regulation of an Authority, or for any other reason, such Person has effectively ceded or been divested of the power to exercise such vote or to direct such management or policies. |
| "Water Code" | the water code of the Republic of Chile enacted by DFL N°1122 of 1981 as amended from time to time. |
| "Water Rights Licenses" | the annual licenses that the owners of water rights are required to pay in the Country for the non-use of those water rights as set forth in article 129 bis 4 of the Water Code. |

---

[21]   NTD: Pending final confirmation.

[22]   NTD: To be updated to include amendment.

[23]   NTD: To be updated to reflect assumption.

[AM_ACTIVE 403646503_3]

| | |
|---|---|
| "Water Rights Usufruct Agreement" | the agreement granted by a Chilean notarial public deed, entitled *Contrato de Usufructo de Derechos de Aprovechamiento de Aguas* between the Borrower and AES Andes dated July 1, 2013. |
| "Water Rights Usufruct Lease Agreement" | the agreement granted by a Chilean notarial public deed, entitled *Arrendamiento del Usufructo de los Derechos de Aprovechamiento de Aguas* between the Borrower and AES Andes dated July 1, 2013, as amended on December 9, 2013. |
| "World Bank" | the International Bank for Reconstruction and Development, an international organization established by Articles of Agreement among its member countries. |
| "Write-Down and Conversion Powers" | (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers. |

Section 1.02.  *Financial Calculations*.  (a) All financial calculations to be made under, or for the purposes of, this Agreement and any other Financing Document shall be calculated based on the most recent information available on the applicable date of calculation in respect of the withdrawals and transfers from the Project Accounts under the Accounts Agreements.

(b)     Where annual financial statements for a Financial Year are available, then those annual financial statements shall be used for making financial calculations.

(c)     If a financial calculation is to be made under or for the purposes of this Agreement or any other Financing Document on a Consolidated Basis, that calculation shall be made by reference to the sum of all amounts of a similar nature reported in the relevant financial statements of each of the entities whose accounts are to be consolidated with the accounts of the Borrower plus or minus the consolidation adjustments customarily applied to avoid double counting of transactions among any of those entities, including the Borrower.

- 71 -

Section 1.03.    _Interpretation_.  In this Agreement, unless the context otherwise requires:

(a)    headings are for convenience only and do not affect the interpretation of this Agreement;

(b)    words importing the singular include the plural and vice versa;

(c)    a reference to an Annex, Article, party, Schedule, Section or clause is a reference to that Article, Section or clause of, or that Annex, party or Schedule to, this Agreement;

(d)    a reference to a document includes an amendment, amendment and restatement, or supplement to, or replacement or novation of, that document but disregarding any amendment, amendment and restatement, supplement, replacement or novation made in breach of this Agreement;

(e)    a reference to a party to any document includes that party's successors and permitted assigns; and

(f)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

Section 1.04.    _Business Day Adjustment_.  (a) If a Payment Date of principal or interest under any of the Financing Documents is not a Business Day, then such Payment Date, as applicable, shall be automatically changed to the next Business Day.

(b)    When the day on or by which a payment (other than a payment of principal or interest) is due to be made is not a Business Day, that payment shall be made on or by the next Business Day.

Section 1.05.    _Secured Debt Documents_.  (a) This Agreement, including its definitions, conditions to effectiveness, representations and warranties, covenants, events of default, principles of construction, rules of interpretation and its jurisdiction, governing law and notice provisions, is made a part of each of the Secured Debt Documents to the extent set forth herein or if expressly incorporated by reference therein.

(b)    Subject to Section 1.05(c), this Agreement and each Secured Debt Document shall be read and construed together as one agreement.

(c)    If any provision of this Agreement conflicts with any provision of any Secured Debt Document, then the provisions of the relevant Secured Debt Document shall prevail.

Section 1.06.    _Rights and Obligations of Secured Parties_.  (a) The obligations of each Secured Party under the Financing Documents are several.  Failure by a Secured Party to perform its obligations under the Financing Documents does not affect the obligations of any other Secured Party under the Financing Documents.  No Secured Party is responsible for the obligations of any other Secured Party under the Financing Documents.

[AM_ACTIVE 403646503_3]

(b)     The rights of each Secured Party under or in connection with the Financing Documents are separate and independent rights and any debt arising under the Financing Documents to a Secured Party from the Borrower shall be a separate and independent debt.

(c)     Subject to the Intercreditor Agreement, a Secured Party may, except as otherwise stated in the Financing Documents, separately enforce its rights under the Financing Documents.

(d)     Notwithstanding any term of any Financing Document, the consent of any Person who is not a party hereto is not required to rescind or vary this Agreement at any time.

## ARTICLE II

## Secured Debt

Section 2.01.   *Secured Debt*.

(a)     Prior to the Effective Date, certain Secured Creditors (i) disbursed Senior Loans (under and as defined in the Second Amended and Restated Common Terms Agreement) to the Borrower in an aggregate amount, including accrued interest, equal to $[•] (the "Prior Senior Loans"), (ii) provided Tranche B Capitalization Loans (under and as defined in the Second Amended and Restated Common Terms Agreement) to the Borrower in an aggregate amount equal to $[•] (the "Prior Capitalization Loans"), (iii) provided financing for the Supplier Deferred Payment pursuant to the Supplier Deferred Payment Agreement (as defined in the Second Amended and Restated Common Terms Agreement) to the Borrower in an aggregate amount equal to $[•] (the "Prior Supplier Financing") and (iv) provided Required Hedging Agreements (under and as defined in the Second Amended and Restated Common Terms Agreement) which were terminated by notice from the Hedging Counterparties (under and as defined in the Second Amended and Restated Common Terms Agreement) to the Borrower on November 19, 2021 with an aggregate Termination Payment Amount (as defined in the Required Hedging Agreements) equal to $183,386,694.36 (the "Prior Hedging Debt").  The aggregate amount of the Prior Senior Loans, the Prior Capitalization Loans, the Prior Supplier Financing and the Prior Hedging Debt is equal to $[•] (collectively, the "Prior Senior Debt").

(b)     Subsequent to the Petition Date:

(i)     the Exit Financing Lender provided the DIP Facility to AM DE, which is guaranteed by the Borrower, of which $[•] remain outstanding as of the date hereof;

(ii)     the Sponsor agreed to the Sponsor Deferrals; and

(iii)     the Secured Exit Lender agreed to the Deferred Exit Financing Interest.

(c)     [On the Effective Date and in accordance with the applicable Secure Debt Documents, (i) the Prior Senior Debt will be amended and restated into Secured 2L Loans in an amount equal to $[•]; (ii) the DIP Facility will be amended and restated into Secured Exit Loans in an amount equal to $[60 million] (inclusive of the Sponsor Deferrals and the Deferred Exit Financing Interest), (iii) the Secured Working Capital Facility Lender shall make available to the

- 73 -

Borrower the Secured Working Capital Facility to the Borrower; and, (iv) the VAT Lenders shall make available to the Borrower the VAT Loan Agreement.]

Section 2.02.   _Interest._   Subject to the provisions of Section 2.03(a) *(Default Interest Rate)*, the Borrower shall pay interest on the Secured Debt on each Interest Payment Date thereof in accordance with the terms of this Agreement and the relevant Secured Debt Document governing such Secured Debt.

Section 2.03.   _Default Interest Rate._   (a) Without limiting the remedies available to each Secured Party under this Agreement, any other Financing Document or otherwise (and to the maximum extent permitted by Applicable Law), if the Borrower fails to make any payment of principal or interest (including interest payable pursuant to this Section) on any Secured Debt or any other payment provided for under this Agreement or any other Financing Document when due as specified in this Agreement or the relevant Financing Document (whether at stated maturity or upon acceleration), the Borrower shall pay to the relevant Secured Party interest on the amount of that payment due and unpaid at the rate which shall be the default rate set forth in the applicable Secured Debt Document or, if not set forth therein, the sum of two percent (2%) per annum and the applicable Interest Rate under the Secured Debt Document to which that Secured Party is a party.

(b)   Interest at the rate referred to in Section 2.03(a) shall accrue from the date on which payment of the relevant overdue amount became due until the date of actual payment of that amount (after as well as before judgment), and shall be payable by the Borrower on demand by the Applicable Agent or the relevant Secured Party or, if not demanded, on each Interest Payment Date under this Agreement or the relevant Secured Debt Document falling after any such overdue amount became due.

Section 2.04.   _Repayment_.   (a) Subject to Section 1.04(a) (*Business Day Adjustment*), the Borrower shall repay the Secured Debt in accordance with the terms of the applicable Secured Debt Document.

(b)   Any principal amount of any Secured Debt repaid under this Agreement or the applicable Secured Debt Document may not be re-borrowed or re-issued (except for any repayment of principal amount of the Secured Working Capital Facility prior to the termination of the Secured Working Capital Facility Commitment).

Section 2.05.   _Voluntary Prepayment._   The Borrower shall be permitted to make voluntary prepayments of the Secured Debt in accordance with the terms of the applicable Secured Debt Document; provided that any voluntary prepayment on Secured 2L Debt will be made pro rata across Secured 2L Loans and Secured 2L Notes.

Section 2.06.   _Mandatory Prepayment._   (a) The Borrower shall be required to make mandatory prepayments at the times and subject to the conditions specified in the Offshore Accounts Agreement and the Onshore Accounts Agreement.

(b)   [Simultaneously with any mandatory prepayment, the Borrower shall pay all (A) accrued interest on the Secured Debt to be prepaid, and (B) Increased Costs, if any, on the amount of the Secured 2L Loans, the Secured Working Capital Facility or Secured Exit Loans to be

- 74 -

prepaid, (C) all breakage and redeployment costs incurred upon unwinding funding arrangements resulting from the prepayment, including the amount payable under Section 2.10 (*Unwinding Costs*), of the Secured 2L Loan Agreement, and (D) any make whole amount due and payable under Section 3.7 of the Secured 1L Indenture, in each case, to the extent required under this Agreement, the Secured Debt Documents, VAT Loan, Secured Working Capital Facility or Secured Exit Loans and all other amounts then due and payable under this Agreement and the Secured Debt Documents. *Provided however,* that in respect to the Secured Working Capital Facility and Secured Exit Loans, Increased Costs will only apply to the extent that the Secured Working Capital Facility Lenders or Secured Exit Lenders are commercial banks.]

(c)     Any prepayment shall be applied in inverse order of maturity to the remaining repayment installments of the Secured Debt being prepaid pursuant to this Section 2.06.

(d)     Any prepayment pursuant to Section 2.06(a)(v) shall be applied only to prepay the [Secured Debt owing to the Secured Party affected by the circumstances described in Sections [•](*Illegality*) of the [•][24] and in accordance therewith][25].

(e)     No prepayment premium shall be due on mandatory prepayments made under this Section 2.06.

(f)     Any principal amount of the Secured Debt mandatorily prepaid under this Section 2.06 may not be re-borrowed or re-issued, except for any principal amount mandatorily prepaid under the Secured Working Capital Facility prior to the termination of the Secured Working Capital Facility Commitment.

(g)     Amounts equal to the reasonable and documented third party costs and expenses and Taxes incurred by or on behalf of or payable by the Borrower in connection with the collection and conversion, if necessary, of Expropriation Proceeds, CNM Arbitral Award Proceeds, Disposition Proceeds, Casualty Proceeds, Liquidated Damages Proceeds and/or Termination Proceeds shall be permitted to be transferred out of the Extraordinary Proceeds Account, the Share Transfer Proceeds Account or the Insurance Proceeds and Compensation Account (each as defined in the Offshore Accounts Agreement), as applicable, by the Borrower for payment of such amounts in accordance with the Offshore Accounts Agreement.

Section 2.07.   *Currency and Place of Payments.*  (a) Except as provided in Section 2.07(d), the Borrower shall make all payments of principal, interest, fees, and any other amount due to the Secured Creditors, the Secured Exit Lender and the Secured Working Capital Facility Lender under this Agreement and the other Financing Documents in the Loan Currency, in same day funds, to the Secured Creditor(s), the Secured Exit Lender and the Secured Working Capital Facility Lender entitled thereto, as applicable, at such times and at such places and accounts and in such manner as set forth in the relevant Secured Debt Documents.

---

[24]   NTD: These cross references should be to the relevant illegality section of the loan agreements.

[25]   NTD: To be revised to include this provision in the relevant secured debt documents.

[AM_ACTIVE 403646503_3]

(b)      The tender or payment of any amount payable under this Agreement or any other Financing Document (whether or not by recovery under a judgment) to any Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender in any currency other than the Loan Currency for such Secured 2L Lender, the Secured Exit Lender and the Working Capital Facility Creditor shall not novate, discharge or satisfy the obligation of the Borrower to pay that Secured Creditor, the Secured Exit Lender and the Working Capital Facility Lender in the Loan Currency for its Secured Debt and all amounts payable under this Agreement, the applicable Secured Debt Document, or other Financing Document, as applicable, except to the extent that (and as of the date when) that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender actually receives funds in such Loan Currency in the account specified in, or pursuant to, the relevant Secured Debt Document.

(c)      The Borrower shall indemnify each Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender against any losses resulting from a payment being received or an order or judgment being given under this Agreement in any currency other than the Loan Currency for that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender or any place other than the account specified in, or pursuant to, the relevant Secured Debt Document.  The Borrower shall, as a separate obligation, pay such additional amount to the Applicable Agent (for the account of such Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender) as is necessary to enable that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender to receive, after conversion to the Loan Currency at a market rate, the full amount due to that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender under this Agreement or the relevant Financing Document in the Loan Currency and in the account specified in, or pursuant to, the relevant Secured Debt Document.  The Applicable Agent shall transfer such additional amount to the relevant Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender upon the receipt of detailed instructions to be provided by the relevant Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender to the Applicable Agent.

(d)      Notwithstanding the provisions of Section 2.07(a) and (b) and any other provisions of the Secured Debt Documents, each Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender may require the Borrower by written notice (with a copy to the Applicable Agent) to pay (or reimburse that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender or to pay the Applicable Agent for the account of such Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender) for any Indemnified Taxes, fees, costs, expenses and other amounts payable under [Section 2.11 (*Taxes*) of the Secured 2L Loan Agreement, Section [●] (*Taxes*) of each Secured Indenture, Section [●] (*Taxes*) of the Secured Exit Loan Agreement and Section [●] (*Taxes*) of the Secured Working Capital Facility Agreement and Section 2.08(a) (*Expenses*)] in the currency in which they are payable, if other than the Loan Currency for that Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender; provided that, only payments in freely convertible currencies may be made to the Applicable Agent for the account of the Secured Creditor, the Secured Exit Lender and the Secured Working Capital Facility Lender.

Section 2.08.  *Expenses*.  (a) The Borrower shall pay or, as the case may be, reimburse each Secured Party or its assignees any amount paid by them on account of, all Indemnified Taxes (including Stamp Tax, provided that, any Stamp Tax payable or reimbursable by the Borrower at

[AM_ACTIVE 403646503_3]

any point in time in connection with the Secured 1L Debt and the Secured 2L Debt shall be subject to a cap of an aggregate amount of $16.4 million (converting any amounts paid on account of Stamp Taxes in pesos at the "*observado*" exchange rate in effect at the time of payment)), duties, fees or other charges payable on or in connection with the execution, issue, delivery, registration or notarization of the Transaction Documents and any other documents related to this Agreement or any other Transaction Document.

(b)     The Borrower shall pay to the Applicable Agent (for the account of the relevant Secured Parties) or as the Applicable Agent may direct:

(i)     the reasonable and documented fees and expenses of legal counsel and Consultants incurred in connection with monitoring the Project and the investment by the Secured Creditors provided for under this Agreement and the other Financing Documents;

(ii)    the reasonable and documented fees and expenses of (x) one international legal counsel and one local legal counsel and of Consultants, acting on behalf of the Secured Creditors and (y) one international legal counsel and one local legal counsel acting on behalf of the Secured Exit Lender and Secured Working Capital Facility Lender, in each case, incurred in connection with:

(A)     the preparation of this Agreement, the respective Secured Debt Documents and all other Financing Documents;

(B)     the preparation and review, execution and, where appropriate, translation and registration with the competent Public Registry of the Transaction Documents and any other documents related thereto;

(C)     the giving of any legal opinions required by any Secured Party under or in respect of this Agreement and any other Financing Document;

(D)     the preparation of closing sets for each of the Secured Parties;

(E)     the administration by each Secured Party of the investment provided for in this Agreement and the other Financing Documents or otherwise in connection with any amendment, supplement or modification to, or waiver under, any of the Financing Documents;

(F)     the registration (where appropriate) and the delivery of the evidences of indebtedness relating to the Secured Debt; and

(G)     the release of the Security following repayment in full of the Secured Debt;

(iii)    the reasonable and documented costs and expenses incurred by the Applicable Agent in connection with a secure web-based electronic syndication system used by the Applicable Agent;

(iv)    the documented costs and expenses incurred by each Secured Party in relation to:

(A)    except as otherwise provided in any Secured Debt Document, any amendment, supplement or modification to, waiver under, or restructuring of (but without double-counting any modification fee payable under any Secured Debt Document), any of the Financing Documents, including the fees and expenses of legal counsel and all Consultants;

(B)    the occurrence of any Event of Default or Potential Event of Default or any event requiring a prepayment of any Secured Debt pursuant to Section 2.06(a) (*Mandatory Prepayment*), including, the fees and expenses of legal counsel and all Consultants and any other third party consultants or advisors whose advice is reasonably required by the Required Creditors; and

(C)    efforts to enforce or protect its rights under any Financing Document, or the exercise of its rights or powers consequent upon or arising out of the occurrence of any Event of Default or Potential Event of Default, including legal and other professional consultants' fees on a full indemnity basis;

(v)    except as otherwise provided in any Secured Debt Document, all reasonable and documented out-of-pocket costs and expenses related to the environmental and social monitoring and the expenses related to the periodic environmental and social monitoring visits performed by the Secured 2L Lenders and the Environmental and Social Consultant in accordance with, and subject to the terms and conditions of, the Environmental and Social Monitoring Agreement; and

(vi)    all other costs and expenses incurred by the Environmental and Social Consultant in accordance with the Environmental and Social Monitoring Agreement.

(c)    For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, it is hereby understood and agreed that any fees and expenses incurred by one or more Secured Parties jointly with the Applicable Agent will be paid in full by the Borrower to the Applicable Agent (or as the Applicable Agent may direct), for the account of the relevant Secured Parties, including the Applicable Agent.  Any fees and expenses incurred by one or more Secured Parties, not including the Applicable Agent, shall be paid by the Borrower directly to the relevant Secured Parties (or as the relevant Secured Parties may direct), whether the invoice(s) for

[AM_ACTIVE 403646503_3]

such payment is provided to the Borrower directly by such Secured Parties or through the Applicable Agent.

Section 2.09.   *Application of Payments; Sharing*. (a) Subject to the provisions of Section 2.09(b), (c) and (g), the Applicable Agent shall, promptly after its receipt of each payment from or on behalf of the Borrower in respect of any amount due to the Secured Parties under this Agreement or under any other Financing Document, distribute such payment to the Secured Parties in accordance with the terms of the Intercreditor Agreement.

(b)     Each of the Secured Creditors shall, if it should receive any amount hereunder or under any other Financing Document (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Financing Documents, or otherwise), which, in any such case, is in excess of its *pro rata* share of payments obtained by all of the Secured Creditors party to the Secured Debt Document to which it is a party, then that Secured Creditor receiving such excess payment (except to the extent such payment is received in Convertible Currencies during any Inconvertibility Event, as described in Section 2.09(c), in which case such excess payment shall be remitted to the Borrower or as the relevant Secured Creditor may otherwise determine) shall inform the Applicable Agent and the other Secured Creditors party to the Secured Debt Document to which it is a party within five (5) Business Days of the receipt thereof, and cause the received amounts to be applied pursuant to the terms of the Intercreditor Agreement.

(c)     Notwithstanding anything to the contrary contained in this Agreement concerning the pro rata allocation of any payments received by or for the account of the Secured Creditors in accordance with this Agreement, the Intercreditor Agreement or any other Financing Document, none of the Secured Creditors shall have any obligation to share payments received by or for the account of that Secured Creditor in freely convertible and transferable currencies ("Convertible Currencies") under circumstances where there is an unavailability or shortage of foreign exchange in the Country or there has occurred a general moratorium or general debt rescheduling with respect to indebtedness of entities in the Country (an "Inconvertibility Event"), and by reason of such circumstances, any Authority of the Country having the power to regulate foreign exchange has permitted the Borrower to convert the lawful currency of the Country into, and/or transfer, Convertible Currencies in order to pay obligations denominated in Convertible Currencies which are owed to that Secured Creditor but has not permitted it to do so in order to pay obligations denominated in Convertible Currencies that are owed to the other Secured Creditors.

(d)     Subject to Section 2.09(e), during any Inconvertibility Event the Borrower shall pay all amounts due hereunder or any other Financing Document to or for the joint and exclusive benefit of each Secured Party that is not able to receive or obtain in the contractual place of payment Convertible Currencies in respect of Dollar denominated payment obligations of the Borrower hereunder or any other Financing Document (each such Secured Party, an "Affected Secured Party") into one or more escrow accounts in the Country in the name of, or in trust for, or otherwise for the joint and exclusive benefit of, all Affected Secured Parties (and on terms satisfactory to all such Affected Secured Parties) in the legal currency of the Country or, if permitted, in Dollars, to be held in such escrow account until the Inconvertibility Event no longer exists, at which time all amounts held in such escrow accounts shall be converted into Dollars and paid to the Affected Secured Parties and applied against amounts due hereunder or any other

[AM_ACTIVE 403646503_3]

Financing Document and not paid by virtue of such Inconvertibility Event based on their *pro rata* shares of such amounts. If, following conversion into Dollars the amount is greater than required to pay all such amounts owing to the Affected Secured Parties in respect of which such funds were originally credited to the escrow account, the balance shall be paid to the Borrower, and if the amount is less than required, then the unpaid balance shall be promptly paid by the Borrower, provided that, in either case, all the payments due to the Secured Parties pursuant to Section 2.09(c) have already been made.

(e)    To the extent that on any date when payments are due under this Agreement there is an Inconvertibility Event, payment by the Borrower of amounts contemplated under Section 2.09(c) shall only be made contemporaneously with the payment to the escrow accounts referred to in Section 2.09(d) in the legal currency of the Country or, if permitted, in Dollars of the amount that cannot be paid to the Affected Secured Parties on that date by virtue of the Inconvertibility Event (applying in relation to any payment in the legal currency of the Country to an escrow account an exchange rate equal to the official exchange rate issued by the Central Bank of Chile on the day prior to such payment) and, in the event that the Borrower has insufficient funds to make payment in full in accordance with Section 2.09(c) and to the escrow accounts under Section 2.09(d) in accordance with the foregoing provisions of this Section 2.09(e), payments shall be made *pro rata* to such amounts owing to all Secured Parties. For the avoidance of doubt, for the purposes of this Section 2.09(e), references to amounts "due" or "owing" on any date shall exclude amounts that fell due on an earlier date and cannot be paid by virtue of an Inconvertibility Event but in respect of which the Borrower has previously already paid the required amount into an escrow account as contemplated by Section 2.09(d), regardless of any intermediate exchange rate variation.

(f)    For the avoidance of doubt:

(i)    subject to the proviso of Section 2.09(d), the Affected Secured Parties shall not be bound to share any amounts held in escrow accounts in the name of, in trust for, or otherwise for the joint benefit of, such Affected Secured Parties with any Secured Party that received payments for its account in freely convertible and transferable currencies in accordance with Section 2.09(c) above;

(ii)    neither the existence of an Inconvertibility Event nor any provision of this Section 2.09(f) shall in any way modify, vary or constitute a defense to, the obligations of the Borrower to make payments in Dollars in full when due and payable under the Financing Documents in the required place of payment whether or not the Borrower is subject to any Inconvertibility Event and payment to the escrow account(s) shall not constitute payment for these purposes; and

(iii)    if whilst an Inconvertibility Event is continuing, any Authority of the Country having the power to regulate foreign exchange permits an Affected Secured Party holding funds in an escrow account in accordance with Section 2.09(d) to convert the legal currency of the Country into, and/or transfer, Convertible Currencies outside the Country, then such Affected

- 80 -

Secured Party shall be entitled to receive and convert and/or transfer its *pro rata* share of funds held in escrow accounts and the provisions of Section 2.09(c) shall apply thereto and, for the avoidance of doubt, any shortfall remaining after transfer and/or conversion shall remain due and owing from the Borrower.

(g)     For purposes of distributing Convertible Currencies to any Secured Party pursuant to Section 2.09(c), the Applicable Agent shall be entitled to rely, and shall be fully protected in relying, on written instructions from the Borrower as to the identity of each Secured Party to which such Convertible Currencies are to be remitted and the amount of such Convertible Currencies to be remitted to each such Secured Party.

Section 2.10.   *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected  Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

## ARTICLE III

## Representations and Warranties

Section 3.01.   *Representations and Warranties*. The Borrower represents and warrants to [Secured Creditors] that as of the Effective Date:

(a)     <u>Organization and Authority</u>.  The Borrower is a *sociedad por acciones* duly incorporated and validly existing under the laws of the Country and has the requisite corporate

[AM_ACTIVE 403646503_3]

power and authority and has obtained all required Authorizations to own its assets, conduct its business as presently conducted and to enter into, and comply with its obligations under, the Transaction Documents to which it is a party. AM DE is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has the requisite limited liability company power and authority and has obtained all required Authorizations to own its assets, conduct its business as presently conducted and to enter into, and comply with its obligations under, the Transaction Documents to which it is a party.

(b)   <u>Validity</u>.

(i)   Each Transaction Document to which the Borrower or AM DE is a party has been duly authorized and executed by the Borrower or AM DE, as applicable, and to the best of the Borrower's knowledge, after due inquiry, by each Material Project Participant party thereto and constitutes a valid and legally binding obligation of the Borrower, AM DE and each such Material Project Participant, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors rights generally, and general equitable principles (whether considered in a proceeding in equity or at law). Each Chilean Law Note, when issued and delivered, and if applicable, upon any blanks thereon having been filled in pursuant to the Note Power of Attorney, will constitute a *título ejecutivo* in the Country and entitle the holder thereof to commence summary proceedings (*acción ejecutiva*) in the Country for the enforcement of such Chilean Law Note.

(ii)   [Reserved].

(c)   <u>No Conflict</u>. Neither the execution of any Transaction Document to which the Borrower or AM DE is a party nor the compliance with its terms will conflict with or result in a breach of any terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which the Borrower or AM DE is a party or by which it is bound, or violate any of the terms or provisions of the Borrower's or AM DE's Charter or any Authorization, Applicable Law or Applicable Environmental and Social Law applicable to the Borrower or AM DE or will result in, or create any Lien (other than Permitted Liens) upon or with respect to any of the Borrower's or AM DE's assets now owned or hereafter acquired by the Borrower or AM DE.

(d)   <u>Status of Authorizations</u>.

(i)   Any necessary corporate, shareholder or creditor authorizations and consents required by the Borrower or AM DE and referred to in Section 4.01(d) (*Corporate Documents and Authorizations*) have been obtained by the Borrower or AM DE, as applicable, as of the date of this Agreement.

(ii)   (A) The Authorizations specified in <u>Annex B</u> (*Authorizations*) are all the Authorizations (other than Authorizations that are of a routine nature and

- 82 -

are obtained in the ordinary course of business or, subsequent to the Effective Date, become required for the current stage of the Project) needed by the Borrower to: (1) conduct its business; (2) carry out the Project and for the current stage of the Project; (3) execute and comply with its obligations under this Agreement and each of the other Transaction Documents to which it is a party and; (4) perfect the Liens created in all of the Security Collateral subject to the Security Documents in accordance with the Applicable Priority; (B) the Authorizations specified in Section 1 of Annex B (*Authorizations*) are all the Authorizations that are necessary on the date of this Agreement for (1) the current stage of development, construction, ownership or operation of the Project, (2) the due execution, delivery, validity and enforceability of, and performance by the Borrower of its obligations under, this Agreement and all other Transaction Documents to which the Borrower is a party and (3) the remittance to each Secured Party, counsel or Consultant in Dollars or any other applicable currency of all monies payable under or with respect to any Financing Document and the Monitoring Agreements, and all such Authorizations have been obtained and are in full force and effect; (C) the Borrower, its agent or designee has applied (or is making arrangements to apply) or will apply (or cause third parties to apply) for all Authorizations specified in Section 2 of Annex B (*Authorizations*) (to the extent they have not already been obtained on the date this representation is made), and such Authorizations that have not yet been obtained are not required to be obtained by the Borrower at the time this representation is made for the current stage of the development, construction, ownership or operation of the Project, and the Borrower has no reason to believe that it will not be able to obtain such Authorizations at the time required to comply with its obligations under this Agreement and the other Transaction Documents to which it is a party; and (D) each Authorization required to be obtained by the Borrower for the current stage of the development, construction, ownership and operation of the Project has been duly obtained and is in full force and effect and with respect to (1) the Material Authorizations (other than those listed in clauses (ii) and (iii) of the definition thereof) and all other Authorizations listed under Subpart A of Section 1 of Annex B (*Authorizations*) and, when obtained, Subpart A of Section 2 of Annex B (*Authorizations*), the Borrower is in compliance in all respects with the requirements of all such Authorizations and (2) the Material Authorizations listed in clauses (ii) and (iii) of the definition thereof and all other Authorizations listed in Section 1 of Annex B (*Authorizations*) and, when obtained, Section 2 of Annex B (*Authorizations*), the Borrower is in compliance in all material respects with the requirements of all such Authorizations, and in each case there has not been any revocation or

- 83 -

variation of any such Authorization where such revocation or variation could reasonably be expected to result in a Material Adverse Effect.[26]

(iii) Except for rights that can reasonably be expected to be obtained on commercially reasonable terms at the time required, the Project Documents contain all rights that are necessary for (A) the construction, completion, development, operation and ownership of the Project on terms consistent with the Annual Budget, and (B) the conduct of the business of the Borrower as contemplated by the Transaction Documents to which it is a party.

(iv) All utility services necessary for the Project are available to the Borrower.

(v) The Borrower has:

(A) permanent and unrestricted rights to access the Site and to any buildings or fixtures on the Site required for the current stage of development, construction, ownership or operation of the Project; and

(B) all easements, wayleaves and other property rights required for the current stage of development, construction, ownership or operation of the Project, including the use of electricity lines (overhead or underground) and pipelines or other conveyors for the transportation of water and sewage to and, as appropriate, from the Site.

(vi) The Borrower has obtained all Authorizations (other than those Authorizations that are the responsibility of the Construction Contractor under the Strabag Tunneling Contract) necessary for deposit of muck, in each case in locations appropriate under the Strabag Tunneling Contract adequate to accept deposits of muck in the volumes projected to be produced by the Work (under and as defined in the Strabag Tunneling Contract).

(vii) The Borrower has obtained all Authorizations (other than those Authorizations that are the responsibility of the Construction Contractor under the Strabag Tunneling Contract) necessary for the discharge of water, in each case in locations appropriate under the Strabag Tunneling Contract adequate to accept water discharge in the volumes projected to be produced by the Work (under and as defined in the Strabag Tunneling Contract).

(e)     No Amendments to Charter.  The Borrower's Charter has not been amended since [[●], 2019].  AM DE's Charter has not been amended since [[●], 2022].

---

[26] NTD: This provision to be simplified once Annex B is prepared.

[AM_ACTIVE 403646503_3]

(f)     No Immunity.  Neither the Borrower, AM DE nor any of their respective property enjoys any right of immunity from set-off, suit or execution with respect to its assets or its obligations under any Transaction Document.

(g)     Borrower's Disclosure.    All documents, reports or other written information pertaining to the Borrower, AM DE or the Project that have been furnished to the Applicable Agents or any Secured Creditor by or on behalf of the Borrower or AM DE, including where any such document, report or other written information has been superseded or complemented by any other document, report or other information prior to the date of this Agreement, including  all information relating to the Borrower, AM DE or the Project provided by or on behalf of the Borrower or AM DE to any Secured Creditor (other than projections and other forward-looking statements contained in the Base Case Model and other forecasts and projections, which were prepared by or on behalf of the Borrower in good faith on the basis of reasonable assumptions representing its views as at the date given or made), were, as at the date provided by or on behalf of the Borrower or AM DE, and including any supplemental information provided by the Borrower or AM DE, continue to be true and accurate in all material respects and do not contain any information that is misleading in any material respect nor do they omit any information the omission of which makes the information contained in them misleading in any material respect.

(h)     Financial Condition.   Since [date of last financial statements], other than the commencement of the Chapter 11 Cases and effects thereof, the Borrower:

> (i)     has not suffered any change that has, or could reasonably be expected to have, a Material Adverse Effect or incurred any substantial loss or Liabilities, in each case, required to be disclosed in accordance with Accounting Standards, except as disclosed in accordance with the Accounting Standards or by the Borrower to the Intercreditor Agent pursuant to the Transaction Documents; or

> (ii)     has not incurred any Financial Debt other than Permitted Financial Debt and the DIP Facility.

(i)     Financial Statements.   The most recent financial statements of the Borrower delivered to the Secured Creditors pursuant to Section 4.01(i) (*Conditions of Effectiveness - Financial Statements*):

> (i)     have been prepared in accordance with the Accounting Standards, and present fairly the financial condition of the Borrower as of the date as of which they were prepared and the results of its operations during the period then ended; and

> (ii)     present fairly all Liabilities of the Borrower required to be disclosed in accordance with Accounting Standards, as at the relevant date, and the reserves, if any, for such Liabilities and all unrealized or anticipated Liabilities and losses arising from commitments entered into by it.

(j)     Title to Assets and Permitted Liens.

- 85 -

(i)     The Borrower has valid and unencumbered title to and has a valid and unencumbered right to use, enjoy and dispose (*usar, gozar y disponer*) all of the assets and properties purported to be owned by it, and has a valid and unencumbered right to use and enjoy (*usar y gozar*) all assets and properties (including the Transmission Lines) that it purports to use and enjoy and otherwise has valid rights over the Electric Concession and, subject to the qualifications in clauses (ii) and (iii) below, the Mining Concessions, the Real Estate Rights and water rights, in each case that are necessary for the development, construction, ownership or operation of the Project; in all cases free and clear of all Liens and any prior ranking or *pari passu* ranking claims of any third party (other than claims mandatorily preferred by Applicable Law or any Applicable Environmental and Social Law and Permitted Liens); and no contracts or arrangements, conditional or unconditional, exist for the creation by the Borrower of any Lien, except for Permitted Liens.

(ii)    The Borrower has entered into all Real Estate Rights Agreements and obtained all water rights necessary for the development, construction, ownership and operation of the Project and which are set forth in Schedule 3.01(j)(ii) (*Real Estate Rights Agreements and Water Rights*).

(iii)   All Mining Concessions are set forth in Part A of Schedule 3.01(j)(iii) (*Mining Concessions*) and, as of the Effective Date, the Borrower has obtained all such Mining Concessions.

(iv)    The Security Documents are effective to create, in favor of the Secured Parties, legal, valid, enforceable and, upon execution and compliance with any formality required under Applicable Law or any Applicable Environmental and Social Law for the perfection of the relevant security in accordance with the Applicable Priority on or in all of the Security Collateral covered by the Security (other than claims mandatorily preferred by Applicable Law or any Applicable Environmental and Social Law and Liens described in clauses (ix) and (xiv) of the definition of Permitted Liens).

(v)     All recordings and filings have been made in all public offices and Public Registries at the times required by this Agreement, all necessary consents have been obtained and all other actions have been taken so that the Liens created by each Security Document constitute (or will constitute once those recordings and filings have been completed) perfected Liens on the Security Collateral with the priority specified in the Security Documents and in accordance with the Applicable Priority.

(vi)    Neither the Borrower nor AM DE has authorized or consented to any filing, and there is no mortgage, charge or financing statement or other instrument or recordation covering all or any part of the assets and properties purported to be covered by the Security Documents on file in any recording office,

- 86 -

except such as may have been filed in favor of any Secured Parties and except with respect to Permitted Liens.

(k)     Taxes[27].

(i)     All tax returns and reports of the Borrower required by Applicable Law to be filed have been duly filed and all Taxes upon the Borrower, its properties, its income or its assets that are due and payable or to be withheld have been paid or withheld, other than those presently payable without penalty or interest (other than Taxes being contested for which the Borrower has made adequate reserves in accordance with the Accounting Standards).

(ii)    As of the date of this Agreement, no Taxes are required to be withheld or deducted on any payment to be made by or on account of any obligation of the Borrower under any Financing Document by reason of the place of organization, management or activities of (A) the Borrower, other than applicable Chilean withholding Tax in respect of (*x*) interest payments (and any other amounts to the extent deemed to be interest payments) made by the Borrower from the Country to any Foreign Lender and (*y*) any other payments to any foreign Secured Party that are assessable as income of such Secured Party pursuant to the Chilean income tax regulations, (B) any Person owning an equity interest (either directly or indirectly) in the Borrower or (C) any Person acting on behalf of the Borrower.

(iii)   As of the date of this Agreement, neither the execution, delivery or performance of any Financing Document, nor the consummation of any of the transactions contemplated thereby will result in any Tax being imposed by any Authority upon or with respect to any Secured Party, other than applicable Stamp Tax and the withholding Tax referred to in Section 3.01(k)(ii). Except for the registration required for the perfection of the relevant Security, under the laws of the Country and the registration with the Central Bank of Chile pursuant to the provisions of *Capítulo XIV del Compendio de Normas de Cambios Internacionales del Banco Central de Chile* (Chapter XIV of the Compendium of Foreign Exchange Regulations of the Central Bank of Chile), it is not necessary that the Financing Documents be filed, recorded or registered with a court or any other authority or any other authority registration or similar tax (other than applicable Stamp Tax) be paid on or in relation to the Financing Documents or the transactions contemplated by the Financing Documents.

(l)     Litigation.

(i)     Except as set forth in Schedule 3.01(l) (*Litigation*), neither the Borrower nor AM DE, the Sponsor or Shareholder is a party to or, to the best of the

_____

[27] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

Borrower's knowledge, threatened by, any litigation, arbitration, administrative proceedings, or criminal or regulatory investigation the outcome of which has or could reasonably be expected to have a Material Adverse Effect.

(ii)     Except as set forth in <u>Schedule 3.01(l)</u> (*Litigation*), there is, to the knowledge of the Borrower after due inquiry, no material dispute in connection with any Material Project Document.

(iii)    No judgment or order has been issued against the Borrower, AM DE, the Sponsor or the Shareholder that has or could reasonably be expected to have a Material Adverse Effect.

(m)    <u>Compliance with Law</u>.  Each of the Borrower and AM DE is not in violation of any Applicable Law in any material respect.

(n)    <u>Environmental and Social Matters</u>.    Except as set forth in <u>Schedule 3.01(n)</u> (*Environmental and Social Matters*), the Borrower:

(i)     is in compliance in all material respects with all Environmental and Social Requirements and all Authorizations regarding Environmental and Social Matters, unless a Corrective Action Plan, in form and substance satisfactory to the Required Creditors, is in place with respect thereto and the Borrower is in compliance therewith, and, to the knowledge of the Borrower after due inquiry, there are no pending Environmental Claims that have not been disclosed to the Intercreditor Agent;

(ii)    has not received and is not aware of either (A) any existing or, to the best of its knowledge, threatened complaint, order, directive, claim, citation or notice from any Authority or (B) any material written communication from any Person, in each case concerning the Project's failure to comply with any matter covered by the Environmental and Social Requirements, which failure has or could reasonably be expected to have a Material Adverse Effect or a material adverse impact on the implementation or operation of the Project in accordance with the Environmental and Social Requirements;

(iii)   certifies that there are no existing risks or adverse impacts relating to Environmental and Social Matters that have not been adequately mitigated or compensated or notified in writing to the Intercreditor Agent and that are duly addressed in the Environmental and Social Reports and Plans to the satisfaction of the Required Creditors;

(iv)    certifies that all information relating to the Project contained in any document or submitted by the Borrower or any Person on behalf of the Borrower to any Authority in connection with any Environmental and Social Matters was true and accurate in all material respects at the time of submission and no such document or material omitted any information the

- 88 -

omission of which would have made such document or material misleading in any material respect;

(v)     has provided to the Intercreditor Agent true and complete copies of the Environmental and Social Reports and Plans (other than the Environmental and Social Monitoring Reports) and where applicable, in accordance with <u>Annex F</u> (*Environmental, Social and Health and Safety Action Plan*), all other investigations, studies, audits, reviews, reports, plans or other analyses conducted by or on behalf of, or that are in the possession of, the Borrower or, to the Borrower's knowledge after due inquiry, any other Environmental Party with respect to any Environmental and Social Matters related to the Project; and

(vi)    is not aware of any fact or circumstance that would contravene or conflict with, in any material respect, any conclusion, finding or assumption contained in any (*x*) Environmental and Social Reports and Plans, unless resolved, mitigated or superseded by more recent Environmental and Social Reports and Plans or otherwise to the satisfaction of the Required Creditors or (*y*) other document referred to in the preceding sub-clause (v).

(o)     <u>Labor Matters</u>.  There are no ongoing or, to the best knowledge of the Borrower, threatened strikes, slowdowns or work stoppages by employees of the Borrower, or any Project Party with respect to the Project, other than strikes, slowdowns or work stoppages by employees of the Borrower or any Project Party with respect to the Project that could not reasonably be expected to have a Material Adverse Effect.

(p)     <u>Sanctionable Practices</u>. None of the Borrower, AM DE, the Shareholder, the Sponsor nor any Affiliate, nor any Person acting on its or their behalf, (i) has committed or engaged in, with respect to the Project or any transaction contemplated by this Agreement and the Secured Debt Documents, any Sanctionable Practice or (ii) is a Prohibited Party.

(q)     <u>Pari Passu Ranking</u>. The Borrower's and AM DE's payment obligations under the Financing Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors and except for the obligations mandatorily preferred by the laws of the Country, as applicable to the Borrower.

(r)     <u>Governing Law and Jurisdiction</u>. The choice of New York Law or of Chilean Law, as applicable, as the governing law of the applicable Financing Documents, as well as the relevant jurisdiction provisions contained therein, will be recognized and enforced in the Country.

(s)     <u>Financial Debt</u>.  [The Borrower has no Financial Debt other than Permitted Financial Debt, including as of the date of this Agreement, the Financial Debt listed in <u>Annex D</u> (*Existing Financial Debt*).  AM DE has no Financial Debt, other than 1L/ 2L Secured Debt.]

(t)     <u>Base Case Model</u>.  The Base Case Model has been prepared in good faith on the basis of reasonable assumptions, believed to be reasonable by the Borrower at the time when made, and the Borrower has no reason to believe that such assumptions are incorrect or misleading in any material respect.

- 89 -

(u)    <u>No Other Accounts</u>.  The Borrower has no bank accounts other than the Project Accounts.  AM DE has no bank accounts[, other than [•]][28].

(v)    <u>Sufficient Funds</u>. The Project is on schedule and has sufficient available funds in order for the Construction Completion Date to occur no later than the Required Completion Date.

(w)    <u>Project Documents</u>.

    (i)    All Material Project Documents executed by the Borrower are valid, binding and in full force and effect.

    (ii)    Except as disclosed to the [Secured Creditors] on the date hereof, the Borrower has no written notice of any material breach or threatened termination of any Material Project Document.

    (iii)    Except for services, materials or rights that can reasonably be expected to be available on commercially reasonable terms at the time required or the absence of which could not reasonably be expected to have a Material Adverse Effect, the Material Project Documents constitute all contracts, agreements or instruments necessary for the current stage of development, construction, ownership or operation of the Project.  All conditions precedent to the obligations of the Borrower under the Material Project Documents, if any, have been satisfied or waived. The Borrower is in compliance in all material respects with its obligations under each of the Material Project Documents.

(x)    <u>Insurance</u>.[29]

    (i)    All insurances and reinsurances required to be in full force and effect at such time in accordance with <u>Annex C</u> (*Insurance Requirements*) are in full force and effect and all premiums due and payable have been paid in full; and

    (ii)    to the knowledge of the Borrower, no event or circumstance has occurred nor has there been any omission to disclose a fact that in any such case would entitle any insurer or reinsurer to avoid or otherwise reduce its liability thereunder to less than the amount provided in the relevant policy.

(y)    <u>Intellectual Property</u>.  The Borrower has or will have, prior to the date upon which they are required, all intellectual property rights required by the Borrower in order to carry out the Project.

---

[28] NTD: Any AM DE accounts post-emergence to be added.

[29] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

(z)     No Other Business.  The Borrower has not carried on any business since the date of its incorporation that does not relate to the Project. AM DE has not carried on any business since the date of its formation that does not relate to the Chapter 11 proceeding.

(aa)    Subsidiaries - Affiliate Transactions.

(i)      The Borrower does not hold directly or indirectly any participations in any Person and has no Subsidiaries other than AM DE;

(ii)     AM DE does not hold directly or indirectly any participations in any Person and has no Subsidiaries;  and

(iii)    each of the Borrower and AM DE (x) has not entered into, directly or indirectly, any transaction with or for the benefit of an Affiliate of the Borrower (including guarantees and assumptions of obligations of an Affiliate of the Borrower) except upon reasonable terms no less favorable to the Borrower than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Borrower, except as permitted under the Financing Documents and (y) nor does it intend to enter into, directly or indirectly, any transaction with or for the benefit of an Affiliate of the Borrower (including guarantees and assumptions of obligations of an Affiliate of the Borrower) without the consent of the Intercreditor Agent (acting on instructions of the Required Creditors).  As of the date of this Agreement, each agreement entered into by the Borrower or AM DE with an Affiliate is listed in Schedule 3.01(aa) (*Affiliate Contracts*).

Section 3.02.  *Reliance*.  The Borrower acknowledges that it makes the representations and warranties in Section 3.01 (*Representations and Warranties*) with the intention of inducing each of the Secured Parties that is a party hereto to enter into this Agreement and each of the other Financing Documents to which it is a party and that each of the Secured Parties has entered into such documents on the basis of, and in full reliance on, each of such representations and warranties.

# ARTICLE IV

## Conditions of Effectiveness

Section 4.01.  *Conditions of Effectiveness*.  This Agreement shall become effective on the date the Intercreditor Agent issues a notice to the Borrower confirming that each of the following conditions have been met in form and substance satisfactory to the Secured 2L Lenders:

(a)     Transaction Documents.  The Transaction Documents (other than Additional Project Documents and those Transaction Documents not required by this Agreement or any other Financing Document to be entered into on the Effective Date) the Monitoring Agreements, and the Intercreditor Agreement, have been entered into by all parties thereto in form and substance satisfactory to the Secured 2L Lenders and have become (or, as the case may be, remain) unconditional and fully effective in accordance with their respective terms (except for this Agreement having become unconditional and fully effective, if that is a condition of any of those

agreements), and the Intercreditor Agent has received a copy of each of the aforementioned agreements.

(b)     Charters.  (i) The Intercreditor Agent has received:

(A)     a true and complete copy of the Borrower's Charter, [other than the excerpt of the Capital Increase Deed published in the Official Gazette and registered in the Santiago Registry of Commerce, which shall be delivered in accordance with Section 5.01(a) (*Corporate Existence; Conduct of Business*)]; and

(B)     a true and complete copy of the Charter of each of AM DE, Sponsor and Shareholder;

along with, in the case of the Borrower and the Shareholder, a *certificado de vigencia* (good standing certificate) and in the case of AM DE, a good standing certificate, in each case dated as of a date no earlier than ten (10) Business Days prior to the Effective Date;

(ii)     a certificate, addressed to the Secured 2L Lenders, confirming that no amendment has been made to the Borrower's Charter since [•] and no amendment has been made to AM DE's Charter.

(c)     Security.[30]

(i)     The Intercreditor Agent has received evidence that each of the Security Document Amendments and the Security Documents Cancellation and Release has been executed;

(ii)     The Security in respect of each of the Security Documents and the Security Documents Amendments has been duly created, perfected and if applicable, registered, granting security interests consistent with the Applicable Priority or a valid promise or conditional assignment, or (with respect to the Mortgages) right to register a mortgage, as applicable, in all the Security Collateral subject to each such Security Documents; notwithstanding any filings and registrations related to the Security Document Amendments executed on the date hereof, that shall be completed as provided in Section ___ below;

(iii)     The Borrower has fully and timely complied with all of its obligations under the Onshore Security Documents, including execution and registration of the applicable declaration deeds (*escrituras de declaración*) required under mortgages over future assets in the terms and conditions set forth in the relevant Onshore Security Documents;

---

[30] NTD: Pending final confirmations.

[AM_ACTIVE 403646503_3]

(iv)     The Borrower has executed all applicable declaration deeds (*escrituras de declaración*) in connection with those Onshore Security Documents corresponding to pledges without conveyance, for purpose of identifying after acquired secured assets and recording (*protocolizar*) with a Notary Public a copy of the Chilean Law Notes and other documents evidencing secured obligations thereunder and not registered in a public registry in Chile, executed after the execution date of the relevant pledge without conveyance and on or prior to the Effective Date, in the terms and conditions set forth in the relevant Onshore Security Documents; and

(v)      The Security Documents Amendments related to the Onshore Share Pledge Agreement have been duly notified to the Borrower by a notary public and annotated in the Shareholder's registry (*registro de accionistas*) of the Borrower; and

(vi)     The Intercreditor Agent has received completed requests for information or copies of the Uniform Commercial Code search reports and tax lien, judgment and litigation search reports, dated no more than ten (10) Business Days before the Closing Date, for the State of Delaware and any other jurisdiction reasonably requested by the Intercreditor Agent, together with copies of each UCC financing statement, fixture filing or other filings listed therein, which shall evidence no Liens on assets of AM DE, other than Permitted Liens.

(d)     <u>Corporate Documents and Authorizations</u>.  (i) The Intercreditor Agent has received an officer's certificate from an Authorized Representative of each of the Borrower, AM DE, the Sponsor and the Shareholder dated as of the date of this Agreement (including with respect to all attachments thereto) and certifying that:

(A)     included in such certificate is a Certificate of Incumbency and Authority including a true and complete copy of the incumbency and signature of the Persons authorized to execute and deliver on its behalf the Transaction Documents to which it is or is to be a party and any other documents in connection with the transactions contemplated hereby and thereby, including the notarized powers of attorney granted to such Persons;

(B)     attached to such certificate are true and complete copies of the valid resolutions from the board of directors, managers, shareholders or members, as applicable and/or any other necessary corporate, shareholder or creditor authorizations and consents required by the Borrower, AM DE, the Sponsor or the Shareholder, as applicable, duly authorizing or ratifying (*x*) its execution of, delivery of and performance under each Transaction Document to which it is or is to be party and each other document required to be executed and delivered by it in accordance with the provisions hereof or thereof;

- 93 -

and (*y*) to the extent applicable, the granting of Liens by it under the Security Documents; and

    (ii)    The Intercreditor Agent has received copies of all Authorizations listed in Section 1 of Annex B (*Authorizations*) and all those Authorizations are in full force and effect.

(e)    DIP Financing. The DIP Financing shall have been fully disbursed.

(f)    Insurance.  The Intercreditor Agent has received copies of certificates evidencing all insurance and reinsurance policies required to be obtained pursuant to Section 5.04 (*Insurance*) and Annex C (*Insurance Requirements*) prior to the Effective Date and a certification of the Borrower's insurers or insurance agents, addressed to the Intercreditor Agent, confirming that such insurance and reinsurance policies are in full force and effect, all premiums then due and payable thereunder have been paid and, if required pursuant to Section 5.04 (*Insurance*) or Annex C (*Insurance Requirements*), the Offshore Collateral Agent, has been named as sole loss payee (*beneficiario exclusivo*) (except in the case of third party liability, workers' compensation and automobile insurance) and each Secured Party has been named as additional insured under such insurance policies.

(g)    Authorization of Auditors.  The Intercreditor Agent has received a copy of the authorization to the Auditors referred to in Section 5.01(e) (*Affirmative Covenants - Auditors*).

(h)    Agent for Service of Process.  The appointment of the agent for service of process delivered in connection with the Second Amended and Restated Common Terms Agreement shall be extended until a date that is no earlier than six (6) months after the latest possible 2L Maturity Date and shall be extended to include AM DE.

(i)    Financial Statements.  The Intercreditor Agent has received a copy of (i) the Borrower's consolidated audited financial statements prepared in accordance with the Accounting Standards for the Financial Year ended on December 31, 2021 and (ii) the Borrower and AM DE's consolidated quarterly unaudited financial statements prepared in accordance with the Accounting Standards for the Financial Quarter ended on March 31, 2022.

(j)    Consultant Reports.  The Intercreditor Agent has received, each in form and substance satisfactory to the Secured 2L Lenders:

    (i)    a report from the Independent Engineer on the construction progress of the Project; and

    (ii)    [●].[31]

(k)    Base Case Model.  Delivery by the Borrower to the Intercreditor Agent of the most recent Base Case Model.

---

[31]    NTD: Pending final confirmations.

[AM_ACTIVE 403646503_3]

(l)    Annual Budget. Delivery by the Borrower to the Intercreditor Agent of the initial Annual Budget in form and substance acceptable to the Secured 2L Lenders.

(m)    Project Land; Site. The Intercreditor Agent has received a certificate issued no more than thirty (30) days prior to the date of this Agreement by the relevant *Registro de Propiedades* (Real Estate Registrar) certifying that no Liens and litigation have been registered as affecting any real estate owned by the Borrower.

(n)    Environmental and Social Documents, Reports and Plans. The Secured 2L Lenders have received evidence that the documents, reports and plans required to be delivered on or prior to the Effective Date pursuant to Annex F (*Environmental, Social and Health and Safety Action Plan*) to the Second Amended & Restated Common Terms Agreement have been delivered in accordance with the requirements of such Annex F.

(o)    [Transfer of Water Rights. All water rights subject to the Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement have been contributed to the Borrower in accordance with such agreement or otherwise to the satisfaction of the Intercreditor Agent (acting on the instruction of the Required Creditors).][32]

(p)    No Default. [As of Plan Effective Date], no Event of Default or Potential Event of Default has occurred and is continuing.

(q)    Legal Opinions. [under further legal review].

(r)    Fees; Expenses. Each of the Secured Parties has received all fees due and payable pursuant to the Financing Documents on or prior to the Effective Date, and all costs and expenses (including costs, fees and expenses of legal counsel and Consultants) due and payable thereunder for which invoices have been [presented to the Borrower at least [six (6) Business Days] prior to the Effective Date].

Section 4.02.    *Conditions for Creditors' Benefit*.    The conditions in Section 4.01 (*Conditions of Effectiveness*) are for the benefit of the Secured 2L Lenders and may be waived only by the Secured 2L Lenders in its sole discretion.

## ARTICLE V

### Particular Covenants

Section 5.01.    *Affirmative Covenants*.    Unless the 2L Administrative Agent (acting in accordance with the Intercreditor Agreement) otherwise agrees in writing, the Borrower covenants and agrees that until the Release Date, it shall perform or observe (as applicable) the following obligations in favor and for the benefit of the Secured 2L Lenders:

---

[32]    NTD: Subject to final confirmation.

[AM_ACTIVE 403646503_3]

(a)    <u>Corporate Existence; Conduct of Business</u>.    Maintain its corporate existence, comply with its Charter, and implement the Project and conduct its business with due diligence and efficiency and in accordance with sound engineering, financial and business practices.

(b)    <u>Additional Interest Certificates</u>. [(i) On April 1 and October 1 of each year, the Borrower shall deliver an Estimated Additional Interest Certificate to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent setting forth the April Estimated Additional Interest and the October Estimated Additional Interest, respectively; and (b) On March 1 of each year, the Borrower shall deliver an Actual Additional Interest Certificate to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent setting forth the Actual Additional Interest earned during the previous calendar year.]

(c)    <u>Compliance with Laws; Taxes</u>.

(i)    Conduct its business in compliance with and, in respect of the Project, cause each Environmental Party to comply with (A) prudent industry practice and (B) Applicable Law, in all material respects.

(ii)    File by the date due all returns, reports and filings in respect of Taxes required to be filed by it and pay, when due, all Taxes due and payable by it, except for Taxes being contested in good faith and for which adequate reserves have been established in accordance with Accounting Standards.

(d)    <u>Accounting and Financial Management</u>.

(i)    Maintain an accounting and control system, a management information system and books of account and other records, that together fairly present the financial condition of the Borrower and the results of its operations in conformity with the Accounting Standards.

(ii)    Prepare its financial statements in accordance with the Accounting Standards.

(iii)    Without limiting the foregoing and notwithstanding anything to the contrary herein, the Borrower shall comply with Corrupt Practices Laws and shall maintain the systems described in clause (i) above and related management and accounting policies in a manner adequate to ensure compliance with applicable Corrupt Practices Laws.

(e)    <u>Auditors</u>.

(i)    Appoint and maintain at all times an Acceptable Accounting Firm as Auditors of the Borrower.

(ii)    Irrevocably authorize, in the form of <u>Schedule 2</u> (*Form of Letter to Borrower's Auditors*), the Auditors (whose fees and expenses shall be for the account of the Borrower) to communicate directly with the 2L Administrative Agent, and the Secured 2L Lenders, with reasonable notice

- 96 -

and during business hours, regarding the Borrower's financial statements (both audited and unaudited), accounts and operations, and provide to the Intercreditor Agent a copy of that authorization.

 (iii) Notify the Secured 2L Lenders of any change in Auditors and the reason therefor.

 (iv) No later than thirty (30) days after any change in Auditors, issue the authorization set forth in clause (ii) above to the new Auditors and provide a copy thereof to the 2L Administrative Agent.

 (f) <u>Access</u>.  Upon any request from either 2L Administrative Agent or any Secured 2L Lender, and with reasonable prior notice to the Borrower, permit representatives of such 2L Administrative Agent and the Secured 2L Lenders (including the Consultants), during normal office hours or as otherwise agreed with the Borrower, to:

 (i) visit any of the sites and premises where the business of the Borrower is conducted, including the Site;

 (ii) inspect any of the Borrower's sites, facilities, plants and equipment, including the Site, provided that such representatives shall comply with all safety requirements and regulations at the Site notified to them;

 (iii) have access to the Borrower's books of account and all records; and

 (iv) have access to those employees, agents and contractors of the Borrower and, to the extent available, subcontractors of the Borrower's contractors, in each case who have or may have knowledge of matters with respect to which the 2L Administrative Agent, or any Secured 2L Lender seeks information;

<u>provided</u> that (A) no such reasonable prior notice shall be necessary if an Event of Default or Potential Event of Default has occurred and is continuing, (B) the Borrower shall be permitted to have its representatives present and attending the visit or inspection during any visit, access or inspection described in this Section 5.01(f), (C) except where an Event of Default or Potential Event of Default has occurred and is continuing and otherwise as set forth in sub-clause (D) below, the Borrower shall pay only for one such visit and/or inspection in any calendar year, <u>provided</u> that nothing in this Section 5.01(f) shall prejudice the rights of the Secured Parties under Section 2.08 (*Expenses*) of this Agreement and under each Secured Debt Document in respect of reimbursement of costs and expenses incurred by a Secured Party, and (D) the Independent Engineer and the Special Geology Advisor may visit the Project (*x*) prior to the Construction Completion Date, once every Financial Quarter  and (*y*) thereafter, once every twelve (12) months, in each case unless additional visits are reasonably requested by any Secured 2L Lender; and <u>provided</u>, <u>further</u>, that the obligations of the Borrower under the Monitoring Agreements also shall not be affected by this Section 5.01(f).

 (g) <u>Environmental and Social Matters</u>.

[AM_ACTIVE 403646503_3]

(i)    Require that the Environmental Parties and the contractor under the Transmission Line EPC Contract, ensure that the design, construction, testing, commissioning, operation, maintenance, management and monitoring of the Project's sites, plants, equipment, operations and facilities are undertaken in compliance with prudent industry practice and in all material respects with the Environmental and Social Requirements, unless a Corrective Action Plan is in place and the Borrower, the Environmental Parties and the contractor under the Transmission Line EPC Contract, as applicable, are in compliance therewith.

(ii)    Comply with, and conduct its business, operations, assets, equipment, property, leaseholds and other facilities in compliance in all material respects with the Environmental and Social Requirements and all other terms and conditions set forth in the Secured Debt Documents, unless a Corrective Action Plan is in place and the Borrower is in compliance therewith.

(h)    [Reserved].

(i)    Authorizations.

(i)    Obtain and maintain in force (and where appropriate, renew in a timely manner) all Authorizations, including the Authorizations specified in Annex B (*Authorizations*), which are necessary for the then current stage of development, construction, ownership and operation of the Project, the carrying out of the Borrower's business and operations generally and the compliance by the Borrower with all its obligations under the Transaction Documents.

(ii)    Comply (*x*) in all respects with all the conditions and restrictions contained in, or imposed on the Borrower by, the Material Authorizations (other than those listed in clauses (ii) and (iii) of the definition thereof) and all other Authorizations listed under Subpart A of Section 1 of Annex B (*Authorizations*) and Subpart A of Section 2 of Annex B (*Authorizations*) and (*y*) in all material respects with all the conditions and restrictions contained in, or imposed on the Borrower by, the Material Authorizations listed in clauses (ii) and (iii) of the definition thereof and all other Authorizations listed in Section 1 of Annex B (*Authorizations*) and Section 2 of Annex B (*Authorizations*).

(iii)    Obtain and maintain in force all Authorizations (other than those Authorizations that are the responsibility of the Construction Contractor under the Strabag Tunneling Contract) necessary for deposit of muck, in each case in locations appropriate under the Strabag Tunneling Contract adequate to accept deposits of muck in the volumes projected to be produced by the Work (under and as defined in the Strabag Tunneling Contract).

- 98 -

(iv)    Obtain and maintain in force all Authorizations (other than those Authorizations that are the responsibility of the Construction Contractor under the Strabag Tunneling Contract) necessary for the discharge of water, in each case in locations appropriate under the Strabag Tunneling Contract adequate to accept water discharge in the volumes projected to be produced by the Work (under and as defined in the Strabag Tunneling Contract).

(j)    <u>Security</u>.

(i)    The Borrower shall, within ten (10) Business Days from the Effective Date, provide evidence satisfactory to the [Intercreditor Agent] with respect to (*w*) filing of the requests for registration and annotation of the applicable Security Documents Amendments dated the date hereof and the Security Documents Cancellation and Release with the relevant registrars, (*x*) annotation of such registration and annotation requests in the corresponding *Repertorio* (Registry Index), as applicable, and (*y*) payment of any fees and taxes required in connection with such filing, registration, annotation or notice.

(ii)    The Borrower shall, within thirty (30) days from the Effective Date, provide evidence satisfactory to the [Intercreditor Agent] with respect to the Security Documents Amendments and the Security Documents Cancellation and Release, of the annotation (*anotación marginal*) of each such Security Documents Amendment and of the Security Documents Cancellation and Release in each public deed containing the original Security Document being amended by the relevant Security Documents Amendment or security document being cancelled by the Security Documents Cancellation and Release.

(iii)    As soon as reasonably practicable after the Effective Date, and in any event within sixty (60) days thereafter, the Borrower shall obtain the registration of the Security Documents Amendments and Security Documents Cancellation and Release filed for registration pursuant to  Section 5.01(j) (*Security*), in the corresponding Public Registries and the perfection in accordance with the Applicable Priority in all the Security Collateral subject to such Security Documents amended by the Security Documents Amendments and deliver to the Intercreditor Agent evidence of each such registration, recordation and perfection of the Liens created thereby (which evidence shall be confirmed by a legal opinion from counsel to the [Secured Creditors] in the Country, addressed to the [Secured Creditors], in form and substance satisfactory to the [Secured Creditors]).

(k)    <u>Further Assurances</u>.

(i)    Take all necessary action so that the Security created or purported to be created by each Security Document constitutes and remains perfected

- 99 -

Security on the Security Collateral with the priority specified in the Security Documents and in accordance with the Applicable Priority.

(ii)     Obtain within ninety (90) days from the date of execution of the relevant Security Document, Security Document Amendments or amendments referred to in (iii) below, that all security interests created (or amended) under a Security Document executed after the Effective Date have been duly created (or amended) and perfected in accordance with the Applicable Priority and that payment of any fees required in connection with any filing, registration, annotation or notice made in respect thereof, has been made; and provide to the [Secured Creditors] within fifteen (15) days of the date of perfection of the security interests (or amendment thereof) indicated above, a legal opinion from counsel to the Borrower in the Country, addressed to the [Secured Creditors], in form and substance satisfactory to the [Secured Creditors].

(iii)    [Reserved].

(iv)     From time to time, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such further instruments required under a Security Document or as may reasonably be requested by any Secured Party for perfecting or maintaining in full force and effect the Security or for re-registering the Security or otherwise and, if necessary, create and perfect additional Security, to enable the Borrower to comply with its obligations under the Transaction Documents, including execution of the applicable declaration deeds (*escrituras de declaración*) required under mortgages over future assets and pledges without conveyance in the terms and conditions set forth in the relevant Onshore Security Document.

(l)      Pari Passu.   Ensure at all times the obligations of the Borrower under this Agreement, the Secured Debt Documents and the Chilean Law Notes (or acknowledgments of debt in replacement thereof) rank at least *pari passu* in priority of payment and in all other respects with all other unsecured obligations of the Borrower outstanding at any time, except for any obligations mandatorily preferred by the laws of the Country, as applicable to the Borrower.

(m)      Project Documents.

(i)      Perform in all material respects its obligations under and comply in all material respects with the terms of each Material Project Document.

(ii)     Except to the extent prohibited pursuant to this Agreement, maintain all of its rights under each of the Material Project Documents and take all commercially reasonable steps to enforce its rights thereunder.

(iii)    Promptly after entering into any Additional Project Document that is a Material Project Document, if reasonably requested by the Intercreditor Agent (acting on the instructions of the Required Creditors) execute and

[AM_ACTIVE 403646503_3]

deliver a Direct Agreement in respect thereto in form and substance satisfactory to the Intercreditor Agent.

(iv)     Diligently and reasonably pursue payment of the arbitral award by, and enforcement of the arbitral award against, Constructora Nuevo Maipo S.A. in relation to the arbitration with respect to the termination of the Hochtief Tunneling Contract (the "CNM Arbitration").

(n)     Insurance Requirements.  Maintain and comply at all times with the insurance requirements set forth in Section 5.04 (*Insurance*) and Annex C (*Insurance Requirements*).

(o)     Project Accounts.  Open and maintain the Project Accounts and maintain each such account funded in accordance with the requirements of the Accounts Agreements.

(p)     Fees.  Pay all fees owed to the Secured Parties and to the Secured Credits' counsel and Consultants pursuant to Section 2.08 (*Expenses*).

(q)     Property.  Maintain the Project (including all of the assets located on the Site) in good working order and condition (ordinary wear and tear excepted), in accordance with prudent industry practice and in accordance with all Real Estate Rights Agreements and the Shared Facilities Agreement in all material respects, and maintain good, legal and valid title to all its property and assets, free of all Liens other than Permitted Liens.

(r)     OFAC Lists.  None of the Borrower, AM DE, the Shareholder, the Sponsor and each of their directors, officers and members of senior management shall be included in the Specially Designated Nationals and Blocked Persons List maintained by OFAC.

(s)     VAT Loan Proceeds.  Proceeds of the VAT Loan shall be deposited into the VAT Escrow Account, as applicable, pursuant to [Section [•] of the VAT Loan Agreement and Section [•] of the Onshore Accounts Agreement], and the proceeds thereof may not be used for any purpose other than for the repayment of the VAT Loan or made available to Strabag for payment of the VAT on the Strabag Invoice.

(t)     Compliance with Annual Budget.  [Comply with the Annual Budget approved for any Financial Year; provided that, the Borrower's actual expenditures during any Financial Year (*x*) for (A) Taxes; (B) costs relating to the remainder of the Project construction works; (C) amounts paid to the Borrower or payable by the Borrower as instructed by the CEN; and (D) Designated Contract Payments, shall not be subject to compliance with the applicable line items in the Annual Budget and (*y*) for all other line items may exceed by up to ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most recently approved Annual Budget without triggering any requirement for the Annual Budget to be amended.]

(u)     [Reserved].

(v)     VAT Loan Agreement.  [The Borrower shall draw an amount equal to the VAT Loan Commitment under the VAT Loan Agreement when the Strabag Invoice is issued in accordance with Section [•] of the VAT Loan Agreement. *However*, in the event that the Strabag Invoice is not issued on or before July 29, 2022, the available funds for the VAT Loan

[AM_ACTIVE 403646503_3]

Commitment shall be drawn and deposited in the Onshore VAT Escrow Account, as applicable, in accordance with Section [●] of the VAT Loan Agreement.]

(w)    <u>Filings with the Central Bank of Chile</u>.  The Borrower shall make the applicable filings when required with the Central Bank of Chile pursuant to the provisions of *Capítulo XIV del Compendio de Normas de Cambios Internacionales del Banco Central de Chile* (Chapter XIV of the Compendium of Foreign Exchange Regulations of the Central Bank of Chile) and shall provide to the Intercreditor Agent a copy of all such filings promptly upon request.

(x)    <u>[Reserved]</u>.

(y)    <u>DFC-Specific Covenants</u>.  During any period prior to the Release Date during which DFC is a Secured Creditor, the Borrower shall perform all obligations set forth on Schedule 16 (*DFC-Specific Covenants*).

Section 5.02.  <u>*Negative Covenants*</u>.  Unless the 2l Administrative Agent (acting in accordance with the Intercreditor Agreement) otherwise agrees in writing, the Borrower covenants and agrees in favor and for the benefit of the Secured 2L Lenders that until the Release Date, it shall not perform or observe (as applicable) the following:

(a)    <u>Restricted Payments</u>.  Declare or make any Restricted Payment.

(b)    <u>Environmental and Social Reports and Plans</u>.  Make, or permit to be made, any change or modification that is more than immaterial to any Environmental and Social Reports and Plans, Environmental and Social Compliance Report or Environmental and Social Construction Report without the prior consent of the Intercreditor Agent (acting on the instructions of the Required Creditors).

(c)    <u>Capital Expenditures</u>.  Incur expenditures or commitments for expenditures for fixed assets, other than:

       (i)    those required to carry out the Project and essential operations of the Borrower, as contemplated in the Annual Budget, as applicable, for the relevant Financial Year;

       (ii)    Permitted Capital Expenditures;

       (iii)    required capital expenditures to respond to any Emergency (documented evidence of which shall be delivered to the Intercreditor Agent within fifteen (15) days after the expenditure is made); and

       (iv)    capital expenditures in connection with or resulting from any major maintenance required for the Project and approved by the Intercreditor Agent (acting on the instructions of the Required Creditors and in consultation with the Independent Engineer).

(d)    <u>Permitted Financial Debt</u>.  Incur, assume or permit to exist any Financial Debt other than Permitted Financial Debt.  The Borrower may not [prepay] all or any part of any Long-term

Debt (other than the Secured Debt or any working capital facility that constitutes Permitted Financial Debt).

(e)     <u>Permitted Liens</u>.  Create or permit to exist any Lien on any property, revenues or other assets, present or future, of the Borrower other than Permitted Liens.

(f)     <u>Leases</u>.  Enter into any agreement or arrangement to lease any property or equipment of any kind except (i) under the Real Estate Rights Agreements, (ii) Financial Leases that constitute Permitted Financial Debt, (iii) under the Project Documents and (iv) otherwise only to the extent the aggregate payments under all such agreements or arrangements do not exceed five million Dollars ($5,000,000) (or its equivalent in any other currency or currencies) in any Financial Year.

(g)     <u>Arm's Length Transactions</u>.  Enter into any transaction that is not on the basis of arm's-length arrangements.

(h)     <u>Purchasing or Sales Agency</u>.  Establish any sole and exclusive purchasing or sales agency (other than pursuant to the Project Documents to the extent that the contractual arrangements contained therein constitute a sole and exclusive purchasing or sales agency).

(i)     <u>Profit Sharing Arrangements</u>.  Enter into any partnership, profit-sharing or royalty agreement or other similar arrangement whereby the Borrower's revenue, income or profits are, or might be, shared with any other Person, other than agreements and arrangements listed in <u>Schedule 5.02(i)</u> (*Profit Sharing Arrangements*) hereto (including any Project Documents listed therein).

(j)     <u>Management Contracts</u>.    Enter into any management contract or similar arrangement whereby its business or operations is managed by any other Person, other than the Project Documents listed in <u>Schedule 5.02(j)</u> (*Management Contracts*).

(k)     <u>Subsidiaries and Acquisitions</u>.  (i) Purchase, subscribe for or otherwise acquire any shares or option rights (or other securities or any interest therein) in, or incorporate, any other company (whether it is a Subsidiary or not), or agree to do any of the foregoing, other than (1) the CEN and (2) ownership of AM DE; or

(ii)     form, or enter into any partnership, consortium, joint venture or other similar arrangement.

(l)     <u>Permitted Investments</u>.  Make or permit to exist loans or advances to, or deposits (other than commercial bank deposits in the ordinary course of business) with, other Persons or investments in any Person or enterprise (other than Permitted Investments).

(m)     <u>Fundamental Changes</u>.  Change:

(i)     its Charter in any manner that would be inconsistent with the provisions of any Transaction Document (<u>provided</u> that, a copy of any amendment permitted hereunder shall be delivered to the Intercreditor Agent promptly following its execution);

[AM_ACTIVE 403646503_3]

(ii)     its Financial Year;

(iii)    [Reserved];

(iv)    its accounting principles or reporting practices, except as required to comply with the Accounting Standards; or

(v)     the nature or scope of the Project or the nature of its present or contemplated business or operations.

(n)     <u>Asset Sales</u>.  Sell, transfer, lease or otherwise dispose of all or a substantial part of its assets, other than inventory, whether in a single transaction or in a series of transactions, related or otherwise, except for:

(i)     assets reasonably determined by the Borrower to be obsolete, worn-out, damaged, defective, uneconomic, or no longer used by or useful to the Borrower for the operation or maintenance of the Project, but only if such asset is replaced with the proceeds of such sale, to the extent necessary to be consistent with prudent industry practices;

(ii)    the connection bays of the Alto Maipo Substation that AES Andes shall require for purposes of operating its transmission system;

(iii)   the sale of electricity and capacity in the ordinary course of business on the spot market and in accordance with Applicable Law (including any Applicable Environmental and Social Law) or pursuant to the Material Project Documents or an Approved PPA; and

(iv)    the sale of water rights under the RPG Water Rights Agreement.

(o)     <u>Merger, Consolidation, Etc</u>.    Undertake or permit any merger, spin-off, consolidation or reorganization.

(p)     <u>Amendments, Waivers, Assignment, Etc</u>.  Except as provided in Section 5.02(t) (*Negative Covenants - Change Orders and Construction Contracts*) or otherwise contemplated by the Share Retention Agreement or the Plan of Reorganization: (i) [modify or amend any Material Project Document, the Aguas Andinas Agreement, the Framework Agreement, the VAT Documents, the Secured Exit Loan Agreement, the Secured Working Capital Facility Agreement or any Approved PPA] (except, with respect to (*w*) any Material Project Document, to the extent that such modification or amendment does not change the overall performance, quality, schedule or cost of the Project and is otherwise in accordance with the requirements of Section 5.02(t) (*Negative Covenants - Change Orders and Construction Contracts*), (*x*) an Approved PPA or the Framework Agreement, to the extent that such modification or amendment does not have an adverse economic impact on the Borrower and (*y*) the VAT Documents, with respect to extensions of the maturity date of the VAT Loan), (ii) grant a waiver under any Material Project Document (other than any waiver that does not change the overall performance, quality, schedule or cost of the Project and is otherwise in accordance with the requirements of Section 5.02(p)(iii) and Section 5.02(t) (*Negative Covenants - Change Orders and Construction Contracts*), the Aguas Andinas

- 104 -

Agreement, or Approved PPA (other than to correct minor or technical errors that do not change any party's rights or obligations in any material respect or to the extent that such waiver does not have an adverse economic impact on the Borrower), (iii) compromise or settle any claim, dispute, arbitral proceeding or litigation against any Material Project Participant if the amount is greater than five million Dollars ($5,000,000) (iv) compromise or settle payment of the arbitral award rendered by the arbitral tribunal in favor of the Borrower under the CNM Arbitration without the prior written consent of the Required 2L Lenders or (v) assign any Material Project Document, the Aguas Andinas Agreement, or Approved PPA or consent to an assignment by a Material Project Participant, Aguas Andinas S.A., AES Andes or by a counterparty to an Approved PPA if the relevant Material Project Document, the Aguas Andinas Agreement, or Approved PPA, as applicable, requires the Borrower's consent for an assignment by any such Material Project Participant, Aguas Andinas S.A., or counterparty to an Approved PPA.

(q)    VAT Loan Agreement.  Until the payment in full of all VAT on the Strabag Invoice, cancel any VAT Loan Commitment other than in connection with the repayment of the VAT Loans.

(r)    Sanctionable Practices.  Engage in (and shall not authorize or permit any Affiliate or any other Person acting on its behalf to engage in) with respect to the Project or any transaction contemplated by this Agreement, any Sanctionable Practices.  The Borrower further covenants that should any Secured Party notify the Borrower of its concerns that there has been a violation of the provisions of this Section 5.02(r) or of Section 3.01(p) (*Representations and Warranties - Sanctionable Practices*) of this Agreement, it shall cooperate in good faith with that Secured Party and its representatives in determining whether such a violation has occurred, and shall respond promptly and in reasonable detail to any notice from that Secured Party, and shall furnish documentary support for such response upon that Secured Party's request.

(s)    Hedging Agreements.    Enter into any Hedging Agreement or assume the obligations of any party to any Hedging Agreement.

(t)    Change Orders and Construction Contracts. (a) Take any of the following actions under any of the Construction Contracts without the prior approval of the Intercreditor Agent (acting on instructions of the Required Creditors) (excluding Strabag):

    (i)    agree to any change orders;

    (ii)    deliver to the applicable Construction Contractor under the applicable Construction Contract any Critical Milestone Work Transfer Notice (as defined in the Strabag Tunneling Contract), a Critical Milestone Substantial Completion Certificate (as defined in the Strabag Tunneling Contract), Substantial Completion Certificate (as defined in the Voith EPC Contract), Tunnel Complex Substantial Completion Certificate (as defined in the Strabag Tunneling Contract) or Final Completion Certificate (as defined in the applicable Construction Contract);

    (iii)    suspend construction of the Project under any Construction Contract for any reason (other than due to (1) a Force Majeure Event, (2) defective work, (3)

- 105 -

Environmental and Social Matters, or (4) emergency, health or safety reasons as permitted under Section 4.4.1 of the Strabag Tunneling Contract or Section 4.4.1 of the Voith EPC Contract), in each case, for more than ninety (90) days or suspend work for convenience for any period of time under any Construction Contract;

(iv)    release any bond, letter of credit or guaranty (except as required under any Construction Contract);

(v)    [Reserved];

(vi)    reach any agreement with any Construction Contractor to cure a material default under any Construction Contract;

(vii)    approve an Acceptable Credit Provider under the Strabag Tunneling Contract;

(viii)    approve the Final O&M Manual (as defined in the Strabag Tunneling Contract) or any amendment to the Quality Assurance Plan (as defined in the Strabag Tunneling Contract) without consultation with the Independent Engineer; or

(b) use the proceeds from a Strabag Letter of Credit for any purpose other than (i) to cure the alleged breach or rectify the alleged performance issue for which the funds of the Strabag Letter of Credit were drawn or, in the case of liquidated damages, in accordance with the terms of the Offshore Accounts Agreement, and (ii) [otherwise with the prior consent of Required Creditors (excluding Strabag) in consultation with the Independent Engineer.]

(u)    <u>Blocked Persons List</u>.  Be included on the Specifically Designated Nations and Blocked Persons List maintained by the United States Department of the Treasury's Office of Foreign Asset Control and none of its Affiliates or any other Person acting on its behalf shall be included on such lists.

(v)    <u>UN Security Council Resolutions and Prohibited Parties</u>.  Enter into any transaction or engage in any activity prohibited by Sanctions, including any resolution of the United Nations Security Council under Chapter VII of the United Nations Charter, or enter into any transaction with any Prohibited Party or become a Prohibited Party (and none of the Shareholder, the Sponsor nor any Affiliate, nor any Person acting on its or their behalf shall become a Prohibited Party); <u>provided</u> that, for purposes of this Section 5.02(v), item (iii) of the definition of Prohibited Party shall not apply.

(w)    <u>Project Accounts</u>.  Open or maintain any account other than the Project Accounts.

(x)    <u>Additional Project Documents</u>.  Enter into any Additional Project Document without the approval of the Intercreditor Agent (acting on the instructions of the Required Creditors) and, in the case of an Additional Project Document that is a Material Project Document, if requested by the Intercreditor Agent (acting on the instructions of the Required Creditors),

- 106 -

without the counterparty to any such new agreements entering into a Direct Agreement in accordance with Section 5.01(m)(iii) (*Affirmative Covenants - Project Documents*).

(y)     Approved PPAs.  Enter into any power purchase agreement that is not an Approved PPA.

(z)     Additional Water.  (i) Present or file, or permit to be presented or filed, any new application or request to environmentally assess or obtain Authorizations for the use of the Additional Water without the prior written consent of the Intercreditor Agent (acting on the instructions of the Required Creditors).

(ii)     Utilize the Additional Water to generate energy unless (1) the Borrower obtains the required Authorizations and (2) the potential environmental and social impacts of the use of such additional quantities of water are in compliance in all material respects with the Environmental and Social Requirements.

(aa)     Invoice of Supplier Deferred Payment.  Accept the invoice from Strabag stated in Section 6.3.4.4 of the Strabag Tunneling Contract ("Strabag Invoice") prior to the date that is [to conform to final Tunneling Contract Amendment].

(bb)     Battery Storage Project.  Enter into, either directly or through any of its Affiliates, any agreements or otherwise to commence construction of any Battery Storage Project.  For the avoidance of doubt, the Secured 2L Lenders will only consider a request for consent to a Battery Storage Project that is undertaken with the objective of increasing value to the Borrower.

Section 5.03.  *Reporting Requirements*.  Unless the Intercreditor Agent (acting in accordance with the Intercreditor Agreement) otherwise agrees in writing, the Borrower shall:[33]

(a)     Quarterly Financial Statements and Reports.  As soon as available, but in any event within sixty (60) days after the end of first (1st) and third (3rd) Financial Quarters of each Financial Year, seventy-five (75) days after the end of the second (2nd) Financial Quarter of each Financial Year, and ninety (90) days after the end of the fourth (4th) Financial Quarter of each Financial Year, deliver to the Intercreditor Agent for delivery to the Secured 2L Lenders:

(i)     a copy of the Borrower and AM DE's complete consolidated unaudited financial statements for that fiscal quarter prepared in accordance with the Accounting Standards, certified by the chief executive officer or any other officer or director of the Borrower (who shall also be an Authorized Representative of the Borrower).

(b)     Annual Financial Statements and Reports.  As soon as available but in any event within one hundred and twenty (120) days after the end of each Financial Year, deliver to the Intercreditor Agent for delivery to the Secured 2L Lenders:

---

[33]     NTD: Reporting requirements pending final confirmation.

[AM_ACTIVE 403646503_3]

(i)     a copy of the Borrower and AM DE's complete consolidated and audited financial statements for that Financial Year, which are in agreement with its books of account and prepared in accordance with the Accounting Standards, together with the Auditors' audit report on them;

(ii)    a management letter and any other communication from the Auditors commenting, with respect to that Financial Year, on, among other things, the adequacy of the Borrower's financial control procedures, accounting systems and management information system;

(iii)   a certificate, in the form attached as Schedule 4 (*Form of Certificate for Quarterly and Annual Financial Ratio Reporting*), signed by the chief executive officer or any other officer or director of the Borrower (who shall also be an Authorized Representative of the Borrower) certifying compliance with all obligations of the Borrower under Section 5.01 (*Affirmative Covenants*) and Section 5.02 (*Negative Covenants*); and

(iv)    a report by the Borrower on its operations during that Financial Year, in the form of, and addressing the matters listed in, Schedule 3 (*Information to be Included in Quarterly and Annual Review of Operations*).

(c)     Management Letters.  Deliver to the 2L Administrative Agent for delivery to the Secured 2L Lenders, promptly following receipt, a copy of any material management letter or other material communication sent by the Auditors (or any other accountants retained by the Borrower) to the Borrower or its management in relation to the Borrower's financial, accounting and other systems, management or accounts, if not provided pursuant to Section 5.03(b)(ii) (*Annual Financial Statements and Reports*).

(d)     Changes to Project; Material Adverse Effect.  Promptly, but in any event within five (5) Business Days after its occurrence, notify the Intercreditor Agent of any proposed change (other than any proposed change that does not affect the overall performance, quality, schedule or cost of the Project) in the nature or scope of the Project or the business or operations of the Borrower and of any event or condition that has or could reasonably be expected to have a Material Adverse Effect.

(e)     Litigation, Etc.  (i) Promptly, but in any event within five (5) days after the Borrower should reasonably have become aware of any litigation or other legal or administrative proceedings brought against the Borrower, the Project, AM DE or AES Andes in respect of or in connection with the Project, before any Authority or arbitral body that has or could reasonably be expected to have a Material Adverse Effect, notify the 2L Administrative Agent of that event specifying the nature of such litigation or proceedings and the steps the Borrower, AM DE or AES Andes, as applicable, is taking or proposes to take with respect thereto;

(ii)    Within thirty (30) days after the end of each Financial Quarter, deliver to the 2L Administrative Agent an update in respect of the legal proceedings concerning the matters listed in Schedule 3.01(l) (*Litigation*) other than in respect of the CNM Arbitration; and

(iii)    (1) Within thirty (30) days after the end of each Financial Quarter, deliver to the 2L Administrative Agent an update on the Borrower's efforts to pursue collection of the arbitral award in respect of the CNM Arbitration, including any material correspondence between or on behalf of the Borrower and Constructora Nuevo Maipo S.A. (including any of its guarantors, affiliates, or parent companies) or any material notices or correspondence from the arbitral tribunal and (2) promptly, but in any event within ten (10) days of the Borrower's knowledge of any efforts by Constructora Nuevo Maipo S.A. to appeal the arbitral award in court or otherwise.

(f)    <u>Default</u>.  Promptly, but in any event within ten (10) days after the date that the Borrower should have become aware of an Event of Default or Potential Event of Default, notify the Intercreditor Agent by email specifying the nature of such Event of Default or Potential Event of Default and any steps the Borrower is taking or proposes to take to remedy it.

(g)    <u>Compliance Requirements</u>.  Promptly provide to the 2L Administrative Agent such information about the Borrower, its assets and the Project that the 2L Administrative Agent reasonably requests from time to time on behalf of the Secured 2L Lenders for the Secured 2L Lenders to satisfy requirements under applicable laws and regulations, including those concerning anti-money laundering and combating the financing of terrorism (AML/CFT).

(h)    <u>Annual Budget</u>. (i) On or before ninety (90) days prior to the end of each Financial Year, submit a draft annual budget for review and comment by the Intercreditor Agent (acting on the instructions of the Required Creditors and in consultation with the Independent Engineer). The Intercreditor Agent shall provide any comments it has within twenty (20) days following its receipt of the draft annual budget. On or before sixty (60) days prior to the end of each Financial Year, submit an annual budget (the "<u>Annual Budget</u>"), considering any comments provided by the Intercreditor Agent to the draft annual budget, for review and approval by the Intercreditor Agent (acting on the instructions of the Required Creditors and in consultation with the Independent Engineer) (which approval shall not be unreasonably withheld or delayed).  The initial Annual Budget has been delivered to the Secured 2L Lenders pursuant to Section 4.01(l) (*Annual Budget*).

(ii)    Such Annual Budget shall be deemed rejected if the Intercreditor Agent does not notify the Borrower in writing, within thirty (30) days from receipt by the Intercreditor Agent of such proposed Annual Budget, that such proposed Annual Budget has been approved.

(iii)    If the Annual Budget is not approved pursuant to clause (i) immediately above, the Intercreditor Agent shall provide the Borrower with notice providing an explanation of the reasons for such disapproval as provided by the Secured 2L Lenders and, following receipt of such a notice, the Borrower may submit a revised Annual Budget to the Intercreditor Agent for approval.

(iv)    If at any time during a Financial Year, the Annual Budget has not been approved, and until such approval has been given, the Borrower shall

- 109 -

operate on the basis of the most-recently approved Annual Budget; <u>provided</u> that, the Borrower's actual expenditures during such Financial Year shall be subject to the requirements of Section 5.01(t) (*Affirmative Covenants - Compliance with Annual Budget*).

(v)     The Borrower may request the Intercreditor Agent's approval of an amended Annual Budget at any time during a Financial Year and such proposed amendment shall be approved or disapproved by the Intercreditor Agent in accordance with the procedures set forth in clauses (i) and (ii) immediately above.

(vi)    The Secured Creditors acknowledge and agree that the Annual Budget will not include amounts attributable to: (1) Taxes; or (2) amounts paid to the Borrower or payable by the Borrower as instructed by the CEN; and, but will include estimates of all such items (1) and (2) and of the Designated Contract Payments.

(vii)   The Intercreditor Agent shall provide all draft and proposed Annual Budgets to the Secured 2L Lenders and the final, approved Annual Budget to all Secured Creditors.

(i)     <u>Construction Progress Report</u>.[34]  [In order to inform the Secured 2L Lenders and the Intercreditor Agent about the physical progress as well as provide evidence to the Secured 2L Lenders and the Intercreditor Agent of the remaining expenditures to be incurred on the Project, the Borrower shall, prior to the Construction Completion Date, provide to the Intercreditor Agent and the Independent Engineer within thirty (30) days after the end of each calendar month, a progress report (the "<u>Construction Progress Report</u>") addressed to the Intercreditor Agent addressing the items set forth in <u>Schedule 14</u> (*Form of Construction Progress Report*) and attaching any notices provided pursuant to Section 5.03(d) (*Changes to Project; Material Adverse Effect*), which report shall be in form and content satisfactory to the Intercreditor Agent (in consultation with the Independent Engineer) and which the Independent Engineer shall confirm in a certificate substantially in the form attached to <u>Schedule 14</u> (*Form of Construction Progress Report*) to the Intercreditor Agent within ten (10) Business Days after delivery thereof; <u>provided</u> that, if the Independent Engineer fails to deliver such certificate and the Borrower has duly and timely provided to the Independent Engineer all the information required for its issuance, such failure shall not constitute a Potential Event of Default or an Event of Default hereunder; <u>provided</u>, <u>further</u>, that the Construction Progress Report provided by the Borrower in March, June, September and December of each calendar year shall also include a forecast of costs (on an aggregate and month-by-month basis) of the Project's works required to achieve the Construction Completion Date (showing any deviations from the Annual Budget).]

---

[34]   NTD: To be revised as necessary to reflect the status of construction closer to the Effective Date.

(j)    Base Case Model. [As soon as available but in any event within sixty (60) days after the end of every other Financial Year (commencing January 1, 2023)[35] submit to the Secured 2L Lenders (i) an updated Base Case Model incorporating any revised projections (including based on the updated Market Consultant report and, if applicable, Hydrology Consultant report, in each case, provided by the Secured 2L Lenders to the Borrower at least sixty (60) days before the Borrower is required to submit the updated Base Case Model), such revised projections to be in substance satisfactory to the Intercreditor Agent (acting on the instruction of the Required Creditors), (ii) a report from the Project Model Auditor with respect to such updated Base Case Model and (iii) an updated Base Case Model prepared by the Borrower using projections prepared or selected by the Borrower. The Borrower will cooperate with the Hydrology Advisor and the Market Consultant in the preparation of their draft reports, which reports will be prepared in consultation, and with a scope agreed, with the Intercreditor Agent (acting on the instruction of the Required Creditors).]

(k)    [Reserved].

(l)    Annual Review of Operations.  Within the time periods specified in Schedule 5 (*Information to be Included in Annual Review of Operations*), deliver to the 2L Administrative Agent an annual review of operations addressing the matters specified in Schedule 5 (*Information to be Included in Annual Review of Operations*) and certified by an Authorized Representative of the Borrower, which schedule may be reasonably updated by the Required Creditors from time to time with three (3) months' advance notice to the Borrower prior to the beginning of the next succeeding reporting period.

(m)    Chilean Banking Reports.  Deliver to the Local Banks the following information, together with copies of the relevant documentation, at the sole cost and expense of the Borrower: (A) no later than five (5) Business Days following its request by any Local Bank, (i) the information required to properly apply the provisions of Articles 84 and 85 of the *Ley General de Bancos* (Chilean Banking Law), Decree with the Force of Law No. 3 of 1997, as amended from time to time; and (ii) updated information on the Charter of the Borrower and powers of attorney granted by the Borrower; and (B) with the periodicity required to comply with the provisions of Chapter 12-3 of the *Recopilación Actualizada de Normas* (Updated Compendium of Regulations) of the *Superintendencia de Bancos e Instituciones Financieras* (Banks and Financial Institutions Commission), as amended or replaced, an appraisal of the assets of the Borrower or the Shareholder granted as Security to the Local Banks.

(n)    Illicit Funding.  Promptly inform the 2L Administrative Agent if the Borrower should at any time be informed of an illicit origin of any funds invested in the Borrower's Share Capital or used for the financing of the Project.

(o)    Independent Engineer Monitoring Reports.  Cooperate with and use commercially reasonable efforts to provide the Independent Engineer with all information required to enable the Independent Engineer to deliver to the 2L Administrative Agent (i) within forty-five (45) Business Days after the end of each Financial Quarter prior to the Project Completion Date, an Independent

---

[35] NTD: First required delivery date under discussion.

[AM_ACTIVE 403646503_3]

Engineer Quarterly Monitoring Report in respect of the Financial Quarter most recently ended; and (ii) within forty-five (45) Business Days after the end of each twelve (12) month period following the Project Completion Date, an Independent Engineer Annual Monitoring Report in respect of the twelve (12) month period most recently ended.

(p)    Environmental and Social Consultant Monitoring Reports.  Cooperate with and use commercially reasonable efforts to provide the Environmental and Social Consultant with all information required to enable the Environmental and Social Consultant to deliver the corresponding Environmental and Social Monitoring Report to the 2L Administrative Agent, within sixty (60) days after receiving (*x*) each Environmental and Social Compliance Report pursuant to Section 5.05(a) (*Environmental and Social Reporting Requirements*) for the applicable period and (*y*) the Environmental and Social Construction Report pursuant to Section 5.05(c) (*Environmental and Social Reporting Requirements*), such information in each case to be delivered in accordance with the Environmental and Social Monitoring Agreement.[36]

(q)    Other Information.  Promptly provide to any Secured Party such other information as that Secured Party from time to time reasonably requests about the Borrower, its assets and the Project, and the transactions contemplated by this Agreement and any other Financing Document, including any information required by any Secured 2L Lender to complete any necessary "Know Your Customer" inquiries.

(r)    Quality Assurance Plan.  Promptly provide to the 2L Administrative Agent and the Independent Engineer any update to the Quality Assurance Plan (as defined in the Strabag Tunneling Contract).

(s)    Consultants and Advisors.  Promptly notify the 2L Administrative Agent of the engagement of any financial advisor, market advisor, or any other consultant engaged by the Borrower to provide advice on the Project.

Section 5.04.  *Insurance*.

(a)    [Insurance Requirements.  Unless the 2L Administrative Agent (acting in accordance with the Intercreditor Agreement) otherwise agrees in writing, the Borrower shall:

(i)    insure and keep insured, (A) with insurers authorized to provide insurance in the Country having (*x*) a financial strength rating of "A-" or better by AM Best's Insurance Guide and Key Ratings, (*y*) a Standard and Poor's Rating Group or Fitch Ratings (or an equivalent rating by another internationally recognized insurance rating agency of similar standing) financial strength rating of "A-" or higher, or (*z*) a Humphreys Calificadora de Riesgo Ltda., or Feller Rate Clasificadora de Riesgo Ltda., domestic financial strength rating of "AA" or higher, or (B) with any other insurer satisfactory to the 2L Administrative Agent (acting in consultation with the Insurance Consultant) all its assets and business that can be insured against the

_____

[36]    NTD: Pending final confirmation.

[AM_ACTIVE 403646503_3]

insurable losses specified in Annex C (*Insurance Requirements*) and any insurance required by Applicable Law or any Applicable Environmental and Social Law and the Material Project Documents; provided that, where a relevant insurer does not meet the above financial rating requirements, the Borrower shall cause to be acquired via a relevant insurer reinsurance with reinsurers that meet such requirements in respect of the losses specified in Annex C (*Insurance Requirements*) and those required by Applicable Law (including any Applicable Environmental and Social Law) and the Material Project Documents; local retentions by subsidiaries of multinational insurers who meet the rating requirements may be effected subject to a limit of five million Dollars ($5,000,000);

(ii)    at any time or from time to time, promptly following the receipt of a notice by the 2L Administrative Agent, obtain such additional insurance coverage of risks or liabilities that are not specified in Annex C (*Insurance Requirements*) as would from time to time be obtained by a prudent and comparable electricity generation company that does not self-insure and which shall be in such amounts and deductibles as are specified in that notice;

(iii)    at any time or from time to time following consultation by the Secured 2L Lenders with the Borrower, promptly following the receipt of a notice by the 2L Administrative Agent, obtain such additional insurance(s) or make such modifications to the terms, conditions, amounts or deductibles of any insurance policy required pursuant to clauses (a)(i) and (a)(ii) of this Section 5.04 as the Required Creditors may determine and is specified in such notice to be necessary to cover any material change in the identified risk exposure of the Borrower, its business or assets, or changes in insurance market practice; and

(iv)    at any time or from time to time, promptly following the receipt of a notice by the 2L Administrative Agent pursuant to the terms of proviso (A) below of this sub-clause (iv), make such modifications to the amounts and deductibles of any insurance policy required to be obtained under this Agreement as 2L Administrative Agent specifies in such notice to be necessary to take account of inflationary and other relevant factors;

provided that:

(A)    the Secured 2L Lenders shall be entitled from time to time to review, in consultation with the Borrower, the monetary limits and deductibles of each insurance policy required to be obtained under this Agreement, such review not to be conducted more frequently than once every calendar year with respect to each insurance policy; and

[AM_ACTIVE 403646503_3]

(B)     if at any time and for any reason any insurance required to be maintained hereunder shall not be in full force and effect or otherwise the Borrower fails to comply with any of the requirements in this Section 5.04, each Secured Party shall thereupon, or at any time while the same is continuing, be entitled (but have no obligation) on its own behalf or on behalf of the Secured Parties to procure such insurance or, as the case may be, the fulfillment of the relevant requirement at the expense of the Borrower and to take all such steps to minimize hazard as that Secured Party may consider expedient or necessary; and

(C)     in the event any insurance coverage (including the limits or deductibles thereof) required to be maintained pursuant to this Section 5.04 and Annex C (*Insurance Requirements*), other than insurance required by Applicable Law or any Applicable Environmental and Social Law, shall not be available or shall not be available on commercially reasonable terms in the commercial insurance market, the 2L Administrative Agent (in consultation with the Insurance Consultant and acting on the instructions of the Required Creditors) may consent to waive such requirement, which consent shall not be unreasonably withheld to the extent the maintenance of such insurance is not available or is not available on commercially reasonable terms in the commercial insurance market; provided, however, that (i) the Borrower shall first request any such waiver in writing certifying that such insurance coverage is not available or is not available on commercially reasonable terms in the commercial insurance market for hydroelectric facilities of similar type and capacity (and, in any case where the required amount of insurance coverage is not so available or is not available on commercially reasonable terms in the commercial insurance market, certifying as to the maximum amount of insurance coverage that is available on commercially reasonable terms in the commercial insurance market) and explaining in detail the basis for such conclusions; and (ii) any such waiver shall be effective only so long as such insurance shall not be available or shall not be available on commercially reasonable terms in the commercial insurance market.

For purposes of this Section 5.04(a), insurance will be considered "not available on commercially reasonable terms in the commercial insurance market" when it is obtainable only at excessive costs that are not justified in terms of the risk to be insured and is generally not carried in the Country or by hydroelectric facilities in other

- 114 -

countries of similar type and capacity as the Project in light of such excessive costs.][37]

(b)    <u>Policy Provisions</u>.  Each insurance and re-insurance policy required to be obtained pursuant to Section 5.04(a) shall be on terms and conditions acceptable to the Required Creditors, together with provisions to the effect that:

(i)    no policy can expire without being renewed immediately nor can it be canceled or suspended by the Borrower or the insurer for any reason (including failure to renew the policy or to pay the premium or any other amount) unless the 2L Administrative Agent and, in the case of expiration or if cancellation or suspension is initiated by the insurer, the Borrower receive at least forty-five (45) days' notice (or such lesser period as the 2L Administrative Agent may agree with respect to cancellation, suspension or termination in the event of war and kindred peril) or ten (10) days' notice for non-payment of premium, prior to the effective date of termination, cancellation or suspension; <u>provided</u> that, any cancelled policy shall be renewed or replaced to the satisfaction of the 2L Administrative Agent at least ten (10) days prior to its expiration or cancellation;

(ii)    the Offshore Collateral Agent is named as sole loss payee (*beneficiario exclusivo*) on all insurance and reinsurance policies (except in the case of third party liability, workers' compensation and automobile insurance) and each Secured Party is named as additional insured on all insurance policies;

(iii)    where relevant, all its provisions (except those relating to limits of liability) shall operate as if they were a separate policy covering each insured party;

(iv)    on every insurance policy on the Borrower's assets that are the subject of the Security and for business interruption and delayed start-up, the Offshore Collateral Agent is named as loss payee;

(v)    where relevant, the insurers waive all rights of recourse or subrogation, howsoever arising, against the Secured Parties; and

(vi)    subject to Section 5.04(b)(i) above, all provisions of each insurance policy conferring any right, protection or benefit to any Secured Party (including, non-vitiation, loss payee and additional insured provisions, notice requirements, etc.) shall at all times remain in full force and effect notwithstanding any act or failure to act on the part of the Borrower, its agents or employees (other than failure to pay any premium under such insurance policy that has not been cured by either the Borrower or a Secured

---

[37] NTD: Subject to further review.

[AM_ACTIVE 403646503_3]

Party) or on the part of the Construction Contractors or Project Subcontractors;

provided that, none of the policies required pursuant to Section 5.04(a) and Annex C (*Insurance Requirements*) shall include any provision for self-insurance or any self-insured retention except to the extent of the deductibles specified in Annex C (*Insurance Requirements*) or as the 2L Administrative Agent otherwise approve from time to time.

(c)    Borrower's Undertakings.  The Borrower shall:

    (i)    punctually pay any premium, commission and any other amounts necessary for effecting and maintaining in force each insurance policy;

    (ii)    promptly and pursuant to the applicable insurance policy's conditions, notify the relevant insurer of any event entitling the Borrower to make a claim under any insurance policy written by that insurer and diligently pursue that claim;

    (iii)    comply with all warranties and obligations under each policy of insurance (including the survey warranty clause), including in respect of reporting requirements;

    (iv)    not do or omit to do, or permit to be done or not done, anything that might:

        (A)    render any insurance policy, or any provision of that policy, obtained pursuant to Section 5.04(a) or Annex C (*Insurance Requirements*) void or voidable or lead to its suspension or impair or defeat any such policy in whole or in part; or

        (B)    prejudice the Borrower's or, where a Secured Party is named loss payee or is an additional insured, the right of such Secured Party to claim or recover under any insurance policy;

    (v)    not rescind, terminate, cancel or cause a material change (with the exception of policy improvements) to any insurance policy;

    (vi)    procure that each insurer and reinsurer under all policies obtained pursuant to Section 5.04(a) and Annex C (*Insurance Requirements*):

        (A)    is promptly notified of the security interests created in favor of the Offshore Collateral Agent under the Security in the Borrower's title to, and rights, interest and benefits under, such policies;

        (B)    (1) notes on each such policy by way of endorsement the interest of the Offshore Collateral Agent and the Secured Parties in that policy under the Security, such endorsement to be in form and substance satisfactory to the 2L Administrative Agent (acting on the instructions of the Required Creditors), (2) issues a notice of

- 116 -

confirmation and acknowledgment of assignment and (3) deposits each such policy with its brokers or the Offshore Collateral Agent;

(C)     together with the relevant brokers, notify the 2L Administrative Agent and the Offshore Collateral Agent (with a copy to the Insurance Consultant) of the issuance of any notice of cancellation or suspension or modification of the relevant policy and of any fact of which they become aware that could reasonably be expected to affect the coverage under that policy and of such other matters as specified in Annex C (*Insurance Requirements*); and

(D)     acknowledges that none of the Secured Parties, as a lender and/or beneficiary under the relevant policy and the Security, is liable to the insurers or reinsurers for the payment of any insurance or reinsurance premiums nor for any other obligations of the Borrower;

(vii)    use commercially reasonable efforts to ascertain that payments of reinsurance premiums under reinsurance policies of insurances required to be maintained by the Borrower pursuant to Section 5.04(a) and Annex C (*Insurance Requirements*) are paid in a timely manner and promptly inform the 2L Administrative Agent when it becomes aware that any such premiums have not been paid;

(viii)    procure that every insurance and reinsurance broker who effects any insurance and reinsurance policy for the Borrower writes a letter to the Secured 2L Lenders in respect thereof in the form set forth in Appendix 1 of Annex C (*Insurance Requirements*) in relation to insurance policies for the operational phase of the Project and liability insurances, immediately after their inception;

(ix)    at any time after the Original Closing Date and until the Secured Obligations are repaid in full, upon the actual completion of additional projects located within the Country and Argentina, in each case that would render the aggregate per occurrence limit then maintained under any global operational all-risk property insurance program under which the Borrower may be insured to equal less than fifty percent (50%) of the estimated property and business interruption values insured within the Country and Argentina, the Borrower shall deliver to the 2L Administrative Agent (with a copy to the Insurance Consultant) an updated probable maximum loss study in respect of (A) the Project and (B) all assets located within the Country and Argentina insured under such global operational all-risk property insurance program, which study shall be satisfactory in form and substance to the 2L Administrative Agent (acting on the instructions of the Required Creditors and in consultation with the Insurance Consultant); and

(x)    no later than thirty (30) days after Commercial Operation Date, deliver to the 2L Administrative Agent (with a copy to the Insurance Consultant) a

[AM_ACTIVE 403646503_3]

probable maximum loss study performed no later than ninety (90) days prior to such date in respect of (A) the Project and (B) all assets located within the Country and Argentina insured under such global operational all-risk property insurance program, which study shall be satisfactory in form and substance to the 2L Administrative Agent (acting on the instructions of the Required Creditors and in consultation with the Insurance Consultant).

(d)    <u>Application of Proceeds</u>.

(i)    All Casualty Proceeds (other than proceeds from delay in start-up and business interruption insurance policies) shall be deposited into the Insurance Proceeds and Compensation Account and applied as provided in this Section 5.04(d) and in the Offshore Accounts Agreement.

(ii)    Upon the occurrence of a casualty event resulting in the receipt of Casualty Proceeds, the Borrower shall be permitted to apply such Casualty Proceeds (other than proceeds from delay in start-up and business interruption insurance policies) in respect thereof from the Insurance Proceeds and Compensation Account in the following manner:

(A)    in the event that the Net Available Amount is less than or equal to five million Dollars ($5,000,000) (or its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, such amount may, at the discretion of the Borrower, be applied by the Borrower to the repair, replacement or restoration of the affected assets or property or deposited in the Offshore Revenue Account;

(B)    in the event that the Net Available Amount is greater than five million Dollars ($5,000,000) but equal to or less than twenty-five million Dollars ($25,000,000) (or, in each case, its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, such amount shall be applied by the Borrower in the repair, replacement or restoration of the affected assets or property;

(C)    in the event that the Net Available Amount is greater than twenty-five million Dollars ($25,000,000) but equal to or less than fifty million Dollars ($50,000,000) (or, in each case, its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, such amount shall be applied by the Borrower in the repair, replacement or restoration of the affected assets or property, <u>provided</u> that:

(1)    the Borrower shall have submitted to the 2L Administrative Agent (with a copy to the Independent Engineer and the Insurance Consultant) a plan for the repair, replacement or

- 118 -

restoration of the affected assets or property (a "Restoration Plan") no more than sixty (60) days after the occurrence of such casualty event and the Independent Engineer shall have delivered a certificate to the 2L Administrative Agent and the Offshore Accounts Bank in a form to be agreed among, and satisfactory to, the Independent Engineer, the 2L Administrative Agent and the Offshore Accounts Bank, to the effect that the Borrower's Restoration Plan is technically feasible and reasonable and appropriate for accomplishing the repairs necessary to restore the damage to the Project and that the amount of such Casualty Proceeds deposited in the Insurance Proceeds and Compensation Account is sufficient (together with all other monies then currently available to the Borrower as determined by the 2L Administrative Agent), in the reasonable opinion of the Independent Engineer, to complete such repair, replacement or restoration; and

(2)     the 2L Administrative Agent (acting in accordance with the Intercreditor Agreement) has consented to such use of the Casualty Proceeds; and

(D)     in the event that the Net Available Amount is greater than fifty million Dollars ($50,000,000) (or its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, such amount shall be applied, at the discretion of the 2L Administrative Agent (acting in accordance with the Intercreditor Agreement) either (*x*) as set forth in Section 5.04(d)(ii)(C), or (*y*) for the prepayment of the Secured Debt in accordance with Section 2.06(a)(i) (*Mandatory Prepayment*).

(iii)     In the event that all or any portion of such Casualty Proceeds referred to in subsection (ii)(B) or subsection (ii)(C) above:

(A)     are determined by the Borrower to not be required for the repair, replacement or restoration of the affected assets or property or are not so applied within the period set forth in the Restoration Plan (in the case of subsection (ii)(C) above) or within such longer period as may be necessary to comply with such Restoration Plan (as determined by the Independent Engineer); or

(B)     are not permitted to be so applied because the conditions in subsection (ii)(C) above are not satisfied;

such unapplied Casualty Proceeds shall be applied by the Offshore Accounts Bank (at the direction of the Intercreditor Agent) to the prepayment of the Secured Debt in accordance with Section 2.06(a)(i) (*Mandatory Prepayment*).

- 119 -

(iv)     The Borrower shall ensure that, promptly upon receipt, any Casualty Proceeds received from any delay in start-up insurance policy and business interruption insurance policy are[, in each case,] paid [into the Disbursement Account if received prior to the Construction Completion Date and, if received on or following the Construction Completion Date,] into the Offshore Revenue Account.

(v)      Third party liability or employers' liability insurance proceeds will be paid to the third party payee that suffers a loss or to the Insurance Proceeds and Compensation Account and, to the extent that such third party has already been compensated by or on behalf of the Borrower, to the Offshore Revenue Account.

(vi)     Amounts equal to the reasonable and documented costs, expenses and Taxes incurred or payable by the Borrower in connection with the collection and conversion, if necessary, of Casualty Proceeds shall be permitted to be transferred out of the Insurance Proceeds and Compensation Account by the Borrower for payment of such amounts or for transfer to the Offshore Revenue Account, in each case in accordance with the Offshore Accounts Agreement.

(vii)    Notwithstanding Section 5.04(d)(ii) above, the Borrower shall be permitted to apply Casualty Proceeds in accordance with [Section 9.02(a)(v)] (*Withdrawals from the Insurance Proceeds Compensation Account*) of the Offshore Accounts Agreement.

(e)     Reporting Requirements. Unless the 2L Administrative Agent otherwise agree, the Borrower shall provide to the 2L Administrative Agent (with a copy to the Insurance Consultant) the following:

(i)      as soon as possible after its occurrence, notice of any event that entitles the Borrower to claim for an aggregate amount equal to or exceeding five million Dollars ($5,000,000) (or its equivalent in any other currency or currencies) under any one or more insurance policies;

(ii)     promptly, but in no event more than fifteen (15) days after (A) the initial placement of any insurance policy and (B) the renewal thereof, evidence of that policy incorporating any loss payee, additional insured and other provisions required under Section 5.04(b) and within sixty (60) days after (A) and (B) above, a copy of such policy;

(iii)    promptly, but in no event more than thirty (30) days after any notice has been given by the 2L Administrative Agent to the Borrower pursuant to Section 5.04(a)(ii), (a)(iii) or (a)(iv), evidence of any additional insurance obtained, or modification of any existing policy made, pursuant to that notice, and within ninety (90) days after any such notice, a copy of such additional insurance or modification to an existing policy;

- 120 -

(iv)    not less than thirty (30) days prior to the initial placement of the operational phase insurances, provide satisfactory information and documentation to the 2L Administrative Agent (acting in consultation with the Insurance Consultant) that the cover proposed to be effected complies with the requirements of this Section 5.04 and <u>Annex C</u> (*Insurance Requirements*);

(v)    not less than two (2) Business Days prior to the expiry date of any insurance policy (or, for insurance with multiple renewal dates, not less than two (2) Business Days prior to the expiry date of the policy on the principal asset), a certificate of renewal from the insurer, insurance broker or agent confirming the renewal of that policy and the renewal period, the premium, the amounts insured for each asset or item and any changes in terms or conditions from the policy's issue date or last renewal, and confirmation from the insurer that provisions naming the Offshore Collateral Agent as sole loss payee *(beneficiario exclusivo)* and the Secured Parties as additional insured, as applicable remain in effect;

(vi)    such evidence of premium payment as any Secured Party may request from time to time; and

(vii)    any other information or documents on each insurance policy as any Secured Party may request from time to time.

Section 5.05.    *Environmental and Social Reporting Requirements*.

(a)    The Borrower shall deliver to the 2L Administrative Agent, with a copy to the Environmental and Social Consultant, an Environmental and Social Compliance Report:

(i)    for each Financial Quarter or part thereof prior to the End of Construction (as defined in the Construction Contracts) being achieved, no later than thirty (30) days after the end of each such Financial Quarter or period;

(ii)    for each Financial Semester during the three (3) year period commencing on the date on which the End of Construction (as defined in the Construction Contracts) is achieved, in respect of such Financial Semester, no later than forty-five (45) days after the end thereof; and

(iii)    thereafter, for each Financial Year, within sixty (60) days after the end of such Financial Year.

(b)    The Borrower shall notify the 2L Administrative Agent as soon as possible, but in any event within five (5) days after the later of the occurrence and the date that the Borrower should reasonably have become aware of the occurrence, after due inquiry, of any fact, circumstance, condition or occurrence that has or could likely result in any of the following relating to the Project or any Environmental Party (but only in respect of or in connection with the Project):

(i)    any non-compliance with the Environmental and Social Requirements;

- 121 -

(ii)    any adverse impact relating to any Environmental and Social Matter;

(iii)    any written communication by or on behalf of the Borrower with any Authority relating to any non-compliance or alleged non-compliance with Applicable Environmental and Social Law, any Authorization and any material issues pertaining to Environmental and Social Matters; or

(iv)    any Environmental Claim;

and such notice shall include a reasonable description of the event detailing the extent, magnitude, impact and cause of such event together with corrective or remedial actions taken as of the date of such notice by the Borrower with respect thereto, and, as necessary, a Corrective Action Plan in form and substance satisfactory to the Required Creditors, which notice may be supplemented from time to time; provided, however, that if a Corrective Action Plan is required, the Borrower shall have an additional thirty (30) days to deliver such Corrective Action Plan, unless earlier delivery is required by the Required Creditors as a result of the severity of the circumstances and upon reasonable notice.

(c)    No later than thirty (30) days prior to the Project Completion Date, deliver to the 2L Administrative Agent, with a copy to the Environmental and Social Consultant, an Environmental and Social Construction Report, in form and substance satisfactory to the Required Creditors.

(d)    Simultaneously with the delivery by the Environmental and Social Consultant of an Environmental and Social Monitoring Report pursuant to Section 5.03(p) (*Environmental and Social Consultant Monitoring Reports*), deliver to the 2L Administrative Agent a certificate of an Authorized Representative of the Borrower certifying that the Borrower is in compliance in all material respects with the Environmental and Social Requirements, unless a Corrective Action Plan is in place and the Borrower is in compliance therewith.

(e)    Within two (2) days after its occurrence, notify the 2L Administrative Agent of any (*x*) social, labor, health and safety, security or environmental incident, accident or circumstance having, or that could reasonably be expected to have, a Material Adverse Effect or material adverse impact on the implementation or operation of the Project in accordance with the Environmental and Social Requirements and (*y*) any deaths or significant injuries or accidents, Release of Hazardous Substances, significant unplanned Releases, explosions or fires.  Within ten (10) days after its occurrence, notify the 2L Administrative Agent and the Secured 2L Lenders of the nature of the incident, accident, or circumstance and any effect resulting or likely to result therefrom, and the measures the Borrower is taking or plans to take to address them and to prevent any future similar event; and keep the 2L Administrative Agent informed of the on-going implementation of those measures and plans.

# ARTICLE VI

## Events of Default

Section 6.01.    *Acceleration after Default*.  If any Event of Default occurs and is continuing (whether it is voluntary or involuntary, or results from operation of law or otherwise), the Secured

2L Lenders may, by notice to the Borrower (with a copy to the Intercreditor Agent), require the Borrower to repay its Secured 2L Loan or such part of its Secured 2L Loan as is specified in that notice.  On receipt of any such notice, the Borrower shall immediately repay such Secured 2L Loan (or that part of such Secured 2L Loan specified in that notice) and pay all interest accrued on it and any other amounts then payable under this Agreement and the Secured 2L Loan Agreement. The Borrower waives any right it might have to further notice, presentment, demand or protest with respect to that demand for immediate payment.

Section 6.02.  *Events of Default*.  Each of the following events or occurrences set forth in this Section 6.02 shall be an Event of Default in respect of the Secured 2L Loans:

(a)    Failure to Pay under Financing Documents.  The Borrower fails to pay when due (i) any part of the principal of or any interest on any Secured 2L Loan, whether at the due date thereof or at a date fixed for mandatory prepayment thereof in accordance with Section 2.06(a) (*Mandatory Prepayment*) or (ii) any other amount payable by it pursuant to the Financing Documents and in the case of this clause (ii), such failure continues unremedied for a period of ten (10) days.

(b)    Failure to Comply with Certain Obligations.

(i)    The Borrower fails to comply with any of its obligations under Section 5.01(a) (*Affirmative Covenants - Corporate Existence; Conduct of Business*), Section 5.01(j) (*Affirmative Covenants - Security; Further Assurances*), Section 5.01(k) (*Further Assurances*), Section 5.01(l) (*Affirmative Covenants - Pari Passu*), Section 5.01(n) (*Affirmative Covenants - Insurance Requirements*), Section 5.01(r) (*Affirmative Covenants - OFAC Lists*), Section 5.01(u) (*Affirmative Covenants - Sanctions*), Section 5.02 (*Negative Covenants*) or Section 5.03(n) (*Reporting Requirements - Illicit Funding*) of this Agreement.[38]

(ii)    The Borrower or AM DE, as applicable, fails to comply with any of its obligations under this Agreement or any other Financing Document or any other agreement between the Borrower or AM DE (as applicable) and the Secured 2L Lenders (other than covenants and agreements referred to in Section 6.02(a) and Section 6.02(b)(i)), and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the Intercreditor Agent notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, if such breach or default cannot be cured within such thirty (30) day period but is capable of being cured within sixty (60) days and the Borrower (A) is proceeding with diligence to cure such default, (B) provides, prior to the expiration of the initial thirty (30) day period, a notice to the Intercreditor Agent explaining the reasons why the Borrower is not able to cure such breach or default within the initial thirty (30) day cure period and

---

[38]    NTD: Similar covenants of AM DE from the Offshore Subsidiary Guaranty & Security Agreement to be added.

the Borrower's plan to achieve the cure within the additional thirty (30) day cure period and, (C) informs the Intercreditor Agent on a periodic basis of all actions being taken in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.

(iii)     Any party to a Financing Document (other than the Secured Parties or the Borrower) fails to observe or perform any of its obligations under that Financing Document, and any such failure is not waived by the Required Creditors (which, in the case of any 1L/ 2L Secured Debt Document, is the Secured Creditor party thereto), and any such failure continues for a period of thirty (30) days after the earlier of (*x*) the date on which the Intercreditor Agent notifies the Borrower thereof and (*y*) the date that the Borrower becomes, or should have become, aware of such failure; except that any failure of the Sponsor or the Shareholder to observe or perform its obligations under Section 2.01 (*Share and Subordinated Loan Retention*), Section 2.02 (*Conditions to All Share Transfers*) Section 2.03 (*Restrictions on Share Transfer Recordation - Notice of Transfers*), and Section 2.05 (*Conditions to Shared Services Loan Transfers*) of the Share Retention Agreement within the time periods set forth therein, in each case shall result in an immediate Event of Default.

(iv)     [Any party to a Material Project Document (other than the Borrower) fails to comply in any material respect with any of its obligations thereunder and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the Intercreditor Agent notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, with respect to any Material Project Document other than a Material Project Document to which AES Andes is the Material Project Participant, if the applicable cure periods provided for in such contract have not expired, then the thirty (30) day cure period provided hereunder shall commence on the date on which the applicable cure period under the relevant Material Project Document has expired; and provided, further, that in the case of any Material Project Document, to the extent such breach or default cannot be cured within such thirty (30) day period, but is capable of being cured within sixty (60) days and the Material Project Participant is proceeding with diligence to cure such default and the Borrower informs the Intercreditor Agent on a periodic basis of all actions that the Borrower is aware of that have been taken by the Material Project Participant in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.]

(v)     Notwithstanding Section 6.02(b)(ii), in the case of a breach or default of the obligations under Section 5.05(e) (*Environmental and Social Reporting Requirements*), such breach or default continues for a period of ten (10) days.

- 124 -

(c)     Misrepresentation.  Any representation or warranty made in ARTICLE III or in any other Financing Document by any of the Borrower, AM DE, the Shareholder or the Sponsor, or in connection with the execution of, or any request, certificate or notice delivered to any Secured Party under or in respect of, this Agreement or any other Financing Document is found to be incorrect in any material respect, unless the facts or conditions giving rise to such misrepresentation are capable of cure and cured in such a manner as to eliminate such misrepresentation within ten (10) days after the earlier of (i) the date on which the Intercreditor Agent notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware thereof.

(d)     Expropriation, Nationalization, Etc.  Any Authority:

  (i)     condemns, nationalizes, seizes, attaches, compulsorily acquires, confiscates or otherwise expropriates (directly or indirectly through measures tantamount to expropriation) all or any substantial part of the property or the assets of the Borrower or AM DE or of their respective Share Capital;

  (ii)    assumes custody or control of all or any substantial part of the property or the assets, or of the business or operations, of the Borrower or AM DE or of their respective Share Capital;

  (iii)   takes or directs any action for the dissolution or disestablishment of the Borrower or AM DE or any action that would prevent the Borrower, AM DE or their respective officers from carrying on all or a substantial part of its business or operations; or

  (iv)    takes any action or enacts any law to effect any of the foregoing.

(e)     Involuntary Proceedings.  A decree or order by a court is entered against the Borrower or AM DE:

  (i)     adjudging the Borrower or AM DE bankrupt, in liquidation or insolvent;

  (ii)    approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or with respect to, the Borrower or AM DE under any applicable law;

  (iii)   appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or AM DE or of any substantial part of its property or other assets; or

  (iv)    ordering the winding up or liquidation of its affairs;

or any petition is filed seeking any of the above and is not dismissed within sixty (60) days.

(f)     Voluntary Proceedings.  The Borrower or AM DE:

(i)     requests a moratorium or suspension of payment of Liabilities from any court;

(ii)    institutes proceedings or takes any form of corporate action to be liquidated or adjudicated bankrupt or insolvent (including any reorganization procedure (*procedimiento concursal de reorganización*), judicial reorganization agreement (*acuerdo de reorganizacíon judicial*), or simplified reorganization agreement (*acuerdo de reorganización extrajudicial o simplificado*), or liquidation procedure (*procedimiento concursal de liquidación*));

(iii)   consents to the institution of bankruptcy, liquidation or insolvency proceedings against it;

(iv)   files a petition or answer or consent seeking reorganization or relief under any applicable law, or consents to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or of any substantial part of its property;

(v)    makes a general assignment for the benefit of creditors; or

(vi)   admits in writing its inability to pay its Liabilities generally as they become due or otherwise becomes insolvent.

(g)    <u>Analogous Events</u>.  Any other event occurs that under any Applicable Law (including any Applicable Environmental and Social Law in the case of clause (h) of this Section 6.02) would have an effect analogous to any of those events listed in clauses (e), (f) or (h) of this Section 6.02.

(h)    <u>Attachment</u>.  An attachment or analogous process is levied or enforced upon or issued against any of the assets of (i) the Borrower and AM DE (together in the same proceeding) for an amount in excess of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) or (ii) AM DE for an amount in excess of one million Dollars ($1,000,000) (or its equivalent in any other currency),  and such attachment or process is not discharged within sixty (60) days.

(i)    <u>Judgments</u>.  A final and non-appealable judgment, order or arbitral award (or series thereof) for the payment of money in excess of the aggregate (i) of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) is rendered against the Borrower and AM DE (together in the same proceeding) or (ii) for AM DE individually, in excess of one million Dollars ($1,000,000) (or its equivalent in any other currency), and in either such case that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed for a period of sixty (60) days; <u>provided</u> that, to the extent that an insurer of any third party liability insurance policy required under <u>Annex C</u> (*Insurance Requirements*) confirms and acknowledges in writing that all or a portion of the amount of any such judgment, order or arbitral award will be paid out of the proceeds of any such insurance policy, the amount confirmed to be paid under such

- 126 -

insurance policy by such insurer shall not be taken into account for purposes of the threshold set forth in this Section 6.02(i).

(j)    Cross-Default.  The Borrower fails to make any payment in respect of any of its Financial Debt (other than the Secured 2L Loans or any other amount payable pursuant to the Financing Documents) in excess of five million Dollars ($5,000,000) (or its equivalent in any other currency) and any such failure continues for more than any applicable period of grace or any such Financial Debt becomes prematurely or immediately due and payable.

(k)    Revocation, Etc., of Security Documents.

    (i)    Any Security Document or any of its provisions:

        (A)    is revoked, terminated or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms) or ceases to provide the security intended, without, in each case, the prior written consent of the Intercreditor Agent (acting on the instructions of the Required Creditors);

        (B)    becomes unlawful, is declared void or becomes unenforceable; or

        (C)    is repudiated or its validity or enforceability is challenged, in each case in writing by any Person (other than a Secured Party).

    (ii)    Any Lien created or purported to be created by any of the Security Documents does not have, or ceases to have, the effect and priority it is expressed or intended to have under the terms of the relevant Security Document and in accordance with the Applicable Priority.

(l)    Revocation, Etc., of Financing Documents. Any Financing Document (other than a Security Document) or any of its provisions:

    (i)    is revoked, terminated, rescinded or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms or as permitted under this Agreement);

    (ii)    becomes unlawful, is declared void or becomes unenforceable; or

    (iii)    [is repudiated in writing by any Person (other than a Secured Party).]

(m)    Revocation, Etc., of Material Project Documents.

    (i)    Any Material Project Document or any of its material provisions (including any warranty given thereunder):

        (A)    is revoked, terminated, rescinded, cancelled or ceases to be in full force and effect (other than at the end of its scheduled term or as permitted under this Agreement);

- 127 -

[AM_ACTIVE 403646503_3]

(B)    becomes unlawful, is declared void or becomes unenforceable; or

(C)    [is repudiated or the validity or enforceability of any of its material provisions at any time is challenged, in each case in writing by any Person (other than a Secured Party or Strabag, in its capacity as Construction Constructor).]

(n)    <u>Abandonment</u>.  The Borrower:

(i)    ceases to carry on its business;

(ii)    abandons the construction or operation of all or a material part of the Project for a period in excess of thirty (30) consecutive days;

(iii)    except in the case of a Force Majeure Event or mandated by an Authority, suspends the construction ($x$) of the Project as a whole for a period in excess of one-hundred and twenty (120) days in any period of twelve (12) consecutive months or, ($y$) of any material part of the Project for a period in excess of one-hundred and eighty (180) days, in any period of twelve (12) consecutive months;

(iv)    except ($w$) in the case of a Force Majeure Event or similar event affecting the operation of the Project, ($x$) if contemplated under the Project Documents (other than the O&M Agreement), ($y$) if mandated by an Authority or the CEN or ($z$) due to an emergency affecting the SEN, suspends the operation of the Project or any material part thereof for a period in excess of one-hundred and eighty (180) days in any period of twelve (12) consecutive months; or

(v)    provides written or electronic notice to the *Superintendencia del Medio Ambiente* (Environmental Superintendence), the *Servicio de Evaluación Ambiental* (Environmental Assessment Service), the *Comisión Nacional de Energía* (National Commission of Energ*y)*, the *Superintendencia de Electricidad y Combustibles* (Superintendence of Electricity and Fuels) or the *Coordinador Independiente del Sistema Eléctrico Nacional* (Independent Coordinator) indicating its decision to shut down, wind-up, indefinitely suspend construction or abandon the Project;

(o)    <u>Material Adverse Effect</u>.  Any event or circumstance (or series of events or circumstances) occurs or exists that has or could reasonably be expected to have a Material Adverse Effect.

(p)    <u>Bankruptcy, Liquidation, Etc., of Material Project Participants</u>.  Any of the events specified in Section 6.02(e) through Section 6.02(g) occurs to any Material Project Participant (other than any counterparty to the Real Estate Rights Agreements or the Aguas Andinas Agreement); <u>provided</u>, <u>however</u>, that in the case of each Construction Contractor, any such event occurs prior to the expiration of the warranty period (excluding any latent defect warranty period) under the Construction Contract to which it is a party.

<div align="center">- 128 -</div>

(q)    [Reserved].

(r)    [Reserved]

(s)    <u>Environmental and Social Requirements</u>.  The Borrower or, with respect to the Project, any Environmental Party fails to comply in all material respects with the Environmental and Social Requirements, unless a Corrective Action Plan, in form and substance satisfactory to the Required Creditors, is in place to cure such breach within thirty (30) days following such breach or earlier if required by the Required Creditors as a result of the severity of the circumstances and upon reasonable notice.

(t)    <u>Prohibited Transferee</u>.  The Sponsor or the Shareholder sells, transfers or assigns, directly or indirectly, any of its Share Capital in the Borrower or any Subordinated Loan to a Prohibited Transferee.

(u)    <u>Loss of Authorizations</u>.  (i) An appealable judgment or order is rendered partially or fully revoking, terminating, cancelling, suspending or declaring void a Material Authorization (the "<u>Adverse Judgment</u>") and such Adverse Judgment could reasonably be expected to result in a Material Adverse Effect.

(ii)    In connection with or following the Adverse Judgment, an injunction is granted or issued by a court of competent jurisdiction with respect to or in connection with a Material Authorization and such injunction orders the stoppage or suspension of any work permitted to be performed in respect of the Project, and such injunction is not vacated, discharged or stayed for a period of sixty (60) days.

(iii)    The Adverse Judgment becomes final and non-appealable.

(v)    <u>Change of Control</u>.  A Change of Control occurs.

Section 6.03.  <u>*Bankruptcy*</u>.  If any Event of Default in Section 6.02 (e) or (f) (*Events of Default*) occurs with respect to the Borrower, all the Secured Debt, all interest accrued on them and any other amounts payable under this Agreement or any other Financing Document will become immediately due and payable without any presentment, demand, protest or notice of any kind, all of which the Borrower waives; <u>provided</u> that, this Section 6.03 shall not apply due to the commencement of a proceeding regulated under Chapter III (*Del Procedimiento Concursal de Reorganización*) of Law No. 20,720 of Chile during the period in which the *Protección Financiera Concursal* described in Article 57 of Law No. 20,720 is in effect with respect to the Borrower.

## ARTICLE VII

## Miscellaneous

Section 7.01.  <u>*Saving of Rights*</u>.  (a) The rights and remedies of the Secured Parties in relation to any misrepresentation or breach of warranty on the part of the Borrower shall not be prejudiced by any investigation by or on behalf of any of the Secured Parties into the affairs of the Borrower, by the execution or the performance of this Agreement or the other Financing

- 129 -

Documents or by any other act or thing that may be done by or on behalf of any of the Secured Parties in connection with this Agreement or the other Financing Documents and that might, apart from this Section 7.01, prejudice such rights or remedies.

(b)     No course of dealing and no failure or delay by any Secured Party in exercising, in whole or in part, any power, remedy, discretion, authority or other right under this Agreement, any other Financing Document or any other agreement shall waive or impair, or be construed to be a waiver of, such or any other power, remedy, discretion, authority or right hereunder or thereunder, or in any manner preclude its additional or future exercise; nor shall the action of any Secured Party with respect to any default, or any acquiescence by it therein, affect or impair any right, power or remedy of that Secured Party (or any other Secured Party) with respect to any other default.

Section 7.02.  _Notices_.  (a) Any notice, request or other communication to be given or made under this Agreement shall be in writing.  Any such communication may be delivered by hand, airmail, or established courier service to the party's address specified on its signature page to this Agreement or at such other address as such party notifies to the other parties from time to time, and will be effective upon receipt; provided, however, that the parties hereto may, at their election, deliver notices, requests or communications to each other or the other Secured Parties by electronic mail to the extent that an e-mail address has been provided for such Person in its notice details (and if no email address has been provided, such communications shall be delivered as otherwise permitted hereunder).

(b)     Any notice, request, report or other communication to be given or made under this Agreement or any other Financing Document by the Borrower shall be delivered to the Intercreditor Agent.

Section 7.03.  _English Language_.  (a) All documents to be provided or communications to be given or made under this Agreement shall be in the English language.

(b)     To the extent that the original version of any document to be provided, or communication to be given or made, to any Secured Party under this Agreement or any other Financing Document is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative to be a true and correct translation of the original.  The parties hereto acknowledge that this Agreement was negotiated and executed in the English language.  A Secured Party may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 7.04.  _Term of Agreement_.  This Agreement and its provisions shall continue in force until the date on which the Secured Obligations and all other amounts, excluding contingent liabilities and obligations that are unasserted at such time, payable to any Secured Party under its respective Secured Debt Documents, this Agreement and all other Financing Documents have been paid in full in cash (such date, with respect to each Secured Party, as the case may be, the "Release Date").

Section 7.05.  *Enforcement*.  At the option of the Required Creditors, this Agreement may be enforced against the Borrower in the courts of the Country or in any other appropriate jurisdiction or concurrently in more than one jurisdiction, and service of process upon the Borrower may be made in any manner authorized by the laws of any such jurisdiction.

Section 7.06.  *Applicable Law and Jurisdiction*.  (a)  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)    For the exclusive benefit of the Secured Parties, the Borrower irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan.  By the execution of this Agreement, the Borrower irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding.  Final judgment against the Borrower in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)    Nothing in this Agreement shall affect the right of a Secured Party to commence legal proceedings or otherwise sue the Borrower in the Country or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(d)    The Borrower hereby confirms, as of the Original Closing Date and reaffirms, of the date hereof, the irrevocable designation, appointment and empowerment of CT Corporation System with an address at 111 Eighth Avenue, New York, NY 10011, as its authorized agent solely to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a Secured Party may bring in the State of New York in respect of this Agreement.

(e)    As long as this Agreement remains in force, the Borrower shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a Secured Party may bring in New York, New York, United States of America, with respect to this Agreement.  The Borrower shall keep the Secured Parties advised of the identity and location of such agent.

(f)    The Borrower also irrevocably consents, if for any reason its authorized agent for service of process of summons, complaint and other legal process in any action, suit or proceeding is not present in New York, New York, to the service of such papers being made out of the courts of the United States of America located in the Southern District of New York and the courts of the State of New York located in the Borough of Manhattan by mailing copies of the papers by registered United States air mail, postage prepaid, to the Borrower, at its address specified pursuant to Section 7.02 (*Notices*).  In such a case, a Secured Party shall also send by facsimile or electronic mail, or have sent by facsimile or electronic mail, a copy of the papers to the Borrower.

(g)    Service in the manner provided in clauses (d), (e) and (f) of this Section 7.06 in any action, suit or proceeding will be deemed personal service, will be accepted by the Borrower as such and will be valid and binding upon the Borrower for all purposes of any such action, suit or proceeding.

(h)    The Borrower irrevocably waives to the fullest extent permitted by Applicable Law:

(i)    any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 7.06;

(ii)    any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)    its right of removal of any matter commenced by any of the Secured Parties in the courts of the State of New York to any court of the United States of America.

(i)    To the extent that the Borrower may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Agreement or any other Transaction Document to which it is a party, from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed) may be attributed to it or its assets, the Borrower irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(j)    [The Borrower hereby acknowledges that DFC shall be entitled under Applicable Law, including the provisions of the International Organizations Immunities Act of 1945 (22 U.S.C. §288), to immunity from a trial by jury in any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby brought against DFC in any court of the United States of America.]

(k)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT TO WHICH THE BORROWER IS A PARTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, AND FOR ANY COUNTERCLAIM THEREON, BROUGHT BY OR AGAINST ANY SECURED CREDITOR IN ANY FORUM IN WHICH SUCH SECURED CREDITOR IS NOT ENTITLED TO IMMUNITY FROM TRIAL BY JURY.

(l)    To the extent that the Borrower may, in any action, suit or proceeding brought in any of the courts referred to in Section 7.06(b) or a court of the Country or elsewhere arising out of or in connection with this Agreement or any other Financing Document to which the Borrower is a party, be entitled to the benefit of any provision of law requiring a Secured Party in such action, suit or proceeding to post security for the costs of the Borrower, or to post a bond or to take similar action, the Borrower hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of the Country or, as the case may be, the jurisdiction in which such court is located.

Section 7.07. _Disclosure of Information_.    (a) Any of the Secured Parties may, notwithstanding the terms of any other agreement between the Borrower and that Secured Party, disclose any documents, records or information relating to the Borrower, its property, business or affairs, or the Project (collectively, the "Borrower's Information") to:

(i)     any other Person who is or becomes a Secured Party from time to time;

(ii)    any Person as that Secured Party may deem reasonably appropriate in connection with the exercise of any power, remedy, right, authority or discretion relevant to this Agreement or any other Transaction Document;

(iii)   any Person as required by Applicable Law (including any Applicable Environmental and Social Law), provided that the Borrower has received written notice of such required disclosure;

(iv)    any banking or other regulatory or examining authorities (whether governmental or otherwise) pursuant to and in accordance with whose instructions it and other financial institutions must customarily comply;

(v)     its directors, officers, employees, arrangers, co-lenders, attorneys, consultants, rating agencies, independent auditors and advisors (including the Consultants and any other technical, financial and other advisors) and their respective affiliates or any affiliate of a Secured Party;

(vi)    any Person in connection with any proposed sale, transfer, assignment or other disposition of such Secured Party's rights under this Agreement or any other Transaction Document; or

(vii)   any Person who intends to, or who does, purchase or otherwise acquire a Participation.

(b)     The Borrower expressly authorizes each Secured Party to request Borrower's Information from any Person, and the Borrower agrees to hold such Secured Party harmless and exempt from any and all liability under applicable law in connection with the request for, and disclosure of, such Borrower's Information in the circumstances contemplated by Section 7.07(a).

(c)     The Borrower acknowledges and agrees that, notwithstanding the terms of any other agreement between the Borrower and any Secured Party, a disclosure of information by that Secured Party in the circumstances contemplated by Section 7.07(a) does not violate any duty owed to the Borrower under this Agreement or any other Financing Document or under any such other agreement.

Section 7.08. _Successors and Assignees_.    (a) [This Agreement and the other Financing Documents bind and benefit the respective successors and assignees of the parties hereto and thereto.  However, the Borrower may not assign or delegate any of its rights or obligations under this Agreement or any other Financing Document without the prior written consent of the Required Creditors.

- 133 -

(b)    Each Secured Creditor may sell, transfer, assign, novate or otherwise dispose of all or part of its rights or obligations under this Agreement and any other Financing Document (including by granting of Participations) in accordance with the provisions of its respective Secured Debt Document and, to the extent it results in a change to the lender holder of record of the relevant Secured Debt, shall provide written notice thereof to the Borrower and to the Intercreditor Agent, who shall promptly notify all the other Secured Parties.]

Section 7.09.    *Amendments, Waivers and Consents*.  (a) No provision of this Agreement may be amended, supplemented, modified or waived, except by a written instrument signed by all of the Secured Creditors (or the Intercreditor Agent, acting in accordance with the instructions of the Required Creditors), the Sponsor and the Borrower, and, to the extent that its rights or obligations may be affected thereby, any Agent, in its individual capacity.

(b)    Any waiver and any amendment, supplement or modification made or entered into in accordance with Section 7.09(a) shall be binding upon the Borrower and the Secured Parties.

(c)    To the extent that any matter to be determined or decided under any terms or provision of this Agreement or any other Financing Document requires the consent or agreement of the Intercreditor Agent and the number of Secured Creditors from whom the Intercreditor Agent must take instructions is not expressly set forth herein, therein or in the Intercreditor Agreement, the Intercreditor Agent shall act solely in accordance with the instructions of [all of the Secured 2L Lenders.

Section 7.10.    *Counterparts*.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

Section 7.11.    *No Reliance*.  Notwithstanding any other provisions of this Agreement:

(a)    each Secured Creditor acknowledges that it has not relied, nor shall it rely, on the other Secured Creditors, or any of their respective officers, directors, employees, representatives, attorneys, agents and affiliates, to inquire into or verify the accuracy or completeness of any information provided, or made available to any of the Secured Creditors, by the Borrower, the Sponsor or any other Person, on or prior to the date of this Agreement or hereafter;

(b)    each Secured Creditor acknowledges that none of the other Secured Creditors, nor any of their respective officers, directors, employees, representatives, attorneys, agents and affiliates, has made any representation or warranty to it, and that no act by any Secured Creditor hereafter taken, including any review of the Project or of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by such Secured Creditor to any other Secured Creditor.  Each Secured Creditor represents to the other Secured Creditors that it has, independently and based on such documents and information as it has deemed appropriate, and without reliance on any documents, reports or other information (including any materials prepared by any other Secured Creditor for use in its own credit analysis, appraisals and decisions) provided by, or on views expressed by, any other Secured Creditor, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, the Sponsor, the Project, the value of and title to any Security, and Applicable Law or any Applicable Environmental and Social Law relating to the transactions

- 134 -

contemplated hereby, and made its own decision to enter into this Agreement and the other Financing Documents and to extend credit to the Borrower hereunder. Each Secured Creditor also represents that it will, independently and without reliance upon any other Secured Creditor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Transaction Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the Project; and

(c)        each Secured Creditor acknowledges that none of the other Secured Creditors, nor any of their respective officers, directors, employees, representatives, attorneys, agents and affiliates, shall be liable for any documents, reports or other information (including any materials prepared by any other Secured Creditor for use in its own credit analysis, appraisals and decisions) provided by, or for any views expressed by, any other Secured Creditor on or prior to the date of this Agreement or hereafter.

Section 7.12.  _Indemnification; No Consequential Damages_.   (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify the Secured 2L Lenders and its officers, directors, employees, agents and representatives (each, an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, and expenses (including fees, charges and disbursements of counsel) incurred by or asserted against any Indemnitee arising out of, in connection with, or related to (i) the execution, delivery or performance of any Financing Document or any other agreement or instrument contemplated thereby or the consummation of the transactions contemplated hereby, (ii) the Secured 2L Loans or the use of proceeds thereof or the Project, (iii) non-compliance by the Borrower or any Environmental Party with any Applicable Law, any Environmental and Social Requirement or any other Environmental and Social Matter, (iv) any actual or alleged presence or Release of a Hazardous Substance on or from any property owned or operated by any Environmental Party in connection with or related to the Project, and any Environmental Claim, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is party thereto; provided that, such indemnity will not be available to any Indemnitee to the extent that such losses, claims, damages, liabilities or expenses resulted directly from such Indemnitee's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(b)        To the maximum extent permitted by Applicable Law (including any Applicable Environmental and Social Law), the Borrower shall not assert, and hereby agrees to waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages arising out of, in connection with, or relating to, this Agreement or any agreement or instrument contemplated hereby, the Secured 2L Loans or the use of the proceeds thereof.

(c)        The rights granted under this Section 7.12 are in addition to the rights granted under any other provision of this Agreement, under any other Financing Document or otherwise.

(d)        This Section 7.12 shall survive the Release Date.

[AM_ACTIVE 403646503_3]

(e)      All amounts payable to any Indemnitee under this Section 7.12 shall be paid within thirty (30) days after receipt by the Borrower from such Indemnitee of a reasonably detailed invoice therefor.

Section 7.13.  _Survival_.  All representations and warranties made in this Agreement, in any other Financing Document and in any document, certificate or statement delivered pursuant hereto or in connection herewith and Section 2.07 (*Currency and Place of Payments*), Section 2.08 (*Expenses*), Section 7.06 (*Applicable Law and Jurisdiction*), Section 7.07 (*Disclosure of Information*) and Section 7.12 (*Indemnification; No Consequential Damages*) and any related provisions of Article I (*Definitions and Interpretation*) shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment in full or expiration or termination of the Secured Debt or the termination of this Agreement or any other Financing Document or any provision hereof or thereof.

Section 7.14.  _Third Amendment and Restatement_.  This Agreement amends and restates the Second Amended and Restated Common Terms Agreement in its entirety.

[*Signature Pages Follow*]

- 136 -

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**ALTO MAIPO SpA,**
as Borrower

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [●]
Telephone: [●]
Email: [●]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**ITAÚ CORPBANCA,**
as Intercreditor Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [●]
Telephone: [●]
Email: [●]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**ITAÚ CORPBANCA,**
as 2L Administrative Agent (as Secured Creditor Representative for the Secured 2L Loans)

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [●]
Telephone: [●]
Email: [●]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**[●],**
as Exit Administrative Agent (as Secured Creditor Representative for the Secured Exit Loans Notes)

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [●]
Telephone: [●]
Email: [●]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**[•],**
as 1L Trustee (as Secured Creditor Representative for the Secured 1L Notes)

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [•]
Telephone: [•]
Email: [•]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first above written.

**[•],**
as 2L Trustee (as Secured Creditor Representative for the Secured 2L Notes)

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Name]
[Address]
Attention: [•]
Telephone: [•]
Email: [•]

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED COMMON TERMS AGREEMENT

## **Exhibit D**

**Secured 1L Indenture**

29299009.2

ALTO MAIPO SpA
4.00% SENIOR SECURED NOTES DUE 2040[1]

—————————

INDENTURE

Dated as of [●], 2022

—————————

[●]

Trustee

---

[1]  **NTD**: This draft Agreement is subject to ongoing discussions, final review and revision, including with respect to cross-references and conformity to other definitive documents and to the RSA.

1     DEFINITIONS AND INCORPORATION BY REFERENCE ........................................ 1

    1.1    Defined Terms ................................................................................................ 1

    1.2    Interpretation ................................................................................................. 9

    1.3    UCC Terms .................................................................................................... 9

    1.4    Accounting Standards and Financial Determinations .................................... 9

2     THE NOTES ............................................................................................................... 9

    2.1    Form and Dating ........................................................................................... 9

    2.2    Execution and Authentication ...................................................................... 11

    2.3    Registrar and Paying Agent; Depositary ..................................................... 11

    2.4    Paying Agent to Hold Money in Trust ......................................................... 12

    2.5    Noteholder Lists .......................................................................................... 12

    2.6    Transfer and Exchange ................................................................................ 12

    2.7    Replacement Notes ...................................................................................... 27

    2.8    Outstanding Notes ....................................................................................... 28

    2.9    Treasury Notes ............................................................................................ 28

    2.10   Temporary Notes ........................................................................................ 28

    2.11   Cancellation ............................................................................................... 29

    2.12   Defaulted Interest ....................................................................................... 29

    2.13   CUSIP Numbers ......................................................................................... 29

    2.14   Use of Proceeds ......................................................................................... 30

3     REDEMPTION AND PREPAYMENT ..................................................................... 31

    3.1    Notices to Trustee ....................................................................................... 31

    3.2    Selection of Notes to Be Redeemed ............................................................ 32

    3.3    Notice of Redemption .................................................................................. 32

    3.4    Effect of Notice of Redemption ................................................................... 33

    3.5    Deposit of Redemption or Purchase Price .................................................... 33

    3.6    Notes Redeemed in Part ............................................................................... 33

    3.7    Optional Redemption ................................................................................... 34

    3.8    Mandatory Redemption by Application of Collateral Proceeds ...................... 35

    3.9    Mandatory Redemption by Application of Excess Cash Flow or Refinancing .............................................................................................. 35

4     COVENANTS ........................................................................................................... 36

    4.1    Payment of Notes ........................................................................................ 36

| | 4.2 | Maintenance of Office or Agency | 37 |
|---|---|---|---|
| | 4.3 | Reports | 37 |
| | 4.4 | Compliance Certificate | 39 |
| | 4.5 | Taxes and Tax Treatment | 39 |
| | 4.6 | Stay, Extension, and Usury Laws | 39 |
| | 4.7 | Limitation on Indebtedness | 39 |
| | 4.8 | Asset Sales | 40 |
| | 4.9 | Affiliate Transaction | 40 |
| | 4.10 | Liens | 41 |
| | 4.11 | Offer to Repurchase Upon Change of Control | 42 |
| | 4.12 | Insurance Requirements | 44 |
| | 4.13 | Security Collateral | 44 |
| | 4.14 | Fundamental Changes | 44 |
| | 4.15 | Power Purchase Agreements | 44 |
| | 4.16 | Offering Memorandum; Nationally Recognized Rating Agency[8] | 45 |
| | 4.17 | CEMBI Index | 45 |
| | 4.18 | Filings with the Central Bank | 45 |
| | 4.19 | Equator Principles; IFC Performance Standards | 45 |
| | 4.20 | Green Bond Certification | 45 |
| 5 | | SUCCESSORS | 46 |
| | 5.1 | Merger, Consolidation, or Sale of Assets | 46 |
| | 5.2 | Successor Corporation Substituted | 46 |
| 6 | | DEFAULTS AND REMEDIES | 46 |
| | 6.1 | Events of Default | 46 |
| | 6.2 | Acceleration | 49 |
| | 6.3 | Other Remedies | 49 |
| | 6.4 | Waiver of Past Defaults | 49 |
| | 6.5 | Control by Majority | 49 |
| | 6.6 | Limitation on Suits | 50 |
| | 6.7 | Rights of Noteholders to Receive Payment | 50 |
| | 6.8 | Collection Suit by Trustee | 50 |
| | 6.9 | Trustee May File Proofs of Claim | 51 |
| | 6.10 | Priorities | 51 |

|      | 6.11 | Undertaking for Costs | 52 |
| 7    | TRUSTEE | | 52 |
|      | 7.1  | Duties of Trustee | 52 |
|      | 7.2  | Rights of Trustee | 53 |
|      | 7.3  | Individual Rights of Trustee | 55 |
|      | 7.4  | Trustee's Disclaimer | 55 |
|      | 7.5  | Notice of Defaults | 56 |
|      | 7.6  | Compensation and Indemnity | 56 |
|      | 7.7  | Replacement of Trustee | 57 |
|      | 7.8  | Successor Trustee by Merger, etc. | 58 |
|      | 7.9  | Eligibility; Disqualification | 58 |
|      | 7.10 | Trustee Protective Provisions | 58 |
| 8    | LEGAL DEFEASANCE AND COVENANT DEFEASANCE | | 59 |
|      | 8.1  | Option to Effect Legal Defeasance or Covenant Defeasance | 59 |
|      | 8.2  | Legal Defeasance and Discharge | 59 |
|      | 8.3  | Covenant Defeasance | 59 |
|      | 8.4  | Conditions to Legal or Covenant Defeasance | 60 |
|      | 8.5  | Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions | 61 |
|      | 8.6  | Repayment to Company | 62 |
|      | 8.7  | Reinstatement | 62 |
| 9    | AMENDMENT, SUPPLEMENT AND WAIVER | | 62 |
|      | 9.1  | Without Consent of Noteholders | 62 |
|      | 9.2  | With Consent of Noteholders | 63 |
|      | 9.3  | Decisions under Other Financing Documents | 64 |
|      | 9.4  | Revocation and Effect of Consents | 65 |
|      | 9.5  | Notation on or Exchange of Notes | 65 |
|      | 9.6  | Trustee to Sign Amendments, etc. | 65 |
| 10   | SECURITY COLLATERAL | | 66 |
|      | 10.1 | Secured 1L Debt | 66 |
|      | 10.2 | Release of Security Collateral | 66 |
| 11   | SATISFACTION AND DISCHARGE | | 67 |
|      | 11.1 | Satisfaction and Discharge | 67 |

11.2    Application of Trust Money...................................................................... 68

12    MISCELLANEOUS ................................................................................... 69

12.1    Notices ................................................................................................ 69

12.2    Certificate and Opinion as to Conditions Precedent ........................... 70

12.3    Statements Required in Certificate or Opinion ................................... 70

12.4    Rules by Trustee and Agents .............................................................. 71

12.5    No Personal Liability of Directors, Officers, Employees and Stockholders ....... 71

12.6    Applicable Law, Jurisdiction, etc........................................................ 71

12.7    No Adverse Interpretation of Other Agreements................................. 73

12.8    Successors ........................................................................................... 73

12.9    Severability ......................................................................................... 73

12.10    Counterpart Originals........................................................................ 73

12.11    Trustee's Receipt of Funds to the Extent not Required to be Applied to Payment of the Notes ............................................................. 74

12.12    Table of Contents, Headings, etc. ..................................................... 74

12.13    USA Patriot Act ................................................................................ 74

EXHIBITS

Exhibit A-1    FORM OF NOTE
Exhibit A-2    FORM OF REGULATION S TEMPORARY GLOBAL NOTE
Exhibit B      FORM OF CERTIFICATE OF TRANSFER
Exhibit C      FORM OF CERTIFICATE OF EXCHANGE
Exhibit D      FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL
               ACCREDITED INVESTOR
Exhibit E      FORM OF ACKNOWLEDGEMENT OF DEBT

INDENTURE dated as of [●], 2022 between Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**") and [●], as Trustee, each a "**Party**" and together the "**Parties**".

The Company and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Noteholders (as defined herein).

# 1    DEFINITIONS AND INCORPORATION BY REFERENCE

## 1.1    Defined Terms

Unless otherwise defined herein, capitalized terms used herein shall have the meanings provided in the Common Terms Agreement. In addition, the following terms shall have the following meanings:

"**Accounting Standards**" means the International Financial Reporting Standards (IFRS) promulgated by the International Accounting Standards Board, which include standards and interpretations approved by the International Accounting Standards Board, together with its pronouncements thereon from time to time, applicable on a consistent basis, and with respect to the Company or any of its Chilean Affiliates, as applied by the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*), governed by Law No. 21,000 of 2017 of Chile, or its successor.

"**Agent**" means any Registrar, co-registrar, Paying Agent,  additional paying agent or Custodian.

"**Applicable Procedures**" means, with respect to any payment, tender, redemption, transfer, exchange or conversion of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such payment, tender, redemption, transfer, exchange or conversion.

"**Authentication Order**" has the meaning set forth in Section 2.2.

"**Automatic Exchange**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Date**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Notice**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Notice Date**" has the meaning set forth in Section 2.6(g).

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.

"**Business Day**" means a day other than Saturday or Sunday when banks are open for business in (i) New York, New York, (ii) [Washington, D.C.,] (iii) Santiago, Chile, (iv) Oslo, Norway, (v) Vienna, Austria and, with respect to payments, in the place of payment.[2]

"**CEMBI Index**" means the Corporate Emerging Markets Bond Index established by JPMorgan Chase & Co.

"**Change of Control**" means [*to include CTA definition once agreed*].

"**Change of Control Offer**" has the meaning set forth in Section 4.11.

"**Change of Control Payment**" has the meaning set forth in Section 4.11.

"**Change of Control Payment Date**" has the meaning set forth in Section 4.11.

"**Change of Control Repurchase Event**" means the occurrence of both a Change of Control and a Rating Downgrade Event.

"**Clearstream**" means Clearstream Banking, *société anonyme*, or any successor securities clearing agency.

"**Collateral Proceeds**" means Casualty Proceeds, CNM Arbitral Awards Proceeds, Disposition Proceeds, Dispute Resolution Proceeds, Expropriation Proceeds, Liquidated Damages Proceeds, and Termination Proceeds and (following any enforcement action) any and all other cash, securities and other property realized from the Security Collateral (including distributions of Security in satisfaction of any Secured Obligations) but excluding any delay in start-up and business interruption insurance proceeds.

"**Common Terms Agreement**" means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among the Company, each Secured Creditor Representative that is a party thereto from time to time and the Intercreditor Agent.

"**Company**" has the meaning set forth in the Preamble hereto.

"**Corporate Trust Office of the Trustee**" means the office of the Trustee at the address of the Trustee specified in Section 12.1 or such other address as to which the Trustee may give notice to the Company and the Noteholders or the designated corporate trust office of any successor Trustee.

"**Covenant Defeasance**" has the meaning set forth in Section 8.3.

"**Custodian**" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"**Debtor Relief Law**" means the Bankruptcy Code and any other applicable government rule of any jurisdiction, domestic or foreign, relating to liquidation, conservatorship bankruptcy,

---

[2]    **NTD**: This definition remains under discussion.

assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or relief of debtors from time to time in effect.

"**Default**" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"**Deferred 2022 Interest**" has the meaning set forth in Section 4.1.

"**Deferred 2023 Interest**" has the meaning set forth in Section 4.1.

"**Deferred Interest**" has the meaning set forth in Section 4.1.

"**Definitive Note**" means a certificated Note registered in the name of the Noteholder, issued in accordance with Section 2.6, substantially in the form of Exhibit A-1 except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"**Depositary**" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.3 as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"**DFC**" means United States International Development Finance Corporation, an agency of the United States of America (as successor in interest to Overseas Private Investment Corporation pursuant to the Better Utilization of Investments Leading to Development Act of 2018, 22 U.S.C. §§9601 et seq.).

"**DTC**" has the meaning set forth in Section 2.3.

"**Euroclear**" means Euroclear Bank, S.A./N.V. or any successor securities clearing agency.

"**Event of Default**" has the meaning set forth in Section 6.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Global Note Legend**" means the legend set forth in Section 2.6(f)(ii).

"**Global Notes**" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in accordance with Sections 2.1 and 2.6.

"**Government Securities**" means securities that are direct obligations of, or obligations guaranteed by, the United States of America for the timely payment of which its full faith and credit is pledged.

"**Hedging Agreement**" means (a) any and all swap transactions, derivative transactions, forward transactions, options, cap transactions, floor transactions, collar transactions, spot

contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement such as the *Condiciones Generales de Contratos de Derivados en el Mercado Local* acknowledged by the Central Bank of Chile (any such master agreement, together with any related schedules, an "**ISDA Master Agreement**"), including any such obligations or liabilities under any ISDA Master Agreement.

"**IAI Global Note**" means a Global Note issued in accordance with Section 2.1(c)(i)(B).

"**Indebtedness**" means any indebtedness of the Company for or in respect of:

(i)     borrowed money;

(ii)     the outstanding principal amount of any bonds, debentures, notes, loans, commercial paper, acceptance credits, bills or promissory notes drawn, accepted, endorsed or issued by the Company;

(iii)     the deferred purchase price of assets or services (except trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

(iv)     non-contingent obligations of the Company to reimburse any other Person for amounts paid by such Person under a letter of credit or similar instrument (excluding any letter of credit or similar instrument issued for the account of the Company with respect to trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

(v)     the amount of any obligation in respect of any lease that would, under the Accounting Standards, be treated as a finance or capital lease;

(vi)     amounts raised under any other transaction having the financial effect of a borrowing and which would be classified as a borrowing under the Accounting Standards (and not as an off-balance sheet financing under the Accounting Standards);

(vii)     the amount of the Company's obligations under any Hedging Agreements entered into in connection with the protection against or benefit from fluctuation in any rate or price (but only the net amount owing by the Company after marking the relevant derivative transactions to market);

(viii)     without double counting, the amount of any obligation in respect of any guarantee or indemnity given by the Company for any of the foregoing

items incurred by any other Person up to the amount guaranteed or agreed to be indemnified by the Company;

(ix)    the net present value of any retirement defined benefit obligations less the market value of any marketable or available for sale securities that are set aside to meet these obligations; and

(x)    any repurchase obligation or liability of any Person with respect to accounts or notes receivable sold by such Person, and, without duplication of any amounts in clause (v) above, any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, any obligation under a "synthetic lease" or any obligation arising with respect to any other transaction that is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Indenture**" means this Indenture, as amended or supplemented from time to time.

"**Indirect Participant**" means a Person who holds a beneficial interest in a Global Note through a Participant.

"**Initial Secured 1L Noteholder**" means each Noteholder that is a Secured 1L Noteholder on the Issue Date.

"**Institutional Accredited Investor**" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who is not also a QIB.

"**Interest Payment Date**" means January 15, April 15, July 15 and October 15 in each year, or if any such day is not a Business Day, the next succeeding Business Day.

"**Issue Date**" means the first date of original issuance of the Notes under this Indenture.

"**Legal Defeasance**" has the meaning set forth in Section 8.2.

"**Liabilities**" means the aggregate of all obligations of the Company to pay or repay money, including:

(i)    Indebtedness;

(ii)    the amount of all liabilities of the Company (actual or contingent) under any conditional sale or a transfer with recourse or obligation to repurchase, including by way of discount or factoring of book debts or receivables;

(iii)    trade accounts incurred and payable in the ordinary course of business to trade creditors within  ninety (90) days of the date they are incurred and which are not overdue (including letters of credit or similar instruments issued for the account of the Company with respect to such trade accounts);

(iv)    accrued expenses, including wages and other amounts due to employees and other services providers;

(v)    the amount of all liabilities of the Company howsoever arising to redeem any of its Shares; and

(vi)    to the extent (if any) not included in the definition of Indebtedness, the amount of all liabilities of any Person to the extent the Company guarantees them or otherwise obligates itself to pay them.

"**Long-term Debt**" means that part of Indebtedness the final maturity of which, by its terms or the terms of any agreement relating to it, falls due more than one year after the date of its incurrence.

"**Nationally Recognized Rating Agencies**" means each of Moody's, S&P, Fitch; provided that if any of Moody's, S&P, and Fitch ceases to provide ratings services to issuers or investors, the Company may appoint a replacement for such Nationally Recognized Rating Agency that is reasonably acceptable to the Intercreditor Agent.

"**Non-U.S. Person**" means a Person who is not a U.S. Person.

"**Noteholder**" means a Person in whose name a Note is registered.

"**Notes**" means $[●] aggregate principal amount of 4.00% Senior Secured Notes due 2040 issued under this Indenture on the date hereof.

"**Offering Memorandum**" means an offering memorandum related to the offering of the Notes to be prepared by the Company in accordance with Section 4.16.

"**Officer's Certificate**" means a certificate signed by the Chairman of the Board, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Director of Finance, the Chief Legal Officer, the Treasurer or any Assistant Treasurer and the Secretary or any Assistant Secretary (or, in each case, the officers of the Company with equivalent positions) that meets the requirements of Section 12.3.

"**Opinion of Counsel**" means an opinion or opinions from legal counsel who is reasonably acceptable to the Trustee that meets the requirements of Section 12.3.  The counsel may be an employee of, or counsel to, the Company.

"**Participant**" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"**Party**" or "**Parties**" has the meaning set forth in the Preamble hereto.

"**Paying Agent**" has the meaning set forth in Section 2.3.

"**Person**" means any natural person, corporation, company, partnership, firm, voluntary association, joint venture, trust, unincorporated organization, national, supranational, regional or local government or governmental, administrative, fiscal, judicial, or government-owned body, department, commission, authority, tribunal, agency or entity, or central bank (or any Person, whether or not government owned and howsoever constituted or called, that exercises the functions of a central bank), or any other entity whether acting in an individual, fiduciary or other capacity.

"**Private Placement Legend**" means the legend set forth in Section 2.6(f)(i).

"**QIB**" means a "qualified institutional buyer" as defined in Rule 144A.

"**Rating Downgrade Event**" means the rating on the Notes is lowered from the rating then in effect by any of the Nationally Recognized Rating Agencies on any date during the period (the "**Trigger Period**") commencing on the date of the first public announcement of any Change of Control (or pending Change of Control) and ending 60 days following consummation of such Change of Control (which Trigger Period will be extended following consummation of a Change of Control for so long as any of the Nationally Recognized Rating Agencies has publicly announced prior to the end of the 60 days following consummation of the Change of Control that it is considering a possible ratings change); *provided* that a Rating Downgrade Event otherwise arising by virtue of a particular lowering in rating will not be deemed to have occurred in respect of a particular Change of Control (and thus will not be deemed a Rating Downgrade Event for purposes of the definition of Change of Control Repurchase Event hereunder) if the Nationally Recognized Rating Agency making the lowering in rating to which this definition would otherwise apply does not announce or publicly confirm or notify the holders through DTC in writing in response to a request made at the direction of holders of a majority in principal amount of the then outstanding Notes that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control shall have occurred at the time of the Rating Downgrade Event). In no event shall the Trustee be charged with knowledge of the rating of the Notes or the Company or any Rating Downgrade Event, nor shall it be charged with monitoring such rating or determining whether any Rating Downgrade Event has occurred or is continuing. Notwithstanding the foregoing, no Rating Downgrade Event will be deemed to have occurred in connection with any particular Change of Control unless and until such Change of Control has actually been consummated.[3]

"**Registrar**" has the meaning set forth in Section 2.3.

"**Regulation S**" means Regulation S promulgated under the Securities Act.

"**Regulation S Global Note**" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as appropriate.

"**Regulation S Permanent Global Note**" means a permanent Global Note issued in accordance with the second paragraph of Section 2.1(c).

---

[3]    **NTD**: This definition remains under discussion.

"**Regulation S Temporary Global Note**" means a temporary Global Note issued in accordance with the first paragraph of Section 2.1(c).

"**Responsible Officer**," when used with respect to the Trustee, means any officer within the corporate trust department of the Trustee (or any successor division or unit of the Trustee) located at the Corporate Trust Office of the Trustee, who has direct responsibility for the administration of this Indenture and also means any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"**Restricted Definitive Note**" means a Definitive Note bearing the Private Placement Legend.

"**Restricted Global Note**" means a Global Note bearing the Private Placement Legend.

"**Restricted Note**" means a Restricted Definitive Note or a Restricted Global Note.

"**Restricted Period**" means the forty-day distribution compliance period as defined in Regulation S.

"**Rule 144**" means Rule 144 promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A promulgated under the Securities Act.

"**Rule 144A Global Note**" means a Global Note issued in accordance with Section 2.1(c)(i).

"**Rule 144A Information**" has the meaning set forth in Section 4.3.

"**Rule 903**" means Rule 903 promulgated under the Securities Act.

"**Rule 904**" means Rule 904 promulgated under the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Creditor Representative**" means (i) the Trustee with respect to this Indenture and the Noteholders, (ii) the Exit Administrative Agent with respect to the Secured Exit Loan Agreement and the Secured Exit Lenders, (iii) the 2L Administrative Agent with respect to the Secured 2L Loan Agreement and the Secured 2L Lenders, (iv) the 2L Trustee with respect to the Secured 2L Indenture and the Secured 2L Noteholders, and (v) the trustee or administrative agent, as applicable, with respect to any Refinancing Debt.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Trustee**" means [●], not individually but solely in its capacity as such, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"**Unrestricted Definitive Note**" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"**Unrestricted Global Note**" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"**U.S. Person**" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

## 1.2    Interpretation

In this Indenture, except to the extent specified to the contrary or where context otherwise requires, the provisions of Section 1.03 of the Common Terms Agreement shall be applied.

## 1.3    UCC Terms

Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the respective meanings given to those terms in the UCC.

## 1.4    Accounting Standards and Financial Determinations

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with the Accounting Standards, as in effect from time to time. If at any time any change in the Accounting Standards would affect the computation of any financial ratio or requirement set forth herein, then such ratio or requirement shall be modified in a manner determined as soon as reasonably practicable and in good faith by the Company and set forth in a written notice to the Trustee that preserves the original intent thereof in light of such change in Accounting Standards.

## 2    THE NOTES

## 2.1    Form and Dating

(a)    *General*. The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture, and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*. Except as otherwise provided in this Section 2.1, Notes issued in global form (and the Trustee's certificate of authentication of such Notes) will be substantially in the form of Exhibit A-1 or A-2 (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each such Note will be dated the date of its authentication. Except as otherwise provided in this Section 2.1, Notes issued in definitive form will be substantially in the form of Exhibit A-1 (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that

the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect transfers, exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Noteholder thereof as required by Section 2.6.

(c)  *Temporary Global Notes*. Notes offered and sold in reliance on Regulation S will be issued in a denomination equal to the outstanding principal amount of such Notes initially substantially in the form of Exhibit A-2. Such Notes will be deposited on behalf of the purchasers of the Notes represented thereby with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Company and authenticated by the Trustee as hereinafter provided. The Restricted Period will be terminated upon the receipt by the Trustee of:

(i)  a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any Beneficial Owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who will take delivery of a beneficial ownership interest in (A) a Global Note substantially in the form of Exhibit A-1, bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, and issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A or (B) a Global Note substantially in the form of Exhibit A-1, bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary, and issued in a denomination equal to the outstanding principal amount of Notes sold to Institutional Accredited Investors, all as contemplated by Section 2.6(b)); and

(ii)  an Officer's Certificate from the Company.

Following the termination of the Restricted Period with respect to any Notes, beneficial interests in the Regulation S Temporary Global Note will be exchanged, pursuant to the Applicable Procedures, for beneficial interests in a permanent Global Note, which will be in the form of Exhibit A-1 bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary, and issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period. Simultaneously with the authentication of the Regulation S Permanent Global Note, the Trustee will cancel the Regulation S Temporary Global Note. The aggregate principal amount of the Regulation S Temporary Global Note and the

Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

      (iii)     *Euroclear and Clearstream Procedures Applicable.* The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Note that are held by Participants through Euroclear or Clearstream.

## 2.2     Execution and Authentication

At least one Authorized Officer must sign the Notes for the Company by manual or facsimile signature.

If an Authorized Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by at least one Authorized Officer (an "**Authentication Order**"), authenticate Notes for original issue that may be validly issued under this Indenture. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.7.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Noteholders or an Affiliate of the Company.

Nothing in this paragraph shall be deemed to modify, replace or otherwise affect the restrictions on transfer applicable to Restricted Notes set forth in Section 2.6.

## 2.3     Registrar and Paying Agent; Depositary

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("**Registrar**") and an office or agency where Notes may be presented for payment ("**Paying Agent**"). The Registrar will keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "**Registrar**" includes any co-registrar and the term "**Paying Agent**" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Noteholder. The Company will notify the Trustee in writing of the

name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such.

The Company initially appoints The Depository Trust Company ("**DTC**") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

## 2.4    Paying Agent to Hold Money in Trust

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Noteholders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Subject to applicable abandoned property laws, all payments to a Paying Agent on any Notes which remain unclaimed for a period of two years after such payment was due shall be repaid to the Company. Thereafter, the Noteholder may look only to the Company for repayment. Upon payment over to the Trustee, or to the Company as the case may be, the Paying Agent will have no further liability for the money.

## 2.5    Noteholder Lists

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Noteholders. If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Noteholders.

## 2.6    Transfer and Exchange

(a)    *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(i)    the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary for the Global Notes or that it has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary;

(ii)    the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers

a written notice to such effect to the Trustee; provided, that in no event shall the Regulation S Temporary Global Note be exchanged by the Company for Definitive Notes prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B); or

(iii)    there has occurred and is continuing an Event of Default with respect to the Notes and the Trustee or the Registrar has received a written request from the Depositary, or from a holder of a beneficial interest in such Global Note, to exchange such Global Note or beneficial interest, as applicable, for one or more Definitive Notes.

Upon the occurrence of either of the preceding events in (i), (ii) or (iii) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.7 and 2.10. Except as provided in this Section 2.6(a), every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.6 or Sections 2.7 or 2.10, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.6(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.6(b) or (c).

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. The Company shall not have any liability or responsibility for any records relating to or payments made on account of beneficial ownership interest in a Global Note, or the maintaining, supervision or reviewing of any records relating to such beneficial ownership interests. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; provided, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Secured 1L Noteholder). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required

to be delivered to the Registrar to effect the transfers described in this Section 2.6(b)(i).

(ii)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.6(b)(i), the transferor of such beneficial interest must deliver to the Registrar either:

    (A)    both:

        (1)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

        (2)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

    (B)    both:

        (1)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

        (2)    instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above;

provided, that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Notes pursuant to Section 2.6(h).

(iii)    *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in

another Restricted Global Note if the transfer complies with the requirements of Section 2.6(b)(ii) and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in the Rule 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

(B)     if the transferee will take delivery in the form of a beneficial interest in the Regulation S Temporary Global Note or the Regulation S Permanent Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

(C)     if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(iv)     *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note*. A beneficial interest in any Restricted Global Note may be exchanged by any Noteholder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.6(b)(ii) and the Registrar receives the following:

(A)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(a) thereof; or

(B)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof; and, in each such case set forth in this Section 2.6(b)(iv), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.2, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)     *Transfer or Exchange of Beneficial Interests for Definitive Notes.*

(i)     *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If any Noteholder holding a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (2)(a) thereof;

(B)     if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(C)     if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(D)     if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(E)     if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(F)     if such beneficial interest is being transferred to the Company, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

> (G)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(h), and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c) shall be registered in such name or names and in such authorized denomination or denominations as the Noteholder holding such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

> (ii)    *Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes*. Notwithstanding Sections 2.6(c)(i)(A) and (i)(C), a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B), except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

> (iii)    *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A Noteholder holding a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

> > (A)    if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(b) thereof; or

> > (B)    if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)     *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any Noteholder holding a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.6(b)(ii), the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(h), and the Company will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) will be registered in such name or names and in such authorized denomination or denominations as the Noteholder holding such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) will not bear the Private Placement Legend.

(d)     *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(i)     *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Noteholder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the Noteholder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (2)(b) thereof;

(B)     if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(C)     if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903

or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(F)    if such Restricted Definitive Note is being transferred to the Company, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(c) thereof,

the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the Rule 144A Global Note, in the case of clause (C) above, the Regulation S Global Note, in the case of clause (E) above, the IAI Global Note and in all other cases, the appropriate Unrestricted Global Note.

(ii)    *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Noteholder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A)    if the Noteholder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(c) thereof; or

(B)    if the Noteholder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from

such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

and in each such case, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.6(d)(ii), the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)     *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Noteholder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.2, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)     *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Noteholder of Definitive Notes and such Noteholder's compliance with the provisions of this Section 2.6(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Noteholder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Noteholder or by its attorney, duly authorized in writing. In addition, the requesting Noteholder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.6(e).

(i)     *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(ii)    *Restricted Definitive Notes to Unrestricted Definitive Notes*. Any Restricted Definitive Note may be exchanged by the Noteholder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A)    if the Noteholder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(d) thereof; or

(B)    if the Noteholder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    *Unrestricted Definitive Notes to Unrestricted Definitive Notes*. A Noteholder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Noteholder thereof.

(f)     *Legends*. The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(i)     *Private Placement Legend*.

(A)     Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, (1) REPRESENTS THAT (A) IT IS A "**QUALIFIED INSTITUTIONAL BUYER**" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 (a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT AND (2) AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "**RESALE RESTRICTION TERMINATION DATE**") THAT IS [IN THE CASE OF RULE 144A NOTES: ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY)][, IN THE CASE OF REGULATION S NOTES: FORTY DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S), IN RELIANCE ON REGULATION S], ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "**QUALIFIED INSTITUTIONAL BUYER**" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL

"ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE NOTES FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL "ACCREDITED INVESTOR", FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE NOTEHOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE OR AS OTHERWISE PROVIDED FOR IN THE INDENTURE."

(B)     Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii) or (e)(iii) of this Section 2.6 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(ii)     *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.6(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("**DTC**"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN

AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

     (iii)    *Regulation S Temporary Global Note Legend*. The Regulation S Temporary Global Note will bear a Global Note Legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

     (g)    *Automatic Exchange from Global Note Bearing Restricted Notes Legend to Global Note Not Bearing Private Placement Legend.* Upon the Company's satisfaction that the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act, beneficial interests in a Restricted Global Note may be automatically exchanged into beneficial interests in an Unrestricted Global Note without any action required by or on behalf of the Noteholder (the "**Automatic Exchange**") at any time on or after the date that is the 366th calendar day after the later of (i) the Issue Date or (ii) the last date on which the Company or any Affiliate of the Company was the owner of such Note (or of any other Global Note with the same CUSIP number) or if such day is not a Business Day, on the next succeeding Business Day (the "**Automatic Exchange Date**"). Upon the Company's satisfaction that the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act, the Company may, pursuant to the rules and procedures of the Depositary (i) provide written notice to the Depositary at least fifteen calendar days prior to the Automatic Exchange Date, instructing the Depositary to exchange all of the outstanding beneficial interests in a particular Restricted Global Note to a particular Unrestricted Global Note, which the Company shall have previously otherwise made eligible for exchange with the Depositary, (ii) provide prior written notice (the "**Automatic Exchange Notice**") to each Noteholder of the beneficial interests in the Restricted Global Note at such Noteholder's address appearing in the register of Noteholders at least fifteen calendar days prior to the Automatic Exchange Date (the "**Automatic Exchange Notice Date**"), which notice must include (w) the Automatic Exchange Date, (x) the section of this Indenture pursuant to which the Automatic Exchange shall occur, (y) the CUSIP number of the Restricted Global Note from which such Noteholder's beneficial interests shall be transferred and (z) the CUSIP number of the Unrestricted Global Note into which such Noteholder's beneficial interests shall be transferred, and (iii) on or prior to the Automatic Exchange Date, deliver to the Trustee for authentication one or more Unrestricted Global Notes, duly executed by the Company, in an aggregate principal amount equal to the aggregate principal amount of Restricted Global Notes to be exchanged. At the Company's request on no less than five calendar days' notice

prior to the Automatic Exchange Notice Date, the Trustee shall deliver, in the Company's name and at its expense, the Automatic Exchange Notice to each Noteholder of the beneficial interests in the Restricted Global Note at such Noteholder's address appearing in the register of Noteholders. Notwithstanding anything to the contrary in this Section 2.6(g), during the fifteen-day period prior to the Automatic Exchange Date, no transfers or exchanges other than pursuant to this Section 2.6(g) shall be permitted without the prior written consent of the Company. Upon such exchange of beneficial interests pursuant to this Section 2.6(g), the aggregate principal amount of the Global Notes shall be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depositary, to reflect the relevant increase or decrease in the principal amount of such Global Note resulting from the applicable exchange. The Restricted Global Note from which beneficial interests are transferred pursuant to an Automatic Exchange shall be canceled following the Automatic Exchange.

(h)     *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i)     *General Provisions Relating to Transfers and Exchanges*.

    (i)     To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.2 or at the Registrar's request.

    (ii)     No service charge will be made to a Noteholder of a beneficial interest in a Global Note or to a Noteholder of a Definitive Note for any registration of transfer or exchange (except as otherwise expressly permitted herein), but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10 and 9.5).

(iii)    The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    Neither the Registrar nor the Company will be required:

   (A)    to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business fifteen days before the day of any selection of Notes for redemption under Section 3.2 and ending at the close of business on the day of selection;

   (B)    to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

   (C)    to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

(vi)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(vii)    The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.2.

(viii)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.6 to effect a registration of transfer or exchange may be submitted by facsimile.

(ix)    None of the Trustee, the Paying Agent or the Registrar shall have any responsibility or obligation to any Beneficial Owner in a Global Note, an agent member of the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any agent member of the Depositary, with respect to any ownership interest in the Notes or with respect to the delivery to any agent member of the Depositary, Beneficial Owner or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Noteholders and all payments to be made to Noteholders under the Notes

and this Indenture shall be given or made only to or upon the order of the registered holders (which shall be the Depositary or its nominee in the case of the Global Note). The rights of Beneficial Owners in the Global Note shall be exercised only through the Depositary subject to the Applicable Procedures. The Trustee, the Paying Agent and the Registrar shall be entitled to rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners. None of the Trustee, the Paying Agent or the Registrar shall have any responsibility or liability for any acts or omissions of the Depositary with respect to such Global Note, for the records of any such depositary, including records in respect of beneficial ownership interests in respect of any such Global Note, for any transactions between the Depositary and any agent member of the Depositary or between or among the Depositary, any such agent member of the Depositary and/or any holder or owner of a beneficial interest in such Global Note, or for any transfers of beneficial interests in any such Global Note.

(x)     Notwithstanding the foregoing, with respect to any Global Note, nothing herein shall prevent the Company, the Trustee, or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by any Depositary (or its nominee), as a Noteholder, with respect to such Global Note or shall impair, as between such Depositary and owners of beneficial interests in such Global Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Noteholder of such Global Note.

(xi)    None of the Trustee, the Paying Agent or the Registrar shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any security (including any transfers between or among Depositary participants, members or Beneficial Owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

## 2.7    Replacement Notes

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Noteholder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

## 2.8    Outstanding Notes

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.8 as not outstanding. Except as set forth in Section 2.9, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note; provided, that Notes held by the Company or an Affiliate of the Company shall not be deemed to be outstanding for purposes of Sections 3.7, 3.8, and 3.9.

If a Note is replaced pursuant to Section 2.7, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replacement Note is held by a "protected purchaser" under the UCC.

If the principal amount of any Note is considered paid under Section 4.1, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company or an Affiliate thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

## 2.9    Treasury Notes

In determining whether the Noteholders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that the Trustee knows are so owned will be so disregarded.  For purposes of this Section 2.9, "controlling," "controlled" and "control" shall have the meanings given to such terms in the definition of Affiliate in the Common Terms Agreement.

## 2.10    Temporary Notes

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Noteholders of temporary Notes will be entitled to all of the benefits of this Indenture.

## 2.11    Cancellation

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes (subject to the record retention requirement of the Exchange Act). Certification of the cancellation of Notes will be delivered to the Company upon the Company's written request. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

## 2.12    Defaulted Interest

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner *plus*, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Noteholders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1. The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; provided, that no such special record date may be less than ten days prior to the related payment date for such defaulted interest. At least fifteen days before the special record date, the Company (or, upon the written request of the Company and provision of such notice information, the Trustee in the name and at the expense of the Company) will mail or cause to be mailed (or otherwise transmit in accordance with the Applicable Procedures of DTC) to Noteholders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

## 2.13    CUSIP Numbers

The Company in issuing the Notes may use "CUSIP", "ISIN" or other similar numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP", "ISIN" or other similar numbers in notices of redemption as a convenience to Noteholders; provided that the Trustee shall have no liability for any defect in the "CUSIP", "ISIN" or other similar numbers as they appear on any Note, notice or elsewhere, and, provided further that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company will promptly notify the Trustee in writing of any change in the "CUSIP", "ISIN" or other similar numbers.

## 2.14    Chilean Acknowledgement of Debt[4]

Concurrently with the issuance of the Notes, the Company shall execute a *reconocimiento de deuda* (acknowledgement of debt) in the form of a Chilean notarial public deed, for the benefit of the Trustee acting on behalf of the Noteholders, pursuant to which the Company will acknowledge unconditionally and irrevocably to owe to the Trustee, acting on behalf of all the

---

[4]    **NTD**: This provision remains under discussion.

Noteholders, the principal amount of the Notes issued by the Company plus the applicable interests, in substantially the form attached hereto as Exhibit E; *provided, however*, that any reduction (by repayment, prepayment or otherwise) in the principal or interest amount of the Notes shall discharge pro tanto the equivalent principal or interest amount evidenced by such *reconocimiento de deuda* (acknowledgement of debt)[; and provided, further, that the Company shall not be obligated to execute any such reconocimiento de deuda (acknowledgement of debt) to the extent the Company will be required to pay any additional stamp tax arising from the execution and delivery of the reconocimiento de deuda (acknowledgement of debt), unless the Noteholders agree to pay or reimburse the Company for any such additional stamp tax taxes.]

## 2.15    Payment of Additional Amounts[5]

The Company is required to make all payments in respect of the Notes free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, fines, penalties, assessments or other governmental charges of whatever nature (or interest on any taxes, duties, fines, penalties, assessments or other governmental charges of whatever nature) (collectively, "**Taxes**"), imposed, levied, collected, withheld or assessed by, within or on behalf of the Republic of Chile or any other jurisdiction where Company is resident for tax purposes, in each case, any political subdivision or governmental authority thereof or therein having power to tax ("**Relevant Jurisdiction**"), unless such withholding or deduction is required by law. In such event, the Company is required to pay such additional amounts ("**Additional Amounts**") as may be necessary to ensure that the net amounts received by the Noteholders (including Additional Amounts) after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Notes in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable in respect of a Note (i) in the case of payments for which presentation of a Note is required, if such Note is presented for payment more than 30 days after the later of (a) the date on which such payment first became due and (b) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the Holder by the Trustee, except to the extent that such Holder would have been entitled to such Additional Amounts on presenting such Notes for payment on the last day of such period of 30 days; (ii) for any estate, inheritance, gift, sales, transfer, personal property or similar Taxes; (iii) if such Note is held by or on behalf of a Holder or beneficial owner who is liable for Taxes in respect of such Note by reason of having some present or former, direct or indirect, connection with any Relevant Jurisdiction, other than the mere holding of such Note or the receipt of payments in respect thereof; (iv) for any Tax imposed due to the failure of the Holder or beneficial owner to satisfy any certification, identification or other reporting requirements whether imposed by statute, treaty, regulation or administrative practice, provided, however, that the Company has delivered a request to the Holder or beneficial owner to comply with such requirements at least 30 days prior to the date by which such compliance is required; or (v) any combination of clauses (i) through (iv) above. In addition, no Additional Amounts shall be paid, and the second preceding sentence shall not apply, with respect to any payment to any Holder of Notes who is a fiduciary or a partnership or other than the sole beneficial owner of such Notes to the extent that the beneficiary or settlor with respect to such fiduciary, the member of such partnership or the beneficial owner of such

---

[5]    **NTD**: This provision remains under discussion.

Notes would not have been entitled to Additional Amounts had such beneficiary, settlor, member or beneficial owner held such Notes directly.

Notwithstanding anything to the contrary in this section, none of the Company, the paying agent or any other person shall be required to pay any Additional Amounts with respect to any payment in respect of any Taxes imposed under Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), any successor law of regulation implementing or complying with, or introduced in order to conform to, such sections or any intergovernmental agreement or any agreement entered into pursuant to section 1471(b)(1) of the Code.

References to principal, interest, premium or other amounts payable in respect of the Notes shall be deemed also to refer to any Additional Amounts which may be payable.

The Company will also (i) make any required withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Company will furnish to the Trustee, within 60 days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Company, or, if such receipts are not obtainable, other evidence of such payments by the Company reasonably satisfactory to the Trustee.

The Company will pay any present or future stamp, court or documentary taxes or any excise or property taxes, charges or similar levies that arise in any jurisdiction from the execution, delivery or registration of the Notes or any other document or instrument relating to the issuance thereof, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside a Relevant Jurisdiction.

## 2.16    Use of Proceeds

The Company acknowledges that it has used the proceeds of the Notes solely for purposes permitted by Section 5.01(b) of the Common Terms Agreement.

## 3    REDEMPTION AND PREPAYMENT

## 3.1    Notices to Trustee

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.7, it must furnish to the Trustee, at least thirty days but not more than sixty days before a redemption date, an Officer's Certificate setting forth:

(a)    the Section of this Indenture pursuant to which the redemption shall occur;

(b)    the redemption date;

(c)    the principal amount of Notes to be redeemed;

(d)    the redemption price or the manner of calculation thereof; and

(e)    the CUSIP number of the Notes to be redeemed.

## 3.2      Selection of Notes to Be Redeemed

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption on a *pro rata* basis, by lot or by such other method as the Trustee shall deem fair and appropriate (<u>provided</u>, that, in the case of Global Notes, the Depositary may select Global Notes for redemption pursuant to its Applicable Procedures) unless otherwise required by law, Depositary requirements, or applicable stock exchange requirements.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof to be redeemed. Notes and portions of Notes selected will be in amounts of $100,000 or whole multiples of $1,000 in excess thereof; except that if all of the Notes of a Noteholder are to be redeemed, the entire outstanding amount of Notes held by such Noteholder, even if not in the amount of $100,000 or a whole multiple of $1,000 thereof, shall be redeemed. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

## 3.3      Notice of Redemption

At least thirty days but not more than sixty days before a redemption date, the Company will mail or cause to be mailed by first class mail or delivered electronically, a notice of redemption to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 11.

The notice will identify the Notes to be redeemed and will state:

(a)      the redemption date;

(b)      the redemption price;

(c)      if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued in the name of the Noteholder upon cancellation of the original Note;

(d)      the name and address of the Paying Agent;

(e)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)      that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)      the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)     that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; provided, that the Company has delivered to the Trustee, at least 45 days prior to the redemption date (unless a shorter period is acceptable to the Trustee), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

## 3.4    Effect of Notice of Redemption

Once notice of redemption is mailed or delivered electronically in accordance with Section 3.3, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price; provided, that a notice of redemption may be conditional (in which case such Notes shall become irrevocably due and payable on the redemption date at the redemption price upon the satisfaction or waiver of any such conditions).

If the redemption is delayed pursuant to this Section 3.4 and the terms of the applicable notice of redemption, such redemption date as so delayed may occur at any time after the original redemption date set forth in the applicable notice of redemption and after the satisfaction of any applicable conditions precedent, including, without limitation, on a date that is less than 30 days after the original redemption date or more than 60 days after the date of the applicable notice of redemption.

## 3.5    Deposit of Redemption or Purchase Price

At least one Business Day prior to the redemption date, the Company will deposit or will cause to be deposited with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest on all Notes to be redeemed on that date. The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption price of, and accrued interest on all Notes to be redeemed.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption date, interest will cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption is not so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.1.

## 3.6    Notes Redeemed in Part

Upon surrender of a Note that is redeemed in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Noteholder at the expense of the Company a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

### 3.7    Optional Redemption

Prior to [●][6] (the "**Par Call Date**"), the Company may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:

> (1) (a) the sum of the present values of the remaining scheduled payments of principal and interest on the Notes being redeemed discounted to the redemption date (assuming the notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 40 basis points, less (b) interest accrued to the date of redemption, and

> (2) 100% of the principal amount of the Notes to be redeemed,

> *plus*, in either case, accrued and unpaid interest thereon to the redemption date.

On or after the Par Call Date, the Company may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by the Company in accordance with the following two paragraphs.

The Treasury Rate shall be determined by the Company after 4:15 p.m., New York City time (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third business day preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) - H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities–Treasury constant maturities–Nominal" (or any successor caption or heading). In determining the Treasury Rate, the Company shall select, as applicable: (1) the yield for the Treasury constant maturity on H.15 exactly equal to the period (the "**Remaining Life**") from the redemption date to the date that reflects the remaining weighted average life of the Notes (assuming the last amortization payment on the Notes is made on the Par Call Date) (the "**WAL Date**"); or (2) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the two yields – one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than and one yield corresponding to the Treasury constant maturity on H.15 immediately longer than the Remaining Life – and shall interpolate to the WAL Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (3) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to

---

[6]    **NTD**: To include the date that is twelve and a half years from the date of the Indenture.

have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

If on the third business day preceding the redemption date H.15 or any successor designation or publication is no longer published, the Company shall calculate the Treasury Rate based on the rate per annum equal to the semi-annual equivalent yield to maturity at 11:00 a.m., New York City time, on the second business day preceding such redemption date of the United States Treasury security maturing on, or with a maturity that is closest to, the WAL Date, as applicable. If there is no United States Treasury security maturing on the WAL Date but there are two or more United States Treasury securities with a maturity date equally distant from the WAL Date, one with a maturity date preceding the WAL Date and one with a maturity date following the WAL Date, the Company shall select the United States Treasury security with a maturity date preceding the WAL Date. If there are two or more United States Treasury securities maturing on the WAL Date or two or more United States Treasury securities meeting the criteria of the preceding sentence, the Company shall select from among these two or more United States Treasury securities the United States Treasury security that is trading closest to par based upon the average of the bid and asked prices for such United States Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this and the preceding paragraphs, the semi-annual yield to maturity of the applicable United States Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such United States Treasury security, and rounded to three decimal places.

The notice of redemption with respect to the foregoing redemption need not set forth the redemption price but only the manner of calculation thereof. The Company will notify the Trustee of the redemption price with respect to any redemption promptly after the calculation, and the Trustee shall not be responsible for such calculation.

## 3.8    Mandatory Redemption by Application of Collateral Proceeds[7]

Subject to the terms of the Intercreditor Agreement or the Security Documents, if the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a)(i) through (vii) of the Common Terms Agreement. Any such mandatory redemption shall follow the procedures set forth in Sections 3.1 to 3.6. For the avoidance of doubt, no premium will be payable in respect of any such mandatory redemption.

## 3.9    Mandatory Redemption by Application of Excess Cash Flow or Refinancing

Subject to the terms of the Intercreditor Agreement or the Security Documents, if the Company is required to make a mandatory redemption of the Notes in accordance with Sections 2.06(a)(viii) or (ix) of the Common Terms Agreement, then the Company will be required to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a)

---

[7]    **NTD**: Treatment of amortization and redemption payments under discussion with Trustee.

of the Common Terms Agreement. Any such mandatory redemption shall follow the procedures set forth in Sections 3.1 to 3.6. For the avoidance of doubt, no premium will be payable in respect of any such mandatory redemption.

## 4    COVENANTS

The Company undertakes to perform and comply with each of the covenants in this Article 4.

### 4.1    Payment of Notes

The Company will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in this Indenture and in the Notes. Each Noteholder will receive its *pro rata* share of such payments. Interest payable on any Interest Payment Date in 2022 shall be capitalized (the "**Deferred 2022 Interest**").[8]

Interest payable on the Interest Payment Date occurring in January 2023 (the "**January 2023 Interest Payment Date**") may be capitalized at the option of the Company (if so capitalized, the "**Deferred 2023 Interest**" and, together with the Deferred 2022 Interest, the "**Deferred Interest**") if, after giving pro forma effect to the payment in full in cash on the January 2023 Interest Payment Date of priorities first through seventh of Section 5.02(a) of the Offshore Accounts Agreement (including interest on the Secured 1L Debt), the balance in the Offshore Revenue Account would be less than $10 million (without giving effect to any loan disbursed pursuant to the Secured Working Capital that is outstanding as of such January 2023 Interest Payment Date). If the Company elects to capitalize the interest payable on the January 2023 Interest Payment Date, it will (i) provide the Trustee with written notice of such election at least five (5) Business Days prior to the January 2023 Interest Payment Date; and (ii) publish a notice disclosing such capitalization on or prior to the Interest Payment Date by means of a press release published on its website.

Deferred Interest that is capitalized in accordance with this Section 4.1 will accrue interest at 4.0% per annum.

Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent holds as of 12:00 p.m. New York City time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

The Company will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue principal and overdue installments of interest (without regard to any applicable grace period), in each case, at the rate equal to 2.0% per annum in excess of the then applicable interest rate on the Notes to the extent lawful.

If a payment date is not a Business Day at a place of payment, payment may be made at that place on the next succeeding day that is a Business Day, with the same force and effect as if made on the date for such payment, and no interest shall accrue for the intervening period. Interest

---

[8]    **NTD**: Treatment of deferred interest under discussion with Trustee.

will be computed on the basis of a 360-day year of twelve thirty-day months and will be payable (or, in the case of Deferred Interest, capitalized) quarterly on each Interest Payment Date on the basis of three thirty-day months. Principal shall be paid semi-annually on each Interest Payment Date occurring on April 15 and October 15 commencing on April 15, 2024. The entire remaining outstanding principal amount of the Notes shall be payable no later than June 30, 2040 unless the outstanding principal balance of the Notes becomes due and payable at an earlier date pursuant to the Indenture.

## 4.2     Maintenance of Office or Agency

The Company will maintain in the United States an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, presentations and surrenders of the Notes may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the United States for such purposes. The Company will give written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company where Notes may be surrendered for registration of transfer or for exchange in accordance with Section 2.3.

## 4.3     Reports

(a)     If the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, then the Company shall provide to the Trustee and the Noteholders within fifteen days after the Company files them with the SEC, copies of its annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) that the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act.

(b)     So long as any Notes are outstanding, the Company will furnish to the Noteholders and Beneficial Owners of the Notes and to *bona fide* securities analysts and *bona fide* prospective investors in the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto) ("**Rule 144A Information**").

(c)     So long as any of the Notes are outstanding, in addition to the requirement to furnish Rule 144A Information as provided in the preceding clause (b), the Company shall

furnish or cause to be furnished to Noteholders and (upon the request thereof delivered to the Company) to Beneficial Owners of an interest in any Global Note (1) consolidated annual audited financial statements of the Company prepared in accordance with Accounting Standards (together with notes thereto and a report thereon by an independent accountant of established national reputation), such statements to be so furnished within 120 days after the end of the Financial Year covered thereby and (2) consolidated unaudited financial statements of the Company for each of the Financial Quarters of each Financial Year and the corresponding quarter and year-to-year period of the prior year prepared in all material respects on a basis consistent with the annual financial statements furnished pursuant to clause (1) of this clause (c), such statements to be so furnished within 60 days after the end of the first and third Financial Quarters, 75 days after the end of the second Financial Quarter, and 90 days after the end of the fourth Financial Quarter.

(d)    The Company may comply with this Section 4.3 by posting the information described above on a website or online data system no later than the date that the Company is required to provide those reports pursuant to this Section 4.03 and maintaining such posting for so long as any Notes remain outstanding. Access to such reports on such website or online data system may be subject to a confidentiality acknowledgment and password protection; provided, that, no other conditions may be imposed on access to such reports other than a representation by the Person accessing such reports that it is the Trustee, a Noteholder, a Beneficial Owner of the Notes, a *bona fide* prospective investor or a *bona fide* securities analyst.

(e)    Delivery of the reports, information and documents contemplated by this Section 4.3 to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive knowledge or notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

(f)    Notwithstanding the foregoing, any reports or other information required to be filed, delivered or furnished pursuant to this Section 4.3 shall be deemed filed, delivered or furnished if filed electronically with the SEC through the SEC's Electronic Data Gathering, Analysis and Retrieval System (or any successor system).

(g)    If the Noteholders are required to vote on any manner under this Indenture and the Intercreditor Agreement, the Company shall, promptly after such vote, publicly disclose the material information provided by the Company to the Noteholders in connection with such vote which, absent such disclosure would otherwise constitute material nonpublic information in the hands of the Noteholders. For the avoidance of doubt, the Company shall have no obligation to make any information available to the Noteholders other than the information set forth in this Section 4.3

38

and the information that the Company determines necessary in connection with any request for the Noteholders to vote.

## 4.4 Compliance Certificate

(a)    The Company shall deliver to the Trustee, within 45 days after the end of each Financial Quarter (with the first Officer's Certificate to be delivered for the Financial Quarter ending on June 30, 2022), an Officer's Certificate stating that to the signing Authorized Officer's knowledge no Default or Event of Default has occurred and is continuing (or, if a Default or Event of Default has occurred and is continuing, describing all such Defaults or Events of Default of which he or she has knowledge and what action the Company is taking or proposes to take with respect thereto).

(b)    So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Authorized Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

## 4.5 Taxes and Tax Treatment

The Company shall pay, prior to delinquency, all material taxes, assessments and governmental levies except (a) such as are being contested in good faith and by appropriate negotiations or proceedings, (b) where the failure to effect such payment is not adverse in any material respect to the Noteholders.

## 4.6 Stay, Extension, and Usury Laws

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of and such law, and covenant that shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

## 4.7 Limitation on Indebtedness

For so long as any Secured 2L Debt is outstanding (i) the Company will not, directly or indirectly, create, incur, assume permit, suffer to exist or otherwise be or become liable with respect to, contingently or otherwise, any Indebtedness other than Permitted Financial Debt, and (ii) the Company may not prepay all or any part of any Long-term Debt (other than the Secured Debt or any working capital facility that constitutes Permitted Financial Debt).

If the Secured 2L Debt has been repaid in full, the Company will not, directly or indirectly, create, incur, assume permit, suffer to exist or otherwise be or become liable with respect to, contingently or otherwise, any Indebtedness other than (i) Permitted Financial Debt and (ii) additional Indebtedness if, after giving pro forma effect to the incurrence of such Indebtedness, the minimum Debt Service Coverage Ratio[9] projected by the Company for each semi-annual period commencing on the date such Indebtedness is to be incurred through the stated maturity date of the Notes is at least 1.40:1.00.

## 4.8    Asset Sales

The Company will not sell, transfer, lease or otherwise dispose of all or a substantial part of its assets, other than inventory, whether in a single transaction or in a series of transactions, related or otherwise, except for:

(a)    assets reasonably determined by the Company to be obsolete, worn-out, damaged, defective, uneconomic, or no longer used by or useful to the Company for the operation or maintenance of the Project, but only if such asset is replaced with the proceeds of such sale, to the extent necessary to be consistent with prudent industry practices;

(b)    the connection bays of the Alto Maipo Substation that AES Andes shall require for purposes of operating its transmission system;

(c)    the sale of electricity and capacity in the ordinary course of business on the spot market and in accordance with Applicable Law (including any Applicable Environmental and Social Law) or pursuant to the Material Project Documents or an Approved PPA; and

(d)    the sale of water rights under the RPG Water Rights Agreement.

## 4.9    Affiliate Transaction

Other than power purchase agreement and agreements related to any battery storage project which are governed by Section 4.15(b), the Company shall not sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each of the foregoing, an "**Affiliate Transaction**"), unless: (i) such Affiliate Transaction is on terms that are no less favorable to the Company than those that would have been obtained in a comparable transaction by the Company with an unrelated Person, and (ii) the Company delivers to the Trustee with respect to any Affiliate Transaction involving aggregate payments in excess of $1.0 million, a resolution adopted by a majority of the disinterested nonemployee directors of the Board of Directors approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above.

---

[9]    **NTD**: This provision remains under discussion.

**4.10    Liens**

(a)    The Company shall not create or permit to exist any Lien on any property, revenues or other assets, present or future, of the Company other than Permitted Liens; provided that if the Secured 2L Debt has been repaid in full, in addition to Permitted Liens, the Company shall be permitted to create or permit to exist the following:

(i)    Liens created solely for the purpose of securing Indebtedness permitted under Section 4.7 incurred to finance, refinance or refund the purchase price or cost (including the cost of construction, development or improvement) of property or assets acquired by the Company (individually or together with other Persons) after the date hereof (by purchase, construction or otherwise), including after acquired inventory or other assets, *provided* that no such Lien shall extend to or cover any property or assets other than the property or assets so acquired and improvements thereon (other than, in the case of Liens securing Indebtedness incurred to finance construction or improvement costs, any theretofore unimproved real property on which the property so constructed, or the improvement, is located, or any buildings, structures, machinery or other fixtures constituting such property or assets);

(ii)    Liens which secure only Indebtedness owed by a Subsidiary to the Company and/or one or more Subsidiaries or by the Company to one or more Subsidiaries;

(iii)    Liens on any property or assets acquired from a Person which is merged with or into the Company or any Subsidiary, or any Liens on the property or assets of any Person or other entity existing at the time such Person or other entity becomes a Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such Person), provided, that the underlying action or transaction does not violate the requirements set forth in Section 5.1;

(iv)    any Lien on any property or assets existing at the time of acquisition thereof and which is not created as a result of or in connection with or in anticipation of such acquisition (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such property or assets);

(v)    any Lien securing Indebtedness permitted under Section 4.7 under any agreement or instrument in respect of an interest rate or currency swap, exchange or hedging transaction or other financial derivatives transaction, provided that such Indebtedness was entered into in the ordinary course of business and not for speculative purposes or the obtaining of credit;

(vi)    Liens arising solely by operation of law; and

      (vii)    Liens created for the sole purpose of securing Indebtedness that, when incurred, will be applied to repay all or part of the Notes and all other amounts payable under the Notes; *provided* that such Notes and all other such amounts are fully satisfied within 30 days after the incurrence of such Indebtedness.

(b)    Notwithstanding the foregoing provisions, if the Secured 2L Debt has been repaid in full, the Company may issue, assume or guarantee Indebtedness secured by Liens if such Indebtedness is permitted under Section 4.7 and ranks at least *pari passu* with the Notes[, provided that each Nationally Recognized Rating Agency then rating the Notes shall have reaffirmed in writing that the ratings of the Notes immediately following any such issuance, assumption or guarantee, will not be lower than the ratings of the Notes immediately prior to any such issuance, assumption or guarantee.][10]

(c)    Liens required by any contract or statute in order to permit the Company to perform any contract or subcontract made by it with or at the request of a governmental entity or any department, agency or instrumentality thereof, or to secure partial, progress, advance or any other payments to the Company by a governmental entity or any department, agency or instrumentality thereof pursuant to the provisions of any contract or statute shall not be deemed to create Indebtedness secured by Liens.

## 4.11   Offer to Repurchase Upon Change of Control

(a)    Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder describing the transaction or transactions that constitute the Change of Control and stating:

    (i)    that the Change of Control Offer is being made pursuant to this Section 4.11 and that all Notes tendered will be accepted for payment;

    (ii)    the purchase price and the purchase date, which shall be no earlier than thirty days and no later than sixty days from the date such notice is mailed or delivered electronically (the "**Change of Control Payment Date**");

    (iii)    that any Note not tendered will continue to accrete or accrue interest;

---

[10]    **NTD**: This provision remains under discussion.

      (iv)     that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrete or accrue interest after the Change of Control Payment Date;

      (v)     that Noteholders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Noteholder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

      (vi)     that Noteholders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, electronically or by mail a notice setting forth the name of the Noteholder, the principal amount of Notes delivered for purchase, and a statement that such Noteholder is withdrawing his election to have the Notes purchased; and

      (vii)     that Noteholders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $100,000 in principal amount or an integral multiple of $1,000 in excess thereof.

The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Repurchase Event. To the extent that the provisions of any securities laws or regulations conflict with this Section 4.11, or compliance with this Section 4.11 would constitute a violation of any such laws or regulations, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.11 by virtue of such compliance.

      (b)     On the Change of Control Payment Date, the Company will, to the extent lawful:

      (i)     accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

      (ii)     deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

      (iii)     deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent will promptly mail or transmit in accordance with the Applicable Procedures of DTC (but in any case not later than five days after the Change of Control Payment Date) to each

Noteholder properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Noteholder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, that each such new Note will be in a principal amount of $100,000 or an integral multiple of $1,000 in excess thereof.

(c)     If Noteholders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Company, or any third party making a Change of Control Offer in lieu of the Company, purchases all of the Notes validly tendered and not withdrawn by such Noteholders, the Company will have the right, upon not less than thirty nor more than sixty days' prior notice, given not more than thirty days following such purchase pursuant to the Change of Control Offer described above, to redeem all Notes that remain outstanding following such purchase at a redemption price in cash equal to the applicable Change of Control Payment *plus*, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, thereon, to, but not including, the date of redemption.

## 4.12    Insurance Requirements[11]

The Company shall maintain with insurance companies (believed in good faith by the Company to be financially sound and reputable) that customarily write insurance for the risks covered thereby such insurance as may be required by law and as is usually carried by companies of established repute engaged in the same or similar business, owning similar properties, and located in the same general areas as the Company, except where failures to do so could not reasonably be expected to result in a Material Adverse Effect.

## 4.13    Security Collateral

The Company shall do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances, financing statements, agreements and other instruments and take all such other actions as may be required under applicable law or that the Collateral Agents reasonably request to evidence, grant, preserve, protect, maintain and/or perfect the Security on any Security Collateral in favor of the Collateral Agents, or otherwise to give effect to the validity and priority of the security interests created or intended to be created by the Security Documents in the Security Collateral.

## 4.14    Fundamental Changes

The Company shall not materially change the nature or scope of the Project or the nature of its present or contemplated business or operations.

## 4.15    Power Purchase Agreements

(a)     The Company shall not agree to (x) any amendment that would reduce (i) volumes, tenor, or (ii) the price, the indexation formula, or capacity in any material respect,

---

[11]    **NTD**: This provision remains under discussion.

or (y) termination of the MLP PPA, unless in each case, (a) the Company has obtained the consent of the Trustee acting at the instruction of a majority of the Noteholders to such amendment or termination, or (b) such amendment was ordered in a final non-appealable judgement of an arbitral tribunal or court of competent jurisdiction.

(b)    For so long as any Secured 2L Debt is outstanding, the Company shall not enter into any power purchase agreement or agreement related to any battery storage project after the Issue Date.

## 4.16    Offering Memorandum; Nationally Recognized Rating Agency[12]

No later than [October 31, 2022], the Company shall, at its own cost (provided that the Company shall not be required to incur costs in excess of $[3,000,000] under this Section 4.16) (i) deliver red herring and final versions of an Offering Memorandum to the Trustee and (ii) use commercially reasonable efforts to cause the Notes to be rated by at least two Nationally Recognized Rating Agencies. No later than [March 31, 2023], the Company will engage at least two international investment banking firms to organize a roadshow with a view toward promoting secondary market trading of the Notes and the 2L Notes.

## 4.17    CEMBI Index

The Company shall use commercially reasonable efforts to cause the Notes to be listed on the CEMBI Index.

## 4.18    Filings with the Central Bank

The Company shall make the applicable filings when required with the Central Bank of Chile pursuant to the provisions of *Capítulo XIV del Compendio de Normas de Cambios Internacionales del Banco Central de Chile - Normas Aplicables a los Creditos, Depósitos, Inversiones y Aportes de Capital Provenientes del Exterior* (Chapter XIV of the Compendium of Foreign Exchange Regulations of the Central Bank of Chile - Rules Applicable to Loans, Deposits, Investments and Capital Contributions from Abroad) and shall provide to the Intercreditor Agent a copy of all such filings made simultaneously with their delivery to the Chilean Central Bank.

## 4.19    Equator Principles; IFC Performance Standards[13]

The Company shall comply, and cause the Project to comply, with the Equator Principles and the IFC Performance Standards in effect as of the date of this Indenture.

## 4.20    Green Bond Certification

The Company shall use commercially reasonable efforts to furnish to appoint an institution that in the opinion of the Company (acting reasonably) (a) has environmental expertise; and (b) is

---

[12]    **NTD**: This provision remains under discussion, including payment of investment banker's fees, representations to placement agents, and covenant to maintain ratings.

[13]    **NTD**: This provision remains under discussion.

independent from the Company, to deliver a second-party opinion on the alignment of the Company's Green Bond Framework and the Notes with the Green Bond Principles 2021, administered by the International Capital Market Association (ICMA).[14]

## 5    SUCCESSORS

### 5.1    Merger, Consolidation, or Sale of Assets

For so long as any Notes are outstanding, the Company may not, directly or indirectly, consolidate or merge with or into another Person; sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to another Person, unless:

(a)    the transaction is a merger or consolidation and the Company is the surviving entity;

(b)    each Nationally Recognized Rating Agency then rating the Notes shall have reaffirmed in writing that the ratings of the Notes immediately following any such action or transaction will not be lower than the ratings of the Notes immediately prior to any such action or transactions; or

(c)    any such action or transaction has been approved by the Trustee acting at the instruction of the Noteholders of a majority in aggregate principal amount of the Notes then outstanding.

### 5.2    Successor Corporation Substituted

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.1, the successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein, and (except in the case of a lease) when the successor Person expressly assumes all the obligations of the Company under this Indenture and the Notes pursuant to and in accordance with Section 5.01 hereof, the predecessor Company shall be relieved from all such obligations.

## 6    DEFAULTS AND REMEDIES

### 6.1    Events of Default

Each of the following is an "**Event of Default**:"

---

[14]    **NTD**: This provision remains under discussion.

(a)     (i) the Company fails to pay principal or premium amounts due on the Notes (provided that if such failure to pay is caused by an administrative or technical error, the Company shall have three Business Days to cure such failure); or (ii) the Company fails to pay interest or other amounts due on the Notes within thirty days of the same becoming due;

(b)     the Company fails to observe or perform any agreement contained in this Indenture (other than a failure that is the subject of the foregoing clause (a) above) and such failure continues for 45 days after notice to the Company by the Trustee or to the Company and the Trustee by the Noteholders of at least 25% in principal amount of the then outstanding Notes, specifying such failure and requiring it to be remedied and stating that such notice constitutes a notice of Default;

(c)     [any "Event of Default" specified in Section 6.02 of the Common Terms Agreement that has not been waived for 90 days by Strabag, as applicable, provided that if Strabag waives an Event of Default, such Event of Default shall be deemed cured under this Indenture;][15]

(d)     the Company fails to pay when due (whether at maturity, upon redemption or acceleration or otherwise) the principal of any Indebtedness in excess of $20.0 million (or the equivalent thereof in other currencies), if such failure shall continue for more than the period of grace, if any, applicable thereto and the period for payment has not been expressly extended;

(e)     a final and non-appealable judgment, order or arbitral award (or series thereof) for the payment of money in excess of $20.0 million (or the equivalent thereof in other currencies) is rendered against the Company and is not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged, vacated or stayed; *provided* that such judgment or decree shall only be considered an Event of Default if the Company (a) has been notified of enforcement proceedings commenced by any creditor and such judgment or decree is not dismissed within 30 days following commencement of such enforcement proceedings; and (b) fails to contest such enforcement proceedings within 60 days from the time that such Company receives notice thereof; *provided further* that, to the extent that an insurer of any third party liability insurance policy required under <u>Annex C</u> (*Insurance Requirements*) of the Common Terms Agreement confirms and acknowledges in writing that all or a portion of the amount of any such judgment, order or arbitral award will be paid out of the proceeds of any such insurance policy, the amount confirmed to be paid under such insurance policy by such insurer shall not be taken into account for purposes of the threshold set forth in this Section 6.1(e);

(f)     a decree or order by a court is entered against the Company or AM DE:

    (i)     adjudging the Company or AM DE bankrupt, in liquidation or insolvent;

---

[15]    **NTD**: This provision remains under discussion.

(ii)     approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or with respect to, the Company or AM DE under any applicable law;

(iii)     appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or AM DE or of any substantial part of its property or other assets; or

(iv)     ordering the winding up or liquidation of its affairs;

or any petition is filed seeking any of the above and is not dismissed within sixty (60) days; provided that, for the avoidance of doubt, nothing in this Indenture shall be construed as providing that a Permitted Reorganization is an Event of Default.

(g)     the Company or AM DE:

(i)     requests a moratorium or suspension of payment of Liabilities from any court;

(ii)     institutes proceedings or takes any form of corporate action to be liquidated or adjudicated bankrupt or insolvent (including any reorganization procedure (*procedimiento concursal de reorganización*), judicial reorganization agreement (*acuerdo de reorganizacíon judicial*), or simplified reorganization agreement (*acuerdo de reorganización extrajudicial o simplificado*), or liquidation procedure (*procedimiento concursal de liquidación*));

(iii)     consents to the institution of bankruptcy, liquidation or insolvency proceedings against it;

(iv)     files a petition or answer or consent seeking reorganization or relief under any applicable law, or consents to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property;

(v)     makes a general assignment for the benefit of creditors; or

(vi)     admits in writing its inability to pay its Liabilities generally as they become due or otherwise becomes insolvent.

(h)     [a determination is made in a judicial proceeding that any Lien in favor of the Noteholders under the Security Documents shall be unenforceable or invalid against the Company for any reason and the same is not replaced with an enforceable and valid Lien under a Security Document within 10 Business Days

(subject to Permitted Liens), or there is any other material breach of a Security Document and such breach continues for 10 Business Days.][16]

## 6.2    Acceleration

In the case of an Event of Default specified in Section 6.01(f) or Section 6.01(g) above, all outstanding Notes will become due and payable immediately without further action or notice (subject to applicable law). If any other Event of Default occurs and is continuing, the Trustee or the Noteholders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately, by notice in writing to the Company, specifying the Event of Default.

Upon any such declaration, the Notes shall become due and payable immediately, unless such acceleration is rescinded as provided in Section 6.4.

## 6.3    Other Remedies

Subject to the terms of the Intercreditor Agreement, if an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Noteholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

## 6.4    Waiver of Past Defaults

Noteholders of a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf  of all Noteholders waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes; provided, that the Noteholders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

## 6.5    Control by Majority

Noteholders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may

---

[16]   **NTD**: This provision remains under discussion.

refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Noteholders (provided, however, that the Trustee shall not have an affirmative obligation to determine whether any such direction is unduly prejudicial to the rights of any other Noteholder) or that may involve the Trustee in personal liability.

## 6.6   Limitation on Suits

Subject to the terms of the Intercreditor Agreement, a Noteholder may pursue a remedy with respect to this Indenture or the Notes only if:

(a)   such Noteholder has previously given the Trustee written notice that an Event of Default is continuing;

(b)   Noteholders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)   such Noteholder or Noteholders have offered and, if requested, provided to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(d)   the Trustee has not complied with such request within sixty days after the receipt of the request and the offer and, if requested, the provision of security or indemnity; and

(e)   Noteholders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request within such sixty-day period.

(f)   A Noteholder may not use this Indenture to prejudice the rights of another Noteholder or to obtain a preference or priority over another Noteholder.

## 6.7   Rights of Noteholders to Receive Payment

Notwithstanding any other provision of this Indenture, the right of any Noteholder to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Noteholder; <u>provided</u>, that a Noteholder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

## 6.8   Collection Suit by Trustee

Subject to the terms of the Intercreditor Agreement, if an Event of Default specified in Section 6.1(a) occurs and is continuing, the Trustee is authorized to recover judgment in its own

name and as trustee of an express trust against the Company for the whole amount of principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

### 6.9    Trustee May File Proofs of Claim

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Noteholders allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Noteholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.6. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.6 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Noteholders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Noteholder, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such proceeding.

### 6.10    Priorities

Subject to the terms of the Intercreditor Agreement, if the Trustee collects any money pursuant to this Article 5.2, or, after an Event of Default, any money or other property is distributable in respect of the Company's obligations under this Indenture, it shall pay out the money or property in the following order:

*first*: to the Trustee (including any predecessor trustee), its agents and attorneys for amounts due under Section 7.6, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

*second*: to Noteholders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

*third*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 6.10.

## 6.11    Undertaking for Costs

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Noteholder pursuant to Section 6.7, or a suit by Noteholders of more than 10% in aggregate principal amount of the then outstanding Notes.

## 7    TRUSTEE

## 7.1    Duties of Trustee

(a)    If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture (provided, that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts, statements, opinions or conclusions stated therein)).

(c)     The Trustee may not be relieved from liabilities for its own grossly negligent action, its own grossly negligent failure to act, or its own willful misconduct, except that:

　　(i)     this paragraph does not limit the effect of paragraphs (b) and (e) of this Section 7.1;

　　(ii)    the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

　　(iii)   the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.5.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to this Section 7.1 and Section 7.2.

(e)     No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Noteholders, unless such Noteholder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f)     The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

## 7.2     Rights of Trustee

(a)     The Trustee may conclusively rely upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, judgment, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Trustee need not investigate any fact or matter stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, judgment, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled (subject to reasonable confidentiality arrangements as may be proposed by the Company) to make reasonable investigation (upon prior notice and during regular business hours) of the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both; provided, that an Officer's Certificate

or Opinion of Counsel will not be required if the Indenture requires the Company to deliver a certificate of an Authorized Officer of the Company in connection with such act or refrain from acting. The Trustee will not be liable for any action it takes, suffers or omits to take in good faith in reliance on such Officer's Certificate, Opinion of Counsel or a certificate of an Authorized Officer of the Company. The Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     The Trustee will not be liable for any action it takes, suffers or omits to take in good faith that it reasonably believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided for in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Authorized Officer of the Company.

(f)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders unless such Noteholders have offered to the Trustee indemnity or security satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of such Default or Event of Default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture and states that it is a notice of Default or Event of Default.

(h)     The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; pandemics; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder (and under the other Financing

Documents to which it is a party) and each agent, custodian and other Person employed to act hereunder or thereunder.

(j)    The Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(k)    Anything in this Indenture notwithstanding, in no event shall the Trustee be liable for special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action.

(l)    The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as duties.

(m)    The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(n)    The Trustee shall have no responsibility as to the validity, sufficiency, genuineness, ownership or transferability of the Security Collateral, written instruction, or any other documents in connection therewith, and will not be regarded as making nor required to make, any representations with respect thereto.

(o)    The Trustee shall have no obligation to give, execute, deliver, file, record, authorize or obtain any financing statements, notices, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect or validate the security interest granted to the Collateral Agent or (ii) enable the Trustee to exercise and enforce its rights under the Financing Documents with respect to such pledge and security interest.  In addition, the Trustee shall have no responsibility or liability (i) in connection with the acts or omissions of the Company in respect of the foregoing or (ii) for or with respect to the legality, validity and enforceability of any security interest created in the Security Collateral or the perfection and priority of such security interest.

**7.3    Individual Rights of Trustee**

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights. The Trustee is also subject to Section 7.9.

**7.4    Trustee's Disclaimer**

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction

under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

**7.5    Notice of Defaults**

If a Default or Event of Default occurs and is continuing and if it is actually known to a Responsible Officer of the Trustee, the Trustee will mail (or otherwise transmit in accordance with the Applicable Procedures of DTC) to Noteholders a notice of the Default or Event of Default within ninety days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest on, any Note, the Trustee may withhold the notice if and so long as a Responsible Officer in good faith determines that withholding the notice is in the interests of the Noteholders.

**7.6    Compensation and Indemnity**

(a)    The Company will pay to the Trustee from time to time compensation for its acceptance of this Indenture and services hereunder in accordance with written arrangements between the Company and the Trustee. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)    The Company will indemnify the Trustee and hold it harmless against any and all loss, liability, action, suits or proceedings at law or in equity and any other reasonable and documented fees, charges or expenses (including reasonable and documented attorneys' fees and expenses) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture and the Financing  Documents, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.6) and defending itself against any claim (whether asserted by the Company, any Noteholder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder or thereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence or willful misconduct. The Trustee will notify the Company promptly of any third party claim for which it may seek indemnity. Failure by the Trustee to so notify the Company will not relieve the Company of its obligations hereunder. The Company will defend the claim and the Trustee will cooperate in the defense. The Trustee may have separate counsel and the Company will pay the reasonable and documented fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)    The obligations of the Company to the Trustee under this Section 7.6 will survive the satisfaction and discharge of this Indenture, the repayment of the Notes, the

termination for any reason of this Indenture and the resignation or removal of the Trustee.

(d) To secure the Company's payment obligations in this Section 7.6, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture, the repayment of the Notes, the termination for any reason of this Indenture and the resignation or removal of the Trustee.

(e) When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.02(e) or Section 6.02(f) of the Common Terms Agreement as described in Section 6.1(b) occurs, the expenses and the compensation for the services (including the reasonable and documented fees and expenses of its agents and counsel) are intended to constitute expenses of administration for purposes of priority under any Debtor Relief Law.

(f) "**Trustee**" for purposes of this Section shall include any predecessor Trustee.

## 7.7    Replacement of Trustee

(a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.7.

(b) The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company with 30 days prior written notice. The Noteholders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company with 30 days prior written notice. The Company may remove the Trustee if:

(i) the Trustee fails to comply with Section 7.9;

(ii) the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Debtor Relief Law;

(iii) a custodian or public officer takes charge of the Trustee or its property; or

(iv) the Trustee becomes incapable of acting.

(c) If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Noteholders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d) If a successor Trustee does not take office within sixty days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Company's expense), the

Company, or the Noteholders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)     If the Trustee, after written request by any Noteholder who has been a Noteholder for at least six months, fails to be compliant with Section 7.9, such Noteholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)     A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Noteholders. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; provided, that all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.6. Notwithstanding replacement of the Trustee pursuant to this Section 7.7, the Company's obligations under Section 7.6 will continue for the benefit of the retiring Trustee.

## 7.8    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another Person, the successor Person without any further act will be the successor Trustee. In case any Notes shall have been authenticated but not delivered by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

## 7.9    Eligibility; Disqualification

There will at all times be a Trustee hereunder that is a Person organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100,000,000 as set forth in its most recent published annual report of condition.

## 7.10    Trustee Protective Provisions

Without duplication of any amounts the Trustee is entitled to recover under any indemnification provisions in the Financing  Documents, the rights, privileges, protections, indemnities, immunities and benefits provided to the Trustee in this Indenture are in addition to, and are not intended to be in conflict with or limited by, any such provisions in the Financing Documents. The Trustee, in executing and performing its duties under the Financing Documents, shall be entitled to all of the rights, protections, immunities and indemnities granted to it hereunder.

# 8    LEGAL DEFEASANCE AND COVENANT DEFEASANCE

## 8.1    Option to Effect Legal Defeasance or Covenant Defeasance

The Company may at any time, as evidenced by a resolution duly adopted by the authorized governing body and set forth in an Officer's Certificate, elect to have either Sections 8.2 or 8.3 be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

## 8.2    Legal Defeasance and Discharge

Upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.2, the Company will, subject to the satisfaction of the conditions set forth in Section 8.4, be deemed to have been discharged from its obligations with respect to all outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "**Legal Defeasance**"). For this purpose, Legal Defeasance means that the Company will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which will thereafter be deemed to be "**outstanding**" only for the purposes of Section 8.5 and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes and this Indenture (and the Trustee, on written demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(a)    the rights of Noteholders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.4;

(b)    the Company's obligations with respect to such Notes under Article 2 and Section 4.2;

(c)    the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Company's obligations in connection therewith; and

(d)    this Article 8.

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.2 notwithstanding the prior exercise of its option under Section 8.3.

## 8.3    Covenant Defeasance

Upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.3, the Company will, subject to the satisfaction of the conditions set forth in Section 8.4, be released from each of its obligations under the covenants contained in Sections 4.3 through 4.19 with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.4 are satisfied (hereinafter, "**Covenant Defeasance**"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Noteholders (and the consequences of any thereof) in connection with such covenants, but will

continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).

For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.1, but, except as specified above, the remainder of this Indenture and such Notes will be unaffected thereby. In addition, upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.3, subject to the satisfaction of the conditions set forth in Section 8.4, the failure to comply with Sections 6.1(a) through 6.1(h) will not constitute Events of Default.

## 8.4    Conditions to Legal or Covenant Defeasance

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.2 or 8.3:

(a)    the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Noteholders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm, or firm of independent public accountants, to pay the principal of, premium, if any, and interest on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(b)    in the case of an election under Section 8.2, the Company has delivered to the Trustee an Opinion of Counsel confirming that:

(i)    the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(ii)    since the Issue Date, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Noteholders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)    in the case of an election under Section 8.3, the Company must deliver to the Trustee an Opinion of Counsel confirming that the Noteholders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on

the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)     no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(e)     such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Company is a party or by which the Company is bound;

(f)     the Company must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Company with the intent of preferring the Noteholders over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others;

(g)     the Company must deliver to the Trustee an Officer's Certificate stating that all conditions precedent set forth in clauses (a) through (f) of this Section 8.4 have been complied with; and

(h)     the Company must deliver to the Trustee an Opinion of Counsel (which opinion of counsel may be subject to customary assumptions, qualifications and exclusions), stating that all conditions precedent set forth in clauses (b), (c) and (e) of this Section 8.4 have been complied with; provided, that the Opinion of Counsel with respect to clause (e) of this Section 8.4 may be to the knowledge of such counsel.

## 8.5     Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions

Subject to Section 8.6, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.5, the "**Trustee**") pursuant to Section 8.4 in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Noteholders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.4 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Noteholders of the outstanding Notes.

Notwithstanding anything in this *Article 8* to the contrary, the Trustee will deliver or pay to the Company from time to time upon the request of the Company any money or non-callable Government Securities held by it as provided in Section 8.4 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.4(a)), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

**8.6    Repayment to Company**

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Noteholder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; provided, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in the New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than thirty days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

**8.7    Reinstatement**

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Sections **8.2** or **8.3**, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes will be revived and reinstated as though no deposit had occurred pursuant to Sections **8.2** or **8.3** until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Sections **8.2** or **8.3**, as the case may be; provided, that, if the Company makes any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its obligations, the Company will be subrogated to the rights of the Noteholders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

**9        AMENDMENT, SUPPLEMENT AND WAIVER**

**9.1    Without Consent of Noteholders**

Notwithstanding Section 9.2, the Company and the Trustee may amend or supplement the Notes and this Indenture without the consent of any Noteholder:

(a)    to cure any ambiguity, defect or inconsistency;

(b)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(c)     to make any change that would provide any additional rights or benefits to the Noteholders or that does not adversely affect the legal rights hereunder of any Noteholder;

(d)     to provide for a successor Trustee in accordance with the provisions of this Indenture; or

(e)     to provide for the assumption of the Company's obligations to the Noteholders by a successor to the Company pursuant to Article 5.

Upon the request of the Company accompanied by a resolution duly adopted by the authorized governing body authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.2(b) and 9.6, the Trustee will join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties, indemnities or immunities under this Indenture or otherwise.

## 9.2     With Consent of Noteholders

Except as provided below in this Section 9.2, (i) the Company and the Trustee may amend or supplement this Indenture and the Notes with the consent of the Noteholders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class, and (ii) subject to the Common Terms Agreement, the Intercreditor Agreement, and Sections 6.4 and 6.7, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Noteholders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.8 shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.2.

Upon the request of the Company accompanied by a resolution duly adopted by the authorized governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Noteholders as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.2(b) and 9.6, the Trustee will join with the Company in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties, indemnities or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental indenture.

It is not necessary for the consent of the Noteholders under this Section 9.2 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.2 becomes effective, the Company will mail to the Noteholders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Notwithstanding the foregoing, without the consent of each Noteholder affected and subject to the provisions of the Intercreditor Agreement, an amendment, supplement or waiver under this Section 9.2 may not (with respect to any Notes held by a non-consenting Noteholder):

(a)    reduce the principal amount of Notes whose Noteholders must consent to an amendment, supplement or waiver;

(b)    reduce the principal of or change the fixed maturity of any Note or alter or waive any of the provisions with respect to the redemption of the Notes;

(c)    reduce the rate of or extend the time for payment of interest, including default interest, on any Note;

(d)    waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the Noteholders of a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(e)    make any Note payable in currency other than that stated in the Notes;

(f)    make any change in the provisions of this Indenture relating to waivers of past Defaults or in the provisions of this Indenture, the Common Terms Agreement or the Intercreditor Agreement relating to the rights of Noteholders to receive payments of principal of, premium, if any, or interest, on the Notes;

(g)    waive a redemption payment with respect to any Note;

(h)    release AM DE (as defined in the Common Terms Agreement) from any of its obligations under the Offshore Subsidiary Guaranty and Security Agreement (as defined in the Common Terms Agreement), except in accordance with the terms of the Common Terms Agreement; or

(i)    make any change in the preceding amendment and waiver provisions.

**9.3    Decisions under Other Financing Documents**

(a)    Notwithstanding any provision of this Indenture or the Intercreditor Agreement to the contrary, each Noteholder shall be deemed to have consented to, and the Trustee shall be required, without the requirement of any vote or consent by the Noteholders and without seeking vote, consent or direction by or from the Noteholders with respect to any of the clauses set forth below, to vote in connection as Secured

Creditor Representative under the Intercreditor Agreement or any other Financing Document as follows:

(i)     [*intercreditor provisions remain under Lender discussion*].

(b)     Prior to voting in accordance with this Section 9.3, the Trustee shall have received a certificate from an Authorized Officer of the Company, which certificate shall set forth (1) the vote or consent the Trustee is directed to make as required by this Section 9.3 and (2) the relevant subsection of this Section 9.3 pursuant to which such vote is required.  The Trustee shall be entitled to conclusively rely on such certificate and shall have no duty or obligation to make any independent determinations prior to voting in accordance with this Section 9.3.

## 9.4     Revocation and Effect of Consents

Until an amendment, supplement or waiver becomes effective, a consent to it by a Noteholder is a continuing consent by the Noteholder of a Note and every subsequent Noteholder or portion of a Note that evidences the same debt as the consenting Noteholder's Note, even if notation of the consent is not made on any Note. However, any such Noteholder or subsequent Noteholder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Noteholder.

## 9.5     Notation on or Exchange of Notes

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

## 9.6     Trustee to Sign Amendments, etc.

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities, indemnities or immunities of the Trustee. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.1) will be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture by the Company is authorized or permitted by this Indenture and that such supplemental indenture is the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to customary exceptions.

## 10    SECURITY COLLATERAL

### 10.1    Secured 1L Debt

(a)    For all purposes under the Common Terms Agreement, the Intercreditor Agreement, and the Security Documents: (i) the Notes, upon issuance, will be Secured 1L Debt, (ii) the Noteholders shall be Secured 1L Noteholders, (iii) the Trustee shall be the Secured Creditor Representative for the Secured 1L Noteholders, and (iv) the Secured 1L Noteholders shall be Secured Creditors.

(b)    Each Noteholder, by its acceptance of the Notes, instructs and directs the Trustee to execute and deliver the Common Terms Agreement and the Intercreditor Agreement, each of which the Trustee will be a party to on the Issue Date, and, subject to all of its rights, protections, immunities and indemnities set forth herein (including its right to be directed by the Noteholders) to exercise all the rights and perform all the obligations of a Secured Creditor Representative set out in the Common Terms Agreement and the Intercreditor Agreement, including making, on behalf of the Noteholders, the agreements expressed to be made by Secured Noteholders under the Financing Documents.

(c)    Upon the execution and delivery of the Common Terms Agreement and the Intercreditor Agreement, this Indenture will constitute a Secured 1L Debt Document and the Notes will constitute Secured 1L Debt that is *pari passu* with all other Secured 1L Debt.  The Notes will be secured by the Security Collateral equally and ratable with all other Secured 1L Debt.

### 10.2    Release of Security Collateral

(a)    With respect to the Notes, the Collateral Agents' Liens upon Security Collateral will no longer secure the Senior Secured Obligations with respect to the Notes and the right of the Noteholders of such Secured Obligations to the benefits and proceeds of the Collateral Agents' Liens on Security Collateral will terminate and be discharged:

    (i)    (A) upon satisfaction and discharge of this Indenture as set forth in Section 11.1, or (B) upon a Legal Defeasance or Covenant Defeasance with respect to the Notes as set forth in Article 8, (C) upon payment in full of the applicable Notes and all other related Secured Obligations that are outstanding, due and payable under this Indenture at the time the Notes are paid in full; or

    (ii)    in accordance with the Common Terms Agreement, the Intercreditor Agreement and the Security Documents.

(b)    At the request of the Company pursuant to an Officer's Certificate confirming that all applicable conditions under this Indenture for the release of Security Collateral have been complied with, the Trustee will, based on such Officer's Certificate, deliver a certificate to the applicable Collateral Agent instructing such Collateral

Agent to release the relevant Liens without the further consent of the Noteholders. No certificate by the Trustee, nor any consent by the Noteholders, shall be required in connection with any sale, transfer or other disposition of Security Collateral if such sale, transfer or other disposition is permitted by the terms of the Common Terms Agreement, the Intercreditor Agreement and the Security Documents and such documents do not require delivery of such certificate. If the Security Collateral is then held by the Trustee, the Trustee shall, execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release prepared by the Company and at the expense of the Company to evidence such release.

(c)     The release of any Security Collateral from the terms of this Indenture, the Common Terms Agreement, the Intercreditor Agreement and the Security Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Security Collateral is released pursuant to the terms of the Common Terms Agreement, the Intercreditor Agreement and the Security Documents.

## 11      SATISFACTION AND DISCHARGE

### 11.1   Satisfaction and Discharge

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a)     either:

(i)     all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company, have been delivered to the Trustee for cancellation; or

(ii)    all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the sending of a notice of redemption or otherwise or will become due and payable within one year and the Company has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Noteholders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(b)     no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing);

(c)   such deposit will not result in a breach or violation of, or constitute a default under (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing), any material agreement or instrument to which the Company is a party or by which the Company is bound;

(d)   the Company has paid or caused to be paid all sums payable by it under this Indenture; and

(e)   the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, the Company must deliver to the Trustee (1) an Officer's Certificate stating that all conditions precedent set forth in clauses (a) through (e) of this Section 11.1 have been satisfied, and (2) an Opinion of Counsel (which opinion of counsel may be subject to customary assumptions, qualifications and exclusions), stating that all conditions precedent set forth in clauses (c) and (e) of this Section 11.1 have been satisfied; provided, that the Opinion of Counsel with respect to clause (c) of this Section 11.1 may be to the knowledge of such counsel.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (ii) of clause (a) of this Section 11.1, the provisions of Sections 11.2 and Section 7.6 will survive. In addition, nothing in this Section 11.1 will be deemed to discharge those provisions of Section 7.6, that, by their terms, survive the satisfaction and discharge of this Indenture. After the conditions to discharge contained in this Article Eleven have been satisfied, and the Company has paid or caused to be paid all other sums payable hereunder by the Company, and delivered to the Trustee an Officer's Certificate and Opinion of Counsel, each stating that all conditions precedent to satisfaction and discharge have been satisfied, the Trustee upon Company request shall acknowledge in writing the discharge of the obligations of the Company.

## 11.2    Application of Trust Money

Subject to the provisions of Section 8.6, all money deposited with the Trustee pursuant to Section 11.1 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.1 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.1; provided, that if the Company has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the

Noteholders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## 12    MISCELLANEOUS

### 12.1    Notices

Any notice or communication by the Company or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), electronic mail or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention:  General Manager
> Telephone: +56 2 3333 8301
> Email: luis.urrejola@aes.com


> With a copy to:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention:  Felix Gomez
> Email: felix.gomez@aes.com

If to the Trustee:

> [_____]
> Address:

> Attention:
> Telephone:
> E-mail:

The Company or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Noteholders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; at the time sent, if transmitted by electronic mail; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery; provided, that all notices and communications to the

Trustee shall not be deemed received by the Trustee unless actually received by the Trustee at its address or electronic mail address set forth above.

Any notice or communication to a Noteholder will be mailed by first class mail, or by certified or registered mail, return receipt requested, by overnight air courier guaranteeing next day delivery, or to electronic mail to the address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Noteholder or any defect in it will not affect its sufficiency with respect to other Noteholders. Notwithstanding any other provision of this Indenture or any Global Note, where this Indenture or any Global Note provides for notice of any event (including any notice of redemption or repurchase) to a holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary (or its designee) pursuant to the Applicable Procedures, including by electronic mail in accordance with the standing instructions from the Depositary.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Noteholders, it will send a copy to the Trustee and each Agent at the same time by any of the means described above with respect to notice or communication by the Company.

## 12.2 Certificate and Opinion as to Conditions Precedent

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(a)     an Officer's Certificate in form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.3) stating that, in the opinion of the signers (who may rely upon an Opinion of Counsel as to matters of law), all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)     an Opinion of Counsel in form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.3) stating that, in the opinion of such counsel (who may rely upon an Officer's Certificate as to matters of fact), all such conditions precedent and covenants have been complied with; provided, that no such Opinion of Counsel shall be delivered on the date of this Indenture in connection with the original issuance of the initial Global Notes.

## 12.3 Statements Required in Certificate or Opinion

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(a)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

## 12.4    Rules by Trustee and Agents

The Trustee may make reasonable rules for action by or at a meeting of Noteholders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

## 12.5    No Personal Liability of Directors, Officers, Employees and Stockholders

No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

## 12.6    Applicable Law, Jurisdiction, etc.

(a)    This Indenture shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)    For the exclusive benefit of the Noteholders and the Trustee, the Company irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Indenture may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan.  By the execution of this Indenture, the Company irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding.  Final judgment against the Company in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)    Nothing in this Indenture shall affect the right of a party to commence legal proceedings or otherwise sue the Company in the Country or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Company in any manner authorized by the laws of any such jurisdiction.

(d)    The Company hereby confirms, as of the date hereof, the irrevocable designation, appointment and empowerment of Corporation Service Company, with offices currently located

at 19 West 44th Street, Suite 200, New York, New York 10036, as its authorized agent solely to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a party may bring in the State of New York in respect of this Indenture.

(e)     As long as this Indenture remains in force, the Company shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a party may bring in New York, New York, United States of America, with respect to this Indenture.

(f)     The Company also irrevocably consents, if for any reason its authorized agent for service of process of summons, complaint and other legal process in any action, suit or proceeding is not present in New York, New York, to the service of such papers being made out of the courts of the United States of America located in the Southern District of New York and the courts of the State of New York located in the Borough of Manhattan by mailing copies of the papers by registered United States air mail, postage prepaid, to the Company, at its address specified pursuant to Section 12.1 (*Notices*).  In such a case, a party shall also send by facsimile or electronic mail, or have sent by facsimile or electronic mail, a copy of the papers to the Company.

(g)     Service in the manner provided in clauses (d), (e) and (f) of this Section 12.6 in any action, suit or proceeding will be deemed personal service, will be accepted by the Company as such and will be valid and binding upon the Company for all purposes of any such action, suit or proceeding.

(h)     Each party irrevocably waives to the fullest extent permitted by Applicable Law:

(i)     any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 12.6;

(ii)    any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)   its right of removal of any matter commenced by the Trustee in the courts of the State of New York to any court of the United States of America.

(i)     To the extent that the Company may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Indenture, from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed) may be attributed to it or its assets, the Company irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(j)     The Company hereby acknowledges that DFC shall be entitled under Applicable Law, including the provisions of the International Organizations Immunities Act of 1945 (22 U.S.C. §288), to immunity from a trial by jury in any action, suit or proceeding arising out of or relating to this Indenture or the transactions contemplated hereby brought against DFC in any court of the United States of America.

(k)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND THE TRUSTEE HEREBY (AND THE NOTEHOLDERS, BY THEIR ACCEPTANCE OF THE NOTES, THEREBY) IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS INDENTURE OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON, BROUGHT BY OR AGAINST ANY PARTY IN ANY FORUM IN WHICH SUCH PARTY IS NOT ENTITLED TO IMMUNITY FROM TRIAL BY JURY.

(l)     To the extent that the Company may, in any action, suit or proceeding brought in any of the courts referred to in Section 12.6(b) or a court of the Country or elsewhere arising out of or in connection with this Indenture to which the Company is a party, be entitled to the benefit of any provision of law requiring a party in such action, suit or proceeding to post security for the costs of the Company, or to post a bond or to take similar action, the Company hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of the Country or, as the case may be, the jurisdiction in which such court is located.

### 12.7   No Adverse Interpretation of Other Agreements

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or of any other Person. Except as expressly set forth herein, no such other indenture, loan or debt agreement may be used to interpret this Indenture.

### 12.8   Successors[17]

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors.

### 12.9   Severability

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

### 12.10  Counterpart Originals

The Parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. The exchange of copies of this Indenture and of signature pages in electronic format (*i.e.*, "pdf" or "tif") transmission shall constitute effective execution and delivery of this Indenture as to the Parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the Parties hereto transmitted in electronic format (*i.e.*, "pdf" or "tif") shall be deemed to be their original signatures for all purposes.

---

[17] **Note to Draft**: Subject to further review.

**12.11  Trustee's Receipt of Funds to the Extent not Required to be Applied to Payment of the Notes**

To the extent the Trustee receives any money from the Company or pursuant to any of the Financing Documents, and such money is not required to be used to redeem or repay the Notes as set forth in the certificate of an Authorized Officer of the Company, such moneys shall be deposited into the Account under the Offshore Accounts Agreement as specified by the Company in such certificate.

**12.12  Table of Contents, Headings, etc.**

The Table of Contents and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

**12.13  USA Patriot Act**

The parties hereto acknowledge that, in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA PATRIOT Act.

*[Signatures on following page]*

SIGNATURES

ALTO MAIPO SpA

By: _____
Name:
Title:

[●],
as Trustee

By: _____
Name:
Title:

EXHIBIT A-**1**

[Face of Note]

<div align="right">
CUSIP:

ISIN:
</div>

4.00% Senior Secured Notes due 2040

No. _____                                                            $ _____

ALTO MAIPO SpA

promises    to    pay    to    _____    or    registered    assigns,    the    principal    sum    of
_____ DOLLARS, together with accrued interest
thereon, on the dates and in the amounts set forth on Schedule 1 with the final installment of
principal to be paid in full on June 30, 2040.

Interest Payment Dates:  January 15, April 15, July 15 and October 15, in each year, or if any such
day is not a Business Day, the next succeeding Business Day[, commencing January 17, 2023.]

Record Dates: _____ and _____

Dated: _____, _____

ALTO MAIPO SpA

By: _____
Name:
Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

[_____],
as Trustee

By: _____
            Authorized Signatory

[Back of Note]
4.00% Senior Secured Notes due 2040

[*Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture*]

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)     *INTEREST*. Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**"), promises to pay interest on the principal amount of this Note at 4.00% per annum from the date of issuance until maturity. The Company will pay 90 days of interest quarterly in arrears on January 15, April 15, July 15 and October 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "**Interest Payment Date**"). Interest payable on any Interest Payment Date in 2022 shall be capitalized and the Company shall have the option to capitalize the interest payable on the  Interest Payment Date occurring in January 2023, as provided in Section 4.1 of the Indenture. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided, that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; [provided, further, that the first Interest Payment Date shall be January 17, 2023, unless the interest payable on such date is capitalized pursuant to Section 4.1 of the Indenture, in which case the first Interest Payment Date shall be April 15, 2023].[18] The Company will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.0% per annum in excess of the rate then in effect to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360-day year of twelve thirty-day months.

(2)     *PRINCIPAL*. Until fully paid, the Company will make semi-annual principal payments on this Note on each Interest Payment Date occurring in April and October of each year commencing April 15, 2024 and in the amounts as set forth on Schedule 1. The entire remaining outstanding principal amount of this Note shall be payable no later than June 30, 2040 unless the outstanding principal balance of this Note becomes due and payable at an earlier date pursuant to the Indenture, in each case such payment shall be made in an amount and in the manner provided in the Indenture.

(3)     *METHOD OF PAYMENT*. The Company will pay principal and interest on the Notes (except defaulted interest) to the Persons who are registered Noteholders at the close of business on the _____ or _____ next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided

---

[18]     **NTD**: This provision remains under discussion.

in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Paying Agent or Registrar maintained for such purpose, or, at the option of the Company, payment of interest may be made by check mailed to the Noteholders at their addresses set forth in the register of Noteholders; provided, that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest on, all Global Notes and all other Notes the Noteholders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(4)    *PAYING AGENT AND REGISTRAR*. Initially, [●], the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Noteholder.

(5)    *INDENTURE AND SECURITY DOCUMENTS*. The Company issued the Notes under an Indenture dated as of [●], 2022 (the "**Indenture**") between the Company and the Trustee. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Noteholders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured obligations of the Company. The Notes are secured by a pledge of Security Collateral (as defined in the Intercreditor Agreement) pursuant to the Security Documents.

(6)    *OPTIONAL REDEMPTION*.

Prior to [●][19] (the "**Par Call Date**"), the Company may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:

(1) (a) the sum of the present values of the remaining scheduled payments of principal and interest on the Notes being redeemed discounted to the redemption date (assuming the notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 40 basis points, less (b) interest accrued to the date of redemption, and

(2) 100% of the principal amount of the Notes to be redeemed,

*plus*, in either case, accrued and unpaid interest thereon to the redemption date.

On or after the Par Call Date, the Company may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

---

[19]    **NTD**: To include the date that is twelve and a half years from the date of the Indenture.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by the Company in accordance with the following two paragraphs.

The Treasury Rate shall be determined by the Company after 4:15 p.m., New York City time (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third business day preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) - H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities–Treasury constant maturities–Nominal" (or any successor caption or heading). In determining the Treasury Rate, the Company shall select, as applicable: (1) the yield for the Treasury constant maturity on H.15 exactly equal to the period (the "**Remaining Life**") from the redemption date to the date that reflects the remaining weighted average life of the Notes (assuming the last amortization payment on the Notes is made on the Par Call Date) (the "**WAL Date**"); or (2) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the two yields – one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than and one yield corresponding to the Treasury constant maturity on H.15 immediately longer than the Remaining Life – and shall interpolate to the WAL Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (3) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

If on the third business day preceding the redemption date H.15 or any successor designation or publication is no longer published, the Company shall calculate the Treasury Rate based on the rate per annum equal to the semi-annual equivalent yield to maturity at 11:00 a.m., New York City time, on the second business day preceding such redemption date of the United States Treasury security maturing on, or with a maturity that is closest to, the WAL Date, as applicable. If there is no United States Treasury security maturing on the WAL Date but there are two or more United States Treasury securities with a maturity date equally distant from the WAL Date, one with a maturity date preceding the WAL Date and one with a maturity date following the WAL Date, the Company shall select the United States Treasury security with a maturity date preceding the WAL Date. If there are two or more United States Treasury securities maturing on the WAL Date or two or more United States Treasury securities meeting the criteria of the preceding sentence, the Company shall select from among these two or more United States Treasury securities the United States Treasury security that is trading closest to par based upon the average of the bid and asked prices for such United States Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this and the preceding paragraphs, the semi-annual yield to maturity of the applicable United States Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such United States Treasury security, and rounded to three decimal places.

The notice of redemption with respect to the foregoing redemption need not set forth the redemption price but only the manner of calculation thereof. The Company will notify the Trustee of the redemption price with respect to any redemption promptly after the calculation, and the Trustee shall not be responsible for such calculation.

(7)  *MANDATORY REDEMPTION.*

If the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section 2.6(a) of the Common Terms Agreement.

If there are Excess Cash Flows in the Offshore Revenue Account and the Common Terms Agreement and the Offshore Accounts Agreement require such Excess Cash Flows to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section [●] of the Common Terms Agreement.

(8)  *REPURCHASE AT THE OPTION OF THE NOTEHOLDER.*

Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(9)  *NOTICE OF REDEMPTION.*

Notice of redemption will be mailed or delivered electronically at least thirty days but not more than sixty days before the redemption date to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $100,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the Notes held by a Noteholder are to be redeemed.

(10)  *DENOMINATIONS, TRANSFER, EXCHANGE.*

The Notes are in registered form without coupons in denominations of $100,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Noteholder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of

a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of fifteen days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(11)   *Persons Deemed Owners*. The registered Noteholder of a Note may be treated as its owner for all purposes.

(12)   *Trustee Dealings with Company*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(13)   *No Recourse Against Others*. No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

(14)   *Authentication*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(15)   *Abbreviations*. Customary abbreviations may be used in the name of a Noteholder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(16)   *CUSIP Numbers*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Noteholders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(17)   *Governing Law*. This Note shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

The Company will furnish to any Noteholder upon written request and without charge a copy of the Indenture. Requests may be made to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com

With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

[SCHEDULE 1]
[AMORTIZATION SCHEDULE]

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably _____
appoint to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date:_____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:

_____

*        Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

Option of Noteholder to Elect Purchase

If you want to elect to have this Note purchased by the Company pursuant to Section 4.11 of the Indenture, check the appropriate box below:

□ Section 4.11

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.11 of the Indenture, state the amount you elect to have purchased:

$_____

Date:___

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Your Signature: _____

Signature Guarantee*:

_____

*       Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount [at maturity] of this Global Note | Amount of increase in Principal Amount [at maturity] of this Global Note | Principal Amount [at maturity] of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

EXHIBIT A-2

[Face of Regulation S Temporary Global Note]

CUSIP:

ISIN:

4.00% Senior Secured Notes due 2040

No. _____                                              $ _____

ALTO MAIPO SpA

promises   to   pay   to   _____   or   registered   assigns,   the   principal   sum   of
_____ DOLLARS, together with accrued interest
thereon, on the dates and in the amounts set forth on Schedule 1 with the final installment of
principal to be paid in full on June 30, 2040.

Interest Payment Dates:  January 15, April 15, July 15 and October 15, in each year, or if any such
day is not a Business Day, the next succeeding Business Day, [commencing January 17, 2023]

Record Dates: _____ and _____

Dated: _____, ____

                                        ALTO MAIPO SpA


                                        By: _____
                                        Name:
                                        Title:


This is one of the Notes referred to
in the within-mentioned Indenture:


[_____],
as Trustee


By: _____
            Authorized Signatory

[Back of Regulation S Temporary Global Note]
4.00 % Senior Secured Notes due 2040

THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN). NEITHER THE NOTEHOLDER NOR THE BENEFICIAL OWNERS OF THIS REGULATION S TEMPORARY GLOBAL NOTE SHALL BE ENTITLED TO RECEIVE PAYMENT OF INTEREST HEREON.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO Section 2.6 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO Section 2.6(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO Section 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, (1) REPRESENTS THAT (A) IT IS A "**QUALIFIED INSTITUTIONAL BUYER**" (AS DEFINED IN RULE 144A UNDER THE

SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 (a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT AND (2) AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "**RESALE RESTRICTION TERMINATION DATE**") THAT IS FORTY DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S), IN RELIANCE ON REGULATION S, ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "**QUALIFIED INSTITUTIONAL BUYER**" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL ''ACCREDITED INVESTOR'' WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE NOTES FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ''ACCREDITED INVESTOR'', FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE OR AS OTHERWISE PROVIDED FOR IN THE INDENTURE."

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)     *INTEREST.* Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**"), promises to pay interest on the principal amount of this Note at 4.00% per annum from the date of issuance until maturity. The Company will pay 90 days of interest quarterly in arrears on January 15, April 15, July 15 and October 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "**Interest Payment Date**"). Interest payable on any Interest Payment Date in 2022 shall be capitalized and

the Company shall have the option to capitalize the interest payable on the Interest Payment Date occurring in January 2023, as provided in Section 4.1 of the Indenture. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided, that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; [provided, further, that the first Interest Payment Date shall be January 17, 2023, unless the interest payable on such date is capitalized pursuant to Section 4.1 of the Indenture, in which case the first Interest Payment Date shall be April 15, 2023].[20] The Company will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.0% per annum in excess of the rate then in effect to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360-day year of twelve thirty-day months.

Until this Regulation S Temporary Global Note is exchanged for one or more Regulation S Permanent Global Notes, the Noteholder hereof shall not be entitled to receive payments of interest hereon; until so exchanged in full, this Regulation S Temporary Global Note shall in all other respects be entitled to the same benefits as other Notes under the Indenture.

(2)    *PRINCIPAL*. Until fully paid, the Company will make semi-annual principal payments on this Note on each Interest Payment Date occurring in April and October each year commencing April 15, 2024 and in the amounts as set forth on Schedule 1. The entire remaining outstanding principal amount of this Note shall be payable no later than June 30, 2040 unless the outstanding principal balance of this Note becomes due and payable at an earlier date pursuant to the Indenture, in each case such payment shall be made in an amount and in the manner provided in the Indenture.

(3)    *METHOD OF PAYMENT*. The Company will pay principal and interest on the Notes (except defaulted interest) to the Persons who are registered Noteholders at the close of business on the _____ or _____ next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Paying Agent or Registrar maintained for such purpose, or, at the option of the Company, payment of interest may be made by check mailed to the Noteholders at their addresses set forth in the register of Noteholders; provided, that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest on all Global Notes and all other Notes the Noteholders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

---

[20]    **NTD**: This provision remains under discussion.

(4)    *PAYING AGENT AND REGISTRAR.* Initially, [●], the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Noteholder.

(5)    *INDENTURE AND SECURITY DOCUMENTS.* The Company issued the Notes under an Indenture dated as of [●], 2022 (the "**Indenture**") between the Company and the Trustee. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Noteholders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured obligations of the Company. The Notes are secured by a pledge of Security Collateral (as defined in the Common Terms Agreement) pursuant to the Security Documents.

(6)    *OPTIONAL REDEMPTION.*

Prior to [●][21] (the "**Par Call Date**"), the Company may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:

(1) (a) the sum of the present values of the remaining scheduled payments of principal and interest on the Notes being redeemed discounted to the redemption date (assuming the notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 40 basis points, less (b) interest accrued to the date of redemption, and

(2) 100% of the principal amount of the Notes to be redeemed,

*plus*, in either case, accrued and unpaid interest thereon to the redemption date.

On or after the Par Call Date, the Company may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by the Company in accordance with the following two paragraphs.

The Treasury Rate shall be determined by the Company after 4:15 p.m., New York City time (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third business day preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) - H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities–Treasury constant maturities–Nominal" (or any successor caption or heading). In determining the Treasury Rate, the

---

[21]    **NTD**: To include the date that is twelve and a half years from the date of the Indenture.

Company shall select, as applicable: (1) the yield for the Treasury constant maturity on H.15 exactly equal to the period (the "**Remaining Life**") from the redemption date to the date that reflects the remaining weighted average life of the Notes (assuming the last amortization payment on the Notes is made on the Par Call Date) (the "**WAL Date**"); or (2) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the two yields – one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than and one yield corresponding to the Treasury constant maturity on H.15 immediately longer than the Remaining Life – and shall interpolate to the WAL Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (3) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

If on the third business day preceding the redemption date H.15 or any successor designation or publication is no longer published, the Company shall calculate the Treasury Rate based on the rate per annum equal to the semi-annual equivalent yield to maturity at 11:00 a.m., New York City time, on the second business day preceding such redemption date of the United States Treasury security maturing on, or with a maturity that is closest to, the WAL Date, as applicable. If there is no United States Treasury security maturing on the WAL Date but there are two or more United States Treasury securities with a maturity date equally distant from the WAL Date, one with a maturity date preceding the WAL Date and one with a maturity date following the WAL Date, the Company shall select the United States Treasury security with a maturity date preceding the WAL Date. If there are two or more United States Treasury securities maturing on the WAL Date or two or more United States Treasury securities meeting the criteria of the preceding sentence, the Company shall select from among these two or more United States Treasury securities the United States Treasury security that is trading closest to par based upon the average of the bid and asked prices for such United States Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this and the preceding paragraphs, the semi-annual yield to maturity of the applicable United States Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such United States Treasury security, and rounded to three decimal places.

The notice of redemption with respect to the foregoing redemption need not set forth the redemption price but only the manner of calculation thereof. The Company will notify the Trustee of the redemption price with respect to any redemption promptly after the calculation, and the Trustee shall not be responsible for such calculation.

(7)    *MANDATORY REDEMPTION.*

If the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section 2.6(a) of the Common Terms Agreement.

If there are Excess Cash Flows in the Offshore Revenue Account and the Common Terms Agreement and the Offshore Accounts Agreement require such Excess Cash Flows to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section [●] of the Common Terms Agreement.

(8)    *REPURCHASE AT THE OPTION OF THE NOTEHOLDER.*

Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(9)    *NOTICE OF REDEMPTION.*

Notice of redemption will be mailed or delivered electronically at least thirty days but not more than sixty days before the redemption date to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $100,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the Notes held by a Noteholder are to be redeemed.

(10)    *DENOMINATIONS, TRANSFER, EXCHANGE.*

The Notes are in registered form without coupons in denominations of $100,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Noteholder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of fifteen days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

This Regulation S Temporary Global Note is exchangeable in whole or in part for one or more Global Notes only (i) on or after the termination of the forty-day distribution compliance period (as defined in Regulation S) and (ii) upon presentation of certificates (accompanied by an Opinion of Counsel, if applicable) required by Article 2 of the Indenture. Upon exchange of this Regulation S Temporary Global Note for one or more Global Notes, the Trustee shall cancel this Regulation S Temporary Global Note.

(11)   PERSONS DEEMED OWNERS. The registered Noteholder of a Note may be treated as its owner for all purposes.

(12)   *TRUSTEE DEALINGS WITH COMPANY*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(13)   *NO RECOURSE AGAINST OTHERS*. No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under federal securities laws.

(14)   *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(15)   *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Noteholder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(16)   *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Noteholders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(17)   *GOVERNING LAW*. THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA, WITHOUT TAKING INTO ACCOUNT ITS CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company will furnish to any Noteholder upon written request and without charge a copy of the Indenture. Requests may be made to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com


With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

[SCHEDULE 1]
[AMORTIZATION SCHEDULE]

<div align="center">ASSIGNMENT FORM</div>

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

<div align="right">(Insert assignee's legal name)</div>

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably _____

appoint to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date:_____

<div align="right">Your Signature: _____</div>

<div align="right">(Sign exactly as your name appears on the face of this Note)</div>

Signature Guarantee*:

_____

*       Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

Option of Noteholder to Elect Purchase

If you want to elect to have this Note purchased by the Company pursuant to Section 4.11 of the Indenture, check the appropriate box below:

☐ Section 4.11

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.11 of the Indenture, state the amount you elect to have purchased:

$_____

Date:___

<div style="margin-left:40%;">

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Your Signature: _____

</div>

Signature Guarantee*:

_____

\*        Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE REGULATIONS
TEMPORARY GLOBAL NOTE

The following exchanges of a part of this Regulation S Temporary Global Note for an interest in another Global Note, or exchanges of a part of another Restricted Global Note for an interest in this Regulation S Temporary Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount [at maturity] of this Global Note | Amount of increase in Principal Amount [at maturity] of this Global Note | Principal Amount [at maturity] of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

_____, as Trustee
[ADDRESS]

cc:    Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  General Manager
       Telephone: +56 2 3333 8301
       Email: luis.urrejola@aes.com


       With a copy to:

       Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  Felix Gomez
       Email: felix.gomez@aes.com

       Re:    4.00% Senior Secured Notes due 2040 issued by Alto Maipo SpA

Reference is hereby made to the Indenture, dated as of [●], 2022 (as amended or supplemented from time to time, the "**Indenture**"), between Alto Maipo SpA, as issuer (the "**Company**") and _____, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "**Transferor**") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "**Transfer**"), to (the "**Transferee**"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.  □ **Check if Transferee will take delivery of a beneficial interest in the Rule 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with

any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Rule 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2. ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Temporary Global Note, the Regulation S Permanent Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, (x) the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Secured 1L Noteholder) and (y) the interest transferred will be held immediately thereafter through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Permanent Global Note, the Regulation S Temporary Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)        ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)        ☐ such Transfer is being effected to the Company;

<div align="center">or</div>

(c)         □ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act;

<div align="center">or</div>

(d)         □ such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the registration requirements of the Securities Act other than Rule 144A, Rule 144, Rule 903 or Rule 904, and the Transferor hereby further certifies that it has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies with the transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requirements of the exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in the form of Exhibit D to the Indenture and (2) an Opinion of Counsel provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification), to the effect that such Transfer is in compliance with the Securities Act. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the IAI Global Note and/or the Restricted Definitive Notes and in the Indenture and the Securities Act.

**4. □ <u>Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note</u>.**

(a)         □ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)         □ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private

<div align="center">B-3</div>

Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)          □ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated:

ANNEX A TO CERTIFICATE OF TRANSFER

1.  The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)           □  a beneficial interest in the:

    (i)        □ Rule 144A Global Note (CUSIP _____), or

    (ii)       □ Regulation S Global Note (CUSIP _____); or

    (iii)      □ IAI Global Note (CUSIP _____); or

(b)           □  a Restricted Definitive Note.

2.  After the Transfer the Transferee will hold:

[CHECK ONE]

(a)           □  a beneficial interest in the:

    (i)        □ Rule 144A Global Note (CUSIP _____), or

    (ii)       □ Regulation S Global Note (CUSIP _____); or

    (iii)      □ IAI Global Note (CUSIP _____); or

    (iv)       □ Unrestricted Global Note (CUSIP _____).

(b)           □  Restricted Definitive Note; or

(c)           □  an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

_____, as Trustee
[ADDRESS]


cc:  Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com


With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com


Re:  4.00% Senior Secured Notes due 2040 issued by Alto Maipo SpA

(CUSIP _____)

Reference is hereby made to the Indenture, dated as of _____, ____, (as amended or supplemented from time to time, the "**Indenture**"), between Alto Maipo SpaA, as issuer (the "**Company**") and _____, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "**Owner**") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "**Exchange**"). In connection with the Exchange, the Owner hereby certifies that:

1. **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

(a)    □ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such

Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)         ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)         ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)         ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.    **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)         ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial

interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b) □ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] □ Rule 144A Global Note or □ Regulation S Global Note or □ IAI Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]


By: _____
Name:
Title:


Dated:

EXHIBIT D

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

_____, as Trustee

[ADDRESS]


cc:    Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention: General Manager
       Telephone: +56 2 3333 8301
       Email: luis.urrejola@aes.com


       With a copy to:

       Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention: Felix Gomez
       Email: felix.gomez@aes.com


       Re:    4.00% Senior Secured Notes due 2040 issued by Alto Maipo SpA

       Reference is hereby made to the Indenture, dated as of _____, ____ (the "**Indenture**"), between Alto Maipo SpA, as issuer (the "**Company**") and _____ as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

       In connection with our proposed purchase of $ _____ aggregate principal amount of:

       (a)    ☐ a beneficial interest in a Global Note, or

       (b)    ☐ a Definitive Note,

       we confirm that:

       1.    We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "**Securities Act**").

2.　　　We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence. We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter and, an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to the provisions of Rule 144 under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any Person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.　　　We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.　　　We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.　　　We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____

[Insert Name of Accredited Investor]


By: _____
Name:
Title:


Dated:_____

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

EXHIBIT E[22]

FORM OF ACKNOWLEDGEMENT OF DEBT

**REPERTORIO N°:**

**RECONOCIMIENTO DE DEUDA**

**ALTO MAIPO SpA**

**A**

**[DEPOSITARY/TRUSTEE]**

**En Santiago de Chile,** a [●], ante mí, [NOTARIO PÚBLICO], comparece: don [●], [nacionalidad], [estado civil], [profesión u oficio], cédula de identidad [para extranjeros] número [●], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA** una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [●] /en adelante el "**Deudor**"/; el compareciente mayor de edad, quien acredita su identidad con la cédula antes citada y expone que viene en otorgar el siguiente reconocimiento de deuda, el "**Reconocimiento de Deuda**":

<u>**PRIMERO**</u>: **Antecedentes.**

/**a**/ Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC, filial del Deudor, iniciaron un procedimiento de insolvencia conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/**b**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados a esa fecha por el Deudor asociados a la construcción del Proyecto, en títulos de deuda transables en el mercado de capitales. Atendido lo anterior, por instrumento privado denominado "*Indenture*", otorgado con fecha [●] de dos mil veintidós, suscrito en idioma inglés y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, en calidad de emisor, y [●] en calidad de *Trustee*, suscribieron un contrato de emisión de títulos de deuda o *Notes* /en adelante, dicho contrato, según sea modificado, complementado, actualizado de tiempo en tiempo, el "**OneL Indenture**"/.

/**c**/ Conforme a lo establecido en el OneL Indenture, el Deudor, en calidad de emisor de títulos de deuda, ha llevado a cabo una emisión internacional de títulos de deuda /*Notes*/ con sujeción a la Regla número 144A y a la Regulación S, ambas emitidas por la *Securities and Exchange Commission* de los Estados Unidos de América en aplicación de la *Securities Act of 1933* o ley de

---

[22]   **NTD**: Exhibit E remains under discussion.

valores de los Estados Unidos de América, y sus modificaciones posteriores, referidas, respectivamente, a la exención de la obligación de registrar y efectuar oferta pública en los Estados Unidos de América y a ofertas de valores efectuadas fuera de esa nación.

/**d**/ Así es como con [esta fecha / fecha [●] de dos mil veintidós], el Deudor ha emitido bajo el OneL Indenture, títulos de deuda en beneficio de determinados acreedores del Deudor /los "**Inversionistas**"/, por un monto total de capital de [●] dólares de los Estados Unidos de América /"**Dólares**"/, con vencimiento final el treinta de junio de dos mil cuarenta y cuyo capital devengará intereses a una tasa fija anual de cuatro por ciento /los "**Títulos de Deuda**"/.

/**e**/ Con el objeto de facilitar el cobro por parte de los respectivos Inversionistas de los montos de capital e intereses adeudados por el Deudor bajo los Títulos de Deuda, y sin ánimo de novar, el Deudor suscribe el presente Reconocimiento de Deuda.

**SEGUNDO: Reconocimiento de Deuda.** /**a**/ Por este acto y mediante el presente instrumento, el Deudor declara y reconoce, expresa e irrevocablemente, deber y adeudar a los Inversionistas, representados por [Depositary/Trustee] /el "**Acreedor**"/ la suma de [●] Dólares por concepto de capital /el "**Capital Adeudado**"/. El Capital Adeudado deberá ser pagado al Acreedor en [número de cuotas] cuotas semestrales y sucesivas /cada una, una "**Cuota de Capital**"/, la primera de ellas pagadera el quince de abril de dos mil veinticuatro y la última Cuota de Capital pagadera el día treinta de junio de dos mil cuarenta /cada una, una "**Fecha de Pago de Capital**"/, conforme al calendario de amortizaciones que se adjunta como Anexo I del presente instrumento, el que se protocoliza conjuntamente con esta escritura bajo el mismo número de repertorio. /**b**/ Se deja expresa constancia que el presente acto constituye sólo una documentación de una obligación preexistente, consistente en la obligación del Deudor de pagar el capital y los intereses de los Títulos de Deuda a los Inversionistas, no habiendo entrega de dinero y no constituyendo, por tanto, una operación de crédito de dinero bajo la Ley número dieciocho mil diez. Asimismo, el Deudor deja constancia que la declaración y reconocimiento de deuda efectuada mediante este instrumento no constituye en ninguna forma una novación de la deuda reconocida.

**TERCERO: Intereses.** El Deudor se obliga incondicionalmente a pagar intereses sobre el Capital Adeudado a contar [de esta fecha / del [●]] y hasta la fecha de su pago íntegro y efectivo, a una tasa de interés anual de cuatro por ciento /la "**Tasa de Interés**"/. Los intereses devengados sobre el Capital Adeudado deberán ser pagados trimestralmente y en dinero efectivo /con excepción de lo señalado más adelante/, los días quince de enero, quince de abril, quince de julio y quince de octubre de cada año. Los intereses devengados por el Capital Adeudado durante el año dos mil veintidós serán capitalizados e incrementarán el Capital Adeudado. Los intereses pagaderos el quince de enero de dos mil veintitrés podrán ser capitalizados en vez de pagados en dinero efectivo, de cumplirse las condiciones establecidas para ello en el OneL Indenture. Todos los cómputos de intereses se harán sobre la base de años de trescientos sesenta días y de doce meses de treinta días, en cada caso por el número de días efectivamente transcurridos durante el plazo por el cual deban pagarse tales intereses. Los intereses que no fueren pagados a su vencimiento se capitalizarán en dicha fecha y, sin necesidad de demanda judicial, devengarán un interés moratorio, pagadero al mero requerimiento del Acreedor, a una tasa adicional anual equivalente en todo momento a un dos por ciento por año por sobre la Tasa de Interés aplicable en ese momento. El interés moratorio se calculará sobre el monto del Capital Adeudado que se encuentra en mora /incluidos los intereses

capitalizados conforme a esta Cláusula/, y correrá desde la mora o simple retardo hasta la fecha del pago efectivo de lo adeudado.

**CUARTO: Pagos.** Todos los pagos de capital, intereses y otras cantidades bajo este Reconocimiento de Deuda deberán efectuarse al Acreedor en Dólares, en fondos de inmediata disponibilidad, sin deducciones, compensaciones o reconvenciones, en la cuenta bancaria que éste le indique oportunamente a el Deudor. Toda vez que la fecha de vencimiento de cualquier pago que deba efectuarse conforme a este Reconocimiento de Deuda haya de ocurrir en un día que no sea Día Hábil /según este término se define más adelante/, ese pago se efectuará el Día Hábil inmediatamente siguiente, considerando los intereses que se hubiesen devengado en el intertanto respecto de cuotas de capital pero no intereses. Para efectos de esta Cláusula, "**Día Hábil**" significa un día /distinto de un sábado o domingo/ en que los bancos estén abiertos al público en las ciudades de Nueva York, Estados Unidos o Santiago, Chile.

**QUINTO: Aceleración.** En caso que el Deudor incumpla su obligación de pagar a su vencimiento el capital o intereses adeudados bajo este Reconocimiento de Deuda, o en caso de que el Deudor tenga la calidad de deudor en un procedimiento concursal de liquidación, o tenga la calidad de deudor en un procedimiento concursal de reorganización, en todos los casos anteriores ya sea en Chile o en otra jurisdicción, o se encuentre en notoria insolvencia, el Acreedor tendrá derecho a declarar inmediata e íntegramente exigibles y pagaderos el monto de capital insoluto, los intereses devengados bajo este Reconocimiento de Deuda y todas las demás cantidades que debe pagar el Deudor bajo este Reconocimiento de Deuda, con lo cual dichas cantidades se considerarán de plazo vencido y exigibles, sin necesidad de protesto, reclamo, demanda, ni otras formalidades de ningún tipo, todas las que en este acto son expresamente renunciadas por el Deudor. Las causales de caducidad del plazo antes indicadas se han establecido en beneficio exclusivo del Acreedor, y sólo podrán invocarse y ejercerse conforme a lo establecido en la Ley número veinte mil setecientos veinte, "Ley de Reorganización y Liquidación de Empresas y Personas".

**SEXTO: Renuncia.** Sin perjuicio que el reconocimiento de deuda al que se refiere este instrumento constituye un acto unilateral del Deudor, éste renuncia en este acto a modificar o dejar sin efecto en todo o en parte lo expresado en este instrumento, sin el consentimiento previo del Acreedor, y declara que cumplirá fielmente con aquellas obligaciones que en virtud de éste asume.

**SÉPTIMO: Gastos.** El Deudor pagará y reembolsará al Acreedor, a su mero requerimiento, todos los costos y gastos, si existieren, en que dicho Acreedor haya incurrido con motivo del cobro forzado de este Reconocimiento de Deuda, incluyendo los honorarios y gastos documentados de abogados.

**OCTAVO: Nulidad e Ineficacia.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez de las demás estipulaciones de este instrumento.

**NOVENO: Ley Aplicable. Domicilio y Jurisdicción.** Este Reconocimiento de Deuda se regirá y será interpretado y exigible de conformidad con las leyes de la República de Chile. Para todos los efectos legales del presente instrumento, el Deudor fija su domicilio en la ciudad de Santiago y se

somete irrevocablemente a la jurisdicción y competencia no exclusiva de los tribunales ordinarios de justicia con asiento en la ciudad y comuna de Santiago, República de Chile.

**PERSONERÍA**. [•]. La citada personería no se inserta por ser conocidas por la parte compareciente y por el Notario que autoriza. En comprobante y previa lectura firma el compareciente. Se dan copias. DOY FE.

_____
**[•]**
**p.p. ALTO MAIPO SpA**

**Exhibit E**

**Secured 2L Loan Agreement**

# Secured 2 Loan and Accounts Payable Agreement

**among**

**ALTO MAIPO SpA**
**(as Borrower)**

**THE SECURED 2L LENDERS PARTY HERETO**

**and**

**ITAÚ CORPBANCA NEW YORK BRANCH,**

**(as 2L Administrative Agent)**

**Dated as of [●], 2022**

# TABLE OF CONTENTS

Article/
Section                          Item                                                                    Page No.

ARTICLE I            Definitions and Interpretation ........................................................................3

   Section 1.01.    Definitions.  : ...........................................................................................3
   Section 1.02.    Financial Calculations; Interpretation; Business Day Adjustment.................10
   Section 1.03.    Conflict with Common Terms Agreement....................................................10

ARTICLE II           The Secured 2L Loans ...................................................................................11

   Section 2.01.    The Secured 2L Loans....................................................................................11
   Section 2.02.    Interest. .........................................................................................................11
   Section 2.03.    Chilean Law Notes and Acknowledgments of Debt. ....................................12
   Section 2.04.    Repayment......................................................................................................15
   Section 2.05.    Prepayment.....................................................................................................15
   Section 2.06.    Fees and Other Payments. .............................................................................16
   (Section 2.07.   Currency and Place of Payments....................................................................16
   Section 2.08.    Reimbursement of Expenses. .........................................................................17
   Section 2.09.    Increased Costs...............................................................................................17
   Section 2.10.    [Reserved] ......................................................................................................18
   Section 2.11.    Taxes. .............................................................................................................18
   Section 2.12.    Illegality..........................................................................................................19

ARTICLE III          2L Debt Exchange..........................................................................................20

   Section 3.01.    2L Debt Exchange Option...............................................................................20
   Section 3.02.    Exchange Option Process................................................................................20
   Section 3.03.    Breach of Exchange........................................................................................20
   Section 3.04.    Promissory Note..............................................................................................21

ARTICLE IV           Common Terms ..............................................................................................21

   Section 4.01.    Representations and Warranties. ....................................................................21
   Section 4.02.    Covenants. ......................................................................................................21
   Section 4.03.    Events of Default............................................................................................21

ARTICLE V            The 2L Administrative Agent .........................................................................22

   Section 5.01.    Appointment and Authorization of 2L Administrative Agent. .....................22
   Section 5.02.    Delegation of Duties of the 2L Administrative Agent. ..................................23
   Section 5.03.    Liability of the 2L Administrative Agent.  .....................................................24
   Section 5.04.    Reliance by the 2L Administrative Agent. .....................................................24
   Section 5.05.    Notice of Default; Other Notices....................................................................24
   Section 5.06.    Credit Decision...............................................................................................25

43584870.1

[AM_ACTIVE 403871367_4]

Section 5.07.    Indemnification of the 2L Administrative Agent.

Section 5.08.    2L Administrative Agent in Individual Capacity. ..........................................26

Section 5.09.    Successor 2L Administrative Agent.  ...........................................................26

Section 5.10.    Allocation of Funds.  ...................................................................................27

Section 5.11.    U.S.A. Patriot Act. ......................................................................................28

ARTICLE VI    Miscellaneous ..................................................................................................28

Section 6.01.    Notices.  ......................................................................................................28

Section 6.02.    Term of Agreement. .....................................................................................29

Section 6.03.    Saving of Rights. ..........................................................................................29

Section 6.04.    Enforcement.  ...............................................................................................29

Section 6.05.    Successors and Assignees. . .........................................................................29

Section 6.06.    Disclosure of Information.  . .........................................................................31

Section 6.07.    Amendments, Waivers and Consent.  ...........................................................31

Section 6.08.    Counterparts. ...............................................................................................31

Section 6.09.    English Language. ........................................................................................31

Section 6.10.    Entire Agreement.. .......................................................................................32

Section 6.11.    No Third Party Beneficiaries.......................................................................32

Section 6.12.    Amendment and Restatement.  ....................................................................32

43584870.1

SCHEDULES

SCHEDULE 1          CFADS Calculation

EXHIBIT

EXHIBIT A          FORM OF CHILEAN LAW ALLONGE

EXHIBIT B          FORM OF ACKNOWLEDGMENT OF DEBT

[EXHIBIT C          FORM OF ASSIGNMENT AGREEMENT]

[EXHIBIT D          FORM OF ACCESSION AGREEMENT]

[EXHIBIT E          FORM OF 2L SHARE CONVERSION AGREEMENT]

43584870.1

[AM_ACTIVE 403871367_4]

# SECURED 2L LOAN AND ACCOUNTS PAYABLE AGREEMENT

This **SECURED 2L LOAN AND ACCOUNTS PAYABLE AGREEMENT** (this "Agreement"), dated as of [●], 2022, is entered into by and among:

(1)    **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower");

(2)    **EACH SECURED 2L LENDER THAT BECOMES A PARTY HERETO ON THE DATE HEREOF AND FROM TIME TO TIME**; and

(3)    **ITAÚ CORPBANCA NEW YORK BRANCH**, a branch domiciled in New York, New York of Itaú Corpbanca (in its capacity as administrative agent on behalf of the Secured 2L Lenders, the "2L Administrative Agent").

## RECITALS

**WHEREAS,** the Borrower is undertaking the construction, completion, ownership and operation of the Project;

**WHEREAS**, the Borrower and Inter-American Development Bank, acting through its agent the Inter-American Investment Corporation ("IDB"), entered into, and IDB disbursed loans under, that certain Second Amended and Restated Loan Agreement, dated as of May 8, 2018 (as previously amended, the "Second Amended and Restated IDB Loan Agreement");

**WHEREAS**, the Borrower and United States International Development Finance Corporation, an agency of the United States of America (as successor in interest to Overseas Private Investment Corporation pursuant to the Better Utilization of Investments Leading to Development Act of 2018, 22 U.S.C. §§9601 et seq.), "DFC") entered into, and DFC disbursed loans under, that certain Second Amended and Restated OPIC Finance Agreement, dated as of May 8, 2018 (as previously amended, the "Second Amended and Restated DFC Finance Agreement");

**WHEREAS**, the Borrower, Banco de Crédito e Inversiones S.A., a bank organized and existing under the laws of the Country ("BCI"); Itaú Corpbanca, a bank organized and existing under the laws of the Country ("Itaú Corpbanca"); Itaú Corpbanca New York Branch, a branch domiciled in New York, New York ("Itaú NY"); DNB Bank ASA, a bank organized and existing under the laws of Norway ("DNB"), together with the other Commercial Lenders (as defined therein) from time to time party thereto, entered into, and the Commercial Lenders disbursed loans under, that certain Second Amended and Restated Loan

43584870.1

1

Agreement, dated as of May 8, 2018 (as previously amended, the "Second Amended and Restated Commercial Banks Loan Agreement");

**WHEREAS**, the Borrower and Deutsche Bank AG, London Branch, each 2018 Senior Lender (as defined therein) from time to time party thereto, and Itaú NY, as 2018 Paying Agent, entered into, and the 2018 Senior Lenders disbursed loans under, that certain 2018 Loan Agreement dated as of May 8, 2018 (as previously amended, "2018 Loan Agreement");

**WHEREAS**, the Borrower and DNB Bank ASA entered into that certain 2002 ISDA Master Agreement dated as of December 9, 2013; the Borrower and Itaú Corpbanca entered into that certain 2002 ISDA Master Agreement dated as of December 9, 2013; the Borrower and KfW IPEX-Bank GmbH entered into that certain 2002 ISDA Master Agreement dated as of December 9, 2013; the Borrower and BCI entered into that certain 2002 ISDA Master Agreement dated as of December 9, 2013 (together, in each case as previously amended, the "Interest Rate Hedge Agreements"), and which were terminated by notice from the hedge providers under each Interest Rate Hedge Agreement to the Borrower on November 19, 2021 resulting in a Termination Payment Amount (as defined therein) equal to $183,386,694.36;

**WHEREAS**, the Borrower and Strabag SpA, a *sociedad por acciones* organized under the laws of the Republic of Chile entered into that certain Supplier Deferred Payment Agreement dated as of May 8, 2018 (as previously amended, the "Supplier Deferred Payment Agreement" and, together with the Interest Rate Hedge Agreements, the 2018 Loan Agreement, the Second Amended and Restated Commercial Banks Loan Agreement, the Second Amended and Restated DFC Finance Agreement, and the Second Amended and Restated IDB Loan Agreement, the "Existing Debt Documents");

**WHEREAS,** on November 17, 2021, each of the Borrower and Alto Maipo Delaware LLC commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Court");

**WHEREAS,** the execution and delivery of this Agreement is a condition precedent to Plan Effective Date of a chapter 11 plan of reorganization of the Borrower approved by the Court pursuant to which it will exit the Bankruptcy Cases;

**WHEREAS**, on the Effective Date, the aggregate total amount of $[●] of existing debt obligations under the Existing Debt Documents (the "Prior Senior Debt") is being (i) amended and restated into Secured 1L Loans in an amount equal to $[●], (ii) converted into Secured 1L Notes in an amount equal to $[●], (iii) amended and restated into Secured 2L Loans in an amount equal to $[●] subject to and governed by the terms of this Agreement, and (iv) converted into Secured 2L Notes in an amount equal to $[●];

43584870.1

[AM_ACTIVE 403871367_4]

**WHEREAS**, the Stamp Tax applicable to the Existing Debt Documents (other than the Supplier Deferred Payment Agreement and the Interest Rate Hedge Agreements) and related Chilean Law Notes was duly and timely paid at the highest then applicable rate, and accordingly no additional Stamp Tax needs to be paid in connection with the loans evidenced thereby and being converted, amended and restated into Secured 1L Loans and Secured 2L Loans;

**WHEREAS**, the Interest Rate Hedge Agreements are not subject to Stamp Tax according to Chilean laws and regulations and the Supplier Deferred Payment Agreement does not evidence money credit operations (*operaciones de crédito de dinero*) per the terms of Chilean Law No. 18,010 of 1981 (as amended) and accordingly, no Stamp Tax was applicable to the Existing Accounts Payable Agreements and no additional Stamp Tax needs to be paid in connection with the accounts payable evidenced thereby and being converted, amended and restated into Secured 1L Loans and Secured 2L Loans, other than with respect to the Chilean  Law Notes issued to evidence such indebtedness of the Borrower in connection thereto;

**NOW THEREFORE**, in consideration of the foregoing, the Secured 2L Lenders are willing to maintain the Secured 2L Loans upon the terms and conditions set forth in this Agreement and the other Secured Debt Documents.

## ARTICLE I

### Definitions and Interpretation

Section 1.01.  *Definitions*.  Wherever used in this Agreement, and except as otherwise defined herein, terms defined in the Common Terms Agreement shall have the meaning ascribed to them therein, and the following terms have the meanings opposite them:

| | |
|---|---|
| "2L Administrative Agent" | Itaú Corpbanca, New York Branch |
| "2L Capitalizations" | the capitalization of accrued and unpaid interest on the Secured 2L Loans (including each interest accrued and unpaid on each previous 2L Capitalization). |
| "2L Loan-to-Debt Exchange" | has the meaning provided to such term under Section 3.01 of this Agreement. |
| "2L Interest Period" | each period of six (6) months, in each case beginning on an 2L Payment Date and ending on the day immediately before the next following 2L Payment Date. |

43584870.1

3

"2L Maturity Date"  October 15, 2052[1].

"2L Payment Date"  means April 15 and October 15 in each year.

"2L Refinancing Debt"  debt incurred by the Borrower that is the result of an extension, renewal or refinancing of the Secured 2L Loans or the Secured 2L Notes outstanding, in full or in part, and any refinancing, refunding, renewal, replacement or extension thereof.

"2L Share Conversion Agreement"  means the form of share conversion agreement attached hereto as Exhibit F.

"Additional Interest"  means fifty percent (50%) of the positive difference (if any), calculated as of December 31 of each calendar year, resulting from:

(x) Cash Flow Available for Debt Service for the calendar year ending on December 31 <u>minus</u>

(y) projected Cash Flow Available for Debt Service for the same calendar year as reflected in <u>Schedule 1</u>.

"Cash Flow Available for Debt Service"  for any period, the amount that is equal to:

(i)  all revenues received by the Borrower in relation to contracted or spot market sales of capacity and energy, including any other electricity related payments such as ancillary or complementary services, net of any payments required by the CEN; <u>plus</u>

(ii)  all revenues received by the Borrower in relation to any Battery Storage Project; <u>plus</u>

(iii)  all reimbursements or refunds of VAT received by the Borrower that were previously expensed and paid (other than Recoverable VAT to the extent it shall be used to repay the VAT Loan pursuant to the terms of the VAT Loan Agreement or the Secured 2L Debt pursuant to the terms of the Onshore Accounts Agreement); <u>plus</u>

(iv)  all (A) interest earned on Project Accounts, and

---

[1] NTD: Subject to further review.

43584870.1

4

(B) other payments received by the Borrower under the Project Documents and deposited into the Offshore Revenue Account (as defined in the Offshore Accounts Agreement) or Onshore Revenue Account (as defined in the Onshore Accounts Agreement), as applicable (other than Termination Proceeds and Dispute Resolution Proceeds (as both terms are defined in the Common Terms Agreement); <u>plus</u>

(v)    any business interruption insurance proceeds paid to the Borrower; provided that such proceeds are received by the Borrower during the same measurement period as the insured business interruption event occurred; <u>less</u>

(vi)    operating and maintenance expenses, including pursuant to the O&M Agreement, the Energy and Capacity Losses Compensation Agreement, the Shared Facilities Agreement and the Connection and Toll Agreement (other than the Contingent Intercompany Payments and, until the date paid in cash, the Sponsor Deferrals); <u>less</u>

(vii)    insurance premiums payable by the Borrower (to the extent not already included in clause (vi) above); <u>less</u>

(viii)    any de-watering expenditure (without double-counting any expenses captured in clause (vi) above); <u>less</u>

(ix)    capital expenditures permitted under the Common Terms Agreement; <u>less</u>

(x)    CNM Arbitral Award Proceeds (to the extent captured in clauses (i) through (v)); <u>less</u>

(xi)    any Taxes paid by the Borrower[2].

"Common Terms Agreement"    the Third Amended and Restated Common Terms Agreement, dated as of the date hereof, by and among the Borrower, each Secured Creditor Representatives,

---

[2] NTD: Subject to further review.

43584870.1

5

as defined therein, and Itaú Corpbanca in its capacity as intercreditor agent [for the benefit of the Secured Parties].

"Exchange Option"    Shall have the meaning provided to such term under Section 3.01

"Exchange Option Date"    means March [_] 2023, and thereafter, on each subsequent anniversary of such date, subject to the Exchange Option Limitation.

"Exchange Option Limitation"    means, for each Secured 2L Lender (or group of affiliated Secured 2L Lenders), no more than four (4) exercises, in the aggregate, of the Exchange Option.

"Excluded Taxes"    with respect to any of the Secured 2L Lenders or any other Person to whom the Borrower is obligated to make any payment under this Agreement or any other Financing Document related to the Secured 2L Loan, (a) Taxes imposed on or measured by its net income (however denominated), franchise Taxes and branch profits Taxes, in each case, imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or in which it has or maintains a permanent office or establishment or, in the case of any Secured 2L Lender, in which its applicable lending office is located, (b) Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction of the Authority imposing such Tax, other than a connection arising solely as a result of the arrangements contemplated under this Agreement or under any other Financing Document, (c) any withholding tax that is imposed in the Country on any payments to Secured 2L Lenders or a Participant thereof, as applicable, in excess of the amount that would have been imposed at the Chilean Preferential Withholding Rate on interest payments, (d) any United States backup withholding Tax, (e) any U.S. federal withholding Taxes imposed under FATCA, or (f) any Stamp Tax imposed as a result of a replacement of a Chilean Law Note or an issuance of a Chilean Law Note to an assignee of a Secured 2L Lender in accordance with Section 2.03(h), Section 2.03(i) and Section 2.03(j) (*Chilean Law Note*)

43584870.1

6

| "FATCA" | Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the U.S. Internal Revenue Code of 1986, as amended, any intergovernmental agreement entered into in connection with the implementation of such Sections of the U.S. Internal Revenue Code of 1986, as amended, and any fiscal or regulation legislation, rules or practices adopted pursuant to such intergovernmental agreement. |
| --- | --- |
| "Federal Funds Effective Rate" | for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero (0) for purposes of this Agreement. |
| "Increased Costs" | the amount certified in an Increased Costs Certificate to be the net incremental costs of, or reduction in return to, any Secured 2L Lender (or any Participant thereof) in connection with the making or maintaining of its Secured 2L Loan (or its Participation, as the case may be) that result from: |

(a) any enactment of any law or regulation or mandatory directive after the Effective Date or any change in any Applicable Law (including any Applicable Environmental and Social Law) or in its interpretation or application by any Authority charged with its administration;

(b) in respect of Local Banks only, any requirement (including any reserve requirement), sanction or penalty imposed by the *Comisión para el Mercado Financiero* (Financial Market Commission) on a Local Bank solely as a result of the amount of equity contributions made to the Borrower as

Subordinated Loans (rather than cash) exceeding the amount of other equity contributions made to the Borrower as of the date of delivery of a notice by the *Comisión para el Mercado Financiero* (Financial Market Commission) unless, within thirty (30) days of notice of such increased costs by the Local Bank to the Borrower, the Borrower reduces its Subordinated Loans (by conversion to equity or otherwise) to a level that would avoid such increased costs, but in no event to a level where the amount of the equity contributions made to the Borrower as cash or other assets will exceed the amount of equity contributions made to the Borrower as Subordinated Loans; or

(c)   compliance with any request from, or requirement of, any central bank or any Authority;

which, in any such case, after the Effective Date:

(i)   imposes, modifies or makes applicable any reserve, special deposit or similar requirements against assets held by, or deposits with or for the account of, or loans made by, that Secured 2L Lender (or that Participant);

(ii)   imposes a cost (other than Taxes) on that Secured 2L Lender as a result of that Secured 2L Lender having made its Secured 2L Loan (or on that Participant as a result of that Participant having acquired its Participation) or reduces the rate of return (other than with respect to Taxes) on the overall capital of that Secured 2L Lender (or that Participant) that it would have achieved had that Secured 2L Lender not made its Secured 2L Loan (or that Participant not acquired its Participation);

(iii)   changes the basis of taxation on payments received by that Secured 2L Lender in respect of its Secured 2L Loan (or by that Participant with respect to its Participation) (other than with respect to Excluded Taxes) imposed by the jurisdiction of its incorporation (or in which it books its Participation) or in any political subdivision of such jurisdiction; or

(iv) imposes on that Secured 2L Lender (or that Participant) any other condition regarding the making or maintaining of its Secured 2L Loan (or its

43584870.1

8

Participation, as the case may be);

but excluding any incremental costs of making or maintaining a Secured 2L Loan (or any Participation thereof) that are a direct result of that Secured 2L Lender (or its Participant) having its principal office in the Country or having or maintaining a permanent office or establishment in the Country, if and to the extent that permanent office or establishment acquires that Secured 2L Loan (or Participation).

"Increased Costs Certificate"  a certificate provided from time to time by any Secured 2L Lender (based on a certificate to such Secured 2L Lender from any Participant of such Secured 2L Lender, if Increased Costs affect its Participation), with a copy to the 2L Administrative Agent, certifying:

> (a)  the circumstances giving rise to the Increased Costs;

> (b)  that the costs of that Secured 2L Lender (or that Participant) have increased or the rate of return of that Secured 2L Lender (or that Participant) has been reduced;

> (c)  that such Secured 2L Lender (or such Participant) has, in its opinion, exercised reasonable efforts to minimize or eliminate the relevant increase or reduction, as the case may be; and

> (d)  the amount of Increased Costs.

"Indemnified Taxes"  Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of the Borrower hereunder or under any other Financing Document to any of the Secured 2L Lenders or the 2L Administrative Agent.

"Interest Rate"  two percent (2%) per annum.

"Loan Additional Interest"  means an amount equal to W% of the Additional Interest ("Total Loan Additional Interest"), where W is equal to:

> W = 100 times ((x) the total principal amount of Secured 2L Loans divided by (y) the total principal amount of Secured 2L Debt).

43584870.1

9

| "Note Power of Attorney" | means a power of attorney issued by the Borrower to DFC with respect to its Chilean Law Notes prior to the date of this Agreement pursuant to such DFC's Existing Debt Document. |

"Permitted Secured 2L Loan Transferee"[3]  a potential assignee of Secured 2L Loans who is

    (a)   a bank or financial institution; or

    (b)   a trust, fund or other entity that is regularly engaged or established for the purpose of making, purchasing or investing in loans, securities or other financial institutions provided that either (x) such potential assignee manages assets with a value greater than five hundred million Dollars ($500,000,000);

and provided that the minimum amount of the Secured 2L Loans to be transferred to any such potential assignee is no less than ten million Dollars ($10,000,000).

| "Relevant Change" | is defined in Section 2.11 (*Illegality*). |

| "Secured 2L Loans" | is defined in Section 2.01 (*The Secured 2L Loans*). |

| "VAT" | value added tax imposed in the Country. |

Section 1.02. *Financial Calculations; Interpretation; Business Day Adjustment*. (a) This Agreement is the Secured 2L Loan Agreement referred to in the Common Terms Agreement.

(b)    Sections 1.02 (*Financial Calculations*), 1.03 (*Interpretation*) and 1.04 (*Business Day Adjustment*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

(c)    In the context of this Agreement, and except as otherwise provided in this Agreement, any reference to "the date of this Agreement" or any similar reference, is a reference to the date of execution of this Agreement.

Section 1.03. *Conflict with Common Terms Agreement*. In the event of any conflict between the terms of this Agreement and the terms of the Common

---

[3] NTD: Subject to further review.

43584870.1

10

Terms Agreement, the terms of this Agreement will prevail as among the parties to this Agreement.

## ARTICLE II

### The Secured 2L Loans

Section 2.01.  *The Secured 2L Loans*.  On the date hereof, $[•] of the Prior Senior Debt is amended and restated as loans in an outstanding principal amount of $[•] (the "Secured 2L Loans").  The amount of Secured 2L Loans of each Secured 2L Lender as of the date hereof is specified on such Secured 2L Lender's signature page to this Agreement.  Each Secured 2L Lender agrees to continue the Prior Senior Debt evidenced by its Secured 2L Loans on the terms and conditions of this Agreement.

Section 2.02.  *Interest*.

(a)    Subject to Section 2.03 (*Default Interest Rate*) of the Common Terms Agreement, the Borrower shall pay interest on the Secured 2L Loans in accordance with this Section 2.02.

(b)    Each Secured 2L Loan (including each 2L Capitalization) shall bear interest at the Interest Rate, plus Loan Additional Interest (if any) in accordance with Section 2.02(e).

(c)    Interest on the Secured 2L Loan (including each 2L Capitalization) at the Interest Rate shall accrue from day to day beginning on the Effective Date, be prorated on the basis of a 365 or 366 day year, as the case may be, for the actual number of days in the relevant 2L Interest Period and be payable in arrears (except for amounts capitalized pursuant to Section 2.02(d) on the 2L Payment Date that such amounts would otherwise have been due and payable but for such 2L Capitalization) on the 2L Payment Date immediately following the end of that 2L Interest Period, starting from the 2L Payment Date occurring on October 15, 2022.  The interest payment due on the October 15, 2022 2L Payment Date will be for interest accrued from [the Plan Effective Date] through the end of that 2L Interest Period.

(d)    On any 2L Payment Date, if there is not adequate cash available, pursuant to the applicable priority of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement, to pay all interest accrued on the Secured 2L Loans (including each 2L Capitalization) at the Interest Rate that is due and payable on such 2L Payment Date, then the amount equal to (x) all interest accrued at the Interest Rate due and payable to the Secured 2L Lenders on such 2L Payment Date minus (y) the amount of such interest paid in cash to the Secured 2L Lenders on such 2L Payment Date shall be capitalized. For the avoidance of doubt, such capitalization shall not constitute an Event of Default.

43584870.1

(e)     On each April 15 2L Payment Date, the Borrower will pay Loan Additional Interest on the Secured 2L Loans for the calendar year immediately preceding such 2L Payment Date.  Loan Additional Interest accrues as of December 31 of each calendar year (which, for the avoidance of doubt means that, if the Secured 2L Loans are fully repaid on or prior to December 30 of any calendar year, no Loan Additional Interest shall be payable for that year). Notwithstanding anything to the contrary, all Secured 2L Loans that convert to Shares pursuant to the [2L Share Conversion Agreement] upon the occurrence of the 2L Maturity Date will accrue and be paid Loan Additional Interest for the 2052 calendar year (notwithstanding the conversion of those Secured 2L Loans to equity prior to December 31 in the 2052 calendar year).

(f)     On any April 15 2L Payment Date, if there is not adequate cash available, pursuant to the applicable priority of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement, to pay all the Loan Additional Interest then due on the Secured 2L Loans, then the amount equal to (x) the Loan Additional Interest due and payable to the Secured 2L Lenders on such April 15 2L Payment Date <u>minus</u> (y) the amount of such Loan Additional Interest paid in cash to the Secured 2L Lenders on such April 15 2L Payment Date shall be capitalized. For the avoidance of doubt, such capitalization shall not constitute an Event of Default.

Section 2.03.   <u>*Chilean Law Notes and Acknowledgments of Debt*</u>.  (a) To further evidence its obligation to repay the Prior Senior Debt, with interest accrued thereon, the Borrower has issued to the order of each Secured 2L Lender, either Chilean Law Note(s) which have been amended on the date hereof through al, onges or *hojas de prolongación* substantially in the form of <u>Exhibit A</u> (<u>*Form of Chilean Law Allonge*</u>) , or acknowledgment(s) of debt (*Reconocimiento de Deuda*) which have been amended on the date hereof through public deeds executed by the Borrower substantially in the form of <u>Exhibit B</u> (<u>*Form of Amendment to Acknowledgment of Debt*</u>).  The Borrower has also issued to DFC a Note Power of Attorney.

(b)     Each Secured 2L Lender will note on its internal records the amount of each Secured 2L Loan made by it and on the reverse side of each Chilean Law Note or on the applicable allonge or *hoja de prolongación* of each Chilean Law Note, each payment received in respect thereof, and will, prior to any transfer of any of its Chilean Law Notes, record on the reverse side thereof or on the applicable allonge or *hoja de prolongación* thereto the outstanding principal amount of its Secured 2L Loans evidenced thereby. Failure to make such notation shall not affect the Borrower's obligations in respect of such Secured 2L Loans. Each Secured 2L Lender further agrees that, notwithstanding any provision of any Chilean Law Note or acknowledgment of debt, it shall not demand payment of any amount under any Chilean Law Note (or use a Note Power of Attorney to insert the due date in a Chilean Law Note) or acknowledgment of debt unless such amount is then due and payable (whether at

43584870.1

12

stated maturity, by acceleration or otherwise) by the Borrower in accordance with the terms of this Agreement.

(c)     Each Secured 2L Lender acknowledges and agrees that (i) in the event that such Secured 2L Lender receives payment of any amounts constituting a principal installment or interest under this Agreement or any Chilean Law Notes or acknowledgment of debt, amounts due under this Agreement or the Chilean Law Notes or acknowledgments of debt, as the case may be, shall be deemed to be reduced by such paid amounts *pro tanto* and such Secured 2L Lender shall not seek enforcement of this Agreement or the Chilean Law Notes or acknowledgments of debt with respect to such paid amounts, and *vice versa*, and (ii) the aggregate amounts paid under all Chilean Law Notes and acknowledgments of debt shall not in any case exceed the aggregate amounts payable to such Secured 2L Lender pursuant to this Agreement.

(d)     Upon repayment in full of the principal and interest of its Secured 2L Loan, the relevant Secured 2L Lender shall promptly upon request of the Borrower return the relevant Chilean Law Note to the Borrower marked "cancelled" (and, if applicable in the case of a Chilean Law Note issued to DFC, together with the corresponding Note Power of Attorney).

(e)     Except as set forth below, neither the execution, delivery, participation or assignment of any Chilean Law Note or acknowledgment of debt, or the commencement of any judicial enforcement proceeding or exercise of any other right or remedy in connection with any Chilean Law Note or acknowledgment of debt, nor the total or partial collection of any Chilean Law Note or acknowledgment of debt shall be deemed to be a novation or a waiver of any right of any Secured 2L Lender under, or an amendment of any term or condition of, this Agreement or any other Financing Document, including with respect to the governing law thereof.  The rights and claims of any Secured 2L Lender under the Chilean Law Notes and acknowledgments of debt shall not replace or supersede any rights and claims of such Secured 2L Lender under this Agreement.

(f)     The Borrower hereby agrees to promptly, upon the request of any Secured 2L Lender, amend by an *hoja de prolongación* any Chilean Law Note or through an amendment deed any acknowledgment of debt delivered by the Borrower, to reflect any changes in the Secured 2L Loans in accordance with this Agreement.

(g)     Upon receipt by the Borrower of an affidavit of any Secured 2L Lender (i) certifying, to the best of its knowledge, as to the loss, theft, destruction or mutilation of any Chilean Law Note, (ii) agreeing that if the relevant Chilean Law Note is found or otherwise is in its custody or power, it shall promptly deliver such Chilean Law Note to the Borrower for cancellation and (iii) agreeing to indemnify and hold harmless the Borrower for any losses incurred by the Borrower in connection with collection procedures and payments imposed on the

43584870.1

Borrower as a result of such lost, stolen, destroyed or mutilated Chilean Law Note, then the Borrower shall execute and deliver in lieu of such lost, stolen, destroyed or mutilated Chilean Law Note (y) an acknowledgment of debt by public deed (*reconocimiento de deuda*), substantially in the form of <u>Exhibit B</u> (*Form of Acknowledgment of Debt*) or (z) a new Chilean Law Note (or series of Chilean Law Notes) in the same terms as the Chilean Law Note so replaced; <u>provided</u> that, any applicable Stamp Tax resulting from the execution and delivery of such new deed or Chilean Law Note shall be for the account of, and payable by, such Secured 2L Lender.

(h)      At any Secured 2L Lender's request, the Borrower shall promptly execute and deliver new Chilean Law Notes or an acknowledgment of debt by public deed satisfactory to such Secured 2L Lender, to substitute for the Chilean Law Notes previously delivered to such Secured 2L Lender other than any Chilean Law Note returned by Secured 2L Lender to the Borrower marked "cancelled", provided that the Borrower shall have previously or simultaneously received the Chilean Law Notes in substitution for which such Secured 2L Lender requests such new Chilean Law Notes; <u>provided</u> that, any applicable Stamp Tax resulting from the execution and delivery of such new Chilean Law Note or acknowledgment of debt by public deed shall be for the account of, and payable by, such Secured 2L Lender.

(i)      If requested by an assigning Secured 2L Lender or its assignees, the Borrower shall, to the extent any Chilean Law Note corresponding to any assigned Secured 2L Loan evidences a principal amount higher than the one being assigned, deliver to the assignee Secured 2L Lender in replacement for any Chilean Law Note previously delivered by the Borrower to the assigning Secured 2L Lender, either (*x*) a duly completed Chilean Law Note evidencing the assignee's assigned Secured 2L Loans in form and substance satisfactory to such assignee Secured 2L Lender or (*y*) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of <u>Exhibit B</u> (*Form of Acknowledgment of Debt*), evidencing the assignee's assigned Secured 2L Loans; <u>provided</u>, <u>however</u>, that if the assigning Secured 2L Lender has retained a portion of its Secured 2L Loans, upon request of the assigning Secured 2L Lender, the Borrower shall execute and deliver to such Secured 2L Lender either (i) an *hoja de prolongación* in respect of the applicable Chilean Law Note previously delivered by the Borrower to the assigning Secured 2L Lender, amending the principal amount stated therein to reflect the principal amount of the Secured 2L Loan that was retained by the assigning Secured 2L Lender, or (ii) a replacement Chilean Law Note or Chilean Law Notes, as the case may be, reflecting the principal amount of the Secured 2L Loans retained by the assigning Secured 2L Lender (such Chilean Law Note(s) to be in exchange for, but not in payment of, the Chilean Law Note(s), if any, held by such Secured 2L Lender), or (iii) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of <u>Exhibit B</u> (*Form of Acknowledgment of Debt*), reflecting the principal amount of the Senior Loans retained by the assigning Secured 2L Lender; <u>provided</u> that, the Borrower shall not be obligated to issue new Chilean Law Note(s) or replacement Chilean Law

43584870.1

14

Note(s) pursuant to this Section 2.03(i) unless the assignee Secured 2L Lender (in the case of a new Chilean Law Note) and the assigning Secured 2L Lender (in the case of a replacement Chilean Law Note) shall have agreed to pay the amount of any applicable Stamp Tax payable in order to notarize such new Chilean Law Note or replacement Chilean Law Note.]

Section 2.04. _Repayment_. (a) Subject to Section 1.04 *(Business Day Adjustment)*, Section 2.05 (*Voluntary Prepayment*) and Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement, in accordance with Section 2.04 (*Repayment*) of the Common Terms Agreement, the Borrower shall repay the Secured 2L Loans and 2L Capitalizations on each 2L Payment Date to the extent of cash available at the applicable priority of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement; provided that the entire outstanding principal amount of all Secured 2L Loans and all 2L Capitalizations of each Secured 2L Lender shall be due and payable on the 2L Maturity Date.

(b) On the 2L Maturity Date all outstanding principal amounts of Secured 2L Loans (including 2L Capitalizations) to which that 2L Maturity Date applies will be converted to Shares pursuant to the [2L Share Conversion Agreement].

(c) Any principal amount of the Secured 2L Loan repaid under this Agreement, or converted to Shares pursuant to the [2L Share Conversion Agreement] may not be re-borrowed.

(d) Notwithstanding anything to the contrary herein, the Borrower shall have no obligation to pay on the 2L Maturity Date a principal amount on the Secured 2L Loans that, when taken together with any prior prepayments of principal made on the Secured 2L Loans, would exceed the principal amount of the Secured 2L Loans.

Section 2.05. _Prepayment_. (a) Subject to the Common Terms Agreement, the Borrower shall have the right, at its option, upon fifteen (15) days' prior written notice to the Secured 2L Lenders, to prepay the Secured 2L Loan, in whole or in part, on any 2L Payment Date. Each such prepayment shall be accompanied by all accrued and unpaid interest and Increased Costs, if any, on the Secured 2L Loan, as well as any other amounts then due and payable pursuant to this Agreement.

(b) The Borrower shall prepay the Secured 2L Loans upon occurrence of the events set forth in, and to the extent required by, Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement. Each application of such amounts shall be made pro rata among the Secured 2L Lenders, allocated to each Secured 2L Lender based on such Secured 2L Lender's outstanding Secured 2L Loans.

43584870.1

(c)      [Reserved].

(d)      No prepayment premium shall be due on voluntary or mandatory prepayments pursuant to this Section 2.05.

Section 2.06.  *Fees and Other Payments*.  (a) The Borrower shall pay to the 2L Administrative Agent any customary account transfer charges incurred by the 2L Administrative Agent in the performance of its duties hereunder.

(b) In the event that the Borrower requests an amendment to or waiver of any provision of this Agreement or any other Financing Document, the Secured 2L Lenders will consider such an amendment or waiver on its merits and reserve the right to request a modification fee which, in the Secured 2L Lenders' sole discretion, shall be commensurate with the complexity and timing constraints of such amendment or waiver; *provided*, *however*, that no modification fee will be payable if the amendment or waiver is necessary: (i) to correct an error or omission in any Financing Document or (ii) in the Secured 2L Lenders' determination, to improve the operations of the Project without materially altering the risks undertaken by the Secured 2L Lenders. The Secured 2L Lenders are under no obligation to agree to any amendment or waiver.

Section 2.07.  *Currency and Place of Payments*.  (a) The Borrower shall make all payments to the 2L Administrative Agent for the account of the Secured 2L Lenders and the 2L Administrative Agent of principal, interest, fees and any other amount due to the Secured 2L Lenders and the 2L Administrative Agent under this Agreement and the other Financing Documents in accordance with Section 2.07 (*Currency and Place of Payments*) of the Common Terms Agreement, in same day funds, to the following account:

> Bank: Itaú Corpbanca New York Branch
> ABA: 026014627
> Swift Code: CONBUS33
> For the account of: Itau Corpbanca New York Branch
> Account Number: 250004000100
> Reference: Alto Maipo
> Attention: Operations Department

(b)      The payment obligations of the Borrower under this Agreement shall be discharged or satisfied only to the extent that (and as of the date when) the 2L Administrative Agent actually receives (for the account of the Secured 2L Lenders and the 2L Administrative Agent) funds in the Loan Currency in the account referred to in subsection (a) above, notwithstanding the tender or payment (including by way of recovery under a judgment) of any amount in any currency other than the Loan Currency. Accordingly, the Borrower shall, as a separate obligation or by way of indemnity, as the case may be, pay such additional amount as is necessary to enable the 2L Administrative Agent to receive (for the account of the Secured 2L Lenders and the 2L Administrative Agent), after

43584870.1

conversion to the Loan Currency at a market rate and transfer to that account, the full amount due to each Secured 2L Lender or the 2L Administrative Agent under this Agreement in the Loan Currency and in the account referred to in subsection (a) above.

(c)    Notwithstanding the provisions of Section 2.07(b), the 2L Administrative Agent (on behalf of any Secured 2L Lender) may require the Borrower, and the Borrower shall be obligated, to pay (or reimburse) the 2L Administrative Agent (for the account of such Secured 2L Lender) in any currency other than Dollars in accordance with Section 2.07(d) (*Currency and Place of Payments*) of the Common Terms Agreement.

(d)    The 2L Administrative Agent shall promptly remit payments received by it for the account of any Secured 2L Lender to the account of such Secured 2L Lender as informed in writing by such Secured 2L Lender to the 2L Administrative Agent.

Section 2.08.    *Reimbursement of Expenses*.  (a) Costs, expenses and losses incurred by any Secured 2L Lenders and the 2L Administrative Agent in connection with its Secured 2L Loan shall be subject to Section 2.08 (*Expenses*) of the Common Terms Agreement.

(b) To the extent not otherwise paid pursuant to the Common Terms Agreement, the Borrower shall pay to the 2L Administrative Agent (for the account of each Secured 2L Lender), all reasonable and documented out-of-pocket expenses incurred outside the daily course of business (including periodic travel and subsistence expenses as may be incurred in relation to bank meetings and other site visits reasonably required by any Secured 2L Lender); provided that payment of expenses incurred in relation to site visits pursuant to Section [5.01(f)] of the Common Terms Agreement shall not exceed in aggregate, for any single Secured Lender (or group of affiliated Secured Lenders), the equivalent of twenty thousand Dollars ($20,000) in any calendar year for each such Secured Lender (or group of affiliated Secured Lenders); provided, further, that if at any time there are more than 20 Secured Lenders (counting for these purposes each group of affiliated Secured 1L Lenders and Secured 2L Lenders as a single Senior Lender ), then at January 1 of each calendar year the cap for each Secured Lender (or group of affiliated Secured Lenders) for site visits will be equal to (x) four hundred thousand Dollars ($400,000) divided by (y) the total number of Secured Lenders (or groups of affiliated Secured Lenders).

Section 2.09.  *Increased Costs*.  On each 2L Payment Date, the Borrower shall pay, in addition to interest, the amount that each Secured 2L Lender from time to time notifies to the Borrower (with a copy to the 2L Administrative Agent) in an Increased Costs Certificate as being the aggregate Increased Costs of the Secured 2L Lenders and the Participants in the applicable Secured 2L Loans accrued and unpaid prior to that 2L Payment Date; provided that, the Borrower shall not be required to compensate any Secured 2L Lender (or

43584870.1

Participant) for any Increased Costs (i) incurred more than one-hundred and eighty (180) days prior to the date that such Secured 2L Lender provides the Borrower with the Increased Costs Certificate, or (ii) in excess of the amount that would have been payable by the Borrower if the Secured 2L Lenders (other than DFC) had not sold Participations in the applicable Secured 2L Loans.

Section 2.10.   [Reserved]

Section 2.11.   *Taxes*. (a) The Borrower shall pay or cause to be paid all Indemnified Taxes on or in connection with the payment of any and all amounts due under this Agreement or any other Financing Document applicable to the Secured 2L Loan that are now or in the future levied or imposed by any Authority of the Country or by any organization of which the Country is a member or any jurisdiction through or out of which a payment is made. Notwithstanding anything to the contrary herein, the Borrower shall not be required to make any payment pursuant to this Section 2.11(a) if any Secured 2L Lender or the 2L Administrative Agent makes demand for such payment more than one-hundred and eighty (180) days after the earlier of: (i) the date on which the relevant Authority makes written demand upon such Secured Party for payment of such Indemnified Taxes and (ii) the date on which such Secured Party has made payment of such Indemnified Taxes.

(b)     All payments of principal, interest, fees and other amounts due under this Agreement or any other Financing Document shall be made without deduction or withholding for or on account of any Taxes, except as required by Applicable Law.

(c)     If the Borrower is required by Applicable Law to deduct or withhold any Taxes from payments of principal or (as the case may be) interest, fees or other amounts due under this Agreement or, as the case may be, the relevant Financing Document, then the Borrower shall make such deduction or withholding and if the Tax deducted or withheld is an Indemnified Tax, the sum payable shall be increased to such amount as may be necessary so that the applicable Secured 2L Lender or the 2L Administrative Agent receives the full amount that it would have received (taking into account any Indemnified Taxes payable on amounts payable by the Borrower under this clause (c)) had those payments been made without that deduction. If any Secured 2L Lender or the 2L Administrative Agent so requests, the Borrower shall deliver to the requesting Secured Party, within thirty (30) days of the date of such request, with a copy to the 2L Administrative Agent, official tax receipts evidencing payment (or certified copies of them) or other evidence of such payment reasonably satisfactory to the applicable Secured Party.

(d)     Each Secured 2L Lender agrees to use commercially reasonable efforts to cooperate with the Borrower (but without the obligation to incur costs or expenses) in completing any procedural formalities necessary for the Borrower (and notified in writing by the Borrower to the Secured 2L Lender in sufficient

43584870.1

time to enable such Secured 2L Lender to so cooperate) to obtain authorization to make any payment to which that Secured 2L Lender is entitled without deduction or withholding or at a reduced rate of withholding, including cooperation in obtaining the following certificates, documents or information, to the extent applicable: (i) in the case of a Secured 2L Lender or any Participant thereof that is a foreign non-resident bank for Chilean tax purposes, evidence requested by the Borrower that demonstrates such status, to determine if any such Secured 2L Lender, or any such Participant thereof is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party, (ii) in the case of a foreign non-resident financial institution for Chilean tax purposes other than DFC, and to the extent that such foreign non-resident financial institution is not registered but has approved in writing to be registered in the special registry kept by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) referred to in its Circular No. 27 of 2008 (as amended), the certificates and information required by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) in Exempt Resolution No. 95 of 2021 (as amended) and other related Chilean Internal Revenue Service instructions to determine if a Secured 2L Lender (other than DFC) or any Participant is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party (including articles of incorporation and audited financial statements of the foreign non-resident financial institution); (iii) IRS Form W-9, W-8BEN, W-8ECI, W-8IMY (with accompanying forms) or other applicable Form W-8 to determine if such Secured 2L Lender or Participant is subject to U.S. backup withholding or information reporting requirements, (iv) in the case of a Secured 2L Lender or Participant that is eligible to benefit from the provisions of any Double Taxation Treaty enforced in the Country, evidence required by any contracting states of such Double Taxation Treaty in order to claim such benefits, or (v) that is reasonably requested by the Borrower, the 2L Administrative Agent or any Collateral Agent, as the case may be, to determine if such Secured 2L Lender or Participant has complied with its obligations under FATCA (including any amendments to FATCA after the date hereof that impose obligations that are not materially more onerous than the obligations in effect on the date such Secured 2L Lender becomes party to this Agreement); <u>provided</u> that, DFC will not be required to provide any such certificate, documentation or information; <u>provided</u>, <u>further</u>, that a Secured 2L Lender's failure to cooperate with the Borrower as stated herein shall not affect the Borrower's obligations under this <u>Section 2.11</u>.

Section 2.12.    *Illegality*.  If, after the date of this Agreement, any change made in any Applicable Law (including any Applicable Environmental and Social Law) (or its interpretation or application by any Authority charged with its administration) (a "<u>Relevant Change</u>") makes it unlawful for any Secured 2L Lender (or any Participant under any Secured 2L Loan) to continue to maintain its Secured 2L Loan (or such Participation, as the case may be):

(a)    the Borrower shall, upon written request by the relevant Secured 2L Lender, with a copy to the 2L Administrative Agent (but subject to any

43584870.1

applicable Authorization having been obtained), on the earlier of (i) the next 2L Payment Date, and (ii) the date that such Secured 2L Lender advises the Borrower is the latest day permitted by the Relevant Change, prepay in full that Secured 2L Loan (or, as the case may be, that part of the Secured 2L Loan that the relevant Secured 2L Lender advises corresponds to that Participation);

(b)     concurrently with the prepayment of any part of the Secured 2L Loan, the Borrower shall pay all accrued interest and Increased Costs (if any) on that part of the Secured 2L Loan; and

(c)     the Borrower agrees to take all reasonable steps to obtain, as quickly as possible after receipt of any Secured 2L Lender's request for prepayment, the Authorization referred to in <u>Section 2.12(a)</u> if any such Authorization is then required.

## ARTICLE III
## 2L Loan-to-Note Exchange

Section 3.01. <u>2L Loan-to-Note Exchange Option</u>. The Borrower irrevocably grants each of the Secured 2L Lenders an option (the "<u>Exchange Option</u>") to exchange, on each Exchange Option Date in accordance with Section 3.02, all or a portion of their then-outstanding Secured 2L Loans for Secured 2L Notes (the "<u>2L Loan-to-Debt Exchange</u>").

Section 3.02. <u>Exchange Process</u>. (a) No later than 20 Business Days before each Exchange Option Date, any Secured 2L Lender who desires to exchange some or all of its outstanding Secured 2L Loans for Secured 2L Notes on that Exchange Option Date will deliver an irrevocable Exchange Exercise Notice to the Borrower. (b) On each Exchange Option Date for which an Exchange Exercise Notice has been delivered, the 2L Loan-to-Debt Exchange will be evidenced by an Additional Note, pursuant to Section 2.1(d) of the Secured 2L Indenture, and a Supplemental Indenture will be issued, in accordance with the Secured 2L Indenture. (c) On the Exchange Option Date, the Secured 2L Lender shall receive Secured 2L Notes in an aggregate principal amount equal to the aggregate principal amount of the Secured 2L Loans [(excluding accrued interest)] being exchanged on such date pursuant to the 2L Loan-to-Debt Exchange. (d) Each Exchange Exercise Notice must be for an amount no less than twenty-five million Dollars (US$25,000,000) (or, if less, the total outstanding amount of a Secured 2L Lender's Secured 2L Loans).

Section 3.03. <u>Remedies</u>. Without limiting the remedies available to the Secured 2L Lenders under this Agreement, any other Financing Document and otherwise (and to the maximum extent permitted by Applicable Law) if the Borrower fails to consummate any 2L Loan-to-Notes Exchange in accordance with any Exchange Exercise Notice delivered by a Secured 2L Lender, such Secured 2L Lender shall be entitled to, but not limited to, specific performance.

43584870.1

20

Section 3.04.  Stamp Tax. Any Stamp Tax payable in connection with the issuance of Notes to Secured 2L Lenders as a result of a 2L Loans-to-Notes Exchange shall be paid in full by the Borrower up to 0.8% over the original principal amount of the Secured 2L Notes being converted (which is the effective rate as of the date hereof).

## ARTICLE IV
## Common Terms

Section 4.01.  *Representations and Warranties*.  (a)  The representations and warranties set out in Section 3.01 (*Representations and Warranties*) of the Common Terms Agreement shall be made on the date hereof, *mutatis mutandis*, for the benefit of the Secured 2L Lenders and the 2L Administrative Agent as if set out in this Agreement in full.

(b)  The Borrower acknowledges that the 2L Administrative  Agent and the Secured 2L Lenders enter into this Agreement and the other Financing Documents, and that the Secured 2L Lenders agreed to amend and restate the terms of the Secured 2L Loans as stated herein on the basis of, and in full reliance on, each of the representations and warranties referred to in Section 3.01 (*Representations and Warranties*) of the Common Terms Agreement.

Section 4.02.  *Covenants*.  So long as any amount of any Secured 2L Loan is outstanding under any of the Financing Documents, the covenants set out in Article V (*Particular Covenants*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, for the benefit of the Secured 2L Lenders as if set out in this Agreement in full.

Section 4.03.  *Events of Default*.  (a)  The Events of Default set out in Section 6.02 (*Events of Default*) of the Common Terms Agreement (which Events of Default are incorporated herein by reference as if fully set forth herein) shall each constitute an event of default under this Agreement.

(b)  If any Event of Default occurs and is continuing (whether it is voluntary or involuntary, or results from operation of law or otherwise), each Secured 2L Lender may, by notice to the Borrower, require the Borrower to repay its Secured 2L Loan in full or such part of its Secured 2L Loan as is specified in that notice.  On receipt of any such notice, the Borrower shall immediately repay such Secured 2L Loan (or that part of such Secured 2L Loan specified in that notice) and pay all interest accrued on it and any other amounts then payable under this Agreement and the other Financing Documents.  The Borrower waives any right it might have to further notice, presentment, demand or protest with respect to that demand for immediate payment and the Secured 2L Lenders' remedies.

43584870.1

[AM_ACTIVE 403871367_4]

## ARTICLE V

### The 2L Administrative Agent

Section 5.01.   *Appointment and Authorization of 2L Administrative Agent*.

(a)    Each Secured 2L Lender hereby irrevocably appoints, designates and authorizes the 2L Administrative Agent to take such action on its behalf under the provisions of this Agreement as are expressly mentioned in this Agreement and any Financing Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any such Financing Document.

(b)    Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any Financing Document, the 2L Administrative Agent:

(i)    shall not have any duties or responsibilities except those expressly set forth herein and in the Financing Documents, nor shall the 2L Administrative Agent have or be deemed to have any fiduciary relationship with any Secured 2L Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Financing Document or otherwise exist against the 2L Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "2L Administrative Agent" in this Agreement with reference to the 2L Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead, such terms are used merely as a matter of market custom, and are intended to create or reflect only a relationship between independent contracting parties;

(ii)    shall not be required to initiate or conduct any litigation or collection proceedings under any Financing Document;

(iii)    shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, other evidence of indebtedness or other paper or document, but the 2L Administrative Agent, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if it shall determine to make such further inquiry or investigation, it shall incur no liability or additional liability of any kind by reason of such inquiry or investigation;

43584870.1

(iv)    shall have no responsibility or liability for special, indirect, exemplary, incidental or consequential loss, expense or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the 2L Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(v)    shall not be required to expend or risk its own funds or otherwise incur financial liability for the performance of any of its duties hereunder or the exercise of any of its rights or powers if it shall have grounds for believing that the repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(vi)    shall have no duty (A) to see to any recording, filing, or depositing of this Agreement or any agreement referred to herein or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind or (D) to confirm or verify the contents of any reports or certificates delivered to the 2L Administrative Agent pursuant to any Financing Document believed by the 2L Administrative Agent to be genuine and to have been signed or presented by the proper party or parties; and

(vii)    shall not be required to give any bond or surety in respect of the powers granted hereunder.

(c)    Delivery of reports, information and documents to the 2L Administrative Agent shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including any entity's compliance with any covenants under any Financing Document. The 2L Administrative Agent shall not be obligated to monitor or confirm, on a continuing basis or otherwise, any other party's compliance with the covenants described in any Financing Document or with respect to any reports or other documents filed under any other Financing Document.

Section 5.02.  *Delegation of Duties of the 2L Administrative Agent*.  The 2L Administrative Agent may execute any of its duties under this Agreement or any Financing Document by or through agents or attorneys-in-fact with consent of the Secured 2L Lenders and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The 2L Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

43584870.1

[AM_ACTIVE 403871367_4]

Section 5.03. _Liability of the 2L Administrative Agent_.    The 2L Administrative Agent shall not (a) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Secured 2L Lender or any other Person for any recital, statement, representation or warranty made by the Borrower or any Affiliate, or any officer thereof, contained in this Agreement or in any other Transaction Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the 2L Administrative Agent under or in connection with, this Agreement or any other Transaction Document, or for the value of or title to any Security, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Transaction Document, or for any failure of the Borrower or any other party to any Transaction Document to perform its obligations hereunder or thereunder.  The 2L Administrative Agent shall not be under any obligation to any Secured 2L Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Transaction Document, or to inspect the properties, books or records of the Borrower or any Affiliate.

Section 5.04. _Reliance by the 2L Administrative Agent_.    The 2L Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, electronic mail or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the 2L Administrative Agent with reasonable care.  The 2L Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document (a) if such action would, in the opinion of the 2L Administrative Agent, be contrary to Applicable Law or the terms of this Agreement or any Financing Document or (b) if such action is not specifically provided for in this Agreement or the Financing Documents to which the 2L Administrative Agent is a party, and it shall not have received such advice or instruction of the Intercreditor Agent or the Secured 2L Lenders as it deems appropriate. The 2L Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or consent of the Intercreditor Agent or the Secured 2L Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Secured 2L Lenders.

Section 5.05. _Notice of Default; Other Notices_.  The 2L Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Event of Default or Event of Default (notwithstanding any other relationship with the Borrower, whether as quotaholder, financial advisor or otherwise) unless the 2L Administrative Agent shall have received written notice

43584870.1

from a Secured 2L Lender, the Intercreditor Agent or the Borrower referring to the Common Terms Agreement or this Agreement, as applicable, describing such Potential Event of Default or Event of Default. The 2L Administrative Agent shall take such action with respect to such Potential Event of Default or Event of Default as may be requested by the Secured 2L Lenders in accordance with the terms of this Agreement; provided that unless and until the 2L Administrative Agent has received any such request, the 2L Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Potential Event of Default or Event of Default as it shall deem advisable or in the best interest of the Secured 2L Lenders.

Section 5.06.  *Credit Decision*.  Each Secured 2L Lender acknowledges that the 2L Administrative Agent has not made any representation or warranty to it, and that no act by the 2L Administrative Agent hereafter taken, including any review of the Project or of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the 2L Administrative Agent to any Secured 2L Lender.  Each Secured 2L Lender represents to the 2L Administrative Agent that it has, independently and without reliance upon the 2L Administrative Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, the Project, the value of and title to any Security, and all Applicable Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Secured 2L Lender also represents that it will, independently and without reliance upon the 2L Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Financing Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the Project.  Except for notices, reports and other documents expressly required pursuant to any Financing Document to be furnished to the Secured 2L Lenders by the 2L Administrative Agent, the 2L Administrative Agent shall not have any duty or responsibility to provide any Secured 2L Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower and the Project that may come into the possession of the 2L Administrative Agent.

Section 5.07.  *Indemnification of the 2L Administrative Agent*.   (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold the 2L Administrative Agent harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, charges, expenses or disbursements (including the documented fees and expenses of their counsel) of any kind or nature whatsoever that may at any time (including at any time following repayment of

43584870.1

25

the Secured 2L Loans or the termination, resignation or replacement of the 2L Administrative Agent or any Secured 2L Lender) be imposed on, incurred by or asserted by a third party or by the Borrower against any such Person in any way relating to or arising out of this Agreement or any other Transaction Document, including the Security Documents and any other document or instrument contemplated by or referred to herein or therein, or the transactions contemplated hereby and thereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to the exercise by the 2L Administrative Agent of any of its respective rights or remedies under any of the Financing Documents, and any investigation, litigation or proceeding (including any bankruptcy, insolvency, reorganization or other similar proceeding or appellate proceeding) related to this Agreement or any other Transaction Document or the Secured 2L Loans, or the use of the proceeds thereof, whether or not any such Person is a party thereto; <u>provided</u> that the Borrower shall have no obligation hereunder to any such Person with respect to (i) the 2L Administrative Agent resulting directly from the gross negligence or willful misconduct of the 2L Administrative Agent as determined in a final, non-appealable judgment by a court of competent jurisdiction and (ii) Taxes, which shall be governed solely by Section 2.11 (*Taxes*).

(b)     The obligations set forth in this Section 5.07 shall survive payment of the Secured 2L Loans and all other amounts payable to the Secured 2L Lenders hereunder or under the other Financing Documents, and the resignation or replacement of the 2L Administrative Agent.

Section 5.08.   *2L Administrative Agent in Individual Capacity*.   The 2L Administrative Agent and its affiliates may make loans to, acquire equity interests in and generally engage in any kind of financial advisory, underwriting or other business with the Borrower or its Affiliates as though the 2L Administrative Agent were not a 2L Administrative Agent hereunder and without notice to or consent of the Secured 2L Lenders.   The Secured 2L Lenders acknowledge that, pursuant to such activities, the 2L Administrative Agent or its affiliates may receive information regarding the Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such Affiliates) and acknowledge that the 2L Administrative Agent shall be under no obligation to provide such information to them. If the 2L Administrative Agent is also a Secured 2L Lender hereunder, in its capacity as Secured 2L Lender it shall have the same rights and powers under this Agreement as any other Secured 2L Lender and may exercise the same as though it were not 2L Administrative Agent, and the terms "Secured 2L Lender" and "Secured 2L Lenders" shall include the 2L Administrative Agent in its individual capacity as such.

Section 5.09.   *Successor 2L Administrative Agent*.   (a) Subject to the appointment and acceptance of a successor as provided below, the 2L Administrative Agent may resign at any time by giving ninety (90) days advance notice thereof to the Secured 2L Lenders and the Borrower, and the 2L

43584870.1

[AM_ACTIVE 403871367_4]

Administrative Agent may be removed at any time with or without cause by the Secured 2L Lenders constituting the Required Creditors (excluding, if applicable, any Secured 2L Lender that is the 2L Administrative Agent or is an affiliate of the 2L Administrative Agent).  Upon any such resignation or removal, the Secured 2L Lenders constituting the Required Creditors shall have the right to appoint a successor to the 2L Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing).  If no successor 2L Administrative Agent shall have been appointed by the Secured 2L Lenders, and shall have accepted such appointment within thirty (30) days after the resigning 2L Administrative Agent's giving of notice of resignation or the giving of any notice of removal of the 2L Administrative Agent, then the resigning 2L Administrative Agent or the 2L Administrative Agent being removed, as the case may be, may appoint a successor to the 2L Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing).  Upon the acceptance of its appointment as a successor 2L Administrative Agent hereunder, such successor 2L Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of such resigning or removed 2L Administrative Agent, and such resigning 2L Administrative Agent or removed 2L Administrative Agent shall be discharged from its duties and obligations hereunder.  The retiring 2L Administrative Agent shall, at its own cost, make available to the successor 2L Administrative Agent such documents and records and provide such assistance as the successor 2L Administrative Agent may reasonably request for the purposes of performing its functions as 2L Administrative Agent hereunder and under the Financing Documents.

(b)    After the 2L Administrative Agent's resignation, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the 2L Administrative Agent.

Section 5.10.    *Allocation of Funds*.    (a) In the event that the 2L Administrative Agent receives at any time less than the full amount then due and payable to the 2L Administrative Agent under any Financing Document in respect of the Secured 2L Loans, the 2L Administrative Agent (unless prevented by Applicable Law) shall apply and allocate such amounts on a *pari passu* basis among the Secured 2L Lenders (in proportion to the respective amounts of interest and other sums besides principal, or (as the case may be) of principal, then due and payable on and in respect of each Secured 2L Loan of such Secured 2L Lender), first to costs and expenses (if any), second to fees (if any), third to interest and any other sums besides principal then due and payable, and fourth to any principal of the Secured 2L Loans then due and payable, and the 2L Administrative Agent shall promptly provide a notice to the Secured 2L Lenders informing them of the same.

(b)    In the event the 2L Administrative Agent receives, from or on behalf of the Borrower, payments of sums due on any due date in respect of the

43584870.1

[AM_ACTIVE 403871367_4]

Secured 2L Loans but not of all sums due on all such Secured 2L Loans, and if the 2L Administrative Agent believes that full payment is expected to be made in due course of all sums due on such due date in respect of all such Secured 2L Loans, the 2L Administrative Agent may proceed to make payments with respect to the relevant Secured 2L Loans in respect of which payment has been received, notwithstanding that full payment of all such amounts has not yet been made. In the event that subsequently it appears unlikely that full payment in fact will be made within a reasonable period of time after such due date, then at the 2L Administrative Agent's request, those Secured 2L Lenders to whom such payments have been made shall reimburse such portions of those payments as may be appropriate to comply with the provisions of Section 5.10(a).

(c)    The 2L Administrative Agent shall not be obligated to make any payment to any Secured 2L Lender until the 2L Administrative Agent establishes that it has actually received such amount from the Borrower. However, if the 2L Administrative Agent makes such payment and it proves to be the case that it had not received such amount, then each Secured 2L Lender shall, on demand by the 2L Administrative Agent, promptly reimburse the sum paid to such Secured 2L Lender together with interest on the repaid amount at either (in the 2L Administrative Agent's sole discretion): (i) the overnight deposit rate determined by the 2L Administrative Agent or (ii) Federal Funds Effective Rate. This Section 5.10(c) shall survive the termination of this Agreement if, and to the extent of, any preference or similar period under any bankruptcy law applicable to the Borrower or any of its assets.

Section 5.11.   _U.S.A. Patriot Act_.  The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the 2L Administrative Agent, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the 2L Administrative Agent. Each of the parties hereto agrees that it will provide the 2L Administrative Agent with such information as it may request in order for the 2L Administrative Agent to satisfy the requirements of the U.S.A. Patriot Act.

## ARTICLE VI
## Miscellaneous

Section 6.01.   _Notices_.  Any notice, request or other communication to be given or made under this Agreement shall be given in accordance with Section 7.02 (_Notices_) of the Common Terms Agreement. The 2L Administrative Agent's, Borrower's and the Secured 2L Lenders' respective address for purpose of notices, requests and communication to be made or given under this Agreement shall be the address specified on the signature pages to this Agreement and as such party notifies to the other parties to this Agreement from time to time.

43584870.1

28

Section 6.02.  *Term of Agreement*.  This Agreement shall continue in force until all monies, excluding contingent liabilities and obligations that are unasserted at such time, payable under it have been fully paid in accordance with its provisions.

Section 6.03.  *Saving of Rights*.  Section 7.01 (*Saving of Rights*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured 2L Lenders and the 2L Administrative Agent and each reference to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

Section 6.04.  *Enforcement*.  (a)  This Agreement is governed by, and shall be construed in accordance with, the laws of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)  Section 7.06(b) through and including (l) (but excluding clause (j)) (*Applicable Law and Jurisdiction*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured 2L Lenders and the 2L Administrative Agent and each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

Section 6.05.  *Successors and Assignees*. (a) This Agreement binds and benefits the respective successors and assignees of the parties.  However, the Borrower may not assign or delegate any of its rights or obligations under this Agreement without the prior consent of the 2L Administrative Agent (acting on instructions of the Secured 2L Lenders constituting the Required Creditors).

(b)  Each Secured 2L Lender shall be entitled to sell, transfer, assign, novate or otherwise dispose of all or part of its rights or obligations under this Agreement (including by granting of Participations) subject to the following terms and conditions:

(i)     with the consent of DFC and the Borrower (such Borrower consent not to be unreasonably withheld, conditioned or delayed); provided that any assignment to a Person who is not a bank or financial institution shall be to a Permitted Secured 2L Loan Transferee or a fund that meets the requirements in clause (b) of the definition of Permitted Secured 2L Loan Transferee;

(ii)    at any time, upon the occurrence and continuation of an Event of Default, with the consent of DFC (other than to another Secured 2L Lender);

43584870.1

29

(iii)    in each case (other than a Participation) such sale, transfer, assignment, novation or disposition shall be documented by an Assignment Agreement substantially in the form of Exhibit C (*Form of Assignment Agreement*) (or such other form acceptable to the transferring Secured 2L Lender) and as provided in Section 2.03(j);

(iv)    in each case (other than a Participation) such assignee, transferee or novatee will execute and deliver an accession agreement in the form of Exhibit D (*Form of Accession Agreement*) and will provide to the Borrower any information required pursuant to Section 2.11(d); and

(v)    in each case (other than a Participation), such Secured 2L Lender shall provide written notice of the identity and contact information of the assignee, transferee or novatee to the Borrower and the 2L Administrative Agent, who will in turn promptly notify the Intercreditor Agent.

(c)    (i) The consent of DFC to an assignment pursuant to this Section 6.05 shall not be denied if the assignment is to (x) another Secured Lender or (y) an assignee that has complied, as determined by DFC, with the "Know Your Customer" and character risk due diligence requirements of DFC; provided, that in respect of clause (y) above, the assigning Secured 2L Lender shall deliver to DFC a certificate from the proposed assignee certifying that neither it, nor, in the case of a proposed assignee that is a fund, any of its manager(s), director(s) or officer(s), is included in either of (A) the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control or (B) the Specifically Designated Nations and Blocked Persons List maintained by the United States Department of the Treasury's Office of Foreign Asset Control.

(ii)    DFC shall, acting in good faith, respond to a request for consent under Section 6.05(c)(i) within the ten (10) Business Days following delivery of the certificate described in Section 6.05(c)(i) and either (x) grant or deny its consent to the proposed assignment or (y) indicate that DFC requires additional time to process the request for consent.  If DFC does not respond within such ten (10) Business Day period, the assigning Secured 2L Lender will send a second notice to DFC indicating that such ten (10) Business Day period has ended.

(iii)    If DFC has not granted or denied consent during the first ten (10) Business Day period pursuant to Section 6.05(c)(ii), it shall have a second period of ten (10) Business Days (equaling a total of twenty (20) Business Days from the date the certificate was delivered pursuant to Section 6.05(c)(i)) during which it shall,

acting in good faith, respond to the request for consent and either grant or deny its consent to the proposed assignment.  If DFC has not granted or denied a request for consent by the end of such aggregate period of twenty (20) Business Days, its consent will be deemed to have been given.

(iv)    Notwithstanding the above, if the assignment occurs upon the occurrence and continuation of an Event of Default, the consent of DFC to the proposed assignment shall be deemed given upon delivery by the assigning Secured 2L Lender, as applicable, to DFC of the certificate referred to in <u>Section 6.05(c)(i)</u>.

(v)    [In the event that an assignment by Secured 2L Lender results, at the time of such assignment, for the Borrower in increased costs under Section 2.11 (*Taxes*) exceeding those that the Borrower would have been required to pay the assigning Secured 2L Lender absent such assignment, if the assignment is made to a Person that is subject to withholding tax in the Country at a rate higher than the Chilean Preferential Withholding Rate applicable at the time of assignment, the assignee Secured 2L Lender shall be responsible for payment of any amounts payable in excess of the Chilean Preferential Withholding Rate.][4]

Section 6.06.  *Disclosure of Information*.   Section 7.07 (*Disclosure of Information*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured 2L Lenders and the 2L Administrative Agent and each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

Section 6.07.  *Amendments, Waivers and Consent*.  Any amendment or waiver of, or any consent given under, any provision of this Agreement shall be in writing and, in the case of an amendment, signed by the parties to this Agreement (or by the Borrower and the 2L Administrative Agent, acting on instructions of the Secured 2L Lenders constituting the Required Creditors).

Section 6.08.  *Counterparts*.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

Section 6.09.  *English Language*.  (a)  All documents to be provided or communications to be given or made under this Agreement may be in the Spanish or English language.

---

[4] NTD: Subject to further review.

43584870.1

(b)     To the extent that the original version of any document to be provided, or communication to be given or made, to any Secured 2L Lender or the 2L Administrative Agent under this Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative to be a true and correct translation of the original.  The parties hereto acknowledge that this Agreement was negotiated and executed in the English language.  Any Secured 2L Lender or the 2L Administrative Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 6.10.  *Entire Agreement*.   This Agreement and the other Financing Documents represent the final and complete agreement of the parties hereto with respect to the financing of the Project, and all prior negotiations, representations, understandings, writings and statements of any nature with respect thereto are hereby superseded in their entirety by the terms of this Agreement and the other Financing Documents.

Section 6.11.  *No Third Party Beneficiaries*.   The agreement of each Secured 2L Lender to maintain its Secured 2L Loan to the Borrower on the terms and conditions set forth in this Agreement and the other Financing Documents is solely for the benefit of the Borrower, and no other Person (including any Sponsor, Shareholder, any other Project Party, or any subcontractor, supplier, worker, carrier, warehouseman or materialman furnishing supplies, goods or services to or for the benefit of the Project) shall have any rights hereunder against the 2L Administrative Agent or any Secured 2L Lender with respect to its Secured 2L Loan, the proceeds thereof or otherwise.

Section 6.12.  *Amendment and Restatement*.   This Agreement amended and restates, to the extent of the Secured 2L Loans, the Existing Debt Documents.

*[Signature pages follow]*

43584870.1

32

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed in their respective names as of the date first above written.

**ALTO MAIPO SpA,**
as Borrower

By:_____
    Name:
    Title:

[insert notice information]

43584870.1

*[Signature Page to Secured 2L Loan Agreement]*

**[INSERT SIGNATURE PAGES FOR SECURED 2L LENDERS ]**

[insert notice information]
Outstanding Principal Amount of Secured 1L
Loans: $[●]

**ITAÚ CORPBANCA NEW YORK BRANCH,**
as 2L Administrative Agent


By:_____
  Name:
  Title:

  [insert notice information]

*[Signature Page to Secured 2L Loan Agreement]*

Schedule 1

**CFADS Calculation from January 28, 2022 Borrower Base Case Financial Model**

| USD million | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | ($12,997,175) | $125,989,976 | $104,414,911 | $97,041,807 | $96,588,621 | $91,661,615 | $101,759,205 | $104,150,515 | $104,168,198 | $108,474,190 | $109,225,042 | $112,658,745 |

| Cash Flow Available for Debt Service | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $113,552,844 | $117,143,134 | $121,750,787 | $124,519,202 | $125,445,289 | $130,546,507 | $100,169,716 | $63,398,920 | $65,139,585 | $66,667,365 | $68,059,348 | $69,453,582 |

| Cash Flow Available for Debt Service | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 |
|---|---|---|---|---|---|---|---|
| Cash Flow Available for Debt Service | $70,909,646 | $72,352,863 | $73,838,086 | $75,275,050 | $76,774,969 | $78,258,994 | $79,330,149 |

Schedule 1

[AM_ACTIVE 403871367_4]

Schedule 1

[AM_ACTIVE 403871367_4]

# <u>EXHIBIT A</u>

## FORM OF CHILEAN LAW ALLONGE

[AM_ACTIVE 403871367_4]

## **EXHIBIT B**

## **FORM OF ACKNOWLEDGMENT OF DEBT**

## EXHIBIT C
## FORM OF ASSIGNMENT AGREEMENT

This ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [●], 20[●] is by and between [*assigning Secured 2L Lender*] (the "Assignor") and [●] ("[●]") (the "Assignee").

## RECITALS

WHEREAS, the Assignor is party to (i) a Secured 2L Loan Agreement, dated as of [●], 2022, by and among Alto Maipo SpA (the "Borrower"), the Borrower, the Secured 2L Lenders from time to time party thereto, Itaú Corpbanca in its capacity as 2L Administrative Agent (as amended or otherwise modified as of the date hereof, the "Secured 2L Loan Agreement") and (ii) the Third Amended and Restated Intercreditor and Security Sharing Agreement, dated as of [●], 2022, among the 2L Administrative Agent, the other Agents identified therein, the Secured 2L Lenders and the other Secured Creditors from time to time party thereto (as amended or otherwise modified as of the date hereof, the "Intercreditor Agreement");

WHEREAS, Assignor proposes to sell, assign and transfer [a portion][all] of its outstanding Secured 2L Loans (as indicated in Attachment A) to the Assignee, and the Assignee proposes to accept and assume from the Assignor the rights and obligations of the Assignor relating to such Secured 2L Loans on the terms and subject to the conditions of this Agreement (such interest in these rights and obligations being hereinafter referred to as the "Assigned Interest");

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.    Definitions.  All capitalized terms used herein shall have the meanings specified in the Secured 2L Loan Agreement unless otherwise defined herein or unless the context requires otherwise.  The Assignee hereby acknowledges receipt of a copy of each of the Common Terms Agreement, the Secured 2L Loan Agreement and the Intercreditor Agreement.

Section 2.    Assignment and Assumption.

(a)    For an agreed consideration, as of the Assignment Effective Date, the Assignor irrevocably sells, transfers, conveys and assigns, without recourse, representation or warranty (except as expressly set forth herein), to the Assignee the Assigned Interest set forth in Attachment A and the Assignee irrevocably purchases from the Assignor the Assigned Interest set forth in Attachment A and agrees to perform and comply with all obligations and liabilities of Assignor with respect to such Assigned Interest resulting from facts, events or circumstances arising or occurring on or after the Assignment Effective Date.

(b)    From and after the Assignment Effective Date, the Borrower shall make all

43584870.1

Exhibit C - page 1

payments in respect of the Assigned Interest (including all payments of principal, interest, fees and other amounts) to the 2L Administrative Agent for the account of the Assignee.

Section 3.    **Representations, Warranties and Undertakings**.

(a)    The Assignor (i) represents and warrants that (A) it is the legal and beneficial owner of the Assigned Interest and such Assigned Interest is free and clear of any Lien or adverse claim and (B) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and (ii) makes no representation or warranty and assumes no responsibility with respect to (A) any statements, warranties or representations made in or in connection with the Common Terms Agreement, the Secured 2L Loan Agreement, the Intercreditor Agreement or the other Financing Documents or the execution, legality, validity, enforceability or genuineness, of sufficiency or value of the Common Terms Agreement, the Secured 2L Loan Agreement, the Intercreditor Agreement, the other Financing Documents, or any other instrument or document furnished pursuant thereto or in connection therewith or (B) the financial condition of the Borrower, the Shareholder, the Sponsor or any Material Project Participant or the performance or observance by the Borrower or any other Person of any of its obligations under the Common Terms Agreement, any other Financing Document, or any other instrument or document furnished pursuant thereto or in connection therewith.

(b)    The Assignee represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a Secured 2L Lender under the Common Terms Agreement, the Secured 2L Loan Agreement, the Intercreditor Agreement and the other Financing Documents, (ii) it has, or has access to, such information as it deems appropriate under the circumstances, to make an informed decision to enter into this Agreement and to assume the Assigned Interest, (iii) it is a sophisticated entity with respect to the purchase of the Assigned Interest and it has independently and without reliance on the Assignor, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement and purchase and assume the Assigned Interest, (iv) its execution, delivery, and performance of this Agreement has not resulted and will not result in a breach or violation of any provision of (A) Assignee's organizational documents, (B) any statute, law, writ, order, rule or regulation of any Authority applicable to the Assignee, (C) any judgment, injunction, decree or determination of any Authority applicable to the Assignee or (D) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which the Assignee may be a party, by which the Assignee may be bound or to which any of the assets of the Assignee is subject, and (v) except as provided in the Common Terms Agreement or the Secured 2L Loan Agreement, no notice to, registration with, consent or approval of or any other action by any relevant Authority is, will be or was required for the Assignee to execute, deliver, and perform its obligations under this Agreement.

(c)    The Assignee acknowledges that the Assignor has not given it any investment advice or opinion on whether the decision to enter into this Agreement and to purchase and assume the Assigned Interest is prudent. Except as otherwise provided herein, the Assignee has not relied, and will not rely, on the Assignor to furnish or make available any documents or other

43584870.1

Exhibit C - page 2

[AM_ACTIVE 403871367_4]

information regarding the transaction contemplated by this Agreement. The Assignee acknowledges that (x) the Assignor currently may have, and later may come into possession of, information regarding the Assigned Interest that is not known to it and that may be material to a decision to enter into this Agreement and assume the Assigned Interest ("Excluded Information"), (y) it has determined to enter into this Agreement and purchase and assume the Assigned Interest notwithstanding its lack of knowledge of the Excluded Information, and (z) the Assignor shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the Assignor, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of the Assignor herein.

Section 4.     Effectiveness. The effectiveness of this Agreement, and the sale, assignment, assumption and transfer pursuant to Section 2 (Assignment and Assumption) hereof, is effective as of the date hereof upon the execution and delivery of this Agreement by the Assignor and the Assignee (the "Assignment Effective Date").

Section 5.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without taking into account its conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law).

Section 6.     Counterparts. This Agreement may be executed in several counterparts, each of which is an original, but all of which together shall constitute one and the same agreement. Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

Section 7.     Further Assurances. The Assignor and the Assignee hereby agree to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Agreement including, without limitation, the delivery of any notices to the Borrower that may be required in connection with the assignment contemplated hereby.

Section 8.     Binding Effect; Amendment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, subject, however, to the provisions of the Common Terms Agreement, the Intercreditor Agreement and the Secured 2L Loan Agreement. Any amendment or waiver of, or any consent given under, any provision of this Agreement shall be in writing and, in the case of any amendment, signed by the Assignor and the Assignee or their permitted successors and assigns.

Section 9.     Notices. Any notice, request or other communication to be given or made under this Agreement shall be in writing. Any such communication may be delivered by hand, airmail, facsimile or established courier service to the party's address set forth below the name of such party on the signature pages to this Agreement at such other address as such party notifies to the other parties from time to time, and will be effective upon receipt; provided that the parties may, at their election, deliver notices, requests or communications under this Agreement by e-mail to the e-mail addresses specified on the signature pages of this Agreement.

43584870.1

Exhibit C - page 3

[AM_ACTIVE 403871367_4]

<u>Section 10.</u>    <u>Confidentiality</u>. Except for disclosures required or permitted under the Secured 2L Loan Agreement, the Intercreditor Agreement and the other Financing Documents, the parties hereto shall maintain the confidentiality of the terms of this Agreement and the transactions contemplated hereby, unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose such terms to their respective affiliates, and the directors, officers, employees, agents, advisors, counsel, rating agencies, participants, sub-participants and auditors of such parties and of such parties' affiliates and in connection with the enforcement of the parties' respective rights and obligations hereunder. Either party shall be permitted to make any necessary disclosures to their respective assignees regarding the terms of this Agreement and the transactions contemplated hereby, provided that such assignees shall be subject to substantially the same confidentiality restrictions as set forth herein.

*[Signature page immediately follows]*

43584870.1

Exhibit C - page 4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first written above.

[●],
as Assignor

By:_____
    Name:
    Title:


Address for Notices:
    [_____]

[●],
as Assignee

By:_____
   Name:
   Title:


<u>Address for Notices</u>:
   [_____]

43584870.1

Exhibit C - page 6

<u>Attachment A</u>
to Assignment Agreement

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

43584870.1

Exhibit C - page 7

<u>**EXHIBIT D**</u>

**FORM OF ACCESSION AGREEMENT**

To: Itaú Corpbanca New York Branch, as 2L Administrative Agent, and Alto Maipo SpA, as Borrower.

From: [*new Secured 2L Lender*] (the "<u>Acceding Secured 2L Lender</u>")

**RECITALS**

We refer to that certain (i) Secured 2L Loan Agreement, dated as of [•], 2022, by and among Alto Maipo SpA (the "<u>Borrower</u>"), the Borrower, the Secured 2L Lenders from time to time party thereto, Itaú Corpbanca in its capacity as 2L Administrative Agent (as amended or otherwise modified as of the date hereof, the "<u>Secured 2L Loan Agreement</u>") and (ii) Third Amended and Restated Intercreditor and Security Sharing Agreement, dated as of [•], 2022, among the 2L Administrative Agent, the other Agents identified therein, the Secured 2L Lenders and the other Secured Creditors from time to time party thereto (as amended or otherwise modified as of the date hereof, the "<u>Intercreditor Agreement</u>");

WHEREAS, on the date hereof, immediately prior to the execution of this Agreement, the Acceding Secured 2L Lender assumed the Secured 2L Loans (the "<u>Transferred Loans</u>") in the amounts and as further described on <u>Attachment A</u> (*<u>Transferred Loans</u>*);

WHEREAS, the Acceding Secured 2L Lender intends to accede to the Secured 2L Loan Agreement and the Intercreditor Agreement on the terms and conditions of this Agreement.

THIS AGREEMENT WITNESSES as follows:

<u>Section 1.</u>    <u>Definitions</u>.  All capitalized terms used herein shall have the meanings specified in the Secured 2L Loan Agreement unless otherwise defined herein or unless the context requires otherwise.  The Acceding Secured 2L Lender hereby acknowledges receipt of a copy of each of the Common Terms Agreement, the Secured 2L Loan Agreement and the Intercreditor Agreement.

<u>Section 2.</u>    <u>Accession of Acceding Secured 2L Lender</u>.  Effective as of the date hereof:

(a)    the Acceding Secured 2L Lender accedes to and agrees to be bound by the terms of the Secured 2L Loan Agreement and the Intercreditor Agreement as if the Acceding Secured 2L Lender had executed and delivered the Secured 2L Loan Agreement and the Intercreditor Agreement as of the date thereof;

(b)    the Acceding Secured 2L Lender makes each of the undertakings and agreements of the Secured 2L Lenders set out in the Secured 2L Loan Agreement and the Intercreditor Agreement, and binds such Acceding Secured 2L Lender to the undertakings and agreements set out in the Secured 2L Loan Agreement and the Intercreditor Agreement;

43584870.1

Exhibit D - page 1

(c)    the Acceding Secured 2L Lender accepts each of the rights and benefits extended to Secured 2L Lenders under, and agrees to be bound by the terms of, the Financing Documents applicable to such Secured 2L Lenders, on the terms and subject to the conditions and limitations set out in such Financing Documents;

(d)    for all purposes of the Financing Documents, the Acceding Secured 2L Lender shall be a Secured Lender and the indebtedness of the Borrower under the Secured 2L Loan Agreement, including the Transferred Loans, shall be Secured Obligations; and

(e)    without limiting the generality of the foregoing, the rights of the Acceding Secured 2L Lender shall be subject to the terms and conditions of the Secured 2L Loan Agreement, the Common Terms Agreement, the Intercreditor Agreement and the other Financing Documents applicable to such Acceding Secured 2L Lender and each of the other provisions of such agreements shall apply to the Transferred Loans.

Section 3.    Representations, Warranties and Undertakings. The Acceding Secured 2L Lender hereby represents and warrants that, as of the date of this Agreement, it is duly authorized to execute this Agreement, including making the agreements expressed to be made by Senior Lenders under the Financing Documents.

Section 4.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without taking into account its conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law).

Section 5.    Binding Effect; Amendment. This Agreement shall be binding upon and inure to the benefit of the Acceding Secured 2L Lender, the Secured Creditors and the Borrower and their respective successors and assigns, subject, however, to the provisions of the Common Terms Agreement, the Secured 2L Loan Agreement and the Intercreditor Agreement.

Yours truly,

[*ACCEDING SECURED 2L LENDER*]

By:    _____

Name:    _____

Title:    _____

Address:

    [_____]

    [_____]

    Email:    [_____]

    Attention:    [_____]

43584870.1

Exhibit D - page 2

**Acknowledged**:

ITAÚ CORPBANCA,

as the 2L Administrative Agent

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

**Acknowledged**:

ALTO MAIPO SpA,

as Borrower

By:        _____

Name:      _____

Title:     _____

<u>Attachment A</u>
to Accession Agreement

43584870.1

Exhibit D - page 5

[AM_ACTIVE 403871367_4]

**Exhibit F**

**Secured 2L Indenture**

ALTO MAIPO SpA
2.00% SECOND LIEN SECURED NOTES DUE [2052][1]

_____

INDENTURE

Dated as of [●], 2022

_____

[●]

Trustee

---

[1] **NTD**: This draft Agreement is subject to ongoing discussions, final review and revision, including with respect to cross-references and conformity to other definitive documents and to the RSA.

| | | |
|---|---|---|
| 1 | DEFINITIONS AND INCORPORATION BY REFERENCE | 1 |
| | 1.1 Defined Terms | 1 |
| | 1.2 Interpretation | 9 |
| | 1.3 UCC Terms | 10 |
| | 1.4 Accounting Standards and Financial Determinations | 10 |
| 2 | THE NOTES | 10 |
| | 2.1 Form and Dating | 10 |
| | 2.2 Execution and Authentication | 12 |
| | 2.3 Registrar and Paying Agent; Depositary | 12 |
| | 2.4 Paying Agent to Hold Money in Trust | 13 |
| | 2.5 Noteholder Lists | 13 |
| | 2.6 Transfer and Exchange | 13 |
| | 2.7 Replacement Notes | 28 |
| | 2.8 Outstanding Notes | 29 |
| | 2.9 Treasury Notes | 29 |
| | 2.10 Temporary Notes | 29 |
| | 2.11 Cancellation | 30 |
| | 2.12 Defaulted Interest | 30 |
| | 2.13 CUSIP Numbers | 30 |
| | 2.14 Chilean Acknowledgement of Debt | 30 |
| | 2.15 Use of Proceeds | 31 |
| 3 | REDEMPTION AND PREPAYMENT | 32 |
| | 3.1 Notices to Trustee | 32 |
| | 3.2 Selection of Notes to Be Redeemed | 33 |
| | 3.3 Notice of Redemption | 33 |
| | 3.4 Effect of Notice of Redemption | 34 |
| | 3.5 Deposit of Redemption or Purchase Price | 34 |
| | 3.6 Notes Redeemed in Part | 34 |
| | 3.7 Optional Redemption | 35 |
| | 3.8 Mandatory Redemption by Application of Collateral Proceeds | 35 |
| | 3.9 Mandatory Redemption by Application of Excess Cash Flow or Refinancing | 35 |

[AM_ACTIVE 403928027_6]

| | | | |
|---|---|---|---|
| 4 | | COVENANTS | 35 |
| | 4.1 | Payment of Notes | 35 |
| | 4.2 | Maintenance of Office or Agency | 37 |
| | 4.3 | Reports | 37 |
| | 4.4 | Compliance Certificate | 39 |
| | 4.5 | Taxes and Tax Treatment | 39 |
| | 4.6 | Stay, Extension, and Usury Laws | 39 |
| | 4.7 | Limitation on Indebtedness | 39 |
| | 4.8 | Asset Sales | 39 |
| | 4.9 | Affiliate Transaction | 40 |
| | 4.10 | Liens | 40 |
| | 4.11 | Offer to Repurchase Upon Change of Control | 40 |
| | 4.12 | Insurance Requirements | 42 |
| | 4.13 | Security Collateral | 43 |
| | 4.14 | Fundamental Changes | 43 |
| | 4.15 | Power Purchase Agreements | 43 |
| | 4.16 | Offering Memorandum | 43 |
| | 4.17 | CEMBI Index | 43 |
| | 4.18 | Filings with the Central Bank | 43 |
| | 4.19 | Equator Principles; IFC Performance Standards | 43 |
| | 4.20 | Compliance with Law | 44 |
| | 4.21 | Pari Passu | 44 |
| | 4.22 | Project Documents | 44 |
| | 4.23 | Annual Budget | 44 |
| | 4.24 | Capital Expenditure | 45 |
| | 4.25 | OFAC; Sanctions. | 45 |
| | 4.26 | Subsidiaries and Acquisitions. | 45 |
| | 4.27 | Battery Storage Project. | 46 |
| | 4.28 | Green Bond Certification | 46 |
| 5 | | SUCCESSORS | 46 |
| | 5.1 | Merger, Consolidation, or Sale of Assets | 46 |
| | 5.2 | Successor Corporation Substituted | 46 |

[AM_ACTIVE 403928027_6]

| | | | |
|---|---|---|---|
| 6 | | DEFAULTS AND REMEDIES ............................................................ | 47 |
| | 6.1 | Events of Default ............................................................................ | 47 |
| | 6.2 | Acceleration .................................................................................... | 49 |
| | 6.3 | Other Remedies ............................................................................... | 49 |
| | 6.4 | Waiver of Past Defaults .................................................................. | 49 |
| | 6.5 | Control by Majority ........................................................................ | 50 |
| | 6.6 | Limitation on Suits ......................................................................... | 50 |
| | 6.7 | Rights of Noteholders to Receive Payment ................................... | 50 |
| | 6.8 | Collection Suit by Trustee .............................................................. | 51 |
| | 6.9 | Trustee May File Proofs of Claim .................................................. | 51 |
| | 6.10 | Priorities ......................................................................................... | 52 |
| | 6.11 | Undertaking for Costs ..................................................................... | 52 |
| 7 | | TRUSTEE ........................................................................................... | 52 |
| | 7.1 | Duties of Trustee ............................................................................. | 52 |
| | 7.2 | Rights of Trustee ............................................................................. | 53 |
| | 7.3 | Individual Rights of Trustee ........................................................... | 56 |
| | 7.4 | Trustee's Disclaimer ....................................................................... | 56 |
| | 7.5 | Notice of Defaults ........................................................................... | 56 |
| | 7.6 | Compensation and Indemnity ......................................................... | 56 |
| | 7.7 | Replacement of Trustee .................................................................. | 57 |
| | 7.8 | Successor Trustee by Merger, etc. ................................................. | 58 |
| | 7.9 | Eligibility; Disqualification ........................................................... | 58 |
| | 7.10 | Trustee Protective Provisions ......................................................... | 59 |
| 8 | | LEGAL DEFEASANCE AND COVENANT DEFEASANCE..................... | 59 |
| | 8.1 | Option to Effect Legal Defeasance or Covenant Defeasance ............ | 59 |
| | 8.2 | Legal Defeasance and Discharge .................................................... | 59 |
| | 8.3 | Covenant Defeasance ...................................................................... | 60 |
| | 8.4 | Conditions to Legal or Covenant Defeasance ................................. | 60 |
| | 8.5 | Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions.................................................................. | 61 |
| | 8.6 | Repayment to Company ................................................................... | 62 |
| | 8.7 | Reinstatement.................................................................................. | 62 |

[AM_ACTIVE 403928027_6]

| | | | |
|---|---|---|---|
| 9 | | AMENDMENT, SUPPLEMENT AND WAIVER | 63 |
| | 9.1 | Without Consent of Noteholders | 63 |
| | 9.2 | With Consent of Noteholders | 63 |
| | 9.3 | Decisions under Other Financing Documents | 65 |
| | 9.4 | Revocation and Effect of Consents | 65 |
| | 9.5 | Notation on or Exchange of Notes | 65 |
| | 9.6 | Trustee to Sign Amendments, etc. | 66 |
| 10 | | SECURITY COLLATERAL; INDEPENDENT DIRECTOR | 66 |
| | 10.1 | Secured 2L Debt | 66 |
| | 10.2 | Release of Security Collateral | 66 |
| | 10.3 | Independent Director; Organizational Documents; Special Majority Matters | 67 |
| 11 | | SATISFACTION AND DISCHARGE | 69 |
| | 11.1 | Satisfaction and Discharge | 69 |
| | 11.2 | Application of Trust Money | 70 |
| 12 | | MISCELLANEOUS | 71 |
| | 12.1 | Notices | 71 |
| | 12.2 | Certificate and Opinion as to Conditions Precedent | 72 |
| | 12.3 | Statements Required in Certificate or Opinion | 73 |
| | 12.4 | Rules by Trustee and Agents | 73 |
| | 12.5 | No Personal Liability of Directors, Officers, Employees and Stockholders | 73 |
| | 12.6 | Applicable Law, Jurisdiction, etc. | 73 |
| | 12.7 | No Adverse Interpretation of Other Agreements | 75 |
| | 12.8 | Successors | 75 |
| | 12.9 | Severability | 76 |
| | 12.10 | Counterpart Originals | 76 |
| | 12.11 | Trustee's Receipt of Funds to the Extent not Required to be Applied to Payment of the Notes | 76 |
| | 12.12 | Table of Contents, Headings, etc. | 76 |
| | 12.13 | USA Patriot Act | 76 |

[AM_ACTIVE 403928027_6]

EXHIBITS

Exhibit A-1    FORM OF NOTE
Exhibit A-2    FORM OF REGULATION S TEMPORARY GLOBAL NOTE
Exhibit B      FORM OF CERTIFICATE OF TRANSFER
Exhibit C      FORM OF CERTIFICATE OF EXCHANGE

Exhibit D      FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL
               ACCREDITED INVESTOR
EXHIBIT E      ADDITIONAL NOTES AND SUPPLEMENTAL INDENTURES FOR
               ADDITIONAL NOTES
EXHIBIT F      FORM OF ACKNOWLEDGEMENT OF DEBT

[AM_ACTIVE 403928027_6]

INDENTURE dated as of [●], 2022 between Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**") and [●], as Trustee, each a "**Party**" and together the "**Parties**".

The Company and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Noteholders (as defined herein).

# 1    DEFINITIONS AND INCORPORATION BY REFERENCE

## 1.1    Defined Terms

Unless otherwise defined herein, capitalized terms used herein shall have the meanings provided in the Common Terms Agreement. In addition, the following terms shall have the following meanings:

"**Accounting Standards**" means the International Financial Reporting Standards (IFRS) promulgated by the International Accounting Standards Board, which include standards and interpretations approved by the International Accounting Standards Board, together with its pronouncements thereon from time to time, applicable on a consistent basis, and with respect to the Company or any of its Chilean Affiliates, as applied by the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*), governed by Decree Law No. 21,000 of 2017 of Chile, or its successor.

["**Additional Interest**" means fifty percent (50%) of the positive difference (if any), calculated as of December 31 of each calendar year, resulting from:

(x) Cash Flow Available for Debt Service for the calendar year ending on December 31 minus; and

(y) projected Cash Flow Available for Debt Service for the same calendar year as reflected in Schedule 1.][2]

"**Additional Notes**" means Notes (other than the Initial Notes) issued under this Indenture in accordance with Section 2.1(d) and Exhibit E, having the same terms and conditions as the Notes in all respects, except for the issue date, issue price and the first payment on those Additional Notes.

"**Agent**" means any Registrar, co-registrar, Paying Agent,  additional paying agent or Custodian.

"**Alternate Independent Director**" means a member of the Board of Directors of the Company duly designated by the Required Creditors pursuant to Section [ ] of the Intercreditor Agreement to act as Alternate Independent Director.

"**Applicable Procedures**" means, with respect to any payment, tender, redemption, transfer, exchange or conversion of or for beneficial interests in any Global Note, the rules and

---

[2]    **NTD**: Treatment of amortization and redemption payments under discussion with Trustee.

procedures of the Depositary, Euroclear and Clearstream that apply to such payment, tender, redemption, transfer, exchange or conversion.

"**Authentication Order**" has the meaning set forth in Section 2.2.

"**Automatic Exchange**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Date**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Notice**" has the meaning set forth in Section 2.6(g).

"**Automatic Exchange Notice Date**" has the meaning set forth in Section 2.6(g).

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.

"**Business Day**" means a day other than Saturday or Sunday when banks are open for business in (i) New York, New York, (ii) [Washington, D.C.,] (iii) Santiago, Chile, (iv) Oslo, Norway, (v) Vienna, Austria and, with respect to payments, in the place of payment.

"**CEMBI Index**" means the Corporate Emerging Markets Bond Index established by JPMorgan Chase & Co.

"**Change of Control**" means [*to include CTA definition once agreed*].

"**Change of Control Offer**" has the meaning set forth in Section 4.11.

"**Change of Control Payment**" has the meaning set forth in Section 4.11.

"**Change of Control Payment Date**" has the meaning set forth in Section 4.11.

"**Change of Control Repurchase Event**" means the occurrence of a Change of Control.

"**Clearstream**" means Clearstream Banking, *société anonyme*, or any successor securities clearing agency.

"**Collateral Proceeds**" means Casualty Proceeds, CNM Arbitral Awards Proceeds, Disposition Proceeds, Dispute Resolution Proceeds, Expropriation Proceeds, Liquidated Damages Proceeds, and Termination Proceeds and (following any enforcement action) any and all other cash, securities and other property realized from the Security Collateral (including distributions of Security in satisfaction of any Secured Obligations) but excluding any delay in start-up and business interruption insurance proceeds.

[AM_ACTIVE 403928027_6]

"**Common Terms Agreement**" means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among the Company, each Secured Creditor Representative that is a party thereto from time to time and the Intercreditor Agent.

"**Company**" has the meaning set forth in the Preamble hereto.

"**Corporate Trust Office of the Trustee**" means the office of the Trustee at the address of the Trustee specified in Section 12.1 or such other address as to which the Trustee may give notice to the Company and the Noteholders or the designated corporate trust office of any successor Trustee.

"**Covenant Defeasance**" has the meaning set forth in Section 8.3.

"**Custodian**" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"**Debtor Relief Law**" means the Bankruptcy Code and any other applicable government rule of any jurisdiction, domestic or foreign, relating to liquidation, conservatorship bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or relief of debtors from time to time in effect.

"**Default**" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"**Deferred Interest**" [*to be defined*].

"**Definitive Note**" means a certificated Note registered in the name of the Noteholder, issued in accordance with Section 2.6, substantially in the form of Exhibit A-1 except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"**Depositary**" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.3 as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"**DFC**" means United States International Development Finance Corporation, an agency of the United States of America (as successor in interest to Overseas Private Investment Corporation pursuant to the Better Utilization of Investments Leading to Development Act of 2018, 22 U.S.C. §§9601 et seq.).

"**DTC**" has the meaning set forth in Section 2.3.

"**Euroclear**" means Euroclear Bank, S.A./N.V. or any successor securities clearing agency.

"**Event of Default**" has the meaning set forth in Section 6.1.

3

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Global Note Legend**" means (i) the legend set forth in Section 2.6(f)(ii) and (ii) in the case of any Additional Notes, a legend required or permitted by Section 2.1(d).

"**Global Notes**" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes and any Additional Notes issued as a Global Note, deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in accordance with Sections 2.1 and 2.6.

"**Government Securities**" means securities that are direct obligations of, or obligations guaranteed by, the United States of America for the timely payment of which its full faith and credit is pledged.

"**Hedging Agreement**" means (a) any and all swap transactions, derivative transactions, forward transactions, options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement such as the *Condiciones Generales de Contratos de Derivados en el Mercado Local* acknowledged by the Central Bank of Chile (any such master agreement, together with any related schedules, an "**ISDA Master Agreement**"), including any such obligations or liabilities under any ISDA Master Agreement.

"**IAI Global Note**" means a Global Note issued in accordance with Section 2.1(c)(i)(B).

"**Indebtedness**" means any indebtedness of the Company for or in respect of:

(i)      borrowed money;

(ii)     the outstanding principal amount of any bonds, debentures, notes, loans, commercial paper, acceptance credits, bills or promissory notes drawn, accepted, endorsed or issued by the Company;

(iii)    the deferred purchase price of assets or services (except trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

(iv)     non-contingent obligations of the Company to reimburse any other Person for amounts paid by such Person under a letter of credit or similar instrument (excluding any letter of credit or similar instrument issued for the account of the Company with respect to trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and that are not overdue);

[AM_ACTIVE 403928027_6]

(v)     the amount of any obligation in respect of any lease that would, under the Accounting Standards, be treated as a finance or capital lease;

(vi)    amounts raised under any other transaction having the financial effect of a borrowing and which would be classified as a borrowing under the Accounting Standards (and not as an off-balance sheet financing under the Accounting Standards);

(vii)   the amount of the Company's obligations under any Hedging Agreements entered into in connection with the protection against or benefit from fluctuation in any rate or price (but only the net amount owing by the Company after marking the relevant derivative transactions to market);

(viii)  any premium payable on a redemption or replacement of any of the foregoing items;

(ix)    without double counting, the amount of any obligation in respect of any guarantee or indemnity given by the Company for any of the foregoing items incurred by any other Person up to the amount guaranteed or agreed to be indemnified by the Company;

(x)     the net present value of any retirement defined benefit obligations less the market value of any marketable or available for sale securities that are set aside to meet these obligations; and

(xi)    any repurchase obligation or liability of any Person with respect to accounts or notes receivable sold by such Person, and, without duplication of any amounts in clause (v) above, any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, any obligation under a "synthetic lease" or any obligation arising with respect to any other transaction that is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Indenture**" means this Indenture, as amended or supplemented from time to time.

"**Independent Director**" means, a member of the Board of Directors of the Company duly designated by the Required Creditors pursuant to Section [ ] of the Intercreditor Agreement to act as primary Independent Director.

"**Independent Director Trigger Event**" means the earlier of (i) the date on which there are less than three (3) Secured 2L Lenders and (ii) the date on which the Secured 2L Loans represent fifteen percent (15%) or less of the overall Secured 2L Debt.

"**Indirect Participant**" means a Person who holds a beneficial interest in a Global Note through a Participant.

5

"**Initial Notes**" $[●] aggregate principal amount of 2.00% Second Lien Secured Notes due [2052] issued under this Indenture on the date hereof.[3]

"**Initial Secured 2L Noteholder**" means each Noteholder that is a Secured 2L Noteholder on the Issue Date.

"**Institutional Accredited Investor**" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who is not also a QIB.

"**Interest Payment Date**" means January 15, April 15, July 15 and October 15 in each year, or if any such day is not a Business Day, the next succeeding Business Day.

"**Issue Date**" means the first date of original issuance of the Notes under this Indenture.

"**Legal Defeasance**" has the meaning set forth in Section 8.2.

"**Liabilities**" means the aggregate of all obligations of the Company to pay or repay money, including:

    (i)    Indebtedness;

    (ii)    the amount of all liabilities of the Company (actual or contingent) under any conditional sale or a transfer with recourse or obligation to repurchase, including by way of discount or factoring of book debts or receivables;

    (iii)    trade accounts incurred and payable in the ordinary course of business to trade creditors within ninety (90) days of the date they are incurred and which are not overdue (including letters of credit or similar instruments issued for the account of the Company with respect to such trade accounts);

    (iv)    accrued expenses, including wages and other amounts due to employees and other services providers;

    (v)    the amount of all liabilities of the Company howsoever arising to redeem any of its Shares; and

    (vi)    to the extent (if any) not included in the definition of Indebtedness, the amount of all liabilities of any Person to the extent the Company guarantees them or otherwise obligates itself to pay them.

"**Long-term Debt**" means that part of Indebtedness the final maturity of which, by its terms or the terms of any agreement relating to it, falls due more than one year after the date of its incurrence.

"**Nationally Recognized Rating Agencies**" means each of Moody's, S&P, Fitch; provided that if any of Moody's, S&P, and Fitch ceases to provide ratings services to issuers or investors,

---

[3]    **NTD**: For final confirmation.

the Company may appoint a replacement for such Nationally Recognized Rating Agency that is reasonably acceptable to the Noteholders or Independent Director.

"**Non-U.S. Person**" means a Person who is not a U.S. Person.

"**Noteholder**" means a Person in whose name a Note is registered.

"**Notes**" means  the Initial Notes and any Additional Notes, unless the context otherwise requires.

"**Notes Additional Interest**" means an amount equal to W% of the Additional Interest, where W is equal to W = 100 times ((x) the total principal amount of Notes divided by (y) the total principal amount of Secured 2L Debt).

"**Offering Memorandum**" means a final offering memorandum related to the offering of the Notes to be prepared by the Company in accordance with Section 4.16.

"**Officer's Certificate**" means a certificate signed by the Chairman of the Board, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Director of Finance, the Chief Legal Officer, the Treasurer or any Assistant Treasurer and the Secretary or any Assistant Secretary (or, in each case, the officers of the Company with equivalent positions) that meets the requirements of Section 12.3.

"**Opinion of Counsel**" means an opinion or opinions from legal counsel who is reasonably acceptable to the Trustee that meets the requirements of Section 12.3.  The counsel may be an employee of, or counsel to, the Company.

"**Payment Date**" means April 15 and October 15 in each year, or if any such day is not a Business Day, the next succeeding Business Day.

"**Participant**" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"**Party**" or "**Parties**" has the meaning set forth in the Preamble hereto.

"**Paying Agent**" has the meaning set forth in Section 2.3.

"**Person**" means any natural person, corporation, company, partnership, firm, voluntary association, joint venture, trust, unincorporated organization, national, supranational, regional or local government or governmental, administrative, fiscal, judicial, or government-owned body, department, commission, authority, tribunal, agency or entity, or central bank (or any Person, whether or not government owned and howsoever constituted or called, that exercises the functions of a central bank), or any other entity whether acting in an individual, fiduciary or other capacity.

"**Private Placement Legend**" means (i) in the case of Initial Notes, the legend set forth in Section 2.6(f)(i) and (ii) in the case of any Additional Notes, any legend required or permitted by Section 2.1(d)

"**QIB**" means a "qualified institutional buyer" as defined in Rule 144A.

"**Qualified Nominee**" means a person who: (i) is a resident of Chile; (ii) is not employed by, and who does not derive any material portion of their income from, an electric generation or distribution company in Chile; (iii) is not employed by, is a director of or otherwise affiliated with the Company or any Affiliate of the Company or a labor union; (iv) is experienced in matters relating to the energy and/or hydroelectric sector in Chile; (v) is not a Sanctioned Person; (vi) has not been convicted of a crime of moral turpitude or relating to fraud, and has not been disbarred from doing business with the U.S. or Chilean governments or any multilateral development bank or lending institution, or (vii) is otherwise acceptable to the Required Creditors.[4]

"**Registrar**" has the meaning set forth in Section 2.3.

"**Regulation S**" means Regulation S promulgated under the Securities Act.

"**Regulation S Global Note**" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as appropriate.

"**Regulation S Permanent Global Note**" means a permanent Global Note issued in accordance with the second paragraph of Section 2.1(c).

"**Regulation S Temporary Global Note**" means a temporary Global Note issued in accordance with the first paragraph of Section 2.1(c).

"**Responsible Officer**," when used with respect to the Trustee, means any officer within the corporate trust department of the Trustee (or any successor division or unit of the Trustee) located at the Corporate Trust Office of the Trustee, who has direct responsibility for the administration of this Indenture and also means any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"**Restricted Definitive Note**" means a Definitive Note bearing the Private Placement Legend.

"**Restricted Global Note**" means a Global Note bearing the Private Placement Legend.

"**Restricted Note**" means a Restricted Definitive Note or a Restricted Global Note.

"**Restricted Period**" means the forty-day distribution compliance period as defined in Regulation S.

"**Rule 144**" means Rule 144 promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A promulgated under the Securities Act.

"**Rule 144A Global Note**" means a Global Note issued in accordance with Section 2.1(c)(i).

---

[4]    **NTD**: This definition remains under discussion.

[AM_ACTIVE 403928027_6]

"**Rule 144A Information**" has the meaning set forth in Section 4.3.

"**Rule 903**" means Rule 903 promulgated under the Securities Act.

"**Rule 904**" means Rule 904 promulgated under the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Sanctioned Person**" means, at any time, (a) any a Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any relevant Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a country or territory that is a target of Sanction, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Secured Creditor Representative**" means (i) the Trustee with respect to this Indenture and the Noteholders, (ii) the Exit Administrative Agent with respect to the Secured Exit Loan Agreement and the Secured Exit Lenders, (iii) the 2L Administrative Agent with respect to the Secured 2L Loan Agreement and the Secured 2L Lenders, (iv) the 2L Trustee with respect to the Secured 2L Indenture and the Secured 2L Noteholders, and (v) the trustee or administrative agent, as applicable, with respect to any Refinancing Debt.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Supplemental Indenture**" means any indenture supplemental to this Indenture governing the terms and conditions of any Additional Notes issued from time to time pursuant to Section 2.1(d), in each case, to the extent that the Indebtedness evidence by any Additional Notes, and the terms and conditions of any such Indebtedness, Additional Notes and Supplemental Indenture, are permitted by this Indenture, including Article 4.

"**Trustee**" means [●], not individually but solely in its capacity as such, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"**Unrestricted Definitive Note**" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"**Unrestricted Global Note**" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"**U.S. Person**" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

**1.2    Interpretation**

In this Indenture, except to the extent specified to the contrary or where context otherwise requires, the provisions of Section 1.03 of the Common Terms Agreement shall be applied.

[AM_ACTIVE 403928027_6]

### 1.3    UCC Terms

Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the respective meanings given to those terms in the UCC.

### 1.4    Accounting Standards and Financial Determinations

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with the Accounting Standards, as in effect from time to time. If at any time any change in the Accounting Standards would affect the computation of any financial ratio or requirement set forth herein, then such ratio or requirement shall be modified in a manner determined as soon as reasonably practicable and in good faith by the Company and set forth in a written notice to the Trustee that preserves the original intent thereof in light of such change in Accounting Standards.

## 2    THE NOTES

### 2.1    Form and Dating

(a)    *General*. The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture, and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*. Except as otherwise provided in this Section 2.1, Notes issued in global form (and the Trustee's certificate of authentication of such Notes) will be substantially in the form of Exhibit A-1 or A-2 (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each such Note will be dated the date of its authentication. Except as otherwise provided in this Section 2.1, Notes issued in definitive form will be substantially in the form of Exhibit A-1 (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect transfers, exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Noteholder thereof as required by Section 2.6.

(c)    *Temporary Global Notes*. Notes offered and sold in reliance on Regulation S will be issued in a denomination equal to the outstanding principal amount of such Notes initially substantially in the form of Exhibit A-2. Such Notes will be deposited on

[AM_ACTIVE 403928027_6]

behalf of the purchasers of the Notes represented thereby with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Company and authenticated by the Trustee as hereinafter provided. The Restricted Period will be terminated upon the receipt by the Trustee of:

(i)    a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any Beneficial Owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who will take delivery of a beneficial ownership interest in (A) a Global Note substantially in the form of Exhibit A-1, bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, and issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A or (B) a Global Note substantially in the form of Exhibit A-1, bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary, and issued in a denomination equal to the outstanding principal amount of Notes sold to Institutional Accredited Investors, all as contemplated by Section 2.6(b)); and

(ii)    an Officer's Certificate from the Company.

Following the termination of the Restricted Period with respect to any Notes, beneficial interests in the Regulation S Temporary Global Note will be exchanged, pursuant to the Applicable Procedures, for beneficial interests in a permanent Global Note, which will be in the form of Exhibit A-1 bearing the Global Note Legend and the Private Placement Legend, deposited with or on behalf of, and registered in the name of, the Depositary or the nominee of the Depositary, and issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period. Simultaneously with the authentication of the Regulation S Permanent Global Note, the Trustee will cancel the Regulation S Temporary Global Note. The aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(iii)    *Euroclear and Clearstream Procedures Applicable*. The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Note that are held by Participants through Euroclear or Clearstream.

11

(d)    Additional Notes. Subject to compliance with the provisions of this Indenture, the Company may from time to time after the Issue Date issue Additional Notes as provided in Exhibit E, which is incorporated by reference in this Section 2.1(d). Additional Notes issued in this manner will be consolidated and form a single series with the previously outstanding Notes. Any Additional Notes subsequently issued that for U.S. federal income tax purposes (i) are not issued pursuant to a "qualified reopening" of the Notes, (ii) are not treated as part of the same "issue" as the Notes, and (iii) have greater than a *de minimis* amount of original issue discount shall have a separate CUSIP, ISIN or other identifying number from the previously outstanding Notes.[5]

## 2.2    Execution and Authentication

At least one Authorized Officer must sign the Notes for the Company by manual or facsimile signature.

If an Authorized Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by at least one Authorized Officer (an "**Authentication Order**"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.7.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Noteholders or an Affiliate of the Company.

The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes. Nothing in this paragraph shall be deemed to modify, replace or otherwise affect the restrictions on transfer applicable to Restricted Notes set forth in Section 2.6.

## 2.3    Registrar and Paying Agent; Depositary

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("**Registrar**") and an office or agency where Notes may be presented for payment ("**Paying Agent**"). The Registrar will keep a register of the Notes and of

---

[5]  **NTD**: This provision remains under discussion.

their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "**Registrar**" includes any co-registrar and the term "**Paying Agent**" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Noteholder. The Company will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such.

The Company initially appoints The Depository Trust Company ("**DTC**") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

**2.4    Paying Agent to Hold Money in Trust**

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Noteholders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Subject to applicable abandoned property laws, all payments to a Paying Agent on any Notes which remain unclaimed for a period of two years after such payment was due shall be repaid to the Company. Thereafter, the Noteholder may look only to the Company for repayment. Upon payment over to the Trustee, or to the Company as the case may be, the Paying Agent will have no further liability for the money.

**2.5    Noteholder Lists**

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Noteholders. If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Noteholders.

**2.6    Transfer and Exchange**

(a)    *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(i)    the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary for the Global Notes or that it has ceased to be a clearing agency registered under the Exchange Act

[AM_ACTIVE 403928027_6]

and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary;

(ii)    the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; provided, that in no event shall the Regulation S Temporary Global Note be exchanged by the Company for Definitive Notes prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B); or

(iii)    there has occurred and is continuing an Event of Default with respect to the Notes and the Trustee or the Registrar has received a written request from the Depositary, or from a holder of a beneficial interest in such Global Note, to exchange such Global Note or beneficial interest, as applicable, for one or more Definitive Notes.

Upon the occurrence of either of the preceding events in (i), (ii) or (iii) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.7 and 2.10. Except as provided in this Section 2.6(a), every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.6 or Sections 2.7 or 2.10, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.6(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.6(b) or (c).

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. The Company shall not have any liability or responsibility for any records relating to or payments made on account of beneficial ownership interest in a Global Note, or the maintaining, supervision or reviewing of any records relating to such beneficial ownership interests. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; provided, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account

14

or benefit of a U.S. Person (other than an Initial Secured 2L Noteholder). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.6(b)(i).

(ii)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.6(b)(i), the transferor of such beneficial interest must deliver to the Registrar either:

(A)    both:

(1)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(2)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B)    both:

(1)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(2)    instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above;

provided, that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Notes pursuant to Section 2.6(h).

15

(iii)  *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.6(b)(ii) and the Registrar receives the following:

    (A)  if the transferee will take delivery in the form of a beneficial interest in the Rule 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

    (B)  if the transferee will take delivery in the form of a beneficial interest in the Regulation S Temporary Global Note or the Regulation S Permanent Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

    (C)  if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(iv)  *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.* A beneficial interest in any Restricted Global Note may be exchanged by any Noteholder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.6(b)(ii) and the Registrar receives the following:

    (A)  if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(a) thereof; or

    (B)  if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof; and, in each such case set forth in this Section 2.6(b)(iv), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the

16

restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.2, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)     *Transfer or Exchange of Beneficial Interests for Definitive Notes*.

(i)     *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes*. If any Noteholder holding a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (2)(a) thereof;

(B)     if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(C)     if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(D)     if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(E)     if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

17

(F)     if such beneficial interest is being transferred to the Company, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

(G)     if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(h), and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c) shall be registered in such name or names and in such authorized denomination or denominations as the Noteholder holding such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)    *Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes*. Notwithstanding Sections 2.6(c)(i)(A) and (i)(C), a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B), except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)   *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A Noteholder holding a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(A)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(b) thereof; or

(B)     if the Noteholder holding such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted

18

> > Definitive Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

> (iv)   *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any Noteholder holding a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.6(b)(ii), the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(h), and the Company will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) will be registered in such name or names and in such authorized denomination or denominations as the Noteholder holding such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) will not bear the Private Placement Legend.

> (d)   *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

> (i)   *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Noteholder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

> > (A)   if the Noteholder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (2)(b) thereof;

> > (B)   if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

[AM_ACTIVE 403928027_6]

(C)       if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(D)       if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(E)       if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(F)       if such Restricted Definitive Note is being transferred to the Company, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G)       if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(c) thereof,

the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the Rule 144A Global Note, in the case of clause (C) above, the Regulation S Global Note, in the case of clause (E) above, the IAI Global Note and in all other cases, the appropriate Unrestricted Global Note.

(ii)       *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.* A Noteholder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A)       if the Noteholder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(c) thereof; or

(B)       if the Noteholder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a

> > beneficial interest in the Unrestricted Global Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

> and in each such case, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar and the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

> Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.6(d)(ii), the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

> > (iii)    *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Noteholder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.2, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

> (e)    *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Noteholder of Definitive Notes and such Noteholder's compliance with the provisions of this Section 2.6(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Noteholder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Noteholder or by its attorney, duly authorized in writing. In addition, the requesting Noteholder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.6(e).

> > (i)    *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

[AM_ACTIVE 403928027_6]

(A) if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

(C) if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(ii) *Restricted Definitive Notes to Unrestricted Definitive Notes*. Any Restricted Definitive Note may be exchanged by the Noteholder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A) if the Noteholder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit C, including the certifications in item (1)(d) thereof; or

(B) if the Noteholder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Noteholder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) *Unrestricted Definitive Notes to Unrestricted Definitive Notes*. A Noteholder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Noteholder thereof.

(f) *Legends*. The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in

the applicable provisions of this Indenture or any Supplemental Indenture governing Additional Notes.

(i) *Private Placement Legend.*

(A) Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, (1) REPRESENTS THAT (A) IT IS A "**QUALIFIED INSTITUTIONAL BUYER**" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 (a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT AND (2) AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "**RESALE RESTRICTION TERMINATION DATE**") THAT IS [IN THE CASE OF RULE 144A NOTES: ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF THE ISSUANCE OF ANY ADDITIONAL NOTES AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY)][, IN THE CASE OF REGULATION S NOTES: FORTY DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF ANY ADDITIONAL NOTES AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S), IN RELIANCE ON REGULATION S], ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "**QUALIFIED INSTITUTIONAL BUYER**" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL

[AM_ACTIVE 403928027_6]

"ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE NOTES FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL "ACCREDITED INVESTOR", FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE NOTEHOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE OR AS OTHERWISE PROVIDED FOR IN THE INDENTURE."

> (B)     Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii) or (e)(iii) of this Section 2.6 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

> (ii)     *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.6(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("**DTC**"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN

AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

    (iii)    *Regulation S Temporary Global Note Legend*. The Regulation S Temporary Global Note will bear a Global Note Legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

    (g)    *Automatic Exchange from Global Note Bearing Restricted Notes Legend to Global Note Not Bearing Private Placement Legend.* Upon the Company's satisfaction that the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act, beneficial interests in a Restricted Global Note may be automatically exchanged into beneficial interests in an Unrestricted Global Note without any action required by or on behalf of the Noteholder (the "**Automatic Exchange**") at any time on or after the date that is the 366th calendar day after (A) with respect to the Notes issued on the Issue Date, the later of (i) the Issue Date or (ii) the last date on which the Company or any Affiliate of the Company was the owner of such Note (or of any other Global Note with the same CUSIP or ISIN number) or (B) with respect to Additional Notes, if any, the later of (i) the issue date of such Additional Notes or (ii) the last date on which the Company or any Affiliate of the Company was the owner of such Additional Note (or of any other Global Note with the same CUSIP or ISIN number), or, in each case, if such day is not a Business Day, on the next succeeding Business Day (the "**Automatic Exchange Date**"). Upon the Company's satisfaction that the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act, the Company may, pursuant to the rules and procedures of the Depositary (i) provide written notice to the Depositary at least fifteen calendar days prior to the Automatic Exchange Date, instructing the Depositary to exchange all of the outstanding beneficial interests in a particular Restricted Global Note to a particular Unrestricted Global Note, which the Company shall have previously otherwise made eligible for exchange with the Depositary, (ii) provide prior written notice (the "**Automatic Exchange Notice**") to each Noteholder of the beneficial interests in the Restricted Global Note at such Noteholder's address appearing in the register of Noteholders at least fifteen calendar days prior to the Automatic Exchange Date (the "**Automatic Exchange Notice Date**"), which notice must include (w) the Automatic Exchange Date, (x) the section of this Indenture pursuant to which the Automatic Exchange shall occur, (y) the CUSIP number of the Restricted Global Note from which such Noteholder's beneficial interests shall be transferred and (z) the CUSIP number of the Unrestricted Global Note into which such Noteholder's beneficial interests shall be transferred, and (iii) on or prior to

the Automatic Exchange Date, deliver to the Trustee for authentication one or more Unrestricted Global Notes, duly executed by the Company, in an aggregate principal amount equal to the aggregate principal amount of Restricted Global Notes to be exchanged. At the Company's request on no less than five calendar days' notice prior to the Automatic Exchange Notice Date, the Trustee shall deliver, in the Company's name and at its expense, the Automatic Exchange Notice to each Noteholder of the beneficial interests in the Restricted Global Note at such Noteholder's address appearing in the register of Noteholders. Notwithstanding anything to the contrary in this Section 2.6(g), during the fifteen-day period prior to the Automatic Exchange Date, no transfers or exchanges other than pursuant to this Section 2.6(g) shall be permitted without the prior written consent of the Company. Upon such exchange of beneficial interests pursuant to this Section 2.6(g), the aggregate principal amount of the Global Notes shall be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depositary, to reflect the relevant increase or decrease in the principal amount of such Global Note resulting from the applicable exchange. The Restricted Global Note from which beneficial interests are transferred pursuant to an Automatic Exchange shall be canceled following the Automatic Exchange.

(h)     *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i)     *General Provisions Relating to Transfers and Exchanges*.

    (i)     To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.2 or at the Registrar's request.

    (ii)    No service charge will be made to a Noteholder of a beneficial interest in a Global Note or to a Noteholder of a Definitive Note for any registration of transfer or exchange (except as otherwise expressly permitted herein), but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other

26

than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10 and 9.5).

(iii)    The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    Neither the Registrar nor the Company will be required:

(A)    to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business fifteen days before the day of any selection of Notes for redemption under Section 3.2 and ending at the close of business on the day of selection;

(B)    to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C)    to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

(vi)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(vii)    The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.2.

(viii)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.6 to effect a registration of transfer or exchange may be submitted by facsimile.

(ix)    None of the Trustee, the Paying Agent or the Registrar shall have any responsibility or obligation to any Beneficial Owner in a Global Note, an agent member of the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any agent member of the Depositary, with respect to any ownership interest in the Notes or with respect to the delivery to any agent member of the Depositary, Beneficial Owner or other Person (other than the Depositary) of any notice (including

27

any notice of redemption) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Noteholders and all payments to be made to Noteholders under the Notes and this Indenture shall be given or made only to or upon the order of the registered holders (which shall be the Depositary or its nominee in the case of the Global Note). The rights of Beneficial Owners in the Global Note shall be exercised only through the Depositary subject to the Applicable Procedures. The Trustee, the Paying Agent and the Registrar shall be entitled to rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners. None of the Trustee, the Paying Agent or the Registrar shall have any responsibility or liability for any acts or omissions of the Depositary with respect to such Global Note, for the records of any such depositary, including records in respect of beneficial ownership interests in respect of any such Global Note, for any transactions between the Depositary and any agent member of the Depositary or between or among the Depositary, any such agent member of the Depositary and/or any holder or owner of a beneficial interest in such Global Note, or for any transfers of beneficial interests in any such Global Note.

(x)    Notwithstanding the foregoing, with respect to any Global Note, nothing herein shall prevent the Company, the Trustee, or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by any Depositary (or its nominee), as a Noteholder, with respect to such Global Note or shall impair, as between such Depositary and owners of beneficial interests in such Global Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Noteholder of such Global Note.

(xi)    None of the Trustee, the Paying Agent or the Registrar shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any security (including any transfers between or among Depositary participants, members or Beneficial Owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

## 2.7    Replacement Notes

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Noteholder that is sufficient in the judgment of the Trustee and the

[AM_ACTIVE 403928027_6]

Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

## 2.8    Outstanding Notes

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.8 as not outstanding. Except as set forth in Section 2.9, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note; provided, that Notes held by the Company or an Affiliate of the Company shall not be deemed to be outstanding for purposes of Sections 3.7, 3.8, and 3.9.

If a Note is replaced pursuant to Section 2.7, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replacement Note is held by a "protected purchaser" under the UCC.

If the principal amount of any Note is considered paid under Section 4.1, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company or an Affiliate thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

## 2.9    Treasury Notes

In determining whether the Noteholders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that the Trustee knows are so owned will be so disregarded.  For purposes of this Section 2.9, "controlling," "controlled" and "control" shall have the meanings given to such terms in the definition of Affiliate in the Common Terms Agreement.

## 2.10    Temporary Notes

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

[AM_ACTIVE 403928027_6]

Noteholders of temporary Notes will be entitled to all of the benefits of this Indenture.

## 2.11    Cancellation

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes (subject to the record retention requirement of the Exchange Act). Certification of the cancellation of Notes will be delivered to the Company upon the Company's written request. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

## 2.12    Defaulted Interest

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner *plus*, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Noteholders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1. The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; provided, that no such special record date may be less than ten days prior to the related payment date for such defaulted interest. At least fifteen days before the special record date, the Company (or, upon the written request of the Company and provision of such notice information, the Trustee in the name and at the expense of the Company) will mail or cause to be mailed (or otherwise transmit in accordance with the Applicable Procedures of DTC) to Noteholders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

## 2.13    CUSIP Numbers

The Company in issuing the Notes may use "CUSIP", "ISIN" or other similar numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP", "ISIN" or other similar numbers in notices of redemption as a convenience to Noteholders; provided that the Trustee shall have no liability for any defect in the "CUSIP", "ISIN" or other similar numbers as they appear on any Note, notice or elsewhere, and, provided further that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company will promptly notify the Trustee in writing of any change in the "CUSIP", "ISIN" or other similar numbers.

## 2.14    Chilean Acknowledgement of Debt

Concurrently with the issuance of the Notes (including the Additional Notes), the Company shall execute a *reconocimiento de deuda* (acknowledgement of debt) in the form of a Chilean notarial public deed, for the benefit of the Trustee acting on behalf of the Noteholders, pursuant to which the Company will acknowledge unconditionally and irrevocably to owe to the Trustee,

[AM_ACTIVE 403928027_6]

acting on behalf of all the Noteholders, the principal amount of the Notes issued by the Company plus the applicable interests, in substantially the form attached hereto as Exhibit F; *provided, however*, that any reduction (by repayment, prepayment or otherwise) in the principal or interest amount of the Notes (including the Additional Notes) shall discharge pro tanto the equivalent principal or interest amount evidenced by such *reconocimiento de deuda* (acknowledgement of debt); and provided, further, that the Company shall not be obligated to execute any such reconocimiento de deuda (acknowledgement of debt) to the extent the Company will be required to pay any additional stamp tax arising from the execution and delivery of the reconocimiento de deuda (acknowledgement of debt), unless the Noteholders agree to pay or reimburse the Company for any such additional stamp tax taxes.

## 2.15    Payment of Additional Amounts[6]

The Company is required to make all payments in respect of the Notes free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, fines, penalties, assessments or other governmental charges of whatever nature (or interest on any taxes, duties, fines, penalties, assessments or other governmental charges of whatever nature) (collectively, "**Taxes**"), imposed, levied, collected, withheld or assessed by, within or on behalf of the Republic of Chile or any other jurisdiction where Company is resident for tax purposes, in each case, any political subdivision or governmental authority thereof or therein having power to tax ("**Relevant Jurisdiction**"), unless such withholding or deduction is required by law. In such event, the Company is required to pay such additional amounts ("**Additional Amounts**") as may be necessary to ensure that the net amounts received by the Noteholders (including Additional Amounts) after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Notes in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable in respect of a Note (i) in the case of payments for which presentation of a Note is required, if such Note is presented for payment more than 30 days after the later of (a) the date on which such payment first became due and (b) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the Holder by the Trustee, except to the extent that such Holder would have been entitled to such Additional Amounts on presenting such Notes for payment on the last day of such period of 30 days; (ii) for any estate, inheritance, gift, sales, transfer, personal property or similar Taxes; (iii) if such Note is held by or on behalf of a Holder or beneficial owner who is liable for Taxes in respect of such Note by reason of having some present or former, direct or indirect, connection with any Relevant Jurisdiction, other than the mere holding of such Note or the receipt of payments in respect thereof; (iv) for any Tax imposed due to the failure of the Holder or beneficial owner to satisfy any certification, identification or other reporting requirements whether imposed by statute, treaty, regulation or administrative practice, provided, however, that the Company has delivered a request to the Holder or beneficial owner to comply with such requirements at least 30 days prior to the date by which such compliance is required; or (v) any combination of clauses (i) through (iv) above. In addition, no Additional Amounts shall be paid, and the second preceding sentence shall not apply, with respect to any payment to any Holder of Notes who is a fiduciary or a partnership or other than the sole beneficial owner of such Notes to the extent that the beneficiary or settlor with respect to such fiduciary, the member of such partnership or the beneficial owner of such

---

[6]    **NTD**: This provision remains under discussion.

Notes would not have been entitled to Additional Amounts had such beneficiary, settlor, member or beneficial owner held such Notes directly.

Notwithstanding anything to the contrary in this section, none of the Company, the paying agent or any other person shall be required to pay any Additional Amounts with respect to any payment in respect of any Taxes imposed under Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), any successor law of regulation implementing or complying with, or introduced in order to conform to, such sections or any intergovernmental agreement or any agreement entered into pursuant to section 1471(b)(1) of the Code.

References to principal, interest, premium or other amounts payable in respect of the Notes shall be deemed also to refer to any Additional Amounts which may be payable.

The Company will also (i) make any required withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Company will furnish to the Trustee, within 60 days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Company, or, if such receipts are not obtainable, other evidence of such payments by the Company reasonably satisfactory to the Trustee.

The Company will pay any present or future stamp, court or documentary taxes or any excise or property taxes, charges or similar levies that arise in any jurisdiction from the execution, delivery or registration of the Notes or any other document or instrument relating to the issuance thereof, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside a Relevant Jurisdiction.

## 2.16    Use of Proceeds

The Company acknowledges that it has used the proceeds of the Notes solely for purposes permitted by Section 5.01(b) of the Common Terms Agreement.

## 3    REDEMPTION AND PREPAYMENT

## 3.1    Notices to Trustee

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.7, it must furnish to the Trustee, at least thirty days but not more than sixty days before a redemption date, an Officer's Certificate setting forth:

(a)    the Section of this Indenture pursuant to which the redemption shall occur;

(b)    the redemption date;

(c)    the principal amount of Notes to be redeemed;

(d)    the redemption price or the manner of calculation thereof; and

(e)    the CUSIP number of the Notes to be redeemed.

[AM_ACTIVE 403928027_6]

**3.2    Selection of Notes to Be Redeemed**

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption on a *pro rata* basis, by lot or by such other method as the Trustee shall deem fair and appropriate (<u>provided</u>, that, in the case of Global Notes, the Depositary may select Global Notes for redemption pursuant to its Applicable Procedures) unless otherwise required by law, Depositary requirements, or applicable stock exchange requirements.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof to be redeemed. Notes and portions of Notes selected will be in amounts of $100,000 or whole multiples of $1,000 in excess thereof; except that if all of the Notes of a Noteholder are to be redeemed, the entire outstanding amount of Notes held by such Noteholder, even if not in the amount of $100,000 or a whole multiple of $1,000 thereof, shall be redeemed. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

**3.3    Notice of Redemption**

At least thirty days but not more than sixty days before a redemption date, the Company will mail or cause to be mailed by first class mail or delivered electronically, a notice of redemption to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 11.

The notice will identify the Notes to be redeemed and will state:

(a)    the redemption date;

(b)    the redemption price;

(c)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued in the name of the Noteholder upon cancellation of the original Note;

(d)    the name and address of the Paying Agent;

(e)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)    that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

33

(h)      that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; provided, that the Company has delivered to the Trustee, at least 45 days prior to the redemption date (unless a shorter period is acceptable to the Trustee), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

## 3.4      Effect of Notice of Redemption

Once notice of redemption is mailed or delivered electronically in accordance with Section 3.3, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price; provided, that a notice of redemption may be conditional (in which case such Notes shall become irrevocably due and payable on the redemption date at the redemption price upon the satisfaction or waiver of any such conditions).

If the redemption is delayed pursuant to this Section 3.4 and the terms of the applicable notice of redemption, such redemption date as so delayed may occur at any time after the original redemption date set forth in the applicable notice of redemption and after the satisfaction of any applicable conditions precedent, including, without limitation, on a date that is less than 30 days after the original redemption date or more than 60 days after the date of the applicable notice of redemption.

## 3.5      Deposit of Redemption or Purchase Price

At least one Business Day prior to the redemption date, the Company will deposit or will cause to be deposited with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest on all Notes to be redeemed on that date. The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption price of, and accrued interest on all Notes to be redeemed.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption date, interest will cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption is not so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.1.

## 3.6      Notes Redeemed in Part

Upon surrender of a Note that is redeemed in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Noteholder at the expense of the Company a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

34

### 3.7 Optional Redemption

The Company may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

### 3.8 Mandatory Redemption by Application of Collateral Proceeds[7]

Subject to the terms of the Intercreditor Agreement or the Security Documents, if the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a)(i) through (vii) of the Common Terms Agreement. Any such mandatory redemption shall follow the procedures set forth in Sections 3.1 to 3.6. For the avoidance of doubt, no premium will be payable in respect of any such mandatory redemption.

### 3.9 Mandatory Redemption by Application of Excess Cash Flow or Refinancing

Subject to the terms of the Intercreditor Agreement or the Security Documents, if the Company is required to make a mandatory redemption of the Notes in accordance with Section 2.06(a)(viii) of the Common Terms Agreement, then the Company will be required to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a) of the Common Terms Agreement. Any such mandatory redemption shall follow the procedures set forth in Sections 3.1 to 3.6. For the avoidance of doubt, no premium will be payable in respect of any such mandatory redemption.

### 4 COVENANTS

The Company undertakes to perform and comply with each of the covenants in this Article 4.

### 4.1 Payment of Notes[8]

The Company will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in this Indenture and in the Notes. Each Noteholder will receive its *pro rata* share of such payments.

Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent holds as of 12:00 p.m. New York City time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

The Company will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue principal and overdue installments of interest (without regard

---

[7]   **NTD**: Treatment of amortization and redemption payments under discussion with Trustee.
[8]   **NTD**: Mechanics for 2L payments under discussion with Trustee.

[AM_ACTIVE 403928027_6]

to any applicable grace period), in each case, at the rate equal to 2.0% per annum in excess of the then applicable interest rate on the Notes to the extent lawful.

If a payment date is not a Business Day at a place of payment, payment may be made at that place on the next succeeding day that is a Business Day, with the same force and effect as if made on the date for such payment, and no interest shall accrue for the intervening period. Interest (including Deferred Interest amounts that have been capitalized) will be computed on the basis of a 360-day year of twelve thirty-day months and will be payable semi-annually on each Payment Date on the basis of six thirty-day months.[9] [The entire remaining outstanding principal amount of the Notes shall be payable no later than October 15, [2052] unless the outstanding principal balance of the Notes becomes due and payable at an earlier date pursuant to the Indenture.]

On any Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all interest accrued on the Notes (including each Deferred Interest amount) at the Interest Rate that is due and payable on such Payment Date, then the amount equal to (x) all interest accrued at the Interest Rate due and payable on the Notes on such Payment Date minus (y) the amount of such interest paid in cash on the Notes on such Payment Date, shall be capitalized as Deferred Interest. For the avoidance of doubt, such payment capitalization shall not constitute an Event of Default.

On each April 15 Payment Date, the Company will pay Notes Additional Interest on the Notes for the calendar year immediately preceding such Payment Date, if applicable. Notes Additional Interest accrues as of December 31 of each calendar year (which, for the avoidance of doubt means that, if the Notes are fully repaid on or prior to December 30 of any calendar year, no Notes Additional Interest shall be payable for that year). Notwithstanding anything to the contrary, all Notes that convert to Shares pursuant to the Share Conversion Agreement upon the occurrence of the 2L Maturity Date will accrue and be paid Notes Additional Interest for the [2052] calendar year (notwithstanding the conversion of those Notes to equity prior to December 31 in the [2052] calendar year).

On any April 15 Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all the Loan Additional Interest then due on the Notes, then the amount equal to (x) the Notes Additional Interest due and payable on the Notes on such April 15 Payment Date minus (y) the amount of such Loan Additional Interest paid in cash on the Notes on such April 15 Payment Date shall be capitalized. For the avoidance of doubt, such capitalization shall not constitute an Event of Default.

Principal shall be paid semi-annually on each Payment Date occurring in April and October of each year to the extent there is any cash deposited in the Offshore Revenue Account to pay principal on the Notes in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement.

---

[9]    **NTD**: Treatment of deferred interest under discussion with Trustee.

On the 2L Maturity Date, the principal amount of the Notes then outstanding (including Deferred Interest) will be converted to Shares pursuant to the [2L Share Conversion Agreement].

## 4.2   Maintenance of Office or Agency

The Company will maintain in the United States an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, presentations and surrenders of the Notes may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the United States for such purposes. The Company will give written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company where Notes may be surrendered for registration of transfer or for exchange in accordance with Section 2.3.

## 4.3   Reports

(a)   If the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, then the Company shall provide to the Trustee and the Noteholders within fifteen days after the Company files them with the SEC, copies of its annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) that the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act.

(b)   So long as any Notes are outstanding, the Company will furnish to the Noteholders and Beneficial Owners of the Notes and to *bona fide* securities analysts and *bona fide* prospective investors in the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto) ("**Rule 144A Information**").

(c)   So long as any of the Notes are outstanding, in addition to the requirement to furnish Rule 144A Information as provided in the preceding clause (b), the Company shall furnish or cause to be furnished to Noteholders and (upon the request thereof delivered to the Company) to Beneficial Owners of an interest in any Global Note (1) consolidated annual audited financial statements of the Company prepared in accordance with Accounting Standards (together with notes thereto and a report thereon by an independent accountant of established national reputation), such

37

statements to be so furnished within 120 days after the end of the Financial Year covered thereby and (2) consolidated unaudited financial statements of the Company for each of the Financial Quarters of each Financial Year and the corresponding quarter and year-to-year period of the prior year prepared in all material respects on a basis consistent with the annual financial statements furnished pursuant to clause (1) of this clause (c), such statements to be so furnished within 60 days after the end of the first and third Financial Quarters, 75 days after the end of the second Financial Quarter, and 90 days after the end of the fourth Financial Quarter.

(d)     The Company may comply with this Section 4.3 by posting the information described above on a website or online data system no later than the date that the Company is required to provide those reports pursuant to this Section 4.03 and maintaining such posting for so long as any Notes remain outstanding. Access to such reports on such website or online data system may be subject to a confidentiality acknowledgment and password protection; provided, that, no other conditions may be imposed on access to such reports other than a representation by the Person accessing such reports that it is the Trustee, a Noteholder, a Beneficial Owner of the Notes, a *bona fide* prospective investor or a *bona fide* securities analyst.

(e)     Delivery of the reports, information and documents contemplated by this Section 4.3 to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive knowledge or notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

(f)     Notwithstanding the foregoing, any reports or other information required to be filed, delivered or furnished pursuant to this Section 4.3 shall be deemed filed, delivered or furnished if filed electronically with the SEC through the SEC's Electronic Data Gathering, Analysis and Retrieval System (or any successor system).

(g)     If the Noteholders are required to vote on any manner under this Indenture and the Intercreditor Agreement, the Company shall, promptly after such vote, publicly disclose the material information provided by the Company to the Noteholders in connection with such vote which, absent such disclosure would otherwise constitute material nonpublic information in the hands of the Noteholders. For the avoidance of doubt, the Company shall have no obligation to make any information available to the Noteholders other than the information set forth in this Section 4.3 and the information that the Company determines necessary in connection with any request for the Noteholders to vote.

[AM_ACTIVE 403928027_6]

**4.4**    **Compliance Certificate**

(a)    The Company shall deliver to the Trustee, within 45 days after the end of each Financial Quarter (with the first Officer's Certificate to be delivered for the Financial Quarter ending on June 30, 2022), an Officer's Certificate stating that to the signing Authorized Officer's knowledge no Default or Event of Default has occurred and is continuing (or, if a Default or Event of Default has occurred and is continuing, describing all such Defaults or Events of Default of which he or she has knowledge and what action the Company is taking or proposes to take with respect thereto).

(b)    So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Authorized Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

**4.5**    **Taxes and Tax Treatment**

The Company shall pay, prior to delinquency, all material taxes, assessments and governmental levies except (a) such as are being contested in good faith and by appropriate negotiations or proceedings or (b) where the failure to effect such payment is not adverse in any material respect to the Noteholders.

**4.6**    **Stay, Extension, and Usury Laws**

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of and such law, and covenant that shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

**4.7**    **Limitation on Indebtedness**

The Company will not, directly or indirectly, create, incur, assume permit, suffer to exist or otherwise be or become liable with respect to, contingently or otherwise, any Indebtedness other than Permitted Financial Debt, and (ii) the Company may not prepay all or any part of any Long-term Debt (other than the Secured Debt or any working capital facility that constitutes Permitted Financial Debt).

**4.8**    **Asset Sales**

The Company will not sell, transfer, lease or otherwise dispose of all or a substantial part of its assets, other than inventory, whether in a single transaction or in a series of transactions, related or otherwise, except for:

[AM_ACTIVE 403928027_6]

(a)      assets reasonably determined by the Company to be obsolete, worn-out, damaged, defective, uneconomic, or no longer used by or useful to the Issuer for the operation or maintenance of the Project, but only if such asset is replaced with the proceeds of such sale, to the extent necessary to be consistent with prudent industry practices;

(b)      the connection bays of the Alto Maipo Substation that AES Andes shall require for purposes of operating its transmission system;

(c)      the sale of electricity and capacity in the ordinary course of business on the spot market and in accordance with Applicable Law (including any Applicable Environmental and Social Law) or pursuant to the Material Project Documents or an Approved PPA; and

(d)      the sale of water rights under the RPG Water Rights Agreement.

**4.9    Affiliate Transaction**

Other than power purchase agreement and agreements related to any battery storage project which are governed by Section 4.15, the Company shall not sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each of the foregoing, an "**Affiliate Transaction**"), unless: (i) such Affiliate Transaction is on terms that are no less favorable to the Company than those that would have been obtained in a comparable transaction by the Company with an unrelated Person, and (ii) the Company delivers to the Trustee with respect to any Affiliate Transaction involving aggregate payments in excess of $1.0 million, a resolution adopted by a majority of the disinterested nonemployee directors of the Board of Directors approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above.

**4.10    Liens**

(a)      The Company shall not create or permit to exist any Lien on any property, revenues or other assets, present or future, of the Company other than Permitted Liens.

(b)      Liens required by any contract or statute in order to permit the Company to perform any contract or subcontract made by it with or at the request of a governmental entity or any department, agency or instrumentality thereof, or to secure partial, progress, advance or any other payments to the Company by a governmental entity or any department, agency or instrumentality thereof pursuant to the provisions of any contract or statute shall not be deemed to create Indebtedness secured by Liens.

**4.11    Offer to Repurchase Upon Change of Control**

(a)      Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the

aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder describing the transaction or transactions that constitute the Change of Control and stating:

(i)     that the Change of Control Offer is being made pursuant to this Section 4.11 and that all Notes tendered will be accepted for payment;

(ii)    the purchase price and the purchase date, which shall be no earlier than thirty days and no later than sixty days from the date such notice is mailed or delivered electronically (the "**Change of Control Payment Date**");

(iii)   that any Note not tendered will continue to accrete or accrue interest;

(iv)    that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrete or accrue interest after the Change of Control Payment Date;

(v)     that Noteholders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Noteholder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(vi)    that Noteholders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, electronically or by mail a notice setting forth the name of the Noteholder, the principal amount of Notes delivered for purchase, and a statement that such Noteholder is withdrawing his election to have the Notes purchased; and

(vii)   that Noteholders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $100,000 in principal amount or an integral multiple of $1,000 in excess thereof.

The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Repurchase Event. To the extent that the provisions of any securities laws or regulations conflict with this Section 4.11, or compliance with this Section 4.11 would constitute a violation of any

[AM_ACTIVE 403928027_6]

such laws or regulations, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.11 by virtue of such compliance.

(b)     On the Change of Control Payment Date, the Company will, to the extent lawful:

(i)     accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(ii)     deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(iii)     deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent will promptly mail or transmit in accordance with the Applicable Procedures of DTC (but in any case not later than five days after the Change of Control Payment Date) to each Noteholder properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Noteholder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; <u>provided</u>, that each such new Note will be in a principal amount of $100,000 or an integral multiple of $1,000 in excess thereof.

(c)     If Noteholders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Company, or any third party making a Change of Control Offer in lieu of the Company, purchases all of the Notes validly tendered and not withdrawn by such Noteholders, the Company will have the right, upon not less than thirty nor more than sixty days' prior notice, given not more than thirty days following such purchase pursuant to the Change of Control Offer described above, to redeem all Notes that remain outstanding following such purchase at a redemption price in cash equal to the applicable Change of Control Payment *plus*, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, thereon, to, but not including, the date of redemption.

## 4.12    Insurance Requirements[10]

The Company shall maintain with insurance companies (believed in good faith by the Company to be financially sound and reputable) that customarily write insurance for the risks covered thereby such insurance as may be required by law and as is usually carried by companies of established repute engaged in the same or similar business, owning similar properties, and located in the same general areas as the Company, except where failures to do so could not reasonably be expected to result in a Material Adverse Effect.

---

[10]     **NTD**: This provision remains under discussion.

### 4.13   Security Collateral

The Company shall do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances, financing statements, agreements and other instruments and take all such other actions as may be required under applicable law or that the Collateral Agents reasonably request to evidence, grant, preserve, protect, maintain and/or perfect the Security on any Security Collateral in favor of the Collateral Agents, or otherwise to give effect to the validity and priority of the security interests created or intended to be created by the Security Documents in the Security Collateral.

### 4.14   Fundamental Changes

The Company shall not materially change the nature or scope of the Project or the nature of its present or contemplated business or operations.

### 4.15   Power Purchase Agreements

The Company shall not enter into any power purchase agreement after the Issue Date.

### 4.16   Offering Memorandum[11]

No later than [October 31, 2022], the Company shall, at its own cost (provided that the Company shall not be required to incur costs in excess of $[3,000,000] under this Section 4.16) (i) deliver a final Offering Memorandum to the Trustee.  No later than [March 31, 2023], the Company will engage at least two international investment banking firms to organize a roadshow with a view toward promoting secondary market trading of the Notes and the Secured 1L Notes.

### 4.17   CEMBI Index

The Company shall use commercially reasonable efforts to cause the Notes to be listed on the CEMBI Index.

### 4.18   Filings with the Central Bank

The Company shall make the applicable filings when required with the Central Bank of Chile pursuant to the provisions of *Capítulo XIV del Compendio de Normas de Cambios Internacionales del Banco Central de Chile - Normas Aplicables a los Creditos, Depósitos, Inversiones y Aportes de Capital Provenientes del Exterior* (Chapter XIV of the Compendium of Foreign Exchange Regulations of the Central Bank of Chile - Rules Applicable to Loans, Deposits, Investments and Capital Contributions from Abroad) and shall provide to the Intercreditor Agent a copy of all such filings made simultaneously with their delivery to the Chilean Central Bank.

### 4.19   Equator Principles; IFC Performance Standards[12]

---

[11] **NTD**: This provision remains under discussion, including payment of investment banker's fees and representations to placement agents.

[12] **NTD**: This provision remains under discussion.

[AM_ACTIVE 403928027_6]

The Company shall comply, and cause the Project to comply, with the Equator Principles and the IFC Performance Standards in effect as of the date of this Indenture.

**4.20    Compliance with Law**

The Company shall not conduct its business in compliance with Applicable Law, in all material respects.

**4.21    Pari Passu**

The Company shall ensure at all times that the obligations of the Company under this Agreement, the Secured Debt Documents and the Chilean Law Notes (or acknowledgments of debt in replacement thereof) rank at least pari passu in priority of payment and in all other respects with all other unsecured obligations of the Company outstanding at any time, except for any obligations mandatorily preferred by the laws of the Country, as applicable to the Company.

**4.22    Project Documents**[13]

(a)    The Company shall not enter into or agree to any amendment, waiver or modification to or under any Material Project Document (i) in the case of any Material Project Document with an Affiliate, that is material in any respect and (ii) in the case of any other Material Project Documents, that would reasonably be expected to result in a Material Adverse Effect.

(b)    The Company shall diligently and reasonably pursue payment of the arbitral award by, and enforcement of the arbitral award against, Constructora Nuevo Maipo S.A. in relation to the arbitration with respect to the termination of the Hochtief Tunneling Contract.

**4.23    Annual Budget**[14]

(a)    Prior to the end of each Financial Year on and after the occurrence of the Independent Director Trigger Event, the Company shall adopt an Annual Budget, which shall be approved by the Independent Director.  If at any time during a Financial Year, the Annual Budget has not been approved, and until such approval has been given by the Independent Director, the Company shall operate on the basis of the most-recently approved Annual Budget; provided that, the Company's actual expenditures during such Financial Year shall be subject to the requirements in the following paragraph.

(b)    The Company shall comply with such Annual Budget for each Financial Year; provided that, the Company's actual expenditures during any Financial Year for (A) Taxes; (B) amounts paid to the Company or payable by the Company as instructed by the CEN; and (C) Designated Contract Payments, shall not be subject to compliance with the applicable line items in the Annual Budget. The Company

---

[13]    **NTD**: This provision remains under discussion.
[14]    **NTD**: This provision remains under discussion.

[AM_ACTIVE 403928027_6]

shall not exceed the Annual Budget in any Financial Year by more than ten percent (10%) of such Annual Budget without the consent of the Independent Director.

### 4.24    Capital Expenditure

(a)    Prior to the occurrence of an Independent Director Trigger Event, the Company shall not incur expenditures or commitments for expenditures for fixed assets, other than in accordance with Section 5.02(c) of the Common Terms Agreement.

(b)    On and after the occurrence of the Independent Director Trigger Event, the Company shall not incur expenditures or commitments for expenditures for fixed assets, other than:

    (i)    those required to carry out the Project and essential operations of the Company, as contemplated in the Annual Budget for the relevant Financial Year;

    (ii)    Permitted Capital Expenditures;

    (iii)    required capital expenditures to respond to any Emergency;

    (iv)    capital expenditures in connection with or resulting from any major maintenance required for the Project and approved by the Independent Director; and

    (v)    capital expenditures approved by the Independent Director.

### 4.25    OFAC; Sanctions.

None of the Company, AM DE, the Shareholder, the Sponsor and each of their directors, officers and members of senior management shall be included in the Specially Designated Nationals and Blocked Persons List maintained by OFAC.  The Company shall not be included on the Specifically Designated Nations and Blocked Persons List maintained by the United States Department of the Treasury's Office of Foreign Asset Control and none of its Affiliates or any other Person acting on its behalf shall be included on such lists.  The Company shall not engage in (and shall not authorize or permit any Affiliate or any other Person acting on its behalf to engage in) with respect to the Project or any transaction contemplated by this Indenture, any Sanctionable Practices.

### 4.26    Subsidiaries and Acquisitions.

The Company shall not:

(a)    purchase, subscribe for or otherwise acquire any shares or option rights (or other securities or any interest therein) in, or incorporate, any other company (whether it is a Subsidiary or not), or agree to do any of the foregoing, other than (1) the CEN and (2) ownership of AM DE; or

45

(b)     form, or enter into any partnership, consortium, joint venture or other similar arrangement.

## 4.27    Battery Storage Project.

On and after the Independent Director Trigger Event, the Company shall not enter into, either directly or through any of its Affiliates, any agreements or otherwise commence construction of any Battery Storage Project unless (i) such Battery Storage Project is undertaken with the objective of increasing value to the Company, (ii) such Battery Storage Project is funded with equity, and (iii) the Independent Director has reviewed and approved of the Company's plans for the Battery Storage Project and all related contracts.

## 4.28    Green Bond Certification

The Company shall use commercially reasonable efforts to furnish to appoint an institution that in the opinion of the Issuer (acting reasonably) (a) has environmental expertise; and (b) is independent from the Company, to deliver a second-party opinion on the alignment of the Company's Green Bond Framework and the Notes with the Green Bond Principles 2021, administered by the International Capital Market Association (ICMA).[15]

## 5    SUCCESSORS

## 5.1    Merger, Consolidation, or Sale of Assets

For so long as any Notes are outstanding, the Company may not, directly or indirectly, consolidate or merge with or into another Person; sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to another Person, unless:

(a)     the transaction is a merger or consolidation and the Company is the surviving entity;

(b)     each Nationally Recognized Rating Agency then rating the Notes shall have reaffirmed in writing that the ratings of the Notes immediately following any such action or transaction will not be lower than the ratings of the Notes immediately prior to any such action or transactions; or

(c)     any such action or transaction has been approved by the Trustee acting at the instruction of the Noteholders of a majority in aggregate principal amount of the Notes then outstanding.

## 5.2    Successor Corporation Substituted

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.1, the successor Person formed by such consolidation or into or with which the Company is merged or to which

---

[15]    **NTD**: This provision remains under discussion.

[AM_ACTIVE 403928027_6]

such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein, and (except in the case of a lease) when the successor Person expressly assumes all the obligations of the Company under this Indenture and the Notes pursuant to and in accordance with Section 5.01 hereof, the predecessor Company shall be relieved from all such obligations.

## 6    DEFAULTS AND REMEDIES

### 6.1    Events of Default

Each of the following is an "**Event of Default**:"

(a)    (i) the Company fails to pay principal or Notes Additional Interest amounts due on the Notes (provided that if such failure to pay is caused by an administrative or technical error, the Company shall have three Business Days to cure such failure); or (ii) the Company fails to pay interest or other amounts due on the Notes within thirty days of the same becoming due;

(b)    the Company fails to observe or perform any agreement contained in this Indenture (other than a failure that is the subject of the foregoing clause (a) above) and such failure continues for 45 days after notice to the Company by the Trustee or to the Company and the Trustee by the Noteholders of at least 25% in principal amount of the then outstanding Notes, specifying such failure and requiring it to be remedied and stating that such notice constitutes a notice of Default;

(c)    [any "Event of Default" specified in Section 6.02 of the Common Terms Agreement with respect to the Secured 2L Loans that has not been waived for 90 days by the Secured 2L Lenders; provided that if the Secured 2L Lenders waive such Event of Default, such Event of Default shall be deemed cured under this Indenture;][16]

(d)    the Company fails to pay when due (whether at maturity, upon redemption or acceleration or otherwise) the principal of any Indebtedness in excess of $20.0 million (or the equivalent thereof in other currencies), if such failure shall continue for more than the period of grace, if any, applicable thereto and the period for payment has not been expressly extended;

(e)    a final and non-appealable judgment, order or arbitral award (or series thereof) for the payment of money in excess of $20.0 million (or the equivalent thereof in other currencies) is rendered against the Company and is not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged, vacated or stayed; *provided* that such judgment or decree shall only be considered an Event of Default if the Company (a) has been notified of enforcement

---

[16]    **NTD**: This provision remains under discussion.

proceedings commenced by any creditor and such judgment or decree is not dismissed within 30 days following commencement of such enforcement proceedings; and (b) fails to contest such enforcement proceedings within 60 days from the time that such Company receives notice thereof; *provided further* that, to the extent that an insurer of any third party liability insurance policy required under <u>Annex C</u> (*Insurance Requirements*) of the Common Terms Agreement confirms and acknowledges in writing that all or a portion of the amount of any such judgment, order or arbitral award will be paid out of the proceeds of any such insurance policy, the amount confirmed to be paid under such insurance policy by such insurer shall not be taken into account for purposes of the threshold set forth in this Section 6.1(e);

(f)    a decree or order by a court is entered against the Company or AM DE:

   (i)    adjudging the Company or AM DE bankrupt, in liquidation or insolvent;

   (ii)    approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or with respect to, the Company or AM DE under any applicable law;

   (iii)    appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or AM DE or of any substantial part of its property or other assets; or

   (iv)    ordering the winding up or liquidation of its affairs;

   or any petition is filed seeking any of the above and is not dismissed within sixty (60) days; provided that, for the avoidance of doubt, nothing in this Indenture shall be construed as providing that a Permitted Reorganization is an Event of Default.

(g)    the Company or AM DE:

   (i)    requests a moratorium or suspension of payment of Liabilities from any court;

   (ii)    institutes proceedings or takes any form of corporate action to be liquidated or adjudicated bankrupt or insolvent (including any reorganization procedure (*procedimiento concursal de reorganización*), judicial reorganization agreement (*acuerdo de reorganizacíon judicial*), or simplified reorganization agreement (*acuerdo de reorganización extrajudicial o simplificado*), or liquidation procedure (*procedimiento concursal de liquidación*));

   (iii)    consents to the institution of bankruptcy, liquidation or insolvency proceedings against it;

   (iv)    files a petition or answer or consent seeking reorganization or relief under any applicable law, or consents to the filing of any such petition or to the

appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property;

(v)     makes a general assignment for the benefit of creditors; or

(vi)    admits in writing its inability to pay its Liabilities generally as they become due or otherwise becomes insolvent.

(h)    [a determination is made in a judicial proceeding that any Lien in favor of the Noteholders under the Security Documents shall be unenforceable or invalid against the Company for any reason and the same is not replaced with an enforceable and valid Lien under a Security Document within 10 Business Days (subject to Permitted Liens) or there is any other material breach of a Security Document and such breach continues for 10 Business Days.][17]

## 6.2    Acceleration

In the case of an Event of Default specified in Section 6.01(f) or Section 6.01(g) above, all outstanding Notes will become due and payable immediately without further action or notice (subject to applicable law). If any other Event of Default occurs and is continuing, the Trustee or the Noteholders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately, by notice in writing to the Company, specifying the Event of Default.

Upon any such declaration, the Notes shall become due and payable immediately, unless such acceleration is rescinded as provided in Section 6.4.

## 6.3    Other Remedies

Subject to the terms of the Intercreditor Agreement, if an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Noteholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

## 6.4    Waiver of Past Defaults

Noteholders of a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf  of all Noteholders waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the

---

[17]    **NTD**: This provision remains under discussion.

[AM_ACTIVE 403928027_6]

payment of the principal of, premium, if any, or interest on, the Notes; <u>provided</u>, that the Noteholders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

## 6.5    Control by Majority

Noteholders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Noteholders (provided, however, that the Trustee shall not have an affirmative obligation to determine whether any such direction is unduly prejudicial to the rights of any other Noteholder) or that may involve the Trustee in personal liability.

## 6.6    Limitation on Suits

Subject to the terms of the Intercreditor Agreement, a Noteholder may pursue a remedy with respect to this Indenture or the Notes only if:

(a)    such Noteholder has previously given the Trustee written notice that an Event of Default is continuing;

(b)    Noteholders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)    such Noteholder or Noteholders have offered and, if requested, provided to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(d)    the Trustee has not complied with such request within sixty days after the receipt of the request and the offer and, if requested, the provision of security or indemnity; and

(e)    Noteholders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request within such sixty-day period.

(f)    A Noteholder may not use this Indenture to prejudice the rights of another Noteholder or to obtain a preference or priority over another Noteholder.

## 6.7    Rights of Noteholders to Receive Payment

Notwithstanding any other provision of this Indenture, the right of any Noteholder to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Noteholder; <u>provided</u>, that a Noteholder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

## 6.8    Collection Suit by Trustee

Subject to the terms of the Intercreditor Agreement, if an Event of Default specified in Section 6.1(a) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

## 6.9    Trustee May File Proofs of Claim

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Noteholders allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Noteholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.6. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.6 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Noteholders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Noteholder, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such proceeding.

[AM_ACTIVE 403928027_6]

**6.10    Priorities**

Subject to the terms of the Intercreditor Agreement, if the Trustee collects any money pursuant to this Article 6, or, after an Event of Default, any money or other property is distributable in respect of the Company's obligations under this Indenture, it shall pay out the money or property in the following order:

>*first*: to the Trustee (including any predecessor trustee), its agents and attorneys for amounts due under Section 7.6, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

>*second*: to Noteholders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

>*third*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 6.10.

**6.11    Undertaking for Costs**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Noteholder pursuant to Section 6.7, or a suit by Noteholders of more than 10% in aggregate principal amount of the then outstanding Notes.

**7    TRUSTEE**

**7.1    Duties of Trustee**

(a)    If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied

covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture (provided, that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts, statements, opinions or conclusions stated therein)).

(c)     The Trustee may not be relieved from liabilities for its own grossly negligent action, its own grossly negligent failure to act, or its own willful misconduct, except that:

(i)     this paragraph does not limit the effect of paragraphs (b) and (e) of this Section 7.1;

(ii)     the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(iii)     the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.5.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to this Section 7.1 and Section 7.2.

(e)     No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Noteholders, unless such Noteholder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f)     The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

## 7.2    Rights of Trustee

(a)     The Trustee may conclusively rely upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, judgment, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Trustee need not investigate any fact or matter stated in any

resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, judgment, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled (subject to reasonable confidentiality arrangements as may be proposed by the Company) to make reasonable investigation (upon prior notice and during regular business hours) of the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both; provided, that an Officer's Certificate or Opinion of Counsel will not be required if the Indenture requires the Company to deliver a certificate of an Authorized Officer of the Company in connection with such act or refrain from acting. The Trustee will not be liable for any action it takes, suffers or omits to take in good faith in reliance on such Officer's Certificate, Opinion of Counsel or a certificate of an Authorized Officer of the Company. The Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     The Trustee will not be liable for any action it takes, suffers or omits to take in good faith that it reasonably believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided for in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Authorized Officer of the Company.

(f)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders unless such Noteholders have offered to the Trustee indemnity or security satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of such Default or Event of Default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture and states that it is a notice of Default or Event of Default.

54

(h)     The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; pandemics; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder (and under the other Financing Documents to which it is a party) and each agent, custodian and other Person employed to act hereunder or thereunder.

(j)     The Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     Anything in this Indenture notwithstanding, in no event shall the Trustee be liable for special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action.

(l)     The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as duties.

(m)     The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(n)     The Trustee shall have no responsibility as to the validity, sufficiency, genuineness, ownership or transferability of the Security Collateral, written instruction, or any other documents in connection therewith, and will not be regarded as making nor required to make, any representations with respect thereto.

(o)     The Trustee shall have no obligation to give, execute, deliver, file, record, authorize or obtain any financing statements, notices, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect or validate the security interest granted to the Collateral Agent or (ii) enable the Trustee to exercise and enforce its rights under the Financing Documents with respect to such pledge and security interest.  In addition, the Trustee shall have no responsibility or liability (i) in connection with the acts or omissions of the Company in respect of the foregoing or (ii) for or with respect to the legality,

55

validity and enforceability of any security interest created in the Security Collateral or the perfection and priority of such security interest.

### 7.3 Individual Rights of Trustee

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights. The Trustee is also subject to Section 7.9.

### 7.4 Trustee's Disclaimer

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

### 7.5 Notice of Defaults

If a Default or Event of Default occurs and is continuing and if it is actually known to a Responsible Officer of the Trustee, the Trustee will mail (or otherwise transmit in accordance with the Applicable Procedures of DTC) to Noteholders a notice of the Default or Event of Default within ninety days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest on, any Note, the Trustee may withhold the notice if and so long as a Responsible Officer in good faith determines that withholding the notice is in the interests of the Noteholders.

### 7.6 Compensation and Indemnity

(a)     The Company will pay to the Trustee from time to time compensation for its acceptance of this Indenture and services hereunder in accordance with written arrangements between the Company and the Trustee. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)     The Company will indemnify the Trustee and hold it harmless against any and all loss, liability, action, suits or proceedings at law or in equity and any other fees, charges or expenses (including attorneys' fees and expenses) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture and the Financing Documents, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.6) and defending itself against any claim (whether asserted by the Company, any

56

Noteholder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder or thereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence or willful misconduct. The Trustee will notify the Company promptly of any third party claim for which it may seek indemnity. Failure by the Trustee to so notify the Company will not relieve the Company of its obligations hereunder. The Company will defend the claim and the Trustee will cooperate in the defense. The Trustee may have separate counsel and the Company will pay the reasonable and documented fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)     The obligations of the Company to the Trustee under this Section 7.6 will survive the satisfaction and discharge of this Indenture, the repayment of the Notes, the termination for any reason of this Indenture and the resignation or removal of the Trustee.

(d)     To secure the Company's payment obligations in this Section 7.6, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture, the repayment of the Notes, the termination for any reason of this Indenture and the resignation or removal of the Trustee.

(e)     When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.02(e) or Section 6.02(f) of the Common Terms Agreement as described in Section 6.1(b) occurs, the expenses and the compensation for the services (including the reasonable and documented fees and expenses of its agents and counsel) are intended to constitute expenses of administration for purposes of priority under any Debtor Relief Law.

(f)     "**Trustee**" for purposes of this Section shall include any predecessor Trustee.

**7.7     Replacement of Trustee**

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.7.

(b)     The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company with 30 days prior written notice. The Noteholders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company with 30 days prior written notice. The Company may remove the Trustee if:

(i)     the Trustee fails to comply with Section 7.9;

(ii)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Debtor Relief Law;

(iii)    a custodian or public officer takes charge of the Trustee or its property; or

(iv)    the Trustee becomes incapable of acting.

(c)    If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Noteholders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d)    If a successor Trustee does not take office within sixty days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Company's expense), the Company, or the Noteholders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)    If the Trustee, after written request by any Noteholder who has been a Noteholder for at least six months, fails to be compliant with Section 7.9, such Noteholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Noteholders. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; provided, that all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.6. Notwithstanding replacement of the Trustee pursuant to this Section 7.7, the Company's obligations under Section 7.6 will continue for the benefit of the retiring Trustee.

## 7.8    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another Person, the successor Person without any further act will be the successor Trustee. In case any Notes shall have been authenticated but not delivered by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

## 7.9    Eligibility; Disqualification

There will at all times be a Trustee hereunder that is a Person organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such

[AM_ACTIVE 403928027_6]

laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100,000,000 as set forth in its most recent published annual report of condition.

## 7.10    Trustee Protective Provisions

Without duplication of any amounts the Trustee is entitled to recover under any indemnification provisions in the Financing  Documents, the rights, privileges, protections, indemnities, immunities and benefits provided to the Trustee in this Indenture are in addition to, and are not intended to be in conflict with or limited by, any such provisions in the Financing Documents. The Trustee, in executing and performing its duties under the Financing Documents, shall be entitled to all of the rights, protections, immunities and indemnities granted to it hereunder.

## 8    LEGAL DEFEASANCE AND COVENANT DEFEASANCE

## 8.1    Option to Effect Legal Defeasance or Covenant Defeasance

The Company may at any time, as evidenced by a resolution duly adopted by the authorized governing body and set forth in an Officer's Certificate, elect to have either Sections 8.2 or 8.3 be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

## 8.2    Legal Defeasance and Discharge

Upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.2, the Company will, subject to the satisfaction of the conditions set forth in Section 8.4, be deemed to have been discharged from its obligations with respect to all outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "**Legal Defeasance**"). For this purpose, Legal Defeasance means that the Company will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which will thereafter be deemed to be "**outstanding**" only for the purposes of Section 8.5 and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes and this Indenture (and the Trustee, on written demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(a)    the rights of Noteholders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.4;

(b)    the Company's obligations with respect to such Notes under Article 2 and Section 4.2;

(c)    the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Company's obligations in connection therewith; and

(d)    this Article 8.

[AM_ACTIVE 403928027_6]

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.2 notwithstanding the prior exercise of its option under Section 8.3.

**8.3     Covenant Defeasance**

Upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.3, the Company will, subject to the satisfaction of the conditions set forth in Section 8.4, be released from each of its obligations under the covenants contained in Sections 4.3 through 4.27 with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.4 are satisfied (hereinafter, "**Covenant Defeasance**"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Noteholders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).

For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.1, but, except as specified above, the remainder of this Indenture and such Notes will be unaffected thereby. In addition, upon the Company's exercise under Section 8.1 of the option applicable to this Section 8.3, subject to the satisfaction of the conditions set forth in Section 8.4, the failure to comply with Sections 6.1(a) through 6.1(h) will not constitute Events of Default.

**8.4     Conditions to Legal or Covenant Defeasance**

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.2 or 8.3:

(a)     the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Noteholders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm, or firm of independent public accountants, to pay the principal of, premium, if any, and interest on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(b)     in the case of an election under Section 8.2, the Company has delivered to the Trustee an Opinion of Counsel confirming that:

(i)     the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

[AM_ACTIVE 403928027_6]

(ii)    since the Issue Date, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Noteholders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)    in the case of an election under Section 8.3, the Company must deliver to the Trustee an Opinion of Counsel confirming that the Noteholders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(e)    such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Company is a party or by which the Company is bound;

(f)    the Company must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Company with the intent of preferring the Noteholders over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others;

(g)    the Company must deliver to the Trustee an Officer's Certificate stating that all conditions precedent set forth in clauses (a) through (f) of this Section 8.4 have been complied with; and

(h)    the Company must deliver to the Trustee an Opinion of Counsel (which opinion of counsel may be subject to customary assumptions, qualifications and exclusions), stating that all conditions precedent set forth in clauses (b), (c) and (e) of this Section 8.4 have been complied with; provided, that the Opinion of Counsel with respect to clause (e) of this Section 8.4 may be to the knowledge of such counsel.

## 8.5    Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions

Subject to Section 8.6, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes

of this Section 8.5, the "**Trustee**") pursuant to Section 8.4 in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Noteholders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.4 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Noteholders of the outstanding Notes.

Notwithstanding anything in this *Article 8* to the contrary, the Trustee will deliver or pay to the Company from time to time upon the request of the Company any money or non-callable Government Securities held by it as provided in Section 8.4 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.4(a)), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

**8.6    Repayment to Company**

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Noteholder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; provided, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in the New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than thirty days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

**8.7    Reinstatement**

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Sections **8.2** or **8.3**, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes will be revived and reinstated as though no deposit had occurred pursuant to Sections **8.2** or **8.3** until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Sections **8.2** or **8.3**, as the case may be; provided, that, if the Company makes any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its

obligations, the Company will be subrogated to the rights of the Noteholders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## 9    AMENDMENT, SUPPLEMENT AND WAIVER

### 9.1    Without Consent of Noteholders

Notwithstanding Section 9.2, the Company and the Trustee may amend or supplement the Notes and this Indenture without the consent of any Noteholder:

(a)    to cure any ambiguity, defect or inconsistency;

(b)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(c)    to make any change that would provide any additional rights or benefits to the Noteholders or that does not adversely affect the legal rights hereunder of any Noteholder;

(d)    to provide for a successor Trustee in accordance with the provisions of this Indenture;

(e)    to provide for the assumption of the Company's obligations to the Noteholders by a successor to the Company pursuant to Article 5; or

(f)    to issue Additional Notes either pursuant to this Indenture or pursuant to a Supplemental Indenture, subject to compliance with the provisions of this Indenture.

Upon the request of the Company accompanied by a resolution duly adopted by the authorized governing body authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.2(b) and 9.6, the Trustee will join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties, indemnities or immunities under this Indenture or otherwise.

### 9.2    With Consent of Noteholders

Except as provided below in this Section 9.2, (i) the Company and the Trustee may amend or supplement this Indenture and the Notes (including Additional Notes, if any) with the consent of the Noteholders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class, and (ii) subject to the Common Terms Agreement, the Intercreditor Agreement, and Sections 6.4 and 6.7, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes , except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Noteholders of a majority in aggregate principal amount of the then outstanding Notes (including Additional Notes,

[AM_ACTIVE 403928027_6]

if any) voting as a single class (including consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.8 shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.2.

Upon the request of the Company accompanied by a resolution duly adopted by the authorized governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Noteholders as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.2(b) and 9.6, the Trustee will join with the Company in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties, indemnities or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental indenture.

It is not necessary for the consent of the Noteholders under this Section 9.2 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.2 becomes effective, the Company will mail to the Noteholders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Notwithstanding the foregoing, without the consent of each Noteholder affected and subject to the provisions of the Intercreditor Agreement, an amendment, supplement or waiver under this Section 9.2 may not (with respect to any Notes held by a non-consenting Noteholder):

(a)     reduce the principal amount of Notes whose Noteholders must consent to an amendment, supplement or waiver;

(b)     reduce the principal of or change the fixed maturity of any Note or alter or waive any of the provisions with respect to the redemption of the Notes;

(c)     reduce the rate of or extend the time for payment of interest, including default interest, on any Note;

(d)     waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the Noteholders of a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(e)     make any Note payable in currency other than that stated in the Notes;

(f)     make any change in the provisions of this Indenture relating to waivers of past Defaults or in the provision of this Indenture, the Common Terms Agreement or the Intercreditor Agreement relating to the rights of Noteholders to receive payments of principal of, premium, if any, or interest, on the Notes;

64

(g)     waive a redemption payment with respect to any Note;

(h)     release AM DE (as defined in the Common Terms Agreement) from any of its obligations under the Offshore Subsidiary Guaranty and Security Agreement (as defined in the Common Terms Agreement), except in accordance with the terms of the Common Terms Agreement; or

(i)     make any change in the preceding amendment and waiver provisions.

**9.3     Decisions under Other Financing Documents**

(a)     Notwithstanding any provision of this Indenture or the Intercreditor Agreement to the contrary, each Noteholder shall be deemed to have consented to, and the Trustee shall be required, without the requirement of any vote or consent by the Noteholders and without seeking vote, consent or direction by or from the Noteholders with respect to any of the clauses set forth below, to vote in connection as Secured Creditor Representative under the Intercreditor Agreement or any other Financing Document as follows:

(i)     [*intercreditor provisions remain under Lender discussion*].

(b)     Prior to voting in accordance with this Section 9.3, the Trustee shall have received a certificate from an Authorized Officer of the Company, which certificate shall set forth (1) the vote or consent the Trustee is directed to make as required by this Section 9.3 and (2) the relevant subsection of this Section 9.3 pursuant to which such vote is required.  The Trustee shall be entitled to conclusively rely on such certificate and shall have no duty or obligation to make any independent determinations prior to voting in accordance with this Section 9.3.

**9.4     Revocation and Effect of Consents**

Until an amendment, supplement or waiver becomes effective, a consent to it by a Noteholder is a continuing consent by the Noteholder of a Note and every subsequent Noteholder or portion of a Note that evidences the same debt as the consenting Noteholder's Note, even if notation of the consent is not made on any Note. However, any such Noteholder or subsequent Noteholder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Noteholder.

**9.5     Notation on or Exchange of Notes**

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

[AM_ACTIVE 403928027_6]

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

**9.6    Trustee to Sign Amendments, etc.**

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities, indemnities or immunities of the Trustee. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.1) will be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture by the Company is authorized or permitted by this Indenture and that such supplemental indenture is the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to customary exceptions.

**10    SECURITY COLLATERAL; INDEPENDENT DIRECTOR**

**10.1    Secured 2L Debt**

    (a)    For all purposes under the Common Terms Agreement, the Intercreditor Agreement, and the Security Documents: (i) the Notes, upon issuance, will be Secured 2L Debt, (ii) the Noteholders shall be Secured 2L Noteholders, (iii) the Trustee shall be the Secured Creditor Representative for the Secured 2L Noteholders, and (iv) the Secured 2L Noteholders shall be Secured Creditors.

    (b)    Each Noteholder, by its acceptance of the Notes, instructs and directs the Trustee to execute and deliver the Common Terms Agreement and the Intercreditor Agreement, each of which the Trustee will be a party to on the Issue Date, and, subject to all of its rights, protections, immunities and indemnities set forth herein (including its right to be directed by the Noteholders) to exercise all the rights and perform all the obligations of a Secured Creditor Representative set out in the Common Terms Agreement and the Intercreditor Agreement, including making, on behalf of the Noteholders, the agreements expressed to be made by Secured Noteholders under the Financing Documents.

    (c)    Upon the execution and delivery of the Common Terms Agreement and the Intercreditor Agreement, this Indenture will constitute a Secured 2L Debt Document and the Notes will constitute Secured 2L Debt that is *pari passu* with all other Secured 2L Debt.  The Notes will be secured by the Security Collateral equally and ratable with all other Secured 2L Debt.

**10.2    Release of Security Collateral**

    (a)    With respect to the Notes, the Collateral Agents' Liens upon Security Collateral will no longer secure the Senior Secured Obligations with respect to the Notes and the right of the Noteholders of such Secured Obligations to the benefits and

[AM_ACTIVE 403928027_6]

proceeds of the Collateral Agents' Liens on Security Collateral will terminate and be discharged:

(i)     (A) upon satisfaction and discharge of this Indenture as set forth in Section 11.1, or (B) upon a Legal Defeasance or Covenant Defeasance with respect to the Notes as set forth in Article 8, (C) upon payment in full of the applicable Notes and all other related Secured Obligations that are outstanding, due and payable under this Indenture at the time the Notes are paid in full; or

(ii)    in accordance with the Common Terms Agreement, the Intercreditor Agreement and the Security Documents.

(b)     At the request of the Company pursuant to an Officer's Certificate confirming that all applicable conditions under this Indenture for the release of Security Collateral have been complied with, the Trustee will, based on such Officer's Certificate, deliver a certificate to the applicable Collateral Agent instructing such Collateral Agent to release the relevant Liens without the further consent of the Noteholders. No certificate by the Trustee, nor any consent by the Noteholders, shall be required in connection with any sale, transfer or other disposition of Security Collateral if such sale, transfer or other disposition is permitted by the terms of the Common Terms Agreement, the Intercreditor Agreement and the Security Documents and such documents do not require delivery of such certificate. If the Security Collateral is then held by the Trustee, the Trustee shall, execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release prepared by the Company and at the expense of the Company to evidence such release.

(c)     The release of any Security Collateral from the terms of this Indenture, the Common Terms Agreement, the Intercreditor Agreement and the Security Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Security Collateral is released pursuant to the terms of the Common Terms Agreement, the Intercreditor Agreement and the Security Documents.

## 10.3    Independent Director; Organizational Documents; Special Majority Matters

(a)     Following an Independent Director Trigger Event, (i) Shareholder shall amend the by-laws of the Company in order to increase the number of Directors to five, create the position of Alternate Director and to provide for the other amendments set forth in Exhibit [●] attached hereto; and (ii) the Required Creditors shall nominate, in accordance with Section [●] of the Intercreditor Agreement, an Independent Director and an Alternate Independent Director, both of whom shall be Qualified Nominees.  The Company shall take, and shall cause the Shareholder to take, all necessary corporate and other action to cause such proposed Independent Director and Alternate Independent Director to be duly nominated, approved and

[AM_ACTIVE 403928027_6]

appointed as Director and Alternate Director in accordance with the organizational documents of the Company and applicable law.[18]

        (b)      The Company will not amend or modify its organizational documents, or permit any such amendment or modification to the following provisions:

              (i)      The meetings of the Board of Directors must be called with no less than seven-calendar days' notice for ordinary matters and upon no less than two-calendar days' notice for urgent matters. For such purpose, the chairman, or vice-chairman in case the vice-chairman is replacing the chairman, shall give notice to members of the Board of Directors at their special domiciles by certified mail, acknowledgment of receipt requested, or by any other effective means, including by electronic mail. Such notice must state the date, time and place of the meeting (or the medium used for such meeting if to be held telephonically or via video-conference) as well as the agenda thereof. Prior notice for such meetings shall not be necessary if all of the members of the Board of Directors are present or if the same are ordinary meetings held according to the regular periodicity and schedule previously set by the Board of Directors. For the avoidance of doubt, meetings of the Board of Directors will be permitted to be held telephonically or via video-conference;

              (ii)      The Board of Directors may only hold a meeting if a majority of its members, who shall constitute a quorum, are in attendance and may pass resolutions by a plurality vote of those members present. In case of a tie, the chairman shall have a casting vote, except that approval of the Special Majority Matters (as defined below) shall also require the affirmative vote of the Independent Director and such matters may not be approved if the Independent Director is not present or on the Board of Directors at such time;

              (iii)      The compensation for the Independent Director and the Alternate Independent Director shall be at least equal to the compensation for any other Director or Alternate Director;

              (iv)      The indemnities and D&O insurance coverage provided to the Independent Director and the Alternate Independent Director shall be at least equal to the indemnities and D&O insurance coverage for any other Director or Alternate Director;

              (v)      The following matters are "<u>Special Majority Matters</u>", the approval of which shall require the approval of the Independent Director:

                    (A)      [List matters]

              (vi)      The Independent Director and Alternate Independent Director may not be removed (i) without the consent of the Required Creditors other than for legal cause or (ii) with the consent of the Required Creditors unless, prior to the effective date of such

---

[18]   **NTD**: This provision remains under discussion.

removal, the Required Creditors have duly designated a replacement Independent Director or Alternate Independent Director in accordance with clause (vii) below.

(vii)    If the Independent Director or the Alternate Independent Director resigns, is terminated as a result of death or disability or is removed, (i) the Company shall deliver notice thereof to the Trustee describing the reason for the Independent Director's resignation, termination or removal, (ii) the Required Creditors shall appoint a new Independent Director or Alternate Independent Director, as applicable, in accordance with Section [•] of the Intercreditor Agreement, and the Company shall take, and shall cause the Shareholder  to take, all necessary corporate and other action to cause such proposed new Independent Director or Alternate Independent Director, as applicable, to be duly nominated, approved and appointed as Independent Director or Alternate Director in accordance with the organizational documents of the Company and applicable law and (iii) with respect to any resignation, termination, or removal of the Independent Director, the then-incumbent Alternate Independent Director shall become the Independent Director.

(c)    If either (A) (x) the Independent Director and the Alternate Independent Director have resigned, terminated or removed and (y) within six months after the resignation, termination and removal, the Required Creditors have failed to designate a replacement Independent Director or Alternate Independent Director, as applicable, that are Qualified Nominees or (B) within six months of the occurrence of an Independent Director Trigger Event, the Required Creditors have failed to appoint an Independent Director and Alternate Independent Director that are Qualified Nominees, the Company shall engage a nationally-recognized executive search firm who shall be vested with the power to interview and hire an Independent Director and Alternate Independent Director that are Qualified Nominees and the Company shall take, and shall cause the Shareholder  to take, all necessary corporate action to cause such proposed Independent Director and Alternate Independent Director to be duly nominated and approved as Director and Alternate Director in accordance with the organizational documents of the Company and applicable law.

## 11    SATISFACTION AND DISCHARGE

### 11.1    Satisfaction and Discharge

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a)    either:

(i)    all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company, have been delivered to the Trustee for cancellation; or

(ii)    all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the sending of a notice of redemption or otherwise or will become due and payable within one year and the

Company has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Noteholders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(b) no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing);

(c) such deposit will not result in a breach or violation of, or constitute a default under (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting of Liens securing such borrowing), any material agreement or instrument to which the Company is a party or by which the Company is bound;

(d) the Company has paid or caused to be paid all sums payable by it under this Indenture; and

(e) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, the Company must deliver to the Trustee (1) an Officer's Certificate stating that all conditions precedent set forth in clauses (a) through (e) of this Section 11.1 have been satisfied, and (2) an Opinion of Counsel (which opinion of counsel may be subject to customary assumptions, qualifications and exclusions), stating that all conditions precedent set forth in clauses (c) and (e) of this Section 11.1 have been satisfied; provided, that the Opinion of Counsel with respect to clause (c) of this Section 11.1 may be to the knowledge of such counsel.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (ii) of clause (a) of this Section 11.1, the provisions of Sections 11.2 and Section 7.6 will survive. In addition, nothing in this Section 11.1 will be deemed to discharge those provisions of Section 7.6, that, by their terms, survive the satisfaction and discharge of this Indenture. After the conditions to discharge contained in this Article Eleven have been satisfied, and the Company has paid or caused to be paid all other sums payable hereunder by the Company, and delivered to the Trustee an Officer's Certificate and Opinion of Counsel, each stating that all conditions precedent to satisfaction and discharge have been satisfied, the Trustee upon Company request shall acknowledge in writing the discharge of the obligations of the Company.

## 11.2   Application of Trust Money

Subject to the provisions of Section 8.6, all money deposited with the Trustee pursuant to Section 11.1 shall be held in trust and applied by it, in accordance with the provisions of the Notes

and this Indenture, to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.1 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.1; provided, that if the Company has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Noteholders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## 12    MISCELLANEOUS

### 12.1    Notices

Any notice or communication by the Company or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), electronic mail or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention:  General Manager
> Telephone: +56 2 3333 8301
> Email: luis.urrejola@aes.com


With a copy to:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention:  Felix Gomez
> Email: felix.gomez@aes.com

71

If to the Trustee:

[_____]
Address:

Attention:
Telephone:
E-mail:

The Company or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Noteholders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; at the time sent, if transmitted by electronic mail; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery; provided, that all notices and communications to the Trustee shall not be deemed received by the Trustee unless actually received by the Trustee at its address or electronic mail address set forth above.

Any notice or communication to a Noteholder will be mailed by first class mail, or by certified or registered mail, return receipt requested, by overnight air courier guaranteeing next day delivery, or to electronic mail to the address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Noteholder or any defect in it will not affect its sufficiency with respect to other Noteholders. Notwithstanding any other provision of this Indenture or any Global Note, where this Indenture or any Global Note provides for notice of any event (including any notice of redemption or repurchase) to a holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary (or its designee) pursuant to the Applicable Procedures, including by electronic mail in accordance with the standing instructions from the Depositary.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Noteholders, it will send a copy to the Trustee and each Agent at the same time by any of the means described above with respect to notice or communication by the Company.

## 12.2    Certificate and Opinion as to Conditions Precedent

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(a)    an Officer's Certificate in form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.3) stating that, in the opinion of the signers (who may rely upon an Opinion of Counsel as to matters of law), all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

72

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.3) stating that, in the opinion of such counsel (who may rely upon an Officer's Certificate as to matters of fact), all such conditions precedent and covenants have been complied with; <u>provided</u>, that no such Opinion of Counsel shall be delivered on the date of this Indenture in connection with the original issuance of the initial Global Notes.

## 12.3   Statements Required in Certificate or Opinion

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(a) a statement that the Person making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

## 12.4   Rules by Trustee and Agents

The Trustee may make reasonable rules for action by or at a meeting of Noteholders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

## 12.5   No Personal Liability of Directors, Officers, Employees and Stockholders

No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

## 12.6   Applicable Law, Jurisdiction, etc.

(a) This Indenture shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b) For the exclusive benefit of the Noteholders and the Trustee, the Company irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this

73

Indenture may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan. By the execution of this Indenture, the Company irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding. Final judgment against the Company in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)      Nothing in this Indenture shall affect the right of a party to commence legal proceedings or otherwise sue the Company in the Country or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Company in any manner authorized by the laws of any such jurisdiction.

(d)      The Company hereby confirms, as of the date hereof, the irrevocable designation, appointment and empowerment of Corporation Service Company, with offices currently located at 19 West 44th Street, Suite 200, New York, New York 10036, as its authorized agent solely to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a party may bring in the State of New York in respect of this Indenture.

(e)      As long as this Indenture remains in force, the Company shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a party may bring in New York, New York, United States of America, with respect to this Indenture.

(f)      The Company also irrevocably consents, if for any reason its authorized agent for service of process of summons, complaint and other legal process in any action, suit or proceeding is not present in New York, New York, to the service of such papers being made out of the courts of the United States of America located in the Southern District of New York and the courts of the State of New York located in the Borough of Manhattan by mailing copies of the papers by registered United States air mail, postage prepaid, to the Company, at its address specified pursuant to Section 12.1 (*Notices*). In such a case, a party shall also send by facsimile or electronic mail, or have sent by facsimile or electronic mail, a copy of the papers to the Company.

(g)      Service in the manner provided in clauses (d), (e) and (f) of this Section 12.6 in any action, suit or proceeding will be deemed personal service, will be accepted by the Company as such and will be valid and binding upon the Company for all purposes of any such action, suit or proceeding.

(h)      Each party irrevocably waives to the fullest extent permitted by Applicable Law:

(i)      any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 12.6;

(ii)      any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)      its right of removal of any matter commenced by the Trustee in the courts of the State of New York to any court of the United States of America.

74

(i)     To the extent that the Company may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Indenture, from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed) may be attributed to it or its assets, the Company irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(j)     The Company hereby acknowledges that DFC shall be entitled under Applicable Law, including the provisions of the International Organizations Immunities Act of 1945 (22 U.S.C. §288), to immunity from a trial by jury in any action, suit or proceeding arising out of or relating to this Indenture or the transactions contemplated hereby brought against DFC in any court of the United States of America.

(k)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND THE TRUSTEE HEREBY (AND THE NOTEHOLDERS, BY THEIR ACCEPTANCE OF THE NOTES, THEREBY) IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS INDENTURE OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON, BROUGHT BY OR AGAINST ANY PARTY IN ANY FORUM IN WHICH SUCH PARTY IS NOT ENTITLED TO IMMUNITY FROM TRIAL BY JURY.

(l)     To the extent that the Company may, in any action, suit or proceeding brought in any of the courts referred to in Section 12.6(b) or a court of the Country or elsewhere arising out of or in connection with this Indenture to which the Company is a party, be entitled to the benefit of any provision of law requiring a party in such action, suit or proceeding to post security for the costs of the Company, or to post a bond or to take similar action, the Company hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of the Country or, as the case may be, the jurisdiction in which such court is located.

## 12.7    No Adverse Interpretation of Other Agreements

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or of any other Person. Except as expressly set forth herein, no such other indenture, loan or debt agreement may be used to interpret this Indenture.

## 12.8    Successors[19]

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors.

---

[19] **Note to Draft**: Subject to further review.

[AM_ACTIVE 403928027_6]

**12.9    Severability**

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

**12.10    Counterpart Originals**

The Parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. The exchange of copies of this Indenture and of signature pages in electronic format (*i.e.*, "pdf" or "tif") transmission shall constitute effective execution and delivery of this Indenture as to the Parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the Parties hereto transmitted in electronic format (*i.e.*, "pdf" or "tif") shall be deemed to be their original signatures for all purposes.

**12.11    Trustee's Receipt of Funds to the Extent not Required to be Applied to Payment of the Notes**

To the extent the Trustee receives any money from the Company or pursuant to any of the Financing Documents, and such money is not required to be used to redeem or repay the Notes as set forth in the certificate of an Authorized Officer of the Company, such moneys shall be deposited into the Account under the Offshore Accounts Agreement as specified by the Company in such certificate.

**12.12    Table of Contents, Headings, etc.**

The Table of Contents and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

**12.13    USA Patriot Act**

The parties hereto acknowledge that, in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA PATRIOT Act.

*[Signatures on following page]*

[AM_ACTIVE 403928027_6]

SIGNATURES

ALTO MAIPO SpA

By: _____
Name:
Title:

[TRUSTEE],
as Trustee

By: _____
Name:
Title:

[AM_ACTIVE 403928027_6]

EXHIBIT A-**1**

[Face of Note]

CUSIP:

ISIN:

2.00% Senior Secured Notes due [2052]

No. _____                                                                          $ _____

ALTO MAIPO SpA

promises    to    pay    to    _____    or    registered    assigns,    the    principal    sum    of
_____ DOLLARS, together with accrued interest
thereon with the final installment of principal to be paid in full on October 15, [2052].

Interest Payment Dates:  January 15, April 15, July 15 and October 15, in each year, or if any such
day is not a Business Day, the next succeeding Business Day.

Record Dates: _____ and _____

Dated: _____, _____

ALTO MAIPO SpA

By: _____
Name:
Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

[_____],
as Trustee

By: _____
                Authorized Signatory

A-1-1

[Back of Note]
_____% Senior [Secured] Notes due _____

[*Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture*]

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)      *INTEREST.* Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**"), promises to pay interest on the principal amount of this Note at 2.00% per annum from the date of issuance until maturity. The Company will pay 180 days of interest semi-annually in arrears on April 15 and October 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "**Interest Payment Date**") with the Interest Payment on January 17, 2023. Interest will be computed on the basis of a 360-day year of twelve thirty-day months.

On any Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all interest accrued on the Notes (including each Deferred Interest amount) at the Interest Rate that is due and payable on such Payment Date, then the amount equal to (x) all interest accrued at the Interest Rate due and payable on the Notes on such Payment Date <u>minus</u> (y) the amount of such interest paid in cash on the Notes on such Payment Date, shall be capitalized as Deferred Interest. For the avoidance of doubt, such payment capitalization shall not constitute an Event of Default.

On each April 15 Payment Date, the Company will pay Notes Additional Interest on the Notes for the calendar year immediately preceding such Payment Date, if applicable.  Notes Additional Interest accrues as of December 31 of each calendar year (which, for the avoidance of doubt means that, if the Notes are fully repaid on or prior to December 30 of any calendar year, no Notes Additional Interest shall be payable for that year).  Notwithstanding anything to the contrary, all Notes that convert to Shares pursuant to the Share Conversion Agreement upon the occurrence of the 2L Maturity Date will accrue and be paid Notes Additional Interest for the [2052] calendar year (notwithstanding the conversion of those Notes to equity prior to December 31 in the [2052] calendar year).

On any April 15 Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all the Loan Additional Interest then due on the Notes, then the amount equal to (x) the Notes Additional Interest due and payable on the Notes on such April 15 Payment Date <u>minus</u> (y) the amount of such Loan Additional Interest paid in cash on the Notes on such April 15 Payment Date shall be capitalized. For the avoidance of doubt, such capitalization shall not constitute an Event of Default.

(2)      *PRINCIPAL.* Principal shall be paid semi-annually on each Payment Date occurring in April and October of each year to the extent there is any cash deposited in the Offshore Revenue

A-1-2

Account to pay principal on the Notes in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement.

On the 2L Maturity Date, the principal amount of the Notes then outstanding (including Deferred Interest) will be converted to Shares pursuant to the [2L Share Conversion Agreement].

(3)    *METHOD OF PAYMENT*. The Company will pay principal and interest on the Notes (except defaulted interest) to the Persons who are registered Noteholders at the close of business on the _____ or _____ next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Paying Agent or Registrar maintained for such purpose , or, at the option of the Company, payment of interest may be made by check mailed to the Noteholders at their addresses set forth in the register of Noteholders; provided, that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest on, all Global Notes and all other Notes the Noteholders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(4)    *PAYING AGENT AND REGISTRAR*. Initially, [●], the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Noteholder.

(5)    *INDENTURE AND SECURITY DOCUMENTS*. The Company issued the Notes under an Indenture dated as of [●], 2022 (the "**Indenture**") between the Company and the Trustee. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Noteholders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured obligations of the Company. The Notes are secured by a pledge of Security Collateral (as defined in the Intercreditor Agreement) pursuant to the Security Documents.

(6)    *OPTIONAL REDEMPTION*.

The Company may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

(7)    *MANDATORY REDEMPTION*.

If the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section 2.6(a) of the Common Terms Agreement.

If the Company is required to make a mandatory redemption of the Notes in accordance with Section 2.06(a)(viii) of the Common Terms Agreement, then the Company will be required

[AM_ACTIVE 403928027_6]

to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a) of the Common Terms Agreement.

(8)     *REPURCHASE AT THE OPTION OF THE NOTEHOLDER.*

Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(9)     *NOTICE OF REDEMPTION.*

Notice of redemption will be mailed or delivered electronically at least thirty days but not more than sixty days before the redemption date to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $100,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the Notes held by a Noteholder are to be redeemed.

(10)     *DENOMINATIONS, TRANSFER, EXCHANGE.*

The Notes are in registered form without coupons in denominations of $100,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Noteholder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of fifteen days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(11)     *PERSONS DEEMED OWNERS.* The registered Noteholder of a Note may be treated as its owner for all purposes.

(12)     *TRUSTEE DEALINGS WITH COMPANY.* The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(13)     *NO RECOURSE AGAINST OTHERS.* No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will

[AM_ACTIVE 403928027_6]

have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

(14)   *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(15)   *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Noteholder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(16)   *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Noteholders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(17)   *GOVERNING LAW*. This Note shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

The Company will furnish to any Noteholder upon written request and without charge a copy of the Indenture. Requests may be made to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com


With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

[AM_ACTIVE 403928027_6]

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably _____
appoint to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date:_____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:

‾‾‾‾‾
*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

Option of Noteholder to Elect Purchase

If you want to elect to have this Note purchased by the Company pursuant to Section 4.11 of the Indenture, check the appropriate box below:

☐ Section 4.11

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.11 of the Indenture, state the amount you elect to have purchased:

$_____

Date:__

<div style="margin-left: 40%;">

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Your Signature: _____

</div>

Signature Guarantee*:

——————

*  Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-1-7

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount [at maturity] of this Global Note | Amount of increase in Principal Amount [at maturity] of this Global Note | Principal Amount [at maturity] of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

A-1-8

[AM_ACTIVE 403928027_6]

EXHIBIT A-2

[Face of Regulation S Temporary Global Note]

CUSIP:

ISIN:

2.00% Senior Secured Notes due [2052]

No. _____                                                                    $ _____

ALTO MAIPO SpA

promises to pay to _____ or registered assigns, the principal sum of _____ DOLLARS, together with accrued interest thereon with the final installment of principal to be paid in full on October 15, [2052].

Interest Payment Dates:  January 15, April 15, July 15 and October 15, in each year, or if any such day is not a Business Day, the next succeeding Business Day.

Record Dates: _____ and _____

Dated: _____, ____

ALTO MAIPO SpA

By: _____
Name:
Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

[_____],
as Trustee

By: _____
          Authorized Signatory

A-2-1

[Back of Regulation S Temporary Global Note]
2.00 % Senior Secured Notes due [2052]

THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN). NEITHER THE NOTEHOLDER NOR THE BENEFICIAL OWNERS OF THIS REGULATION S TEMPORARY GLOBAL NOTE SHALL BE ENTITLED TO RECEIVE PAYMENT OF INTEREST HEREON.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO Section 2.6 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO Section 2.6(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO Section 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, (1) REPRESENTS THAT (A) IT IS A "**QUALIFIED INSTITUTIONAL BUYER**" (AS DEFINED IN RULE 144A UNDER THE

A-2-2

SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 (a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT AND (2) AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "**RESALE RESTRICTION TERMINATION DATE**") THAT IS [IN THE CASE OF RULE 144A NOTES: ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF THE ISSUANCE OF ANY ADDITIONAL NOTES AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY)][, IN THE CASE OF REGULATION S NOTES: FORTY DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF ANY ADDITIONAL NOTES AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S), IN RELIANCE ON REGULATION S], ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "**QUALIFIED INSTITUTIONAL BUYER**" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL ''ACCREDITED INVESTOR'' WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE NOTES FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ''ACCREDITED INVESTOR'', FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE OR AS OTHERWISE PROVIDED FOR IN THE INDENTURE."

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)  *INTEREST*. Alto Maipo SpA, a *sociedad por acciones* organized and existing under the laws of the Country (the "**Company**"), promises to pay interest on the principal amount of this Note at 2.00% per annum from the date of issuance until maturity. The Company will pay 180 days of interest semi-annually in arrears on April 15 and October 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "**Interest Payment Date**") with the Interest Payment on January 17, 2023. Interest will be computed on the basis of a 360-day year of twelve thirty-day months.

On any Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all interest accrued on the Notes (including each Deferred Interest amount) at the Interest Rate that is due and payable on such Payment Date, then the amount equal to (x) all interest accrued at the Interest Rate due and payable on the Notes on such Payment Date <u>minus</u> (y) the amount of such interest paid in cash on the Notes on such Payment Date, shall be capitalized as Deferred Interest. For the avoidance of doubt, such payment capitalization shall not constitute an Event of Default.

On each April 15 Payment Date, the Company will pay Notes Additional Interest on the Notes for the calendar year immediately preceding such Payment Date, if applicable.  Notes Additional Interest accrues as of December 31 of each calendar year (which, for the avoidance of doubt means that, if the Notes are fully repaid on or prior to December 30 of any calendar year, no Notes Additional Interest shall be payable for that year).  Notwithstanding anything to the contrary, all Notes that convert to Shares pursuant to the Share Conversion Agreement upon the occurrence of the 2L Maturity Date will accrue and be paid Notes Additional Interest for the [2052] calendar year (notwithstanding the conversion of those Notes to equity prior to December 31 in the [2052] calendar year).

On any April 15 Payment Date, if there is not sufficient cash deposited in the Offshore Revenue Account to pay, in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement, all the Loan Additional Interest then due on the Notes, then the amount equal to (x) the Notes Additional Interest due and payable on the Notes on such April 15 Payment Date <u>minus</u> (y) the amount of such Loan Additional Interest paid in cash on the Notes on such April 15 Payment Date shall be capitalized. For the avoidance of doubt, such capitalization shall not constitute an Event of Default.

(2)  *PRINCIPAL*. Principal shall be paid semi-annually on each Payment Date occurring in April and October of each year to the extent there is any cash deposited in the Offshore Revenue Account to pay principal on the Notes in accordance with the priorities described in Section 5.02(a)(i) of the Offshore Account Agreement.

On the 2L Maturity Date, the principal amount of the Notes then outstanding (including Deferred Interest) will be converted to Shares pursuant to the [2L Share Conversion Agreement].

(3)  *METHOD OF PAYMENT*. The Company will pay principal and interest on the Notes (except defaulted interest) to the Persons who are registered Noteholders at the close of business on the _____ or _____ next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided

in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Paying Agent or Registrar maintained for such purpose , or, at the option of the Company, payment of interest may be made by check mailed to the Noteholders at their addresses set forth in the register of Noteholders; provided, that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest on all Global Notes and all other Notes the Noteholders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(4)     *PAYING AGENT AND REGISTRAR*. Initially, [●], the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Noteholder.

(5)     *INDENTURE AND SECURITY DOCUMENTS*. The Company issued the Notes under an Indenture dated as of [●], 2022 (the "**Indenture**") between the Company and the Trustee. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Noteholders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured obligations of the Company. The Notes are secured by a pledge of Security Collateral (as defined in the Common Terms Agreement) pursuant to the Security Documents.

(6)     *OPTIONAL REDEMPTION*.

The Company may redeem the Notes, in whole (but not in part), at any time and from time to time, at a redemption price equal to 100% of the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to the redemption date.

(7)     *MANDATORY REDEMPTION*.

If the Company receives Collateral Proceeds and the Common Terms Agreement requires the Net Available Amount of such Collateral Proceeds to be applied towards a mandatory redemption of the Notes, then the Company will be required to redeem the Notes in the amount and on the dates set forth in Section 2.6(a) of the Common Terms Agreement.

If the Company is required to make a mandatory redemption of the Notes in accordance with Section 2.06(a)(viii) of the Common Terms Agreement, then the Company will be required to redeem the Notes in the amount and on the dates set forth in the applicable clause of Section 2.06(a) of the Common Terms Agreement.

(8)     *REPURCHASE AT THE OPTION OF THE NOTEHOLDER*.

Upon the occurrence of a Change of Control Repurchase Event, the Company will make an offer (a "**Change of Control Offer**") to each Noteholder to repurchase all or any part (equal to $100,000 or an integral multiple of $1,000 in excess thereof) of that Noteholder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased *plus* accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of

[AM_ACTIVE 403928027_6]

repurchase, subject to the rights of Noteholders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "**Change of Control Payment**"). No later than thirty days following any Change of Control Repurchase Event, the Company will mail or deliver electronically a notice to each Noteholder setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(9)     *Notice of Redemption*.

Notice of redemption will be mailed or delivered electronically at least thirty days but not more than sixty days before the redemption date to each Noteholder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or delivered electronically more than sixty days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $100,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the Notes held by a Noteholder are to be redeemed.

(10)     *Denominations, Transfer, Exchange*.

The Notes are in registered form without coupons in denominations of $100,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Noteholder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of fifteen days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

This Regulation S Temporary Global Note is exchangeable in whole or in part for one or more Global Notes only (i) on or after the termination of the forty-day distribution compliance period (as defined in Regulation S) and (ii) upon presentation of certificates (accompanied by an Opinion of Counsel, if applicable) required by Article 2 of the Indenture. Upon exchange of this Regulation S Temporary Global Note for one or more Global Notes, the Trustee shall cancel this Regulation S Temporary Global Note.

(11)     Persons Deemed Owners. The registered Noteholder of a Note may be treated as its owner for all purposes.

(12)     *Trustee Dealings with Company*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(13)     *No Recourse Against Others*. No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture, the Security Documents, the Financing Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Noteholder by accepting a Note waives and releases all

such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under federal securities laws.

(14)    *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(15)    *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Noteholder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(16)    *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Noteholders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(17)    *GOVERNING LAW*. THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA, WITHOUT TAKING INTO ACCOUNT ITS CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company will furnish to any Noteholder upon written request and without charge a copy of the Indenture. Requests may be made to:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention: General Manager
> Telephone: +56 2 3333 8301
> Email: luis.urrejola@aes.com


With a copy to:

> Alto Maipo SpA
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention: Felix Gomez
> Email: felix.gomez@aes.com

[AM_ACTIVE 403928027_6]

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably _____

appoint to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date:_____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:

_____

*      Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

Option of Noteholder to Elect Purchase

If you want to elect to have this Note purchased by the Company pursuant to Section 4.11 of the Indenture, check the appropriate box below:

☐ Section 4.11

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.11 of the Indenture, state the amount you elect to have purchased:

$_____

Date:___

<div style="text-align:right">

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Your Signature: _____

</div>

Signature Guarantee*:

_____

*        Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE REGULATIONS
TEMPORARY GLOBAL NOTE

The following exchanges of a part of this Regulation S Temporary Global Note for an interest in another Global Note, or exchanges of a part of another Restricted Global Note for an interest in this Regulation S Temporary Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount [at maturity] of this Global Note | Amount of increase in Principal Amount [at maturity] of this Global Note | Principal Amount [at maturity] of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

A-2-10

[AM_ACTIVE 403928027_6]

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

_____, as Trustee
[ADDRESS]

cc:    Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  General Manager
       Telephone: +56 2 3333 8301
       Email: luis.urrejola@aes.com


       With a copy to:

       Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  Felix Gomez
       Email: felix.gomez@aes.com

Re:    2.00% Senior Secured Notes due [2052] issued by Alto Maipo SpA

Reference is hereby made to the Indenture, dated as of [●], 2022 (as amended or supplemented from time to time, the "**Indenture**"), between Alto Maipo SpA, as issuer (the "**Company**") and _____, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "**Transferor**") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "**Transfer**"), to (the "**Transferee**"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.    ☐ **Check if Transferee will take delivery of a beneficial interest in the Rule 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with

B-1

any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Rule 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2. ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Temporary Global Note, the Regulation S Permanent Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, (x) the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Secured 1L Noteholder) and (y) the interest transferred will be held immediately thereafter through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Permanent Global Note, the Regulation S Temporary Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)         ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

<div align="center">or</div>

(b)        ☐ such Transfer is being effected to the Company;

<div align="center">B-2</div>

or

(c)          □ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act;

or

(d)          □ such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the registration requirements of the Securities Act other than Rule 144A, Rule 144, Rule 903 or Rule 904, and the Transferor hereby further certifies that it has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies with the transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requirements of the exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in the form of Exhibit D to the Indenture and (2) an Opinion of Counsel provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification), to the effect that such Transfer is in compliance with the Securities Act. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the IAI Global Note and/or the Restricted Definitive Notes and in the Indenture and the Securities Act.

4.  □  **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a)          □ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)          □ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private

B-3

Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)         □ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

<div style="text-align:right">

_____

[Insert Name of Transferor]

By: _____
Name:
Title:

</div>

Dated:

[AM_ACTIVE 403928027_6]

ANNEX A TO CERTIFICATE OF TRANSFER

1.  The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)          □  a beneficial interest in the:

   (i)       □ Rule 144A Global Note (CUSIP _____), or

   (ii)      □ Regulation S Global Note (CUSIP _____); or

   (iii)     □ IAI Global Note (CUSIP _____); or

(b)          □ a Restricted Definitive Note.

2.  After the Transfer the Transferee will hold:

[CHECK ONE]

(a)          □  a beneficial interest in the:

   (i)       □ Rule 144A Global Note (CUSIP _____), or

   (ii)      □ Regulation S Global Note (CUSIP _____); or

   (iii)     □ IAI Global Note (CUSIP _____); or

   (iv)      □ Unrestricted Global Note (CUSIP _____).

(b)          □ Restricted Definitive Note; or

(c)          □ an Unrestricted Definitive Note,

          in accordance with the terms of the Indenture.

[AM_ACTIVE 403928027_6]

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

_____, as Trustee
[ADDRESS]


cc:    Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  General Manager
       Telephone: +56 2 3333 8301
       Email: luis.urrejola@aes.com


       With a copy to:

       Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  Felix Gomez
       Email: felix.gomez@aes.com

       Re:    2.00% Senior Secured Notes due [2052] issued by Alto Maipo SpA

                         (CUSIP _____)

       Reference is hereby made to the Indenture, dated as of _____, ____, (as amended or supplemented from time to time, the "**Indenture**"), between Alto Maipo SpaA, as issuer (the "**Company**") and _____, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

       _____, (the "**Owner**") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "**Exchange**"). In connection with the Exchange, the Owner hereby certifies that:

   1. **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

   (a)          □ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such

C-1

Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)  □ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)  □ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)  □ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2. **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)  □ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial

[AM_ACTIVE 403928027_6]

interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)        □ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] □ Rule 144A Global Note or □ Regulation S Global Note or □ IAI Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

[AM_ACTIVE 403928027_6]

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____
Name:
Title:

Dated:

[AM_ACTIVE 403928027_6]

EXHIBIT D

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

_____, as Trustee

[ADDRESS]


cc:    Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  General Manager
       Telephone: +56 2 3333 8301
       Email: luis.urrejola@aes.com


       With a copy to:

       Alto Maipo SpA
       Los Conquistadores 1730, Piso 10
       Providencia, Región Metropolitana, Chile
       Attention:  Felix Gomez
       Email: felix.gomez@aes.com


       Re:    2.00% Senior Secured Notes due [2052] issued by Alto Maipo SpA

       Reference is hereby made to the Indenture, dated as of _____, ____ (the "**Indenture**"), between Alto Maipo SpA, as issuer (the "**Company**") and _____ as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

       In connection with our proposed purchase of $ _____ aggregate principal amount of:

       (a)    ☐ a beneficial interest in a Global Note, or

       (b)    ☐ a Definitive Note,

       we confirm that:

       1.    We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "**Securities Act**").

E-1

2.      We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence. We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter and, an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to the provisions of Rule 144 under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any Person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____

[Insert Name of Accredited Investor]

By: _____

Name:

Title:

Dated:_____

[AM_ACTIVE 403928027_6]

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

[AM_ACTIVE 403928027_6]

EXHIBIT E

ADDITIONAL NOTES AND SUPPLEMENTAL
INDENTURES FOR ADDITIONAL NOTES

Reference is made in this <u>Exhibit E</u> to the Indenture dated as of [●], 2022 (the "*Indenture*") between Alto Maipo SpA, (the "*Company*") and [●], as trustee (the "*Trustee*").

(a)    After the Issue Date of the Notes, subject to compliance with the Indenture, including Sections 2.1 and 4.7: thereof and this Exhibit E, the Company may issue Additional Notes, in one or more series, under this Indenture or under one or more Supplemental Indentures that comply with the provisions of this Indenture.  Additional Notes may be issued as a separate series or the same series as the Initial Notes or other Additional Notes, as shall be specified in the form of the Additional Note or in any Supplemental Indenture governing the terms of the Additional Notes permitted to be issued by this Indenture.  Additional Notes may be issued in accordance with the following provisions, which are deemed to be part of Section 2.1(d) of the Indenture:

(b)    Capitalized terms used and not otherwise defined in this <u>Exhibit E</u> which are defined in Section 1.1 or other Sections of the Indenture have the meanings set forth therein and the following terms have the meanings set forth below:

"*Authorizing Resolution*" means a resolution duly adopted by (1) the authorized governing body of the Company or (2) any pricing or other committee of the authorized governing body of the Company duly authorized to act for it hereunder, a copy of which is delivered to the Trustee, accompanied by an Officer's Certificate that such resolution has been duly adopted, has not been amended, modified, supplemented or rescinded and is in full force and effect.

"*Registered Additional Note*" means any Additional Note registered on the Additional Note Register maintained by the Company pursuant to Section 3.1 below.

**1.1.    Terms of Additional Notes**.  (a) The terms and conditions of any Additional Notes shall be established in or pursuant to an Authorizing Resolution, and set forth in an Officer's Certificate, or established in one or more Supplemental Indentures approved pursuant to an Authorizing Resolution, and as set forth in an Officer's Certificate, prior to the issuance of Additional Notes of any series, which shall include, as applicable:

(i)    the title of the Additional Notes of the series (which shall distinguish the Additional Notes of the series from all other Notes, except if issued as the same series as the Initial Notes or other Additional Notes);

(ii)    any limit upon the aggregate principal amount of the Additional Notes of the series which may be authenticated and delivered under the Indenture (except for Additional Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Additional Notes of the series;

(iii)    the date or dates (or the manner of determining the same) on which the principal of the Additional Notes of the series is payable (which, if so provided in or

pursuant to such Authorizing Resolution or in any Supplemental Indenture, may be determined by the Company from time to time and set forth in the Additional Notes of the series issued from time to time);

(iv)    the rate or rates (or the method of determining the same) at which the Additional Notes of the series shall bear interest, if any, and the date or dates from which such interest shall accrue (which, in the case of either or both, if so provided in or pursuant to such Authorizing Resolution or in any Supplemental Indenture, may be determined by the Company from time to time and set forth in the Additional Notes of the series issued from time to time), the Interest Payment Dates (or the manner of determining the same) on which such interest, if any, shall be payable, the record dates (or the manner of determining the same), if any, for the determination of Holders to whom interest is payable on any Interest Payment Date;

(v)    the place or places where, subject to the Indenture, the principal of (and premium, if any) and interest, if any, on Additional Notes of the series shall be payable, any Additional Notes of the series may be surrendered for registration of transfer and Additional Notes of the series may be surrendered for exchange and the place or places where notices or demands to or upon the Company in respect of the Additional Notes of the series may be served;

(vi)    the period or periods within which, the price or prices at which, and the terms and conditions upon which Additional Notes of the series may be redeemed, in whole or in part, at the option of the Company, pursuant to any sinking fund or otherwise;

(vii)    the obligation, if any, of the Company to redeem, repay, prepay or purchase Additional Notes of the series pursuant to any mandatory prepayment, purchase or redemption provision, sinking fund or analogous provisions or at the option of a Holder thereof and the period or periods within which, the price or prices at which, and the terms and conditions upon which Additional Notes of the series shall be redeemed, repaid, prepaid or purchased, in whole or in part, pursuant to such obligation, or at the option of a Holder thereof;

(viii)    if other than denominations of U.S. $100,000 and any integral multiple of $ 1,000 in excess thereof, the denominations in which Additional Notes of the series shall be issuable;

(ix)    if other than the principal amount thereof, the portion of the principal amount of Additional Notes of the series which shall be payable upon declaration of acceleration of the maturity thereof or the method by which such portion shall be determined;

(x)    if the amount of payments of principal of (or any premium) or any interest on the Additional Notes of the series may be determined with reference to an index, the manner in which such amounts shall be determined;

(xi)    whether the Additional Notes of the series shall be issued in whole or in part in the form of a Global Additional Note or Notes and, in such case, the Depositary for such

Global Additional Note or Notes, if other than DTC, whether such global form shall be permanent or temporary and, if so, whether beneficial owners of interests in any such Global Additional Note may exchange such interests for Additional Notes of such series in certificated form and of like tenor of any authorized form and denomination and the circumstances under which any such exchanges may occur, if other than in the manner provided in this Indenture;

(xii)     in the case of any Global Additional Note that may be exchanged for other Additional Notes, the manner and procedures for effecting such exchange;

(xiii)    whether and under what circumstances, and the terms and conditions on which, the Company will pay additional amounts on the Additional Notes of the series in respect of any tax, assessment or governmental charge withheld or deducted and whether the Company will have the option to redeem such Additional Notes rather than pay such additional amounts or to redeem such Additional Notes in the event of the imposition of any certification, documentation, information or other reporting requirement and, if so, under what circumstances and the terms and conditions on which the Company may exercise such option; and

(xiv)    any other terms of the series of Additional Notes which terms must be consistent with the provisions of the Indenture and, with respect to the matters set forth in Articles 4, 5, 6, 9, and 10 (if any Additional Note is secured by any Collateral) (and any defined terms used therein) must be the same as those provisions (and any defined terms used therein).

(b)     All Additional Notes of any one series shall be substantially identical except that such Additional Notes may differ as to date of issue and the date from which interest, if any, shall accrue.  The terms of such Additional Notes, as set forth above, may be determined by the Company from time to time if so provided in or pursuant to such Authorizing Resolution or in any Supplemental Indenture for Additional Notes.  All Additional Notes of any one series need not, but may, be issued at the same time.

(c)     If any terms of any series of Additional Notes are established by action taken pursuant to an Authorizing Resolution, a copy of an appropriate record of such action shall be certified by the Secretary or an Assistant Secretary of the Company and delivered to the Trustee at or prior to the delivery of the Officer's Certificate setting forth the terms of the series.

**1.2.     Issuance of Additional Notes**. (a) When authorized by an Authorizing Resolution, Additional Notes may be issued either pursuant to the Indenture or pursuant to a Supplemental Indenture, in each case, without the consent of the Holders of any Notes, subject to compliance with the provisions of this Indenture.

(b)     In authenticating or delivering any Additional Notes under the Indenture, or in executing, or accepting the additional trusts created by, any Supplemental Indenture for Additional Notes permitted by the Indenture, the Trustee shall be entitled to receive, and shall be fully

[AM_ACTIVE 403928027_6]

protected in relying upon, and the Company shall cause to be provided, an Opinion of Counsel that (subject to customary exceptions and assumptions):

> (i)     such Additional Notes, when authenticated and delivered by the Trustee and issued by the Company and paid for by the purchaser(s) thereof, in each case in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles; and

> (ii)    the execution and delivery by the Company of such Additional Notes and any Supplemental Indenture for Additional Notes (A) have been duly authorized by all necessary limited liability company, managing member or other action on the part of the Company or its members and (B) will not violate the limited liability company agreement, certificate of formation or other organizational documents of the Company, any law binding on the Company, or the Indenture and the other Financing Documents.

In executing any amendment, modification or supplement of any Additional Notes or any Supplemental Indenture for Additional Notes, the Trustee shall be entitled to receive, and shall be fully protected in relying upon, and the Company shall cause to be provided, an Opinion of Counsel (subject to customary exceptions and assumptions) stating that the amendment, modification or supplement of any Additional Notes or Supplemental Indenture for Additional Notes is authorized or permitted by the Indenture and that such supplemental indenture is the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)    The Trustee and the Company, at any time and from time to time, may enter into one or more Supplemental Indentures, in form satisfactory to the Trustee and the Company, (i) to establish the forms or terms of Additional Notes of any series permitted by this Indenture or (ii) to amend such forms or terms in any manner, solely to the extent such amendment is permitted by the terms of this Indenture. The Trustee may, but shall not be obligated to, enter into any such Supplemental Indenture for Additional Notes which materially and adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

(d)    Upon the execution of any Supplemental Indenture for Additional Notes, any such Supplemental Indenture shall form a part of this Indenture for purposes of such Additional Notes and upon the execution of any amendment, modification or supplement of any Supplemental Indenture for Additional Notes in accordance with this Indenture, the Holders of Additional Notes of any series affected thereby theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

(f)    Additional Notes of any series authenticated and delivered after the execution of any Supplemental Indenture for Additional Notes may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such Supplemental Indentures. If the Company shall so determine, new Additional Notes of any series, so modified as to conform, in the opinion of the Trustee and the authorized governing body of the Company, to any such Supplemental Indenture for Additional Notes may be prepared and executed by the

Company and authenticated and delivered by the Trustee in exchange for outstanding Additional Notes of such series.

      **2.1**    **Form of Additional Notes**.  (a) Any Additional Notes of the same series as the Initial Notes will be in the form or forms provided in Sections 2.1(a), (b) or (c), as applicable, of the Indenture.

      (b)    Any Additional Notes of a separate series from the Initial Notes will be in such form or forms, subject to the compliance with all other provisions of the Indenture, as shall be established in or pursuant to an Authorizing Resolution (and set forth in an Authorizing Resolution or, to the extent established pursuant to (rather than as set forth in) such Authorizing Resolution, in an Officer's Certificate as to such establishment) or in one or more Supplemental Indentures for the Additional Notes permitted to be issued by this Indenture approved pursuant to an Authorizing Resolution.

      (c)    Except as provided in <u>Section 2.1(b)</u> above, the Additional Notes of each series shall be issued as (i) Registered Additional Notes or (ii) Global Additional Notes.

      (d)    Additional Notes may be issued, in each case, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by the Indenture or any Supplemental Indenture for Additional Notes, shall have such legends as may be required by applicable law, and may have such letters, numbers or other marks of identification and such other legends or endorsements placed thereon as may be required to comply with the rules of any securities exchange, Depositary or clearing organization, or to conform to usage, as may, consistently herewith, be determined by the officers of the Company executing such Additional Notes, as evidenced by their execution of such Additional Notes.

      (e)    Each Additional Note (including a Global Additional Note) shall be dated the date of its authentication.

      (d)    The Company in issuing the Additional Notes may use "CUSIP," "CINS," "ISIN" and other reference numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP," "CINS," "ISIN" and other such reference numbers in notices as a convenience to Holders; <u>provided</u> that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Additional Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Additional Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Company will promptly notify the Trustee of any changes in the "CUSIP," "CINS," "ISIN" or the other such reference numbers.

      **2.2**    **Form of Trustee Authentication for Additional Notes.**

      (a)    The Trustee's certificate of authentication on all Additional Notes shall be in substantially the following form:

      "This is one of the Additional Notes of the series designated therein referred to in the within-mentioned Indenture.

[AM_ACTIVE 403928027_6]

[●],
as Trustee

By     _____
              Authorized Signatory

**3.1    Registration, Registration of Transfer and Exchange**.  (a) If the Additional Notes of or within a series are issuable as a Global Additional Note, the provisions of Section 2.6 of the Indenture shall apply to the transfer and exchange of the Global Additional Note.

(b)    If the Additional Notes of or within a series are issuable as a Registered Additional Note that is not a Global Additional Note, the Company shall cause to be kept a register or registers in respect of each series of Additional Notes (herein sometimes referred to as the "Additional Note Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Registered Additional Notes of such series and the registration of transfers of Registered Additional Notes of such series.

(c)    Upon surrender for registration of transfer of any Registered Additional Note of any series at the office or agency of the Company maintained for such purpose in respect of such series, but subject to any restrictions thereon, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Registered Additional Notes of such series of any authorized denominations, of a like stated maturity and aggregate principal amount and with like terms and conditions.

(d)    At the option of the Holder, Registered Additional Notes of any series may be exchanged for one or more other Registered Additional Notes of such series of any authorized denominations, of a like stated maturity and aggregate principal amount and with like terms and conditions, upon surrender of the Registered Additional Notes to be exchanged at any such office or agency.

(e)    Whenever any Registered Additional Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Additional Notes which the Holder making the exchange is entitled to receive.

(f)    All Additional Notes issued upon any registration of transfer or exchange of Additional Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under the Indenture, as the Additional Notes surrendered upon such registration of transfer or exchange.

(g)    Every Registered Additional Note of a series presented or surrendered for registration of transfer or exchange shall (if so required by the Company or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee and the Additional Note Registrar in respect of such series duly executed, by the Holder thereof or such Holder's attorney duly authorized in writing.

(h)    No service charge shall be made for any registration of transfer or exchange of Additional Notes, but the Company may require payment of a sum sufficient to cover any tax or

[AM_ACTIVE 403928027_6]

other governmental charge that may be imposed in connection with any registration of transfer or exchange of Additional Notes.

(i)    The Company shall not be required (A) to issue, register the transfer of or exchange any Additional Note of any series during a period beginning at the opening of business 15 days before the day of the mailing or electronic delivery of a notice of redemption of Additional Notes of such series selected for redemption hereunder and ending at the close of business on the day of such mailing or (B) to register the transfer of or exchange any Registered Additional Note of such series so selected for redemption in whole or in part, except the unredeemed portion of any Registered Additional Note being redeemed in part.

**3.2    Persons Deemed Owners**.  (a) The Company, the Trustee and any paying agent, the Additional Note registrar and any other agent of the Company or the Trustee in respect of the Additional Notes of any series may treat the Person in whose name any Registered Additional Note of such series is registered as the owner of such Registered Additional Note for the purpose of receiving payment of principal of (and premium, if any) and interest, if any, on such Registered Additional Note and for all other purposes whatsoever, whether or not such Registered Additional Note be overdue, and neither the Company nor the Trustee nor any paying agent, Additional Note registrar or other agent of the Company or the Trustee in respect of the Registered Additional Notes of such series shall be affected by notice to the contrary.

(b)    None of the Company, the Trustee and any paying agent, the Additional Note registrar and any other agent of the Company or the Trustee will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Additional Note or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(c)    Notwithstanding the foregoing, with respect to any Global Additional Note, nothing herein shall prevent the Company, the Trustee, or any agent of the Company or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by any Depositary, as a Holder, with respect to such Global Additional Note or impair, as between such Depositary and owners of beneficial interests in such Global Additional Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Holder of such Global Additional Note.

[AM_ACTIVE 403928027_6]

EXHIBIT F

FORM OF ACKNOWLEDGMENT OF DEBT[20]

**REPERTORIO N°:**

**RECONOCIMIENTO DE DEUDA**

**ALTO MAIPO SpA**

**A**

**[DEPOSITARY/TRUSTEE]**

**En Santiago de Chile,** a [•], ante mí, [NOTARIO PÚBLICO], comparece: don [•], [nacionalidad], [estado civil], [profesión u oficio], cédula de identidad [para extranjeros] número [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA** una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•] /en adelante el "**Deudor**"/; el compareciente mayor de edad, quien acredita su identidad con la cédula antes citada y expone que viene en otorgar el siguiente reconocimiento de deuda, el "**Reconocimiento de Deuda**":

**PRIMERO**: **Antecedentes.**

/a/ Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC, filial del Deudor, iniciaron un procedimiento de insolvencia conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/b/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados a esa fecha por el Deudor asociados a la construcción del Proyecto, en títulos de deuda transables en el mercado de capitales. Atendido lo anterior, por instrumento privado denominado "*Indenture*", otorgado con fecha [•] de dos mil veintidós, suscrito en idioma inglés y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, en calidad de emisor, y [•] en calidad de *Trustee*, suscribieron un contrato de emisión de títulos de deuda o *Notes* /en adelante, dicho contrato, según sea modificado, complementado, actualizado de tiempo en tiempo, el "**TwoL Indenture**"/.

/c/ Conforme a lo establecido en el TwoL Indenture, el Deudor, en calidad de emisor de títulos de deuda, ha llevado a cabo una emisión internacional de títulos de deuda /*Notes*/ con sujeción a la Regla número 144A y a la Regulación S, ambas emitidas por la *Securities and Exchange*

---

[20] **NTD**: Exhibit E remains under discussion.

[AM_ACTIVE 403928027_6]

*Commission* de los Estados Unidos de América en aplicación de la *Securities Act of 1933* o ley de valores de los Estados Unidos de América, y sus modificaciones posteriores, referidas, respectivamente, a la exención de la obligación de registrar y efectuar oferta pública en los Estados Unidos de América y a ofertas de valores efectuadas fuera de esa nación.

/**d**/ Así es como con [esta fecha / fecha [●] de dos mil veintidós], el Deudor ha emitido bajo el TwoL Indenture, títulos de deuda en beneficio de determinados acreedores del Deudor /los "**Inversionistas**"/, por un monto total de capital de [●] dólares de los Estados Unidos de América /"**Dólares**"/, con vencimiento final el treinta de junio de dos mil cuarenta y cuyo capital devengará intereses a una tasa fija anual de cuatro por ciento /los "**Títulos de Deuda**"/.

/**e**/ Con el objeto de facilitar el cobro por parte de los respectivos Inversionistas de los montos de capital e intereses adeudados por el Deudor bajo los Títulos de Deuda, y sin ánimo de novar, el Deudor suscribe el presente Reconocimiento de Deuda.

**SEGUNDO: Reconocimiento de Deuda.** /**a**/ Por este acto y mediante el presente instrumento, el Deudor declara y reconoce, expresa e irrevocablemente, deber y adeudar a los Inversionistas, representados por [Depositary/Trustee] /el "**Acreedor**"/ la suma de [●] Dólares por concepto de capital /el "**Capital Adeudado**"/. El Capital Adeudado deberá ser pagado al Acreedor en [número de cuotas] cuotas semestrales y sucesivas /cada una, una "**Cuota de Capital**"/, la primera de ellas pagadera el quince de abril de dos mil veinticuatro y la última Cuota de Capital pagadera el día treinta de junio de dos mil cuarenta /cada una, una "**Fecha de Pago de Capital**"/, conforme al calendario de amortizaciones que se adjunta como Anexo I del presente instrumento, el que se protocoliza conjuntamente con esta escritura bajo el mismo número de repertorio. /**b**/ Se deja expresa constancia que el presente acto constituye sólo una documentación de una obligación preexistente, consistente en la obligación del Deudor de pagar el capital y los intereses de los Títulos de Deuda a los Inversionistas, no habiendo entrega de dinero y no constituyendo, por tanto, una operación de crédito de dinero bajo la Ley número dieciocho mil diez. Asimismo, el Deudor deja constancia que la declaración y reconocimiento de deuda efectuada mediante este instrumento no constituye en ninguna forma una novación de la deuda reconocida.

**TERCERO: Intereses.** El Deudor se obliga incondicionalmente a pagar intereses sobre el Capital Adeudado a contar [de esta fecha / del [●]] y hasta la fecha de su pago íntegro y efectivo, a una tasa de interés anual de cuatro por ciento /la "**Tasa de Interés**"/. Los intereses devengados sobre el Capital Adeudado deberán ser pagados trimestralmente y en dinero efectivo /con excepción de lo señalado más adelante/, los días quince de enero, quince de abril, quince de julio y quince de octubre de cada año. Los intereses devengados por el Capital Adeudado durante el año dos mil veintidós serán capitalizados e incrementarán el Capital Adeudado. Los intereses pagaderos el quince de enero de dos mil veintitrés podrán ser capitalizados en vez de pagados en dinero efectivo, de cumplirse las condiciones establecidas para ello en el TwoL Indenture. Todos los cómputos de intereses se harán sobre la base de años de trescientos sesenta días y de doce meses de treinta días, en cada caso por el número de días efectivamente transcurridos durante el plazo por el cual deban pagarse tales intereses. Los intereses que no fueren pagados a su vencimiento se capitalizarán en dicha fecha y, sin necesidad de demanda judicial, devengarán un interés moratorio, pagadero al mero requerimiento del Acreedor, a una tasa adicional anual equivalente en todo momento a un dos por ciento por año por sobre la Tasa de Interés aplicable en ese momento. El interés moratorio

[AM_ACTIVE 403928027_6]

se calculará sobre el monto del Capital Adeudado que se encuentra en mora /incluidos los intereses capitalizados conforme a esta Cláusula/, y correrá desde la mora o simple retardo hasta la fecha del pago efectivo de lo adeudado.

**CUARTO: Pagos.** Todos los pagos de capital, intereses y otras cantidades bajo este Reconocimiento de Deuda deberán efectuarse al Acreedor en Dólares, en fondos de inmediata disponibilidad, sin deducciones, compensaciones o reconvenciones, en la cuenta bancaria que éste le indique oportunamente al Deudor. Toda vez que la fecha de vencimiento de cualquier pago que deba efectuarse conforme a este Reconocimiento de Deuda haya de ocurrir en un día que no sea Día Hábil /según este término se define más adelante/, ese pago se efectuará el Día Hábil inmediatamente siguiente, considerando los intereses que se hubiesen devengado en el intertanto respecto de cuotas de capital pero no de intereses. Para efectos de esta Cláusula, "**Día Hábil**" significa un día /distinto de un sábado o domingo/ en que los bancos estén abiertos al público en las ciudades de Nueva York, Estados Unidos o Santiago, Chile.

**QUINTO: Aceleración.** En caso que el Deudor incumpla su obligación de pagar a su vencimiento el capital o intereses adeudados bajo este Reconocimiento de Deuda, o en caso de que el Deudor tenga la calidad de deudor en un procedimiento concursal de liquidación, o tenga la calidad de deudor en un procedimiento concursal de reorganización, en todos los casos anteriores ya sea en Chile o en otra jurisdicción, o se encuentre en notoria insolvencia, el Acreedor tendrá derecho a declarar inmediata e íntegramente exigibles y pagaderos el monto de capital insoluto, los intereses devengados bajo este Reconocimiento de Deuda y todas las demás cantidades que debe pagar el Deudor bajo este Reconocimiento de Deuda, con lo cual dichas cantidades se considerarán de plazo vencido y exigibles, sin necesidad de protesto, reclamo, demanda, ni otras formalidades de ningún tipo, todas las que en este acto son expresamente renunciadas por el Deudor. Las causales de caducidad del plazo antes indicadas se han establecido en beneficio exclusivo del Acreedor, y sólo podrán invocarse y ejercerse conforme a lo establecido en la Ley número veinte mil setecientos veinte, "Ley de Reorganización y Liquidación de Empresas y Personas".

**SEXTO: Renuncia.** Sin perjuicio que el reconocimiento de deuda al que se refiere este instrumento constituye un acto unilateral del Deudor, éste renuncia en este acto a modificar o dejar sin efecto en todo o en parte lo expresado en este instrumento, sin el consentimiento previo del Acreedor, y declara que cumplirá fielmente con aquellas obligaciones que en virtud de éste asume.

**SÉPTIMO: Gastos.** El Deudor pagará y reembolsará al Acreedor, a su mero requerimiento, todos los costos y gastos, si existieren, en que dicho Acreedor haya incurrido con motivo del cobro forzado de este Reconocimiento de Deuda, incluyendo los honorarios y gastos documentados de abogados.

**OCTAVO: Nulidad e Ineficacia.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez de las demás estipulaciones de este instrumento.

**NOVENO: Ley Aplicable. Domicilio y Jurisdicción.** Este Reconocimiento de Deuda se regirá y será interpretado y exigible de conformidad con las leyes de la República de Chile. Para todos los efectos legales del presente instrumento, el Deudor fija su domicilio en la ciudad de Santiago y se

somete irrevocablemente a la jurisdicción y competencia no exclusiva de los tribunales ordinarios de justicia con asiento en la ciudad y comuna de Santiago, República de Chile.

**PERSONERÍA**. [•]. La citada personería no se inserta por ser conocidas por la parte compareciente y por el Notario que autoriza. En comprobante y previa lectura firma el compareciente. Se dan copias. DOY FE.

_____
**[•]**
**p.p. ALTO MAIPO SpA**

[AM_ACTIVE 403928027_6]

**Exhibit G**

**Third Amended and Restated Share Retention Agreement**

29299009.2

*Working Draft 4.27.2022*

**DFC Loan Numbers 513-2014-949-IG &9000042574**

# THIRD AMENDED AND RESTATED SHARE RETENTION AGREEMENT

**among**

**ALTO MAIPO SpA,**
**as Borrower,**

**AES ANDES S.A.,**
**as Sponsor,**

**NORGENER RENOVABLES SpA,**
**as Shareholder,**

**and**

**ITAÚ CORPBANCA,**
**as Intercreditor Agent,**

**Dated as of [●], 2022**

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

# **TABLE OF CONTENTS**

Article/Section                              Item                                    Page No.

ARTICLE I    Definitions.................................................................................2

    Section 1.01.    *Common Terms Agreement Definitions*.  ...................................2
    Section 1.02.    *Other Definitions*. .........................................................2
    Section 1.03.    *Interpretation*.  ..........................................................4

ARTICLE II    Share and Subordinated Loan Retention.............................................4

    *Section 2.01.*    *Share and Subordinated Loan Retention*. ...................................4
    Section 2.02.    *Conditions to All Share and Subordinated Loan Transfers*.......................5
    Section 2.03.    *Restrictions on Share Transfer Recordation - Notice of Transfers*. ...........7
    Section 2.04.    *Notification of Transfer Restrictions*. ....................................7
    Section 2.05.    *Conditions to Shared Services Loan Transfers*.................................8

ARTICLE III    Representations and Warranties .....................................................8

    Section 3.01.    *Representations and Warranties*.............................................8
    Section 3.02.    *Lender Reliance*. .........................................................10

ARTICLE IV    Covenants.......................................................................10

    Section 4.01.    *No Sanctionable Practices*.................................................10
    Section 4.02.    *Security*. ................................................................10
    Section 4.03.    *Secondary Marketing Support*. .............................................11
    Section 4.04.    *Restrictions on Solicitation of Debt Acquisition*. ........................11

ARTICLE V    Miscellaneous ...................................................................11

    Section 5.01.    *Severability*. ............................................................11
    Section 5.02.    *Saving of Rights*. ........................................................11
    Section 5.03.    *Amendment*. ...............................................................12
    Section 5.04.    *Fees and Expenses* ........................................................12
    Section 5.05.    *Notices*. .................................................................12
    Section 5.06.    *English Language*. ........................................................14
    Section 5.07.    *Counterparts*. ............................................................14
    Section 5.08.    *Applicable Law and Jurisdiction*. .........................................14
    Section 5.09.    *Third Party Rights*. ......................................................16
    Section 5.10.    *Successors and Assigns*. ..................................................16
    Section 5.11.    *Termination*. .............................................................17
    Section 5.12.    *Prior Statements*. ........................................................17
    Section 5.13.    *Effectiveness*. ...........................................................17
    Section 5.14.    *Amendment and Restatement.* ...............................................17

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

SCHEDULE 1:        Form of Accession Instrument – Joinder Agreement

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

## THIRD AMENDED AND RESTATED SHARE RETENTION AGREEMENT

This THIRD AMENDED AND RESTATED SHARE RETENTION AGREEMENT (this "Agreement") dated as of [●], 2022 is by and among:

(1)     **ALTO MAIPO SpA,** a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower");

(2)     **AES ANDES S.A.,** a *sociedad anónima* existing and organized under the laws of the Country and formerly known as AES Gener S.A. (the "Sponsor");

(3)     **NORGENER RENOVABLES SpA,** a *sociedad por acciones* organized and existing under the laws of the Country and successor to Norgener SpA (the "Shareholder"); and

(4)     **ITAÚ CORPBANCA,** a Chilean banking corporation, in its capacity as Intercreditor Agent under the Common Terms Agreement (in such capacity, the "Intercreditor Agent").

## RECITALS

WHEREAS, the Borrower is undertaking the development of a 531MW hydropower plant, consisting of the Alfalfal II Power Station and the Las Lajas Power Station and related interconnection and transmission assets located in San José de Maipo, approximately 50 kilometers east of Santiago in the Republic of Chile (the "Project");

WHEREAS, the Borrower, the Sponsor, the Shareholder, Strabag, and the Administrative Agent are parties to that certain Second Amended and Restated Share Retention Agreement, dated as of May 18, 2018 (as amended and otherwise modified prior to the date hereof, the "Second Amended and Restated Share Retention Agreement);

WHEREAS, in order to finance the cost of developing the Project, the Borrower, Overseas Private Investment Corporation, Inter-American Development Bank (acting by and through the Inter-American Investment Corporation as its agent), the Commercial Banks party thereto, the 2018 Senior Lenders party thereto, Itaú Corpbanca in its capacity as Administrative Agent, and DNB Bank ASA as LC Issuing Bank entered into a Second Amended and Restated Common Terms Agreement, dated as of May 8, 2018 (the "Existing Common Terms Agreement"), pursuant to which the Senior Lenders (as defined therein) agreed to make available certain credit facilities to the Borrower, on and subject to the terms and conditions set out in that agreement;

WHEREAS, on November 17, 2021, each of the Borrower and Alto Maipo Delaware LLC commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, as a condition precedent to the effective date of a chapter 11 plan of reorganization of the Borrower approved by the Court pursuant to which it will exit the Bankruptcy

Cases, the Existing Common Terms Agreement is being amended and restated as of the date hereof (the "Common Terms Agreement");

**WHEREAS**, the Borrower, the Sponsor, the Shareholder and the Intercreditor Agent wish to amend and restate the Second Amended and Restated Share Retention Agreement in its entirety as set forth herein;

**NOW THEREFORE**, in consideration of the foregoing, and other good and valid consideration, the receipt of which is hereby expressly acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I

## Definitions

Section 1.01.  _Common Terms Agreement Definitions_.  Wherever used in this Agreement, including in the Recitals hereto, and unless otherwise defined herein, or unless the context shall otherwise require, capitalized terms used herein shall have the same meanings as defined in the Common Terms Agreement.

Section 1.02.  _Other Definitions_.  In addition, unless the context otherwise requires, the following terms have the meanings opposite them:

| | |
|---|---|
| "Accession Instrument" | a joinder agreement to this Agreement substantially in the form of Schedule 1 (_Form of Accession Instrument_). |
| "Affiliate" | has the meaning assigned to it in the Common Terms Agreement provided that, when used in Section 3.01(f) (_Representations and Warranties_) or Section 4.01 (_No Sanctionable Practices_) only, the direct or indirect ownership of more than fifty percent (50%) of Voting Rights of a Person is required to constitute control of that Person. |
| "Permitted Transferee" | any Person that is not a Prohibited Transferee, as defined in the Common Terms Agreement. |
| "Prohibited Encumbrance" | with respect to any Shares, a Lien, grant of an option, conditional sale, conditional transfer or other conditional disposition over such Shares. |
| "Relevant Parties" | collectively, the Sponsor, the Shareholder and the Borrower. |

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

"Second Amended & Restated Share Retention Agreement"

has the meaning assigned to it in the recitals to this Agreement.

"Transfer"

with respect to any Shares, Subordinated Loans, or Shared Services Loans as the context may require, (i) a sale, assignment, transfer, disposition, Lien or granting of an option, in each case, whether actual or contingent, of or over such Shares, Subordinated Loans or Shared Services Loans, or (ii) an agreement to sell, assign, transfer, pledge, grant an option over or otherwise dispose of, or encumber or permit any Lien to exist over, such Shares, Subordinated Loans or Shared Services Loans, including, in all contexts with respect to Shares, any Voting Rights and Economic Ownership Interests relating to such Shares; other than, in each case, any Lien arising from (A) any Taxes if the obligation underlying any such Lien is not yet due or, if due, is being contested in good faith by appropriate proceedings so long as: (x) those proceedings do not involve any substantial risk of the sale, forfeiture or loss of any part of the Shares, Subordinated Loans or Shared Services Loans, title thereto or any interest therein; and (y) the Sponsor, Shareholder, Subordinated Lender, or holder of the Shared Services Loans, as applicable, has set aside adequate reserves in accordance with the Accounting Standards and (B) Liens consented to by the Required Creditors.

"U.S. Person"

(i)    U.S. citizen or U.S. lawful permanent resident;

(ii)   for-profit corporation, partnership, or other entity or association created under the laws of the U.S. or any state or territory thereof, or the District of Columbia, and more than twenty-five percent (25%) beneficially owned by U.S. citizens or U.S. lawful permanent residents;

(iii)  for-profit corporation, partnership, or other entity or association created under the laws of a foreign jurisdiction, and more than fifty percent (50%) beneficially owned by U.S. citizens or U.S. lawful permanent residents;

(iv)   non-profit corporation, partnership, or other entity or association created under the laws of

- 3 -

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

the U.S. or any state or territory thereof, or the District of Columbia; or

(v) non-profit corporation, partnership, or other entity or association created under the laws of a foreign jurisdiction and where more than fifty percent (50%) of the members of its board of directors or similar governing body are U.S. citizens or U.S. lawful permanent residents.

Section 1.03.   _Interpretation_.  In this Agreement, unless the context otherwise requires:

(a) headings are for convenience only and do not affect the interpretations of this Agreement;

(b) words importing the singular include the plural and vice versa;

(c) a reference to a document includes an amendment or supplement to, or replacement or novation of, that document but disregarding any amendment, supplement, replacement or novation made in breach of this Agreement;

(d) a reference to a party to any document includes that party's successors and permitted assigns; and

(e) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

## ARTICLE II

## Share and Subordinated Loan Retention

The commitments and undertakings in this Article II are made for the benefit of the Secured Lenders while their Secured Loans are outstanding.

Section 2.01.   Share and Subordinated Loan Retention.   Subject to Section 2.02 (_Conditions to All Share and Subordinated Loan Transfers_):

(a) The Sponsor shall, at all times until the Release Date, subject to Section 2.01(b):

(i) directly or indirectly (including through the Shareholder), legal and beneficial ownership of not less than fifty and one-tenth percent (50.1%) of the outstanding Shares, and maintain such ownership free from all

- 4 -

Prohibited Encumbrances (other than the Security, including the arrangements contemplated by the Onshore Share Pledge Agreement);[1]

(ii)     directly or indirectly (including through the Shareholder), its rights, interests and obligations in the Subordinated Loans (if any) such that the Sponsor's (direct or indirect) beneficial ownership right in amounts under the Subordinated Loans shall not be less than fifty and one-tenth percent (50.1%) of all outstanding Subordinated Loans; and

(iii)    the Sponsor shall ensure that (A) the Shareholder shall not Transfer the Shares and (B) the Shareholder and any other Affiliate of the Sponsor shall not Transfer Subordinated Loans that in either case it now owns or may hereafter from time to time acquire (including, for the avoidance of doubt, of the Voting Rights and Economic Ownership Interests relating to such Shares) if, after giving effect to such Transfer, the provisions of clause (a)(i) or (a)(ii) of this Section 2.01, as applicable, would be breached.

(b)     [In all cases in which DFC remains a Secured Lender, prior to and including the Project Completion Date, the Sponsor shall ensure at all times that one or more U.S. Persons shall be the ultimate beneficial owner of at least twenty-five percent (25%) of the capital stock of the Borrower and all Voting Rights with respect thereto.][2]

Section 2.02.    _Conditions to All Share and Subordinated Loan Transfers_.  Any direct or indirect Transfer of Subordinated Loans or Shares in the Borrower by any Sponsor or the Shareholder (or, in the case of Subordinated Loans, any Affiliate of the Sponsor), including as provided in Section 5.10 (_Successors and Assigns_), and any issuance of additional Shares to a Person other than the Shareholder, and any making of Subordinated Loans shall be subject to the following conditions:

(i)      with respect to (a) the transferee or Person to whom Shares are issued is a Permitted Transferee and (b) the transferee or lender of a Subordinated Loan, is a Permitted Subordinated Lender;

(ii)     in the case of a direct transfer (or issuance) of Shares or Subordinated Loans, the transferee (or Person to whom Shares are issued, or who is making the Subordinated Loans) shall (A) grant (*x*) a first ranking (and, to the extent applicable, any other Applicable Priority ranking) Lien in favor

---

[1] NTD: This paragraph assumes that the 2L Lenders will not have the right to convert into shares in 2042.

[2] NTD: Section to be deleted if Project Completion is reached prior to execution.  As of April 22, 2022 it is not expected that the Project Completion Date will occur prior to execution.

- 5 -

of the Secured Parties, on substantially the same terms as the Onshore Share Pledge Agreement, over the transferred (or newly issued) Shares (or such other documents reasonably requested by the Onshore Collateral Agent in the event that those Shares are already subject to a first ranking (and, to the extent applicable, any other Applicable Priority ranking) Lien in favor of the Secured Parties, pursuant to a duly executed and registered Onshore Share Pledge Agreement, or otherwise), and (*y*) a first ranking (and, to the extent applicable, any other Applicable Priority ranking) Lien in favor of the Secured Parties on substantially the same terms as the Pledge of Subordinated Loans, over the transferee's (or Person who is making Subordinated Loans) interests in any Subordinated Loans that are also transferred (or otherwise made) and with respect to any future Subordinated Loans that may be made by such Person at any point in time (or such other documents reasonably requested by the Onshore Collateral Agent in the event that those Subordinated Loans are already subject to a first ranking (and, to the extent applicable, any other Applicable Priority ranking) Lien in favor of the Secured Parties, pursuant to a duly executed and registered Pledge of Subordinated Loans, or otherwise), and agree to subordinate all such Subordinated Loans on terms and conditions substantially the same as the Subordination Agreement, (B) deliver to the Collateral Agents, Intercreditor Agent and Senior Lenders an opinion of counsel, in form and substance and from counsel reasonably satisfactory to the Intercreditor Agent, addressing the perfection, effectiveness, validity and enforceability of each agreement referred to in clause (A) above, subject to any registration requirements that cannot be completed at the time of execution of the relevant pledge, (C) make, or cause to be made, all filings and registrations in the Borrower's stock registry book (*Registro de Accionistas*) and all requests necessary for the perfection of the Security granted thereunder, (D) execute and deliver, or cause to be executed and delivered, all other documents required in connection with the perfection of the Security (including any certificates representing the pledged Shares and any Subordinated Loan Agreements representing the Subordinated Loans) and (E) take, or cause to be taken, all other actions that the Senior Lenders reasonably believe are necessary in connection with the perfection of the Security granted thereunder;

(iii)    the transferee (or Person to whom Shares are issued, or who is making the Subordinated Loans) executes an Accession Instrument and agrees to assume the obligations of the transferor (where applicable) and to be bound under this Agreement; and

(iv)    the Net Available Amount of all Disposition Proceeds from any direct or indirect Transfer by the Sponsor or the Shareholder (or issuance of Shares to or making of Subordinated Loans by any Person other than the Sponsor or the Shareholder) shall be contributed to the Borrower in the form of

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

equity or Subordinated Loans and deposited into the Extraordinary Proceeds Account for further application in accordance with the terms of the Offshore Accounts Agreement.  For the avoidance of doubt, the previous sentence includes any equity contributions or shareholder loans (including Subordinated Loans) made to the Borrower, directly or indirectly, by or through any Person who was not a Shareholder or a Sponsor on the date hereof.

Section 2.03.  *Restrictions on Share Transfer Recordation - Notice of Transfers*.  The Borrower shall:

(a)    to the extent permitted by Applicable Law, not recognize any purported Transfer of Shares to the extent that such Transfer would be inconsistent with the provisions of Section 2.01 (*Share and Subordinated Loan Retention*), unless authorized in writing by the Senior Lenders (acting through the Intercreditor Agent);

(b)    not issue any additional Shares if such issuance would be inconsistent with the provisions of Section 2.01 (*Share and Subordinated Loan Retention*), unless authorized in writing by the Senior Lenders (acting through the Intercreditor Agent); and

(c)    notify the Intercreditor Agent, promptly but in any event within five (5) days of receipt thereof, if it receives any request to register or record any Transfer of Shares or any other transaction in respect of Shares or Subordinated Loans, together with the details of such request, to the extent that such Transfer or other transaction would be inconsistent with the provisions of Section 2.01 (*Share and Subordinated Loan Retention*).

Section 2.04.  *Notification of Transfer Restrictions*.  The restrictions imposed under this Article II shall be recorded in the Borrower's stock registry book (*Libro de Registro de Acciones*) and noted on the Share certificates issued by the Borrower to the Shareholder, in each case by way of a legend that substantially includes the following:

"THE SHARES EVIDENCED BY THIS [SHARE CERTIFICATE] [PAGE OF THE STOCK REGISTRY BOOK] ARE SUBJECT TO THE RESTRICTIONS STATED IN, AND ARE TRANSFERABLE ONLY UPON COMPLIANCE WITH THE PROVISIONS OF, THE THIRD AMENDED AND RESTATED SHARE RETENTION AGREEMENT DATED AS OF [•], 2022 (THE "AGREEMENT"), AMONG ALTO MAIPO SPA, AES ANDES S.A., NORGENER RENOVABLES SPA, AND ITAÚ CORPBANCA AS INTERCREDITOR AGENT, A COPY OF WHICH IS ON FILE IN THE PRINCIPAL OFFICE OF ALTO MAIPO SPA.  EXCEPT AS SET FORTH IN THE AGREEMENT, THE SHARES EVIDENCED [BY THIS SHARE CERTIFICATE] [IN THIS STOCK REGISTRY BOOK] MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, SUBJECTED TO A SECURITY INTEREST OR OTHERWISE DISPOSED OF AND/OR ENCUMBERED AND

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

MAY NOT BE TRANSFERRED TO PERSONS NOT QUALIFIED TO BE HOLDERS OF RECORD AS PROVIDED IN THE AGREEMENT.

LA TRANSFERENCIA DE LAS ACCIONES REPRESENTATIVAS DEL CAPITAL DE ALTO MAIPO SPA QUE SE ENCUENTRAN DETALLADAS EN [ESTE TÍTULO DE ACCIONES] [ESTE FOLIO DEL REGISTRO DE ACCIONISTAS] SE ENCUENTRA SUJETA A LAS RESTRICCIONES, CONDICIONES Y A LA PROHIBICIÓN DE GRAVAR Y ENAJENAR ESTABLECIDAS EN EL THIRD AMENDED AND RESTATED SHARE RETENTION AGREEMENT, SUSCRITO EL DÍA DE [●] DE [●] DE 2022 (EL "CONTRATO") ENTRE ALTO MAIPO SPA, AES ANDES S.A., NORGENER RENOVABLES SPA, E ITAÚ CORPBANCA COMO AGENTE ADMINISTRATIVO, EL QUE SE ENCUENTRA DEPOSITADO Y PUEDE SER CONSULTADO EN LAS OFICINAS DE LA SOCIEDAD. SALVO DE CONFORMIDAD A LO DISPUESTO EN EL CONTRATO, LAS ACCIONES DE QUE DA CUENTA [ESTE FOLIO] [ESTE TÍTULO DE ACCIONES] NO PUEDEN SER VENDIDAS, CEDIDAS, PRENDADAS, SER OBJETO DE DERECHOS REALES Y/O DE OTRA FORMA ENAJENADAS U OBJETO DE GRAVÁMENES Y NO PUEDEN SER TRANSFERIDAS A PERSONAS QUE NO CALIFIQUEN COMO TITULARES DE LAS MISMAS DE CONFORMIDAD CON EL CONTRATO."

Section 2.05.    _Conditions to Shared Services Loan Transfers_.  Any Transfer of the Shared Services Loans shall be subject to the following conditions:

(a)    the transferee is a Permitted Transferee; and

(b)    the Transfer is made simultaneously with an assignment of Sponsor's rights and obligations under each of the Energy and Capacity Losses Agreement and the Connection and Toll Agreement, and such assignment is permitted under each of the Energy and Capacity Losses Agreement, the Connection and Toll Agreement and the Direct Agreement applicable to each such Material Project Document.

# ARTICLE III

## Representations and Warranties

Section 3.01.    _Representations and Warranties_.  Each of the Relevant Parties (other than the Borrower) hereby represents and warrants as to itself, on the date hereof that:

(a)    it is a legal entity duly organized and validly existing under the laws of its place of incorporation and has the corporate power to enter into, deliver and perform its obligations under this Agreement and has the power and authority to own its property and assets and to transact the business in which it is engaged, and (i) the Shareholder is duly qualified and in good standing in the Country and (ii) the Sponsor is duly qualified and in good standing in each jurisdiction where

the ownership, leasing or operation of property or the conduct of its business requires such qualification, except (in the case of this clause (ii) only) to the extent that any failure to so qualify could not reasonably be expected to have a Material Adverse Effect;

(b)     this Agreement has been duly authorized and executed by it and constitutes its valid and legally binding obligation, enforceable in accordance with its terms except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors rights generally and the application of general principles of equity regardless of whether considered in a proceeding at law or in equity;

(c)     the execution, delivery and performance of this Agreement will not (i) contravene any Applicable Law or Authorization applicable to it, (ii) contravene any provision of its Charter, or (iii) contravene any contractual restriction binding on or affecting it or any of its assets;

(d)     all Authorizations and corporate and non-governmental third party authorizations required for the execution and delivery of this Agreement and the performance of its obligations hereunder have been obtained and are in full force and effect;

(e)     it has been provided with, and acknowledges receipt of, a copy of each of the Secured 1L Loan Agreement, Secured 2L Loan Agreement, the Secured 1L Indenture, and the Common Terms Agreement;

(f)     neither it nor any of its Affiliates, nor any Person acting on its behalf, has committed or engaged in, with respect to the Project or any transaction contemplated by the Transaction Documents, any Sanctionable Practice or has entered into any transaction or engaged in any activity with respect to the Project prohibited by any resolution of the United Nations Security Council under Chapter VII of the United Nations Charter or by any Corrupt Practices Laws;

(g)     it has adequate means to obtain from the Borrower, on a continuing basis, information concerning the financial condition of the Borrower, and it does not rely on any Secured Party to provide such information, now or in the future;

(h)     (i)     the authorized Share Capital of the Borrower consists of [•] Shares, all of which are owned beneficially and legally of record by the Shareholder, and all of which have been subscribed and fully paid;

(ii)     all outstanding Shares have been duly authorized, validly issued, fully paid in cash or other consideration and are non-assessable; and

(iii)     no Person holds any Shares, Voting Rights, or Economic Ownership Interests in respect of the Borrower other than as specified in clause (i) above; and

(i)     the execution and delivery by it of, and the compliance with its obligations under, this Agreement, constitute private and commercial acts rather than public or governmental acts, and none of its property has any immunity (sovereign or otherwise) from any legal action, suit or

- 9 -

proceeding (whether service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, enforcement of liens or other security interest or otherwise) or from the jurisdiction of any court or from set-off.

Section 3.02.  *Lender Reliance*.  Each of the Relevant Parties (other than the Borrower) acknowledges that it has made the representations in <u>Section 3.01 (*Representations and Warranties*)</u> with the intention of inducing the Secured 1L Lenders and Secured 2L Lenders to enter into the Common Terms Agreement, the Secured 1L Loan Agreement, and the Secured 2L Loan Agreement (and the Participants to enter into the Participations) and that the Intercreditor Agent (acting on behalf of the Secured 1L Lenders and Secured 2L Lenders) enters into this Agreement and the Secured 1L Lenders and Secured 2L Lenders enter into their respective Secured Loan Agreements and the Common Terms Agreement (and the Participants will enter into the Participations) on the basis of, and in full reliance on, each of such representations.

## ARTICLE IV

## Covenants

Each Relevant Party hereby covenants and agrees as set forth below, (a) in the case of Sections 4.01 (*No Sanctionable Practices*) and 4.02 (*Security*), for the benefit of the Secured Lenders while their Secured Loans are outstanding, (b) in the case of Section 4.03 (*Secondary Marketing Support*), for the benefit of the Secured Noteholders while their Secured Notes are outstanding, and (c) in the case only of Section 4.04 (*Restrictions on Debt Purchase Solicitation*), for the benefit of the Secured Creditors while their Secured Debt is outstanding.

Section 4.01.  <u>*No Sanctionable Practices*</u>.  The Sponsor and the Shareholder covenants as to itself that neither it nor any of its Affiliates, nor any Person acting on the Sponsor's or the Shareholder's behalf, shall engage in, with respect to the Project or any transaction contemplated by this Agreement, any Sanctionable Practice.  The Sponsor further covenants as to itself that, should any Secured 1L Lender and Secured 2L Lender (acting through the Intercreditor Agent) notify the Sponsor of its concern that there has been a violation of the provisions of this <u>Section 4.01</u>, the Sponsor shall cooperate in good faith with the Secured 1L Lenders, Secured 2L Lenders, the Intercreditor Agent and their representatives in determining whether such a violation has occurred, and shall promptly respond and in reasonable detail to any notice from any such Secured Party, and shall furnish documentary support for such response upon such Secured Party's request.

Section 4.02.  *Security*.  Each of the Sponsor and the Shareholder shall take all action necessary (including but not limited to executing the relevant declaration deeds, amendment deeds or new Security Documents) to ensure that the Secured Parties have at all times a first ranking (and, as applicable, any other Applicable Priority ranking) Lien, on all Shares and Subordinated Loans, including any further registrations required to take place that cannot be completed on the date of any Transfer (or issuance of additional Shares or making of additional Subordinated Loans) permitted hereunder.

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

Section 4.03.  *Secondary Marketing Support*.  The Sponsor will use commercially reasonable efforts to facilitate a roadshow promoting initial secondary market trading of the Secured Notes, as contemplated in [Section 4.18] (*Offering Memorandum; Nationally Recognized Rating Agency*) of each of the Secured Indentures, and otherwise facilitate initial secondary market making for the Secured Notes.[3]

Section 4.04.  *Restrictions on Solicitation of Debt Acquisition*.  The Sponsor and the Shareholder covenant that neither itself nor any nor any of its Affiliates, nor any Person acting on behalf of the Sponsor, the Shareholder or any of their Affiliates, shall (directly or indirectly, including through any agent or intermediary) make or initiate any effort or offer to acquire, purchase or otherwise own any Secured Debt other than:

(a)     through a public tender open to all holders of such Secured Debt;

(b)     through or a broker, provided that the Sponsor, the Shareholder or Affiliate, as applicable, discloses to the holders of such Secured Debt or to the public generally that it is seeking to acquire such Secured Debt;

provided that this <u>Section 4.04</u> will not restrict the Sponsor, Shareholder, or their respective Affiliates from responding to or engaging with any Secured Creditor who solicits the Sponsor, Shareholder or such Affiliate to acquire Secured Debt.

## ARTICLE V

## Miscellaneous

Section 5.01.  *Severability*.  Should any clause, sentence, paragraph, subsection, or Section of this Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken here by the parties hereto, and the remainder will have the same force and effect as if such stricken part or parts had never been included herein.

Section 5.02.  *Saving of Rights*.  (a) The rights and remedies of the Secured 1L Lenders, Secured 2L Lenders or the Intercreditor Agent acting on their behalf in relation to any misrepresentation or breach of warranty on the part of any Relevant Party shall not be prejudiced by any investigation by or on behalf of any such Secured Party into the affairs of any Relevant Party by the execution or the performance of this Agreement or by any other act or thing that may be done by or on behalf of any such Secured Party in connection with this Agreement and that might, apart from this <u>Section 5.02</u>, prejudice such rights or remedies.

---

[3] NTD: Cross reference to indenture to be updated after indentures are finalized.

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

(b)    No course of dealing or waiver and no failure or delay by any Secured 1L Lender, Secured 2L Lender or the Intercreditor Agent acting on their behalf in exercising, in whole or in part, any power, remedy, discretion, authority or other right under this Agreement, any other Financing Document or any other agreement shall waive or impair, or be construed to be a waiver of or an acquiescence in, such or any other power, remedy, discretion, authority or right under this Agreement, any other Financing Document or any other agreement, or in any manner preclude its additional or future exercise; nor shall the action of any Secured 1L Lender or Secured 2L Lender (or the Intercreditor Agent acting on their behalf) with respect to any default, or any acquiescence by it therein, affect or impair any right, power or remedy of such Secured Party with respect to any other default.

Section 5.03.  _Amendment_.    No provision of this Agreement may be amended, supplemented, modified or waived, except by a written instrument signed by all of the parties hereto.

Section 5.04.  _Fees and Expenses_.    The Sponsor and the Shareholder shall pay or reimburse to the Intercreditor Agent the documented costs and expenses incurred by the Secured 1L Lenders, Secured 2L Lenders or the Intercreditor Agent acting on their behalf in relation to the enforcement or protection of their rights under this Agreement against the Relevant Parties, including legal and other professional fees or other expenses payable by such Secured Parties.

Section 5.05.  _Notices_.  Any notice, request or other communication to be given or made under this Agreement shall be in writing and, unless otherwise specified herein, may be delivered by: (i) hand, airmail, facsimile, or established courier service to each party hereto at its respective address specified below or at such other address as it may notify the other parties hereto from time to time, and will be effective upon receipt; or (ii) email to each party hereto at its respective email address specified below or at such other email address as it may notify the other parties hereto from time to time, and will be effective upon electronic confirmation of receipt.

For the Sponsor:

> AES Andes S.A.
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile
> Attention:  Ricardo Roizen, Chief Financial Officer
> Telephone: +56 2 3333 8301
> Email:  ricardo.roizen@aes.com

With a copy to:

> AES Andes S.A.
> Los Conquistadores 1730, Piso 10
> Providencia, Región Metropolitana, Chile

- 12 -

Attention:  Felix Gomez
Email:  felix.gomez@aes.com

For the Shareholder:

Norgener Renovables SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Chief Executive Officer
Telephone: +56 2 2686- 8939
Facsimile: +56 2 2686-8991
Email: ricardo.falu@aes.com

With a copy to:

Norgener Renovables SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Ricardo Roizen, Chief Financial Officer
Email: ricardo.roizen@aes.com

For Alto Maipo SpA

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com

With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

For the Intercreditor Agent:

Itaú Corpbanca, as Intercreditor Agent
Presidente Riesco 5537, piso 19
Las Condes, Santiago, Chile
Telephone: +56 2 2834 6157
Attention: [●]

- 13 -

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

Email: : [●]
Attention: : [●]
Email: : [●]

Section 5.06.  *English Language*.  All documents to be provided or communications to be given or made under this Agreement shall be in the English language.  To the extent that the original version of any document to be provided, or communication to be given or made, to the Intercreditor Agent under this Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative of the Borrower to be a true and correct translation of the original. The parties hereto acknowledge that this Agreement was negotiated and executed in the English language. The Intercreditor Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 5.07.  *Counterparts*.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement. Delivery of a duly executed signature page of this Agreement by electronic mail in "Portable Document Format" ("PDF") or by facsimile transmission shall be considered effective delivery.

Section 5.08.  *Applicable Law and Jurisdiction*.  (a) This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)    Each of the parties hereto irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan.  By the execution of this Agreement, each of the parties hereto irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding.  Final judgment against any Relevant Party in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)    Nothing in this Agreement shall affect the right of any Secured Party to commence legal proceedings or otherwise sue any Relevant Party in the Country, or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon any Relevant Party in any manner authorized by the laws of any such jurisdiction.

(d)    Each Relevant Party hereby reaffirms as of the date hereof the irrevocable designation, appointment and empowerment of Corporation Service Company, with offices currently located at 19 West 44th Street, Suite 200, New York, New York 10036, as its authorized

- 14 -

agent solely to receive for and on its behalf service of any summons, complaint and other legal process in any action, suit or proceeding in the State of New York in respect of this Agreement.

(e)     As long as this Agreement remains in force, each Relevant Party shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding in New York, New York, United States of America with respect to this Agreement.  The Relevant Parties shall keep the Intercreditor Agent advised of the identity and location of such agent.

(f)     Each party hereto (except the Intercreditor Agent) irrevocably waives to the fullest extent permitted by Applicable Law:

(i)     any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 5.08;

(ii)    any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)   its right of removal of any matter commenced by any other party hereto in the courts of the State of New York to any court of the United States of America.

(g)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON.

(h)     To the extent that any Relevant Party may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Agreement from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed), may be attributed to it or its assets, it irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(i)     To the extent that any Relevant Party may, in any action, suit or proceeding brought in any of the courts referred to in Section 5.08(b) or a court of the Country or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring a Secured Party in such action, suit or proceeding to post security for such Relevant Party's costs or to post a bond or to take similar action, such Relevant Party hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of New York, New York, United States of America, the Country, or, as the case may be, the jurisdiction in which such court is located.

- 15 -

Section 5.09. *Third Party Rights*. Except for the Secured 1L Lenders and Secured 2L Lenders (and, in the case only Sections 4.03 (*Secondary Marketing Support*) and 4.04 (*Restrictions on Debt Purchase Solicitation*), the Secured 1L Noteholders and Secured 2L Noteholders) a Person who is not a party to this Agreement shall have no right to enforce any term of this Agreement.

Section 5.10. *Successors and Assigns*. (a) This Agreement binds and benefits the respective successors and permitted assignees of its parties. However, no Relevant Party may assign or delegate any of its rights or obligations under this Agreement without the prior written consent of the Intercreditor Agent (acting on instruction of the Required Creditors). The benefit of this Agreement may be freely and unconditionally assigned, transferred, or otherwise disposed of, in whole or in part, by the Intercreditor Agent to any Person, corporate or otherwise, that becomes a successor to the Intercreditor Agent pursuant to Section [●] (*Successor Intercreditor Agent*) of the Intercreditor Agreement. Any such assignee of the Intercreditor Agent shall be deemed to be a party to this Agreement as the Intercreditor Agent. Any purported assignment or disposition in violation of this <u>Section 5.10</u> shall be void.

(b) In addition, no Relevant Party may assign or delegate any of its rights or obligations under this Agreement unless:

    (i) the assignee or delegatee executes an Accession Instrument and all other agreements and instruments, which agreements and instruments shall be in form and substance reasonably satisfactory to the Intercreditor Agent (acting on instruction of the Required Creditors), as shall be necessary for such assignee or delegatee to assume the obligations of the transferor under this Agreement;

    (ii) in its Accession Instrument, such assignee or delegatee agrees to bear responsibility for costs and expenses of enforcement of this Agreement against assignee or delegatee (on the terms provided in <u>Section 5.04 (*Fees and Expenses*)</u>);

    (iii) the assignee or delegatee is a Permitted Transferee; and

    (iv) such assignment or delegation is made in full compliance with Applicable Law and does not adversely affect in the reasonable opinion of Intercreditor Agent (acting on instruction of the Required Creditors), (A) the Share and Subordinated Loans retention contemplated by this Agreement, or (B) the share pledge contemplated in the Onshore Share Pledge Agreement or the pledge of Subordinated Loans contemplated by the Pledge of Subordinated Loans.

(c) For the avoidance of doubt, any Relevant Party (other than the Borrower) that Transfers all of its direct or indirect Shares (together with all of its Subordinated Loans) in accordance with the terms set forth in this Agreement shall be deemed to no longer be party to this

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

Agreement, and from the date of such Transfer, will have no rights or any obligations under this Agreement except for those rights and obligations that may have accrued prior to such date.

(d)    From time to time, and in accordance with the terms of this Agreement, one or more Permitted Transferees may be added to this Agreement by its execution and delivery of an Accession Instrument. For the avoidance of doubt, this Agreement shall be binding on such parties upon their execution of such Accession Instrument.

Section 5.11. _Termination_. This Agreement shall terminate, and the Relevant Parties shall have no further obligations under this Agreement, as of (i) with respect to the Secured 1L Lenders, the Release Date applicable to the Secured 1L Loan, (ii) with respect to the Secured 2L Lenders, the Release Date applicable to the Secured 2L Loan, (iii) with respect to the Secured 1L Noteholders the Release Date applicable to the Secured 1L Notes, and (iv) with respect to the Secured 2L Noteholders the Release Date applicable to the Secured 2L Notes. For purposes of the foregoing, the Release Date applicable to the Secured 2L Loan shall include conversion of the Secured 2L Loan into Secured 2L Notes or Shares pursuant to the terms and conditions of the Secured 2L Loans.

Section 5.12. _Prior Statements_. This Agreement and the other Financing Documents set forth the entire agreement relating to the subject matter hereof, and supersede all prior statements, agreements, and understandings, whether written or oral, relating hereto.

Section 5.13. _Effectiveness_. There are no conditions to the full effectiveness of this Agreement.

Section 5.14. _Amendment and Restatement._ This Agreement amends and restates the Second Amended and Restated Share Retention Agreement in its entirety.

[_Signature Pages Follow_]

- 17 -

IN WITNESS WHEREOF, the parties hereto, acting through their duly authorized representatives, have caused this Agreement to be signed in their respective names as of the day and year first above written.

**ALTO MAIPO SpA,**
as Borrower

By:_____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Share Retention Agreement*]

**AES ANDES S.A.,**
as Sponsor


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Share Retention Agreement*]

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

**NORGENER RENOVABLES SpA,**
as Shareholder


By:_____
      Name:
      Title:

[*Signature Page to Third Amended and Restated Share Retention Agreement*]

**ITAÚ CORPBANCA,**
as Intercreditor Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


[*Signature Page to Third Amended and Restated Share Retention Agreement*]

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

**SCHEDULE 1**
**FORM OF ACCESSION INSTRUMENT**

<u>JOINDER AGREEMENT</u>

THIS JOINDER AGREEMENT (this "<u>Agreement</u>") is made on, [_____] by [___] of [_____] (the "<u>Covenantor</u>") in favor of the persons whose names are set out in <u>Appendix A</u> to this Agreement and is supplemental to, the Third Amended and Restated Share Retention Agreement, dated as of [●], 2022, among [*insert parties*] (the "<u>Share Retention Agreement</u>"), and is entered into pursuant to Section 5.10 (*Successors and Assigns*) thereof.

The Covenantor hereby agrees as follows:

(1)     The Covenantor confirms that it has been given and has read a copy of the Share Retention Agreement and hereby agrees for the benefit of each person named in <u>Appendix A</u> to this Agreement and each other person who, after the date of this Agreement, executes a joinder agreement to the Share Retention Agreement substantially in the form set forth in Schedule 1 thereof that it shall have the rights and be subject to the obligations of a [Sponsor]/[Shareholder] under the terms of the Share Retention Agreement.

(2)     The Covenantor, by execution of this Agreement, makes the representations, warranties and acknowledgement contained in Sections 3.01 (*Representations and Warranties*) and 3.02 (*Lender Reliance*) of the Share Retention Agreement for the benefit of the other parties to the Share Retention Agreement, provided that such representations, warranties and acknowledgement shall be made as of the date of this Agreement, and not as of the date of the Share Retention Agreement.

(3)     The Covenantor covenants and agrees that it shall pay or reimburse to the Intercreditor Agent the documented costs and expenses incurred by the Secured 1L Lenders, Secured 2L Lenders or the Intercreditor Agent acting on their behalf in relation to the enforcement or protection of their rights under the Share Retention Agreement against the Covenantor, including legal and other professional fees or other expenses payable by such Secured Parties.

(4)     The Covenantor's address for purposes of Section 5.05 (*Notices*) of the Share Retention Agreement is:

[*Company*]
[*Street Address*]
[*City; Postal Code*]
[*Country*]
Facsimile: [___]
Attention: [___]
Email: [___]

SCHEDULE 1 - 1

(5)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

IN WITNESS WHEREOF this Agreement has been executed by the undersigned and is intended to be and is hereby delivered on the date first written above.

[COVENANTOR]

By: _____
      Name:
      Title:

SCHEDULE 1 - 3

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

## APPENDIX A TO JOINDER AGREEMENT

[*Insert names of those persons who are party to the Share Retention Agreement on the date of this Joinder Agreement.*]

[AM_ACTIVE 403619747_10]

[AM_ACTIVE 403619747_13]

**Exhibit H**

**Third Amended and Restated Offshore Accounts and Collateral Agency Agreement**

*Working Draft 4.27.2022*

**DFC Loan Number 513-2014-949-IG & 9000042574**

# THIRD AMENDED AND RESTATED OFFSHORE ACCOUNTS AND COLLATERAL AGENCY AGREEMENT

among

**ALTO MAIPO SpA,**

**ITAÚ CORPBANCA NEW YORK BRANCH,**
as Offshore Collateral Agent,

**ITAÚ CORPBANCA NEW YORK BRANCH,**
as Offshore Accounts Bank,

and

**ITAÚ CORPBANCA,**
as Intercreditor Agent

**Dated as of [•], 2022**

# <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I Definitions and Interpretations ................................................................... 2

    Section 1.01   Definitions............................................................................... 2
    Section 1.02   Interpretation ........................................................................ 14

ARTICLE II Appointment; Grant of Security Interest ................................................. 14

    Section 2.01   Appointment ......................................................................... 15
    Section 2.02   Representations and Warranties of the Offshore Accounts Bank.................. 16
    Section 2.03   Certain Duties of the Offshore Accounts Bank ............................................. 16
    Section 2.04   Treatment of Financial Assets ......................................................................... 18
    Section 2.05   Offshore Collateral Accounts as Deposit Accounts...................................... 18
    Section 2.06   Grant of Security Interests .............................................................................. 19
    Section 2.07   Control and Perfection of Account Collateral .............................................. 19
    Section 2.08   Securities Intermediary's Jurisdiction..............**Error! Bookmark not defined.**
    Section 2.09   Subordination.................................................................................................... 20
    Section 2.10   Payments Received by the Borrower .............................................................. 21

ARTICLE III Establishment of the Offshore Collateral Accounts............................... 21

    Section 3.01   Establishment of the Offshore Collateral Accounts..................................... 21
    Section 3.02   Maintaining the Offshore Collateral Accounts ............................................. 22
    Section 3.03   Deposits into and Withdrawals from the Offshore Collateral Accounts ........ 23

ARTICLE IV Disbursement Account ............................................................................. 23

    Section 4.01   Payments into the Disbursement Account ...................................................... 23
    Section 4.02   Withdrawals from the Disbursement Account................................................ 24
    Section 4.03   Closing of Disbursement Account ................................................................... 25

ARTICLE V Offshore Revenue Account ....................................................................... 25

    Section 5.01   Payments into the Offshore Revenue Account .............................................. 25
    Section 5.02   Withdrawals from the Offshore Revenue Account........................................ 27

ARTICLE VI Special Debt Service Payment Account ................................................. 32

    Section 6.01   Payments into the Special Debt Service Payment Account........................... 32
    Section 6.02   Withdrawals from the Special Debt Service Payment Account .................... 32
    Section 6.03   Closing of Special Debt Service Payment Account........................................ 33

ARTICLE VII 1L Debt Service Payment Account ....................................................... 33

    Section 7.01   Payments into the 1L Debt Service Payment Account .................................. 33

Section 7.02     Withdrawals from the 1L Debt Service Payment Account.............................. 33

ARTICLE VIII Strabag Escrow Account...................................................................................... 34

Section 8.01     Payments into the Strabag Escrow Account ...................................................... 34
Section 8.02     Withdrawals from the Strabag Escrow Account................................................. 34
Section 8.03     Closing of Strabag Escrow Account .................................................................. 35

ARTICLE IX Additional Interest Reserve Account .................................................................... 35

Section 9.01     Payments into the Additional Interest Reserve Account ................................... 35
Section 9.02     Withdrawals from the Additional Interest Reserve Account.......................... 35

ARTICLE X Debt Service Reserve Account................................................................................. 36

Section 10.01    Payments into the Debt Service Reserve Account............................................. 36
Section 10.02    Withdrawals from the Debt Service Reserve Account ..................................... 36

ARTICLE XI [Reserved]...............................................................**Error! Bookmark not defined.**

ARTICLE XII Insurance Proceeds and Compensation Account.................................................. 37

Section 12.01    Payments into the Insurance Proceeds and Compensation Account .............. 37
Section 12.02    Withdrawals from the Insurance Proceeds and Compensation Account........ 37

ARTICLE XIII Extraordinary Proceeds Account......................................................................... 42

Section 13.01    Payments into the Extraordinary Proceeds Account........................................ 42
Section 13.02    Withdrawals from the Extraordinary Proceeds Account ................................. 43
Section 13.03    Extraordinary Proceeds Sub-accounts ............................................................. 49

ARTICLE XIV General Provisions Relating to the Offshore Collateral Accounts .................... 49

Section 14.01    No Security Interests........................................................................................ 49
Section 14.02    Currencies ........................................................................................................ 49
Section 14.03    Withdrawals and Deposits Generally................................................................ 51
Section 14.04    No Overdraft .................................................................................................... 52
Section 14.05    Acknowledgments............................................................................................ 52
Section 14.06    Further Assurances........................................................................................... 52

ARTICLE XV Offshore Authorized Investments and Interest......**Error! Bookmark not defined.**

Section 15.01    Power to Invest .............................................**Error! Bookmark not defined.**
Section 15.02    Investing of Amounts in the Offshore Collateral Accounts..**Error! Bookmark not defined.**
Section 15.03    Sale and Liquidation .......................................**Error! Bookmark not defined.**

ARTICLE XVI Default and Enforcement ................................................................................... 55

Section 16.01    Notices of Suspension ................................................................. 55
Section 16.02    Offshore Collateral Agent Appointed Attorney-in-Fact ................. 56
Section 16.03    Enforcement ................................................................................. 57
Section 16.04    Application of Proceeds ............................................................... 60

ARTICLE XVII The Offshore Accounts Bank ........................................................... 60

Section 17.01    Duties of Offshore Accounts Bank as Securities Intermediary ..... 60
Section 17.02    Offshore Accounts Bank's Performance ....................................... 61
Section 17.03    Reliance by Offshore Accounts Bank; Right to Request Instruction ............. 62
Section 17.04    Notice of Default .......................................................................... 63
Section 17.05    Resignation or Removal of the Offshore Accounts Bank .............. 63
Section 17.06    Merger of the Offshore Accounts Bank ........................................ 64
Section 17.07    No Right of Set-Off ...................................................................... 64

ARTICLE XVIII The Offshore Collateral Agent ....................................................... 64

Section 18.01    Appointment of Offshore Collateral Agent ................................... 65
Section 18.02    Offshore Collateral Agent May Perform ...................................... 65
Section 18.03    The Offshore Collateral Agent's Duties under the Accounts Agreement ...... 65
Section 18.04    Delegation of Duties ..................................................................... 66
Section 18.05    Offshore Collateral Agent's Performance ..................................... 66
Section 18.06    Reliance by Offshore Collateral Agent ......................................... 66
Section 18.07    Resignation or Removal of Offshore Collateral Agent .................. 67
Section 18.08    Merger of the Offshore Collateral Agent ...................................... 68
Section 18.09    Absence of Fiduciary Relationship ............................................... 68
Section 18.10    Additional Actions ....................................................................... 69
Section 18.11    U.S.A. Patriot Act ........................................................................ 69

ARTICLE XIX Expenses; Indemnification; Fees ..................................................... 69

Section 19.01    Expenses ...................................................................................... 69
Section 19.02    Indemnification ............................................................................ 70
Section 19.03    Fees .............................................................................................. 70

ARTICLE XX Representations and Warranties ........................................................ 70

Section 20.01    Representations and Warranties of the Borrower .......................... 71
Section 20.02    Representations and Warranties of the Offshore Accounts Bank ... 72
Section 20.03    Representations and Warranties of the Offshore Collateral Agent ... 72

ARTICLE XXI Miscellaneous .................................................................................. 73

Section 21.01    Amendments, Waivers and Consents ............................................ 73
Section 21.02    Applicable Law and Jurisdiction .................................................. 73
Section 21.03    Counterparts ................................................................................. 75
Section 21.04    English Language .......................................................................... 75
Section 21.05    Exculpatory Provisions ................................................................. 75

Section 21.06   Secured Party Reliance ......................................................................... 76
Section 21.07   Currency and Place of Payment............................................................ 76
Section 21.08   Notices .................................................................................................. 76
Section 21.09   Payments Set Aside.............................................................................. 77
Section 21.10   Prior Statements ................................................................................... 77
Section 21.11   Rights Cumulative ................................................................................ 77
Section 21.12   Saving of Rights................................................................................... 77
Section 21.13   Severability .......................................................................................... 78
Section 21.14   Successors and Assignees .................................................................... 78
Section 21.15   Survival................................................................................................. 79
Section 21.16   Third Party Rights ................................................................................ 79
Section 21.17   Termination of Accounts Agreement.................................................... 79
Section 21.18   Force Majeure ...................................................................................... 79
Section 21.19   Amendment and Restatement ............................................................... 79

Schedule 1 – Form of Disbursement Account Transfer Certificate
Schedule 2 – Form of Offshore Revenue Account Transfer Certificate
Schedule 3 – Form of Special Debt Service Payment Account Transfer Certificate
Schedule 4 – Form of 1L Debt Service Payment Account Transfer Certificate
Schedule 5 – Form of Strabag Escrow Account Transfer Certificate
Schedule 6 – Form of Additional Interest Reserve Account Transfer Certificate
Schedule 7 – Form of Debt Service Reserve Account Transfer Certificate
Schedule 8 – Form of Insurance Proceeds and Compensation Account Transfer Certificate
Schedule 9 – Form of Extraordinary Proceeds Account Transfer Certificate
Schedule 10 – Form of Stamp Tax Reserve Account Transfer Certificate

# THIRD AMENDED AND RESTATED OFFSHORE ACCOUNTS AND COLLATERAL AGENCY AGREEMENT

This **THIRD AMENDED AND RESTATED OFFSHORE ACCOUNTS AND COLLATERAL AGENCY AGREEMENT** (this "Accounts Agreement"), dated as of [●], 2022 is made by and among:

(1)     **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower");

(2)     **ITAÚ CORPBANCA NEW YORK BRANCH**, a branch in New York, New York of Itaú Corpbanca, a bank organized and existing under the laws of the Country, as offshore collateral agent (in such capacity, the "Offshore Collateral Agent");

(3)     **ITAÚ CORPBANCA NEW YORK BRANCH**, a branch in New York, New York of Itaú Corpbanca, a bank organized and existing under the laws of the Country, as offshore accounts bank (in such capacity, the "Offshore Accounts Bank");

(4)     **ITAÚ CORPBANCA**, a Chilean banking corporation (in such capacity, the "Intercreditor Agent").

WHEREAS:

(A)     the Borrower is undertaking the development of a 531MW hydropower plant, consisting of the Alfalfal II Power Station and the Las Lajas Power Station and related interconnection and transmission assets located in San José de Maipo, approximately 50 kilometers east of Santiago in the Republic of Chile (the "Project");

(B)     the Borrower, Deutsche Bank Trust Company Americas as the offshore collateral agent, Deutsche Bank Trust Company Americas as the offshore accounts bank and Itaú Corpbanca as the administrative agent (the "Original Administrative Agent") entered into that certain Offshore Accounts and Collateral Agency Agreement, dated as of December 9, 2013 (as amended and otherwise modified as of March 17, 2017, the "Original Offshore Accounts Agreement");

(C)     the Borrower, Deutsche Bank Trust Company Americas as the offshore collateral agent, Deutsche Bank Trust Company Americas as the offshore accounts bank and the Original Administrative Agent amended and restated the Original Offshore Accounts Agreement by entering into that certain Amended and Restated Offshore Accounts and Collateral Agency Agreement, dated as of March 17, 2017 (as amended and otherwise modified as of May 8, 2018, the "Amended and Restated Offshore Accounts Agreement");

(D)     the Borrower, Itaú Corpbanca New York Branch as successor to Deutsche Bank Trust Company Americas as the offshore collateral agent, Itaú Corpbanca New York Branch as successor to Deutsche Bank Trust Company Americas as the offshore accounts bank and the Original Administrative Agent amended and restated the Amended and Restated Offshore Accounts Agreement by entering into that certain Second Amended and Restated Offshore Accounts and Collateral Agency Agreement, dated as of May 8, 2018

(as amended and otherwise modified as of the date hereof, the "Second Amended and Restated Offshore Accounts Agreement");

(E)   on November 17, 2021, each of the Borrower and its subsidiary Alto Maipo Delaware LLC commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

(F)   in connection with the Bankruptcy Cases, the Borrower, the Offshore Collateral Agent, the Offshore Accounts Bank and the Intercreditor Agent wish to amend and restate the Second Amended and Restated Offshore Accounts Agreement in its entirety as set forth herein;

(G)   the Borrower, each Secured Creditor Representative party thereto from time to time, and the Intercreditor Agent have entered into that certain Third Amended and Restated Common Terms Agreement, dated as of the date hereof (the "Common Terms Agreement"), for the purposes of setting forth certain common provisions regarding the financing of the Project;

(H)   the execution and delivery of this Accounts Agreement is a condition precedent to the effective date of a chapter 11 plan of reorganization of the Borrower approved by the Bankruptcy Court pursuant to which it will exit the Bankruptcy Cases;

(I)   the Borrower, the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent are entering into this Accounts Agreement in order, inter alia, for the Borrower to grant to the Offshore Collateral Agent, for the benefit of the Secured Parties, a perfected security interest in the Offshore Collateral Accounts in accordance with the Applicable Priority and in all financial assets held therein or credited thereto and all proceeds thereof (subject only to Permitted Liens); and

(J)   the Borrower has agreed to execute and deliver this Accounts Agreement upon and subject to the terms and conditions hereinafter set forth.

   **NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### Definitions and Interpretations

   Section 1.01   Definitions.   (a)   Whenever used in this Accounts Agreement, capitalized terms used but not otherwise defined herein (including in the recitals hereto), shall have the meaning set forth in Section 1.01 (*Definitions*) of the Common Terms Agreement.

   (b)   As used herein, the following terms have the following meanings:

| | |
|---|---|
| "1L Debt Service Payment Account" | has the meaning set forth in Section 3.01(a) (*Establishment of the Offshore Collateral Accounts*). |
| "1L Debt Service Payment Account Transfer Certificate" | a certificate in substantially the form of Schedule 4, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the 1L Debt Service Payment Account. |
| "Account Collateral" | has the meaning set forth in Section 2.06 (Grant of Security Interests). |
| "Actual Additional Interest" | the actual Additional Interest earned in the previous calendar year set forth in the applicable Actual Additional Interest Certificate. |
| "Actual Additional Interest Certificate" | a certificate, in the form attached as <u>Schedule 18</u> (*Form of Actual Additional Interest Certificate*) of the Common Terms Agreement, signed by the chief executive officer or any other officer or director of the Borrower (who shall also be an Authorized Representative of the Borrower), setting forth the Actual Additional Interest earned during the previous calendar year. |
| "Additional Interest Reserve Account" | has the meaning set forth in Section 3.01(b) (*Establishment of the Offshore Collateral Accounts*). |
| "Additional Interest Reserve Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 6</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Additional Interest Reserve Account. |
| "Additional Interest Shortfall" | has the meaning set forth in Section 9.01(b) (*Withdrawals from the Additional Interest Reserve Account*). |
| "Adverse Claim" | has the meaning assigned to that term in Section 8-102(a)(1) of the UCC, or any successor provision. |
| "Amended and Restated Offshore Accounts Agreement" | has the meaning provided in the recitals hereto. |
| "April Estimated Additional Interest" | the estimated amount of the Additional Interest earned between January 1 and April 15 of the |

|  | applicable calendar year set forth in the applicable Estimated Additional Interest Certificate. |
|---|---|
| "Authorized Bank" | a commercial bank with a long-term senior unsecured indebtedness rating of at least "A-" by Standard & Poor's Ratings Group or Fitch Ratings, Inc. or "A3" by Moody's Investors Service, Inc. (or an equivalent rating by another internationally recognized credit rating agency reasonably acceptable to the Required Creditors). |
| "Bank" | has the meaning assigned to that term in Section 9-102(a)(8) of the UCC, or any successor provision. |
| "Bankruptcy Cases" | has the meaning provided in the recitals hereto. |
| "Bankruptcy Court" | has the meaning provided in the recitals hereto. |
| "Business Interruption Insurance Proceeds" | all proceeds of any insurance policies with respect to the Borrower or the Project insuring against business interruption. |
| "Book-Entry Security" | a security maintained in the form of entries (including the Security Entitlements in, and the Financial Assets based on, such security) in the commercial book-entry system of the Federal Reserve System.  Book-Entry Securities shall not include, in any event, any "Certificated Security" (as defined in Section 8-102(a)(4) of the UCC) (or any Security Entitlement in, or Financial Asset based on, any Certificated Security). |
| "Chilean Pesos" | the lawful currency of the Country. |
| "Common Terms Agreement" | has the meaning provided in the recitals hereto. |
| "Construction Dollar Account" | has the meaning assigned to that term in the Onshore Accounts Agreement. |
| "Control" | "control" as defined in the UCC including, as appropriate, Sections 8-106, 9-104 and 9-106 of the UCC, or any successor provision. |
| "De-watering Costs" | any and all costs and expenses incurred by the Borrower in connection with the de-watering of the Project tunnels (in accordance with the Annual Budget in effect for the calendar year during which such de-watering of the tunnels occurs) and any |

|  | repair work required for such tunnels identified as a result of such de-watering. |
|---|---|
| "Debt Service Reserve Account" | has the meaning set forth in Section 3.01(c) (*Establishment of the Offshore Collateral Accounts*). |
| "Debt Service Reserve Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 7</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Debt Service Reserve Account. |
| "Delay Liquidated Damages" | any liquidated damages that are required to be paid by a Construction Contractor or any other Project Party for or on account of any delay. |
| "Delay in Start-up Insurance Proceeds" | all proceeds of any insurance policies with respect to the Borrower or the Project insuring against delayed start-up. |
| "Deposit Account" | has the meaning assigned to that term in Section 9-102(a)(29) of the UCC, or any successor provision. |
| "Disbursement Account" | has the meaning set forth in Section 3.01(d) (*Establishment of the Offshore Collateral Accounts*). |
| "Disbursement Account Transfer Certificate" | a certificate in substantially the form of Schedule 1, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Disbursement Account. |
| "Dispute Resolution Proceeds" | all amounts paid to the Borrower pursuant to a final ruling, order, decision or as a result of settlement of any litigation, arbitration, or similar dispute with respect to the Project, including any and all CNM Arbitral Award Proceeds. |
| "Disputed Project Costs Holdback Amount" | as of any calculation date, an amount necessary for provisions for disputed claims against the Borrower by any Construction Contractor or supplier under any Material Project Document, in each case reasonably satisfactory to the Independent Engineer and no less than the amount required to be provisioned in accordance with the Accounting Standards. |

| | |
|---|---|
| "Entitlement Holder" | a Person that (a) is an "entitlement holder" as defined in Section 8-102(a)(7) of the UCC, or any successor provision (except in respect of a Book-Entry Security); or (b) in respect of any Book-Entry Security, is an "entitlement holder" as defined in 31 C.F.R. §357.2 (or, as applicable to such Book-Entry Security, the corresponding Federal Book-Entry Regulations governing such Book-Entry Security) which, to the extent required or permitted by the Federal Book-Entry Regulations, is also an "entitlement holder" as defined in Section 8-102(a)(7) of the UCC, or any successor provision. |
| "Entitlement Order" | has the meaning assigned to that term in Section 8-102(a)(8) of the UCC, or any successor provision, and shall include any written notice or related instructions from the Offshore Collateral Agent directing the transfer or redemption of the Account Collateral or any part thereof. |
| "Estimated Additional Interest Certificate" | a certificate, in the form attached as <u>Schedule 17</u> (*Form of Estimated Additional Interest Certificate*) of the Common Terms Agreement, signed by the chief executive officer or any other officer or director of the Borrower (who shall also be an Authorized Representative of the Borrower), setting forth the April Estimated Additional Interest or the October Estimated Additional Interest, as applicable. |
| "Extraordinary Proceeds Account" | has the meaning set forth in Section 3.01(f) (*Establishment of the Offshore Collateral Accounts*). |
| "Extraordinary Proceeds Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 9</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Extraordinary Proceeds Account (or a sub-account thereof). |
| "Federal Book-Entry Regulations" | (a) the federal regulations contained in Subpart B ("Treasury/Reserve Automated Debt Entry System (TRADES)") governing book-entry securities consisting of U.S. Treasury bonds, notes and bills and Subpart D ("Additional Provisions") of 31 C.F.R. Part 357, 31 C.F.R. §357.2, §357.10 through §357.14 and §357.41 through §357.44 and (b) to |

| | the extent substantially identical to the federal regulations referred to in clause (a) above (as in effect from time to time), the federal regulations governing other book-entry securities. |
|---|---|
| "Financial Asset" | "financial asset", as defined in Section 8-102(a)(9) of the UCC, or any successor provision, and includes securities issued by the United States Treasury held in a "Participant's Securities Account" (as defined in §357.2 of the Federal Book-Entry Regulations) pursuant to the Treasury/Reserve Automated Debt Entry System (TRADES) that constitute "Book-Entry Securities" as such term is defined in §357.2 of the Federal Book-Entry Regulations. |
| "Forex Conversion Affiliate" | an Affiliate of the Offshore Accounts Bank (i) whose regular business includes managing foreign currency conversions for clients, and (ii) who is authorized (to the extent any such authorization is required) under all Applicable Law to engage in the business of foreign currency conversions. |
| "Forex Conversion Date" | the date the Borrower instructs the Offshore Accounts Bank to convert one currency into another currency under, as applicable, Disbursement Account Transfer Certificate, Offshore Revenue Account Transfer Certificate, Special Debt Service Payment Account Transfer Certificate, 1L Debt Service Payment Account Transfer Certificate, Strabag Escrow Account Transfer Certificate, Additional Interest Reserve Account Transfer Certificate, Debt Service Reserve Account Transfer Certificate, Insurance Proceeds and Compensation Account Transfer Certificate, Extraordinary Proceeds Account Transfer Certificate, and Stamp Tax Reserve Account Transfer Certificate. |
| "Hague Securities Convention" | The Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary, dated July 5, 2006, as signed by the United States on such date, which came into legal force and effect on April 1, 2017. |
| "Insurance Proceeds and Compensation | has the meaning set forth in Section 3.01(g) |

| | |
|---|---|
| Account" | (*Establishment of the Offshore Collateral Accounts*). |
| "Insurance Proceeds and Compensation Account Transfer Certificate" | a certificate in substantially the form of *Schedule 8*, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Insurance Proceeds and Compensation Account. |
| "Investment Grade" | means (x) with respect to Standard and Poor's Rating Group or Fitch Ratings, "BBB-" or better and (y) with respect to Moody's Investors Service, "Baa3" or better. |
| "Minimum Debt Service Reserve Amount" | twenty million Dollars ($20,000,000); provided, that if the Secured 1L Notes achieve an Investment Grade Rating without inclusion of a debt service reserve, the Minimum Debt Service Reserve Amount shall be zero. |
| "Monthly Date" | the 13th day of each calendar month; underline provided that if such day is not a Business Day, then such Monthly Date shall be the next Business Day. |
| "Notice of Objection" | means a written notice of objection from the Offshore Collateral Agent (acting on the direction of the Intercreditor Agent in accordance with the Intercreditor Agreement) (a) stating that (i) the requested withdrawals or transfers are not permitted under the Financing Documents, (ii) an Event of Default has occurred and is continuing or (iii) there has been an error in calculating the amounts requested to be withdrawn or transferred and (b) instructing the Offshore Accounts Bank not to proceed with the requested withdrawal or transfer that is subject of such notice of objection. |
| "Notice of Suspension" | has the meaning set forth in Section 16.01 (*Notices of Suspension*). |
| "October Estimated Additional Interest" | the estimated amount of the Additional Interest earned between January 1 and October 15 of the applicable calendar year set forth in the applicable Estimated Additional Interest Certificate minus the April Estimated Additional Interest for that calendar year. |

| | |
|---|---|
| "Offshore Accounts Property" | any funds, instruments, securities, Financial Assets or other assets from time to time held in any of the Offshore Collateral Accounts or credited thereto or otherwise in possession of the Offshore Accounts Bank pursuant to this Accounts Agreement. |
| "Offshore Authorized Investments" | (a)    cash in hand, time deposits or other cash equivalents in Dollars with an Authorized Bank; |
| | (b)    commercial paper denominated in Dollars maturing in two hundred seventy (270) days or less from the date of issuance that at the time of acquisition is rated A-3 or better by Standard & Poor's Ratings Group or P-3 or better by Moody's Investors Service, Inc.; |
| | (c)    any bank instrument denominated in Dollars that matures within one (1) year from the date of acquisition issued by a bank that, on the date of issuance of any such instrument, is an Authorized Bank; |
| | (d)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within ninety (90) days from the date of acquisition; and |
| | (e)    direct and general obligations of any State of the United States of America or any municipality or other political subdivision thereof, in each case if at the time of acquisition such obligation bears a credit rating of A-3 or better from Standard & Poor's Ratings Group or P-3 or better from Moody's Investors Service, Inc., maturing within ninety (90) days from the date of the acquisition. |
| "Offshore Collateral Accounts" | each of the 1L Debt Service Payment Account, the Additional Interest Reserve Account, the Debt Service Reserve Account, the Disbursement Account, the Special Debt Service Payment Account, the Extraordinary Proceeds Account (including any sub-accounts thereof), the Insurance Proceeds and Compensation Account, the Offshore |

|  | Revenue Account, the Strabag Escrow Account, and the Stamp Tax Reserve Account. |
|---|---|
| "Offshore Revenue Account" | has the meaning set forth in Section 3.01(h) (*Establishment of the Offshore Collateral Accounts*). |
| "Offshore Revenue Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 2</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Offshore Revenue Account. |
| "Onshore Revenue Accounts" | has the meaning assigned to that term in the Onshore Accounts Agreement. |
| "Operating Accounts" | has the meaning assigned to that term in the Onshore Accounts Agreement. |
| "Original Administrative Agent" | has the meaning provided in the recitals hereto. |
| "Original Offshore Accounts Agreement" | has the meaning provided in the recitals hereto. |
| "Proceeds" | has the meaning assigned to that term in Section 9-102(a)(64) of the UCC, or any successor provision. |
| "Project" | has the meaning provided in the recitals hereto. |
| "Punchlist Holdback Amount" | as of any calculation date, if the relevant Construction Contractor fails to provide or maintain a Punch List LC as defined in and required under the Voith EPC Contract or Punch List / Warranty Security as defined in and required under the Strabag Tunneling Contract, the required stated amount of such Punch List LC or Punch List / Warranty Security. |
| "Required Debt Service Amount" | (a) on a Monthly Date that is six (6) months prior to the next Principal Payment Date, one-sixth (1/6); |
|  | (b) on a Monthly Date that is five (5) months prior to the next Principal Payment Date, one-third (1/3); and |
|  | (c) on a Monthly Date that is less than four (4) months prior to the next Principal Payment Date, one-half (1/2), |

(d) on a Monthly Date that is three (3) months prior to the next Principal Payment Date, two-thirds (2/3);

(e) on a Monthly Date that is two (2) months prior to the next Principal Payment Date, five-sixths (5/6); and

(f) on a Monthly Date that is less than one (1) month prior to the next Principal Payment Date, 100%,

in each case of the principal on the Secured Exit Loans, the Sponsor Deferrals, the Secured 1L Loans, the Secured 1L Notes, and any 1L Refinancing Debt, as applicable, that is to be due and payable on the next Principal Payment Date.

"Required Interest Debt Service Amount"

(a) on a Monthly Date that is two (2) months prior to the next Interest Payment Date, one-third (1/3);

(b) on a Monthly Date that is one (1) month prior to the next Interest Payment Date, two-thirds (2/3); and

(c) on a Monthly Date that is less than one (1) month prior to the next Interest Payment Date, 100%,

in each case of the interest on the Secured Exit Loans, the Sponsor Deferrals, the Secured 1L Loans, the Secured 1L Notes and any 1L Refinancing Debt, as applicable, that is to be due and payable on the next Interest Payment Date.

"Second Amended and Restated Offshore Accounts Agreement"

has the meaning provided in the recitals hereto.

"Securities Account"

has the meaning assigned to that term in Section 8-501 of the UCC, or any successor provision.

"Securities Intermediary"

a Person that (a) is a "securities intermediary" as defined in Section 8-102(a)(14) of the UCC, or any successor provision (except in respect of a Book-Entry Security) or (b) in respect of any Book-Entry Security, a "securities intermediary" as defined in 31 C.F.R. §357.2 (or, as applicable to such Book-Entry Security, the corresponding Federal

|  |  |
|---|---|
|  | Book-Entry Regulations governing such Book-Entry Security) that, to the extent required or permitted by the Federal Book-Entry Regulations, is also a "securities intermediary" as defined in Section 8-102(a)(14) of the UCC, or any successor provision. |
| "Security Entitlement" | (a) "security entitlement" as defined in Section 8-102(a)(17) of the UCC, or any successor provision (except in respect of a Book-Entry Security); or (b) in respect of any Book-Entry Security, a "security entitlement" as defined in 31 C.F.R. §357.2 (or, as applicable to such Book-Entry Security, the corresponding Federal Book-Entry Regulations governing such Book-Entry Security) that, to the extent required or permitted by the Federal Book-Entry Regulations, is also a "security entitlement" as defined in Section 8-102(a)(17) of the UCC, or any successor provision. |
| "Special Debt Service Payment Account" | has the meaning set forth in Section 3.01(e) (*Establishment of the Offshore Collateral Accounts*). |
| "Special Debt Service Payment Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 3</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Special Debt Service Payment Account. |
| "Stamp Tax Reserve Account" | has the meaning set forth in Section 3.01(j) (*Establishment of the Offshore Collateral Accounts*). |
| "Stamp Tax Reserve Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 10</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal of funds from the Stamp Tax Reserve Account. |
| "Strabag Escrow Account" | has the meaning set forth in Section 3.01(i) (*Establishment of the Offshore Collateral Accounts*). |
| "Strabag Escrow Account Transfer Certificate" | a certificate in substantially the form of <u>Schedule 5</u>, duly executed by an Authorized Representative of the Borrower, directing the transfer or withdrawal |

of funds from the Strabag Escrow Account.

| | |
|---|---|
| "Strabag Insurance Claims" | approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) under the Strabag Tunneling Contract (or the amount determined to be payable in connection with such claims in connection with such policy). |
| "Strabag Trigger Date"[1] | the date on which each of the following conditions has occurred: (i) the Borrower accepts the invoice from Strabag stated in Section 6.3.4.4 of the Strabag Tunneling Contract, (ii) the occurrence of COD as defined in and in accordance with the terms of the Strabag Tunneling Contract, (iii) the earlier to occur of (x) Substantial Completion (as defined in the Strabag Tunneling Contract) of each of Critical Milestones D, E and F (as defined in the Strabag Tunneling Contract) or (y) March 31, 2023 if Substantial Completion of any of Critical Milestones D, E and F has not been achieved only as a result of Acceptance Tests (as defined in the Strabag Tunneling Contract) for such Critical Milestone not having been completed. |
| "Succeeding Entity" | any Person into which the Offshore Collateral Agent or the Offshore Accounts Bank, as the case may be, is merged, or with which it is consolidated, or any corporation resulting from any merger or consolidation to which the Offshore Collateral Agent or the Offshore Accounts Bank, as the case may be and in its individual capacity, is a party, or any Person succeeding to all or substantially all of the corporate trust business of the Offshore Collateral Agent or the banking business of the Offshore Accounts Bank, as the case may be. |
| "Tunnel Damage Event" | any event arising in connection with or from any loss or damage to any of the Project's tunnels or tunnel work that gives rise to a need for repair of such tunnels or tunnel work (including repairs of |

---

[1]    **NTD:** Subject to AMs further review.

|  |  |
|---|---|
|  | underlying root causes), whether or not such event entitles the Borrower to make a claim under any Construction Contract, any insurance policy or otherwise. |
| "UCC" | the Uniform Commercial Code as in effect as of the date hereof and from time to time thereafter, in the State of New York; provided, that, if perfection or the effect of perfection or non-perfection or the priority of a Lien in any of the Account Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority. |
| "Unsecured Working Capital Facility" | any working capital facility other than the Secured Working Capital Facility that constitutes Permitted Financial Debt. |

Section 1.02    Interpretation.    In this Accounts Agreement, unless the context otherwise requires:

(a)    headings are for convenience only and do not affect the interpretation of this Accounts Agreement;

(b)    words importing the singular include the plural and vice versa;

(c)    a reference to an Annex, Article, party, Schedule, Section or clause is a reference to that Article, Section or clause of, or that Annex, party or Schedule to, this Accounts Agreement;

(d)    a reference to a document includes an amendment or supplement to, or replacement or novation of, that document but disregarding any amendment, supplement, replacement or novation made in breach of this Accounts Agreement;

(e)    a reference to a party to any document includes that party's successors and permitted assigns; and

(f)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

## ARTICLE II

## Appointment; Grant of Security Interest

Section 2.01 <u>Appointment</u>. (a) The Borrower and the Offshore Collateral Agent (acting on the instruction of the Original Administrative Agent) confirmed, as of the date of the Original Offshore Accounts Agreement, reconfirmed as of the date of each of the Amended and Restated Offshore Accounts Agreement and the Second Amended and Restated Offshore Accounts Agreement, and, acting on the instruction of the Intercreditor Agent, hereby reconfirm as of the date hereof, the appointment of the Offshore Accounts Bank to act as Securities Intermediary and/or Bank with respect to the Offshore Collateral Accounts, in each case, for the benefit of the Secured Parties with such powers as are expressly delegated to the Offshore Accounts Bank by the terms of this Accounts Agreement, together with such other powers as are reasonably incidental thereto. The Offshore Accounts Bank hereby reconfirms its continued acceptance of this appointment by the Borrower and the Offshore Collateral Agent and agrees to act as Securities Intermediary and/or Bank with respect to the Offshore Collateral Accounts in accordance with the terms of this Accounts Agreement. The Offshore Accounts Bank further confirms that it will establish, hold and accept, as Securities Intermediary or as Bank, in its custody and in accordance with the terms of this Accounts Agreement the Offshore Collateral Accounts and the Offshore Accounts Property. The Offshore Collateral Accounts and all other Account Collateral shall, until applied in accordance with the terms of this Accounts Agreement or until the Secured Parties' Lien thereon is exercised, constitute the property of the Borrower, subject to (i) the security interest created therein in favor of the Offshore Collateral Agent for the benefit of the Secured Parties; and (ii) the right of the Offshore Collateral Agent pursuant to the terms of this Accounts Agreement to issue orders and other demands and instructions with respect to the Offshore Collateral Accounts and any Account Collateral. The Offshore Accounts Property will not constitute repayment of the Secured Obligations until so applied as payments in accordance with the terms of this Accounts Agreement and the other Financing Documents.

(b)     The Offshore Collateral Agent (on the instruction of the Intercreditor Agent) also confirms the ongoing appointment and authorizes the Offshore Accounts Bank to act on its behalf for the purpose of the perfection of a security interest in favor of the Offshore Collateral Agent for the benefit of the Secured Parties in the Offshore Collateral Accounts and the Account Collateral in accordance with the Applicable Priority. The Offshore Accounts Bank reconfirms its acceptance of this appointment by the Offshore Collateral Agent and agrees to act as the Offshore Accounts Bank of the Offshore Collateral Agent for the benefit of the Secured Parties for such purpose. The Offshore Accounts Bank hereby agrees to comply with any and all instructions directing disposition of funds or Financial Assets in any Offshore Collateral Accounts and any and all Entitlement Orders with respect to any Offshore Collateral Accounts or Account Collateral, in each case, originated by the Offshore Collateral Agent without any further consent of the Borrower or any other Person.

(c)     The Offshore Accounts Bank shall not have title to the funds on deposit in or credited to the Offshore Collateral Accounts, and shall credit the Offshore Collateral Accounts with all receipts of interest, dividends and other income received on the property held in the Offshore Collateral Accounts in accordance with this Accounts Agreement or written instructions received pursuant hereto. The Offshore Accounts Bank shall administer and manage the Offshore Collateral Accounts in strict compliance with all of the terms applicable to the Offshore Collateral Accounts pursuant to this Accounts Agreement, and shall be subject to and comply with all of the obligations that the Offshore Accounts Bank owes to the Offshore Collateral Agent with respect to the Offshore Collateral Accounts, including all subordination

obligations set forth in Section 2.08 (*Subordination*) with respect to the Offshore Accounts Bank's right of set-off or recoupment or right to obtain a Lien, pursuant to the terms of this Accounts Agreement.

Section 2.02    Representations and Warranties of the Offshore Accounts Bank. The Offshore Accounts Bank hereby represents and warrants to the Offshore Collateral Agent, the Intercreditor Agent and the Borrower as follows:

(a)    it is a Securities Intermediary on the date hereof and shall act as such in maintaining the Offshore Collateral Accounts and all of the Account Collateral (including all Security Entitlements deposited in or credited to the Offshore Collateral Accounts) from time to time transferred, deposited in or credited to or maintained in the Offshore Collateral Accounts;

(b)    it is the Bank in respect to each Offshore Collateral Account that is maintained as a Deposit Account and the Securities Intermediary in respect to each Offshore Collateral Account that is maintained as a Securities Account;

(c)    it has established and maintains the Offshore Collateral Accounts as set forth in Section 3.01 (*Establishment of the Offshore Collateral Accounts*);

(d)    except for the claims and interest of the Borrower and the Offshore Collateral Agent, for the benefit of the Secured Parties, in the Offshore Collateral Accounts, as applicable, it does not know of and has not received written notice of any right or claim to or interest in (including any Adverse Claim) the Offshore Collateral Accounts or any Account Collateral (including funds and Financial Assets) deposited in or credited to the Offshore Collateral Accounts by any Person;

(e)    it has not entered into any agreement with any other Person relating to the Offshore Collateral Accounts and/or Offshore Accounts Property or other Account Collateral pursuant to which it has agreed to comply with Entitlement Orders or other instructions or directions of such Person.  It has not entered into any other agreement with the Borrower or any other Person purporting to limit or condition the obligation of the Offshore Accounts Bank to comply with Entitlement Orders or other directions, instructions or orders originated by the Offshore Collateral Agent; and

(f)    as of the date hereof, it has an office in the United States which satisfies the requirements of clauses (1) and (2) of Article 4 of the Hague Securities Convention.

Section 2.03    Certain Duties of the Offshore Accounts Bank.  The Offshore Accounts Bank hereby covenants and agrees as follows:

(a)    it shall promptly perform all duties imposed upon a Securities Intermediary and a Bank under the UCC and this Accounts Agreement;

(b)    all property delivered to the Offshore Accounts Bank pursuant to this Accounts Agreement or the other Financing Documents will be held by the Offshore Accounts Bank and promptly deposited in or credited to an Offshore Collateral Account by an appropriate entry in its records in accordance with this Accounts Agreement;

(c)    if it obtains actual knowledge of any lien, encumbrance or Adverse Claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against any Offshore Collateral Account or Offshore Accounts Property other than the claims and interests of the Offshore Collateral Agent, the Offshore Accounts Bank will promptly notify the Borrower, the Intercreditor Agent and the Offshore Collateral Agent in writing thereof;

(d)    if at any time it receives an Entitlement Order or any other order from the Offshore Collateral Agent directing the transfer, redemption or liquidation of any Financial Asset carried in the Offshore Collateral Accounts or any written instruction originated by the Offshore Collateral Agent directing the disbursement, deposit and/or transfer of any funds or other property held in the Offshore Collateral Accounts, the Offshore Accounts Bank shall comply with such Entitlement Order, instruction or other order without further consent by the Borrower or any other Person;

(e)    it will not enter into any agreement with any other Person relating to the Offshore Collateral Accounts and/or Offshore Accounts Property or other Account Collateral pursuant to which it will agree to comply with Entitlement Orders or other instructions or directions of such Person;

(f)    within ten (10) Business Days after the end of the month in which the first deposit is made into any Offshore Collateral Account and within ten (10) Business Days after the end of each month thereafter, it shall deliver to the Borrower, the Offshore Collateral Agent and the Intercreditor Agent a statement, with respect to the Offshore Collateral Accounts, setting forth in reasonable detail all deposits to and withdrawals and transfers from each of the Offshore Collateral Accounts during such month, including the date on which such deposits and withdrawals and transfers were made, and the balances of and any investments in each of the Offshore Collateral Accounts at the end of such month, including information regarding categories, amounts, maturities and issuers of Offshore Authorized Investments; provided that the requirements of this Section 2.03(f) may be performed by the Offshore Accounts Bank by granting Borrower, Offshore Collateral Agent and Intercreditor Agent on-line read only access to the Offshore Collateral Accounts;

(g)    within five (5) Business Days after each Interest Payment Date, it shall deliver to the Borrower, the Offshore Collateral Agent and the Intercreditor Agent a statement, with respect to the Offshore Collateral Accounts, setting forth in reasonable detail all deposits to and withdrawals and transfers from each of the Offshore Collateral Accounts during the Interest Period ending on such Interest Payment Date, including the date on which such deposits and withdrawals and transfers were made, and the balances of and any investments in each of the Offshore Collateral Accounts as of such Interest Payment Date, including information regarding categories, amounts, maturities and issuers of Offshore Authorized Investments; provided that the requirements of this Section 2.03(g) may be performed by the Offshore Accounts Bank by granting Borrower, Offshore Collateral Agent and Intercreditor Agent on-line read only access to the Offshore Collateral Accounts;

(h)    within five (5) Business Days after receipt of any written request by the Borrower, the Offshore Collateral Agent, the Intercreditor Agent, or any Secured Lender, it shall provide the Borrower, the Offshore Collateral Agent, the Intercreditor Agent, or such Secured Lender, as

the case may be, with such other information as the Borrower, the Offshore Collateral Agent, the Intercreditor Agent or such Secured Lender may specify regarding all Offshore Authorized Investments and any other investments made by the Offshore Accounts Bank pursuant hereto and regarding amounts available in, transfers from or deposits to the Offshore Collateral Accounts;

(i)     it shall maintain all such accounts, books and records as may be necessary to record all transactions carried out by it under this Accounts Agreement; and

(j)     within five (5) Business Days after receipt of any written request by the Borrower, the Offshore Collateral Agent, the Intercreditor Agent, or any Secured Lender, it will provide the Borrower, the Offshore Collateral Agent, the Intercreditor Agent, or such Secured Lender, as the case may be, such additional information regarding the Account Collateral, the Offshore Collateral Accounts and the balances of any Offshore Authorized Investments therein as any of them may reasonably request from time to time.

Section 2.04    Treatment of Financial Assets.  (a)  The Offshore Collateral Agent is the Entitlement Holder in any Security Entitlements with respect to any Financial Assets deposited in or credited to the Offshore Collateral Accounts for the benefit of the Secured Parties.

(b)     All Financial Assets acquired by or delivered to the Offshore Accounts Bank shall be held by it and credited by book entry to the relevant Offshore Collateral Account or otherwise accepted by it for credit to the relevant Offshore Collateral Account.  Any Financial Asset so credited or accepted for credit to the relevant Offshore Collateral Account shall be registered in the name of, payable to, or to the order of, or indorsed to the Offshore Accounts Bank or in blank and in no case will any Financial Asset credited to any Offshore Collateral Account or held by the Offshore Accounts Bank for credit to any Offshore Collateral Account be registered in the name of, payable to, to the order of, or indorsed to, the Borrower, except to the extent that such Financial Asset has been subsequently indorsed by the Borrower to the Offshore Accounts Bank or in blank.

(c)     Each item of property (including any cash, security, general intangible, document, instrument or obligation, share, participation, interest or other property whatsoever) deposited in or credited to any Offshore Collateral Account shall be treated as a Financial Asset for the purposes of Section 8-102(a)(9)(iii) of the UCC.  Notwithstanding any provision herein contained to the contrary, any property contained in the Offshore Collateral Accounts that is not deemed to be a Financial Asset under Applicable Law, to the extent permitted by Applicable Law, will be deemed to be deposited in a Deposit Account and subject to Section 2.05 (*Offshore Collateral Accounts as Deposit Accounts*).

Section 2.05    Offshore Collateral Accounts as Deposit Accounts.  (a) To the extent that the Offshore Collateral Accounts are not considered Securities Accounts, the Offshore Collateral Accounts shall be deemed to be Deposit Accounts in respect of any property deposited in or credited to the Offshore Collateral Accounts that is not deemed to be a Financial Asset under Applicable Law.  Such Deposit Accounts and such property shall be maintained with the Offshore Accounts Bank acting not as a Securities Intermediary, but as a Bank.

(b)    The parties hereto agree that, to the extent that the Offshore Collateral Accounts are deemed to be Deposit Accounts, the Offshore Collateral Agent shall have Control of the Offshore Collateral Accounts for the benefit of the Secured Parties, the Offshore Accounts Bank shall comply with written instructions originated by the Offshore Collateral Agent directing disposition of the Offshore Accounts Property deposited in or credited to the Offshore Collateral Accounts without further consent of the Borrower, and the Borrower disclaims any entitlement to claim Control of such Deposit Accounts.

Section 2.06   Grant of Security Interests.   As security for the prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Secured Obligations and the due performance and compliance by the Borrower with all of the terms, conditions and agreements contained in the Common Terms Agreement and the other Financing Documents, the Borrower hereby pledges, collaterally assigns, hypothecates, transfers and delivers to the Offshore Collateral Agent for the benefit of the Secured Parties, and grants and creates a lien on and security interest in favor of the Offshore Collateral Agent for the benefit of the Secured Parties in accordance with the Applicable Priority, in, all of its right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Borrower, wherever located, and whether now or hereafter existing or arising (collectively, the "Account Collateral"):

(a)    each of the Offshore Collateral Accounts, including all Offshore Authorized Investments at any time held in, required to be held in or credited to any of the Offshore Collateral Accounts, and all interest, dividends and other income derived from any such Offshore Authorized Investments and all funds credited thereto and Security Entitlements carried therein;

(b)    all Offshore Accounts Property;

(c)    all statements, certificates, instruments and investment property representing or evidencing any Offshore Collateral Account and all Offshore Authorized Investments and other property from time to time received, receivable or otherwise distributed in respect of such Offshore Authorized Investments and held in or credited to any Offshore Collateral Account; and

(d)    to the extent not included in the foregoing, all Proceeds of and to any and all of the foregoing, including whatever is received upon any collection, exchange, sale or other disposition of any of the foregoing and any property into which any of the foregoing is converted, whether cash or non-cash Proceeds, and any and all other amounts paid or payable under or in connection with any of the foregoing and all Security Entitlements of the Borrower in any and all of the foregoing.

Section 2.07   Control and Perfection of Account Collateral.   (a) The Borrower shall maintain (i) each Offshore Collateral Account pledged hereunder so that the Offshore Collateral Agent has Control, for the benefit of the Secured Parties (and no other Person), of such Offshore Collateral Account in the manner specified in Section 9-104 of the UCC, (ii) all Offshore Authorized Investments pledged hereunder so that the Offshore Collateral Agent has Control of such Offshore Authorized Investments in the manner specified in Sections 9-106 and 8-106 of the UCC, and (iii) all Financial Assets held in the Offshore Collateral Accounts and

pledged hereunder so that the Offshore Collateral Agent has Control of such Financial Assets in the manner specified in Sections 9-106 and 8-106 of the UCC.

(b)  The Borrower shall give, execute, deliver, file, record, authenticate, authorize or obtain all such UCC financing statements as may be necessary or desirable to perfect the security interest granted under this Accounts Agreement.

(c)  Until the Release Date, the Borrower shall not have any rights against or to monies held in the Offshore Collateral Accounts, except the right to receive or make requisitions of funds deposited in or credited to the Offshore Collateral Accounts as permitted by this Accounts Agreement.

(d)  The Borrower hereby disclaims any entitlement to claim Control of the Security Entitlements carried in the Offshore Collateral Accounts and of the Financial Assets carried in the Offshore Collateral Accounts to the extent provided in this Accounts Agreement.

(e)  The Offshore Collateral Agent shall not be responsible for and makes no representation as to the existence, genuineness, value or protection of any Account Collateral or Financial Asset, for the legality, effectiveness or sufficiency of any Security Document, or for the creation, perfection, priority, sufficiency or protection of any liens.  For the avoidance of doubt, nothing herein shall require the Offshore Collateral Agent to file financing statements or continuation statements, or be responsible for maintaining the security interests purported to be created as described herein (except for the safe custody of any Account Collateral in its possession, the accounting for moneys actually received by it hereunder, and as otherwise specifically instructed in writing by the Intercreditor Agent) and such responsibility shall be solely that of the Borrower in accordance with Section 5.01(k)(i) (*Further Assurances*) of the Common Terms Agreement.

Section 2.08  Securities Intermediary's Jurisdiction.  The parties hereto agree that the Securities Intermediary's jurisdiction of the Offshore Accounts Bank, for purposes of Section 8-110(e) of the UCC, is and shall continue to be the State of New York, and the Bank's jurisdiction of the Offshore Accounts Bank, for purposes of Section 9-304 of the UCC, is and shall continue to be the State of New York.

Section 2.09  Subordination.  The Offshore Accounts Bank hereby acknowledges the security interest granted hereby to the Offshore Collateral Agent for the benefit of the Secured Parties by the Borrower.  In the event that the Offshore Accounts Bank has or subsequently obtains by operation of Applicable Law a right of recoupment or set-off or any Lien in any of the Offshore Collateral Accounts or the Offshore Accounts Property or any Security Entitlement related thereto, or any other Account Collateral, the Offshore Accounts Bank hereby agrees that such right of recoupment or set-off and/or any such Lien shall be subordinate to the security interest of the Offshore Collateral Agent and the Secured Parties.  The Offshore Accounts Bank agrees that it shall not assert or enforce any such right of recoupment or set-off and/or any Lien until the Release Date other than any rights of the Offshore Accounts Bank with respect to deduction, set-off, banker's lien and recoupment to the extent (and only to the extent) of returned items and chargebacks either for uncollected checks or other items of payment and transfers previously credited to any such account, and each of the Offshore

Collateral Agent, on behalf of and for the benefit of the Secured Parties, and the Borrower hereby expressly authorize the Offshore Accounts Bank to debit any such account for such amounts.

Section 2.10    Payments Received by the Borrower.  All payments received by the Borrower under or in connection with any of the Account Collateral, or the sale, transfer, lease, or disposal of any assets of the Borrower, and required to be deposited into the Offshore Collateral Accounts in accordance with the terms of this Accounts Agreement or any other Financing Document shall be held by the Borrower in trust for the Offshore Collateral Agent for the benefit of the Secured Parties, shall be segregated from other funds of the Borrower and shall, forthwith upon receipt by the Borrower, be turned over to the Offshore Collateral Agent in the same form as received by the Borrower (duly endorsed by the Borrower to the Offshore Collateral Agent or the Offshore Accounts Bank, if requested) for deposit and disbursement in accordance with this Accounts Agreement.

## ARTICLE III

### Establishment of the Offshore Collateral Accounts

Section 3.01    Establishment of the Offshore Collateral Accounts.  The Offshore Accounts Bank has established and will maintain, in the name of the Borrower and on the books and records of the Offshore Accounts Bank's corporate trust department's offices located in New York, New York, the accounts set forth below:

(a)    a special, segregated, irrevocable, Dollar-denominated account entitled "1L Debt Service Payment Account", Account No. [●] (the "1L Debt Service Payment Account");

(b)    a special, segregated, irrevocable, Dollar-denominated account entitled "Additional Interest Reserve Account", Account No. [●] (the "Additional Interest Reserve Account");

(c)    a special, segregated, irrevocable, Dollar-denominated account entitled "Debt Service Reserve Account", Account No. 3010339 (the "Debt Service Reserve Account");

(d)    a special, segregated, irrevocable, Dollar-denominated account entitled "Disbursement Account", Account No. 3010454 (the "Disbursement Account");

(e)    a special, segregated, irrevocable, Dollar-denominated account entitled "Special Debt Service Payment Account", Account No. [●] (the "Special Debt Service Payment Account");

(f)    a special, segregated, irrevocable, Dollar-denominated account entitled "Extraordinary Proceeds Account", Account No. 3010389 (the "Extraordinary Proceeds Account") and any sub-account thereof established pursuant to Section 13.03 (*Extraordinary Proceeds Sub-accounts*);

(g)     a special, segregated, irrevocable, Dollar-denominated account entitled "Insurance Proceeds and Compensation Account", Account No. 3010397 (the "Insurance Proceeds and Compensation Account");

(h)     a special, segregated, irrevocable, Dollar-denominated account entitled "Offshore Revenue Account", Account No. 3010423 (the "Offshore Revenue Account");

(i)     a special, segregated, irrevocable, Dollar-denominated account entitled "Strabag Escrow Account", Account No. [●] (the "Strabag Escrow Account"); and

(j)     a special, segregated, irrevocable, Dollar-denominated account entitled "Stamp Tax Reserve Account", Account No. [●] (the "Stamp Tax Reserve Account").

Section 3.02   Maintaining the Offshore Collateral Accounts.   (a) Until the Release Date:

(i)     each Offshore Collateral Account shall be maintained at the offices of the Offshore Accounts Bank located in New York, New York;

(ii)     each Offshore Collateral Account shall be separate from all other accounts held or maintained by the Offshore Accounts Bank or under its control and dominion;

(iii)     notwithstanding any term or condition to the contrary in any other agreement relating to the Offshore Collateral Accounts, and except as otherwise provided by Section 4.02 (*Withdrawals from the Disbursement Account*), Section 5.02 (*Withdrawals from the Offshore Revenue Account*), Section 6.02 (*Withdrawals from the Special Debt Service Payment Account*), Section 7.02 (*Withdrawals from the 1L Debt Service Payment Account*), Section 8.02 (*Withdrawals from the Strabag Escrow Account*), Section 9.02 (*Withdrawals from the Additional Interest Reserve Account*), Section 10.02 (*Withdrawals from the Debt Service Reserve Account*), Section 11.02 (*Withdrawals from the Stamp Tax Reserve Account*), Section 12.02 (*Withdrawals from the Insurance Proceeds and Compensation Account*), and Section 13.02 (*Withdrawals from the Extraordinary Proceeds Account*), no amount (including interest on Offshore Authorized Investments deposited in or credited thereto) shall be paid or released to or for the account of, or withdrawn by or for the account of, the Borrower or any other Person from any Offshore Collateral Account except at the direction of the Offshore Collateral Agent; and

(iv)     upon receipt of a Notice of Suspension, the Offshore Accounts Bank shall, at any time, and without notice to, or consent from, the Borrower, transfer, or direct the transfer of, funds deposited in or credited to the Offshore Collateral Accounts to satisfy any Secured Obligation then due and payable in accordance with the written directions of the Offshore Collateral Agent.

(b)     The Borrower agrees that it shall not open or maintain any accounts other than (i) the Offshore Collateral Accounts and (ii) the Onshore Project Accounts.

(c)     Neither the Offshore Accounts Bank nor the Borrower shall change the name, account number or denomination of any Offshore Collateral Account without the prior written consent of the Offshore Collateral Agent.

(d)     All interest, investment income and other amounts, if any, relating to the Offshore Collateral Accounts that are required to be reported to any federal, state or local taxing Authority shall be reported under the name of the Borrower.  The Offshore Accounts Bank does not have any interest in the funds held in the accounts deposited hereunder but is serving as Bank and Securities Intermediary only and having only possession thereof.  The Borrower shall pay or reimburse the Offshore Accounts Bank upon request for any transfer taxes or other taxes relating to the funds held in the accounts incurred in connection herewith and shall indemnify and hold harmless the Offshore Accounts Bank any amounts that it is obligated to pay in the way of such taxes.  Any payments of income from this account shall be subject to withholding regulations then in force with respect to United States taxes.  The Borrower will provide the Offshore Accounts Bank with appropriate W-9 forms for tax identification number certifications, or W-8 forms for non-resident alien certifications.  It is understood that the Offshore Accounts Bank shall only be responsible for income reporting with respect to income earned on the Offshore Collateral Accounts and will not be responsible for any other reporting.  This paragraph shall survive notwithstanding any termination of this Accounts Agreement or the resignation or removal of the Offshore Accounts Bank.

(e)     All service charges and fees with respect to the Offshore Collateral Accounts shall be for the account of the Borrower.

Section 3.03    Deposits into and Withdrawals from the Offshore Collateral Accounts.   Amounts shall be deposited into and withdrawn or transferred from each of the Offshore Collateral Accounts in strict accordance with the applicable provisions of ARTICLE IV (*Disbursement Account*) through ARTICLE XII (*Extraordinary Proceeds Account*), respectively.

## ARTICLE IV

### Disbursement Account

Section 4.01    Payments into the Disbursement Account.  (a) The Borrower shall cause the following amounts to be paid into the Disbursement Account to the extent received by the Borrower prior to the Project Completion Date:

> (i)     all proceeds of any disbursement made under the Secured Working Capital Facility or Unsecured Working Capital Facility that the Borrower, at its discretion, elects to have deposited in the Disbursement Account (as opposed to the Offshore Revenue Account) to the extent required for payment of amounts described in Section 4.02 (*Withdrawals from the Disbursement Account*);

(ii) all proceeds of any Equity Contribution made to the Borrower in cash (other than those required to be made pursuant to the Contribution Agreement) and any distributions from AM DE on or after exit from the Bankruptcy Cases (or otherwise) to the extent required for payment of amounts described in Section 4.02 (*Withdrawals from the Disbursement Account*);

(iii) all Delay in Start-up Insurance Proceeds received by the Borrower; and

(iv) all Delay Liquidated Damages received by the Borrower.

(b) The Offshore Accounts Bank shall deposit into the Disbursement Account (i) all amounts required to be deposited in the Disbursement Account pursuant to Section 5.02 (*Withdrawals from the Construction Accounts*) of the Onshore Accounts Agreement, and (ii) any funds from the Offshore Revenue Account that the Borrower requests the Offshore Accounts Bank to transfer to the Disbursement Account to make any of the withdrawals permitted under Section 4.02 (*Withdrawals from the Disbursement Account*).

 Section 4.02 <u>Withdrawals from the Disbursement Account</u>. The Offshore Accounts Bank shall make the following withdrawals and transfers from the Disbursement Account, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, of a Disbursement Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) and in each case subject to and in accordance with the express instructions of the Borrower contained in such Disbursement Account Transfer Certificate with respect to each and every item set forth in this Section 4.02:

(a) for direct payment, or transfer to the [*name of account*] of AM DE for the payment, to an applicable payee, the amount necessary (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) to pay for fees, costs and expenses incurred in connection with the Bankruptcy Cases, including the fees, costs and expenses of any Consultant, counsel or professional advisor that are then due and payable in accordance with amounts approved by the Bankruptcy Court.

(b) prior to the Project Completion Date, (i) for direct payment to an applicable payee, the amount necessary (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) to pay Project Costs constituting amounts owed under the Construction Contracts or any other Material Project Document or for fees, costs and expenses of any Consultant, counsel or professional advisor that are then due and payable in accordance with the amounts set forth in the Annual Budget on an aggregate and not a periodic basis (including any permitted application of the contingency line item), (ii) for direct payment to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or for transfer to the Construction Dollar Account of the amounts necessary to pay other Project Costs (other than amounts covered in sub-clause (i) above) that are due and payable or that will become due and payable within the next thirty (30) days in accordance with the amounts set forth in the Annual Budget on an aggregate and not a periodic basis (including any permitted application of the contingency line item), and (iii) as directed by the Borrower for

Project related expenses or other costs of the Borrower's business, in the case of Equity Contributions (other than those required to be made pursuant to the Contribution Agreement), up to the amount of such Equity Contribution;

(c)        on the Project Completion Date, all amounts on deposit in the Disbursement Account shall be transferred to the Offshore Revenue Account other than (A) the Punchlist Holdback Amount which shall remain on deposit in the Disbursement Account for payment to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or for the transfer of amounts to the Construction Dollar Account of any other amounts necessary to pay the Construction Contractors in final settlement of the Contract Price under and as defined in each Construction Contract (other than any disputed amounts or amounts to be transferred pursuant to subclause (B) hereof), (B) the Disputed Project Costs Holdback Amount which shall remain on deposit in the Disbursement Account for payment to any applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) of any previously disputed Project Costs for which the Disputed Project Costs Holdback Amount was provisioned and that are no longer disputed, in each case in accordance with the amounts set forth in the Annual Budget on an aggregate and not a periodic basis and including any permitted application of the contingency line item, and (C) remaining Project Costs certified by the Borrower and confirmed by the Independent Engineer which shall remain on deposit in the Disbursement Account for payment (without double-counting amounts in subclauses (A) and (B)) of remaining Project Costs in the manner contemplated in Section 4.02(a);

(d)        if the Borrower has certified and the Independent Engineer has confirmed that (1) all Punch List items as defined under each Construction Contract have been completed, (2) the Contract Price under and as defined in each Construction Contract has been paid in full, and there are no claims for payment or for damages outstanding by any Construction Contractor against the Borrower, and (3) there are no further Project Costs projected to be incurred or to become due and payable, then all amounts on deposit in the Disbursement Account shall be transferred to the Offshore Revenue Account.

Section 4.03    Closing of Disbursement Account.  If the Borrower requests in writing to the Offshore Accounts Bank (with a copy to the Offshore Collateral Agent and the Intercreditor Agent) at any time after the transfers pursuant to Section 4.02(c) (*Withdrawals from the Disbursement Account*) above that the Disbursement Account is no longer required to be utilized pursuant to this Accounts Agreement and that the Disbursement Account be closed (as confirmed in writing by the Intercreditor Agent), the Offshore Accounts Bank shall close the Disbursement Account.

## ARTICLE V

## Offshore Revenue Account

Section 5.01    Payments into the Offshore Revenue Account.  (a) The Borrower shall cause the following amounts to be paid into the Offshore Revenue Account:

(i)     all Project revenues (including all amounts received by the Borrower from sales of energy or capacity) denominated in Dollars;

(ii)    all amounts required to be transferred from the Onshore Revenue Accounts to the Offshore Revenue Account pursuant to Section 4.02(a)(iv) (*Withdrawals from the Onshore Revenue Accounts*) of the Onshore Accounts Agreement;

(iii)   all amounts required to be transferred from the Construction Accounts (as defined in the Onshore Accounts Agreement) to the Offshore Revenue Account pursuant to Section 5.02 (*Withdrawals from the Construction Accounts*) of the Onshore Accounts Agreement;

(iv)    other than amounts deposited in the Disbursement Account in accordance with 4.01(a)(i) (*Payments into the Disbursement Account*), all proceeds of any disbursement made under the Secured Working Capital Facility or Unsecured Working Capital Facility;

(v)     other than amounts deposited in the Disbursement Account in accordance with 4.01(a)(ii) (*Payments into the Disbursement Account*), all proceeds of any Equity Contribution made to the Borrower in cash (other than those required to be made pursuant to the Contribution Agreement) and any distributions from AM DE upon exit from the Bankruptcy Cases (or otherwise);

(vi)    all Business Interruption Insurance Proceeds received by the Borrower;

(vii)   all Delay in Start-up Insurance Proceeds received by the Borrower on or after the Project Completion Date;

(viii)  all Delay Liquidated Damages received by the Borrower on or after the Project Completion Date;

(ix)    all interest and other investment income earned from investments in the Offshore Authorized Investments;

(x)     other than amounts required to be deposited into (A) other Offshore Collateral Accounts pursuant to this Accounts Agreement or (B) the Onshore Revenue Accounts pursuant to the Onshore Accounts Agreement, all other income (howsoever earned), revenue (howsoever generated) and proceeds of any nature whatsoever received by or on account or on behalf of the Borrower denominated in Dollars;

(xi)    Termination Proceeds received in connection with the termination of an Approved PPA;

(xii)   Dispute Resolution Proceeds (other than the CNM Arbitral Award Proceeds); and

(xiii)   subject to Section 5.01(b) below, any other amounts that, pursuant to the terms of this Accounts Agreement or any other Financing Documents, are required or permitted to be deposited in the Offshore Revenue Account.

(b)      The Offshore Accounts Bank shall deposit into the Offshore Revenue Account (i) all amounts required to be deposited in the Offshore Revenue Account pursuant to Section 9.02(a) (*Withdrawals from the Additional Interest Payment Account*), Section 10.02(b) (*Withdrawals from the Debt Service Reserve Account*), Section 12.02(a) (*Withdrawals from the Insurance Proceeds and Compensation Account*), and Section 13.02(a) (*Withdrawals from the Extraordinary Proceeds Account*), [and (ii) any funds from the Disbursement Account that the Borrower requests the Offshore Accounts Bank to transfer to the Offshore Revenue Account to make any of the withdrawals permitted under the **first** to **eight** priority of Section 5.02(a)(i)].

Section 5.02   Withdrawals from the Offshore Revenue Account.

(a)      On and after the Effective Date, the Offshore Accounts Bank shall make the following withdrawals and transfers in the following order of priority from the Offshore Revenue Account, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, of an Offshore Revenue Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) and in each case subject to and in accordance with the express instructions of the Borrower contained in such Offshore Revenue Account Transfer Certificate with respect to each and every item set forth in this Section 5.02(a):

(i)      **first**, on each Monthly Date,

(A)    for direct payment, or transfer to the [*name of account*] of AM DE for the payment, to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable), the amounts due to Material Project Participants under the O&M Agreement and the Shared Facilities Agreement, and for fees, costs and expenses of Consultants, counsel or professional advisors, in each case, not exceeding by more than ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most-recently approved Annual Budget (when taken together with any other payments made with respect to such line item during the annual period to which such Annual Budget applies);

(B)    for direct payment, or transfer to the [*name of account*] of AM DE for the payment, to the applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or for transfer of amounts to the Operating Accounts to pay any other operating costs (including De-watering costs and costs of repairing, replacing or restoring property damaged by, or otherwise remediate the effects of, any Tunnel Damage Event (to the extent that any such costs are not paid from transfers and

withdrawals pursuant to Section 12.02 (*Withdrawals from the Insurance Proceeds and Compensation Account*)) not exceeding by more than ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most-recently approved Annual Budget (when taken together with any other payments made (including amounts covered in sub-clause (A) above) with respect to such line item during the annual period to which such Annual Budget applies), any payments required to be made pursuant to instructions from the CEN, any Designated Contract Payments (other than any Deferred Intercompany Payments) and/or any payments of Taxes (other than the VAT amount paid with the VAT Loan and Stamp Taxes for the conversion of Secured 2L Loans to Secured 2L Notes for which amounts have been reserved in the Stamp Tax Reserve Account), in each case that are permitted to be paid pursuant to the Financing Documents and that are due and payable or that will become due and payable within the next thirty (30) days (but only to the extent that funds are not available in the Operating Accounts to pay for such operating costs, payments and/or Taxes);

(C)     to the applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or for transfer of amounts to the Operating Accounts, the amounts due or that will become due within the next thirty (30) days with respect to Permitted Financial Debt set forth in clauses (ii) (deferred purchase price of assets and services) or (iv) (financial leases and purchase money indebtedness) of the definition thereof and any fees or other charges with respect to Permitted Financial Debt set forth in clauses (vii) (surety bonds, performance bonds, bankers acceptances, letters of credit or similar instruments) and (viii) (surety bonds and letters of credit required by CEN to participate in the spot market) of the definition thereof;

(D)     in the case of Equity Contributions (other than those required to be made pursuant to the Contribution Agreement) up to the amount of such Equity Contribution, as directed by the Borrower for Project related expenses or other costs of the Borrower's business (other than to make any Restricted Payments);

(E)     in the case of Dispute Resolution Proceeds, for direct payment to an applicable payee of any costs, expenses and Taxes incurred or payable by the Borrower in connection with the collection and conversion, if in a currency other than Dollars, of such Dispute Resolution Proceeds; and

(F) on the Monthly Dates occurring in each of January 2023, February 2023, and March 2023, an amount equal to $2,649,915.44 to the Stamp Tax Reserve Account;

(ii) **second**, at any time, for payment of principal or reimbursement obligations that are due and payable in connection with Permitted Financial Debt set forth in clauses (vii) (surety bonds, performance bonds, bankers acceptances, letters of credit or similar instruments) and (viii) (surety bonds and letters of credit required by CEN to participate in the spot market) of the definition thereof (other than any Secured Obligations);

(iii) **third**, at any time, to pay all fees, costs, charges and any other amounts (other than as otherwise paid below) that are due and payable to the Secured Parties under the Financing Documents or creditors under the Permitted Financial Debt set forth in clauses [(vi) (Unsecured Working Capital Facility), (xi) (Secured Exit Loan), [●] (the Sponsor Deferrals), and (xii) (Secured Working Capital Facility) of the definition thereof (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable)];

(iv) **fourth**, on each Monthly Date, *first*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral due and payable on December 31, 2022 and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon and *second*, to pay the Strabag Change Order Deferral due and payable on December 31, 2022 and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon;

(v) **fifth**, on each Monthly Date, *pro rata*, (A) to the Special Debt Service Payment Account in an amount equal to the Required Interest Debt Service Amount on such Monthly Date with respect to interest on the Secured Exit Loans and the Sponsor Deferrals, (B) to pay interest that is due and payable on such Monthly Date under the Secured Working Capital Facility, and (C) if there were insufficient funds available on previous Monthly Dates during the same Interest Period for payment of amounts due under clauses (A) or (B) of this priority, an amount equal to any such shortfall to the Special Debt Service Payment Account or creditors under the Secured Working Capital Facility, as applicable;

(vi) **sixth**, on each Monthly Date, to the Special Debt Service Payment Account *pro rata*, (A) in an amount equal to the Required Debt Service Amount on such Monthly Date with respect to principal on the Secured Exit Loans and the Sponsor Deferrals that is due and payable on the next Principal Payment Date, (B) on the Monthly Date occurring in January 2024, to the Special Debt Service Payment Account in an amount equal to

the outstanding principal on the Secured Working Capital Loans; and (C) if there were insufficient funds available on previous Monthly Dates during the same Interest Period for payment of amounts due under clauses (A) or (B) of this priority, an amount equal to any such shortfall to the Special Debt Service Payment Account;

(vii)    **seventh**, on each Monthly Date, *pro rata* (A) to pay (or, with regard to payments to be made in connection with the VAT Documents, transfer of such amounts to the Operating Accounts for further application towards such payments, if applicable) all interest that is due and payable to creditors under any Unsecured Working Capital Facility and all interest, fees, costs, charges and any other amounts under the VAT Loan Agreement (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable), (B) to the 1L Debt Service Payment Account in an amount equal to the Required Interest Debt Service Amount on such Monthly Date with respect to interest on the Secured 1L Debt, and (C) if there were insufficient funds available on previous Monthly Dates during the same Interest Period for payment of amounts due under clauses (A) or (B) of this priority, an amount equal to any such shortfall to the creditors under the Unsecured Working Capital Facility, the VAT Lenders, or the 1L Debt Service Payment Account, as applicable; provided that prior to the Strabag Trigger Date, Strabag's *pro rata* share of interest on the Secured 1L Debt shall be transferred to the Strabag Escrow Account;

(viii)   **eighth**, on each Monthly Date, to the 1L Debt Service Payment Account (A) in an amount equal to the Required Debt Service Amount on such Monthly Date with respect to principal on the Secured 1L Debt that is due and payable on the next Principal Payment Date and (B) if there were insufficient funds available on previous Monthly Dates during the same Interest Period for payment of amounts due under this priority, an amount equal to any such shortfall; provided that prior to the Strabag Trigger Date, Strabag's *pro rata* share of principal on the Secured 1L Debt shall be transferred to the Strabag Escrow Account;

(ix)     **ninth**, to remain on deposit in the Offshore Revenue Account, an amount equal to ten million Dollars ($10,000,000) (which amount shall be disregarded in making each of the calculations and transfers pursuant to priorities **twelfth** and **fourteenth**, allowing the Borrower to use all or a portion of such deposit to make the transfers required therein);

(x)      **tenth**, on each Monthly Date (other than the Monthly Date occurring in January 2024), to the Special Debt Service Payment Account in an amount equal to the outstanding principal on the Secured Working Capital Loans;

(xi)     **eleventh**, after making each applicable withdrawal and transfer above, (A) at any time, if a mandatory prepayment is required under Section

2.06(a)(v) (*Mandatory Prepayment*) of the Common Terms Agreement, to apply the amount of such prepayment directly to the prepayment of the affected Secured Debt, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment;

(xii)  **twelfth**, on each Monthly Date that occurs in March of each calendar year, to the Additional Interest Reserve Account in an amount equal to the Additional Interest Shortfall;

(xiii)  **thirteenth**, to remain on deposit in the Offshore Revenue Account, an amount equal to twenty-five million Dollars ($25,000,000) (including the amount retained under priority **ninth**) (which amount shall be disregarded in making each of the calculations and transfers pursuant to priorities **fourteenth**, allowing the Borrower to use all or a portion of such deposit to make the transfers required therein);

(xiv)  **fourteenth**, (A) on each Monthly Date that occurs in April of each calendar year, to the Additional Interest Reserve Account in an amount equal to the April Estimated Additional Interest and (B) on each Monthly Date that occurs in October of each calendar year, to the Additional Interest Reserve Account in an amount equal to the October Estimated Additional Interest;

(xv)  **fifteenth**, on each Monthly Date, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon;

(xvi)  **sixteenth**, on each Monthly Date, to the 1L Debt Service Payment Account to pay the Deferred 1L Interest then outstanding;

(xvii)  **seventeenth**, on the [*VAT Loan Maturity Date*], to pay the principal on any VAT Loans then outstanding;

(xviii)  **eighteenth**, on each Monthly Date, for payment to the applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) of any principal amount that is due and payable under any Unsecured Working Capital Facility that constitutes Permitted Financial Debt;

(xix)  **nineteenth**, on each Monthly Date that occurs on the same month as a Principal Payment Date, if the amount standing to the credit of the Debt Service Reserve Account on such date is less than the Minimum Debt Service Reserve Amount, to the Debt Service Reserve Account, the amount required to ensure that the amount standing to the credit of the Debt Service Reserve Account is equal to the Minimum Debt Service Reserve Amount;

(xx)     **twentieth**, on each Monthly Date that occurs on the same month as an Principal Payment Date, until the Secured 2L Debt has been repaid in full, to the 2L Administrative Agent and the 2L Trustee for the *pro rata* payment of interest that is due and payable on the Secured 2L Debt (including all Capitalizations); <u>provided</u> that prior to the Strabag Trigger Date, Strabag's *pro rata* share of interest on the Secured 2L Debt shall be transferred to the Strabag Escrow Account;

(xxi)    **twenty-first**, on each Monthly Date that occurs on the same month as a Principal Payment Date, until the Secured 2L Debt has been repaid in full or otherwise discharged, all remaining amounts standing to the credit of the Offshore Revenue Account to the 2L Administrative Agent and the 2L Trustee for the pro rata payment of the outstanding principal amount of the Secured 2L Debt (including all Capitalizations) in accordance with Section 2.06(a)(viii) (*Mandatory Prepayments*) of the Common Terms Agreement; <u>provided</u> that prior to the Strabag Trigger Date, Strabag's *pro rata* share of principal on the Secured 2L Debt shall be transferred to the Strabag Escrow Account and

(xxii)   **twenty-second**, on each Monthly Date, until the Secured 1L Debt has been repaid in full or otherwise discharged, all remaining amounts standing to the credit of the Offshore Revenue Account to the 1L Debt Service Payment Account for the pro rata payment of the outstanding principal amount of the Secured 1L Debt in accordance with Section 2.06(a)(viii) (*Mandatory Prepayments*) of the Common Terms Agreement; <u>provided</u> that prior to the Strabag Trigger Date, Strabag's *pro rata* share of principal on the Secured 2L Debt shall be transferred to the Strabag Escrow Account.

(b)     If on any date the funds on deposit in the Offshore Revenue Account are insufficient to pay in full all of the payments required at any particular level of priority from the Offshore Revenue Account, the required payments of such level of priority shall be made on a *pro rata basis* to the extent of funds available therefor.

## ARTICLE VI

### Special Debt Service Payment Account

Section 6.01   <u>Payments into the Special Debt Service Payment Account</u>.   The Offshore Accounts Bank shall deposit into the Special Debt Service Payment Account all amounts required to be deposited in the Special Debt Service Payment Account pursuant to priorities **fifth, sixth,** and **tenth** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*).

Section 6.02   <u>Withdrawals from the Special Debt Service Payment Account</u>. The Offshore Accounts Bank shall make withdrawals and transfers from the Special Debt Service Payment Account, as follows, in each case following delivery by the Borrower to the

Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, of a Special Debt Service Payment Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such Debt Service Payment Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)), and in each case subject to and in accordance with the express instructions of the Borrower contained in such Special Debt Service Payment Account Transfer Certificate or written instructions of the Offshore Collateral Agent, as applicable, with respect to each and every item set forth in this Section 6.02 on each Interest Payment Date:

(a)      **first**, *pro rata* to (i) to the Exit Administrative Agent for payment of interest on the Secured Exit Loans then due and owing under the Secured Exit Loan Agreement, and (ii) to the Sponsor for payment of interest on the Sponsor Deferrals then due and owing; and

(b)      **second**, *pro rata* to (i) the WC Facility Administrative Agent for payment of principal on the Secured Working Capital Facility then due and owing under the Secured Working Capital Facility, (ii) the Exit Administrative Agent for payment of the principal on the Secured Exit Loans then due and owing under the Secured Exit Loan Agreement, and (iii) to the Sponsor for payment of principal on the Sponsor Deferrals then due and owing.

Section 6.03    Closing of Special Debt Service Payment Account.    If the Borrower requests in writing to the Offshore Accounts Bank (with a copy to the Offshore Collateral Agent and the Intercreditor Agent) at any time after the Secured Working Capital Facility, the Sponsor Deferrals, Secured Exit Loans and the Sponsor Deferrals have been repaid in full, the Offshore Accounts Bank shall close the Special Debt Service Payment Account.

## ARTICLE VII

### 1L Debt Service Payment Account

Section 7.01    Payments into the 1L Debt Service Payment Account.

(a)      The Offshore Accounts Bank shall deposit into the 1L Debt Service Payment Account all amounts required to be deposited in the 1L Debt Service Payment Account pursuant to priorities **seventh**, **eighth**, **sixteenth**, and **twenty-second** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*).

(b)      The Offshore Accounts Bank shall deposit all net proceeds of any Refinancing Instrument in respect of any 1L Refinancing Debt into the 1L Debt Service Payment Account; provided that prior to the Strabag Trigger Date, Strabag's pro rata share of the proceeds of such Refinancing Instrument shall be transferred to the Strabag Escrow Account.

Section 7.02    Withdrawals from the 1L Debt Service Payment Account.    The Offshore Accounts Bank shall make withdrawals and transfers from the 1L Debt Service Payment Account, as follows, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, of a 1L Debt Service Payment Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such 1L Debt Service Payment Account

Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)), and in each case subject to and in accordance with the express instructions of the Borrower contained in such 1L Debt Service Payment Account Transfer Certificate or written instructions of the Offshore Collateral Agent, as applicable, with respect to each and every item set forth in this Section 7.02 on:

    (a)    each Monthly Date that occurs in the same month as an Interest Payment Date:

        (i)    **first**, to the extent amounts have been deposited in the 1L Debt Service Payment Account pursuant to priority sixteenth of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*), to the 1L Administrative Agent and the 1L Trustee for the *pro rata* payment of the Deferred 1L Interest then outstanding;

        (ii)    **second**, to the 1L Administrative Agent, the 1L Trustee, and the trustee with respect to the 1L Refinancing Debt (if applicable), for the *pro rata* payment of interest on the Secured 1L Debt then due and owing under each Secured Debt Instrument (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable); and

        (iii)    **third**, to the 1L Administrative Agent, the 1L Trustee, and the trustee with respect to the 1L Refinancing Debt (if applicable), for the *pro rata* repayment of the principal on the Secured 1L Debt then due and owing under each Secured Debt Instrument; and

    (b)    upon receipt of the net proceeds of any 1L Refinancing Debt, to the 1L Administrative Agent and the 1L Trustee for the pro rata repayment of the interest and principal on the Secured 1L Debt then due and owing under each Secured Debt Instrument in accordance with Section 2.06(a)(ix) (*Mandatory Prepayments*) of the Common Terms Agreement.

## ARTICLE VIII

### Strabag Escrow Account

    Section 8.01  <u>Payments into the Strabag Escrow Account</u>.  The Offshore Accounts Bank shall deposit into the Strabag Escrow Account all amounts required to be deposited therein pursuant to (a) priority **seventh, eighth, twentieth,** and **twenty-first** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) and (b) Section 7.01(b) (*Withdrawals from the 1L Debt Service Payment Account*).

    Section 8.02  <u>Withdrawals from the Strabag Escrow Account</u>.  Upon the occurrence of the Strabag Trigger Date, the Borrower shall submit a Strabag Escrow Account Transfer Certificate to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) directing the Offshore Accounts Bank to withdraw all amounts on deposit in the Strabag Escrow Account and transfer such funds to Strabag (or, if the Borrower fails to deliver such Strabag Escrow Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)).

Section 8.03   Closing of Strabag Escrow Account.  If the Borrower requests in writing to the Offshore Accounts Bank (with a copy to the Offshore Collateral Agent and the Intercreditor Agent) at any time after the transfers pursuant to Section 8.02 (*Withdrawals from the Strabag Escrow Account*) above, that the Strabag Escrow Account is no longer required to be utilized pursuant to this Accounts Agreement and that the Strabag Escrow Account be closed (as confirmed in writing by the Intercreditor Agent), the Offshore Accounts Bank shall close the Strabag Escrow Account.

## ARTICLE IX

### Additional Interest Reserve Account

Section 9.01   Payments into the Additional Interest Reserve Account.

(a)     The Offshore Accounts Bank shall deposit into the Additional Interest Reserve Account all amounts required to be deposited therein pursuant to priorities **twelfth** and **fourteenth** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*).

(b)     If, on the Monthly Date occurring in March of each calendar year, the amount standing to the credit of the Additional Interest Account is less than the Actual Additional Interest for the previous calendar year, the Borrower shall request transfer from the Offshore Revenue Account to the Additional Interest Reserve Account an amount equal to the difference between the Actual Additional Interest and the amount standing to the credit of the Additional Interest Account (such amount, the "Additional Interest Shortfall") pursuant to priority **twelfth** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*).

Section 9.02   Withdrawals from the Additional Interest Reserve Account.  The Offshore Accounts Bank shall make withdrawals and transfers from the Additional Interest Reserve Account, as follows, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, of an Additional Interest Reserve Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such Additional Interest Reserve Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)), and in each case subject to and in accordance with the express instructions of the Borrower contained in such Additional Interest Reserve Account Transfer Certificate or written instructions of the Offshore Collateral Agent, as applicable, with respect to each and every item set forth in this Section 9.02:

(a)     [If, on the Monthly Date occurring in October of each calendar year, the amounts on deposit in the credit of the Additional Interest Account exceed the October Estimated Additional Interest for such year, to the Offshore Revenue Account an amount equal to such excess.][2]

---

[2] **Note to draft**: subject to further review.

(b)     If, on the Monthly Date occurring in March of each calendar year, the amounts on deposit in the credit of the Additional Interest Account exceed the Actual Additional Interest for the previous calendar year, to the Offshore Revenue Account an amount equal to such excess.

(c)     On the Monthly Date occurring in April of each calendar year, to the 2L Administrative Agent and the 2L Trustee in an amount equal to the Actual Additional Interest for the previous calendar year for the *pro rata* payment of the Additional Interest to the Secured 2L Creditors.

## ARTICLE X

## Debt Service Reserve Account

Section 10.01  <u>Payments into the Debt Service Reserve Account</u>.  The Offshore Accounts Bank shall deposit into the Debt Service Reserve Account (i) all amounts required to be deposited into the Debt Service Reserve Account pursuant to priority **nineteenth** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) and Section 13.02(a)(v) (*Extraordinary Proceeds Account*) and (ii) all other amounts required to be deposited by the Offshore Accounts Bank in the Debt Service Reserve Account pursuant to this Accounts Agreement.

Section 10.02  <u>Withdrawals from the Debt Service Reserve Account</u>.

(a)     If the Borrower has reason to believe that the funds deposited in or credited to the Offshore Revenue Account and the 1L Debt Service Payment Account will not be sufficient to pay in full any payments of interest, principal, costs, charges and other amounts under the Secured 1L Debt that are due and payable on any Interest Payment Date, but excluding in each such case any mandatory prepayments, then the Borrower shall, by delivering to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, a Debt Service Reserve Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such Debt Service Reserve Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)), request the Offshore Accounts Bank to withdraw from the Debt Service Reserve Account and pay directly to the 1L Administrative Agent, the 1L Trustee, and the trustee with respect to the 1L Refinancing Debt (as applicable) on such Interest Payment Date or when otherwise due and payable under the Financing Documents, any and all amounts necessary for the payment in full of the relevant amounts in respect of the Secured 1L Debt that, in each case, are then due and payable and are not to be paid from other sources.

(b)     (i) To the extent that amounts on deposit in the Debt Service Reserve Account on any date exceed the Minimum Debt Service Reserve Amount or (ii) if the Secured 1L Notes achieve an Investment Grade Rating without inclusion of a debt service reserve, the Borrower may direct the Offshore Accounts Bank to transfer such amounts to the Offshore Revenue Account.

## ARTICLE XI

### Stamp Tax Reserve Account

Section 11.01 <u>Payments into the Stamp Tax Reserve Account</u>.  The Offshore Accounts Bank shall deposit into the Stamp Tax Reserve Account all amounts required to be deposited into the Stamp Tax Reserve Account pursuant to priority **first** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*).

Section 11.02 <u>Withdrawals from the Stamp Tax Reserve Account</u>.

(a)    The Borrower shall, by delivering to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent, a Stamp Tax Reserve Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such Stamp Tax Reserve Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)), request the Offshore Accounts Bank to withdraw from the Stamp Tax Reserve Account and pay, in accordance with the terms of the Secured 2L Loan Agreement, all Stamp Taxes due and payable in connection with each applicable Secured 2L Lender's exercise of the Exchange Option (as defined in the Secured 2L Loan Agreement): (i) on the Exchange Option Date (as defined in the Secured 2L Loan Agreement) occurring in March 2023, for reimbursement to each Secured 2L Lender that exercised the Exchange Option on the Effective Date, (ii) on the Exchange Option Date occurring in March 2023, for payment to each Secured 2L Lender that exercises the Exchange Option on such Exchange Option Date, and (iii) on each subsequent Exchange Option Date, for payment to each Secured 2L Lender that exercises the Exchange Option on such Exchange Option Date.

## ARTICLE XII

### Insurance Proceeds and Compensation Account

Section 12.01 <u>Payments into the Insurance Proceeds and Compensation Account</u>. The Borrower shall cause all (i) Casualty Proceeds (other than the Delay in Start-up Insurance Proceeds, Business Interruption Insurance Proceeds, and Strabag Insurance Proceeds), (ii) any compensation from a Construction Contractor in connection with a Tunnel Damage Event (which does not include the Strabag Insurance Proceeds) received by it, and (iii) any draw on a letter of credit issued by Strabag under the Strabag Tunneling Contract, in each case to be paid or transferred directly into the Insurance Proceeds and Compensation Account.

Section 12.02 <u>Withdrawals from the Insurance Proceeds and Compensation Account</u>. (a)    The Offshore Accounts Bank shall make withdrawals and transfers from the Insurance Proceeds and Compensation Account as follows, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent of an Insurance Proceeds and Compensation Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) and in each case subject to and in accordance with the express instructions of the Borrower contained in such Insurance Proceeds

and Compensation Account Transfer Certificate with respect to each and every item set forth in this Section 12.02(a):

(i)     in the event that the Net Available Amount with respect to a casualty event resulting in the receipt of Casualty Proceeds (other than Delay in Start-up Insurance Proceeds or Business Interruption Insurance Proceeds or Strabag Insurance Proceeds) or any compensation from a Construction Contractor in connection with a Tunnel Damage Event (which does not include the Strabag Insurance Proceeds) is:

(A)     less than or equal to five million Dollars ($5,000,000) (or its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, up to such amount for direct payment to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) such amount may, at the discretion of the Borrower, be applied to pay for the repair, replacement or restoration of the affected assets or property or for transfer to the Offshore Revenue Account;

(B)     greater than five million Dollars ($5,000,000) but equal to or less than twenty-five million Dollars ($25,000,000) (or, in each case, its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, up to such amount for direct payment to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) to pay for the repair, replacement or restoration of the affected assets or property; or

(C)     greater than twenty-five million Dollars ($25,000,000) in the aggregate from any individual claim or series of related claims, up to such amount for direct payment to an applicable payee (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) to pay for the repair, replacement or restoration of the affected assets or property, provided that (A) the Intercreditor Agent (acting in accordance with the Intercreditor Agreement) shall have consented to such use of proceeds pursuant to Section 5.04(d)(ii)(C)(2) (*Insurance*) of the Common Terms Agreement and (B) the Independent Engineer shall have delivered a certificate to the Intercreditor Agent to the effect that the Borrower's Restoration Plan is technically feasible and reasonable and appropriate for accomplishing repairs necessary to restore the damage to the Project and the amount of such Casualty Proceeds or compensation from a Construction Contractor deposited in the Insurance Proceeds and Compensation Account is sufficient (together with all other monies then currently available to the Borrower as determined by the Intercreditor Agent), in the

reasonable opinion of the Independent Engineer, to complete such repair, replacement or restoration;

(ii)     notwithstanding clause (i) above, if any amount deposited into the Insurance Proceeds and Compensation Account represents Casualty Proceeds received in respect of a third party liability or employers' liability, (A) to the extent such loss payee has not been already compensated directly by the relevant insurer for such liability, for direct payment to an applicable loss payee of the amounts (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) to meet such liability or (B) to the extent such loss payee has been already compensated directly by the relevant insurer or the Borrower for such liability, to the Offshore Revenue Account;

(iii)    notwithstanding clause (i) above, amounts equal to the reasonable and documented costs, expenses and Taxes (other than VAT) incurred or payable by the Borrower in connection with the collection and conversion, if in a currency other than Dollars, of any Casualty Proceeds or any compensation from a Construction Contractor, (A) to the extent such amounts have not already been paid directly by the Borrower, for direct payment to an applicable payee of such amounts (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or (B) to the extent such amounts have been already been paid directly by the Borrower, to the Offshore Revenue Account;

(iv)    notwithstanding clause (i) above, with respect to any Casualty Proceeds or any compensation from a Construction Contractor, in each case, received in connection with a Tunnel Damage Event, if (x) the Independent Engineer has confirmed in writing to the Intercreditor Agent that the Borrower's Restoration Plan, or other restoration plan delivered by the Borrower, as applicable, is technically feasible and reasonable and appropriate for accomplishing repairs necessary to restore the damage to the Project resulting from such Tunnel Damage Event, (y) the Independent Engineer has confirmed in writing to the Intercreditor Agent that all repair work in connection with such Tunnel Damage Event has been completed in accordance with such Borrower's Restoration Plan or such other restoration plan, as applicable, in a manner satisfactory to the Independent Engineer, and (z) the Independent Engineer and legal counsel to the Secured Creditors have confirmed in writing to the Intercreditor Agent that there are no disputes with the relevant Construction Contractor in connection with such repair work at the time of the requested transfer (other than any disputes that could only result in the payment of additional funds to the Borrower), then an amount equal to the amount of such proceeds  or compensation, for transfer to the Sponsor; provided that, in the event that the conditions set forth in clauses (x), (y) or (z) above are not satisfied or to the extent there are any remaining proceeds or compensation after giving effect to such transfer, any  such proceeds or

compensation shall be applied in accordance with clauses (i), (ii), (iii) and (vii) of this Section 12.02(a), *mutatis mutandis*;

(v)     notwithstanding clause (i) above, if any amount deposited into the Insurance Proceeds and Compensation Account represents Casualty Proceeds received from a reinsurer for payment in respect of the same casualty event and claim for which an insurer has deposited funds into the Insurance Proceeds and Compensation Account in favor of the Offshore Collateral Agent, in each case in its capacity as sole loss payee under any insurance and reinsurance policies obtained and maintained by the Borrower pursuant to Section 5.04 (*Insurance*) of the Common Terms Agreement, to the extent that such aggregate funds exceed the full amount claimed under the relevant insurance policies with respect to such casualty event and claim transfer any such funds for reimbursement to the insurer that made such payment if the Insurance Proceeds and Compensation Account Transfer Certificate is accompanied by (x) a copy of a valid written claim for reimbursement made to the Borrower by such insurer and (y) evidence to the Intercreditor Agent that the proceeds deposited into the Insurance Proceeds and Compensation Account by the insurer for which reimbursement is requested correspond to the same casualty event and claim for which payment was made by the reinsurer;

(vi)    if any Equity Contributions (other than those required to be made pursuant to the Contribution Agreement) have been provided by the Sponsor (or at the direction of the Sponsor) in connection with any casualty event, then with respect to any Casualty Proceeds or any compensation from a Construction Contractor received in connection with such casualty event, for transfer to the Sponsor of an amount equal to the amount of such Equity Contributions; provided that:

(A)     the Independent Engineer has confirmed in writing to the Intercreditor Agent that the Borrower's Restoration Plan, or other restoration plan delivered by the Borrower, as applicable, is technically feasible and reasonable and appropriate for accomplishing repairs necessary to restore the damage to the Project resulting from such casualty event;

(B)     the Independent Engineer has confirmed in writing to the Intercreditor Agent that all repair work in connection with such casualty event has been completed in accordance with such Borrower's Restoration Plan or such other restoration plan, as applicable, in a manner satisfactory to the Independent Engineer;

(C)     the Independent Engineer and legal counsel to the Secured Creditors have confirmed in writing to the Intercreditor Agent that there are no disputes with the relevant Construction Contractor in connection with such repair work at the time of the requested

transfer (other than any disputes that could only result in the payment of additional funds to the Borrower); and

(D)    the Sponsor has provided evidence of the making of such Equity Contributions and application of the proceeds thereof to the applicable repair work in form and substance reasonably satisfactory to the Intercreditor Agent;

(vii)    in the event that:

(A)    all or any portion of the Net Available Amounts referred to in Sections 11.02(a)(i) above remains after completion of the relevant repair, replacement or restoration;

(B)    the Intercreditor Agent determines that the requirements set forth in Section 5.04(d)(ii)(C) (*Application of Proceeds*) of the Common Terms Agreement have not been satisfied within the time period required pursuant to such Section; or

(C)    the Net Available Amount with respect to a casualty event resulting in the receipt of Casualty Proceeds (other than Delay in Start-up Insurance Proceeds, Business Interruption Insurance Proceeds and Strabag Insurance Proceeds) is greater than fifty million Dollars ($50,000,000) (or its equivalent in any other currency or currencies) in the aggregate from any individual claim or series of related claims, and the Intercreditor Agent (acting in accordance with the Intercreditor Agreement) determines that such Net Available Amount shall be applied towards prepayment of the Secured Debt;

(i)    in each case, the Net Available Amount of such Casualty Proceeds shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, fifth, to pay the

Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, *pro rata* to the pay the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full, *eighth*, to the *pro rata* prepayment of the Secured 1L Debt until such loans and notes are prepaid in full, *ninth*, to the payment of any VAT Loan then outstanding, and *tenth*, to the *pro rata* prepayment of the Secured 2L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(i) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment.

(b)     To the extent that, as provided for in Section 11.5.1 (*Increase for Change Order initiated by Contractor pursuant to 11.2.1*) of the Strabag Tunneling Contract and as confirmed in writing by the Independent Engineer, Change Orders are permitted to be paid with Casualty Proceeds corresponding directly to Direct Costs associated with an applicable Change Order (each as defined in the Strabag Tunneling Contract), such amounts shall be paid to Strabag before any other application pursuant to this Section 12.02.

(c)     In the event that any draw on a letter of credit issued by Strabag under the Strabag Tunneling Contract is held to be wrongful by a final and binding decision rendered in accordance with Section 18.1 of the Strabag Tunneling Contract, amounts remaining in the Insurance Proceeds and Compensation Account up to the amount of such draw shall be promptly returned to Strabag, without prejudice to any other rights or remedies of Strabag under the Strabag Tunneling Contract.

(d)     In the event that the Borrower fails to request the transfer and withdrawal required pursuant to Section 12.02(a)(vii), the Offshore Accounts Bank shall make withdrawals and transfers from the Insurance Proceeds and Compensation Account at the direction of the Offshore Collateral Agent (acting on written instructions of the Intercreditor Agent).

## ARTICLE XIII

## Extraordinary Proceeds Account

Section 13.01 <u>Payments into the Extraordinary Proceeds Account</u>.  The Borrower shall cause the following amounts to be paid into the Extraordinary Proceeds Account (or a sub-account thereof):

(a)     all Expropriation Proceeds;

(b)    all Termination Proceeds (other than Termination Proceeds received in connection with the termination of an Approved PPA);

(c)    all Liquidated Damages Proceeds (other than compensation received from a Construction Contractor in connection with a Tunnel Damage Event);

(d)    all Disposition Proceeds; and

(e)    all Strabag Insurance Proceeds; provided that the Borrower shall provide the Intercreditor Agent with written notice of receipt of the Strabag Insurance Proceeds (and the Intercreditor Agent shall provide such notice to all Secured Lenders).

Section 13.02 <u>Withdrawals from the Extraordinary Proceeds Account</u>. (a)   The Offshore Accounts Bank shall make withdrawals and transfers from the Extraordinary Proceeds Account (or the applicable sub-account thereof) as follows, in each case following delivery by the Borrower to the Offshore Accounts Bank, the Offshore Collateral Agent and Intercreditor Agent of an Extraordinary Proceeds Account Transfer Certificate in accordance with Section 14.03 (*Withdrawals and Deposits Generally*) (or, if the Borrower fails to deliver such Extraordinary Proceeds Account Transfer Certificate, at the written direction of the Offshore Collateral Agent (acting upon the instruction of the Intercreditor Agent)) and in each case subject to and in accordance with the express instructions of the Borrower contained in such Extraordinary Proceeds Account Transfer Certificate or written instructions of the Offshore Collateral Agent, as applicable with respect to each and every item set forth in this Section 13.02(a):

(i)    with respect to any Net Available Amount of Expropriation Proceeds:

(A)    if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account on the last day Business Day before an Interest Payment Date is in excess of ten million Dollars ($10,000,000), such amount shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag

Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, *pro rata* to the pay the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full, *eighth*, to the *pro rata* prepayment of the Secured 1L Debt until such loans and notes are prepaid in full, and *ninth*, to the payment of any VAT Loan then outstanding, and *tenth*, to the pro rata prepayment of the Secured 2L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(ii) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment; and

(B)     on the last Business Day before each Interest Payment Date, if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account is ten million Dollars ($10,000,000) or less, such amounts shall be transferred to the Offshore Revenue Account on such date;

(ii)     with respect to any Net Available Amount of Termination Proceeds (other than in connection with the MLP PPA):

(A)     if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account on the last day Business Day before an Interest Payment Date is in excess of ten million Dollars ($10,000,000), such amount shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, *pro rata* to the pay the Sponsor Deferrals and

the Secured Exit Loans until such deferrals and loans are prepaid in full, *eight,* to the payment of any VAT Loan then outstanding, *ninth*, to the *pro rata* prepayment of the Secured 2L Debt until such loans and notes are prepaid in full, and *tenth*, to the *pro rata* prepayment of the Secured 1L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(iii) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment; and

(B)     on the last Business Day before each Interest Payment Date, if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account is ten million Dollars ($10,000,000) or less, such amounts shall be transferred to the Offshore Revenue Account on such date;

(iii)     with respect to any Net Available Amount of Termination Proceeds in connection with the termination of the MLP PPA:

(A)     if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account on the last day Business Day before an Interest Payment Date is in excess of ten million Dollars ($10,000,000), such amount shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, *pro rata* to the pay the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full, eighth, to the *pro rata* prepayment of the Secured 1L Debt until such loans and notes are prepaid in full, *ninth*, to the payment of any VAT Loan then outstanding, and *tenth*, to the *pro rata*

prepayment of the Secured 2L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(iii) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment; and

(B)     on the last Business Day before each Interest Payment Date, if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account is ten million Dollars ($10,000,000) or less, such amounts shall be transferred to the Offshore Revenue Account on such date;

(iv)     with respect to any Net Available Amount of Liquidated Damages Proceeds:

(A)     if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account on the last day Business Day before an Interest Payment Date is in excess of ten million Dollars ($10,000,000), such amount shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, *pro rata* to the pay the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full, *eighth*, to the payment of any VAT Loan then outstanding,, *ninth*, to the *pro rata* prepayment of the Secured 2L Debt until such loans and notes are prepaid in full, and *tenth*, to the pro rata prepayment of the Secured 1L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(iv) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable

under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment; and

(B) on the last Business Day before each Interest Payment Date, if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account is ten million Dollars ($10,000,000) or less, such amounts shall be transferred to the Offshore Revenue Account on such date;

(v) with respect to any Net Available Amount of Disposition Proceeds:

(A) if the Net Available Amount of such proceeds on deposit in the Extraordinary Proceeds Account on the last day Business Day before an Interest Payment Date is in excess of ten million Dollars ($10,000,000), such amount shall be applied on the next Interest Payment Date *first*, to the Offshore Revenue Account so that after payments made pursuant to priorities **first** through **seventh** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) on such Interest Payment Date, the amount on deposit in the Offshore Revenue Account would be at least equal to the Minimum Cash Balance, *second*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *third*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *sixth*, to pay the Deferred 1L Interest then outstanding, *seventh*, pro rata to the pay the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full, *eighth*, to the *pro rata* prepayment of the Secured 1L Debt until such loans and notes are prepaid in full, *ninth*, to the payment of any VAT Loan then outstanding, and *tenth*, to the pro rata prepayment of the Secured 2L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(vi) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment; and

(B) on the last Business Day before each Interest Payment Date, if the Net Available Amount of such proceeds on deposit in the

Extraordinary Proceeds Account is ten million Dollars ($10,000,000) or less, such amounts shall be transferred to the Offshore Revenue Account on such date; and

(vi)  with respect to any Net Available Amount of CNM Arbitral Award Proceeds, such amount shall be applied *first*, to repay any outstanding loans under the Secured Working Capital Facility until the Secured Working Capital Facility Discharge Date has occurred, *second*, if the full amount of the Strabag Insurance Proceeds have been deposited in the Extraordinary Proceeds Account, to pay the Strabag Insurance Deferral then outstanding and, if the Strabag Insurance Deferral is being paid in full, all accrued and unpaid interest thereon, *third*, to pay the Strabag Change Order Deferral then outstanding and, if the Strabag Change Order Deferral is being paid in full, all accrued and unpaid interest thereon, *fourth*, to pay the Strabag Construction Deferral then outstanding and, if the Strabag Construction Deferral is being paid in full, all accrued and unpaid interest thereon, *fifth*, to pay the Deferred 1L Interest then outstanding, *sixth*, up to fifty percent (50%) of such remaining amount to pay, *pro rata*, the Sponsor Deferrals and the Secured Exit Loans until such deferrals and loans are prepaid in full and the remaining amount to the Debt Service Reserve Account until the amount standing to the credit of the Debt Service Reserve Account is equal to the Minimum Debt Service Reserve Amount, *seventh*, to the payment of any VAT Loan then outstanding, and *eighth*, to the *pro rata* prepayment of the Secured 2L Debt until such loans and notes are prepaid in full in accordance with Section 2.06(a)(vii) (*Mandatory Prepayment*) of the Common Terms Agreement on such Interest Payment Date, together with any amounts that may be payable under Section 2.06(b) (*Mandatory Prepayment*) of the Common Terms Agreement as a consequence of such prepayment;

(vii)  with respect to Strabag Insurance Proceeds received on or prior to December 29, 2022, such amount shall be applied (A) at any time on or prior to December 29, 2022, to the extent there are insufficient funds in the Offshore Revenue Account for any transfer or withdrawal required pursuant to clauses (A) through (C) of priority **first** of Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*), any and all amounts necessary for any such transfer or withdrawal, to the Offshore Revenue Account and (B) on December 30, 2022, (1) if the Strabag Insurance Deferral has not been repaid in full, including all accrued and unpaid interest, to Strabag in its capacity as Construction Contractor under the Strabag Tunneling Contract in the amount of the Strabag Insurance Deferral then outstanding and (2) if the Strabag Insurance Deferral has been repaid in full (including all accrued and unpaid interest), to the Offshore Revenue Account;

(viii)  with respect to Strabag Insurance Proceeds received after December 29, 2022, such amount shall be applied (A) if the Strabag Insurance Deferral

has not been repaid in full, including all accrued and unpaid interest, to Strabag in its capacity as Construction Contractor under the Strabag Tunneling Contract and (2) if the Strabag Insurance Deferral has been repaid in full (including all accrued and unpaid interest), to the Offshore Revenue Account; and

(ix)     with respect to the reasonable and documented costs, expenses and Taxes incurred or payable by the Borrower in connection with the collection and conversion, if in a currency other than Dollars, of Expropriation Proceeds, Termination Proceeds, Liquidated Damages Proceeds, Disposition Proceeds, or Strabag Insurance Proceeds, (A) if such amounts have not yet been paid, for direct payment to an applicable payee of such amounts (after conversion of applicable amounts on deposit in Dollars to Chilean Pesos, if applicable) or (B) if such amounts were previously paid by the Borrower, to the Offshore Revenue Account.

Section 13.03  <u>Extraordinary Proceeds Sub-accounts</u>.   In the event that any Expropriation Proceeds, Termination Proceeds, Liquidated Damages Proceeds, Disposition Proceeds and/or Strabag Insurance Proceeds would be commingled in the Extraordinary Proceeds Account, the Borrower shall request (or if the Borrower fails to make such request, the Offshore Collateral Agent may request (upon written instruction from the Intercreditor Agent)) the Offshore Accounts Bank to create one or more separate sub-accounts to segregate such proceeds and the Borrower shall cause relevant proceeds to be deposited in such sub-accounts. Any sub-account established in accordance with this Section 13.03 shall be considered to be part of the Extraordinary Proceeds Account for all purposes of this Accounts Agreement.

## ARTICLE XIV

### General Provisions Relating to the Offshore Collateral Accounts

Section 14.01  <u>No Security Interests</u>.  The Borrower shall not at any time during the term of this Accounts Agreement create or permit to subsist any Lien (other than Liens in favor of the Offshore Collateral Agent for the benefit of the Secured Parties arising under this Accounts Agreement or any Liens arising under the other Security Documents on all or any part of any of the Offshore Collateral Accounts or the Offshore Accounts Property or the Account Collateral or any Liens arising by operation of law or under the Offshore Accounts Bank's operating procedures with respect to the Offshore Collateral Accounts which the Offshore Accounts Bank has acknowledged under Section 2.08 (*Subordination*) are subordinated to the Liens of the other Secured Parties) or assign, transfer or otherwise dispose of all or any part of its right or title to any of the Offshore Collateral Accounts or the Offshore Accounts Property or the Account Collateral other than in accordance with, or as permitted by, the terms of this Accounts Agreement and the Financing Documents.

Section 14.02  <u>Currencies</u>.  (a) If the Offshore Accounts Bank receives, in respect of any Offshore Collateral Account, any amount in a currency other than the currency in which such Offshore Collateral Account is denominated, it shall promptly notify the Borrower of such event and, upon receipt of instructions from the Borrower, convert such other currency and

deposit the resulting amount in accordance with such instructions (provided that such instructions shall comply with the internal policies of, and Applicable Laws applicable to, the Offshore Accounts Bank).

(b)     Notwithstanding any other provision of this Agreement to the contrary, if any transfer certificate or other written instruction delivered to the Offshore Accounts Bank under this Accounts Agreement requires the Offshore Accounts Bank to (x) withdraw Dollars from any Offshore Collateral Account, and (y) convert such Dollars into Chilean Pesos, and (z) transfer the resulting Chilean Pesos for direct payment to third parties, the following provisions of this Section 14.02(b) shall apply:

(i)     Any such transfer certificate or other written instruction shall be delivered to the Offshore Accounts Bank no later than four (4) Business Days prior to the requested date of payment and shall include the following minimum information:

Payee Name:
Payee Bank Name:
Payee Branch Name / Address
Payee Bank Routing ('RUT') Number (9 digits)
Payee Account Number
Contact Person at the Payee: (name, telephone number, e-mail address)
and shall further include the nature and purpose of the payment;

(ii)     The Offshore Accounts Bank, directly or through any of its Affiliates, shall be entitled to verify whether the designated payee is authorized under all Applicable Laws of the Country to, and can operationally, receive a direct wire transfer payment in Chilean Pesos from the Offshore Accounts Bank (directly or through its Forex Conversion Affiliate);

(iii)     Upon successful verification pursuant to clause (ii) above, the Offshore Accounts Bank, directly or by directing its Forex Conversion Affiliate, shall proceed to effect the currency conversion transaction on (and not before) the transfer date specified in the transfer certificate or other written instructions provided to the Offshore Accounts Bank based on the most favorable exchange rate then available to the Offshore Accounts Bank or its Forex Conversion Affiliate (subject to and taking into account prevailing market conditions at the time of execution, including without limitation, available liquidity and counterparty considerations, the conversion amount, and other relevant factors), and shall immediately thereafter (on the same Business Day) transfer or cause its Forex Conversion Affiliate to transfer the Chilean Pesos to the designated payee; and

(iv)     The Offshore Accounts Bank shall notify the Borrower promptly upon any failure to verify the designated payee pursuant to clause (ii) above.

(c)    In no event shall the Offshore Accounts Bank or any of its Affiliates be responsible or liable for any failure to effect a withdrawal, conversion and transfer as contemplated by this Section 14.02 in the event that (x) the Borrower has not complied with the requirement of Section 14.02(b)(i) above, or (y) it shall not have been able to conclude the verification process contemplated in Section 14.02(b)(ii) above, or (z) such verification process has failed to confirm that the designated payee is legally authorized and operationally able to receive such funds in accordance with this Section 14.02.    In no event shall the Offshore Accounts Bank or any of its Affiliates be responsible for any currency conversion losses or other deficiencies in the amount of Chilean Pesos available for transfer as a result of actions taken in accordance with this Section 14.02.    Any reasonable and documented fees and expenses associated with effecting the transactions contemplated by this Section 14.02 shall be charged by the Accounts Bank to the relevant Offshore Account from which such transfer is made.

Section 14.03  Withdrawals and Deposits Generally.  (a) No withdrawals from or deposits to any of the Offshore Collateral Accounts shall be made except as expressly permitted by this Accounts Agreement.

(b)    Subject to Section 14.02(b)(i) (*Currencies*), any certificate or written instruction required to be delivered hereunder by the Borrower shall be (i) delivered to the Offshore Accounts Bank, the Offshore Collateral Agent, and the Intercreditor Agent prior to 3:00 p.m. (New York City time) at least three (3) Business Days prior to the date of any transfer or distribution contemplated by such certificate or written instruction and (ii) if such transfer or distribution requires the Administrative Agents or the Trustees to accept any deposit or make any transfer, the Intercreditor Agent shall provide a copy of such certificate or written instruction together with the specific amounts required to be paid from or paid to applicable Secured Creditor prior to 11:00 a.m. (New York City time) at least one (1) Business Day prior to the date of any transfer or distribution contemplated by such certificate or written instruction.    Such certificate or instructions may be delivered by facsimile or other electronic transmissions pursuant to Section 21.08 (*Notices*).  A certificate shall not be considered delivered hereunder if it is incomplete or inaccurate, is not substantially in the form of the corresponding Schedule or does not otherwise meet the requirements set forth in this Accounts Agreement or the other Financing Documents.

(c)    Unless the Offshore Accounts Bank has received a Notice of Objection no later than 12:00 noon (New York City time) one (1) Business Day prior to the requested withdrawal or transfer from any Offshore Collateral Account pursuant to the applicable certificate or written instruction submitted by the Borrower to the Offshore Accounts Bank (with a copy to the Offshore Collateral Agent and the Intercreditor Agent), the Offshore Accounts Bank will make such withdrawals or transfer in accordance with Section 14.03(d) (*Withdrawals and Deposits Generally*).  If the Offshore Accounts Bank has not received a Notice of Objection by the deadline identified above, it shall have no liability for any such withdrawal or transfer.

(d)    Subject to the timely receipt of a certificate or written notice, if and as prescribed herein, and subject to the availability of cash in the applicable Offshore Collateral Account, the Offshore Accounts Bank shall initiate any payment or transfer hereunder required by means of wire transfer of immediately available funds, to the account of the payee set forth in such certificate or written instructions or schedule thereto, prior to 2:00 p.m. (New York City time) on

the date requested for such payment or transfer.  Notwithstanding the foregoing, none of the Offshore Accounts Bank, the Offshore Collateral Agent or any other Secured Party shall be responsible in any manner for the truth and accuracy of any information or calculation contained in any certificate or written information provided by the Borrower and shall have no duty to independently verify any such information or calculation.

(e)    If any transfer, withdrawal, deposit, investment or payment of any funds by the Offshore Accounts Bank or any other action to be taken by the Offshore Accounts Bank under this Accounts Agreement is to be made or taken on a day other than a Business Day, such transfer, withdrawal, deposit, investment, payment or other action will be made or taken on the next succeeding Business Day.

(f)    All amounts withdrawn from any of the Offshore Collateral Accounts by the Offshore Accounts Bank for application in or toward making a specific payment or meeting a specific liability shall be applied in or towards making that payment or meeting that liability and for no other purpose.

(g)    Notwithstanding any other provision of the Financing Documents, without the express written consent of the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent), the Borrower may not instruct the Offshore Accounts Bank to transfer or withdraw any amount from any Offshore Collateral Account if an Event of Default would occur as a result of such withdrawal.

(h)    On the date of each withdrawal or transfer by the Offshore Accounts Bank, the Borrower shall be deemed to represent and warrant that no Event of Default would occur as a result of such withdrawal, unless the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent) has previously consented in writing to such withdrawal, notwithstanding that an Event of Default would occur as a result of such withdrawal.

Section 14.04  No Overdraft.  None of the Offshore Collateral Accounts shall go into overdraft, and the Offshore Accounts Bank shall not comply with any instruction or request to transfer or withdraw any funds from any Offshore Collateral Account to the extent that it would cause any of the Offshore Collateral Accounts to do so.

Section 14.05  Acknowledgments.   (a)  The Borrower acknowledges that any insufficiency of funds in the Offshore Collateral Accounts (or any of them) at any time shall not limit, reduce or otherwise affect the Borrower's obligations under any Financing Document.

(b)    Each party to this Accounts Agreement acknowledges that none of the Offshore Accounts Bank, the Offshore Collateral Agent or any Secured Party shall incur any obligation or liability in circumstances where there are insufficient funds deposited in or credited to any Offshore Collateral Account to make a payment in full that would otherwise have been made pursuant to the terms of this Accounts Agreement, except (in the case of the Offshore Accounts Bank) to the extent that the insufficiency of funds resulted from a loss that arose directly from the Offshore Accounts Bank's gross negligence, willful misconduct or fraud.

Section 14.06  Further Assurances.  (a)  The Borrower shall, at any time and from time to time at the first demand of the Offshore Accounts Bank, the Intercreditor Agent, or the

Offshore Collateral Agent and at the sole expense of the Borrower, promptly and duly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action, that may be necessary or required under Applicable Law or that the Offshore Accounts Bank, the Intercreditor Agent, or the Offshore Collateral Agent may reasonably request, (i) in order to perfect and protect any pledge or security interest granted or purported to be granted hereunder or to enable each of the Offshore Accounts Bank and the Offshore Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Account Collateral, (ii) for the purposes of ensuring the validity and legality of this Accounts Agreement and the rights of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent and the Secured Parties under this Accounts Agreement, or (iii) for the purposes of the proper exercise of rights and powers granted to the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or the Secured Parties under this Accounts Agreement.

(b)     Without limiting the generality of the foregoing, the Borrower will promptly with respect to the Account Collateral:

(i)     execute or authenticate and file such UCC financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Offshore Accounts Bank, the Intercreditor Agent, or the Offshore Collateral Agent may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted hereunder;

(ii)     take all action necessary to ensure that the Offshore Collateral Agent has Control of the Account Collateral as provided in Sections 8-106, 9-104, 9-106 and any other applicable Section of the UCC;

(iii)     take all action necessary to ensure the Offshore Collateral Agent for the benefit of the Secured Parties has a perfected security interest in all Account Collateral described in Section 2.06 (*Grant of Security Interests*) in accordance with the Applicable Priority under the laws of New York; and

(iv)     deliver to the Offshore Collateral Agent and the Intercreditor Agent evidence that all other action that the Offshore Accounts Bank, the Intercreditor Agent, or the Offshore Collateral Agent may deem reasonably necessary in order to perfect and protect the security interest created by the Borrower under this Accounts Agreement has been taken.

(c)     No provision in Section 14.06(b) shall be deemed to limit the provisions in Section 14.06(a).

(d)     The Borrower hereby authorizes the Offshore Collateral Agent to file one or more UCC financing or continuation statements, and amendments thereto, relating to all or any part of the Account Collateral without the signature of the Borrower where permitted by Applicable Law.

## ARTICLE XV
## Offshore Authorized Investments and Interest

Section 15.01 <u>Power to Invest</u>.    Subject to ARTICLE XIV (*Default and Enforcement*), the Offshore Accounts Bank shall, from the amounts deposited in or credited to the Offshore Collateral Accounts, maintain such amounts in cash, invest in Offshore Authorized Investments or realize any Offshore Authorized Investment and reinvest in another Offshore Authorized Investment, on the written instructions of an Authorized Representative of the Borrower, as provided in this Accounts Agreement; provided that, without its prior written consent, the Offshore Accounts Bank shall not be required to invest, realize or reinvest in any of the investments described in items (b) to (e) of the definition of Offshore Authorized Investment.

Section 15.02 <u>Investing of Amounts in the Offshore Collateral Accounts</u>.  (a) So long as the Offshore Accounts Bank has not received a Notice of Suspension pursuant to Section 16.01 (*Notices of Suspension*), all Offshore Authorized Investments shall be made by the Offshore Accounts Bank in accordance with the Borrower's written instructions, and shall be realized by the Offshore Accounts Bank in accordance with the Borrower's written instructions. All interest and other investment income earned from investments in Offshore Authorized Investments shall be deposited in the Offshore Revenue Account and applied in accordance with this Accounts Agreement.

(b)    The Offshore Accounts Bank shall act for the Borrower on an "execution only" basis.  The Borrower acknowledges that it is not relying on the Offshore Accounts Bank to exercise any judgment as to whether an investment is an Offshore Authorized Investment or to give any advice to the Borrower on the merits, value, validity, genuineness or suitability of any Offshore Authorized Investment.

(c)    The Offshore Accounts Bank shall have no obligation to invest or reinvest (i) in any of the investments described in items (b) to (e) of the definition of Offshore Authorized Investment without its prior written consent, (ii) any amounts held hereunder in the absence of written investment directions from the Borrower or the Offshore Collateral Agent, or (iii)  the funds held in any account on such day of deposit if deposited with the Offshore Accounts Bank after 11:00 a.m. (New York City time).  Instructions received after 11:00 a.m. (New York City time) will be treated as if received on the following Business Day.  Any interest or other income received on such investment and reinvestment of the funds shall become part of the account and any losses incurred on such investment and reinvestment of the funds shall be debited against the account.  In no event shall the Offshore Accounts Bank be liable for the selection of Offshore Authorized Investments or for any investment losses incurred thereon including to the extent of any realization on, or other disposition of, any Offshore Authorized Investments.

(d)    If a Notice of Suspension has been delivered to the Offshore Accounts Bank and such Notice of Suspension has not been withdrawn, all Offshore Authorized Investments shall be made by the Offshore Accounts Bank in accordance with the Offshore Collateral Agent's written instructions (acting upon the Intercreditor Agent's instructions), and shall be realized by the Offshore Accounts Bank in accordance with the Offshore Collateral Agent's written instructions (acting upon the Intercreditor Agent's instructions).

(e)     It is agreed and understood that the entity serving as Offshore Accounts Bank or Offshore Collateral Agent may earn fees associated with the investments outlined above in accordance with the terms of such investments.  In no event shall the Offshore Accounts Bank or Offshore Collateral Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder.  It is understood and agreed that the Offshore Accounts Bank, Offshore Collateral Agent or its affiliates are permitted to receive additional compensation that could be deemed to be in the Offshore Accounts Bank or Offshore Collateral Agent's economic self-interest for (1) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the investments, (2) using affiliates to effect transactions in certain investments and (3) effecting transactions in investments.

Section 15.01 <u>Sale and Liquidation</u>.    The Offshore Collateral Agent (at the written direction of the Intercreditor Agent)  may direct the Offshore Accounts Bank to sell or liquidate (and the Borrower hereby irrevocably instructs the Offshore Collateral Agent, without any further action by or notice to or from the Borrower, to so direct) all or any portion of the Offshore Authorized Investments held in or in respect of the Offshore Collateral Accounts at any time that the Offshore Collateral Agent (on the advice of the Intercreditor Agent) determines that the Proceeds thereof are required for any withdrawal or transfer of available funds from any Offshore Collateral Accounts to another Offshore Collateral Account or any other Person (or any account of any Person) pursuant to the terms of this Accounts Agreement.  None of the Secured Parties, the Offshore Collateral Agent, or the Offshore Accounts Bank shall have any liability to the Borrower or any other Person for, or as a result of, any losses suffered from any such sale or liquidation unless such losses result from such Person's gross negligence, fraud or willful misconduct.

## ARTICLE XVI
## Default and Enforcement

Section 16.01 <u>Notices of Suspension</u>.  (a) The occurrence of an Event of Default under, and as defined in, a Financing Document as it relates to the relevant Secured Party thereto shall constitute an Event of Default hereunder for the benefit of such Secured Party. Any such Event of Default shall be considered cured or waived for the purposes of this Agreement when it has been cured or waived by such Secured Party in accordance with the relevant Financing Document.

(b)     The Offshore Collateral Agent (at the written direction of the Intercreditor Agent) may suspend the right of the Borrower to withdraw or otherwise deal with any funds deposited in or credited to the Offshore Collateral Accounts at any time following the occurrence and during the continuance of an Event of Default by delivering a notice to the Offshore Accounts Bank (with a copy to the other parties hereto) (such notice, a "<u>Notice of Suspension</u>").

(c)     Notwithstanding any other provision of the Financing Documents, after the issuance by the Offshore Collateral Agent of a Notice of Suspension in accordance with Section 16.01(b) and until such time as the Offshore Collateral Agent delivers written notice to the other parties hereto that it has withdrawn such Notice of Suspension, no amount may be withdrawn by the Offshore Accounts Bank from any Offshore Collateral Account, including for

investment in Offshore Authorized Investments, without the express written consent of the Offshore Collateral Agent.

(d)    The Intercreditor Agent shall provide written direction to the Offshore Collateral Agent to withdraw the Notice of Suspension once the Intercreditor Agent determines or is advised by the Required Creditors that the Event of Default no longer exists, and the Offshore Collateral Agent shall withdraw such Notice of Suspension promptly following receipt of such instructions from the Intercreditor Agent.

(e)    The Offshore Collateral Agent may withdraw a particular Notice of Suspension without affecting any other notice that it may have issued.

Section 16.02 <u>Offshore Collateral Agent Appointed Attorney-in-Fact</u>.    The Borrower hereby confirms the irrevocable and continuing appointment of the Offshore Collateral Agent and any officer or agent thereof (which agent may include any Secured Lender), with full power of substitution, as its true and lawful attorney-in-fact (which appointment as attorney-in-fact shall be coupled with an interest), with full authority, if a Notice of Suspension has been delivered to the Offshore Accounts Bank and until such Notice of Suspension has been withdrawn, to take any action and to execute any and all documents and instruments in the place and stead of the Borrower and in the name of the Borrower or otherwise, that the Offshore Collateral Agent or such officer or agent thereof may deem necessary or advisable to accomplish the purposes of this Accounts Agreement, without notice to the Borrower, including:

(a)    if an Event of Default has occurred and is continuing, to exercise the rights and remedies set forth in Section 16.03 (*Enforcement*);

(b)    to take any action that the Offshore Collateral Agent or the Intercreditor Agent may, in its discretion and at the Borrower's expense, deem necessary or appropriate (i) to perfect, maintain and enforce any security interest or other Lien created in favor of the Secured Parties, (ii) to create, perfect, maintain and enforce any security interest or other Lien granted or purported to be granted hereby or (iii) to otherwise accomplish the purposes of this Accounts Agreement or any other Security Document;

(c)    to receive, endorse and collect all funds or other property in which the Borrower has an interest and that would constitute Account Collateral under the terms of this Accounts Agreement, in each case representing any Proceeds, dividends, interest payments or other distributions constituting Account Collateral or any part thereof and to give full discharge for the same and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Offshore Collateral Agent for the purpose of collecting any and all of such Proceeds, dividends, payments or other distributions;

(d)    to pay or discharge Taxes and Liens levied or placed on the Account Collateral;

(e)    (i) to direct any party liable for any payment under or with respect to any of the Account Collateral to make payment of any and all moneys due or to become due thereunder or with respect thereto directly to the Offshore Collateral Agent or as the Offshore Collateral Agent may direct, (ii) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out

of any of the Account Collateral, (iii) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Account Collateral or any part thereof and to enforce any other right in respect of any of the Account Collateral, (iv) to defend any suit, action or proceeding brought against the Borrower with respect to any of the Account Collateral and (v) to settle, compromise or adjust any suit, action or proceeding described in Section 16.03(a)(iii) and Section 16.03(a)(iv) (*Enforcement*) and, in connection therewith, to give such discharges or releases as the Offshore Collateral Agent may deem appropriate;

(f)     to execute, in connection with any sale, lease, license or other disposition permitted to be made by the Offshore Collateral Agent hereunder, any endorsements, assignments, transfer statements or other instruments of conveyance or transfer with respect to the Account Collateral, and to file or register the same if required by or advisable under Applicable Law; and

(g)     to communicate in its own name with any party to any agreement or instrument included in the Account Collateral, at any reasonable time, with regard to any matter relating to such agreement or instrument.

Section 16.03 <u>Enforcement</u>.    (a) Notwithstanding any other provision of the Financing Documents, the Offshore Collateral Agent or its designee (which designee may include any Secured Lender) may, at any time during the occurrence and continuance of an Event of Default, and following delivery of a Notice of Suspension that has not been withdrawn (provided that any failure to deliver such notice shall not affect the validity of any actions taken under this Section 16.03(a)) take enforcement action with respect to the Account Collateral, without limitation and in addition to any and all rights with respect to the Offshore Collateral Accounts and the Offshore Accounts Property under the Common Terms Agreement and the other Financing Documents, by:

(i)     personally, or by attorneys, taking possession of the Account Collateral or any part thereof, from the Offshore Accounts Bank, the Borrower or any other Person that then has possession of any part thereof with or without notice or process of law;

(ii)     instructing any obligor, guarantor or counterparty to any agreement, instrument or other obligation in respect of or relating to the Borrower or the Account Collateral to make any payment required by the terms of such agreement, instrument or obligation directly to the Offshore Collateral Agent, for the benefit of the Secured Parties;

(iii)     taking possession of the Account Collateral or any part thereof by directing the Offshore Accounts Bank or the Borrower, as the case may be, to deliver the same to the Offshore Collateral Agent at any place or places designated by the Offshore Collateral Agent, it being understood that the Offshore Accounts Bank's and the Borrower's obligations to so deliver the Account Collateral is of the essence of this Accounts Agreement and that, accordingly, upon application to a court of equity

having jurisdiction, the Offshore Collateral Agent shall be entitled to a decree requiring specific performance by the Offshore Accounts Bank or Borrower, as the case may be, of such obligations;

(iv)  foreclosing on the Account Collateral as herein provided or in any manner permitted by Applicable Law (including through any permitted non-judicial foreclosure) either concurrently or in such order as the Offshore Collateral Agent may determine without affecting the rights or remedies to which the Offshore Collateral Agent and the Secured Parties may be entitled under this Accounts Agreement, the Common Terms Agreement or any other Financing Document. The Borrower hereby waives, to the extent permitted by Applicable Law, notice and judicial hearing in connection with the Offshore Collateral Agent's taking possession or commencing any collection, recovery, receipt, appropriation, repossession, retention, set-off, sale, leasing, licensing, conveyance, assignment, transfer, liquidation, or other disposition of or realization upon any or all of the Account Collateral, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which the Borrower would otherwise have under Applicable Law;

(v)  withdrawing any and all cash and liquidating any and all Offshore Authorized Investments in any of the Offshore Collateral Accounts and applying such cash, the liquidation proceeds of Offshore Authorized Investments and other cash, if any, then held in any Offshore Collateral Account or as Offshore Accounts Property in accordance with the provisions of the Common Terms Agreement or other Financing Documents; and

(vi)  selling, assigning or otherwise liquidating the Account Collateral, or any part thereof, at a public or private sale, for cash, upon credit or for future delivery, and at such prices as the Offshore Collateral Agent may deem satisfactory, and taking possession of the proceeds of any such sale or liquidation.

(b)    The Borrower and the Offshore Accounts Bank acknowledge that if an Event of Default has occurred and is continuing, the Offshore Collateral Agent shall be entitled to apply amounts deposited in or credited to any Offshore Collateral Account as contemplated in Section 16.04 (*Application of Proceeds*).

(c)    The Offshore Accounts Bank shall promptly comply with any written instruction given by the Offshore Collateral Agent as contemplated by Section 2.01 (*Appointment*) (without reference to any inconsistent request or instruction from the Borrower or otherwise).

(d)    The Offshore Collateral Agent may, following the occurrence and during the continuance of an Event of Default, exercise its rights under this Section 16.03 as frequently, and as many times, as it considers appropriate.

(e)    Any public sale of the Offshore Collateral Accounts or the Offshore Accounts Property under this Section 16.03 shall be held at such time(s) within ordinary business hours and at such place(s) as the Offshore Collateral Agent may determine, in accordance with Applicable Law.  At any such sale, the Offshore Collateral Accounts or the Offshore Accounts Property may be sold in one lot as an entirety or in separate parcels, as the Offshore Collateral Agent may determine.  The Offshore Collateral Agent shall not be obligated to make any such sale pursuant to any previously delivered notice.  The Offshore Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned.  In case of any sale of all or any part of the Offshore Collateral Accounts or the Offshore Accounts Property on credit or for future delivery, the Offshore Collateral Accounts or the Offshore Accounts Property so sold may be retained by the Offshore Collateral Agent until the selling price is paid by the purchaser thereof, but the Offshore Collateral Agent shall not incur any liability in case of the failure of such purchaser to take up and pay for the Offshore Collateral Accounts or the Offshore Accounts Property so sold and, in case of any such failure, such Offshore Collateral Accounts or Offshore Accounts Property may again be sold upon like notice.  Neither the Offshore Collateral Agent, the Offshore Accounts Bank nor any Secured Party shall incur any liability as a result of the manner of disposition of the Account Collateral, or any part thereof, at any private disposition conducted in a commercially reasonable manner.  The Borrower hereby waives, to the extent permitted by Applicable Law, any claims against the Offshore Collateral Agent, the Offshore Accounts Bank, any other Secured Party or any designee of either the Offshore Collateral Agent or the Offshore Accounts Bank, or any other Secured Party arising by reason of the fact that the price at which the Account Collateral, or any part thereof, may have been disposed of at a private disposition was less that the price which might have been obtained at a public disposition or was less than the aggregate amount of the Secured Obligations, even if the Offshore Collateral Agent accepts the first offer received that the Offshore Collateral Agent deems to be commercially reasonable under the circumstances and does not offer the Account Collateral to more than one offeree.  To the extent permitted by Applicable Law, the Borrower shall have the burden of proving that any such disposition of the Account Collateral was conducted in a commercially unreasonable manner.   To the extent permitted by Applicable Law, the Borrower hereby specifically waives all rights of stay or appraisal which it has or may have under any Applicable Law now existing or hereafter enacted.  The Borrower authorizes the Offshore Collateral Agent and the Offshore Accounts Bank, at any time and from time to time, (i) to execute, in connection with a disposition of the Account Collateral pursuant to the provisions of this Accounts Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Account Collateral and (ii) to make any filing with, or seek any approval from, any Authority as may be necessary to effectuate any sale, lease, license or other disposition permitted to be made by the Offshore Collateral Agent hereunder.

(f)    To the extent permitted by Applicable Law, the Offshore Collateral Agent or any Secured Party may bid for and become the purchaser of the Offshore Collateral Accounts or the Offshore Accounts Property (or any portion thereof) offered for sale in accordance with this Section 16.03.

(g)    The Offshore Collateral Agent may, following the occurrence and during the continuance of an Event of Default, and following the delivery of a Notice of Suspension, and

until such notice has been withdrawn, (underline>provided that any failure to deliver such notice shall not affect the validity of any actions taken under this Section 16.03(g)), in addition to the rights otherwise provided herein, exercise all rights of a secured party under the UCC. In addition to the rights otherwise provided herein, the Offshore Collateral Agent may proceed by a suit or suits at law or in equity to foreclose the security interests in and sell the Offshore Collateral Accounts or the Offshore Accounts Property (or any portion thereof) under a judgment or decree of a court or courts of competent jurisdiction.

(h)     Upon any sale of the Offshore Collateral Accounts or the Offshore Accounts Property under this Section 16.03, the Offshore Collateral Agent shall have the right to deliver, assign and transfer to the purchaser thereof the Offshore Collateral Accounts or Offshore Accounts Property so sold. Each purchaser at any such sale shall hold the Offshore Collateral Accounts or the Offshore Accounts Property so sold to it absolutely and free from any Lien, claim or right of any kind, and the Borrower, to the extent permitted by Applicable Law, hereby specifically waives all rights of redemption, stay or appraisal that it has or may have under any Applicable Law now existing or hereafter adopted. The Borrower will execute and deliver such documents and take such other actions as the Offshore Collateral Agent deems reasonably necessary or reasonably advisable in order that any such sale may be made in compliance with Applicable Law.

(i)     Without limiting the generality of the foregoing and except as otherwise provided by Applicable Law, neither the Offshore Collateral Agent nor the Offshore Accounts Bank shall be required to marshal the Account Collateral subject to the security interest created hereby, or to resort to any item of the Account Collateral or guarantees in any particular order. To the extent that the Borrower lawfully may, the Borrower hereby (i) agrees that it will not invoke any Applicable Law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Secured Parties' rights under this Accounts Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured and (ii) irrevocably waives the benefits of all Applicable Law and any and all rights to equity of redemption or other rights of redemption that it may have in equity or at law with respect to the Account Collateral.

Section 16.04  <u>Application of Proceeds</u>. Any monies received by or on behalf of the Offshore Collateral Agent after enforcement hereunder following an Event of Default may be applied in full or in part by the Offshore Collateral Agent for the benefit of the Secured Parties in accordance with the Financing Documents and the Intercreditor Agreement.

## ARTICLE XVII

### The Offshore Accounts Bank

Section 17.01  <u>Duties of Offshore Accounts Bank as Securities Intermediary</u>. (a) The Offshore Accounts Bank, , acting as a Securities Intermediary, will have the obligations of a Securities Intermediary under Article 8 of the UCC, and, acting as a Bank, will have the obligations of a Bank under Article 9 of the UCC. The Offshore Accounts Bank will also have those duties and responsibilities expressly set forth in this Accounts Agreement or as may be

imposed by Applicable Law, and no additional duties, responsibilities, obligations or liabilities shall be inferred from the provisions of this Accounts Agreement or imposed on the Offshore Accounts Bank. The Offshore Accounts Bank will act at the written direction of the Offshore Collateral Agent or the Intercreditor Agent, but will not be required to take any action that is contrary to this Accounts Agreement or Applicable Law or that, in its sole judgment, would involve it in expense or liability, unless it has been furnished with indemnity satisfactory to it in its sole discretion against such expense or liability. The Offshore Accounts Bank will have no responsibility to ensure the performance by the Borrower of its duties and obligations hereunder. The Offshore Accounts Bank will use the same care with respect to the safekeeping and handling of property held in the Offshore Collateral Accounts and the Offshore Accounts Property as the Offshore Accounts Bank uses in respect of property held for its own sole benefit. The provisions of this ARTICLE XV are solely for the benefit of the Offshore Accounts Bank, the Offshore Collateral Agent and the Secured Parties.

(b)     In performing its functions and duties under this Accounts Agreement, the Offshore Accounts Bank will act solely as the Securities Intermediary or Bank, as the case may be, with respect to the Offshore Collateral Accounts subject to the provisions set forth in ARTICLE II (*Appointment; Grant of Security Interest*). The Offshore Accounts Bank does not assume and will not be deemed to have assumed any obligation toward or relationship of agency or trust with or for the Borrower or any Person other than its obligations under this Accounts Agreement owed to the Offshore Collateral Agent and the Secured Parties. The Borrower will not have any rights against the Offshore Accounts Bank or any of its directors, officers, employees or agents hereunder, other than for the Offshore Accounts Bank's gross negligence, willful misconduct or fraud. Except as otherwise expressly provided in this Accounts Agreement, the Borrower will not have any right to direct the Offshore Accounts Bank to distribute or allocate any funds, instruments, securities, Financial Assets or other assets in the Offshore Collateral Accounts or to withdraw or transfer any funds, instruments, securities, Financial Assets or other assets from the Offshore Collateral Accounts. It is expressly understood and agreed that any investment made with funds held in the Offshore Collateral Accounts may be made only in accordance with the express provisions of Section 15.01 (*Power to Invest*) and, when an investment is so made, it is expressly understood and agreed that such investment was made with the permission of the Offshore Collateral Agent in the exercise of its exclusive possession of, and dominion and control over, the Offshore Collateral Accounts, which it maintains through the Offshore Accounts Banks for the benefit of the Secured Parties.

Section 17.02 <u>Offshore Accounts Bank's Performance</u>.   (a)     The Offshore Accounts Bank shall:

(i)     promptly inform the Intercreditor Agent of the contents of any notice or document it receives from or delivers to any Authority in connection with the Offshore Collateral Accounts;

(ii)     except as otherwise expressly provided in this Accounts Agreement or any Financing Document, perform its duties in accordance with any written instructions given to it by the Intercreditor Agent or the Offshore Collateral Agent; and

(iii)    if so instructed in writing by the Intercreditor Agent or the Offshore Collateral Agent, refrain from exercising any right, power, authority or discretion vested in it as the Offshore Accounts Bank hereunder or under any other Financing Document.

(b)    Except as otherwise expressly provided in this Accounts Agreement, the Offshore Accounts Bank shall not take any actions other than upon the written instruction of the Offshore Collateral Agent or the Intercreditor Agent.

Section 17.03 <u>Reliance by Offshore Accounts Bank; Right to Request Instruction</u>.  (a) Any instruction, direction, notice, request or requisition given to the Offshore Accounts Bank by the Borrower with respect to the transfer, withdrawal, deposit, investment or payment of any funds under this Accounts Agreement or with respect to any other obligations to be performed by the Offshore Accounts Bank under this Accounts Agreement (i) must be in writing, (ii) in referencing any of the Offshore Collateral Accounts, must refer to the specific Offshore Collateral Account name and number, and (iii) shall constitute a representation by the Borrower that all conditions set forth in this Accounts Agreement for such withdrawal have been satisfied.

(b)    Notwithstanding anything to the contrary in this Accounts Agreement (except in the case of gross negligence, willful misconduct or fraud on the part of the Offshore Accounts Bank), the Offshore Accounts Bank will be entitled to rely upon, and shall incur no liability and shall be fully protected in relying upon, any certificate, notice or other document (including any cable, telegram, telecopy or telex) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the Person or Persons purporting to issue such certificate, notice or other document, and upon advice and statement of legal counsel, independent accountants and other experts selected by the Offshore Accounts Bank with reasonable care.  As to any matters not expressly provided for by this Accounts Agreement, the Offshore Accounts Bank will not be required to take any action or exercise any discretion.  The Offshore Accounts Bank will have the right at any time to seek instructions from the Intercreditor Agent or the Offshore Collateral Agent concerning the administration of this Accounts Agreement and will, in all such cases, be fully protected in acting, or in refraining from acting, hereunder in accordance with the written instructions of the Intercreditor Agent or the Offshore Collateral Agent.

(c)    The Offshore Accounts Bank shall not be liable (i) with respect to any action taken or omitted to be taken by it in accordance with the direction of the Offshore Collateral Agent or the Intercreditor Agent relating to the time, method and place of conducting any proceeding for any remedy available to the Offshore Collateral Agent or the Intercreditor Agent, or exercising any trust or power conferred upon the Offshore Collateral Agent or the Intercreditor Agent, under this Accounts Agreement; or (ii) for any loss of profits, consequential, incidental, punitive, exemplary or indirect damages.

(d)    Except as provided in Section 17.05 (*Resignation or Removal of the Offshore Accounts Bank*), no provision of this Accounts Agreement shall require the Offshore Accounts Bank to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have any

grounds in its sole judgment for believing that repayment of such funds or indemnity satisfactory to it in its sole discretion against such risk or liability is not assured to it.

(e)     The Borrower shall deliver to the Offshore Accounts Bank on or before the date hereof, an authority and incumbency certificate setting forth the names and specimen signatures of the Borrower's Authorized Representatives permitted to provide instructions to the Offshore Accounts Bank, and promptly provide any changes to such certificate from time to time thereafter.  The Offshore Accounts Bank shall be entitled to rely conclusively on such certificate until it receives a certificate specifically stating that it is a superseding certificate.

Section 17.04   <u>Notice of Default</u>.  The Offshore Accounts Bank will be entitled to rely on any written notice it receives from the Offshore Collateral Agent, the Intercreditor Agent or the Borrower stating that an Event of Default has occurred and is continuing.  The Offshore Accounts Bank will not be deemed to have knowledge of an Event of Default unless and until it has received written notice (in compliance with this Accounts Agreement) thereof from the Offshore Collateral Agent, the Intercreditor Agent or the Borrower.

Section 17.05   <u>Resignation or Removal of the Offshore Accounts Bank</u>.   (a)  Subject to the appointment and acceptance of a successor Offshore Accounts Bank as provided below, the Offshore Accounts Bank may resign at any time by giving at least sixty (60) days' prior written notice thereof to the Offshore Collateral Agent, the Intercreditor Agent and the Borrower.  The Offshore Accounts Bank may be removed at any time with or without cause by the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent).  Upon any such resignation or removal, the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent) will have the right and responsibility to appoint a successor Offshore Accounts Bank, which successor Offshore Accounts Bank shall (unless an Event of Default or Potential Event of Default has occurred and is continuing) be reasonably acceptable to the Borrower.   If no successor Offshore Accounts Bank has been appointed by the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent) and has accepted such appointment within sixty (60) days after the retiring Offshore Accounts Bank's giving of notice of resignation or the Offshore Collateral Agent's (acting on the instructions of the Intercreditor Agent) removal of the retiring Offshore Accounts Bank, then the retiring Offshore Accounts Bank or the Offshore Accounts Bank being removed, as the case may be, may apply to any court of competent jurisdiction to appoint a successor Offshore Accounts Bank to act until such time, if any, as a successor Offshore Accounts Bank is otherwise appointed in accordance with this Section 17.05, which court-appointed successor Offshore Accounts Bank shall be an Authorized Bank, operating in New York, United States of America, that has capital, surplus, and undistributed profits of at least five billion Dollars ($5,000,000,000).  Until the appointment of a successor Offshore Accounts Bank by such court, the retiring or removed Offshore Accounts Bank shall continue to act as Offshore Accounts Bank pursuant to the terms of this Accounts Agreement and the other Financing Documents.   Any successor Offshore Accounts Bank appointed by such court shall immediately and without further act be superseded by any successor Offshore Accounts Bank appointed by the Offshore Collateral Agent (acting on the instructions of the Intercreditor Agent) in accordance with this Section 17.05.   Upon its acceptance of appointment as Offshore Accounts Bank hereunder, (i) a successor Offshore Accounts Bank will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Offshore Accounts Bank and the retiring Offshore Accounts

Bank will be discharged from its duties and obligations hereunder and (ii) the retiring Offshore Accounts Bank will promptly transfer all of the Offshore Collateral Accounts, the Offshore Accounts Property to the possession or control of the successor Offshore Accounts Bank and will execute and deliver such notices, instructions and assignments as may be necessary or desirable to transfer the rights of the Offshore Accounts Bank with respect to the Offshore Collateral Accounts and the Offshore Accounts Property to the successor Offshore Accounts Bank. After the retiring Offshore Accounts Bank's resignation or removal hereunder as Offshore Accounts Bank, the provisions of this ARTICLE XV and ARTICLE XVII (*Expenses; Indemnification; Fees*) will continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Offshore Accounts Bank.

(b)      If the Offshore Accounts Bank resigns pursuant to Section 17.05(a), the retiring Offshore Accounts Bank shall, at its own cost and expense, make available to the successor Offshore Accounts Bank such records, documents and information in the retiring Offshore Accounts Bank's possession and provide such assistance as the successor Offshore Accounts Bank may reasonably request in connection with its appointment as the successor Offshore Accounts Bank. For the avoidance of doubt, other than the costs and expenses set forth in the preceding sentence, all costs and expenses associated with the appointment of a successor Offshore Accounts Bank shall be for the account of the Borrower in accordance with ARTICLE XVII (*Expenses; Indemnification; Fees*).

Section 17.06  <u>Merger of the Offshore Accounts Bank</u>. Any Succeeding Entity to the Offshore Accounts Bank shall automatically be deemed to be a successor Offshore Accounts Bank in accordance with Section 17.05 (*Resignation or Removal of the Offshore Accounts Bank*) if, and only if, such Succeeding Entity satisfies the requirements of an Authorized Bank.

Section 17.07  <u>No Right of Set-Off</u>. The Offshore Accounts Bank acknowledges and agrees that it shall have no right of setoff with regard to funds in the Offshore Collateral Accounts, any Financial Assets or any Offshore Accounts Property and that the Financial Assets and other items deposited in or credited to the Offshore Collateral Accounts, and the Offshore Accounts Property will not be subject to deduction, set-off, banker's lien or any other right in favor of any Person other than the Secured Parties. Notwithstanding anything to the contrary set forth in this Accounts Agreement, no Secured Party shall have a right of set-off, banker's lien or any other right in respect of or with regards to the Offshore Collateral Accounts or any funds or Financial Assets deposited in or credited to the Offshore Collateral Accounts other than any rights of the Offshore Accounts Bank with respect to deduction, set-off, banker's lien and recoupment to the extent (and only to the extent) of returned items and chargebacks either for uncollected checks or other items of payment and transfers previously credited to any such account, and each of the Offshore Collateral Agent, on behalf of and for the benefit of the Secured Parties, and the Borrower hereby expressly authorize the Offshore Accounts Bank to debit any such account for such amounts.

## ARTICLE XVIII

## The Offshore Collateral Agent

Section 18.01 <u>Appointment of Offshore Collateral Agent</u>.   The Intercreditor Agent (on the instruction of the Required Creditors) hereby reconfirms the appointment of the Offshore Collateral Agent to act on the Secured Parties' behalf as their collateral agent with respect to (i) the Offshore Collateral Accounts for the benefit of the Secured Parties, with such powers as are expressly delegated to the Offshore Collateral Agent by the terms of this Accounts Agreement, together with such other powers as are reasonably incidental thereto, (ii) the Offshore Security Agreement, (iii) the Direct Agreements to which it is a party, and (iv) the Deed of Assignment of Reinsurance, and authorizes the Offshore Collateral Agent to exercise any rights and powers as are expressly granted to the Secured Parties by the terms of the Deed of Assignment of Reinsurance.   The Offshore Collateral Agent hereby reconfirms its acceptance of this appointment and agrees to act as the collateral agent for the Secured Parties with respect to the Offshore Collateral Accounts and with respect to the Deed of Assignment of Reinsurance, on behalf and for the benefit of the Secured Parties, in accordance with the terms of this Accounts Agreement.   The Offshore Collateral Agent further confirms that it will continue to hold in its control and in accordance with the terms of this Accounts Agreement, for the Secured Parties, the Offshore Collateral Accounts referred to in Section 3.01 (*Establishment of the Offshore Collateral Accounts*).

Section 18.02 <u>Offshore Collateral Agent May Perform</u>.   If the Borrower fails to perform any agreement contained herein, the Offshore Collateral Agent, acting on behalf of the Secured Parties, may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Offshore Collateral Agent incurred in connection therewith shall be payable by the Borrower under both Section 19.01 (*Expenses*) of this Accounts Agreement and Section 7.12 (*Indemnification; No Consequential Damages*) of the Common Terms Agreement.

Section 18.03 <u>The Offshore Collateral Agent's Duties under the Accounts Agreement</u>.  (a) The powers conferred on the Offshore Collateral Agent hereunder are solely to protect the Secured Parties' interest in the Offshore Collateral Accounts.  Except for the safe custody of any Offshore Collateral Accounts and the Account Collateral in its possession and the accounting for moneys actually received by it hereunder, the Offshore Collateral Agent shall have no duty as to any Offshore Collateral Account or Account Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Offshore Collateral Account or the Account Collateral, whether or not the Intercreditor Agent has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Offshore Collateral Account or Account Collateral.  The Offshore Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Offshore Collateral Account or Account Collateral in its possession if such Offshore Collateral Account is accorded treatment substantially equal to that which the Offshore Collateral Agent accords its own property.

(b)      The Offshore Collateral Agent's duties and responsibilities hereunder shall be determined solely by the express provisions of this Accounts Agreement, and no other further duties or responsibilities shall be implied.   The Offshore Collateral Agent makes no representation and has no responsibility as to the validity of this Accounts Agreement or of any other instrument referred to herein, or the creation or perfection of any security interest.   The

Offshore Collateral Agent, and any of its directors, officers, employees or agents, shall not be liable for any error of judgment, or any act done or omitted by it in good faith, or for any mistake of fact or law, or for anything which it may do or refrain from doing in connection therewith, except its fraud, gross negligence or willful misconduct.

Section 18.04  <u>Delegation of Duties</u>.  The Offshore Collateral Agent may execute any of its respective duties under this Accounts Agreement or any other Financing Document by or through agents or attorneys-in-fact, at the reasonable expense of the Borrower, and shall be entitled to advice of counsel or other advisors concerning all matters pertaining to its duties and rights hereunder.  The Offshore Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

Section 18.05  <u>Offshore Collateral Agent's Performance</u>.  (a)  The Offshore Collateral Agent shall:

(i) promptly inform the Intercreditor Agent of the contents of any notice or document that, in its capacity as the Offshore Collateral Agent, it receives from or delivers to the Borrower, the Offshore Accounts Bank or any Authority;

(ii) except as otherwise expressly provided in any Financing Document to which it is a party, perform its duties in accordance with any written instructions given to it by the Intercreditor Agent; and

(iii) if so instructed in writing by the Intercreditor Agent, refrain from exercising any right, power, authority or discretion vested in it as the Offshore Collateral Agent hereunder or under any other Financing Document.

(b)  Except as otherwise expressly provided in this Accounts Agreement, the Offshore Collateral Agent shall not take any actions other than upon the written instruction of the Intercreditor Agent.

Section 18.06  <u>Reliance by Offshore Collateral Agent</u>.  (a)  Notwithstanding anything to the contrary in this Accounts Agreement (except in the case of gross negligence, willful misconduct or fraud on the part of the Offshore Collateral Agent), the Offshore Collateral Agent will be entitled to rely upon, and shall incur no liability and shall be fully protected in relying upon, any certificate, notice or other document (including any cable, telegram, telecopy or telex) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the Person or Persons purporting to issue such certificate, notice or other document, and upon advice and statement of legal counsel, independent accountants and other experts selected by the Offshore Collateral Agent with reasonable care.  As to any matters not expressly provided for by this Accounts Agreement or any other Security Document to which it is a party, the Offshore Collateral Agent will not be required to take any action or exercise any discretion.  The Offshore Collateral Agent will have the right at any time to seek instructions from the Intercreditor Agent concerning the administration of this Accounts Agreement and will,

in all such cases, be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with the written instructions of the Intercreditor Agent.

(b)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Accounts Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Offshore Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction, reasonable satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Offshore Collateral Agent, it is understood that in all cases the Offshore Collateral Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Intercreditor Agent, as it deems appropriate.  The Offshore Collateral Agent shall not be liable (i) with respect to any action taken or omitted to be taken by it in accordance with the direction of the Intercreditor Agent relating to the time, method and place of conducting any proceeding for any remedy available to the Intercreditor Agent, or exercising any trust or power conferred upon the Intercreditor Agent, under this Accounts Agreement or any other Security Document to which it is a party, or (ii) for any loss of profits, consequential, incidental, punitive, exemplary or indirect damages.

(c)     The Offshore Collateral Agent shall not be deemed to have knowledge of the existence of any Event of Default until such time as it has received notification (in compliance with this Accounts Agreement) of such Event of Default from the Intercreditor Agent or the Borrower.

(d)     Except as provided in Section 18.07 (*Resignation or Removal of Offshore Collateral Agent*), no provision of this Accounts Agreement shall require the Offshore Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Offshore Collateral Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity satisfactory to it against the costs, expenses and liabilities that might be incurred by it in performing such duty or exercising such right or power.

Section 18.07  Resignation or Removal of Offshore Collateral Agent.  (a) Subject to the appointment and acceptance of a successor Offshore Collateral Agent as provided below, the Offshore Collateral Agent may resign at any time by giving at least sixty (60) days' prior written notice thereof to the Intercreditor Agent, the Offshore Accounts Bank and the Borrower. The Offshore Collateral Agent may be removed at any time with or without cause by the Intercreditor Agent (acting on the instructions of the Required Creditors).  Upon any such resignation or removal, the Intercreditor Agent (acting on the instructions of the Required Creditors) will have the right and responsibility to appoint a successor Offshore Collateral Agent, which successor Offshore Collateral Agent shall (unless an Event of Default has occurred and is continuing) be reasonably acceptable to the Borrower.  If no successor Offshore Collateral Agent has been appointed by the Intercreditor Agent (acting on the instructions of the Required Creditors) and has accepted such appointment within sixty (60) days after the retiring Offshore

Collateral Agent's giving of written notice of resignation or the Intercreditor Agent's (acting on the instructions of the Required Creditors) removal of the retiring Offshore Collateral Agent, then the retiring Offshore Collateral Agent or Offshore Collateral Agent being removed, as the case may be, may apply to any court of competent jurisdiction to appoint a successor Offshore Collateral Agent to act until such time, if any, as a successor Offshore Collateral Agent is otherwise appointed in accordance with this Section 18.07, which court-appointed successor Offshore Collateral Agent shall be an Authorized Bank, operating in New York, United States, that has capital, surplus, and undistributed profits of at least five billion Dollars ($5,000,000,000). Until the appointment of a successor Offshore Collateral Agent by such court, the retiring or removed Offshore Collateral Agent shall continue to act as Offshore Collateral Agent pursuant to the terms of this Accounts Agreement and the other Financing Documents. Any successor Offshore Collateral Agent appointed by such court shall immediately and without further act be superseded by any successor Offshore Collateral Agent appointed by the Intercreditor Agent in accordance with this Section 18.07. Upon its acceptance of appointment as Offshore Collateral Agent hereunder, (i) a successor Offshore Collateral Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Offshore Collateral Agent and the retiring Offshore Collateral Agent will be discharged from its duties and obligations hereunder and each relevant Financing Document and (ii) the retiring Offshore Collateral Agent will promptly transfer all of the Security held in the name of the retiring Offshore Collateral Agent and will execute and deliver such notices, instructions and assignments as may be necessary or desirable to transfer the rights of the Offshore Collateral Agent with respect to such Offshore Collateral Accounts to the successor Offshore Collateral Agent. After the retiring Offshore Collateral Agent's resignation or removal hereunder as Offshore Collateral Agent, the provisions of this ARTICLE XVI and ARTICLE XVII (*Expenses; Indemnification; Fees*) will continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Offshore Collateral Agent.

(b)      If the Offshore Collateral Agent resigns pursuant to Section 18.07(a), the retiring Offshore Collateral Agent shall, at its own cost and expense, make available to the successor Offshore Collateral Agent such records, documents and information in the retiring Offshore Collateral Agent's possession and provide such assistance as the successor Offshore Collateral Agent may reasonably request in connection with its appointment as the successor Offshore Collateral Agent. For the avoidance of doubt, other than the costs and expenses set forth in the preceding sentence, the reasonable and documented costs and expenses associated with the appointment of a successor Offshore Collateral Agent shall be for the account of the Borrower, in accordance with ARTICLE XVII (*Expenses; Indemnification; Fees*).

Section 18.08 <u>Merger of the Offshore Collateral Agent</u>. Any Succeeding Entity to the Offshore Collateral Agent shall automatically be deemed to be a successor Offshore Collateral Agent in accordance with Section 18.07 (*Resignation or Removal of Offshore Collateral Agent*) if, and only if, such Succeeding Entity satisfies the requirements of an Authorized Bank.

Section 18.09 <u>Absence of Fiduciary Relationship</u>. Each of the Offshore Collateral Agent and the Offshore Accounts Bank undertakes to perform or to observe only such of its agreements and obligations as are specifically set forth in this Accounts Agreement or any other Financing Document. No implied agreements, covenants or obligations with respect to any

party hereto shall be read into this Accounts Agreement against the Offshore Collateral Agent, the Offshore Accounts Bank or any other Secured Party. None of the Offshore Collateral Agent, the Offshore Accounts Bank or any other Secured Party is a fiduciary of and shall not owe or be deemed to owe any fiduciary duty to any party hereto.

Section 18.10 <u>Additional Actions</u>. From time to time, the Borrower shall execute and deliver to the Intercreditor Agent and the Offshore Collateral Agent such additional documents, and take such other actions, as the Offshore Collateral Agent may reasonably require to carry out the purposes of this Accounts Agreement or to preserve and protect the Secured Creditors' rights, the rights of the Offshore Accounts Bank, the rights of the Intercreditor Agent or the rights of the Offshore Collateral Agent, for the benefit of the Secured Parties, as contemplated herein.

Section 18.11 <u>U.S.A. Patriot Act</u>. The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Offshore Collateral Agent and the Offshore Accounts Bank, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the Offshore Accounts Bank and/or Offshore Collateral Agent. Each of the parties hereto agrees that it will provide the Offshore Collateral Agent and the Offshore Accounts Bank with such information as it may request in order for the Offshore Collateral Agent or the Offshore Accounts Bank, as applicable, to satisfy the requirements of the U.S.A. Patriot Act.

## ARTICLE XIX

## Expenses; Indemnification; Fees

Section 19.01 <u>Expenses</u>. (a) The Borrower agrees to reimburse, within thirty (30) days after receipt of written demand, all reasonable and documented out-of-pocket expenses of each of the Offshore Collateral Agent and the Offshore Accounts Bank (including the reasonable and documented costs and expenses of one legal counsel for each jurisdiction for each such party) in respect of the preparation, execution, delivery and performance of this Accounts Agreement and the Insurance Designation, as applicable, the administration and maintenance of the Offshore Collateral Accounts and the performance of the Offshore Collateral Agent under the Insurance Designation, as applicable, the enforcement of any of the provisions of this Accounts Agreement or the Insurance Designation, as applicable and any amendment, waiver or consent relating to this Accounts Agreement or the Insurance Designation, as applicable.

(b) The Borrower will upon demand pay to each of the Offshore Collateral Agent and the Offshore Accounts Bank the amount of any and all reasonable and documented costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that the Offshore Collateral Agent or the Offshore Accounts Bank may incur in connection with (i) the administration of this Accounts Agreement or the Insurance Designation, as applicable, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Offshore Collateral Accounts (if an Event of Default has occurred and is continuing) or any Casualty Proceeds, (iii) the processing of any waiver or amendment in connection with this Accounts Agreement or the Insurance Designation, as applicable, (iv) the

exercise or enforcement of any of the rights of the Offshore Collateral Agent, the Offshore Accounts Bank or the Intercreditor Agent hereunder or under the Insurance Designation or (v) the failure by the Borrower to perform or observe any of the provisions hereof or under the Insurance Designation, as applicable.

(c)    The reimbursement by the Borrower of costs and expenses of the Secured Parties in connection with this Accounts Agreement shall be determined in accordance with the Section 2.08 (*Expenses*) of the Common Terms Agreement.

Section 19.02 <u>Indemnification</u>.  (a) The Borrower agrees to pay, indemnify and hold harmless each of the Offshore Collateral Agent and the Offshore Accounts Bank and their respective Affiliates and their respective officers, directors, employees, agents and advisors, from and against any and all obligations, claims, damages, losses, penalties, suits, costs, liabilities (including any environmental liabilities) and expenses (including reasonable and documented attorney's fees and disbursements) that may at any time (including at any time following the payment of the Secured Debt) be imposed on, incurred by or asserted or awarded against any such indemnified party, in each case arising out of or in connection with or resulting from this Accounts Agreement, the Insurance Designation, or any other Financing Document, as applicable, except (a) to the extent that such claim, damage, loss, liability or expense is caused by the indemnified party's gross negligence, fraud or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction and (b) those costs and expenses which are expressly for the account of the Offshore Accounts Bank and the Offshore Collateral Agent according to Section 17.05(b) (*Resignation or Removal of the Offshore Accounts Bank*) and Section 18.07(b) (*Resignation or Removal of Offshore Collateral Agent*), respectively.  The foregoing indemnity in this Section 19.02 shall survive any resignation or removal of the Offshore Collateral Agent or the Offshore Accounts Bank.

(b)    The indemnification obligations of the Borrower in favor of the Secured Creditors and their respective Affiliates and their respective officers, directors, employees, agents and advisors in connection with this Accounts Agreement shall be determined in accordance with Section 7.12 (*Indemnification; No Consequential Damages*) of the Common Terms Agreement.

(c)    The indemnification obligations of the Borrower in favor of the Intercreditor Agent and its officers, directors, employees, agents and advisors shall be determined in accordance with Section [13.2] (*Indemnification of the Intercreditor Agent*) of the Intercreditor Agreement.

Section 19.03 <u>Fees</u>.  The Borrower shall pay the Offshore Collateral Agent and the Offshore Accounts Bank, as the case may be, such fees as have been separately agreed to in writing between the Borrower and each of the Offshore Collateral Agent and the Offshore Accounts Bank.

## ARTICLE XX

## Representations and Warranties

Section 20.01 <u>Representations and Warranties of the Borrower</u>.  The Borrower represents and warrants as of the date of this Accounts Agreement that:

(a)      it is the legal and beneficial owner of the Account Collateral free and clear of any Lien, claim, encumbrance, option or right of others, except for the security interest created under this Accounts Agreement and the other Financing Documents and has the power and authority to pledge the Account Collateral pledged by it hereunder.  No effective financing statement or other instrument similar in effect covering all or any part of the Account Collateral or listing the Borrower or any trade name of the Borrower as debtor is on file in the applicable District of Columbia recording office, except such as may have been filed in favor of the Secured Parties relating to the Financing Documents, and it has not entered into any security control agreement or other agreement similar in effect, in each case covering all or any part of the Account Collateral, except such as may have been entered into in favor of the Secured Parties relating to this Accounts Agreement or the other Financing Documents and other than Liens arising by operation of law and not as a result of any default by the Borrower;

(b)      no authorization or approval or other action by, and no notice to or filing with, any Authority or any other third party is required for (i) the grant by the Borrower of the pledge and security interest granted hereunder or for the execution, delivery or performance of this Accounts Agreement by the Borrower, (ii) the perfection or maintenance of the pledge and security interest created hereunder (including the first, second, and third priority nature of such pledge or security interest) other than filing of UCC financing statements, or (iii) the exercise by the Offshore Collateral Agent, the Intercreditor Agent and the Offshore Accounts Bank of their respective rights provided for in this Accounts Agreement or the remedies in respect of the Account Collateral pursuant to this Accounts Agreement;

(c)      it has no bank accounts in New York other than the accounts specified in Section 3.01 (*Establishment of the Offshore Collateral Accounts*);

(d)      except for the rights of the Offshore Collateral Agent, the Intercreditor Agent and the Secured Parties granted hereunder or pursuant hereto or to the Financing Documents or the Intercreditor Agreement, it does not know of and has not received written notice of any right or claim to or interest in (including any Adverse Claim) any Account Collateral by any Person other than the Borrower;

(e)      the security interest granted to the Secured Parties pursuant to this Accounts Agreement in and to the Offshore Collateral Accounts and the Offshore Accounts Property will constitute a valid and enforceable security interest therein that, to the extent such security interest may be perfected under the UCC, will be perfected and that will be subject to no prior security interest that can be perfected under the UCC upon the Offshore Collateral Agent making all filings, registrations, notifications and recordings required by the UCC;

(f)      the Borrower has not executed or authorized to be filed in any public office any UCC financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Offshore Collateral Accounts or the Offshore Accounts Property, except for the filings or registrations made or to be made in respect of and covering the security interests granted hereby or pursuant to any other Security Document by the Borrower;

(g)      its exact legal name is Alto Maipo SpA.  It is duly organized and validly existing as a *sociedad por acciones* (sole shareholder corporation) under the laws of the Country.  Its sole place of business and chief executive office is located at the address provided for the Borrower in Section 21.08 (*Notices*).

Section 20.02  Representations and Warranties of the Offshore Accounts Bank. The Offshore Accounts Bank represents and warrants as of the date of this Accounts Agreement that:

(a)      (i) it is duly constituted, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, (ii) it is not insolvent or in liquidation or administration or subject to any other insolvency procedures, (iii) no receiver, manager, trustee, custodian or analogous officer has been appointed in respect of any part of its property, undertaking or assets, and (iv) it has the appropriate power and authority to own its property and assets, to carry on its business as presently conducted and to enter into and perform its obligations under this Accounts Agreement;

(b)      this Accounts Agreement has been duly authorized and executed by all necessary action on its part and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting the enforcement of creditor's rights generally and by general equitable principles (whether considered in a proceeding in equity or at law);

(c)      neither the execution, delivery and performance of this Accounts Agreement nor the compliance with its terms will conflict with or result in breach of any of the material terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which it is a party or by which it is bound, or violate, as applicable, any of the terms or provisions of its organizational documents or any Authorization or Applicable Law; and

(d)      it has not entered into and will not enter into any agreement with any other Person relating to the Offshore Collateral Accounts or funds deposited in or credited thereto pursuant to which it has agreed or will agree to comply with instructions of such Person.  The Offshore Accounts Bank has not entered into any other agreement with the Borrower or any other Person purporting to limit or condition the obligation of the Offshore Accounts Bank to comply with instructions originated by the Offshore Collateral Agent, on behalf and for the benefit of the Secured Parties.

Section 20.03  Representations and Warranties of the Offshore Collateral Agent. The Offshore Collateral Agent represents and warrants as of the date of this Accounts Agreement that:

(a)      (i) it is duly constituted, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, (ii) it is not insolvent or in liquidation or administration or subject to any other insolvency procedures, (iii) no receiver, manager, trustee, custodian or analogous officer has been appointed in respect of any part of its property,

undertaking or assets, and (iv) it has the appropriate power and authority to own its property and assets, to carry on its business as presently conducted and to enter into and perform its obligations under this Accounts Agreement;

(b)      this Accounts Agreement has been duly authorized and executed by all necessary action on its part and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, moratorium, insolvency reorganization or other similar laws affecting the enforcement of creditor's rights generally and by general equitable principles (whether considered in a proceeding in equity or at law); and

(c)      neither the execution, delivery and performance of this Accounts Agreement nor the compliance with its terms will conflict with or result in a breach of any of the material terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which it is a party or by which it is bound, or violate, as applicable, any of the terms or provisions of its organizational documents or any Authorization or Applicable Law.

## ARTICLE XXI

### Miscellaneous

Section 21.01 <u>Amendments, Waivers and Consents</u>.    Neither this Accounts Agreement nor any of the terms of this Accounts Agreement may be amended, supplemented, waived, discharged or terminated unless such amendment, waiver, supplement, discharge or termination is in writing and signed by each of the parties to this Accounts Agreement.

Section 21.02 <u>Applicable Law and Jurisdiction</u>.  (a) This Accounts Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).  Without limiting the preceding sentence, as permitted by Article 4 of the Hague Securities Convention the Parties hereto agree that the laws of the State of New York, United States of America, shall govern each of the issues specified in Article 2(1) of the Hague Securities Convention.

(b)      For the exclusive benefit of each of the Secured Parties and the Offshore Collateral Agent, the Borrower irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Accounts Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan.  By the execution of this Accounts Agreement, the Borrower irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding.  Final judgment against the Borrower in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)    Nothing in this Accounts Agreement shall affect the right of any Secured Party or the Offshore Collateral Agent to commence legal proceedings or otherwise sue the Borrower in the Country, or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(d)    The Borrower hereby irrevocably designates, appoints and empowers Corporation Service Company, with offices currently located at 19 West 44th Street, Suite 200, New York, New York 10036, as its authorized agent solely to receive for and on its behalf service of any summons, complaint and other legal process in any action, suit or proceeding that the Intercreditor Agent or the Offshore Collateral Agent may bring in the State of New York in respect of this Accounts Agreement.

(e)    As long as this Accounts Agreement remains in force, the Borrower shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding the Intercreditor Agent or the Offshore Collateral Agent may bring in New York, New York, United States of America. with respect to this Accounts Agreement.  The Borrower shall keep the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent advised of the identity and location of such agent.

(f)    The Borrower irrevocably waives to the fullest extent permitted by Applicable Law:

(i)    any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 21.02;

(ii)    any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)    its right of removal of any matter commenced by the Offshore Accounts Bank, the Offshore Collateral Agent or the Intercreditor Agent in the courts of the State of New York to any court of the United States of America.

(g)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS ACCOUNTS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS ACCOUNTS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON.

(h)    To the extent that the Borrower may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Accounts Agreement from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed), may be attributed to it or its assets, it irrevocably agrees not to claim and

irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(i)     To the extent that the Borrower may, in any action, suit or proceeding brought in any of the courts referred to in Section 21.02(b) above or a court of the Country or elsewhere arising out of or in connection with this Accounts Agreement, be entitled to the benefit of any provision of law requiring the Offshore Collateral Agent, the Offshore Accounts Bank, the Intercreditor Agent, the Secured Creditors or any other Secured Party in such action, suit or proceeding to post security for the Borrower's costs or to post a bond or to take similar action, the Borrower hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of New York, New York, United States of America, the Country, or, as the case may be, the jurisdiction in which such court is located.

Section 21.03 <u>Counterparts</u>.   This Accounts Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.   Delivery of a duly executed signature page of this Accounts Agreement by electronic mail in "Portable Document Format" ("PDF") or by facsimile transmission shall be considered effective delivery.

Section 21.04 <u>English Language</u>.   All documents to be provided or communications to be given or made under this Accounts Agreement shall be in the English language.   To the extent that the original version of any document to be provided, or communication to be given or made, to the Offshore Accounts Bank, the Offshore Collateral Agent or the Intercreditor Agent under this Accounts Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative of the Borrower to be a true and correct translation of the original.   The parties hereto acknowledge that this Accounts Agreement was negotiated and executed in the English language.   The Offshore Accounts Bank, the Offshore Collateral Agent or the Intercreditor Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 21.05 <u>Exculpatory Provisions</u>.   Neither the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or any other Secured Party nor any of their respective officers, directors, employees, agents, representatives, affiliates, attorneys-in-fact or Affiliates shall be liable to the Borrower for any action taken or omitted to be taken by it under or in connection with this Accounts Agreement, except for its own gross negligence, fraud or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction, or be responsible in any manner to any Person for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Accounts Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Offshore Accounts Bank, the Offshore Collateral Agent or the Intercreditor Agent under or in connection with, this Accounts Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Accounts Agreement or for any failure of the Borrower to perform any of its obligations under any Financing Document. None of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or any other Secured Party shall be under any obligation to any Person to ascertain or to inquire as

to the observance or performance of any of the agreements contained in, or conditions of, this Accounts Agreement or to inspect the properties or records of the Borrower.

Section 21.06 <u>Secured Party Reliance</u>.  Each of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent and the other Secured Parties shall be entitled to rely upon, shall incur no liability (except in the case of gross negligence, willful misconduct or fraud on its part as determined by a final and non-appealable judgment of a court of competent jurisdiction), and shall be fully protected in relying upon, any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by it.

Section 21.07 <u>Currency and Place of Payment</u>.  The provisions of Section 2.07 (*Currency and Place of Payments*) of the Common Terms Agreement shall apply to this Accounts Agreement and to all payments to the Secured Creditors, the Offshore Accounts Bank, the Administrative Agents, the Trustees, and the Offshore Collateral Agent hereunder *mutatis mutandis*.

Section 21.08 <u>Notices</u>.  Any notice, request or other communication to be given or made under this Accounts Agreement shall be in writing and, unless otherwise specified herein, may be delivered by: (i) hand, airmail, or established courier service to each party hereto at its respective address specified below or at such other address as it may notify the other parties hereto from time to time, and will be effective upon receipt; or (ii) email to each party hereto at its respective email address specified below or at such other email address as it may notify the other parties hereto from time to time with a requisite notice included in PDF format executed by an Authorized Representative of the sender, and will be effective upon receipt.

For the Borrower:

    Alto Maipo SpA
    Los Conquistadores 1730, Piso 10
    Providencia, Región Metropolitana, Chile
    Attention:  General Manager
    Telephone: +56 2 3333 8301
    Email: luis.urrejola@aes.com

With a copy to:

    Alto Maipo SpA
    Los Conquistadores 1730, Piso 10
    Providencia, Región Metropolitana, Chile
    Attention:  Felix Gomez
    Email: felix.gomez@aes.com

For the Offshore Collateral Agent and Offshore Accounts Bank:

Itaú Corpbanca New York Branch
885 3rd Ave. 33rd Floor
New York, NY 10022
Attention:       Paula Morales Felis
Telephone:      +56 2 2834-6090
Email:          paula.morales@itau.cl
Attention:       Katherine Toro Torres
Email:          katherine.toro@itau.cl

For the Intercreditor Agent:

Itaú Corpbanca, as Intercreditor Agent
Presidente Riesco 5537, piso 19
Las Condes, Santiago, Chile
Attention:       Paula Morales Felis
Telephone:      +56 2 2834-6090
Email:          paula.morales@itau.cl
Attention:       Katherine Toro Torres
Email:          katherine.toro@itau.cl

Section 21.09  <u>Payments Set Aside</u>.  To the extent that the Borrower or any other Person on behalf of the Borrower makes a payment or payments to the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent, the Secured Creditors or any other Secured Party, or the Offshore Collateral Agent or any Secured Party enforces any Security or exercises any right of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Secured Obligations or any part thereof originally intended to be satisfied, and this Accounts Agreement and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

Section 21.10  <u>Prior Statements</u>.   This Accounts Agreement and the other Financing Documents set forth the entire agreement relating to the subject matter hereof, and supersede all prior statements, agreements, and understandings, whether written or oral, relating hereto.

Section 21.11  <u>Rights Cumulative</u>.  The powers, rights, authorities, discretions and remedies of the Offshore Accounts Bank, the Offshore Collateral Agent and the Intercreditor Agent under this Accounts Agreement and the other Financing Documents are cumulative and do not exclude any other right, power, authority, discretion or remedy.

Section 21.12  <u>Saving of Rights</u>.  (a)  The rights and remedies of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent and the other Secured Parties in relation to any misrepresentation or breach of warranty on the part of the Borrower shall not be prejudiced by any investigation by or on behalf of the Offshore Accounts Bank, the

Offshore Collateral Agent, the Intercreditor Agent, any other Secured Party or any of the Participants into the affairs of the Borrower, by the execution or the performance of this Accounts Agreement or the other Financing Documents, or by any other act or thing that may be done by or on behalf of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent, or any other Secured Party, or any of the Participants, in connection with this Accounts Agreement or the other Financing Documents, and that might, apart from this Section 21.12, prejudice such rights or remedies.

(b)    The rights and remedies of the Secured Parties in relation to any misrepresentation or breach of warranty on the part of the Offshore Accounts Bank or the Offshore Collateral Agent, as the case may be, shall not be prejudiced by any investigation by or on behalf of any of the Participants or any other Secured Parties into the affairs of the Offshore Accounts Bank or the Offshore Collateral Agent, as applicable, by the execution or the performance of this Accounts Agreement or the other Financing Documents, or by any other act or thing that may be done by or on behalf of the Secured Parties in connection with this Accounts Agreement or the other Financing Documents, and that might, apart this Section 21.12, prejudice such rights or remedies.

(c)    No course of dealing or waiver and no failure or delay by the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or any other Secured Party in exercising, in whole or in part, any power, remedy, discretion, authority or other right under this Accounts Agreement, any other Financing Document or any other agreement shall waive or impair, or be construed to be a waiver of or an acquiescence in, such or any other power, remedy, discretion, authority or right under this Accounts Agreement, any other Financing Document or any other agreement, or in any manner preclude its additional or future exercise; nor shall the action of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or any other Secured Party with respect to any default, or any acquiescence by it therein, affect or impair any right, power or remedy of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or the Secured Parties with respect to any other default.

Section 21.13  Severability.  Should any clause, sentence, paragraph, subsection, or Section of this Accounts Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Accounts Agreement, and the parties hereto agree that the part or parts of this Accounts Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken here by the parties hereto, and the remainder will have the same force and effect as if such stricken part or parts had never been included herein.

Section 21.14  Successors and Assignees. This Accounts Agreement binds and benefits the respective successors and permitted assignees of its parties.  However, the Borrower may not assign or delegate any of its rights or obligations under this Accounts Agreement without the prior written consent of the Intercreditor Agent and the Offshore Collateral Agent may not assign or delegate any of its rights or obligations under this Accounts Agreement except pursuant to Section 18.07 (*Resignation or Removal of Offshore Collateral Agent*), and the Offshore Accounts Bank may not assign or delegate any of its rights or obligations under this Accounts Agreement except pursuant to Section 17.05 (R*esignation or Removal of the Offshore Accounts Bank*).  The benefit of this Accounts Agreement may be freely and unconditionally

assigned, transferred, or otherwise disposed of, in whole or in part, by the Intercreditor Agent to any Person, corporate or otherwise, that becomes a successor to the Intercreditor Agent pursuant to Section [12.7] (*Resignation and Removal of the Intercreditor Agent*) of the Intercreditor Agreement.  Any such assignee of the Intercreditor Agent shall be deemed to be a party to this Accounts Agreement as the Intercreditor Agent.  Any purported assignment or disposition in violation of this Section 21.14 shall be void.

Section 21.15  Survival.  All representations, warranties and indemnities made herein shall survive the execution and delivery of this Accounts Agreement and repayment of the Secured Obligations, and shall be deemed to be material and to have been relied upon by the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent and the other Secured Parties, regardless of any investigation made by or on behalf of the Offshore Accounts Bank, the Offshore Collateral Agent, the Intercreditor Agent or any other Secured Party, as the case may be.  Notwithstanding anything in this Accounts Agreement or implied by law to the contrary, the agreement and obligations of the Borrower set forth in Sections 17.01 (*Expenses*), 17.02 (*Indemnification*) and 19.07 (*Currency and Place of Payment*) shall survive the payment or prepayment of the Secured Obligations.

Section 21.16  Third Party Rights.  Except for the Secured Parties, any Person who is not a party to this Accounts Agreement shall have no right to enforce any term of this Accounts Agreement.

Section 21.17  Termination of Accounts Agreement.  This Accounts Agreement shall continue in force and shall terminate only upon the Release Date.

Section 21.18  Force Majeure.  The Offshore Accounts Bank and Offshore Collateral Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Offshore Accounts Bank and Offshore Collateral Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility); it being understood that the Offshore Accounts Bank and Offshore Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 21.19  Amendment and Restatement.  This Accounts Agreement amends and restates the Second Amended and Restated Offshore Accounts Agreement in its entirety.

*(remainder of this page intentionally left blank)*

IN WITNESS WHEREOF, the parties, acting through their duly authorized representatives, have caused this Third Amended and Restated Offshore Accounts and Collateral Agency Agreement to be executed in their respective names as of the date first written above.

**ALTO MAIPO SpA,**
**as Borrower**


**By:** _____
      **Name:**
      **Title:**

IN WITNESS WHEREOF, the parties, acting through their duly authorized representatives, have caused this Third Amended and Restated Offshore Accounts and Collateral Agency Agreement to be executed in their respective names as of the date first written above.

**ITAÚ CORPBANCA NEW YORK BRANCH,**
**as Offshore Accounts Bank**


**By:** _____ \
       **Name:**
       **Title:**


**By:** _____
       **Name:**
       **Title:**

IN WITNESS WHEREOF, the parties, acting through their duly authorized representatives, have caused this Third Amended and Restated Offshore Accounts and Collateral Agency Agreement to be executed in their respective names as of the date first written above.

**ITAÚ CORPBANCA NEW YORK BRANCH,**
**as Offshore Collateral Agent**

**By:** _____ \
       **Name:**
       **Title:**

**By:** _____
       **Name:**
       **Title:**

IN WITNESS WHEREOF, the parties, acting through their duly authorized representatives, have caused this Third Amended and Restated Offshore Accounts and Collateral Agency Agreement to be executed in their respective names as of the date first written above.

**ITAÚ CORPBANCA,**
**as Intercreditor Agent**


**By:** _____ \
      **Name:**
      **Title:**


**By:** _____
      **Name:**
      **Title:**

**<u>Exhibit I</u>**

**Third Amended and Restated Onshore Accounts Agreement**

**Working Draft 4/27/22**

**DFC Loan Number 513-2014-949-IG & 9000042574**

# THIRD AMENDED AND RESTATED ONSHORE ACCOUNTS AGREEMENT

among

**ALTO MAIPO SpA,**
**As Borrower**

**ITAÚ CORPBANCA,**
**as Onshore Collateral Agent,**

**ITAÚ CORPBANCA,**
**as Onshore Accounts Bank,**

and

**ITAÚ CORPBANCA,**
**as Intercreditor Agent,**

**Dated as of [__], 2022**

# [TABLE OF CONTENTS][1]

**Article/**
**Section**                          **Item**                                                      **Page**


Article I          Definitions and Interpretations ..............................................................2

    Section 1.01      Definitions..............................................................................2
    Section 1.02      Interpretation .........................................................................8

Article II         Establishment of the Onshore Project Accounts ..................................8

    Section 2.01      Establishment of the Onshore Project Accounts.......................8
    Section 2.02      Maintaining the Onshore Project Accounts ..............................9
    Section 2.03      Deposits into and Withdrawals from the Onshore Project Accounts .....10
    Section 2.04      Payments Received by the Borrower ......................................10

Article III        Revenue Accounts Transfer/Withdrawal Instruction ........................10

    Section 3.01      Delivery of a Revenue Accounts Transfer/Withdrawal Instruction .......10

Article IV         Onshore Revenue Accounts and VAT Account ................................12

    Section 4.01      Payments into the Onshore Revenue Accounts ......................12
    Section 4.02      Withdrawals from the Onshore Revenue Accounts.................13
    Section 4.03      Payments into the VAT Account ...........................................15
    Section 4.04      Withdrawals from the VAT Account......................................15

Article V          Construction Accounts .....................................................................16

    Section 5.01      Payments into the Construction Accounts .............................17
    Section 5.02      Withdrawals from the Construction Accounts........................17
    Section 5.03      Closing of Construction Accounts .........................................18

Article VI         Operating Accounts ..........................................................................18

    Section 6.01      Payments into the Operating Dollar Account .........................18
    Section 6.02      Payments into the Operating Peso Account ............................18
    Section 6.03      Withdrawals from the Operating Accounts ............................18

Article VII        General Provisions Relating to the Onshore Project Accounts ........19

    Section 7.01      No Security Interests.............................................................19
    Section 7.02      Currencies .............................................................................19

---

[1] **Note to Draft**: Table of Contents to be updated.

- i -

Section 7.03    Withdrawals and Transfers Generally ...................................20
Section 7.04    No Overdraft.............................................................................21
Section 7.05    Acknowledgments......................................................................21
Section 7.06    Further Assurances....................................................................21

Article VIII    Onshore Authorized Investments and Interest ....................................22

Section 8.01    Power to Invest ........................................................................22
Section 8.02    Investing of Amounts in the Onshore Project Accounts........................22
Section 8.03    Sale and Liquidation ................................................................23

Article IX    Default and Enforcement....................................................................23

Section 9.01    Notices of Suspension...............................................................23
Section 9.02    Onshore Collateral Agent Appointed Attorney-in-Fact........................24
Section 9.03    Enforcement.............................................................................24
Section 9.04    Application of Proceeds ............................................................25

Article X    The Onshore Accounts Bank........................................................................25

Section 10.01    Appointment of Onshore Accounts Bank.....................................25
Section 10.02    The Onshore Accounts Bank's Duties ........................................26
Section 10.03    Onshore Accounts Bank's Performance ....................................26
Section 10.04    Reliance by Onshore Accounts Bank; Right to Request Instruction ......27
Section 10.05    Notice of Default......................................................................28
Section 10.06    Resignation or Removal of the Onshore Accounts Bank ..................28
Section 10.07    Merger of the Onshore Accounts Bank ......................................29
Section 10.08    No Right to Set-Off...................................................................29
Section 10.09    Subordination ..........................................................................29

Article XI    Expenses; Indemnification; Fees........................................................30

Section 11.01    Expenses ................................................................................30
Section 11.02    Indemnification.........................................................................30
Section 11.03    Fees .......................................................................................30

Article XII    Representations, Warranties and Covenants .....................................31

Section 12.01    Representations and Warranties of the Borrower ....................31
Section 12.02    Representations and Warranties of the Onshore Accounts Bank ..........31
Section 12.03    Representations and Warranties of the Onshore Collateral Agent .........32
Section 12.04    Covenants of the Onshore Accounts Bank ...........................33

Article XIII    Miscellaneous.......................................................................34

Section 13.01    Amendments,  Waivers and Consents ..............................34
Section 13.02    Applicable Law and Jurisdiction ............................................34

ii

Section 13.03    Counterparts ...................................................................36
Section 13.04    English Language ...............................................................36
Section 13.05    Exculpatory Provisions .......................................................36
Section 13.06    Secured Party Reliance .......................................................36
Section 13.07    Currency and Place of Payment ...........................................37
Section 13.08    Notices ............................................................................37
Section 13.09    Payments Set Aside ...........................................................38
Section 13.10    Prior Statements ...............................................................39
Section 13.11    Rights Cumulative .............................................................39
Section 13.12    Saving of Rights ...............................................................39
Section 13.13    Severability ......................................................................39
Section 13.14    Successors and Assignees ...................................................40
Section 13.15    Third Party Rights .............................................................40
Section 13.16    Survival ...........................................................................40
Section 13.17    Termination of Accounts Agreement ......................................40
Section 13.18    Force Majeure ...................................................................40
Section 13.19    Amendment and Restatement ..............................................41

SCHEDULES

Schedule 1 – Form of Revenue Accounts Transfer/Withdrawal Instruction
Schedule 2 – Form of VAT Transfer Instructions

[AM_ACTIVE 403928122_2]

## THIRD AMENDED AND RESTATED ONSHORE ACCOUNTS AGREEMENT[2]

This **THIRD AMENDED AND RESTATED ONSHORE ACCOUNTS AGREEMENT** (this "Accounts Agreement"), dated as of [__] [__], 2022 is made by and among:

(1)     **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower");

(2)     **ITAÚ CORPBANCA**, a Chilean banking corporation, as onshore collateral agent (in such capacity, the "Onshore Collateral Agent");

(3)     **ITAÚ CORPBANCA**, a Chilean banking corporation, as onshore accounts bank (in such capacity, the "Onshore Accounts Bank"); and

(4)     **ITAÚ CORPBANCA**, a Chilean banking corporation, as intercreditor agent (in such capacity, the "Intercreditor Agent").

**WHEREAS:**

(A)     the Borrower is undertaking the development of the Project;

(B)     the Borrower, the Onshore Collateral Agent, the Onshore Accounts Bank and Itaú Corpbanca, as administrative agent, were parties to that certain Onshore Accounts Agreement, dated as of December 9, 2013 (as amended or otherwise modified as of March 17, 2017, the "Original Onshore Accounts Agreement");

(C)     the Borrower, the Onshore Collateral Agent, the Onshore Accounts Bank and the Administrative Agent were parties to that certain Amended and Restated Onshore Accounts Agreement, dated as of March 17, 2017 (the "Amended and Restated Onshore Accounts Agreement");

(D)     the Borrower, the Onshore Collateral Agent, the Onshore Accounts Bank and the Administrative Agent were parties to that certain Second Amended and Restated Onshore Accounts Agreement, dated as of May 8, 2018 (the "Second Amended and Restated Onshore Accounts Agreement");

(E)     on November 17, 2021, each of the Borrower and Alto Maipo Delaware LLC commenced a bankruptcy case (jointly, the "Bankruptcy Cases") by filing a petition under chapter 11 of the Bankruptcy Code, before the United States Bankruptcy Court of the District of Delaware (the "Bankruptcy Court");

---

[2] **Note to Draft**: [Global] party delivering instructions/notices to be discussed.

(F)     in connection with the Bankruptcy Cases, the Parties wish to amend and restate the Second Amended and Restated Onshore Accounts Agreement in its entirety as set forth herein;

(G)     the Borrower, each Secured Creditor Representative party thereto from time to time, and the Intercreditor Agent have entered into that certain Third Amended and Restated Common Terms Agreement, dated as of the date hereof (the "Common Terms Agreement"), for the purposes of setting forth certain common provisions regarding the financing of the Project;

(H)     the execution and delivery of this Accounts Agreement is a condition precedent to the effective date of a chapter 11 plan of reorganization of the Borrower, approved by the Court pursuant to which, it will exit the Bankruptcy Cases; and

(I)     the Borrower has agreed to execute and deliver this Accounts Agreement upon and subject to the terms and conditions hereinafter set forth.

    **NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

## ARTICLE I

## Definitions and Interpretations

    Section 1.01    _Definitions_.  (a) Whenever used in this Accounts Agreement, capitalized terms used but not otherwise defined herein (including in the recitals hereto), shall have the meaning set forth in the Common Terms Agreement.

    (b)     In addition, as used herein, the following terms have the following meanings:

| | |
|---|---|
| "2L VAT Payments" | means the aggregate total amount of all payments made on the VAT Loans pursuant to Section 5.02(a) (_Withdrawals from the Offshore Revenue Account_) Section 12.02 (_Withdrawals from the Insurance Proceeds and Compensation Account_), and Section 13.02 (_Withdrawals from the Extraordinary Proceeds Account_) of the Offshore Accounts Agreement. |
| "2L VAT True-Up Date" | means the date when the Secured 2L Creditors have received payments from funds on deposit in the VAT Holding Account in an aggregate total amount equal to the 2L VAT Payments; provided that if on the VAT Discharge Date the 2L VAT Payments are zero the 2L VAT True-Up Date will be deemed to have occurred. |
| "Actual VAT Netted Amount" | for any period, the amount of VAT netted by the Borrower as set forth on Form 29 or Form 2,117 filed by |

- 2 -

the Borrower for such period.

"Authorized Bank"                   either: (a) a commercial bank having a short-term local rating of at least "N-1+" by one Chilean rating agency published by the *Superintendencia de Bancos e Instituciones Financieras* or a short-term international rating of at least "A-1" by S&P or Fitch or "A3" by Moody's (or an equivalent rating by an internationally recognized credit rating agency reasonably acceptable to the Required Creditors) or another bank acceptable to the Required Creditors.

"Bankruptcy Cases"                  has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Court"                  has the meaning set forth in the recitals of this Agreement.

"Cash Equivalents"                  as to any Person:

(a) Chilean Peso, Unidades de Fomento (UF) and/or Dollar denominated time deposits and certificates of deposit of any Authorized Bank, maturing no more than six (6) months from the date of acquisition by such Person;

(b) Chilean Peso or Unidades de Fomento (UF) denominated commercial paper issued by any Person incorporated in the Country with a local rating of at least "A" by Feller Rate, Fitch Chile, Humphrey's or ICR, and maturing not more than six (6) months after the date of acquisition by such Person; and

(c) investments in money market funds substantially all of which assets are comprised of securities of the types described in clauses (a) or (b) above.

"Chilean IRS"                       the Internal Revenue Service (*Servicio de Impuestos Internos de Chile*) of the Country.

"Chilean Pesos"                     the lawful currency of the Country.

"Common Terms Agreement"            has the meaning set forth in the recitals of this Accounts Agreement.

"Construction Accounts"             collectively, the Construction Dollar Account and the Construction Peso Account.

- 3 -

| | |
|---|---|
| "Construction Dollar Account" | has the meaning set forth in Section 2.01(a)(vii) (*Establishment of the Onshore Project Accounts*). |
| "Construction Peso Account" | has the meaning set forth in Section 2.01(a)(vi) (*Establishment of the Onshore Project Accounts*). |
| "Expected VAT Netted Amount" | for any period, the amount of VAT the Borrower reasonably expects will be netted for such period, and as the Borrower reasonably expects will be set forth in the filing of Form 29 or Form 2,117 for such period. |
| "Fitch" | Fitch Ratings, Inc. |
| "Forex Conversion Date" | the date the Borrower instructs the Onshore Accounts Bank to convert one currency into another currency under, as applicable: |

(a) Revenue Accounts Transfer/Withdrawal Instruction issued pursuant to Section 3.01 (*Delivery of a Revenue Accounts Transfer/Withdrawal Instruction*);

(b) instructions issued by the Borrower pursuant to Section 5.02 (*Withdrawals from the Construction Accounts*); or

(c) instructions issued by the Borrower pursuant to Section 6.03 (*Withdrawals from the Operating Accounts*).

| | |
|---|---|
| "Form 2,117" | Form No. 2,117 of the Chilean IRS, "Request" (*Formulario número 2.117 del Servicio de Impuestos Internos, "Solicitud"*). |
| "Form 29" | Form No. 29 of the Chilean IRS, "Monthly Declaration and Simultaneous Payment of Taxes" (*Formulario número 29 del Servicio de Impuestos Internos, "Declaración Mensual y Pago Simultáneo de Impuestos"*). |
| "Funding Date" | any date on which funds are deposited in or credited to an Onshore Revenue Account. |
| "Monthly Date" | has the meaning assigned to that term in the Offshore Accounts Agreement. |
| "Monthly Period" | the period starting on a Monthly Date and ending on the date immediately prior to the next subsequent Monthly |

- 4 -

|  | Date. |
|---|---|
| "Moody's" | Moody's Investors Service, Inc. |
| "Notice of Suspension" | has the meaning set forth in Section 9.01 (*Notices of Suspension*). |
| "Offshore Project Accounts" | has the meaning assigned to such term in the Offshore Accounts Agreement. |
| "Offshore Revenue Account" | has the meaning assigned to such term in the Offshore Accounts Agreement. |
| "Onshore Authorized Investments" | as to any Person, investments in: |
|  | (a) cash in hand or at an Authorized Bank and Cash Equivalents; and |
|  | (b) Permitted Marketable Securities. |
| "Onshore Dollar Revenue Account" | has the meaning set forth in Section 2.01(a)(ii) (*Establishment of the Onshore Project Accounts*). |
| "Onshore Peso Revenue Account" | has the meaning set forth in Section 2.01(a)(i) (*Establishment of the Onshore Project Accounts*). |
| "Onshore Project Accounts" | collectively, the Onshore Revenue Accounts, the Construction Accounts, the Operating Accounts, VAT Holding Account, the UF VAT Escrow Account, the USD VAT Escrow Account and each subaccount established in any such account. |
| "Onshore Revenue Accounts" | collectively, the Onshore Peso Revenue Account and the Onshore Dollar Revenue Account. |
| "Operating Accounts" | collectively, the Operating Dollar Account and the Operating Peso Account. |
| "Operating Dollar Account" | has the meaning set forth in Section 2.01(a)(ix) (*Establishment of the Onshore Project Accounts*). |
| "Operating Peso Account" | has the meaning set forth in Section 2.01(a)(viii) (*Establishment of the Onshore Project Accounts*). |
| "Permitted Marketable Securities" | (a) investments in fixed income securities issued by any of the following: |
|  | (i) the Chilean *Tesorería General de la* |

- 5 -

[AM_ACTIVE 403928122_2]

*República* (General Treasury of the Country);

    (ii)   the Central Bank of Chile;

    (iii)  any Secured Lender; or

    (iv)  any commercial bank having a long-term debt rating of at least "AA-" by one Chilean rating agency or "A" by one international rating agency;

(b)  other investment instruments approved in writing by the Administrative Agent; and

(c)  investments in mutual funds as long as:

    (i)   the investment term is less than thirty (30) days and the fund invests in fixed income securities either in Chilean Pesos or Dollars;

    (ii)  the mutual funds are managed by subsidiaries or affiliates of any Secured Lender; and

    (iii)  the investment portfolio of any such fund is comprised exclusively of instruments issued or secured by the Republic of Chile, the Central Bank of Chile or the Chilean *Tesorería General de la República* (General Treasury of the Country) and/or instruments issued or secured by banks or financial institutions, foreign or domestic operating in the Country, having a long-term debt rating of at least "AA-" by one Chilean rating agency or "A" by one international rating agency.

| | |
|---|---|
| "Retention Amount" | one million Dollars ($1,000,000) or the equivalent thereof in Chilean Pesos using the *Dólar Observado* exchange rate (referred to in item No. 6 of Chapter I of the Compendium of Foreign Exchange Regulations of the Chilean Central Bank) published by the Chilean Central Bank on the immediately previous Business Day to the calculation date. |
| "Revenue Accounts Transfer/Withdrawal Instruction" | has the meaning set forth in Section 3.01(a) (*Delivery of a Revenue Accounts Transfer/Withdrawal Instruction*). |
| "S&P" | Standard & Poor's Ratings Group. |

- 6 -

[AM_ACTIVE 403928122_2]

"Standing Instruction" | has the meaning set forth in Section 3.01(b)(i) (*Delivery of a Revenue Accounts Transfer/Withdrawal Instruction*).

"Succeeding Entity" | any Person into which the Onshore Collateral Agent or the Onshore Accounts Bank, as the case may be, is merged, or with which it is consolidated, or any corporation resulting from any merger or consolidation to which the Onshore Collateral Agent or the Onshore Accounts Bank, as the case may be and in its individual capacity, is a party, or any Person succeeding to all or substantially all of the corporate trust business of the Onshore Collateral Agent or the banking business of the Onshore Accounts Bank, as the case may be.

"Tesorería" | the General Treasury of the Republic of Chile (*Tesorería General de la República de Chile*) or any other Authority acting on behalf of such General Treasury.

"UF VAT Lenders" | means *Acreedores UF* as defined in the VAT Loan Agreement

"UF VAT Escrow Account" | has the meaning provided in Section 2.01(a)(v) (*Establishment of the Onshore Project Accounts*).

"Unpaid VAT Amount" | as of any date, the positive difference, if any, of (a) the outstanding principal amount of the VAT Loan less (b) the sum of (i) all Actual VAT Netted Amounts previously paid by the Borrower to the VAT Lender plus (ii) any VAT Refunds previously paid to the VAT Lender.

"USD VAT Escrow Account" | has the meaning provided in Section 2.01(a)(iv) (*Establishment of the Onshore Project Accounts*).

"USD VAT Lenders" | means *Acreedores USD* as defined in the VAT Loan Agreement

"VAT Deficiency" | has the meaning provided in Section 4.02(a)(ii) (*Withdrawals from the Onshore Revenue Accounts*).

"VAT Discharge Date" | the date when all obligations (other than contingent or indemnifications for which no claim has been made) of the Borrower under the VAT Loan Agreement have been indefeasibly paid in full in immediately available funds and no commitments under the VAT Loan Agreement remain outstanding.

"VAT Holding Account" | has the meaning provided in Section 2.01(a)(iii)

[AM_ACTIVE 403928122_2]

<table>
<tbody>
<tr><td></td><td>(*Establishment of the Onshore Project Accounts*).</td></tr>
<tr><td>"VAT Lenders"</td><td>jointly, the UF VAT Lenders and the USD VAT Lenders.</td></tr>
<tr><td>"VAT Transfer Date"</td><td>any day after the date the VAT Loan is disbursed when the Borrower files Form 29 or Form 2,117 with the Chilean IRS; provided, however, that if the Borrower has not delivered VAT Transfer Instructions to the Onshore Accounts Bank by 12:00 p.m. (Santiago time) on such date, then the VAT Transfer Date shall be the following Chilean Business Day.</td></tr>
<tr><td>"VAT Transfer Instructions"</td><td>a written instruction from the Borrower to the Onshore Accounts Bank in the form of Schedule 2 (*Form of VAT Transfer Instructions*).</td></tr>
</tbody>
</table>

Section 1.02   *Interpretation*.  In this Accounts Agreement, unless the context otherwise requires:

(a)    headings are for convenience only and do not affect the interpretation of this Accounts Agreement;

(b)    words importing the singular include the plural and vice versa;

(c)    a reference to an Annex, Article, party, Schedule, Section or clause is a reference to that Article, Section or clause of, or that Annex, party or Schedule to, this Accounts Agreement;

(d)    a reference to a document includes an amendment or supplement to, or replacement or novation of, that document but disregarding any amendment, supplement, replacement or novation made in breach of this Accounts Agreement;

(e)    a reference to a party to any document includes that party's successors and permitted assigns; and

(f)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

## ARTICLE II

### Establishment of the Onshore Project Accounts

Section 2.01   *Establishment of the Onshore Project Accounts*.    (a) The Onshore Accounts Bank has established, in the name of the Borrower and on the books and records of the Onshore Accounts Bank's offices in Santiago, Chile, the following accounts:

[AM_ACTIVE 403928122_2]

(i)     a special, segregated, irrevocable, Chilean Peso-denominated non-checking *cuenta de orden* account entitled Onshore Peso Revenue Account, Account No. 43499620 (the "Onshore Peso Revenue Account");

(ii)    a special, segregated, irrevocable, Dollar-denominated non-checking *cuenta de orden* account entitled Onshore Dollar Revenue Account, Account No. 43499655 (the "Onshore Dollar Revenue Account");

(iii)   a special, segregated, Chilean Peso-denominated non-checking *cuenta de orden* account entitled VAT Holding Account, Account [No. 56919972] (the "VAT Holding Account");

(iv)    a special, segregated, Dollar-denominated non-checking *cuenta de orden* account entitled VAT Escrow Account, Account [No. *] (the "USD VAT Escrow Account");

(v)     a special, segregated, Chilean Peso-denominated non-checking *cuenta de orden* account entitled VAT Escrow Account, Account [No. *] (the "UF VAT Escrow Account");

(vi)    a special, segregated, irrevocable, Chilean Peso-denominated checking *cuenta corriente* account entitled Construction Peso Account, Account No. 43536801 (the "Construction Peso Account");

(vii)   a special, segregated, irrevocable, Dollar-denominated checking *cuenta corriente account* entitled Construction Dollar Account, Account No. 43536984 (the "Construction Dollar Account");

(viii)  a special, segregated, irrevocable, Chilean Peso-denominated checking *cuenta corriente* account entitled Operating Peso Account, Account No. 43538669 (the "Operating Peso Account"); and

(ix)    a special, segregated, irrevocable, Dollar-denominated checking *cuenta corriente account* entitled Operating Dollar Account, Account No. 43538863 (the "Operating Dollar Account").

(b)     The Borrower shall be the owner (including for all tax purposes) of all the funds deposited in or credited to any of the Onshore Project Accounts and all Onshore Authorized Investments made with such funds, and all investment income earned on such Onshore Authorized Investments shall be for the account of the Borrower.

Section 2.02   *Maintaining the Onshore Project Accounts*.   (a) Until the Release Date, the Onshore Accounts Bank shall:

(i)     maintain each Onshore Project Account at its offices located in Santiago, Chile; and

- 9 -

[AM_ACTIVE 403928122_2]

(ii)     cause each such Onshore Project Account to be, and each such Onshore Project Account shall be, separate from all other accounts held or maintained by it, whether under the control and dominion of the Onshore Collateral Agent or the Borrower, as the case may be, or otherwise.

(b)     The Borrower agrees that it shall not open or maintain any accounts other than (i) the Onshore Project Accounts and (ii) the Offshore Project Accounts.

(c)     Neither the Onshore Accounts Bank nor the Borrower shall change the name, account number or denomination of any Onshore Project Account without the prior written consent of the Onshore Collateral Agent.

(d)     All interest, investment income and other amounts, if any, relating to the Onshore Project Accounts that are required to be reported to any taxing Authority shall be reported under the name and taxpayer identification number of the Borrower.

(e)     All service charges and fees with respect to the Onshore Project Accounts shall be for the account of the Borrower.

Section 2.03    *Deposits into and Withdrawals from the Onshore Project Accounts*. Amounts shall be deposited into and withdrawn from the Onshore Revenue Accounts, the Construction Accounts and the Operating Accounts in strict accordance with the provisions of ARTICLE IV (*Onshore Revenue Accounts and VAT Holding Account*) through ARTICLE VI (*Operating Accounts*), respectively.

Section 2.04    *Payments Received by the Borrower*.   All payments received by the Borrower and required to be deposited into the Onshore Project Accounts in accordance with the terms of this Accounts Agreement or any other Financing Document shall be (i) held by the Borrower in trust for the Onshore Collateral Agent for the benefit of the Secured Parties, (ii) segregated from other funds of the Borrower and (iii) forthwith upon receipt by the Borrower, turned over to the Onshore Collateral Agent in the same form as received by the Borrower (duly endorsed by the Borrower to the Onshore Collateral Agent or the Onshore Accounts Bank, if requested) for deposit and disbursement in accordance with this Accounts Agreement.

## ARTICLE III

## Revenue Accounts Transfer/Withdrawal Instruction

Section 3.01    *Delivery of a Revenue Accounts Transfer/Withdrawal Instruction*.   (a) The Borrower shall only be permitted to request the disbursement, withdrawal or transfer of funds from the Onshore Revenue Accounts pursuant to a proposed instruction for the disbursements, withdrawals or transfers to be made to or from the Onshore Revenue Accounts on the Funding Dates substantially in the form of Schedule 1 (the "Revenue Accounts Transfer/Withdrawal Instruction") delivered in accordance with the terms of this Accounts Agreement. An Authorized Representative of the Borrower shall certify that any proposed Revenue Accounts Transfer/Withdrawal Instruction is being delivered, and the disbursements, withdrawals and transfers specified therein are being requested, in accordance with this Accounts Agreement.

- 10 -

(b)     The Borrower shall, at least three (3) Business Days (or such shorter period as the Onshore Accounts Bank and the Administrative Agent may accept) prior to each Monthly Date, deliver to the Onshore Collateral Agent, the Onshore Accounts Bank and the Administrative Agent a Revenue Accounts Transfer/Withdrawal Instruction for the disbursements, withdrawals or transfers to be made to or from the Onshore Revenue Accounts on the Funding Dates occurring during the following Monthly Period. The Revenue Accounts Transfer/Withdrawal Instruction delivered by the Borrower may contain:

> (i)     standing instructions from the Borrower to the Onshore Accounts Bank for the application of funds received into the Onshore Revenue Accounts that have not been specifically identified in that Revenue Accounts Transfer/Withdrawal Instruction and for the application of funds constituting the Retention Amount (each a "Standing Instruction"), provided that each Standing Instruction must be consistent with Section 4.02 (*Withdrawals from the Onshore Revenue Accounts*); and

> (ii)    proposed instructions from the Borrower for the currency conversion and transfer of amounts from one Onshore Revenue Account into the other Onshore Revenue Account on the Forex Conversion Date instructed by the Borrower.

(c)     The Borrower may, following the delivery of a Revenue Accounts Transfer/Withdrawal Instruction in accordance with Section 3.01(a), issue amendments to such Revenue Accounts Transfer/Withdrawal Instruction. Any such amendments to the Revenue Accounts Transfer/Withdrawal Instruction shall take effect three (3) Business Days after delivery thereof (or earlier if accepted by the Onshore Collateral Agent and the Administrative Agent) to the Onshore Collateral Agent, the Onshore Accounts Bank and the Administrative Agent and may be made in respect of:

> (i)     amendments to any Standing Instructions;

> (ii)    the conversion of a currency in, or to be deposited into, an Onshore Revenue Account and the transfer of the converted amount into the applicable Onshore Revenue Account for the converted currency (which will be carried out in accordance with the procedure set out in Section 7.02 (*Currencies*)); or

> (iii)   any amounts deposited or to be deposited into the Onshore Revenue Accounts after the date of the Revenue Accounts Transfer/Withdrawal Instruction that was delivered for that Monthly Period, and for which the timing of receipt into the relevant Onshore Revenue Account was not certain at the time such Revenue Accounts Transfer/Withdrawal Instruction was delivered.

(d)     Other than in respect of any Standing Instructions, any Revenue Accounts Transfer/Withdrawal Instruction that the Borrower delivers in accordance with this Accounts Agreement shall specify:

- 11 -

     (i)     the Onshore Revenue Account from which each disbursement, withdrawal or transfer is requested;

     (ii)    the Person, Onshore Project Account or Offshore Project Account to which each such disbursement, withdrawal or transfer is to be made;

     (iii)   the amount and denomination of each such disbursement, withdrawal or transfer;

     (iv)   each Forex Conversion Date applicable to the conversion of currency from one Onshore Revenue Account to the other; and

     (v)    the date on which each such disbursement, withdrawal or transfer is to be made.

(e)    Each Standing Instruction that the Borrower delivers in accordance with this Accounts Agreement shall specify:

     (i)     the Onshore Revenue Account from which the relevant application of funds is requested;

     (ii)    the Onshore Project Account or Offshore Project Account to which relevant application of funds is to be made;

     (iii)   any instructions regarding the conversion of one currency into another currency (which will be carried out in accordance with the procedure set out in Section 7.02 (*Currencies*)); and

     (iv)   any applicable monthly threshold for the application of funds specified in the relevant Standing Instruction.

## ARTICLE IV

## Onshore Revenue Accounts, VAT Holding Account, UF VAT Escrow Account and USD VAT Escrow Account

Section 4.01  <u>*Payments into the Onshore Revenue Accounts*</u>.  The Borrower shall cause the following amounts to be paid into the Onshore Revenue Accounts, <u>provided</u> that all Chilean Peso-denominated amounts shall be deposited into the Onshore Peso Revenue Account and all Dollar-denominated amounts shall be deposited into the Onshore Dollar Revenue Account:

(a)    all Project revenues (including all amounts received by the Borrower from sales of energy or capacity) denominated in Chilean Pesos;

(b)    all interest and other investment income earned from investments in Onshore Authorized Investments on or after the Construction Completion Date;

- 12 -

(c)     all proceeds of borrowings under any working capital facility that constitutes Permitted Financial Debt; and

(d)     subject to Section 8.02(a) (*Investing of Amounts in the Onshore Project Accounts*), all other income (howsoever earned), revenue (howsoever generated) and proceeds of any nature whatsoever received by or on account or on behalf of the Borrower denominated in Chilean Pesos and any other amounts that, pursuant to the terms of this Accounts Agreement or any other Financing Documents, are required or permitted to be deposited in the Onshore Revenue Account,

but excluding in each case (i) any amounts required to be deposited in any Offshore Project Account, (ii) VAT Refunds that are required to be deposited into the VAT Holding Account and (iii) the proceeds of the VAT Loan that shall be deposited into the UF VAT Escrow Account and USD VAT Escrow Account or otherwise applied pursuant to the terms of the VAT Documents.

Section 4.02     *Withdrawals from the Onshore Revenue Accounts*.  (a)  Unless a Notice of Suspension has been delivered to the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn and so long as adequate  funds are then available in the Onshore Revenue Accounts, on and after the Effective Date, the Onshore Accounts Bank shall make the following withdrawals and transfers in the following order of priority from the Onshore Revenue Account, in each case following the delivery by the Borrower to the Onshore Accounts Bank, the Onshore Collateral Agent and the Intercreditor Agent, of an Onshore Account Transfer Instruction in accordance with Section 7.03 (*Withdrawals and Deposits Generally*) and in reach case subject to and in accordance with the express instructions of the Borrower contained in such Onshore Revenue Account Transfer Certificate with respect to each and every item set forth in this Section 4.02 (a):

(i)     **first**, to the extent necessary (*x*) to pay (1) any operating costs (other than any operating costs paid directly from the Offshore Project Accounts) not exceeding by more than ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most-recently approved Annual Budget (when taken together with any other payments made with respect to such line item during the annual period to which such Annual Budget applies), (2) any Designated Contract Payments (other than any Designated Contract Payments paid directly from the Offshore Project Accounts and any Deferred Intercompany Payments), (3) any payments required to be made pursuant to instructions from the CEN, (4) any payments of Taxes (other than the VAT amount to be paid with the proceeds from the VAT Loan), in each case that are permitted to be paid pursuant to the Financing Documents and that are due and payable or that will become due and payable during the applicable Monthly Period to which such Revenue Accounts Transfer/Withdrawal Instruction applies, and (5) payment of outstanding interest and principal amounts due under any working capital facility that constitutes Permitted Financial Debt to the extent (A) the amount requested for payment of such amounts pursuant to the relevant transfer instruction delivered by the Borrower in accordance with the

- 13 -

Offshore Accounts Agreement is insufficient to cover the full amounts due and (B) such deficit arises solely due to foreign currency exchange rate fluctuations between the date of the applicable transfer instruction delivered by the Borrower and the requested date of such transfer, and (*y*) [if after giving effect to the transfers in clause (*x*) above, the amount standing to the credit of the Operating Accounts (less the amounts set forth in clause (*x*) above) is less than the Retention Amount, to transfer the amount that does not exceed the amount required to ensure that the amount standing to the credit of the Operating Accounts (less the amounts set forth in clause (*x*) above) is equal to the Retention Amount][3]:

(A)     to transfer amounts received in or previously converted to Dollars to the Operating Dollar Account;

(B)     to transfer amounts received in or previously converted to Chilean Pesos to the Operating Peso Account;

(C)     to convert amounts on deposit in Chilean Pesos to Dollars and transfer such amounts to the Operating Dollar Account; and

(D)     to convert amounts on deposit in Dollars to Chilean Pesos and transfer such amounts to the Operating Peso Account;

(ii)     ***second***, starting after the date the VAT Loan is disbursed and until the later to occur of the VAT Discharge Date and the 2L VAT True-Up Date, after giving effect to the transfers set forth in Section 4.02(a)(i), if on the immediately preceding VAT Transfer Date, less than the full amount of the applicable Actual VAT Netted Amount was transferred to the VAT Holding Account (any such amounts, a "<u>VAT Deficiency</u>"), to transfer to the VAT Holding Account an amount equal to any such VAT Deficiency (A) first, from the Onshore Peso Revenue Account and (B) second, to the extent insufficient funds were transferred pursuant to the immediately preceding clause (A), from the Onshore Dollar Revenue Account after converting such amounts into Chilean Pesos; provided, however, in no event shall any amounts be transferred pursuant to this clause (ii) that are in excess of the lesser of (x) the applicable Actual VAT Netted Amount and (y) the Unpaid VAT Amount (or, after the VAT Discharge Date, the difference between the 2L VAT Payments and the amounts previously applied to pay the Secured 2L Debt from the VAT Holding Account);

(iii)     ***third***, starting after the date the VAT Loan is disbursed and until the later to occur of the VAT Discharge Date and the 2L VAT True-Up Date, after giving effect to the transfers set forth in Sections 4.02(a)(i) and (ii), to the VAT Holding Account in an amount so that the amount on deposit in the

---

[3] <u>**Note to Draft**</u>: To be confirmed.

VAT Holding Account is equal to the lesser of (x) the Expected VAT Netted Amount for the period prior to the next Form 29 or Form 2,117 and to be evidenced therein, to be filed by the Borrower and (y) the Unpaid VAT Amount (or, after the VAT Discharge Date, the difference between the 2L VAT Payments and the amounts previously applied to pay the Secured 2L Debt from the VAT Holding Account), (A) first, from transfers from the Onshore Peso Revenue Account and (B) second, to the extent insufficient funds were transferred pursuant to the immediately preceding clause (A), from the Onshore Dollar Revenue Account after converting such amounts into Chilean Pesos; and

(iv)     *fourth*, after giving effect to the transfers set forth in clauses (i), (ii) and (iii) above, to (*x*) transfer from the Onshore Dollar Revenue Account to the Offshore Revenue Account and (*y*) convert amounts in the Onshore Peso Revenue Account into Dollars and transfer to the Offshore Revenue Account, any amounts remaining in the Onshore Revenue Accounts.

(b)     If a Notice of Suspension has been delivered to the Onshore Accounts Bank by the Onshore Collateral Agent and such Notice of Suspension has not been withdrawn, the Onshore Accounts Bank shall, at the written direction of the Onshore Collateral Agent (on the instruction of the Administrative Agent) with a copy of such direction delivered simultaneously to the Borrower, withdraw funds deposited in or credited to the Onshore Revenue Accounts and transfer or otherwise cause such amounts to be paid to any account or Person, in each case directed by the Onshore Collateral Agent in accordance with the Financing Documents.

Section 4.03     *Funding VAT Holding Account*.  The Borrower shall cause the following amounts to be deposited into the VAT Holding Account (a) VAT Refunds; (b) amounts transferred from the Onshore Revenue Account pursuant to Section 4.02(a); and (c) amounts transferred from the UF VAT Escrow Account or USD VAT Escrow Account pursuant to VAT Loan Agreement.

Section 4.04     *Withdrawals from the VAT Holding Account*.

(a)     Unless a Notice of Suspension has been delivered to and received by the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn, on each VAT Transfer Date, the Borrower shall deliver VAT Transfer Instructions to the Onshore Accounts Bank and the Onshore Accounts Bank shall in accordance with any such VAT Transfer Instructions, withdraw funds deposited in or credited to the VAT Holding Account and convert and transfer such funds as follows:

(i) *first*, until the VAT Discharge Date, in an amount equal to (A) the lesser of (1) the Unpaid VAT Amount and (2) the Actual VAT Netted Amount corresponding to such VAT Transfer Date, or (B) if there are insufficient funds on deposit in the VAT Holding Account to make such transfer in full, then the full amount of funds on deposit in the VAT Holding Account, to each VAT Lender *pro rata* in accordance with their corresponding VAT Loan commitments (with such *pro rata* calculation

- 15 -

being done after giving effect to the conversion of Pesos to Dollars and Pesos to UF, as applicable, for each VAT Lender's outstanding VAT Loans);

(ii) *second*, after giving effect to the transfer set forth in clause (i), and in the event that the VAT Loan has been repaid in full, until the 2L VAT True-Up Date, to the 2L Administrative Agent and the 2L Trustee for the pro rata payment of the outstanding principal amount of the Secured 2L Debt (including all Capitalizations); and

(b)    *thereafter*, any amounts remaining on deposit in the VAT Holding Account shall be converted into Dollars and transferred to the Offshore Revenue Account.

(c)    If a Notice of Suspension has been delivered to and received by the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn, the Onshore Accounts Bank shall, at the written direction of the Intercreditor Agent or the Onshore Collateral Agent (at the direction of the Intercreditor Agent) with a copy of such direction delivered simultaneously to the Borrower, withdraw funds deposited in or credited to the VAT Holding Account and transfer or otherwise cause such amounts to be paid to any account or Person directed by the Intercreditor Agent or the Onshore Collateral Agent (at the direction of the Intercreditor Agent) in accordance with the Financing Documents.

(d)    Following the delivery by the Intercreditor Agent to the Borrower of a notice under Section 6.01 (*Acceleration after Default*) of the Common Terms Agreement requiring immediate repayment of the Secured Debt, the Onshore Accounts Bank, at the written direction of the Onshore Collateral Agent (at the direction of the Intercreditor Agent), shall apply amounts on deposit in the VAT Holding Account in accordance with such instructions.

Section 4.05    _Funding UF VAT Escrow Account_.  The UF VAT Escrow Account shall be funded in accordance with the terms and conditions included under Sections *Cuatro.Dos* and *Cuatro.Dos/a//ii/* and *Cuatro.Dos/a//iii/* of the VAT Loan Agreement.

Section 4.06    _Withdrawals from the UF VAT Escrow Account_.  Funds from the UF VAT Escrow Account shall be released in accordance with the terms and conditions included under Sections *Cuatro.Dos* and *Cuatro.Dos/a//iii/* of the VAT Loan Agreement.

Section 4.07    _Funding USD VAT Escrow Account_.  The USD VAT Escrow Account shall be funded in accordance with the terms and conditions included under Sections *Cuatro.Dos* and *Cuatro.Dos/a//ii/* of the VAT Loan Agreement.

Section 4.08    _Withdrawals from the USD VAT Escrow Account_.  Funds from the VAT Escrow Account shall be released in accordance with the terms and conditions included under Sections *Cuatro.Dos* and *Cuatro.Dos/a//iii/* of the VAT Loan Agreement.

## ARTICLE V

### Construction Accounts

- 16 -

Section 5.01    *Payments into the Construction Accounts*.  (a) The Borrower shall deposit or cause to be deposited into the Construction Dollar Account:

     (i)     all amounts required to be deposited into the Construction Dollar Account pursuant to Sections 4.02(b) and (c) (*Withdrawals from the Disbursement Account*) of the Offshore Accounts Agreement;

     (ii)     all interest and other investment income denominated in Dollars earned from investments in Onshore Authorized Investments prior to the Construction Completion Date; and

     (iii)     all amounts required to be deposited into the Construction Dollar Account pursuant to Section 5.01(c) below.

     (b)     The Borrower shall deposit or cause to be deposited into the Construction Peso Account:

     (i)     all interest and other investment income denominated in Chilean Pesos earned from investments in Onshore Authorized Investments prior to the Construction Completion Date; and

     (ii)     all amounts required to be deposited into the Construction Peso Account pursuant to Section 5.01(c) below.

     (c)     The Borrower may, in accordance with Section 5.02 (*Withdrawals from the Construction Accounts*), (i) convert any amounts from Chilean Pesos to Dollars and transfer to the Construction Dollar Account any amounts deposited in or credited to the Construction Peso Account or (ii) convert any amounts from Dollars to Chilean Pesos and transfer to the Construction Peso Account any amounts deposited in or credited to the Construction Dollar Account.

Section 5.02    *Withdrawals from the Construction Accounts*.    Unless a Notice of Suspension has been delivered to the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn and so long as adequate funds are then available in such Construction Account, the Borrower may, on any day, write checks against each Construction Account, initiate wire or electronic funds transfers, and otherwise instruct the Onshore Accounts Bank to transfer monies, including the conversion of currencies in accordance with Section 5.01(b) (*Payments into the Construction Accounts*), to another Construction Account or to the applicable payee, in each case, as may be necessary to pay directly any Project Costs owed by the Borrower and any scheduled settlement in Chilean Pesos and in accordance with the amounts set forth in the Annual Budget on an aggregate and not a periodic basis (including any permitted application of the contingency line item), in each case other than Project Costs paid directly from the Disbursement Account (as defined in the Offshore Accounts Agreement).  The Borrower may, at any time, instruct the Onshore Accounts Bank to transfer funds deposited in or credited to the Construction Accounts (x) prior to the Project Completion Date, to the Disbursement Account and (y) on and after the Project Completion Date, to the Offshore Revenue Account.  The Borrower's writing checks, initiating wire or electronic funds transfers, or instructing the

[AM_ACTIVE 403928122_2]

Onshore Accounts Bank to transfer monies, in each case shall be in accordance with procedures that the Onshore Accounts Bank applies generally to transactions by its customers.

Section 5.03  *Closing of Construction Accounts*.  If the Borrower requests in writing to the Onshore Accounts Bank (with a copy to the Onshore Collateral Agent and the Administrative Agent) at any time after the Project Completion Date, that a Construction Account is no longer required to be utilized pursuant to this Accounts Agreement and that such Construction Account be closed (in each case, as confirmed in writing by the Administrative Agent), the Onshore Accounts Bank shall close such Construction Account and transfer any amount standing to the credit of such Construction Account (together with any accrued interest or profit on or income from such amount) to the Offshore Revenue Account.

## ARTICLE VI

## Operating Accounts

Section 6.01  *Payments into the Operating Dollar Account*.  (a) The Borrower shall cause the following amounts to be deposited into the Operating Dollar Account:

  (i)  all amounts in Dollars received from the Offshore Accounts Bank for deposit into the Operating Accounts pursuant to Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement; and

  (ii)  to the extent such amounts are in Dollars, all amounts required to be deposited into the Operating Dollar Account pursuant to Section 4.02(a)(i) (*Withdrawals from the Onshore Revenue Accounts*).

(b)  The Borrower may, in accordance with Section 6.03 (*Withdrawals from the Operating Accounts*), convert any amounts from Chilean Pesos to Dollars and transfer to the Operating Dollar Account any amounts deposited in or credited to the Operating Peso Account.

Section 6.02  *Payments into the Operating Peso Account*.

(a)  The Borrower shall instruct the Onshore Accounts Bank to deposit into the Operating Peso Account, to the extent such amounts are in Chilean Pesos, all amounts required to be deposited into the Operating Peso Account pursuant to Section 4.02(a)(i) (*Withdrawals from the Onshore Revenue Accounts*) and any amounts in Pesos received from the Offshore Accounts Bank for deposit into the Operating Accounts pursuant to Section 5.02(a) (*Withdrawals from the Offshore Revenue Account*) of the Offshore Accounts Agreement.

(b)  The Borrower may, in accordance with Section 6.03 (*Withdrawals from the Operating Accounts*), convert any amounts from Dollars to Chilean Pesos and transfer to the Operating Peso Account any amounts deposited in or credited to the Operating Dollar Account.

Section 6.03  *Withdrawals from the Operating Accounts*.  Unless a Notice of Suspension has been delivered to the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn and so long as adequate funds are then available in such Operating Account, the

- 18 -

[AM_ACTIVE 403928122_2]

Borrower may, on any day, write checks against each Operating Account, initiate wire or electronic funds transfers, and otherwise instruct the Onshore Accounts Bank to transfer monies, including the conversion of currencies in accordance with Section 6.01(b) (*Payments into the Operating Dollar Account*) or Section 6.02(b) (*Payments into the Operating Peso Account*), to another Operating Account, in each case as may be necessary to pay directly any amounts owed by the Borrower for (a) the payment of operating costs (other than amounts paid directly from the Offshore Project Accounts) not exceeding by more than ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most-recently approved Annual Budget (when taken together with any other payments made with respect to such line item during the annual period in which such Annual Budget applies), (b) any Designated Contract Payments (other than any Designated Contract Payments paid directly from the Offshore Project Accounts and any Deferred Intercompany Payments until such payments are no longer deferred in accordance with the definition thereof), (c) any payments required to be made pursuant to instructions from the CEN, (d) any payments of Taxes (other than the VAT amount paid with the VAT Loan), (e) the payment of costs, fees and expenses in connection with the VAT Documents, in each case not exceeding the aggregate amount deposited from Section 5.02(a)(vii) of the Offshore Accounts Agreement and the payment of interest in connection with the VAT Documents, in each case not exceeding the aggregate amount deposited from Section 5.02(a)(vii) of the Offshore Accounts Agreement and (f) the payment of outstanding interest and principal amounts due under any working capital facility that constitutes Permitted Financial Debt to the extent (A) the amount requested for payment of such amounts pursuant to the relevant transfer instruction delivered by the Borrower in accordance with the Offshore Accounts Agreement is insufficient to cover the full amounts due and (B) such deficit arises solely due to foreign currency exchange rate fluctuations between the date of the applicable transfer instruction delivered by the Borrower and the requested date of such transfer. The Borrower's writing checks, initiating wire or electronic funds transfers, or instructing the Onshore Accounts Bank to transfer monies, in each case shall be in accordance with procedures that the Onshore Accounts Bank applies generally to transactions by its customers.

## ARTICLE VII

## General Provisions Relating to the Onshore Project Accounts

Section 7.01    *No Security Interests*.  The Borrower shall not at any time during the term of this Accounts Agreement create or permit to subsist any Lien on all or any part of any of the Onshore Project Accounts or any funds or Onshore Authorized Investments on deposit therein or credited thereto, or assign, transfer or otherwise dispose of all or any part of its right or title to any of the Onshore Project Accounts other than in accordance with, or as permitted by, the terms of this Accounts Agreement and the Financing Documents.

Section 7.02    *Currencies*.  (a) If the Onshore Accounts Bank receives, in respect of any Onshore Project Account, any amount in a currency other than the currency in which such Onshore Project Account is denominated, it shall (i) promptly notify the Borrower of such event and (ii) if such amounts are denominated in (A) Chilean Pesos, transfer such amounts to the Onshore Peso Revenue Account, (B) Dollars, transfer such amounts to the Onshore Dollar Revenue Account, or (C) any other currency, transfer and convert such amounts pursuant to the

- 19 -

instructions received from the Borrower (provided that such instructions shall comply with the internal policies and Applicable Laws applicable to the Onshore Accounts Bank).

(b)    If any foreign exchange conversion is required to be made pursuant to Section 4.02(a) (*Withdrawals from the Onshore Revenue Accounts*), Section 4.04(a) (*Withdrawals from the VAT Holding Account*), Section 4.06 (*Withdrawals from the UF VAT Escrow Account*), Section 4.08 (*Withdrawals from the USD VAT Escrow Account*), Section 5.02 (*Withdrawals from the Construction Accounts*) or Section 6.03 (*Withdrawals from the Operating Accounts*), then an Authorized Representative of the Borrower shall instruct by telephone the Onshore Accounts Bank prior to 12:00 p.m. (Santiago time) on the relevant receipt date or Forex Conversion Date (as applicable) on the implementation of the instructed foreign exchange conversion. If the Borrower does not provide such instructions prior to 12:00 p.m. (Santiago time) on the applicable date, then (subject to the immediately succeeding sentence) the Onshore Accounts Bank shall effect the foreign exchange conversion using the foreign exchange rate that the Onshore Accounts Bank is offering to third parties at 12:30 p.m. (Santiago time) as of such date for comparable quantities of the relevant currency. If the Borrower sends written notice to the Onshore Accounts Bank no later than 12:00 p.m. (Santiago time) on the applicable date instructing the Onshore Accounts Bank to purchase the relevant currency from the selected bank, on such receipt date or Forex Conversion Date (as applicable) (and in the absence of instructions to the contrary from an Authorized Representative of the Borrower) the Onshore Accounts Bank shall purchase the relevant currency with the currency which is being converted, in accordance with such instructions.

(c)    With respect to any instruction to be given to the Onshore Accounts Bank for a foreign exchange conversion under Section 7.02(b), the Borrower shall, prior to 12:00 p.m. (Santiago time) on the relevant receipt date or Forex Conversion Date (as applicable), request and receive quotes from each Local Bank with respect to the required foreign exchange conversion and shall instruct the Onshore Accounts Bank to effect such conversion using the Local Bank whose quoted rate was most favorable to the Borrower.

(d)    Following delivery of a Notice of Suspension, any determinations required under the provisions of this Section 7.02 with respect to foreign currency conversions or otherwise shall be made by the Onshore Accounts Bank in accordance with the instructions by the Administrative Agent.

Section 7.03    *Withdrawals and Transfers Generally*.    (a) No withdrawals or transfers from any of the Onshore Project Accounts may be made except as expressly permitted by this Accounts Agreement.

(b)    If any transfer, withdrawal, deposit, investment or payment of any funds by the Onshore Accounts Bank or any other action to be taken by the Onshore Accounts Bank under this Accounts Agreement is to be made or taken on a day other than a Business Day, such transfer, withdrawal, deposit, investment, payment or other action will be made or taken on the next succeeding Business Day.

(c)    All amounts withdrawn or transferred from any of the Onshore Project Accounts by the Onshore Accounts Bank for application in or toward making a specific payment or

- 20 -

meeting a specific liability shall be applied in or towards making that payment or meeting that liability and for no other purpose.

(d)    Notwithstanding any other provision of the Financing Documents, without the express written consent of the Onshore Collateral Agent (acting on the instructions of the Administrative Agent), the Borrower may not instruct the Onshore Accounts Bank to transfer or withdraw any amount from any Onshore Project Account if an Event of Default would occur as a result of such withdrawal.

(e)    On the date of each withdrawal by the Onshore Accounts Bank, the Borrower shall be deemed to represent and warrant that no Event of Default would occur as a result of such withdrawal, unless the Onshore Collateral Agent (acting on the instructions of the Administrative Agent) has previously consented in writing to such withdrawal, notwithstanding that an Event of Default would occur as a result of such withdrawal.

Section 7.04    _No Overdraft_.    None of the Onshore Project Accounts shall go into overdraft, and the Onshore Accounts Bank shall not comply with any request to transfer or withdraw any funds from any Onshore Project Account to the extent that it would cause any of the Onshore Project Accounts to do so.

Section 7.05    _Acknowledgments_.    (a) The Borrower acknowledges that any insufficiency of funds in the Onshore Project Accounts (or any of them) at any time shall not limit, reduce or otherwise affect the Borrower's obligations under any Financing Document.

(b)    Each party to this Accounts Agreement acknowledges that none of the Onshore Accounts Bank, the Onshore Collateral Agent, the Administrative Agent or any Secured Party shall incur any obligation or liability in circumstances where there are insufficient funds deposited in or credited to any Onshore Project Account to make a payment in full that would otherwise have been made pursuant to the terms of this Accounts Agreement, except that the Onshore Accounts Bank shall be liable to the extent that the insufficiency resulted from a loss that arose directly from the Onshore Accounts Bank's gross negligence or willful misconduct.

Section 7.06    _Further Assurances_.    The Borrower shall, at any time and from time to time at the first demand of the Onshore Accounts Bank, the Administrative Agent or the Onshore Collateral Agent and at the sole expense of the Borrower, promptly and duly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action, that may be necessary or required under Applicable Law or that the Onshore Accounts Bank, the Administrative Agent or the Onshore Collateral Agent may reasonably request:

(a)    for the purposes of ensuring the validity and legality of this Accounts Agreement and the rights of the Onshore Accounts Bank, the Onshore Collateral Agent or the Administrative Agent under this Accounts Agreement; or

(b)    for the purposes of the proper exercise of rights and powers granted to the Onshore Accounts Bank, the Onshore Collateral Agent or the Administrative Agent under this Accounts Agreement.

## ARTICLE VIII

### Onshore Authorized Investments and Interest

Section 8.01   *Power to Invest*.  Subject to ARTICLE IX (*Default and Enforcement*), the Onshore Accounts Bank shall, from the amounts deposited in or credited to the Onshore Project Accounts, maintain such amounts in cash, invest in Onshore Authorized Investments or realize any Onshore Authorized Investment and reinvest in another Onshore Authorized Investment, in each case on the instructions of the Borrower, as provided in this Accounts Agreement.

Section 8.02   *Investing of Amounts in the Onshore Project Accounts*.  (a) So long as the Onshore Accounts Bank has not received a Notice of Suspension pursuant to Section 9.01 (*Notices of Suspension*), all Onshore Authorized Investments shall be made by the Onshore Accounts Bank in accordance with the Borrower's instructions (which may be in the form of a Standing Instruction) and shall be realized by the Onshore Accounts Bank in accordance with the Borrower's instructions. All interest and other investment income from investments in Onshore Authorized Investments (i) shall be deposited in the applicable Construction Account to the extent earned prior to the Construction Completion Date, (ii) shall be deposited in the applicable Onshore Revenue Account to the extent earned on or after the Construction Completion Date and (iii) in each case, shall be applied in accordance with this Accounts Agreement.

(b)     The Onshore Accounts Bank shall act for the Borrower on an "execution only" basis and may assume that the Borrower is not relying on the Onshore Accounts Bank to exercise any judgment as to whether an investment is an Onshore Authorized Investment or to give any advice to the Borrower on the merits, value, validity, genuineness or suitability of any Onshore Authorized Investment.

(c)     The Onshore Accounts Bank shall have no obligation to invest or reinvest any amounts held hereunder in the absence of written investment directions from the Borrower. Any interest or other income received on such investment and reinvestment of the funds shall become part of the account and any losses incurred on such investment and reinvestment of the funds shall be debited against the account. In no event shall the Onshore Accounts Bank be liable for the selection of the Onshore Authorized Investments or for the investment losses incurred thereon.

(d)     If a Notice of Suspension has been delivered to the Onshore Accounts Bank and such Notice of Suspension has not been withdrawn, all Onshore Authorized Investments shall be made by the Onshore Accounts Bank in accordance with the Onshore Collateral Agent's instructions, and shall be realized by the Onshore Accounts Bank in accordance with the Onshore Collateral Agent's instructions.

(e)     It is agreed and understood that the entity serving as Onshore Accounts Bank or Onshore Collateral Agent may earn fees associated with the investments outlined above in accordance with the terms of such investments. In no event shall the Onshore Accounts Bank or Onshore Collateral Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder. It is understood and agreed that the Onshore Accounts Bank, Onshore Collateral Agent or its affiliates are permitted to receive additional compensation that

[AM_ACTIVE 403928122_2]

could be deemed to be in the Onshore Accounts Bank or Onshore Collateral Agent's economic self-interest for (1) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the investments, (2) using affiliates to effect transactions in certain investments and (3) effecting transactions in investments.

(f)    All Onshore Authorized Investments shall be made in the same currency as that of the funds in the Onshore Project Account from which the funds are used for such Onshore Authorized Investments.

Section 8.03    *Sale and Liquidation*.    The Administrative Agent or the Onshore Collateral Agent may direct (with simultaneous notification to the Borrower) the Onshore Accounts Bank to sell or liquidate (and the Borrower hereby irrevocably instructs the Administrative Agent and the Onshore Collateral Agent, without any further action by or notice to or from the Borrower, to so direct) all or any portion of the Onshore Authorized Investments held in or in respect of the Onshore Project Accounts at any time that the Administrative Agent or the Onshore Collateral Agent determines that the proceeds thereof are required for any withdrawal or transfer of available funds from any Onshore Project Account to another Onshore Project Account, an Offshore Project Account or any other Person (or any account of any Person) pursuant to the terms of this Accounts Agreement. None of the Secured Parties, the Onshore Collateral Agent, the Administrative Agent or the Onshore Accounts Bank shall have any liability to the Borrower or any other Person for, or as a result of, any losses suffered from any such sale or liquidation unless such losses result from such Person's own gross negligence or willful misconduct.

## ARTICLE IX

### Default and Enforcement

Section 9.01    *Default*. [The occurrence of an Event of Default under, and as defined in, the relevant 1L/ 2L Secured Debt Documents as it relates to the relevant Secured Creditors that are a party thereto, the Working Capital Facility Agreement as it relates to the Working Capital Facility Lenders and the Secured Exit Loan Agreement as it relates to the Secured Exit Lenders party thereto, shall constitute an Event of Default hereunder for the benefit of the relevant Secured Creditors, the Working Capital Facility Lenders and the Secured Exit Loan Lenders, as applicable. Any such Event of Default shall be considered cured or waived for the purposes of this Agreement when it has been cured or waived by such Secured Creditor, Working Capital Facility Lenders or Secured Exit Loan Lenders, as the case may be, in accordance with the relevant 1L/ 2L Secured Debt Documents, the Working Capital Facility Agreement and the Secured Exit Loan Agreement, respectively.][4]

Section 9.02    *Notices of Suspension*.    (a) The Onshore Collateral Agent (acting on the instruction of the Administrative Agent) may suspend the right of the Borrower to withdraw or otherwise deal with any funds deposited in or credited to the Onshore Project Accounts at any time following the occurrence and during the continuance of an Event of Default by delivering a

---

[4] **NTD**: Subject to further discussion.

[AM_ACTIVE 403928122_2]

notice to the Onshore Accounts Bank (with a copy to the other parties hereto) (such notice, a "Notice of Suspension").

(b)      Notwithstanding any other provision of the Financing Documents, after the issuance by the Onshore Collateral Agent of a Notice of Suspension in accordance with Section 9.01(a) and until such time as the Onshore Collateral Agent provides written notice to the other parties hereto that it has withdrawn such Notice of Suspension, no amount may be withdrawn by the Onshore Accounts Bank from any Onshore Project Account, including for investment in Onshore Authorized Investments, without the express written consent of the Onshore Collateral Agent.

(c)      The Administrative Agent shall instruct the Onshore Collateral Agent to withdraw such Notice of Suspension once it is satisfied that no Event of Default is continuing, and the Onshore Collateral Agent shall withdraw such Notice of Suspension promptly following receipt of such instructions from the Administrative Agent.

Section 9.03    _Onshore Collateral Agent Appointed Attorney-in-Fact_.    The Borrower confirmed, as of the date of the Original Onshore Accounts Agreement, and hereby reconfirms, as of the date hereof, the irrevocable and continuing appointment of the Onshore Collateral Agent and any officer or agent thereof (which agent may include any Secured Creditor), with full power of substitution, as its true and lawful attorney-in-fact (which appointment as attorney-in-fact shall be coupled with an interest), with full authority, if a Notice of Suspension has been delivered to the Onshore Accounts Bank and until such Notice of Suspension has been withdrawn, to take any action and to execute any and all documents and instruments in the place and stead of the Borrower and in the name of the Borrower or otherwise, that the Onshore Collateral Agent or such officer or agent thereof may deem necessary or advisable to accomplish the purposes of this Accounts Agreement, without notice to the Borrower, including, if an Event of Default has occurred and is continuing, to exercise the rights and remedies set forth in Section 9.03 (_Enforcement_).

Section 9.04    _Enforcement_.    (a) Notwithstanding any other provision of the Financing Documents, the Onshore Collateral Agent or its designee (which designee may include any Secured Creditor) may, at any time following the occurrence and during the continuance of an Event of Default, and following delivery of a Notice of Suspension that has not been withdrawn (provided that any failure to deliver such notice shall not affect the validity of any actions taken under this Section 9.03(a)) take enforcement action with respect to the Onshore Project Accounts, in addition to any and all rights with respect to the Onshore Project Accounts under the Common Terms Agreement and the other Financing Documents, by:

    (i)      instructing any obligor, guarantor or counterparty to any agreement, instrument or other obligation in respect of or relating to the Borrower or the Onshore Project Accounts to make any payment required by the terms of such agreement, instrument or obligation directly to the Onshore Collateral Agent, for the benefit of the Secured Parties;

    (ii)      withdrawing any and all cash and liquidating any and all Onshore Authorized Investments in any of the Onshore Project Accounts and

- 24 -

applying such cash, the liquidation proceeds of Onshore Authorized Investments and other cash, if any, then held in any such Onshore Project Account in accordance with the provisions of the Common Terms Agreement or other Financing Documents; and

(iii)    applying amounts deposited in or credited to any Onshore Project Account as contemplated in Section 4.02(b) or (c) (*Withdrawals from the Onshore Revenue Accounts*) or Section 9.04 (*Application of Proceeds*).

(b)     The Onshore Accounts Bank shall promptly comply with any instruction given by or on behalf of the Onshore Collateral Agent or the Intercreditor Agent as contemplated by Section 10.01 (*Appointment of Onshore Accounts Bank*), Section 4.02(b) or (c) (*Withdrawals from the Onshore Revenue Accounts*) or Section 4.04(b) (*Withdrawals from the VAT Holding Account*), (without reference to any inconsistent request or instruction from the Borrower or otherwise).

(c)     The Onshore Collateral Agent may, following the occurrence and during the continuance of an Event of Default, and at any time following delivery of a Notice of Suspension, and until such notice has been withdrawn (provided that any failure to deliver such notice shall not affect the validity of any actions taken under this Section 9.03) exercise its rights under this Section 9.03 as frequently, and as many times, as it considers appropriate.

Section 9.05    *Application of Proceeds*.   Any moneys received by or on behalf of the Onshore Collateral Agent after enforcement hereunder following an Event of Default may be applied in full or in part by the Onshore Collateral Agent for the benefit of the Secured Parties in accordance with the Financing Documents and the Intercreditor Agreement.

## ARTICLE X

### The Onshore Accounts Bank

Section 10.01 *Appointment of Onshore Accounts Bank*.   (a) The Intercreditor Agent (on instruction of the Required Creditors), on behalf of the Secured Lenders, the Onshore Collateral Agent and the Borrower confirmed, as of the date of the 2nd Amended and Restated Onshore Accounts Agreement, and hereby reconfirm, as of the date hereof, the appointment of the Onshore Accounts Bank to act as accounts bank with respect to the Onshore Project Accounts, with such powers as are expressly delegated to the Onshore Accounts Bank by the terms of this Accounts Agreement, together with such other powers as are reasonably incidental thereto. The Onshore Accounts Bank hereby reconfirms its continued acceptance of this appointment and agrees to act as the accounts bank with respect to the Onshore Project Accounts in accordance with the terms of this Accounts Agreement.

(b)     The Onshore Accounts Bank shall not have title to the funds on deposit in the Onshore Project Accounts, and shall credit the Onshore Project Accounts with all receipts of interest, dividends and other income received on the property held in the Onshore Project Accounts in accordance with this Accounts Agreement or written instructions received pursuant hereto. The Onshore Accounts Bank shall administer and manage the Onshore Project Accounts

- 25 -

in strict compliance with all of the terms applicable to the Onshore Project Accounts pursuant to this Accounts Agreement, and shall be subject to and comply with all of the obligations of the Onshore Accounts Bank pursuant to the terms of this Accounts Agreement.

(c)    As and when required by the terms of this Accounts Agreement, the Onshore Accounts Bank agrees to continue complying with any and all instructions originated by the Secured Lenders, Intercreditor Agent or the Onshore Collateral Agent directing the disbursement, deposit and/or transfer of any funds and all other property held in the Onshore Project Accounts without any further consent of the Borrower or any other Person.

Section 10.02 *The Onshore Accounts Bank's Duties*. (a) Except for the safe custody of any Onshore Project Accounts in its possession and the accounting for moneys actually received by it hereunder, the Onshore Accounts Bank shall have no duty as to any Onshore Project Account, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Onshore Project Account, whether or not the Onshore Collateral Agent or the Intercreditor Agent has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Onshore Project Account. The Onshore Accounts Bank shall be deemed to have exercised reasonable care in the custody and preservation of any Onshore Project Account in its possession if such Onshore Project Account is accorded treatment substantially equal to that which the Onshore Accounts Bank accords its own property.

(b)    The Onshore Accounts Bank's duties and responsibilities hereunder shall be determined solely by the express provisions of this Accounts Agreement, and no other further duties or responsibilities shall be implied. The Onshore Accounts Bank makes no representation and has no responsibility as to the validity of this Accounts Agreement or of any other instrument referred to herein, or the creation or perfection of any security interest. The Onshore Accounts Bank or any of its directors, officers, employees or agents shall not be liable for any error of judgment, or any act done or omitted by it in good faith, or for any mistake of fact or law, or for anything which it may do or refrain from doing in connection therewith, except its own gross negligence or willful misconduct.

Section 10.03 *Onshore Accounts Bank's Performance*. (a) The Onshore Accounts Bank shall:

(i)    promptly inform the Intercreditor Agent of the contents of any notice or document that, in its capacity as the Onshore Accounts Bank, it receives from or delivers to any Authority in connection with the Onshore Project Accounts;

(ii)    except as otherwise expressly provided in any Financing Document to which it is a party, perform its duties in accordance with any written instructions given to it by the Intercreditor Agent or the Onshore Collateral Agent; and

(iii)    if so instructed in writing by the Intercreditor Agent or the Onshore Collateral Agent, refrain from exercising any right, power, authority or

- 26 -

discretion vested in it as the Onshore Accounts Bank hereunder or under any other Financing Document.

(b)     Except as otherwise expressly provided in this Accounts Agreement, the Onshore Accounts Bank shall not take any actions other than upon the written instruction of the Onshore Collateral Agent or the Intercreditor Agent.

Section 10.04 _Reliance by Onshore Accounts Bank; Right to Request Instruction_.   (a) Any instruction, direction, notice, request or requisition given to the Onshore Accounts Bank by the Borrower with respect to the transfer, withdrawal, deposit, investment or payment of any funds under this Accounts Agreement or with respect to any other obligations to be performed by the Onshore Accounts Bank under this Accounts Agreement (i) must be in writing, (ii) in referencing any of the Onshore Project Accounts, must refer to the specific Onshore Project Account name and number, and (iii) shall constitute a representation by the Borrower that all conditions set forth in this Accounts Agreement for such withdrawal have been satisfied.

(b)     Notwithstanding anything to the contrary in this Accounts Agreement (except in the case of its own gross negligence or willful misconduct on the part of the Onshore Accounts Bank), the Onshore Accounts Bank will be entitled to rely upon, and shall incur no liability and shall be fully protected in relying upon, any certificate, notice or other document (including any cable, telegram, telecopy or telex) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the Person or Persons purporting to issue such certificate, notice or other document, and upon advice and statement of legal counsel, independent accountants and other experts selected by the Onshore Accounts Bank with reasonable care. As to any matters not expressly provided for by this Accounts Agreement, the Onshore Accounts Bank will not be required to take any action or exercise any discretion. The Onshore Accounts Bank will have the right at any time to seek instructions from the Intercreditor Agent or the Onshore Collateral Agent concerning the administration of this Accounts Agreement and will, in all such cases, be fully protected in acting, or in refraining from acting, hereunder in accordance with the written instructions of the Intercreditor Agent or the Onshore Collateral Agent.

(c)     The Onshore Accounts Bank shall not be liable (i) with respect to any action taken or omitted to be taken by it in accordance with (A) the direction of the Onshore Collateral Agent or the Intercreditor Agent relating to the time, method and place of conducting any proceeding for any remedy available to the Onshore Collateral Agent or the Intercreditor Agent, or exercising any trust or power conferred upon the Onshore Collateral Agent or the Intercreditor Agent under this Accounts Agreement or (B) the instruction of the Borrower, including any Revenue Accounts Transfer/Withdrawal Instruction delivered to the Onshore Accounts Bank by the Borrower pursuant to Section 3.01(b) (_Delivery of a Revenue Accounts Transfer/Withdrawal Instruction_) prior to the effectiveness of any amendment to such Revenue Accounts Transfer/Withdrawal Instruction pursuant to Section 3.01(c) (_Delivery of a Revenue Accounts Transfer/Withdrawal Instruction_), or (ii) for any loss of profits, consequential, incidental, punitive, exemplary or indirect damages.

(d)     Except as provided in Section 10.06(b) (_Resignation or Removal of the Onshore Accounts Bank_), no provision of this Accounts Agreement shall require the Onshore Accounts

- 27 -

Bank to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

(e)    The Borrower shall (i) deliver to the Onshore Accounts Bank on or before the date hereof, an authority and incumbency certificate setting forth the names and specimen signatures of the Authorized Representatives authorized to provide directions to the Onshore Accounts Bank, and (ii) promptly provide any changes thereto from time to time thereafter. The Onshore Accounts Bank shall be entitled to rely conclusively on such certificate until it receives a certificate specifically stating that it is a superseding certificate.

Section 10.05  *Notice of Default*.  The Onshore Accounts Bank will be entitled to rely on any written notice it receives from any the Onshore Collateral Agent, the Intercreditor Agent or the Borrower stating that an Event of Default has occurred and is continuing. The Onshore Accounts Bank will not be deemed to have knowledge of an Event of Default unless and until it has received written notice (in compliance with this Accounts Agreement) thereof from the Intercreditor Agent, the Onshore Collateral Agent or the Borrower.

Section 10.06  *Resignation or Removal of the Onshore Accounts Bank*.  (a) Subject to the appointment and acceptance of a successor Onshore Accounts Bank as provided below, the Onshore Accounts Bank may resign at any time by giving at least sixty (60) days' prior written notice thereof to the Intercreditor Agent, the Onshore Collateral Agent and the Borrower. The Onshore Accounts Bank may be removed at any time with or without cause by the Onshore Collateral Agent (acting on the instructions of the Intercreditor Agent). Upon any such resignation or removal, the Onshore Collateral Agent will have the right and responsibility to appoint a successor Onshore Accounts Bank, which successor Onshore Accounts Bank shall (unless an Event of Default has occurred and is continuing) be reasonably acceptable to the Borrower. If no successor Onshore Accounts Bank has been appointed by the Onshore Collateral Agent (acting on the instructions of the Intercreditor Agent) and has accepted such appointment within sixty (60) days after the retiring Onshore Accounts Bank's giving of notice of resignation or the Onshore Collateral Agent's (acting on the instructions of the Intercreditor Agent) removal of the retiring Onshore Accounts Bank, then the retiring Onshore Accounts Bank or the Onshore Accounts Bank being removed, as the case may be, may apply to any court of competent jurisdiction to appoint a successor Onshore Accounts Bank to act until such time, if any, as a successor Onshore Accounts Bank is otherwise appointed in accordance with this Section 10.06, which court-appointed successor Onshore Accounts Bank shall be an Authorized Bank, operating in the Country, that has capital, surplus, and undistributed profits of at least one billion Dollars ($1,000,000,000) (or the equivalent thereof in Chilean Pesos). Until the appointment of a successor Onshore Accounts Bank by such court, the retiring or removed Onshore Accounts Bank shall continue to act as Onshore Accounts Bank pursuant to the terms of this Accounts Agreement and the Financing Documents. Any successor Onshore Accounts Bank appointed by such court shall immediately and without further act be superseded by any successor Onshore Accounts Bank appointed by the Onshore Collateral Agent in accordance with this Section 10.06. Upon its acceptance of appointment as Onshore Accounts Bank hereunder, (i) a successor Onshore Accounts Bank will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Onshore Accounts Bank and the retiring Onshore Accounts Bank will be discharged from its duties and obligations hereunder and each relevant Financing Document and (ii) the retiring Onshore Accounts Bank will promptly transfer

- 28 -

all of the Onshore Project Accounts to the possession or control of the successor Onshore Accounts Bank and will execute and deliver such notices, instructions and assignments as may be necessary or desirable to transfer the rights of the Onshore Accounts Bank with respect to the Onshore Project Accounts to the successor Onshore Accounts Bank. After the retiring Onshore Accounts Bank's resignation or removal hereunder as Onshore Accounts Bank, the provisions of this ARTICLE X and ARTICLE XI will continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Onshore Accounts Bank.

(b)    If the Onshore Accounts Bank resigns pursuant to Section 10.06(a), the retiring Onshore Accounts Bank shall, at its own cost and expense, make available to the successor Onshore Accounts Bank such records, documents and information in the retiring Onshore Accounts Bank's possession and provide such assistance as the successor Onshore Accounts Bank may reasonably request in connection with its appointment as successor Onshore Accounts Bank. For the avoidance of doubt, other than the costs and expenses set forth in the preceding sentence, all costs and expenses associated with the appointment of a successor Onshore Accounts Bank shall be for the account of the Borrower, in accordance with ARTICLE XI (*Expenses; Indemnification; Fees*).

Section 10.07 *Merger of the Onshore Accounts Bank*.  Any Succeeding Entity to the Onshore Accounts Bank shall automatically be deemed to be a successor Onshore Accounts Bank in accordance with Section 10.06 (*Resignation or Removal of the Onshore Accounts Bank*) if, and only if, such Succeeding Entity satisfies the requirements of an Authorized Bank.

Section 10.08 *No Right to Set-Off*.  The Onshore Accounts Bank acknowledges and agrees that it shall have no right of setoff with regard to funds in the Onshore Project Accounts and that the funds deposited in or credited to the Onshore Project Accounts will not be subject to deduction, set-off, banker's liens or any other right in favor of any person other than the Secured Parties. The Onshore Project Accounts or any financial asset or other property deposited therein or credited thereto shall be subject to deduction, set-off, banker's lien and recoupment to the extent of returned items and chargebacks either for uncollected checks or other items of payment and transfers previously credited to one or more Onshore Project Accounts, and each of the Onshore Collateral Agent, on behalf of and for the benefit of the Secured Parties, and the Borrower hereby expressly authorize the Onshore Accounts Bank to debit the relevant Onshore Project Account(s) for such amounts.

Section 10.09 *Subordination*.  In the event that the Onshore Accounts Bank has or subsequently obtains by operation of Applicable Law a right of recoupment or set-off or any Lien in any of the Onshore Project Accounts or any funds held in any Onshore Project Accounts, the Onshore Accounts Bank hereby agrees that such right of recoupment or set-off and/or any such security interest shall be subordinate to repayment in full of the Secured Obligations. The Onshore Accounts Bank agrees that it shall not assert or enforce any such right of recoupment or set-off and/or any security interest until all Secured Obligations have been paid in full other than any rights of the Onshore Accounts Bank with respect to deduction, set-off, banker's lien and recoupment to the extent (and only to the extent) of returned items and chargebacks either for uncollected checks or other items of payment and transfers previously credited to any such account, and each of the Onshore Collateral Agent, on behalf of and for the benefit of the

[AM_ACTIVE 403928122_2]

Secured Parties, and the Borrower hereby expressly authorize the Onshore Accounts Bank to debit any such account for such amounts..

# ARTICLE XI

## Expenses; Indemnification; Fees

Section 11.01 *Expenses*.  (a) The Borrower agrees to reimburse on demand all reasonable and documented out-of-pocket expenses of each of the Onshore Collateral Agent and the Onshore Accounts Bank (including the reasonable and documented costs and expenses of one legal counsel for each jurisdiction for each such party) in respect of the preparation, execution, delivery and performance of this Accounts Agreement, the administration and maintenance of the Onshore Project Accounts, the enforcement of any of the provisions of this Accounts Agreement, and any amendment, waiver or consent relating to this Accounts Agreement.

(b)    The Borrower will upon demand pay to each of the Onshore Collateral Agent and the Onshore Accounts Bank the amount of any and all reasonable and documented costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that the Onshore Collateral Agent or the Onshore Accounts Bank may incur in connection with (i) the administration of this Accounts Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Onshore Project Accounts, (iii) the processing of any waiver or amendment in connection with this Accounts Agreement, (iv) the exercise or enforcement of any of the rights of the Onshore Collateral Agent, the Intercreditor Agent, the Onshore Accounts Bank or the Secured Parties hereunder or (v) the failure by the Borrower to perform or observe any of the provisions hereof.

(c)    The reimbursement by the Borrower of costs and expenses of the Secured Parties in connection with this Accounts Agreement shall be determined in accordance with Section 2.08 (*Expenses*) of the Common Terms Agreement.

Section 11.02 *Indemnification*.    The Borrower agrees to pay, indemnify and hold harmless each of the Onshore Collateral Agent and the Onshore Accounts Bank and their respective Affiliates and their respective officers, directors, employees, agents and advisors, from and against any and all obligations, claims, damages, losses, penalties, suits, costs, liabilities (including any environmental liabilities) and expenses (including reasonable and documented attorney's fees and disbursements) that may at any time (including at any time following the payment of the Secured Debt) be imposed on, incurred by or asserted or awarded against any such indemnified party, in each case arising out of or in connection with or resulting from this Accounts Agreement, except (a) to the extent that such claim, damage, loss, liability or expense is caused by the indemnified party's gross negligence or willful misconduct, and (b) those costs and expenses that are expressly for the account of the Onshore Accounts Bank according to Section 10.06(b) (*Resignation or Removal of the Onshore Accounts Bank*). The foregoing indemnity in this Section 11.02 shall survive any resignation or removal of the Onshore Collateral Agent or the Onshore Accounts Bank.

Section 11.03 *Fees*.  The Borrower shall pay the Onshore Collateral Agent and the Onshore Accounts Bank, as the case may be, such fees as have been separately agreed to in

- 30 -

writing between the Borrower and each of the Onshore Collateral Agent and the Onshore Accounts Bank.

## ARTICLE XII

### Representations, Warranties and Covenants

Section 12.01 _Representations and Warranties of the Borrower_.    The Borrower represents and warrants as of the date of this Accounts Agreement that:

(a)    it is the legal owner of all the funds deposited in or credited to the Onshore Project Accounts described in Section 2.01 (_Establishment of the Onshore Project Accounts_) free and clear of any Lien, claim, encumbrance, option or right of others;

(b)    no authorization or approval or other action by, and no notice to or filing with, any Authority or any other third party is required for the exercise by the Onshore Collateral Agent or the Onshore Accounts Bank of their respective rights provided for in this Accounts Agreement;

(c)    this Accounts Agreement has been duly authorized and executed by all necessary action on its part and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting the enforcement of creditor's rights generally and by general equitable principles (whether considered in a proceeding in equity or at law);

(d)    neither the execution, delivery and performance of this Accounts Agreement nor the compliance with its terms will conflict with or result in breach of any of the terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which it is a party or by which it is bound, or violate, as applicable, any of the terms or provisions of its organizational documents or any Authorization or Applicable Law;

(e)    it has no bank accounts in the Country other than those accounts specified in Section 2.01 (_Establishment of the Onshore Project Accounts_); and

(f)    except for the rights of the Onshore Collateral Agent and the other Secured Parties granted hereunder or pursuant hereto or to the Financing Documents, it does not know of and has not received written notice of any right or claim to or interest in any of the Onshore Project Accounts by any Person other than the Borrower.

Section 12.02 _Representations and Warranties of the Onshore Accounts Bank_.    The Onshore Accounts Bank represents and warrants as of the date of this Accounts Agreement that:

(a)    (i) it is duly constituted, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, (ii) it is not insolvent or in liquidation or administration or subject to any other insolvency procedures, (iii) no receiver, manager, trustee, custodian or analogous officer has been appointed in respect of any part of its property,

- 31 -

undertaking or assets, and (iv) it has the appropriate power and authority to own its property and assets, to carry on its business as presently conducted and to enter into and perform its obligations under this Accounts Agreement;

(b)      this Accounts Agreement has been duly authorized and executed by all necessary action on its part and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, moratorium, insolvency or other similar laws affecting the enforcement of creditor's rights generally;

(c)      neither the execution, delivery and performance of this Accounts Agreement nor the compliance with its terms will conflict with or result in breach of any of the material terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which it is a party or by which it is bound, or violate, as applicable, any of the terms or provisions of its organizational documents or any Authorization or Applicable Law; and

(d)      it has not entered into any agreement with any other Person relating to the Onshore Project Accounts or funds deposited in or credited thereto pursuant to which it has agreed to comply with instructions of such Person. The Onshore Accounts Bank has not entered into any other agreement with the Borrower or any other Person purporting to limit or condition the obligation of the Onshore Accounts Bank to comply with instructions originated by the Onshore Collateral Agent, on behalf and for the benefit of the Secured Parties.

Section 12.03 *Representations and Warranties of the Onshore Collateral Agent*.   The Onshore Collateral Agent represents and warrants as of the date of this Accounts Agreement that:

(a)      (i) it is duly constituted, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, (ii) it is not insolvent or in liquidation or administration or subject to any other insolvency procedures, (iii) no receiver, manager, trustee, custodian or analogous officer has been appointed in respect of any part of its property, undertaking or assets, and (iv) it has the appropriate power and authority to own its property and assets, to carry on its business as presently conducted and to enter into and perform its obligations under this Accounts Agreement;

(b)      this Accounts Agreement has been duly authorized and executed by all necessary action on its part and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, moratorium, insolvency or other similar laws affecting the enforcement of creditor's rights generally; and

(c)      neither the execution, delivery and performance of this Accounts Agreement nor the compliance with its terms will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which it is a party or by which it is

- 32 -

bound, or violate, as applicable, any of the terms or provisions of its organizational documents or any Authorization or Applicable Law.

Section 12.04 *Covenants of the Onshore Accounts Bank*.  The Onshore Accounts Bank hereby covenants and agrees with the Onshore Collateral Agent, the Intercreditor Agent and the Borrower as follows:

(a)    if the Onshore Accounts Bank receives notice of any claim or interest in any Onshore Project Account or any property (including funds deposited in or credited to such Onshore Project Account) credited to any Onshore Project Account other than claims and interests of the Onshore Collateral Agent or the other Secured Parties, the Onshore Accounts Bank will promptly provide copy of such notice to the Borrower, the Intercreditor Agent and the Onshore Collateral Agent;

(b)    all property delivered to the Onshore Accounts Bank pursuant to this Accounts Agreement or the other Financing Documents will be held by the Onshore Accounts Bank and promptly deposited in or credited to an Onshore Project Account by an appropriate entry in its records in accordance with this Accounts Agreement;

(c)    within ten (10) Business Days after the end of the calendar month in which the first deposit is made into any Onshore Project Account and within ten (10) Business Days after the end of each calendar month thereafter, it shall deliver to the Borrower and the Intercreditor Agent a statement, with respect to the Onshore Project Accounts, setting forth in reasonable detail all deposits to and disbursements from each of the Onshore Project Accounts during such month, including the date on which such deposits and disbursements were made, and the balances of and any investments in each of the Onshore Project Accounts at the end of such month, including information regarding categories, amounts, maturities and issuers of Onshore Authorized Investments; provided that the requirements of this Section 12.04(c) may be performed by the Onshore Accounts Bank by granting Borrower and Intercreditor Agent on-line read only access to the Onshore Project Accounts;

(d)    within ten (10) Business Days after each Interest Payment Date, it shall deliver to the Borrower and the Intercreditor Agent a statement, with respect to the Onshore Project Accounts, setting forth in reasonable detail all deposits to and disbursements from each of the Onshore Project Accounts during the Interest Period ending on such Interest Payment Date, including the date on which such deposits and disbursements were made, and the balances of and any investments in each of the Onshore Project Accounts as of such Interest Payment Date, including information regarding categories, amounts, maturities and issuers of Onshore Authorized Investments; provided that the requirements of this Section 12.04(d) may be performed by the Onshore Accounts Bank by granting Borrower and Intercreditor Agent on-line read only access to the Onshore Project Accounts;

(e)    it shall maintain all such accounts, books and records as may be necessary to record all transactions carried out by it under this Accounts Agreement;

[AM_ACTIVE 403928122_2]

(f)      it will not enter into any agreement with any other Person relating to the Onshore Project Accounts or funds deposited in or credited thereto pursuant to which it will agree to comply with instructions of such Person; and

(g)      within five (5) Business Days after receipt of any written request by the Borrower, the Onshore Collateral Agent or the Intercreditor Agent, it will provide the Borrower, the Onshore Collateral Agent or the Intercreditor Agent, as applicable, such additional information regarding the Onshore Project Accounts and the balances of any Onshore Authorized Investments therein as any of them may reasonably request from time to time.

## ARTICLE XIII

### Miscellaneous

Section 13.01 *Amendments, Waivers and Consents*.  Neither this Accounts Agreement nor any of the terms of this Accounts Agreement may be amended, supplemented, waived, discharged or terminated unless such amendment, waiver, supplement, discharge or termination is in writing and signed by each of the parties to this Accounts Agreement.

Section 13.02 *Applicable Law and Jurisdiction*.  (a) This Accounts Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law).

(b)      For the exclusive benefit of each of the Secured Parties and the Onshore Collateral Agent, each of the Onshore Accounts Bank and the Borrower irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Accounts Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan. By the execution of this Accounts Agreement, each of the Onshore Accounts Bank and the Borrower irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding. Final judgment against the Onshore Accounts Bank and/or the Borrower in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)      Nothing in this Accounts Agreement shall affect the right of any Secured Party or the Onshore Collateral Agent to commence legal proceedings or otherwise sue the Onshore Accounts Bank and/or the Borrower in the Country, or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(d)      The Borrower hereby irrevocably designates, appoints and empowers Corporation Service Company, with offices currently located at 19 West 44th Street, Suite 200, New York, New York 10036, as its authorized agent solely to receive for and on its behalf service of any summons, complaint and other legal process in any action, suit or proceeding that the

[AM_ACTIVE 403928122_2]

Administrative Agent or the Onshore Collateral Agent may bring in the State of New York in respect of this Accounts Agreement.

(e)        As long as this Accounts Agreement remains in force, the Borrower shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding the Administrative Agent or the Onshore Collateral Agent may bring in New York, New York, U.S.A. with respect to this Accounts Agreement. The Borrower shall keep the Onshore Accounts Bank, the Onshore Collateral Agent and the Administrative Agent advised of the identity and location of such agent.

(f)        Each of the Onshore Accounts Bank and the Borrower irrevocably waives to the fullest extent permitted by Applicable Law:

(i)        any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 13.02;

(ii)        any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)        its right of removal of any matter commenced by the Onshore Accounts Bank, the Onshore Collateral Agent or the Administrative Agent in the courts of the State of New York to any court of the United States of America.

(g)        TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS ACCOUNTS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS ACCOUNTS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON.

(h)        To the extent that either of the Onshore Accounts Bank and/or the Borrower may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Accounts Agreement from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed), may be attributed to it or its assets, it irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(i)        To the extent that either of the Onshore Accounts Bank or the Borrower may, in any action, suit or proceeding brought in any of the courts referred to in Section 13.02(b) above or a court of the Country or elsewhere arising out of or in connection with this Accounts Agreement, be entitled to the benefit of any provision of law requiring the Onshore Collateral Agent, the Administrative Agent, the Onshore Accounts Bank or any other Secured Party in such action, suit or proceeding to post security for such Person's costs or to post a bond or to take similar action, each of the Onshore Accounts Bank and the Borrower hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of

- 35 -

New York, New York, U.S.A., the Country, or, as the case may be, the jurisdiction in which such court is located.

Section 13.03 *Counterparts*. This Accounts Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement. Delivery of a duly executed signature page of this Accounts Agreement by electronic mail in "Portable Document Format" ("PDF") or by facsimile transmission shall be considered effective delivery.

Section 13.04 *English Language*. All documents to be provided or communications to be given or made under this Accounts Agreement shall be in the English language. To the extent that the original version of any document to be provided, or communication to be given or made, to the Onshore Accounts Bank, the Onshore Collateral Agent or the Intercreditor Agent under this Accounts Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative of the Borrower to be a true and correct translation of the original. The parties hereto acknowledge that this Accounts Agreement was negotiated and executed in the English language. The Onshore Accounts Bank, the Onshore Collateral Agent or the Intercreditor Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 13.05 *Exculpatory Provisions*. Neither the Onshore Accounts Bank, the Onshore Collateral Agent or the Intercreditor Agent nor any of their respective officers, directors, employees, agents, representatives, attorneys-in-fact or Affiliates shall be liable to the Borrower for any action taken or omitted to be taken by it under or in connection with this Accounts Agreement, except for its own gross negligence or willful misconduct, or be responsible in any manner to any Person for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Accounts Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Onshore Accounts Bank, the Onshore Collateral Agent or the Intercreditor Agent under or in connection with, this Accounts Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Accounts Agreement or for any failure of the Borrower to perform any of its obligations under any Financing Document. None of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or any other Secured Party shall be under any obligation to any Person to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Accounts Agreement or to inspect the properties or records of the Borrower.

Section 13.06 *Secured Party Reliance*. Each of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent and the other Secured Parties shall be entitled to rely upon, shall incur no liability (except in the case of gross negligence or willful misconduct on its part), and shall be fully protected in relying upon, any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and

- 36 -

other experts selected by it. None of the Onshore Accounts Bank, the Onshore Collateral Agent or any other Secured Party shall have any obligation (except, in the case of the Onshore Accounts Bank and the Onshore Collateral Agent, as expressly set forth herein) to any Person to act or refrain from acting or exercising any of its rights under this Accounts Agreement.

Section 13.07   *Currency and Place of Payment*.   The provisions of Section 2.07(*Currency and Place of Payments*) of the Common Terms Agreement shall apply to this Accounts Agreement and to all payments to the Secured Parties, the Onshore Accounts Bank, the Intercreditor Agent and the Onshore Collateral Agent hereunder *mutatis mutandis*.

Section 13.08   *Notices*.   Any notice, request or other communication to be given or made under this Accounts Agreement shall be in writing and, unless otherwise specified herein, may be delivered by: (i) hand, airmail, facsimile, or established courier service to each party hereto at its respective address specified below or at such other address as it may notify the other parties hereto from time to time, and will be effective upon receipt; or (ii) email to each party hereto at its respective email address specified below or at such other email address as it may notify the other parties hereto from time to time, and will be effective upon electronic confirmation of receipt.

    For the Borrower:

        Alto Maipo SpA
        Los Conquistadores 1730, Piso 10
        Providencia Región Metropolitana, Chile
        Attention: General Manger
        Telephone: +56 2 3333 8301

    With a copy to:

        Alto Maipo SpA
        Los Conquistadores 1730, Piso 10
        Providencia Región Metropolitana, Chile
        Attention: Felix Gomez
        Email: felix.gomez@aes.com

    [For the Onshore Collateral Agent:][5]

        Itaú Corpbanca, as Onshore Collateral Agent
        Presidente Riesco 5537, piso 19
        Las Condes, Santiago, Chile
        Telephone: +56 2 2834 615

        Attention: Nicolás Gómez-Acebo I.
        Email: nicolas.gomezacebo@itau.cl

---

[5] **Note to Draft**: To be confirmed.

Attention: Pamela Chicao Soto
Email: pamela.chicao@itau.cl

[For the Onshore Accounts Bank:][6]

Itaú Corpbanca, as Onshore Accounts Bank
Presidente Riesco 5537, piso 19
Las Condes, Santiago
Chile
Telephone: +56 2 2834 6157
Attention: Nicolás Gómez-Acebo I.
Email: nicolas.gomezacebo@itau.cl

Attention: Pamela Chicao Soto
Email: pamela.chicao@itau.cl

[For the Intercreditor Agent:][7]

Itaú Corpbanca, as Intercreditor Agent
Presidente Riesco 5537, piso 19
Las Condes, Santiago, Chile
Telephone: +56 2 2834 615

Attention: Nicolás Gómez-Acebo I.
Email: nicolas.gomezacebo@itau.cl
Attention: Pamela Chicao Soto
Email: pamela.chicao@itau.cl

Section 13.09 *Payments Set Aside*.  To the extent that the Borrower or any other Person on behalf of the Borrower makes a payment or payments to the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or any other Secured Party, or the Onshore Collateral Agent or any Secured Party enforces any Security or exercises any right of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Secured Obligations or any part thereof originally intended to be satisfied, and this Accounts Agreement and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

---

[6] **Note to Draft**: To be confirmed.

[7] **Note to Draft**: To be confirmed.

[AM_ACTIVE 403928122_2]

Section 13.10 *Prior Statements*.  This Accounts Agreement and the other Financing Documents set forth the entire agreement relating to the subject matter hereof, and supersede all prior statements, agreements, and understandings, whether written or oral, relating hereto.

Section 13.11 *Rights Cumulative*.  The powers, rights, authorities, discretions and remedies of the Onshore Accounts Bank, the Onshore Collateral Agent and the Intercreditor Agent under this Accounts Agreement and the other Financing Documents are cumulative and do not exclude any other right, power, authority, discretion or remedy.

Section 13.12 *Saving of Rights*.  (a) The rights and remedies of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent and the other Secured Parties in relation to any misrepresentation or breach of warranty on the part of the Borrower shall not be prejudiced by any investigation by or on behalf of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent, any other Secured Party or any of the Participants into the affairs of the Borrower, by the execution or the performance of this Accounts Agreement or the other Financing Documents, or by any other act or thing that may be done by or on behalf of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent, any other Secured Party or any of the Participants, in connection with this Accounts Agreement or the other Financing Documents, and that might, apart from this Section 13.12, prejudice such rights or remedies.

(b)    The rights and remedies of the Secured Parties in relation to any misrepresentation or breach of warranty on the part of the Onshore Accounts Bank or the Onshore Collateral Agent, as the case may be, shall not be prejudiced by any investigation by or on behalf of any of the Participants or any other Secured Parties into the affairs of the Onshore Accounts Bank or the Onshore Collateral Agent, as applicable, by the execution or the performance of this Accounts Agreement or the other Financing Documents, or by any other act or thing that may be done by or on behalf of the Secured Parties in connection with this Accounts Agreement or the other Financing Documents, and that might, apart this Section 13.12, prejudice such rights or remedies.

(c)    No course of dealing or waiver and no failure or delay by the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or any other Secured Party in exercising, in whole or in part, any power, remedy, discretion, authority or other right under this Accounts Agreement, any other Financing Document or any other agreement shall waive or impair, or be construed to be a waiver of or an acquiescence in, such or any other power, remedy, discretion, authority or right under this Accounts Agreement, any other Financing Document or any other agreement, or in any manner preclude its additional or future exercise; nor shall the action of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or any other Secured Party with respect to any default, or any acquiescence by it therein, affect or impair any right, power or remedy of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or the Secured Parties with respect to any other default.

Section 13.13 *Severability*.  Should any clause, sentence, paragraph, subsection, or Section of this Accounts Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Accounts Agreement, and the parties hereto agree that the part or parts of this Accounts Agreement so held

- 39 -

to be invalid, unenforceable or void will be deemed to have been stricken here by the parties hereto, and the remainder will have the same force and effect as if such stricken part or parts had never been included herein.

Section 13.14 *Successors and Assignees*.  This Accounts Agreement binds and benefits the respective successors and permitted assignees of its parties. However, the Borrower may not assign or delegate any of its rights or obligations under this Accounts Agreement without the prior written consent of the Intercreditor Agent; the Onshore Collateral Agent may not assign or delegate any of its rights or obligations under this Accounts Agreement except pursuant to Section Two of Article Second of the Onshore Collateral Agency Agreement; and the Onshore Accounts Bank may not assign or delegate any of its rights or obligations under this Accounts Agreement except pursuant to Section 10.06(b) (*Resignation or Removal of the Onshore Accounts Bank*). The benefit of this Accounts Agreement may be freely and unconditionally assigned, transferred, or otherwise disposed of, in whole or in part, by the Intercreditor Agent to any Person, corporate or otherwise, that becomes a successor to the Intercreditor Agent pursuant to Section 12.7 (*Resignation and Removal of the Intercreditor Agent*) of the Intercreditor Agreement. Any such assignee of the Intercreditor Agent shall be deemed to be a party to this Accounts Agreement as such assignee Intercreditor Agent. Any purported assignment or disposition in violation of this Section 13.14 shall be void.

Section 13.15 *Third Party Rights*.  Except for the Secured Parties, any Person who is not a party to this Accounts Agreement shall have no right to enforce any term of this Accounts Agreement.

Section 13.16 *Survival*.  All representations, warranties and indemnities made herein shall survive the execution and delivery of this Accounts Agreement and repayment of the Secured Obligations, and shall be deemed to be material and to have been relied upon by the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent and the other Secured Parties, regardless of any investigation made by or on behalf of the Onshore Accounts Bank, the Onshore Collateral Agent, the Intercreditor Agent or any other Secured Party, as the case may be. Notwithstanding anything in this Accounts Agreement or implied by law to the contrary, the agreement and obligations of the Borrower set forth in Section 11.01 (*Expenses*) and Section 11.02 (*Indemnification*) and Section 13.07 (*Currency and Place of Payment*) shall survive the payment or prepayment of the Secured Obligations.

Section 13.17 *Termination of Accounts Agreement*.  This Accounts Agreement shall continue in force and shall terminate only upon the Release Date.

Section 13.18 *Force Majeure*.  The Onshore Accounts Bank and Onshore Collateral Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Onshore Accounts Bank and Onshore Collateral Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of any wire or communication facility); it being understood that the Onshore Accounts Bank and Onshore Collateral Agent shall use reasonable efforts which are consistent with accepted

practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.19 *Amendment and Restatement*.    This Accounts Agreement amends and restates the Second Amended and Restated Onshore Accounts Agreement in its entirety.

(*remainder of this page intentionally left blank*)

IN WITNESS WHEREOF, the parties, acting through their duly authorized representatives, have caused this Amended and Restated Onshore Accounts Agreement to be executed in their respective names as of the date first written above.

**ALTO MAIPO SpA**
as Borrower

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Onshore Accounts Agreement*]

**ITAÚ CORPBANCA,**
as Onshore Accounts Bank

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Onshore Accounts Agreement*]

**ITAÚ CORPBANCA,**
as Onshore Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Onshore Accounts Agreement*]

**ITAÚ CORPBANCA,**
as Intercreditor Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signature Page to Third Amended and Restated Onshore Accounts Agreement*]

<div align="right">Schedule 1
to Third Amended and Restated Onshore Accounts Agreement</div>

**FORM OF REVENUE ACCOUNTS TRANSFER/WITHDRAWAL INSTRUCTION**

<div align="center">

**Section 3.01(b)**

[LETTERHEAD OF THE BORROWER]

</div>

[Date]

To:   Itaú Corpbanca, as Onshore Accounts Bank
     Itaú Corpbanca, as Onshore Collateral Agent
     Itaú Corpbanca, as Administrative Agent
     Itaú Corpbanca, as Intercreditor Agent
     **Revenue Accounts Transfer/Withdrawal Instruction No. [_____]**

Ladies and Gentlemen:

Re:   Alto Maipo SpA

This Revenue Accounts Transfer/Withdrawal Instruction is provided pursuant to the Third Amended and Restated Onshore Accounts Agreement dated as of [_____], 2022 and entered into among Itaú Corpbanca, as Onshore Accounts Bank (the "Onshore Accounts Bank"), Itaú Corpbanca, as Onshore Collateral Agent (the "Onshore Collateral Agent"), Itaú Corpbanca, as Intercreditor Agent (the "Intercreditor Agent") and Alto Maipo SpA (the "Borrower") (the "Accounts Agreement"). Unless otherwise defined herein, all capitalized terms in this Revenue Accounts Transfer/Withdrawal Instruction shall have the meanings assigned to such terms in, or incorporated by reference into, the Accounts Agreement.

The Borrower hereby requests that the Onshore Accounts Bank disburse, deposit and/or transfer funds, as applicable, from the [Onshore Dollar Revenue Account (Account No. [_____]) [and] [the Onshore Peso Revenue Account (Account No. [_____]) on the Funding Date(s) during the Monthly Period from [_____, 20___] (inclusive) to [_____, 20___] (inclusive), and with respect to paragraphs (b), (c), (d), (g) and (j) below, for conversion of funds on the Forex Conversion Date(s) in the amounts and currencies specified in such paragraphs, in the following amounts and in the priority set forth in Section 4.02(a) (*Withdrawals from the Onshore Revenue Accounts*) of the Accounts Agreement:

[*Transfers and conversions from the Onshore Dollar Revenue Account:*]

(A)    Transfer from the Onshore Dollar Revenue Account into the Operating Dollar Account (*Section 4.02(a)(i)(A), Priority First*)

Amounts: up to [ ] Dollars

<div align="center">SCHEDULE 1 - 1</div>

All Funding Dates in the Monthly Period from [_____, 20__] (inclusive) to [_____, 20__] (inclusive).

    (B)    Conversion of Dollars from the Onshore Dollar Revenue Account into Chilean Pesos for transfer to the Operating Peso Account (*Section 4.02(a)(i)(D), Priority First*)

Amounts: up to [ ]

Forex Conversion Date(s):

    (C)    Conversion of Dollars from the Onshore Dollar Revenue Account into Chilean Pesos for transfer to the VAT Holding Account(Section 4.02(a)(ii)(B), Priority Second)

Amounts: up to [ ]

Forex Conversion Date(s):

    (D)    Conversion of Dollars from the Onshore Dollar Revenue Account into Chilean Pesos for transfer to the VAT Holding Account(Section 4.02(a)(iii)(B), Priority Third)

Amounts: up to [ ]

Forex Conversion Date(s):

    (E)    Transfer from the Onshore Dollar Revenue Account into the Offshore Revenue Account (Section 4.02(a)(iv)(x), Priority Fourth)

All amounts remaining on deposit in the Onshore Dollar Revenue Account after giving effect to the transfers/withdrawals set forth in paragraphs (A) through (D) above.

*[Transfers and conversions from the Onshore Peso Revenue Account:]*

    (F)    Transfer from the Onshore Peso Revenue Account into the Operating Peso Account (Section 4.02(a)(i)(B), Priority First)

Amounts: up to [ ] Chilean Pesos

All Funding Dates in the Monthly Period from [_____, 20__] (inclusive) to [_____, 20__] (inclusive).

    (G)    Conversion of Chilean Pesos from the Onshore Peso Revenue Account into Dollars for transfer to the Operating Dollar Account (Section 4.02(a)(i)(C), Priority First)

Amounts: up to [ ]

<div align="center">SCHEDULE 1 - 2</div>

Forex Conversion Date(s):

(H)    Transfer from the Onshore Peso Revenue Account into the VAT Holding Account(Section 4.02(a)(ii)(A), Priority Second)

Amounts: up to [ ] Chilean Pesos

All Funding Dates in the Monthly Period from [_____, 20__] (inclusive) to [_____, 20__] (inclusive).

(I)    Transfer from the Onshore Peso Revenue Account into the VAT Holding Account(Section 4.02(a)(iii)(A), Priority Third)

Amounts: up to [ ] Chilean Pesos

All Funding Dates in the Monthly Period from [_____, 20__] (inclusive) to [_____, 20__] (inclusive).

(J)    Conversion of Chilean Pesos from the Onshore Peso Revenue Account into Dollars for transfer to the Offshore Revenue Account (Section 4.02(a)(iv)(y), Priority Fourth)

All amounts remaining on deposit in the Onshore Peso Revenue Account after giving effect to the transfers/withdrawals set forth in paragraphs (F) through (I) above.]

In support of the disbursements, deposits and/or transfers requested by the Borrower in this Revenue Accounts Transfer/Withdrawal Instruction, the Borrower hereby represents and certifies to the Administrative Agent, the Onshore Collateral Agent and the Onshore Accounts Bank that:

1.    The Person signing on behalf of the Borrower is an Authorized Representative of the Borrower.

2.    No Notice of Suspension has been delivered to the Onshore Accounts Bank or, if a Notice of Suspension was previously delivered to the Onshore Accounts Bank such Notice of Suspension has been withdrawn, and no Event of Default will occur as a result of the disbursements, deposits, and/or transfers requested by the Borrower in this Revenue Accounts Transfer/Withdrawal Instruction.

3.    This proposed Revenue Accounts Transfer/Withdrawal Instruction is being delivered, and the disbursements, withdrawals and transfers specified herein are being requested in accordance with the terms of the Accounts Agreement.

4.    The Borrower has not requested in any prior Revenue Accounts Transfer/Withdrawal Instructions the withdrawal of amounts to pay the same

[AM_ACTIVE 403928122_2]

costs associated with the Project for which a withdrawal is being requested in this Revenue Accounts Transfer/Withdrawal Instruction.

5.     The amounts requested to be withdrawn from the Onshore Revenue Accounts to be deposited into the Operating Dollar Account and the Operating Peso Account are equal to the amounts necessary (x) to pay (i) any operating costs (other than any costs for which amounts have been reserved and any operating costs paid directly from the Offshore Project Accounts) not exceeding by more than ten percent (10%) in the aggregate the amount set forth for the applicable line item in the most-recently approved Annual Budget (when taken together with any other payments made with respect to such line item during the annual period to which such Annual Budget applies), (ii) any Designated Contract Payments (other than any Designated Contract Payments paid directly from the Offshore Project Accounts and any Deferred Intercompany Payments), (iii) any payments required to be made pursuant to instructions from the CDEC-SIC, (iv) any payments of Taxes (other than the VAT amount paid with the VAT Loan), in each case that are permitted to be paid pursuant to the Financing Documents and that are due and payable or that will become due and payable during the Monthly Period to which this Revenue Accounts Transfer/Withdrawal Instruction applies, and (v) payment of outstanding interest and principal amounts due under any working capital facility that constitutes Permitted Financial Debt to the extent (A) the amount requested for payment of such amounts pursuant to the relevant transfer instruction delivered by the Borrower in accordance with the Offshore Accounts Agreement is insufficient to cover the full amounts due and (B) such deficit arises solely due to foreign currency exchange rate fluctuations between the date of the applicable transfer instruction delivered by the Borrower and the requested date of such transfer and (y) to ensure that the amount standing to the credit of the Operating Accounts (less the amounts set forth in clause (x) above) is equal to the Retention Amount.

6.     The amounts required to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (c) and (h) above and transferred to the VAT Holding Account represent amounts necessary to pay any VAT Deficiency, and such amounts do not exceed the lessor of the (x) the applicable Actual VAT Netted Amount and (y) the Unpaid VAT Amount.

7.     The amounts required to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (C) and (H) above and transferred to the VAT Holding Account represent amounts necessary to pay any VAT Deficiency, and such amounts do not exceed the lessor of the (x) the applicable Actual VAT Netted Amount and (y) the Unpaid VAT Amount.

8.     The amounts required to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (d) and (i) above and transferred to the VAT Holding Account represent amounts necessary to ensure that the amount on deposit in the VAT Holding Account is equal to the lesser of (x) the Expected

[AM_ACTIVE 403928122_2]

VAT Netted Amount for the period prior to the next Form 29 or Form 2,117 and (y) the Unpaid VAT Amount.

9.      The amounts required to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (D) and (I) above and transferred to the VAT Holding Account represent amounts necessary to ensure that the amount on deposit in the VAT Holding Account is equal to the lesser of (x) the Expected VAT Netted Amount for the period prior to the next Form 29 or Form 2,117 and (y) the Unpaid VAT Amount.

10.      The amounts to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (e) and (j) above are all excess amounts on deposit or credited to the Onshore Revenue Accounts after giving effect to the transfer/withdrawals set forth in paragraphs (a), (b), (c), (d), (f), (g), (h) and (i) above, as applicable.

11.      The amounts to be withdrawn from the Onshore Revenue Accounts set forth in paragraphs (E) and (J) above are all excess amounts on deposit or credited to the Onshore Revenue Accounts after giving effect to the transfer/withdrawals set forth in paragraphs (A), (B), (C), (D), (F), (G), (H) and (I) above, as applicable.

SCHEDULE 1 - 5

IN WITNESS WHEREOF, the Borrower has caused this Revenue Accounts Transfer/Withdrawal Instruction to be executed by an Authorized Representative as of the day and year first above written.

**ALTO MAIPO SpA**
as Borrower

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

SCHEDULE 1 - 6

<div align="right">Schedule 2
to Second Amended and Restated Onshore Accounts Agreement</div>

## FORM OF VAT TRANSFER INSTRUCTIONS

### Section 4.04(a)

[LETTERHEAD OF THE BORROWER]

[Date]

To:    Itaú Corpbanca, as Onshore Accounts Bank
       Itaú Corpbanca, as Onshore Collateral Agent
       Itaú Corpbanca, as Administrative Agent
       Itaú Corpbanca, as Intercreditor Agent

**VAT Transfer Instructions No. [_____]**

Ladies and Gentlemen:

Re:    Alto Maipo SpA

These VAT Transfer Instructions are being provided pursuant to the Third Amended and Restated Onshore Accounts Agreement dated as of [____], 2022 and entered into among Itaú Corpbanca, as Onshore Accounts Bank (the "Onshore Accounts Bank"), Itaú Corpbanca, as Onshore Collateral Agent (the "Onshore Collateral Agent"), Itaú Corpbanca, as Intercreditor Agent (the "Intercreditor Agent") and Alto Maipo SpA (the "Borrower") (the "Accounts Agreement"). Unless otherwise defined herein, all capitalized terms in these VAT Transfer Instructions shall have the meanings assigned to such terms in, or incorporated by reference into, the Accounts Agreement.

The Borrower hereby requests that the Onshore Accounts Bank transfer funds from the VAT Holding Account(Account No. **[_____]**) on the date hereof in the following amounts:

Transfer from the VAT Holding Account[into the VAT Holding Account]/[to VAT Lenders]/[to Offshore Revenue Account]

Amounts: [   ] Chilean Pesos

The Borrower hereby requests that the Onshore Accounts Bank convert funds from the VAT Holding Account(Account No. **[_____]**)] in the following amounts and in the following currencies into the following accounts:

[Conversion of Chilean Pesos from VAT Holding Account into Dollars and Transfer into [USD VAT Lenders] [Offshore Revenue Account] / [Transfer Chilean Pesos to each UF VAT Lender]

<div align="center">SCHEDULE 2 - 1</div>

All excess amounts after giving effect to the transfer set forth in paragraph (a).

In support of the transfers requested by the Borrower in these VAT Transfer Instructions, the Borrower hereby represents and certifies to the Senior Lenders, the Onshore Collateral Agent and the Onshore Accounts Bank as follows:

The Person signing on behalf of the Borrower is an Authorized Representative of the Borrower.

No Notice of Suspension has been delivered to the Onshore Accounts Bank or, if a Notice of Suspension was previously delivered to the Onshore Accounts Bank such Notice of Suspension has been withdrawn, and no Potential Event of Default or Event of Default will occur as a result of the transfers requested by the Borrower in these VAT Transfer Instructions.

These proposed VAT Transfer Instructions are being delivered, and the disbursements, withdrawals and transfers specified herein are being requested in accordance with the terms of the Accounts Agreement.

The amounts requested to be withdrawn from the VAT Holding Accountto be deposited into the VAT Holding Accountrepresent the lesser of (a) the Unpaid VAT Advance Amount and (b) the Actual VAT Netted Amount as set forth in Form 29 or Form 2,117, as applicable, attached hereto as Exhibit A, which the Borrower has filed with the Chilean IRS.

The amounts to be withdrawn from the VAT Holding Accountset forth in paragraph (b) are all excess amounts on deposit or credited to the VAT Holding Accountafter giving effect to the transfer set forth in paragraph (a).

[AM_ACTIVE 403928122_2]

IN WITNESS WHEREOF, the Borrower has caused these VAT Transfer Instructions to be executed by an Authorized Representative as of the day and year first above written.

**ALTO MAIPO SpA**
as Borrower

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

SCHEDULE 2 - 3

EXHIBIT A

Form 29 or Form 2,117

[attached]

SCHEDULE 2 - 4

## **Exhibit J**

**Onshore Collateral Agency Agreement**

**REPERTORIO N° [•]**

**MODIFICACIÓN Y TEXTO REFUNDIDO**

**DE CONTRATO DE AGENCIA DE GARANTÍAS LOCAL[1]**

**U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**

**Y OTROS**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/ [•]**, en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en representación, según se acreditará, de **ITAÚ CORPBANCA**, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, rol único tributario número noventa y siete millones veintitrés mil guion nueve, del mismo domicilio de sus representantes /sucesor de Banco Itaú Chile y de Corpbanca, en adelante también en calidad de acreedor o contraparte de derivados, "**Itaú Corpbanca**" y en su calidad de agente de acreedores bajo los Documentos del Financiamiento, según dicho término se define más adelante, el "**Agente de Acreedores**", y actuando en su calidad de agente de garantías chileno, el "**Agente de Garantías Local**"/, entidad que a su vez comparece por sí y en representación en su calidad de Agente de Acreedores, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Acreedores, sin perjuicio del domicilio indicado para cada una de ellas: **/a/ CERBERUS GLOBAL NPL FUND, [•]**, con domicilio en [•] /en adelante "**Cerberus Global**"/; **/b/ CERBERUS FSBA Corporate, [•]**, con domicilio en [•] /en adelante "**Cerberus FSBA**"/; **/c/** [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; **/d/** [**FIDERA**] /en adelante "**Fidera**"/ **/e/** [**FINEPOINT**] /en adelante "**Finepoint**"/; **/f/** KfW IPEX-BANK GMBH, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraβe cinco guion nueve, seis cero tres dos cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; **/g/** [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; **/h/** [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; **/i/** [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; **/j/** [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; **/k/** [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; **/l/** [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; **/m/**

---

[1] Documento sujeto a revisión.

[**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; /**n**/ [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; /**o**/ [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; /**p**/ [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; /**q**/ [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF V**"/; /**r**/ [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; /**s**/ [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; /**t**/ **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /**u**/ **ITAÚ CORPBANCA, NEW YORK BRANCH** /antes, Corpbanca, New York Branch/, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca /en adelante "**Itaú NY**"; y /**v**/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /**Tres**/ [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES**, un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con las partes comparecientes anteriores distintas a Alto Maipo SpA, y aquellas partes que en el futuro se adhieran al Contrato de Agencia de Garantías Local /según se define más adelante/ como acreedores, las "**Partes Garantizadas**"/; todos los anteriores en adelante también conjuntamente denominados como las "**Partes**". Los comparecientes mayores de edad, quienes acreditan sus identidades con las cédulas indicadas y exponen:

**PRIMERO: ANTECEDENTES.** /**Uno**/ Mediante escritura pública de fecha nueve de diciembre de dos mil trece otorgada en la Notaría de Santiago de don José Musalem Saffie, bajo el repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se celebró el contrato denominado "Contrato de Agencia de Garantías", por el cual Corpbanca /hoy Itaú Corpbanca/ fue designado como agente de garantías, de conformidad con lo

establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, a fin de que represente a las Partes Garantizadas ahí establecidas /incluyendo aquéllas que en el futuro se adhieran a dicho contrato de agencia de garantías o los sucesores o cesionarios permitidos de éstas/, en la constitución, modificación o extinción y en el ejercicio mancomunado de los derechos que para ellos emanen de las garantías y resguardos a que se refiere dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Original**"/. El Contrato de Agencia de Garantías Local Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Los términos en mayúscula empleados en este contrato que no tengan asignado un significado específico en el mismo, tienen aquél que se les confiere en el Contrato de Agencia de Garantías Local Modificado y Refundido.

/**Dos**/ Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

[/**Tres**/ En relación con el Capítulo Once y en virtud de varios instrumentos de esta misma fecha, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los contratos, pagarés y reconocimientos de deuda en que constan las obligaciones garantizadas por las Garantías /según se define más adelante/, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas por las Garantías. Entre otras materias objeto de esta reestructuración, se acordó:

/i/ Modificar el Contrato de Crédito IDB Modificado y Refundido, el Contrato de Crédito OPIC Modificado y Refundido, el Contrato de Crédito Dos Mil Dieciocho, y el Contrato de Bancos Comerciales Modificado y Refundido, para efectos de que los términos y condiciones de los préstamos adeudados por el Deudor bajo dichos contratos de crédito sean regulados en un contrato de emisión de bonos /*indenture*/, en idioma inglés y regido por las leyes del Estado de Nueva York y en un contrato denominado [*Secured TwoL Loan Agreement and Accounts Payable*] suscrito por el Deudor en idioma inglés y regido por las leyes del Estado de Nueva York /; así como también otorgar el derecho a los acreedores del Secured TwoL Agreement para que todo o parte de sus créditos bajo dicho contrato puedan ser reestructurados en, o canjeados por, un bono emitido por el Deudor en los Estados Unidos de América; todo según lo establecido en los siguientes instrumentos:

/**a**/ un contrato en idioma inglés suscrito con esta misma fecha entre el Deudor, DFC y Strabag, entre otros, y regido por las leyes del Estado de Nueva York y denominado [*Secured TwoL Loan Agreement and Accounts Payable*] /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Agreement**"/; y

/**b**/ un contrato de emisión de bonos /*indenture*/ suscrito con esta misma fecha entre el Deudor y Wilmington Trust, National Association, en idioma inglés y regido por las leyes del

Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/.

/**ii**/ Modificar el Contrato de Términos Comunes Modificado y Refundido y establecer un nuevo texto modificado y refundido del mismo /en adelante dicho texto modificado y refundido, y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Términos Comunes**"/.

/**iii**/ Reflejar la reprogramación de parte de los préstamos adeudados bajo los diversos Documentos del Financiamiento, como parte del Secured TwoL Agreement bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado**".

/**iv**/ Reflejar la reprogramación o canje de los préstamos adeudados bajo los diversos Documentos del Financiamiento, según la asignación efectuada por cada acreedor, en bonos emitidos por el Deudor con cargo al Secured OneL Indenture y denominados "*Secured OneL Notes*" /en adelante los "**Bonos Preferentes**"/.

/**v**/ Reflejar la reprogramación o canje de parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, según la asignación efectuada por Strabag, en Bonos Preferentes.

/**vi**/ Considerar parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, como parte del Tramo Subordinado, de manera que los términos y condiciones de pago de dicha cuenta por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de Strabag en Bonos Subordinados /según dicho término se define más adelante/.

/**vii**/ Diferir el pago de los siguientes montos que sean adeudados a Strabag /*Strabag Construction Deferral* según dicho término se define en el Contrato de Términos Comunes/ de conformidad con el EPC Strabag /según se define más adelante/: /**uno**/ pago de un millón ciento cuarenta y un mil noventa y siete Dólares como consecuencia de las órdenes de cambio número uno, dos y cuatro bajo el EPC Strabag, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Change Order Deferral* según dicho término se define en el Contrato de Términos Comunes/; /**dos**/ pago de diez millones de Dólares por haber alcanzado la Terminación Sustancial del Hito F /*Substantial Completion of Milestone F* según dichos términos se definen en el EPC Strabag/, pago que se aplazará hasta que se pague el barrido de exceso de flujo de caja /*excess cash flow sweep*/ de acuerdo a las condiciones del Contrato de Términos Comunes ; y /**tres**/ pagos por los montos que sean efectivamente recibidos por el Deudor bajo su póliza de seguros de todo riesgo construcción /*Construction All Risks*/ contratada con Seguros Generales Suramericana S.A. y Chilena Consolidada S.A. en virtud de los reclamos uno uno ocho cuatro nueve cinco cero tres dos, uno uno nueve cuatro ocho ocho ocho ocho seis, uno nueve cuatro cuatro ocho cero uno cuatro y uno uno nueve cuatro cuatro ocho cero dos uno, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /conjuntamente, los "**Pagos Diferidos Strabag**"/.

/**viii**/ Considerar como parte del Tramo Subordinado, parte de las deudas del Deudor con cada uno de Itaú Corpbanca, BCI, DNB y KfW /conjuntamente las "**Contrapartes de Derivados**"/ producto de la terminación de los Contratos Requeridos de Derivados efectuada con fecha veintitrés de noviembre de dos mil veintiuno, de manera que los

términos y condiciones de pago de dichas cuentas por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de las Contrapartes de Derivados en Bonos Subordinados /según dicho término se define más adelante/.

/**ix**/ Contemplar la opción para los demás acreedores bajo el Tramo Subordinado, de canjear todo o parte de los créditos adeudados bajo el Tramo Subordinado, en bonos emitidos por el Deudor /denominados "*Secured TwoL Notes*", en adelante los "**Bonos Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y Wilmington Trust, National Association, en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**"/.

/**x**/ Que los VAT Lenders /según dicho término se define en el Contrato de Términos Comunes/ otorguen al Deudor una línea de crédito a corto plazo dividido en dos tramos, por un monto de hasta [•] Unidades de Fomento y por un monto de hasta [•] Dólares, para el financiamiento o refinanciamiento del impuesto al valor agregado asociado al "*Supplier Deferred Payment*" /según dicho termino se define en el Contrato de Términos Comunes/ que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis del decreto ley ochocientos veinticinco sobre impuestos a las ventas y servicios /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Crédito IVA**"/.

/**xi**/ Que AES Andes otorgue al Deudor una línea de crédito de capital de trabajo de hasta quince millones de Dólares con vencimiento el quince de enero de dos mil veinticuatro, a ser documentada en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Working Capital Facility*, en adelante y según sea modificado o modificado y refundido en el futuro, el "**Crédito de Capital de Trabajo**"/.

/**xii**/ Que AES Andes, Alto Maipo Delaware, LLC y el Deudor modifiquen, mediante una novación por cambio de deudor, los términos y condiciones del crédito súper-preferente otorgado por AES Andes a Alto Maipo Delaware, LLC durante el Capítulo Once por un capital de hasta cincuenta millones de Dólares /*DIP Financing Facility*/, de manera tal que el Deudor asuma la calidad de deudor bajo dicho financiamiento, conjuntamente con determinadas cuentas por cobrar que AES Andes irá devengando en contra del Deudor conforme a determinados contratos celebrados con el Deudor con fecha primero de julio de dos mil trece /específicamente, un Contrato de Operación y Mantenimiento /*O&M Agreement*/, un Contrato de Instalaciones Compartidas /*Technical Support and Services Agreement*/ y un Contrato de Conexión y Peajes /*Connection and Toll Agreement*//, se paguen por el Deudor de acuerdo con los términos y condiciones establecidos en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Secured Exit Loans*, en adelante y según sea modificado o modificado y refundido en el futuro, el "**Financiamiento de Salida**"/.

/**xiii**/ El eventual pago de los créditos del Tramo Subordinado que no se hayan extinguido a más tardar el quince de octubre del año dos mil cincuenta y dos, con acciones del Deudor, conforme a lo establecido en el Secured TwoL Agreement, en el Contrato de Conversión /según dicho término se define más adelante/ y según se establezca en el Secured TwoL Indenture, en caso de ser otorgado.

/**xiv**/ modificar y otorgar las Garantías, según corresponda, de manera tal que las obligaciones del Deudor bajo los Bonos Preferentes, el Tramo Subordinado, los Bonos Subordinados /una vez emitidos/, el Contrato de Crédito IVA, el Crédito de Capital de Trabajo y el Financiamiento de Salida, así como las obligaciones de AES Andes, entre otros a favor de los acreedores del Tramo Dos bajo el Contrato de Conversión, sean garantizadas por las Garantías en el mismo grado o prioridad actualmente existente, exceptuando aquellas Garantías que sean otorgadas exclusivamente en favor de los Acreedores de IVA y de los Acreedores bajo el Tramo Subordinado, y sin perjuicio de que el Agente de Garantías Local, para su ejecución y para distribuir los fondos derivados de esa ejecución, deberá observar las reglas establecidas en el Contrato entre Acreedores a que se refiere el Contrato de Agencia de Garantías Local contenido en este instrumento, en que se establecen las siguientes prioridades de pago entre las distintas clases de acreedores del Deudor y cuyos créditos se encuentran garantizados por las Garantías: /**a**/ primera prioridad para las obligaciones del Deudor bajo el Crédito de Capital de Trabajo y el Financiamiento de Salida, a prorrata y hasta su total satisfacción; /**b**/ segunda prioridad para las obligaciones del Deudor bajo los Bonos Preferentes, los Pagos Diferidos Strabag- y los Préstamos IVA, a prorrata y hasta su total satisfacción; y /**c**/ tercera prioridad para las obligaciones del Deudor bajo el Tramo Subordinado, los Bonos Subordinados y bajo el Contrato de Conversión, a prorrata y hasta su total satisfacción.

/**xv**/ Modificar los pagarés y reconocimientos de deuda suscritos por el Deudor, o que el Deudor suscriba nuevos pagarés o reconocimientos de deuda bajo ley chilena, para reflejar los términos y condiciones que les correspondan según el Secured TwoL Agreement.

/**xvi**/ La suscripción por parte del Deudor de reconocimientos de deuda bajo ley chilena a favor del representante de los tenedores de Bonos, para efectos de reflejar el monto total adeudado por el Deudor al momento de la emisión de los Bonos respectivos.][2]

/**Cuatro**/ Para efectos de dejar constancia de todo lo anterior, las Partes acuerdan modificar el Contrato de Agencia de Garantías Local Modificado y Refundido en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segunda siguiente /en adelante el "**Contrato de Agencia de Garantías Local**"/.

**SEGUNDO: <u>TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE AGENCIA DE GARANTÍAS LOCAL</u>.** Las Partes declaran que el texto del Contrato de Agencia de Garantías Local Modificado y Refundido, ha sido nuevamente modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación. Se deja constancia asimismo que el contrato así modificado y refundido contempla términos comunes aplicables a los contratos de garantía que el Deudor o cualquier tercero otorguen en favor del Agente de Garantías Local, actuando por cuenta y/o en nombre de las Partes Garantizadas /según dicho término se define más adelante/, las cuales serán incluidas por referencia a cada uno de dichos contratos de garantía, según se establezca en los mismos:

**"CONTRATO DE AGENCIA DE GARANTÍAS U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION Y OTROS A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

---

[2] Pendiente. Sujeto a revisión.

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós, ante mí, [•], comparecen: /Uno/ [•]**, en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en representación, según se acreditará, de **ITAÚ CORPBANCA**, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, rol único tributario número noventa y siete millones veintitrés mil guion nueve, del mismo domicilio de sus representantes /sucesor de Banco Itaú Chile y de Corpbanca, en adelante también en calidad de acreedor o contraparte de derivados, "**Itaú Corpbanca**" y en su calidad de agente de acreedores bajo los Documentos del Financiamiento, según dicho término se define más adelante, el "**Agente de Acreedores**", y actuando en su calidad de agente de garantías chileno, el "**Agente de Garantías Local**"/, entidad que a su vez comparece por sí y en representación en su calidad de Agente de Acreedores, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Acreedores, sin perjuicio del domicilio indicado para cada una de ellas: **/a/ CERBERUS GLOBAL NPL FUND,** [•], con domicilio en [•] /en adelante "**Cerberus Global**"/; **/b/ CERBERUS FSBA Corporate,** [•], con domicilio en [•] /en adelante "**Cerberus FSBA**"/; **/c/** [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; **/d/** [**FIDERA**] /en adelante "**Fidera**"/ **/e/** [**FINEPOINT**] /en adelante "**Finepoint**"/; **/f/ KfW IPEX-BANK GMBH**, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraße cinco guion nueve, seis cero tres dos cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; **/g/** [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; **/h/** [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; **/i/** [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; **/j/** [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; **/k/** [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; **/l/** [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; **/m/** [**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; **/n/** [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; **/o/** [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; **/p/** [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; **/q/** [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CV**"/; **/r/** [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; **/s/** [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; **/t/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; **/u/ ITAÚ CORPBANCA, NEW YORK BRANCH** /antes, Corpbanca, New York Branch/, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca /en adelante "**Itaú NY**"/; y **/v/ DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; **/Tres/** [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES,** un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; **/Cuatro/** [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA**

**S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con las partes comparecientes anteriores distintas a Alto Maipo SpA, y aquellas partes que en el futuro se adhieran como acreedores al contrato de agencia de garantías de que da cuenta este instrumento /en adelante el "**Contrato de Agencia de Garantías Local**"/, en adelante las "**Partes Garantizadas**"; todos los anteriores en adelante también conjuntamente denominados como las "**Partes**". Los comparecientes mayores de edad, quienes acreditan sus identidades con las cédulas indicadas y exponen:

<u>**CLÁUSULA PRIMERA**</u>: ANTECEDENTES.

/**Uno**/ **Texto Modificado y Refundido.** Se deja constancia que el presente Contrato de Agencia de Garantías Local, es un texto modificado y refundido del contrato de agencia de garantías celebrado mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, considerando sus modificaciones posteriores, incluyendo aquella que estableció su texto refundido anterior, que consta en la escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, repertorio número tres mil novecientos sesenta y ocho /el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/.

/**Dos**/ **Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río

Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. Desde el catorce de abril de dos mil veintidós, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Tres/ Procedimiento de Reestructuración de Pasivos del Deudor.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC, filial del Deudor, iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**[/Cuatro/ Contratos de Crédito y Cuentas por Cobrar, Contratos de Emisión de Bonos, Contrato de Conversión, Contrato de Términos Comunes, Contratos Requeridos de Derivados, EPC Strabag, Contrato de Pago Diferido del Proveedor, Contrato de Crédito IVA, Crédito de Capital de Trabajo y Financiamiento de Salida.**

Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió, entre otros, los contratos de financiamiento y otros contratos que se describen a continuación, los cuales han sido modificados y refundidos o bien reemplazados o complementados con nuevos contratos como parte del Capítulo Once, como se establece a continuación:

**/i/ Contrato de Crédito IDB. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Inter-American Development Bank /en adelante, "**IDB**"/, suscribieron un contrato de crédito en idioma inglés denominado *IDB Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y cuatro guion dos mil trece /el "**Contrato de Crédito IDB Original**"/. **/B/** El Contrato de Crédito IDB Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y dos guion dos mil diecisiete /el "**Contrato de Crédito IDB**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, suscribieron el contrato en idioma inglés denominado *Second Amended and Restated Loan Agreement*, en virtud del cual el Contrato de Crédito IDB fue nuevamente

modificado y refundido /en adelante, el "**Contrato de Crédito IDB Modificado y Refundido**"/. Una copia del Contrato de Crédito IDB Modificado y Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y uno guion dos mil dieciocho. **/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor y algunos de sus acreedores, denominado *Secured TwoL Loan and Accounts Payable Agreement* /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Agreement**"/, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor bajo el Contrato de Crédito IDB Modificado y Refundido que no hayan sido reestructurados en, o canjeados por, Bonos /según dicho término se define más adelante/, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado IDB**"/. Una copia del Secured TwoL Agreement fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. **/E/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, con fecha [•] de dos mil veintidós, el Deudor y Wilmington Trust, National Association, suscribieron un contrato de emisión de bonos en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Indenture*" /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/, en virtud del cual el Deudor emitió bonos /en adelante los "**Bonos Preferentes**"/, para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito IDB Modificado y Refundido que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo el Contrato de Crédito IDB Modificado y Refundido. Una copia del Secured OneL Indenture fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. **/F/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Secured TwoL Agreement contempla la opción para los acreedores bajo el Secured TwoL Agreement, incluyendo los acreedores del Tramo Subordinado IDB, de canjear todo o parte de sus créditos por bonos emitidos por el Deudor /denominados "*Secured TwoL Notes*", en adelante los "**Bonos Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y Wilmington Trust, National Association, en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**" y junto con el Secured OneL Indenture, los "**Indentures**"/, según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los préstamos desembolsados inicialmente por IDB y cedidos posteriormente a Cerberus Global y Cerberus FSBA, incluyendo sus capitalizaciones de intereses, se documentaron en pagarés regidos por ley chilena suscritos por el Deudor a la orden de IDB, los cuales, con sus correspondientes modificaciones mediante hojas de prolongación, fueron endosados en dominio a Cerberus Global y Cerberus FSBA, en adelante los "**Pagarés Emitidos Cerberus**". Copias simples de los documentos que constituyen los Pagarés Emitidos Cerberus han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio. /**H**/ Los montos adeudados bajo el Tramo Subordinado IDB a Cerberus Global y Cerberus FSBA, o sus sucesores o cesionarios, que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Cerberus**" y conjuntamente con los Pagarés Emitidos Cerberus, los "**Pagarés Cerberus**".

**/ii/ Contrato de Crédito DFC. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Overseas Private Investment Corporation o/"**OPIC**", hoy denominada U.S. International Development Finance Corporation o "**DFC**"/, suscribieron un contrato de crédito en idioma inglés denominado *OPIC Finance Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y cinco guion dos mil trece /el "**Contrato de Crédito OPIC Original**"/. **/B/** El Contrato de Crédito OPIC Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated OPIC Finance Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y tres guion dos mil diecisiete /el "**Contrato de Crédito OPIC**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con OPIC, suscribieron un contrato de crédito en idioma inglés denominado *Second Amended and Restated OPIC Finance Agreement*, en virtud del cual el Contrato de Crédito OPIC fue nuevamente modificado y refundido /en adelante, el Contrato de Crédito OPIC, modificado y refundido en el *Second Amended and Restated OPIC Finance Agreement*, el "**Contrato de Crédito OPIC Modificado y Refundido**"/. Una copia del Contrato de Crédito OPIC Modificado y Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y dos guion dos mil dieciocho. **/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor a DFC bajo el Contrato de Crédito OPIC Modificado y Refundido que no fueren reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de acuerdo con los términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado DFC**"/. **/E/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito OPIC Modificado y Refundido que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos conforme al Contrato de Crédito OPIC Modificado y Refundido. **/F/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado DFC que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados según lo decida el acreedor respectivo conforme al Secured TwoL Agreement. **/G/** Los préstamos desembolsados por DFC, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden de DFC, con sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor, respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos DFC**"/. **/H/** Los montos adeudados bajo el Tramo Subordinado DFC, a los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés

regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir DFC**" y conjuntamente con los Pagarés y Reconocimientos Emitidos DFC, los "**Pagarés y Reconocimientos DFC**".

**/iii/ Contrato de Crédito Dos Mil Dieciocho. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con International Finance Corporation, una organización internacional establecida mediante Convenio Constitutivo entre sus Estados miembros, incluyendo a la República de Chile /en adelante "**IFC**"/, suscribieron un contrato de crédito en idioma inglés denominado *Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y seis guion dos mil trece /el "**Contrato de Crédito IFC Original**"/. **/B/** El Contrato de Crédito IFC Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y cuatro guion dos mil diecisiete /en adelante el "**Contrato de Crédito IFC**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, IFC cedió y transfirió a Deutsche Bank AG, London Branch /"**DB Londres**"/, la totalidad de los créditos de que era titular en contra del Deudor bajo el Contrato de Crédito IFC y los demás Documentos del Financiamiento /según dicho término se definió en dicho documento/ de que era parte, dejando en consecuencia IFC de ser acreedor del Deudor bajo el Contrato de Crédito IFC y de los demás Documentos del Financiamiento ahí referidos, pasando DB Londres, a ser parte, en calidad de acreedor, de los Documentos del Financiamiento señalados. A su vez, el Contrato de Crédito IFC fue reemplazado con el Contrato de Crédito Dos Mil Dieciocho /según dicho término se define más adelante/. **/D/** Atendida la cesión y transferencia a DB Londres de la totalidad de los créditos de que era titular IFC en contra del Deudor bajo el Contrato de Crédito IFC y los demás Documentos del Financiamiento de que era parte, IFC endosó en dominio a favor de DB Londres con fecha ocho de mayo de dos mil dieciocho la totalidad de los pagarés que habían sido emitidos por el Deudor a la orden de IFC, los cuales a su vez fueron modificados por hojas de prolongación otorgadas en la misma fecha. **/E/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DB Londres, Santana y Itaú NY /este último en calidad de agente de pagos/, suscribieron un contrato de crédito en idioma inglés denominado *Dos Mil Dieciocho Loan Agreement* /el "**Contrato de Crédito Dos Mil Dieciocho**"/. Una copia del Contrato de Crédito Dos Mil Dieciocho fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y cuatro guion dos mil dieciocho. En virtud del Contrato de Crédito Dos Mil Dieciocho, los créditos cedidos por IFC a DB Londres más la porción de esos créditos cedida por este último a Larraín Vial Servicios Profesionales Limitada y por éste a Santana, fueron reprogramados en los términos y condiciones establecidos en el Contrato de Crédito Dos Mil Dieciocho. **/F/** Como parte del acuerdo adoptado por los acreedores del Deudor y éste último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor bajo el Contrato de Crédito Dos Mil Dieciocho que no fueron reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de

acuerdo con los términos del Secured TwoL Agreement , bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Dos Mil Dieciocho**"/. **/G/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Tramo Preferente Dos Mil Dieciocho que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de los préstamos existentes y adeudados bajo el Contrato de Crédito Dos Mil Dieciocho. **/H/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Dos Mil Dieciocho que opten por reestructurar en, o canjear por, Bonos Subordinados, todo o parte de sus créditos conforme al Secured TwoL Agreement según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. **/I/** Los préstamos desembolsados con cargo al Contrato de Crédito Dos Mil Dieciocho, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden del respectivo acreedor o su cesionario, y sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor, respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos Dos Mil Dieciocho**"/. **/J/** Los montos adeudados bajo el Tramo Subordinado Dos Mil Dieciocho, que los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Dos Mil Dieciocho**" y conjuntamente con los Pagarés y Reconocimientos Emitidos Dos Mil Dieciocho, los "**Pagarés y Reconocimientos Dos Mil Dieciocho**".

**/iv/ Contrato de Crédito Bancos Comerciales. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Banco de Crédito e Inversiones S.A., Miami Branch, Banco del Estado de Chile, New York Branch, Banco Itaú Chile /hoy Itaú Corpbanca/, Corpbanca, New York Branch /hoy Itaú Corpbanca, New York Branch/, DNB y KfW, suscribieron un contrato de crédito en idioma inglés denominado *Commercial Banks Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y ocho guion dos mil trece /el "**Contrato Bancos Comerciales Original**"/. **/B/** El Contrato Bancos Comerciales Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y cinco guion dos mil diecisiete /en adelante, el "**Contrato de Crédito Bancos Comerciales**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB e Itaú Corpbanca, entre otros, suscribieron un contrato de crédito en idioma inglés denominado *Second Amended and Restated Loan Agreement*, en virtud del cual el Contrato de Crédito Bancos Comerciales fue nuevamente modificado y refundido /en adelante, el Contrato de Crédito Bancos Comerciales, modificado y refundido en el *Second Amended and Restated Loan Agreement*, se denomina el "**Contrato de Crédito Bancos Comerciales Modificado y Refundido**"/. Una copia del Contrato de Crédito Bancos Comerciales Modificado y

Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y tres guion dos mil dieciocho. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados bajo el Contrato de Crédito Bancos Comerciales Modificado y Refundido que no fueron reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de acuerdo con los términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Bancos Comerciales**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito Bancos Comerciales Modificado y Refundido, que optaron por reestructurar en, o canjear por, Bonos Preferentes,  parte de sus créditos conforme al Contrato de Crédito Bancos Comerciales Modificado y Refundido. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Bancos Comerciales que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los préstamos desembolsados con cargo al Contrato de Crédito Bancos Comerciales Modificado y Refundido, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden del respectivo acreedor o su cesionario, y sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor, respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos Bancos Comerciales**"/. /**H**/ Los montos adeudados bajo el Tramo Subordinado Bancos Comerciales, a los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Bancos Comerciales**" y conjuntamente con los Pagarés y Reconocimientos Emitidos Bancos Comerciales, los "**Pagarés y Reconocimientos Bancos Comerciales**".

/**v**/ **Contrato de Carta de Crédito.** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB, suscribieron un contrato de crédito en idioma inglés denominado *Letter of Credit Facility Agreement*, el cual fue modificado y refundido por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Amended and Restated Letter of Credit Facility Agreement* /en adelante dicho contrato, el "**Contrato de Carta de Crédito**". Una copia del Contrato de Carta de Crédito se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y siete guion dos mil trece. El Contrato de Carta de Crédito fue terminado por las partes del mismo con fecha veinticuatro de marzo de dos mil veintiuno.

/**vi**/ **Contratos Requeridos de Derivados.** /**A**/ En virtud del Contrato de Términos Comunes Original, el Deudor se obligó a celebrar uno o más Contratos Requeridos de Derivados /"*Required Hedging Agreements*", según este término se define en el Contrato de Términos

Comunes Original/, con el objeto de contar con una cobertura de riesgo /i/ ante fluctuaciones de las tasas de interés por los períodos señalados en el Contrato de Términos Comunes Original; y /ii/ ante eventuales fluctuaciones de la Unidad de Fomento de Chile contra el Dólar. Por tanto, el Deudor celebró con fecha nueve de diciembre de dos mil trece con Corpbanca Chile /hoy Itaú Corpbanca/, BCI, Banco Itaú /hoy Itaú Corpbanca/ y KfW /conjuntamente, las "**Contrapartes de Derivados**"/, los siguientes contratos de derivados suscritos en idioma inglés, sujetos a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante los ISDA Dos Mil Dos Master Agreements y sus respectivos anexos /*schedules*/ que se señalan a continuación, se denominan conjuntamente como los "**Master Agreements ISDA Dos Mil Dos Celebrados**"/: /i/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y Corpbanca Chile /hoy Itaú Corpbanca/ y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y nueve guion dos mil trece; /ii/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y BCI, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta guion dos mil trece; /iii/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y Banco Itaú /hoy Itaú Corpbanca/, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y uno guion dos mil trece; /iv/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y KfW, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y dos guion dos mil trece; y /v/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y DNB, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y tres guion dos mil trece. Con anterioridad a esta fecha se suscribieron una serie de confirmaciones /*Confirmations*/ en relación a los Master Agreements ISDA Dos Mil Dos Celebrados antes señalados /en adelante cada una de ellas una "**Confirmación**"/. /B/ Posteriormente, por instrumentos privados de fecha diecisiete de marzo de dos mil diecisiete, /i/ el Deudor junto con Itaú Corpbanca, suscribieron dos modificaciones de las Confirmaciones suscritas entre Banco Itaú Chile /hoy Itaú Corpbanca/ y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes; /ii/ el Deudor junto con Itaú Corpbanca, suscribieron dos modificaciones de las Confirmaciones suscritas entre Corpbanca /hoy Itaú Corpbanca/ y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes; y /iii/ el Deudor junto con BCI, suscribieron dos modificaciones y textos refundidos de las Confirmaciones suscritas entre BCI y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes. Copias de los documentos en que constan las referidas modificaciones a las Confirmaciones de fecha diecisiete de marzo de dos mil diecisiete fueron protocolizados con dicha fecha en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento noventa y uno guion dos mil diecisiete. En adelante los Master Agreements ISDA Dos Mil Dos Celebrados y sus correspondientes Confirmaciones, se denominan en adelante, los

"**Contratos de Derivados**". /**C**/ Como consecuencia del Capítulo Once, los Contratos de Derivados fueron terminados con fecha veintitrés de noviembre de dos mil veintiuno, y el monto adeudado a las Contrapartes de Derivados bajo los Contratos de Derivados se estableció en la cantidad total de [●] Dólares /en adelante, la "**Cuenta por Cobrar por Derivados**"/. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de la Cuenta por Cobrar por Derivados que no fue reestructurada en, o canjeada por, Bonos Preferentes, para ser pagada de acuerdo con los términos del Secured TwoL Agreement bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Derivados**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a las Contrapartes de Derivados que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo la Cuenta por Cobrar por Derivados,. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Derivados, incluyendo las Contrapartes de Derivados, que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los montos adeudados a las Contrapartes de Derivados que opten por no reestructurar en, o canjear por, Bonos Subordinados, todo o parte de su Cuenta por Cobrar Derivados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Derivados**".

/**vii**/ **EPC Strabag, Contrato de Pago Diferido del Proveedor y Pagos Diferidos Strabag.** /**A**/ Para efectos de llevar adelante la construcción de las obras del Proyecto, el Deudor y Strabag celebraron un contrato en idioma inglés denominado "*Tunnel Complex Construction Contract*" /Contrato de Construcción de un Complejo de Túneles/, de fecha once de octubre de dos mil doce, el cual fue modificado por instrumento privado en idioma inglés denominado "*Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract*" /Modificación y Texto Refundido del Contrato de Construcción a Suma Alzada de un Complejo de Túneles/ de fecha diecinueve de febrero de dos mil dieciocho, sujeto a las leyes del Estado de Nueva York, y que fue a su vez modificado por instrumento privado en idioma inglés y sujeto a las leyes del Estado de Nueva York, de fecha ocho de mayo de dos mil dieciocho /en adelante conjuntamente el "**EPC Strabag**"/. /**B**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor y Strabag, suscribieron un contrato en idioma inglés denominado "*Supplier Deferred Payment Agreement*" /en adelante el "**Contrato de Pago Diferido del Proveedor**"/, en virtud del cual Strabag y el Deudor acordaron los términos y plazos de pago de ciertas sumas de dinero originadas en las obras de construcción ejecutadas bajo el EPC Strabag /la "**Cuenta por Cobrar EPC**". /**C**/ Como parte del acuerdo adoptado por Strabag, los acreedores del Deudor y este último dentro del Capítulo Once, /**i**/ el EPC Strabag fue nuevamente modificado mediante instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York /según sea modificado, complementado o refundido en el futuro, el "**EPC Strabag Modificado**"/ y /**ii**/ se modificó el Contrato de Pago Diferido del Proveedor para que la Cuenta por Cobrar EPC pueda ser pagada de acuerdo con los términos del Secured TwoL Agreement, el Secured OneL Indenture y eventualmente, el Secured TwoL Indenture. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los créditos bajo la Cuenta por Cobrar EPC, para ser pagada de acuerdo con los

términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante, el "**Tramo Subordinado Strabag**" y, conjuntamente con el Tramo Subordinado IDB, el Tramo Subordinado DFC, el Tramo Subordinado Dos Mil Dieciocho, el Tramo Subordinado Bancos Comerciales y el Tramo Subordinado Derivados, el "**Tramo Subordinado**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once el Deudor emitió Bonos Preferentes para ser entregados a Strabag como acreedor de la Cuenta por Cobrar EPC, según la opción ejercida por Strabag de reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo la Cuenta por Cobrar EPC. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Strabag que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los montos adeudados a los acreedores del Tramo Subordinado Strabag que opten por no reestructurar en, o canjear por, Bonos Subordinados, todo o parte de su Cuenta por Cobrar EPC, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés Strabag**". /**H**/ Adicionalmente, como parte de los acuerdos adoptados en el Capítulo Once, se acordó diferir el pago de los siguientes montos que sean adeudados a Strabag de conformidad con el EPC Strabag /según se define más adelante/: /**uno**/ pago de un millón ciento cuarenta y un mil noventa y siete Dólares como consecuencia de las órdenes de cambio número uno, dos y cuatro bajo el EPC Strabag el cual se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Change Order Deferral* según dicho término se define en el Contrato de Términos Comunes/; /**dos**/ pago de diez millones de Dólares por haber alcanzado la Terminación Sustancial del Hito F /*Substantial Completion of* Milestone F según dichos términos se definen en el EPC Strabag/ que se aplazará hasta que se pague el [exceso de flujo de caja] /[*excess cash flow sweep*]/ de acuerdo a las condiciones del Contrato de Términos Comunes /*Strabag Construction Deferral* según dicho término se define en el Contrato de Términos Comunes/; y /**tres**/ pagos por los montos que sean efectivamente recibidos por el Deudor bajo su póliza de seguros de todo riesgo construcción /*Construction All Risks*/ contratada con Seguros Generales Suramericana S.A. y Chilena Consolidada S.A. en virtud de los reclamos uno uno ocho cuatro nueve cinco cero tres dos, uno uno nueve cuatro ocho ocho ocho ocho seis, uno nueve cuatro cuatro ocho cero uno cuatro y uno uno nueve cuatro cuatro cero cero cero dos uno el cual se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Insurance Deferral* según dicho término se define en el Contrato de Términos Comunes y conjuntamente, los "**Pagos Diferidos Strabag**"/.

/**viii**/ **Contrato de Términos Comunes.** /**A**/ Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, IFC, OPIC, DNB y KfW, entre otros, suscribieron un contrato en idioma inglés denominado *Common Terms Agreement* /el "**Contrato de Términos Comunes Original**"/. /**B**/ El Contrato de Términos Comunes Original fue modificado con fecha diecinueve de diciembre de dos mil catorce, y adicionalmente fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Common Terms Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante el "**Contrato de Términos Comunes Dos Mil Diecisiete**"/. /**C**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, IFC, OPIC y DNB, entre

otros, suscribieron un contrato en idioma inglés denominado *Second Amended and Restated Common Terms Agreement*, en virtud del cual el Contrato de Términos Comunes Dos Mil Diecisiete fue nuevamente modificado y refundido /en adelante, el Contrato de Términos Comunes, modificado y refundido en el *Second Amended and Restated Common Terms Agreement*, se denomina el "**Contrato de Términos Comunes Modificado y Refundido**"/. /D/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Third Amended and Restated Common Terms Agreement*, se modificó el Contrato de Términos Comunes Modificado y Refundido /en adelante el Contrato de Términos Comunes Modificado y Refundido modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato de Términos Comunes**"/. Una copia del Contrato de Términos Comunes fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. El Contrato de Términos Comunes contiene las reglas comunes aplicables al Secured TwoL Agreement, razón por la cual los términos y condiciones del Secured TwoL Agreement deben entenderse, para todos los efectos a que haya lugar, complementados por los términos y condiciones del Contrato de Términos Comunes. El Secured Two LAgreement, conjuntamente con el Contrato de Términos Comunes, contemplan entre otras materias, la obligación del Deudor de pagar los préstamos y cuentas por cobrar de que dan cuenta los mismos en Dólares, las causales de pago anticipado obligatorio de cada préstamo y cuenta por cobrar, las condiciones para efectuar pagos anticipados voluntarios, la tasa de interés, los períodos de pago de intereses, las fechas de pago de capital e intereses y reglas relativas a capitalizaciones de intereses. El Secured TwoLAgreement, conjuntamente con el Contrato de Términos Comunes, contemplan, además, el pago de intereses penales sobre montos adeudados e insolutos o morosos, el pago de comisiones, impuestos, gastos, honorarios, costas y otras sumas y, asimismo, regulan las obligaciones de hacer y de no hacer, los eventos que motivarán prepagos obligatorios y los casos de incumplimiento que, de ocurrir, sujeto a los términos y condiciones de tales instrumentos, permitirán a cada uno de los acreedores declarar todo o parte del saldo adeudado de los préstamos y cuentas por cobrar, o cualquier otra obligación, como de plazo vencido e inmediatamente exigibles.

**/ix/ Crédito de Capital de Trabajo**[3]. Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Working Capital Facility Agreement*", celebrado entre AES Andes, y el Deudor, en virtud del cual AES Andes otorgó al Deudor una línea de crédito de capital de trabajo de hasta quince millones de Dólares con vencimiento el quince de enero de dos mil veinticuatro /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Crédito de Capital de Trabajo**"/. Una copia del Crédito de Capital de Trabajo fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**/x/ Financiamiento de Salida**[4]. Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Secured Exit Loan Agreement*", celebrado entre AES

---

[3] Sujeto a revisiones adicionales.
[4] Sujeto a revisiones adicionales.

Andes, el Deudor y Alto Maipo Delaware LLC /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Financiamiento de Salida**"/, las partes novaron y modificaron los términos y condiciones del crédito súper preferente otorgado por AES Andes a Alto Maipo Delaware LLC durante el Capítulo Once por hasta cincuenta millones de Dólares /el "**Financiamiento DIP**"/, constituyendo al Deudor como deudor bajo el mismo, postergando su fecha de vencimiento en tres años y estableciendo un nuevo calendario de amortización y nueva tasa de interés, entre otras materias, y contemplando la capitalización de ciertos intereses y reflejando como parte del monto de capital adeudado, determinadas cuentas por cobrar adeudadas por el Deudor a AES Andes conforme a determinados contratos celebrados con el Deudor con fecha primero de julio de dos mil trece /específicamente, un Contrato de Operación y Mantenimiento /*O&M Agreement*/, un Contrato de Instalaciones Compartidas /*Technical Support and Services Agreement*/ y un Contrato de Conexión y Peajes /*Connection and Toll Agreement*//. Una copia del Financiamiento de Salida fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. Adicionalmente, la transición del Financiamiento DIP al Financiamiento de Salida fue documentada mediante una novación por cambio de deudor que consta en escritura pública de fecha [●] de dos mil veintidós otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●] y un reconocimiento de deuda que consta en escritura pública de fecha [●] de dos mil veintidós otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●] /el "**Reconocimiento DIP**"/.

/**xi**/ **Financiamiento IVA.** /**A**/ Mediante escritura pública otorgada  con esta misma fecha,[ en esta misma Notaría], bajo el repertorio número [•]el Deudor, Itaú Corpbanca, BCI, DNB, [Moneda] y [UBS] /los "**Acreedores de IVA**"/ celebraron un contrato regido por las leyes de la República de Chile, denominado "*Contrato de Crédito para Financiamiento de Impuesto al Valor Agregado*" /el "**Contrato de Crédito IVA**"/, en virtud del cual los Acreedores de IVA acordaron otorgar al Deudor un crédito a corto plazo dividido en dos tramos /los "**Préstamos IVA**"/, para el financiamiento o refinanciamiento del impuesto al valor agregado /"**IVA**"/ asociado al "*Supplier Deferred Payment*" /según dicho termino se define en el Contrato de Términos Comunes/ que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis del decreto ley ochocientos veinticinco sobre impuestos a las ventas y servicios: /**i**/ un Tramo A por la suma total de [•] Unidades de Fomento, a ser desembolsado y pagadero en su equivalente en pesos, moneda de curso legal en Chile /el "**Tramo IVA UF**"/, comprometido por Itaú Corpbanca y BCI en la cantidad de [•] Unidades de Fomento cada uno; y /**ii**/ un Tramo B por la suma total de [•] Dólares, a ser desembolsado y pagadero en dicha moneda /el "**Tramo IVA USD**"/, comprometido por [UBS] y DNB.] /**B**/ Los Préstamos IVA desembolsados serán documentados en pagarés suscritos por el Deudor a la orden del respectivo Acreedor de IVA /los "**Pagarés IVA**" y conjuntamente con los Pagarés y Reconocimientos DFC, los Pagarés y Reconocimientos Crédito Dos Mil Dieciocho, los Pagarés y Reconocimientos Crédito Comercial, los Pagarés por Derivados, el Pagaré Strabag y el Reconocimiento DIP y los pagarés y/o reconocimientos de deuda que se emitan a futuro conforme al Crédito Capital de Trabajo o cualquier otro Documento del Financiamiento, en adelante los "**Pagarés y Reconocimientos**"/. /**C**/ Los principales términos y condiciones de los Préstamos IVA son los siguientes: Pago: La totalidad de los Préstamos IVA deberá pagarse el día [•] de dos mil veintitrés, sin perjuicio de los pagos anticipados obligatorios que correspondan de acuerdo a lo establecido en el Contrato de Crédito IVA. El capital e intereses del Tramo A deberá pagarse en pesos chilenos de acuerdo a la equivalencia de la Unidad de Fomento a la fecha de pago, y el capital e

intereses del Tramo B deberá pagarse en Dólares. <u>Intereses</u>: [  ]. <u>Comisiones</u>: Según se establece en cartas de comisiones suscritas por los Acreedores IVA y el Deudor.

**/xii/ Términos y Condiciones del Secured TwoL Agreement. /A/** Los principales términos y condiciones del Secured TwoL Agreement son los siguientes: <u>Pago</u>: El Deudor se obligó a pagar el total del capital del Tramo Subordinado en [•] cuotas semestrales pagaderas el quince de abril y quince de octubre de cada año, la primera de ellas el [quince de octubre de dos mil veintidós] y la última de ellas el quince de octubre de dos mil cuarenta y dos, [en los porcentajes indicados en el Calendario de Amortización /*Loan Repayment Schedule*, según dicho término se define en el Secured TwoL Agreement/ contenido en anexo /*Schedule*/ uno del Secured TwoL Agreement]. <u>Intereses</u>: El capital adeudado bajo el Tramo Subordinado devengará intereses a una tasa de interés anual igual a dos por ciento, los que se devengarán día a día, se calcularán sobre la base de un año de trescientos sesenta y cinco o trescientos sesenta y seis días por el número efectivo de días transcurridos en el período de interés respectivo, y se pagarán por período vencido en la fecha de pago de interés /quince de abril y quince de octubre de cada año/ inmediatamente siguiente al término del período de interés correspondiente. Lo anterior sin perjuicio de la capitalización de tales intereses que sea aplicable conforme a lo establecido en el Secured TwoL Agreement. En caso de mora o simple retardo en el pago del capital o de cualquier otra suma pagadera en virtud del Secured TwoL Agreement, la suma impaga devengará a título de interés penal un interés anual a una tasa equivalente a la suma mayor entre /i/ la tasa de interés de dos por ciento incrementada en dos por ciento anual, y /ii/ el interés máximo convencional que sea aplicable, de haberlo. El referido interés moratorio se devengará a contar de la fecha de la mora o del simple retardo y hasta la fecha del pago efectivo, y será pagadero por el Deudor a solicitud del acreedor respectivo, o si no fuese solicitado, en cada Fecha de Pago de Intereses después de la mora o simple retardo. Todos los pagos que se hagan serán en Dólares, a más tardar a las once a.m. /hora de la ciudad de Nueva York, Estados Unidos de América/ del día del vencimiento correspondiente, con fondos de inmediata disponibilidad, libres y netos de cualquier impuesto, tributo, contribución, derecho, retención o carga, distintos de Impuestos Excluidos /*Excluded Taxes*, según este término se define en el Contrato de Términos Comunes/, directamente a ITAÚ CORPBANCA NEW YORK BRANCH por cuenta del acreedor respectivo, por medio de transferencia electrónica a la cuenta indicada en la sección [dos punto cero siete] del Secured TwoL Agreement.

**/B/** Para todos los efectos de este instrumento, se entiende por "**Préstamos**", los pagos adeudados a las Partes Garantizadas en virtud de cuentas por cobrar o préstamos otorgados y documentados bajo los Secured LAgreements, el Crédito de Capital de Trabajo y el Financiamiento de Salida.

**/xiii/ Términos y Condiciones de los Indentures. /A/ Secured OneL Indenture:** Los principales términos y condiciones del Secured OneL Indenture son los siguientes: <u>Pago</u>: [•]. <u>Intereses</u>: [•]. **/B/ Secured TwoL Indenture:** Los principales términos y condiciones del Secured TwoL Indenture en el evento que sea otorgado, serán los siguientes: <u>Pago</u>: [•]. <u>Intereses</u>: [•].

**/xiv/ Contrato entre Acreedores. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, IDB, IFC, OPIC, Banco de Crédito e Inversiones S.A., Miami Branch, Banco del Estado de Chile, New York Branch, Banco Itaú Chile /hoy Itaú Corpbanca/ y Corpbanca, New York Branch /hoy Itaú Corpbanca, New York Branch/, DNB

y KfW, entre otros, suscribieron un contrato en idioma inglés denominado "*Intercreditor Agreement*" /en adelante el "**Contrato entre Acreedores Original**"/. /**B**/ El Contrato entre Acreedores Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Intercreditor Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América y posteriormente modificado nuevamente por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Second Amended and Restated Intercreditor Agreement*" /en adelante, el Contrato entre Acreedores Original, modificado y refundido en la forma antes señalada, el "**Contrato entre Acreedores Modificado y Refundido**"/. /**C**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Contrato entre Acreedores Modificado y Refundido fue nuevamente modificado y refundido por instrumento privado en idioma inglés, otorgado con fecha [•] de dos mil veintidós, denominado "*Third Amended and Restated Intercreditor Agreement*", suscrito entre los acreedores bajo el Secured 1L Loan Agreement, los acreedores bajo el Secured TwoL Agreement, los Acreedores de IVA, el acreedor bajo el Crédito de Capital de Trabajo y bajo el Financiamiento de Salida, entre otros /en adelante el Contrato entre Acreedores Modificado y Refundido, modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato entre Acreedores**"/.

/**xv**/ **Contrato de Conversión**. Por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés y sujeto a las leyes de la República de Chile, AES Andes, AES Chile SpA /antes denominada Norgener Renovables SpA/, el Deudor e Itaú Corpbanca, en representación de las partes ahí señaladas, suscribieron un contrato denominado "*Share Conversion Agreement and Shareholders' Agreement*" /en adelante el "**Contrato de Conversión**"/. El Contrato de Conversión establece la obligación de AES Andes, AES Chile SpA, el Deudor, y las otras partes que califiquen como Relevant Party /según dicho término se define en el Contrato de Conversión, en adelante las "**Relevant Parties**"/, de realizar todas las actuaciones que sean necesarias para permitir la implementación de opción otorgada a los acreedores bajo el Tramo Subordinado, de capitalizar sus créditos bajo dicho Tramo en contra del Deudor [en octubre del año dos mil cuarenta y uno, convirtiéndolos en acciones del Deudor, y la capitalización obligatoria] en octubre del año dos mil cincuenta y dos, de aquellos créditos vigentes a esa fecha bajo el Tramo Subordinado, conforme a lo establecido en el Secured TwoL Agrement y en el Contrato de Conversión y según se establezca en el Secured TwoL Indenture, en caso de ser otorgado.][5]

[/**Cinco**/ **Obligaciones Garantizadas.** Para todos los efectos de este contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", todas y cada una de las obligaciones que tenga en cualquier tiempo el Deudor, sean presentes o futuras, civiles o naturales, puras y simples o sujetas a modalidad, para con las respectivas Partes Garantizadas o aquellas entidades que tengan o adquieran la calidad de Partes Garantizadas de conformidad a lo establecido en los Documentos del Financiamiento /según dicho término se define más adelante/, bajo cualquiera del Secured TwoL Agreement, los Indentures, el Contrato de Crédito IVA, los Pagos Diferidos Strabag, el Crédito de Capital de Trabajo, el Financiamiento de Salida, los Préstamos, los Bonos, el Contrato de Términos Comunes, los Pagarés y Reconocimientos, el Contrato de Conversión o alguno de los otros Documentos del Financiamiento /"*Financing Documents*", según dicho término se define en el Contrato de Términos Comunes, en adelante los

---

[5] Pendiente. Sujeto a revisión.

"**Documentos del Financiamiento**"/. Las Obligaciones Garantizadas incluyen las obligaciones de pagar el capital y los intereses de todo tipo devengados con motivo de los actos y contratos antes indicados, así como las comisiones y demás montos adeudados bajo los mismos o cualquier instrumento que los reemplace o complemente. Las Obligaciones Garantizadas incluyen cualquier prórroga, renovación y/o modificación de que puedan ser objeto las obligaciones del Deudor contenidas a esta fecha en los contratos antes señalados, así como cualquier obligación derivada de las Obligaciones Garantizadas. Las Obligaciones Garantizadas también incluyen cualquier pago directo o reembolso a las Partes Garantizadas que de acuerdo a los documentos antes señalados sean de cargo del Deudor con motivo de impuestos, tributos, contribuciones, derechos, cargas, retenciones, honorarios, remuneraciones, cargos financieros, indemnizaciones de perjuicios, aumentos de costos y desembolsos relacionados a los mismos.

**/Seis/ Garantías.** En virtud del Contrato de Términos Comunes Modificado y Refundido, y con el objeto de garantizar el cumplimiento total, íntegro, efectivo y oportuno de las Obligaciones Garantizadas, y sin que ello implique limitación, el Deudor, AES Andes y AES Chile SpA /antes Norgener Renovables SpA/ se obligaron a otorgar y otorgaron en favor de todas y cada una de las Partes Garantizadas /según este término se define en el Contrato de Agencia de Garantías Local Modificado y Refundido y este último se define más adelante/, las garantías que se señalan en la definición de Documentos de Garantía /"*Security Documents*", según este término se define en el Contrato de Términos Comunes Modificado y Refundido/, lo que comprende, sin que implique limitación, hipotecas, prendas de cualquier naturaleza /incluyendo, prendas sobre derechos emanados de contratos, prendas sobre acciones/, cesiones condicionales, designación como beneficiario o asegurado adicional de pólizas de seguro, promesas de constitución de algunas garantías y mandatos, en adelante tales garantías y resguardos, también e indistintamente las "**Garantías Iniciales**". De conformidad a lo establecido en los Documentos del Financiamiento, y los acuerdos adoptados en el Capítulo Once, las obligaciones del Deudor bajo los Bonos Preferentes, el Tramo Subordinado, los Bonos Subordinados /una vez emitidos/, los Pagos Diferidos Strabag, los Préstamos IVA, el Crédito de Capital de Trabajo, el Financiamiento de Salida y el Contrato de Conversión, deben ser garantizadas con las Garantías Iniciales y las nuevas garantías y cauciones que deban otorgarse en base a lo establecido en los Documentos del Financiamiento y los demás acuerdos adoptados en el Capítulo Once /en adelante conjuntamente con las Garantías Iniciales, las "**Garantías**"/, en el mismo grado o prioridad /salvo respecto de aquellas Garantías otorgadas exclusivamente en beneficio de los Acreedores de IVA y subsidiariamente de los acreedores bajo el Tramo Subordinado/, para lo cual las Garantías Iniciales deberán modificarse para tales efectos; todo lo anterior sin perjuicio de que el Agente de Garantías Local, para su ejecución y para distribuir los fondos derivados de esa ejecución, deberá observar las reglas establecidas en el Contrato entre Acreedores, en que se establecen las siguientes prioridades de pago entre las distintas clases de acreedores del Deudor y cuyos créditos se encuentran garantizados por las Garantías: /**a**/ primera prioridad para las obligaciones del Deudor bajo el Crédito de Capital de Trabajo y el Financiamiento de Salida, a prorrata y hasta su total satisfacción; /**b**/ segunda prioridad para las obligaciones del Deudor bajo el Tramo Preferente, los Bonos Preferentes, los Pagos Diferidos Strabag y los Préstamos IVA, a prorrata y hasta su total satisfacción; y /**c**/ tercera prioridad para las obligaciones del Deudor bajo el Tramo Subordinado, los Bonos Subordinados y del Deudor y AES Andes bajo el Contrato de Conversión, a prorrata y hasta su total satisfacción.][6]

---

[6] Pendiente. Sujeto a revisión.

**/Siete/ Objeto de este Contrato de Agencia de Garantías.** Las Partes Garantizadas dejan expresa constancia que, atendido que la suscripción de los contratos de financiamiento antes singularizados, así como la suscripción de los contratos que dan cuenta de las Obligaciones Garantizadas, y todas las obligaciones que de ellos emanan, han tenido por objeto exclusivo financiar, el diseño, desarrollo, financiamiento, construcción, puesta en marcha, operación y mantenimiento del Proyecto, han convenido en designar al Agente de Garantías Local como su agente de garantías en los términos que se indican en la cláusula segunda de este instrumento, a fin de que los represente, colectiva y mancomunadamente, **/i/** en la suscripción u otorgamiento de cada uno de los documentos necesarios para la constitución, modificación y extinción de las Garantías, y **/ii/** en el ejercicio mancomunado de los derechos que emanen de las Garantías, incluyendo su ejecución. [De esta manera, cada Parte Garantizada renuncia a favor del Agente de Garantías Local, a su derecho de ejercer personal e individualmente los derechos anteriormente señalados, los que serán ejercidos colectivamente a través del Agente de Garantías Local conforme a lo establecido en los Documentos del Financiamiento y en particular en el Contrato entre Acreedores.][7]

**/Ocho/ Incorporación por referencia**. Las Partes dejan constancia que el Contrato de Agencia de Garantías Local contempla términos comunes aplicables a los contratos de garantía que el Deudor o cualquier tercero hayan otorgado u otorguen en favor del Agente de Garantías Local, actuando por cuenta y/o en nombre de las Partes Garantizadas /según dicho término se define más adelante/, las cuales serán incluidas por referencia a cada uno de dichos contratos de garantía, según se establezca en los mismos.

<u>CLÁUSULA SEGUNDA</u>: **DESIGNACIÓN DEL AGENTE DE GARANTÍAS LOCAL, OTORGAMIENTO DE MANDATO Y OTRAS DISPOSICIONES.**

**/A/ Designación y mandato.** Por el presente instrumento, las Partes Garantizadas, debidamente representadas en la forma indicada en la comparecencia de este instrumento, de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, han designado a Itaú Corpbanca como Agente de Garantías Local a fin de que como mandatario común y en cumplimiento de las instrucciones que al efecto le den las Partes Garantizadas de acuerdo a lo establecido en el Contrato entre Acreedores, represente a estas últimas en la suscripción u otorgamiento de los documentos necesarios para la constitución, modificación y extinción de las Garantías, y en el ejercicio mancomunado de los derechos que para ellos emanen de dichas Garantías, incluyendo su ejecución. Para los efectos indicados anteriormente, las Partes Garantizadas comparecientes, debidamente representadas en la forma indicada en la comparecencia de este instrumento, han conferido al Agente de Garantías Local un mandato mercantil irrevocable para que con amplias facultades, y de conformidad a lo establecido en el Contrato de Términos Comunes, el Contrato entre Acreedores y los demás Documentos del Financiamiento, desempeñe tales funciones, renunciando cada Parte Garantizada a favor del Agente de Garantías Local, a su derecho de ejercer personal e individualmente los derechos anteriormente señalados, los que serán ejercidos colectivamente a través del Agente de Garantías Local conforme a lo establecido en los Documentos del Financiamiento y en particular en el Contrato entre Acreedores. En virtud de ello, y sin que la descripción de facultades que se señalan a continuación tenga el carácter de taxativa, en el ejercicio del presente mandato, previas instrucciones que al efecto le den las Partes Garantizadas de conformidad a lo establecido en el Contrato entre Acreedores, lo que no será necesario acreditar ante terceros, el Agente de Garantías Local

---

[7] Pendiente. Sujeto a revisión.

estará amplia y expresamente facultado, pudiendo incluso autocontratar en caso que actúe por cuenta simultánea del Deudor, y/o de las Partes Garantizadas, para:

**/Uno/ /a/** Recibir y custodiar títulos accionarios, títulos representativos de derechos sociales y contractuales, títulos de crédito, pagarés u otros que en derecho corresponda entregar a y ser recibidos por las Partes Garantizadas, para el total perfeccionamiento de las Garantías, o encomendar esta labor a terceras personas; **/b/** celebrar todos los actos y contratos, realizar todas las gestiones y tramitaciones, suscribir todos los documentos públicos o privados, y efectuar todas las inscripciones o publicaciones que sean pertinentes, necesarias y/o conducentes en orden a constituir y perfeccionar completa y legalmente todas las Garantías, pudiendo incluso requerir de un ministro de fe las notificaciones, inscripciones, publicaciones y/o anotaciones que sean pertinentes de conformidad a la ley para tales fines, así como requerir o delegar poder para requerir las anotaciones, registros, inscripciones conservatorias, y publicaciones que fueren pertinentes; **/c/** ejecutar todos los actos y suscribir todos los documentos públicos o privados que sean necesarios o convenientes para mantener, modificar, sustituir, alzar y/o extinguir todas y cada una de las Garantías; **/d/** realizar todos los actos y gestiones, judiciales y extrajudiciales, que sean pertinentes en orden a proceder a la realización y ejecución de las Garantías que sean aplicables, estando incluso facultado para cobrar y percibir. El Agente de Garantías Local deberá realizar y ejecutar las Garantías en conformidad a las instrucciones que reciba exclusivamente de las Partes Garantizadas de acuerdo a lo establecido en el Contrato entre Acreedores Modificado y Refundido y las disposiciones de los demás Documentos del Financiamiento, lo que no será necesario acreditar ante terceros; **/e/** realizar todos los actos y gestiones, judiciales y extrajudiciales, que sean pertinentes en orden a proceder al cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, estando incluso facultado para cobrar y percibir, y **/f/** aceptar toda clase de acuerdos de subordinación de créditos en favor de las Partes Garantizadas, sean estos suscritos por instrumento público o privado, bajo ley chilena o extranjera. El Agente de Garantías Local deberá realizar y proceder al cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, en conformidad a las instrucciones que reciba exclusivamente de las Partes Garantizadas de conformidad a lo dispuesto en el Contrato entre Acreedores Modificado y Refundido y los demás Documentos del Financiamiento, lo que no será necesario acreditar frente a terceros.

**/Dos/** Representar a las Partes Garantizadas en todos los juicios y gestiones judiciales relacionados con las Garantías y con los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, que fueren pertinentes, ante cualquier tribunal ordinario, especial, arbitral, administrativo o de cualquier naturaleza, así intervengan los Acreedores Preferentes, Strabag y/o cualquier otra Parte Garantizada, como demandantes, demandados o terceros, de cualquiera especie, hasta la completa ejecución de la sentencia, pudiendo ejercer toda clase de acciones, sean ellas ordinarias, ejecutivas, especiales, de jurisdicción no contenciosa o de cualquiera otra naturaleza. En el ejercicio de este poder judicial para la realización y ejecución de las Garantías y para el cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, el Agente de Garantías Local queda facultado para representar a las Partes Garantizadas con todas las facultades ordinarias y extraordinarias del mandato judicial, contenidas en ambos incisos del artículo séptimo del Código de Procedimiento Civil, las que se dan por íntegramente reproducidas en este acto, una a una, pudiendo, sin que la siguiente enunciación signifique limitación alguna, demandar, iniciar cualquiera otra especie de gestiones judiciales, sean de jurisdicción voluntaria o contenciosa, aceptar la demanda contraria, desistirse de la acción deducida, renunciar los recursos y los términos

legales, absolver posiciones, someter asuntos a compromiso y designar árbitros con facultades de arbitradores, transigir, aprobar convenios y percibir, con expresa declaración que la facultad de transigir comprende también la transacción extrajudicial, percibir, y nombrar abogados patrocinantes y apoderados con todas las facultades que por este instrumento se le confieren. El Agente de Garantías Local podrá delegar las facultades que se indican en este número dos y reasumir total o parcialmente cuantas veces sea conveniente.

**/Tres/** Adicionalmente a las facultades conferidas al Agente de Garantías Local en los numerales precedentes, el Deudor y las Partes Garantizadas han designado irrevocablemente al Agente de Garantías Local, con las más amplias facultades de sustitución, como su apoderado, en el evento que haya sido enviada una Notificación de Suspensión /"*Notice of Suspension*", según este término se define en el Onshore Accounts Agreement y según este último término se define en el Contrato de Términos Comunes, en adelante según el mismo sea modificado o modificado y refundido en el futuro, el "**Onshore Accounts Agreement**" / al Banco de Cuentas Locales / "*Onshore Accounts Bank*" según este último término se define en el Contrato de Términos Comunes, en adelante el "**Banco de Cuentas Locales**"/ y hasta que dicha Notificación de Suspensión sea dejada sin efecto o, en caso que un Evento de Incumplimiento /"*Event of Default*", según este término se define en el Contrato de Términos Comunes / haya ocurrido y persista, para ejecutar todos los actos y suscribir todos los documentos o instrumentos que el Agente de Garantías Local, o los agentes o apoderados del mismo, estimen necesario o aconsejable de acuerdo a lo dispuesto en los Documentos del Financiamiento, en nombre y representación del Deudor, para el cumplimiento de las disposiciones contenidas en el Onshore Accounts Agreement, sin necesidad de notificar al Deudor para estos efectos y para ejercer los derechos y recursos establecidos en la Sección nueve punto cero tres /*Enforcement*/ del referido Onshore Accounts Agreement. Se deja constancia que el mandato otorgado al Agente de Garantías Local de que da cuenta este contrato, ha sido otorgado en interés de todas y cada una de las Partes Garantizadas, de manera que es irrevocable en los términos del Artículo doscientos cuarenta y uno del Código de Comercio.

**/B/ Responsabilidad del Agente de Garantías Local y normas supletorias. /Uno/** El Agente de Garantías Local responderá de culpa grave en el cumplimiento de las obligaciones establecidas en el presente mandato. Asimismo, las Partes acuerdan y dejan constancia que respecto de cualquier materia no reglamentada en el presente instrumento se recurrirá a las disposiciones relevantes de los Documentos del Financiamiento.

**/Dos/** Se deja constancia que respecto de aquellas materias que, conforme a los documentos suscritos por el Agente de Garantías Local en el cumplimiento de las obligaciones establecidas en el presente mandato, se requiera el consentimiento o autorización del Agente de Garantías Local, o la actuación o ejercicio de derechos por parte del Agente de Garantías Local, éste actuará exclusivamente de acuerdo a, y sujeto a recibir, instrucciones otorgadas al efecto por las Partes Garantizadas de conformidad con el Contrato entre Acreedores y los demás Documentos del Financiamiento, circunstancia que no será necesario acreditar frente a terceros.

**/Tres/** Se entenderá que el Agente de Garantías Local ha obrado conforme a instrucciones de las Partes Garantizadas cada vez que lo haya hecho en cumplimiento de instrucciones que el Agente de Garantías Local haya creído de buena fe recibir de parte de las Partes Garantizadas, sin que le corresponda al Agente de Garantías Local verificar si al

impartírsele las mismas por parte de las Partes Garantizadas se han cumplido o no los requisitos formales o habilitantes necesarios para la emisión de instrucciones.

**CLÁUSULA TERCERA: ACEPTACIONES.**

**/Uno/ Aceptación del Agente de Garantías Local.** El Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia de este instrumento, acepta la designación y el mandato que por este acto le confieren las Partes Garantizadas, en los términos expuestos precedentemente.

**/Dos/ Aceptación del Deudor.** Por su parte, el Deudor, debidamente representado en la forma indicada en la comparecencia de este instrumento, acepta expresamente la agencia de garantías, la designación del Agente de Garantías Local y el mandato de que da cuenta este instrumento.

**CLÁUSULA CUARTA: RENUNCIA Y SUSTITUCIÓN DEL AGENTE DE GARANTÍAS LOCAL.**

Sujeto a la designación y aceptación de un agente de garantías sustituto, según se indica más adelante, el Agente de Garantías Local podrá renunciar a su cargo en cualquier momento, mediante el envío de una comunicación a las Partes Garantizadas, al Banco de Cuentas Locales y al Deudor. Las Partes convienen en que las Partes Garantizadas, actuando conjuntamente, tendrán derecho a remover al Agente de Garantías Local con o sin expresión de causa en cualquier tiempo. Ocurrida la renuncia o remoción del Agente de Garantías Local, las Partes Garantizadas designarán, tan pronto sea posible, un nuevo agente de garantías que deberá ser un banco comercial autorizado para operar en Chile. La renuncia del Agente de Garantías Local se hará efectiva transcurridos que sean ciento veinte días desde que su renuncia haya sido puesta en conocimiento de las Partes Garantizadas, del Banco de Cuentas Locales y del Deudor, y una vez que un nuevo agente de garantías, el cual será designado en la forma antes señalada, hubiere tomado posesión del renunciado cargo. La remoción, a su vez, sólo se hará efectiva una vez que un nuevo agente de garantías haya tomado posesión de su cargo en reemplazo del removido agente de garantías, no pudiendo en todo caso exceder el plazo máximo de ciento veinte días desde que el agente de garantías removido recibiere aviso escrito de parte de las Partes Garantizadas. En caso que transcurridos los referidos ciento veinte días desde la notificación de la renuncia respectiva, o desde la remoción del agente de garantías efectuada por las Partes Garantizadas, un nuevo agente de garantías no hubiere sido designado por las Partes Garantizadas como tal y aceptado el cargo, el agente de garantías renunciado o removido, según el caso, podrá solicitar a un juez competente que designe a un sustituto idóneo para que actúe hasta que un agente de garantías sucesor sea designado conforme a esta cláusula cuarta, de ocurrir ello. Hasta que no sea nombrado el respectivo sustituto por el juez competente, el renunciado o removido agente de garantías seguirá actuando en su calidad de tal, de acuerdo con los términos y condiciones de este contrato de agencia de garantías y los Documentos del Financiamiento. Cualquier agente de garantías sustituto nombrado por el juez competente será inmediatamente y sin más trámite reemplazado por cualquier agente de garantías sucesor designado por las Partes Garantizadas conforme a los términos de esta cláusula cuarta. Aceptado que sea el cargo por un agente de garantías sucesor, **/i/** el agente de garantías reemplazante sucederá, a contar de ese momento, al agente de garantías removido o renunciado y estará investido de todos los derechos, poderes, privilegios y deberes del agente de garantías que renuncia o se retira, y éste último quedará liberado de sus derechos, poderes, deberes y obligaciones

bajo el presente contrato de agencia de garantías, y **/ii/** el agente de garantías removido o renunciado transferirá tan pronto sea posible al agente de garantías reemplazante todos los títulos, registros, pagarés y demás documentos, ya sean públicos o privados, que hubiesen estado bajo su custodia y ejecutará y celebrará todos los actos o contratos y entregará todos los avisos o instrucciones que sean necesarias o convenientes para transferir, traspasar y ceder al agente de garantías reemplazante los derechos que le correspondían al agente de garantías renunciado o removido. En cuanto sea necesario, a juicio exclusivo de las Partes Garantizadas, el Deudor deberá concurrir a los actos y contratos que sean requeridos para concretar la remoción del agente de garantías, o de quienes le sucedan o reemplacen, y la designación de su o sus sustitutos. Sin perjuicio de aquello, al concurrir a dichos actos y contratos el Deudor no podrá ser forzado a contraer nuevas obligaciones distintas de las Obligaciones Garantizadas.

<u>**CLÁUSULA QUINTA**</u>**: IDENTIFICACIÓN.** En los instrumentos de constitución de las Garantías y en las inscripciones de ellas según corresponda, no será necesario identificar a las Partes Garantizadas, bastando individualizar este contrato de agencia de garantías y expresar el nombre del Agente de Garantías Local.

<u>**CLÁUSULA SEXTA**</u>**: INCORPORACIÓN A ESTE CONTRATO DE NUEVAS PARTES GARANTIZADAS.**

Las Partes acuerdan que el presente Contrato de Agencia de Garantías Local beneficiará a todas aquellas entidades que en el futuro se adhieran como acreedores al mismo al calificar como "*Secured Parties*" en los términos y condiciones contenidas en el Contrato de Términos Comunes, incluyendo a aquellas entidades que en el futuro se incorporen y adquieran dicha calidad, todos las cuales, para efectos de beneficiarse de este Contrato de Agencia de Garantías Local, deberán suscribir un contrato de adhesión por instrumento privado el cual, debidamente firmado por el adherente respectivo y el Agente de Garantías Local, deberá protocolizarse en una Notaría de la ciudad de Santiago. Dicho instrumento deberá celebrarse en términos sustancialmente similares a los contenidos en el modelo que, como **Anexo A**, se protocoliza con esta fecha y en esta misma Notaría bajo el mismo número de repertorio de la presente escritura, y que se entiende formar parte de este instrumento para todos los efectos legales.

<u>**CLÁUSULA SÉPTIMA**</u>**:** <u>**TÉRMINOS COMUNES APLICABLES A LAS GARANTÍAS.**</u>

<u>**Siete.Uno**</u>**.** <u>**Parte integral.**</u> Las estipulaciones contenidas en la Cláusula Primera y en esta Cláusula Séptima, incluyendo sus modificaciones posteriores y en tanto sean incluidas por referencia en las Garantías, se entenderán formar parte integral de las Garantías para todos los efectos legales o contractuales a que pudiere haber lugar, sin necesidad de encontrarse expresamente reproducidas en los instrumentos por medio de los cuales las Garantías se otorguen o de tener que hacer modificaciones a las Garantías para hacer referencia a eventuales modificaciones de este Contrato de Agencia de Garantías Local.

<u>**Siete.Dos**</u>**.** <u>**Regla de interpretación.**</u> Para efectos del artículo mil quinientos sesenta y cuatro, inciso segundo, del Código Civil de Chile, las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en esta Cláusula Séptima, formen parte integrante de las Garantías en los términos indicados en la sección Siete.Uno precedente, debiendo interpretarse las Garantías conjuntamente con las mencionadas disposiciones, y bajo el entendido de que éstas forman parte integrante de cada una de aquellas.

**Siete.Tres**. **Términos comunes aplicables a todas las garantías**.

**Siete.Tres.Uno**. **Irrevocabilidad de los poderes**. A menos que se indique expresamente lo contrario, todos los mandatos que cualquiera de los constituyentes de las Garantías, en calidad de mandantes, otorgue al Agente de Garantías Local, por sí o por nombre y/o cuenta de los mandantes en calidad de mandatario, en relación con las Garantías, o en virtud de los instrumentos en virtud de los cuales las Garantías fueron celebradas, serán mandatos mercantiles irrevocables, otorgados en interés de ambas partes en los términos del artículo doscientos cuarenta y uno del Código de Comercio, y con facultad de autocontratar. Las Partes dejan expresa constancia de que dichos mandatos no serán remunerados, a menos que se indique expresa e indubitadamente lo contrario.

**Siete.Tres.Dos**. **Extinción de obligaciones**. Se deja constancia de que toda Obligación Garantizada cuyo pago se haya convenido en moneda extranjera se entenderá extinguida sólo hasta por el monto por el que las Partes Garantizadas hayan recibido dicha moneda en divisas de libre convertibilidad y disponibilidad o, si el pago se efectuare en otra moneda, sólo hasta por el monto con el que con dicha moneda puedan adquirir la moneda extranjera con la que haya debido hacérseles el pago en virtud de la convención o la ley, el día hábil siguiente a aquél en que las Partes Garantizadas reciban los dineros en cuestión.

**Siete.Tres.Tres**. **Ausencia de modificación y novación.** Lo dispuesto en las Garantías y en los instrumentos por medio de los cuales ellas se celebren no se considerará bajo ninguna circunstancia como modificación, o limitación de los derechos que tengan el Agente de Garantías Local, el Deudor, las Partes Garantizadas o las otras demás partes de las Garantías en virtud de la ley, ni de los demás Documentos del Financiamiento, según corresponda, o de cualquier otro instrumento suscrito en relación con los anteriores, ni constituye bajo ningún concepto una novación de las Obligaciones Garantizadas.

**Siete.Tres.Cuatro**. **Mandato especial para notificaciones asociadas a las Garantías**. Sin perjuicio de cualquier designación de mandatarios para recibir notificaciones judiciales que se haya hecho o que se haga en el futuro, adicionalmente cada uno del Deudor, AES Andes y AES Chile SpA, confiere poder especial e irrevocable a [•] y a [•], para que, actuando cualquiera de ellos individualmente, puedan recibir, por y en representación de cada una de tales sociedades, notificaciones y requerimientos judiciales o extrajudiciales, en cualquier gestión, procedimiento o juicio, cualquiera que fuese el procedimiento aplicable o el tribunal o autoridad que tuviere encomendado su conocimiento y que diga relación con este instrumento, con cualquiera de las Garantías de que fuere parte, con los Documentos del Financiamiento, con las Obligaciones Garantizadas o con cualquier otro instrumento otorgado para garantizarlas. Consecuentemente, si cualquier notificación o requerimiento se realiza a los mandatarios anteriormente mencionados, la o las sociedades a quienes dicha notificación se dirigía se considerarán válidamente notificadas o requeridas con respecto al acto, procedimiento o demanda en cuestión. En el ejercicio del poder especial e irrevocable que por este acto se otorga, los mandatarios estarán ampliamente facultados para representar a cada una de las sociedades mandantes antes indicadas en el orden judicial, incluyendo las facultades de recibir notificaciones, contestar demandas y actuar con las atribuciones señaladas en ambos incisos del artículo séptimo del Código de Procedimiento Civil de la República de Chile, las cuales se dan por íntegramente reproducidas, una por una. Presentes a este acto [•] y [•], ambos ya individualizados, domiciliados para estos efectos en [•], Santiago; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y declaran que aceptan el

poder especial e irrevocable que se otorga en esta cláusula y se obligan a no renunciar al mismo sin el consentimiento escrito del Agente de Garantías Local, el cual no podrá ser denegado sin causa razonable, para lo cual cada una del Deudor, AES Andes y AES Chile SpA, deberá, en forma previa, designar un nuevo mandatario judicial con las mismas facultades y en los mismos términos de esta cláusula, nuevo mandatario que deberá comparecer y aceptar el mandato otorgado en el mismo instrumento de renuncia, ser una persona natural residente permanente en Chile y ser aprobado previamente por el Agente de Garantías Local. Asimismo, cada una del Deudor, AES Andes y AES Chile SpA, se obliga a mantener en todo momento dos o más apoderados con las mismas facultades y en los mismos términos de esta cláusula en caso de que el mandato irrevocable otorgado en esta cláusula terminare por fallecimiento de cualquiera de los apoderados, o en caso de que cualquiera de ellos dejare de ser residente permanente en Chile. El poder otorgado por este acto por cada una del Deudor, AES Andes y AES Chile SpA, no revoca ningún poder otorgado con anterioridad a esta fecha y, en el evento de otorgar otro poder en el futuro, no se entenderá por ese hecho revocado el poder otorgado en el presente instrumento.

**Siete.Tres.Cinco. Título suficiente.** Cada uno del Deudor, AES Andes y AES Chile SpA declara, en favor del Agente de Garantías Local, que reconocerá copia autorizada de la Garantía de que se trate, conjuntamente con una copia autorizada de los respectivos Documentos del Financiamiento, como buen y suficiente título para iniciar y proseguir todas las acciones que en derecho correspondan en relación con dicha Garantía. Lo dispuesto en este instrumento y en los instrumentos por medio de los cuales se celebren las Garantías no se considerará bajo ninguna circunstancia como limitación de los derechos que correspondan al Agente de Garantías Local, actuando en nombre y representación de las Partes Garantizadas en virtud de la ley, ni como una modificación, sustitución o limitación de los derechos otorgados al Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, en virtud de los Documentos del Financiamiento, según corresponda. Asimismo, se deja expresa constancia de que cada una de las Garantías será sin perjuicio de cualquier otra garantía y prohibición que se hubiere constituido por el Deudor, AES Andes y AES Chile SpA y/o por terceros, sea real o personal, para caucionar las Obligaciones Garantizadas.

**Siete.Tres.Seis. Impuestos y sucesores.** Cada uno del Deudor, AES Andes y AES Chile SpA declara que las Garantías de las cuales son parte y los poderes que se otorguen por medio de los instrumentos en virtud de los cuales ellas serán otorgadas, así como el ejercicio de los derechos que puedan derivar de ellos, no se encontrarán sujetos a impuestos ni cargos de ninguna naturaleza, ni a cargos por concepto de timbres u otros impuestos o cargos similares y, en consecuencia, el Agente de Garantías Local tendrá libre acceso para ejercer sus derechos, sin restricciones derivadas del no pago o incumplimiento de los aspectos señalados anteriormente. Asimismo, cada uno del Deudor, AES Andes y AES Chile SpA acuerda que las Garantías, y los derechos que las mismas otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes revistan la calidad de sucesores o cesionarios de este bajo los Documentos del Financiamiento, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos del Agente de Garantías Local, tendrán en contra del Deudor, AES Andes y AES Chile SpA los mismos derechos y beneficios que esta escritura y que las Garantías otorgan al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**Siete.Tres.Siete. Nulidad o ineficacia de las Garantías.** Si por cualquier causa, una o más de las estipulaciones de las Garantías y, a mayor abundamiento, de los instrumentos

por medio de los cuales las Garantías se celebran, fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez y eficacia de las demás estipulaciones del instrumento de que se trate ni de los demás Documentos del Financiamiento, ni de cualquier otro documento relacionado con los mismos.

**Siete.Tres.Ocho. Domicilio, competencia y ley aplicable a las Garantías.** Para todos los efectos legales y contractuales derivados de las Garantías y, a mayor abundamiento, de los instrumentos por medio de los cuales las Garantías se celebren, el Deudor, AES Andes, AES Chile SpA y el Agente de Garantías Local fijan su domicilio en la ciudad y comuna de Santiago y se someten a los tribunales ordinarios de justicia con asiento y competencia en la comuna de Santiago. Las Garantías se regirán por las leyes y demás disposiciones reglamentarias y de otra índole vigentes en la República de Chile.

**Siete.Tres.Nueve. Gastos asociados a las Garantías.** Todos los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, publicaciones y cualesquiera otros gastos y desembolsos de cualquiera naturaleza necesarios para el perfeccionamiento de las Garantías, los derivados de las escrituras públicas complementarias que puedan ser necesarias otorgar para clarificar, rectificar o introducir adiciones a las Garantías; y aquellos correspondientes a las cancelaciones o alzamientos de las mismas, serán de exclusivo cargo del Deudor.

**Siete.Tres.Diez. Poder de rectificación de las Garantías.** Cada uno de el Deudor, AES Andes y AES Chile SpA otorga poder irrevocable a María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que actuando uno cualquiera de ellos conjuntamente con el Agente de Garantías Local; puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar a las Garantías, pudiendo suscribir las escrituras públicas o instrumentos privados que se requieran a dicho efecto. El Agente de Garantías Local, podrá ejercer dicho mandato por medio de sus representantes o por medio de quien éstos designen para tales efectos.

**Siete.Tres.Once. Renuncia de derechos bajo las Garantías.** El hecho de que el Agente de Garantías Local no ejercitare o demorare el ejercicio de cualquiera de sus derechos bajo las Garantías, o bajo cualquiera de los demás Documentos del Financiamiento, no constituirá una renuncia de ellos, como tampoco el ejercicio separado o parcial de algún derecho impedirá el ejercicio del mismo o de otros derechos. Las acciones y derechos a que aquí se hace referencia son acumulativos y no excluyen ninguna otra acción o derecho reconocido por la ley.

**Siete.Tres.Doce. Denominación de las cláusulas de las Garantías.** Las denominaciones que las partes de cada Garantía asignen a sus distintas estipulaciones se establecerán sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que cada cláusula en su integridad pueda tener, incluso cuando dicho significado o alcance sea distinto o contrario a la denominación de la respectiva cláusula.

**Siete.Tres.Trece. Alzamientos.** En el ejercicio del mandato de que da cuenta el Contrato de Agencia de Garantías Local, el Agente de Garantías Local deberá alzar y cancelar las Garantías respectivas una vez extinguidas todas las Obligaciones Garantizadas por las mismas y devolver al constituyente respectivo cualquier título, pagaré e instrumento donde consten dichas obligaciones o sean objeto de las respectivas Garantías.

**CLÁUSULA OCTAVA: INTERPRETACIÓN.** A menos que se disponga lo contrario, cualquier referencia en el presente Contrato de Agencia de Garantías Local a cualquier persona incluirá a sus sucesores y cesionarios permitidos bajo el Contrato de Términos Comunes y los demás Documentos del Financiamiento. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa.

**CLÁUSULA NOVENA: NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará a la validez de las demás estipulaciones de este instrumento, cualquier otro Documento del Financiamiento, o cualesquiera otros documentos relacionados con los mismos.

**CLÁUSULA DÉCIMA: AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** Lo dispuesto en este instrumento no se considerará bajo ninguna circunstancia como modificación, o limitación de los derechos que tengan el Agente de Garantías Local, las Partes Garantizadas, o el Deudor en virtud de la ley, del Contrato de Términos Comunes, de los Pagarés y Reconocimientos, de cualquier otro Documento del Financiamiento, o de cualquier otro instrumento suscrito en relación con los anteriores, ni constituye bajo ningún concepto una novación.

**CLÁUSULA UNDÉCIMA: JURISDICCIÓN Y LEY APLICABLE.** Para todos los efectos legales derivados de presente contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se someten a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Este contrato se rige por la ley chilena.

**CLÁUSULA DUODÉCIMA: GASTOS.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo del Deudor. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones de las Garantías, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de las mismas, los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a las Garantías o a este instrumento, o por renuncias o remociones del Agente de Garantías Local; y aquellos correspondientes a las cancelaciones o alzamientos de las mismas, serán de exclusivo cargo del Deudor. De la misma manera, serán de cargo del Deudor todos los gastos originados por asesorías legales, ya sea de abogados externos en Chile o en los Estados Unidos de América, como también todos aquellos gastos razonables en que deba incurrir el Agente de Garantías Local a fin de dar fiel cumplimiento al mandato encomendado en el presente instrumento, de conformidad con lo previsto en los Documentos del Financiamiento.

**CLÁUSULA DÉCIMO TERCERA: PODER DE RECTIFICACIÓN.** Los comparecientes de esta escritura otorgan poder irrevocable a /a/ Felipe Moro Vargas, Fernando Noriega Potoncjack y Diego Peralta Valenzuela; y /b/ María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los cinco segundos, puedan realizar las rectificaciones o aclaraciones que sean necesarias

realizar al presente Contrato de Agencia de Garantías Local, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.

**CLÁUSULA DÉCIMO CUARTA**: **DENOMINACIÓN DE LAS CLÁUSULAS.** Las denominaciones asignadas por las Partes a las distintas estipulaciones de este Contrato de Agencia de Garantías Local han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula o sección en su integridad pueda tener distintos que dicha denominación.".

**TERCERO**: **ANEXOS DEL CONTRATO DE AGENCIA DE GARANTÍAS LOCAL.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos A y Anexo B a que hace referencia el Contrato de Agencia de Garantías Local.

**CUARTO**: **ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Agencia de Garantías Local Modificado y Refundido y el nuevo texto modificado y refundido que consta en este Contrato de Agencia de Garantías Local.

**QUINTO**: **GASTOS.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo del Deudor. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo del Deudor.

**SEXTO**: **NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez de las demás estipulaciones de este instrumento, del Contrato de Agencia de Garantías Local, de cualquier otro Documento del Financiamiento, o cualesquiera otros documentos relacionados con los mismos, las cuales permanecerán íntegramente vigentes.

**SÉPTIMO**: **DOMICILIO Y COMPETENCIA.** Para todos los efectos legales derivados del otorgamiento de este contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se someten a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Esta modificación al Contrato de Agencia de Garantías Local Modificado y Refundido se rige por la ley chilena.

**OCTAVO**: **PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a /a/ Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y /b/ María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los cinco segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.

**NOVENO**: **AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** El presente instrumento no se considerará bajo ninguna circunstancia como una modificación, sustitución o limitación de

los derechos otorgados al Agente de Garantías Local, en virtud de los Documentos del Financiamiento.

**DÉCIMO**: **DENOMINACIÓN DE LAS CLÁUSULAS**. Las denominaciones asignadas por las Partes a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las partes y del Notario que autoriza. En comprobante y previa lectura, así lo otorgan y firman los comparecientes con el Notario que autoriza.- Se da copia. Doy fe.-

## ANEXO A

### ESCRITURA DE ADHESIÓN

| | |
|---|---|
| **ADHESIÓN A** | **ADHESION TO** |
| **CONTRATO DE AGENCIA DE GARANTÍAS LOCAL** | **ONSHORE COLLATERAL AGENCY AGREEMENT** |

| | |
|---|---|
| **[NUEVA PARTE GARANTIZADA]** | **[NEW SECURED PARTY]** |

EN SANTIAGO DE CHILE, a [●] de [●] de [●], ante mí, [●], Notario Público Titular de la [●] Notaría de Santiago, con domicilio en esta ciudad, [●], comparece don [●], [nacionalidad], [estado civil], [profesión u oficio], cédula nacional de identidad número [●], en nombre y representación, según se acreditará, de [NUEVA PARTE GARANTIZADA], [*individualización*], ambos domiciliados para estos efectos en [●], en adelante también e indistintamente el "**Adherente**"; y expone:

KNOW ALL PERSONS BY THESE PRESENTS, that in Santiago, Chile, this [●] day of [●], [●], before me, [●], Notary Public of the [●] Notarial Office in and for Santiago, located at [●], personally appeared Mr. [●], [nationality], [marital status], [profession or occupation], bearing national identification card number [●], as hereinbelow evidenced for and on behalf of [NEW SECURED PARTY] [●], both domiciled for these purposes at [●] /hereinafter the "**Adherent**"/; and states:

**PRIMERO**: **Contrato de Agencia de Garantías Local**.

**FIRST:** **Onshore Collateral Agency Agreement**.

Por escritura pública de fecha [●] de 2022, otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●], **/A/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,** sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, **ITAÚ CORPBANCA, NEW YORK BRANCH, DNB BANK ASA**, entre otros, e **ITAÚ CORPBANCA** /éste último, en adelante, el "**Agente de Garantías Local**"/, todas ellas en su calidad de "**Partes Garantizadas**" /*Secured Parties*/ bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías referido más abajo, en adelante conjuntamente, las "**Partes Garantizadas**", y **/B/ ALTO MAIPO SpA**, en su calidad de deudor bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de

By public deed dated [●], 2022, executed at the notarial office of Santiago of [●], under record number [●], **/A/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,** successor in interest of OVERSEAS PRIVATE INVESTMENT CORPORATION, **ITAÚ CORPBANCA, NEW YORK BRANCH, DNB BANK ASA**, among others, and **ITAÚ CORPBANCA** /the latter, hereinafter, the "**Onshore Collateral Agent**"/, all of them acting in their capacity as "**Secured Parties**" under the Financing Documents, as such term is defined in the Collateral Agency Agreement referred to below, hereinafter, jointly, the "**Secured Parties**", and **/B/ ALTO MAIPO SpA** as borrower under the Financing Documents, as such term is defined in the Collateral Agency Agreement referred to below, hereinafter, the "**Borrower**", as provided

Agencia de Garantías referido más abajo, en adelante el "**Deudor**", conforme a lo dispuesto en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, modificaron y establecieron un texto refundido de un contrato de agencia de garantías, en adelante el "**Contrato de Agencia de Garantías**", mediante el cual, por una parte, las Partes Garantizadas designaron a Itaú Corpbanca, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, domiciliada para estos efectos en [●], como Agente de Garantías Local y le confirieron un mandato mercantil irrevocable para que en tal calidad los represente en la constitución, modificación o extinción de las Garantías, según este término se define en el Contrato de Agencia de Garantías, y en el ejercicio mancomunado de los derechos que para ellos emanen de dichas Garantías y, por otra parte, designaron al Agente de Garantías Local para que los represente en la gestión de los créditos que les correspondan bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, como también en el ejercicio mancomunado de los derechos que emanen de tales créditos, y le otorgaron un mandato mercantil irrevocable para que con amplias facultades desempeñe tales funciones.

in article 18 of Law 20,190 of June 5, 2007, amended and restated a collateral agency agreement (the "**Collateral Agency Agreement**"), whereby the Secured Parties, on one part, appointed Itaú Corpbanca, a banking corporation organized and existing under the laws of Chile, as tax payer number 97,023,000-9, with domicile for this purpose at [●], as Onshore Collateral Agent and granted to it an irrevocable commercial mandate in order that, in such capacity, it represents them in the execution, modification or cancellation of the Security, as defined in the Collateral Agency Agreement, and in the joint exercise of the rights arising therefrom in their favor, and, on the other part, appointed the Onshore Collateral Agent so that it represents them in the management of the credits that belong to them under the Financing Documents, as such term is defined in the Collateral Agency Agreement, as well as in the joint exercise of the rights arising therefrom, and granted to it an irrevocable commercial mandate with broad authority to fulfill such functions.

**SEGUNDO**: Adhesión al Contrato de Agencia de Garantías.

**SECOND**: Accession to the Collateral Agency Agreement.

Por el presente instrumento, el Adherente acepta expresamente ser parte del Contrato de Agencia de Garantías y sujetarse íntegramente a los términos y condiciones estipulados en dicho documento. Presente a este acto, don [●], [nacionalidad], [estado civil], [profesión u oficio], cédula nacional de identidad número [●] y don [●], [nacionalidad],

The Adherent hereby expressly accepts to become a party to the Collateral Agency Agreement and to be subject entirely to the terms and conditions stipulated therein. Present herewith, Mr. [●], [nationality], [marital status], [profession or occupation], bearing national identification card number [●] and Mr. [●], [nationality], [marital status], [profession or occupation],

[estado civil], [profesión u oficio], cédula nacional de identidad número [●], ambos en nombre y representación, según se acreditará, de Itaú Corpbanca, todos domiciliados para estos efectos en [●], quienes declaran que, en la representación que invisten, vienen en aceptar expresamente la adhesión del Adherente al Contrato de Agencia de Garantías, conforme a los términos de este instrumento y lo establecido en la Cláusula Sexta del referido contrato.

bearing national identification card number [●], both as hereinbelow evidenced for and on behalf of Itaú Corpbanca, all domiciled for these purposes at [●], who states that they expressly accept on behalf of the Onshore Collateral Agent the accession by the Adherent pursuant to the terms contained herein and the regulations of Clause Sixth of the Collateral Agency Agreement.

**TERCERO**: Vigencia.

**THIRD**: Effectiveness.

El Adherente declara y reconoce que la adhesión al Contrato de Agencia de Garantías referida precedentemente no podrá dejarse sin efecto sino con el consentimiento previo y por escrito otorgado por el Agente de Garantías Local y se obliga a hacer llegar copia autorizada tanto al Agente de Garantías Local como al Deudor, de la protocolización de este instrumento en un plazo máximo de tres días hábiles bancarios contados desde dicha protocolización.

The Adherent hereby represents and acknowledges that the accession to the Collateral Agency Agreement referred to above shall not be cancelled other than with the prior written consent of the Onshore Collateral Agent and agrees to submit, within a maximum of 3 banking business days, a certified copy of the notarial recordation of this instrument to the Onshore Collateral Agent and the Borrower.

**CUARTO**: Jurisdicción y Ley Aplicable.

**FOURTH**: Jurisdiction and Applicable Law.

Para todos los efectos legales derivados del presente contrato, el Adherente fija su domicilio en la ciudad y comuna de Santiago de Chile y se somete a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. El presente contrato se regirá por las leyes de la República de Chile.

For all legal purposes arising from this instrument, the Adherent establishes its domicile in the city and municipal district of Santiago, Chile, and submits to the jurisdiction of the ordinary courts of justice in the borough of Santiago, Chile. This agreement shall be governed by the laws of the Republic of Chile.

**PERSONERÍAS**.

**LEGAL CAPACITIES**.

La personería de [don/doña] [*nombre completo*] para representar a [Adherente] consta de [●].

The legal capacity of [Mr./Ms.] [*full name*] to act on behalf of [Adherent] is evidenced in [●].

La personería de [don/doña] [*nombre completo*] para representar a **ITAÚ CORPBANCA** consta de [●].

The legal capacity of [Mr./Ms.] [*full name*] to act on behalf of **ITAÚ CORPBANCA** is evidenced in [●].

La personería de [don/doña] [*nombre completo*] para representar a **ITAÚ CORPBANCA** consta de [●].

The legal capacity of [Mr./Ms.] [*full name*] to act on behalf of **ITAÚ CORPBANCA** is evidenced in [●].

En caso de cualquier contradicción entre la versión en español y en inglés, la versión en español prevalecerá.

In case of any inconsistency between the Spanish and English versions, the wording of the Spanish version shall prevail.

_____
[nombre completo/full name]
p.p. [Adherente/Adherent]

_____
[nombre completo/full name]
**p.p. ITAÚ CORPBANCA**

_____
[nombre completo/full name]
**p.p. ITAÚ CORPBANCA**

## **ANEXO B**

## **PAGARÉS Y RECONOCIMIENTOS DE DEUDA**

## **Exhibit K**

**VAT Loan Agreement**

C&C's comments to CAREY DRAFT APRIL 27, 2022

**CONTRATO DE FINANCIAMIENTO**

**PARA FINANCIAMIENTO**

**DE IMPUESTO AL VALOR AGREGADO**

**BANCO DE CRÉDITO E INVERSIONES**

**Y OTROS**

Como Acreedores IVA

**A**

**ALTO MAIPO SpA**

**Como Deudor**

**EN SANTIAGO DE CHILE**, a [●] de 2022, ante mí, **[●]**, abogado, Notario Público Titular de la [●] Notaría de Santiago, con oficio en [●], Comuna de [●], comparecen:

**/Uno/ [•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES**, una sociedad anónima de giro bancario, constituida y existente bajo las leyes de Chile, rol único tributario número noventa y siete millones seis mil guion seis, todos domiciliados en esta ciudad, en Avenida El Golf número ciento veinticinco, comuna de Las Condes /en adelante indistintamente "**BCI**"/;

**/Dos/ [•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **ITAÚ CORPBANCA**, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, rol único tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados en esta ciudad, en **[•]**;

**/Tres/ [•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de [•], y este en su calidad de administrador de **[MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSIÓN]**, un fondo de inversión constituido y existente bajo las leyes de Chile, rol único tributario número [•], todos domiciliados en esta ciudad, en [•] /en adelante indistintamente "**Moneda I**"/;

/**Cuatro**/ [•], [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **[MONEDA RENTA CLP FONDO DE INVERSIÓN]**, un fondo de inversión constituido y existente bajo las leyes de Chile, rol único tributario número [•], todos domiciliados en esta ciudad, en [•] /en adelante indistintamente "**Moneda II**"/;

/**Cinco**/ [•], [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **DNB Bank ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/;

/**Seis**/ [•], [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y don **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **CLOVER PRIVATE CREDIT OPPORTUNITIES ORIGINATION II LP**, una sociedad constituida y existente bajo las leyes de [•], todos domiciliados para estos efectos en [•]/en adelante indistintamente "**Clover I**"/;

/**Siete**/ [•], [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **CLOVER PRIVATE CREDIT OPPORTUNITIES ORIGINATION (LEVERED) II LP**, una sociedad constituida y existente bajo las leyes de [•], todos domiciliados para estos efectos en [•]/en adelante indistintamente "**Clover II**" y conjuntamente con BCI, Itaú Corpbanca, Moneda I, Moneda II, DNB y Clover I, los "**Acreedores IVA**"/; y

/**Ocho**/ [•], [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], y don **[•]**, [nacionalidad], [estado civil], [profesión], cédula de identidad número [•], ambos en representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**" o la "**Sociedad**", y conjuntamente con los Acreedores IVA denominados las "**Partes**"/; todos los comparecientes mayores de edad, quienes acreditaron su identidad con las cédulas [o pasaportes] indicadas, exponen que han convenido en celebrar un contrato de financiamiento /en adelante indistintamente el "**Contrato de Financiamiento IVA**" o el "**Contrato**"/, en los términos y condiciones que se estipulan en este instrumento:

**<u>CLÁUSULA PRIMERA</u>: <u>ANTECEDENTES</u>.**

**<u>Uno.Uno</u>. <u>Alto Maipo SpA</u>.**

**/a/ <u>Constitución</u>.**

Por escritura pública de fecha primero de agosto de dos mil once, otorgada en la Notaría de Santiago de don Osvaldo Pereira González bajo el repertorio número dieciséis mil novecientos cuarenta y uno guion once, se constituyó la Sociedad como una sociedad por acciones bajo la razón social de Alto Maipo SpA. Un extracto de dicha escritura fue inscrito a fojas cuarenta y cinco mil once, número treinta y tres mil doscientos setenta y nueve del Registro de Comercio del Conservador de Bienes Raíces y Comercio de Santiago correspondiente al año dos mil once y fue publicado en el Diario Oficial de fecha dieciséis de agosto del mismo año.

**/b/ <u>Modificaciones</u>.**

A esta fecha, los estatutos de la Sociedad han experimentado diversas modificaciones, siendo la última de ellas la que consta de escritura pública de fecha [●] de dos mil veintidós, otorgada en la Notaría de Santiago de [●]. Un extracto de dicha escritura fue inscrito a fojas [●], número [●] del Registro de Comercio del Conservador de Bienes Raíces de Santiago correspondiente al año dos mil veintidós, y se publicó en el Diario Oficial con fecha [●] de dos mil veintidós.

**<u>Uno.Dos</u>. <u>Proyecto</u>.**

El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. Al [•] de dos mil veintidós, todas las Centrales de Generación se

encuentran interconectadas al Sistema Eléctrico Nacional y en operación comercial.

**Uno.Tres**. Procedimiento de Insolvencia del Deudor.

Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC, filial del Deudor, iniciaron un procedimiento de insolvencia conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**Uno.Cuatro**. Contrato de Términos Comunes.

**/A/** Con el objeto de obtener financiamiento para el Proyecto, por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB e Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Common Terms Agreement* /el "**Contrato de Términos Comunes Original**"/.

**/B/** El Contrato de Términos Comunes Original fue modificado con fecha diecinueve de diciembre de dos mil catorce, y adicionalmente fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Common Terms Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante el "**Contrato de Términos Comunes Modificado**"/.

**/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB e Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Second Amended and Restated Common Terms Agreement*, en virtud del cual el Contrato de Términos Comunes Modificado fue nuevamente modificado y refundido /en adelante, el Contrato de Términos Comunes Modificado, modificado y refundido en el *Second Amended and Restated Common Terms Agreement*, se denomina el "**Contrato de Términos Comunes Modificado y Refundido**"/.

**/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Third Amended and Restated Common Terms Agreement*, se modificó el Contrato de Términos Comunes Modificado y Refundido /en adelante el Contrato de Términos Comunes Modificado y Refundido modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato de Términos Comunes**"/. Una copia del Contrato de Términos Comunes fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**Uno.Cinco. Financiamiento de Construcción.**

**[/A/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, DNB e Itaú Corpbanca, entre otros, denominado [*Secured OneL Loan Agreement*] /en adelante y según sea modificado o modificado o refundido en el futuro, el "**Secured OneL Agreement**"/, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados a esa fecha por el Deudor asociados a la construcción del Proyecto, bajo la denominación de "*Secured OneL Loans*", en adelante el "**Tramo Preferente**". Una copia del Secured OneL Agreement fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].][1]

**/B/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, DNB e Itaú Corpbanca, entre otros, denominado [*Secured TwoL Loan and Accounts Payable Agreement*] /en adelante y según sea modificado o modificado o refundido en el futuro, el "**Secured TwoL Agreement**"/, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados a esa fecha por el Deudor asociados a la construcción del Proyecto, bajo la denominación de "*Secured TwoL Loans*", en adelante el "**Tramo Subordinado**" y conjuntamente con el Tramo Preferente los "**Tramos**" y cada uno de ellos un "**Tramo**". Una copia del Secured TwoL Agreement fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**/C/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, con fecha [•] de dos mil veintidós, el Deudor y [•] suscribieron un contrato de emisión de bonos en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Indenture*" /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/, en virtud del cual el Deudor [acordó emitir / emitió] bonos garantizados al mismo nivel de preferencia que el Tramo Preferente, en adelante los "**Bonos Preferentes**". Una copia del Secured OneL Indenture fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Secured TwoL Agreement contempla la opción para los acreedores bajo el Tramo Subordinado, de canjear todo o parte de los créditos adeudados bajo el Tramo Subordinado, en bonos emitidos por el Deudor /denominados "*Secured TwoL*

---

*Notes*", en adelante los "**Bonos Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y [Wilmington Trust, National Association] en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**" y junto con el Secured OneL Indenture, los "**Indentures**"/.

**Uno.Seis**. EPC Strabag y Contrato de Pago Diferido del Proveedor.

/**A**/ Para efectos de llevar adelante la construcción de las obras del Proyecto, el Deudor y Strabag SpA celebraron un contrato en idioma inglés denominado "*Tunnel Complex Construction Contract*" /*Contrato de Construcción de un Complejo de Túneles*/, de fecha once de octubre de dos mil doce, el cual fue modificado por instrumento privado en idioma inglés denominado "*Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract*" /Modificación y Texto Refundido del Contrato de Construcción a Suma Alzada de un Complejo de Túneles/ de fecha diecinueve de febrero de dos mil dieciocho, sujeto a las leyes del Estado de Nueva York, y que fue a su vez modificado por instrumento privado en idioma inglés y sujeto a las leyes del Estado de Nueva York, de fecha ocho de mayo de dos mil dieciocho /en adelante conjuntamente el "**EPC Strabag**"/.

/**B**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, el Deudor y Strabag, suscribieron un contrato en idioma inglés denominado "*Supplier Deferred Payment Agreement*" /en adelante el "**Contrato de Pago Diferido del Proveedor**"/, en virtud del cual Strabag y el Deudor acordaron los términos y plazos de pago de ciertas sumas de dinero originadas en las obras de construcción ejecutadas bajo el EPC Strabag.

/**C**/ Como parte del acuerdo adoptado por Strabag, los acreedores del Deudor y este último dentro del Capítulo Once, /i/ el EPC Strabag fue nuevamente modificado mediante instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York /según sea modificado, complementado o refundido en el futuro, el "**EPC Strabag Modificado**"/; y /ii/ se acordó, entre otras materias, reflejar la reprogramación de parte de las cuentas por pagar adeudadas a esa fecha por el Deudor a Strabag SpA bajo el Contrato de Pago Diferido del Proveedor, en el Tramo Subordinado, en el Tramo Preferente y en el Secured OneL Indenture.

**Uno.Siete**. Financiamiento IVA.

Como parte del acuerdo adoptado por Strabag, los acreedores del Deudor y este último dentro del Capítulo Once, los Acreedores IVA acordaron otorgar al Deudor un crédito a corto plazo dividido en dos tramos /los "**Préstamos IVA**"/, para el financiamiento del IVA aplicable al ["*Supplier Deferred Payment*" /según dicho término se define en el Contrato de

Términos Comunes/][2] que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis de la Ley de IVA /en adelante el "**Monto IVA Strabag**"/.

**Uno.Ocho. Contrato de Cuentas Locales.**

/**A**/ Con el objeto de obtener financiamiento para el Proyecto, por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Onshore Accounts Agreement* /el "**Contrato de Cuentas Locales Original**"/.

/**B**/ El Contrato de Cuentas Locales Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Onshore Accounts Agreement*, de fecha diecisiete de marzo de dos mil dieciséis, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante el "**Contrato de Cuentas Locales Modificado**"/.

/**C**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Second Amended and Restated Onshore Accounts Agreement*, en virtud del cual el Contrato de Cuentas Locales Modificado fue nuevamente modificado y refundido /en adelante, el Contrato de Cuentas Locales Modificado, modificado y refundido en el *Second Amended and Restated Onshore Accounts Agreement*, se denomina el "**Contrato de Cuentas Locales Modificado y Refundido**"/.

/**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Third Amended and Restated Onshore Accounts Agreement*, se modificó el Contrato de Cuentas Locales Modificado y Refundido /en adelante el Contrato de Cuentas Locales Modificado y Refundido modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato de Cuentas Locales**"/. Una copia del Contrato de Cuentas Locales fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [●].

**Uno.Nueve**. **Contrato de Cuentas Extranjeras.**

/**A**/ Con el objeto de obtener financiamiento para el Proyecto, por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con

---

[2] Nota: Confirmar que la referencia es correcta en el sentido que no se haya modificado mediante otro acuerdo del Chapter 11, el monto correspondiente a ser pagado a Strabag por ese concepto.

Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Offshore Accounts Agreement* /el "**Contrato de Cuentas Extranjeras Original**"/.

**/B/** El Contrato de Cuentas Extranjeras Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Offshore Accounts Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante el "**Contrato de Cuentas Extranjeras Modificado**"/.

**/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente Itaú Corpbanca, entre otros, suscribieron un contrato en idioma inglés denominado *Second Amended and Restated Offshore Accounts Agreement*, en virtud del cual el Contrato de Cuentas Extranjeras Modificado fue nuevamente modificado y refundido /en adelante, el Contrato de Cuentas Extranjeras Modificado, modificado y refundido en el *Second Amended and Restated Offshore Accounts Agreement*, se denomina el "**Contrato de Cuentas Extranjeras Modificado y Refundido**"/.

**/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Third Amended and Restated Offshore Accounts Agreement*, se modificó el Contrato de Cuentas Extranjeras Modificado y Refundido /en adelante el Contrato de Cuentas Extranjeras Modificado y Refundido modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato de Cuentas Extranjeras**"/. Una copia del Contrato de Cuentas Extranjeras fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**Uno.Diez. Acuerdo entre Acreedores.**

**/A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, BCI y DNB, entre otros, suscribieron un contrato en idioma inglés denominado "*Intercreditor Agreement*" /en adelante el "**Contrato entre Acreedores Original**"/.

**/B/** El Contrato entre Acreedores Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Intercreditor Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América y posteriormente modificado nuevamente por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Second Amended and Restated Intercreditor Agreement*" /en adelante, el Contrato entre Acreedores Original, modificado y refundido en la forma antes señalada, el "**Contrato entre Acreedores Modificado y Refundido**"/.

-8-

/**C**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Contrato entre Acreedores Modificado y Refundido fue nuevamente modificado y refundido por instrumento privado en idioma inglés, otorgado con fecha [•] de dos mil veintidós, denominado ["*Third Amended and Restated Intercreditor Agreement*"], suscrito entre los acreedores bajo el Secured 1L Loan Agreement, los acreedores bajo el Secured TwoL Loan Agreement, y los Acreedores IVA, entre otros /en adelante el Contrato entre Acreedores Modificado y Refundido, modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato entre Acreedores**"/. Una copia del Contrato entre Acreedores ha sido protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

/**D**/ En virtud del Contrato entre Acreedores, las partes del mismo regularon los términos para que el ejercicio de los derechos de cada parte bajo los Documentos del Financiamiento /"*Financing Documents*"/, según dicho término se define en el Contrato de Términos Comunes, se ejerzan de manera coordinada y respetando las preferencias y grados de las garantías otorgadas para asegurar el debido cumplimiento de las obligaciones que de ellos emanan, así como la toma de decisiones entre las partes de los Documentos del Financiamiento con respecto a determinados temas, como las medidas que pueden adoptarse ante el incumplimiento del Deudor, y el uso y la distribución de los montos obtenidos, pagos, entre otros.

**Uno.Once**. **Contrato de Agencia de Garantías Local**.

/**A**/ Mediante escritura pública de fecha nueve de diciembre de dos mil trece otorgada en la Notaría de Santiago de don José Musalem Saffie, bajo el repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se celebró el contrato denominado "Contrato de Agencia de Garantías", por el cual Corpbanca /hoy Itaú Corpbanca/ fue designado como agente de garantías, de conformidad con lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, a fin de que represente a las Partes Garantizadas ahí establecidas /incluyendo aquéllas que en el futuro se adhieran a dicho contrato de agencia de garantías o los sucesores o cesionarios permitidos de éstas/, en la constitución, modificación o extinción y en el ejercicio mancomunado de los derechos que para ellos emanen de las garantías y resguardos a que se refiere dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Original**"/. El Contrato de Agencia de Garantías Local Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado y refundido mediante escritura pública de fecha [•] de dos mil veintidós otorgada en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•] /en adelante, el Contrato de Agencia de Garantías Local Modificado y Refundido así modificado y refundido, y según pueda ser modificado o modificado o refundido en el

futuro, se denomina el "**Contrato de Agencia de Garantías Local**"/.

**/b/** En virtud del Contrato de Agencia de Garantías Local: /i/ se ha designado a Itaú Copbanca como agente de garantías /en adelante, incluyendo cualquier entidad que en el futuro lo suceda o reemplace en tal calidad, el "**Agente de Garantías Local**"/; /ii/ se han conferido al Agente de Garantías Local las facultades que allí se indican; y /iii/ se han acordado los términos por los que se regirán las relaciones de los Acreedores IVA y las demás Partes Garantizadas /según dicho término se define en el Contrato de Agencia de Garantías Local/ en relación con los distintos documentos de garantía otorgados a favor del Agente de Garantías Local en virtud del Contrato de Agencia de Garantías Local.

## CLÁUSULA SEGUNDA: DEFINICIONES.

Las Partes convienen que, con excepción de los nombres propios y de la palabra inicial de cualquier frase, los términos con mayúscula inicial que se usan en este instrumento y que no hayan sido definidos especialmente en el mismo, tendrán para todos los efectos de este Contrato, en cada caso, el significado que para cada uno de ellos se pasa a indicar, siendo extensivas tales definiciones tanto a su forma en singular o plural, según sea el caso:

### Dos.Uno. Definiciones Integrales.

Se aplicarán las siguientes definiciones al presente Contrato de Financiamiento IVA:

"**Acreedores IVA**": tiene el significado asignado en la comparecencia de este instrumento.

"**Acreedores UBS**": significa fondos o cuentas administrados por UBS O'Connor LLC junto con cualquier cesionario de los anteriores de Préstamos IVA, que sea una persona que controle, sea controlada por, o bajo control común de UBS O'Connor LLC, y siempre y cuando ese cesionario haya sido previamente aprobado por el Deudor, cuyo consentimiento no puede ser denegado o retrasado injustificadamente y en especial si el tratamiento tributario en Chile del cesionario no sería peor para el Deudor que el tratamiento tributario en Chile del Acreedor UBS cedente.

"**Acreedores UF**": significa conjuntamente BCI, Itaú Corpbanca, Moneda I y Moneda II, y sus sucesores o cesionarios respectivos.

"**Acreedores USD**": significa conjuntamente DNB, Clover I y Clover II, y sus sucesores o cesionarios respectivos.

"**Agente de Cuentas**": significa cualquiera de Itaú Corpbanca en su calidad de Agente de Cuentas bajo el Contrato de Cuentas Locales, o Itaú Corpbanca New York Branch en su calidad de Agente de Cuentas bajo el Contrato de Cuentas Extranjeras, o sus respectivos sucesores o cesionarios en dicha capacidad.

"**Agente de Garantías Local**": tiene el significado asignado en la sección Uno.Once /b/ de

-10-

la Cláusula Primera de este Contrato.

"**Asesor Tributario**": significa Carey y Cía. Limitada, o quien lo reemplace en el futuro.

"**Autoridad Gubernamental**": significa cualquier autoridad del gobierno central, regional, provincial, comunal o de cualquier división administrativa que corresponda, o cualquier cuerpo, agencia o autoridad /incluyendo, sin limitación alguna, el Servicio de Impuestos Internos, la Tesorería o los Tribunales de Justicia/ que ejerza funciones ejecutivas, legislativas, judiciales, regulatorias o administrativas, en el ejercicio de una función pública y que tenga competencia sobre la persona o materia de que se trate.

"**Banco Central**": significa el Banco Central de Chile.

"**Cartas de Comisiones**": significa las cartas de comisiones y honorarios suscritas con esta misma fecha entre el Deudor y cada uno de los Acreedores UF.

"**Causal de Incumplimiento**": tiene el significado que se le asigna a dicho término en la Cláusula Undécima del presente Contrato.

"**CMF**": significa la Comisión para el Mercado Financiero, sucesora de la Superintendencia de Valores y Seguros y de la Superintendencia de Bancos e Instituciones Financieras.

"**Condiciones Factura**": significa las siguientes condiciones suspensivas y copulativas, establecidas en exclusivo beneficio de los Acreedores IVA: [/**i**/ que hayan transcurrido diez días desde la fecha en que la orden de confirmación /*confirmation order*/, que confirma el plan de reorganización del capítulo once presentado por el Deudor, haya sido ingresada en el expediente mantenido por el Tribunal de Quiebras respectivo de conformidad con las Reglas de Quiebras /*Bankruptcy Rules*/ 5003 y 9021 del Código de Quiebras de los Estados Unidos de América;][3] y /**ii**/ el Deudor, en su calidad de propietario /*owner*/, emita la Notificación de Transferencia de Trabajo de Hito Crítico /*Critical Milestone Work Transfer Notice*/, según ese término se define en el EPC Strabag/ para [cada uno] de los Hitos Críticos D, E y F /Critical Milestones D, E, and F según se definen dichos términos en el EPC Strabag/.[4]

"**Contrato de Opción**": significa uno o más contratos de opción | a ser celebrados por Alto Maipo para comprar USD por un monto igual al Monto Comprometido Tramo USD a un *strike price* que no sea mayor a un cinco por ciento por sobre del precio de mercado spot a la fecha de celebración del contrato, a un plazo no inferior a setenta y cinco días desde la fecha de su celebración y el costo de los cuales, en total, no exceda de un millón de Dólares.

---

[3] Nota: a ser actualizado según corresponda conforme al resultado del proceso de reorganización de Alto Maipo.

[4] Nota: sujeto a confirmación del acuerdo comercial entre Alto Maipo y Strabag y a la revisión del documento en que consta dicho acuerdo.

**Commented [A1]:** Nota a Carey: nos parece innecesario especificar. La opción europea es más barata y se puede vender antes del maturity.

"**Contratos de Garantía de IVA**": significa conjuntamente los siguientes actos y contratos otorgados a favor del Agente de Garantías Local, actuando por y en beneficio de los Acreedores IVA: /**i**/ Prenda sobre Resoluciones SII; /**ii**/ Prenda sobre Dinero e Inversiones Permitidas IVA; /**iii**/ Mandato de Cobro IVA; y /**iv**/ Prenda sobre Dinero e Inversiones Permitidas Escrow.

"**Cuenta de Devolución IVA**": significa, la cuenta denominada "*VAT Holding Account*" en el Contrato de Cuentas Locales, correspondiente a la cuenta de orden, denominada en Pesos, número [56919972], abierta a nombre de la Sociedad en Itaú Corpbanca.[5]

"**Cuenta Escrow UF**": significa, la cuenta denominada "*UF VAT Escrow Account*" en el Contrato de Cuentas Locales, correspondiente a la cuenta de orden, denominada en Pesos, número [____], abierta a nombre de la Sociedad en Itaú Corpbanca.[6]

"**Cuenta Escrow USD**": significa, la cuenta denominada "*USD VAT Escrow Account*" en el Contrato de Cuentas Locales, correspondiente a la cuenta de orden, denominada en Dólares, número [____], abierta a nombre de la Sociedad en Itaú Corpbanca.[7]

"**Día Hábil**": significa cualquier día del año que no sea sábado, domingo o un día en que los bancos comerciales estén obligados o autorizados por ley para permanecer cerrados en Santiago, Chile; Nueva York, Estados Unidos de América; Washington D.C., Estados Unidos de América; Oslo, Noruega; y Viena, Austria.

"**Documentos del Financiamiento**": tiene el significado asignado a "*Financing Documents*" en el Contrato de Términos Comunes.

"**Documentos del Financiamiento IVA**": significa, conjuntamente: /**a**/ el presente Contrato; /**b**/ los Pagarés IVA y sus eventuales hojas de prolongación; /**c**/ los Contratos de Garantía de IVA; /**d**/ las Cartas de Comisiones; /**e**/ /**i**/ cualquier otro documento definido como un Documento del Financiamiento IVA, bajo este Contrato y/o bajo cualquiera de los documentos referidos en los literales /a/, /b/ y /c/ precedente, o en cualquier otro Documento del Financiamiento IVA; y /**ii**/ cualquier otro documento identificado como Documento del Financiamiento IVA por el Deudor y los Acreedores IVA; /**f**/ cada complementación, corrección, autorización respecto de cualquiera de los documentos referidos en los literales /a/ a /e/ precedentes; y /**g**/ cualquier documento que reemplace cualquiera de los documentos referidos en los literales /a/ a /f/ precedentes.

"**Dólares**" o "**USD**": significa la moneda de curso legal en los Estados Unidos de América.

"**Ejecutivo Principal**": tiene el significado que le asigna el inciso segundo del Artículo

---

[5] Nota: descripción a ser consistente con Contrato de Cuentas Locales.

[6] Nota: descripción a ser consistente con Contrato de Cuentas Locales.

[7] Nota: descripción a ser consistente con Contrato de Cuentas Locales.

sesenta y ocho de la Ley número dieciocho mil cuarenta y cinco, de Mercado de Valores, y sus modificaciones, especialmente aquéllas contenidas en la Ley número veinte mil trescientos ochenta y dos, publicada en el Diario Oficial de veinte de octubre de dos mil nueve.

"**Factura Strabag**": significa la factura que Strabag SpA deberá emitir sujeto al cumplimiento de las Condiciones Factura, a nombre del Deudor, por el monto en Pesos correspondiente al "*Supplier Deferred Payment*" /según dicho término se define en el Contrato de Términos Comunes/ en la fecha de emisión de esa factura de acuerdo con el Tipo de Cambio Observado, más el IVA aplicable.

"**Fecha de Pago de Capital IVA**": tiene el significado asignado en la sección Tres.Tres. /b/ /i/ de la Cláusula Tercera.

"**Fecha de Vencimiento Final**": significa la fecha correspondiente a doce meses contados desde la fecha de desembolso de los Préstamos IVA.

"**Financiamiento IVA**": tiene el significado asignado en la sección Tres.Uno. /a/ de la Cláusula Tercera.

"**Impuesto Adicional**": significa el impuesto adicional establecido en el Título IV del Decreto Ley número ochocientos veinticuatro, Ley sobre Impuesto a la Renta.

"**Impuesto de Timbres**": significa el impuesto establecido en el Artículo Primero de la Ley de Timbres y Estampillas, a la tasa allí establecida.

"**Impuestos Excluidos**": significa /i/ respecto de DNB, el Impuesto Adicional a una tasa mayor a la establecida en el artículo cincuenta y nueve número uno, letra /b/, del Decreto Ley número ochocientos veinticuatro de mil novecientos setenta y cuatro, Ley de Impuesto a la Renta; y /ii/ respecto de cualquier otro Acreedor IVA distinto a Acreedores UBS, el Impuesto Adicional, sujeto a lo señalado en la sección Doce.Uno /a//ii/ para los Acreedores UBS.

"**Interés Máximo Convencional**": significa el límite máximo que establece la Comisión para el Mercado Financiero para tasas de interés en operaciones de crédito de dinero, el cual se encuentra regulado en el artículo sexto de la ley 18.010 /*Ley sobre Operaciones de Crédito de Dinero*/.

"**Inversiones Permitidas**": significa las inversiones, tomadas a través del Agente de Cuentas respectivo, con fondos depositados en la Cuenta Escrow UF, en la Cuenta Escrow USD o en la Cuenta de Devolución IVA, que se encuentren permitidas conforme a lo establecido en el Contrato de Cuentas Locales.

"**IVA**": significa el impuesto al valor agregado establecido en la Ley de IVA.

"**Ley de IVA**": significa el Decreto Ley número ochocientos veinticinco, de mil novecientos

-13-

setenta y cuatro, y sus modificaciones posteriores, ley de impuesto a las ventas y servicios.

"**Ley de Timbres**": significa el Decreto Ley número tres mil cuatrocientos setenta y cinco, de mil novecientos ochenta, sobre impuesto de timbres y estampillas, publicado en el Diario Oficial de cuatro de septiembre de mil novecientos ochenta y sus modificaciones posteriores.

"**Mandato de Cobro IVA**": significa el mandato irrevocable que la Sociedad ha otorgado al Agente de Garantías Local, actuando por y en beneficio de los Acreedores IVA, mediante escritura pública de esta misma fecha y en esta misma Notaría, para cobrar y percibir de la Tesorería General de la República u otra Autoridad Gubernamental competente, los dineros a que por concepto de devolución del Monto IVA Strabag asociado a la Factura Strabag tenga derecho la Sociedad.

"**Monto Comprometido Tramo UF**": tiene el significado asignado en la sección Tres.Uno. /a/ de la Cláusula Tercera.

"**Monto Comprometido Tramo USD**": tiene el significado asignado en la sección Tres.Uno. /a/ de la Cláusula Tercera.

"**Monto IVA Strabag**": tiene el significado asignado en la sección Uno.Siete de la Cláusula Primera.

"**Montos Comprometidos**": tiene el significado asignado en la sección Tres.Uno. /a/ de la Cláusula Tercera.

"**Pagarés IVA**": significa los pagarés y sus eventuales hojas de prolongación, que sean suscritos para evidenciar los desembolsos bajo el Financiamiento IVA, en términos sustancialmente similares al formado adjunto en el **Anexo III** del presente Contrato.

"**Partes Garantizadas**": tiene el significado asignado en el Contrato de Agencia de Garantías Local.

"**Período de Disponibilidad IVA**": tiene el significado asignado en la sección Tres.Dos. /a/ /i/ de la Cláusula Tercera.

"**Período de Intereses**": tiene el significado asignado en la sección Tres.Cuatro. /b/ de la Cláusula Tercera.

"**Período de Intereses Subsecuente**": tiene el significado asignado en la sección Tres.Cuatro. /b/ de la Cláusula Tercera.

"**Peso**": significa la moneda de curso legal en Chile.

"**Potencial Incumplimiento**" significa aquel evento que, con el transcurso del tiempo o

mediando notificación o comunicación, constituiría una Causal de Incumplimiento.

"**Prenda sobre Dinero e Inversiones Permitidas IVA**": significa la prenda sin desplazamiento y prohibiciones de primer grado que el Deudor ha otorgado a favor del Agente de Garantías Local, en beneficio de los Acreedores IVA, respecto de los dineros depositados o a ser depositados y de las Inversiones Permitidas efectuadas con dineros depositados en la Cuenta de Devolución IVA.

"**Prenda sobre Dinero e Inversiones Permitidas Escrow**": significa la prenda sin desplazamiento y prohibiciones de primer grado que el Deudor ha otorgado a favor del Agente de Garantías Local, en beneficio de los Acreedores IVA, respecto de los dineros depositados o a ser depositados y de las Inversiones Permitidas efectuadas con dineros depositados en la Cuenta Escrow UF y en la Cuenta Escrow USD.

"**Prenda sobre Resoluciones SII**": significa la prenda sin desplazamiento de primer grado y prohibiciones sobre cualquier resolución emitida por el Servicio de Impuestos Internos que aprueba la devolución de IVA de todo o parte del Monto IVA Strabag asociado a la Factura Strabag a favor del Agente de Garantías IVA, actuando por y en beneficio de los Acreedores IVA.

"**Préstamos IVA**": tiene el significado asignado en la sección Uno.Siete. de la Cláusula Primera.

"**Préstamos UF**": significa aquellos préstamos desembolsados por los Acreedores UF con cargo al Monto Comprometido Tramo UF.

"**Préstamos USD**": significa aquellos préstamos desembolsados por los Acreedores USD con cargo al Monto Comprometido Tramo USD.

"**Primer Período de Intereses**": tiene el significado asignado en la sección Tres.Cuatro. /b/ de la Cláusula Tercera.

"**Segundo Período de Intereses**": tiene el significado asignado en la sección Tres.Cuatro. /b/ de la Cláusula Tercera.

"**Solicitud de Reembolso Anticipado**": significa la solicitud que el Deudor deberá efectuar al Servicio de Impuestos Internos de conformidad a lo dispuesto en el Artículo veintisiete bis de la Ley de IVA, para el reembolso anticipado del IVA crédito asociado al Monto IVA Strabag.

"**Tesorería**": significa la Tesorería General de la República de Chile.

"**Tipo de Cambio Observado**": significa la cantidad de Pesos necesarios para comprar una unidad de Dólar, según determinación efectuada por el Banco Central conforme al número siete del Capítulo I del Compendio de Normas de Cambios Internacionales del Banco Central, que sea publicada en el Diario Oficial, o aquél que lo reemplace, o en la

página de internet www.bcentral.cl, para tener vigencia en la respectiva fecha de pago o cálculo. Si el Tipo de Cambio Observado no fuere publicado ni determinado por el Banco Central, se aplicará el tipo de cambio promedio, informado en la fecha respectiva por el Banco Central. Si éste informare cotizaciones "*comprador*" y "*vendedor*", se aplicará como tipo de cambio el promedio aritmético entre ellas. Si el Banco Central dejare de informar dicho tipo de cambio promedio, se aplicará el promedio aritmético de las transacciones bancarias promedio entre comprador y vendedor, el Día Hábil inmediatamente anterior a la fecha de pago o cálculo, por las oficinas principales en Santiago de Banco de Crédito e Inversiones. Para todos los efectos del Contrato, se entenderá que el Tipo de Cambio Observado es también aquél que lo sustituya o reemplace de conformidad con esta definición.

"**Unidad de Fomento**" o "**UF**": significa en cualquier fecha de determinación, la unidad de reajustabilidad establecida por el Banco Central, de conformidad con las disposiciones del Artículo treinta y cinco número nueve del Artículo primero de la Ley número dieciocho mil ochocientos cuarenta y el Capítulo II.B.Tres, *"Sistemas de Reajustabilidad Autorizados por el Banco Central /Acuerdo Nº 05-07-900105/"*, del Compendio de Normas Financieras del Banco Central, y publicado en la fecha más reciente a dicha determinación en el Diario Oficial o en el sitio web www.bcentral.cl. Si por cualquier causa la Unidad de Fomento o su actual base de cálculo dejare de existir o variare sustancialmente, las obligaciones expresadas en UF en este Contrato continuarán regidas por la normativa y bases de cálculo relativas a la Unidad de Fomento vigentes a la fecha de este Contrato, lo que no obsta a que las Partes convengan reemplazar esta unidad de reajuste sobre su base actual por otro sistema de reajustabilidad disponible a los bancos chilenos conforme a la normativa en vigor a esa fecha del Banco Central.

**CLÁUSULA TERCERA**: **FINANCIAMIENTO IVA**.

**Tres.Uno**. **Monto Comprometido. Participaciones. Objeto. Carácter No Rotativo.**

**/a/ Monto**. Por el presente instrumento, /i/ los Acreedores UF acuerdan poner a disposición del Deudor, un financiamiento por hasta la cantidad de Unidades de Fomento equivalentes [a la fecha de emisión de la Factura Strabag][8] a la suma de [●] Dólares /el "**Monto Comprometido Tramo UF**"/, a ser denominado en UF pero desembolsado en Pesos de acuerdo a la equivalencia con el Tipo de Cambio Observado y la Unidad de Fomento vigentes el día de desembolso de los Préstamos UF en la cuenta correspondiente, pero que una vez desembolsado será denominado nuevamente en Unidades de Fomento, debiendo pagarse en Pesos de acuerdo a la equivalencia con la Unidad de Fomento vigente el día del pago respectivo; y /ii/ los Acreedores USD acuerdan poner a disposición del Deudor un financiamiento por hasta la suma de [●] Dólares /el "**Monto Comprometido Tramo USD**" y conjuntamente con el Monto Comprometido Tramo UF, los "**Montos Comprometidos**"/, importes que se distribuyen entre los Acreedores IVA conforme el siguiente detalle /el "**Financiamiento IVA**"/:

---

[8] Nota: lenguaje entre paréntesis en este párrafo y el siguiente sujeto a negociación entre las partes.

**/i/ Monto Comprometido Tramo UF:** BCI, la cantidad de Unidades de Fomento equivalentes [a la fecha de emisión de la Factura Strabag] a la suma de [●] Dólares; Itaú Corpbanca, la cantidad de Unidades de Fomento equivalentes [a la fecha de emisión de la Factura Strabag] a la suma de [●] Dólares; Moneda I, la cantidad de Unidades de Fomento equivalentes [a la fecha de emisión de la Factura Strabag] a la suma de [●] Dólares; y Moneda II, la cantidad de Unidades de Fomento equivalentes [a la fecha de emisión de la Factura Strabag] a la suma de [●] Dólares.

**/ii/ Monto Comprometido Tramo USD:** DNB, la cantidad de [●] Dólares; Clover I, la cantidad de [●] Dólares; y Clover II, la cantidad de [●] Dólares.

**/b/ Carácter No Rotativo.**

Los montos pagados y/o prepagados de los préstamos desembolsados con cargo al Financiamiento IVA, no darán derecho a la Sociedad a solicitar nuevos desembolsos.

**/c/ Objeto.**

El Financiamiento IVA tiene por objeto exclusivo financiar el IVA asociado al Monto IVA Strabag.

**Tres.Dos**. **Período de Disponibilidad del Financiamiento IVA.**

**/a/ Período de Disponibilidad.**

**/i/** Sujeto al cumplimiento de las condiciones establecidas en la Sección Cuatro.Dos de la Cláusula Cuarta siguiente, el Deudor sólo podrá solicitar desembolsos con cargo a los Montos Comprometidos, y los Acreedores IVA deberán cursarlos, a partir de esta fecha y hasta lo que ocurra primero entre: **/y/** la fecha en que los Montos Comprometidos se hubieren reducido a cero; y **/z/** el veintinueve de julio de dos mil veintidós /conjuntamente el "**Período de Disponibilidad IVA**"/.

**/ii/** En todo caso, no se cursarán préstamos con cargo al Financiamiento IVA en el evento que haya ocurrido y se mantenga vigente alguna Causal de Incumplimiento.

**/iii/** Lo señalado en /ii/ es sin perjuicio del desembolso a ser realizado conforme a lo establecido en la sección Cuatro.Dos /a/ /ii/ de la Cláusula Cuarta siguiente.

**/b/ Solicitud de Desembolso.**

La Sociedad solo podrá solicitar un desembolso durante la vigencia del Período de Disponibilidad IVA, sujeto al cumplimiento de las condiciones establecidas en la Sección Cuatro.Dos de la Cláusula Cuarta de este Contrato, y por el monto total del Monto IVA Strabag que haya sido validado por el Asesor Tributario como susceptible de ser reembolsado anticipadamente por la Tesorería conforme al artículo veintisiete Bis de la

-17-

Ley de IVA.

**Tres.Tres. Pago del Capital.**

**/a/** El capital de los Préstamos UF deberá pagarse en Pesos de acuerdo a la equivalencia con la Unidad de Fomento vigente el día de pago, y el capital de los Préstamos USD deberá ser pagados en Dólares.

**/b/ /i/** El capital adeudado bajo el Financiamiento IVA deberá pagarse a los Acreedores IVA [setenta y cinco] días después de que los Préstamos IVA hayan sido desembolsados por los Acreedores IVA, o en la fecha prorrogada de acuerdo a lo establecido en los literales /ii/ y /iii/ siguientes /en adelante, el plazo inicial o así prorrogado, la "**Fecha de Pago de Capital IVA**"/; **/ii/** con relación al plazo establecido en la letra /b//i/ anterior, la fecha de pago se podrá extender por períodos adicionales según se establece en el literal /iii/ siguiente, en el evento que /v/ ello sea solicitado por escrito por el Deudor con anterioridad a la Fecha de Pago de Capital IVA inicial o la prórroga respectiva, **/w/** a la Fecha de Pago de Capital IVA inicial o cualquiera de sus prórrogas, el Deudor no hubiera recibido de parte de la Tesorería un pago correspondiente a la Solicitud de Reembolso Anticipado por un monto al menos igual al monto de capital de los Préstamos IVA desembolsados y no pagados, /x/ se modifiquen los Pagarés IVA para establecer la nueva Fecha de Pago de Capital IVA y se entreguen las respectivas hojas de prolongación a los Acreedores IVA, **/y/** se pague por el Deudor el respectivo Impuesto de Timbres aplicable y se entregue evidencia de dicho pago a los Acreedores IVA, y **/z/** que no exista una Causal de Incumplimiento o Potencial Incumplimiento que permanezca vigente; **/iii/** De cumplirse para cada prórroga las condiciones establecidas en el literal /ii/ anterior, la Fecha de Pago de Capital IVA inicial indicada en el literal /i/ precedente podrá ser prorrogada de la siguiente forma: **/w/** primero, por un período adicional de setenta y cinco días, y **/x/** en adelante, por períodos adicionales de treinta días cada uno hasta la Fecha de Vencimiento Final.

**/c/** Lo establecido en la letra /a/ anterior es, sin perjuicio, de los prepagos obligatorios que la Sociedad deba efectuar en los términos de la Sección Tres.Cinco /a/ del presente Contrato.

**/d/** Toda vez que la Fecha de Pago de Capital IVA no sea un Día Hábil, esa fecha corresponderá al Día Hábil inmediatamente siguiente.

**Tres.Cuatro. Estipulaciones sobre Intereses.**

**/a/ Tasa de Interés**.

**/i/ Préstamos USD.** El Deudor se obliga a pagar intereses a los Acreedores USD según las siguientes reglas: **/x/** para el Primer Período de Intereses, la cantidad equivalente al [tres por ciento] del capital de los Préstamos USD adeudado al primer día de dicho Período de Intereses; **/y/** para el Segundo Período de Intereses, la cantidad equivalente al [dos por ciento] del capital de los Préstamos USD adeudado al primer día de dicho

Período de Intereses; y **/z/** para cada Período de Intereses Subsecuente, la cantidad equivalente al [uno por ciento] del capital de los Préstamos USD adeudado al primer día de cada Período de Intereses Subsecuentes. El monto de intereses a pagar por cada Período de Intereses será informado por los Acreedores USD al Deudor el mismo día del inicio de cada uno de tales períodos. Las Partes dejan constancia que para estos efectos, se entenderá que la tasa de interés de los Préstamos USD será la relación entre el monto de interés antes indicado para cada Período de Interés y el capital adeudado de los Préstamos USD para el mismo período. Para mayor claridad, se deja constancia que la totalidad de los intereses de los Préstamos USD se devengan el primer día del respectivo Período de Intereses.

**/ii/ Préstamos UF.** El capital de los Préstamos UF adeudados a los Acreedores UF, devengará intereses a partir de la fecha en que sean desembolsados y hasta la fecha de su pago efectivo, a una tasa de interés de cuatro coma treinta y dos por ciento anual. Los intereses devengados por los Préstamos UF se determinan y calculan según lo establecido en la letra /d/ siguiente de esta Sección Tres.Cuatro.

**/b/ Períodos de Intereses**.

**/i/** Se entenderá por "**Primer Período de Intereses**" aquel período de [setenta y cinco días] que comienza en la fecha de desembolso de los Préstamos IVA.

**/ii/** Se entenderá por "**Segundo Período de Intereses**" aquel período adicional de [setenta y cinco días] que comienza el día [setenta y seis] desde la fecha de desembolso de los Préstamos IVA.

**/iii/** Con posterioridad al Segundo Período de Intereses, se entenderá por un "**Período de Intereses Subsecuente**" /y todos ellos, los "**Períodos de Intereses Subsecuentes**"/, cada período posterior al Segundo Período de Intereses que comienza el día inmediatamente siguiente al vencimiento del Período de Interés inmediatamente anterior y termina treinta días después, hasta la Fecha de Vencimiento Final. El primer Período de Interés Subsecuente comenzará el día [ciento cincuenta y uno] desde la fecha de desembolso de los Préstamos IVA.

**/iv/** El Primer Período de Intereses, el Segundo Período de Intereses y cada Período de Intereses Subsecuente, se denominan conjuntamente los "**Períodos de Intereses**". Ningún Período de Intereses podrá prolongarse más allá de la Fecha de Pago de Capital IVA.

**/c/ Pago de Intereses**.

**/i/** Los intereses devengados por los Préstamos UF deberán pagarse en Pesos de acuerdo a la equivalencia con la Unidad de Fomento vigente el día de pago, y los intereses devengados por los Préstamos USD deberán ser pagados en Dólares.

**/ii/** Los intereses y comisiones adeudados por los Préstamos IVA desembolsados se

pagarán en su totalidad en lo que ocurra primero entre /**y**/ la fecha de pago de la totalidad del capital adeudado de los Préstamos IVA, y /**z**/ la Fecha de Vencimiento Final. Lo anterior, es sin perjuicio del pago de intereses y comisiones que la Sociedad deberá efectuar [respecto del capital pagado anticipadamente el que se hará][9] conjuntamente con el pago de capital en caso de pagos anticipados parciales, según lo establecido en la Sección Tres.Cinco y Sección Tres.Seis del presente Contrato.

/**d**/ **Determinación y Cálculo de Intereses**.

Respecto de los Préstamos USD, la totalidad de los intereses de un Período de Intereses se devengan el primer día del respectivo Período de Intereses. Por su parte, todos los intereses que devenguen los Préstamos UF se calcularán sobre la base un año de trescientos sesenta días por el número de días efectivamente transcurridos en el correspondiente Período de Interés.

**Tres.Cinco**. **Pagos Anticipados Obligatorios**.

/**a**/ **Obligación y Recursos para el Pago**.

La Sociedad deberá destinar al pago anticipado del capital adeudado de los Préstamos IVA desembolsados:

/**i**/ Aquellos pagos o fondos que reciba con motivo de la devolución de IVA de conformidad a lo prescrito en el Artículo veintisiete bis de la Ley de IVA por parte de la Tesorería u otra Autoridad Gubernamental competente en relación al Monto IVA Strabag, por un monto equivalente a los pagos o fondos recibidos;

/**ii**/ aquellos fondos disponibles en la Cuenta de Devolución IVA por un monto equivalente al monto de crédito fiscal IVA del Deudor que[, a contar de la fecha de las Resoluciones SII, sean positivas o negativas,][10] haya sido compensado con débitos fiscales IVA del mismo por el Servicio de Impuestos Internos o por Tesorería; y

/**iii**/ la totalidad de los fondos disponibles en la Cuenta Escrow UF, en la Cuenta Escrow USD y en la Cuenta de Devolución IVA en el evento que las Condiciones Factura y las demás condiciones establecidas en la Sección Cuatro.Dos. de la Cláusula Cuarta siguiente para liberar los fondos mantenidos en la Cuenta Escrow UF, no se hayan cumplido, en los términos ahí establecidos.

/**b**/ **Imputación y Prioridad de Pago. Pago de Intereses y Comisiones**.

/**i**/ El pago anticipado obligatorio que se realice deberá imputarse íntegramente a pago de capital de los Préstamos IVA. En caso que exista más de un Acreedor IVA, los pagos

---

[9] Nota: lenguaje entre paréntesis en este párrafo y el siguiente sujeto a negociación entre las partes.

[10] Nota: lenguaje entre paréntesis en este párrafo y el siguiente sujeto a negociación entre las partes.

deberán efectuarse a prorrata entre los Acreedores IVA en caso que el monto respectivo no sea suficiente para pagar la totalidad del capital adeudado de los Préstamos IVA desembolsados.

**/ii/** Junto con el pago de capital, el Deudor deberá pagar en la misma fecha de pago anticipado de capital y con fondos no provenientes de la Cuenta Escrow UF, la Cuenta Escrow USD [o la Cuenta de Devolución IVA][11] la totalidad de los intereses y comisiones devengados y no pagados hasta la fecha del prepago por el monto de capital de los Préstamos IVA que se prepaga.

**/iii/** En caso que el pago anticipado amortice parcialmente el monto de capital adeudado bajo cualquier desembolso, el saldo de capital adeudado seguirá devengando intereses, según corresponda, a la tasa de interés que sea aplicable conforme a este Contrato.

**/c/ Comunicación a los Acreedores IVA.**

La Sociedad deberá comunicar por escrito a los Acreedores IVA dentro de los dos Días Hábiles siguientes a la fecha en que [reciba la notificación][12]que el Servicio de Impuestos Internos aprobó la Solicitud de Reembolso Anticipado.

**/d/ Fecha de Pago Anticipado y Fecha Opcional de Pago.** Los pagos anticipados deberán efectuarse dentro de los cinco Días Hábiles de ser recibidos los fondos por el Deudor en fondos de inmediata disponibilidad.

**Tres.Seis. Pagos Anticipados Voluntarios.**

**/a/ Requisitos.** El Deudor podrá efectuar pagos anticipados voluntarios, parciales o totales, del capital adeudado de los Préstamos IVA, a prorrata de la participación de cada Acreedor IVA en tales Préstamos IVA, con fondos inmediatamente disponibles, en la medida que se hubieren cumplido previamente las siguientes condiciones suspensivas y copulativas:

**/i/** que el Deudor envíe a los Acreedores IVA un aviso por escrito con al menos cinco Días Hábiles Bancarios de anticipación a la fecha prevista para el pago anticipado voluntario. Este aviso tendrá carácter de irrevocable y el monto respectivo quedará vencido y pagadero en la fecha del prepago. En el referido aviso, el Deudor deberá indicar el monto de capital que se prepagará, la distribución a prorrata que corresponde a los Acreedores IVA, de ser aplicable, y el monto total de intereses y comisiones que se pagarán junto con el capital; y

**/ii/** que, junto con el pago de capital, el Deudor pague en la misma fecha de pago anticipado de capital la totalidad de los intereses y comisiones devengados y no pagados

---

[11] Nota: exclusión a ser consistente con Contrato de Cuentas Locales.

[12] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

hasta la fecha del prepago por el monto de capital de los Préstamos IVA que se prepaga.

**/b/** Los montos objeto de prepago anticipado voluntario por el Deudor no podrán ser desembolsados nuevamente.

**CLÁUSULA CUARTA: DESEMBOLSOS.**

**Cuatro.Uno. Procedimiento para Cursar Desembolsos.**

**/a/** El Deudor deberá solicitar por escrito el desembolso a los Acreedores IVA, mediante una solicitud a ser entregada con una anterioridad no inferior a [tres] Días Hábiles a la fecha solicitada para el desembolso, conforme al formato que se contiene en el **Anexo Cuatro.Uno** al presente Contrato /la "**Solicitud de Desembolso IVA**"/.

**/b/** En caso de cumplirse las condiciones establecidas en este Contrato para cursar la correspondiente Solicitud de Desembolso IVA, los Acreedores IVA desembolsarán los fondos de los préstamos solicitados en la fecha de desembolso indicada en la correspondiente Solicitud de Desembolso IVA, mediante la transferencia de fondos inmediatamente disponibles a la cuenta [●][13], después de efectuada la conversión de UF a Pesos en el caso de los Préstamos UF; y a la cuenta [●][14],en el caso de los Préstamos USD.

**/c/** Se deja constancia que la obligación de efectuar desembolsos por parte de los Acreedores IVA será simplemente conjunta y no solidaria y a prorrata de los Acreedores IVA.

**/d/** Los desembolsos se efectuarán en Pesos por los Acreedores UF y en Dólares por los Acreedores USD, y serán pagados en esas respectivas monedas por el Deudor.

**Cuatro.Dos. Condiciones para Cursar el Desembolso.**

La Solicitud de Desembolso IVA sólo será cursada por los Acreedores IVA y, en consecuencia, estos sólo pondrán a disposición los fondos solicitados por la Sociedad [por medio de su depósito en la Cuenta Escrow UF][15], si se cumplen las siguientes condiciones suspensivas y copulativas, establecidas en el solo beneficio de los Acreedores IVA, por lo que podrán renunciar a las mismas, en todo o parte, de conformidad a lo establecido en la Sección Cuatro.Tres siguiente:

**/a/ Período de Disponibilidad.**

/i/ Que la Solicitud de Desembolso IVA haya sido enviada por la Sociedad dentro del

---

[13] Nota: Completar con cuenta correspondiente de acuerdo al Contrato de Cuentas Locales.

[15] Nota: a ser consistente con Contrato de Cuentas Locales.

Período de Disponibilidad IVA, conforme al formato de Solicitud de Desembolso IVA.

/ii/ En el evento que las Condiciones Factura [o cualquiera de las otras condiciones establecidas en esta Sección Cuatro.Dos][16] no se hayan cumplido con anterioridad al veintinueve de julio de dos mil veintidós, el Deudor instruye irrevocablemente en este acto a los Acreedores IVA, para que desembolsen la totalidad de los Montos Comprometidos el día veintinueve de julio de dos mil veintidós, y depositen los fondos así desembolsados en la Cuenta Escrow UF o en la Cuenta Escrow USD, según corresponda, renunciando los Acreedores IVA en este acto a exigir el cumplimiento a las condiciones establecidas en la presente sección Cuatro.Dos, distintas al otorgamiento y perfeccionamiento de la Prenda sobre Dinero e Inversiones Permitidas Escrow, la suscripción y entrega de los Pagarés IVA [y la certificación de la Sociedad][17]. Los montos depositados en la Cuenta Escrow USD se mantendrán en dicha cuenta hasta que deban ser liberados al Deudor según lo establecido en el literal /iii/ siguiente, en cuyo momento deberán ser convertidos a Pesos de acuerdo a los mecanismos establecidos en el Contrato de Cuentas Locales, y ser transferidos a la Cuenta Escrow UF. Los montos depositados en la Cuenta Escrow UF podrán ser invertidos en Inversiones Permitidas.

/iii/ Los montos que conforme a lo establecido en el literal /ii/ anterior hayan sido depositados en la Cuenta Escrow UF, serán liberados al Deudor en el evento que se cumplan las Condiciones Factura y las demás condiciones establecidas en la presente sección Cuatro.Dos /salvo el otorgamiento y perfeccionamiento de la Prenda sobre Dinero e Inversiones Permitidas Escrow y la suscripción y entrega de los Pagarés IVA [y la certificación de la Sociedad][18]/ en o con anterioridad a la Fecha de Vencimiento Final. En caso contrario, serán destinados a realizar un prepago obligatorio del capital adeudado a los Acreedores IVA, conforme a lo establecido en la sección Tres.Cinco /a/ /iii/ de la Cláusula Tercera anterior.

**/b/ Certificación de la Sociedad.**

Que se haya entregado a los Acreedores IVA conjuntamente con la Solicitud de Desembolso IVA, un certificado emitido por el Gerente General o un Ejecutivo Principal con poder suficiente de la Sociedad, conforme al formato que se contiene en el **Anexo Cuatro.Dos/b/** al presente Contrato de Financiamiento IVA, en el que deje constancia de lo siguiente:

/i/ Que [la Sociedad se encuentra en cumplimiento de todas sus obligaciones bajo los Documentos del Financiamiento y los demás Documentos del Financiamiento IVA; y que][19] no ha ocurrido ni se encuentra vigente a la fecha del certificado antes referido

---

[16] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

[17] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

[18] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

[19] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

alguna de las Causales de Incumplimiento estipuladas en la Cláusula Décimo Tercera siguiente del presente Contrato; y

[/ii/ que siguen siendo verídicas en todos sus aspectos sustanciales las declaraciones y seguridades formuladas por el Deudor en este Contrato, como si se hubieren emitido a la fecha de Solicitud de Desembolso IVA y en la fecha prevista para el desembolso, salvo por aquéllas que ya contengan una calificación de relevancia, en cuyo caso deberán ser verídicas en todo momento.][20]

### /c/ Factura Strabag.

Se deberán haber cumplido las Condiciones Factura y la Sociedad deberá haber recibido y aceptado la Factura Strabag, copia de la cual deberá ser entregada a los Acreedores IVA simultáneamente con la Solicitud de Desembolso IVA.

### /d/ Contratos de Garantía de IVA.

Deberán haberse celebrado y encontrarse plenamente vigentes conforme a derecho los Contratos de Garantía de IVA que deban encontrarse otorgados a la fecha del desembolso.[21]

### /e/ Pagarés IVA.

Que, en la fecha del desembolso solicitado, la Sociedad suscriba y entregue a los Acreedores IVA y a satisfacción de éstos, uno o más Pagarés IVA /según dicho término se encuentra definido más adelante/ y que estos documentos constituyan /una vez pagado el Impuesto de Timbres aplicable y autorizadas las firmas de los apoderados de la Sociedad por un Notario Público/ título ejecutivo en conformidad con las normas del Código de Procedimiento Civil, y cumplan con las demás normas legales aplicables contenidas en la Ley número dieciocho mil noventa y dos, sobre letra de cambio y pagaré.

### /f/ Cumplimiento.

Que, a la fecha solicitada para el desembolso, no se haya producido alguna Causal de Incumplimiento o Potencial Incumplimiento que se encuentre vigente.

### /g/ Opinión Tributaria.

Los Acreedores IVA deberán haber recibido a su satisfacción, una opinión del Asesor Tributario, indicando que el EPC Strabag y la Factura Strabag, entre otros documentos, califican para que opere la devolución de IVA establecida en el Artículo veintisiete Bis de

---

[20] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

[21] Nota: sujeto a confirmación fecha de suscripción de la Prenda sobre Resoluciones SII.

la Ley de IVA.

**/h/ Contrato de Opción.**

La Sociedad debe haber firmado[, o debe firmar dentro de los dos días hábiles bancarios siguientes a la fecha en que la Factura Strabag haya sido aprobada][22], a satisfacción de los Acreedores IVA, el Contrato de Opción, y entregado una copia del mismo a los Acreedores IVA.

**Cuatro.Tres. Renuncia de Condiciones Precedentes.**

**/a/** Las Partes dejan constancia que las condiciones suspensivas y copulativas en la sección Cuatro.Dos precedente se han establecido en el solo beneficio de los Acreedores IVA, por lo que éstos podrán renunciar a las mismas, en todo o parte, con o sin condiciones.

**/b/** La renuncia a alguna de las condiciones suspensivas y copulativas previstas en la sección Cuatro.Dos anterior es específica, y no constituye precedente ni crea derecho alguno al Deudor respecto de la materia objeto de la renuncia.

**CLÁUSULA QUINTA: PAGARÉS IVA.**

**/a/** Para los efectos de documentar las obligaciones de pagar a los Acreedores IVA las sumas de dinero que se giren con cargo al presente Contrato y sus intereses, el Deudor deberá, simultáneamente al desembolso de los Préstamos IVA, ya sea en la Cuenta [•] y [•] o bien en la Cuenta Escrow UF o Cuenta Escrow USD, suscribir a la orden de cada Acreedor IVA uno o más pagarés /los "**Pagarés IVA**"/, en conformidad con los formatos que se contienen en el **Anexo III** al presente Contrato. Las firmas de los apoderados del Deudor que concurran a suscribir el o los Pagarés IVA deberán ser autorizadas por un Notario Público y entregarse evidencia del pago del Impuesto de Timbres aplicable. La suscripción y entrega de los Pagarés IVA no constituirá novación ni limitará, reducirá o afectará en forma alguna las obligaciones que el Deudor ha asumido para con los Acreedores IVA con motivo de los préstamos que éstos le otorguen conforme al presente Contrato.

**/b/** En el evento que corresponda que la Fecha de Pago de Capital IVA sea prorrogada conforme a lo establecido en la sección Tres.Tres. /b/ /i/, el Deudor deberá suscribir y entregar a los Acreedores IVA como condición precedente para dicha prórroga, una hoja de prolongación de los Pagarés IVA ya emitidos, para reflejar la nueva Fecha de Pago de Capital IVA, junto con evidencia del pago del Impuesto de Timbres aplicable.

**CLÁUSULA SEXTA: PAGOS.**

---

[22] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

**Commented [A2]:** Nota a Carey: comprar las opciones antes del desembolso deja "largo" al deudor en caso que no se le otorgue el crédito. Podemos ponerlo como una obligación si prefieren.

**Seis.Uno**. <u>**Forma de Pago de los Préstamos IVA**</u>.

Los pagos de capital e intereses de los Préstamos IVA cursados conforme al presente Contrato se efectuarán a los Acreedores IVA por el Deudor, mediante la entrega a cada Acreedor IVA de fondos de disponibilidad inmediata, sin necesidad de requerimiento alguno, a más tardar, a las doce horas, mediodía, de la fecha en que deba efectuarse el pago correspondiente conforme a los términos del presente Contrato o, a más tardar, a las doce horas, mediodía, del Día Hábil inmediatamente siguiente, en caso que el día en que corresponda efectuar dicho pago ocurra en un día que no sea Día Hábil.

**Seis.Dos**. <u>**Denominación y Moneda de Pago**</u>.

El capital, intereses y comisiones de los Préstamos UF, deberán ser pagados en Pesos conforme a la equivalencia con la Unidad de Fomento en el día del pago respectivo; y el capital e intereses de los Préstamos USD, deberán ser pagados en Dólares. Cualquier otra suma que se adeude conforme al presente Contrato y los demás Documentos del Financiamiento IVA se determinarán y pagarán en la moneda en que dichos montos fueron puestos a disposición del Deudor o en la moneda en que se encuentran denominados en el respectivo Documento del Financiamiento IVA.

**Seis.Tres**. <u>**Montos Netos**</u>.

**/a/** Todas las cantidades que el Deudor deba pagar a los Acreedores IVA en virtud de este Contrato, se abonarán en su totalidad, sin deducción o retención alguna, sea por motivo de impuestos u otra clase de cargas, costo o gastos o tributos, distintos del impuesto a la renta que grave a los Acreedores IVA y de Impuestos Excluidos. A tal efecto, si por cualquier causa el Deudor estuviere legal e ineludiblemente obligado a efectuar alguna de dichas deducciones o retenciones, la efectuará, pero abonará a los Acreedores IVA aquellas cantidades complementarias que resulten necesarias a fin de que éstos reciban una cantidad neta igual a la que les hubiere correspondido percibir en el supuesto de que no se hubieran efectuado tales deducciones o retenciones distintas del impuesto a la renta que grave a los Acreedores IVA y de Impuestos Excluidos.

**/b/** Sin perjuicio de lo establecido en esta Sección Seis.Tres, si cualquiera de los Acreedores IVA estuviere obligado a realizar cualquier pago a cuenta de cualquier impuesto, que no sea un impuesto que grave su renta y/o patrimonio o Impuestos Excluidos, sobre o en relación con cualquier cantidad cobrada o a cobrar por el mismo en virtud del presente Contrato de Financiamiento IVA y de los demás Documentos del Financiamiento IVA, la Sociedad deberá indemnizar a los Acreedores IVA con una cantidad equivalente a la de dicho pago de impuestos, junto con cualesquiera intereses, multas o gastos devengados en relación con los mismos, todo ello dentro del plazo de cinco Días Hábiles, contado desde la comunicación de este hecho con el detalle adjunto a la comunicación.

**Seis.Cuatro**. <u>**Mora o Simple Retardo**</u>.

-26-

**/a/** En caso de mora o simple retardo en el pago del todo o parte de cualquiera cantidad de dinero adeudada en virtud de este Contrato, y/o de los préstamos otorgados conforme al mismo y/o de los Pagarés IVA, sea por concepto de capital, de intereses o por cualquier otro concepto, tales cantidades devengarán un interés penal según las siguientes reglas: **/i/** en el caso de Préstamos USD y de cualquier cualquiera cantidad de dinero adeudada en Dólares, un interés penal equivalente al catorce por ciento y **/ii/** en el caso de Préstamos UF y de cualquier cualquiera cantidad de dinero adeudada en Unidades de Fomento, un interés penal equivalente a la tasa de interés aplicable, incrementada en [dos] puntos porcentuales anuales /[dos] por ciento anual/, pero que en ningún caso podrá exceder del Interés Máximo Convencional en caso de ser aplicable.

**/b/** Sin perjuicio de lo anterior, los intereses que no fueren pagados a su vencimiento se capitalizarán en dicha fecha y, sin necesidad de demanda judicial, devengarán nuevos intereses, los que se calcularán y pagarán a una tasa igual a la del interés penal antes referido.

<u>**Seis.Cinco**</u>. <u>**Imputación al Pago**</u>.

El Deudor declara y acepta que los pagos que efectúe a los Acreedores IVA conforme al presente Contrato y que no tengan establecido un destino en particular, se imputarán, respetando lo indicado en el Contrato de Cuentas Locales y en los demás Documentos del Financiamiento, a las deudas vencidas conforme al siguiente orden: **/a/** impuestos; **/b/** comisiones; **/c/** indemnizaciones; **/d/** intereses moratorios**; /e/** gastos; **/f/** costas judiciales; **/g/** intereses ordinarios; y **/h/** capital.

<u>**CLÁUSULA SÉPTIMA**</u>: <u>**COMISIONES**</u>.

El Deudor deberá pagar la o las comisiones u honorarios que se establecen en las Cartas de Comisiones, en las oportunidades ahí establecidas.

<u>**CLÁUSULA OCTAVA**</u>: <u>**IMPUESTOS Y GASTOS**</u>.

<u>**Ocho.Uno**</u>. <u>**Impuestos de Cargo del Deudor**</u>.

El Deudor deberá suministrar oportunamente a los Acreedores IVA toda la documentación que sea necesaria para acreditar el pago de cualquier impuesto que sea de su cargo bajo este Contrato, salvo que dicho impuesto haya sido retenido y enterado directamente por los Acreedores IVA.

<u>**Ocho.Dos**</u>. <u>**Impuesto de Timbres**</u>.

El Deudor deberá pagar el Impuesto de Timbres aplicable a los Préstamos IVA conjuntamente con la emisión de los Pagarés IVA.

<u>**Ocho.Tres**</u>. <u>**Gastos**</u>.

Serán de cargo del Deudor los gastos documentados que se deriven o causen por la negociación, preparación, celebración, cumplimiento o ejecución de este Contrato y de los demás Documentos del Financiamiento IVA, incluyendo, los siguientes:

**/a/** Derechos y honorarios documentados de los notarios públicos, conservadores y otros servicios públicos que intervengan, en su caso, en la formalización, registro o inscripción de los Documentos del Financiamiento IVA;

**/b/** gastos por transferencias mediante algún sistema de pagos de alto valor autorizado por el Banco Central;

**/c/** honorarios razonables y gastos documentados de los asesores jurídicos externos y del Asesor Tributario de los Acreedores IVA en relación con la negociación y suscripción de los Documentos del Financiamiento IVA incluidas las garantías que corresponda constituir conforme al presente Contrato, según lo acordado previamente por las Partes;

**/d/** gastos y costas judiciales, incluidos los honorarios de abogados que se originen por el cobro judicial por parte de los Acreedores IVA o el Agente de Garantías Local del cumplimiento de las obligaciones bajo los Documentos del Financiamiento IVA ante los tribunales de justicia; y

**/e/** otros gastos efectuados por los Acreedores IVA o el Agente de Garantías Local en relación con el presente Contrato, o los demás los Documentos del Financiamiento IVA, los que deberán ser debidamente acreditados para su cobro.

### <u>Ocho.Cuatro</u>. <u>Incremento Costos</u>.

Si el establecimiento de una disposición legal, regla o regulación de alguna autoridad competente, o cualquier cambio a alguna ley, regulación o regla vigente, en cada caso después de la fecha de este Contrato, que tenga el efecto de incrementar impuestos /salvo el impuesto a la renta [o Impuestos Excluidos][23]/, reserva técnica o cualquier otro requerimiento legal o regulatorio, sea en los plazos de los montos o en la manera de calcular esos requerimientos, sujeto a que afecte a la generalidad de la industria bancaria o financiera en Chile, y que en definitiva resulte en un mayor costo de fondos para los Acreedores IVA, el Acreedor IVA respectivo deberá enviar prontamente al Deudor un aviso por escrito que indique el monto de dicho incremento de costos en relación con los Préstamos IVA y un informe con detalle razonable de la base de los cálculos respectivos. El Deudor deberá pagar prontamente a los Acreedores IVA aquellos montos adicionales que sean suficientes para compensar a los Acreedores IVA por dicho incremento de costos con respecto a los Préstamos IVA, ello en la medida que tales costos no estén reflejados en la determinación de la tasa de interés aplicable.

---

[23] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

**CLÁUSULA NOVENA: DECLARACIONES Y SEGURIDADES.**

**Nueve.Uno.** El Deudor declara y asegura a los Acreedores IVA lo siguiente a esta fecha:

**/a/ Poderes y Personería.** El Deudor se encuentra debidamente facultado para: /i/ suscribir y cumplir con todas las obligaciones asumidas por él en virtud de los Documentos del Financiamiento IVA; y /ii/ cumplir con todas las formalidades necesarias para la celebración y cumplimiento de los Documentos del Financiamiento IVA.

**/b/ Validez Legal.** Las obligaciones emanadas de cada Documento del Financiamiento IVA son obligaciones legales, válidas, obligatorias y ejecutables en su contra, de acuerdo con sus términos.

**/c/ Ausencia de infracción.** La suscripción, entrega y cumplimiento por parte del Deudor de cualquiera de los Documentos del Financiamiento IVA, están y estarán comprendidos dentro de las funciones tendientes a cumplir con su objeto social y no viola o contraviene, según corresponda, la legislación, normativa o resoluciones vigentes aplicables al Deudor, ni sus estatutos, o cualquier acuerdo o convención vigente del cual sea parte.

**/d/ Autorizaciones Corporativas.** /i/ El Deudor ha obtenido todas las autorizaciones que requieran ser obtenidas o presentadas, según corresponda, a fin de permitir al Deudor la celebración de los Documentos del Financiamiento IVA; /ii/ todas las autorizaciones necesarias se encuentran plenamente vigentes y el Deudor ha cumplido con las disposiciones de las mismas y dichas autorizaciones necesarias no están sujetas a, y según su leal entender no existe ninguna amenaza de, una oposición, suspensión o revocación pendiente por parte de las autoridades competentes.

**/e/ No Incumplimiento.** Que no se ha verificado y se encuentra vigente alguna Causal de Incumplimiento.

**/f/ Inmunidad.** Ni la Sociedad ni sus bienes, gozan de inmunidad de jurisdicción respecto de cualquier tribunal o procedimiento bajo las leyes de Chile.

**[Nueve.Dos.** Las declaraciones y seguridades formuladas en esta Cláusula Novena, aunque se efectúen inicialmente en esta fecha con referencia a las circunstancias existentes o conocidas a esta fecha, se reiterarán expresamente, por referencia, por parte de la Sociedad, en el momento de cursar la Solicitud de Desembolso IVA, y a la fecha del correspondiente desembolso de fondos con cargo al Financiamiento IVA.][24]

**CLÁUSULA DÉCIMA: OBLIGACIONES DE HACER.**

**Diez.Uno.** Mientras se encuentre pendiente de pago cualquier suma adeudada a los Acreedores IVA en virtud del presente Contrato y de los demás Documentos del

---

[24] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

-29-

Financiamiento IVA, el Deudor se obliga en favor de los Acreedores IVA a cumplir las siguientes obligaciones de hacer:

**/a/ Notificación.** Tan pronto el Deudor tome conocimiento y no más allá de tres Días Hábiles de haber tomado conocimiento, el Deudor deberá notificar a los Acreedores IVA cualquier Causal de Incumplimiento o Potencial Incumplimiento /como también de las medidas adoptadas, si las hubiese, para remediarlo/.

**/b/ Factura Strabag, Devolución de IVA y Compensaciones.** El Deudor deberá: /i/ enviar a los Acreedores IVA, para revisión del Asesor Tributario, dentro de los diez Días Hábiles siguientes a la fecha de este Contrato, el borrador de Solicitud de Reembolso Anticipado, los respectivos documentos de respaldo y el formato de Factura Strabag a ser emitida por Strabag, para revisión y comentarios del Asesor Tributario. Asimismo, deberá entregar para revisión y comentarios del Asesor Tributario, cualquier presentación adicional, complementación o corrección a la Solicitud de Reembolso Anticipado, con a lo menos cinco Días Hábiles de anticipación a la fecha en que se vaya a presentar al Servicio de Impuestos Internos; /ii/ presentar al Servicio de Impuestos Internos dentro de los tres Días Hábiles siguientes al desembolso de, o liberación de fondos correspondientes a, los Préstamos IVA, la Solicitud de Reembolso Anticipado con los comentarios efectuados por el Asesor Tributario, de haberlos, solicitando que los fondos respectivos sean depositados en la Cuenta de Devolución IVA; /iii/ entregar a los Acreedores IVA una copia de dicha solicitud a más tardar el Día Hábil siguiente a su presentación; /iv/ informar a los Acreedores IVA de cualquier comunicación recibida de, u observación efectuada por, el Servicio de Impuestos Internos relativa a la Solicitud de Reembolso Anticipado, y enviar copia de cualquier documentación recibida, todo dentro del plazo de dos Días Hábiles de recibida; y /v/ entregar a los Acreedores IVA una copia de la resolución emitida por el Servicio de Impuestos Internos que apruebe la Solicitud de Reembolso Anticipado, a más tardar dentro del plazo de dos Días Hábiles siguientes a la fecha en que se notifique al Deudor, o éste tome conocimiento de, lo que ocurra primero, dicha resolución.

**/c/ Contratos de Garantías de IVA.**[25] Constituir y perfeccionar los Contratos de Garantía de IVA, con el objeto de garantizar las obligaciones del Deudor bajo el presente Contrato, para lo cual deberá proporcionar evidencia satisfactoria a los Acreedores IVA que acredite: /i/ haberse efectuado todas las solicitudes de inscripción en el Registro de Prendas sin Desplazamiento de aquellos Contratos de Garantía de IVA consistentes en prendas sin desplazamiento, y haberse obtenido el número de repertorio respectivo en dicho registro, dentro del plazo de siete Días Hábiles contados desde la fecha de este Contrato, /ii/ dentro del mismo plazo antes señalado, haberse realizado por el Deudor los pagos que correspondan respecto de las inscripciones, registros y gestiones, autorizaciones, cargas e impuestos aplicables dependiendo del tipo de Contrato de Garantía de IVA de que se trate, y /iii/ haberse realizado las inscripciones, registros y notificaciones que sean procedentes para la debida validez, perfeccionamiento y

---

[25] Nota: a ser actualizado según la fecha de otorgamiento de la prenda sobre la resolución.

preferencia de los Contratos de Garantía de IVA, a más tardar en el plazo de cuarenta y cinco días corridos contados desde esta fecha.

**CLÁUSULA UNDÉCIMA. CAUSALES DE INCUMPLIMIENTO.**

**Once.Uno. Exigibilidad Anticipada. Causales de Incumplimiento.**

Las Partes convienen que los Acreedores IVA podrán declarar todo o parte de las sumas adeudadas por parte de la Sociedad bajo el presente Contrato como exigibles y de plazo vencido, sin necesidad de declaración o resolución judicial alguna, de ocurrir una cualquiera de las siguientes causales de incumplimiento /las "**Causales de Incumplimiento**"/:

**/Uno/** Si la Sociedad incurriere en mora o simple retardo en el pago de cualquier suma adeudada a los Acreedores IVA en virtud de este Contrato y/o de los demás Documentos del Financiamiento IVA;

**/Dos/** [Si cualquiera de las declaraciones y seguridades efectuadas por la Sociedad de que da cuenta la Cláusula Novena de este Contrato, resultare no ser verdadera, o fuere inexacta o incompleta al momento en el que la misma haya sido o se entienda efectuada;][26]

**/Tres/** Si la Sociedad incurriere en incumplimiento de cualquiera de las obligaciones de hacer establecidas en la Cláusula Décima;

**/Cuatro/** Si por cualquier motivo se hicieren exigibles, se aceleraren, y/o se interpusieren acciones de cobro de cualquier naturaleza relativas a las obligaciones financieras de la Sociedad bajo cualquiera de los Documentos del Financiamiento;

**/Cinco/** Si la Sociedad **/a/** iniciare cualquier procedimiento tendiente a su disolución, liquidación, reorganización judicial, concurso, ajuste o arreglo de pagos de ella o de sus bienes de acuerdo con cualquier ley concursal de deudores; o solicitar la designación de un liquidador, veedor, u otro funcionario similar respecto de la Sociedad, o solicitare la declaración de nulidad o incumplimiento de un acuerdo de reorganización; o si la Sociedad tomare cualquier medida para permitir alguno de los actos señalados precedentemente en este número /Cinco/; o **/b/** fuere declarada en liquidación o insolvencia, siempre que ello no fuere dejado sin efecto dentro de los sesenta días siguientes a su inicio o de su notificación a la Sociedad.

**Once.Dos. Reconocimiento de la Sociedad.**

La Sociedad reconoce y acepta que la presente estipulación de exigibilidad anticipada del saldo adeudado constituye una estipulación de caducidad de plazo que se establece

---

[26] Nota: lenguaje entre paréntesis sujeto a negociación entre las partes.

exclusivamente a favor de los Acreedores IVA, entendiendo asimismo la Sociedad que ésta estipulación no impone a los Acreedores IVA la obligación de demandar ejecutivamente tan pronto ocurra el primer incumplimiento.

**CLÁUSULA DUODÉCIMA: DISPOSICIONES VARIAS.**

**Doce.Uno. Cesiones de Derechos, Modificaciones y Otros.**

**/a/ Cesiones.**

**/i/** Los Acreedores IVA podrá ceder la totalidad o parte de sus derechos bajo el presente Contrato de Financiamiento IVA y los demás Documentos del Financiamiento IVA sin necesidad de autorización o consentimiento por parte del Deudor.

**/ii/** La cesión referida no podrá importar mayores costos ni términos más gravosos para el Deudor que los que tiene con el acreedor cedente /incluyendo mayores impuestos que puedan devengarse producto de dicha cesión, en caso de ser aplicables/, salvo que se encuentre vigente una Causal de Incumplimiento, en cuyo caso podrá efectuarse la cesión, aun cuando ésta genere costos adicionales para el Deudor, y en la medida que dicho cesionario haya adherido al Contrato entre Acreedores y al Contrato de Agencia de Garantías Local en la forma ahí establecida y haya acordado por escrito quedar obligado por sus términos y condiciones.

**/iii/** La cesión de los créditos que se otorguen de conformidad a este Contrato deberá hacerse conjuntamente con sus Pagarés IVA y las garantías que los caucionan, debiendo el cesionario asumir las obligaciones y compromisos que le impone este Contrato a los Acreedores IVA en proporción a los créditos cedidos, pero, manteniéndose, en todo caso, el carácter abstracto, autónomo e incausado de los Pagarés IVA.

**/b/ Modificaciones y Renuncias.**

**/i/** Ninguna renuncia a cualquier disposición a los Documentos del Financiamiento IVA /incluyendo las condiciones para cursar desembolsos establecidas en la Cláusula Cuarta/, o de cualquier instrumento otorgado según sus términos, ni el consentimiento para que la Sociedad actúe en forma diferente a ellos, tendrá efecto alguno a menos que haya sido otorgada por escrito y suscrita por los Acreedores IVA, y en tal caso esa renuncia o consentimiento tendrá efecto solamente en el caso específico y para el objeto específico para el cual se haya otorgado. En todo caso, toda modificación de los Documentos del Financiamiento IVA, deberá ceñirse y respetar, en todo lo que fuere aplicable, las estipulaciones contenidas en tales instrumentos.

**/ii/** Cualquier modificación a los términos del presente Contrato o de los demás Documentos del Financiamiento IVA, será válida en la medida en que dicha modificación sea acordada con el consentimiento dado por escrito por parte de todos los Acreedores IVA y cumpla con las normas para adoptar acuerdos establecidas en el Contrato entre Acreedores.

**Doce.Dos**. <u>Sucesores Legales y Cesionarios</u>.

Lo dispuesto en este Contrato será obligatorio para, y redundará a beneficio de las Partes y de sus respectivos sucesores legales y cesionarios.

## <u>CLÁUSULA DÉCIMO TERCERA</u>: <u>NULIDAD</u>.

Si por cualquier motivo una o más de las disposiciones del presente Contrato fuera declarada nula y sin efecto, total o parcialmente, dicha declaración no podrá afectar la validez de las restantes disposiciones de este Contrato.

## <u>CLÁUSULA DÉCIMO CUARTA</u>: <u>GASTOS E IMPUESTOS</u>.

Será de cargo exclusivo del Deudor pagar los impuestos, derechos y gastos, incluyendo honorarios legales de los abogados externos de los Acreedores IVA que se devenguen en relación a los Documentos del Financiamiento IVA.

## <u>CLÁUSULA DÉCIMO QUINTA</u>: <u>NOTIFICACIONES. COMUNICACIONES</u>.

Todas las notificaciones y comunicaciones que hayan de enviarse las partes en virtud de este Contrato, deberán ser enviadas a las personas de contacto, y direcciones postales o electrónicas que se indican en el **Anexo [____]** al presente Contrato.

## <u>CLÁUSULA DÉCIMO SEXTA</u>: <u>LEY APLICABLE AL CONTRATO</u>.

El presente Contrato y todas las disposiciones contenidas en el mismo se rigen y serán interpretados conforme a las leyes de Chile.

## <u>CLÁUSULA DÉCIMO SÉPTIMA</u>: <u>DOMICILIO. COMPETENCIA.</u>

Para todos los efectos de este Contrato, los comparecientes fijan su domicilio en la ciudad y comuna de Santiago y se someten a la Competencia de los Tribunales Ordinarios de Justicia de la ciudad y comuna de Santiago.

**PERSONERÍAS. [●]**

**Exhibit L**

**Secured Exit Loan Agreement**

# Secured Exit Loan Agreement

**among**

**ALTO MAIPO SpA**
**(as Borrower)**

**ALTO MAIPO DELAWARE LLC**
**(as Guarantor)[1]**

**THE SECURED EXIT LENDERS PARTY HERETO**
**and**

**AES Andes S.A.,**

**(as Exit Administrative Agent)**

**Dated as of [●], 2022**

---

[1] NTD: Guarantor-related and other provisions will follow the updates to the 1L/ CTA agreements.

# TABLE OF CONTENTS

Article/
Section                          Item                                                                          Page No.

ARTICLE I          Definitions and Interpretation ...........................................................................3

    Section 1.01.    *Definitions*. .............................................................................................................3
    Section 1.02.    *Financial Calculations; Interpretation; Business Day Adjustment* ................7
    Section 1.03.    *Conflict with Common Terms Agreement*.. ......................................................7

ARTICLE II         The Secured Exit Loans ....................................................................................7

    Section 2.01.    *The Secured Exit Loans*. ....................................................................................7
    Section 2.02.    *Interest; Market Disruption*................................................................................7
    Section 2.03.    *Chilean Law Notes*. ............................................................................................8
    Section 2.04.    *Repayment*.. .......................................................................................................10
    Section 2.05.    *Prepayment*........................................................................................................11
    Section 2.06.    *Fees and Other Payments*.................................................................................11
    Section 2.07.    *Currency and Place of Payments*. ....................................................................12
    Section 2.08.    *Reimbursement of Expenses*. ...........................................................................13
    Section 2.09.    *Increased Costs*.. ...............................................................................................13
    Section 2.10.    *Unwinding Costs.* ..............................................................................................13
    Section 2.11.    *Taxes*..................................................................................................................14
    Section 2.12.    *Illegality*.............................................................................................................15

ARTICLE III        Common Terms ...............................................................................................16

    Section 3.01.    *Representations and Warranties*. .....................................................................16
    Section 3.02.    *Covenants*.. ........................................................................................................16
    Section 3.03.    *Events of Default*.. .............................................................................................16

ARTICLE IV         The Exit Administrative Agent.......................................................................17

    Section 4.01.    *Appointment and Authorization of Exit Administrative Agent*. .....................17
    Section 4.02.    *Delegation of Duties of the Exit Administrative Agent*. ................................19
    Section 4.03.    *Liability of the Exit Administrative Agent*. ....................................................19
    Section 4.04.    *Reliance by the Exit Administrative Agent*.....................................................19
    Section 4.05.    *Notice of Default; Other Notices*.....................................................................20
    Section 4.06.    *Credit Decision*.................................................................................................20
    Section 4.07.    *Indemnification of the Exit Administrative Agent*. ........................................21
    Section 4.08.    *Exit Administrative Agent in Individual Capacity*..........................................21
    Section 4.09.    *Successor Exit Administrative Agent*...............................................................22
    Section 4.10.    *Allocation of Funds*. .........................................................................................22
    Section 4.11.    *U.S.A. Patriot Act*.............................................................................................23

ARTICLE V          Miscellaneous .................................................................................................24

35382226.6

i

| Section 5.01. | *Notices*. | 24 |
| Section 5.02. | *Term of Agreement*.. | 24 |
| Section 5.03. | *Saving of Rights*. | 24 |
| Section 5.04. | *Enforcement*. | 24 |
| Section 5.05. | *Successors and Assignees*. | 24 |
| Section 5.06. | *Disclosure of Information*. | 26 |
| Section 5.07. | *Amendments, Waivers and Consent*. | 26 |
| Section 5.08. | *Counterparts*. | 26 |
| Section 5.09. | *English Language*. | 27 |
| Section 5.10. | *Entire Agreement*. | 27 |
| Section 5.11. | *No Third Party Beneficiaries*. | 27 |
| Section 5.12. | *Amendment and Restatement*. | 27 |

35382226.6

[AM_ACTIVE 403871367_4]

<u>SCHEDULES</u>

SCHEDULE 1          REPAYMENT SCHEDULE

<u>EXHIBIT</u>

EXHIBIT A          FORM OF CHILEAN LAW ALLONGE

EXHIBIT B          FORM OF ACKNOWLEDGMENT OF DEBT

EXHIBIT C          FORM OF ASSIGNMENT AGREEMENT

EXHIBIT D          FORM OF ACCESSION AGREEMENT

35382226.6

[AM_ACTIVE 403871367_4]

# SECURED EXIT LOAN AGREEMENT

This **SECURED EXIT LOAN AGREEMENT** (this "<u>Agreement</u>"), dated as of [●], 2022, is entered into by and among:

(1)    **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "<u>Borrower</u>");

(2)    **ALTO MAIPO DELAWARE LLC**, a Delaware limited liability company (the "<u>Guarantor</u>");

(3)    **EACH SECURED EXIT LENDER THAT BECOMES A PARTY HERETO ON THE DATE HEREOF AND FROM TIME TO TIME**; and

(4)    **AES ANDES S.A.** (formerly AES Gener S.A.), a *sociedad anónima* organized and existing under the laws of the Country (in its capacity as Exit Administrative Agent on behalf of the Secured Exit Lenders, the "<u>Exit Administrative Agent</u>").

## RECITALS

**WHEREAS,** the Borrower is undertaking the construction, completion, ownership and operation of the Project;

**WHEREAS,** on November 17, 2021, each of the Borrower and Alto Maipo Delaware LLC commenced a bankruptcy case (together, the "<u>Bankruptcy Cases</u>") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>");

**WHEREAS**, ALTO MAIPO Delaware LLC, a limited liability company duly organized and existing under the laws of Delaware, as borrower, ALTO MAIPO SpA., a *sociedad por acciones* duly organized and validly existing under the laws of Chile, as guarantor (the borrower and the guarantor the "<u>Loan Parties</u>"), AES Andes S.A., as the initial DIP Lender (the "<u>Initial DIP Lender</u>") and as administrative agent thereof (the "<u>Administrative Agent</u>"), have entered into that certain Super-Priority Debtor-In-Possession Revolving Loan Agreement, dated as of November 24, 2021, as amended by (i) that certain First Amendment to the Credit Agreement entered into by the Loan Parties, the Initial DIP Lender and the Administrative Agent, dated as of February 17, 2022, (ii) that certain Second Amendment to the Credit Agreement entered into by the Loan Parties, the Initial DIP Lender and the Administrative Agent, dated as of February 23, 2022; (iii) that certain Third Amendment to the Credit Agreement entered into by the Loan Parties, the Initial DIP Lender and the Administrative Agent, dated as of February 28, 2022; and (iv) that certain Fourth Amendment to the Credit Agreement entered into by the Loan Parties, the Initial DIP Lender and the Administrative Agent, dated as of February 28, 2022 (as further amended, restated, amended and restated,

35382226.6

supplemented or otherwise modified from time to time, including pursuant to this Fourth Amendment, the "<u>DIP Credit Agreement</u>" and the loans made thereunder, the "<u>DIP Loans</u>");

**WHEREAS**, the Loan Parties, the Initial DIP Lender and the Administrative Agent have agreed to amend and restate the DIP Credit Agreement as set forth herein;

**WHEREAS,** the execution and delivery of this Agreement is a condition precedent to Plan Effective Date of a chapter 11 plan of reorganization of the Borrower approved by the Court pursuant to which it will exit the Bankruptcy Cases;

**WHEREAS**, on the Effective Date, the aggregate total amount of $[51,500,000] of existing debt obligations under the DIP Credit Agreement are being amended and restated into this Secured Exit Loan Agreement in an amount equal to $[51,500,000] subject to and governed by the terms of this Agreement;

**NOW THEREFORE**, in consideration of the foregoing, the Secured Exit Lenders are willing to maintain the Secured Exit Loans upon the terms and conditions set forth in this Agreement and the other Financing Documents.

## ARTICLE I

### Definitions and Interpretation

Section 1.01. <u>*Definitions*</u>. Wherever used in this Agreement, and except as otherwise defined herein, terms defined in the Common Terms Agreement shall have the meaning ascribed to them therein, and the following terms have the meanings opposite them:

| | |
|---|---|
| "Closing Date" | shall mean the date on which the conditions precedent set forth in Section 5.01 have been satisfied or waived; for the avoidance of doubt, this Agreement shall be effective on the Closing Date. |
| "Common Terms Agreement" | the Third Amended and Restated Common Terms Agreement, dated as of the date hereof, by and among the Borrower, each Secured Creditor Representative, as defined therein, and Itaú Corpbanca in its capacity as intercreditor agent for the Secured Creditors. |
| "Deferred Exit Financing Interest" | has the meaning ascribed to such term in Section 2.02 herein. |
| "Exit Interest Payment Date" | shall mean January 15, April 15, July 15 and October 15. |

35382226.6

2

| | |
|---|---|
| "Exit Maturity Date" | [•][2] |
| "Exit Payment Date" | shall mean January 15, April 15, July 15 and October 15. |
| "Excluded Taxes"[3] | with respect to any of the Secured Exit Lenders or any other Person to whom the Borrower is obligated to make any payment under this Agreement or any other Financing Document[4] related to the Secured Exit Loan, (a) Taxes imposed on or measured by its net income (however denominated), franchise Taxes and branch profits Taxes, in each case, imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or in which it has or maintains a permanent office or establishment or, in the case of any Secured Exit Lender, in which its applicable lending office is located, (b) Taxes imposed as a result of a present or former connection between such Secured Exit Lender and the jurisdiction of the Authority imposing such Tax, other than a connection arising solely as a result of the arrangements contemplated under this Agreement or under any other Financing Document, (c) any withholding tax that is imposed in the Country on any payments to Secured Exit Lenders or a Participant thereof, as applicable, in excess of the amount that would have been imposed at the Chilean Preferential Withholding Rate on interest payments, (d) any United States backup withholding Tax, (e) any U.S. federal withholding Taxes imposed under FATCA, or (f) any Stamp Tax imposed as a result of a replacement of a Chilean Law Note or an issuance of a Chilean Law Note to an assignee of a Secured Exit Lender in accordance with <u>Section 2.03(h)</u>, <u>Section 2.03(i)</u> and <u>Section 2.03(j)</u> (<u>*Chilean Law Note*</u>). |
| "Exit Loan Obligations" | shall mean at any date, the due and punctual payment of (a) the principal and interest at the applicable rate provided in this Agreement on the Exit Loans, when |

---

[2] NTD: Insert the date that is 3 years post emergence.

[3] NTD: Subject to further review.

[4] NTD: Definition in the CTA will include promissory notes.

35382226.6

3

|  | and as due, whether at maturity, by acceleration or otherwise, and (b) all other costs, expenses and indemnities owing to the Secured Exit Lenders under the Secured Exit Loan Agreement and the Financing Documents. |
|---|---|
| "FATCA" | Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the U.S. Internal Revenue Code of 1986, as amended, any intergovernmental agreement entered into in connection with the implementation of such Sections of the U.S. Internal Revenue Code of 1986, as amended, and any fiscal or regulation legislation, rules or practices adopted pursuant to such intergovernmental agreement. |
| "Federal Funds Effective Rate" | for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero (0) for purposes of this Agreement. |
| "Increased Costs" | the amount certified in an Increased Costs Certificate to be the net incremental costs of, or reduction in return to, any Secured Exit Lender (or any Participant thereof) in connection with the making or maintaining of its Secured Exit Loan (or its Participation, as the case may be) that result from: |

(a) any enactment of any law or regulation or mandatory directive after the Closing Date or any change in any Applicable Law (including any Applicable Environmental and Social Law) or in its interpretation or application by any Authority charged with its administration; or

35382226.6

4

(b)   compliance with any request from, or requirement of, any central bank or any Authority;

which, in any such case, after the Closing Date:

(i)   imposes, modifies or makes applicable any reserve, special deposit or similar requirements against assets held by, or deposits with or for the account of, or loans made by, that Secured Exit Lender (or that Participant);

(ii)   imposes a cost (other than Taxes) on that Secured Exit Lender as a result of that Secured Exit Lender having made its Secured Exit Loan (or on that Participant as a result of that Participant having acquired its Participation) or reduces the rate of return (other than with respect to Taxes) on the overall capital of that Secured Exit Lender (or that Participant) that it would have achieved had that Secured Exit Lender not made its Secured Exit Loan (or that Participant not acquired its Participation);

(iii)   changes the basis of taxation on payments received by that Secured Exit Lender in respect of its Secured Exit Loan (or by that Participant with respect to its Participation) (other than with respect to Excluded Taxes) imposed by the jurisdiction of its incorporation (or in which it books its Participation) or in any political subdivision of such jurisdiction; or

(iv) imposes on that Secured Exit Lender (or that Participant) any other condition regarding the making or maintaining of its Secured Exit Loan (or its Participation, as the case may be);

but excluding any incremental costs of making or maintaining a Secured Exit Loan (or any Participation thereof) that are a direct result of that Secured Exit Lender (or its Participant) having its principal office in the Country or having or maintaining a permanent office or establishment in the Country, if and to the extent that permanent office or establishment acquires that Secured Exit Loan (or Participation).

| "Increased Costs Certificate" | a certificate provided from time to time by any Secured Exit Lender (based on a certificate to such Secured Exit Lender from any Participant of such Secured Exit |

Lender, if Increased Costs affect its Participation), with a copy to the Exit Administrative Agent, certifying:

(a) the circumstances giving rise to the Increased Costs;

(b) that the costs of that Secured Exit Lender (or that Participant) have increased or the rate of return of that Secured Exit Lender (or that Participant) has been reduced;

(c) that such Secured Exit Lender (or such Participant) has, in its opinion, exercised reasonable efforts to minimize or eliminate the relevant increase or reduction, as the case may be; and

(d) the amount of Increased Costs.

| | |
|---|---|
| "Indemnified Taxes" | Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of the Borrower hereunder or under any other Financing Document to any of the Secured Exit Lenders or the Exit Administrative Agent. |
| "Initial Repayment Date" | the Exit Payment Date occurring on July 15, 2023. |
| "Interest Period" | each period of three (3) months, in each case beginning on an Exit Interest Payment Date and ending on the day immediately before the next following Exit Interest Payment Date |
| "Interest Rate" | four percent (4%) per annum. |
| "Majority Exit Lenders" | shall mean, at any date, Secured Exit Lenders having or holding more than 50% of the outstanding principal amount of the Exit Loans at such date. For the avoidance of doubt, in the event that there is a single Secured Exit Lender, all references herein to the Majority Exit Lenders shall be deemed to refer to such Secured Exit Lender. |
| "Relevant Change" | is defined in Section 2.12. |
| "Repayment Schedule" | is defined in Section 2.04. |

35382226.6

[AM_ACTIVE 403871367_4]

"Secured Exit Loans"    is defined in Section 2.01.

Section 1.02.  *Financial Calculations; Interpretation; Business Day Adjustment*.  (a)  This Agreement is the Secured Exit Loan Agreement referred to in the Common Terms Agreement.

(b)    Sections 1.02 (*Financial Calculations*), 1.03 (*Interpretation*) and 1.04 (*Business Day Adjustment*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

(c)    In the context of this Agreement, and except as otherwise provided in this Agreement, any reference to "the date of this Agreement" or any similar reference, is a reference to the date of execution of this Agreement.

Section 1.03.  *Conflict with Common Terms Agreement*.  In the event of any conflict between the terms of this Agreement and the terms of the Common Terms Agreement, the terms of this Agreement will prevail as among the parties to this Agreement[5].

## ARTICLE II

## The Secured Exit Loans

Section 2.01.  *The Secured Exit Loans*.  On the date hereof, $[51,000,000] of the existing debt obligations under the DIP Credit Agreement are amended and restated as loans in an outstanding principal amount of $[51,000,000] (the "Secured Exit Loans"). The initial Secured Exit Lender (formerly, the Initial DIP Lender), agrees to continue the DIP Loans evidenced by the DIP Credit Agreement on the terms and conditions of this Agreement.

Section 2.02.  *Interest*.

(a)    Subject to Section 2.03 (*Default Interest Rate*) of the Common Terms Agreement, the Borrower shall pay interest on the Secured Exit Loans in accordance with this Section 2.02.

(b)    Each Secured Exit Loan shall bear interest at the Interest Rate.

(c)    Interest on the then outstanding principal amount of Secured Exit Loan shall accrue from day to day beginning on the Closing Date, be prorated on

---

[5] NTD: Superpriority status and collateral to be addressed in the Security Agreements and the CTA.

35382226.6

[AM_ACTIVE 403871367_4]

the basis of a 365 or 366 day year, as the case may be, for the actual number of days in the relevant Interest Period.

(d)　　Interest shall be payable in arrears on the Exit Interest Payment Date immediately following the end of that Interest Period, starting from the Exit Interest Payment Date occurring on April 15, 2023; provided, however, that unless a [Potential Event of Default] or an Default or Event of Default has occurred and is continuing (i) the interest payable on the Exit Interest Payment Dates occurring on July 15, 2022, October 15, 2022 and January 15, 2023 (the "Deferred Exit Financing Interest") shall be capitalized; provided, further, that the Deferred Exit Financing Interest shall be mandatorily prepaid if the conditions set forth in Section [2.06(i) through (vii)] of the Common Terms Agreement are satisfied. The interest payment due on the July 15, 2022 Exit Interest Payment Date will be for interest accrued from the Closing Date through the end of that Interest Period.

Section 2.03.　*Chilean Law Notes*.  (a) To further evidence its obligation to repay the DIP Loans, with interest accrued thereon, the Borrower has issued to the order of the initial Secured Exit Lender, Chilean Law Note(s) which have been amended through allonges or *hojas de prolongación* substantially in the form of Exhibit A (*Form of Chilean Law Allonge*).

(b)　　Notwithstanding the above, and as provided under Section 2.03(j), the obligation of the Borrower to further evidence its obligation to repay each Secured Exit Loan, with interest accrued thereon, may be evidenced if requested by a Secured Exit Lender or its assignee, by acknowledgments of debt (*Reconocimiento de Deuda*) executed by the Borrower as provided therein.

(c)　　Each Secured Exit Lender will note on its internal records the amount of each Secured Exit Loan made by it and on the reverse side of each Chilean Law Note or on the applicable allonge or *hoja de prolongación* of each Chilean Law Note, each payment received in respect thereof, and will, prior to any transfer of any of its Chilean Law Notes, record on the reverse side thereof or on the applicable allonge or *hoja de prolongación* thereto the outstanding principal amount of its Secured Exit Loans evidenced thereby. Failure to make such notation shall not affect the Borrower's obligations in respect of such Secured Exit Loans. Each Secured Exit Lender further agrees that, notwithstanding any provision of any Chilean Law Note, it shall not demand payment of any amount under any Chilean Law Note (or use a Note Power of Attorney to insert the due date in a Chilean Law Note) unless such amount is then due and payable (whether at stated maturity, by acceleration or otherwise) by the Borrower in accordance with the terms of this Agreement.

(d)　　Each Secured Exit Lender acknowledges and agrees that (i) in the event that such Secured Exit Lender receives payment of any amounts constituting a principal installment or interest under this Agreement or any Chilean Law Notes, amounts due under this Agreement or the Chilean Law Notes, as the case may be, shall be deemed to be reduced by such paid amounts *pro tanto* and such Secured

35382226.6

8

Exit Lender shall not seek enforcement of this Agreement or the Chilean Law Notes with respect to such paid amounts, and vice versa, and (ii) the aggregate amounts paid under all Chilean Law Notes shall not in any case exceed the aggregate amounts payable to such Secured Exit Lender pursuant to this Agreement.

(e)     Upon repayment in full of the principal and interest of its Secured Exit Loan, the relevant Secured Exit Lender shall promptly (but not later than ten (10) Business Days of such repayment) return the relevant Chilean Law Note to the Borrower marked "cancelled."

(f)     Except as set forth below, neither the execution, delivery, participation or assignment of any Chilean Law Note or acknowledgment of debt, or the commencement of any judicial enforcement proceeding or exercise of any other right or remedy in connection with any Chilean Law Note or acknowledgment of debt, nor the total or partial collection of any Chilean Law Note or acknowledgment of debt shall be deemed to be a novation or a waiver of any right of any Secured Exit Lender under, or an amendment of any term or condition of, this Agreement or any other Financing Document, including with respect to the governing law thereof.  The rights and claims of any Secured Exit Lender under the Chilean Law Notes and acknowledgments of debt shall not replace or supersede any rights and claims of such Secured Exit Lender under this Agreement.

(g)     The Borrower hereby agrees, promptly upon the request of any Secured Exit Lender, but in any event no later than ten (10) Business Days following the date of any such request, to amend by an *hoja de prolongación* any Chilean Law Note or through an amendment deed any acknowledgment of debt delivered by the Borrower, to reflect any changes in the Secured Exit Loans in accordance with this Agreement.

(h)     Upon receipt by the Borrower of an affidavit of any Secured Exit Lender (i) certifying, to the best of its knowledge, as to the loss, theft, destruction or mutilation of any Chilean Law Note, (ii) agreeing that if the relevant Chilean Law Note is found or otherwise is in its custody or power, it shall promptly deliver such Chilean Law Note to the Borrower for cancellation and (iii) agreeing to indemnify and hold harmless the Borrower for any losses incurred by the Borrower in connection with collection procedures and payments imposed on the Borrower as a result of such lost, stolen, destroyed or mutilated Chilean Law Note, then the Borrower shall execute and deliver in lieu of such lost, stolen, destroyed or mutilated Chilean Law Note (y) an acknowledgment of debt by public deed (*reconocimiento de deuda*), substantially in the form of Exhibit B (*Form of Acknowledgment of Debt*) or (z) a new Chilean Law Note (or series of Chilean Law Notes) in the same terms as the Chilean Law Note so replaced; provided that, any applicable Stamp Tax resulting from the execution and delivery of such new deed or Chilean Law Note shall be for the account of, and payable by, such Secured Exit Lender.

35382226.6

[AM_ACTIVE 403871367_4]

(i)     At any Secured Exit Lender's request, the Borrower shall promptly execute and deliver new Chilean Law Notes or an acknowledgment of debt by public deed satisfactory to such Secured Exit Lender, to substitute for the Chilean Law Notes previously delivered to such Secured Exit Lender other than any Chilean Law Note returned by Secured Exit Lender to the Borrower marked "cancelled", provided that the Borrower shall have previously or simultaneously received the Chilean Law Notes in substitution for which such Secured Exit Lender requests such new Chilean Law Notes; provided that, any applicable Stamp Tax resulting from the execution and delivery of such new Chilean Law Note or acknowledgment of debt by public deed shall be for the account of, and payable by, such Secured Exit Lender.

(j)     If requested by an assigning Secured Exit Lender or its assignees, the Borrower shall, to the extent any Chilean Law Note corresponding to any assigned Secured Exit Loan evidences a principal amount higher than the one being assigned, deliver to the assignee Secured Exit Lender in replacement for any Chilean Law Note previously delivered by the Borrower to the assigning Secured Exit Lender, either (x) a duly completed Chilean Law Note evidencing the assignee's assigned Secured Exit Loans in form and substance satisfactory to such assignee Secured Secured Lender or (y) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of Exhibit B (*Form of Acknowledgment of Debt*), evidencing the assignee's assigned Secured Exit Loans; provided, however, that if the assigning Secured Exit Lender has retained a portion of its Secured Exit Loans, upon request of the assigning Secured Exit Lender, the Borrower shall execute and deliver to such Secured Exit Lender either (i) an *hoja de prolongación* in respect of the applicable Chilean Law Note previously delivered by the Borrower to the assigning Secured Exit Lender, amending the principal amount stated therein to reflect the principal amount of the Secured Exit Loan that was retained by the assigning Secured Exit Lender, or (ii) a replacement Chilean Law Note or Chilean Law Notes, as the case may be, reflecting the principal amount of the Secured Exit Loans retained by the assigning Secured Exit Lender (such Chilean Law Note(s) to be in exchange for, but not in payment of, the Chilean Law Note(s), if any, held by such Secured Exit Lender), or (iii) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of Exhibit B (*Form of Acknowledgment of Debt*), reflecting the principal amount of the Exit Loans retained by the assigning Secured Exit Lender; provided that, the Borrower shall not be obligated to issue new Chilean Law Note(s) or replacement Chilean Law Note(s) pursuant to this Section 2.03(j) unless the assignee Secured Exit Lender (in the case of a new Chilean Law Note) and the assigning Secured Exit Lender (in the case of a replacement Chilean Law Note) shall have agreed to pay the amount of any applicable Stamp Tax payable in order to notarize such new Chilean Law Note or replacement Chilean Law Note.

Section 2.04.   *Repayment*.   (a)   Subject to Section 1.04 *(Business Day Adjustment)*, Section 2.05 *(Voluntary Prepayment)* and Section 2.06 *(Mandatory Prepayment)* of the Common Terms Agreement, in accordance with Section 2.04 *(Repayment)* of the Common Terms Agreement, the Borrower shall repay the

35382226.6

[AM_ACTIVE 403871367_4]

Secured Exit Loans on each Exit Payment Date in the amounts set forth in Schedule 1 (*Loan Repayment Schedule*) (the "Repayment Schedule") starting on the Initial Repayment Date and ending on the Exit Maturity Date; provided that the entire outstanding principal amount of all Secured Exit Loans shall be due and payable on the Exit Maturity Date.

(b)     Any principal amount of the Secured Exit Loan repaid under this Agreement may not be re-borrowed.

(c)     Notwithstanding anything to the contrary herein, the Borrower shall have no obligation to pay on the Exit Maturity Date a principal amount on the Secured Exit Loans that, when taken together with any prior prepayments of principal made on the Secured Exit Loans, would exceed the principal amount of the Secured Exit Loans.

Section 2.05.  *Prepayment*.  (a)  The Borrower shall have the right, at its option, upon fifteen (15) days' prior written notice to the Secured Exit Lenders, to prepay the Secured Exit Loan, in whole but not in part, on any Exit Interest Payment Date. Each such prepayment shall be accompanied by all accrued and unpaid interest and Increased Costs, if any, on the Secured Exit Loan, as well as any other amounts then due and payable pursuant to this Agreement.

(b)     The Borrower shall prepay the Secured Exit Loans outstanding upon occurrence of the events set forth in, and to the extent required by, Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement. The amounts prepaid pursuant to the prior sentence shall be applied by the Exit Administrative Agent (on behalf of each Secured Exit Lender) to the outstanding installments of principal of the applicable Secured Exit Loans in inverse order of maturity in accordance with Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement. Each application of such amounts shall be made pro rata among the Secured Exit Lenders, allocated to each Secured Exit Lender based on such Secured Exit Lender's outstanding Secured Exit Loans. Each such prepayment shall be accompanied by all accrued and unpaid interest and Increased Costs, if any, on the Secured Exit Loan, as well as any other amounts then due and payable pursuant to this Agreement.

(c)     No prepayment premium shall be due on voluntary or mandatory prepayments pursuant to this Section 2.05.

Section 2.06.  *Fees and Other Payments*.  The Borrower shall pay to the Exit Administrative Agent any customary account transfer charges incurred by the Exit Administrative Agent in the performance of its duties hereunder.

Section 2.07.  *Currency and Place of Payments*.  (a) The Borrower shall make all payments to the Exit Administrative Agent for the account of the Secured Exit Lenders and the Exit Administrative Agent of principal, interest, fees and any other amount due to the Secured Exit Lenders and the Exit Administrative Agent

35382226.6

[AM_ACTIVE 403871367_4]

under this Agreement and the other Financing Documents in accordance with Section 2.07 (*Currency and Place of Payments*) of the Common Terms Agreement, in same day funds, to the following account:

> Bank: [•]
> ABA: [•]
> Swift Code: [•]
> For the account of: [•]
> Account Number: [•]
> Reference: [•]
> Attention: [•]

(b)     The payment obligations of the Borrower under this Agreement shall be discharged or satisfied only to the extent that (and as of the date when) the Exit Administrative Agent actually receives (for the account of the Secured Exit Lenders and the Exit Administrative Agent) funds in the Loan Currency in the account referred to in subsection (a) above, notwithstanding the tender or payment (including by way of recovery under a judgment) of any amount in any currency other than the Loan Currency.   Accordingly, the Borrower shall, as a separate obligation or by way of indemnity, as the case may be, pay such additional amount as is necessary to enable the Exit Administrative Agent to receive (for the account of the Secured Exit Lenders and the Exit Administrative Agent), after conversion to the Loan Currency at a market rate and transfer to that account, the full amount due to each Secured Exit Lender or the Exit Administrative Agent under this Agreement in the Loan Currency and in the account referred to in subsection (a) above.

(c)     Notwithstanding the provisions of Section 2.07(b), the Exit Administrative Agent (on behalf of any Secured Exit Lender) may require the Borrower, and the Borrower shall be obligated, to pay (or reimburse) the Exit Administrative Agent (for the account of such Secured Exit Lender) in any currency other than Dollars in accordance with Section 2.07(d) (*Currency and Place of Payments*) of the Common Terms Agreement.

(d)     The Exit Administrative Agent shall promptly remit payments received by it for the account of any Secured Exit Lender to the account of such Secured Exit Lender as informed in writing by such Secured Exit Lender to the Exit Administrative Agent.

Section 2.08.   <u>*Reimbursement of Expenses*</u>.  (a) Costs, expenses and losses incurred by any Secured Exit Lenders and the Exit Administrative Agent in connection with its Secured Exit Loan shall be subject to Section 2.08 (*Expenses*) of the Common Terms Agreement.

(b) To the extent not otherwise paid pursuant to the Common Terms Agreement, the Borrower shall pay to the Exit Administrative Agent (for the account of each Secured Exit Lender), all reasonable and documented out-of-

35382226.6

12

pocket expenses incurred outside the daily course of business (including periodic travel and subsistence expenses as may be incurred in relation to bank meetings and other site visits reasonably required by any Secured Exit Lender); <u>provided</u> that payment of expenses incurred in relation to site visits pursuant to Section [5.01(f)] of the Common Terms Agreement shall not exceed in aggregate the equivalent of twenty thousand Dollars ($20,000) in any calendar year.

Section 2.09. <u>*Increased Costs*</u>. On each Exit Interest Payment Date, the Borrower shall pay, in addition to interest, the amount that each Secured Exit Lender (other than AES Andes or any of its Affiliates) from time to time notifies to the Borrower (with a copy to the Exit Administrative Agent) in an Increased Costs Certificate as being the aggregate Increased Costs of the Secured Exit Lenders and the Participants in the applicable Secured Exit Loans accrued and unpaid prior to that Exit Interest Payment Date; <u>provided</u> that, the Borrower shall not be required to compensate any Secured Exit Lender (or Participant) for any Increased Costs (i) incurred more than one-hundred and eighty (180) days prior to the date that such Secured Exit Lender provides the Borrower with the Increased Costs Certificate, or (ii) in excess of the amount that would have been payable by the Borrower if the Secured Exit Lenders had not sold Participations in the applicable Secured Exit Loans.

Section 2.10.    [Reserved].

Section 2.11. <u>*Taxes*</u>. (a) The Borrower shall pay or cause to be paid all Indemnified Taxes on or in connection with the payment of any and all amounts due under this Agreement or any other Financing Document applicable to the Secured Exit Loan that are now or in the future levied or imposed by any Authority of the Country or by any organization of which the Country is a member or any jurisdiction through or out of which a payment is made. Notwithstanding anything to the contrary herein, the Borrower shall not be required to make any payment pursuant to this Section 2.11(a) if any Secured Exit Lender or the Exit Administrative Agent makes demand for such payment more than one-hundred and eighty (180) days after the earlier of: (i) the date on which the relevant Authority makes written demand upon such Secured Party for payment of such Indemnified Taxes and (ii) the date on which such Secured Party has made payment of such Indemnified Taxes.

(b)    All payments of principal, interest, fees and other amounts due under this Agreement or any other Financing Document shall be made without deduction or withholding for or on account of any Taxes, except as required by Applicable Law.

(c)    If the Borrower is required by Applicable Law to deduct or withhold any Taxes from payments of principal or (as the case may be) interest, fees or other amounts due under this Agreement or, as the case may be, the relevant Financing Document, then the Borrower shall make such deduction or withholding and if the Tax deducted or withheld is an Indemnified Tax, the sum payable shall be increased

to such amount as may be necessary so that the applicable Secured Exit Lender or the Exit Administrative Agent receives the full amount that it would have received (taking into account any Indemnified Taxes payable on amounts payable by the Borrower under this clause (c)) had those payments been made without that deduction.  If any Secured Exit Lender or the Exit Administrative Agent so requests, the Borrower shall deliver to the requesting Secured Party, within thirty (30) days of the date of such request, with a copy to the Exit Administrative Agent, official tax receipts evidencing payment (or certified copies of them) or other evidence of such payment reasonably satisfactory to the applicable Secured Party.

(d)    Each Secured Exit Lender agrees to use commercially reasonable efforts to cooperate with the Borrower (but without the obligation to incur costs or expenses) in completing any procedural formalities necessary for the Borrower (and notified in writing by the Borrower to the Secured Exit Lender in sufficient time to enable such Secured Exit Lender to so cooperate) to obtain authorization to make any payment to which that Secured Exit Lender is entitled without deduction or withholding or at a reduced rate of withholding, including cooperation in obtaining the following certificates, documents or information, to the extent applicable: (i) in the case of a Secured Exit Lender or any Participant thereof that is a foreign non-resident bank for Chilean tax purposes, evidence requested by the Borrower that demonstrates such status, to determine if any such Secured Exit Lender, or any such Participant thereof is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party, (ii) in the case of a foreign non-resident financial institution for Chilean tax purposes, and to the extent that such foreign non-resident financial institution is not registered but has approved in writing to be registered in the special registry kept by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) referred to in its Circular No. 27 of 2008 (as amended), the certificates and information required by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) in Exempt Resolution No. 95 of 2021 (as amended) and other related Chilean Internal Revenue Service instructions to determine if a Secured Exit Lender or any Participant is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party (including articles of incorporation and audited financial statements of the foreign non-resident financial institution); (iii) IRS Form W-9, W-8BEN, W-8ECI, W-8IMY (with accompanying forms) or other applicable Form W-8 to determine if such Secured Exit Lender or Participant is subject to U.S. backup withholding or information reporting requirements, (iv) in the case of a Secured Exit Lender or Participant that is eligible to benefit from the provisions of any Double Taxation Treaty enforced in the Country, evidence required by any contracting states of such Double Taxation Treaty in order to claim such benefits, or (v) that is reasonably requested by the Borrower, the Exit Administrative Agent or any Collateral Agent, as the case may be, to determine if such Secured Exit Lender or Participant has complied with its obligations under FATCA (including any amendments to FATCA after the date hereof that impose obligations that are not materially more onerous than the obligations in effect on the date such Secured Exit Lender becomes party to this Agreement); provided that a Secured Exit Lender's failure to cooperate with

35382226.6

14

the Borrower as stated herein shall not affect the Borrower's obligations under this Section 2.11.

Section 2.12. _Illegality_.[6] If, after the date of this Agreement, any change made in any Applicable Law (including any Applicable Environmental and Social Law) (or its interpretation or application by any Authority charged with its administration) (a "Relevant Change") makes it unlawful for any Secured Exit Lender (or any Participant under any Secured Exit Loan) to continue to maintain its Secured Exit Loan (or such Participation, as the case may be):

(a)    the Borrower shall, upon written request by the relevant Secured Exit Lender, with a copy to the Exit Administrative Agent (but subject to any applicable Authorization having been obtained), on the earlier of (i) the next Exit Interest Payment Date, and (ii) the date that such Secured Exit Lender advises the Borrower is the latest day permitted by the Relevant Change, prepay in full that Secured Exit Loan (or, as the case may be, that part of the Secured Exit Loan that the relevant Secured Exit Lender advises corresponds to that Participation);

(b)    concurrently with the prepayment of any part of the Secured Exit Loan, the Borrower shall pay all accrued interest and Increased Costs (if any) on that part of the Secured Exit Loan; and

(c)    the Borrower agrees to take all reasonable steps to obtain, as quickly as possible after receipt of any Secured Exit Lender's request for prepayment, the Authorization referred to in Section 2.12(a) if any such Authorization is then required.

## ARTICLE III

### Common Terms

Section 3.01. _Representations and Warranties_. (a) The representations and warranties set out in Section 3.01 (_Representations and Warranties_) of the Common Terms Agreement shall be made on the date hereof, _mutatis mutandis_, for the benefit of the Secured Exit Lenders and the Exit Administrative Agent as if set out in this Agreement in full.

(b)    The Borrower acknowledges that the Exit Administrative Agent and the Secured Exit Lenders enter into this Agreement and the other Financing Documents, and that the Secured Exit Lenders agreed to amend and restate the terms of the DIP Loans as stated herein on the basis of, and in full reliance on, each of the representations and warranties referred to in Section 3.01 (_Representations and Warranties_) of the Common Terms Agreement.

---

[6] NTD: Replacement of Lenders to be included.

35382226.6

15

Section 3.02.  *Covenants*.  So long as any amount of any Exit Loan is outstanding under this Agreement, the covenants set out in Article V (*Particular Covenants*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, for the benefit of the Secured Exit Lenders as if set out in this Agreement in full (and as if each reference therein to "Secured Lender" or "Secured Lenders" or "Secured Creditors" were a reference to the Secured Exit Lenders; as if each reference therein to "Intercreditor Agent" or "Administrative Agent" were reference to the Exit Administrative Agent under this Agreement; as if each reference to the "Required Lenders" were reference to the "Majority Exit Lenders"; and as if each reference to "this Agreement" or "the Financing Documents" were a reference to this Agreement); provided that, Section [5.03](h)(i) through (vi) of the Common Terms Agreement shall not apply to the Secured Exit Lender.

## ARTICLE IV

Section 4.01.  *Acceleration After Default*.    Subject to Section 4.04, if any Event of Default occurs and is continuing (whether it is voluntary or involuntary, or results from operation of law or otherwise), each Secured Exit Lender may, by notice to the Borrower (with a copy to the Intercreditor Agent), require the Borrower to repay its Exit Loan in full or such part of its Exit Loan as is specified in that notice. On receipt of any such notice, the Borrower shall immediately repay such Exit Loan (or that part of such Exit Loan specified in that notice) and pay all interest accrued on it and any other amounts then payable under this Agreement. The Borrower waives any right it might have to further notice, presentment, demand or protest with respect to that demand for immediate payment and the Secured Exit Lenders' remedies.

Section 4.02.  *Events of Default*.    Each of the following events or occurrences set forth in this **Error! Reference source not found.** shall be an Event of Default in respect of the Exit Loans:

(a)    Failure to Pay under Financing Documents. The Borrower fails to pay when due (i) any part of the principal of or any interest on any Exit Loan, whether at the due date thereof or at a date fixed for mandatory prepayment thereof in accordance with Section 2.05(b) or (ii) any other amount payable by it pursuant to the Financing Documents and in the case of this clause (ii), such failure continues unremedied for a period of ten (10) days.

(b)    Failure to Comply with Certain Obligations.

(i)    The Borrower fails to comply with any of its obligations under [Section 5.01(a) (*Affirmative Covenants - Corporate Existence; Conduct of Business*), Section 5.01(j) (*Affirmative Covenants - Security; Further Assurances*), Section 5.01(k) (*Further Assurances*), Section 5.01(l) (*Affirmative Covenants - Pari Passu*), Section 5.01(n) (*Affirmative Covenants - Insurance Requirements*), Section 5.01(r) (*Affirmative Covenants - OFAC Lists*), Section 5.01(u) (*Affirmative*

*Covenants - Sanctions*), Section 5.02 (*Negative Covenants*) or Section 5.03(n) (*Reporting Requirements - Illicit Funding*)][7] of the Common Terms Agreement.

(ii)     The Borrower or the Guarantor, as applicable, fails to comply with any of its obligations under this Agreement (other than covenants and agreements referred to in **Error! Reference source not found.** and Section 4.02(a)(i), and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the Exit Administrative Agent (acting at the instructions of the Majority Exit Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, if such breach or default cannot be cured within such thirty (30) day period but is capable of being cured within sixty (60) days and the Borrower (A) is proceeding with diligence to cure such default, (B) provides, prior to the expiration of the initial thirty (30) day period, a notice to the Exit Administrative Agent explaining the reasons why the Borrower is not able to cure such breach or default within the initial thirty (30) day cure period and the Borrower's plan to achieve the cure within the additional thirty (30) day cure period and, (C) informs the Exit Administrative Agent on a periodic basis of all actions being taken in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.

(iii)     [8]Any party to a Material Project Document (other than the Borrower) fails to comply in any material respect with any of its obligations thereunder and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the Exit Administrative Agent (acting at the instructions of the Majority Exit Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, with respect to any Material Project Document other than a Material Project Document to which AES Andes is the Material Project Participant, if the applicable cure periods provided for in such contract have not expired, then the thirty (30) day cure period provided hereunder shall commence on the date on which the applicable cure period under the relevant Material Project Document has expired; and provided, further, that in the case of any Material Project Document, to the extent such breach or default cannot be cured within such thirty (30) day period, but is capable of being cured within sixty (60) days and the Material Project Participant is proceeding with diligence to cure such default and the Borrower informs the Exit Administrative Agent on a periodic basis of all actions that the Borrower is aware of that have been taken by the Material Project Participant in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.

(iv)     Notwithstanding Section 4.02(b)(ii), in the case of a breach or default of the obligations under Section 5.05(e) (*Environmental and Social*

---

[7] NTD: Cross references to be confirmed upon finalization of the documentation.

[8] NTD: Provision to follow CTA.

35382226.6

*Reporting Requirements*) of the Common Terms Agreement, such breach or default continues for a period of ten (10) days.

(c)    <u>Misrepresentation</u>. Any representation or warranty made in ARTICLE III of the Common Terms Agreement or in this Agreement by any of the Borrower or the Guarantor, or in connection with the execution of, or any request, certificate or notice delivered to any Secured Exit Lender under or in respect of, this Agreement is found to be incorrect in any material respect, unless the facts or conditions giving rise to such misrepresentation are capable of cure and cured in such a manner as to eliminate such misrepresentation within ten (10) days after the earlier of (i) the date on which the Exit Administrative Agent (acting at the instructions of the Secured Exit Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware thereof.

(d)    <u>Expropriation, Nationalization, Etc</u>. Any Authority:

(i)    condemns, nationalizes, seizes, attaches, compulsorily acquires, confiscates or otherwise expropriates (directly or indirectly through measures tantamount to expropriation) all or any substantial part of the property or the assets of the Borrower or the Guarantor or of their respective Share Capital;

(ii)    assumes custody or control of all or any substantial part of the property or the assets, or of the business or operations, of the Borrower or the Guarantor or of their respective Share Capital;

(iii)    takes or directs any action for the dissolution or disestablishment of the Borrower or the Guarantor or any action that would prevent the Borrower, the Guarantor or their respective officers from carrying on all or a substantial part of its business or operations; or

(iv)    takes any action or enacts any law to effect any of the foregoing.

(e)    <u>Involuntary Proceedings</u>. A decree or order by a court is entered against the Borrower or the Guarantor:

(i)    adjudging the Borrower or the Guarantor bankrupt, in liquidation or insolvent;

(ii)    approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or with respect to, the Borrower or the Guarantor under any applicable law;

(iii)    appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or the Guarantor or of any substantial part of its property or other assets; or

(iv)    ordering the winding up or liquidation of its affairs;

35382226.6

or any petition is filed seeking any of the above and is not dismissed within sixty (60) days.

    (f)    <u>Voluntary Proceedings</u>.  The Borrower or the Guarantor:

    (i)    requests a moratorium or suspension of payment of Liabilities from any court;

    (ii)    institutes proceedings or takes any form of corporate action to be liquidated or adjudicated bankrupt or insolvent (including any reorganization procedure (*procedimiento concursal de reorganización*), judicial reorganization agreement (*acuerdo de reorganizacíon judicial*), or simplified reorganization agreement (*acuerdo de reorganización extrajudicial o simplificado*), or liquidation procedure (*procedimiento concursal de liquidación*));

    (iii)    consents to the institution of bankruptcy, liquidation or insolvency proceedings against it;

    (iv)    files a petition or answer or consent seeking reorganization or relief under any applicable law, or consents to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or of any substantial part of its property;

    (v)    makes a general assignment for the benefit of creditors; or

    (vi)    admits in writing its inability to pay its Liabilities generally as they become due or otherwise becomes insolvent.

    (g)    <u>Analogous Events</u>. Any other event occurs that under any Applicable Law (including any Applicable Environmental and Social Law in the case of clause (h) of this Section 4.02) would have an effect analogous to any of those events listed in clauses (e), (f) or (h) of this Section 4.02**Error! Reference source not found.**; <u>provided</u> that, for the avoidance of doubt, nothing in this Agreement shall be construed as providing that a [Permitted Reorganization] shall constitute an Event of Default[9].

    (h)    <u>Attachment</u>.[10]  An attachment or analogous process is levied or enforced upon or issued against any of the assets of the Borrower or the Guarantor, in each case, for an amount in excess of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency), and such attachment or process is not discharged within sixty (60) days.

---

[9] NTD: Proviso to be added in the CTA.

[10] NTD: Provision to follow CTA.

35382226.6

[AM_ACTIVE 403871367_4]

(i)    Judgments.[11]  A final and non-appealable judgment, order or arbitral award (or series thereof) for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) is rendered against the Borrower or the Guarantor and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed for a period of sixty (60) days; provided that, to the extent that an insurer of any third party liability insurance policy required under Annex C (*Insurance Requirements*) confirms and acknowledges in writing that all or a portion of the amount of any such judgment, order or arbitral award will be paid out of the proceeds of any such insurance policy, the amount confirmed to be paid under such insurance policy by such insurer shall not be taken into account for purposes of the threshold set forth in this Section 4.02(i).

(j)    Cross-Default.  The Borrower fails to make any payment in respect of any of its Financial Debt (other than the Secured Exit Loans or any other amount payable to the Secured Exit Lender pursuant to the Financing Documents) in excess of five million Dollars ($5,000,000) (or its equivalent in any other currency) and any such failure continues for more than any applicable period of grace or any such Financial Debt becomes prematurely or immediately due and payable.

(k)    Revocation, Etc., of Security Documents.

(i)    Any Security Document or any of its provisions:

is revoked, terminated or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms) or ceases to provide the security intended, without, in each case, the prior written consent of the Exit Administrative Agent (acting on the instructions of the Majority Exit Lenders);

becomes unlawful, is declared void or becomes unenforceable; or

is repudiated or its validity or enforceability is challenged, in each case in writing by any Person (other than a Secured Exit Lender).

(ii)    Any Lien created or purported to be created by any of the Security Documents does not have, or ceases to have, the effect and priority it is expressed or intended to have under the terms of the relevant Security Document and in accordance with the Applicable Priority.

(l)    Revocation, Etc., of Financing Documents. This Agreement, the Common Terms Agreement or any of their provisions:

---

[11] NTD: Provision to follow CTA.

35382226.6

[AM_ACTIVE 403871367_4]

(i)      is revoked, terminated, rescinded or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms or as permitted under this Agreement);

(ii)     becomes unlawful, is declared void or becomes unenforceable; or

(iii)    is repudiated or the validity or enforceability of any of its provisions at any time is challenged, in each case in writing by any Person (other than a Secured Party).

(m)      [12]Revocation, Etc., of Material Project Documents.

(i)      Any Material Project Document or any of its material provisions (including any warranty given thereunder):

is revoked, terminated, rescinded, cancelled or ceases to be in full force and effect (other than at the end of its scheduled term or as permitted under this Agreement);

becomes unlawful, is declared void or becomes unenforceable; or

is repudiated or the validity or enforceability of any of its material provisions at any time is challenged, in each case in writing by any Person (other than a Secured Party or Strabag, in its capacity as Construction Constructor).

(n)      Abandonment.  The Borrower:

(i)      ceases to carry on its business;

(ii)     abandons the construction or operation of all or a material part of the Project for a period in excess of thirty (30) consecutive days;

(iii)    except in the case of a Force Majeure Event or mandated by an Authority, suspends the construction ($x$) of the Project as a whole for a period in excess of one-hundred and twenty (120) days in any period of twelve (12) consecutive months or, ($y$) of any material part of the Project for a period in excess of one-hundred and eighty (180) days, in any period of twelve (12) consecutive months;

(iv)     except ($w$) in the case of a Force Majeure Event or similar event affecting the operation of the Project, ($x$) if contemplated under the Project Documents (other than the O&M Agreement), ($y$) if mandated by an Authority or the CEN or ($z$) due to an emergency affecting the SEN, suspends the operation of

---

[12] NTD: Provision to follow CTA.

35382226.6

[AM_ACTIVE 403871367_4]

the Project or any material part thereof for a period in excess of one-hundred and eighty (180) days in any period of twelve (12) consecutive months; or

(v)     provides written or electronic notice to the *Superintendencia del Medio Ambiente* (Environmental Superintendence), the *Servicio de Evaluación Ambiental* (Environmental Assessment Service), the *Comisión Nacional de Energía* (National Commission of Energy*)*, the *Superintendencia de Electricidad y Combustibles* (Superintendence of Electricity and Fuels) or the *Coordinador Independiente del Sistema Eléctrico Nacional* (Independent Coordinator) indicating its decision to shut down, wind-up, indefinitely suspend construction or abandon the Project;

(o)     <u>Material Adverse Effect</u>.  Any event or circumstance (or series of events or circumstances) occurs or exists that has or could reasonably be expected to have a Material Adverse Effect.

(p)     <u>Bankruptcy, Liquidation, Etc., of Material Project Participants</u>.  Any of the events specified in Section 4.02(e) through Section 4.02(g) occurs to any Material Project Participant (other than any counterparty to the Real Estate Rights Agreements or the Aguas Andinas Agreement); <u>provided</u>, <u>however</u>, that in the case of each Construction Contractor, any such event occurs prior to the expiration of the warranty period (excluding any latent defect warranty period) under the Construction Contract to which it is a party.

(q)     [Reserved]

(r)     [Reserved]

(s)     <u>Environmental and Social Requirements</u>.  The Borrower or, with respect to the Project, any Environmental Party fails to comply in all material respects with the Environmental and Social Requirements, unless a Corrective Action Plan, in form and substance satisfactory to the Majority Exit Lenders, is in place to cure such breach within thirty (30) days following such breach or earlier if required by the Majority Exit Lenders as a result of the severity of the circumstances and upon reasonable notice.

(t)     [<u>Reserved</u>.]

(u)     <u>Loss of Authorizations</u>.  (i) An appealable judgment or order is rendered partially or fully revoking, terminating, cancelling, suspending or declaring void a Material Authorization (the "<u>Adverse Judgment</u>") and such Adverse Judgment could reasonably be expected to result in a Material Adverse Effect.

(ii)     In connection with or following the Adverse Judgment, an injunction is granted or issued by a court of competent jurisdiction with respect to or in connection with a Material Authorization and such injunction orders the stoppage or suspension of any work permitted to be performed in respect of the

35382226.6

22

Project, and such injunction is not vacated, discharged or stayed for a period of sixty (60) days.

(iii)    The Adverse Judgment becomes final and non-appealable.

(v)    <u>Change of Control</u>.  A Change of Control occurs.

Section 4.03.  *Bankruptcy*.  If any Event of Default in Section 4.02(e) or (f) (*Events of Default*) occurs with respect to the Borrower, all the Exit Loans, all interest accrued on them and any other amounts payable to the Secured Exit Lenders under this Agreement or any other Financing Document will become immediately due and payable without any presentment, demand, protest or notice of any kind, all of which the Borrower waives; <u>provided</u> that, this Section 4.03 shall not apply due to the commencement of a proceeding regulated under Chapter III (Del Procedimiento Concursal de Reorganización) of Law No. 20,720 of Chile during the period in which the Protección Financiera Concursal described in Article 57 of Law No. 20,720 is in effect with respect to the Borrower.

Section 4.04.  <u>Right to Cure</u>. (a) Notwithstanding anything to the contrary contained in this Agreement and subject to Section 4.04(b), the Secured Exit Lenders shall not exercise any right it may have under this Agreement or the Financing Documents, at law or in equity, to accelerate, to suspend or terminate this Agreement or any of its obligations thereunder, as the result of any default or other action or omission of the Borrower or the Guarantor in the performance of any of its obligations under this Agreement (hereinafter an "<u>Agreement Default</u>") or take any action (including, without limitation, to initiate foreclosure proceedings, to request interim measures (*medidas precautorias*), to initiate collection proceedings, to request the seizure of property or to request the declaration of bankruptcy or insolvency) that could be reasonably expected to cause the bankruptcy, *liquidación*, insolvency, reorganization, receivership or similar condition of the Borrower or the Guarantor or its assets until it:

(i)    first delivers to the Intercreditor Agent and the Borrower written notice stating its intention to do so, setting forth, as applicable:

the relevant Agreement Default or circumstances giving rise to its right to accelerate, or to suspend, terminate or enforce, as the case may be, certain rights under this Agreement;

the amounts claimed to be due and payable or that, to the best of its knowledge after due inquiry, may become due and payable to it (including damages) under this Agreement as of the date of such statement, including as a result of the occurrence of an Agreement Default, together with a reasonable description of all such amounts;

a summary of any obligations, other than payment of amounts due and payable, that the Secured Exit Lenders believe that the Borrower or the

35382226.6

23

Guarantor has failed to perform as of such date under this Agreement (an "Outstanding Obligations Statement"),

> provided that, if following the delivery of an Outstanding Obligations Statement, a different Agreement Default has occurred and is continuing or a circumstance arises that would entitle the Secured Exit Lenders to the rights described in this Section 4.04(i), or any default, amount or obligation under 0, 0 or 0 above changes, the Secured Exit Lenders shall act in accordance with this Section 4.04 and deliver to the Intercreditor Agent and the Borrower a new or updated Outstanding Obligations Statement in respect thereof; and

(ii)    gives the Intercreditor Agent the opportunity to cure, or cause to be cured, such Agreement Default for a period of one hundred and twenty (120) calendar days following the later of (A) receipt of the Outstanding Obligations Statement by the Intercreditor Agent and (B) the expiration of the cure period provided to the Borrower in this Agreement.

(b)    Section 4.04(a) shall not apply in the event that, and any cure period shall be immediately terminated if, any Secured Creditor has taken an [Acceleration Action] or an [Enforcement Action] pursuant to the terms of the applicable Financing Document.

## ARTICLE V

Section 5.01.    *Conditions of Effectiveness*. [This Agreement shall become effective (unless this condition is waived in accordance with Section 7.07) on the date that the Intercreditor Agent issues a notice to the Borrower confirming that each of the conditions set forth in Section 4.01 of the Common Terms Agreement have been met in form and substance satisfactory to each of the Secured Lenders.]

## ARTICLE VI

### The Exit Administrative Agent

Section 6.01.    *Appointment and Authorization of Exit Administrative Agent*.

(a)    Each Secured Exit Lender hereby irrevocably appoints, designates and authorizes the Exit Administrative Agent to take such action on its behalf under the provisions of this Agreement as are expressly mentioned in this Agreement and any Financing Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any such Financing Document.

(b)    Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any Financing Document, the Exit Administrative Agent:

35382226.6

24

(i)       shall not have any duties or responsibilities except those expressly set forth herein and in the Financing Documents, nor shall the Exit Administrative Agent have or be deemed to have any fiduciary relationship with any Secured Exit Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Financing Document or otherwise exist against the Exit Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "Exit Administrative Agent" in this Agreement with reference to the Exit Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead, such terms are used merely as a matter of market custom, and are intended to create or reflect only a relationship between independent contracting parties;

(ii)     shall not be required to initiate or conduct any litigation or collection proceedings under any Financing Document;

(iii)    shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, other evidence of indebtedness or other paper or document, but the Exit Administrative Agent, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if it shall determine to make such further inquiry or investigation, it shall incur no liability or additional liability of any kind by reason of such inquiry or investigation;

(iv)    shall have no responsibility or liability for special, indirect, exemplary, incidental or consequential loss, expense or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Exit Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(v)     shall not be required to expend or risk its own funds or otherwise incur financial liability for the performance of any of its duties hereunder or the exercise of any of its rights or powers if it shall have grounds for believing that the repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(vi)    shall have no duty (A) to see to any recording, filing, or depositing of this Agreement or any agreement referred to

35382226.6

herein or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind or (D) to confirm or verify the contents of any reports or certificates delivered to the Exit Administrative Agent pursuant to any Financing Document believed by the Exit Administrative Agent to be genuine and to have been signed or presented by the proper party or parties; and

(vii)    shall not be required to give any bond or surety in respect of the powers granted hereunder.

(c)    Delivery of reports, information and documents to the Exit Administrative Agent shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including any entity's compliance with any covenants under any Financing Document. The Exit Administrative Agent shall not be obligated to monitor or confirm, on a continuing basis or otherwise, any other party's compliance with the covenants described in any Financing Document or with respect to any reports or other documents filed under any other Financing Document.

Section 6.02.    *Delegation of Duties of the Exit Administrative Agent*.    The Exit Administrative Agent may execute any of its duties under this Agreement or any Financing Document by or through agents or attorneys-in-fact with consent of the Secured Exit Lenders and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Secured Exit Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

Section 6.03.    *Liability of the Exit Administrative Agent*.    The Exit Administrative Agent shall not (a) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Secured Exit Lender or any other Person for any recital, statement, representation or warranty made by the Borrower or any Affiliate, or any officer thereof, contained in this Agreement or in any other Transaction Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Exit Administrative Agent under or in connection with, this Agreement or any other Transaction Document, or for the value of or title to any Security, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Transaction Document, or for any failure of the Borrower or any other party to any Transaction Document to perform its obligations hereunder or thereunder.  The Exit Administrative Agent shall not be under any obligation to any Secured Exit Lender to ascertain or to inquire as to the

35382226.6

observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Transaction Document, or to inspect the properties, books or records of the Borrower or any Affiliate.

Section 6.04. _Reliance by the Exit Administrative Agent_.    The Exit Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, electronic mail or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Exit Administrative Agent with reasonable care.   The Exit Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document (a) if such action would, in the opinion of the Exit Administrative Agent, be contrary to Applicable Law or the terms of this Agreement or any Financing Document or (b) if such action is not specifically provided for in this Agreement or the Financing Documents to which the Exit Administrative Agent is a party, and it shall not have received such advice or instruction of the Intercreditor Agent or the Secured Exit Lenders as it deems appropriate. The Exit Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or consent of the Intercreditor Agent or the Secured Exit Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Secured Exit Lenders.

Section 6.05. _Notice of Default; Other Notices_.  The Exit Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Event of Default or Event of Default (notwithstanding any other relationship with the Borrower, whether as quotaholder, financial advisor or otherwise) unless the Exit Administrative Agent shall have received written notice from a Secured Exit Lender, the Intercreditor Agent or the Borrower referring to the Common Terms Agreement or this Agreement, as applicable, describing such Potential Event of Default or Event of Default. The Exit Administrative Agent shall take such action with respect to such Potential Event of Default or Event of Default as may be requested by the Secured Exit Lenders in accordance with the terms of this Agreement; <u>provided</u> that unless and until the Exit Administrative Agent has received any such request, the Exit Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Potential Event of Default or Event of Default as it shall deem advisable or in the best interest of the Secured Exit Lenders.

Section 6.06. _Credit Decision_.  Each Secured Exit Lender acknowledges that the Exit Administrative Agent has not made any representation or warranty to it, and that no act by the Exit Administrative Agent hereafter taken, including any review of the Project or of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the Exit Administrative Agent to any Secured Exit Lender.  Each Secured Exit Lender represents to the Exit Administrative

35382226.6

27

Agent that it has, independently and without reliance upon the Exit Administrative Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, the Project, the value of and title to any Security, and all Applicable Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Secured Exit Lender also represents that it will, independently and without reliance upon the Exit Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Financing Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the Project.  Except for notices, reports and other documents expressly required pursuant to any Financing Document to be furnished to the Secured Exit Lenders by the Exit Administrative Agent, the Exit Administrative Agent shall not have any duty or responsibility to provide any Secured Exit Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower and the Project that may come into the possession of the Exit Administrative Agent.

Section 6.07.  *Indemnification of the Exit Administrative Agent*.    (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold the Exit Administrative Agent harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, charges, expenses or disbursements (including the documented fees and expenses of their counsel) of any kind or nature whatsoever that may at any time (including at any time following repayment of the Secured Exit Loans or the termination, resignation or replacement of the Exit Administrative Agent or any Secured Exit Lender) be imposed on, incurred by or asserted by a third party or by the Borrower against any such Person in any way relating to or arising out of this Agreement or any other Transaction Document, including the Security Documents and any other document or instrument contemplated by or referred to herein or therein, or the transactions contemplated hereby and thereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to the exercise by the Exit Administrative Agent of any of its respective rights or remedies under any of the Financing Documents, and any investigation, litigation or proceeding (including any bankruptcy, insolvency, reorganization or other similar proceeding or appellate proceeding) related to this Agreement or any other Transaction Document or the Secured Exit Loans, or the use of the proceeds thereof, whether or not any such Person is a party thereto; provided that the Borrower shall have no obligation hereunder to any such Person with respect to (i) the Exit Administrative Agent resulting directly from the gross negligence or willful misconduct of the Exit Administrative Agent as determined in a final, non-appealable judgment by a

35382226.6

court of competent jurisdiction and (ii) Taxes, which shall be governed solely by Section 2.11.

(b)    The obligations set forth in this Section 6.07 shall survive payment of the Secured Exit Loans and all other amounts payable to the Secured Exit Lenders hereunder or under the other Financing Documents, and the resignation or replacement of the Exit Administrative Agent.

Section 6.08.    _Exit Administrative Agent in Individual Capacity_.    The Exit Administrative Agent and its affiliates may make loans to, acquire equity interests in and generally engage in any kind of financial advisory, underwriting or other business with the Borrower or its Affiliates as though the Exit Administrative Agent were not a Exit Administrative Agent hereunder and without notice to or consent of the Secured Exit Lenders.  The Secured Exit Lenders acknowledge that, pursuant to such activities, the Exit Administrative Agent or its affiliates may receive information regarding the Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such Affiliates) and acknowledge that the Exit Administrative Agent shall be under no obligation to provide such information to them. If the Exit Administrative Agent is also a Secured Exit Lender hereunder, in its capacity as Secured Exit Lender it shall have the same rights and powers under this Agreement as any other Secured Exit Lender and may exercise the same as though it were not Exit Administrative Agent, and the terms "Secured Exit Lender" and "Secured Exit Lenders" shall include the Exit Administrative Agent in its individual capacity as such.

Section 6.09.    _Successor Exit Administrative Agent_.    (a) Subject to the appointment and acceptance of a successor as provided below, the Exit Administrative Agent may resign at any time by giving ninety (90) days advance notice thereof to the Secured Exit Lenders and the Borrower, and the Exit Administrative Agent may be removed at any time with or without cause by the Secured Exit Lenders constituting the Required Creditors (excluding, if applicable, any Secured Exit Lender that is the Exit Administrative Agent or is an affiliate of the Exit Administrative Agent).  Upon any such resignation or removal, the Secured Exit Lenders constituting the Majority Exit Lenders shall have the right to appoint a successor to the Exit Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing).  If no successor Exit Administrative Agent shall have been appointed by the Secured Exit Lenders, and shall have accepted such appointment within thirty (30) days after the resigning Exit Administrative Agent's giving of notice of resignation or the giving of any notice of removal of the Exit Administrative Agent, then the resigning Exit Administrative Agent or the Exit Administrative Agent being removed, as the case may be, may appoint a successor to the Exit Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing).  Upon the acceptance of its appointment as a successor Exit Administrative Agent hereunder, such successor Exit Administrative Agent shall thereupon succeed to and become vested with all

35382226.6

29

the rights, powers, privileges and duties of such resigning or removed Exit Administrative Agent, and such resigning Exit Administrative Agent or removed Exit Administrative Agent shall be discharged from its duties and obligations hereunder.  The retiring Exit Administrative Agent shall, at its own cost, make available to the successor Exit Administrative Agent such documents and records and provide such assistance as the successor Exit Administrative Agent may reasonably request for the purposes of performing its functions as Exit Administrative Agent hereunder and under the Financing Documents.

(b)    After the Exit Administrative Agent's resignation, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Exit Administrative Agent.

Section 6.10.  _Allocation of Funds_.    (a) In the event that the Exit Administrative Agent receives at any time less than the full amount then due and payable to the Exit Administrative Agent under any Financing Document in respect of the Secured Exit Loans, the Exit Administrative Agent (unless prevented by Applicable Law) shall apply and allocate such amounts on a _pari passu_ basis among the Secured Exit Lenders (in proportion to the respective amounts of interest and other sums besides principal, or (as the case may be) of principal, then due and payable on and in respect of each Secured Exit Loan of such Secured Exit Loan) first to costs and expenses (if any), second to fees (if any), third to interest and any other sums besides principal then due and payable, and fourth to any principal of the Secured Exit Loans then due and payable, and the Exit Administrative Agent shall promptly provide a notice to the Secured Exit Lenders informing them of the same.

(b)    In the event the Exit Administrative Agent receives, from or on behalf of the Borrower, payments of sums due on any due date in respect of the Secured Exit Loans but not of all sums due on all such Secured Exit Loans, and if the Exit Administrative Agent believes that full payment is expected to be made in due course of all sums due on such due date in respect of all such Secured Exit Loans, the Exit Administrative Agent may proceed to make payments with respect to the relevant Secured Exit Loans in respect of which payment has been received, notwithstanding that full payment of all such amounts has not yet been made.  In the event that subsequently it appears unlikely that full payment in fact will be made within a reasonable period of time after such due date, then at the Exit Administrative Agent's request, those Secured Exit Lenders to whom such payments have been made shall reimburse such portions of those payments as may be appropriate to comply with the provisions of Section 6.10(a).

(c)    The Exit Administrative Agent shall not be obligated to make any payment to any Secured Exit Lender until the Exit Administrative Agent establishes that it has actually received such amount from the Borrower. However, if the Exit Administrative Agent makes such payment and it proves to be the case that it had not received such amount, then each Secured Exit Lender shall, on demand by the Exit Administrative Agent, promptly reimburse the sum paid to such Secured Exit

35382226.6

[AM_ACTIVE 403871367_4]

Lender together with interest on the repaid amount at either (in the Exit Administrative Agent's sole discretion): (i) the overnight deposit rate determined by the Exit Administrative Agent or (ii) the Federal Funds Effective Rate. This Section 6.10(c) shall survive the termination of this Agreement if, and to the extent of, any preference or similar period under any bankruptcy law applicable to the Borrower or any of its assets.

Section 6.11.  *U.S.A. Patriot Act*.  The parties hereto acknowledge that any Exit Administrative Agent that is subject to the U.S.A. Patriot Act is required, in accordance with Section 326 of the U.S.A. Patriot Act, in order to help fight the funding of terrorism and money laundering, to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the Exit Administrative Agent. Each of the parties hereto agrees that it will provide the Exit Administrative Agent with such information as it may request in order for the Exit Administrative Agent to satisfy the requirements of the U.S.A. Patriot Act.

## ARTICLE VII

### Miscellaneous

Section 7.01.  *Notices*.  Any notice, request or other communication to be given or made under this Agreement shall be given in accordance with Section 7.02 (*Notices*) of the Common Terms Agreement. The Exit Administrative Agent's, Borrower's and the Secured Exit Lenders' respective address for purpose of notices, requests and communication to be made or given under this Agreement shall be the address specified as follows and as such party notifies to the other parties to this Agreement from time to time.

(i)    For the Borrower and the Guarantor:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com

With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

(ii)    For AES Andes:

35382226.6

31

AES Andes S.A.
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Ricardo Roizen, Chief Financial Officer
Telephone: +56 2 3333 8301
Email:  ricardo.roizen@aes.com

With a copy to:

AES Andes S.A.
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email:  felix.gomez@aes.com

Section 7.02.  _Term of Agreement_.  This Agreement shall continue in force until all monies, excluding contingent liabilities and obligations that are unasserted at such time, payable under it have been fully paid in accordance with its provisions.

Section 7.03.  _Saving of Rights_.  Section 7.01 (_Saving of Rights_) of the Common Terms Agreement shall apply herein, _mutatis mutandis_, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured Exit Lenders and the Exit Administrative Agent and each reference to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

Section 7.04.  _Enforcement_.  (a)  This Agreement is governed by, and shall be construed in accordance with, the laws of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)  Section 7.06(b) through and including (l) (but excluding clause (j)) (_Applicable Law and Jurisdiction_) of the Common Terms Agreement shall apply herein, _mutatis mutandis_, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured Exit Lenders and the Exit Administrative Agent and each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

(c)  The Borrower hereby confirms, as of the date hereof, the irrevocable designation, appointment and empowerment of CT Corporation System with an address at 111 Eighth Avenue, New York, NY 10011, as its authorized agent solely to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a Secured Exit Lender may bring in the State of New York in respect of this Agreement.

35382226.6

[AM_ACTIVE 403871367_4]

Section 7.05.  *Successors and Assignees*.  (a)  This Agreement binds and benefits the respective successors and assignees of the parties. However, the Borrower may not assign or delegate any of its rights or obligations under this Agreement without the prior consent of the Exit Administrative Agent (acting on instructions of the Secured Exit Lenders constituting the Majority Exit Lenders).

(b)  [•][13].

(c)  The Borrower acknowledges that the Secured Exit Lender may be required to assign its rights and obligations under this Agreement to a Secured Lender (as such term is defined in the Common Terms Agreement) or an Affiliate thereto pursuant to Section [•] of the [Intercreditor Agreement]/[Common Terms Agreement].

Section 7.06.  *Disclosure of Information*.  Section 7.07 (*Disclosure of Information*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Secured Exit Lenders and the Exit Administrative Agent and each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

Section 7.07.  *Amendments, Waivers and Consent*.[14] (a) No modification, amendment or waiver of any provision of this Agreement and no consent to any departure by any of the Borrower or the Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Exit Lenders (or signed by the Administrative Agent with the consent of the Majority Exit Facility Lenders), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; provided, however, that no such modification or amendment shall without the prior written consent of:

(i)  each Secured Exit Lender directly and adversely affected thereby to (A) reduce the principal amount of any Exit Loan, or the rate of interest payable thereon (provided that only the consent of the Majority Exit Lenders be necessary for a waiver of default interest referred to in Section 2.03 (*Default Interest Rate*) of the Common Terms Agreement)), or extend any date for the payment of interest hereunder or extend the final maturity of the Borrower's obligations hereunder or (B) amend, modify or waive any provision of Section 6.10(a);

(ii)  all of the Secured Exit Lenders to (A) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the Secured Exit Lenders, (B) amend or modify this **Error! Reference source**

---

[13] NTD: Provision to follow 2L loan.

[14] NTD: Subject to further review.

35382226.6

33

**not found.** or modify the percentage of the Secured Exit required in the definition of Majority Exit Lenders, or (C) amend, modify or waive any provision of this Agreement in order to permit the incurrence of any financing that is *pari passu* or senior to the Exit Loans with respect to the Exit Loan Obligations; and

(iii)    the Majority Exit Lenders to (A) amend or modify the order of application of any prepayment of Exit Loans from the application thereof set forth in the applicable provisions of this Agreement in any manner that adversely affects the Secured Exit Lenders under this Agreement, or (B) impose any greater restriction on the ability of any Secured Exit Lenders to assign any of its rights or obligations hereunder.

(b)    No such amendment or modification shall adversely affect the rights and obligations of the Exit Administrative Agent without its prior written consent.

(c)    No notice to or demand on the Borrower or the Guarantor shall entitle the Borrower or the Guarantor to any other or further notice or demand in the same, similar or other circumstances, unless otherwise required under this Agreement or the Financing Documents. Each assignee under **Error! Reference source not found.** shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, and any consent by a Secured Exit Lender shall bind any Person subsequently acquiring an interest in the Exit Loans held by such Secured Exit Lender. No amendment to this Agreement shall be effective against the Borrower and the Guarantor unless signed by the Borrower and the Guarantor, as the case may be.

(d)    Notwithstanding anything to the contrary contained in Section 7.07(a), if the Exit Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any provision of this Agreement, then the Exit Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement if the same is not objected to in writing by the Majority Exit Lenders within seven (7) Business Days after written notice thereof to the Majority Exit Lenders.

Section 7.08.    *Indemnification; No Consequential Damages*. Section 7.12 (*Indemnification; No Consequential Damages*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Lender" were a reference to the Secured Exit Lenders, each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement and each reference to "Secured Loans" were a reference to the "Exit Loans").

Section 7.10.    *Counterparts*.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

35382226.6

34

Section 7.11.  *English Language*.  (a)  All documents to be provided or communications to be given or made under this Agreement may be in the Spanish or English language.

(b)     To the extent that the original version of any document to be provided, or communication to be given or made, to any Secured Exit Lender or the Exit Administrative Agent under this Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an Authorized Representative to be a true and correct translation of the original.  The parties hereto acknowledge that this Agreement was negotiated and executed in the English language.  Any Secured Exit Lender or the Exit Administrative Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 7.12.  *Entire Agreement*.  This Agreement and the other Financing Documents represent the final and complete agreement of the parties hereto with respect to the financing of the Project, and all prior negotiations, representations, understandings, writings and statements of any nature with respect thereto are hereby superseded in their entirety by the terms of this Agreement and the other Financing Documents.

Section 7.13.  *No Third Party Beneficiaries*. Except for Section 4.04 of this Agreement that shall be for the benefit of the Offshore Collateral Agent [(for the benefit of the Secured Lenders)], the agreement of each Secured Exit Lender to maintain its Secured Exit Loan to the Borrower on the terms and conditions set forth in this Agreement and the other Financing Documents is solely for the benefit of the Borrower, and no other Person (including any Sponsor (other than AES Andes, in its capacity as Secured Exit Lender), Shareholder, any other Project Party, or any subcontractor, supplier, worker, carrier, warehouseman or materialman furnishing supplies, goods or services to or for the benefit of the Project) shall have any rights hereunder against the Exit Administrative Agent or any Secured Exit Lender with respect to its Secured Exit Loan, the proceeds thereof or otherwise.

Section 7.14.  *Amendment and Restatement*.  This Agreement amends and restates, to the extent of the Secured Exit Loans, the DIP Credit Agreement.

*[Signature pages follow]*

35382226.6

[AM_ACTIVE 403871367_4]

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed in their respective names as of the date first above written.

**ALTO MAIPO SpA,**
as Borrower

By:_____
    Name:
    Title:

[insert notice information]

35382226.6

*[Signature Page to Secured Exit Loan Agreement]*

**AES ANDES S.A.,**
as Secured Exit Lender and Exit Administrative
    Agent

By:  _____
    Name:
    Title:

    Outstanding Principal Amount of Secured Exit
    Loans: $[●]

    [insert notice information]

35382226.6

*[Signature Page to Secured Exit Loan Agreement]*

## SCHEDULE 1

### Secured Exit Loans Repayment Schedule

| Exit Payment Date | Principal Amount Due on Secured Exit Loans (US$) | Interest Amount Due on Secured Exit Loans (US$) | Total Debt Service Due on Secured Exit Loans (Principal + Interest) (US$) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Total** | **100%** | | |

35382226.6

Exhibit A - page 2

[AM_ACTIVE 403871367_4]

**<u>Exhibit M</u>**

**Secured Working Capital Facility Agreement**

# Working Capital Facility Agreement

**among**

**ALTO MAIPO SpA**
**(as Borrower)**

**Alto Maipo Delaware LLC**

**(as Guarantor)[1]**

**THE WORKING CAPITAL FACILITY LENDERS PARTY HERETO**

**and**

**AES Andes S.A.,**

**(as WC Administrative Agent)**

**Dated as of [●], 2022**

---

[1] NTD: Guarantor-related and other provisions will follow the updates to the 1L/ CTA agreements.

35382226.6

[AM_ACTIVE 403892018_5]

# TABLE OF CONTENTS

Article/

Section                     Item                                                                Page No.

## ARTICLE I

Definitions and Interpretation ........................................................................................2

    Section 1.01.    *Definitions* ........................................................................................2
    Section 1.02.    *Financial Calculations; Interpretation; Business Day Adjustment* .................9
    Section 1.03.    *Conflict with Common Terms Agreement* .......................................9

## ARTICLE II

The WC Loans ..............................................................................................................10

    Section 2.01.    *WC Loans.* ......................................................................................10
    Section 2.02.    *Request for WC Loans.* ..................................................................10
    Section 2.03.    *Funding of WC Loans.* ..................................................................11
    Section 2.04.    *Pro Rata Share, Availability of Funds.* ...........................................12
    Section 2.05.    *Interest.* ...........................................................................................13
    Section 2.06.    *Use of Proceeds.* ............................................................................13
    Section 2.07.    *Chilean Law Notes* .........................................................................13
    Section 2.08.    *Repayment* .......................................................................................16
    Section 2.09.    *Prepayment.* .....................................................................................17
    Section 2.10.    *Other Payments* ..............................................................................18
    Section 2.11.    *Currency and Place of Payments* ....................................................18
    Section 2.12.    *Reimbursement of Expenses* ...........................................................19
    Section 2.13.    *Increased Costs* ..............................................................................19
    Section 2.14.    *Taxes* ................................................................................................20
    Section 2.15.    *Illegality* ..........................................................................................21
    Section 2.16.    *Defaulting Working Capital Facility Lenders.* ..............................22

## ARTICLE III

Common Terms ............................................................................................................25

    Section 3.01.    *Representations and Warranties* .....................................................25
    Section 3.02.    *Covenants* ........................................................................................25

## ARTICLE IV

Events of Default .........................................................................................................25

    Section 4.01.    *Acceleration after Default* .............................................................25
    Section 4.02.    *Events of Default* ............................................................................26
    Section 4.03.    *Bankruptcy.* .....................................................................................32

35382226.6

i

Section 4.04.    *Right to Cure* ..............................................................................33

## ARTICLE V

Conditions of Lending ..............................................................................34

Section 5.01.    *[Conditions of Lending* ..............................................................34
Section 5.02.    *Conditions of Lending* ..............................................................34

## ARTICLE VI

The WC Administrative Agent ..............................................................................35

Section 6.01.    *Appointment and Authorization of WC Administrative Agent* ........................35
Section 6.02.    *Delegation of Duties of the WC Administrative Agent* ................................37
Section 6.03.    *Liability of the WC Administrative Agent* ..........................................37
Section 6.04.    *Reliance by the WC Administrative Agent* ..........................................37
Section 6.05.    *Notice of Default; Other Notices* ..................................................38
Section 6.06.    *Credit Decision* ..................................................................38
Section 6.07.    *Indemnification of the WC Administrative Agent* ....................................39
Section 6.08.    *WC Administrative Agent in Individual Capacity* ....................................39
Section 6.09.    *Successor WC Administrative Agent* ................................................40
Section 6.10.    *Allocation of Funds* ..............................................................41
Section 6.11.    *U.S.A. Patriot Act* ..............................................................42

## ARTICLE VII

Miscellaneous ..............................................................................42

Section 7.01.    *Notices* ..........................................................................42
Section 7.02.    *Term of Agreement* ................................................................43
Section 7.03.    *Saving of Rights* ................................................................43
Section 7.04.    *Enforcement* ......................................................................43
Section 7.05.    *Successors and Assignees* ..........................................................43
Section 7.06.    *Disclosure of Information* ........................................................44
Section 7.07.    *Amendments, Waivers and Consent* ..................................................44
Section 7.08.    *[•]* ............................................................................45
Section 7.09.    *Indemnification; No Consequential Damages* ........................................45
Section 7.10.    *Counterparts* ....................................................................45
Section 7.11.    *English Language* ................................................................45
Section 7.12.    *Entire Agreement* ................................................................46
Section 7.13.    *No Third Party Beneficiaries* ....................................................46

35382226.6

[AM_ACTIVE 403892018_5]

<u>EXHIBIT</u>

EXHIBIT A        FORM OF CHILEAN LAW ALLONGE

EXHIBIT B        FORM OF ACKNOWLEDGMENT OF DEBT

EXHIBIT C        FORM OF ASSIGNMENT AGREEMENT

EXHIBIT D        FORM OF ACCESSION AGREEMENT

EXHIBIT E        FORM OF WC LOAN REQUEST

35382226.6

iii

# WORKING CAPITAL FACILITY AGREEMENT

This **WORKING CAPITAL FACILITY AGREEMENT** (this "Agreement"), dated as of [●], 2022, is entered into by and among:

(1)     **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of the Country (the "Borrower");

(2)     **ALTO MAIPO DELAWARE LLC**, a Delaware limited liability company (the "Guarantor");

(3)     **EACH WORKING CAPITAL FACILITY LENDER THAT BECOMES A PARTY HERETO ON THE DATE HEREOF AND FROM TIME TO TIME**; and

(4)     **AES ANDES S.A.** (formerly AES Gener S.A.), a *sociedad anónima* organized and existing under the laws of the Country (in its capacity as WC Administrative Agent on behalf of the Working Capital Facility Lenders, the "WC Administrative Agent").

## RECITALS

**WHEREAS,** the Borrower is undertaking the construction, completion, ownership and operation of the Project;

**WHEREAS,** on November 17, 2021, each of the Borrower and the Guarantor commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Court");

**WHEREAS,** the execution and delivery of this Agreement is a condition precedent to Plan Effective Date of a chapter 11 plan of reorganization of the Borrower approved by the Court pursuant to which it will exit the Bankruptcy Cases;

**WHEREAS**, the Borrower has requested that the Working Capital Facility Lenders provide a revolving loan facility in an aggregate original principal amount of up to US$15 million; and

**WHEREAS,,** the Working Capital Facility Lenders have agreed to extend such credit to the Borrower upon the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, the parties hereto hereby agree as follows.

35382226.6

1

# ARTICLE I

## Definitions and Interpretation

Section 1.01.   *Definitions*. Wherever used in this Agreement, and except as otherwise defined herein, terms defined in the Common Terms Agreement shall have the meaning ascribed to them therein, and the following terms have the meanings opposite them:

"Borrowing"                    the incurrence or extension of a WC Loan.

"Borrowing Date"               the date of a Borrowing.

"Closing Date"                 shall mean the date on which the conditions precedent set forth in 5.01 have been satisfied or waived; for the avoidance of doubt, this Agreement shall be effective on the Closing Date.

"Commitment"                   has the meaning set forth in Section 2.01(a) hereto.

"Commitment Period"            the period from the Closing Date to but excluding the Commitment Termination Date.

"Commitment Termination Date"  the earliest of (a) January 15, 2024; and (b) the date of the termination of the Commitments pursuant to Section 4.01.

"Common Terms Agreement"       the Third Amended and Restated Common Terms Agreement, dated as of the date hereof, by and among the Borrower, each Secured Creditor Representative, as defined therein, and Itaú Corpbanca in its capacity as intercreditor agent for the Secured Creditors.

"Defaulting Lender"            shall mean, at any time, any Working Capital Facility Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid by it hereunder, to fund or pay (x) any portion of the WC Loans or (y) any other amount required to be paid by it hereunder to the WC Administrative Agent or any other Working Capital Facility Lender (or its banking Affiliates), unless, in the case of clause (x) above, such Working Capital Facility Lender notifies the WC Administrative Agent and the Borrower in writing that such failure is the result of such Working Capital Facility Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower, the WC

35382226.6

2

Administrative Agent or any other Working Capital Facility Lender in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Working Capital Facility Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied), (c) has failed, within three (3) Business Days after request by the WC Administrative Agent or the Borrower, acting in good faith, to provide a confirmation in writing from an authorized officer or other authorized representative of such Working Capital Facility Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective WC Loans under this Agreement, which request shall only have been made after the conditions precedent to borrowings have been met, provided that such Working Capital Facility Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the WC Administrative Agent's, such other Working Capital Facility Lender's or the Borrower's, as applicable, receipt of such confirmation in form and substance satisfactory to it and the WC Administrative Agent, or (d) has become, or has had its Parent Company become, the subject of a Bankruptcy Event; provided that a Working Capital Facility Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Working Capital Facility Lender or its Parent Company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Working Capital Facility Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Working Capital Facility Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Working Capital Facility Lender. If the WC Administrative Agent determines that a Working Capital Facility Lender is a Defaulting Lender under any of clauses (a) through (d) above, such Working Capital Facility Lender will be deemed to be a

35382226.6

[AM_ACTIVE 403892018_5]

|  | Defaulting Lender upon notification of such determination by the WC Administrative Agent to the Borrower, and the Working Capital Facility Lenders. |
|---|---|
| "Excess Cash Prepayment Amount" | shall mean, as of any date of determination, the amount the Borrower is entitled to withdraw from the Offshore Revenue Account pursuant to priority [•] pursuant to Section 5.02(a) of the Offshore Accounts Agreement to prepay the Working Capital Facility. |
| "Excluded Taxes"[2] | with respect to any of the Working Capital Facility Lenders or any other Person to whom the Borrower is obligated to make any payment under this Agreement or any other Financing Document[3] related to the WC Loan, (a) Taxes imposed on or measured by its net income (however denominated), franchise Taxes and branch profits Taxes, in each case, imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or in which it has or maintains a permanent office or establishment or, in the case of any Working Capital Facility Lender, in which its applicable lending office is located, (b) Taxes imposed as a result of a present or former connection between such Working Capital Facility Lender and the jurisdiction of the Authority imposing such Tax, other than a connection arising solely as a result of the arrangements contemplated under this Agreement or under any other Financing Document, (c) any withholding tax that is imposed in the Country on any payments to Working Capital Facility Lenders or a Participant thereof, as applicable, in excess of the amount that would have been imposed at the Chilean Preferential Withholding Rate on interest payments, (d) any United States backup withholding Tax, (e) any U.S. federal withholding Taxes imposed under FATCA, or (f) any Stamp Tax imposed as a result of a replacement of a Chilean Law Note or an issuance of a Chilean Law Note to an assignee of a Working Capital Facility Lender in accordance with Section |

---

[2] NTD: Subject to further review.

[3] NTD: Definition in the CTA to include promissory notes.

35382226.6

4

2.07(g), Section 2.07(h) and Section 2.07(i) (*Chilean Law Notes*)

| | |
|---|---|
| "Federal Funds Effective Rate" | for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero (0) for purposes of this Agreement. |
| "Federal Funds Effective Rate" | for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero (0) for purposes of this Agreement. |
| "FATCA" | Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the U.S. Internal Revenue Code of 1986, as amended, any intergovernmental agreement entered into in connection with the implementation of such Sections of the U.S. Internal Revenue Code of 1986, as amended, and any fiscal or regulation legislation, rules or practices adopted pursuant to such intergovernmental agreement. |
| "Increased Costs" | the amount certified in an Increased Costs Certificate to be the net incremental costs of, or reduction in return to, any Working Capital Facility Lender (or any Participant thereof) in connection with the making or |

35382226.6

5

maintaining of its WC Loan (or its Participation, as the case may be) that result from:

(a) any enactment of any law or regulation or mandatory directive after the Closing Date or any change in any Applicable Law (including any Applicable Environmental and Social Law) or in its interpretation or application by any Authority charged with its administration; or

(b) compliance with any request from, or requirement of, any central bank or any Authority;

which, in any such case, after the Closing Date:

(i) imposes, modifies or makes applicable any reserve, special deposit or similar requirements against assets held by, or deposits with or for the account of, or loans made by, that Working Capital Facility Lender (or that Participant);

(ii) imposes a cost (other than Taxes) on that Working Capital Facility Lender as a result of that Working Capital Facility Lender having made its WC Loan (or on that Participant as a result of that Participant having acquired its Participation) or reduces the rate of return (other than with respect to Taxes) on the overall capital of that Working Capital Facility Lender (or that Participant) that it would have achieved had that Working Capital Facility Lender not made its WC Loan (or that Participant not acquired its Participation);

(iii) changes the basis of taxation on payments received by that Working Capital Facility Lender in respect of its WC Loan (or by that Participant with respect to its Participation) (other than with respect to Excluded Taxes) imposed by the jurisdiction of its incorporation (or in which it books its Participation) or in any political subdivision of such jurisdiction; or

(iv) imposes on that Working Capital Facility Lender (or that Participant) any other condition regarding the making or maintaining of its WC Loan (or its Participation, as the case may be);

35382226.6

6

but excluding any incremental costs of making or maintaining a WC Loan (or any Participation thereof) that are a direct result of that Working Capital Facility Lender (or its Participant) having its principal office in the Country or having or maintaining a permanent office or establishment in the Country, if and to the extent that permanent office or establishment acquires that WC Loan (or Participation).

"Increased Costs Certificate"

a certificate provided from time to time by any Working Capital Facility Lender (based on a certificate to such Working Capital Facility Lender from any Participant of such Working Capital Facility Lender, if Increased Costs affect its Participation), with a copy to the WC Administrative Agent, certifying:

(a) the circumstances giving rise to the Increased Costs;

(b) that the costs of that Working Capital Facility Lender (or that Participant) have increased or the rate of return of that Working Capital Facility Lender (or that Participant) has been reduced;

(c) that such Working Capital Facility Lender (or such Participant) has, in its opinion, exercised reasonable efforts to minimize or eliminate the relevant increase or reduction, as the case may be; and

(d) the amount of Increased Costs.

"Indemnified Taxes"

Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of the Borrower hereunder or under any other Financing Document to any of the Working Capital Facility Lenders or the WC Administrative Agent.

"Interest Period"

each period of three (3) months, in each case beginning on a WC Facility Interest Payment Date and ending on the day immediately before the next following WC Facility Interest Payment Date

"Interest Rate"

four percent (4%) per annum.

"Majority WC Facility Lenders"

shall mean, at any date, Non-Defaulting Lenders having or holding more than 50% of the sum of (i) the undrawn Commitments at such date and (ii)

35382226.6

7

outstanding principal amount of the WC Loans (excluding WC Loans held by Defaulting Lenders) at such date. For the avoidance of doubt, in the event that there is a single Working Capital Facility Lender, all references herein to the Majority WC Facility Lenders shall be deemed to refer to such WC Facility Lender.

"Maturity Date"  the date upon which the Working Capital Facility will mature on the earliest to occur of any of the following: (a) January 15, 2024; and (b) the date of acceleration of any WC Loans under the Working Capital Facility pursuant to an Event of Default.

"Offshore Collateral Accounts"  has the meaning set forth in the Offshore Accounts Agreement.

"Offshore Revenues Account"  has the meaning set forth in the Offshore Accounts Agreement.

"Onshore Collateral Accounts"  has the meaning set forth in the Offshore Accounts Agreement.

"Parent Company"  shall mean, with respect to a Working Capital Facility Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Working Capital Facility Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Working Capital Facility Lender.

"Relevant Change"  is defined in Section 2.15 (*Illegality*).

"Revolving Availability"  as of any date of determination, the amount equal to (i) the Commitments *minus* (ii) the Total Utilization of Commitments.

"Total Utilization of Commitments"  as at any date of determination, the aggregate original principal amount of all outstanding WC Loans.

"VAT"  value added tax imposed in the Country.

"WC Facility Interest Payment Date"  shall mean January 15, April 15, July 15 and October 15.

"WC Loan Request"  a request by the Borrower, executed by an authorized representative of the Borrower, for a WC Loan in

35382226.6

accordance with Section 2.02 in substantially the form of <u>Exhibit E</u>

.

| | |
|---|---|
| "WC Loans" | is defined in Section 2.01 (*WC Loans*). |
| "WC Obligations" | shall mean at any date, the due and punctual payment of (a) the principal and interest at the applicable rate provided in this Agreement on the WC Loans, when and as due, whether at maturity, by acceleration or otherwise, and (b) all other costs, expenses and indemnities owing to the Working Capital Facility Lenders under the Working Capital Facility Agreement and the Financing Documents. |
| "WC Promissory Notes" | has the meaning set forth in <u>Section 2.02(i)</u>. |
| "Working Capital Facility"[4] | the revolving credit facility established under this Agreement in favor of the Borrower in accordance with the terms set forth herein and pursuant to which the Commitments are established. |

Section 1.02. <u>*Financial Calculations; Interpretation; Business Day Adjustment*</u>. (a) This Agreement is the Working Capital Facility Agreement referred to in the Common Terms Agreement.

(b)     Sections 1.02 (*Financial Calculations*), 1.03 (*Interpretation*) and 1.04 (*Business Day Adjustment*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

(c)     In the context of this Agreement, and except as otherwise provided in this Agreement, any reference to "the date of this Agreement" or any similar reference, is a reference to the date of execution of this Agreement.

Section 1.03. <u>*Conflict with Common Terms Agreement*</u>. In the event of any conflict between the terms of this Agreement and the terms of the Common Terms

---

[4] NTD: Defined term in the CTA to make a cross reference to the definition in this agreement.

35382226.6

[AM_ACTIVE 403892018_5]

Agreement, the terms of this Agreement will prevail as among the parties to this Agreement.[5]

## ARTICLE II

### The WC Loans

Section 2.01.  *WC Loans*.

(a)     During the Commitment Period, the Working Capital Facility Lenders severally agree from time to time to make loans to the Borrower in an aggregate amount not to exceed, at any time outstanding the sum of $15 million (collectively, the "Commitments" and collectively the loans made thereunder "WC Loans"); provided, that as of the date of the WC Loan Request, the aggregate balance in the Onshore Collateral Accounts and Offshore Collateral Accounts is less than $10 million.

(b)     Any amount borrowed under this Section 2.01 may be repaid and reborrowed at any time during the Commitment Period. Each Working Capital Facility Lender's Commitments shall expire on the Commitment Termination Date and all WC Loans and all other amounts owed hereunder with respect to the WC Loans and the Commitments, subject to Section 2.08 and Section 2.09, shall be paid in full no later than the Maturity Date.

(c)     The Commitments shall automatically and permanently terminate on the Commitment Termination Date, at which time the Borrower shall no longer have any right to submit a WC Loan Request or otherwise re-borrow regardless of the Commitment available immediately prior to the Commitment Termination Date.

Section 2.02.  *Request for WC Loans*.

To request a WC Loan (including to request the extension or re-borrowing of a previously made WC Loan in accordance with the terms hereof), the Borrower shall notify the WC Administrative Agent of such request by electronic mail or delivery of a written WC Loan Request not later than 10:00 a.m., New York City time, three (3) Business Days before each Borrowing Date. Each such written WC Loan Request shall be substantially in the form of Exhibit E

 and specify the following information:

(i)     the aggregate amount of the requested WC Loans, which shall not exceed the Revolving Availability, and the payment date to be included in the WC Promissory Note to be issued to document such WC Loan which cannot extend

---

[5] NTD: Superpriority status and collateral to be addressed in the Security
    Agreement and the CTA.

35382226.6

[AM_ACTIVE 403892018_5]

beyond the Maturity Date (in a minimum amount of $500,000 each) (the "<u>WC Promissory Notes</u>");

(ii)    the date of the requested WC Loans, which shall be a Business Day;

(iii)    the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(iv)    other than in the case of extension of a previously made WC Loan, irrevocable instructions to each Working Capital Facility Lender to deduct from the principal amount of the WC Loan the amount required to pay the applicable Stamp Tax;

(v)    other than in the case of extension of a previously made WC Loan, wire transfer instructions for the account of the Borrower into which the proceeds of such WC Loans (after deducting the amount required to pay the Stamp Tax) shall be deposited, which shall be, at the Borrower's instruction at its sole discretion, the Offshore Revenues Account or the Disbursement Account (such account, the "<u>Proceeds Account</u>"); and

(vi)    certify that, as of the date of the WC Loan Request, no Event of Default exists.

(b)    Promptly following receipt of a WC Loan Request in accordance with this Section 2.02(b), the WC Administrative Agent shall advise each Working Capital Facility Lender of the details thereof and of the amount of such Working Capital Facility Lender's WC Loan to be made as part of the requested WC Loan.

Section 2.03.    *Funding of WC Loans*.

(a)    Each Working Capital Facility Lender shall make each WC Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, or such earlier time as may be reasonably practicable, to the account of the WC Administrative Agent most recently designated by it for such purpose by notice to the Working Capital Facility Lenders. Upon satisfaction or waiver of the conditions precedent specified herein, and subject to Section 2.02, the WC Administrative Agent will make such WC Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to the Proceeds Account.

(b)    Unless the WC Administrative Agent shall have received notice from a Working Capital Facility Lender prior to the proposed date of any WC Loan that such Working Capital Facility Lender will not make available to the WC Administrative Agent such Working Capital Facility Lender's share of such WC Loan, the WC Administrative Agent may assume that such Working Capital Facility Lender has made such share available on such date in accordance with paragraph (a)of this Section 2.03 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a

35382226.6

11

Working Capital Facility Lender has not in fact made its share of the applicable WC Loan available to the WC Administrative Agent, then the applicable Working Capital Facility Lender and the Borrower severally agree to pay to the WC Administrative Agent forthwith upon written demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to, but excluding, the date of payment to the WC Administrative Agent, at (i) in the case of such Working Capital Facility Lender, the greater of the Federal Funds Effective Rate and a rate determined by the WC Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate otherwise applicable to such WC Loan. If such Working Capital Facility Lender pays such amount to the WC Administrative Agent, then such amount shall constitute such Working Capital Facility Lender's WC Loan included in such WC Loan and the Borrower shall not be obligated to repay such amount pursuant to the preceding sentence if not previously repaid.

(c)     All WC Loan Proceeds (less any agreed upon amounts to be retained for payments allocable under Section 2.02(iv) and Section 2.06(a)(ii)) shall be deposited into the Proceeds Account on the date of funding pending such use of proceeds. All WC Loan Proceeds shall only be utilized in accordance with the use of proceeds restrictions set forth in Section 2.06.

(d)     If any Defaulting Lender shall fail to make any payment required to be made by it pursuant to Section 2.03 of this Agreement, then the WC Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the WC Administrative Agent for the account of such Defaulting Lender to satisfy such Defaulting Lender's obligations thereunder until all such unsatisfied obligations are fully paid.

Section 2.04.    *Pro Rata Share, Availability of Funds.*

(a)     Pro Rata Share. All WC Loans shall be made by the Working Capital Facility Lenders proportionately to their respective pro rata share of the Commitments, it being understood that no Working Capital Facility Lender shall be responsible for any default by any other Working Capital Facility Lender in such other Working Capital Facility Lender's obligation to make a WC Loan requested hereunder, nor shall any Commitment of any Working Capital Facility Lender be increased or decreased as a result of a default by any other Working Capital Facility Lender in such other Working Capital Facility Lender's obligation to make a WC Loan requested hereunder.

(b)     Availability of Funding. Subject to the satisfaction of the terms and conditions set forth in Section 5.01 and 5.02 herein, the Working Capital Facility, including any amounts borrowed that have been repaid, not to exceed at any time the applicable Revolving Availability, shall be made available in one (1) or more

35382226.6

[AM_ACTIVE 403892018_5]

draws in a minimum amount of $500,000 each until the Commitment Termination Date.

Section 2.05.   *Interest*.

(a)     Subject to Section 2.03 (*Default Interest Rate*) of the Common Terms Agreement, the Borrower shall pay interest on each WC Loan in accordance with this Section 2.05.

(b)     Each WC Loan shall bear interest at the Interest Rate.

(c)     Interest on the then outstanding principal amount of WC Loan shall accrue from day to day beginning on the Closing Date, be prorated on the basis of a 365 or 366 day year, as the case may be, for the actual number of days in the relevant Interest Period. In computing interest on any WC Loan, the Borrowing Date or the first day of an Interest Period applicable to such WC Loan shall be included, and the date of payment of such WC Loan or the expiration date of an Interest Period applicable to such WC Loan shall be excluded; provided, that if a WC Loan is repaid on the same day on which it is made, one day's interest shall be paid on that WC Loan.

(d)     Interest accrued on each WC Loan (if any) shall be payable in arrears on (i) the WC Facility Interest Payment Date immediately following the end of that Interest Period, starting from the WC Facility Interest Payment Date occurring on July 15, 2022, (ii) the date of any prepayment of such WC Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid and (iii) the maturity of the WC Loans, including on the Maturity Date. The interest payment due on the July 15, 2022 WC Facility Interest Payment Date will be for interest accrued from the Closing Date through the end of that Interest Period, if any.

Section 2.06.   *Use of Proceeds*.

(a)     Use of Proceeds. The Borrower shall use the proceeds from each WC Loan (the "WC Loan Proceeds"):

(i)     for working capital and general corporate purposes of the Borrower, any emergency costs and as otherwise permitted hereunder; and

(ii)     payment of the Stamp Tax levied on any WC Loan and the Chilean Law Note issued in connection thereto.

Section 2.07.   *Chilean Law Notes*. (a) To further evidence its obligation to repay the WC Loans, with interest accrued thereon, the Borrower shall issue in the name of each Working Capital Facility Lender and deliver to each Working Capital Facility Lender or its designee, on the date of each Borrowing (other than an extension of the scheduled maturity date of a WC Loan), Chilean Law Notes issued by the Borrower in favor of each Working Capital Facility Lender in an

35382226.6

13

aggregate principal amount equal to the principal amount of the Borrowing requested from such Working Capital Facility Lender and payable on the date specified in the WC Loan Request. Each WC Promissory Note shall be executed by one or more authorized representatives of the Borrower and duly authorized by a Chilean notary public; provided that, in the case of a new WC Loan (but not, for the avoidance of doubt, in the case of an extension of a previously made WC Loan), the applicable Chilean Stamp Tax, if any, shall be withheld by such Working Capital Lender from such Borrowing and paid by such Working Capital Lender directly to the *Tesorería General de la República de Chile* (Chilean Treasury); provided, further, that if the amount withheld by such Working Capital Lender exceeds the amount paid by such Working Capital Lender to the *Tesorería General de la República de Chile* (Chilean Treasury) for the applicable Chilean Stamp Tax, such Working Capital Lender shall promptly deposit such excess amount in the [*relevant onshore Peso Account*][6].

(b)    Each Working Capital Facility Lender will note on its internal records the amount of each WC Loan made by it and on the reverse side of each Chilean Law Note or on the applicable allonge or *hoja de prolongación* of each Chilean Law Note, each payment received in respect thereof, and will, prior to any transfer of any of its Chilean Law Notes, record on the reverse side thereof or on the applicable allonge or *hoja de prolongación* thereto the outstanding principal amount of its WC Loans evidenced thereby. Failure to make such notation shall not affect the Borrower's obligations in respect of such WC Loans. Each Working Capital Facility Lender further agrees that, notwithstanding any provision of any Chilean Law Note, it shall not demand payment of any amount under any Chilean Law Note unless such amount is then due and payable (whether at stated maturity, by acceleration or otherwise) by the Borrower in accordance with the terms of this Agreement.

(c)    Each Working Capital Facility Lender acknowledges and agrees that (i) in the event that such Working Capital Facility Lender receives payment of any amounts constituting a principal installment or interest under this Agreement or any Chilean Law Notes, amounts due under this Agreement or the Chilean Law Notes, as the case may be, shall be deemed to be reduced by such paid amounts *pro tanto* and such Working Capital Facility Lender shall not seek enforcement of this Agreement or the Chilean Law Notes with respect to such paid amounts, and vice versa, and (ii) the aggregate amounts paid under all Chilean Law Notes shall not in any case exceed the aggregate amounts payable to such Working Capital Facility Lender pursuant to this Agreement.

(d)    Upon repayment in full of the principal and interest of any WC Loan, the relevant Working Capital Facility Lender shall promptly (but not later

---

[6] NTD: Defined term to be conformed to Onshore Accounts Agreement.

35382226.6

than ten (10) Business Days of such repayment) return the relevant Chilean Law Note to the Borrower marked "cancelled."

(e)    Except as set forth below, neither the execution, delivery, participation or assignment of any Chilean Law Note, or the commencement of any judicial enforcement proceeding or exercise of any other right or remedy in connection with any Chilean Law Note, nor the total or partial collection of any Chilean Law Note shall be deemed to be a novation or a waiver of any right of any Working Capital Facility Lender under, or an amendment of any term or condition of, this Agreement or any other Financing Document, including with respect to the governing law thereof. The rights and claims of any Working Capital Facility Lender under the Chilean Law Notes and acknowledgments of debt shall not replace or supersede any rights and claims of such Working Capital Facility Lender under this Agreement.

(f)    The Borrower hereby agrees, promptly upon the request of any Working Capital Facility Lender, but in any event no later than ten (10) Business Days following the date of any such request, to amend by an *hoja de prolongación* any Chilean Law Note, to reflect any changes in the WC Loans in accordance with this Agreement.

(g)    Upon receipt by the Borrower of an affidavit of any Working Capital Facility Lender (i) certifying, to the best of its knowledge, as to the loss, theft, destruction or mutilation of any Chilean Law Note, (ii) agreeing that if the relevant Chilean Law Note is found or otherwise is in its custody or power, it shall promptly deliver such Chilean Law Note to the Borrower for cancellation and (iii) agreeing to indemnify and hold harmless the Borrower for any losses incurred by the Borrower in connection with collection procedures and payments imposed on the Borrower as a result of such lost, stolen, destroyed or mutilated Chilean Law Note, then the Borrower shall execute and deliver in lieu of such lost, stolen, destroyed or mutilated Chilean Law Note (y) an acknowledgment of debt by public deed (*reconocimiento de deuda*), substantially in the form of <u>Exhibit B</u> (*Form of Acknowledgment of Debt*) or (z) a new Chilean Law Note (or series of Chilean Law Notes) in the same terms as the Chilean Law Note so replaced; <u>provided</u> that, any applicable Stamp Tax resulting from the execution and delivery of such new deed or Chilean Law Note shall be for the account of, and payable by, such Working Capital Facility Lender.

(h)    At any Working Capital Facility Lender's request, the Borrower shall promptly execute and deliver new Chilean Law Notes or an acknowledgment of debt by public deed satisfactory to such Working Capital Facility Lender, to substitute for the Chilean Law Notes previously delivered to such Working Capital Facility Lender other than any Chilean Law Note returned by Working Capital Facility Lender to the Borrower marked "cancelled", provided that the Borrower shall have previously or simultaneously received the Chilean Law Notes in substitution for which such Working Capital Facility Lender requests such new Chilean Law Notes; <u>provided</u> that, any applicable Stamp Tax resulting from the

35382226.6

15

execution and delivery of such new Chilean Law Note or acknowledgment of debt by public deed shall be for the account of, and payable by, such Working Capital Facility Lender.

(i)    If requested by an assigning Working Capital Facility Lender or its assignees, the Borrower shall, to the extent any Chilean Law Note corresponding to any assigned WC Loan evidences a principal amount higher than the one being assigned, deliver to the assignee Working Capital Facility Lender in replacement for any Chilean Law Note previously delivered by the Borrower to the assigning Working Capital Facility Lender, either (*x*) a duly completed Chilean Law Note evidencing the assignee's assigned WC Loans in form and substance satisfactory to such assignee Working Capital Facility Lender or (*y*) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of Exhibit B (*Form of Acknowledgment of Debt*), evidencing the assignee's assigned WC Loans; provided, however, that if the assigning Working Capital Facility Lender has retained a portion of its WC Loans, upon request of the assigning Working Capital Facility Lender, the Borrower shall execute and deliver to such Working Capital Facility Lender either (i) an *hoja de prolongación* in respect of the applicable Chilean Law Note previously delivered by the Borrower to the assigning Working Capital Facility Lender, amending the principal amount stated therein to reflect the principal amount of the WC Loan that was retained by the assigning Working Capital Facility Lender, or (ii) a replacement Chilean Law Note or Chilean Law Notes, as the case may be, reflecting the principal amount of the WC Loans retained by the assigning Working Capital Facility Lender (such Chilean Law Note(s) to be in exchange for, but not in payment of, the Chilean Law Note(s), if any, held by such Working Capital Facility Lender), or (iii) an acknowledgment of debt (*Reconocimiento de Deuda*) substantially in the form of Exhibit B (*Form of Acknowledgment of Debt*), reflecting the principal amount of the WC Loans retained by the assigning Working Capital Facility Lender; provided that, the Borrower shall not be obligated to issue new Chilean Law Note(s) or replacement Chilean Law Note(s) pursuant to this Section 2.07(i)unless the assignee Working Capital Facility Lender (in the case of a new Chilean Law Note) and the assigning Working Capital Facility Lender (in the case of a replacement Chilean Law Note) shall have agreed to pay the amount of any applicable Stamp Tax payable in order to notarize such new Chilean Law Note or replacement Chilean Law Note.

Section 2.08. _Repayment_. (a) Subject to Section 1.04 *(Business Day Adjustment)*, on the Maturity Date, the Borrower hereby unconditionally promises to pay to the WC Administrative Agent for the ratable account of each Working Capital Facility Lender the then unpaid principal amount of each WC Loan then outstanding, in accordance with the terms herein.

(b)    Each Working Capital Facility Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Working Capital Facility Lender resulting from each WC Loan made by such Working Capital Facility Lender, including the amounts of principal and interest payable and paid to such Working Capital Facility Lender from time to

35382226.6

[AM_ACTIVE 403892018_5]

time hereunder. Each Working Capital Facility Lender will also leave record of any payment on the reverse side of each WC Promissory Note or on the applicable allonge or *hoja de prolongación* of each WC Promissory Note.

(c)    The WC Administrative Agent shall maintain accounts in which it shall record (i) the Commitments, the amount of each WC Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Working Capital Facility Lender hereunder and (iii) the amount of any prepayment or repayment in respect of the WC Loans and any other sum received by the WC Administrative Agent hereunder for the account of the Working Capital Facility Lender and each Working Capital Facility Lender's share thereof. The Borrower shall have the right, upon reasonable notice, to request information regarding the accounts referred to in the preceding sentence.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.08 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Working Capital Facility Lender or the WC Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the WC Loans in accordance with the terms of this Agreement.

Section 2.09.    *Prepayment*.

(a)    The Borrower shall have the right, at any time and from time to time, to prepay any WC Loans on any Business Day, in whole or in part, without premium or penalty, upon electronic mail notice delivered to the WC Administrative Agent by 1:00 p.m., New York City time, two (2) Business Days prior to the proposed date of prepayment. Partial prepayments shall be in an aggregate minimum amount of $100,000 and integral equal multiples in excess thereof. Upon the giving of any such notice, the principal amount of the WC Loans specified in such notice shall become due and payable on the prepayment date specified therein. Until the Commitment Termination Date, amounts so prepaid may be re-borrowed in accordance with the terms and conditions herein. Each notice of prepayment shall specify the prepayment date and the principal amount of the WC Loans to be prepaid. The WC Administrative Agent shall, promptly after receiving notice from the Borrower hereunder, notify each Working Capital Facility Lender of the principal amount of the WC Loans held by such Working Capital Facility Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

(b)    The Borrower shall prepay the WC Loans outstanding upon occurrence of the events set forth in, and to the extent required by, Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement.

(c)    No later than 10 Business Days after the end of each calendar month, beginning with the calendar month immediately following the month on which the

35382226.6

[AM_ACTIVE 403892018_5]

Closing Date has occurred, the Borrower shall prepay the WC Obligations as set forth in this Section 2.09, in an aggregate amount equal to the Excess Cash Prepayment Amount (if positive) calculated as of the last Business Day of the immediately preceding calendar month.

(d)     The prepayment of less than all the outstanding aggregate principal amount of all the WC Loans shall be made pro rata among the Working Capital Facility Lenders, allocated to each Working Capital Facility Lender based on such Working Capital Facility Lender's outstanding WC Loans.

(e)     The WC Administrative Agent shall apply prepayments of the WC Loans as follows:

(i)     *first,* to any payments owed to the WC Administrative Agent under Section 2.10 of this Agreement;

(ii)     *second,* to the payment of all expenses specified in Section 2.12, to the full extent thereof; and

(iii)     *third, pro rata*, to all WC Loan Obligations, in the following order: (1) to the payment of any accrued interest payable at the default interest rate set forth in Section 2.03 of the Common Terms Agreement, if any; (2) to the payment of any accrued interest (other than default rate interest), and (3) to the payment of the outstanding principal amounts of any WC Loans on a pro rata basis.

(f)     No prepayment premium shall be due on voluntary or mandatory prepayments pursuant to this Section 2.09.

Section 2.10.   *Other Payments*. The Borrower shall pay to the WC Administrative Agent any customary account transfer charges incurred by the WC Administrative Agent in the performance of its duties hereunder.

Section 2.11.   *Currency and Place of Payments*. (a) The Borrower shall make all payments to the WC Administrative Agent for the account of the Working Capital Facility Lenders and the WC Administrative Agent of principal, interest, fees and any other amount due to the Working Capital Facility Lenders and the WC Administrative Agent under this Agreement and the other Financing Documents in accordance with Section 2.11 (*Currency and Place of Payments*) of the Common Terms Agreement, in same day funds, to the following account:

Bank: [●]
ABA: [●]
Swift Code: [●]
For the account of: [●]
Account Number: [●]
Reference: [●]
Attention: [●]

35382226.6

18

(b)    The payment obligations of the Borrower under this Agreement shall be discharged or satisfied only to the extent that (and as of the date when) the WC Administrative Agent actually receives (for the account of the Working Capital Facility Lenders and the WC Administrative Agent) funds in the Loan Currency in the account referred to in subsection (a) above, notwithstanding the tender or payment (including by way of recovery under a judgment) of any amount in any currency other than the Loan Currency. Accordingly, the Borrower shall, as a separate obligation or by way of indemnity, as the case may be, pay such additional amount as is necessary to enable the WC Administrative Agent to receive (for the account of the Working Capital Facility Lenders and the WC Administrative Agent), after conversion to the Loan Currency at a market rate and transfer to that account, the full amount due to each Working Capital Facility Lender or the WC Administrative Agent under this Agreement in the Loan Currency and in the account referred to in subsection (a) above.

(c)    Notwithstanding the provisions of Section 2.11(b), the WC Administrative Agent (on behalf of any Working Capital Facility Lender) may require the Borrower, and the Borrower shall be obligated, to pay (or reimburse) the WC Administrative Agent (for the account of such Working Capital Facility Lender) in any currency other than Dollars in accordance with Section 2.11(d) (*Currency and Place of Payments*) of the Common Terms Agreement.

(d)    The WC Administrative Agent shall promptly remit payments received by it for the account of any Working Capital Facility Lender to the account of such Working Capital Facility Lender as informed in writing by such Working Capital Facility Lender to the WC Administrative Agent.

Section 2.12.    *Reimbursement of Expenses*. (a) Costs, expenses and losses incurred by any Working Capital Facility Lender and the WC Administrative Agent in connection with any WC Loan shall be subject to Section 2.08 (*Expenses*) of the Common Terms Agreement.

(b)    To the extent not otherwise paid pursuant to the Common Terms Agreement, the Borrower shall pay to the WC Administrative Agent (for the account of each Working Capital Facility Lender), all reasonable and documented out-of-pocket expenses incurred outside the daily course of business (including periodic travel and subsistence expenses as may be incurred in relation to bank meetings and other site visits reasonably required by any Working Capital Facility Lender); provided that payment of expenses incurred in relation to site visits pursuant to Section [5.01(f)] of the Common Terms Agreement shall not exceed in aggregate the equivalent of twenty thousand Dollars ($20,000) in any calendar year.

Section 2.13.    *Increased Costs*. On each WC Facility Interest Payment Date, the Borrower shall pay, in addition to interest, the amount that each Working Capital Facility Lender (other than AES Andes or any of its Affiliates) from time to time notifies to the Borrower (with a copy to the WC Administrative Agent) in an Increased Costs Certificate as being the aggregate Increased Costs of the

35382226.6

[AM_ACTIVE 403892018_5]

Working Capital Facility Lenders and the Participants in the applicable WC Loans accrued and unpaid prior to that WC Facility Interest Payment Date; provided that, the Borrower shall not be required to compensate any Working Capital Facility Lender (or Participant) for any Increased Costs (i) incurred more than one-hundred and eighty (180) days prior to the date that such Working Capital Facility Lender provides the Borrower with the Increased Costs Certificate, or (ii) in excess of the amount that would have been payable by the Borrower if the Working Capital Facility Lenders had not sold Participations in the applicable WC Loans.

Section 2.14. _Taxes_. (a) The Borrower shall pay or cause to be paid all Indemnified Taxes on or in connection with the payment of any and all amounts due under this Agreement or any other Financing Document applicable to the WC Loans that are now or in the future levied or imposed by any Authority of the Country or by any organization of which the Country is a member or any jurisdiction through or out of which a payment is made. Notwithstanding anything to the contrary herein, the Borrower shall not be required to make any payment pursuant to this Section 2.14(a) if any Working Capital Facility Lender or the WC Administrative Agent makes demand for such payment more than one-hundred and eighty (180) days after the earlier of: (i) the date on which the relevant Authority makes written demand upon such Working Capital Facility Lender for payment of such Indemnified Taxes and (ii) the date on which such Working Capital Facility Lender has made payment of such Indemnified Taxes.

(b)    All payments of principal, interest, fees and other amounts due under this Agreement or any other Financing Document shall be made without deduction or withholding for or on account of any Taxes, except as required by Applicable Law.

(c)    If the Borrower is required by Applicable Law to deduct or withhold any Taxes from payments of principal or (as the case may be) interest, fees or other amounts due under this Agreement or, as the case may be, the relevant Financing Document, then the Borrower shall make such deduction or withholding and if the Tax deducted or withheld is an Indemnified Tax, the sum payable shall be increased to such amount as may be necessary so that the applicable Working Capital Facility Lender or the WC Administrative Agent receives the full amount that it would have received (taking into account any Indemnified Taxes payable on amounts payable by the Borrower under this clause (c)) had those payments been made without that deduction. If any Working Capital Facility Lender or the WC Administrative Agent so requests, the Borrower shall deliver to the requesting Working Capital Facility Lender, within thirty (30) days of the date of such request, with a copy to the WC Administrative Agent, official tax receipts evidencing payment (or certified copies of them) or other evidence of such payment reasonably satisfactory to the applicable Working Capital Facility Lender.

(d)    Each Working Capital Facility Lender agrees to use commercially reasonable efforts to cooperate with the Borrower (but without the obligation to incur costs or expenses) in completing any procedural formalities necessary for the

35382226.6

20

Borrower (and notified in writing by the Borrower to the Working Capital Facility Lender in sufficient time to enable such Working Capital Facility Lender to so cooperate) to obtain authorization to make any payment to which that Working Capital Facility Lender is entitled without deduction or withholding or at a reduced rate of withholding, including cooperation in obtaining the following certificates, documents or information, to the extent applicable: (i) in the case of a Working Capital Facility Lender or any Participant thereof that is a foreign non-resident bank for Chilean tax purposes, evidence requested by the Borrower that demonstrates such status, to determine if any such Working Capital Facility Lender, or any such Participant thereof is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party, (ii) in the case of a foreign non-resident financial institution for Chilean tax purposes, and to the extent that such foreign non-resident financial institution is not registered but has approved in writing to be registered in the special registry kept by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) referred to in its Circular No. 27 of 2008 (as amended), the certificates and information required by the Chilean Internal Revenue Service (*Servicio de Impuestos Internos*) in Exempt Resolution No. 95 of 2021 (as amended) and other related Chilean Internal Revenue Service instructions to determine if a Working Capital Facility Lender or any Participant is eligible for the Chilean Preferential Withholding Rate on interest payments under the Financing Documents to which it is a party (including articles of incorporation and audited financial statements of the foreign non-resident financial institution); (iii) IRS Form W-9, W-8BEN, W-8ECI, W-8IMY (with accompanying forms) or other applicable Form W-8 to determine if such Working Capital Facility Lender or Participant is subject to U.S. backup withholding or information reporting requirements, (iv) in the case of a Working Capital Facility Lender or Participant that is eligible to benefit from the provisions of any Double Taxation Treaty enforced in the Country, evidence required by any contracting states of such Double Taxation Treaty in order to claim such benefits, or (v) that is reasonably requested by the Borrower, the WC Administrative Agent or any Collateral Agent, as the case may be, to determine if such Working Capital Facility Lender or Participant has complied with its obligations under FATCA (including any amendments to FATCA after the date hereof that impose obligations that are not materially more onerous than the obligations in effect on the date such Working Capital Facility Lender becomes party to this Agreement); <u>provided</u> that, a Working Capital Facility Lender's failure to cooperate with the Borrower as stated herein shall not affect the Borrower's obligations under this Section 2.14.

Section 2.15. *Illegality*.[7] If, after the date of this Agreement, any change made in any Applicable Law (including any Applicable Environmental and Social Law) (or its interpretation or application by any Authority charged with its

---

[7] NTD: Replacement of Lenders section to follow 1L once it is reinserted in the 1L (we will add one event – "any Working Capital Facility Lender becomes a Defaulting Lender"), as per comment to the 1L agreement.

35382226.6

administration) (a "<u>Relevant Change</u>") makes it unlawful for any Working Capital Facility Lender (or any Participant under any WC Loan) to continue to maintain its WC Loan (or such Participation, as the case may be):

(a)    the Borrower shall, upon written request by the relevant Working Capital Facility Lender, with a copy to the WC Administrative Agent (but subject to any applicable Authorization having been obtained), on the earlier of (i) the next WC Facility Interest Payment Date, and (ii) the date that such Working Capital Facility Lender advises the Borrower is the latest day permitted by the Relevant Change, prepay in full that WC Loan (or, as the case may be, that part of the WC Loan that the relevant Working Capital Facility Lender advises corresponds to that Participation);

(b)    concurrently with the prepayment of any part of the WC Loan, the Borrower shall pay all accrued interest and Increased Costs (if any) on that part of the WC Loan; and

(c)    the Borrower agrees to take all reasonable steps to obtain, as quickly as possible after receipt of any Working Capital Facility Lender's request for prepayment, the Authorization referred to in Section 2.15(a) if any such Authorization is then required.

Section 2.16.    <u>*Defaulting Working Capital Facility Lenders*</u>.

(a)    If at any time any Working Capital Facility Lender becomes a Defaulting Lender, then the Borrower may, on fifteen (15) Business Days' prior written notice to the WC Administrative Agent and such Working Capital Facility Lender, replace such Working Capital Facility Lender by causing such Working Capital Facility Lender to (and such Working Capital Facility Lender shall be obligated to) assign pursuant to Section 7.05(b) [(with the assignment fee to be waived in such instance and subject to any consents required by such Section)] all of its rights and obligations under this Agreement to one (1) or more assignees; <u>provided</u> that neither the WC Administrative Agent nor any Working Capital Facility Lender shall have any obligation to the Borrower to find a replacement Working Capital Facility Lender or other such Person.

(b)    Any Working Capital Facility Lender being replaced pursuant to Section 2.16(a) shall (i) execute and deliver an Assignment Agreement substantially in the form of <u>Exhibit C</u> (*Form of Assignment Agreement*) with respect to such Working Capital Facility Lender's outstanding Commitments and WC Loans, and (ii) deliver any documentation evidencing such WC Loans to the Borrower or the WC Administrative Agent. Pursuant to such Assignment Agreement, (A) the assignee Working Capital Facility Lender shall acquire all or a portion, as specified by the Borrower and such assignee, of the assigning Working Capital Facility Lender's outstanding Commitments and WC Loans, (B) all obligations of the Borrower owing to the assigning Working Capital Facility Lender relating to the Commitments and WC Loans so assigned shall be paid in

35382226.6

22

full in cash by the assignee Working Capital Facility Lender to such assigning Working Capital Facility Lender concurrently with such Assignment Agreement, and (C) upon such payment and, if so requested by the assignee Working Capital Facility Lender, delivery to the assignee Working Capital Facility Lender of the appropriate documentation executed by the Borrower in connection with previous Borrowings, the assignee Working Capital Facility Lender shall become a Working Capital Facility Lender hereunder and the assigning Working Capital Facility Lender shall cease to constitute a Working Capital Facility Lender hereunder with respect to such assigned Commitments and WC Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Working Capital Facility Lender; provided that an assignment contemplated by this Section 2.16(b) shall become effective notwithstanding the failure by the Working Capital Facility Lender being replaced to deliver the Assignment Agreement contemplated by this Section 2.16(b), so long as the other actions specified in this Section 2.16(b) shall have been taken, and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such Working Capital Facility Lender's having been a Defaulting Lender.

(c)     [Reserved]

(d)     Any amount paid by the Borrower or otherwise received by the WC Administrative Agent for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but shall instead be retained by the WC Administrative Agent in a segregated account until (subject to Section 2.16(e)) the termination of the Commitments and payment in full in cash of all WC Obligations of the Borrower hereunder and will be applied by the WC Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority:

first, to the payment of any amounts owing by such Defaulting Lender to the WC Administrative Agent,

second, to the payment of the default interest and then current interest due and payable to the Working Capital Facility Lender which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such interest then due and payable to them,

third, to the payment of fees then due and payable to the Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them,

fourth, to the ratable payment of other amounts then due and payable to the Non-Defaulting Lenders, and

35382226.6

23

fifth, after the termination of the Commitments and payment in full in cash of all obligations of the Borrower hereunder, to pay amounts owing under this Agreement to such Defaulting Lender or as a court of competent jurisdiction may otherwise direct.

The Borrower may terminate the unused amount of the Commitment of any Working Capital Facility Lender that is a Defaulting Lender upon not less than fifteen (15) Business Days' prior notice to the WC Administrative Agent (which shall promptly notify the Working Capital Facility Lender thereof), and in such event the provisions of Section 2.16(d) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), provided that (i) no Event of Default shall have occurred and be continuing and (ii) such termination shall not be deemed to be a waiver or release of any claim the Borrower, the WC Administrative Agent, or any Working Capital Facility Lender may have against such Defaulting Lender.

(e)    If the Borrower and the WC Administrative Agent agree in writing that a Working Capital Facility Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the WC Administrative Agent will so notify the Working Capital Facility Lender, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Working Capital Facility Lender shall purchase at par such portions of outstanding WC Loans of the other Working Capital Facility Lender, and/or make such other adjustments, as the WC Administrative Agent may determine to be necessary to cause the Working Capital Facility Lender to hold WC Loans on a pro rata basis in accordance with their respective Commitments, whereupon such Working Capital Facility Lender shall cease to be a Defaulting Lender and will be a Non-Defaulting Lender; provided that no adjustments shall be made retroactively with respect to fees accrued while such Working Capital Facility Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such Working Capital Facility Lender's having been a Defaulting Lender.

(f)    Notwithstanding anything to the contrary herein, the WC Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 6.09.

35382226.6

24

## ARTICLE III

## Common Terms[8]

Section 3.01.   _Representations and Warranties_. (a) The representations and warranties set out in Section 3.01 (_Representations and Warranties_) of the Common Terms Agreement shall be made on the date hereof, _mutatis mutandis_, for the benefit of the Working Capital Facility Lenders and the WC Administrative Agent as if set out in this Agreement in full.

(b)    The Borrower acknowledges that the WC Administrative Agent and the Working Capital Facility Lenders enter into this Agreement and the other Financing Documents on the basis of, and in full reliance on, each of the representations and warranties referred to in Section 3.01 (_Representations and Warranties_) of the Common Terms Agreement.

Section 3.02.   _Covenants_. So long as any amount of any WC Loan is outstanding under this Agreement, the covenants set out in Article V (_Particular Covenants_) of the Common Terms Agreement shall apply herein, _mutatis mutandis_, for the benefit of the Working Capital Facility Lenders as if set out in this Agreement in full (and as if each reference therein to "Secured Lender" or "Secured Lenders" or "Secured Creditors" were a reference to the Working Capital Facility Lenders; as if each reference therein to "Intercreditor Agent" or "Administrative Agent" were reference to the WC Administrative Agent under this Agreement; as if each reference to the "Required Lenders" were reference to the "Majority WC Facility Lenders"; and as if each reference to "this Agreement" or "the Financing Documents" were a reference to this Agreement); provided that, Section [5.03](h)(i) through (vi) of the Common Terms Agreement shall not apply to the Working Capital Facility Lender.

## ARTICLE IV

## Events of Default[9]

Section 4.01.   _Acceleration after Default_. Subject to Section 4.04, if any Event of Default occurs and is continuing (whether it is voluntary or involuntary, or results from operation of law or otherwise), each Working Capital Facility Lender may, by notice to the Borrower (with a copy to the Intercreditor Agent), take one or more of the following actions, at the same or different times: (i) require the Borrower to repay its WC Loan in full or such part of its WC Loan as is specified in that notice and (ii) terminate forthwith the Commitments. On receipt of any such notice, the Borrower shall immediately repay such WC Loan (or that

---

[8] NTD: Subject to further review.

[9] NTD: Subject to further review

part of such WC Loan specified in that notice) and pay all interest accrued on it and any other amounts then payable under this Agreement. The Borrower waives any right it might have to further notice, presentment, demand or protest with respect to that demand for immediate payment and the Working Capital Facility Lenders' remedies.

Section 4.02. *Events of Default*. Each of the following events or occurrences set forth in this Section 4.02 shall be an Event of Default in respect of the WC Loans:

(a)    Failure to Pay under Financing Documents. The Borrower fails to pay when due (i) any part of the principal of or any interest on any WC Loan, whether at the due date thereof or at a date fixed for mandatory prepayment thereof in accordance with Section 2.09(b) and 2.09(c) or (ii) any other amount payable by it pursuant to the Financing Documents and in the case of this clause (ii), such failure continues unremedied for a period of ten (10) days.

(b)    Failure to Comply with Certain Obligations.

(i)    The Borrower fails to comply with any of its obligations under [Section 5.01(a) (*Affirmative Covenants - Corporate Existence; Conduct of Business*), Section 5.01(j) (*Affirmative Covenants - Security; Further Assurances*), Section 5.01(k) (*Further Assurances*), Section 5.01(l) (*Affirmative Covenants - Pari Passu*), Section 5.01(n) (*Affirmative Covenants - Insurance Requirements*), Section 5.01(r) (*Affirmative Covenants - OFAC Lists*), Section 5.01(u) (*Affirmative Covenants - Sanctions*), Section 5.02 (*Negative Covenants*) or Section 5.03(n) (*Reporting Requirements - Illicit Funding*)][10] of the Common Terms Agreement.

(ii)    The Borrower or the Guarantor, as applicable, fails to comply with any of its obligations under this Agreement (other than covenants and agreements referred to in Section 4.02(a) and Section 4.02(b)(i)), and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the WC Administrative Agent (acting at the instructions of the Majority WC Facility Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, if such breach or default cannot be cured within such thirty (30) day period but is capable of being cured within sixty (60) days and the Borrower (A) is proceeding with diligence to cure such default, (B) provides, prior to the expiration of the initial thirty (30) day period, a notice to the WC Administrative Agent explaining the reasons why the Borrower is not able to cure such breach or default within the initial thirty (30) day cure period and the Borrower's plan to achieve the cure within the additional thirty (30) day cure period and, (C) informs the WC Administrative Agent on a periodic

---

[10] NTD: Cross references to be confirmed upon finalization of the documentation.

basis of all actions being taken in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.

(iii)    [11]Any party to a Material Project Document (other than the Borrower) fails to comply in any material respect with any of its obligations thereunder and any such failure continues for a period of thirty (30) days after the earlier of (i) the date on which the WC Administrative Agent (acting at the instructions of the Majority WC Facility Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware of such failure; provided that, with respect to any Material Project Document other than a Material Project Document to which AES Andes is the Material Project Participant, if the applicable cure periods provided for in such contract have not expired, then the thirty (30) day cure period provided hereunder shall commence on the date on which the applicable cure period under the relevant Material Project Document has expired; and provided, further, that in the case of any Material Project Document, to the extent such breach or default cannot be cured within such thirty (30) day period, but is capable of being cured within sixty (60) days and the Material Project Participant is proceeding with diligence to cure such default and the Borrower informs the WC Administrative Agent on a periodic basis of all actions that the Borrower is aware of that have been taken by the Material Project Participant in furtherance thereof, then such thirty (30) day cure period shall be extended to sixty (60) days.

(iv)    Notwithstanding Section 4.02(b)(ii), in the case of a breach or default of the obligations under Section 5.05(e) (*Environmental and Social Reporting Requirements*) of the Common Terms Agreement, such breach or default continues for a period of ten (10) days.

(c)    Misrepresentation. Any representation or warranty made in ARTICLE III of the Common Terms Agreement or in this Agreement by any of the Borrower or the Guarantor, or in connection with the execution of, or any request, certificate or notice delivered to any Working Capital Facility Lender under or in respect of, this Agreement is found to be incorrect in any material respect, unless the facts or conditions giving rise to such misrepresentation are capable of cure and cured in such a manner as to eliminate such misrepresentation within ten (10) days after the earlier of (i) the date on which the WC Administrative Agent (acting at the instructions of the Majority WC Facility Lenders) notifies the Borrower thereof and (ii) the date that the Borrower becomes, or should have become, aware thereof.

(d)    Expropriation, Nationalization, Etc. Any Authority:

(i)    condemns, nationalizes, seizes, attaches, compulsorily acquires, confiscates or otherwise expropriates (directly or indirectly through measures

---

[11] NTD: Provision to follow the CTA.

35382226.6

[AM_ACTIVE 403892018_5]

tantamount to expropriation) all or any substantial part of the property or the assets of the Borrower or the Guarantor or of their respective Share Capital;

(ii)    assumes custody or control of all or any substantial part of the property or the assets, or of the business or operations, of the Borrower or the Guarantor or of their respective Share Capital;

(iii)    takes or directs any action for the dissolution or disestablishment of the Borrower or the Guarantor or any action that would prevent the Borrower, the Guarantor or their respective officers from carrying on all or a substantial part of its business or operations; or

(iv)    takes any action or enacts any law to effect any of the foregoing.

(e)    <u>Involuntary Proceedings</u>.  A decree or order by a court is entered against the Borrower or the Guarantor:

(i)    adjudging the Borrower or the Guarantor bankrupt, in liquidation or insolvent;

(ii)    approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or with respect to, the Borrower or the Guarantor under any applicable law;

(iii)    appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or the Guarantor or of any substantial part of its property or other assets; or

(iv)    ordering the winding up or liquidation of its affairs;

or any petition is filed seeking any of the above and is not dismissed within sixty (60) days.

(f)    <u>Voluntary Proceedings</u>.  The Borrower or the Guarantor:

(i)    requests a moratorium or suspension of payment of Liabilities from any court;

(ii)    institutes proceedings or takes any form of corporate action to be liquidated or adjudicated bankrupt or insolvent (including any reorganization procedure (*procedimiento concursal de reorganización*), judicial reorganization agreement (*acuerdo de reorganizacíon judicial*), or simplified reorganization agreement (*acuerdo de reorganización extrajudicial o simplificado*), or liquidation procedure (*procedimiento concursal de liquidación*));

(iii)    consents to the institution of bankruptcy, liquidation or insolvency proceedings against it;

35382226.6

[AM_ACTIVE 403892018_5]

(iv)    files a petition or answer or consent seeking reorganization or relief under any applicable law, or consents to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or of any substantial part of its property;

(v)    makes a general assignment for the benefit of creditors; or

(vi)    admits in writing its inability to pay its Liabilities generally as they become due or otherwise becomes insolvent.

(g)    _Analogous Events_. Any other event occurs that under any Applicable Law (including any Applicable Environmental and Social Law in the case of clause (h) of this Section 4.02) would have an effect analogous to any of those events listed in clauses (e), (f) or (h) of this Section 4.02; _provided_ that, for the avoidance of doubt, nothing in this Agreement shall be construed as providing that a [Permitted Reorganization] shall constitute an Event of Default [12].

(h)    [13]_Attachment_.    An attachment or analogous process is levied or enforced upon or issued against any of the assets of the Borrower or the Guarantor, in each case, for an amount in excess of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency), and such attachment or process is not discharged within sixty (60) days.

(i)    [14]_Judgments_.  A final and non-appealable judgment, order or arbitral award (or series thereof) for the payment of money in excess of the aggregate of fifteen million Dollars ($15,000,000) (or its equivalent in any other currency) is rendered against the Borrower or the Guarantor and that judgment, order or arbitral award continues to be unsatisfied or is not vacated, discharged or stayed for a period of sixty (60) days; _provided_ that, to the extent that an insurer of any third party liability insurance policy required under _Annex C_ (_Insurance Requirements_) confirms and acknowledges in writing that all or a portion of the amount of any such judgment, order or arbitral award will be paid out of the proceeds of any such insurance policy, the amount confirmed to be paid under such insurance policy by such insurer shall not be taken into account for purposes of the threshold set forth in this Section 4.02(i).

(j)    _Cross-Default_. The Borrower fails to make any payment in respect of any of its Financial Debt (other than the WC Loans or any other amount payable to the Working Capital Facility Lender pursuant to the Financing Documents) in excess of five million Dollars ($5,000,000) (or its equivalent in any other currency)

---

[12] NTD: Proviso to be added in the CTA.

[13] NTD: Provision to follow new version in the CTA.

[14] NTD: Provision to follow new version in the CTA.

35382226.6

[AM_ACTIVE 403892018_5]

and any such failure continues for more than any applicable period of grace or any such Financial Debt becomes prematurely or immediately due and payable.

(k)    Revocation, Etc., of Security Documents.

(i)    Any Security Document or any of its provisions:

(A)    is revoked, terminated or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms) or ceases to provide the security intended, without, in each case, the prior written consent of the WC Administrative Agent (acting on the instructions of the Majority WC Facility Lenders);

(B)    becomes unlawful, is declared void or becomes unenforceable; or

(C)    is repudiated or its validity or enforceability is challenged, in each case in writing by any Person (other than a Working Capital Facility Lender).

(ii)    Any Lien created or purported to be created by any of the Security Documents does not have, or ceases to have, the effect and priority it is expressed or intended to have under the terms of the relevant Security Document and in accordance with the Applicable Priority.

(l)    Revocation, Etc., of Financing Documents. This Agreement, the Common Terms Agreement or any of their provisions:

(i)    is revoked, terminated, rescinded or ceases to be in full force and effect (other than at the end of its scheduled term or in accordance with its terms or as permitted under this Agreement);

(ii)    becomes unlawful, is declared void or becomes unenforceable; or

(iii)    is repudiated or the validity or enforceability of any of its provisions at any time is challenged, in each case in writing by any Person (other than a Secured Party).

(m)    [15]Revocation, Etc., of Material Project Documents.

(i)    Any Material Project Document or any of its material provisions (including any warranty given thereunder):

---

[15] NTD: Provision to follow new version in the CTA.

35382226.6

30

(A)    is revoked, terminated, rescinded, cancelled or ceases to be in full force and effect (other than at the end of its scheduled term or as permitted under this Agreement);

(B)    becomes unlawful, is declared void or becomes unenforceable; or

(C)    is repudiated or the validity or enforceability of any of its material provisions at any time is challenged, in each case in writing by any Person (other than a Secured Party or Strabag, in its capacity as Construction Constructor).

(n)    <u>Abandonment</u>.  The Borrower:

(i)    ceases to carry on its business;

(ii)    abandons the construction or operation of all or a material part of the Project for a period in excess of thirty (30) consecutive days;

(iii)    except in the case of a Force Majeure Event or mandated by an Authority, suspends the construction ($x$) of the Project as a whole for a period in excess of one-hundred and twenty (120) days in any period of twelve (12) consecutive months or, ($y$) of any material part of the Project for a period in excess of one-hundred and eighty (180) days, in any period of twelve (12) consecutive months;

(iv)    except ($w$) in the case of a Force Majeure Event or similar event affecting the operation of the Project, ($x$) if contemplated under the Project Documents (other than the O&M Agreement), ($y$) if mandated by an Authority or the CEN or ($z$) due to an emergency affecting the SEN, suspends the operation of the Project or any material part thereof for a period in excess of one-hundred and eighty (180) days in any period of twelve (12) consecutive months; or

(v)    provides written or electronic notice to the *Superintendencia del Medio Ambiente* (Environmental Superintendence), the *Servicio de Evaluación Ambiental* (Environmental Assessment Service), the *Comisión Nacional de Energía* (National Commission of Energy*)*, the *Superintendencia de Electricidad y Combustibles* (Superintendence of Electricity and Fuels) or the *Coordinador Independiente del Sistema Eléctrico Nacional* (Independent Coordinator) indicating its decision to shut down, wind-up, indefinitely suspend construction or abandon the Project;

(o)    <u>Material Adverse Effect</u>.  Any event or circumstance (or series of events or circumstances) occurs or exists that has or could reasonably be expected to have a Material Adverse Effect.

(p)    <u>Bankruptcy, Liquidation, Etc., of Material Project Participants</u>.  Any of the events specified in Section 4.02(e) through Section 4.02(g) occurs to any

35382226.6

31

Material Project Participant (other than any counterparty to the Real Estate Rights Agreements or the Aguas Andinas Agreement); provided, however, that in the case of each Construction Contractor, any such event occurs prior to the expiration of the warranty period (excluding any latent defect warranty period) under the Construction Contract to which it is a party.

(q)    [Reserved]

(r)    [Reserved]

(s)    Environmental and Social Requirements.  The Borrower or, with respect to the Project, any Environmental Party fails to comply in all material respects with the Environmental and Social Requirements, unless a Corrective Action Plan, in form and substance satisfactory to the Majority WC Facility Lenders, is in place to cure such breach within thirty (30) days following such breach or earlier if required by the Majority WC Facility Lenders as a result of the severity of the circumstances and upon reasonable notice.

(t)    [Reserved.]

(u)    Loss of Authorizations.  (i) An appealable judgment or order is rendered partially or fully revoking, terminating, cancelling, suspending or declaring void a Material Authorization (the "Adverse Judgment") and such Adverse Judgment could reasonably be expected to result in a Material Adverse Effect.

(ii)    In connection with or following the Adverse Judgment, an injunction is granted or issued by a court of competent jurisdiction with respect to or in connection with a Material Authorization and such injunction orders the stoppage or suspension of any work permitted to be performed in respect of the Project, and such injunction is not vacated, discharged or stayed for a period of sixty (60) days.

(iii)    The Adverse Judgment becomes final and non-appealable.

(v)    Change of Control.  A Change of Control occurs.

Section 4.03.    *Bankruptcy*.  If any Event of Default in Section 4.02(e) or (f) (*Events of Default*) occurs with respect to the Borrower, all the WC Loans, all interest accrued on them and any other amounts payable to the Working Capital Facility Lenders under this Agreement or any other Financing Document will become immediately due and payable without any presentment, demand, protest or notice of any kind, all of which the Borrower waives; provided that, this Section 4.03 shall not apply due to the commencement of a proceeding regulated under Chapter III (Del Procedimiento Concursal de Reorganización) of Law No. 20,720 of Chile during the period in which the Protección Financiera Concursal described in Article 57 of Law No. 20,720 is in effect with respect to the Borrower.

35382226.6

32

Section 4.04. *Right to Cure*. (a) Notwithstanding anything to the contrary contained in this Agreement and subject to Section 4.04(b), the Working Capital Facility Lenders shall not exercise any right it may have under this Agreement or the Financing Documents, at law or in equity, to accelerate, to suspend or terminate the Working Capital Facility Agreement or any of its obligations thereunder, as the result of any default or other action or omission of the Borrower or the Guarantor in the performance of any of its obligations under this Agreement (hereinafter an "Agreement Default") or take any action (including, without limitation, to initiate foreclosure proceedings, to request interim measures (*medidas precautorias*), to initiate collection proceedings, to request the seizure of property or to request the declaration of bankruptcy or insolvency) that could be reasonably expected to cause the bankruptcy, *liquidación*, insolvency, reorganization, receivership or similar condition of the Borrower or the Guarantor or its assets until it:

(i)      first delivers to the Intercreditor Agent and the Borrower  written notice stating its intention to do so, setting forth, as applicable:

(A)      the relevant Agreement Default or circumstances giving rise to its right to accelerate, to suspend, terminate or enforce, as the case may be, certain rights under this Agreement;

(B)      the amounts claimed to be due and payable or that, to the best of its knowledge after due inquiry, may become due and payable to it (including damages) under this Agreement as of the date of such statement, including as a result of the occurrence of an Agreement Default, together with a reasonable description of all such amounts;

(C)      a summary of any obligations, other than payment of amounts due and payable, that the Working Capital Facility Lenders believe that the Borrower or the Guarantor has failed to perform as of such date under this Agreement (an "Outstanding Obligations Statement"),

provided that, if following the delivery of an Outstanding Obligations Statement, a different Agreement Default has occurred and is continuing or a circumstance arises that would entitle the Working Capital Facility Lenders to the rights described in this Section 4.04(i), or any default, amount or obligation under (A), (B)(B) or (C) above changes, the Working Capital Facility Lenders shall act in accordance with this Section 4.04 and deliver to the Intercreditor Agent and the Borrower a new or updated Outstanding Obligations Statement in respect thereof; and

(ii)      gives the Intercreditor Agent the opportunity to cure, or cause to be cured, such Agreement Default for a period of one hundred and twenty (120) calendar days following the later of (A) receipt of the Outstanding Obligations

35382226.6

[AM_ACTIVE 403892018_5]

Statement by the Intercreditor Agent and (B) the expiration of the cure period provided to the Borrower in this Agreement.

(b)    Section 4.04(a) shall not apply in the event that, and any cure period shall be immediately terminated if, any Secured Creditor has taken an [Acceleration Action] or an [Enforcement Action] pursuant to the terms of the applicable Financing Document.[16]

## ARTICLE V

## Conditions of Lending[17]

Section 5.01.    [*Conditions of Lending*. The obligation of the Working Capital Facility Lenders to make WC Loans pursuant to the terms hereof shall be subject to satisfaction of the condition (unless waived in accordance with Section 7.07) that the Intercreditor Agent issues a notice to the Borrower confirming that each of the conditions set forth in Section 4.01 of the Common Terms Agreement have been met in form and substance satisfactory to each of the Secured Lenders.

Section 5.02.    *Conditions of Lending*. The obligation of the Working Capital Facility Lenders to make each WC Loan or extend the maturity of a previously made WC Loan on any Borrowing Date is subject to the satisfaction of the following conditions precedent (unless waived in accordance with Section 7.07):

(a)    Notice. With respect to the Borrowing of any WC Loan, the WC Administrative Agent shall have received a WC Loan Request pursuant to Section 2.02 with respect to such Borrowing (modified as appropriate, in the reasonable discretion of the WC Administrative Agent, in respect to any request for an extension of the maturity date of a WC Loan).

(b)    [Representations and Warranties. All representations and warranties contained in this Agreement and the Common Terms Agreement shall be true and correct in all material respects as of the applicable Borrowing Date (both before and after giving effect thereto and, in the case of each WC Loan, the application of proceeds therefrom) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such WC Loan.]

---

[16] NTD: Subject to reviewing the draft of the Intercreditor Agreement.

[17] NTD: Subject to further review.

35382226.6

(c)    No Default. On the Borrowing Date of such WC Loan, no Default or Event of Default, shall have occurred and be continuing nor shall any such Event of Default or Default, as the case may be, occur by reason of the making of the requested Borrowing and, in the case of each WC Loan, the application of proceeds thereof.

(d)    Compensation and Expenses. The WC Administrative Agent and Working Capital Facility Lenders shall have received all compensation owed under the terms of this Agreement (to the extent due), including any expenses due and payable pursuant to Section 2.12, in each case, to the extent invoiced at least five (5) Business Days prior to the applicable Borrowing Date.

(e)    WC Loan Request. The WC Administrative Agent shall have received a WC Loan Request pursuant to Section 2.02.

(f)    Chilean Law Note. The WC Administrative Agent shall have received (i) in the case of a new WC Loan, a Chilean Law Note duly executed by an authorized representative of the Borrower and the Guarantor whose signature shall be authorized by a competent Chilean notary public; or (ii) in the case of an extension of a previously made WC Loan, an allonge to the WC Promissory Note which documents the WC Loan being extended extending the maturity date thereof, duly executed by an authorized representative of the Borrower whose signature shall be authorized by a competent Chilean notary public and with sufficient funds to pay the Stamp Tax applicable to the extension thereof.

(g)    [Material Adverse Effect. Since the date of this Agreement, no event has occurred (other than the Chapter 11 Cases and any event related thereto) that has or could reasonably be expected to have a Material Adverse Effect].]

## ARTICLE VI

## The WC Administrative Agent

Section 6.01.    *Appointment and Authorization of WC Administrative Agent.*

(a)    Each Working Capital Facility Lender hereby irrevocably appoints, designates and authorizes AES Andes S.A. to take such action on its behalf under the provisions of this Agreement as are expressly mentioned in this Agreement and any Financing Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any such Financing Document.

(b)    Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any Financing Document, the WC Administrative Agent:

(i)    shall not have any duties or responsibilities except those expressly set forth herein and in the Financing Documents, nor shall the WC Administrative Agent have or be deemed to have any fiduciary relationship with any Working

35382226.6

[AM_ACTIVE 403892018_5]

Capital Facility Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Financing Document or otherwise exist against the WC Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "WC Administrative Agent" in this Agreement with reference to the WC Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead, such terms are used merely as a matter of market custom, and are intended to create or reflect only a relationship between independent contracting parties;

(ii)     shall not be required to initiate or conduct any litigation or collection proceedings under any Financing Document;

(iii)     shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, other evidence of indebtedness or other paper or document, but the WC Administrative Agent, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if it shall determine to make such further inquiry or investigation, it shall incur no liability or additional liability of any kind by reason of such inquiry or investigation;

(iv)     shall have no responsibility or liability for special, indirect, exemplary, incidental or consequential loss, expense or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the WC Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(v)     shall not be required to expend or risk its own funds or otherwise incur financial liability for the performance of any of its duties hereunder or the exercise of any of its rights or powers if it shall have grounds for believing that the repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(vi)     shall have no duty (A) to see to any recording, filing, or depositing of this Agreement or any agreement referred to herein or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind or (D) to confirm or verify the contents of any reports or certificates delivered to the WC Administrative Agent pursuant to any Financing Document believed by the  WC Administrative Agent to be genuine and to have been signed or presented by the proper party or parties; and

(vii)     shall not be required to give any bond or surety in respect of the powers granted hereunder.

35382226.6

[AM_ACTIVE 403892018_5]

(c)    Delivery of reports, information and documents to the WC Administrative Agent shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including any entity's compliance with any covenants under any Financing Document. The WC Administrative Agent shall not be obligated to monitor or confirm, on a continuing basis or otherwise, any other party's compliance with the covenants described in any Financing Document or with respect to any reports or other documents filed under any other Financing Document.

Section 6.02.    _Delegation of Duties of the WC Administrative Agent_. The WC Administrative Agent may execute any of its duties under this Agreement or any Financing Document by or through agents or attorneys-in-fact with consent of the Working Capital Facility Lenders and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The WC Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

Section 6.03.    _Liability of the WC Administrative Agent_. The WC Administrative Agent shall not (a) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Working Capital Facility Lenders or any other Person for any recital, statement, representation or warranty made by the Borrower or any Affiliate, or any officer thereof, contained in this Agreement or in any other Transaction Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the WC Administrative Agent under or in connection with, this Agreement or any other Transaction Document, or for the value of or title to any Security, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Transaction Document, or for any failure of the Borrower or any other party to any Transaction Document to perform its obligations hereunder or thereunder. The WC Administrative Agent shall not be under any obligation to any Working Capital Facility Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Transaction Document, or to inspect the properties, books or records of the Borrower or any Affiliate.

Section 6.04.    _Reliance by the WC Administrative Agent_. The WC Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, electronic mail or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the WC Administrative Agent with reasonable care. The WC Administrative Agent shall be fully justified in failing or refusing to take any action under this

35382226.6

37

Agreement or any other Transaction Document (a) if such action would, in the opinion of the WC Administrative Agent, be contrary to Applicable Law or the terms of this Agreement or any Financing Document or (b) if such action is not specifically provided for in this Agreement or the Financing Documents to which the WC Administrative Agent is a party, and it shall not have received such advice or instruction of the Working Capital Facility Lenders as it deems appropriate. The WC Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or consent of the Intercreditor Agent or the Working Capital Facility Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Working Capital Facility Lenders.

Section 6.05. *Notice of Default; Other Notices*. The WC Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Event of Default or Event of Default (notwithstanding any other relationship with the Borrower, whether as quotaholder, financial advisor or otherwise) unless the WC Administrative Agent shall have received written notice from a Working Capital Facility Lender, the Intercreditor Agent or the Borrower referring to the Common Terms Agreement or this Agreement, as applicable, describing such Potential Event of Default or Event of Default. The WC Administrative Agent shall take such action with respect to such Potential Event of Default or Event of Default as may be requested by the Working Capital Facility Lenders in accordance with the terms of this Agreement; provided that unless and until the WC Administrative Agent has received any such request, the WC Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Potential Event of Default or Event of Default as it shall deem advisable or in the best interest of the Working Capital Facility Lenders.

Section 6.06. *Credit Decision*. Each Working Capital Facility Lender acknowledges that the WC Administrative Agent has not made any representation or warranty to it, and that no act by the WC Administrative Agent hereafter taken, including any review of the Project or of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the WC Administrative Agent to any Working Capital Facility Lender. Each Working Capital Facility Lender represents to the WC Administrative Agent that it has, independently and without reliance upon the WC Administrative Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, the Project, the value of and title to any Security, and all Applicable Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Working Capital Facility Lender also represents that it will, independently and without reliance upon the WC Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Financing Documents, and

35382226.6

[AM_ACTIVE 403892018_5]

to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the Project. Except for notices, reports and other documents expressly required pursuant to any Financing Document to be furnished to the Working Capital Facility Lenders by the WC Administrative Agent, the WC Administrative Agent shall not have any duty or responsibility to provide any Working Capital Facility Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower and the Project that may come into the possession of the WC Administrative Agent.

Section 6.07.  *Indemnification of the WC Administrative Agent*.  (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold the WC Administrative Agent harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, charges, expenses or disbursements (including the documented fees and expenses of their counsel) of any kind or nature whatsoever that may at any time (including at any time following repayment of the WC Loans or the termination, resignation or replacement of the WC Administrative Agent or any Working Capital Facility Lender) be imposed on, incurred by or asserted by a third party or by the Borrower against any such Person in any way relating to or arising out of this Agreement or any other Transaction Document, including the Security Documents and any other document or instrument contemplated by or referred to herein or therein, or the transactions contemplated hereby and thereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to the exercise by the WC Administrative Agent of any of its respective rights or remedies under any of the Financing Documents, and any investigation, litigation or proceeding (including any bankruptcy, insolvency, reorganization or other similar proceeding or appellate proceeding) related to this Agreement or any other Transaction Document or the WC Loans, or the use of the proceeds thereof, whether or not any such Person is a party thereto; <u>provided</u> that the Borrower shall have no obligation hereunder to any such Person with respect to (i) the WC Administrative Agent resulting directly from the gross negligence or willful misconduct of the WC Administrative Agent as determined in a final, non-appealable judgment by a court of competent jurisdiction and (ii) Taxes, which shall be governed solely by Section 2.14 (*Taxes*).

(b)      The obligations set forth in this Section 6.07 shall survive payment of the WC Loans and all other amounts payable to the Working Capital Facility Lenders hereunder or under the other Financing Documents, and the resignation or replacement of the WC Administrative Agent.

Section 6.08.  *WC Administrative Agent in Individual Capacity*. The WC Administrative Agent and its affiliates may make loans to, acquire equity interests in and generally engage in any kind of financial advisory, underwriting or other business with the Borrower or its Affiliates as though the WC Administrative Agent were not an WC Administrative Agent hereunder and without notice to or

35382226.6

39

consent of the Working Capital Facility Lenders. The Working Capital Facility Lenders acknowledge that, pursuant to such activities, the WC Administrative Agent or its affiliates may receive information regarding the Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such Affiliates) and acknowledge that the WC Administrative Agent shall be under no obligation to provide such information to them. If the WC Administrative Agent is also a Working Capital Facility Lender hereunder, in its capacity as Working Capital Facility Lender it shall have the same rights and powers under this Agreement as any other Working Capital Facility Lender and may exercise the same as though it were not WC Administrative Agent, and the terms "Working Capital Facility Lender" and "Working Capital Facility Lenders" shall include the WC Administrative Agent in its individual capacity as such.

Section 6.09. _Successor WC Administrative Agent_. (a) Subject to the appointment and acceptance of a successor as provided below, the WC Administrative Agent may resign at any time by giving [ninety (90) days] advance notice thereof to the Working Capital Facility Lenders and the Borrower, and the WC Administrative Agent may be removed at any time with or without cause by the Working Capital Facility Lenders constituting the Majority WC Facility Lenders (excluding, if applicable, any Working Capital Facility Lender that is the WC Administrative Agent or is an affiliate of the WC Administrative Agent). Upon any such resignation or removal, the Working Capital Facility Lenders constituting the Majority WC Facility Lenders shall have the right to appoint a successor to the WC Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing). If no successor WC Administrative Agent shall have been appointed by the Working Capital Facility Lenders, and shall have accepted such appointment within thirty (30) days after the resigning WC Administrative Agent's giving of notice of resignation or the giving of any notice of removal of the WC Administrative Agent, then the resigning WC Administrative Agent or the WC Administrative Agent being removed, as the case may be, may appoint a successor to the WC Administrative Agent, which must be reasonably acceptable to the Borrower (unless a Potential Event of Default or an Event of Default has occurred and is continuing). Upon the acceptance of its appointment as a successor WC Administrative Agent hereunder, such successor WC Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of such resigning or removed WC Administrative Agent, and such resigning WC Administrative Agent or removed WC Administrative Agent shall be discharged from its duties and obligations hereunder. The retiring WC Administrative Agent shall, at its own cost, make available to the successor WC Administrative Agent such documents and records and provide such assistance as the successor WC Administrative Agent may reasonably request for the purposes of performing its functions as WC Administrative Agent hereunder and under the Financing Documents.

35382226.6

40

(b)     After the WC Administrative Agent's resignation, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the WC Administrative Agent.

Section 6.10. _Allocation of Funds_. (a) In the event that the WC Administrative Agent receives at any time less than the full amount then due and payable to the WC Administrative Agent under any Financing Document in respect of the WC Loans, the application of which is not otherwise provided for in this Agreement, the WC Administrative Agent (unless prevented by Applicable Law) shall apply and allocate such amounts pursuant to Section 2.09(e) of this Agreement.

(b)     In the event the WC Administrative Agent receives, from or on behalf of the Borrower, payments of sums due on any due date in respect of the WC Loans but not of all sums due on all such WC Loans, and if the WC Administrative Agent believes that full payment is expected to be made in due course of all sums due on such due date in respect of all such WC Loans, the WC Administrative Agent may proceed to make payments with respect to the relevant WC Loans in respect of which payment has been received, notwithstanding that full payment of all such amounts has not yet been made. In the event that subsequently it appears unlikely that full payment in fact will be made within a reasonable period of time after such due date, then at the WC Administrative Agent's request, those Working Capital Facility Lenders to whom such payments have been made shall reimburse such portions of those payments as may be appropriate to comply with the provisions of Section 6.10(a).

(c)     The WC Administrative Agent shall not be obligated to make any payment to any Working Capital Facility Lender until the WC Administrative Agent establishes that it has actually received such amount from the Borrower. However, if the WC Administrative Agent makes such payment and it proves to be the case that it had not received such amount, then each Working Capital Facility Lender shall, on demand by the WC Administrative Agent, promptly reimburse the sum paid to such Working Capital Facility Lender together with interest on the repaid amount at either (in the WC Administrative Agent's sole discretion): (i) the overnight deposit rate determined by the WC Administrative Agent or (ii) the Federal Funds Effective Rate. This Section 6.10(c) shall survive the termination of this Agreement if, and to the extent of, any preference or similar period under any bankruptcy law applicable to the Borrower or any of its assets.

(d)     On each Borrowing Date, the WC Administrative Agent shall be authorized (but not obligated) to advance, for the account of each of the Working Capital Facility Lenders, the amount of the WC Loan to be made by such Working Capital Facility Lenders in accordance with such Working Capital Facility Lenders' Commitment hereunder. Should the WC Administrative Agent do so, each of the Working Capital Facility Lenders agrees forthwith to reimburse the WC Administrative Agent in immediately available funds for the amount so advanced on its behalf by the WC Administrative Agent, together with interest at the Federal

35382226.6

[AM_ACTIVE 403892018_5]

Funds Effective Rate if not so reimbursed on the date due from and including the date such WC Loan was advanced by the Administrative Agent but not including the date of reimbursement.

Section 6.11.  *U.S.A. Patriot Act*. The parties hereto acknowledge that any WC Administrative Agent that is subject to the U.S.A. Patriot Act is required, in accordance with Section 326 of the U.S.A. Patriot Act, in order to help fight the funding of terrorism and money laundering, to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the WC Administrative Agent. Each of the parties hereto agrees that it will provide the WC Administrative Agent with such information as it may request in order for the WC Administrative Agent to satisfy the requirements of the U.S.A. Patriot Act.

# ARTICLE VII

## Miscellaneous

Section 7.01.  *Notices*. Any notice, request or other communication to be given or made under this Agreement shall be given in accordance with Section 7.02 (*Notices*) of the Common Terms Agreement. The WC Administrative Agent's, Borrower's and the Working Capital Facility Lenders' respective address for purpose of notices, requests and communication to be made or given under this Agreement shall be the address specified as follows and as such party notifies to the other parties to this Agreement from time to time.

(i)    For the Borrower and the Guarantor:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: luis.urrejola@aes.com

With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: felix.gomez@aes.com

(ii)    For AES Andes:

AES Andes S.A.
Los Conquistadores 1730, Piso 10

35382226.6

42

Providencia, Región Metropolitana, Chile
Attention:  Ricardo Roizen, Chief Financial Officer
Telephone: +56 2 3333 8301
Email:  ricardo.roizen@aes.com

With a copy to:

AES Andes S.A.
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: mailto:felix.gomez@aes.com

Section 7.02.    _Term of Agreement_. This Agreement shall continue in force until all monies, excluding contingent liabilities and obligations that are unasserted at such time, payable under it have been fully paid in accordance with its provisions.

Section 7.03.    _Saving of Rights_. Section 7.01 (_Saving of Rights_) of the Common Terms Agreement shall apply herein, _mutatis mutandis_, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Working Capital Facility Lenders and the WC Administrative Agent and each reference to "this Agreement" or "the Financing Documents" were a reference to this Agreement).

Section 7.04.    _Enforcement_. (a) This Agreement is governed by, and shall be construed in accordance with, the laws of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)      Section 7.06(b) through and including (l) (but excluding clause (j) and (d)) (_Applicable Law and Jurisdiction_) of the Common Terms Agreement shall apply herein, _mutatis mutandis_, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" or "Secured Creditor" were a reference to the Working Capital Facility Lenders and the WC Administrative Agent, each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

(c)      The Borrower hereby confirms, as of the date hereof, the irrevocable designation, appointment and empowerment of CT Corporation System with an address at 111 Eighth Avenue, New York, NY 10011, as its authorized agent solely to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding a Working Capital Facility Lender may bring in the State of New York in respect of this Agreement.

Section 7.05.    _Successors and Assignees_. (a) This Agreement binds and benefits the respective successors and assignees of the parties. However, the

35382226.6

43

Borrower may not assign or delegate any of its rights or obligations under this Agreement without the prior consent of the WC Administrative Agent (acting on instructions of the Working Capital Facility Lenders constituting the Majority WC Facility Lenders).

(b)      [•][18].

Section 7.06.  *Disclosure of Information*.  Section 7.07 (*Disclosure of Information*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Party" or "Secured Parties" were a reference to the Working Capital Facility Lenders and the WC Administrative Agent and each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement).

Section 7.07.  *Amendments, Waivers and Consent*.[19] (a) No modification, amendment or waiver of any provision of this Agreement and no consent to any departure by any of the Borrower or the Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority WC Facility Lenders (or signed by the Administrative Agent with the consent of the Majority WC Facility Lenders), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; provided, however, that no such modification or amendment shall without the prior written consent of:

(i)      each Working Capital Facility Lender directly and adversely affected thereby to (A) reduce the principal amount of any WC Loan, or the rate of interest payable thereon (provided that only the consent of the Majority WC Facility Lenders be necessary for a waiver of default interest referred to in Section 2.03 (*Default Interest Rate*) of the Common Terms Agreement)), or extend any date for the payment of interest hereunder or extend the final maturity of the Borrower's obligations hereunder or (B) amend, modify or waive any provision of Section 2.09(e) or 6.10(a);

(ii)      all of the Working Capital Facility Lenders to (A) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the Working Capital Facility Lenders, (B) amend or modify this Section 7.07 or modify the percentage of the Working Capital Facility Lenders required in the definition of Majority WC Facility Lenders, or (C) amend, modify or waive any provision of this Agreement in order to permit the incurrence of any financing that is *pari passu* or senior to the WC Loans with respect to the WC Obligations; and

---

[18] NTD: To follow 1L agreement.

[19] NTD: Subject to reviewing and conforming to the Intercreditor Agreement.

35382226.6

[AM_ACTIVE 403892018_5]

(iii)     the Majority WC Facility Lenders to (A) amend or modify the order of application of any prepayment of WC Loans from the application thereof set forth in the applicable provisions of this Agreement in any manner that adversely affects the Working Capital Facility Lenders under this Agreement, or (B) impose any greater restriction on the ability of any Working Capital Facility Lenders to assign any of its rights or obligations hereunder.

(b)     No such amendment or modification shall adversely affect the rights and obligations of the WC Administrative Agent without its prior written consent.

(c)     No notice to or demand on the Borrower or the Guarantor shall entitle the Borrower or the Guarantor to any other or further notice or demand in the same, similar or other circumstances, unless otherwise required under this Agreement or the Financing Documents. Each assignee under Section 7.05(b) shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, and any consent by a Working Capital Facility Lender shall bind any Person subsequently acquiring an interest in the WC Loans held by such Working Capital Facility Lender. No amendment to this Agreement shall be effective against the Borrower and the Guarantor unless signed by the Borrower and the Guarantor, as the case may be.

Section 7.08.    *[•]*. Notwithstanding anything to the contrary contained in Section 7.07(a), if the WC Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any provision of this Agreement, then the WC Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement if the same is not objected to in writing by the Majority WC Facility Lenders within seven (7) Business Days after written notice thereof to the Working Capital Facility Lenders.

Section 7.09.    *Indemnification; No Consequential Damages*. Section 7.12 (*Indemnification; No Consequential Damages*) of the Common Terms Agreement shall apply herein, *mutatis mutandis*, as if set out in this Agreement in full (and as if each reference therein to "Secured Lender" were a reference to the Working Capital Facility Lenders, each reference to "this Agreement", "Financing Documents" or "Transaction Documents" were a reference to this Agreement and each reference to "Secured Loans" were a reference to the "WC Loans").*Counterparts*. This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

Section 7.11.    *English Language*. (a) All documents to be provided or communications to be given or made under this Agreement may be in the Spanish or English language.

35382226.6

45

(b)     To the extent that the original version of any document to be provided, or communication to be given or made, to any Working Capital Facility Lender or the WC Administrative Agent under this Agreement is in a language other than English, that document or communication shall be accompanied by an English translation certified by an authorized representative to be a true and correct translation of the original. The parties hereto acknowledge that this Agreement was negotiated and executed in the English language. Any Working Capital Facility Lender or the WC Administrative Agent may, if it so requires, obtain an English translation of any document or communication received in a language other than English (and not accompanied by the required translation) at the cost and expense of the Borrower.

Section 7.12.   *Entire Agreement*. This Agreement and the other Financing Documents represent the final and complete agreement of the parties hereto with respect to the financing of the Project, and all prior negotiations, representations, understandings, writings and statements of any nature with respect thereto are hereby superseded in their entirety by the terms of this Agreement and the other Financing Documents.

Section 7.13.   *No Third Party Beneficiaries*. Except for Section 4.04 of this Agreement that shall be for the benefit of the Offshore Collateral Agent [(for the benefit of the Secured Lenders)], the agreement of each Working Capital Facility Lender to maintain its WC Loan to the Borrower on the terms and conditions set forth in this Agreement and the other Financing Documents is solely for the benefit of the Borrower, and no other Person (including any Sponsor, Shareholder, any other Project Party, or any subcontractor, supplier, worker, carrier, warehouseman or materialman furnishing supplies, goods or services to or for the benefit of the Project) shall have any rights hereunder against the WC Administrative Agent or any Working Capital Facility Lender with respect to its WC Loan, the proceeds thereof or otherwise.

*[Signature pages follow]*

35382226.6

[AM_ACTIVE 403892018_5]

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed in their respective names as of the date first above written.

**ALTO MAIPO SpA,**
as Borrower

By:_____
    Name:
    Title:

[insert notice information]

35382226.6

*[Signature Page to Working Capital Facility Agreement]*

**AES ANDES S.A.,**
as WC Administrative Agent

By: _____
    Name:
    Title:

    [insert notice information]

35382226.6

*[Signature Page to Working Capital Facility Agreement]*

**EXHIBIT A**[1]

**FORM OF CHILEAN LAW ALLONGE**

---

[1] NTD: To be prepared based on final agreed draft of this Agreement.

Exhibit A - page 1

**<u>EXHIBIT B</u>**

**FORM OF ACKNOWLEDGMENT OF DEBT[21]**

---

[21] NTD: To be prepared based on final agreed draft of this Agreement.

<u>**EXHIBIT C**</u>

**FORM OF ASSIGNMENT AGREEMENT**

This ASSIGNMENT AGREEMENT (this "<u>Agreement</u>"), dated as of [●], 20[●] is by and between [*assigning Working Capital Facility Lender*] (the "<u>Assignor</u>") and [●] ("<u>[●]</u>") (the "<u>Assignee</u>").

**RECITALS**

WHEREAS, the Assignor is party to (i) a Working Capital Facility Agreement, dated as of [●], 2022, by and among Alto Maipo SpA (the "<u>Borrower</u>"), the Borrower, the Working Capital Facility Lenders from time to time party thereto, AES Andes S.A., WC Administrative Agent (as amended or otherwise modified as of the date hereof, the "<u>Working Capital Facility Agreement</u>") and (ii) the Third Amended and Restated Intercreditor and Security Sharing Agreement, dated as of [●], 2022, among the WC Administrative Agent, the other Agents identified therein, the Working Capital Facility Lenders and the other Secured Creditors from time to time party thereto (as amended or otherwise modified as of the date hereof, the "<u>Intercreditor Agreement</u>");

WHEREAS, Assignor proposes to sell, assign and transfer [a portion][all] of its outstanding [WC Loans] [and] [Commitments] (as indicated in <u>Attachment A</u>) to the Assignee, and the Assignee proposes to accept and assume from the Assignor the rights and obligations of the Assignor relating to such WC Loans and Commitments on the terms and subject to the conditions of this Agreement (such interest in these rights and obligations being hereinafter referred to as the "<u>Assigned Interest</u>");

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<u>Section 1.</u>    <u>Definitions</u>. All capitalized terms used herein shall have the meanings specified in the Working Capital Facility Agreement unless otherwise defined herein or unless the context requires otherwise. The Assignee hereby acknowledges receipt of a copy of each of the Common Terms Agreement, the Working Capital Facility Agreement and the Intercreditor Agreement.

<u>Section 2.</u>    <u>Assignment and Assumption</u>.

(a)    For an agreed consideration, as of the Assignment Effective Date, the Assignor irrevocably sells, transfers, conveys and assigns, without recourse, representation or warranty (except as expressly set forth herein), to the Assignee the Assigned Interest set forth in <u>Attachment A</u> and the Assignee irrevocably purchases from the Assignor the Assigned Interest set forth in <u>Attachment A</u> and agrees to perform and comply with all obligations and liabilities of Assignor with respect to such Assigned Interest resulting from facts, events or circumstances arising or occurring on or after the Assignment Effective Date.

Exhibit C - page 1

(b)    From and after the Assignment Effective Date, the Borrower shall make all payments in respect of the Assigned Interest (including all payments of principal, interest, fees and other amounts) to the WC Administrative Agent for the account of the Assignee.

Section 3.    Representations, Warranties and Undertakings.

(a)    The Assignor (i) represents and warrants that (A) it is the legal and beneficial owner of the Assigned Interest and such Assigned Interest is free and clear of any Lien or adverse claim and (B) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and (ii) makes no representation or warranty and assumes no responsibility with respect to (A) any statements, warranties or representations made in or in connection with the Common Terms Agreement, the Working Capital Facility Agreement, the Intercreditor Agreement or the other Financing Documents or the execution, legality, validity, enforceability or genuineness, of sufficiency or value of the Common Terms Agreement, the Working Capital Facility Agreement, the Intercreditor Agreement, the other Financing Documents, or any other instrument or document furnished pursuant thereto or in connection therewith or (B) the financial condition of the Borrower, the Shareholder, the Sponsor or any Material Project Participant or the performance or observance by the Borrower or any other Person of any of its obligations under the Common Terms Agreement, any other Financing Document, or any other instrument or document furnished pursuant thereto or in connection therewith.

(b)    The Assignee represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a Working Capital Facility Lender under the Common Terms Agreement, the Working Capital Facility Agreement, the Intercreditor Agreement and the other Financing Documents, (ii) it has, or has access to, such information as it deems appropriate under the circumstances, to make an informed decision to enter into this Agreement and to assume the Assigned Interest, (iii) it is a sophisticated entity with respect to the purchase of the Assigned Interest and it has independently and without reliance on the Assignor, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement and purchase and assume the Assigned Interest, (iv) its execution, delivery, and performance of this Agreement has not resulted and will not result in a breach or violation of any provision of (A) Assignee's organizational documents, (B) any statute, law, writ, order, rule or regulation of any Authority applicable to the Assignee, (C) any judgment, injunction, decree or determination of any Authority applicable to the Assignee or (D) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which the Assignee may be a party, by which the Assignee may be bound or to which any of the assets of the Assignee is subject, and (v) except as provided in the Common Terms Agreement or the Working Capital Facility Agreement, no notice to, registration with, consent or approval of or any other action by any relevant Authority is, will be or was required for the Assignee to execute, deliver, and perform its obligations under this Agreement.

(c)    The Assignee acknowledges that the Assignor has not given it any investment advice or opinion on whether the decision to enter into this Agreement and to purchase and assume the Assigned Interest is prudent. Except as otherwise provided herein, the Assignee has not relied, and will not rely, on the Assignor to furnish or make available any documents or other

Exhibit C - page 2

information regarding the transaction contemplated by this Agreement. The Assignee acknowledges that (x) the Assignor currently may have, and later may come into possession of, information regarding the Assigned Interest that is not known to it and that may be material to a decision to enter into this Agreement and assume the Assigned Interest ("Excluded Information"), (y) it has determined to enter into this Agreement and purchase and assume the Assigned Interest notwithstanding its lack of knowledge of the Excluded Information, and (z) the Assignor shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the Assignor, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of the Assignor herein.

Section 4.     Effectiveness. The effectiveness of this Agreement, and the sale, assignment, assumption and transfer pursuant to Section 2 (*Assignment and Assumption*) hereof, is effective as of the date hereof upon the execution and delivery of this Agreement by the Assignor and the Assignee (the "Assignment Effective Date").

Section 5.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without taking into account its conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law).

Section 6.     Counterparts. This Agreement may be executed in several counterparts, each of which is an original, but all of which together shall constitute one and the same agreement. Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

Section 7.     Further Assurances. The Assignor and the Assignee hereby agree to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Agreement including, without limitation, the delivery of any notices to the Borrower that may be required in connection with the assignment contemplated hereby.

Section 8.     Binding Effect; Amendment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, subject, however, to the provisions of the Common Terms Agreement, the Intercreditor Agreement and the Working Capital Facility Agreement. Any amendment or waiver of, or any consent given under, any provision of this Agreement shall be in writing and, in the case of any amendment, signed by the Assignor and the Assignee or their permitted successors and assigns.

Section 9.     Notices. Any notice, request or other communication to be given or made under this Agreement shall be in writing. Any such communication may be delivered by hand, airmail, facsimile or established courier service to the party's address set forth below the name of such party on the signature pages to this Agreement at such other address as such party notifies to the other parties from time to time, and will be effective upon receipt; provided that the parties may, at their election, deliver notices, requests or communications under this Agreement by e-mail to the e-mail addresses specified on the signature pages of this Agreement.

Exhibit C - page 3

<u>Section 10.</u>    <u>Confidentiality</u>. Except for disclosures required or permitted under the Working Capital Facility Agreement, the Intercreditor Agreement and the other Financing Documents, the parties hereto shall maintain the confidentiality of the terms of this Agreement and the transactions contemplated hereby, unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose such terms to their respective affiliates, and the directors, officers, employees, agents, advisors, counsel, rating agencies, participants, sub-participants and auditors of such parties and of such parties' affiliates and in connection with the enforcement of the parties' respective rights and obligations hereunder. Either party shall be permitted to make any necessary disclosures to their respective assignees regarding the terms of this Agreement and the transactions contemplated hereby, provided that such assignees shall be subject to substantially the same confidentiality restrictions as set forth herein.

*[Signature page immediately follows]*

Exhibit C - page 4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed in their respective names by their authorized representatives as of the date first written above.

[●],
as Assignor

By:_____
   Name:
   Title:

Address for Notices:
   [_____]

[●],
as Assignee

By:_____
    Name:
    Title:


Address for Notices:
    [_____]

35382226.6

Exhibit C - page 6

[AM_ACTIVE 403892018_5]

<u>Attachment A</u>
to Assignment Agreement

| Aggregate Amount of Commitments/ WC Loans | Percentage Assigned of Commitments/ WC Loans |
|---|---|
| $ | % |

35382226.6

Exhibit C - page 7

[AM_ACTIVE 403892018_5]

## EXHIBIT D

## FORM OF ACCESSION AGREEMENT

To: AES Andes S.A., as WC Administrative Agent, and Alto Maipo SpA, as Borrower.

From: [*new Working Capital Facility Lender*] (the "Acceding Working Capital Facility Lender")

## RECITALS

We refer to that certain (i) Working Capital Facility Agreement, dated as of [●], 2022, by and among Alto Maipo SpA (the "Borrower"), the Borrower, the Working Capital Facility Lenders from time to time party thereto, AES Andes S.A. in its capacity as WC Administrative Agent (as amended or otherwise modified as of the date hereof, the "Working Capital Facility Agreement") and (ii) Third Amended and Restated Intercreditor and Security Sharing Agreement, dated as of [●], 2022, among the WC Administrative Agent, the other Agents identified therein, the Lenders and the other Secured Creditors from time to time party thereto (as amended or otherwise modified as of the date hereof, the "Intercreditor Agreement");

WHEREAS, on the date hereof, immediately prior to the execution of this Agreement, the Acceding Working Capital Facility Lender assumed the [WC Loans] [and] [the Commitments] (the "Transferred WC Loans") in the amounts and as further described on Attachment A (*Transferred WC Loans*);

WHEREAS, the Acceding Working Capital Facility Lender intends to accede to the Working Capital Facility Agreement and the Intercreditor Agreement on the terms and conditions of this Agreement.

THIS AGREEMENT WITNESSES as follows:

Section 1.    Definitions. All capitalized terms used herein shall have the meanings specified in the Working Capital Facility Agreement unless otherwise defined herein or unless the context requires otherwise. The Acceding Working Capital Facility Lender hereby acknowledges receipt of a copy of each of the Common Terms Agreement, the Working Capital Facility Agreement and the Intercreditor Agreement.

Section 2.    Accession of Acceding Working Capital Facility Lender. Effective as of the date hereof:

(a)    the Acceding Working Capital Facility Lender accedes to and agrees to be bound by the terms of the Working Capital Facility Agreement and the Intercreditor Agreement as if the Acceding Working Capital Facility Lender had executed and delivered the Working Capital Facility Agreement and the Intercreditor Agreement as of the date thereof;

(b)    the Acceding Working Capital Facility Lender makes each of the undertakings and agreements of the Working Capital Facility Lenders set out in the WC Loan Agreement and the Intercreditor Agreement, and binds such Acceding Working Capital Facility Lender to the

35382226.6

Exhibit D - page 1

undertakings and agreements set out in the Working Capital Facility Agreement and the Intercreditor Agreement;

(c)     the Acceding Working Capital Facility Lender accepts each of the rights and benefits extended to Working Capital Facility Lenders under, and agrees to be bound by the terms of, the Financing Documents applicable to such Working Capital Facility Lenders, on the terms and subject to the conditions and limitations set out in such Financing Documents;

(d)     for all purposes of the Financing Documents, the Acceding Working Capital Facility Lender shall be a Working Capital Facility Lender and the indebtedness of the Borrower under the Working Capital Facility Agreement, including the Transferred WC Loans, shall be Secured Obligations; and

(e)     without limiting the generality of the foregoing, the rights of the Acceding Working Capital Facility Lender shall be subject to the terms and conditions of the Working Capital Facility Agreement , the Common Terms Agreement, the Intercreditor Agreement and the other Financing Documents applicable to such Acceding Working Capital Facility Lender and each of the other provisions of such agreements shall apply to the Transferred WC Loans.

<u>Section 3.</u>     <u>Representations, Warranties and Undertakings</u>. The Acceding Working Capital Facility Lender hereby represents and warrants that, as of the date of this Agreement, it is duly authorized to execute this Agreement, including making the agreements expressed to be made by Working Capital Facility Lenders under the Financing Documents.

<u>Section 4.</u>     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without taking into account its conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law).

<u>Section 5.</u>     <u>Binding Effect; Amendment</u>. This Agreement shall be binding upon and inure to the benefit of the Acceding Working Capital Facility Lender, the Secured Parties and the Borrower and their respective successors and assigns, subject, however, to the provisions of the Common Terms Agreement, the Working Capital Facility Agreement and the Intercreditor Agreement.

35382226.6

Exhibit D - page 2

Yours truly,

[*ACCEDING WORKING CAPITAL FACILITY LENDER*]

By: _____

Name: _____

Title: _____

Address:

[_____]

[_____]

Email:          [_____]

Attention:     [_____]

35382226.6

Exhibit D - page 3

**Acknowledged**:

AES Andes S.A.,

as the WC Administrative Agent

By:        _____

Name:     _____

Title:     _____


By:        _____

Name:     _____

Title:     _____

**Acknowledged**:

ALTO MAIPO SpA,

as Borrower

By:           _____

Name:       _____

Title:       _____

35382226.6

Exhibit D - page 5

Attachment                                                                  A

to Accession Agreement

35382226.6

[AM_ACTIVE 403892018_5]

## <u>EXHIBIT E</u>

## FORM OF WC LOAN REQUEST

To: AES ANDES S.A. (the "WC Administrative Agent")

From: ALTO MAIPO SpA (the "Borrower")

Date: [_____][22]

Working Capital Facility Agreement dated as of November [_], 2022 among, *inter alios*, the Borrower, the WC Administrative Agent and the Working Capital Facility Lenders party thereto (as amended, restated, modified, supplemented, extended or amended and restated from time to time, the "Working Capital Facility Agreement"). Capitalized terms not defined herein shall have the meanings assigned to such terms in the Working Capital Facility Agreement.

1.  We hereby give notice in accordance with Section 2.02 of the Working Capital Facility Agreement that we wish a Borrowing of WC Loans to be made as follows:

    (a) Total principal amount of WC Loans: $[    ]

    (b) WC Loan Disbursement Date: [    ] (which is a Business Day)

    (c) Initial Interest Period: [    ]

    (d) Repayment Date: [    ]

2.  This WC Loan Request is irrevocable.

3.  Balance of WC Loan amount (after payment of agreed fees and expenses) to be remitted to:

[Bank:
Swift Code:
Account Number:
ABA:
Account Name:]

4.  The Borrower hereby (i) instructs to each Working Capital Facility Lender to deduct from the principal amount of the WC Loan the amount required to pay the applicable

---

[22] Loan Request to be delivered by hand, facsimile or electronic mail not later than 10:00 a.m., New York City time, three (3) Business Days before the date of the proposed Loan.

35382226.6

Exhibit E

Stamp Tax, and (ii) certifies that, as of the date of the WC Loan Request, (x) no Event of Default exists and (y) aggregate balance in the Onshore Collateral Accounts and Offshore Collateral Accounts is less than $10 million.

5. This WC Loan Request shall be governed by the laws of the State of New York, without giving effect to any conflict of law principles or other rule of law which would cause the application of the law of any jurisdiction other than the law of the State of New York. All notices hereunder shall be delivered in accordance with Section 7.01 of the Working Capital Facility Agreement (regardless of whether the Working Capital Facility Agreement ever becomes effective).

Yours faithfully,

ALTO MAIPO SpA

By: _____

Name:
Title:

*[Signature Page to Form of WC Loan Request]*

## **Exhibit O**

**Amendment to Amended Strabag Tunneling Contract**

**AMENDMENT NO. 2 DRAFT**
**VERSION 3**

**ALTO MAIPO SpA**

**CONTRACT AMENDMENT[1]**

**AMENDMENT N° 2 TO AMENDED AND RESTATED LUMP SUM FIXED PRICE TUNNEL COMPLEX CONSTRUCTION CONTRACT**

This Amendment No. 2 to the Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract (this "Amendment") is made and entered into as of _____, 2022, by and between Alto Maipo SpA, a *sociedad por acciones* organized under the laws of the Republic of Chile ("Owner" or "Alto Maipo"), and Strabag SpA, a *sociedad por acciones* organized under the laws of the Republic of Chile ("Contractor").

## RECITALS:

**WHEREAS,** Owner and Contractor entered into that certain Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract, dated as of February 19, 2018 ("Contract");

**WHEREAS,** Contractor is also (i) a shareholder under the Shareholders' Agreement of Alto Maipo SpA among Norgener Renovables SpA, Strabag, and Alto Maipo (as amended and restated from time to time, the "Shareholders' Agreement"); (ii) a lender under certain subordinated loan agreements among Strabag and Alto Maipo; and (iii) a secured creditor with respect to the Supplier Deferred Payment (as defined in the Common Terms Agreement);

**WHEREAS,** Owner and Contractor, among others, entered into that certain Restructuring Support Agreement dated November 16, 2021 (as amended and supplemented, the "RSA");

**WHEREAS,** on November 17, 2021, Owner and its affiliate, Alto Maipo Delaware LLC (together, the "Debtors"), filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered as *In re Alto Maipo Delaware LLC, et al.*, Case No. 21-11507 (KBO) (the "Chapter 11 Cases");

**WHEREAS,** Owner and Contractor enter into this Amendment with the exclusive purpose of modifying the Contract and resolving existing disputes in the context of and subject to a potential plan of reorganization (the "Plan") in the Chapter 11 Cases on the terms agreed with Contractor and other senior lenders pursuant to the RSA; and

**WHEREAS,** subject to Bankruptcy Court approval and the effectiveness of the Plan as set forth herein, Contractor and Owner desire to amend the Contract in accordance with the terms and conditions set forth in this Amendment.

---

[1] THIS DRAFT FORM CONTAINS BRACKETED "[  ]"LANGUAGE THAT IS STILL BEING FINALIZED AND DISCUSSED.

1

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements contained in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Contractor hereby agree, subject to Bankruptcy Court approval and effectiveness of the Plan, as follows:

I.    **Definitions.** All capitalized terms used but not defined in this Amendment shall have the meanings set forth in the Contract (as subsequently amended and restated, including by this Amendment) or in the RSA, as applicable.

II.    **Payment; Change Orders; Transfer Notices; Substantial Completion.**

1.    Contractor has an allowed, secured, perfected $391.5 million "Supplier Deferred Payment" claim that is entitled to, and will receive, *pari passu* treatment with other prepetition first-lien claims pursuant to and subject to confirmation of the Plan, allocated to New 1L Debt and New 2L Debt in the same proportion as the other prepetition first-lien claims, irrespective of whether the condition(s) to payment of the Supplier Deferred Payment under the Contract (or as permitted pursuant to the RSA) have been satisfied as of the Effective Date, *provided, however*, that if such condition(s) to payment have not been satisfied as of the Effective Date, Contractor's Pro Rata Share of the New 1L Debt and New 2L Debt (including all related interest paid thereon) shall be held in escrow pending satisfaction of such condition(s).

2.    The following amounts shall be due to Contractor and shall be paid pursuant to the "Deferrals" section below:

   A.    $761,030 upon acceptance by the Company of completion of signed Change Order 1,

   B.    $326,240 upon acceptance by the Company of completion of signed Change Order 2,

   C.    $53,827 upon acceptance by the Company of completion of signed Change Order 4,

   D.    $10 million upon Substantial Completion of Critical Milestone F, and

   E.    upon receipt, approximately $6,268,021 in insurance proceeds to be paid by Seguros Generales Suramericana, S.A. and Chilena Consolidada S.A. corresponding to insurance claims (No. 118495032, No. 119488886, No. 119448014, No. 119448021) against the Construction All Risks insurance policy (Policy No. 4492152) (or the amount determined to be payable in connection with such claims in connection with such policy) (the "Strabag Insurance Payable").

3.    Deferrals.

   A.    Owner shall pay Contractor the Strabag Change Order Deferral on December 30, 2022. The Strabag Change Order Deferral shall accrue interest at 4% per annum from the date due.

B. Owner shall pay Contractor the Strabag Insurance Deferral on the later of December 30, 2022 or the date that the applicable insurance proceeds are received. The Strabag Insurance Deferral shall accrue interest at 4% per annum from the date the insurance proceeds are received.

C. Owner shall pay Contractor the Strabag Construction Deferral pursuant to the Excess Cash Flow Sweep. The Strabag Construction Deferral shall accrue interest at 4% per annum from the date of Substantial Completion (as defined in the Contract) of Critical Milestone F.

D. The Strabag Deferrals shall share *pari passu* with the New 1L Debt in all collateral. A payment default with respect to a Strabag Deferral shall constitute a payment default with respect to the New 1L Debt.

E. All Strabag Deferrals shall initially be structured as accounts payable evidenced by acknowledgments of debt.

4. All subordinated debt and common equity held and earned by Contractor through Plan Effective Date shall be released and discharged.

5. All future work that is within scope of the Contract or otherwise subject to Section 11.3 of the Contract shall be performed by Contractor without further compensation in cash, shares or otherwise. For the avoidance of doubt, nothing herein shall operate to waive or release any of Contractor's other applicable rights under the Contract, including without limitation its rights to receive insurance proceeds (as provided in the Common Terms Agreement) or seek extensions of time under Section 11.3 of the Tunneling Contract. Subject to receiving approval from the New 1L Lenders and New 2L Lenders holding 1L Loans and 2L Loans, respectively (provided that any New 1L Debt and New 2L Debt held by Contractor will be excluded from voting on such approval), Owner shall issue a Change Order and pay Contractor in cash for all future changes that are outside the scope of the Contract.

6. Owner shall issue a single Change Order for Ecoflow environmental monitoring device at each intake in the aggregate total amount of $112,000.00 and shall pay such amount to Contractor upon Tunnel Complex Substantial Completion.

7. Owner shall deliver the Critical Milestone Work Transfer Notice with respect to Critical Milestone D upon the earliest to occur of (x) May 2, 2022, (y) immediately following confirmation from the Senior Lenders' insurance consultant that the Owner will be in compliance with all insurance requirements under the Common Terms Agreement after giving effect to the Critical Milestone Work Transfer Notice, and (z) the Critical Milestone Substantial Completion Date for Critical Milestone D.

8. If Substantial Completion of Critical Milestone E or Critical Milestone F has not yet occurred, Owner shall issue the Critical Milestone Work Transfer Notices for each such Critical Milestone as follows:

A. Owner shall issue the Critical Milestone Work Transfer Notice for Critical Milestone E after both (i) COD (which, for the avoidance of doubt, has already been achieved as of the date hereof) and (ii) the ventilation system of the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II

powerhouse, and the Alfalfal II transformer cavern is operational in accordance with the specifications in the Contract used to design and construct the ventilation system so that the air quality inside the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II powerhouse, and the Alfalfal II transformer cavern meets the technical requirements for which the ventilation system is specified and that the ventilation system can be operated reliably, continuously, and safely for its intended purpose of providing for ventilation to the Alfalfal II powerhouse, the access tunnels to the upper and lower Alfalfal II powerhouse, and the Alfalfal II transformer cavern.

B. Owner shall issue the Critical Milestone Work Transfer Notice for Critical Milestone F on May 2, 2022; provided that if the Works for Critical Milestone F have not been completed at that date, the Basic Warranty Period for Critical Milestone F Works will not start on the delivery of the Critical Milestone Work Transfer Notice but will instead start when the Contractor has completed all of the work related to Critical Milestone F, and all portions of such Critical Milestone Work can be legally and safely operated or utilized for their intended purposes, including emergency operations.

9. Section 7.5 of the Contract shall apply to all Work described in Annex A attached hereto for any Critical Milestone where a Critical Milestone Work Transfer Notice is delivered prior to the Critical Milestone Substantial Completion Date for such Critical Milestone.

10. Section 15.3.2 of the Contract shall be amended as follows:

A. On the date of delivery of the Critical Milestone Work Transfer Notice for Critical Milestone D (assuming that Substantial Completion of Critical Milestone D has not yet occurred), the Performance Security will be reduced by the amount of forty five million Dollars (US$45,000,000). At Substantial Completion of Critical Milestone D (assuming that the Critical Milestone Work Transfer Notice for Critical Milestone D has been delivered), the Performance Security will be further reduced by the amount of twenty-five million Dollars (US$25,000,000), such that the total reduction is seventy million Dollars (US$70,000,000).

B. On May 2, 2022, if Substantial Completion of Critical Milestone E has not yet been achieved, the Performance Security will be reduced by the amount of twenty five million Dollars (US$25,000,000). At Substantial Completion of Critical Milestone E (assuming that the Critical Milestone Work Transfer Notice for Critical Milestone E has been delivered), the Performance Security will be further reduced by the amount of twenty-five million Dollars (US$25,000,000), such that the total reduction is fifty million Dollars (US$50,000,000).

C. On May 2, 2022, if Substantial Completion of Critical Milestone F has not yet been achieved, the Performance Security will be reduced by the amount of forty million Dollars (US$40,000,000). At Substantial Completion of Critical Milestone F (assuming that the Critical Milestone Work Transfer Notice for Critical Milestone F has been delivered), the Performance Security will be further reduced by the amount of forty million Dollars (US$40,000,000), such that the total reduction is eighty million Dollars (US$80,000,000).

11. Contractor will perform all works associated with the Manzano Intake (included in Annex A), including the construction of the Intake in accordance with the designs provided by Contractor that have been submitted to the environmental authority. Contractor will perform such works as soon as practicable after the issuance of the relevant permit from the environmental authority. If the permit is issued prior to December 31, 2022, Contractor will perform such works at no additional cost; if the permit is issued after December 31, 2022, Contractor will perform such works and Contractor and Owner will negotiate in good faith the payment of additional costs (such as re-mobilization and price inflation), if any. Such works will not affect the Critical Milestone Dates.

12. Provided that Contractor is granted access prior to December 31, 2023, Contractor will perform all works associated with the Maurino Intake, including the design of the Intake to be in compliance with Applicable Laws. Such works will not affect the Critical Milestone Dates.

13. Contractor and Owner shall continue to negotiate in good faith concerning the impact, if any, on the matters set forth in the two foregoing items if Owner is unable to obtain permit(s) that would enable Contractor to complete the works described by December 31, 2023.

14. For the avoidance of doubt, the completion of the works associated with the Manzano Intake and Maurino Intake shall not be a required condition for Substantial Completion of the Project or any aspect thereof.

15. Any not yet issued Substantial Completion Certificate shall be deemed to have been issued on March 31, 2023 (the "Long Stop Date"); *provided that* Contractor completes all Critical Pending Work (defined below), subject to Punch List items, by August 31, 2022; and *provided further* that if Contractor does not complete all Critical Pending Work (defined below), subject to Punch List items, by August 31, 2022, then the Long Stop Date shall be March 31, 2024[, *provided that* Contractor completes all Critical Pending Work (defined below) by August 31, 2023]. Any defects discovered through Acceptance Tests conducted after the Long Stop Date shall not entitle Owner to Late Critical Milestone Payments, but rather shall be subject to the warranty/latent defect provisions of the Contract.

16. "Critical Pending Work" as used herein means works in connection with the following:

     A. La Engorda Intake
     B. Colina Intake
     C. Las Placas Intake
     D. Morado Intake
     E. Desander Volcan
     F. Yeso Intake
     G. VA1 Ventilation System
     H. Maitenes Intake
     I. Maitenes Desander
     J. Maitenes Channel
     K. Forebay Bottom Outlet
     L. Delivery Works to Forebay
     M. Alfalfal I Discharge Modification

N.  Aucayes Intake
O.  L1 Discharge

17. Contractor shall be excused from any delay in achieving a Guaranteed Critical Milestone Date due to the unavailability of water necessary to perform Owner's testing or any other Acceptance Test, but such excused delay shall be without additional compensation to either Contractor or Owner. For the avoidance of doubt, this does not in any way diminish or reduce Contractor's rights under footnote (***) to table 1 of Appendix A.

18. Contractor shall be entitled to a Day for Day extension of the Guaranteed Critical Milestone Dates for any delays caused by Owner (including due to any non-performance by Owner of the Owner obligations under Article 3) and for any delays attributable to the events identified in Section 11.3.1.

19. Nothing in the RSA, Plan or any ancillary agreement thereto shall release or waive any right or defense that any Party may have with respect to its alleged liability for, or entitlement to, Late Critical Milestone Payments, including without limitation any defense arising out of, or that may be asserted based upon, section 7.3.3.

20. If Substantial Completion for any of Critical Milestones D, E and F has not occurred, by March 31, 2023 only as a result of Acceptance Tests for such Critical Milestone not having been completed,[ ~~and *provided that* Contractor completed all Critical Pending Work (defined above) by August 31, 2022,~~ ]then on March 31, 2023,

A.  all remaining Performance Security will be reduced pursuant to Section 15.3.2 as though Substantial Completion had occurred,

B.  the Punch List/Warranty Security required to be delivered pursuant to Section 15.7 upon Substantial Completion will be delivered,

C.  Contractor will remain obligated to successfully complete the Acceptance Tests and achieve Substantial Completion for the applicable Critical Milestones in accordance with the Contract, and

21. the Punch List/Warranty Security will thereafter be available for any claims relating to Acceptance Tests and achieving Substantial Completion for such Critical Milestones. The Parties shall work together in good faith to agree on the details and procedures relating to the Acceptance Tests.

22. Contractor is entitled to issue its invoice for the Supplier Deferred Payment on the date that each of the following conditions have been met: (a) ten (10) days have elapsed after the date that the order confirming the Plan is entered by the Bankruptcy Court; and (2) Owner has issued the Critical Milestone Work Transfer Notice for each of Critical Milestones D, E, and F; *provided, however,* that Owner may waive the requirement that the ventilation system of Critical Milestone E be completed for purposes of issuing the Critical Milestone Work Transfer Notice for such Critical Milestone.

23. Contractor is entitled to issue its invoice for the Supplier Deferred Payment, not earlier than ten days after Borrower's emergence from bankruptcy and upon the completion

6

of both of the following conditions: (a) Commercial Operation Date of all units (which, for the avoidance of doubt, has occurred as of the date hereof), *and* (b) the earlier of the Critical Milestone Substantial Completion Date or the date of delivery of the Critical Milestone Work Transfer Notice for at least two of the following Critical Milestones: Critical Milestone D, Critical Milestone E, and Critical Milestone F.

24.  [Appendix K to the Contract shall be amended and modified to reflect the following: With regard to Construction/Erection All Risk Insurance addressed in Paragraph 1.2 and General Liability Insurance addressed in Paragraph 1.4 of Appendix K, such insurance coverage shall be provided by Owner until and through May 2, 2022. The Additional Coverage for "Extended maintenance" over Contractor's remaining work, including the Punch List items and other remaining scope items (addressed in Annex A) which includes the "Critical Pending Work," shall be in effect from May 2, 2022 until the earlier (i) twenty-four (24) months extended maintenance period, and (ii) the end of the Warranty Period. ]

III.    **Payment for Power.** Contractor shall continue to be obligated to pay Owner in cash pursuant to Section 2.13.2 for power purchased by Contractor, including without limitation any amounts accrued but unpaid prior to the Petition Date.

IV.    **Release.** Subject to and except for the rights and obligations set forth in the RSA (as amended, restated, or supplemented), and notwithstanding anything to the contrary in the Plan, Contractor and Owner, on behalf of themselves and their successors, assigns, parents, subsidiaries, divisions, affiliates, agents, directors, officers, employees, insurers, shareholders and attorneys, fully and finally waive, discharge and release any and all past and current claims, counterclaims, Changes, disputes, demands, causes of action, liabilities, and damages for additional time or compensation of whatever nature, cause of action or theory, which are either known as of April 5, 2022 (the  "Cut-Off Date"), or should have been known as of the Cut-Off Date in the exercise of reasonable diligence by the respective releasing Party (recognizing the relative expertise, position, and engineering sophistication of each respective Party); including without limitation construction claims, including credits and back-charges, descope claims, omitted-scope claims, Change Order claims, future bonuses, breach of contract, liquidated damages, tort or otherwise, arising out of or relating to the Contract or Project that Contractor and Owner may have against one another, their successors, assigns, parents, subsidiaries, divisions, affiliates, agents, directors, officers, employees, insurers, shareholders and attorneys through the Cut-Off Date, *provided, however*, that any claims by Owner or Contractor, as applicable, arising from:

(a)  a Warranty;

(b)  a latent defect (in accordance with Section 10.4.3);

(c)  any defect (i) discovered by Owner during the completion of Acceptance Tests conducted after the Cut-Off Date, or (ii) identified after full-load tests have been completed, *provided that* Contractor's liability under clause (ii) above for any defect resulting from any failure by Contractor to comply with its obligations under Sections 2.3.1.1, 2.3.1.3, and 2.3.1.4 as they relate to the Hydraulic Design, if any, combined with any Late Critical Milestone Payments shall be limited to a maximum of seventy  million Dollars (US$70,000,000);

(d) [intentionally omitted];

(e) any fines or penalties imposed by a government environmental authority after the Cut-Off Date that have been proximately caused by such released Party's activities in connection with the Project; and

(f) the Punch List items and all other items listed in Annex A (except for those items in Annex A that are labelled as "Waived Items" or "Additional Scope", which items are released or otherwise addressed on the terms described in Annex A);

are not released and are expressly preserved; and ***provided further***, that all of the rights and defenses of each Party with respect to any claims asserted by the other Party pursuant to subsections (a)-(f) above are expressly preserved.

For the avoidance of doubt, nothing herein shall release, waive, or modify any Party's right to recover any insurance proceeds, seek or oppose relief from any Late Critical Milestone Payments, require completion of the Acceptance Tests (to the extent those Acceptance Tests have not been completed prior to the Cut-Off Date), or pursue or oppose any other claims related to Contractor's entitlement to a Substantial Completion Certificate for any Critical or Contract Milestone, or any other non-monetary claims, in each case to the extent provided in, and pursuant to the terms of, the Contract; ***provided, however*** that neither Party may assert entitlement to specific performance for claims that are otherwise released.

The Parties acknowledge and agree that Annex A contains all Punch List items and other remaining scope items that are known as of the Cut-Off Date or should have been known as of the Cut-Off Date in the exercise of reasonable diligence by the Parties (recognizing the relative expertise, position, and engineering sophistication of each respective Party).

V.    **Future Changes.** Any future Changes initiated by Owner must be approved by the New 1L Lenders and New 2L Lenders (as defined in the RSA) (provided that any New 1L Debt and New 2L Debt held by Contractor shall be excluded from voting on such approval). All future alleged Changes claimed by Contractor or Owner that are within the scope of the Contract, or that the Contract requires to be payable in shares and/or subordinated loans, shall be performed by Contractor without further compensation in cash, shares, or otherwise.[For the avoidance of doubt, nothing in this section V shall operate to waive or release any of Contractor's other applicable rights under the Contract, including without limitation its rights to receive insurance proceeds (as provided in the Common Terms Agreement) or seek extensions of time under Section 11.3 of the Contract.] Subject to receiving approval from the New 1L Lenders and New 2L Lenders as specified above, Owner shall issue a Change Order and pay Contractor in cash for all future Changes that are outside the scope of the Contract.

VI.   **Fast Track Dispute Resolution Procedures.**  Sections 2.29, 11.2.1, 11.6, 18.1, and 18.11 of the Contract are hereby amended as follows:

2.29 <u>Owner's Instructions</u>. Contractor shall comply with and strictly adhere to Owner's instructions and directions given solely by Owner's Authorized Representative, except to the extent (a) prevented by any Applicable Law, or (b) Contractor reasonably believes that compliance with such instructions or directions would cause safety hazards to any Person

or the environment.  Contractor shall take instructions and directions only from Owner in writing (except to the extent that such instruction is given under the circumstances discussed under Sections 2.17.7 and 4.4.1, in which case Contractor shall follow Owner's verbal instruction which shall be confirmed in writing within a reasonable time) as to the performance of the Work.

2.29.1 <u>Owner's Instructions or Other Work That May Constitute a Change; Dispute Resolution Procedures</u>.

2.29.1.1  If (a) Contractor believes that any work (including, without limitation, any work requested or directed to be performed in connection with a Punch List or in response to a Notice of Critical Milestone Substantial Completion or Notice of Tunnel Complex Substantial Completion) constitutes a Change, (b) Owner withholds any payment, back-charge, certificates, notices, or similar documents from Contractor in connection with a dispute over whether Contractor has executed Contractor's original work scope or Punch List work scope, (c) any other dispute concerning a modification to or interpretation of Contractor's work scope arises, or (d) any dispute arises over the value of any work included on a Punch List or Draft Punch List (any of (a)-(d) a "<u>Section 2.29 Dispute</u>"), Contractor shall, as soon as practicable, and in any case within fifteen (15) Days of the date the Section 2.29 Dispute arose, issue to Owner a notice (a "<u>Section 2.29 Notice</u>") specifying the applicable Section 2.29 Dispute and stating (i) the anticipated impact that the Section 2.29 Dispute is likely to have, if any, on the Contract Price and the timely achievement of any Guaranteed Critical Milestone Dates; and (ii) including sufficient background information on the nature of the Section 2.29 Dispute to permit the Owner to make an assessment of the situation in advance of the Section 2.29 Meeting (defined below herein). If Contractor fails to deliver to Owner a Section 2.29 Notice within fifteen (15) Days of the date the Section 2.29 Dispute arose, Contractor will be deemed to have waived any right to receive an adjustment to the Contract Price, Punch List, or Guaranteed Critical Milestone Dates.  For the avoidance of doubt, pending resolution of any Section 2.29 Dispute, Contractor and Owner shall retain full recourse to all rights and remedies otherwise available under the Contract.

2.29.1.2  No later than fifteen (15) Days after Contractor submits a Section 2.29 Notice, the Parties shall meet and discuss (a "<u>Section 2.29 Meeting</u>") the applicable Section 2.29 Dispute in a good faith effort to resolve any disagreements concerning Contractor's entitlement to, and the extent of, an adjustment to the Contract Price, Punch List, or Guaranteed Critical Milestone Dates, or any other relief, as appropriate.

2.29.1.3  If (i) the Parties fail to convene a Section 2.29 Meeting within fifteen (15) Days of Contractor's Section 2.29 Notice or (ii) if the Parties have not reached a mutually acceptable agreement within ten (10) Days of the Section 2.29 Meeting, then the Section 2.29 Dispute shall be submitted (the "<u>Submission</u>" and the date of the Submission, the "<u>Submission Date</u>") to Michael C. Loulakis of Capital Project Strategies, LLC (the "<u>Independent Adjudicator</u>") for determination (a "<u>Determination</u>"); *provided, however*, that if Michael C. Loulakis is or becomes unwilling or unable to serve as Independent Adjudicator, the Parties shall work together in good faith to select an alternative Independent Adjudicator with similar engineering and legal qualifications.  If the Parties are unable to select and agree upon an available Independent Adjudicator within forty-five

(45) days of determining the unavailability of Mr. Loulakis, the Parties shall request that an Independent Adjudicator be appointed by the ICC. The Independent Adjudicator shall have the sole and exclusive authority to determine whether a submitted dispute constitutes a Section 2.29 Dispute subject to his adjudication; provided that if the Independent Adjudicator determines that a Submission is not a Section 2.29 Dispute, either Party may submit the dispute to resolution pursuant to Section 18.1. The Independent Adjudicator shall have complete authority to conduct the proceedings in the manner he deems necessary to fulfill his function as the Independent Adjudicator and shall issue a Determination following review of the Parties' written submissions (the "Party Submissions") (which Party Submissions shall not be required to be submitted fewer than twenty (20) days after the Submission Date) and any hearing as the Independent Adjudicator may deem necessary. The Independent Adjudicator shall have the authority to make any inquiries he or she believes are reasonably necessary to render his or her Determination. The Independent Adjudicator shall not be permitted to rule *ex aequo et bono*. The Independent Adjudicator shall issue his or her Determination as soon as practicable, but in no event later than thirty (30) Days after the date of the Party Submissions. The Parties agree that a Determination of the Independent Adjudicator shall be binding on the Parties, subject to Section 2.29.1.5. The Party deemed to be the non-prevailing Party, if any, by the Independent Adjudicator's Determination shall bear all costs and expenses of the Independent Adjudicator, as well as 100% of the reasonable costs and expenses borne by the Party deemed to be the prevailing Party, if any, by the Independent Adjudicator's Determination.  For the avoidance of doubt, the Independent Adjudicator shall not consider, and shall not issue a Determination with respect to, any dispute between the Parties relating to any draw on a letter of credit posted by the Contractor in favor of the Owner; any such dispute shall be adjudicated pursuant to the provisions of Section 18.1 of this Contract.

2.29.1.4  The terms of this Contract permitting the referral to, and resolution of, Section 2.29 Disputes by the Independent Adjudicator are exclusive and self-executing, and it is unnecessary for either Party to petition a court to compel the Parties to refer a Section 2.29 Dispute to the Independent Adjudicator to initiate a Determination proceeding. The Independent Adjudicator shall have the sole and exclusive authority to determine whether a submitted dispute constitutes a Section 2.29 Dispute subject to his or her adjudication.

2.29.1.5  Contractor shall be obligated to perform any work that is subject to a Section 2.29 Dispute pending a Determination by the Independent Adjudicator. Within one hundred twenty (120) Days of the issuance of any Determination by the Independent Adjudicator, either Owner or Contractor may challenge the Determination in whole or in part, with such dispute to be resolved *de novo and without regard to the Determination* in accordance with Section 18.1 of this Contract; provided that pending an order of the ICC, Contractor and Owner shall proceed in accordance with the Determination; and further provided that, in the event that any Work previously subject to a Section 2.29 Dispute or Determination is first required to be later tested or used more than one hundred twenty (120) Days from the Issuance Date, the one period of one hundred twenty (120) Days will be counted instead from the earliest date Owner reasonably was able to evaluate the sufficiency of the technical solution implemented by the Contractor.  Furthermore, in the event the Determination is issued in favor of the Contractor, Contractor's obligation to

10

perform the work shall not be terminated, but shall entitle the Contractor to a Change Order entitling Contractor to payment as provided for in the Construction Contract.

2.29.1.6  If the Independent Adjudicator issues a Determination that Contractor has achieved Critical Milestone Substantial Completion or Tunnel Complex Substantial Completion, such Determination shall constitute and be deemed to be a Critical Milestone Substantial Completion Certificate or Tunnel Complex Substantial Completion Certificate, as applicable, provided, however, that Owner may submit such Determination to be resolved *de novo* and without regard to the Determination pursuant to Section 18.1 of this Contract.

11.2.1 <u>Changes Initiated by Contractor</u>.

11.2.1.1  As soon as Contractor becomes aware, and in any event within fifteen (15) Days, of any circumstance that Contractor has reason to believe may constitute a Change, Contractor shall issue to Owner a "Change Order Notice". Each Change Order Notice shall include documentation sufficient to enable Owner to determine:

(a)  the conditions creating the possibility of a Change;

(b)  the impact that the Change is likely to have on the Contract Price, if any;

(c)  the impact that the Change is likely to have on the timely achievement of the Project Schedule, if any;

(d)  the actions that Contractor is taking and/or planning to take to mitigate the cause of the Change and impact to the Project Schedule and the Contract Price for the events described in Section 11.3; and

(e)  any other information that Owner may request in connection with such Change.

11.2.1.2  As soon as reasonably practicable, and in any event within forty-five (45) Days, after the date Contractor becomes aware of any circumstance that Contractor has reason to believe may constitute a Change, Contractor shall deliver to Owner an updated Change Order Notice with respect to such circumstance.

11.2.1.3  If Contractor fails to deliver to Owner (a) a Change Order Notice within fifteen (15) Days after Contractor knew or should have known about the applicable circumstance or (b) an updated Change Order Notice in accordance with Section 11.2.1.2, then, in either case, notwithstanding anything in this Article 11 to the contrary, Contractor will be deemed to have waived any right to receive a Change Order based upon such circumstance.

11.2.1.4  No later than fifteen (15) Days after Contractor submits an updated Change Order Notice in accordance with Section 11.2.1.2, the Parties shall meet and discuss in good faith such Change Order Notice, including Contractor's initial estimate of the cost of the applicable Change.

11.2.1.5  Owner may, but except as provided in Section 11.3, shall not be obligated to, issue a Change Order pursuant to a timely delivered Change Order Notice.

In the event that Contractor fails to fulfill any of its obligations under Sections 11.2.1.1 or 11.2.1.2, Owner shall have no obligation to issue a Change Order. In the event that Contractor disputes Owner's decision not to issue a Change Order pursuant to a timely delivered Change Order Notice, such dispute shall be resolved in accordance with Section 2.29.1.

11.6    <u>Continued Performance Pending Resolution of Disputes</u>.  Notwithstanding, and pending resolution of, any Dispute with respect to a Change, Contractor must proceed, upon written notice from Owner, with the performance of any Work associated with the disputed Change.

18.1    <u>Generally</u>.  If a dispute arises between the Parties regarding the application, interpretation, enforceability, validity, performance or breach of this Contract or matters arising therefrom or relating thereto, whether sounding in contract, tort, unfair competition, law, equity, or any other legal form (a "<u>Dispute</u>") (but excluding any Section 2.29 Dispute as defined in Section 2.29.1, which shall be subject to Article 18 solely to the extent and in the manner set forth in Section 2.29.1.5), then each Party shall appoint a senior executive officer and each such senior executive officer shall confer or meet in person as soon as reasonably practicable and use commercially reasonable efforts to attempt to resolve such Dispute in good faith within thirty (30) Days.  Notwithstanding the foregoing, either Party may, at any time, require that such Dispute be submitted to, resolved solely by, and be determined exclusively by, final binding arbitration that shall proceed in accordance with the rules and jurisdiction of the International Chamber of Commerce (the "<u>ICC</u>") then in effect.

18.11   <u>Obligations Continue</u>.  Subject to the terms of this Contract, including but not limited to Section 2.29.1.5, notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Contract, unless the Parties otherwise mutually agree in writing

VII.    **Effectiveness and Bankruptcy Court Approval**.  In connection with confirmation of the Plan by the Bankruptcy Court, the Debtors shall seek assumption of the Contract, as revised hereby, pursuant to 11 U.S.C. § 365 and Federal Rule of Bankruptcy Procedure 9019, with such relief granted through the Confirmation Order.  Contractor agrees that so long as the RSA is in force and effect, (i) the only cure costs that are owed in connection with such assumption are those specified in the Plan, (ii) the Owner will have provided adequate assurance of future performance, and (iii) all other conditions to assumption will have been satisfied. This Amendment shall become effective upon the Effective Date of the Plan (as defined therein).

VIII.   **Interpretation**.  For the avoidance of doubt, in the event of any inconsistencies between this document and the Plan, the language of the Plan shall control.

IN WITNESS WHEREOF, the Parties, subject to Bankruptcy Court Approval as set forth herein, have caused this Amendment to be executed by their duly authorized officers as of the date first written above.

**STRABAG SPA**

By: _____

Name: _____

Title: _____


**ALTO MAIPO SPA**

By: _____

Name: _____

Title: _____

**Exhibit P**

**Amendment to the Connection and Toll Agreement**

**MODIFICACIÓN AL CONTRATO DE CONEXIÓN Y PEAJES**

Esta modificación al Contrato de Conexión y Peajes a que se hace referencia más adelante (la "**Modificación**") se celebra el [●] de 2022 por y entre **AES ANDES S.A.** (antes denominada AES Gener S.A.), una sociedad anónima abierta constituida y existente en virtud de las leyes de Chile ("**AES Andes**") y **ALTO MAIPO SpA**, una sociedad por acciones constituida y existente en virtud de las leyes de Chile ("**Alto Maipo**"). Alto Maipo y AES Andes se denominarán, en adelante, individualmente, una "**Parte**" y, conjuntamente, las "**Partes**".

**ARTÍCULO 1**
**ANTECEDENTES**

Mediante instrumento privado de fecha 1 de julio de 2013, las Partes suscribieron un contrato denominado Contrato de Conexión y Peajes (el "**Contrato**").

El Contrato ha sido modificado por las Partes mediante instrumentos privados de fechas 3 de diciembre de 2013, 17 de marzo de 2017 y 8 de abril de 2018.

A esta fecha, el Contrato no ha sido objeto de ninguna otra modificación adicional.

Los términos con mayúscula inicial que no se encuentren definidos en esta Modificación tendrán los significados que a ellos se les asigna en el Contrato.

**ARTÍCULO 2**
**MODIFICACIONES**

En virtud de la presente Modificación y de conformidad con lo dispuesto en la Sección 14.7 del Contrato, las Partes acuerdan incorporar las siguientes modificaciones al Contrato:

(a) Reemplazar todas las referencias al término "AES Gener" por referencia al término "AES Andes".

(b) En el párrafo inicial de los Considerandos del Contrato, reemplazar "*sistema eléctrico interconectado central de Chile (Sistema Interconectado Central o "SIC")*" por "*Sistema Eléctrico Nacional de Chile ("SEN")*".

(c) Agregar las siguientes definiciones en el Artículo 1 del Contrato, en el orden alfabético que corresponda:

"*Cantidades Diferidas*" tiene el significado que se indica en la Sección 4.8(d).

---

**AMENDMENT TO CONNECTION AND TOLL AGREEMENT**

This amendment to the Connection and Toll Agreement referred to below (this "**Amendment**") is entered into as of [●], 2022, by and between **AES ANDES S.A.** (previously denominated AES Gener S.A.), a *sociedad anónima abierta* organized and existing under the laws of Chile ("**AES Andes**") and **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of Chile ("**Alto Maipo**"). AES Andes and Alto Maipo are referred to individually herein as a "**Party**" and collectively as the "**Parties**".

**ARTICLE 1**
**BACKGROUND**

By means of private instrument dated July 1, 2013, the Parties entered into an agreement called the Connection and Tolls Agreement (the "**Agreement**").

The Agreement has been amended by the Parties by private instruments dated December 3, 2013, March 17, 2017, and April 8, 2018.

As of this date, there have been no additional amendments to the Agreement.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them the Agreement.

**ARTICLE 2**
**AMENDMENTS**

By means of this Amendment and pursuant to the provisions set forth in Section 14.7 of the Agreement, the Parties agree to amend the Agreement as follows:

(a) Replace all references to the term "AES Gener" by references to the term "AES Andes".

(b) In the first paragraph of the Considerations of the Contract, replace "*the central electric interconnected system of Chile (Sistema Interconectado Central or "SIC")*" by "*National Electric System of Chile ("SEN")*".

(c) Include the following definitions in Article 1 of the Agreement, in the corresponding alphabetical order:

"*Deferred Amounts*" has the meaning set forth in Section 4.8(d).

*"Capitalización de Deuda Garantizada 2L"* significa el pago en acciones de Alto Maipo que tienen derecho a recibir los acreedores que sean titulares de Deuda Garantizada 2L al día 15 de octubre de 2052, según los términos y condiciones establecidos en el Contrato de Crédito Garantizado 2L y el Contrato de Emisión Garantizado 2L.

*"Condición Precedente"* tiene el significado que se indica en la <u>Sección 4.6</u>.

*"Condición Precedente Especial"* tiene el significado que se indica en la <u>Sección 4.6</u>.

*"Contrato de Crédito Garantizado 2L"* (*"Secured 2L Loan Agreement"*) tiene el significado que se indica en el Contrato de Términos Comunes.

*"Contrato de Crédito Garantizado de Salida"* (*"Secured Exit Loan Agreement"*) tiene el significado que se indica en el Contrato de Términos Comunes.

*"Contrato de Emisión Garantizado 2L"* (*"Secured 2L Indenture"*) tiene el significado que se indica en el Contrato de Términos Comunes.

*"Deuda Garantizada 2L"* (*"Secured 2L Debt"*) tiene el significado que se indica en el Contrato de Términos Comunes.

*"Fecha Relevante"* tiene el significado que se indica en la <u>Sección 4.6</u>.

*"Pago Contingente"* tiene el significado indicado en la <u>Sección 4.6</u>.

(d) En el <u>Artículo 1</u> del Contrato, reemplazar los términos definidos "CDEC-SIC" y "Contrato de Términos Comunes" por los siguientes:

*"CDEC-SIC"*: significa el Coordinador Eléctrico Independiente del sistema Eléctrico Nacional.

*"Contrato de Términos Comunes"* significa el Tercer Contrato de Términos Comunes Modificado y Refundido, fechado el [●] de 2022, celebrado entre Alto Maipo, cada Representante de los Acreedores Garantizados (Secured Creditor Representative) que sea parte de dicho contrato de dicho contrato de tiempo en tiempo y según se define en dicho contrato, e Itaú Corpbanca, actuando como Agente de Acreedores.

(e) En el <u>Artículo 1</u> del Contrato, eliminar las definiciones de "Acreedores Principales", "Pago Diferido", "Período de Interés" y "Tasa Libo".

*"Secured 2L Debt Capitalization"* means the payment in shares of Alto Maipo that lenders holding Secured 2L Debt are entitled to receive as of October 15, 2052, in accordance with the terms and conditions set forth in the Secured 2L Loan Agreement and the Secured 2L Indenture.

*"Condition Precedent"* has the meaning set forth in <u>Section 4.6</u>.

*"Special Condition Precedent"* has the meaning set forth in <u>Section 4.6</u>.

*"Secured 2L Loan Agreement"* has the meaning set forth in the Common Terms Agreement.

*"Secured Exit Loan Agreement"* has the meaning set forth in the Common Terms Agreement.

*"Secured 2L Indenture"* has the meaning set forth in the Common Terms Agreement.

*"Secured 2L Debt"* has the meaning set forth in the Common Terms Agreement.

*"Relevant Date"* has the meaning set forth in <u>Sección 4.6</u>.

*"Contingent Payment"* has the meaning set forth in <u>Section 4.6</u>.

(d) In <u>Article 1</u> of the Agreement, replace the defined terms "CDEC-SIC" and "Common Terms Agreement" by the following:

*"CDEC-SIC"* means the Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.

*"Common Terms Agreement"* means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among Alto Maipo, each Secured Creditor Representative that is a party thereto from time to time and as defined therein, and Itaú Corpbanca, acting as Intercreditor Agent.

(e) In <u>Article 1</u> of the Agreement, remove the defined terms "Senior Lenders", "Deferred Payment", "Interest Period" and "Libo Rate".

(f) En la <u>Sección 4.1</u> reemplazar las letras (b) y (d) por las siguientes:

"*(b) El peaje anual por las Instalaciones No Modificadas (el "**Peaje por Instalaciones No Modificadas**") será un monto igual a la suma de (i) un millón setecientos cuarenta y un mil cuatrocientos veintiocho Dólares (US$1.741.428), que corresponde a la anualidad del valor de inversión y que estará sujeto a lo dispuesto en la Sección 4.6 siguiente; más (ii) trescientos treinta mil ochocientos setenta y dos Dólares (US$330.872) que corresponden a los costos de operación, mantenimiento y administración anuales de las Instalaciones No Modificadas.*"

"*(d) El peaje anual por las Instalaciones Restantes (el "**Peaje por las Instalaciones Restantes**") será un monto igual a la suma de (i) seiscientos catorce mil setecientos ochenta y siete Dólares (US$614.787), que corresponde a la anualidad del valor de inversión y que estará sujeto a lo dispuesto en la Sección 4.6 siguiente; más (ii) ciento dieciséis mil ochocientos once Dólares (US$116.811) que corresponden a los costos de operación, mantenimiento y administración anuales de las Instalaciones Restantes.*"

(g) Reemplazar la <u>Sección 4.6</u> por la siguiente:

"***4.6. Pagos mientras Alto Maipo adeude Deuda Garantizada 2L***. *El derecho de AES Andes a incluir en sus cobros los conceptos y montos establecidos en las Secciones 4.1(b)(i) y 4.1(d)(i) estará sujeto, hasta lo primero que ocurra entre el 15 de octubre de 2052 y la extinción de la Deuda Garantizada 2L, a la condición suspensiva consistente en la extinción de la Deuda Garantizada 2L, incluyendo como consecuencia de una Capitalización de Deuda Garantizada 2L (la "**Condición Suspensiva**"). A contar de lo primero que ocurra entre el 16 de octubre de 2052 y el cumplimiento de la Condición Suspensiva (la "**Fecha Relevante**"), AES Andes tendrá derecho a empezar a cobrar las cantidades establecidas en las Secciones 4.1(b)(i) y 4.1(d)(i) conjuntamente con los demás cantidades que correspondan de acuerdo con la Sección 4.1. Con respecto a los pagos que se habrían devengado de conformidad con lo dispuesto en las Secciones 4.1(b)(i) y 4.1(d)(i) con anterioridad a la Fecha Relevante (el "**Pago Contingente**"), AES Andes solo tendrá derecho recibirlos en caso que la Deuda Garantizada 2L se hubiese extinguido por una causal distinta a la Capitalización de Deuda Garantizada 2L (la "**Condición Suspensiva Especial**"). El Pago Contingente se devengará conjuntamente con el cumplimiento de la Condición Suspensiva Especial y estará sujeto a las siguientes reglas:*

(f) In <u>Section 4.1</u> replace letters (b) and (d) by the following:

"*(b) The annual toll for the Non-modified Facilities (the "**Non-modified Facilities Toll**") shall be an amount equal to the sum of: (i) one million seven hundred and forty-one thousand four hundred and twenty-eight Dollars ($1,741,428), which corresponds to the annuity of the investment value and shall be subject to Section 4.6 below; plus (ii) three hundred and thirty thousand eight hundred and seventy-two Dollars ($330,872), which corresponds to the Non-modified Facilities annual operation, maintenance and administration costs.*"

"*(d) The annual toll for the Remaining Facilities (the "**Remaining Facilities Toll**") shall be an amount equal to the sum of: (i) six hundred and fourteen thousand seven hundred and eighty-seven Dollars ($614,787), which corresponds to the annuity of the investment value and shall be subject to <u>Section 4.6</u> below; plus (ii) one hundred and sixteen thousand eight hundred and eleven Dollars ($116,811), which corresponds to the Remaining Facilities operation, maintenance and administration costs.*"

(g) Replace <u>Section 4.6</u> for the following:

"***4.6. Payments while Alto Maipo owes Secured 2L Debt.*** *The right of AES Andes to collect the items and amounts set forth in <u>Sections 4.1(b)(i)</u> and <u>4.1(d)(i)</u> shall, until the earlier of October 15, 2052, and the release of the Secured 2L Debt, be subject to a condition precedent consisting of the release of the Secured 2L Debt, including as a consequence of a Secured 2L Debt Capitalization (the "**Condition Precedent**"). From the earlier of October 16, 2052, and the satisfaction of the Condition Precedent (the "**Relevant Date**"), AES Andes will be entitled to start collecting the amounts set forth in <u>Sections 4.1(b)(i)</u> and <u>4.1(d)(i)</u> together with any other amounts due pursuant to <u>Section 4.1</u>. With respect to payments that would have accrued pursuant to <u>Sections 4.1(b)(i)</u> and <u>4.1(d)(i)</u> prior to the Relevant Date (the "**Contingent Payment**"), AES Andes shall only be entitled to receive such payments if the Secured 2L Debt has been released for a reason different than a Secured 2L Debt Capitalization (the "**Special Condition Precedent**"). The Contingent Payment will accrue simultaneously with the satisfaction of the Special Condition precedent and will be subject to the following rules:*

(a) *Alto Maipo deberá llevar un registro de las cantidades que se habrían devengado de conformidad con lo dispuesto en las* <u>Secciones 4.1(b)(i)</u> y <u>4.1(d)(i)</u>, *hasta lo primero que ocurra entre el cumplimiento de la Condición Suspensiva Especial o la Fecha Relevante. Para efectos de calcular el Pago Contingente, tales cantidades se incrementarán, a contar del día [●] de 2022, en un monto igual al que correspondería si éstas devengasen intereses, de acuerdo con las mismas reglas aplicables a la Deuda Garantizada 2L, incluyendo como consecuencia aplicar Intereses Adicionales ("Additional Interest", según dicho término se define en el Contrato de Crédito Garantizado 2L y en el Contrato de Emisión Garantizado 2L). Tales intereses se capitalizarán siguiendo las mismas reglas aplicables a la capitalización de intereses de la Deuda Garantizada 2L. Todos estos montos formarán parte del Pago Contingente.*

(b) *Alto Maipo deberá, a contar del día [●] de 2022 y hasta lo primero que ocurra entre el cumplimiento de la Condición Suspensiva Especial o la Fecha Relevante, informar semestralmente a AES Andes acerca del monto al cual ascendería el Pago Contingente si se hubiese cumplido la Condición Suspensiva Especial.*

(c) *Si se cumple la Condición Suspensiva Especial, generando el devengamiento del Pago Contingente, AES Andes deberá facturar el Pago Contingente durante el mes siguiente al de su devengamiento y Alto Maipo deberá pagarlo de conformidad con lo dispuesto en la* <u>Sección 4.8</u>.

(h) Insertar la siguiente <u>letra d)</u> nueva al final de la <u>Sección 4.7</u>:

(d) *No obstante cualquier otra disposición del presente Contrato, las Partes acuerdan que los montos que sean facturados y fueren pagaderos en cualquier momento a contar del día [●] de 2022 y hasta el día [●] de 2023 (las "**Cantidades Diferidas**"), deberán pagarse conforme con los términos y condiciones del Contrato de Crédito Garantizado de Salida. Por lo tanto, las Cantidades Diferidas:*

(i) *Tendrán garantías de primer grado y gozarán de la máxima prioridad posible para efectos de su pago, de acuerdo con los términos de los Documentos de Financiamiento.*

(ii) *Producirán intereses a contar del trigésimo primer día contado desde la fecha en que hayan sido*

(a) *Alto Maipo shall register any amounts that would have been accrued pursuant to* <u>Sections 4.1(b)(i) and 4.1(d)(i)</u>, *until the earlier of the satisfaction of the Special Condition Precedent or the Relevant Date. For purposes of calculating the Contingent Payment, such amounts shall be increased, from [●], 2022, as if they had accrued interests according to the same rules applicable to the Secured 2L Debt, including as a consequence of applying Additional Interest (as such term is defined in the Secured 2L Loan Agreement and the Secured 2L Indenture). Such interests shall be capitalized according to the same rules applicable to the Secured 2L Debt. All such amounts shall be part of the Contingent Payment.*

(b) *Alto Maipo shall, from [●], 2022, until the earlier of the satisfaction of the Special Condition Precedent or the Relevant Date, inform AES Andes semi-annually about the amount to which the Contingent Payment would amount if the Special Condition Precedent had been satisfied.*

(c) *If the Special Condition Precedent is satisfied, causing the accrual of the Contingent Payment, AES Andes shall invoice the Contingent Payment during the month following its accrual and Alto Maipo shall pay it in accordance with* <u>Section 4.8</u>.

(h) Insert the following new <u>letter d)</u> at the end of <u>Section 4.7</u>:

(d) *Notwithstanding any other provision under this Agreement, the Parties agree that amounts invoiced hereunder that would have been payable anytime between [●], 2022 until [●], 2023 (the "**Deferred Amounts**"), shall be paid in accordance with the terms and conditions of the Secured Exit Loan Agreement. Accordingly, the Deferred Amounts:*

(i) *Shall benefit from a first ranking lien and be super-senior for its payment, according to the terms set forth in the Financing Documents.*

(ii) *Shall accrue interest from the thirty first day following its invoicing, using a fix annual rate of*

*facturadas, utilizando una tasa anual fija de un 4% (considerando meses de 30 días y años de 360 días).*

*4% (considering months of 30 days and years of 360 days).*

(iii) *Los intereses que devenguen las Cantidades Diferidas deberán pagarse trimestralmente a contar del 15 de julio de 2022, en el entendido, sin embargo, que los intereses pagaderos los días 15 de julio de 2022, 15 de octubre de 2022 y 15 de enero de 2023 deberán capitalizarse e incorporarse a las Cantidades Diferidas en cada fecha de pago. Por lo tanto, el primer pago en dinero de intereses devengados a partir de las Cantidades Diferidas deberá realizarse el 15 de abril de 2023.*

(iii) *Interests accrued in respect of the Deferred Amounts shall be paid quarterly starting from July 15, 2022, provided, however, that interests payable on July 15, 2022, October 15, 2022 and January 15, 2023, shall be paid-in-kind and be capitalized into the Deferred Amounts on each payment date. Accordingly, the first interest payment in cash in respect of the Deferred Amounts shall be made on April 15, 2023.*

(iv) *Las Cantidades Diferidas se pagarán en cuotas trimestrales iguales a contar del día 15 de julio de 2023, siendo su fecha final de vencimiento el día [●] de 2025, encontrándose sujetas, en todo caso, a los pagos anticipados obligatorios establecidos en el Contrato de Crédito Garantizado de Salida, incluyendo como consecuencia de la obtención de Ingresos por Laudo CNM ("CNM Arbitral Proceeds", según dicho término se define en el Contrato de Términos Comunes) o aceleración por parte de AES Andes tras la ocurrencia de una Causal de Incumplimiento ("Event of Default", según dicho término se define en el Contrato de Crédito Garantizado de Salida).*

(iv) *The Deferred Amounts shall be paid quarterly in equal installments, commencing on July 15, 2023, with a final maturity date on [●], 2025, being subject, in any case, to the mandatory prepayments set forth in the Secured Exit Loan Agreement, including as a result of obtaining CNM Arbitral Award Proceeds (as such term is defined in the Common Terms Agreement) or acceleration by AES Andes following the occurrence of an Event of Default (as such term is defined in the Secured Exit Loan Agreement).*

*Las Partes acuerdan, adicionalmente, que cualquier modificación en los términos del Contrato de Crédito Garantizado de Salida que pueda ser acordada entre ellas con posterioridad al día [●] de 2022, modificará automáticamente los términos en los cuales se pagarán las Cantidades Diferidas, para lo cual se entenderá que se ha dado cumplimiento a todas las formalidades para modificar el presente Contrato; a no ser que las Partes específicamente dispongan que las Cantidades Diferidas deban tener un tratamiento distinto, en cuyo caso las Partes deberán suscribir una modificación adicional al presente Contrato, si fuere el caso.*

*The Parties further agree that any amendment to the terms of the Secured Exit Loan Agreement that may be agreed between them following [●], 2022, shall automatically amend the payment terms and of the Deferred Amounts, it being understood that all formalities hereunder for such an amendment have been complied with; unless the Parties specifically provide that the Deferred Amounts shall receive a different treatment, in which case the Parties shall enter into an additional amendment to this Agreement, to the extent applicable.*

<div align="center">

**ARTÍCULO 3**
**ALCANCES DE LA MODIFICACIÓN**

</div>

<div align="center">

**ARTICLE 3**
**SCOPE OF THE AMENDMENT**

</div>

Esta Modificación surtirá sus efectos a contar de esta fecha.

This Amendment shall become effective from the date hereof.

Salvo por lo expresamente previsto en esta Modificación, el Contrato se mantiene plenamente vigente, según los términos a la Fecha de Vigencia.

Except as otherwise expressly provided herein, the Agreement shall continue in full force and effect in accordance with its terms as of the Effective Date.

EN TESTIMONIO DE LO CUAL, las Partes con la

IN WITNESS WHEREOF, the Parties, intending to be

intención de quedar legalmente obligadas, dispusieron que sus ejecutivos debidamente autorizados al efecto firmaran esta Modificación en la fecha indicada al principio de la misma.

legally bound, have caused this Amendment to be executed by their duly authorized officers as of the date first set forth above.

_____
[●]
p.p. **AES Gener S.A.**

_____
[●]
p.p. **AES Gener S.A.**

_____
[●]
p.p. **Alto Maipo SpA**

**<u>Exhibit Q</u>**

**Amendment to the Energy and Capacity Losses Compensation Agreement**

**MODIFICACIÓN AL CONTRATO DE PAGOS POR PÉRDIDAS DE ENERGÍA Y CAPACIDAD**

Esta modificación al Contrato de Pagos por Pérdidas de Energía y Capacidad a que se hace referencia más adelante (la "**Modificación**") se celebra el [●] de 2022 por y entre **AES ANDES S.A.** (antes denominada AES Gener S.A.), una sociedad anónima abierta constituida y existente en virtud de las leyes de Chile ("**AES Andes**") y **ALTO MAIPO SpA**, una sociedad por acciones constituida y existente en virtud de las leyes de Chile ("**Alto Maipo**"). Alto Maipo y AES Andes se denominarán, en adelante, individualmente, una "**Parte**" y, conjuntamente, las "**Partes**".

**ARTÍCULO 1**
**ANTECEDENTES**

Mediante instrumento privado de fecha 1 de julio de 2013, las Partes suscribieron un contrato denominado Contrato de Pagos por Pérdidas de Energía y Capacidad (el "**Contrato**").

El Contrato ha sido modificado por las Partes dos veces mediante instrumentos privados de fecha 17 de marzo de 2017 y 8 de abril de 2018.

A esta fecha, el Contrato no ha sido objeto de ninguna otra modificación adicional.

Los términos con mayúscula inicial que no se encuentren definidos en esta Modificación tendrán los significados que a ellos se les asigna en el Contrato.

**ARTÍCULO 2**
**MODIFICACIONES**

En virtud de la presente Modificación y de conformidad con lo dispuesto en la Sección 12.7 del Contrato, las Partes acuerdan incorporar las siguientes modificaciones al Contrato:

(a) Reemplazar todas las referencias al término "AES Gener" por referencia al término "AES Andes".

(b) En el párrafo inicial de los Considerandos del Contrato, reemplazar "*sistema eléctrico interconectado central de Chile (Sistema Interconectado Central o "SIC")*" por "*Sistema Eléctrico Nacional de Chile ("SEN")*".

(c) Agregar las siguientes definiciones en el Artículo 1 del Contrato, en el orden alfabético que corresponda:

**AMENDMENT TO ENERGY AND CAPACITY LOSSES COMPENSATION AGREEMENT**

This amendment to the Energy and Capacity Losses Compensation Agreement referred to below (this "**Amendment**") is entered into as of [●], 2022, by and between **AES ANDES S.A.** (previously denominated AES Gener S.A.), a *sociedad anónima abierta* organized and existing under the laws of Chile ("**AES Andes**") and **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of Chile ("**Alto Maipo**"). AES Andes and Alto Maipo are referred to individually herein as a "**Party**" and collectively as the "**Parties**".

**ARTICLE 1**
**BACKGROUND**

By means of private instrument dated July 1, 2013, the Parties entered into an agreement called Energy and Capacity Losses Compensation Agreement (the "**Agreement**").

The Agreement has been amended by the Parties twice by private instruments dated March 17, 2017, and April 8, 2018.

As of this date, there have been no additional amendment to the Agreement.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them the Agreement.

**ARTICLE 2**
**AMENDMENTS**

By means of this Amendment and pursuant to the provisions set forth in Section 12.7 of the Agreement, the Parties agree to amend the Agreement as follows:

(a) Replace all references to the term "AES Gener" by references to the term "AES Andes".

(b) In the first paragraph of the Considerations of the Contract, replace "*the central electric interconnected system of Chile (Sistema Interconectado Central or "SIC")*" by "*National Electric System of Chile ("SEN")*".

(c) Include the following definitions in Article 1 of the Agreement, in the corresponding alphabetical order:

1

*"**Capitalización de Deuda Garantizada 2L**" significa el pago en acciones de Alto Maipo que tienen derecho a recibir los acreedores que sean titulares de Deuda Garantizada 2L al día 15 de octubre de 2052, según los términos y condiciones establecidos en el Contrato de Crédito Garantizado 2L y el Contrato de Emisión Garantizado 2L.*

*"**Condición Precedente**" tiene el significado que se indica en la <u>Sección 4.1.5</u>*

*"**Condición Precedente Especial**" tiene el significado que se indica en la <u>Sección 4.1.5.</u>*

*"**Contrato de Crédito Garantizado 2L**" ("Secured 2L Loan Agreement") tiene el significado que se indica en el Contrato de Términos Comunes.*

*"**Contrato de Emisión Garantizado 2L**" ("Secured 2L Identure") tiene el significado que se indica en el Contrato de Términos Comunes.*

*"**Deuda Garantizada 2L**" ("Secured 2L Debt") tiene el significado que se indica en el Contrato de Términos Comunes.*

*"**Fecha Relevante**" tiene el significado que se indica en la <u>Sección 4.1.5</u>.*

*"**Pago Contingente**" tiene el significado indicado en la <u>Sección 4.1.5</u>.*

(d) En el <u>Artículo 1</u> del Contrato, reemplazar los términos definidos "**CDEC-SIC**" y "**Contrato de Términos Comunes**" por los siguientes:

*"**CDEC-SIC**" significa el Coordinador Eléctrico Independiente del sistema Eléctrico Nacional.*

*"**Contrato de Términos Comunes**" significa el Tercer Contrato de Términos Comunes Modificado y Refundido, fechado el [●] de 2022, celebrado entre Alto Maipo, cada Representante de los Acreedores Garantizados (Secured Creditor Representative) que sea parte de dicho contrato de tiempo en tiempo y según se define en dicho contrato, e Itaú Corpbanca, actuando como Agente de Acreedores.*

(e) En el <u>Artículo 1</u> del Contrato, eliminar las definiciones de "**Acreedores Principales**", "**Pagos Diferidos**", "**Período de Interés**" and "**Tasa Libo**".

(f) Reemplazar la <u>Sección 4.1.5</u> por la siguiente:

*"**Secured 2L Debt Capitalization**" means the payment in shares of Alto Maipo that lenders holding Secured 2L Debt are entitled to receive as of October 15, 2052, in accordance with the terms and conditions set forth in the Secured 2L Loan Agreement and the Secured 2L Indenture.*

*"**Condition Precedent**" has the meaning set forth in <u>Section 4.1.5.</u>*

*"**Special Condition Precedent**" has the meaning set forth in <u>Section 4.1.5.</u>*

*"**Secured 2L Loan Agreement**" has the meaning set forth in the Common Terms Agreement.*

*"**Secured 2L Indenture**" has the meaning set forth in the Common Terms Agreement.*

*"**Secured 2L Debt**" has the meaning set forth in the Common Terms Agreement.*

*"**Relevant Date**" has the meaning set forth in <u>Section 4.1.5.</u>*

*"**Contingent Payment**" has the meaning set forth in <u>Section 4.1.5.</u>*

(d) In <u>Article 1</u> of the Agreement, replace the defined terms "**CDEC-SIC**" and "**Common Terms Agreement**" by the following:

*"**CDEC-SIC**" means the Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.*

*"**Common Terms Agreement**" means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among Alto Maipo, each Secured Creditor Representative that is a party thereto from time to time and as defined therein, and Itaú Corpbanca, acting as Intercreditor Agent.*

(e) In <u>Article 1</u> of the Agreement, remove the defined terms "**Senior Lenders**", "**Deferred Payments**", "**Interest Period**" and "**Libo Rate**".

(f) Replace <u>Section 4.1.5</u> for the following:

***"4.1.5. Pagos mientras Alto Maipo adeude Deuda Garantizada 2L**. El derecho de AES Andes a realizar cobros según en la <u>Sección 4.1</u> estará sujeto, hasta lo primero que ocurra entre el 15 de octubre de 2052 y la extinción de la Deuda Garantizada 2L, a la condición suspensiva consistente en la extinción de la Deuda Garantizada 2L, incluyendo como consecuencia de una Capitalización de Deuda Garantizada 2L (la "**Condición Suspensiva**"). A contar de lo primero que ocurra entre el 16 de octubre de 2052 y el cumplimiento de la Condición Suspensiva (la "**Fecha Relevante**"), AES Andes tendrá derecho a empezar a cobrar las cantidades establecidas en la <u>Sección 4.1</u>. Con respecto a los pagos que se habrían devengado de conformidad con lo dispuesto en dicha <u>Sección 4.1</u> con anterioridad a la Fecha Relevante (el "**Pago Contingente**"), AES Andes solo tendrá derecho a recibirlos en caso que la Deuda Garantizada 2L se hubiese extinguido por una causal distinta a la Capitalización de Deuda Garantizada 2L (la "**Condición Suspensiva Especial**"). El Pago Contingente se devengará conjuntamente con el cumplimiento de la Condición Suspensiva Especial y estará sujeto a las siguientes reglas:*

(a) *Alto Maipo deberá llevar un registro de las cantidades que se habrían devengado de conformidad con lo dispuesto en la Sección 4.1 , hasta lo primero que ocurra entre el cumplimiento de la Condición Suspensiva Especial o la Fecha Relevante. Para efectos de calcular el Pago Contingente, tales cantidades se incrementarán, a contar del día [●] de 2022, en un monto igual al que correspondería si éstas devengasen intereses, de acuerdo con las mismas reglas aplicables a la Deuda Garantizada 2L, incluyendo como consecuencia aplicar Intereses Adicionales ("Additional Interest", según dicho término se define en el Contrato de Crédito Garantizado 2L y en el Contrato de Emisión Garantizado 2L). Tales intereses se capitalizarán siguiendo las mismas reglas aplicables a la capitalización de intereses de la Deuda Garantizada 2L. Todos estos montos formarán parte del Pago Contingente.*

(b) *Alto Maipo deberá, a contar del día [●] de 2022 y hasta lo primero que ocurra entre el cumplimiento de la Condición Suspensiva Especial o la Fecha Relevante, informar semestralmente a AES Andes acerca del monto al cual ascendería el Pago Contingente si se hubiese cumplido la Condición Suspensiva Especial.*

(c) *Si se cumple la Condición Suspensiva Especial, generando el devengamiento del Pago Contingente, AES Andes deberá facturar el Pago Contingente durante el mes siguiente al de su devengamiento y Alto*

*"**4.1.5. Payments while Alto Maipo owes Secured 2L Debt.** The right of AES Andes to collect under <u>Section 4.1</u> shall, until the earlier of October 15, 2052, and the release of the Secured 2L Debt, be subject to a condition precedent consisting of the release of the Secured 2L Debt, including as a consequence of a Secured 2L Debt Capitalization (the "**Condition Precedent**"). From the earlier of October 16, 2052, and the satisfaction of the Condition Precedent (the "**Relevant Date**"), AES Andes will be entitled to start collecting the amounts set forth in <u>Section 4.1</u>. With respect to payments that would have accrued pursuant to <u>Section 4.1</u> prior to the Relevant Date (the "**Contingent Payment**"), AES Andes shall only be entitled to receive such payments if the Secured 2L Debt has been released for a reason different than a Secured 2L Debts Capitalization (the "**Special Condition Precedent**"). The Contingent Payment will accrue simultaneously with the satisfaction of the Special Condition precedent and will be subject to the following rules:*

(a) *Alto Maipo shall register any amounts that would have been accrued pursuant to <u>Section 4.1</u>, until the earlier of the satisfaction of the Special Condition Precedent or the Relevant Date. For purposes of calculating the Contingent Payment, such amounts shall be increased, from [●], 2022, as if they had accrued interests according to the same rules applicable to the Secured 2L Debt, including as a consequence of applying Additional Interest (as such term is defined in the Secured 2L Loan Agreement and the Secured 2L Indenture). Such interests shall be capitalized according to the same rules applicable to the Secured 2L Debt. All such amounts shall be part of the Contingent Payment.*

(b) *Alto Maipo shall, from [●], 2022, until the earlier of the satisfaction of the Special Condition Precedent or the Relevant Date, inform AES Andes semi-annually about the amount to which the Contingent Payment would amount if the Special Condition Precedent had been satisfied.*

(c) *If the Special Condition Precedent is satisfied, causing the accrual of the Contingent Payment, AES Andes shall invoice the Contingent Payment during the month following its accrual and Alto Maipo shall pay it in accordance with <u>Section 4.2</u>".*

3

*Maipo deberá pagarlo de conformidad con lo dispuesto en la Sección 4.2".*

<table>
<tr><td>

**ARTÍCULO 3**
**ALCANCES DE LA MODIFICACIÓN**

Esta Modificación surtirá sus efectos a contar de esta fecha.

Salvo por lo expresamente previsto en esta Modificación, el Contrato se mantiene plenamente vigente, según los términos a la Fecha de Vigencia.

EN TESTIMONIO DE LO CUAL, las Partes con la intención de quedar legalmente obligadas, dispusieron que sus ejecutivos debidamente autorizados al efecto firmaran esta Modificación en la fecha indicada al principio de la misma.

</td><td>

**ARTICLE 3**
**SCOPE OF THE AMENDMENT**

This Amendment shall become effective from the date hereof.

Except as otherwise expressly provided herein, the Agreement shall continue in full force and effect in accordance with its terms as of the Effective Date.

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be executed by their duly authorized officers as of the date first set forth above.

</td></tr>
</table>

_____
[●]
p.p. **AES Andes S.A.**

_____
[●]
p.p. **AES Andes S.A.**

_____
[●]
p.p. **Alto Maipo SpA**

4

**Exhibit R**

**Amendment to the O&M Agreement**

| | |
|---|---|
| **MODIFICACIÓN AL CONTRATO OPERACIÓN Y MANTENIMIENTO** | **AMENDMENT TO OPERATION AND MAINTENANCE AGREEMENT** |

Esta modificación al Contrato Operación y Mantenimiento a que se hace referencia más adelante (la "**Modificación**") se celebra el [●] de 2022 por y entre **AES ANDES S.A.** (antes denominada AES Gener S.A.), una sociedad anónima abierta constituida y existente en virtud de las leyes de Chile ("**AES Andes**") y **ALTO MAIPO SpA**, una sociedad por acciones constituida y existente en virtud de las leyes de Chile ("**Alto Maipo**"). Alto Maipo y AES Andes se denominarán, en adelante, individualmente, una "**Parte**" y, conjuntamente, las "**Partes**".

This amendment to the Operation and Maintenance Agreement referred to below (this "**Amendment**") is entered into as of [●], 2022, by and between **AES ANDES S.A.** (previously denominated AES Gener S.A.), a *sociedad anónima abierta* organized and existing under the laws of Chile ("**AES Andes**") and **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of Chile ("**Alto Maipo**"). AES Andes and Alto Maipo are referred to individually herein as a "**Party**" and collectively as the "**Parties**".

## ARTÍCULO 1
## ANTECEDENTES

## ARTICLE 1
## BACKGROUND

Mediante instrumento privado de fecha 1 de julio de 2013, las Partes suscribieron un contrato denominado Contrato de Contrato de Operación y Mantenimiento (el "**Contrato**").

By means of private instrument dated July 1, 2013, the Parties entered into an agreement called the Operation and Maintenance Agreement (the "**Agreement**").

A esta fecha, el Contrato no ha sido objeto de ninguna modificación.

As of this date, there have been no amendments to the Agreement.

Los términos con mayúscula inicial que no se encuentren definidos en esta Modificación tendrán los significados que a ellos se les asigna en el Contrato.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them the Agreement.

## ARTÍCULO 2
## MODIFICACIONES

## ARTICLE 2
## AMENDMENTS

En virtud de la presente Modificación y de conformidad con lo dispuesto en la <u>Sección 12.7</u> del Contrato, las Partes acuerdan incorporar las siguientes modificaciones al Contrato:

By means of this Amendment and pursuant to the provisions set forth in <u>Section 12.7</u> of the Agreement, the Parties agree to amend the Agreement as follows:

(a) Reemplazar todas las referencias al término "AES Gener" por referencias al término "AES Andes".

(a) Replace all references to the term "AES Gener" by references to the term "AES Andes".

(b) En el párrafo inicial de los Considerandos del Contrato, reemplazar "*sistema eléctrico interconectado central de Chile (Sistema Interconectado Central o "SIC")*" por "*Sistema Eléctrico Nacional de Chile ("SEN")*".

(b) In the first paragraph of the Considerations of the Contract, replace "*the central electric interconnected system of Chile (Sistema Interconectado Central or "SIC")*" by "*National Electric System of Chile ("SEN")*".

(c) Agregar las siguientes nuevas definiciones en el <u>Artículo 1</u> del Contrato, en el orden alfabético que corresponda:

(c) Include the following new definitions in <u>Article 1</u> of the Agreement, in the corresponding alphabetical order:

"***Cantidades Diferidas***" *tiene el significado que se indica en la <u>Sección 6.5 (e)</u>.*

"***Deferred Amounts***" *has the meaning set forth in <u>Section 6.5 (e)</u>.*

"***Contrato de Crédito Garantizado de Salida***" *("Secured Exit Loan Agreement") tiene el significado que se indica en el Contrato de Términos Comunes.*

"***Secured Exit Loan Agreement***" *has the meaning set forth in the Common Terms Agreement.*

*"**Contrato de Términos Comunes**" significa el Tercer Contrato de Términos Comunes Modificado y Refundido, fechado el [●] de 2022, celebrado entre Alto Maipo, cada Representante de los Acreedores Garantizados (Secured Creditor Representative) que sea parte de dicho contrato de tiempo en tiempo y según se define en dicho contrato, e Itaú Corpbanca, actuando como Agente de Acreedores.*

(d) En el Artículo 1 del Contrato, reemplazar el siguiente término definido "**CDEC-SIC**" por el siguiente:

*"**CDEC-SIC**" significa el Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.*

(e) Insertar la siguiente letra e) nueva al final de la Sección 6.5:

*(e) No obstante cualquier otra disposición del presente Contrato, las Partes acuerdan que los montos que sean facturados y fueren pagaderos en cualquier momento a contar del día [●] de 2022 y hasta el día [●] de 2023 (las "Cantidades Diferidas"), deberán pagarse conforme con los términos y condiciones del Contrato de Crédito Garantizado de Salida. Por lo tanto, las Cantidades Diferidas:*

*(i) Tendrán garantías de primer grado y gozarán de la máxima prioridad posible para efectos de su pago, de acuerdo con los términos de los Documentos de Financiamiento.*

*(ii) Producirán intereses a contar del trigésimo primer día contado desde la fecha en que hayan sido facturadas, utilizando una tasa anual fija de un 4% (considerando meses de 30 días y años de 360 días).*

*(iii) Los intereses que devenguen las Cantidades Diferidas deberán pagarse trimestralmente a contar del 15 de julio de 2022, en el entendido, sin embargo, que los intereses pagaderos los días 15 de julio de 2022, 15 de octubre de 2022 y 15 de enero de 2023 deberán capitalizarse e incorporarse a las Cantidades Diferidas en cada fecha de pago. Por lo tanto, el primer pago en dinero de intereses devengados a partir de las Cantidades Diferidas deberá realizarse el 15 de abril de 2023.*

*(iv) Las Cantidades Diferidas se pagarán en cuotas trimestrales iguales a contar del día 15 de julio de 2023, siendo su fecha final de vencimiento el día [●] de 2025, encontrándose sujetas, en todo caso, a los pagos anticipados obligatorios establecidos en el Contrato de Crédito Garantizado de Salida, incluyendo como consecuencia de la obtención de*

*"**Common Terms Agreement**" means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among Alto Maipo, each Secured Creditor Representative that is a party thereto from time to time and as defined therein, and Itaú Corpbanca, acting as Intercreditor Agent.*

(d) In Article 1 of the Agreement, replace the defined term "**CDEC-SIC**" by the following:

*"**CDEC-SIC**" means the Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.*

(e) Insert the following new letter e) to Section 6.5:

*(e) Notwithstanding any other provision under this Agreement, the Parties agree that amounts invoiced hereunder that would have been payable anytime between [●], 2022 until [●], 2023 (the "Deferred Amounts"), shall be paid in accordance with the terms and conditions of the Secured Exit Loan Agreement. Accordingly, the Deferred Amounts:*

*(i) Shall benefit from a first ranking lien and be super-senior for its payment, according to the terms set forth in the Financing Documents.*

*(ii) Shall accrue interest from the thirty first day following its invoicing, using a fix annual rate of 4% (considering months of 30 days and years of 360 days).*

*(iii) Interests accrued in respect of the Deferred Amounts shall be paid quarterly starting from July 15, 2022, provided, however, that interests payable on July 15, 2022, October 15, 2022 and January 15, 2023, shall be paid-in-kind and be capitalized into the Deferred Amounts on each payment date. Accordingly, the first interest payment in cash in respect of the Deferred Amounts shall be made on April 15, 2023.*

*(iv) The Deferred Amounts shall be paid quarterly in equal installments, commencing on July 15, 2023, with a final maturity date on [●], 2025, being subject, in any case, to the mandatory prepayments set forth in the Secured Exit Loan Agreement, including as a result of obtaining CNM Arbitral Award Proceeds (as such term is defined in the Common Terms*

2

*Ingresos por Laudo CNM ("CNM Arbitral Proceeds", según dicho término se define en el Contrato de Términos Comunes) o aceleración por parte de AES Andes tras la ocurrencia de una Causal de Incumplimiento ("Event of Default", según dicho término se define en el Contrato de Crédito Garantizado de Salida).*

*Agreement) or acceleration by AES Andes following the occurrence of an Event of Default (as such term is defined in the Secured Exit Loan Agreement).*

*Las Partes acuerdan, adicionalmente, que cualquier modificación en los términos del Contrato de Crédito Garantizado de Salida que pueda ser acordada entre ellas con posterioridad al día [●] de 2022, modificará automáticamente los términos en los cuales se pagarán las Cantidades Diferidas, para lo cual se entenderá que se ha dado cumplimiento a todas las formalidades para modificar el presente Contrato; a no ser que las Partes específicamente dispongan que las Cantidades Diferidas deban tener un tratamiento distinto, en cuyo caso las Partes deberán suscribir una modificación adicional al presente Contrato, si fuere el caso.*

*The Parties further agree that any amendment to the terms of the Secured Exit Loan Agreement that may be agreed between them following [●], 2022, shall automatically amend the payment terms and of the Deferred Amounts, it being understood that all formalities hereunder for such an amendment have been complied with; unless the Parties specifically provide that the Deferred Amounts shall receive a different treatment, in which case the Parties shall enter into an additional amendment to this Agreement, to the extent applicable.*

### ARTÍCULO 3
### ALCANCES DE LA MODIFICACIÓN

### ARTICLE 3
### SCOPE OF THE AMENDMENT

Esta Modificación surtirá sus efectos a contar de esta fecha.

This Amendment shall become effective from the date hereof.

Salvo por lo expresamente previsto en esta Modificación, el Contrato se mantiene plenamente vigente, según los términos a la Fecha de Vigencia.

Except as otherwise expressly provided herein, the Agreement shall continue in full force and effect in accordance with its terms as of the Effective Date.

EN TESTIMONIO DE LO CUAL, las Partes con la intención de quedar legalmente obligadas, dispusieron que sus ejecutivos debidamente autorizados al efecto firmaran esta Modificación en la fecha indicada al principio de la misma.

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be executed by their duly authorized officers as of the date first set forth above.

_____
[●]
**p.p. AES Andes S.A.**

_____
[●]
**p.p. AES Andes S.A.**

_____
[●]
**p.p. Alto Maipo SpA**

3

**Exhibit S**

**Amendment to the Share Facilities Agreement**

**MODIFICACIÓN AL CONTRATO DE INSTALACIONES COMPARTIDAS**

Esta modificación al Contrato de Instalaciones Compartidas a que se hace referencia más adelante (la "**Modificación**") se celebra el [●] de 2022 por y entre **AES ANDES S.A.** (antes denominada AES Gener S.A.), una sociedad anónima abierta constituida y existente en virtud de las leyes de Chile ("**AES Andes**") y **ALTO MAIPO SpA**, una sociedad por acciones constituida y existente en virtud de las leyes de Chile ("**Alto Maipo**"). Alto Maipo y AES Andes se denominarán, en adelante, individualmente, una "**Parte**" y, conjuntamente, las "**Partes**".

**ARTÍCULO 1
ANTECEDENTES**

Mediante instrumento privado de fecha 1 de julio de 2013, las Partes suscribieron un contrato denominado Contrato de Instalaciones Compartidas (el "**Contrato**").

A esta fecha, el Contrato no ha sido objeto de ninguna modificación.

Los términos con mayúscula inicial que no se encuentren definidos en esta Modificación tendrán los significados que a ellos se les asigna en el Contrato.

**ARTÍCULO 2
MODIFICACIONES**

En virtud de la presente Modificación y de conformidad con lo dispuesto en la Sección 14.7 del Contrato, las Partes acuerdan incorporar las siguientes modificaciones al Contrato:

(a) Reemplazar todas las referencias al término "AES Gener" por referencias al término "AES Andes".

(b) En el párrafo inicial de los Considerandos del Contrato, reemplazar "*sistema eléctrico interconectado central de Chile (Sistema Interconectado Central o "SIC")*" por "*Sistema Eléctrico Nacional de Chile ("SEN")*".

(c) Agregar las siguientes nuevas definiciones en el Artículo 1 del Contrato, en el orden alfabético que corresponda:

"*Cantidades Diferidas*" tiene el significado que se indica en la Sección 4.3 (e).

"*Contrato de Crédito Garantizado de Salida*" ("*Secured Exit Loan Agreement*") tiene el significado que se indica en el Contrato de Términos Comunes.

---

**AMENDMENT TO THE SHARED FACILITIES AGREEMENT**

This amendment to the Shared Facilities Agreement referred to below (this "**Amendment**") is entered into as of [●], 2022, by and between **AES ANDES S.A.** (previously denominated AES Gener S.A.), a *sociedad anónima abierta* organized and existing under the laws of Chile ("**AES Andes**") and **ALTO MAIPO SpA**, a *sociedad por acciones* organized and existing under the laws of Chile ("**Alto Maipo**"). AES Andes and Alto Maipo are referred to individually herein as a "**Party**" and collectively as the "**Parties**".

**ARTICLE 1
BACKGROUND**

By means of private instrument dated July 1, 2013, the Parties entered into an agreement called the Shared Facilities Agreement (the "**Agreement**").

As of this date, there have been no amendments to the Agreement.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them the Agreement.

**ARTICLE 2
AMENDMENTS**

By means of this Amendment and pursuant to the provisions set forth in Section 14.7 of the Agreement, the Parties agree to amend the Agreement as follows:

(a) Replace all references to the term "AES Gener" by references to the term "AES Andes".

(b) In the first paragraph of the Considerations of the Contract, replace "*the central electric interconnected system of Chile (Sistema Interconectado Central or "SIC")*" by "*National Electric System of Chile ("SEN")*".

(c) Include the following new definitions in Article 1 of the Agreement, in the corresponding alphabetical order:

"*Deferred Amounts*" has the meaning set forth in Section 4.3 (e).

"*Secured Exit Loan Agreement*" has the meaning set forth in the Common Terms Agreement.

1

*"**Contrato de Términos Comunes**" significa el Tercer Contrato de Términos Comunes Modificado y Refundido, fechado el [●] de 2022, celebrado entre Alto Maipo, cada Representante de los Acreedores Garantizados (Secured Creditor Representative) que sea parte de dicho contrato de tiempo en tiempo y según se define en dicho contrato, e Itaú Corpbanca, actuando como Agente de Acreedores.*

(d) En el Artículo 1 del Contrato, reemplazar el siguiente término definido "**CDEC-SIC**" por el siguiente:

*"**CDEC-SIC**" significa el Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.*

(e) Insertar la siguiente letra e) nueva al final de la Sección 4.3:

*(e) No obstante cualquier otra disposición del presente Contrato, las Partes acuerdan que los montos que sean facturados y fueren pagaderos en cualquier momento a contar del día [●] de 2022 y hasta el día [●] de 2023 (las "Cantidades Diferidas"), deberán pagarse conforme con los términos y condiciones del Contrato de Crédito Garantizado de Salida. Por lo tanto, las Cantidades Diferidas:*

*(i) Tendrán garantías de primer grado y gozarán de la máxima prioridad posible para efectos de su pago, de acuerdo con los términos de los Documentos de Financiamiento.*

*(ii) Producirán intereses a contar del trigésimo primer día contado desde la fecha en que hayan sido facturadas, utilizando una tasa anual fija de un 4% (considerando meses de 30 días y años de 360 días).*

*(iii) Los intereses que devenguen las Cantidades Diferidas deberán pagarse trimestralmente a contar del 15 de julio de 2022, en el entendido, sin embargo, que los intereses pagaderos los días 15 de julio de 2022, 15 de octubre de 2022 y 15 de enero de 2023 deberán capitalizarse e incorporarse a las Cantidades Diferidas en cada fecha de pago. Por lo tanto, el primer pago en dinero de intereses devengados a partir de las Cantidades Diferidas deberá realizarse el 15 de abril de 2023.*

*(iv) Las Cantidades Diferidas se pagarán en cuotas trimestrales iguales a contar del día 15 de julio de 2023, siendo su fecha final de vencimiento el día [●] de 2025, encontrándose sujetas, en todo caso, a los pagos anticipados obligatorios establecidos en el Contrato de Crédito Garantizado de Salida, incluyendo como consecuencia de la obtención de*

*"**Common Terms Agreement**" means that certain Third Amended and Restated Common Terms Agreement, dated as of [●], 2022, by and among Alto Maipo, each Secured Creditor Representative that is a party thereto from time to time and as defined therein, and Itaú Corpbanca, acting as Intercreditor Agent.*

(d) In Article 1 of the Agreement, replace the defined term "**CDEC-SIC**" by the following:

*"**CDEC-SIC**" means the Coordinador Eléctrico Independiente del Sistema Eléctrico Nacional.*

(e) Insert the following new letter e) to Section 4.3:

*(e) Notwithstanding any other provision under this Agreement, the Parties agree that amounts invoiced hereunder that would have been payable anytime between [●], 2022 until [●], 2023 (the "Deferred Amounts"), shall be paid in accordance with the terms and conditions of the Secured Exit Loan Agreement. Accordingly, the Deferred Amounts:*

*(i) Shall benefit from a first ranking lien and be super-senior for its payment, according to the terms set forth in the Financing Documents.*

*(ii) Shall accrue interest from the thirty first day following its invoicing, using a fix annual rate of 4% (considering months of 30 days and years of 360 days).*

*(iii) Interests accrued in respect of the Deferred Amounts shall be paid quarterly starting from July 15, 2022, provided, however, that interests payable on July 15, 2022, October 15, 2022 and January 15, 2023, shall be paid-in-kind and be capitalized into the Deferred Amounts on each payment date. Accordingly, the first interest payment in cash in respect of the Deferred Amounts shall be made on April 15, 2023.*

*(iv) The Deferred Amounts shall be paid quarterly in equal installments, commencing on July 15, 2023, with a final maturity date on [●], 2025, being subject, in any case, to the mandatory prepayments set forth in the Secured Exit Loan Agreement, including as a result of obtaining CNM Arbitral Award Proceeds (as such term is defined in the Common Terms*

2

*Ingresos por Laudo CNM ("CNM Arbitral Proceeds", según dicho término se define en el Contrato de Términos Comunes) o aceleración por parte de AES Andes tras la ocurrencia de una Causal de Incumplimiento ("Event of Default", según dicho término se define en el Contrato de Crédito Garantizado de Salida).*

*Agreement) or acceleration by AES Andes following the occurrence of an Event of Default (as such term is defined in the Secured Exit Loan Agreement).*

*Las Partes acuerdan, adicionalmente, que cualquier modificación en los términos del Contrato de Crédito Garantizado de Salida que pueda ser acordada entre ellas con posterioridad al día [●] de 2022, modificará automáticamente los términos en los cuales se pagarán las Cantidades Diferidas, para lo cual se entenderá que se ha dado cumplimiento a todas las formalidades para modificar el presente Contrato; a no ser que las Partes específicamente dispongan que las Cantidades Diferidas deban tener un tratamiento distinto, en cuyo caso las Partes deberán suscribir una modificación adicional al presente Contrato, si fuere el caso.*

*The Parties further agree that any amendment to the terms of the Secured Exit Loan Agreement that may be agreed between them following [●], 2022, shall automatically amend the payment terms and of the Deferred Amounts, it being understood that all formalities hereunder for such an amendment have been complied with; unless the Parties specifically provide that the Deferred Amounts shall receive a different treatment, in which case the Parties shall enter into an additional amendment to this Agreement, to the extent applicable.*

## ARTÍCULO 3
## ALCANCES DE LA MODIFICACIÓN

## ARTICLE 3
## SCOPE OF THE AMENDMENT

Esta Modificación surtirá sus efectos a contar de esta fecha.

This Amendment shall become effective from the date hereof.

Salvo por lo expresamente previsto en esta Modificación, el Contrato se mantiene plenamente vigente, según los términos a la Fecha de Vigencia.

Except as otherwise expressly provided herein, the Agreement shall continue in full force and effect in accordance with its terms as of the Effective Date.

EN TESTIMONIO DE LO CUAL, las Partes con la intención de quedar legalmente obligadas, dispusieron que sus ejecutivos debidamente autorizados al efecto firmaran esta Modificación en la fecha indicada al principio de la misma.

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be executed by their duly authorized officers as of the date first set forth above.

_____
[●]
**p.p. AES Andes S.A.**

_____
[●]
**p.p. AES Andes S.A.**

_____
[●]
**p.p. Alto Maipo SpA**

3

**<u>Exhibit T</u>**

**Third Amended and Restated Offshore Security Agreement**

**DFC Loan Number 513-2014-949-IG & 9000042574**

---

**SECOND AMENDED AND RESTATED OFFSHORE SECURITY AGREEMENT**

**between**

**ALTO MAIPO SpA,**
**as Grantor**

**and**

**ITAÚ CORPBANCA NEW YORK BRANCH,**
**as Offshore Collateral Agent**

**Dated as of _____, 2022**

---

43579538.3

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ............................................................................................2

    1.1        Common Terms Agreement and UCC Definitions...........................................2
    1.2        Defined Terms ................................................................................................2
    1.3        Interpretation..................................................................................................4

ARTICLE II. PLEDGE AND GRANT OF SECURITY INTEREST............................5

    2.1        Granting Clause ..............................................................................................5
    2.2        Delivery of Pledged Equity and Perfection ...................................................8
    2.3        Delivery of Assigned Agreements ................................................................10
    2.4        Special Provisions Relating to Equity Collateral ..........................................10

ARTICLE III. OBLIGATIONS SECURED....................................................................11

ARTICLE IV. REPRESENTATIONS AND WARRANTIES .......................................11

    4.1        Assets ............................................................................................................11
    4.2        No Other Security Interests. .........................................................................11
    4.3        Valid Interest.................................................................................................11
    4.4        Authorization ................................................................................................12
    4.5        Names, etc.....................................................................................................12
    4.6        Changes in Circumstances ............................................................................12

ARTICLE V. COVENANTS............................................................................................12

    5.1        Trade Names .................................................................................................12
    5.2        Prohibition Against Transfer of Collateral ...................................................12
    5.3        Limitation on Liens on Collateral..................................................................13

ARTICLE VI. EVENTS OF DEFAULT.....................................**Error! Bookmark not defined.**

ARTICLE VII. REMEDIES UPON AN EVENT OF DEFAULT ................................13

    7.1        Remedies Upon Event of Default .................................................................13
    7.2        Minimum Notice Period ...............................................................................15
    7.3        Sale of Collateral...........................................................................................15
    7.4        Waiver of Certain Rights and Remedies Under Applicable Law ...................17
    7.5        No Impairment of Remedies.........................................................................17
    7.6        Reasonable Care............................................................................................18
    7.7        Waiver...........................................................................................................18
    7.8        Application of Proceeds.................................................................................18

ARTICLE VIII. SECURITY INTEREST ABSOLUTE ...............................................18

ARTICLE IX. FURTHER ASSURANCES .....................................................................19

    9.1        Remedies Cumulative; Delay Not Waiver.....................................................19
    9.2        Continuing Assignment and Security Interest; Transfer of Notes ..................20
    9.3        Reinstatement................................................................................................20
    9.4        Duties with Respect to the Collateral.............................................................20
    9.5        Attorney-In-Fact ...........................................................................................21
    9.6        Perfection ......................................................................................................22

| | | |
|---|---|---|
| 9.7 | Information Concerning Collateral | 23 |
| 9.8 | Liability | 24 |
| 9.9 | Termination of Security Interest | 24 |

ARTICLE X. MISCELLANEOUS ...............................................................24

| | | |
|---|---|---|
| 10.1 | Amendments; Waivers; Consents | 24 |
| 10.2 | Notices | 25 |
| 10.3 | Severability | 25 |
| 10.4 | Survival of Provisions | 25 |
| 10.5 | Expenses | 26 |
| 10.6 | Successions or Assignments | 26 |
| 10.7 | Entire Agreement | 26 |
| 10.8 | Counterparts | 26 |
| 10.9 | Governing Law | 26 |
| 10.10 | Third Party Rights | 28 |
| 10.11 | Rights of the Offshore Collateral Agent | 28 |
| 10.12 | Second Amendment and Restatement | 28 |

| | |
|---|---|
| Annex 1 | Subsidiary Company Equity Interests |
| Annex 2 | Grantor Information and Filing Details |
| Annex 3 | Grantor's UCC Filing Jurisdiction |

## SECOND AMENDED AND RESTATED OFFSHORE SECURITY AGREEMENT

THIS SECOND AMENDED AND RESTATED OFFSHORE SECURITY AGREEMENT, dated as of [*], [*], 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is entered into by and between Alto Maipo SpA, a *sociedad por acciones* formed and existing under the laws of the Country ("Grantor") and Itaú Corpbanca New York Branch, a branch in New York, New York of Itaú Corpbanca, a bank organized and existing under the laws of Chile and regulated by the Superintendency of Banks and Financial Institutions (SBIF), in its capacity as the offshore collateral agent for the Secured Parties referred to below (together with its successors and permitted assigns in such capacity, the "Offshore Collateral Agent").

## RECITALS

**WHEREAS**, Grantor is undertaking the development of a 531MW hydropower plant, consisting of the Alfalfal II Power Station and the Las Lajas Power Station and related interconnection and transmission assets located in San José de Maipo, approximately 50 kilometers east of Santiago in the Republic of Chile (the "Project").

**WHEREAS**, on November 17, 2021, the Grantor, among others, commenced a bankruptcy case (together, the "Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Court").

**WHEREAS**, to finance certain costs and expenditures in connection with the construction, completion, ownership and operation of the Project, Grantor entered into (i) the Third Amended and Restated Common Terms Agreement, dated as of the date hereof (the "Common Terms Agreement"), by and among the Grantor, as borrower, each Secured Creditor Representative party thereto, as defined therein, and Itaú Corpbanca in its capacity as intercreditor agent for the Secured Creditors, as defined therein and (ii) each of the Financing Documents (as defined in the Common Terms Agreement), pursuant to which, among other things, the Secured Creditors, the Secured Exit Lender, the Secured Working Capital Facility Lender and the VAT Lender have agreed to extend the Secured Debt to Grantor, in its capacity as borrower.

**WHEREAS**, Grantor will gain a substantial economic benefit from the loan and other financial accommodations to be made under the Common Terms Agreement and other Financing Documents and desires that the Secured Creditors, the Secured Exit Lender, the Secured Working Capital Facility Lender and the VAT Lender enter into the Common Terms Agreement and the other Financing Documents.

**WHEREAS**, Grantor and the Offshore Collateral Agent wish to amend and restate that certain Amended and Restated Offshore Security Agreement, dated as of May 8, 2018 (as amended, amended and restated, supplemented or otherwise modified as of the date hereof, the "Amended and Restated Offshore Security Agreement").

**WHEREAS**, the execution and delivery of this Agreement is a condition precedent to the Plan Effective Date of a chapter 11 plan of reorganization of Borrower approved by the Court pursuant to which it will exit the Bankruptcy Cases.

**NOW, THEREFORE**, in consideration of the promises contained herein, and to induce the Secured Parties to enter into the Common Terms Agreement and the other Financing Documents and to make the extensions of credit contemplated thereby, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Grantor hereby agrees with the Offshore Collateral Agent, for the benefit of the Secured Parties, as follows:

ARTICLE I.
DEFINITIONS

1.1    Common Terms Agreement and UCC Definitions.   Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings provided in the Common Terms Agreement or, if not defined therein, Articles 8 and 9 of the UCC.

1.2    Defined Terms.  In addition, unless the context otherwise requires the following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall have the following meanings:

"Agreement" has the meaning given in the preamble to this Agreement.

"Assigned Agreement" and "Assigned Agreements" have the meaning given in Section 2.1 (*Granting Clause*).

"Collateral" has the meaning given in Section 2.1 (*Granting Clause*).

"Common Terms Agreement" has the meaning given in the recitals to this Agreement.

"Default Interest Rate" means two percent (2%) per annum plus (a) with respect to amounts due and unpaid on any Secured Debt, the applicable Interest Rate (as defined in the Common Terms Agreement) in effect from time to time under such Secured Debt Document, other than the default interest rate referred to in Section 2.02[1](a) (*Interest*) therein, (c) with respect to any other amounts, the highest of the Interest Rates in effect from time to time under any of the Secured Debt Documents, other than any default rate under any Secured Debt Document.

"Equipment" means any "equipment", as that term is defined in the UCC, now or hereafter owned by Grantor, including all machinery, equipment, furnishings, fixtures, vehicles, tools,

---

[1] Note to NRF: Please confirm cross reference. This was 2.03 in the draft that we commented on.

supplies and other equipment of any kind and nature (including all related interconnection and transmission assets located in San José de Maipo), wherever situated, used in connection with the operation of the Project and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, improvements, upgrades and accessories installed thereon or affixed thereto.

"Equity Collateral" has the meaning given in Section 2.1.

"Excluded Property" has the meaning given in Section 2.1 (*Granting Clause*).

"General Intangibles" means any "general intangibles", as that term is defined in the UCC, now or hereafter owned by Grantor, including equipment leases, partnership interests, limited liability company interests, joint venture interests, all Intellectual Property, Authorizations, partnership and other business records, customer and subscriber lists, computer programs, tapes, disks and related data processing software owned by or in which Grantor has an interest, all renewals, extensions and continuations-in-part of any of the items referred to above, the right in the name and on behalf of Grantor to appear in and defend any action or proceeding brought with respect to any part of Grantor's real or personal property and to commence any action or proceeding to protect the interest of Grantor in such Collateral, rights to refunds or indemnification, the right to receive any insurance proceeds and all other intangible personal property of Grantor of every kind and nature.

"Grantor" has the meaning given in the preamble to this Agreement.

"Intellectual Property" means, collectively, all:

(a)     copyrights, copyright registrations and applications for copyright registrations, including all renewals and extensions thereof, the right to recover for all past, present and future infringements thereof, and all other rights of any kind whatsoever accruing thereunder or pertaining thereto;

(b)     patents and patent applications, including the inventions and improvements described and claimed therein together with the reissues, divisions, continuations, renewals, extensions and continuations in part thereof, all income, royalties, damages and payments now or hereafter due and/or payable under and with respect thereto, including damages and payments for past or future infringements thereof, the right to sue for past, present and future infringements thereof, and all rights corresponding thereto throughout the world;

(c)     trade names, trademarks and service marks, logos, trademark and service mark registrations, and applications for trademark and service mark registrations, including all renewals of trademark and service mark registrations, all rights corresponding thereto throughout the world, the right to recover for all past, present and future infringements thereof, all other rights of any kind whatsoever accruing thereunder or pertaining thereto, together, in each case, with the product lines and goodwill of the business connected with the use of, and symbolized by, each such trade name, trademark and service mark; and

(d)     (i) inventions, processes, production methods and trade secrets; (ii) licenses or user or other agreements granted to Grantor with respect to any of the foregoing, in each case whether now or hereafter owned or used; (iii) information, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) field repair data and other information relating to sales or service of products now or hereafter manufactured; (v) accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) causes of action, claims and warranties now or hereafter owned or acquired by Grantor in respect of any of the items listed above.

"Inventory" means "inventory", as that term is defined in the UCC, now or hereafter owned by Grantor, including (a) all products, goods, materials and supplies produced, purchased or acquired by Grantor for the purpose of sale in the ordinary course of its business, (b) maintenance materials inventory and (c) goods in which Grantor has an interest in mass or a joint or other interest or right of any kind.

"Offshore Collateral Agent" has the meaning given in the preamble to this Agreement.

"Pledged Equity" has the meaning given in Section 2.1.

"Project" has the meaning given in the recitals to this Agreement.

"Subsidiary Company" means Alto Maipo Delaware, LLC.

"Subsidiary Company LLC Agreement" means the limited liability company operating agreement of Subsidiary Company, dated as of November 16, 2021, as amended on April [ ], 2022, and as amended, amended and restated, supplemented or otherwise modified from time to time.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

1.3     Interpretation.  In this Agreement, unless the context otherwise requires:

(a)     headings are for convenience only and do not affect the interpretation of this Agreement;

(b)     words importing the singular include the plural and vice versa;

(c)      unless otherwise expressly stated, a reference to an Annex, Article, party, Schedule or Section is a reference to that Article or Section of, or that Annex, party or Schedule to, this Agreement;

(d)      a reference to a document includes an amendment or supplement to, or replacement or novation of, that document but disregarding any amendment, supplement, replacement or novation made in breach of this Agreement;

(e)      a reference to a party to any document includes that party's successors and permitted assigns; and

(f)      the words "include" and "including" shall be deemed to be followed by the phrase "including without limitation".

ARTICLE II.
PLEDGE AND GRANT OF SECURITY INTEREST

2.1    Granting Clause.  To secure the timely payment in full in cash when due of the Secured Obligations and the due performance of any obligation of Grantor pursuant to the Financing Documents, Grantor does hereby collaterally assign, grant, convey, transfer and pledge to, and subject to a continuing first priority security interest (subject to Permitted Liens) in favor of, the Offshore Collateral Agent, for the benefit of the Secured Parties, all the estate, right, title and interest of Grantor in, to and under the following property of Grantor, in each case whether now owned or hereafter existing or acquired (collectively, the "Collateral"):

(a)      all membership interests in Subsidiary Company identified in Annex 1 and all other membership interests of whatever class or character of Subsidiary Company, now or hereafter owned by Grantor, and all certificates evidencing the same, if any (the "Pledged Equity"), together with:

(i)      all membership interests, securities, moneys or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split-up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription, warrants, rights or options issued to the holders of, or otherwise in respect of the Pledged Equity; and

(ii)      without affecting the obligations of Grantor under any provision prohibiting such action hereunder or under any Financing Document or other document pursuant to which any other Secured Obligation is incurred, as applicable, in the event of any consolidation or merger in which the Subsidiary Company is not the surviving entity, all ownership interests of any class or character of the successor entity (unless that successor entity is Grantor itself), formed by or resulting from that consolidation or merger (the Pledged Equity, together with all other certificates, shares, securities, properties or moneys as may from time to time be pledged hereunder pursuant to this section 2.1(a)(ii) and 2.1(a)(i) above being herein collectively called the "Equity Collateral");

(b)    all contracts, agreements and documents, including the following contracts, agreements and documents, as amended, amended and restated, supplemented or otherwise modified from time to time (individually, an "Assigned Agreement" and collectively, the "Assigned Agreements") and all of Grantor's rights thereunder:

(i)    the Project Documents to which Grantor is a party;

(ii)    the insurance policies maintained by Grantor under the Financing Documents or any Project Document, including any such policies insuring against loss of revenues by reason of interruption of the operation of the Project and all proceeds and other amounts payable to Grantor thereunder, and all Expropriation Proceeds;

(iii)    all other agreements (including vendor warranties, guaranties, performance bonds, sureties and security), running to Grantor or assigned to Grantor, relating to the construction, maintenance, improvement, operation or acquisition of the Project or any part thereof, or transport of material, equipment and other parts of the Project or any part thereof;

(iv)    all amendments, supplements, substitutions and renewals to any of the agreements listed in clauses (i) – (iii) above; and

(v)    as regards the aforesaid agreements, (A) all rights of Grantor to receive moneys due and to become due thereunder or pursuant thereto, (B) all rights of Grantor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect thereto, (C) all claims of Grantor for damages for breach thereof or default thereunder and (D) the right of Grantor to terminate, amend, supplement or otherwise modify any such agreement or approval;

(c)    all Accounts (as defined in Section 9-102(a)(2) of the UCC and all Account Collateral (as defined in the Offshore Accounts Agreement));

(d)    all Securities Accounts and Deposit Accounts together with all funds, cash, monies, Financial Assets (as such term is defined in the Offshore Accounts Agreement), investments, instruments, certificates of deposit, promissory notes and any other property (including any Permitted Investments deposited therein or credited thereto) at any time on deposit therein or credited to any of the foregoing, all rights to payment or withdrawal therefrom, and all income, profits, gains, and interest thereon;

(e)    all Instruments;

(f)    all Documents;

(g)    all Chattel Paper (whether tangible or electronic);

(h)    all Inventory;

(i)    all Equipment;

(j)     all Intellectual Property;

(k)     all Goods not covered by the preceding clauses of this Section 2.1;

(l)     all Letter-of-Credit Rights;

(m)     all Supporting Obligations;

(n)     all Investment Property;

(o)     all Payment Intangibles, Software and all other General Intangibles whatsoever not covered elsewhere in this Section 2.1;

(p)     all Commercial Tort Claims;

(q)     all rights and claims of Grantor, now or hereafter existing, under any indemnity, warranty or guaranty in connection with any Equipment;

(r)     any and all other drafts, acceptances, contract rights, accounts receivable, rights, interests and assets (including any rents, revenues, incomes and profits in respect of the Project) owned by Grantor on the date hereof or hereafter arising or acquired;

(s)     to the extent not otherwise included in the foregoing, all Proceeds and products of all of the foregoing Collateral, whether cash or non-cash, including (i) all rights of Grantor to receive moneys due and to become due under or pursuant to Grantor's ownership and operation of the Project or any part thereof or otherwise related to the Collateral, (ii) all rights of Grantor to receive return of any premiums for or proceeds of any insurance, indemnity, warranty or guaranty with respect to the Collateral or to receive condemnation proceeds, (iii) all claims of Grantor for damages arising out of or for breach of or default under the Assigned Agreements or any other Collateral, (iv) all rights of Grantor to terminate, amend, supplement, modify or waive performance under the Assigned Agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder, (v) all rights of Grantor under the Assigned Agreements to make determinations, to exercise any election (including the election of remedies) or option or to give or receive any notice, consent, waiver or approval, together with full power and authority with respect to any such contract or agreement to demand, receive, enforce, collect or provide receipt for any of the foregoing rights or any property the subject of any of such contracts or agreements, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action which may be necessary or advisable in connection with any of the foregoing, (vi) all rights of Grantor to payment for goods or other property sold or leased or services performed by Grantor, (vii) to the extent not included in the foregoing, all proceeds receivable or received when any and all of the foregoing Collateral is sold, collected, exchanged or otherwise disposed of, whether voluntarily or involuntarily, and (viii) any and all additions and accessions to the Collateral, and all proceeds thereof, including proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including all awards, all insurance proceeds, including any unearned premiums or refunds of premiums on any insurance policies covering all or any part of the Collateral and the right to receive and apply the

proceeds of any insurance, or of any judgments or settlements made in lieu thereof for damage to or diminution of the Collateral;

(t)    to the extent related to any property described above, all books, correspondence, credit files, records, writings, design documents, invoices and other papers, including all tapes, cards, computer runs, programs, printouts, databases and other computer materials, and documents in the possession or under the control of Grantor; and

(u)    all other tangible and intangible personal property whatsoever of Grantor;

provided, however, notwithstanding anything to the contrary contained in clauses (a) through (t) above, the security interest created by this Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property. "Excluded Property" means, collectively, (i) any asset constituting *bienes corporales* located in Chile and pledged pursuant to any Onshore Security Document, (ii) any permit, license, franchise, lease, promissory note, letter of credit, Project Document or agreement to which Grantor is a party or by which Grantor is bound, and all right, title and interest of Grantor thereunder, in each case, only to the extent and for so long as the terms of such permit, license, franchise, lease, promissory note, letter of credit, Project Document or agreement validly prohibit, impair or restrict the creation by Grantor, or the attachment or perfection, of a security interest in such permit, license, franchise, lease, promissory note, letter of credit, Project Document or agreement in favor of the Offshore Collateral Agent, or such creation, attachment or perfection would give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination or remedy thereunder or would impair the rights of the counterparty thereto or such creation, attachment or perfection would not be permitted by Applicable Law or without the consent of any other person and such consent has not been obtained (after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) or any other Applicable Law or principles of equity), (iii) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law and (iv) the collateral pledged exclusively for the benefit of the VAT Lenders under the VAT Security Documents (until the VAT Loan has been repaid).

It is the intention of the parties that the description of the Collateral be sufficient to enable the Offshore Collateral Agent, at the direction of the Intercreditor Agent, upon the occurrence and continuance of an Event of Default, to take possession of, or foreclose upon, all or any of the interests of Grantor in and to any and all Collateral, and to enable the Offshore Collateral Agent ( or its agent, nominee or designee) to operate, sell or otherwise dispose of the entire interest of Grantor in and to the Project or any part thereof; provided, that all of the Collateral is assigned to the Offshore Collateral Agent solely as collateral security, and the Offshore Collateral Agent or the other Secured Parties shall have no duty, liability or obligation whatsoever with respect to any of the Collateral other than as required pursuant to the terms of this Agreement, the other Financing Documents and Applicable Law.

2.2    Delivery of Pledged Equity and Perfection. Grantor shall:

(a)    if any Pledged Equity constituting part of the Collateral is received by Grantor, forthwith (i) deliver to the Offshore Collateral Agent the certificates or instruments representing or evidencing the same, duly endorsed in blank or accompanied by such instruments of assignment and transfer in such form and substance as the Offshore Collateral Agent may reasonably request, all of which thereafter shall be held by the Offshore Collateral Agent, pursuant to the terms of this Agreement, as part of the Collateral and (ii) take such other action as the Offshore Collateral Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in such Collateral; *provided, however*, upon receipt of any certificates or instruments representing or evidencing replacement Pledged Equity, duly endorsed in blank or accompanied by such instruments of assignment and transfer and otherwise in form acceptable to the Offshore Collateral Agent as replacement Pledged Equity, the Offshore Collateral Agent shall return to the Subsidiary Company, upon the Subsidiary Company's request, for cancellation the original certificates representing or evidencing such Pledged Equity being replaced and such instruments of assignment and transfer related thereto previously delivered to it;

(b)    deliver to the Offshore Collateral Agent any and all instruments constituting part of the Collateral in which Grantor purports to grant a security interest hereunder, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Offshore Collateral Agent may reasonably request; provided, that so long as no Event of Default shall have occurred and be continuing, the Offshore Collateral Agent shall, promptly upon request of Grantor, make appropriate arrangements for making any instrument pledged by Grantor available to Grantor for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent deemed appropriate by the Offshore Collateral Agent, against trust receipt or like document);

(c)    cause the Pledged Equity to be evidenced by and remain "certificated securities" as defined in Article 8 of the UCC. If any of the Pledged Equity consists of "uncertificated securities" within the meaning of the UCC or is otherwise not evidenced by any certificate or instrument, Grantor will promptly notify Offshore Collateral Agent thereof and will promptly take and cause to be taken all actions required under Articles 8 and 9 of the UCC and any other Applicable Laws, to enable Offshore Collateral Agent to acquire "control" (within the meaning of such term under Section 8-106 (or its successor provision) of the UCC) of such uncertificated securities and as may be otherwise reasonably necessary or deemed reasonably appropriate by the Offshore Collateral Agent to perfect the security interest of the Offshore Collateral Agent therein.

(d)    give, execute, deliver, file, record, authorize or obtain all such financing statements, notices, instruments, documents, agreements or consents or other papers as may be necessary or desirable to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable the Offshore Collateral Agent to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, upon the occurrence and during the continuation of an Event of Default and at the instruction of the Intercreditor Agent causing any or all of the Equity Collateral to be transferred of record into the name of the Offshore Collateral Agent or its nominee (and the Offshore Collateral Agent agrees that if any Equity Collateral is transferred into its name or the name of its nominee, the Offshore Collateral Agent

will thereafter promptly give to Grantor copies of any notices and communications received by it with respect to the Equity Collateral pledged by Grantor hereunder);

(e)    keep full and accurate books and records relating to the Pledged Equity, and stamp or otherwise mark such books and records in order to reflect the security interests granted by this Agreement; and

(f)    forward copies of any material written notices received by Grantor with respect to the Pledged Equity all in such manner as the Offshore Collateral Agent may reasonably require.

2.3    <u>Delivery of Assigned Agreements</u>. In furtherance of the grant of security interest under Section 2.1, Grantor has heretofore delivered or concurrently with the delivery hereof is delivering to the Offshore Collateral Agent an executed copy of each Project Document. Grantor shall likewise deliver to the Offshore Collateral Agent an executed copy of each Additional Project Document and any material amendments to any Project Document as they are entered into by Grantor promptly upon the execution thereof.

2.4    <u>Special Provisions Relating to Equity Collateral</u>.

(a)    Grantor shall cause the Equity Collateral to constitute at all times 100% of the total number of shares, partnership, membership or other ownership interests of the Subsidiary Company then outstanding and owned by Grantor.

(b)    So long as no Event of Default has occurred and is continuing, Grantor shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Equity Collateral for all purposes not inconsistent with the terms of any Financing Document or other document pursuant to which any other Secured Obligation is incurred, as applicable, provided that Grantor shall not vote the Equity Collateral in any manner that is inconsistent with the terms of any Financing Document or other document pursuant to which any other Secured Obligation is incurred, as applicable; and the Offshore Collateral Agent shall, at Grantor's expense, execute and deliver to Grantor or cause to be executed and delivered to Grantor all such proxies, powers of attorney, dividend and other orders and other instruments, without recourse, as Grantor may reasonably request for the purpose of enabling Grantor to exercise the rights and powers that it is entitled to exercise pursuant to this <u>Section 2.4(b)</u>.

(c)    If an Event of Default has occurred and is continuing under the Financing Documents, the Offshore Collateral Agent shall have the right, at the direction of the Intercreditor Agent and upon written notice to Grantor, to the fullest extent permitted by applicable law and pursuant to the terms of the Intercreditor Agreement, to exercise all voting, consensual and other powers of ownership pertaining to the Equity Collateral as if the Offshore Collateral Agent were the sole and absolute owner thereof (and the Subsidiary Company agrees to take all such action as may be appropriate to give effect to such right).

(d)    Dividends and other distributions on the Equity Collateral shall be subject to the restrictions included under the Common Terms Agreement, the Offshore Accounts Agreement and any other Financing Document, as applicable.

(e)     Grantor, as the sole member of the Subsidiary Company and as the owner of all of the issued and outstanding membership interests of the Subsidiary Company, hereby irrevocably consents (for all purposes under the Subsidiary Company LLC Agreement and notwithstanding anything to the contrary set forth in the Subsidiary Company LLC Agreement) to the transfer of the Pledged Equity to any Person upon exercise by the Offshore Collateral Agent of its remedies under the Financing Documents.

ARTICLE III.
OBLIGATIONS SECURED

Without limiting the generality of the foregoing, this Agreement and all of the Collateral secure the payment when due of all Secured Obligations and due performance of any obligations of Grantor to the Offshore Collateral Agent and the other Secured Parties pursuant to the Financing Documents.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES

Grantor represents and warrants to and in favor of the Offshore Collateral Agent and the other Secured Parties, as follows:

4.1     Assets.  (a) Grantor has valid and unencumbered title to the Collateral, free and clear of any Lien other than claims mandatorily preferred by Applicable Law and Permitted Liens.

(b) In respect to the Pledged Equity:

(i) is duly authorized, fully paid and nonassessable, and none of the Pledged Equity is or will be subject to any contractual restriction (other than Section 15 of the Subsidiary Company LLC Agreement), or any restriction under the organizational documents of the Subsidiary Company or Grantor, on a transfer of such Pledged Equity (except for any such restriction contained in the Financing Documents), and is owned by Grantor free and clear of all Liens (subject to no other Liens except Permitted Liens).

(ii) constitutes all of the issued and outstanding equity interests or other interests of any class or character in Subsidiary Company (whether or not registered in the name of Grantor), and Annex 1 correctly identifies the Pledged Equity and the respective number (and registered owners) of the interests identified in Annex 1.

(iii) No person, other than the Grantor, is the registered owner of the Pledged Equity.

4.2     No Other Security Interests. No previous assignment of or security interest in Grantor's right, title and interest in any of the Collateral has been made or granted by Grantor that remains in effect other than pursuant to the Transaction Documents to which Grantor is a party.

4.3     Valid Interest.  This Agreement creates in favor of the Offshore Collateral Agent for the benefit of the Secured Parties a valid and enforceable first priority security interest in the

Collateral, subject to no Liens other than claims mandatorily preferred by Applicable Law and Permitted Liens, and this Agreement will create such an interest in all after-acquired property included within the Collateral when acquired, subject to no Liens other than claims mandatorily preferred by Applicable Law and Permitted Liens.  Subject to the requirements contained in the UCC with respect to the filing of continuation statements, as of the date hereof, no filings other than the filing of UCC financing statements in the filing offices identified on <u>Annex 3</u> hereto are necessary under the UCC to perfect or maintain the perfection of the security interest granted to the Offshore Collateral Agent for the benefit of the Secured Parties, to the extent the Offshore Collateral Agent's security interest can be perfected by filing a financing statement pursuant to the UCC.

4.4    <u>Authorization</u>.  Grantor has all right, power and authority to make the assignment and grant the lien and security interest granted herein.

4.5    <u>Names, etc.</u>

As of the date hereof,

(a)    the full and correct legal name, type of organization, jurisdiction of organization, organizational ID number (if applicable) and mailing address of Grantor is correctly set forth in <u>Annex 2</u> hereto;

(b)    Grantor does not utilize a trade name in the conduct of its business; and

(c)    <u>Annex 2</u> hereto correctly specifies the place of business and the location of the chief executive office of Grantor.

4.6    <u>Changes in Circumstances</u>.  Grantor has never changed its location (as defined in Section 9-307 of the UCC) or changed its name.

ARTICLE V.
<u>COVENANTS</u>

Grantor agrees that until the Release Date, Grantor shall comply with each and all of the following covenants:

5.1    <u>Trade Names</u>.  Grantor agrees to maintain its current identity and legal name and will not at any time employ a name or names (including trade names) different from the name shown as its current legal name on Annex 2 or change its location (as defined in Section 9-307 of the UCC) without providing thirty (30) days advance written notice to the Offshore Collateral Agent of such change, in which event, Annex 2 hereto shall be deemed updated.

5.2    <u>Prohibition Against Transfer of Collateral</u>.  Grantor shall not sell, transfer, lease or otherwise dispose of any of the Collateral (including the Equity Collateral), except as expressly permitted pursuant to Section 5.02(n) *(Asset Sales)* of the Common Terms Agreement. The security interest created under Section 2.1 *(Granting Clause)* shall automatically be released with

respect to any portion of the Collateral sold, transferred or otherwise disposed of as permitted pursuant to Section 5.02(n) *(Asset Sales)* of the Common Terms Agreement.

5.3    <u>Limitation on Liens on Collateral.</u>    Other than with respect to Permitted Liens, Grantor shall not file or authorize or permit to be filed, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which the Offshore Collateral Agent or the Onshore Collateral Agent is not named as the secured party for the benefit of the Secured Parties.

# ARTICLE VI.

## EVENTS OF DEFAULT

6.1    [The occurrence of an Event of Default under, and as defined in, the relevant 1L/ 2L Secured Debt Documents as it relates to the relevant Secured Creditors that are a party thereto, the Working Capital Facility Agreement as it relates to the Working Capital Facility Lenders and the Secured Exit Loan Agreement as it relates to the Secured Exit Lenders party thereto, shall constitute an Event of Default hereunder for the benefit of the relevant Secured Creditors, the Working Capital Facility Lenders and the Secured Exit Loan Lenders, as applicable. Any such Event of Default shall be considered cured or waived for the purposes of this Agreement when it has been cured or waived by such Secured Creditor, Working Capital Facility Lenders or Secured Exit Loan Lenders, as the case may be, in accordance with the relevant 1L/ 2L Secured Debt Documents, the Working Capital Facility Agreement and the Secured Exit Loan Agreement, respectively.][2]

## ARTICLE VII.
## REMEDIES UPON AN EVENT OF DEFAULT

7.1    <u>Remedies Upon Event of Default.</u>    Upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, at the direction of the Intercreditor Agent, shall have the right, but not the obligation, to do any of the following:

(a)    proceed to protect and enforce the rights vested in it by this Agreement and under the UCC;

(b)    cause all revenues hereby pledged as security and all other moneys and other property pledged hereunder to be paid and/or delivered directly to it, by demanding, suing for, collecting and/or receiving any such moneys and property;

(c)    cause any action at law or suit in equity or other proceeding to be instituted and prosecuted to collect or enforce any obligation or right hereunder or included in the Collateral, including specific enforcement of any covenant or agreement contained herein, or to foreclose or

---

[2] NTD: Subject to further review.

enforce the security interest in all or any part of the Collateral granted herein, or to enforce any other legal or equitable right vested in it by this Agreement or by Applicable Law;

(d)    foreclose or enforce any agreement or instrument by or under or pursuant to which the Secured Obligations are issued or secured;

(e)    incur expenses, including attorneys' fees, consultants' fees and other costs appropriate to the exercise of any right or power under this Agreement;

(f)    perform any obligation of Grantor hereunder or under any other Financing Document or Assigned Agreement, make payments, submit drawing certificates under any letter of credit, purchase, contest or compromise any encumbrance, charge or lien, pay taxes and expenses and insure, process, replace, alter, add, improve and/or preserve and protect the Collateral, and the documented expenses of the Offshore Collateral Agent incurred in connection therewith shall be part of the Secured Obligations;

(g)    in connection with any acceleration and foreclosure, take possession of the Collateral and of any and all books of account and records of Grantor relating to any of the Collateral and render it usable and repair and/or renovate the same without, however, any obligation to do so, and enter upon, or authorize its designated agent to enter upon, any location where the same may be located for that purpose (including the right of the Offshore Collateral Agent to exclude Grantor and all Persons claiming access through Grantor from any access to the Collateral or to any part thereof) and the Offshore Collateral Agent and its representatives are hereby granted an irrevocable license to enter upon such premises for such purpose, and to hold, control, manage, operate, rent and lease the Collateral, collect all rents, issues, profits, fees, revenues and other income from the Collateral and apply the same to reimburse the Secured Parties for any cost or expenses reasonably incurred hereunder or under any of the Financing Documents and to the payment of Grantor's Secured Obligations and the payment of the cost of performance of any obligation of Grantor hereunder or under any of the Financing Documents, and apply the balance in accordance with Section 7.8 *(Application of Proceeds);*

(h)    defend any suit, action or proceeding brought against Grantor with respect to any Collateral;

(i)    make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral or any suit, action or proceeding related thereto and, in connection therewith, extend the time of payment, arrange for payment installments, or otherwise modify the terms of, any Collateral;

(j)    secure the appointment of a receiver of the Collateral or any part thereof, whether incidental to a proposed sale of the Collateral or otherwise, and all reasonable disbursements made by such receiver and the reasonable expenses of such receivership shall be added to and be made a part of the Secured Obligations, and, whether or not said sum, including such disbursements and expenses, exceeds the indebtedness originally intended to be secured hereby, the entire amount of said sum, including such disbursements and expenses, shall be secured by this Agreement and such disbursements and expenses shall be due and payable upon demand

therefor and thereafter shall bear interest at the Default Interest Rate or the maximum rate permitted by Applicable Law, whichever is less;

        (k)     enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for, the Collateral or any part thereof;

        (l)     transfer the Collateral or any part thereof to the name of the Offshore Collateral Agent or to the name of the Offshore Collateral Agent's nominee;

        (m)     take possession of and endorse in the name of Grantor or in the name of the Offshore Collateral Agent, for the account of Grantor, any bills of exchange, invoices, freight or express bills, storage or warehouse receipts, bills of lading, checks, drafts, money orders, notes or any other chattel paper, assignments, verifications, notices, documents or instruments constituting all or any part of the Collateral or received as interest, rent or other payment on or on account of the Collateral or any part thereof or on account of its sale or lease;

        (n)     execute (in the name, place and stead of Grantor) endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Collateral;

        (o)     take any other action necessary to protect or realize upon its security interest in the Collateral or any part thereof;

        (p)     appoint another Person (who may be an employee, officer or other representative of the Offshore Collateral Agent) to do any of the foregoing, or take any other action permitted hereunder, as agent for or representative of, and on behalf of, the Offshore Collateral Agent; or

        (q)     exercise any other or additional rights or remedies granted to the Offshore Collateral Agent under any other provision of any Financing Document or exercisable by a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by Applicable Law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Offshore Collateral Agent were the sole and absolute owner thereof (and Grantor agrees to take all such action as may be appropriate to give effect to such right).

      7.2    <u>Minimum Notice Period</u>.  If, pursuant to Applicable Law, prior notice of any action described in Section 7.1 *(Remedies Upon Event of Default)* is required to be given to Grantor, Grantor hereby acknowledges that the minimum time required by such Applicable Law, or, if no minimum time is specified, ten (10) days, shall be deemed a reasonable notice period.

      7.3    <u>Sale of Collateral</u>

(a)  In addition to exercising the foregoing rights, upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, at the direction of the Intercreditor Agent, may, to the extent permitted by Applicable Law, arrange for and sell, lease, assign, pledge or otherwise dispose of all or any part of such Collateral, at such place or places as are commercially reasonable, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at a public or private sale (as the Offshore Collateral Agent may elect), which sale may be conducted by an employee or representative of the Offshore Collateral Agent, and any such sale shall be conducted in a commercially reasonable manner. Any Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) by Grantor, any such demand, notice and right or equity being hereby expressly waived and released. The Offshore Collateral Agent, its nominees, designees and agents may execute, in connection with any sale, lease, assignment, pledge or other disposition of the Collateral, any endorsements, assignments, bills of sale or other instruments of conveyance or transfer with respect to the Collateral. The Offshore Collateral Agent agrees to provide at least ten (10) days' prior written notice to Grantor specifying the time and place of any public sale or the time after which any private sale is to be made and Grantor agrees that such ten (10) days' notice shall constitute reasonable notification (unless a longer notice period shall be required by Applicable Law). The Offshore Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.

(b)  The Offshore Collateral Agent may release, temporarily or otherwise, to Grantor any item of Collateral of which the Offshore Collateral Agent has taken possession pursuant to any right granted to the Offshore Collateral Agent by this Agreement without waiving any rights granted to the Offshore Collateral Agent under any Financing Document. Grantor, in dealing with or disposing of the Collateral or any part thereof, hereby waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require, upon foreclosure, sales of assets in a particular order. If the Offshore Collateral Agent sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by the purchaser, received by the Offshore Collateral Agent and applied to the indebtedness of the purchaser (and the Offshore Collateral Agent agrees to promptly so apply such payments to the extent not otherwise applied to necessary costs and expenses of the Project). In the event the purchaser fails to pay for the Collateral, the Offshore Collateral Agent may resell the Collateral, and Grantor shall be credited with the proceeds of the sale. In the event the Offshore Collateral Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by Applicable Law or any Financing Document, the Offshore Collateral Agent may bid any amount or more than the amount of the Secured Obligations. To the extent permitted by Applicable Law, the amount of the successful bid at any such sale, whether the Offshore Collateral Agent or any other party is the successful bidder, shall, absent fraud or gross negligence, be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount (if less than the amount of the Secured Obligations) and the remaining balance of the Secured Obligations shall be conclusively deemed to be the amount of the Secured Obligations.

(c)    Private Sales. Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, applicable state securities laws or other Applicable Law, the Offshore Collateral Agent or an investment banker or other expert employed by the Offshore Collateral Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Grantor acknowledges that any such private sales may be at prices and on terms less favorable to the Offshore Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that the inclusion of such restriction shall not deem such private sale to have not been made in a commercially reasonable manner and that the Offshore Collateral Agent or an investment banker or other expert employed by the Offshore Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the respective issuer thereof to register it for public sale. Grantor hereby waives any claims against the Offshore Collateral Agent and the other Secured Parties arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale (or any other private sale) was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations.

(d)    Other Limitations and Restrictions. Grantor hereby agrees that the Offshore Collateral Agent is hereby authorized to comply with any other limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of Applicable Law, or in order to obtain any required approval of the sale or of the purchaser by any Authority or official, and Grantor further agrees that such compliance shall not by itself result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Offshore Collateral Agent be liable or accountable to Grantor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

7.4    Waiver of Certain Rights and Remedies Under Applicable Law. In exercising its right to take possession of the Collateral at the direction of the Intercreditor Agent upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, personally or by its agents or attorneys, to the fullest extent permitted by Applicable Law, may enter upon any land owned or leased by Grantor without being guilty of trespass or any wrongdoing, and without liability to Grantor for damages thereby occasioned, other than damages attributable to the Offshore Collateral Agent's, or its agent's or attorney's, willful misconduct or gross negligence.

7.5    No Impairment of Remedies. If, in the exercise of any of its rights and remedies under this Agreement, the Offshore Collateral Agent shall forfeit any of its rights or remedies, whether because of any Applicable Law pertaining to "election of remedies" or otherwise, Grantor hereby consents to such action by the Offshore Collateral Agent and, to the extent permitted by Applicable Law, waives any claim based upon such action (other than a claim attributable to the gross negligence or willful misconduct of the Offshore Collateral Agent), even if such action by the Offshore Collateral Agent shall result in a full or partial loss of any rights of subrogation, indemnification or reimbursement which Grantor might otherwise have had but for such action by

the Offshore Collateral Agent or the terms herein. Any election of remedies which results in the denial or impairment of the right of the Offshore Collateral Agent to seek a deficiency judgment against Grantor shall not, to the extent permitted by Applicable Law, impair Grantor's obligation hereunder.

7.6     Reasonable Care.   To the extent any Applicable Law imposes on the Offshore Collateral Agent an obligation to exercise remedies in a commercially reasonable manner, Grantor acknowledges and agrees that, to the extent consistent with Applicable Law, the Offshore Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment that is substantially equivalent to that which the Offshore Collateral Agent accords its own property.

7.7     Waiver.   [Grantor hereby waives, to the maximum extent permitted by Applicable Law, (a) all rights under any law to require the Offshore Collateral Agent to pursue any Person other than Grantor, any security that the Offshore Collateral Agent may hold, or any other remedy before proceeding against Grantor; (b) all rights to require the Offshore Collateral Agent to give any notices of any kind, including notices of nonpayment, nonperformance, protest, dishonor, default, delinquency or acceleration, or to make any presentments, demands or protests, except as set forth herein or as expressly provided in the Common Terms Agreement or other Financing Documents; (c) all rights to assert the bankruptcy or insolvency of Grantor as a defense hereunder or as the basis for rescission hereof; (d) all rights under any Applicable Law purporting to reduce Grantor's obligations hereunder if the Secured Obligations are reduced (other than as a result of payment of such Secured Obligations); and (e) all defenses based on the disability or lack of authority of Grantor or any Person, the repudiation of any Financing Documents by Grantor or any Person, the failure by the Offshore Collateral Agent or the Secured Parties to enforce any claim against Grantor, or the unenforceability in whole or in part of any Financing Documents. The waiver under this clause does not extend to any rights or defenses Grantor may have as owner under the Strabag Tunneling Contract.][3]

7.8     [Application of Proceeds.   Upon the occurrence and during the continuation of an Event of Default, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied at the direction of the Intercreditor Agent and in accordance with [Section 2.09 *(Application of Payments; Sharing)* of the Common Terms Agreement] and the amount of any such proceeds in excess of the Secured Obligations shall be paid to Grantor or as otherwise required by Applicable Law.][4]

<div align="center">

ARTICLE VIII.
SECURITY INTEREST ABSOLUTE

</div>

All rights of the Offshore Collateral Agent and the Secured Parties and all obligations of Grantor hereunder including the grant of the security interest in, and the creation of the Lien on, the Collateral in favor of the Offshore Collateral Agent, for the benefit of the Secured Parties, shall be

---

[3] NTD: Subject to further review.

[4] NTD: Subject to further review,

absolute and unconditional irrespective of any lack of validity or enforceability of any of the Transaction Documents or any of the Collateral or any other agreement or instrument relating thereto.

<div align="center">

ARTICLE IX.
FURTHER ASSURANCES

</div>

9.1    <u>Remedies Cumulative; Delay Not Waiver</u>.

(a)    <u>Remedies Cumulative</u>.  No right, power or remedy herein conferred upon or reserved to the Offshore Collateral Agent hereunder is intended to be exclusive of any other right, power or remedy, and every such right, power and remedy shall, to the extent permitted by Applicable Law, be cumulative and in addition to every other right, power and remedy given hereunder or under any other Financing Document, now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy. Resort to any or all security now or hereafter held by the Offshore Collateral Agent or any other Secured Party may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken nonjudicial proceedings, or both.  If the Offshore Collateral Agent or any Secured Party may, under Applicable Law, proceed to realize its benefits under this Agreement or any other Financing Document giving the Offshore Collateral Agent or such Secured Parties a Lien upon any Collateral, whether owned by Grantor or by any other Person, either by judicial foreclosure or by nonjudicial sale or enforcement, the Offshore Collateral Agent or such Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of the rights and remedies of the Offshore Collateral Agent under this Agreement.

(b)    [<u>Delay Not Waiver; Separate Causes of Action</u>.  No failure on the part of any Secured Party to exercise, and no course of dealing with respect to, and no delay or omission in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by any Secured Party of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No notice to or demand by any Secured Party on Grantor in any case shall entitle Grantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Party to any other or further action in any circumstances without notice or demand.  Any waiver, permit, consent or approval of any kind or character on the part of the Offshore Collateral Agent of any breach or default under this Agreement, or any waiver on the part of the Secured Parties or the Offshore Collateral Agent of any provision or condition of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  Each and every default by Grantor hereunder or under the other Financing Documents shall give rise to a separate cause of action hereunder and thereunder, and separate suits may be brought hereunder and thereunder as each cause of action arises. Every power and remedy given by this Agreement may be exercised from time to time, and as often as shall be deemed expedient or appropriate, by the Offshore Collateral Agent, acting at the direction of the Intercreditor Agent (which shall act for the benefit of the relevant Secured Party pursuant to the

terms of the Intercreditor Agreement), upon the occurrence and during the continuation of an Event of Default.][5]

9.2    <u>Continuing Assignment and Security Interest; Transfer of Notes</u>.  This Agreement shall create a continuing pledge and assignment of and security interest in the Collateral and shall: (a) remain in full force and effect until the Release Date and, with respect to the Equity Collateral and Pledged Equity, until the earlier of (x) the Release Date and (ii) the effective date of the Permitted Reorganization; (b) be binding upon Grantor and its successors and assigns; and (c) inure, together with the rights and remedies of the Offshore Collateral Agent, to the benefit of the Offshore Collateral Agent and its successors and permitted assigns for the benefit of the Secured Parties.  Without limiting the generality of the foregoing clause (c), any of the Secured Parties may assign or otherwise transfer the Secured Obligations held by them in whole or in part to any other Person to the extent permitted by and in accordance with the Financing Documents to which it is a party, and such other Person shall thereupon become vested with all or an appropriate part of the benefits in respect thereof granted to the Secured Parties herein or otherwise.  Other than pursuant to Section 9.9 (*Termination of Security Interest*), the release of the security interest in any or all of the Collateral, the taking or acceptance of additional security, or the resort by the Offshore Collateral Agent or any Secured Party to any security it may have in any order it may deem appropriate, shall not affect the liability of any Person on the indebtedness secured hereby.

9.3    <u>Reinstatement</u>.

(a)    This Agreement and the Secured Obligations shall continue to be effective or be automatically reinstated, as the case may be, if (and to the extent that) at any time payment of the Secured Obligations, or any part thereof, is rescinded or reduced in amount, or must otherwise be restored or returned by the Offshore Collateral Agent or any other Secured Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise with respect to Grantor or any other Person party to a Financing Document.

(b)    In the event that any payment or any part thereof is so rescinded, reduced, restored or returned as described in Section 9.3(a) above, such Secured Obligations shall be reinstated on the same terms and conditions applicable thereto prior to the payment of the rescinded, reduced, restored or returned amount, and shall be deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.  Grantor shall indemnify the Offshore Collateral Agent and each other Secured Party on demand for all documented costs and expenses (including fees and expenses of counsel) incurred by the Offshore Collateral Agent or such Secured Party in connection with such rescission, reduction, restoration or return.

9.4    <u>Duties with Respect to the Collateral</u>

(a)    <u>Limitation on Duty of the Offshore Collateral Agent with Respect to the Collateral.</u>  The powers conferred on the Offshore Collateral Agent hereunder are solely to protect its interest and the interests of the Secured Parties in the Collateral and shall not impose any duty on it to exercise any such powers.  Except for the safe custody of any Collateral in

---

[5] NTD: Subject to further review.

its possession, the accounting for monies actually received by it hereunder and the exercise of reasonable care in the custody and preservation of Collateral in its possession, the Offshore Collateral Agent shall have no duty with respect to any Collateral and no implied duties or obligations shall be read into this Agreement against the Offshore Collateral Agent.

(b)    Continuing Liability under Assigned Agreements,    Anything herein contained to the contrary notwithstanding and except as permitted under the Financing Documents, Grantor shall remain liable under each of the Assigned Agreements to which it is a party, to perform all of the obligations undertaken by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and the Offshore Collateral Agent shall have no obligation or liability under any of such Assigned Agreements by reason of or arising out of this Agreement or any other document related thereto, nor shall the Offshore Collateral Agent be required or obligated in any manner to perform or fulfill any obligations of Grantor thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts that may have been assigned  to it or to which it may be entitled at any time or times.

(c)    Destruction of Collateral,    No injury to, or loss or destruction of the Collateral, or any part thereof shall relieve Grantor of any of its obligations hereunder or any Secured Obligations under any Financing Document.

9.5    Attorney-In-Fact.    Grantor hereby constitutes and appoints the Offshore Collateral Agent, acting for and on behalf of itself and the other Secured Parties and each successor or permitted assign of the Offshore Collateral Agent and the other Secured Parties, the true and lawful attorney-in-fact of Grantor, with full power and authority in the place and stead of Grantor and in the name of Grantor or the Offshore Collateral Agent or otherwise as the Offshore Collateral Agent may deem necessary, subject to the terms of the Common Terms Agreement and the other Financing Documents, during the continuance of an Event of Default and at the direction of the Intercreditor Agent, to enforce all rights, interests and remedies of Grantor with respect to the Collateral, including the right:

(a)    to ask, require, demand, receive and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of the Assigned Agreements or any of the other Collateral, including any insurance policies;

(b)    to elect remedies thereunder and to endorse any checks or other instruments or orders in connection therewith;

(c)    to file any claims or take any action or institute any proceedings in connection therewith that the Offshore Collateral Agent may reasonably deem to be necessary or advisable;

(d)    to pay, settle or compromise all bills and claims that may be or become liens or security interests against any or all of the Collateral, or any part thereof, unless a bond or other security satisfactory to the Offshore Collateral Agent has been provided;

(e)    to vote, demand, receive and enforce Grantor's rights with respect to the Collateral;

(f)    to give appropriate receipts, releases and satisfactions for and on behalf of and in the name of Grantor or, at the option of the Offshore Collateral Agent, in the name of the Offshore Collateral Agent, with the same force and effect as Grantor could do if this Agreement had not been made; and

(g)    upon foreclosure and to the extent provided herein or in any other Financing Document, to do any and every act that Grantor may do on its behalf with respect to the Collateral or any part thereof and to exercise any or all of Grantor's rights and remedies under any or all of the Assigned Agreements;

provided, however, that the Offshore Collateral Agent shall not exercise any of the aforementioned rights unless an Event of Default has occurred and is continuing and it receives an instruction from the Intercreditor Agent to exercise such rights; provided, however, that nothing in this Agreement shall prevent Grantor from, prior to the exercise by the Offshore Collateral Agent of any of the aforementioned rights, undertaking Grantor's operations in the ordinary course of business in accordance with the Financing Documents. This power of attorney is a power coupled with an interest and shall be irrevocable until this Agreement is terminated and the security interests created hereby are released.

9.6    Perfection.  Until the Release Date (but subject to the provisions of Section 9.3 *(Reinstatement))*, Grantor agrees that from time to time, at the expense of Grantor, Grantor shall promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary, or that the Offshore Collateral Agent may reasonably request, in order to perfect, to ensure the continued perfection of, and to protect the assignment and security interest granted or intended to be granted hereby or to enable the Offshore Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Grantor agrees as follows:

(a)    Authorization to File Financing Statements.  Grantor authorizes the Offshore Collateral Agent to execute and file such financing statements or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as may be reasonably necessary (including as required by Applicable Law), in order to perfect and preserve the collateral assignments and security interests granted or purported to be granted hereby. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of the Collateral that describes such property in any other manner as the Offshore Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Offshore Collateral Agent herein, including describing such property as "all assets of Grantor, whether now owned or hereafter acquired" or "all personal property of Grantor, whether now owned or hereafter acquired".

(b)     Commercial Tort Claims. With respect to any commercial tort claim that Grantor may hereafter hold, Grantor shall promptly grant to the Offshore Collateral Agent for the benefit of the Secured Parties a first priority security interest (subject to Permitted Liens) therein and the proceeds thereof.

(c)     Special Provisions Relating to Intellectual Property.

(i)     For the purpose of enabling the Offshore Collateral Agent to exercise rights and remedies under Article VII *(Remedies Upon an Event of Default)* of this Agreement at such time as the Offshore Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and be instructed by the Intercreditor Agent to exercise such rights and remedies, and for no other purpose, Grantor hereby grants to the Offshore Collateral Agent following the occurrence and during the continuance of an Event of Default, an irrevocable license (exercisable without payment of royalty or other compensation to Grantor) to use, assign, license or sublicense (in each case on an exclusive basis upon any exercise by the Offshore Collateral Agent of its remedies hereunder or under the other Financing Documents) any of the Intellectual Property now owned or hereafter acquired by Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof, unless such license would violate the terms of usage of the Intellectual Property.

(ii)     Notwithstanding anything contained herein to the contrary, but subject to the provisions of the other Financing Documents that limit the rights of Grantor to dispose of its property, so long as no Event of Default shall have occurred and be continuing and until any exercise by the Offshore Collateral Agent of its remedies hereunder or under other Financing Documents, Grantor may exploit, use, enjoy, protect or take other actions with respect to the Intellectual Property in the ordinary course of business. In furtherance of the foregoing, unless an Event of Default shall have occurred and be continuing, the Offshore Collateral Agent (at Grantor's cost) shall from time to time, upon the request of Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, that Grantor shall have certified are appropriate (in its judgment) to allow it to take any action permitted above. Further, following termination of this Agreement pursuant to Section 9.9(a) *(Termination of Security Interest),* the Offshore Collateral Agent, upon the written direction of Grantor, shall (at Grantor's cost) grant back to Grantor the license granted pursuant to clause (i) immediately above. The exercise of rights and remedies under Article VII *(Remedies Upon an Event of Default)* of this Agreement by the Offshore Collateral Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by Grantor in accordance with clause (i) immediately above.

9.7     Information Concerning Collateral.    Grantor shall promptly upon reasonable request, and at the expense of Grantor, provide to the Offshore Collateral Agent all information and evidence and such other reports that the Offshore Collateral Agent may reasonably request concerning the Collateral to enable the Offshore Collateral Agent to enforce the provisions of this Agreement.

9.8    <u>Liability</u>. NO CLAIM MAY BE MADE BY ANY PARTY HERETO OR ANY OF ITS SHAREHOLDERS, AFFILIATES, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS OF ANY OF THEM AGAINST ANY OTHER PARTY HERETO OR ANY SECURED PARTY OR THE SHAREHOLDERS, AFFILIATES, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH AND EACH PARTY HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON ANY CLAIM FOR ANY SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

9.9    <u>Termination of Security Interest</u>.

(a)    On the Release Date (provided that, with respect to the Equity Collateral and the Pledged Equity, it shall be on the earlier of (x) the Release Date and (ii) the effective date of the Permitted Reorganization), this Agreement (other than provisions intended to survive termination) and the security interests and all other rights granted hereby shall automatically terminate and all rights to the Collateral shall revert to Grantor.  Upon any such termination, the Offshore Collateral Agent shall promptly, at the expense of and upon written direction from Grantor, execute and, subject to Section 9.3 *(Reinstatement),* deliver to Grantor such documents (including UCC termination statements) as Grantor may reasonably request to evidence such termination, to release all security interests on the Collateral and return such Collateral to Grantor or as otherwise required by Applicable Law.

(b)    The security interest created hereby shall be automatically released with respect to any portion of the Collateral that is sold, transferred or otherwise disposed of in compliance with the terms and conditions of the Financing Documents, including as a result of the Permitted Reorganization.

9.10    [<u>Grantor's Rights as Owner Not Affected</u>. This Agreement is not intended to and does not prejudice or affect in any manner or form whatsoever the Grantor's rights as owner under the Strabag Tunneling Contract.][6]

<div align="center">

ARTICLE X.
MISCELLANEOUS

</div>

10.1    <u>Amendments; Waivers; Consents</u>.    No provision of this Agreement may be amended, supplemented, modified or waived, except by a written instrument signed by all of the parties hereto.

---

[6] NTD: Subject to further review.

10.2    <u>Notices</u>.  Any notice, request or other communication to be given or made under this Agreement shall be in writing and, unless otherwise specified herein, may be delivered by: (i) hand, airmail, facsimile or established courier service to each party hereto at its respective address specified below or at such other address as it may notify the other parties hereto from time to time, and will be effective upon receipt; or (ii) email to each party hereto at its respective email address specified below or at such other email address as it may notify the other parties hereto from time to time, and will be effective upon receipt.

For Grantor:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  General Manager
Telephone: +56 2 3333 8301
Email: <u>luis.urrejola@aes.com</u>

With a copy to:

Alto Maipo SpA
Los Conquistadores 1730, Piso 10
Providencia, Región Metropolitana, Chile
Attention:  Felix Gomez
Email: <u>felix.gomez@aes.com</u>

For Offshore Collateral Agent:

Itau Corpbanca, New York Branch
885 3rd Ave. 33rd Floor, New York, NY 10022
Attention: [*]
Telephone: [*]
Facsimile: [*]
Email: [*]

10.3    <u>Severability</u>.  Should any clause, sentence, paragraph, subsection, or Section of this Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken here by the parties hereto, and the remainder will have the same force and effect as if such stricken part or parts had never been included herein.

10.4    <u>Survival of Provisions</u>.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the Common Terms Agreement and the extensions of credit thereunder. Notwithstanding anything in this Agreement or implied by law to the contrary, the agreement and obligations of Grantor set forth in Sections 9.3 *(Reinstatement)*, 1 0.5 *(Expenses; Interest),* and 10.11 *(Rights of the Offshore Collateral Agent)* and the obligations of the Offshore Collateral Agent to grant back to Grantor the license granted

pursuant to Section 9.6(d)(i) *(Special Provisions Relating to Intellectual Property)* in accordance with Section 9.6(d)(ii) *(Special Provisions Relating to Intellectual Property)* shall survive the payment or prepayment of the Secured Obligations.

10.5    Expenses.

(a)    Expenses.  Grantor agrees to pay, within thirty (30) days after receipt of a reasonably detailed written invoice therefor, all documented costs and expenses incurred by the Offshore Collateral Agent (including documented fees and disbursements of one (1) counsel (except in connection with the exercise of remedies hereunder in which case the documented fees and disbursements of any reasonable number of counsel shall be reimbursed by Grantor)) incident to its enforcement, exercise, protection or preservation of any of its rights, remedies or claims (or the rights or claims of any other Secured Party) under this Agreement.

(b)    Interest. Any amount required to be paid by Grantor pursuant to the terms hereof that is not paid when due shall bear interest computed at a rate *per annum* equal to the Default Interest Rate or the maximum rate permitted by Applicable Law, whichever is less, from the date on which such costs or expenses are payable to the date of payment thereof, shall be added to and constitute part of the Secured Obligations secured by this Agreement and shall be paid by Grantor to the Offshore Collateral Agent within thirty (30) days after demand.

10.6    Successions or Assignments.  This Agreement binds and benefits the respective successors and permitted assignees of its parties. However, Grantor may not assign or delegate any of its rights or obligations under this Agreement without the prior written consent of the Offshore Collateral Agent and the Offshore Collateral Agent may not assign or delegate any of its rights or obligations under this Agreement except pursuant to Section 21.07 (*Resignation or Removal of Offshore Collateral Agent*) of the Offshore Accounts Agreement.  The benefit of this Agreement may be freely and unconditionally assigned, transferred, or otherwise disposed of, in whole or in part, to and be binding upon and inure to the benefit of, the successors or assigns of the Secured Parties who shall have, to the extent of their interest, the rights of the Secured Parties hereunder.  Any purported assignment in violation of this provision shall be void.

10.7    Entire Agreement.  This Agreement and the other Financing Documents set forth the entire agreement relating to the subject matter hereof, and supersede all prior statements, agreements, and understandings, whether written or oral, relating hereto.

10.8    Counterparts.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.  Delivery of a duly executed signature page of this Agreement by electronic mail in "Portable Document Format" ("PDF") or by facsimile transmission shall be considered effective delivery.

10.9    Governing Law.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)     Each of the parties hereto irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan. By the execution of this Agreement, each of the parties hereto irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding. Final judgment against Grantor in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)     Nothing in this Agreement shall affect the right of any Secured Party to commence legal proceedings or otherwise sue Grantor in the Country, or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon Grantor in any manner authorized by the laws of any such jurisdiction.

(d)     Grantor hereby confirms, of the date hereof, the irrevocable designation, appointment and empowerment of CT Corporation System, with offices currently located at 111 Eighth Avenue, New York, New York, 10011, as its authorized agent solely to receive for and on its behalf service of any summons, complaint and other legal process in any action, suit or proceeding in the State of New York in respect of this Agreement.

(e)     As long as this Agreement remains in force, Grantor shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding in New York, New York, United States of America with respect to this Agreement.  Grantor shall keep the Offshore Collateral Agent advised of the identity and location of such agent.

(f)     Grantor irrevocably waives to the fullest extent permitted by Applicable Law:

(i)     any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 10.9;

(ii)     any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)     its right of removal of any matter commenced by the Offshore Collateral Agent in the courts of the State of New York to any court of the United States of America.

(g)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT

OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND FOR ANY COUNTERCLAIM THEREON.

(h)    To the extent that Grantor may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Agreement from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed), may be attributed to it or its assets, it irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(i)    To the extent that Grantor may, in any action, suit or proceeding brought in any of the courts referred to in Section 10.9(b) or a court of the Country or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring a Secured Party in such action, suit or proceeding to post security for Grantor's costs or to post a bond or to take similar action, Grantor hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of New York, New York, United States of America, the Country, or, as the case may be, the jurisdiction in which such court is located.

10.10    Third Party Rights.  Except for the Secured Parties, a Person who is not a party to this Agreement shall have no right to enforce any term of this Agreement.

10.11    Rights of the Offshore Collateral Agent.  The Offshore Collateral Agent shall be entitled to the rights, protections, immunities and indemnities set forth in the Offshore Accounts Agreement as if specifically set forth herein.  With respect to the duties, obligations and rights of the Offshore Collateral Agent, if any conflict between the terms of this Agreement and the terms of the Offshore Accounts Agreement arises, the terms of the Offshore Accounts Agreement shall govern and control.

10.12    Second Amendment and Restatement.  This Agreement amends and restates the Amended and Restated Offshore Security Agreement in its entirety.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto, by their officers duly authorized, intending to be legally bound, have caused this Security Agreement to be duly executed as of the date first above written.

**ALTO MAIPO SpA,**
as Borrower

By: _____
      Name:
      Title:

[insert address]

43579538.3

*[Signature Page to the Second Amended and Restated Offshore Security Agreement]*

**ITAÚ CORPBANCA NEW YORK BRANCH,**
as the Offshore Collateral Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


[insert address]

43579538.3

*[Signature Page to the Second Amended and Restated Offshore Security Agreement]*

# ANNEX 1

# PLEDGED EQUITY

| Current Legal Name of Subsidiary Company | Type of Organization | Jurisdiction of Organization | Organizational ID Number (if applicable) | Number of Membership Interest | Percentage of Membership Interests | Certificate Number(s) |
|---|---|---|---|---|---|---|
| Alto Maipo Delaware LLC | limited liability company | Delaware | 6396654 | | 100% | |

43579538.3

*[Signature Page to the Second Amended and Restated Offshore Security Agreement]*

## ANNEX 2

## GRANTOR

| Current Legal Name | Type of Organization | Jurisdiction of Organization | Organizational ID Number (if applicable) | Current Mailing Address | Place of Business or Location of Chief Executive Office |
|---|---|---|---|---|---|
| Alto Maipo SpA | *sociedad por acciones* | Republic of Chile | RUT 76.170.761-2 | Rosario Norte 532, Piso 19, Las Condes, Santiago, Chile | Rosario Norte 532, Piso 19, Las Condes, Santiago, Chile |

43579538.3

*[Signature Page to the Second Amended and Restated Offshore Security Agreement]*

## **ANNEX 3**

## **GRANTOR'S UCC FILING JURISDICTION**

1. District of Columbia

**Exhibit U**

**Offshore Subsidiary Guaranty and Security Agreement**

29299009.2

**DFC Loan Number 513-2014-949-IG & 9000042574**

---

**SUBSIDIARY GUARANTY AND SECURITY AGREEMENT**

**by and between**

**ALTO MAIPO DELAWARE, LLC,**
**a Delaware limited liability company,**
**as Subsidiary Guarantor,**

**and**

**ITAÚ CORPBANCA NEW YORK BRANCH,**
**as the Offshore Collateral Agent**

**Dated as of _____, 2022**

---

43021822.7

[AM_ACTIVE 403904156_4]

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ........................................................................................................2

    1.1        Common Terms Agreement and UCC Definitions.............................................2
    1.2        Defined Terms .....................................................................................................2
    1.3        Interpretation.......................................................................................................4

ARTICLE II. GRANT OF SECURITY INTEREST ....................................................................4

    2.1        Granting Clause ...................................................................................................4
    2.2        Delivery of Instruments ......................................................................................6
    2.3        Continuing Liability under Assigned Agreements ..............................................6
    2.4        Defaults under Assigned Agreements..................................................................6
    2.5        Destruction of Collateral.....................................................................................7
    2.6        Retention of Certain Rights .................................................................................7
    2.7        Intellectual Property............................................................................................7
    2.8        Commercial Tort Claims.....................................................................................8

ARTICLE III. GUARANTY ........................................................................................................8

    3.1        Guaranty..............................................................................................................8
    3.2        Guaranty and Grant of Security Interest Absolute.............................................8
    3.3        Waivers and Acknowledgments ........................................................................11
    3.4        Subrogation .......................................................................................................12

ARTICLE IV. REPRESENTATIONS AND WARRANTIES .....................................................13

    4.1        Common Terms Agreement Representations. ...................................................13
    4.2        Assets ................................................................................................................13
    4.3        Valid Interest.....................................................................................................13
    4.4        Authorization ....................................................................................................13
    4.5        Organization......................................................................................................14
    4.6        Bank Accounts. .................................................................................................14
    4.7        Changes in Circumstances ................................................................................14

ARTICLE V. COVENANTS.......................................................................................................14

    5.1        Name; Organization Identification Number; State of Organization; Etc........15
    5.2        Business ............................................................................................................15
    5.3        Records .............................................................................................................15
    5.4        Title and Enforcement.......................................................................................15
    5.5        Additional Contracts .........................................................................................16
    5.6        Transfers and Other Liens..................................................................................16
    5.7        Capital Expenditures .........................................................................................16
    5.8        Permitted Financial Debt ..................................................................................16
    5.9        Limitation on Liens on Collateral .....................................................................16
    5.10      Assignment .......................................................................................................16
    5.11      Sanctionable Practices ......................................................................................16
    5.12      Blocked Persons List.........................................................................................17
    5.13      UN Security Council Resolutions and Prohibited Parties................................17
    5.14      Incorporation by Reference...............................................................................17

i

ARTICLE VI. REMEDIES UPON AN EVENT OF DEFAULT ................................................ 17

6.1     Remedies Upon Event of Default ................................................ 17
6.2     Minimum Notice Period ................................................ 20
6.3     Sale of Collateral ................................................ 20
6.4     Waiver of Certain Rights and Remedies Under Applicable Law ................... 22
6.5     Costs and Expenses ................................................ 22
6.6     Actions Taken by the Offshore Collateral Agent ................................ 22
6.7     No Impairment of Remedies ................................................ 22
6.8     Application of Proceeds ................................................ 23

ARTICLE VII. FURTHER ASSURANCES ................................................ 23

7.1     Remedies Cumulative; Delay Not Waiver ................................................ 23
7.2     Continuing Assignment and Security Interest; Transfer of Notes ................... 24
7.3     Reinstatement ................................................ 24
7.4     Attorney-In-Fact ................................................ 25
7.5     Perfection ................................................ 26
7.6     Information Concerning Collateral ................................................ 27
7.7     Waiver ................................................ 27
7.8     Termination of Security Interest ................................................ 28
7.9     Limitation on Duty of Collateral Agent with Respect to the Collateral ......... 28

ARTICLE VIII. MISCELLANEOUS ................................................ 29

8.1     Amendments; Waivers; Consents ................................................ 29
8.2     Notices ................................................ 29
8.3     Severability ................................................ 29
8.4     Survival of Provisions ................................................ 29
8.5     Expenses ................................................ 30
8.6     Successions or Assignments ................................................ 30
8.7     Entire Agreement ................................................ 30
8.8     Counterparts ................................................ 30
8.9     Governing Law ................................................ 30
8.10    WAIVER OF JURY TRIAL ................................................ 32
8.11    Third Party Rights ................................................ 32
8.12    Rights of the Offshore Collateral Agent ................................................ 32
8.13    Effective Date ................................................ 32

Annex 1     Subsidiary Guarantor Information and Filing Details

Annex 2     Subsidiary Guarantor's UCC Filing Jurisdiction

## SUBSIDIARY GUARANTY AND SECURITY AGREEMENT

THIS SUBSIDIARY GUARANTY AND SECURITY AGREEMENT, dated as of [_____], 2022 (this "Agreement"), is entered into by and between **ALTO MAIPO DELAWARE, LLC**, a Delaware limited liability company ("Subsidiary Guarantor"), and **ITAÚ CORPBANCA NEW YORK BRANCH**, a branch domiciled in New York, New York of Itaú Corpbanca ("Itaú NY"), in its capacity as the offshore collateral agent for the Secured Parties (together with its successors and permitted assigns in such capacity, "Offshore Collateral Agent").

## RECITALS

**WHEREAS**, Alto Maipo SpA, a *sociedad por acciones* formed and existing under the laws of the Republic of Chile ("Borrower"), is undertaking the construction, completion, ownership and operation of the Project.

**WHEREAS**, on November 17, 2021, each of Borrower and Subsidiary Guarantor commenced a bankruptcy case (together, the Bankruptcy Cases") by the filing of a petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Court");

**WHEREAS**, to finance certain costs and expenditures in connection with the construction, completion, ownership and operation of the Project, Borrower, the sole member of Subsidiary Guarantor, is entering into (i) the Third Amended and Restated Common Terms Agreement, dated as of the date hereof (the "Common Terms Agreement"), by and among the Borrower, each Secured Creditor Representative party thereto, as defined therein, and Itaú Corpbanca in its capacity as intercreditor agent for the Secured Creditors, as defined therein and (ii) each of the Financing Documents (as defined in the Common Terms Agreement), pursuant to which, among other things, the Secured Creditors, the Secured Exit Lender, the Working Capital Facility Lender and the VAT Lender have agreed to extend the Secured Debt to Borrower.

**WHEREAS**, Subsidiary Guarantor will gain a substantial economic benefit from the loan and other financial accommodations to be made under the Common Terms Agreement and other Financing Documents and desires that the Secured Creditors, the Secured Exit Lender, the Working Capital Facility Lender and the VAT Lender enter into the Common Terms Agreement and the other Financing Documents.

**WHEREAS**, Subsidiary Guarantor has agreed to secure and guarantee all of the Guaranteed Obligations by granting to the Offshore Collateral Agent, for the benefit of the Secured Parties, a Lien in accordance with the Applicable Priority on the Collateral owned by Subsidiary Guarantor.

**WHEREAS**, the execution and delivery of this Agreement is a condition precedent to the Plan Effective Date of a chapter 11 plan of reorganization of Borrower approved by the Court pursuant to which it will exit the Bankruptcy Cases.

**NOW, THEREFORE**, in consideration of the promises contained herein, and to induce the Secured Parties to enter into the Common Terms Agreement and the other Financing Documents and to make, as applicable, the extensions of credit contemplated thereby, and for other

good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Subsidiary Guarantor hereby agrees with the Offshore Collateral Agent, for the benefit of the Secured Parties, as follows:

## ARTICLE I.

## DEFINITIONS

1.1    Common Terms Agreement and UCC Definitions.    Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings provided in the Common Terms Agreement or, if not defined therein, Articles 8 and 9 of the UCC.

1.2    Defined Terms.    In addition, unless the context otherwise requires the following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall have the following meanings:

"Agreement" has the meaning given in the preamble to this Agreement.

"Agreement Collateral" means, collectively, the Assigned Agreements and including (a) all rights of Subsidiary Guarantor to receive moneys due and to become due under or pursuant to the Assigned Agreements, (b) claims of Subsidiary Guarantor for damages arising out of or for breach of or default under the Assigned Agreements and (c) the right of Subsidiary Guarantor to terminate the Assigned Agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder.

"Assigned Agreements" means, collectively, all agreements, contracts and documents, to which Subsidiary Guarantor is now or may hereafter become a party, and all of Subsidiary Guarantor's rights thereunder.

"Borrower" has the meaning given in the preamble to this Agreement.

"Collateral" has the meaning given in Section 2.1.

"Common Terms Agreement" has the meaning given in the recitals to this Agreement.

"Excluded Property" has the meaning given in Section 2.1.

"Guaranteed Obligations" has the meaning given in Section 3.1.

"Guaranty" has the meaning given in Section 3.2(b)(i).

"Intellectual Property" means, collectively, all:

(a)    copyrights, copyright registrations and applications for copyright registrations, including all renewals and extensions thereof, the right to recover for all past, present and future infringements thereof, and all other rights of any kind whatsoever accruing thereunder or pertaining thereto;

(b)    patents and patent applications, including the inventions and improvements described and claimed therein together with the reissues, divisions, continuations, renewals, extensions and continuations in part thereof, all income, royalties, damages and payments now or hereafter due and/or payable under and with respect thereto, including damages and payments for past or future infringements thereof, the right to sue for past, present and future infringements thereof, and all rights corresponding thereto throughout the world;

(c)    trade names, trademarks and service marks, logos, trademark and service mark registrations, and applications for trademark and service mark registrations, including all renewals of trademark and service mark registrations, all rights corresponding thereto throughout the world, the right to recover for all past, present and future infringements thereof, all other rights of any kind whatsoever accruing thereunder or pertaining thereto, together, in each case, with the product lines and goodwill of the business connected with the use of, and symbolized by, each such trade name, trademark and service mark; and

(d)    (i) inventions, processes, production methods and trade secrets; (ii) licenses or user or other agreements granted to Subsidiary Guarantor with respect to any of the foregoing, in each case whether now or hereafter owned or used; (iii) information, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) field repair data and other information relating to sales or service of products now or hereafter manufactured; (v) accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) causes of action, claims and warranties now or hereafter owned or acquired by Subsidiary Guarantor in respect of any of the items listed above.

"Itaú NY" has the meaning given in the preamble to this Agreement.

"Offshore Collateral Agent" has the meaning given in the preamble to this Agreement.

"Permitted Bank Account" means the deposit account in the name of the Subsidiary Guarantor established with Manufacturers and Traders Trust Company, that is subject to a Deposit Account Control Agreement among the Offshore Collateral Agent, Manufacturers and Traders Trust Company and the Subsidiary Guarantor dated as of the date hereof, and any other deposit account in the name of the Subsidiary Guarantor provided that such account is subject to a Deposit Account Control Agreement in form and substance satisfactory to the Offshore Collateral Agent.

"Project" has the meaning given in the recitals to this Agreement.

"Subsidiary Guarantor" has the meaning given in the preamble to this Agreement.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other

jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

1.3    <u>Interpretation</u>.  In this Agreement, unless the context otherwise requires:

(a)    headings are for convenience only and do not affect the interpretation of this Agreement;

(b)    words importing the singular include the plural and vice versa;

(c)    unless otherwise expressly stated, a reference to an Annex, Article, party, Schedule or Section is a reference to that Article or Section of, or that Annex, party or Schedule to, this Agreement;

(d)    a reference to a document includes an amendment or supplement to, or replacement or novation of, that document but disregarding any amendment, supplement, replacement or novation made in breach of this Agreement;

(e)    a reference to a party to any document includes that party's successors and permitted assigns; and

(f)    the words "include" and "including" shall be deemed to be followed by the phrase "including without limitation".

<div align="center">ARTICLE II.</div>

<div align="center"><u>GRANT OF SECURITY INTEREST</u></div>

2.1    <u>Granting Clause</u>.  As collateral security for the prompt payment in full when due (whether at stated maturity, upon acceleration, on any optional or mandatory prepayment date or otherwise) and performance of the Secured Obligations, including Subsidiary Guarantor's obligations under this Agreement, Subsidiary Guarantor hereby collaterally assigns, grants, conveys, transfers and pledges to, and subject to a continuing security interest in accordance with the Applicable Priority (subject to Permitted Liens) in favor of, the Offshore Collateral Agent, for the benefit of the Secured Parties, all the estate, right, title and interest of Subsidiary Guarantor in, to and under the following property of Subsidiary Guarantor, wherever located, in each case whether now owned or hereafter existing or acquired (collectively, the "<u>Collateral</u>"):

(a)    all Accounts;

(b)    all Agreement Collateral;

(c)    all As-Extracted Collateral;

(d)    all Chattel Paper, including all Electronic Chattel Paper;

(e)    all Deposit Accounts;

<div align="center">4</div>

(f)    all Documents;

(g)    all Equipment;

(h)    all Fixtures;

(i)    all Goods not covered by the preceding clauses of this Section 2.1;

(j)    all Instruments, including all Promissory Notes;

(k)    all Intellectual Property;

(l)    all Inventory;

(m)    all Investment Property, including all Securities, all Securities Accounts and all Security Entitlements with respect thereto and Financial Assets carried therein, and all Commodity Accounts and Commodity Contracts;

(n)    all Letter-of-Credit Rights;

(o)    all Money (as defined in Section 1-201(24) of the UCC);

(p)    all Supporting Obligations;

(q)    all Commercial Tort Claims arising out of, relating to or in connection with all or any part of the Inventory, Equipment or Documents of Subsidiary Guarantor;

(r)    all Payment Intangibles, Software and General Intangibles not covered by the preceding clauses of this Section 2.1;

(s)    the insurance policies maintained or required to be maintained by Subsidiary Guarantor or any other Person under the Secured Debt Documents, including all loss proceeds and other amounts payable to Subsidiary Guarantor thereunder;

(t)    all other tangible and intangible property of Subsidiary Guarantor, including all books, correspondence, credit files, records, invoices, tapes, cards, computer runs and other papers and documents in the possession or under the control of Subsidiary Guarantor;

(u)    all Permits obtained by the Subsidiary Guarantor in connection with the construction, development, operation or maintenance of the Project or in connection with any transaction contemplated by Secured Debt Documents; and

(v)    all Proceeds and products in whatever form of all or any part of the other Collateral, including all rents, profits, income and benefits and all proceeds of insurance, indemnity, warranty or guaranty and all condemnation awards and all other compensation for any event of loss with respect to all or any part of the other Collateral (together with all rights to recover and proceed with respect to the same), and all Accessions to, substitutions and replacements of all or any part of the other Collateral.

IT BEING UNDERSTOOD, however, that notwithstanding anything to the contrary contained in clauses (a) through (v) above, (x) the security interest created by this Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property. "Excluded Property" means, collectively, [(i) any asset constituting *bienes corporales* located in Chile and pledged pursuant to any Onshore Security Document, (ii) any property to the extent that a grant of a security interest in such property by operation of law would become void, voidable, terminable or revocable or is prohibited by applicable law, in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law; and (iii) any permit, license, franchise, lease, promissory note, letter of credit or agreement to which Subsidiary Guarantor is a party or by which Subsidiary Guarantor is bound, and all right, title and interest of Subsidiary Guarantor thereunder, in each case, only to the extent and for so long as the terms of such permit, license, franchise, lease, promissory note, letter of credit or agreement validly prohibit, impair or restrict the creation by Subsidiary Guarantor, or the attachment or perfection, of a security interest in such permit, license, franchise, lease, promissory note, letter of credit or agreement in favor of the Offshore Collateral Agent, or such creation, attachment or perfection would give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination or remedy thereunder or would impair the rights of the counterparty thereto or such creation, attachment or perfection would not be permitted by Applicable Law or without the consent of any other person and such consent has not been obtained (after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) or any other Applicable Law or principles of equity).]

2.2     Delivery of Instruments.   In order to effectuate the foregoing, Subsidiary Guarantor has heretofore delivered or concurrently with the delivery hereof is delivering to the Offshore Collateral Agent an executed copy of all certificates, notes and other instruments representing or evidencing any Collateral.

2.3     Continuing Liability under Assigned Agreements.   Anything herein contained to the contrary notwithstanding and except as permitted under the Financing Documents, Subsidiary Guarantor shall remain liable under each of the Assigned Agreements to which it is a party, to perform all of the obligations undertaken by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and the Offshore Collateral Agent shall have no obligation or liability under any of the Assigned Agreements by reason of or arising out of this Agreement or any other document related thereto, nor shall the Offshore Collateral Agent be required or obligated in any manner to perform or fulfill any obligations of Subsidiary Guarantor thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

2.4     Defaults under Assigned Agreements.   If any "event of default" or "default" by Subsidiary Guarantor under any of the Assigned Agreements to which it is a party (collectively, a "Default") shall occur and be continuing at any time at which an Event of Default has occurred and is continuing, Offshore Collateral Agent, at the direction of the Required Creditors, and without limiting any of the Offshore Collateral Agent's rights under any other Financing Document, may remedy any such Default by giving prior written notice of such intent to Subsidiary Guarantor and to the parties to each Assigned Agreement under which such default or event of default exists.  Any curing by the Offshore Collateral Agent of Subsidiary Guarantor's Default

under any of the Assigned Agreements shall not be construed as an assumption by the Offshore Collateral Agent or any other Secured Party of any obligations, covenants or agreements of Subsidiary Guarantor under such Assigned Agreement, and the Offshore Collateral Agent shall not incur any liability to Subsidiary Guarantor or any other Person as a result of any actions undertaken by the Offshore Collateral Agent in curing or attempting to cure any such Default. This Agreement shall not be deemed to release or to affect in any way the obligations of Subsidiary Guarantor under the Assigned Agreement to which it is a party.

2.5     Destruction of Collateral.  No injury to, or loss or destruction of, the Collateral or any part thereof shall relieve Subsidiary Guarantor of any of its obligations hereunder or any of the Secured Obligations under the Financing Documents, except if and to the extent set forth in and pursuant to the terms of the Financing Documents.

2.6     Retention of Certain Rights.  So long as the Offshore Collateral Agent has not exercised remedies with respect to the Collateral under this Agreement or any other Financing Document at the direction of the Required Creditors upon the occurrence and during the continuation of an Event of Default, Subsidiary Guarantor reserves all rights with respect to the Collateral owned by it (except as limited by the Financing Documents), including all rights to possess, use, apply, modify, dispose of or otherwise deal with such Collateral (except as limited by the Financing Documents).

2.7     Intellectual Property.

(a)     For the purpose of enabling the Offshore Collateral Agent to exercise its rights, remedies, powers and privileges under Article VI (*Remedies upon an Event of Default*) at such time or times as the Offshore Collateral Agent is lawfully entitled to exercise those rights, remedies, powers and privileges, and for no other purpose, Subsidiary Guarantor hereby grants to the Offshore Collateral Agent, to the extent assignable or licensable in a manner consistent with this Agreement, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Subsidiary Guarantor) to use, assign, license or sublicense any of the Intellectual Property of Subsidiary Guarantor, together with reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout of those items.

(b)     Notwithstanding anything herein to the contrary, but subject to the provisions of the Financing Documents that limit the rights of Subsidiary Guarantor to dispose of its property, so long as no instruction by the Offshore Collateral Agent at the direction of the Required Creditors has been delivered in connection with an Event of Default that has occurred and is continuing, Subsidiary Guarantor will be permitted to exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of the business of Subsidiary Guarantor.  In furtherance of the foregoing, so long as no instruction by the Offshore Collateral Agent at the direction of the Required Creditors has been delivered in connection with an Event of Default that has occurred and is continuing, the Offshore Collateral Agent shall from time to time, upon the request and at the sole cost and expense of Subsidiary Guarantor, execute and deliver any instruments, certificates or other documents, in the form so requested, that Subsidiary Guarantor shall have certified are appropriate (in its reasonable judgment) to allow it to take any action permitted above.  Further, upon the release of

the Offshore Collateral Agent's Liens on the Collateral pursuant to Section 7.8, the Offshore Collateral Agent shall transfer to Subsidiary Guarantor the license granted pursuant to clause (a) immediately above.  The exercise of rights and remedies under Article VI (*Remedies upon an Event of Default*) by the Offshore Collateral Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by Subsidiary Guarantor in accordance with the first sentence of this clause (b).

2.8    Commercial Tort Claims.  Subsidiary Guarantor agrees that, if it shall acquire any interest in any commercial tort claim (whether from another Person or because such commercial tort claim shall have come into existence), (a)  Subsidiary Guarantor shall, promptly upon such acquisition, deliver to the Offshore Collateral Agent, in each case in form and substance reasonably satisfactory to the Offshore Collateral Agent, a written notice of the existence and nature of such commercial tort claim containing a reasonably specific description of such commercial tort claim, certified by Subsidiary Guarantor as true, correct and complete, (b) the provisions of this Article II (*Grant of Security Interest*) shall apply to such commercial tort claim (and Subsidiary Guarantor authorizes the Offshore Collateral Agent to supplement this Agreement with a description of such commercial tort claim if Subsidiary Guarantor fails to deliver the notice described in clause (a)), and (c)  Subsidiary Guarantor shall execute and deliver to the Offshore Collateral Agent, in each case in form and substance reasonably satisfactory to the Offshore Collateral Agent, any certificate, agreement or other document, and take all other action, deemed by the Offshore Collateral Agent to be reasonably necessary or appropriate for the Offshore Collateral Agent to obtain, on behalf of the Secured Parties, a perfected security interest in accordance with the Applicable Priority in all such commercial tort claims.

ARTICLE III.

GUARANTY

3.1    Guaranty.    Subsidiary Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Offshore Collateral Agent, on behalf of the Secured Parties, the performance and punctual payment when due (whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise) of all amounts owing by Borrower to the Secured Parties under the Common Terms Agreement, the other Financing Documents and all other Secured Obligations of Borrower now or hereafter existing under or in respect of the Financing Documents (including any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Secured Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Secured Obligations being the "Guaranteed Obligations"), and agrees to pay any and all reasonable and documented expenses (including reasonable and documented fees and expenses of counsel) incurred by the Offshore Collateral Agent or any other Secured Party in enforcing any rights under this Section 3.1 in accordance with the terms of Section 2.08 (*Expenses*) of the Common Terms Agreement.

3.2    Guaranty and Grant of Security Interest Absolute.

(a)    Subsidiary Guarantor guarantees that the Guaranteed Obligations will be paid in accordance with the terms of the Financing Documents, regardless of any applicable

laws now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto.  To the maximum extent permitted by Applicable Law, the obligations of Subsidiary Guarantor under or in respect of this Agreement are independent of the Secured Obligations of Borrower under or in respect of the Financing Documents, and a separate action or actions may be brought and prosecuted against Subsidiary Guarantor to enforce this Agreement, irrespective of whether any action is brought against Borrower or whether Borrower is joined in any such action or actions.  The obligations of Subsidiary Guarantor under this Agreement and the rights of the Offshore Collateral Agent and the Liens and security interests hereunder shall be irrevocable, absolute and unconditional irrespective of, and Subsidiary Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

> (i)    any illegality or lack of validity or enforceability of the Secured Obligations, any Financing Document or any agreement or instrument relating thereto;

> (ii)    any failure or omission to assert or enforce, or an agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Financing Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of, or security for the payment of, the Guaranteed Obligations;

> (iii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Financing Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case in accordance with the terms hereof or such Financing Document, or any agreement relating to such other guaranty or security, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to Borrower;

> (iv)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any guaranty, for all or any of the Guaranteed Obligations in each case in accordance with the terms hereof or such Financing Document;

> (v)    any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other assets of Borrower or of Subsidiary Guarantor;

> (vi)    the application of payments received from any source (other than payments received pursuant to the other Financing Documents or from the

proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations;

(vii)    any change, restructuring or termination of the corporate structure or existence of Borrower or Subsidiary Guarantor and any Secured Party's consent thereto and to any corresponding restructuring of the Guaranteed Obligations;

(viii)    the failure of any other Person to execute or deliver any other guaranty or agreement or the release or reduction of liability of any other guarantor or surety with respect to the Guaranteed Obligations;

(ix)    any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Borrower, Subsidiary Guarantor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding;

(x)    any defenses, set offs or counterclaims which Borrower or Subsidiary Guarantor may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; or

(xi)    any other circumstance (including any statute of limitations but excluding payment in full of the Guaranteed Obligations other than unasserted contingent payment obligations that by their nature expressly survive the termination of the Financing Documents) that might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor.

(b)    In furtherance of the foregoing and without limiting the generality thereof, Subsidiary Guarantor agrees as follows:

(i)    Subsidiary Guarantor's guaranty under Section 3.1 (the "Guaranty") is a primary obligation of Subsidiary Guarantor and not merely a contract of surety;

(ii)    The Offshore Collateral Agent may, at the direction of the Required Creditors, enforce this Guaranty upon the occurrence and during the continuance of an Event of Default, notwithstanding the existence of any dispute between Borrower and any Secured Party with respect to the existence of such Event of Default;

(iii)    The obligations of Subsidiary Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor of the obligations of Borrower, and a separate action or actions may be

brought and prosecuted against Subsidiary Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(iv)    Payment by Subsidiary Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge Subsidiary Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Offshore Collateral Agent is awarded a judgment in any suit brought to enforce Subsidiary Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release Subsidiary Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit; and

(v)    Subject to the terms of the Financing Documents, any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of Subsidiary Guarantor's liability hereunder, from time to time may (A) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (B) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (C) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (D) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (E) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Subsidiary Guarantor against any Affiliate or any security for the Guaranteed Obligations; and (F) exercise any other rights available to it under the Financing Documents.

3.3    Waivers and Acknowledgments.

(a)    Subsidiary Guarantor's guaranty under Section 3.1 is a guarantee of payment and not of collection.  Subsidiary Guarantor hereby unconditionally and irrevocably waives, to the maximum extent permitted by applicable laws, promptness, diligence, notice of

acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice of any kind with respect to any of the Secured Obligations and this Agreement and any requirement that any Secured Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against Borrower or any other Person or any Collateral.

(b)     Subsidiary Guarantor hereby acknowledges that this Agreement is continuing in nature (in accordance with the terms hereof) and applies to all Guaranteed Obligations, whether existing now or in the future, and shall remain in full force and effect until such time as the Guaranteed Obligations (other than unasserted contingent payment obligations that by their nature expressly survive the termination of the Financing Documents) have been paid in full.

(c)     Subsidiary Guarantor hereby unconditionally and irrevocably waives, for the benefit of the Secured Parties, to the maximum extent permitted by applicable laws, (i) any right to require any Secured Party, as a condition of payment or performance by Subsidiary Guarantor, to (A) proceed against Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (B) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (C) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of Borrower or any other Person, or (D) pursue any other remedy in the power of any Secured Party whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or by reason of the cessation of the liability of Borrower from any cause other than payment in full of the Guaranteed Obligations (other than unasserted contingent payment obligations that by their nature expressly survive the termination of the Financing Documents); (iii) any defense based upon any Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith, gross negligence or willful misconduct; (iv) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Subsidiary Guarantor's obligations hereunder; and (v) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(d)     Subsidiary Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Financing Documents and that the waivers set forth in Section 3.2 and this Section 3.3 are knowingly made in contemplation of such benefits.

3.4     <u>Subrogation</u>. Subsidiary Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Borrower that arise from the existence, payment, performance or enforcement of Subsidiary Guarantor's obligations under or in respect of this Agreement, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against Borrower or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from Borrower directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, prior to termination under Section 7.8.  Notwithstanding the foregoing sentence, if any amount shall be paid to Subsidiary

Guarantor in violation of the immediately preceding sentence at any time prior to termination under Section 7.8, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of Subsidiary Guarantor and shall promptly (and, in any event, within two (2) Business Days) be paid or delivered to the Offshore Collateral Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of the Financing Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Agreement thereafter arising.  Upon termination under Section 7.8, the Offshore Collateral Agent will, at Subsidiary Guarantor's request and at Subsidiary Guarantor's expense, execute and deliver to such Person appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to Subsidiary Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by Subsidiary Guarantor pursuant to this Agreement.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES

Subsidiary Guarantor represents and warrants to and in favor of the Offshore Collateral Agent and the other Secured Parties as follows:

4.1    Common Terms Agreement Representations.  Each representation and warranty made with respect to Subsidiary Guarantor in the Common Terms Agreement as of the date hereof is true and correct.Assets.  Subsidiary Guarantor has valid and unencumbered title to the Collateral, free and clear of any Lien other than claims mandatorily preferred by Applicable Law and Permitted Liens.

4.3    Valid Interest.  This Agreement creates in favor of the Offshore Collateral Agent for the benefit of the Secured Parties a valid and enforceable first priority security interest in the Collateral, subject to no Liens other than claims mandatorily preferred by Applicable Law and Permitted Liens, and this Agreement will create such an interest in all after-acquired property included within the Collateral when acquired, subject to no Liens other than claims mandatorily preferred by Applicable Law and Permitted Liens.  Subject to the requirements contained in the UCC with respect to the filing of continuation statements, as of the date hereof, no filings other than the filing of UCC financing statements in the filing offices identified on Annex 2 hereto are necessary under the UCC to perfect or maintain the perfection of the security interest granted to the Offshore Collateral Agent for the benefit of the Secured Parties, to the extent the Offshore Collateral Agent's security interest can be perfected by filing a financing statement pursuant to the UCC.

4.4    Authorization.  As of the date hereof,

(a)    Subsidiary Guarantor (i) is a duly formed and validly existing limited liability company in good standing under the laws of Delaware; (ii) is authorized to do business in each jurisdiction where the character of its properties or the nature of its activities

makes such qualification necessary; and (iii) has the power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage.

(b)     Subsidiary Guarantor (i) has the power and authority to execute, deliver and perform under this Agreement and any Assigned Agreements and to pledge and assign the Collateral; (ii) has taken all necessary action to authorize the execution, delivery and performance of this Agreement and any Assigned Agreements; and (iii) has duly executed and delivered this Agreement and any Assigned Agreements.  This Agreement constitutes the legal, valid and binding obligations of Subsidiary Guarantor, enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equitable principles.

(c)     The execution and delivery of, and performance by Subsidiary Guarantor under, this Agreement does not (i) violate any provision of any material agreement to which Subsidiary Guarantor is a party or by which any of its property or assets is bound, or (ii) conflict with any material law, order, rule or regulation applicable to Subsidiary Guarantor of any court or any federal or state government, regulatory body or administrative agency, or any other governmental body having jurisdiction over Subsidiary Guarantor or any of its properties.

4.5     <u>Organization</u>.  Annex 1 sets forth under the appropriate headings (i) Subsidiary Guarantor's full and correct legal name, (ii) type and jurisdiction of organization and organizational ID number (if applicable) of Subsidiary Guarantor and (iii) the principal place of business of Subsidiary Guarantor.

4.6     <u>Bank Accounts</u>.  Subsidiary Guarantor does not have any bank accounts other than the Permitted Bank Account.

4.7     <u>Changes in Circumstances</u>.  Subsidiary Guarantor has never changed its location (as defined in Section 9-307 of the UCC) or changed its name or become a "new debtor" (as defined in Section 9-102(a)(56) of the UCC) with respect to a currently effective security agreement previously entered into by any other Person except with respect to Permitted Liens.

ARTICLE V.

<u>COVENANTS</u>

Subsidiary Guarantor agrees that until the earlier of (i) the Release Date and (ii) the effective date of the Permitted Reorganization[1], Subsidiary Guarantor shall comply with each and all of the following covenants:

---

[1] Defined term to be added to the CTA: "The amalgamation, consolidation or merger with or into, or acquisition of all of the assets of the Subsidiary Guarantor into by the Borrower in a single or series of transactions, to ultimately amalgamate, consolidate or merge into the Borrower, or the dissolution of the Subsidiary Guarantor, or wind-up, liquidation or dissolution of its affairs." As part of a Permitted Reorganization, Alto Maipo should provide comfort that (i) there is no potential tax liability or other material expense to the Borrower in connection with the winding-up of AM DE, (ii) there is no need to

5.1    <u>Name; Organization Identification Number; State of Organization; Etc</u>.  Without limiting any prohibitions or restrictions set forth in the Financing Documents, Subsidiary Guarantor shall not (i) change its name, identity, organizational form, principal place of business or chief executive office, type of organization, jurisdiction of organization or organizational identification number (if any), (ii) establish any trade names or (iii) agree to or authorize any modification of the terms of any item of Collateral that would result in a change thereof from one UCC category to another such category, if the effect thereof would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, (x) except to the extent such actions set forth in sub-clauses (i), (ii) and (iii) of this Section 5.1 are expressly permitted under the Financing Documents and (y) unless, in the case of each of sub-clause (i), (ii), and (iii) of this Section5.1, Subsidiary Guarantor shall have (A) notified the Offshore Collateral Agent in writing (1) at least thirty (30) days prior to any such change in its name, identity, organizational form, type of organization, jurisdiction of organization or organizational identification number (if any) or (2) within thirty (30) days following such change in its principal place of business or chief executive office other than as set forth in Annex 1, in each case identifying such new proposed name, identity, organizational form, principal place of business or chief executive office, jurisdiction of organization, organizational identification number or trade name and providing such other information in connection therewith as the Offshore Collateral Agent may reasonably request and (B) taken all actions necessary to maintain the continuous validity, perfection and the same or better priority of the Offshore Collateral Agent's security interest in the Collateral granted or intended to be granted and agreed to hereby.

5.2    <u>Business</u>.  Subsidiary Guarantor shall not engage in any business activities other than administering the Permitted Bank Account and making the payments required to be made from the Permitted Bank Account to comply with the final bankruptcy court orders and making other payments in accordance with the Annual Budget or as otherwise permitted under the Financing Documents.

5.3    <u>Records</u>.  Subsidiary Guarantor shall, at all times, keep adequate records of the Collateral. Upon three (3) Business Days' prior notice, Subsidiary Guarantor shall permit representatives of the Offshore Collateral Agent at reasonable times during normal business hours of Subsidiary Guarantor to inspect and make abstracts from Subsidiary Guarantor's books and records pertaining to the Collateral.  Upon the occurrence and continuance of any Event of Default, at Offshore Collateral Agent's request, Subsidiary Guarantor shall promptly deliver copies (or, where requested by the Offshore Collateral Agent, and where available, originals) of any and all books and records of the Collateral to the Offshore Collateral Agent.

5.4    <u>Title and Enforcement</u>.  Subsidiary Guarantor shall defend its title to the Collateral and the interest of the Offshore Collateral Agent in the Collateral against any claim or demand of any Persons.  Subsidiary Guarantor shall, at its own expense, execute and deliver such instruments and documents as may be reasonably required by the Offshore Collateral Agent or the Secured Parties to maintain the security interest in the Collateral created hereunder. Any action or proceeding to enforce this Agreement or any Assigned Agreement may be taken by the Offshore

---

maintain any reserves for contingent liability of AM DE in connection with a dissolution, and (iii) in connection with a dissolution, all assets of Subsidiary Guarantor are transferred to the Borrower.

Collateral Agent either in Subsidiary Guarantor's name or in Offshore Collateral Agent's name, as the Offshore Collateral Agent may deem reasonably necessary.

5.5    Additional Contracts. Subsidiary Guarantor shall not enter into any additional contract other than the Financing Documents to which it is a party, other than agreements entered into in connection with the Permitted Reorganization or in in furtherance of making any payments pursuant to Sections 5.02(a)(i)(A) through (C) of the Offshore Accounts Agreement.

5.6    Transfers and Other Liens.  Subsidiary Guarantor shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as expressly permitted by the Financing Documents, or (ii) directly or indirectly create or permit to exist any lien upon or with respect to any of the Collateral, except for Permitted Liens in favor of the Secured Parties. Subsidiary Guarantor shall at its own cost and expense promptly take such action as may be necessary to discharge any such liens.

5.7    Capital Expenditures.  Subsidiary Guarantor shall not incur expenditures or commitments for expenditures for fixed assets, and shall not incur any expenditures that are not included in the Annual Budget.

5.8    Permitted Financial Debt. Subsidiary Guarantor shall not incur, assume or permit to exist any indebtedness other than as expressly permitted to be incurred by Subsidiary Guarantor pursuant to the Financing Documents[2].

5.9    Limitation on Liens on Collateral.

(a)    Other than with respect to Permitted Liens, Subsidiary Guarantor shall not file or authorize or permit to be filed, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which the Offshore Collateral Agent or the Onshore Collateral Agent is not named as the secured party for the benefit of the Secured Parties.

(b)    Subsidiary Guarantor shall not directly or indirectly create, incur, assume or suffer to exist any Liens on or with respect to any part of the Collateral (other than Liens granted pursuant to the Financing Documents or any Permitted Liens).  Subsidiary Guarantor will at its own cost and expense promptly take such action as may be necessary to discharge any such Liens.

5.10    Assignment. Subsidiary Guarantor shall not (i) make any assignment of its rights under any Assigned Agreements (if any) except to the Borrower and (ii) shall not cancel or terminate any Assigned Agreement nor consent to or accept any cancellation or termination thereof, nor amend or otherwise modify any Assigned Agreement, in each case other than in accordance with the Financing Documents.

5.11    Sanctionable Practices.  Subsidiary Guarantor shall not engage in (and shall not authorize or permit any Affiliate or any other Person acting on its behalf to engage in) any Sanctionable Practices with respect to the Project or any transaction contemplated by this

---

[2] NTD: to include customary carve outs for the guarantor.

Agreement. The Subsidiary Guarantor further covenants that should any Secured Party notify Subsidiary Guarantor of its concerns that there has been a violation of the provisions of this Section 5.11 or of Section 3.01(p) (*Representations and Warranties - Sanctionable Practices*) of the Common Terms Agreement, it shall cooperate in good faith with that Secured Party and its representatives in determining whether such a violation has occurred, and shall respond promptly and in reasonable detail to any notice from that Secured Party, and shall furnish documentary support for such response upon that Secured Party's request.

5.12    Blocked Persons List.    Subsidiary Guarantor shall not be included on the Specifically Designated Nations and Blocked Persons List maintained by the United States Department of the Treasury's Office of Foreign Asset Control and none of its Affiliates or any other Person acting on its behalf shall be included on such lists.

5.13    UN Security Council Resolutions and Prohibited Parties. Subsidiary Guarantor shall not enter into any transaction or engage in any activity prohibited by Sanctions, including any resolution of the United Nations Security Council under Chapter VII of the United Nations Charter, or enter into any transaction with any Prohibited Party or become a Prohibited Party (and none of the Shareholder, the Sponsor nor any Affiliate, nor any Person acting on its or their behalf shall become a Prohibited Party); provided that, for purposes of this Section 5.13, item (iii) of the definition of Prohibited Party shall not apply.

5.14    Incorporation by Reference.    Each obligation, covenant and agreement of Borrower set forth in the Financing Documents for which compliance is expressly specified in such Financing Document to be applicable to the Subsidiary Guarantor is hereby incorporated by reference in this Agreement, *mutatis mutandis* as a direct obligation, covenant and agreement of Subsidiary Guarantor only with respect to the beneficiary identified in such Financing Document; provided that this covenant and agreement shall not be deemed to have been breached unless and until the failure to perform and observe such covenant and agreement has separately given rise to an Event of Default; provided, further, that the remedies for such breach shall be limited to the remedies available with respect to such beneficiaries with respect to that Event of Default; and provided, further, that any such breach of this Section 5.14 shall not be subject to any additional cure period as prescribed for such breach under the relevant Financing Document.

ARTICLE VI.

REMEDIES UPON AN EVENT OF DEFAULT

6.1    Remedies Upon Event of Default.    Upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, at the direction of the Required Creditors, shall have the right, but not the obligation, to do any of the following:

(a)    proceed to protect and enforce the rights vested in it by this Agreement by such appropriate judicial proceedings as it shall deem most effective to protect and enforce any of such rights, either at law or in equity or otherwise, whether for specific enforcement of any covenant or agreement contained in any of the Assigned Agreements (including specific performance of any covenant or agreement contained herein), or in aid of the exercise of any power therein or herein granted, or for any foreclosure hereunder and sale under a judgment or decree in

17

any judicial proceeding, or to enforce any other legal or equitable right vested in it by this Agreement or by Applicable Laws and under the UCC;

(b)     cause all revenues hereby pledged as security and all other moneys and other property pledged hereunder to be paid and/or delivered directly to it, by demanding, suing for, collecting and/or receiving any such moneys and property;

(c)     cause any action at law or suit in equity or other proceeding to be instituted and prosecuted to collect or enforce any obligation or right hereunder or included in the Collateral, including specific enforcement of any covenant or agreement contained herein, or to foreclose or enforce the security interest in all or any part of the Collateral granted herein, or to enforce any other legal or equitable right vested in it by this Agreement or by Applicable Law;

(d)     foreclose or enforce any agreement or instrument by or under or pursuant to which the Secured Obligations are issued or secured;

(e)     incur expenses, including attorneys' fees, consultants' fees and other costs appropriate to the exercise of any right or power under this Agreement;

(f)     perform any obligation of Subsidiary Guarantor hereunder or under any other Financing Document or Assigned Agreements, make payments, submit drawing certificates under any letter of credit, purchase, contest or compromise any encumbrance, charge or lien, pay taxes and expenses and insure, process, replace, alter, add, improve and/or preserve and protect the Collateral, and the documented expenses of the Offshore Collateral Agent incurred in connection therewith shall be part of the Guaranteed Obligations;

(g)     in connection with any acceleration or foreclosure under the Financing Documents, take possession of the Collateral and of any and all books of account and records of Subsidiary Guarantor relating to any of the Collateral and render it usable and repair or renovate the same without, however, any obligation to do so, and enter upon, or authorize its designated agent to enter upon, any location where the same may be located for that purpose (including the right of the Offshore Collateral Agent to exclude Subsidiary Guarantor and all Persons claiming access through Subsidiary Guarantor from any access to the Collateral or to any part thereof) and the Offshore Collateral Agent and its representatives are hereby granted an irrevocable license to enter upon such premises for such purpose, and to hold, control, manage, operate, rent and lease the Collateral, collect all rents, issues, profits, fees, revenues and other income from the Collateral and apply the same to reimburse the Secured Parties for any cost or expenses documented and reasonably incurred hereunder or under any of the Financing Documents and to the payment of Subsidiary Guarantor's obligations and the payment of the cost of performance of any obligation of Subsidiary Guarantor hereunder or under any of the Financing Documents, and apply the balance in accordance with Section 2.06 (*Mandatory Prepayment*) of the Common Terms Agreement, and any remaining excess balance to whomsoever is legally entitled thereto;

(h)     defend any suit, action or proceeding brought against Subsidiary Guarantor with respect to any Collateral;

(i)    make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral or any suit, action or proceeding related thereto and, in connection therewith, extend the time of payment, arrange for payment installments, or otherwise modify the terms of, any Collateral;

(j)    secure the appointment of a receiver of the Collateral or any part thereof, whether incidental to a proposed sale of the Collateral or otherwise, and all reasonable disbursements made by such receiver and the reasonable expenses of such receivership shall be added to and be made a part of the Secured Obligations, and, whether or not said sum, including such disbursements and expenses, exceeds the indebtedness originally intended to be secured hereby, the entire amount of said sum, including such disbursements and expenses, shall be secured by this Agreement and such disbursements and expenses shall be due and payable upon demand therefor;

(k)    enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for, the Collateral or any part thereof;

(l)    transfer the Collateral or any part thereof to the name of the Offshore Collateral Agent or to the name of the Offshore Collateral Agent's nominee;

(m)    take possession of and endorse in the name of Subsidiary Guarantor or in the name of the Offshore Collateral Agent, for the account of Subsidiary Guarantor, any bills of exchange, invoices, freight or express bills, storage or warehouse receipts, bills of lading, checks, drafts, money orders, notes or any other chattel paper, assignments, verifications, notices, documents or instruments constituting all or any part of the Collateral or received as interest, rent or other payment on or on account of the Collateral or any part thereof or on account of its sale or lease;

(n)    require Subsidiary Guarantor to assemble the Collateral or any part thereof and to make the same (to the extent the same is moveable) available to the Offshore Collateral Agent at a place to be designated by the Offshore Collateral Agent which is reasonably convenient to Subsidiary Guarantor and the Offshore Collateral Agent;

(o)    make formal application for the transfer of all of Subsidiary Guarantor's permits, licenses, approvals, and the like relating to the Collateral or Subsidiary Guarantor's business to the Offshore Collateral Agent or to any assignee of the Offshore Collateral Agent or to any purchaser of any of the Collateral to the extent the same are assignable in accordance with their terms and Applicable Laws;

(p)    subject to Section 6.3, sell or otherwise dispose of any or all of the Collateral or cause all or any part of the Collateral to be sold or otherwise disposed of in one or more sales or transactions, at such prices as Offshore Collateral Agent may deem commercially reasonable, and for cash or on credit or for future delivery, without assumption of any credit risk, at any broker's board or at public or private sale, without demand of performance or notice of intention to sell or of time or place of sale (except such notice as is required by Applicable Laws and cannot be waived, in which case such notice shall be in accordance with the provisions hereof

to the extent permitted by Applicable Laws), it being agreed that the Offshore Collateral Agent may be a purchaser on behalf of the Secured Parties or on its own behalf at any such sale and that the Offshore Collateral Agent, any other Secured Party or any other Person who may be a bona fide purchaser for value of any or all of the Collateral without notice of any claims of any or all of the Collateral so sold shall thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any equity of redemption, of Subsidiary Guarantor, any such demand, notice or right and equity being hereby expressly waived and released to the extent permitted by Applicable Laws;

(q)    require Subsidiary Guarantor to take any actions that are reasonably necessary or reasonably appropriate to preserve the value of the Collateral and the validity, perfection or priority of the Liens granted by this Agreement in any portion of the Collateral; or take any other action which the Secured Parties or the Offshore Collateral Agent deems reasonably necessary or reasonably desirable to protect or realize upon the Offshore Collateral Agent's security interest in the Collateral or any part thereof, and Subsidiary Guarantor hereby irrevocably appoints Offshore Collateral Agent as Subsidiary Guarantor's attorney in fact (as set forth in Section 7.4) to take any such action in accordance with the terms of this Agreement, including the execution and delivery of any and all documents or instruments related to the Collateral or any part thereof in Subsidiary Guarantor's name, and said appointment shall create in Offshore Collateral Agent a power coupled with an interest which shall be irrevocable; or

(r)    appoint another Person (who may be an employee, officer or other representative of the Offshore Collateral Agent) to do any of the foregoing, or take any other action permitted hereunder, as agent for or representative of, and on behalf of, the Offshore Collateral Agent; or

(s)    exercise any other or additional rights or remedies granted to the Offshore Collateral Agent under any other provision of any Financing Document or exercisable by a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by Applicable Law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Offshore Collateral Agent were the sole and absolute owner thereof (and Subsidiary Guarantor agrees to take all such action as may be appropriate to give effect to such right).

6.2    <u>Minimum Notice Period</u>.  If, pursuant to Applicable Law, prior notice of any action described in Section 6.1 is required to be given to Subsidiary Guarantor, Subsidiary Guarantor hereby acknowledges that the minimum time required by such Applicable Law, or, if no minimum time is specified, ten (10) days, shall be deemed a reasonable notice period.

6.3    <u>Sale of Collateral</u>.

(a)    In addition to exercising the foregoing rights, upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, at the direction of the Required Creditors, may, to the extent permitted by Applicable Law, arrange for and sell, lease, assign, pledge or otherwise dispose of all or any part of such Collateral, at such place or

places as are commercially reasonable, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at a public or private sale (as the Offshore Collateral Agent may elect), which sale may be conducted by an employee or representative of the Offshore Collateral Agent, and any such sale shall be conducted in a commercially reasonable manner.  Any Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) by Subsidiary Guarantor, any such demand, notice and right or equity being hereby expressly waived and released.  The Offshore Collateral Agent, its nominees, designees and agents may execute, in connection with any sale, lease, assignment, pledge or other disposition of the Collateral, any endorsements, assignments, bills of sale or other instruments of conveyance or transfer with respect to the Collateral.  The Offshore Collateral Agent agrees to provide at least ten (10) days' prior written notice to Subsidiary Guarantor specifying the time and place of any public sale or the time after which any private sale is to be made and Subsidiary Guarantor agrees that such ten (10) days' notice shall constitute reasonable notification (unless a longer notice period shall be required by Applicable Law).  The Offshore Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.

(b)     The Offshore Collateral Agent may release, temporarily or otherwise, to Subsidiary Guarantor any item of Collateral of which the Offshore Collateral Agent has taken possession pursuant to any right granted to the Offshore Collateral Agent by this Agreement without waiving any rights granted to the Offshore Collateral Agent under any Financing Document.  Subsidiary Guarantor, in dealing with or disposing of the Collateral or any part thereof, hereby waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require, upon foreclosure, sales of assets in a particular order.  Each successor and assign of Subsidiary Guarantor, including a holder of a Lien subordinate to the Lien created hereby (without implying that Subsidiary Guarantor has, except as expressly provided in the Financing Documents, a right to grant an interest in, or a subordinate Lien on, any of the Collateral), except as otherwise agreed between such successor or assign of Subsidiary Guarantor and the Offshore Collateral Agent, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, to the same extent as if such holder gave the waiver itself.  If Offshore Collateral Agent, at the direction of the Required Creditors, sells any of the Collateral upon credit, Subsidiary Guarantor will be credited only with payments actually made by the purchaser, received by the Offshore Collateral Agent and applied to the indebtedness of the purchaser (and the Offshore Collateral Agent agrees to promptly so apply such payments to the extent not otherwise applied to necessary costs and expenses of the Project).  In the event the purchaser fails to pay for the Collateral, the Offshore Collateral Agent may resell the Collateral, and Subsidiary Guarantor shall be credited with the proceeds of the sale.  In the event the Offshore Collateral Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by Applicable Law or any Financing Document, the Offshore Collateral Agent may bid any amount or more than the amount of the Secured Obligations.  To the extent permitted by Applicable Law, the amount of the successful bid at any such sale, whether the Offshore Collateral Agent or any other party is the successful bidder, shall, absent fraud or gross negligence, be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount (if less than the amount

of the Secured Obligations) and the remaining balance of the Secured Obligations shall be conclusively deemed to be the amount of the Secured Obligations.

(c)      Private Sales.  Offshore Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Article VI (*Remedies upon an Event of Default*) conducted in a commercially reasonable manner and in accordance with the requirements of Applicable Laws, this Agreement and the other Financing Documents.  Subsidiary Guarantor hereby waives any claims against the Offshore Collateral Agent and the other Secured Parties arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale (or any other private sale) was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations; provided that such private sale is conducted in a commercially reasonable manner and in accordance with Applicable Laws, this Agreement and the other Financing Documents.

(d)      Compliance with Limitations and Restrictions.  Subsidiary Guarantor hereby agrees that in respect of any sale of any of the Collateral pursuant to the terms hereof, the Offshore Collateral Agent is hereby authorized to comply with any other limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of Applicable Law, or in order to obtain any required approval of the sale or of the purchaser by any Authority or official, and Subsidiary Guarantor further agrees that such compliance shall not by itself result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Offshore Collateral Agent be liable or accountable to Subsidiary Guarantor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

6.4      Waiver of Certain Rights and Remedies Under Applicable Law.  In exercising its right to take possession of the Collateral upon the occurrence and during the continuation of an Event of Default, the Offshore Collateral Agent, personally or by its agents or attorneys, to the fullest extent permitted by Applicable Law, may enter upon any land owned or leased by Subsidiary Guarantor without being guilty of trespass or any wrongdoing, and without liability to Subsidiary Guarantor for damages thereby occasioned, other than damages attributable to the Offshore Collateral Agent's, or its agent's or attorney's, willful misconduct or gross negligence.

6.5      Costs and Expenses.  All documented and reasonable costs and expenses (including, documented and reasonable attorneys' fees and expenses) incurred by the Offshore Collateral Agent in connection with any actions taken under Article VI (*Remedies upon an Event of Default*) shall be a part of the Guaranteed Obligations and shall be paid by Subsidiary Guarantor to the Offshore Collateral Agent within five (5) Business Days after demand.

6.6      Actions Taken by the Offshore Collateral Agent  Any action or proceeding to enforce this Agreement or any Assigned Agreements may be taken by the Offshore Collateral Agent, at the direction of the Required Creditors, either in Subsidiary Guarantor's name or in Offshore Collateral Agent's name, as the Offshore Collateral Agent may deem necessary.

6.7      No Impairment of Remedies.  If, in the exercise of any of its rights and remedies under this Agreement, the Offshore Collateral Agent shall forfeit any of its rights or remedies, whether because of any Applicable Law pertaining to "election of remedies" or otherwise,

Subsidiary Guarantor hereby consents to such action by the Offshore Collateral Agent and, to the extent permitted by Applicable Law, waives any claim based upon such action (other than a claim attributable to the gross negligence or willful misconduct of the Offshore Collateral Agent), even if such action by the Offshore Collateral Agent shall result in a full or partial loss of any rights of subrogation, indemnification or reimbursement which Subsidiary Guarantor might otherwise have had but for such action by the Offshore Collateral Agent or the terms herein.  Any election of remedies which results in the denial or impairment of the right of the Offshore Collateral Agent to seek a deficiency judgment against Subsidiary Guarantor shall not, to the extent permitted by Applicable Law, impair Subsidiary Guarantor's obligations hereunder.

6.8     <u>Application of Proceeds</u>.  Upon the occurrence and during the continuation of an Event of Default, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied in accordance with Section 2.09 (*Application of Payments; Sharing*) of the Common Terms Agreement and the amount of any such proceeds in excess of the Guaranteed Obligations shall be paid to Subsidiary Guarantor or as otherwise required by Applicable Law. Subsidiary Guarantor will remain liable for any deficiency, as applicable.

<div align="center">ARTICLE VII.</div>

<div align="center"><u>FURTHER ASSURANCES</u></div>

7.1     <u>Remedies Cumulative; Delay Not Waiver</u>.

(a)     <u>Remedies Cumulative</u>.  No right, power or remedy herein conferred upon or reserved to the Offshore Collateral Agent hereunder is intended to be exclusive of any other right, power or remedy, and every such right, power and remedy shall, to the extent permitted by Applicable Law, be cumulative and in addition to every other right, power and remedy given hereunder or under any other Financing Document, now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy. Resort to any or all security now or hereafter held by the Offshore Collateral Agent or any other Secured Party may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken nonjudicial proceedings, or both.  If the Offshore Collateral Agent or any Secured Party may, under Applicable Law, proceed to realize its benefits under this Agreement or any other Financing Document giving the Offshore Collateral Agent or such Secured Parties a Lien upon any Collateral, whether owned by Subsidiary Guarantor or by any other Person, either by judicial foreclosure or by nonjudicial sale or enforcement, the Offshore Collateral Agent or such Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of the rights and remedies of the Offshore Collateral Agent under this Agreement.

(b)     <u>Delay Not Waiver; Separate Causes of Action</u>.  No failure on the part of the Offshore Collateral Agent or any other Secured Party to exercise, and no course of dealing with respect to, and no delay or omission in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Offshore Collateral Agent or any Secured Party of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  No notice to or

<div align="center">23</div>

demand by the Offshore Collateral Agent or any Secured Party on Subsidiary Guarantor in any case shall entitle Subsidiary Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Offshore Collateral Agent or any Secured Party to any other or further action in any circumstances without notice or demand. Any waiver, permit, consent or approval of any kind or character on the part of the Offshore Collateral Agent of any breach or default under this Agreement, or any waiver on the part of the Secured Parties or the Offshore Collateral Agent of any provision or condition of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. Each and every default by Subsidiary Guarantor hereunder or under the other Financing Documents shall give rise to a separate cause of action hereunder and thereunder, and separate suits may be brought hereunder and thereunder as each cause of action arises. Every power and remedy given by this Agreement may be exercised from time to time, and as often as shall be deemed expedient or appropriate, by the Offshore Collateral Agent, acting at the direction of the Required Creditors, upon the occurrence and during the continuation of an Event of Default.

7.2    <u>Continuing Assignment and Security Interest; Transfer of Notes</u>. This Agreement shall create a continuing pledge and assignment of and security interest in the Collateral and shall: (a) remain in full force and effect until the earlier of (x) the Release Date and (y) the effective date of the Permitted Reorganization; (b) be binding upon Subsidiary Guarantor and its successors and assigns; and (c) inure, together with the rights and remedies of the Offshore Collateral Agent, to the benefit of the Offshore Collateral Agent and its successors and permitted assigns for the benefit of the Secured Parties. Without limiting the generality of the foregoing clause (c), any of the Secured Parties may assign or otherwise transfer the Guaranteed Obligations held by them in whole or in part to any other Person to the extent permitted by and in accordance with the Financing Documents to which it is a party, and such other Person shall thereupon become vested with all or an appropriate part of the benefits in respect thereof granted to the Secured Parties herein or otherwise. Other than pursuant to Section 7.8, the release of the security interest in any or all of the Collateral, the taking or acceptance of additional security, or the resort by the Offshore Collateral Agent or any Secured Party to any security it may have in any order it may deem appropriate, shall not affect the liability of any Person on the indebtedness secured hereby.

7.3    <u>Reinstatement</u>.

(a)    This Agreement and the Guaranteed Obligations shall continue to be effective or be automatically reinstated, as the case may be, if (and to the extent that) at any time payment of the Guaranteed Obligations, or any part thereof, is rescinded or reduced in amount, or must otherwise be restored or returned by the Offshore Collateral Agent or any other Secured Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise with respect to Subsidiary Guarantor or any other Person party to a Financing Document.

(b)    In the event that any payment or any part thereof is so rescinded, reduced, restored or returned as described in Section 7.3(a) above, such Guaranteed Obligations shall be reinstated on the same terms and conditions applicable thereto prior to the payment of the rescinded, reduced, restored or returned amount, and shall be deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned. Subsidiary Guarantor shall indemnify the Offshore Collateral Agent and each other Secured Party on demand for all reasonable and documented costs and expenses (including reasonable and documented fees and expenses of

counsel) incurred by the Offshore Collateral Agent or such Secured Party in connection with such rescission, reduction, restoration or return.

7.4    Attorney-In-Fact.    Subsidiary Guarantor hereby constitutes and appoints the Offshore Collateral Agent, acting for and on behalf of itself and the other Secured Parties and each successor or permitted assign of the Offshore Collateral Agent and the other Secured Parties, the true and lawful attorney-in-fact of Subsidiary Guarantor, with full power and authority in the place and stead of Subsidiary Guarantor and in the name of Subsidiary Guarantor or the Offshore Collateral Agent or otherwise as the Offshore Collateral Agent may deem necessary, subject to the terms of the Common Terms Agreement and the other Financing Documents, during the continuance of an Event of Default and at the direction of the Required Creditors, to enforce all rights, interests and remedies of Subsidiary Guarantor with respect to the Collateral, including the right:

(a)    to ask, require, demand, receive and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of the Assigned Agreements or any of the other Collateral, including any insurance policies;

(b)    to elect remedies thereunder and to endorse any checks or other instruments or orders in connection therewith;

(c)    to file any claims or take any action or institute any proceedings in connection therewith that the Offshore Collateral Agent may reasonably deem to be necessary or advisable;

(d)    to pay, settle or compromise all bills and claims that may be or become liens or security interests against any or all of the Collateral, or any part thereof, unless a bond or other security satisfactory to the Offshore Collateral Agent has been provided;

(e)    to vote, demand, receive and enforce Subsidiary Guarantor's rights with respect to the Collateral;

(f)    to do any and every act which Subsidiary Guarantor might do on its behalf with respect to the Collateral or any part thereof and to exercise any or all of Subsidiary Guarantor's rights and remedies under any or all of the Assigned Agreements;

(g)    to preserve the validity, perfection and priority of the Liens granted by this Agreement or under any other Financing Documents to which Subsidiary Guarantor is a party;

(h)    to, in the name of Subsidiary Guarantor or its own name, or otherwise, take possession of, receive and endorse and collect any check, Account, Chattel Paper, draft, note, acceptance or other Instrument for the payment of moneys due under any Account or General Intangible;

(i)    to execute, in connection with any sale or disposition of the Collateral under Article VI (*Remedies upon an Event of Default*), any endorsements, assignments,

bills of sale or other instruments of conveyance or transfer with respect to all or any part of the Collateral;

(j)    to give appropriate receipts, releases and satisfactions for and on behalf of and in the name of Subsidiary Guarantor or, at the option of the Offshore Collateral Agent, in the name of the Offshore Collateral Agent, with the same force and effect as Subsidiary Guarantor could do if this Agreement had not been made; and

(k)    upon foreclosure and to the extent provided herein or in any other Financing Document, to do any and every act that Subsidiary Guarantor may do on its behalf with respect to the Collateral or any part thereof and to exercise any or all of Subsidiary Guarantor's rights and remedies under any or all of the Assigned Agreements;

provided, however, that the Offshore Collateral Agent shall not exercise any of the aforementioned rights unless an Event of Default has occurred and is continuing and has not been waived in accordance with the Finance Documents; provided, however, that nothing in this Agreement shall prevent Subsidiary Guarantor from, prior to the exercise by the Offshore Collateral Agent of any of the aforementioned rights, undertaking Subsidiary Guarantor's operations in the ordinary course of business in accordance with the Collateral and the Financing Documents.  Pursuant to such power of attorney, if an Event of Default has occurred and is continuing, the Offshore Collateral Agent, at the direction of the Required Creditors, may itself perform, or cause the performance of, any obligations of Subsidiary Guarantor,  and the reasonable and documented expenses of the Offshore Collateral Agent incurred in connection therewith shall be payable by Subsidiary Guarantor hereunder.  This power of attorney is a power coupled with an interest and shall be irrevocable until this Agreement is terminated and the security interests created hereby are released.  Subsidiary Guarantor hereby approves, ratifies and confirms each lawful act and deed of or for the Offshore Collateral Agent done or to be done pursuant to, and in accordance with, this appointment and Applicable Laws as the authorized act and deed of Subsidiary Guarantor.

7.5    Perfection.  Until the earlier of (x) the Release Date (but subject to the provisions of Section 7.3) and (y) the effective date of the Permitted Reorganization, Subsidiary Guarantor agrees that from time to time, at the expense of Subsidiary Guarantor, Subsidiary Guarantor shall promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary, or that the Offshore Collateral Agent or any other Secured Party may reasonably request, in order to perfect, to ensure the continued perfection of, and to protect the assignment and first priority (subject to Permitted Liens) security interest granted or intended to be granted hereby or to enable the Offshore Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Subsidiary Guarantor agrees as follows:

(a)    Authorization to File Financing Statements. Subsidiary Guarantor authorizes the Offshore Collateral Agent to execute and file such financing statements or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as may be reasonably necessary (including as required by Applicable Law), in order to perfect and preserve the collateral assignments and security interests granted or purported to be granted hereby.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of the Collateral that describes such

property in any other manner as the Offshore Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Offshore Collateral Agent herein, including describing such property as "all assets of Subsidiary Guarantor, whether now owned or hereafter acquired" or "all personal property of Subsidiary Guarantor, whether now owned or hereafter acquired"; provided, that such description shall not be deemed to modify the description of the Collateral set forth in Article II (*Grant of Security Interest*).

(b)     Subsidiary Guarantor shall cause its equity interests to be evidenced by and remain "certificated securities" as defined in Article 8 of the UCC. If any of Subsidiary Guarantor's equity interests consists of "uncertificated securities" within the meaning of the UCC or is otherwise not evidenced by any certificate or instrument, Subsidiary Guarantor will promptly notify Offshore Collateral Agent thereof and will promptly take and cause to be taken all actions required under Articles 8 and 9 of the UCC and any other Applicable Laws, to enable Offshore Collateral Agent to acquire "control" (within the meaning of such term under Section 8-106 (or its successor provision) of the UCC) of such uncertificated securities and as may be otherwise reasonably necessary or deemed reasonably appropriate by the Offshore Collateral Agent to perfect the security interest of the Offshore Collateral Agent therein.

(c)     If, at any time and from time to time, any Collateral (including any certificate or instrument representing or evidencing any Collateral) is in the possession of a Person other than Offshore Collateral Agent (a "Holder"), and "control" (within the meaning of the applicable UCC) of such Collateral is required to afford the Offshore Collateral Agent a first priority perfected security interest in such Collateral, then Subsidiary Guarantor shall promptly, at Offshore Collateral Agent's option, either cause such Collateral to be delivered into the Offshore Collateral Agent's possession, or cause such Holder to enter into a control agreement, in form and substance satisfactory to the Offshore Collateral Agent, and take all other steps deemed reasonably necessary by the Offshore Collateral Agent to perfect the security interest of the Offshore Collateral Agent in such Collateral, all pursuant to Section 9-106 and Section 9-313 of the UCC or other Applicable Laws governing the perfection of the Offshore Collateral Agent's security interest in the Collateral in the possession of such Holder.

7.6     <u>Information Concerning Collateral</u>.  Subsidiary Guarantor shall promptly upon request, and at the expense of Subsidiary Guarantor, provide to the Offshore Collateral Agent all information and evidence concerning the Collateral to enable the Offshore Collateral Agent to enforce the provisions of this Agreement.

7.7     <u>Waiver</u>.

(a)     Subsidiary Guarantor hereby waives, to the maximum extent permitted by Applicable Law, (a) all rights under any law to require the Offshore Collateral Agent to pursue any Person other than Subsidiary Guarantor, any security that the Offshore Collateral Agent may hold, or any other remedy before proceeding against Subsidiary Guarantor; (b) all rights to require the Offshore Collateral Agent to give any notices of any kind, including notices of nonpayment, nonperformance, protest, dishonor, default, delinquency or acceleration, or to make any presentments, demands or protests, except as set forth herein or as expressly provided in the Common Terms Agreement or other Financing Documents; (c) all rights to assert any

bankruptcy or insolvency of Subsidiary Guarantor as a defense hereunder or as the basis for rescission hereof; (d) all rights under any Applicable Law purporting to reduce Subsidiary Guarantor's obligations hereunder if the Guaranteed Obligations are reduced (other than as a result of payment of such Guaranteed Obligations); and (e) all defenses based on the disability or lack of authority of Subsidiary Guarantor or any Person, the repudiation of any Financing Documents by Subsidiary Guarantor or any Person, the failure by the Offshore Collateral Agent or the Secured Parties to enforce any claim against Subsidiary Guarantor, or the unenforceability in whole or in part of any Financing Documents.

(b)     Subsidiary Guarantor, to the maximum extent permitted by Applicable Laws, hereby agrees that it will not invoke, claim or assert the benefit of any rule of law or statute now or hereafter in effect (including, without limitation, any right to prior notice or judicial hearing in connection with Offshore Collateral Agent's possession, custody or disposition of any Collateral or any appraisal, valuation, stay, extension, moratorium or redemption Applicable Law), or take or omit to take any other action, that would or could reasonably be expected to have the effect of delaying, impeding or preventing the exercise of any rights and remedies in respect of the Collateral in accordance with this Agreement and the other Financing Documents, the absolute sale of any of the Collateral or the possession thereof by any purchaser at any sale thereof, and waives the benefit of all such Applicable Laws and further agrees that it will not hinder, delay or impede the execution of any power granted hereunder to the Offshore Collateral Agent, but that it will permit the execution of every such power as though no such Applicable Laws were in effect.

7.8     Termination of Security Interest.

(a)     On the earlier of (x) the Release Date and (y) the effective date of the Permitted Reorganization, this Agreement (other than provisions intended to survive termination) and the security interests and all other rights granted hereby shall automatically terminate and all rights to the Collateral shall revert to Subsidiary Guarantor. Upon any such termination, the Offshore Collateral Agent shall promptly, at the expense of and upon written direction of Subsidiary Guarantor, execute and, subject to Section 7.3, deliver to Subsidiary Guarantor such documents (including UCC termination statements) as Subsidiary Guarantor may reasonably request to evidence such termination, to release all security interest on the Collateral and return such Collateral to Subsidiary Guarantor or as otherwise required by Applicable Law.

(b)     If any of the Collateral shall be disposed of by Subsidiary Guarantor in a transaction permitted by the Financing Documents, then such Collateral shall automatically, and without further action by any party, be released from the Liens granted hereunder and the Offshore Collateral Agent, at the request and sole expense of Subsidiary Guarantor, shall execute and deliver to Subsidiary Guarantor all releases or other documents reasonably necessary or desirable to confirm or evidence such release of Liens.

7.9     Limitation on Duty of Collateral Agent with Respect to the Collateral. The powers conferred on Offshore Collateral Agent hereunder are solely to protect its interest and the interests of the Secured Parties in the Collateral and shall not impose any duty on it to exercise any such powers. Except for the safe custody of any Collateral in its possession, the accounting for moneys actually received by it hereunder and any duty expressly imposed on Offshore Collateral Agent by

Applicable Laws with respect to any Collateral that has not been waived hereunder, Offshore Collateral Agent shall have no duty with respect to any Collateral and no implied duties or obligations shall be read into this Agreement against Offshore Collateral Agent.  Offshore Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment that is substantially equivalent to that which Offshore Collateral Agent accords its own property, it being expressly agreed, to the maximum extent permitted by Applicable Laws, that the Offshore Collateral Agent shall have no responsibility for (a) taking any necessary steps to preserve rights against any parties with respect to any Collateral or (b) taking any action to protect against any diminution in value of the Collateral, but, in each case, Offshore Collateral Agent may do so and all documented expenses reasonably incurred in connection therewith shall be part of the Secured Obligations.  In no event shall Offshore Collateral Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit).

<div align="center">ARTICLE VIII.</div>

<div align="center">MISCELLANEOUS</div>

8.1     <u>Amendments; Waivers; Consents</u>.  No provision of this Agreement may be amended, supplemented, modified or waived, except by a written instrument signed by all of the parties hereto.

8.2     <u>Notices</u>.  Any notice, request or other communication to be given or made under this Agreement shall be in writing. Any such communication may be delivered by hand, airmail, or established courier service to the party's address specified on its signature page to this Agreement or at such other address as such party notifies to the other parties from time to time, and will be effective upon receipt; <u>provided</u>, <u>however</u>, that the parties hereto may, at their election, deliver notices, requests or communications to each other or the other Secured Parties by electronic mail to the extent that an e-mail address has been provided for such Person in its notice details (and if no email address has been provided, such communications shall be delivered as otherwise permitted hereunder).

8.3     <u>Severability</u>.  Should any clause, sentence, paragraph, subsection, or Section of this Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken here by the parties hereto, and the remainder will have the same force and effect as if such stricken part or parts had never been included herein.

8.4     <u>Survival of Provisions</u>.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the Financing Documents and the extensions of credit thereunder. Notwithstanding anything in this Agreement or implied by law to the contrary, the agreement and obligation of Subsidiary Guarantor set forth in Section 7.3, Section 8.5, and Section 8.12 and the obligations of the Offshore Collateral Agent to grant back to Subsidiary Guarantor the license granted pursuant to Section 2.7(b), in accordance with Section 2.7(b), shall survive the payment or prepayment of the Guaranteed Obligations.

8.5    Expenses.

(a)    Expenses.  Subsidiary Guarantor agrees to pay, within thirty (30) days after receipt of a reasonably detailed written invoice therefor, all reasonable and documented costs and expenses incurred by the Offshore Collateral Agent (including reasonable and documented fees and disbursements of one (1) counsel (except in connection with the exercise of remedies hereunder in which case the reasonable and documented fees and disbursements of any reasonable number of counsel shall be reimbursed by Subsidiary Guarantor)) incident to its enforcement, exercise, protection or preservation of any of its rights, remedies or claims (or the rights or claims of any other Secured Party) under this Agreement. Such costs and expenses shall constitute Secured Obligations and be secured by the Liens of the Financing Documents.

8.6    Successions or Assignments.  This Agreement binds and benefits the respective successors and permitted assignees of its parties. However, Subsidiary Guarantor may not assign or delegate any of its rights or obligations under this Agreement without the prior written consent of the Offshore Collateral Agent and the Offshore Collateral Agent may not assign or delegate any of its rights or obligations under this Agreement except pursuant to Section [21.07] (*Resignation or Removal of the Offshore Collateral Agent*) of the Offshore Accounts Agreement. The benefit of this Agreement may be freely and unconditionally assigned, transferred, or otherwise disposed of, in whole or in part, to and be binding upon and inure to the benefit of, the successors or assigns of the Secured Parties who shall have, to the extent of their interest, the rights of the Secured Parties hereunder.  Any purported assignment in violation of this provision shall be void.

8.7    Entire Agreement.  This Agreement and the other Financing Documents set forth the entire agreement relating to the subject matter hereof, and supersede all prior statements, agreements, and understandings, whether written or oral, relating hereto.

8.8    Counterparts.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.  Delivery of a duly executed signature page of this Agreement by electronic mail in "Portable Document Format" ("PDF") or by facsimile transmission shall be considered effective delivery.

8.9    Governing Law.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without taking into account its conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law).

(b)    Each of the parties hereto irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the United States of America located in the Southern District of New York or in the courts of the State of New York located in the Borough of Manhattan.  By the execution of this Agreement, each of the parties hereto irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding.  Final judgment against Subsidiary Guarantor in any such action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, including the Country, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the judgment, or in any other manner provided by law.

(c)     Nothing in this Agreement shall affect the right of any Secured Party to commence legal proceedings or otherwise sue Subsidiary Guarantor in the Country, or any other appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon Subsidiary Guarantor in any manner authorized by the laws of any such jurisdiction.

(d)     Subsidiary Guarantor hereby confirms, of the date hereof, the irrevocable designation, appointment and empowerment of [CT Corporation System, with offices currently located at 111 Eighth Avenue, New York, New York, 10011], as its authorized agent solely to receive for and on its behalf service of any summons, complaint and other legal process in any action, suit or proceeding in the State of New York in respect of this Agreement.

(e)     As long as this Agreement remains in force, Subsidiary Guarantor shall maintain a duly appointed and authorized agent to receive for and on its behalf service of any summons, complaint or other legal process in any action, suit or proceeding in New York, New York, United States of America with respect to this Agreement.  Subsidiary Guarantor shall keep the Offshore Collateral Agent advised of the identity and location of such agent.

(f)     Subsidiary Guarantor irrevocably waives to the fullest extent permitted by Applicable Law:

(i)     any objection that it may have now or in the future to the laying of the venue of any action, suit or proceeding in any court referred to in this Section 8.9;

(ii)    any claim that any such action, suit or proceeding has been brought in an inconvenient forum; and

(iii)   its right of removal of any matter commenced by the Offshore Collateral Agent in the courts of the State of New York to any court of the United States of America.

(g)     To the extent that Subsidiary Guarantor may be entitled in any jurisdiction to claim for itself or its assets immunity in respect of its obligations under this Agreement from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process or to the extent that in any jurisdiction that immunity (whether or not claimed), may be attributed to it or its assets, it irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted now or in the future by the laws of such jurisdiction.

(h)     To the extent that Subsidiary Guarantor may, in any action, suit or proceeding brought in any of the courts referred to in Section 8.9(b) or a court of the Country or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring a Secured Party in such action, suit or proceeding to post security for Subsidiary Guarantor's costs or to post a bond or to take similar action, Subsidiary Guarantor hereby irrevocably waives such benefit, in each case to the fullest extent now or in the future permitted under the laws of New York, New York, United States of America, the Country, or, as the case may be, the jurisdiction in which such court is located.

8.10    <u>WAIVER OF JURY TRIAL</u>.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, SUBSIDIARY GUARANTOR AND OFFSHORE COLLATERAL AGENT HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF COLLATERAL AGENT OR SUBSIDIARY GUARANTOR.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT.

8.11    <u>Third Party Rights</u>.  Except for the Secured Parties, a Person who is not a party to this Agreement shall have no right to enforce any term of this Agreement.

8.12    <u>Rights of the Offshore Collateral Agent</u>.  The Offshore Collateral Agent shall be entitled to the rights, protections, immunities and indemnities set forth in the Offshore Accounts Agreement as if specifically set forth herein.  With respect to the duties, obligations and rights of the Offshore Collateral Agent, if any conflict between the terms of this Agreement and the terms of the Offshore Accounts Agreement arises, the terms of the Offshore Accounts Agreement shall govern and control.

8.13    <u>Effective Date</u>.  This Agreement shall become effective on the date when it shall have been executed by each of the parties hereto and when the Offshore Collateral Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto, by their officers duly authorized, intending to be legally bound, have caused this Agreement to be duly executed as of the date first above written.

**ALTO MAIPO DELAWARE, LLC,**
as Subsidiary Guarantor


By:_____
    Name:
    Title:

    [insert address]

**ITAÚ CORPBANCA NEW YORK BRANCH,**
as the Offshore Collateral Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


    [insert address]

43021822.7

[*Signature Page to the Subsidiary Guaranty and Security Agreement*]

**ANNEX 1**

**SUBSIDIARY GUARANTOR**

## **ANNEX 2**

## **SUBSIDIARY GUARANTOR'S UCC FILING JURISDICTION**

1.  Secretary of State of Delaware

**Exhibit V**

**Amendment to Onshore Collateral Agency Agreement**

29299009.2

**REPERTORIO N° [•]**

**MODIFICACIÓN Y TEXTO REFUNDIDO**

**DE CONTRATO DE AGENCIA DE GARANTÍAS LOCAL[1]**

**U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**

**Y OTROS**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la **[•]** Notaría de Santiago, con oficio en **[•]**, Región Metropolitana, comparecen: **/Uno/ [•]**, en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en representación, según se acreditará, de **ITAÚ CORPBANCA**, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, rol único tributario número noventa y siete millones veintitrés mil guion nueve, del mismo domicilio de sus representantes /sucesor de Banco Itaú Chile y de Corpbanca, en adelante también en calidad de acreedor o contraparte de derivados, "**Itaú Corpbanca**" y en su calidad de agente de acreedores bajo los Documentos del Financiamiento, según dicho término se define más adelante, el "**Agente de Acreedores**", y actuando en su calidad de agente de garantías chileno, el "**Agente de Garantías Local**"/, entidad que a su vez comparece por sí y en representación en su calidad de Agente de Acreedores, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Acreedores, sin perjuicio del domicilio indicado para cada una de ellas: **/a/ CERBERUS GLOBAL NPL FUND, [•]**, con domicilio en [•] /en adelante "**Cerberus Global**"/; **/b/ CERBERUS FSBA Corporate, [•]**, con domicilio en [•] /en adelante "**Cerberus FSBA**"/; **/c/** [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; **/d/** [**FIDERA**] /en adelante "**Fidera**"/ **/e/** [**FINEPOINT**] /en adelante "**Finepoint**"/; **/f/** **KfW IPEX-BANK GMBH**, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraße cinco guion nueve, seis cero tres dos cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; **/g/** [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; **/h/** [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; **/i/** [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; **/j/** [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; **/k/** [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; **/l/** [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; **/m/**

---

[1] Documento sujeto a revisión.

[**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; /**n**/ [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; /**o**/ [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; /**p**/ [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; /**q**/ [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF V**"/; /**r**/ [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; /**s**/ [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; /**t**/ **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de OVERSEAS  PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /**u**/ **ITAÚ CORPBANCA, NEW YORK BRANCH** /antes, Corpbanca, New York Branch/, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca /en adelante "**Itaú NY**"/; y /**v**/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /**Tres**/ [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES**, un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con las partes comparecientes anteriores distintas a Alto Maipo SpA, y aquellas partes que en el futuro se adhieran al Contrato de Agencia de Garantías Local /según se define más adelante/ como acreedores, las "**Partes Garantizadas**"/; todos los anteriores en adelante también conjuntamente denominados como las "**Partes**". Los comparecientes mayores de edad, quienes acreditan sus identidades con las cédulas indicadas y exponen:

**PRIMERO:** **ANTECEDENTES.** /**Uno**/ Mediante escritura pública de fecha nueve de diciembre de dos mil trece otorgada en la Notaría de Santiago de don José Musalem Saffie, bajo el repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se celebró el contrato denominado "Contrato de Agencia de Garantías", por el cual Corpbanca /hoy Itaú Corpbanca/ fue designado como agente de garantías, de conformidad con lo

establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, a fin de que represente a las Partes Garantizadas ahí establecidas /incluyendo aquéllas que en el futuro se adhieran a dicho contrato de agencia de garantías o los sucesores o cesionarios permitidos de éstas/, en la constitución, modificación o extinción y en el ejercicio mancomunado de los derechos que para ellos emanen de las garantías y resguardos a que se refiere dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Original**"/. El Contrato de Agencia de Garantías Local Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Los términos en mayúscula empleados en este contrato que no tengan asignado un significado específico en el mismo, tienen aquél que se les confiere en el Contrato de Agencia de Garantías Local Modificado y Refundido.

/**Dos**/ Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

[/**Tres**/ En relación con el Capítulo Once y en virtud de varios instrumentos de esta misma fecha, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los contratos, pagarés y reconocimientos de deuda en que constan las obligaciones garantizadas por las Garantías /según se define más adelante/, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas por las Garantías. Entre otras materias objeto de esta reestructuración, se acordó:

/**i**/ Modificar el Contrato de Crédito IDB Modificado y Refundido, el Contrato de Crédito OPIC Modificado y Refundido, el Contrato de Crédito Dos Mil Dieciocho, y el Contrato de Bancos Comerciales Modificado y Refundido, para efectos de que los términos y condiciones de los préstamos adeudados por el Deudor bajo dichos contratos de crédito sean regulados en un contrato de emisión de bonos /*indenture*/, en idioma inglés y regido por las leyes del Estado de Nueva York y en un contrato denominado [*Secured TwoL Loan Agreement and Accounts Payable*] suscrito por el Deudor en idioma inglés y regido por las leyes del Estado de Nueva York /; así como también otorgar el derecho a los acreedores del Secured TwoL Agreement para que todo o parte de sus créditos bajo dicho contrato puedan ser reestructurados en, o canjeados por, un bono emitido por el Deudor en los Estados Unidos de América; todo según lo establecido en los siguientes instrumentos:

/**a**/ un contrato en idioma inglés suscrito con esta misma fecha entre el Deudor, DFC y Strabag, entre otros, y regido por las leyes del Estado de Nueva York y denominado [*Secured TwoL Loan Agreement and Accounts Payable*] /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Agreement**"/; y

/**b**/ un contrato de emisión de bonos /*indenture*/ suscrito con esta misma fecha entre el Deudor y Wilmington Trust, National Association, en idioma inglés y regido por las leyes del

Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/.

/**ii**/ Modificar el Contrato de Términos Comunes Modificado y Refundido y establecer un nuevo texto modificado y refundido del mismo /en adelante dicho texto modificado y refundido, y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Términos Comunes**"/.

/**iii**/ Reflejar la reprogramación de parte de los préstamos adeudados bajo los diversos Documentos del Financiamiento, como parte del Secured TwoL Agreement bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado**".

/**iv**/ Reflejar la reprogramación o canje de los préstamos adeudados bajo los diversos Documentos del Financiamiento, según la asignación efectuada por cada acreedor, en bonos emitidos por el Deudor con cargo al Secured OneL Indenture y denominados "*Secured OneL Notes*" /en adelante los "**Bonos Preferentes**"/.

/**v**/ Reflejar la reprogramación o canje de parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, según la asignación efectuada por Strabag, en Bonos Preferentes.

/**vi**/ Considerar parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, como parte del Tramo Subordinado, de manera que los términos y condiciones de pago de dicha cuenta por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de Strabag en Bonos Subordinados /según dicho término se define más adelante/.

/**vii**/ Diferir el pago de los siguientes montos que sean adeudados a Strabag /*Strabag Construction Deferral* según dicho término se define en el Contrato de Términos Comunes/ de conformidad con el EPC Strabag /según se define más adelante/: /**uno**/ pago de un millón ciento cuarenta y un mil noventa y siete Dólares como consecuencia de las órdenes de cambio número uno, dos y cuatro bajo el EPC Strabag, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Change Order Deferral* según dicho término se define en el Contrato de Términos Comunes/; /**dos**/ pago de diez millones de Dólares por haber alcanzado la Terminación Sustancial del Hito F /*Substantial Completion of Milestone F* según dichos términos se definen en el EPC Strabag/, pago que se aplazará hasta que se pague el barrido de exceso de flujo de caja /*excess cash flow sweep*/ de acuerdo a las condiciones del Contrato de Términos Comunes ; y /**tres**/ pagos por los montos que sean efectivamente recibidos por el Deudor bajo su póliza de seguros de todo riesgo construcción /*Construction All Risks*/ contratada con Seguros Generales Suramericana S.A. y Chilena Consolidada S.A. en virtud de los reclamos uno uno ocho cuatro nueve cinco cero tres dos, uno uno nueve cuatro ocho ocho ocho ocho seis, uno nueve cuatro cuatro ocho cero uno cuatro y uno uno nueve cuatro cuatro ocho cero dos uno, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /conjuntamente, los "**Pagos Diferidos Strabag**"/.

/**viii**/ Considerar como parte del Tramo Subordinado, parte de las deudas del Deudor con cada uno de Itaú Corpbanca, BCI, DNB y KfW /conjuntamente las "**Contrapartes de Derivados**"/ producto de la terminación de los Contratos Requeridos de Derivados efectuada con fecha veintitrés de noviembre de dos mil veintiuno, de manera que los

términos y condiciones de pago de dichas cuentas por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de las Contrapartes de Derivados en Bonos Subordinados /según dicho término se define más adelante/.

/**ix**/ Contemplar la opción para los demás acreedores bajo el Tramo Subordinado, de canjear todo o parte de los créditos adeudados bajo el Tramo Subordinado, en bonos emitidos por el Deudor /denominados "*Secured TwoL Notes*", en adelante los "**Bonos Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y Wilmington Trust, National Association, en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**"/.

/**x**/ Que los VAT Lenders /según dicho término se define en el Contrato de Términos Comunes/ otorguen al Deudor una línea de crédito a corto plazo dividido en dos tramos, por un monto de hasta [•] Unidades de Fomento y por un monto de hasta [•] Dólares, para el financiamiento o refinanciamiento del impuesto al valor agregado asociado al "*Supplier Deferred Payment*" /según dicho termino se define en el Contrato de Términos Comunes/ que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis del decreto ley ochocientos veinticinco sobre impuestos a las ventas y servicios /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Crédito IVA**"/.

/**xi**/ Que AES Andes otorgue al Deudor una línea de crédito de capital de trabajo de hasta quince millones de Dólares con vencimiento el quince de enero de dos mil veinticuatro, a ser documentada en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Working Capital Facility*, en adelante y según sea modificado o modificado y refundido en el futuro, el "**Crédito de Capital de Trabajo**"/.

/**xii**/ Que AES Andes, Alto Maipo Delaware, LLC y el Deudor modifiquen, mediante una novación por cambio de deudor, los términos y condiciones del crédito súper-preferente otorgado por AES Andes a Alto Maipo Delaware, LLC durante el Capítulo Once por un capital de hasta cincuenta millones de Dólares /*DIP Financing Facility*/, de manera tal que el Deudor asuma la calidad de deudor bajo dicho financiamiento, conjuntamente con determinadas cuentas por cobrar que AES Andes irá devengando en contra del Deudor conforme a determinados contratos celebrados con el Deudor con fecha primero de julio de dos mil trece /específicamente, un Contrato de Operación y Mantenimiento /*O&M Agreement*/, un Contrato de Instalaciones Compartidas /*Technical Support and Services Agreement*/ y un Contrato de Conexión y Peajes /*Connection and Toll Agreement*//, se paguen por el Deudor de acuerdo con los términos y condiciones establecidos en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Secured Exit Loans*, en adelante y según sea modificado o modificado y refundido en el futuro, el "**Financiamiento de Salida**"/.

/**xiii**/ El eventual pago de los créditos del Tramo Subordinado que no se hayan extinguido a más tardar el quince de octubre del año dos mil cincuenta y dos, con acciones del Deudor, conforme a lo establecido en el Secured TwoL Agreement, en el Contrato de Conversión /según dicho término se define más adelante/ y según se establezca en el Secured TwoL Indenture, en caso de ser otorgado.

/**xiv**/ modificar y otorgar las Garantías, según corresponda, de manera tal que las obligaciones del Deudor bajo los Bonos Preferentes, el Tramo Subordinado, los Bonos Subordinados /una vez emitidos/, el Contrato de Crédito IVA, el Crédito de Capital de Trabajo y el Financiamiento de Salida, así como las obligaciones de AES Andes, entre otros a favor de los acreedores del Tramo Dos bajo el Contrato de Conversión, sean garantizadas por las Garantías en el mismo grado o prioridad actualmente existente, exceptuando aquellas Garantías que sean otorgadas exclusivamente en favor de los Acreedores de IVA y de los Acreedores bajo el Tramo Subordinado, y sin perjuicio de que el Agente de Garantías Local, para su ejecución y para distribuir los fondos derivados de esa ejecución, deberá observar las reglas establecidas en el Contrato entre Acreedores a que se refiere el Contrato de Agencia de Garantías Local contenido en este instrumento, en que se establecen las siguientes prioridades de pago entre las distintas clases de acreedores del Deudor y cuyos créditos se encuentran garantizados por las Garantías: /**a**/ primera prioridad para las obligaciones del Deudor bajo el Crédito de Capital de Trabajo y el Financiamiento de Salida, a prorrata y hasta su total satisfacción; /**b**/ segunda prioridad para las obligaciones del Deudor bajo los Bonos Preferentes, los Pagos Diferidos Strabag- y los Préstamos IVA, a prorrata y hasta su total satisfacción; y /**c**/ tercera prioridad para las obligaciones del Deudor bajo el Tramo Subordinado, los Bonos Subordinados y bajo el Contrato de Conversión, a prorrata y hasta su total satisfacción.

/**xv**/ Modificar los pagarés y reconocimientos de deuda suscritos por el Deudor, o que el Deudor suscriba nuevos pagarés o reconocimientos de deuda bajo ley chilena, para reflejar los términos y condiciones que les correspondan según el Secured TwoL Agreement.

/**xvi**/ La suscripción por parte del Deudor de reconocimientos de deuda bajo ley chilena a favor del representante de los tenedores de Bonos, para efectos de reflejar el monto total adeudado por el Deudor al momento de la emisión de los Bonos respectivos.][2]

/**Cuatro**/ Para efectos de dejar constancia de todo lo anterior, las Partes acuerdan modificar el Contrato de Agencia de Garantías Local Modificado y Refundido en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segunda siguiente /en adelante el "**Contrato de Agencia de Garantías Local**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE AGENCIA DE GARANTÍAS LOCAL.** Las Partes declaran que el texto del Contrato de Agencia de Garantías Local Modificado y Refundido, ha sido nuevamente modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación. Se deja constancia asimismo que el contrato así modificado y refundido contempla términos comunes aplicables a los contratos de garantía que el Deudor o cualquier tercero otorguen en favor del Agente de Garantías Local, actuando por cuenta y/o en nombre de las Partes Garantizadas /según dicho término se define más adelante/, las cuales serán incluidas por referencia a cada uno de dichos contratos de garantía, según se establezca en los mismos:

**"CONTRATO DE AGENCIA DE GARANTÍAS U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION Y OTROS A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

---

[2] Pendiente. Sujeto a revisión.

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós, ante mí, [•], comparecen: /Uno/ [•]**, en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; /**Dos**/ [•] y [•], en representación, según se acreditará, de **ITAÚ CORPBANCA**, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, rol único tributario número noventa y siete millones veintitrés mil guion nueve, del mismo domicilio de sus representantes /sucesor de Banco Itaú Chile y de Corpbanca, en adelante también en calidad de acreedor o contraparte de derivados, "**Itaú Corpbanca**" y en su calidad de agente de acreedores bajo los Documentos del Financiamiento, según dicho término se define más adelante, el "**Agente de Acreedores**", y actuando en su calidad de agente de garantías chileno, el "**Agente de Garantías Local**"/, entidad que a su vez comparece por sí y en representación en su calidad de Agente de Acreedores, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Acreedores, sin perjuicio del domicilio indicado para cada una de ellas: /a/ **CERBERUS GLOBAL NPL FUND,** [•], con domicilio en [•] /en adelante "**Cerberus Global**"/; /b/ **CERBERUS FSBA Corporate,** [•], con domicilio en [•] /en adelante "**Cerberus FSBA**"/; /c/ [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; /d/ [**FIDERA**] /en adelante "**Fidera**"/ /e/ [**FINEPOINT**] /en adelante "**Finepoint**"/; /f/ **KfW IPEX-BANK GMBH**, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraβe cinco guion nueve, seis cero tres dos cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; /g/ [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; /h/ [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; /i/ [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; /j/ [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; /k/ [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; /l/ [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; /m/ [**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; /n/ [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; /o/ [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; /p/ [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; /q/ [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CV**"/; /r/ [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; /s/ [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; /t/ **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /u/ **ITAÚ CORPBANCA, NEW YORK BRANCH** /antes, Corpbanca, New York Branch/, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca /en adelante "**Itaú NY**"/; y /v/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /**Tres**/ [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES,** un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA**

**S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con las partes comparecientes anteriores distintas a Alto Maipo SpA, y aquellas partes que en el futuro se adhieran como acreedores al contrato de agencia de garantías de que da cuenta este instrumento /en adelante el "**Contrato de Agencia de Garantías Local**"/, en adelante las "**Partes Garantizadas**"; todos los anteriores en adelante también conjuntamente denominados como las "**Partes**". Los comparecientes mayores de edad, quienes acreditan sus identidades con las cédulas indicadas y exponen:

## CLÁUSULA PRIMERA: ANTECEDENTES.

/**Uno**/ **Texto Modificado y Refundido.** Se deja constancia que el presente Contrato de Agencia de Garantías Local, es un texto modificado y refundido del contrato de agencia de garantías celebrado mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, considerando sus modificaciones posteriores, incluyendo aquella que estableció su texto refundido anterior, que consta en la escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, repertorio número tres mil novecientos sesenta y ocho /el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/.

/**Dos**/ **Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río

Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. Desde el catorce de abril de dos mil veintidós, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Tres/ Procedimiento de Reestructuración de Pasivos del Deudor.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC, filial del Deudor, iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**[/Cuatro/ Contratos de Crédito y Cuentas por Cobrar, Contratos de Emisión de Bonos, Contrato de Conversión, Contrato de Términos Comunes, Contratos Requeridos de Derivados, EPC Strabag, Contrato de Pago Diferido del Proveedor, Contrato de Crédito IVA, Crédito de Capital de Trabajo y Financiamiento de Salida.**

Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió, entre otros, los contratos de financiamiento y otros contratos que se describen a continuación, los cuales han sido modificados y refundidos o bien reemplazados o complementados con nuevos contratos como parte del Capítulo Once, como se establece a continuación:

**/i/ Contrato de Crédito IDB. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Inter-American Development Bank /en adelante, "**IDB**"/, suscribieron un contrato de crédito en idioma inglés denominado *IDB Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y cuatro guion dos mil trece /el "**Contrato de Crédito IDB Original**"/. **/B/** El Contrato de Crédito IDB Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y dos guion dos mil diecisiete /el "**Contrato de Crédito IDB**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, suscribieron el contrato en idioma inglés denominado *Second Amended and Restated Loan Agreement*, en virtud del cual el Contrato de Crédito IDB fue nuevamente

modificado y refundido /en adelante, el "**Contrato de Crédito IDB Modificado y Refundido**"/. Una copia del Contrato de Crédito IDB Modificado y Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y uno guion dos mil dieciocho. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor y algunos de sus acreedores, denominado *Secured TwoL Loan and Accounts Payable Agreement* /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Agreement**"/, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor bajo el Contrato de Crédito IDB Modificado y Refundido que no hayan sido reestructurados en, o canjeados por, Bonos /según dicho término se define más adelante/, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado IDB**"/. Una copia del Secured TwoL Agreement fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, con fecha [•] de dos mil veintidós, el Deudor y Wilmington Trust, National Association, suscribieron un contrato de emisión de bonos en idioma inglés, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Indenture*" /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/, en virtud del cual el Deudor emitió bonos /en adelante los "**Bonos Preferentes**"/, para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito IDB Modificado y Refundido que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo el Contrato de Crédito IDB Modificado y Refundido. Una copia del Secured OneL Indenture fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Secured TwoL Agreement contempla la opción para los acreedores bajo el Secured TwoL Agreement, incluyendo los acreedores del Tramo Subordinado IDB, de canjear todo o parte de sus créditos por bonos emitidos por el Deudor /denominados "*Secured TwoL Notes*", en adelante los "**Bonos Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y Wilmington Trust, National Association, en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**" y junto con el Secured OneL Indenture, los "**Indentures**"/, según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los préstamos desembolsados inicialmente por IDB y cedidos posteriormente a Cerberus Global y Cerberus FSBA, incluyendo sus capitalizaciones de intereses, se documentaron en pagarés regidos por ley chilena suscritos por el Deudor a la orden de IDB, los cuales, con sus correspondientes modificaciones mediante hojas de prolongación, fueron endosados en dominio a Cerberus Global y Cerberus FSBA, en adelante los "**Pagarés Emitidos Cerberus**". Copias simples de los documentos que constituyen los Pagarés Emitidos Cerberus han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio. /**H**/ Los montos adeudados bajo el Tramo Subordinado IDB a Cerberus Global y Cerberus FSBA, o sus sucesores o cesionarios, que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Cerberus**" y conjuntamente con los Pagarés Emitidos Cerberus, los "**Pagarés Cerberus**".

**/ii/ Contrato de Crédito DFC. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Overseas Private Investment Corporation o/"**OPIC**", hoy denominada U.S. International Development Finance Corporation o "**DFC**"/, suscribieron un contrato de crédito en idioma inglés denominado *OPIC Finance Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y cinco guion dos mil trece /el "**Contrato de Crédito OPIC Original**"/. **/B/** El Contrato de Crédito OPIC Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated OPIC Finance Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y tres guion dos mil diecisiete /el "**Contrato de Crédito OPIC**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con OPIC, suscribieron un contrato de crédito en idioma inglés denominado *Second Amended and Restated OPIC Finance Agreement*, en virtud del cual el Contrato de Crédito OPIC fue nuevamente modificado y refundido /en adelante, el Contrato de Crédito OPIC, modificado y refundido en el *Second Amended and Restated OPIC Finance Agreement*, el "**Contrato de Crédito OPIC Modificado y Refundido**"/. Una copia del Contrato de Crédito OPIC Modificado y Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y dos guion dos mil dieciocho. **/D/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor a DFC bajo el Contrato de Crédito OPIC Modificado y Refundido que no fueren reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de acuerdo con los términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado DFC**"/. **/E/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito OPIC Modificado y Refundido que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos conforme al Contrato de Crédito OPIC Modificado y Refundido. **/F/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado DFC que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados según lo decida el acreedor respectivo conforme al Secured TwoL Agreement. **/G/** Los préstamos desembolsados por DFC, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden de DFC, con sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor, respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos DFC**"/. **/H/** Los montos adeudados bajo el Tramo Subordinado DFC, a los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés

regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir DFC**" y conjuntamente con los Pagarés y Reconocimientos Emitidos DFC, los "**Pagarés y Reconocimientos DFC**".

**/iii/ Contrato de Crédito Dos Mil Dieciocho. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con International Finance Corporation, una organización internacional establecida mediante Convenio Constitutivo entre sus Estados miembros, incluyendo a la República de Chile /en adelante "**IFC**"/, suscribieron un contrato de crédito en idioma inglés denominado *Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y seis guion dos mil trece /el "**Contrato de Crédito IFC Original**"/. **/B/** El Contrato de Crédito IFC Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y cuatro guion dos mil diecisiete /en adelante el "**Contrato de Crédito IFC**"/. **/C/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, IFC cedió y transfirió a Deutsche Bank AG, London Branch /"**DB Londres**"/, la totalidad de los créditos de que era titular en contra del Deudor bajo el Contrato de Crédito IFC y los demás Documentos del Financiamiento /según dicho término se definió en dicho documento/ de que era parte, dejando en consecuencia IFC de ser acreedor del Deudor bajo el Contrato de Crédito IFC y de los demás Documentos del Financiamiento ahí referidos, pasando DB Londres, a ser parte, en calidad de acreedor, de los Documentos del Financiamiento señalados. A su vez, el Contrato de Crédito IFC fue reemplazado con el Contrato de Crédito Dos Mil Dieciocho /según dicho término se define más adelante/. **/D/** Atendida la cesión y transferencia a DB Londres de la totalidad de los créditos de que era titular IFC en contra del Deudor bajo el Contrato de Crédito IFC y los demás Documentos del Financiamiento de que era parte, IFC endosó en dominio a favor de DB Londres con fecha ocho de mayo de dos mil dieciocho la totalidad de los pagarés que habían sido emitidos por el Deudor a la orden de IFC, los cuales a su vez fueron modificados por hojas de prolongación otorgadas en la misma fecha. **/E/** Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DB Londres, Santana e Itaú NY /este último en calidad de agente de pagos/, suscribieron un contrato de crédito en idioma inglés denominado *Dos Mil Dieciocho Loan Agreement* /el "**Contrato de Crédito Dos Mil Dieciocho**"/. Una copia del Contrato de Crédito Dos Mil Dieciocho fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y cuatro guion dos mil dieciocho. En virtud del Contrato de Crédito Dos Mil Dieciocho, los créditos cedidos por IFC a DB Londres más la porción de esos créditos cedida por este último a Larraín Vial Servicios Profesionales Limitada y por éste a Santana, fueron reprogramados en los términos y condiciones establecidos en el Contrato de Crédito Dos Mil Dieciocho. **/F/** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados por el Deudor bajo el Contrato de Crédito Dos Mil Dieciocho que no fueron reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de

acuerdo con los términos del Secured TwoL Agreement , bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Dos Mil Dieciocho**"/. /**G**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Tramo Preferente Dos Mil Dieciocho que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de los préstamos existentes y adeudados bajo el Contrato de Crédito Dos Mil Dieciocho. /**H**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Dos Mil Dieciocho que opten por reestructurar en, o canjear por, Bonos Subordinados, todo o parte de sus créditos conforme al Secured TwoL Agreement según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**I**/ Los préstamos desembolsados con cargo al Contrato de Crédito Dos Mil Dieciocho, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden del respectivo acreedor o su cesionario, y sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor,  respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos Dos Mil Dieciocho**"/. /**J**/ Los montos adeudados bajo el Tramo Subordinado Dos Mil Dieciocho, de los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Dos Mil Dieciocho**" y conjuntamente con los Pagarés y Reconocimientos Emitidos Dos Mil Dieciocho, los "**Pagarés y Reconocimientos Dos Mil Dieciocho**".

**/iv/ Contrato de Crédito Bancos Comerciales. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con Banco de Crédito e Inversiones S.A., Miami Branch, Banco del Estado de Chile, New York Branch, Banco Itaú Chile /hoy Itaú Corpbanca/, Corpbanca, New York Branch /hoy Itaú Corpbanca, New York Branch/, DNB y KfW, suscribieron un contrato de crédito en idioma inglés denominado *Commercial Banks Loan Agreement*, una copia del cual se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y ocho guion dos mil trece /el "**Contrato Bancos Comerciales Original**"/. /**B**/ El Contrato Bancos Comerciales Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Loan Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, una copia del cual fue protocolizada con fecha diecisiete de marzo de dos mil diecisiete, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento ochenta y cinco guion dos mil diecisiete /en adelante, el "**Contrato de Crédito Bancos Comerciales**"/. /**C**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB e Itaú Corpbanca, entre otros, suscribieron un contrato de crédito en idioma inglés denominado *Second Amended and Restated Loan Agreement*, en virtud del cual el Contrato de Crédito Bancos Comerciales fue nuevamente modificado y refundido /en adelante, el Contrato de Crédito Bancos Comerciales, modificado y refundido en el *Second Amended and Restated Loan Agreement*, se denomina el "**Contrato de Crédito Bancos Comerciales Modificado y Refundido**"/. Una copia del Contrato de Crédito Bancos Comerciales Modificado y

13

Refundido fue protocolizada con fecha ocho de mayo de dos mil dieciocho, en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y tres guion dos mil dieciocho. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los préstamos existentes y adeudados bajo el Contrato de Crédito Bancos Comerciales Modificado y Refundido que no fueron reestructurados en, o canjeados por, Bonos Preferentes, para que sean pagados de acuerdo con los términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Bancos Comerciales**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a los acreedores del Deudor bajo el Contrato de Crédito Bancos Comerciales Modificado y Refundido, que optaron por reestructurar en, o canjear por, Bonos Preferentes,  parte de sus créditos conforme al Contrato de Crédito Bancos Comerciales Modificado y Refundido. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Bancos Comerciales que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los préstamos desembolsados con cargo al Contrato de Crédito Bancos Comerciales Modificado y Refundido, incluyendo sus capitalizaciones de intereses, se encuentran documentados en pagarés regidos por ley chilena suscritos por el Deudor a la orden del respectivo acreedor o su cesionario, y sus correspondientes hojas de prolongación, y en reconocimientos de deuda suscritos por el Deudor, respecto de los cuales copias simples han sido protocolizadas como Anexo B de esta escritura, bajo su mismo número de repertorio, o bien referencia a los mismos se ha incluido en dicho anexo /conjuntamente, los "**Pagarés y Reconocimientos Emitidos Bancos Comerciales**"/. /**H**/ Los montos adeudados bajo el Tramo Subordinado Bancos Comerciales, a los acreedores respectivos que opten por no reestructurar en, o canjear por, Bonos Subordinados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Emitir Bancos Comerciales**" y conjuntamente con los Pagarés y Reconocimientos Emitidos Bancos Comerciales, los "**Pagarés y Reconocimientos Bancos Comerciales**".

/**v**/ **Contrato de Carta de Crédito.** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con DNB, suscribieron un contrato de crédito en idioma inglés denominado *Letter of Credit Facility Agreement*, el cual fue modificado y refundido por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Amended and Restated Letter of Credit Facility Agreement* /en adelante dicho contrato, el "**Contrato de Carta de Crédito**". Una copia del Contrato de Carta de Crédito se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y siete guion dos mil trece. El Contrato de Carta de Crédito fue terminado por las partes del mismo con fecha veinticuatro de marzo de dos mil veintiuno.

/**vi**/ **Contratos Requeridos de Derivados.** /**A**/ En virtud del Contrato de Términos Comunes Original, el Deudor se obligó a celebrar uno o más Contratos Requeridos de Derivados /"*Required Hedging Agreements*", según este término se define en el Contrato de Términos

Comunes Original/, con el objeto de contar con una cobertura de riesgo /i/ ante fluctuaciones de las tasas de interés por los períodos señalados en el Contrato de Términos Comunes Original; y /ii/ ante eventuales fluctuaciones de la Unidad de Fomento de Chile contra el Dólar. Por tanto, el Deudor celebró con fecha nueve de diciembre de dos mil trece con Corpbanca Chile /hoy Itaú Corpbanca/, BCI, Banco Itaú /hoy Itaú Corpbanca/ y KfW /conjuntamente, las "**Contrapartes de Derivados**"/, los siguientes contratos de derivados suscritos en idioma inglés, sujetos a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante los ISDA Dos Mil Dos Master Agreements y sus respectivos anexos /*schedules*/ que se señalan a continuación, se denominan conjuntamente como los "**Master Agreements ISDA Dos Mil Dos Celebrados**"/: /i/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y Corpbanca Chile /hoy Itaú Corpbanca/ y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos sesenta y nueve guion dos mil trece; /ii/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y BCI, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta guion dos mil trece; /iii/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y Banco Itaú /hoy Itaú Corpbanca/, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y uno guion dos mil trece; /iv/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y KfW, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y dos guion dos mil trece; y /v/ ISDA Dos Mil Dos Master Agreement, suscrito entre el Deudor y DNB, y el correspondiente anexo /*Schedule*/, suscrito por las mismas partes. Una copia del ISDA Dos Mil Dos Master Agreement y del correspondiente anexo se protocolizó en la Notaría Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, bajo el repertorio número quince mil cuatrocientos setenta y tres guion dos mil trece. Con anterioridad a esta fecha se suscribieron una serie de confirmaciones /*Confirmations*/ en relación a los Master Agreements ISDA Dos Mil Dos Celebrados antes señalados /en adelante cada una de ellas una "**Confirmación**"/. /B/ Posteriormente, por instrumentos privados de fecha diecisiete de marzo de dos mil diecisiete, /i/ el Deudor junto con Itaú Corpbanca, suscribieron dos modificaciones de las Confirmaciones suscritas entre Banco Itaú Chile /hoy Itaú Corpbanca/ y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes; /ii/ el Deudor junto con Itaú Corpbanca, suscribieron dos modificaciones de las Confirmaciones suscritas entre Corpbanca /hoy Itaú Corpbanca/ y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes; y /iii/ el Deudor junto con BCI, suscribieron dos modificaciones y textos refundidos de las Confirmaciones suscritas entre BCI y el Deudor y regidas por los Contratos Requeridos de Derivados suscritos entre tales partes. Copias de los documentos en que constan las referidas modificaciones a las Confirmaciones de fecha diecisiete de marzo de dos mil diecisiete fueron protocolizados con dicha fecha en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento noventa y uno guion dos mil diecisiete. En adelante los Master Agreements ISDA Dos Mil Dos Celebrados y sus correspondientes Confirmaciones, se denominan en adelante, los

"**Contratos de Derivados**". /**C**/ Como consecuencia del Capítulo Once, los Contratos de Derivados fueron terminados con fecha veintitrés de noviembre de dos mil veintiuno, y el monto adeudado a las Contrapartes de Derivados bajo los Contratos de Derivados se estableció en la cantidad total de [●] Dólares /en adelante, la "**Cuenta por Cobrar por Derivados**"/. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de la Cuenta por Cobrar por Derivados que no fue reestructurada en, o canjeada por, Bonos Preferentes, para ser pagada de acuerdo con los términos del Secured TwoL Agreement bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado Derivados**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Deudor emitió Bonos Preferentes para ser entregados a las Contrapartes de Derivados que optaron por reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo la Cuenta por Cobrar por Derivados,. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Derivados, incluyendo las Contrapartes de Derivados, que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los montos adeudados a las Contrapartes de Derivados que opten por no reestructurar en, o canjear por, Bonos Subordinados, todo o parte de su Cuenta por Cobrar Derivados, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés por Derivados**".

/**vii**/ **EPC Strabag, Contrato de Pago Diferido del Proveedor y Pagos Diferidos Strabag.** /**A**/ Para efectos de llevar adelante la construcción de las obras del Proyecto, el Deudor y Strabag celebraron un contrato en idioma inglés denominado "*Tunnel Complex Construction Contract*" /Contrato de Construcción de un Complejo de Túneles/, de fecha once de octubre de dos mil doce, el cual fue modificado por instrumento privado en idioma inglés denominado "*Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract*" /Modificación y Texto Refundido del Contrato de Construcción a Suma Alzada de un Complejo de Túneles/ de fecha diecinueve de febrero de dos mil dieciocho, sujeto a las leyes del Estado de Nueva York, y que fue a su vez modificado por instrumento privado en idioma inglés y sujeto a las leyes del Estado de Nueva York, de fecha ocho de mayo de dos mil dieciocho /en adelante conjuntamente el "**EPC Strabag**"/. /**B**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor y Strabag, suscribieron un contrato en idioma inglés denominado "*Supplier Deferred Payment Agreement*" /en adelante el "**Contrato de Pago Diferido del Proveedor**"/, en virtud del cual Strabag y el Deudor acordaron los términos y plazos de pago de ciertas sumas de dinero originadas en las obras de construcción ejecutadas bajo el EPC Strabag /la "**Cuenta por Cobrar EPC**". /**C**/ Como parte del acuerdo adoptado por Strabag, los acreedores del Deudor y este último dentro del Capítulo Once, /**i**/ el EPC Strabag fue nuevamente modificado mediante instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York /según sea modificado, complementado o refundido en el futuro, el "**EPC Strabag Modificado**"/ y /**ii**/ se modificó el Contrato de Pago Diferido del Proveedor para que la Cuenta por Cobrar EPC pueda ser pagada de acuerdo con los términos del Secured TwoL Agreement, el Secured OneL Indenture y eventualmente, el Secured TwoL Indenture. /**D**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, se acordó, entre otras materias, reflejar la reprogramación de parte de los créditos bajo la Cuenta por Cobrar EPC, para ser pagada de acuerdo con los

términos del Secured TwoL Agreement, bajo la denominación de "*Secured TwoL Loans*" /en adelante, el "**Tramo Subordinado Strabag**" y, conjuntamente con el Tramo Subordinado IDB, el Tramo Subordinado DFC, el Tramo Subordinado Dos Mil Dieciocho, el Tramo Subordinado Bancos Comerciales y el Tramo Subordinado Derivados, el "**Tramo Subordinado**"/. /**E**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once el Deudor emitió Bonos Preferentes para ser entregados a Strabag como acreedor de la Cuenta por Cobrar EPC, según la opción ejercida por Strabag de reestructurar en, o canjear por, Bonos Preferentes, parte de sus créditos bajo la Cuenta por Cobrar EPC. /**F**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, y en virtud del Secured TwoL Agreement, el Deudor se obligó a emitir Bonos Subordinados en marzo del año dos mil veintitrés para que puedan ser entregados a los acreedores del Tramo Subordinado Strabag que opten por canjear todo o parte de sus créditos conforme al Secured TwoL Agreement por Bonos Subordinados en marzo de dos mil veintitrés según lo decida cada acreedor respectivo bajo el Secured TwoL Agreement. /**G**/ Los montos adeudados a los acreedores del Tramo Subordinado Strabag que opten por no reestructurar en, o canjear por, Bonos Subordinados, todo o parte de su Cuenta por Cobrar EPC, deberán ser reflejados en pagarés regidos por ley chilena suscritos por el Deudor /conjuntamente, los "**Pagarés Strabag**". /**H**/ Adicionalmente, como parte de los acuerdos adoptados en el Capítulo Once, se acordó diferir el pago de los siguientes montos que sean adeudados a Strabag de conformidad con el EPC Strabag /según se define más adelante/: /**uno**/ pago de un millón ciento cuarenta y un mil noventa y siete Dólares como consecuencia de las órdenes de cambio número uno, dos y cuatro bajo el EPC Strabag el cual se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Change Order Deferral* según dicho término se define en el Contrato de Términos Comunes/; /**dos**/ pago de diez millones de Dólares por haber alcanzado la Terminación Sustancial del Hito F /*Substantial Completion of* Milestone F según dichos términos se definen en el EPC Strabag/ que se aplazará hasta que se pague el [exceso de flujo de caja] /[*excess cash flow sweep*]/ de acuerdo a las condiciones del Contrato de Términos Comunes /*Strabag Construction Deferral* según dicho término se define en el Contrato de Términos Comunes/; y /**tres**/ pagos por los montos que sean efectivamente recibidos por el Deudor bajo su póliza de seguros de todo riesgo construcción /*Construction All Risks*/ contratada con Seguros Generales Suramericana S.A. y Chilena Consolidada S.A. en virtud de los reclamos uno uno ocho cuatro nueve cinco cero tres dos, uno uno nueve cuatro ocho ocho ocho seis, uno nueve cuatro cuatro ocho cero uno cuatro y uno uno nueve cuatro cuatro cero cero dos uno el cual se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Insurance Deferral* según dicho término se define en el Contrato de Términos Comunes y conjuntamente, los "**Pagos Diferidos Strabag**"/.

/**viii**/ **Contrato de Términos Comunes.** /**A**/ Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, IFC, OPIC, DNB y KfW, entre otros, suscribieron un contrato en idioma inglés denominado *Common Terms Agreement* /el "**Contrato de Términos Comunes Original**"/. /**B**/ El Contrato de Términos Comunes Original fue modificado con fecha diecinueve de diciembre de dos mil catorce, y adicionalmente fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Common Terms Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América /en adelante la "**Contrato de Términos Comunes Dos Mil Diecisiete**"/. /**C**/ Por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, el Deudor, conjuntamente con IDB, IFC, OPIC y DNB, entre

otros, suscribieron un contrato en idioma inglés denominado *Second Amended and Restated Common Terms Agreement*, en virtud del cual el Contrato de Términos Comunes Dos Mil Diecisiete fue nuevamente modificado y refundido /en adelante, el Contrato de Términos Comunes, modificado y refundido en el *Second Amended and Restated Common Terms Agreement*, se denomina el "**Contrato de Términos Comunes Modificado y Refundido**"/. /D/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado *Third Amended and Restated Common Terms Agreement*, se modificó el Contrato de Términos Comunes Modificado y Refundido /en adelante el Contrato de Términos Comunes Modificado y Refundido modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato de Términos Comunes**"/. Una copia del Contrato de Términos Comunes fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. El Contrato de Términos Comunes contiene las reglas comunes aplicables al Secured TwoL Agreement, razón por la cual los términos y condiciones del Secured TwoL Agreement deben entenderse, para todos los efectos a que haya lugar, complementados por los términos y condiciones del Contrato de Términos Comunes. El Secured Two LAgreement, conjuntamente con el Contrato de Términos Comunes, contemplan entre otras materias, la obligación del Deudor de pagar los préstamos y cuentas por cobrar de que dan cuenta los mismos en Dólares, las causales de pago anticipado obligatorio de cada préstamo y cuenta por cobrar, las condiciones para efectuar pagos anticipados voluntarios, la tasa de interés, los períodos de pago de intereses, las fechas de pago de capital e intereses y reglas relativas a capitalizaciones de intereses. El Secured TwoLAgreement, conjuntamente con el Contrato de Términos Comunes, contemplan, además, el pago de intereses penales sobre montos adeudados e insolutos o morosos, el pago de comisiones, impuestos, gastos, honorarios, costas y otras sumas y, asimismo, regulan las obligaciones de hacer y de no hacer, los eventos que motivarán prepagos obligatorios y los casos de incumplimiento que, de ocurrir, sujeto a los términos y condiciones de tales instrumentos, permitirán a cada uno de los acreedores declarar todo o parte del saldo adeudado de los préstamos y cuentas por cobrar, o cualquier otra obligación, como de plazo vencido e inmediatamente exigibles.

**/ix/ Crédito de Capital de Trabajo[3].** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Working Capital Facility Agreement*", celebrado entre AES Andes, y el Deudor,  en virtud del cual AES Andes otorgó al Deudor una línea de crédito de capital de trabajo de hasta quince millones de Dólares con vencimiento el quince de enero de dos mil veinticuatro /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Crédito de Capital de Trabajo**"/. Una copia del Crédito de Capital de Trabajo fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•].

**/x/ Financiamiento de Salida[4].** Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, por instrumento privado de fecha [●] de dos mil veintidós, en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Secured Exit Loan Agreement*", celebrado entre AES

---

[3] Sujeto a revisiones adicionales.
[4] Sujeto a revisiones adicionales.

Andes, el Deudor y Alto Maipo Delaware LLC /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Financiamiento de Salida**"/, las partes novaron y modificaron los términos y condiciones del crédito súper preferente otorgado por AES Andes a Alto Maipo Delaware LLC durante el Capítulo Once por hasta cincuenta millones de Dólares /el "**Financiamiento DIP**"/, constituyendo al Deudor como deudor bajo el mismo, postergando su fecha de vencimiento en tres años y estableciendo un nuevo calendario de amortización y nueva tasa de interés, entre otras materias, y contemplando la capitalización de ciertos intereses y reflejando como parte del monto de capital adeudado, determinadas cuentas por cobrar adeudadas por el Deudor a AES Andes conforme a determinados contratos celebrados con el Deudor con fecha primero de julio de dos mil trece /específicamente, un Contrato de Operación y Mantenimiento /*O&M Agreement*/, un Contrato de Instalaciones Compartidas /*Technical Support and Services Agreement*/ y un Contrato de Conexión y Peajes /*Connection and Toll Agreement*//. Una copia del Financiamiento de Salida fue protocolizada con esta misma fecha en la Notaría de Santiago de [don Roberto Antonio Cifuentes Allel], bajo el repertorio número [•]. Adicionalmente, la transición del Financiamiento DIP al Financiamiento de Salida fue documentada mediante una novación por cambio de deudor que consta en escritura pública de fecha [●] de dos mil veintidós otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●] y un reconocimiento de deuda que consta en escritura pública de fecha [●] de dos mil veintidós otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●] /el "**Reconocimiento DIP**"/.

/**xi**/ **Financiamiento IVA.** /**A**/ Mediante escritura pública otorgada  con esta misma fecha,[ en esta misma Notaría], bajo el repertorio número [•]el Deudor, Itaú Corpbanca, BCI, DNB, [Moneda] y [UBS] /los "**Acreedores de IVA**"/ celebraron un contrato regido por las leyes de la República de Chile, denominado "*Contrato de Crédito para Financiamiento de Impuesto al Valor Agregado*" /el "**Contrato de Crédito IVA**"/, en virtud del cual los Acreedores de IVA acordaron otorgar al Deudor un crédito a corto plazo dividido en dos tramos /los "**Préstamos IVA**"/, para el financiamiento o refinanciamiento del impuesto al valor agregado /"**IVA**"/ asociado al "*Supplier Deferred Payment*" /según dicho termino se define en el Contrato de Términos Comunes/ que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis del decreto ley ochocientos veinticinco sobre impuestos a las ventas y servicios: /**i**/ un Tramo A por la suma total de [•] Unidades de Fomento, a ser desembolsado y pagadero en su equivalente en pesos, moneda de curso legal en Chile /el "**Tramo IVA UF**"/, comprometido por Itaú Corpbanca y BCI en la cantidad de [•] Unidades de Fomento cada uno; y /**ii**/ un Tramo B por la suma total de [•] Dólares, a ser desembolsado y pagadero en dicha moneda /el "**Tramo IVA USD**"/, comprometido por [UBS] y DNB.] /**B**/ Los Préstamos IVA desembolsados serán documentados en pagarés suscritos por el Deudor a la orden del respectivo Acreedor de IVA /los "**Pagarés IVA**" y conjuntamente con los Pagarés y Reconocimientos DFC, los Pagarés y Reconocimientos Crédito Dos Mil Dieciocho, los Pagarés y Reconocimientos Crédito Comercial, los Pagarés por Derivados, el Pagaré Strabag y el Reconocimiento DIP y los pagarés y/o reconocimientos de deuda que se emitan a futuro conforme al Crédito Capital de Trabajo o cualquier otro Documento del Financiamiento, en adelante los "**Pagarés y Reconocimientos**"/. /**C**/ Los principales términos y condiciones de los Préstamos IVA son los siguientes: <u>Pago</u>: La totalidad de los Préstamos IVA deberá pagarse el día [•] de dos mil veintitrés, sin perjuicio de los pagos anticipados obligatorios que correspondan de acuerdo a lo establecido en el Contrato de Crédito IVA. El capital e intereses del Tramo A deberá pagarse en pesos chilenos de acuerdo a la equivalencia de la Unidad de Fomento a la fecha de pago, y el capital e

intereses del Tramo B deberá pagarse en Dólares. <u>Intereses</u>: [___]. <u>Comisiones</u>: Según se establece en cartas de comisiones suscritas por los Acreedores IVA y el Deudor.

**/xii/ Términos y Condiciones del Secured TwoL Agreement. /A/** Los principales términos y condiciones del Secured TwoL Agreement son los siguientes: <u>Pago</u>: El Deudor se obligó a pagar el total del capital del Tramo Subordinado en [•] cuotas semestrales pagaderas el quince de abril y quince de octubre de cada año, la primera de ellas el [quince de octubre de dos mil veintidós] y la última de ellas el quince de octubre de dos mil cuarenta y dos, [en los porcentajes indicados en el Calendario de Amortización /*Loan Repayment Schedule*, según dicho término se define en el Secured TwoL Agreement/ contenido en anexo /*Schedule*/ uno del Secured TwoL Agreement]. <u>Intereses</u>: El capital adeudado bajo el Tramo Subordinado devengará intereses a una tasa de interés anual igual a dos por ciento, los que se devengarán día a día, se calcularán sobre la base de un año de trescientos sesenta y cinco o trescientos sesenta y seis días por el número efectivo de días transcurridos en el período de interés respectivo, y se pagarán por período vencido en la fecha de pago de interés /quince de abril y quince de octubre de cada año/ inmediatamente siguiente al término del período de interés correspondiente. Lo anterior sin perjuicio de la capitalización de tales intereses que sea aplicable conforme a lo establecido en el Secured TwoL Agreement. En caso de mora o simple retardo en el pago del capital o de cualquier otra suma pagadera en virtud del Secured TwoL Agreement, la suma impaga devengará a título de interés penal un interés anual a una tasa equivalente a la suma mayor entre /i/ la tasa de interés de dos por ciento incrementada en dos por ciento anual, y /ii/ el interés máximo convencional que sea aplicable, de haberlo. El referido interés moratorio se devengará a contar de la fecha de la mora o del simple retardo y hasta la fecha del pago efectivo, y será pagadero por el Deudor a solicitud del acreedor respectivo, o si no fuese solicitado, en cada Fecha de Pago de Intereses después de la mora o simple retardo. Todos los pagos que se hagan serán en Dólares, a más tardar a las once a.m. /hora de la ciudad de Nueva York, Estados Unidos de América/ del día del vencimiento correspondiente, con fondos de inmediata disponibilidad, libres y netos de cualquier impuesto, tributo, contribución, derecho, retención o carga, distintos de Impuestos Excluidos /*Excluded Taxes*, según este término se define en el Contrato de Términos Comunes/, directamente a ITAÚ CORPBANCA NEW YORK BRANCH por cuenta del acreedor respectivo, por medio de transferencia electrónica a la cuenta indicada en la sección [dos punto cero siete] del Secured TwoL Agreement.

**/B/** Para todos los efectos de este instrumento, se entiende por "**Préstamos**", los pagos adeudados a las Partes Garantizadas en virtud de cuentas por cobrar o préstamos otorgados y documentados bajo los Secured LAgreements, el Crédito de Capital de Trabajo y el Financiamiento de Salida.

**/xiii/ Términos y Condiciones de los Indentures. /A/ Secured OneL Indenture:** Los principales términos y condiciones del Secured OneL Indenture son los siguientes: <u>Pago</u>: [•]. <u>Intereses</u>: [•]. **/B/ Secured TwoL Indenture:** Los principales términos y condiciones del Secured TwoL Indenture en el evento que sea otorgado, serán los siguientes: <u>Pago</u>: [•]. <u>Intereses</u>: [•].

**/xiv/ Contrato entre Acreedores. /A/** Por instrumento privado de fecha nueve de diciembre de dos mil trece, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, IDB, IFC, OPIC, Banco de Crédito e Inversiones S.A., Miami Branch, Banco del Estado de Chile, New York Branch, Banco Itaú Chile /hoy Itaú Corpbanca/ y Corpbanca, New York Branch /hoy Itaú Corpbanca, New York Branch/, DNB

y KfW, entre otros, suscribieron un contrato en idioma inglés denominado "*Intercreditor Agreement*" /en adelante el "**Contrato entre Acreedores Original**"/. /**B**/ El Contrato entre Acreedores Original fue modificado y refundido por instrumento privado en idioma inglés denominado *Amended and Restated Intercreditor Agreement*, de fecha diecisiete de marzo de dos mil diecisiete, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América y posteriormente modificado nuevamente por instrumento privado de fecha ocho de mayo de dos mil dieciocho, celebrado en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Second Amended and Restated Intercreditor Agreement*" /en adelante, el Contrato entre Acreedores Original, modificado y refundido en la forma antes señalada, el "**Contrato entre Acreedores Modificado y Refundido**"/. /**C**/ Como parte del acuerdo adoptado por los acreedores del Deudor y este último dentro del Capítulo Once, el Contrato entre Acreedores Modificado y Refundido fue nuevamente modificado y refundido por instrumento privado en idioma inglés, otorgado con fecha [•] de dos mil veintidós, denominado "*Third Amended and Restated Intercreditor Agreement*", suscrito entre los acreedores bajo el Secured 1L Loan Agreement, los acreedores bajo el Secured TwoL Agreement, los Acreedores de IVA, el acreedor bajo el Crédito de Capital de Trabajo y bajo el Financiamiento de Salida, entre otros /en adelante el Contrato entre Acreedores Modificado y Refundido, modificado y refundido en la forma antedicha, y según sea modificado, complementado o refundido en el futuro, se denomina el "**Contrato entre Acreedores**"/.

/**xv**/ **Contrato de Conversión**. Por instrumento privado de fecha [•] de dos mil veintidós, en idioma inglés y sujeto a las leyes de la República de Chile, AES Andes, AES Chile SpA /antes denominada Norgener Renovables SpA/, el Deudor e Itaú Corpbanca, en representación de las partes ahí señaladas, suscribieron un contrato denominado "*Share Conversion Agreement and Shareholders' Agreement*" /en adelante el "**Contrato de Conversión**"/. El Contrato de Conversión establece la obligación de AES Andes, AES Chile SpA, el Deudor, y las otras partes que califiquen como Relevant Party /según dicho término se define en el Contrato de Conversión, en adelante las "**Relevant Parties**"/, de realizar todas las actuaciones que sean necesarias para permitir la implementación de opción otorgada a los acreedores bajo el Tramo Subordinado, de capitalizar sus créditos bajo dicho Tramo en contra del Deudor [en octubre del año dos mil cuarenta y ocho, convirtiéndolos en acciones del Deudor, y la capitalización obligatoria] en octubre del año dos mil cincuenta y dos, de aquellos créditos vigentes a esa fecha bajo el Tramo Subordinado, conforme a lo establecido en el Secured TwoL Agrement y en el Contrato de Conversión y según se establezca en el Secured TwoL Indenture, en caso de ser otorgado.][5]

[/**Cinco**/ **Obligaciones Garantizadas.** Para todos los efectos de este contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", todas y cada una de las obligaciones que tenga en cualquier tiempo el Deudor, sean presentes o futuras, civiles o naturales, puras y simples o sujetas a modalidad, para con las respectivas Partes Garantizadas o aquellas entidades que tengan o adquieran la calidad de Partes Garantizadas de conformidad a lo establecido en los Documentos del Financiamiento /según dicho término se define más adelante/, bajo cualquiera del Secured TwoL Agreement, los Indentures, el Contrato de Crédito IVA, los Pagos Diferidos Strabag, el Crédito de Capital de Trabajo, el Financiamiento de Salida, los Préstamos, los Bonos, el Contrato de Términos Comunes, los Pagarés y Reconocimientos, el Contrato de Conversión o alguno de los otros Documentos del Financiamiento /"*Financing Documents*", según dicho término se define en el Contrato de Términos Comunes, en adelante los

---

[5] Pendiente. Sujeto a revisión.

"**Documentos del Financiamiento**"/. Las Obligaciones Garantizadas incluyen las obligaciones de pagar el capital y los intereses de todo tipo devengados con motivo de los actos y contratos antes indicados, así como las comisiones y demás montos adeudados bajo los mismos o cualquier instrumento que los reemplace o complemente. Las Obligaciones Garantizadas incluyen cualquier prórroga, renovación y/o modificación de que puedan ser objeto las obligaciones del Deudor contenidas a esta fecha en los contratos antes señalados, así como cualquier obligación derivada de las Obligaciones Garantizadas. Las Obligaciones Garantizadas también incluyen cualquier pago directo o reembolso a las Partes Garantizadas que de acuerdo a los documentos antes señalados sean de cargo del Deudor con motivo de impuestos, tributos, contribuciones, derechos, cargas, retenciones, honorarios, remuneraciones, cargos financieros, indemnizaciones de perjuicios, aumentos de costos y desembolsos relacionados a los mismos.

**/Seis/ Garantías.** En virtud del Contrato de Términos Comunes Modificado y Refundido, y con el objeto de garantizar el cumplimiento total, íntegro, efectivo y oportuno de las Obligaciones Garantizadas, y sin que ello implique limitación, el Deudor, AES Andes y AES Chile SpA /antes Norgener Renovables SpA/ se obligaron a otorgar y otorgaron en favor de todas y cada una de las Partes Garantizadas /según este término se define en el Contrato de Agencia de Garantías Local Modificado y Refundido y este último se define más adelante/, las garantías que se señalan en la definición de Documentos de Garantía /"*Security Documents*", según este término se define en el Contrato de Términos Comunes Modificado y Refundido/, lo que comprende, sin que implique limitación, hipotecas, prendas de cualquier naturaleza /incluyendo, prendas sobre derechos emanados de contratos, prendas sobre acciones/, cesiones condicionales, designación como beneficiario o asegurado adicional de pólizas de seguro, promesas de constitución de algunas garantías y mandatos, en adelante tales garantías y resguardos, también e indistintamente las "**Garantías Iniciales**". De conformidad a lo establecido en los Documentos del Financiamiento, y los acuerdos adoptados en el Capítulo Once, las obligaciones del Deudor bajo los Bonos Preferentes, el Tramo Subordinado, los Bonos Subordinados /una vez emitidos/, los Pagos Diferidos Strabag, los Préstamos IVA, el Crédito de Capital de Trabajo, el Financiamiento de Salida y el Contrato de Conversión, deben ser garantizadas con las Garantías Iniciales y las nuevas garantías y cauciones que deban otorgarse en base a lo establecido en los Documentos del Financiamiento y los demás acuerdos adoptados en el Capítulo Once /en adelante conjuntamente con las Garantías Iniciales, las "**Garantías**"/, en el mismo grado o prioridad /salvo respecto de aquellas Garantías otorgadas exclusivamente en beneficio de los Acreedores de IVA y subsidiariamente de los acreedores bajo el Tramo Subordinado/, para lo cual las Garantías Iniciales deberán modificarse para tales efectos; todo lo anterior sin perjuicio de que el Agente de Garantías Local, para su ejecución y para distribuir los fondos derivados de esa ejecución, deberá observar las reglas establecidas en el Contrato entre Acreedores, en que se establecen las siguientes prioridades de pago entre las distintas clases de acreedores del Deudor y cuyos créditos se encuentran garantizados por las Garantías: /**a**/ primera prioridad para las obligaciones del Deudor bajo el Crédito de Capital de Trabajo y el Financiamiento de Salida, a prorrata y hasta su total satisfacción; /**b**/ segunda prioridad para las obligaciones del Deudor bajo el Tramo Preferente, los Bonos Preferentes, los Pagos Diferidos Strabag y los Préstamos IVA, a prorrata y hasta su total satisfacción; y /**c**/ tercera prioridad para las obligaciones del Deudor bajo el Tramo Subordinado, los Bonos Subordinados y del Deudor y AES Andes bajo el Contrato de Conversión, a prorrata y hasta su total satisfacción.][6]

---

[6] Pendiente. Sujeto a revisión.

**/Siete/ Objeto de este Contrato de Agencia de Garantías.** Las Partes Garantizadas dejan expresa constancia que, atendido que la suscripción de los contratos de financiamiento antes singularizados, así como la suscripción de los contratos que dan cuenta de las Obligaciones Garantizadas, y todas las obligaciones que de ellos emanan, han tenido por objeto exclusivo financiar, el diseño, desarrollo, financiamiento, construcción, puesta en marcha, operación y mantenimiento del Proyecto, han convenido en designar al Agente de Garantías Local como su agente de garantías en los términos que se indican en la cláusula segunda de este instrumento, a fin de que los represente, colectiva y mancomunadamente, **/i/** en la suscripción u otorgamiento de cada uno de los documentos necesarios para la constitución, modificación y extinción de las Garantías, y **/ii/** en el ejercicio mancomunado de los derechos que emanen de las Garantías, incluyendo su ejecución. [De esta manera, cada Parte Garantizada renuncia a favor del Agente de Garantías Local, a su derecho de ejercer personal e individualmente los derechos anteriormente señalados, los que serán ejercidos colectivamente a través del Agente de Garantías Local conforme a lo establecido en los Documentos del Financiamiento y en particular en el Contrato entre Acreedores.][7]

**/Ocho/ Incorporación por referencia**. Las Partes dejan constancia que el Contrato de Agencia de Garantías Local contempla términos comunes aplicables a los contratos de garantía que el Deudor o cualquier tercero hayan otorgado u otorguen en favor del Agente de Garantías Local, actuando por cuenta y/o en nombre de las Partes Garantizadas /según dicho término se define más adelante/, las cuales serán incluidas por referencia a cada uno de dichos contratos de garantía, según se establezca en los mismos.

<u>CLÁUSULA SEGUNDA</u>: **DESIGNACIÓN DEL AGENTE DE GARANTÍAS LOCAL, OTORGAMIENTO DE MANDATO Y OTRAS DISPOSICIONES.**

**/A/ Designación y mandato.** Por el presente instrumento, las Partes Garantizadas, debidamente representadas en la forma indicada en la comparecencia de este instrumento, de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, han designado a Itaú Corpbanca como Agente de Garantías Local a fin de que como mandatario común y en cumplimiento de las instrucciones que al efecto le den las Partes Garantizadas de acuerdo a lo establecido en el Contrato entre Acreedores, represente a estas últimas en la suscripción u otorgamiento de los documentos necesarios para la constitución, modificación y extinción de las Garantías, y en el ejercicio mancomunado de los derechos que para ellos emanen de dichas Garantías, incluyendo su ejecución. Para los efectos indicados anteriormente, las Partes Garantizadas comparecientes, debidamente representadas en la forma indicada en la comparecencia de este instrumento, han conferido al Agente de Garantías Local un mandato mercantil irrevocable para que con amplias facultades, y de conformidad a lo establecido en el Contrato de Términos Comunes, el Contrato entre Acreedores y los demás Documentos del Financiamiento, desempeñe tales funciones, renunciando cada Parte Garantizada a favor del Agente de Garantías Local, a su derecho de ejercer personal e individualmente los derechos anteriormente señalados, los que serán ejercidos colectivamente a través del Agente de Garantías Local conforme a lo establecido en los Documentos del Financiamiento y en particular en el Contrato entre Acreedores. En virtud de ello, y sin que la descripción de facultades que se señalan a continuación tenga el carácter de taxativa, en el ejercicio del presente mandato, previas instrucciones que al efecto le den las Partes Garantizadas de conformidad a lo establecido en el Contrato entre Acreedores, lo que no será necesario acreditar ante terceros, el Agente de Garantías Local

---

[7] Pendiente. Sujeto a revisión.

estará amplia y expresamente facultado, pudiendo incluso autocontratar en caso que actúe por cuenta simultánea del Deudor, y/o de las Partes Garantizadas, para:

**/Uno/ /a/** Recibir y custodiar títulos accionarios, títulos representativos de derechos sociales y contractuales, títulos de crédito, pagarés u otros que en derecho corresponda entregar a y ser recibidos por las Partes Garantizadas, para el total perfeccionamiento de las Garantías, o encomendar esta labor a terceras personas; **/b/** celebrar todos los actos y contratos, realizar todas las gestiones y tramitaciones, suscribir todos los documentos públicos o privados, y efectuar todas las inscripciones o publicaciones que sean pertinentes, necesarias y/o conducentes en orden a constituir y perfeccionar completa y legalmente todas las Garantías, pudiendo incluso requerir de un ministro de fe las notificaciones, inscripciones, publicaciones y/o anotaciones que sean pertinentes de conformidad a la ley para tales fines, así como requerir o delegar poder para requerir las anotaciones, registros, inscripciones conservatorias, y publicaciones que fueren pertinentes; **/c/** ejecutar todos los actos y suscribir todos los documentos públicos o privados que sean necesarios o convenientes para mantener, modificar, sustituir, alzar y/o extinguir todas y cada una de las Garantías; **/d/** realizar todos los actos y gestiones, judiciales y extrajudiciales, que sean pertinentes en orden a proceder a la realización y ejecución de las Garantías que sean aplicables, estando incluso facultado para cobrar y percibir. El Agente de Garantías Local deberá realizar y ejecutar las Garantías en conformidad a las instrucciones que reciba exclusivamente de las Partes Garantizadas de acuerdo a lo establecido en el Contrato entre Acreedores Modificado y Refundido y las disposiciones de los demás Documentos del Financiamiento, lo que no será necesario acreditar ante terceros; **/e/** realizar todos los actos y gestiones, judiciales y extrajudiciales, que sean pertinentes en orden a proceder al cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, estando incluso facultado para cobrar y percibir, y **/f/** aceptar toda clase de acuerdos de subordinación de créditos en favor de las Partes Garantizadas, sean estos suscritos por instrumento público o privado, bajo ley chilena o extranjera. El Agente de Garantías Local deberá realizar y proceder al cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, en conformidad a las instrucciones que reciba exclusivamente de las Partes Garantizadas de conformidad a lo dispuesto en el Contrato entre Acreedores Modificado y Refundido y los demás Documentos del Financiamiento, lo que no será necesario acreditar frente a terceros.

**/Dos/** Representar a las Partes Garantizadas en todos los juicios y gestiones judiciales relacionados con las Garantías y con los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, que fueren pertinentes, ante cualquier tribunal ordinario, especial, arbitral, administrativo o de cualquier naturaleza, así intervengan los Acreedores Preferentes, Strabag y/o cualquier otra Parte Garantizada, como demandantes, demandados o terceros, de cualquiera especie, hasta la completa ejecución de la sentencia, pudiendo ejercer toda clase de acciones, sean ellas ordinarias, ejecutivas, especiales, de jurisdicción no contenciosa o de cualquiera otra naturaleza. En el ejercicio de este poder judicial para la realización y ejecución de las Garantías y para el cobro de los Pagarés y Reconocimientos y de cualquier otra deuda que constituya una Obligación Garantizada, el Agente de Garantías Local queda facultado para representar a las Partes Garantizadas con todas las facultades ordinarias y extraordinarias del mandato judicial, contenidas en ambos incisos del artículo séptimo del Código de Procedimiento Civil, las que se dan por íntegramente reproducidas en este acto, una a una, pudiendo, sin que la siguiente enunciación signifique limitación alguna, demandar, iniciar cualquiera otra especie de gestiones judiciales, sean de jurisdicción voluntaria o contenciosa, aceptar la demanda contraria, desistirse de la acción deducida, renunciar los recursos y los términos

legales, absolver posiciones, someter asuntos a compromiso y designar árbitros con facultades de arbitradores, transigir, aprobar convenios y percibir, con expresa declaración que la facultad de transigir comprende también la transacción extrajudicial, percibir, y nombrar abogados patrocinantes y apoderados con todas las facultades que por este instrumento se le confieren. El Agente de Garantías Local podrá delegar las facultades que se indican en este número dos y reasumir total o parcialmente cuantas veces sea conveniente.

/**Tres**/ Adicionalmente a las facultades conferidas al Agente de Garantías Local en los numerales precedentes, el Deudor y las Partes Garantizadas han designado irrevocablemente al Agente de Garantías Local, con las más amplias facultades de sustitución, como su apoderado, en el evento que haya sido enviada una Notificación de Suspensión /"*Notice of Suspension*", según este término se define en el Onshore Accounts Agreement y según este último término se define en el Contrato de Términos Comunes, en adelante según el mismo sea modificado o modificado y refundido en el futuro, el "**Onshore Accounts Agreement**" / al Banco de Cuentas Locales / "*Onshore Accounts Bank*" según este último término se define en el Contrato de Términos Comunes, en adelante el "**Banco de Cuentas Locales**"/ y hasta que dicha Notificación de Suspensión sea dejada sin efecto o, en caso que un Evento de Incumplimiento /"*Event of Default*", según este término se define en el Contrato de Términos Comunes / haya ocurrido y persista, para ejecutar todos los actos y suscribir todos los documentos o instrumentos que el Agente de Garantías Local, o los agentes o apoderados del mismo, estimen necesario o aconsejable de acuerdo a lo dispuesto en los Documentos del Financiamiento, en nombre y representación del Deudor, para el cumplimiento de las disposiciones contenidas en el Onshore Accounts Agreement, sin necesidad de notificar al Deudor para estos efectos y para ejercer los derechos y recursos establecidos en la Sección nueve punto cero tres /*Enforcement*/ del referido Onshore Accounts Agreement. Se deja constancia que el mandato otorgado al Agente de Garantías Local de que da cuenta este contrato, ha sido otorgado en interés de todas y cada una de las Partes Garantizadas, de manera que es irrevocable en los términos del Artículo doscientos cuarenta y uno del Código de Comercio.

/**B**/ **Responsabilidad del Agente de Garantías Local y normas supletorias.** /**Uno**/ El Agente de Garantías Local responderá de culpa grave en el cumplimiento de las obligaciones establecidas en el presente mandato. Asimismo, las Partes acuerdan y dejan constancia que respecto de cualquier materia no reglamentada en el presente instrumento se recurrirá a las disposiciones relevantes de los Documentos del Financiamiento.

/**Dos**/ Se deja constancia que respecto de aquellas materias que, conforme a los documentos suscritos por el Agente de Garantías Local en el cumplimiento de las obligaciones establecidas en el presente mandato, se requiera el consentimiento o autorización del Agente de Garantías Local, o la actuación o ejercicio de derechos por parte del Agente de Garantías Local, éste actuará exclusivamente de acuerdo a, y sujeto a recibir, instrucciones otorgadas al efecto por las Partes Garantizadas de conformidad con el Contrato entre Acreedores y los demás Documentos del Financiamiento, circunstancia que no será necesario acreditar frente a terceros.

/**Tres**/ Se entenderá que el Agente de Garantías Local ha obrado conforme a instrucciones de las Partes Garantizadas cada vez que lo haya hecho en cumplimiento de instrucciones que el Agente de Garantías Local haya creído de buena fe recibir de parte de las Partes Garantizadas, sin que le corresponda al Agente de Garantías Local verificar si al

impartírsele las mismas por parte de las Partes Garantizadas se han cumplido o no los requisitos formales o habilitantes necesarios para la emisión de instrucciones.

<u>**CLÁUSULA TERCERA**</u>**: ACEPTACIONES.**

**/Uno/ Aceptación del Agente de Garantías Local.** El Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia de este instrumento, acepta la designación y el mandato que por este acto le confieren las Partes Garantizadas, en los términos expuestos precedentemente.

**/Dos/ Aceptación del Deudor.** Por su parte, el Deudor, debidamente representado en la forma indicada en la comparecencia de este instrumento, acepta expresamente la agencia de garantías, la designación del Agente de Garantías Local y el mandato de que da cuenta este instrumento.

<u>**CLÁUSULA CUARTA**</u>**: RENUNCIA Y SUSTITUCIÓN DEL AGENTE DE GARANTÍAS LOCAL.**

Sujeto a la designación y aceptación de un agente de garantías sustituto, según se indica más adelante, el Agente de Garantías Local podrá renunciar a su cargo en cualquier momento, mediante el envío de una comunicación a las Partes Garantizadas, al Banco de Cuentas Locales y al Deudor. Las Partes convienen en que las Partes Garantizadas, actuando conjuntamente, tendrán derecho a remover al Agente de Garantías Local con o sin expresión de causa en cualquier tiempo. Ocurrida la renuncia o remoción del Agente de Garantías Local, las Partes Garantizadas designarán, tan pronto sea posible, un nuevo agente de garantías que deberá ser un banco comercial autorizado para operar en Chile. La renuncia del Agente de Garantías Local se hará efectiva transcurridos que sean ciento veinte días desde que su renuncia haya sido puesta en conocimiento de las Partes Garantizadas, del Banco de Cuentas Locales y del Deudor, y una vez que un nuevo agente de garantías, el cual será designado en la forma antes señalada, hubiere tomado posesión del renunciado cargo. La remoción, a su vez, sólo se hará efectiva una vez que un nuevo agente de garantías haya tomado posesión de su cargo en reemplazo del removido agente de garantías, no pudiendo en todo caso exceder el plazo máximo de ciento veinte días desde que el agente de garantías removido recibiere aviso escrito de parte de las Partes Garantizadas. En caso que transcurridos los referidos ciento veinte días desde la notificación de la renuncia respectiva, o desde la remoción del agente de garantías efectuada por las Partes Garantizadas, un nuevo agente de garantías no hubiere sido designado por las Partes Garantizadas como tal y aceptado el cargo, el agente de garantías renunciado o removido, según el caso, podrá solicitar a un juez competente que designe a un sustituto idóneo para que actúe hasta que un agente de garantías sucesor sea designado conforme a esta cláusula cuarta, de ocurrir ello. Hasta que no sea nombrado el respectivo sustituto por el juez competente, el renunciado o removido agente de garantías seguirá actuando en su calidad de tal, de acuerdo con los términos y condiciones de este contrato de agencia de garantías y los Documentos del Financiamiento. Cualquier agente de garantías sustituto nombrado por el juez competente será inmediatamente y sin más trámite reemplazado por cualquier agente de garantías sucesor designado por las Partes Garantizadas conforme a los términos de esta cláusula cuarta. Aceptado que sea el cargo por un agente de garantías sucesor, **/i/** el agente de garantías reemplazante sucederá, a contar de ese momento, al agente de garantías removido o renunciado y estará investido de todos los derechos, poderes, privilegios y deberes del agente de garantías que renuncia o se retira, y éste último quedará liberado de sus derechos, poderes, deberes y obligaciones

bajo el presente contrato de agencia de garantías, y **/ii/** el agente de garantías removido o renunciado transferirá tan pronto sea posible al agente de garantías reemplazante todos los títulos, registros, pagarés y demás documentos, ya sean públicos o privados, que hubiesen estado bajo su custodia y ejecutará y celebrará todos los actos o contratos y entregará todos los avisos o instrucciones que sean necesarias o convenientes para transferir, traspasar y ceder al agente de garantías reemplazante los derechos que le correspondían al agente de garantías renunciado o removido. En cuanto sea necesario, a juicio exclusivo de las Partes Garantizadas, el Deudor deberá concurrir a los actos y contratos que sean requeridos para concretar la remoción del agente de garantías, o de quienes le sucedan o reemplacen, y la designación de su o sus sustitutos. Sin perjuicio de aquello, al concurrir a dichos actos y contratos el Deudor no podrá ser forzado a contraer nuevas obligaciones distintas de las Obligaciones Garantizadas.

**CLÁUSULA QUINTA**: **IDENTIFICACIÓN.** En los instrumentos de constitución de las Garantías y en las inscripciones de ellas según corresponda, no será necesario identificar a las Partes Garantizadas, bastando individualizar este contrato de agencia de garantías y expresar el nombre del Agente de Garantías Local.

**CLÁUSULA SEXTA**: **INCORPORACIÓN A ESTE CONTRATO DE NUEVAS PARTES GARANTIZADAS.**

Las Partes acuerdan que el presente Contrato de Agencia de Garantías Local beneficiará a todas aquellas entidades que en el futuro se adhieran como acreedores al mismo al calificar como "*Secured Parties*" en los términos y condiciones contenidas en el Contrato de Términos Comunes, incluyendo sus modificaciones posteriores y en tanto sean incluidas por referencia en las Garantías, se entenderán formar parte integral de las Garantías para todos los efectos legales o contractuales a que pudiere haber lugar, sin necesidad de encontrarse expresamente reproducidas en los instrumentos por medio de los cuales las Garantías se otorguen o de tener que hacer modificaciones a las Garantías para hacer referencia a eventuales modificaciones de este Contrato de Agencia de Garantías Local, deberán suscribir un contrato de adhesión por instrumento privado el cual, debidamente firmado por el adherente respectivo y el Agente de Garantías Local, deberá protocolizarse en una Notaría de la ciudad de Santiago. Dicho instrumento deberá celebrarse en términos sustancialmente similares a los contenidos en el modelo que, como **Anexo A**, se protocoliza con esta fecha y en esta misma Notaría bajo el mismo número de repertorio de la presente escritura, y que se entiende formar parte de este instrumento para todos los efectos legales.

**CLÁUSULA SÉPTIMA**: **TÉRMINOS COMUNES APLICABLES A LAS GARANTÍAS.**

**Siete.Uno**. **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en esta Cláusula Séptima, incluyendo sus modificaciones posteriores y en tanto sean incluidas por referencia en las Garantías, se entenderán formar parte integral de las Garantías para todos los efectos legales o contractuales a que pudiere haber lugar, sin necesidad de encontrarse expresamente reproducidas en los instrumentos por medio de los cuales las Garantías se otorguen o de tener que hacer modificaciones a las Garantías para hacer referencia a eventuales modificaciones de este Contrato de Agencia de Garantías Local.

**Siete.Dos**. **Regla de interpretación.** Para efectos del artículo mil quinientos sesenta y cuatro, inciso segundo, del Código Civil de Chile, las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en esta Cláusula Séptima, formen parte integrante de las Garantías en los términos indicados en la sección Siete.Uno precedente, debiendo interpretarse las Garantías conjuntamente con las mencionadas disposiciones, y bajo el entendido de que éstas forman parte integrante de cada una de aquellas.

**Siete.Tres**. **Términos comunes aplicables a todas las garantías**.

**Siete.Tres.Uno**. **Irrevocabilidad de los poderes.** A menos que se indique expresamente lo contrario, todos los mandatos que cualquiera de los constituyentes de las Garantías, en calidad de mandantes, otorgue al Agente de Garantías Local, por sí o por nombre y/o cuenta de los mandantes en calidad de mandatario, en relación con las Garantías, o en virtud de los instrumentos en virtud de los cuales las Garantías fueron celebradas, serán mandatos mercantiles irrevocables, otorgados en interés de ambas partes en los términos del artículo doscientos cuarenta y uno del Código de Comercio, y con facultad de autocontratar. Las Partes dejan expresa constancia de que dichos mandatos no serán remunerados, a menos que se indique expresa e indubitadamente lo contrario.

**Siete.Tres.Dos**. **Extinción de obligaciones**. Se deja constancia de que toda Obligación Garantizada cuyo pago se haya convenido en moneda extranjera se entenderá extinguida sólo hasta por el monto por el que las Partes Garantizadas hayan recibido dicha moneda en divisas de libre convertibilidad y disponibilidad o, si el pago se efectuare en otra moneda, sólo hasta por el monto con el que con dicha moneda puedan adquirir la moneda extranjera con la que haya debido hacérseles el pago en virtud de la convención o la ley, el día hábil siguiente a aquél en que las Partes Garantizadas reciban los dineros en cuestión.

**Siete.Tres.Tres**. **Ausencia de modificación y novación.** Lo dispuesto en las Garantías y en los instrumentos por medio de los cuales ellas se celebren no se considerará bajo ninguna circunstancia como modificación, o limitación de los derechos que tengan el Agente de Garantías Local, el Deudor, las Partes Garantizadas o las otras demás partes de las Garantías en virtud de la ley, ni de los demás Documentos del Financiamiento, según corresponda, o de cualquier otro instrumento suscrito en relación con los anteriores, ni constituye bajo ningún concepto una novación de las Obligaciones Garantizadas.

**Siete.Tres.Cuatro**. **Mandato especial para notificaciones asociadas a las Garantías**. Sin perjuicio de cualquier designación de mandatarios para recibir notificaciones judiciales que se haya hecho o que se haga en el futuro, adicionalmente cada uno del Deudor, AES Andes y AES Chile SpA, confiere poder especial e irrevocable a [•] y a [•], para que, actuando cualquiera de ellos individualmente, puedan recibir, por y en representación de cada una de tales sociedades, notificaciones y requerimientos judiciales o extrajudiciales, en cualquier gestión, procedimiento o juicio, cualquiera que fuese el procedimiento aplicable o el tribunal o autoridad que tuviere encomendado su conocimiento y que diga relación con este instrumento, con cualquiera de las Garantías de que fuere parte, con los Documentos del Financiamiento, con las Obligaciones Garantizadas o con cualquier otro instrumento otorgado para garantizarlas. Consecuentemente, si cualquier notificación o requerimiento se realiza a los mandatarios anteriormente mencionados, la o las sociedades a quienes dicha notificación se dirigía se considerarán válidamente notificadas o requeridas con respecto al acto, procedimiento o demanda en cuestión. En el ejercicio del poder especial e irrevocable que por este acto se otorga, los mandatarios estarán ampliamente facultados para representar a cada una de las sociedades mandantes antes indicadas en el orden judicial, incluyendo las facultades de recibir notificaciones, contestar demandas y actuar con las atribuciones señaladas en ambos incisos del artículo séptimo del Código de Procedimiento Civil de la República de Chile, las cuales se dan por íntegramente reproducidas, una por una. Presentes a este acto [•] y [•], ambos ya individualizados, domiciliados para estos efectos en [•], Santiago; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y declaran que aceptan el

poder especial e irrevocable que se otorga en esta cláusula y se obligan a no renunciar al mismo sin el consentimiento escrito del Agente de Garantías Local, el cual no podrá ser denegado sin causa razonable, para lo cual cada una del Deudor, AES Andes y AES Chile SpA, deberá, en forma previa, designar un nuevo mandatario judicial con las mismas facultades y en los mismos términos de esta cláusula, nuevo mandatario que deberá comparecer y aceptar el mandato otorgado en el mismo instrumento de renuncia, ser una persona natural residente permanente en Chile y ser aprobado previamente por el Agente de Garantías Local. Asimismo, cada una del Deudor, AES Andes y AES Chile SpA, se obliga a mantener en todo momento dos o más apoderados con las mismas facultades y en los mismos términos de esta cláusula en caso de que el mandato irrevocable otorgado en esta cláusula terminare por fallecimiento de cualquiera de los apoderados, o en caso de que cualquiera de ellos dejare de ser residente permanente en Chile. El poder otorgado por este acto por cada una del Deudor, AES Andes y AES Chile SpA, no revoca ningún poder otorgado con anterioridad a esta fecha y, en el evento de otorgar otro poder en el futuro, no se entenderá por ese hecho revocado el poder otorgado en el presente instrumento.

**Siete.Tres.Cinco. Título suficiente.** Cada uno del Deudor, AES Andes y AES Chile SpA declara, en favor del Agente de Garantías Local, que reconocerá copia autorizada de la Garantía de que se trate, conjuntamente con una copia autorizada de los respectivos Documentos del Financiamiento, como buen y suficiente título para iniciar y proseguir todas las acciones que en derecho correspondan en relación con dicha Garantía. Lo dispuesto en este instrumento y en los instrumentos por medio de los cuales se celebren las Garantías no se considerará bajo ninguna circunstancia como limitación de los derechos que correspondan al Agente de Garantías Local, actuando en nombre y representación de las Partes Garantizadas en virtud de la ley, ni como una modificación, sustitución o limitación de los derechos otorgados al Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, en virtud de los Documentos del Financiamiento, según corresponda. Asimismo, se deja expresa constancia de que cada una de las Garantías será sin perjuicio de cualquier otra garantía y prohibición que se hubiere constituido por el Deudor, AES Andes y AES Chile SpA y/o por terceros, sea real o personal, para caucionar las Obligaciones Garantizadas.

**Siete.Tres.Seis. Impuestos y sucesores.** Cada uno del Deudor, AES Andes y AES Chile SpA declara que las Garantías de las cuales son parte y los poderes que se otorguen por medio de los instrumentos en virtud de los cuales ellas serán otorgadas, así como el ejercicio de los derechos que puedan derivar de ellos, no se encontrarán sujetos a impuestos ni cargos de ninguna naturaleza, ni a cargos por concepto de timbres u otros impuestos o cargos similares y, en consecuencia, el Agente de Garantías Local tendrá libre acceso para ejercer sus derechos, sin restricciones derivadas del no pago o incumplimiento de los aspectos señalados anteriormente. Asimismo, cada uno del Deudor, AES Andes y AES Chile SpA acuerda que las Garantías, y los derechos que las mismas otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes revistan la calidad de sucesores o cesionarios de este bajo los Documentos del Financiamiento, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos del Agente de Garantías Local, tendrán en contra del Deudor, AES Andes y AES Chile SpA los mismos derechos y beneficios que esta escritura y que las Garantías otorgan al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**Siete.Tres.Siete. Nulidad o ineficacia de las Garantías.** Si por cualquier causa, una o más de las estipulaciones de las Garantías y, a mayor abundamiento, de los instrumentos

por medio de los cuales las Garantías se celebran, fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez y eficacia de las demás estipulaciones del instrumento de que se trate ni de los demás Documentos del Financiamiento, ni de cualquier otro documento relacionado con los mismos.

**Siete.Tres.Ocho. Domicilio, competencia y ley aplicable a las Garantías.** Para todos los efectos legales y contractuales derivados de las Garantías y, a mayor abundamiento, de los instrumentos por medio de los cuales las Garantías se celebren, el Deudor, AES Andes, AES Chile SpA y el Agente de Garantías Local fijan su domicilio en la ciudad y comuna de Santiago y se someten a los tribunales ordinarios de justicia con asiento y competencia en la comuna de Santiago. Las Garantías se regirán por las leyes y demás disposiciones reglamentarias y de otra índole vigentes en la República de Chile.

**Siete.Tres.Nueve. Gastos asociados a las Garantías.** Todos los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, publicaciones y cualesquiera otros gastos y desembolsos de cualquiera naturaleza necesarios para el perfeccionamiento de las Garantías, los derivados de las escrituras públicas complementarias que puedan ser necesarias otorgar para clarificar, rectificar o introducir adiciones a las Garantías; y aquellos correspondientes a las cancelaciones o alzamientos de las mismas, serán de exclusivo cargo del Deudor.

**Siete.Tres.Diez. Poder de rectificación de las Garantías.** Cada uno de el Deudor, AES Andes y AES Chile SpA otorga poder irrevocable a María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que actuando uno cualquiera de ellos conjuntamente con el Agente de Garantías Local; puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar a las Garantías, pudiendo suscribir las escrituras públicas o instrumentos privados que se requieran a dicho efecto. El Agente de Garantías Local, podrá ejercer dicho mandato por medio de sus representantes o por medio de quien éstos designen para tales efectos.

**Siete.Tres.Once. Renuncia de derechos bajo las Garantías.** El hecho de que el Agente de Garantías Local no ejercitare o demorare el ejercicio de cualquiera de sus derechos bajo las Garantías, o bajo cualquiera de los demás Documentos del Financiamiento, no constituirá una renuncia de ellos, como tampoco el ejercicio separado o parcial de algún derecho impedirá el ejercicio del mismo o de otros derechos. Las acciones y derechos a que aquí se hace referencia son acumulativos y no excluyen ninguna otra acción o derecho reconocido por la ley.

**Siete.Tres.Doce. Denominación de las cláusulas de las Garantías.** Las denominaciones que las partes de cada Garantía asignen a sus distintas estipulaciones se establecerán sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que cada cláusula en su integridad pueda tener, incluso cuando dicho significado o alcance sea distinto o contrario a la denominación de la respectiva cláusula.

**Siete.Tres.Trece. Alzamientos.** En el ejercicio del mandato de que da cuenta el Contrato de Agencia de Garantías Local, el Agente de Garantías Local deberá alzar y cancelar las Garantías respectivas una vez extinguidas todas las Obligaciones Garantizadas por las mismas y devolver al constituyente respectivo cualquier título, pagaré e instrumento donde consten dichas obligaciones o sean objeto de las respectivas Garantías.

**CLÁUSULA OCTAVA: INTERPRETACIÓN.** A menos que se disponga lo contrario, cualquier referencia en el presente Contrato de Agencia de Garantías Local a cualquier persona incluirá a sus sucesores y cesionarios permitidos bajo el Contrato de Términos Comunes y los demás Documentos del Financiamiento. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa.

**CLÁUSULA NOVENA: NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará a la validez de las demás estipulaciones de este instrumento, cualquier otro Documento del Financiamiento, o cualesquiera otros documentos relacionados con los mismos.

**CLÁUSULA DÉCIMA: AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** Lo dispuesto en este instrumento no se considerará bajo ninguna circunstancia como modificación, o limitación de los derechos que tengan el Agente de Garantías Local, las Partes Garantizadas, o el Deudor en virtud de la ley, del Contrato de Términos Comunes, de los Pagarés y Reconocimientos, de cualquier otro Documento del Financiamiento, o de cualquier otro instrumento suscrito en relación con los anteriores, ni constituye bajo ningún concepto una novación.

**CLÁUSULA UNDÉCIMA: JURISDICCIÓN Y LEY APLICABLE.** Para todos los efectos legales derivados de presente contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se someten a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Este contrato se rige por la ley chilena.

**CLÁUSULA DUODÉCIMA: GASTOS.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo del Deudor. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones de las Garantías, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de las mismas, los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a las Garantías o a este instrumento, o por renuncias o remociones del Agente de Garantías Local; y aquellos correspondientes a las cancelaciones o alzamientos de las mismas, serán de exclusivo cargo del Deudor. De la misma manera, serán de cargo del Deudor todos los gastos originados por asesorías legales, ya sea de abogados externos en Chile o en los Estados Unidos de América, como también todos aquellos gastos razonables en que deba incurrir el Agente de Garantías Local a fin de dar fiel cumplimiento al mandato encomendado en el presente instrumento, de conformidad con lo previsto en los Documentos del Financiamiento.

**CLÁUSULA DÉCIMO TERCERA: PODER DE RECTIFICACIÓN.** Los comparecientes de esta escritura otorgan poder irrevocable a /a/ Felipe Moro Vargas, Fernando Noriega Potoncjack y Diego Peralta Valenzuela; y /b/ María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los cinco segundos, puedan realizar las rectificaciones o aclaraciones que sean necesarias

realizar al presente Contrato de Agencia de Garantías Local, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.

**CLÁUSULA DÉCIMO CUARTA**: **DENOMINACIÓN DE LAS CLÁUSULAS.** Las denominaciones asignadas por las Partes a las distintas estipulaciones de este Contrato de Agencia de Garantías Local han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula o sección en su integridad pueda tener distintos que dicha denominación.".

**TERCERO**: **ANEXOS DEL CONTRATO DE AGENCIA DE GARANTÍAS LOCAL.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos A y Anexo B a que hace referencia el Contrato de Agencia de Garantías Local.

**CUARTO**: **ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Agencia de Garantías Local Modificado y Refundido y el nuevo texto modificado y refundido que consta en este Contrato de Agencia de Garantías Local.

**QUINTO**: **GASTOS.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo del Deudor. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo del Deudor.

**SEXTO**: **NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez de las demás estipulaciones de este instrumento, del Contrato de Agencia de Garantías Local, de cualquier otro Documento del Financiamiento, o cualesquiera otros documentos relacionados con los mismos, las cuales permanecerán íntegramente vigentes.

**SÉPTIMO**: **DOMICILIO Y COMPETENCIA.** Para todos los efectos legales derivados del otorgamiento de este contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se someten a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Esta modificación al Contrato de Agencia de Garantías Local Modificado y Refundido se rige por la ley chilena.

**OCTAVO**: **PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a /a/ Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y /b/ María Paz Cerda Herreros, Andrea Sougarret Römer, Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los cinco segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.

**NOVENO**: **AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** El presente instrumento no se considerará bajo ninguna circunstancia como una modificación, sustitución o limitación de

los derechos otorgados al Agente de Garantías Local, en virtud de los Documentos del Financiamiento.

**DÉCIMO**: **DENOMINACIÓN DE LAS CLÁUSULAS**. Las denominaciones asignadas por las Partes a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las partes y del Notario que autoriza. En comprobante y previa lectura, así lo otorgan y firman los comparecientes con el Notario que autoriza.- Se da copia. Doy fe.-

## ANEXO A

### ESCRITURA DE ADHESIÓN

| ADHESIÓN A | ADHESION TO |
|---|---|
| **CONTRATO DE AGENCIA DE GARANTÍAS LOCAL** | **ONSHORE COLLATERAL AGENCY AGREEMENT** |

**[NUEVA PARTE GARANTIZADA]**

EN SANTIAGO DE CHILE, a [●] de [●] de [●], ante mí, [●], Notario Público Titular de la [●] Notaría de Santiago, con domicilio en esta ciudad, [●], comparece don [●], [nacionalidad], [estado civil], [profesión u oficio], cédula nacional de identidad número [●], en nombre y representación, según se acreditará, de [NUEVA PARTE GARANTIZADA], [*individualización*], ambos domiciliados para estos efectos en [●], en adelante también e indistintamente el "**Adherente**"; y expone:

**PRIMERO**: **Contrato de Agencia de Garantías Local**.

Por escritura pública de fecha [●] de 2022, otorgada en la Notaría de Santiago de [●], bajo el repertorio número [●], **/A/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,** sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, **ITAÚ CORPBANCA, NEW YORK BRANCH, DNB BANK ASA**, entre otros, e **ITAÚ CORPBANCA** /éste último, en adelante, el "**Agente de Garantías Local**"/, todas ellas en su calidad de "**Partes Garantizadas**" */Secured Parties/* bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías referido más abajo, en adelante conjuntamente, las "**Partes Garantizadas**", y **/B/ ALTO MAIPO SpA**, en su calidad de deudor bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de

**[NEW SECURED PARTY]**

KNOW ALL PERSONS BY THESE PRESENTS, that in Santiago, Chile, this [●] day of [●], [●], before me, [●], Notary Public of the [●] Notarial Office in and for Santiago, located at [●], personally appeared Mr. [●], [nationality], [marital status], [profession or occupation], bearing national identification card number [●], as hereinbelow evidenced for and on behalf of [NEW SECURED PARTY] [●], both domiciled for these purposes at [●] /hereinafter the "**Adherent**"/; and states:

**FIRST:** **Onshore Collateral Agency Agreement**.

By public deed dated [●], 2022, executed at the notarial office of Santiago of [●], under record number [●], **/A/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,** successor in interest of OVERSEAS PRIVATE INVESTMENT CORPORATION, **ITAÚ CORPBANCA, NEW YORK BRANCH, DNB BANK ASA,** among others, and **ITAÚ CORPBANCA** /the latter, hereinafter, the "**Onshore Collateral Agent**"/, all of them acting in their capacity as "**Secured Parties**" under the Financing Documents, as such term is defined in the Collateral Agency Agreement referred to below, hereinafter, jointly, the "**Secured Parties**", and **/B/ ALTO MAIPO SpA** as borrower under the Financing Documents, as such term is defined in the Collateral Agency Agreement referred to below, hereinafter, the "**Borrower**", as provided

34

Agencia de Garantías referido más abajo, en adelante el "**Deudor**", conforme a lo dispuesto en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, modificaron y establecieron un texto refundido de un contrato de agencia de garantías, en adelante el "**Contrato de Agencia de Garantías**", mediante el cual, por una parte, las Partes Garantizadas designaron a Itaú Corpbanca, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, domiciliada para estos efectos en [●], como Agente de Garantías Local y le confirieron un mandato mercantil irrevocable para que en tal calidad los represente en la constitución, modificación o extinción de las Garantías, según este término se define en el Contrato de Agencia de Garantías, y en el ejercicio mancomunado de los derechos que para ellos emanen de dichas Garantías y, por otra parte, designaron al Agente de Garantías Local para que los represente en la gestión de los créditos que les correspondan bajo los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, como también en el ejercicio mancomunado de los derechos que emanen de tales créditos, y le otorgaron un mandato mercantil irrevocable para que con amplias facultades desempeñe tales funciones.

in article 18 of Law 20,190 of June 5, 2007, amended and restated a collateral agency agreement (the "**Collateral Agency Agreement**"), whereby the Secured Parties, on one part, appointed Itaú Corpbanca, a banking corporation organized and existing under the laws of Chile, as tax payer number 97,023,000-9, with domicile for this purpose at [●], as Onshore Collateral Agent and granted to it an irrevocable commercial mandate in order that, in such capacity, it represents them in the execution, modification or cancellation of the Security, as defined in the Collateral Agency Agreement, and in the joint exercise of the rights arising therefrom in their favor, and, on the other part, appointed the Onshore Collateral Agent so that it represents them in the management of the credits that belong to them under the Financing Documents, as such term is defined in the Collateral Agency Agreement, as well as in the joint exercise of the rights arising therefrom, and granted to it an irrevocable commercial mandate with broad authority to fulfill such functions.

**SEGUNDO: Adhesión al Contrato de Agencia de Garantías**.

**SECOND: Accession to the Collateral Agency Agreement**.

Por el presente instrumento, el Adherente acepta expresamente ser parte del Contrato de Agencia de Garantías y sujetarse íntegramente a los términos y condiciones estipulados en dicho documento. Presente a este acto, don [●], [nacionalidad], [estado civil], [profesión u oficio], cédula nacional de identidad número [●] y don [●], [nacionalidad],

The Adherent hereby expressly accepts to become a party to the Collateral Agency Agreement and to be subject entirely to the terms and conditions stipulated therein. Present herewith, Mr. [●], [nationality], [marital status], [profession or occupation], bearing national identification card number [●] and Mr. [●], [nationality], [marital status], [profession or occupation],

[estado civil], [profesión u oficio], cédula nacional de identidad número [●], ambos en nombre y representación, según se acreditará, de Itaú Corpbanca, todos domiciliados para estos efectos en [●], quienes declaran que, en la representación que invisten, vienen en aceptar expresamente la adhesión del Adherente al Contrato de Agencia de Garantías, conforme a los términos de este instrumento y lo establecido en la Cláusula Sexta del referido contrato.

bearing national identification card number [●], both as hereinbelow evidenced for and on behalf of Itaú Corpbanca, all domiciled for these purposes at [●], who states that they expressly accept on behalf of the Onshore Collateral Agent the accession by the Adherent pursuant to the terms contained herein and the regulations of Clause Sixth of the Collateral Agency Agreement.

**TERCERO: Vigencia.**

**THIRD: Effectiveness.**

El Adherente declara y reconoce que la adhesión al Contrato de Agencia de Garantías referida precedentemente no podrá dejarse sin efecto sino con el consentimiento previo y por escrito otorgado por el Agente de Garantías Local y se obliga a hacer llegar copia autorizada tanto al Agente de Garantías Local como al Deudor, de la protocolización de este instrumento en un plazo máximo de tres días hábiles bancarios contados desde dicha protocolización.

The Adherent hereby represents and acknowledges that the accession to the Collateral Agency Agreement referred to above shall not be cancelled other than with the prior written consent of the Onshore Collateral Agent and agrees to submit, within a maximum of 3 banking business days, a certified copy of the notarial recordation of this instrument to the Onshore Collateral Agent and the Borrower.

**CUARTO: Jurisdicción y Ley Aplicable.**

**FOURTH: Jurisdiction and Applicable Law.**

Para todos los efectos legales derivados del presente contrato, el Adherente fija su domicilio en la ciudad y comuna de Santiago de Chile y se somete a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. El presente contrato se regirá por las leyes de la República de Chile.

For all legal purposes arising from this instrument, the Adherent establishes its domicile in the city and municipal district of Santiago, Chile, and submits to the jurisdiction of the ordinary courts of justice in the borough of Santiago, Chile. This agreement shall be governed by the laws of the Republic of Chile.

**PERSONERÍAS**.

**LEGAL CAPACITIES**.

La personería de [don/doña] [*nombre completo*] para representar a [Adherente] consta de [●].

The legal capacity of [Mr./Ms.]  [*full name*] to act on behalf of [Adherent] is evidenced in [●].

La personería de [don/doña] [*nombre completo*] para representar a **ITAÚ CORPBANCA** consta de [●].

The legal capacity of [Mr./Ms.]  [*full name*] to act on behalf of **ITAÚ CORPBANCA** is evidenced in [●].

La personería de [don/doña] [*nombre completo*] para representar a **ITAÚ CORPBANCA** consta de [●].

The legal capacity of [Mr./Ms.] [*full name*] to act on behalf of **ITAÚ CORPBANCA** is evidenced in [●].

En caso de cualquier contradicción entre la versión en español y en inglés, la versión en español prevalecerá.

In case of any inconsistency between the Spanish and English versions, the wording of the Spanish version shall prevail.

_____
[nombre completo/full name]
p.p. [Adherente/Adherent]

_____
[nombre completo/full name]
**p.p. ITAÚ CORPBANCA**

_____
[nombre completo/full name]
**p.p. ITAÚ CORPBANCA**

**ANEXO B**

**PAGARÉS Y RECONOCIMIENTOS DE DEUDA**

**Exhibit W**

**Amendment to Asset Pledge**

REPERTORIO N°


**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA SIN DESPLAZAMIENTO**

**SOBRE BIENES PRESENTES Y FUTUROS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**


**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda,

en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable..

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Activos.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y ocho guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron, como parte del Financiamiento Alto Maipo, un contrato de prenda sin desplazamiento sobre bienes presentes y futuros, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta, y en el Registro de Vehículos Motorizados del Servicio de Registro Civil e Identificación, habiéndose practicado la primera inscripción en este último registro con fecha siete de enero de dos mil catorce /en adelante, el "**Contrato de Prenda de Activos Original**"/. El Contrato de Prenda de Activos Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y nueve guion dos mil diecisiete, y complementado mediante diversos instrumentos en adelante, dicho contrato, complementado en la forma antedicha, el "**Contrato de Prenda de Activos Modificado**"/. El Contrato de Prenda de Activos Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos sesenta y nueve / dos mil dieciocho. Además, el Contrato de Prenda de Activos Modificado fue nuevamente modificado mediante escrituras públicas de alzamientos parciales de fechas: **/i/** nueve de agosto de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número siete mil setecientos ochenta / dos mil diecinueve; **/ii/** veintisiete de febrero de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número mil novecientos sesenta y dos / dos mil veinte ;**/iii/** trece de abril de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número tres mil seiscientos sesenta y dos / dos mil veintiuno; **/iv/** veinticuatro de mayo de

dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número cinco mil trescientos treinta y ocho / dos mil veintiuno; y complementado mediante diversas escrituras públicas /en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Activos Alto Maipo**"/.

/**Cuatro**/ **Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/**Cinco**/ **Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Seis**/ **Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre los activos del Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Siete**/ **Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda de activos de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda de Activos Alto Maipo, las Partes acuerdan modificar el Contrato de Prenda de Activos Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda de Activos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE ACTIVOS ALTO MAIPO.** Las Partes declaran que el texto del Contrato de Prenda de Activos Alto Maipo, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA SIN DESPLAZAMIENTO SOBRE SOBRE BIENES PRESENTES Y FUTUROS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de activos /el "**Contrato de Prenda de Activos**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda sin desplazamiento sobre activos, es un texto modificado y refundido del contrato de prenda sin desplazamiento sobre bienes presentes y futuros celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y ocho guion dos mil trece, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta, y en el Registro de Vehículos Motorizados del Servicio de Registro Civil e Identificación, habiéndose practicado la primera inscripción en este último registro con fecha siete de enero de dos mil catorce, y posteriormente /**i**/ modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y nueve guion dos mil diecisiete; /**ii**/ complementado mediante diversas escrituras públicas; /**iii**/ nuevamente modificado por escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos sesenta y nueve / dos mil dieciocho; y /**iv**/ nuevamente modificado mediante escrituras públicas de alzamientos parciales de fechas: /**I**/ nueve de agosto de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número siete mil setecientos ochenta / dos mil diecinueve; /**II**/ veintisiete de febrero de dos mil veinte, otorgada en la Notaría de Santiago de Santiago de don Patricio Raby Benavente, bajo el repertorio número mil novecientos sesenta y dos / dos mil veinte; /**III**/ trece de abril de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número tres mil seiscientos sesenta y dos / dos mil veintiuno; /**IV**/ veinticuatro de mayo de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número cinco mil trescientos treinta y ocho / dos mil veintiuno; y complementado mediante diversas escrituras públicas /en adelante, dicho contrato de prenda sin desplazamiento sobre activos, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Activos Alto Maipo**"/.

/**Cinco**/ **Documentos del Financiamiento.** Para efectos del artículo tercero, numeral dos, del artículo catorce de la Ley de Prenda sin Desplazamiento /según dicho término se define más adelante/, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas /según dichos términos se definen en el Contrato de Agencia de Garantías Local/ cuyo cumplimiento se garantiza mediante el

presente Contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**CLÁUSULA TERCERA: BIENES PRESENTES DEL DEUDOR.** El Deudor es dueño de los bienes que se detallan a continuación, en adelante los "**Bienes Muebles Presentes**": /**a**/ Plotter, marca HP, modelo Designjet T dos mil trescientos. La adquirió por aporte según da cuenta escritura pública de fecha primero de julio de dos mil trece suscrita en la Notaría de Santiago de don Eduardo Avello Concha; /**b**/ Contenedor de oficina, marca H uno guion seiscientos treinta. La adquirió por aporte según da cuenta escritura pública de fecha primero de julio de dos mil trece suscrita en la Notaría de Santiago de don Eduardo Avello Concha. /**c**/ Contenedor de oficina, marca H uno B dos guion seiscientos treinta. La adquirió por aporte según da cuenta escritura pública de fecha primero de julio de dos mil trece suscrita en la Notaría de Santiago de don Eduardo Avello Concha. /**d**/ Los bienes identificados en la escritura pública de fecha diecisiete de noviembre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trece mil ochocientos siete guion dos mil quince, la cual a su vez fue complementada mediante escritura pública de fecha catorce de diciembre de dos mil quince otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número catorce mil novecientos noventa y nueve guion dos mil quince, excepto por aquellos bienes respecto de los cuales la prenda fue debidamente alzada mediante escritura pública de fecha veinticuatro de mayo de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio cinco mil trescientos treinta y ocho guion dos mil veintiuno. /**e**/ Los bienes identificados en la escritura pública de fecha veintinueve de febrero de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número dos mil sesenta y tres guion dos mil dieciséis. /**f**/ Los bienes identificados en la escritura pública de fecha veintinueve de febrero de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número dos mil sesenta y cuatro guion dos mil dieciséis. /**g**/ Los bienes identificados en la escritura pública de fecha veinticuatro de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil sesenta guion dos mil dieciséis. /**h**/ Los bienes identificados en la escritura pública de fecha ocho de septiembre de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número diez mil cuatrocientos veintinueve guion dos mil dieciséis, excepto por aquel bien respecto del cual la prenda fue debidamente alzada mediante escritura pública de fecha nueve de agosto de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil setecientos ochenta guion dos mil diecinueve. /**i**/ Los bienes identificados en la escritura pública de fecha primero de febrero de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número mil ciento dieciocho guion dos mil diecisiete. /**j**/ Los bienes identificados en la escritura pública de fecha veintisiete de abril de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil novecientos

cuarenta y tres guion dos mil diecisiete. **/k/** Los bienes identificados en la escritura pública de fecha seis de julio de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil seiscientos dos guion dos mil diecisiete, excepto por aquel bien respecto del cual la prenda fue complementada, excluyendo dicho bien de la universalidad, mediante escritura pública de fecha cinco de julio de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil setecientos dieciocho guion dos mil dieciocho. **/l/** Los bienes identificados en la escritura pública de fecha primero de agosto de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil quinientos cuarenta y nueve guion dos mil diecisiete. **/m/** Los bienes identificados en el Anexo Tres de la escritura de modificación y texto refundido de prenda sin desplazamiento sobre bienes presentes y futuros, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos sesenta y nueve guion dos mil dieciocho. [**/n/** Los bienes identificados en el **Anexo Uno** de esta escritura, el que se protocoliza conjuntamente con la misma bajo el mismo número de repertorio y forma parte integrante de ella para todos los efectos legales y contractuales a los que haya lugar.][1] Se deja constancia que los Bienes Muebles Presentes están destinados a la operación, desarrollo y explotación del Proyecto.

<u>**CLÁUSULA CUARTA**</u>: **PRENDAS SIN DESPLAZAMIENTO. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, prenda sin desplazamiento de primer grado de conformidad al artículo catorce de la Ley veinte mil ciento noventa /en adelante, la "**Ley de Prenda sin Desplazamiento**"/, el Reglamento del Registro de Prendas sin Desplazamiento, contenido en el Decreto Supremo número setecientos veintidós, conjunto del Ministerio de Justicia y del Ministerio de Hacienda, publicado en el Diario Oficial de veintitrés de octubre de dos mil diez /el "**Reglamento de Prenda sin Desplazamiento**"/ y a los términos y condiciones del presente instrumento, sobre la universalidad de hecho /la "**Universalidad**"/ conformada por todos los bienes que actualmente sean de propiedad del Deudor o que sean adquiridos en el futuro por el Deudor para la operación, desarrollo y explotación del Proyecto, de conformidad con lo dispuesto en el artículo once de la Ley de Prenda sin Desplazamiento. Se deja constancia que la Universalidad comprende, por lo tanto: **/A/** los Bienes Muebles Presentes, y **/B/** los demás bienes que sean adquiridos por el Deudor en el futuro para el Proyecto, ya sea que consistan en maquinaria, equipamiento, materiales, repuestos y cualquier otro tipo de bienes corporales muebles que sean utilizados en la operación del Proyecto, en adelante también los "**Bienes Futuros**", y conjuntamente con los Bienes Muebles Presentes, los "**Bienes Prendados**". Conforme a lo establecido en el artículo noveno de la Ley de Prenda sin Desplazamiento, el derecho real de prenda sobre los Bienes Futuros se adquirirá una vez que éstos sean adquiridos por el Deudor, y se entenderá constituido el derecho real de prenda desde la fecha de la inscripción del presente instrumento en el Registro de Prendas sin Desplazamiento. Dado que los Bienes Prendados forman parte integrante de la Universalidad, las Partes dejan constancia que, conforme a lo dispuesto en el artículo once de la Ley de Prenda sin Desplazamiento: **/i/** los bienes que formen parte de la Universalidad podrán ser utilizados, reemplazados, transformados o enajenados, en todo o en parte, salvo que el Contrato de Términos Comunes y demás Documentos del Financiamiento que resulten aplicables señalen lo contrario; **/ii/** los Bienes Prendados que sean transformados en virtud de lo dispuesto anteriormente, así como el

---

[1] Sujeto a la existencia de nuevos bienes muebles presentes hasta la fecha de firma.

producto elaborado con los componentes de los Bienes Prendados, quedarán de pleno derecho prendados en favor del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas, en el entendido, sin embargo, que ni la potencia ni la energía eléctrica que sean generadas por el Proyecto estarán afectos a esta prenda; y **/iii/** los bienes que formen parte de la Universalidad se entenderán prendados desde el momento en que el Deudor los adquiera para la construcción, funcionamiento y operación del Proyecto y dejarán de formar parte del Proyecto y estar cubiertos por esta prenda desde que sean enajenados por el Deudor y siempre y cuando ello se encuentre permitido por los Documentos del Financiamiento, entendiéndose que aquellos componentes que salgan de la Universalidad quedarán subrogados por los que posteriormente la integren, hasta la concurrencia del total constituido en prenda. Asimismo, para los efectos de lo establecido en el inciso cuarto del artículo once de la Ley de Prenda sin Desplazamiento, las Partes declaran que el valor de la Universalidad sobre la que recae la prenda constituida por este instrumento /en adelante el "**Valor**"/, asciende al [•] de [•] de dos mil veintidós a la cantidad total de [•] Dólares, cantidad que se irá reajustando automáticamente a medida que el Deudor adquiera nuevos activos que sean parte de la Universalidad, y por lo tanto, Bienes Prendados, mediante la adición del valor al que hayan sido adquiridos dichos nuevos bienes y la sustracción del valor que a esa fecha tengan los Bienes Prendados que dichos nuevos bienes reemplacen, de ser el caso. Asimismo, el Valor se irá ajustando automáticamente de conformidad con las disminuciones de valor que pueda experimentar la Universalidad producto del desgaste de los Bienes Prendados que la conforman a consecuencia de la operación normal del Proyecto. Las Partes dejan constancia que el Valor es independiente del valor que pueda de tiempo en tiempo serle asignado a dichos activos en la contabilidad del Deudor. En consecuencia, por una parte, el Agente de Garantías Local no podrá invocar la exigibilidad anticipada de las Obligaciones Garantizadas y su derecho a la ejecución de la Prenda, por el sólo hecho de haber disminuido considerablemente en el tiempo el valor al que los Bienes Prendados son registrados en la contabilidad el Deudor. Por otra parte, de haber disminuido considerablemente el Valor por hecho o culpa del Deudor, éste no podrá invocar como excepción o defensa al ejercicio de dicho derecho de exigibilidad anticipada de las Obligaciones Garantizadas y de ejecución de la prenda por parte del Agente de Garantías Local, el hecho que, al momento de ser ejercido dicho derecho, el Valor no sea considerablemente inferior al valor al que los Bienes Prendados se encuentren registrados en la contabilidad del Deudor. **/Dos/ Extensión de la Prenda. /A/** La prenda de que da cuenta este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda. Se deja constancia que para efectos de lo dispuesto en el artículo Tercero numeral cuatro de la Ley de Prenda sin Desplazamiento, las Partes reconocen que la presente prenda sin desplazamiento garantiza el cumplimiento de la totalidad de las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda sin desplazamiento que por el presente

instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de los Bienes Prendados.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Bienes Prendados, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Sin embargo, el Deudor podrá realizar todos aquellos actos permitidos de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento, o comprendidos dentro del manejo ordinario de los Bienes Prendados.

**CLÁUSULA SEXTA: INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. /Uno/** Se deja constancia que de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento, la prenda de que da cuenta este instrumento fue debidamente inscrita en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta, y en el Registro de Vehículos Motorizados del Servicio de Registro Civil e Identificación, habiéndose practicado la primera inscripción en este último registro con fecha siete de enero de dos mil catorce. La prenda de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los Bienes Prendados. **/Dos/** El Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Dos** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar los Bienes Futuros que se prendan de la forma establecida en esta escritura, en la medida que: **/i/** tales bienes sean vehículos motorizados o alguna otra clase de bienes sujetos a registro, en cuyo caso la escritura de declaración deberá ser otorgada dentro de los treinta días siguientes a la fecha en que se hubiere practicado la inscripción de los bienes respectivos a nombre del Deudor; o **/ii/** sean equipos principales del Proyecto, entendiéndose por tales aquellos bienes cuyo valor comercial fuere superior a un millón de Dólares, en cuyo caso la escritura de declaración deberá ser otorgada dentro de los sesenta días siguientes a la fecha que ocurra primero entre **/y/** que se haya finalizado su construcción, montaje e instalación en su ubicación definitiva dentro del Proyecto, o **/z/** su adquisición por el Deudor; o **/iii/** se trate de bienes que el Agente de Garantías Local ha solicitado por escrito al Deudor individualizar, sin que el Agente de Garantías Local asuma algún tipo de responsabilidad al efecto, en cuyo caso la escritura de declaración deberá ser otorgada dentro de los treinta días siguientes a la fecha en que se hubiere recibido por el Deudor la solicitud escrita antes señalada. **/Tres/** Asimismo, para efectos de dar cumplimiento a lo dispuesto en el artículo Tercero, numeral dos, de la Ley de Prenda Sin Desplazamiento, el Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Tres** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar tanto los Pagarés y Reconocimientos

como los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, tan pronto éstos lleguen a ser suscritos por el Deudor, y en todo caso dentro de los quince días siguientes a la suscripción de los Pagarés y Reconocimientos, o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público. La referida escritura deberá incluir como anexo protocolizado bajo el mismo número de repertorio de dicha escritura, una copia de los Pagarés y Reconocimientos o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, que en ella se individualicen. **/Cuatro/** Por el presente acto, y para el evento en que el Deudor no dé cumplimiento a lo establecido en los numerales /Dos/ y /Tres/ precedentes, el Deudor confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refieren los numerales /Dos/ y /Tres/ precedentes, e individualizar ya sea los Bienes Futuros respectivos u otros Bienes Futuros adquiridos por el Deudor, o los Pagarés y Reconocimientos, y/o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público una vez que éstos sean suscritos por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**CLÁUSULA SÉPTIMA: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta prenda, para obtener el cumplimiento de las Obligaciones Garantizadas.

**CLÁUSULA OCTAVA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA NOVENA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda sin desplazamiento de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMA: MANTENCIÓN DEL DOMINIO. INSPECCIONES. /Uno/** El Deudor declara y garantiza que los Bienes Muebles Presentes que forman parte de la Universalidad sobre la cual se constituye esta prenda se encuentran debidamente inscritos, respecto de aquéllos sujetos a registro, que le pertenecen como único y exclusivo dueño, el pago de sus impuestos o patentes se encuentra al día, respecto de aquéllos cuya propiedad genere

la obligación de pago de impuestos y/o patentes, fueron legalmente adquiridos, y que, salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no les afectan legítimos derechos de terceros, se encuentran libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros; y que no están sujetas a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Bienes Muebles Presentes o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de estas prendas, con excepción de los permitidos por los demás Documentos del Financiamiento y los constituidos mediante este instrumento. Adicionalmente, el Deudor se obliga a velar y responder por el hecho de que los Bienes Futuros que formarán parte de la Universalidad que por el presente instrumento se prenda, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Bienes Futuros, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo dueño, estarán con sus impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a estas prendas o a Gravámenes Permitidos; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Bienes Futuros o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o las prendas y prohibiciones constituidas por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento. **/Dos/** Mientras subsista esta prenda el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa a los Bienes Prendados. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión de los Bienes Prendados y para defenderlos de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar los Bienes Prendados, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA UNDÉCIMA: SEGUROS.** El Deudor se obliga a mantener pólizas de seguro respecto de los Bienes Prendados contra los riesgos, por las cantidades y en la forma y condiciones que corresponda en cumplimiento de las estipulaciones del Contrato entre Acreedores y los demás Documentos del Financiamiento, y sólo en la medida en que estos documentos así lo exijan. De la misma manera, el Deudor se obliga a designar al Agente de Garantías Local, para su beneficio y el de las Partes Garantizadas, como beneficiario o asegurado adicional, según corresponda, en las pólizas respectivas, debiendo entregar copia del endoso o designación correspondiente dentro del plazo establecido para ello en los Documentos del Financiamiento.

**CLÁUSULA DUODÉCIMA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se

encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que, en virtud de lo señalado en el artículo treinta y ocho de la Ley de Prenda sin Desplazamiento, la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda sin desplazamiento y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda sin desplazamiento la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMA TERCERA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

**CLÁUSULA DÉCIMO CUARTA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE PRENDA DE ACTIVOS MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Prenda de Activos.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda de Activos Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Prenda de Activos.

**QUINTO:** **INSCRIPCIÓN DEL CONTRATO DE PRENDA DE ACTIVOS.** La modificación del Contrato de Prenda de Activos Alto Maipo, que consta en el texto aprobado del Contrato de Prenda de Activos que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en el Registro de Prenda sin Desplazamiento del Servicio de Registro Civil e Identificación y demás registros pertinentes, de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento.

**SEXTO:** **FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda de Activos Alto Maipo.

**SÉPTIMO:** **PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda de Activos Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO:** **PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____
[•]
C.I.N° _____
**p.p. ALTO MAIPO SpA**


_____
[•]
C.I.N° _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
C.I.N° _____
**p.p. ITAÚ CORPBANCA**

**Exhibit X**

**Amendment to Pledge of Electric Concession**

**REPERTORIO N°**


**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA COMERCIAL**

**SOBRE CONCESIÓN ELÉCTRICA**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**


**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda,

1

en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Concesión Eléctrica.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y siete guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de prenda comercial sobre concesión eléctrica /en adelante, el "**Contrato de Prenda sobre Concesión Eléctrica Original**"/. El Contrato de Prenda sobre Concesión Eléctrica Original ha sido objeto de las siguientes modificaciones: **/i/** escritura pública de fecha catorce de enero de dos mil catorce, otorgada en la Notaría de Santiago de don José Musalem Saffie bajo el repertorio número cuatrocientos cincuenta y cuatro guion dos mil catorce; **/ii/** escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trece mil cuarenta y nueve guion dos mil quince; **/iii/** escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil trescientos setenta guion dos mil dieciséis; y **/iv/** escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos dos guion dos mil diecisiete /en adelante, el "**Contrato de Prenda sobre Concesión Eléctrica Modificado**"/. El Contrato de Prenda sobre Concesión Eléctrica Modificado fue modificado mediante escritura pública otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel con fecha ocho de mayo de dos mil dieciocho bajo repertorio número tres mil novecientos setenta y nueve guion dos mil dieciocho, y mediante diversas escrituras públicas, /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Concesión Eléctrica Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los

Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre concesión eléctrica. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda de concesión eléctrica de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Concesión Eléctrica Alto Maipo, las Partes acuerdan modificar el Contrato de Concesión Eléctrica Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda de Concesión Eléctrica**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE CONCESIÓN ELÉCTRICA.** Las Partes declaran que el texto del Contrato de Concesión Eléctrica Alto Maipo, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA COMERCIAL SOBRE CONCESIÓN ELÉCTRICA ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de concesión eléctrica /el "**Contrato de Prenda de Concesión Eléctrica**" o el "**Contrato**"/:

**<u>CLÁUSULA PRIMERA</u>: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo

significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda comercial sobre concesión eléctrica, es un texto modificado y refundido del contrato de prenda comercial sobre concesión eléctrica celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y siete guion dos mil treceel que ha sido objeto de las siguientes modificaciones: **/i/** escritura pública de fecha catorce de enero de dos mil catorce, otorgada en la Notaría de Santiago de don José Musalem Saffie bajo el repertorio número cuatrocientos cincuenta y cuatro guion dos mil catorce; **/ii/** escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trece mil cuarenta y nueve guion dos mil quince; **/iii/** escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil trescientos setenta y siete guion dos mil dieciséis; **/iv/** escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos dos guion dos mil diecisiete; y **/v/** escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y nueve guion dos mil dieciocho; y modificado mediante diversas escrituras públicas /en adelante, dicho contrato de prenda comercial sobre concesión eléctrica, modificado en la forma antedicha, el "**Contrato de Prenda de Concesión Eléctrica Alto Maipo**"/.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**/Dos/** Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLAÚSULA TERCERA: CONCESIÓN ELÉCTRICA.** El Deudor es titular y dueño de la concesión eléctrica definitiva constituida al amparo del Decreto con Fuerza de Ley número cuatro de dos mil siete, que fija el texto refundido de la ley general de servicios eléctricos /en adelante la "**Ley de Servicios Eléctricos**"/, para establecer en la Región Metropolitana, provincia Cordillera, comuna de San José de Maipo, el proyecto de generación de energía eléctrica que se denominará *Proyecto Hidroeléctrico Alto Maipo*", otorgada por el Ministerio de Energía. La referida concesión fue otorgada a la sociedad AES Gener S.A. /hoy AES Andes S.A./ mediante Decreto número setenta y tres, de fecha veinte de julio de dos mil doce, publicado en el Diario Oficial de fecha veintinueve de diciembre de dos mil doce /en adelante, el "**Decreto**"/, el cual fue reducido a escritura pública en la Notaría de Santiago de don Osvaldo Pereira González con fecha treinta y

uno de diciembre de dos mil doce, bajo el repertorio número treinta y cinco mil doscientos nueve guion dos mil doce /en adelante, la "**Concesión**". La Concesión fue cedida al Deudor por AES Gener S.A. /hoy AES Andes S.A./ mediante escritura pública de fecha primero de julio de dos mil trece, otorgada en la Notaría de Santiago de don Eduardo Avello Concha bajo el repertorio quince mil ciento cincuenta y seis guion dos mil trece.

<u>**CLÁUSULA CUARTA**</u>: **PRENDA COMERCIAL. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, prenda comercial de primer grado sobre la Concesión, de conformidad a los artículos ochocientos trece y siguientes del Código de Comercio y a los términos y condiciones del presente instrumento, hasta por el monto de las Obligaciones Garantizadas. **/Dos/ Extensión de la Prenda. /A/** La prenda de que da cuenta este contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a, los Documentos del Financiamiento, aquellos que hayan sido suscritos entre el Deudor al Agente de Garantías Local o las Partes Garantizadas, o por quienes los sucedan o reemplacen, y que digan relación con las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda comercial que por el presente instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de la Concesión. **/D/** Para los efectos de lo dispuesto en el número dos del artículo ochocientos quince del Código de Comercio, las Partes declaran que el monto de las Obligaciones Garantizadas asciende a la suma de /más el monto de los intereses, incluso penales, reajustes y costos/: /i/ hasta [•] Dólares por concepto de capital del Secured OneL Indenture, Secured TwoL Agreement y Secured TwoL Indenture; /ii/ hasta [•] Dólares por concepto de capital del Crédito de Capital de Trabajo; /iii/ hasta [•] Dólares por concepto de capital del Financiamiento de Salida; y /iv/ hasta [•] Dólares por concepto de capital del Contrato de Crédito IVA. **/E/** El Deudor se obliga en este acto a ampliar la prenda de que da cuenta este instrumento, de tiempo en tiempo, en términos sustancialmente similares a los contenidos en el mismo, para garantizar cualquier otro acto o contrato que deba ser caucionado con el presente instrumento.

<u>**CLÁUSULA QUINTA:**</u> **PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga,

gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre la Concesión, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, se obliga a no alterar, modificar o transformar la Concesión, ni celebrar acto o contrato alguno, o cualquier figura contractual nominada o innominada, que suponga o implique el cambio del Deudor como titular de la Concesión, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento y dando estricto cumplimiento a lo establecido en la Ley de Servicios Eléctricos. Tampoco presentará ningún tipo de solicitud administrativa o de otro tipo a autoridad gubernamental alguna, ni suscribirá con tales autoridades acuerdo alguno, que tenga por objeto modificar, transformar o de alguna forma alterar, la Concesión, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados. Finalmente, el Deudor se obliga a cumplir estricta y oportunamente con todas las obligaciones que le correspondan conforme al Decreto y a Ley de Servicios Eléctricos, de manera de no perjudicar la Concesión por acto u omisión suyos, y procurando en todo momento no incurrir en un incumplimiento grave de sus obligaciones como concesionario, en los términos de los mencionados Decreto y Ley de Servicios Eléctricos.

**<u>CLÁUSULA SEXTA</u>: ENTREGA DE TÍTULO.** Para efectos de lo prescrito en los artículos dos mil trescientos ochenta y nueve del Código Civil y ochocientos diecisiete del Código de Comercio, se deja constancia que en el acto del otorgamiento del Contrato de Prenda de Concesión Eléctrica Alto Maipo, el Deudor hizo entrega al Agente de Garantías Local, actuando en representación de las Partes Garantizadas, de una copia autorizada de la reducción a escritura pública del Decreto, habiéndose entregado a dicho agente además, copia de las respectivas modificaciones introducidas al Decreto. Esta entrega constituyó la forma de perfeccionar entre las Partes la prenda y la forma de efectuar la tradición del derecho real de prenda que surge en favor del Agente de Garantías Local, actuando en representación de las Partes Garantizadas, declarando el Agente de Garantías Local haber recibido dicho título a su entera satisfacción.

**<u>CLÁUSULA SÉPTIMA</u>: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta prenda, para obtener el cumplimiento de las Obligaciones Garantizadas.

**<u>CLÁUSULA OCTAVA</u>: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA NOVENA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda comercial de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMA: MANTENCIÓN DEL DOMINIO. INSPECCIONES.** Mientras subsista esta prenda el Deudor deberá pagar íntegra y oportunamente cualquier impuesto o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa a la Concesión. Deberá también pagar todos los gastos que provengan de reparaciones, conservación, ejecución de obras y pagos de servicios a que estén afectos los bienes entregados en Concesión. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión de la Concesión y para defenderla de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar los terrenos afectados por la Concesión, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA DÉCIMO PRIMERA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO SEGUNDA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

**CLÁUSULA DÉCIMO TERCERA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al

presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO:** **ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Concesión Eléctrica Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Concesión Eléctrica.

**CUARTO:** **FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Concesión Eléctrica Alto Maipo.

**QUINTO:** **PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Concesión Eléctrica Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**SEXTO:** **PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
C.I.N° _____
**p.p. ALTO MAIPO SpA**

_____
[•]
C.I.N° _____
**p.p. ALTO MAIPO SpA**

_____
[•]
C.I.N° _____
**p.p. ITAÚ CORPBANCA**

_____
[•]
C.I.N° _____
**p.p. ITAÚ CORPBANCA**

**Exhibit Y**

**Amendment to Pledge of Project Documents**

29299009.2

**REPERTORIO N°**
**OT**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA COMERCIAL**

**SOBRE DERECHOS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran

interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Prenda Comercial sobre Derechos Alto Maipo, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda sobre Derechos Alto Maipo.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y uno guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de prenda comercial sobre derechos, el cual fue posteriormente modificado mediante **/i/** escritura pública de fecha catorce de enero de dos mil catorce, otorgada en la Notaría de Santiago de don José Musalem Saffie, repertorio número cuatrocientos cincuenta y cinco guion dos mil catorce, **/ii/** escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, repertorio número trece mil cuarenta y ocho guion dos mil quince, y **/iii/** escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, repertorio número seis mil trescientos sesenta y nueve guion dos mil dieciséis /en adelante el contrato original y las modificaciones antes señaladas, el "**Contrato de Prenda sobre Derechos Original**"/. El Contrato de Prenda de Derechos Original fue nuevamente modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos uno guion dos mil diecisiete /el Contrato de Prenda de Derechos Original así modificado, en adelante el "**Contrato de Prenda sobre Derechos Modificado**"/. El Contrato de Prenda sobre Derechos Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos setenta y siete guion dos mil dieciocho /en adelante, dicho contrato, complementado en la forma antedicha, el "**Contrato de Prenda sobre Derechos Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante,

dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Prenda sobre Derechos Alto Maipo, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con prendas comerciales sobre los derechos del Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido**. Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda comercial de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda sobre Derechos Alto Maipo, las Partes acuerdan modificar el Contrato de Prenda sobre Derechos Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda Comercial sobre Derechos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA SOBRE DERECHOS ALTO MAIPO.** Las Partes declaran que el texto del Contrato de Prenda sobre Derechos Alto Maipo, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA COMERCIAL SOBRE DERECHOS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato de prenda comercial sobre derechos /el "**Contrato de Prenda Comercial sobre Derechos**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta

y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda comercial sobre derechos, es un texto modificado y refundido del contrato de prenda comercial sobre derechos celebrado mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y uno guion dos mil trece, el cual fue posteriormente modificado mediante: /**i**/ escritura pública de fecha catorce de enero de dos mil catorce, otorgada en la Notaría de Santiago de don José Musalem Saffie, repertorio número cuatrocientos cincuenta y cinco guion dos mil catorce, /**ii**/ escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, repertorio número trece mil cuarenta y ocho guion dos mil quince, /**iii**/ escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, repertorio número seis mil trescientos sesenta y nueve guion dos mil dieciséis; /**iv**/ escritura pública de fecha dieciséte de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos uno guion dos mil diecisiete; y /**v**/ escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos setenta y siete guion dos mil dieciocho; /en adelante, dicho contrato de prenda comercial sobre derechos, modificado en la forma antedicha, el "**Contrato de Prenda sobre Derechos Alto Maipo**"/.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLAÚSULA TERCERA: DOCUMENTOS DEL PROYECTO.** El Deudor es parte o beneficiario de los siguientes contratos: [*/i/* contrato denominado *Lump Sum, Turnkey, Engineering, Procurement and Construction Contract*, de fecha diez de agosto de dos mil doce, suscrito entre el Deudor, Voith Hydro Ltda., y Voith Hydro, S.A., según ha sido modificado con fechas doce de septiembre de dos mil trece, dos de diciembre de dos mil trece, cinco de diciembre de dos mil trece y siete de febrero de dos mil catorce; */ii/* el EPC Strabag; */iii/* garantía */Guaranty/* otorgada por Strabag SE a favor del Deudor, mediante instrumento privado en idioma inglés de fecha ocho de mayo de dos mil dieciocho, y regido por las leyes del Estado de Nueva York, Estados Unidos de América, que reemplaza la Garantía corporativa */"Parent Guaranty Agreement"/*, de fecha once de octubre dos mil doce, suscrita entre Strabag AG y el Deudor; */iv/* contrato denominado *Tunnel Complex Construction Contract*, de fecha seis de noviembre de dos mil doce, suscrito entre el Deudor y Constructora Nuevo Maipo S.A., según fue modificado con fechas diez de diez de junio de dos mil trece, veintiséis de julio de dos mil trece, doce de septiembre de dos mil trece y dos de diciembre de dos mil trece; */v/* contrato denominado *Co-Obligor Undertaking Agreement*, de fecha seis de noviembre de dos mil doce, suscrito entre HOCHTIEF Solutions AG, Cooperativa Muratori & Cementisti – C.M.C. di Ravenna y el Deudor; */vi/* contrato denominado *Operation and Maintenance Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; */vii/* contrato denominado *Construction Management Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, según fue modificado con fecha nueve de diciembre de dos mil trece; */viii/* contrato denominado *Facilities Construction Management and Lease Agreement*, de fecha nueve de diciembre de dos mil trece entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; */ix/* contrato denominado *Shared Facilities Lease Agreement*, de fecha nueve de diciembre de dos mil trece, entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; */x/* contrato denominado *Technical Support and Services Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; */xi/* contrato denominado Contrato de Conexión y Peajes, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, según fue modificado con fecha nueve de diciembre de dos mil trece, diecisiete de marzo de dos mil diecisiete, y ocho de mayo de dos mil dieciocho; */xii/* contrato denominado Contrato de Pagos por Pérdidas de Energía y Capacidad, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./ y modificado con fecha diecisiete de marzo de dos mil diecisiete y ocho de mayo de dos mil dieciocho; */xiii/* contrato denominado *Engineering, Supply, Construction, Assembly, Testing and Entry into Service of the Expansion to the Transmission System*, de fecha nueve de diciembre de dos mil trece, suscrito entre el Deudor, Isolux Ingeniería Agencia Chile y AES Gener S.A. /hoy AES Andes S.A./, y modificado con fechas treinta y uno de julio de dos mil catorce, treinta y uno de agosto de dos mil catorce, treinta de junio de dos mil quince, treinta de octubre de dos mil quince, quince de abril de dos mil dieciséis y veintinueve de noviembre de dos mil dieciséis; */xiv/* contrato denominado Contrato de Suministro de Electricidad, de fecha nueve de diciembre de dos mil trece, entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, y modificado con fecha ocho de mayo de dos mil dieciocho; y */xv/* contrato denominado Contrato de Suministro de Electricidad, de fecha veintiocho de junio de dos mil trece, suscrito entre el Deudor y Antofagasta Minerals S.A., modificado y cedido a Minera Los Pelambres con fecha veinte de junio de dos mil catorce, y modificado con fecha diecisiete de marzo de dos mil diecisiete][1]. En adelante todos los contratos anteriores, incluyendo sus renovaciones, ampliaciones y/o modificaciones que pudieren sufrir de tiempo en tiempo, se denominarán conjuntamente para efectos de este instrumento como los "**Documentos del Proyecto**" y cada una de las partes o emisores bajo los mismos, distinta al Deudor, una "**Contraparte**". En virtud de los Documentos del Proyecto, el Deudor es titular de créditos contra las Contrapartes /en adelante, los "**Créditos Prendados**"/, consistentes fundamentalmente, y sin que la siguiente enunciación tenga un carácter taxativo sino sólo enunciativo, en créditos por concepto de multas, indemnizaciones y cantidades pagaderas en virtud de boletas de garantía, de cartas de crédito */letters of credit/*, incluyendo pero no limitado a las cartas de crédito definidas como "*Performance Security*" y "*Completion Security*" en el EPC Strabag/, de pólizas de seguros, fianzas u otras cauciones otorgadas bajo los mismos.

---

[1] Modificaciones a contratos a ser incorporadas en caso de existir hasta la fecha de firma. Project Documents adicionales a ser incorporados en caso de existir.

**CLÁUSULA CUARTA: PRENDA COMERCIAL. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, prenda comercial de primer grado sobre los Créditos Prendados, según los mismos sean modificados, ampliados y/o prorrogados de tiempo en tiempo, de conformidad a los artículos ochocientos trece y siguientes del Código de Comercio y a los términos y condiciones del presente instrumento, hasta por el monto de las Obligaciones Garantizadas. **/Dos/ Extensión de la Prenda. /A/** La prenda de que da cuenta este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a, los Documentos del Financiamiento, aquellos que hayan sido suscritos entre el Deudor y el Agente de Garantías Local o las Partes Garantizadas, o por quienes los sucedan o reemplacen, y que digan relación con las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda comercial que por el presente instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de los Créditos Prendados. **/D/** Para los efectos de lo dispuesto en el número dos del artículo ochocientos quince del Código de Comercio, las Partes declaran que el monto de las Obligaciones Garantizadas asciende a la suma de /más el monto de los intereses, incluso penales, reajustes y costos/: /i/ hasta [•] Dólares por concepto de capital del Secured OneL Indenture, Secured TwoL Agreement y Secured TwoL Indenture; /ii/ hasta [•] Dólares por concepto de capital del Crédito de Capital de Trabajo; /iii/ hasta [•] Dólares por concepto de capital del Financiamiento de Salida; y /iv/ hasta [•] Dólares por concepto de capital del Contrato de Crédito IVA. **/E/** El Deudor se obliga en este acto a ampliar la prenda de que da cuenta este instrumento, de tiempo en tiempo, en términos sustancialmente similares a los contenidos en el mismo, para garantizar cualquier otro acto o contrato que dé cuenta de Obligaciones Garantizadas y que, por lo mismo, deba ser caucionado por el presente instrumento.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Créditos Prendados, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Finalmente, el Deudor se obliga a cumplir con todas sus obligaciones bajo los Documentos del Proyecto, de manera de no perjudicar los Créditos Prendados por acto u omisión suyos.

**CLÁUSULA SEXTA: TÍTULO Y AUSENCIA DE GRAVÁMENES.** El Deudor, a través de su representante ya individualizado, declara que los Créditos Prendados **/i/** le pertenecen como único y exclusivo titular, y que han sido legalmente adquiridos, **/ii/** salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, se encuentran libres de gravámenes, cargos, litigios, prohibiciones de

gravar y enajenar u otras restricciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias, derechos preferentes en favor de terceros y prendas de ningún tipo, y **/iii/** salvo por los Gravámenes Permitidos y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no están sujetos a opciones, promesas de venta, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir su dominio o darlos en garantía de otras obligaciones, y que no existe impedimento alguno que pueda afectar su libre disposición o la constitución de la prenda comercial y prohibición de gravar y enajenar de que da cuenta esta escritura. Del mismo modo, el Deudor declara que no existe impedimento alguno, tanto respecto de los Créditos Prendados como respecto de sí mismo, para celebrar la prenda y prohibición de que da cuenta este instrumento.

**CLÁUSULA SÉPTIMA: EJERCICIO DE DERECHOS. EJECUCIÓN.** **/A/** En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, el Deudor conservará el pleno ejercicio de los derechos que le correspondan bajo los Créditos Prendados. Si ocurriere y se mantuviere vigente cualquier Evento de Incumplimiento **/"***Event of Default***",** según dicho término se define en el Contrato de Términos Comunes/, el Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, previa notificación escrita a la respectiva Contraparte, con copia al Deudor, por medio de Notario Público, y a contar de la fecha de dicha notificación, con el solo mérito de la misma, de conformidad con lo previsto en el artículo dos mil trescientos ochenta y nueve del Código Civil, podrá cobrar de la Contraparte las sumas de dinero correspondientes a los Créditos Prendados en la medida que se vayan devengando y se hagan exigibles conforme a los Documentos del Proyecto, para cuyo efecto se entenderá representante legal del Deudor, de conformidad al artículo doce del Decreto Ley número setecientos setenta y seis del año mil novecientos veinticinco. El Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, podrá solicitar a la Contraparte que los pagos de los Créditos Prendados se efectúen directamente a su nombre y ésta deberá así hacerlo, y estará autorizado para retirar cheques de pago y cualquier otro documento extendido con dicho objeto por la Contraparte, a la orden o a nombre del Deudor y, en este último caso, podrá endosar en dominio o en comisión de cobranza aquellos cheques y cualquier otro documento y disponer de ellos, cobrarlos y, en caso necesario, abrir una cuenta corriente bancaria y depositarlos en ella, pudiendo además girar en contra de ésta y ejercer todos y cada uno de los demás derechos propios de su titular con la finalidad de percibir efectivamente el valor de aquellos cheques y cualquier otro documento extendido para el pago de todo o parte de los Créditos Prendados. Además, el Agente de Garantías Local deberá otorgar los recibos que le sean solicitados por las cantidades que cobre y perciba y deberá suscribir los documentos públicos o privados que le fueren exigidos en relación con lo anterior por el Deudor. Las cantidades que el Agente de Garantías Local, por cuenta de las Partes Garantizadas, perciba de la Contraparte serán aplicadas por el Agente de Garantías Local sin más trámite y sin sujeción a formalidad alguna, a extinguir las Obligaciones Garantizadas. Para todos los efectos legales, se entenderá que cualquier pago realizado al Agente de Garantías Local bajo los Documentos del Proyecto, tendrá el mismo poder liberatorio y extintivo de obligaciones que un pago realizado directamente al Deudor. **/B/** A partir de la notificación establecida en la letra **/A/** de esta cláusula, le estará prohibido a la Contraparte pagar los Créditos Prendados en manos distintas que las del Agente de Garantías Local, conforme a lo dispuesto en el artículo dos mil trescientos ochenta y nueve del Código Civil, en relación al artículo ochocientos dieciséis del Código de Comercio, debiendo efectuar dichos pagos al Agente de Garantías Local, en las cuentas que el Agente de Garantías Local determine previamente.

**CLÁUSULA OCTAVA: ENTREGA DE TÍTULOS.** Para efectos de lo prescrito en los artículos dos mil trescientos ochenta y nueve del Código Civil y ochocientos diecisiete del Código de Comercio, se deja constancia que el Deudor ha hecho entrega al Agente de Garantías Local, actuando en representación de las Partes Garantizadas, de los títulos en que constan los Créditos Prendados, constituidos por una copia autorizada de cada uno de los Documentos del Proyecto, habiéndose entregado a dicho agente además, copia de las respectivas modificaciones introducidas al Documento del Proyecto. Asimismo, respecto de aquellos Documentos del Proyecto señalados en los numerales /i/, /ii/ y /iv/ de la cláusula segunda precedente, el Deudor hizo entrega al Agente de Garantías Local de un disco compacto que contiene en formato digital todos los anexos /annexes and schedules/ de los referidos contratos. Esta entrega constituyó la forma de perfeccionar entre

las Partes la prenda y la forma de efectuar la tradición del derecho real de prenda que surge en favor del Agente de Garantías Local, actuando en representación de las Partes Garantizadas, declarando el Agente de Garantías Local haber recibido dichos títulos a su entera satisfacción.

**CLÁUSULA NOVENA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA DÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda comercial de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA UNDÉCIMA: MANTENCIÓN DEL DOMINIO.** Mientras subsista esta prenda el Deudor deberá pagar íntegra y oportunamente cualquier impuesto o carga de cualquier especie establecida o que puedan establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Prendados. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Prendados y para defenderlos de acciones de terceros.

**CLÁUSULA DUODÉCIMA: ACEPTACIÓN DE CONTRAPARTES. OBLIGACIÓN DE NOTIFICACIÓN. /A/** Conforme a lo dispuesto en el artículo dos mil trescientos ochenta y nueve del Código Civil, a contar de la fecha en que se efectúe la notificación de que da cuenta el literal /A/ de la cláusula séptima precedente, el Deudor y el Agente de Garantías Local prohíben en virtud de esta escritura a cada uno de los deudores del Deudor bajo los Documentos del Proyecto, pagar todo o parte de los Créditos Prendados en otras manos diversas del Agente de Garantías Local. Se deja constancia que en el Contrato de Prenda sobre Derechos Alto Maipo, AES Gener S.A. /hoy AES Andes S.A./, debidamente representada en la forma que se indica en el Contrato de Prenda sobre Derechos Alto Maipo: /i/ tomó conocimiento y aceptó, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones que constan en el presente instrumento, y autorizó y aceptó la prenda comercial sobre los Créditos Prendados bajo los Documentos del Proyecto de que es Contraparte y que aquí se evidencia, en los términos y condiciones expuestos en el presente instrumento, /ii/ que, en consecuencia, en forma incondicional, irrevocable y sin reservas, aceptó la obligación de pagar los Créditos Prendados al Agente de Garantías Local, desde la fecha de la notificación de que da cuenta el literal /A/ de la Cláusula Séptima precedente, y de acuerdo a lo establecido en el presente instrumento y en el artículo doce del Decreto Ley número setecientos setenta y seis, de mil novecientos veinticinco, y /iii/ que otorgó expresamente su aceptación a cualquier extensión o modificación del Contrato de Prenda sobre Derechos Alto Maipo /lo que incluye el presente contrato/ que el Deudor y el Agente de Garantías Local puedan acordar de tiempo en tiempo, con el objeto de hacer extensivas las disposiciones del presente contrato a futuras modificaciones que acuerden las Partes a los Documentos del Financiamiento y/o las Obligaciones Garantizadas, sin que sea necesario en cada oportunidad reiterar la autorización de que da cuenta esta cláusula. **/B/** Sin perjuicio de las autorizaciones existentes referidas en los numerales /i/, /ii/ y /iii/ de la letra /A/ anterior, **AES Gener S.A. /hoy AES Andes S.A./**, debidamente representada por [●], viene asimismo en ratificar por medio de este acto las aceptaciones y autorizaciones referidas en los numerales /i/, /ii/ y /iii/ de la letra /A/ anterior. [**/C/ Strabag SpA**, debidamente representada por [●], vienen asimismo en ratificar por medio de este acto que han tomado conocimiento y aceptado la presente prenda comercial y prohibición sobre derechos del Deudor bajo los Documentos del Proyecto respecto de los cuales es parte. **/D/** Las Partes dejan constancia que Strabag SE ha tomado conocimiento y aceptado la presente prenda comercial y prohibición sobre derechos del Deudor bajo los Documentos del Proyecto respecto de los cuales es parte, mediante [●]. **/E/** Las Partes dejan constancia que cada una de las Contrapartes distintas a AES Gener S.A. /hoy AES Andes S.A./, Strabag SpA, Strabag SE, y Constructora Nuevo Maipo S.A., ha tomado conocimiento y aceptado la presente prenda comercial y prohibición sobre derechos del Deudor bajo los Documentos del Proyecto respecto de los cuales son

parte, en los siguientes documentos: *a/* instrumento privado suscrito por Voith Hydro Ltda. y Voith Hydro S.A. con fecha diecisiete de marzo de dos mil diecisiete, en idioma inglés, denominado "Estoppel Certificate (EPC Contract)"; *b/* instrumento privado suscrito por Minera Los Pelambres, en idioma inglés, denominado "Estoppel Certificate (AMSA PPA)"; y *c/* instrumento privado suscrito por Hochtief Solutions AG con fecha cinco de mayo de dos mil diecisiete, en idioma inglés, denominado "Consent". */F/* El Deudor se obliga en este acto a notificar a Constructora Nuevo Maipo S.A. el otorgamiento del presente instrumento, entregando una copia autorizada del mismo, dentro del plazo de treinta días contados desde la fecha del presente instrumento, la cual deberá ser realizada por un Notario Público, para todos los efectos legales y contractuales a que pudiere haber lugar y, especialmente, aunque sin limitación, para los efectos de lo establecido en el artículo dos mil trescientos ochenta y nueve del Código Civil.

**CLÁUSULA DÉCIMO TERCERA: IMPUESTOS Y SUCESORES. CESIÓN.** */Uno/* El Deudor declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y al Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. */Dos/* Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO CUARTA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

**CLÁUSULA DÉCIMO QUINTA: PARTE INTEGRAL E INTERPRETACIÓN.**

*/Uno/* Parte integral. Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales y contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

*/Dos/* Interpretación. Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda sobre Derechos Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Prenda sobre Derechos.

**CUARTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean

necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda sobre Derechos Alto Maipo.

**QUINTO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda sobre Derechos Alto Maipo de que da cuenta este instrumento, según corresponda.

**SEXTO: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

## **Exhibit Z**

**Amendment to Pledge Over Future Project Documents**

**REPERTORIO N°**


**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA SIN DESPLAZAMIENTO**

**SOBRE DERECHOS FUTUROS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**


**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**" o el "**Constituyente**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las **Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda,

en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Derechos Futuros.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y tres guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como deudor, celebraron, como parte del Financiamiento Alto Maipo, un contrato de prenda sin desplazamiento sobre derechos futuros, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta y uno guion trece /en adelante, el "**Contrato de Prenda de Derechos Futuros Original**"/. El Contrato de Prenda de Derechos Futuros Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y seis / dos mil diecisiete, y complementado mediante diversos instrumentos en adelante dicho, contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Derechos Futuros Modificado**"/. El Contrato de Prenda de Derechos Futuros Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y cinco / dos mil dieciocho, y complementado mediante diversas escrituras públicas, en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Derechos Futuros Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre todos y cada uno de los derechos del Deudor bajo los documentos que suscriba en el futuro. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda de derechos futuros de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda de Derechos Futuros Alto Maipo, las Partes acuerdan modificar el Contrato de Prenda de Derechos Futuros Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda de Derechos Futuros**"/ y ampliarlo asimismo para constituir prenda y prohibiciones de gravar y enajenar, sobre los derechos del Deudor bajo los documentos que suscriba en el futuro de conformidad a las disposiciones del Contrato de Prenda de Derechos Futuros.

**SEGUNDO**: **TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE DERECHOS FUTUROS ALTO MAIPO**. Las Partes declaran que el texto del Contrato de Prenda de Derechos Futuros Alto Maipo, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA SIN DESPLAZAMIENTO SOBRE DERECHOS FUTUROS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de derechos futuros /el "**Contrato de Prenda de Derechos Futuros**" o el "**Contrato**"/:

<u>**CLÁUSULA PRIMERA**</u>: **ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda sin desplazamiento sobre derechos futuros, es un texto modificado y refundido del contrato de prenda sin desplazamiento sobre derechos futuros celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y tres guion dos mil trece, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta y uno, y posteriormente /**i**/ modificado mediante escritura pública de fecha diecisiete de marzo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento noventa y seis / dos mil diecisiete; /**ii**/ complementado mediante diversas escrituras públicas; y /**iii**/ nuevamente modificado por escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y cinco / dos mil dieciocho, y complementado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de prenda sin desplazamiento sobre derechos futuros, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Derechos Futuros Alto Maipo**"/.

/**Cinco**/ **Documentos del Financiamiento.** Para efectos del artículo tercero, numeral dos, de la Ley de Prenda sin Desplazamiento /según dicho término se define más adelante/, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas /según dichos términos se definen en el Contrato de Agencia de Garantías Local/ cuyo cumplimiento se garantiza mediante el presente Contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

<u>**CLÁUSULA SEGUNDA:**</u> **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

<u>**CLÁUSULA TERCERA: PRENDA SIN DESPLAZAMIENTO.**</u> /**Uno**/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Constituyente, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, prenda sin desplazamiento de primer grado sobre todos y cada uno de los derechos de cobro del Deudor, incluyendo, a mayor abundamiento, créditos por intereses, multas, indemnizaciones y cantidades pagaderas en virtud de boletas de

garantía, pólizas de seguros, fianzas u otras cauciones o pagos a que tenga derecho en conformidad a las disposiciones legales o contractuales vigentes /en adelante los "**Créditos Prendados**"/, bajo los documentos que suscriba en el futuro, siempre que **/i/** califiquen como Documentos del Proyecto /"*Project Documents*", según este término se define en el Contrato de Términos Comunes/ y **/ii/** no sean aquellos Documentos del Proyecto que constituyan un PPA Aprobado /"*Approved PPAs*", según este término se define en el Contrato de Términos Comunes/ ni sea el denominado Contrato Marco /*Framework Agreement*, según este término se define en el Contrato de Términos Comunes/, suscrito con fecha diecisiete de marzo de dos mil diecisiete, entre el Deudor y Fundación AES Gener /hoy, Fundación AES Chile/; en los términos previstos en el artículo noveno de la Ley de Prenda sin Desplazamiento /según se define más adelante/, de conformidad al artículo catorce de la Ley veinte mil ciento noventa /en adelante, la "**Ley de Prenda sin Desplazamiento**"/, el Reglamento del Registro de Prendas sin Desplazamiento, contenido en el Decreto Supremo número setecientos veintidós, conjunto del Ministerio de Justicia y del Ministerio de Hacienda, publicado en el Diario Oficial de veintitrés de octubre de dos mil diez /el "**Reglamento de Prenda sin Desplazamiento**"/ y a los términos y condiciones del presente instrumento. El derecho real de prenda sobre los Créditos Prendados se adquirirá una vez que éstos lleguen a existir, y se entenderá constituido el derecho real de prenda desde la fecha de la inscripción del presente instrumento en el Registro de Prendas sin Desplazamiento, que se realizó con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta y uno. **/Dos/ Extensión de la Prenda. /A/** La prenda de que da cuenta este contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda. Se deja constancia que para efectos de lo dispuesto en el artículo tercero numeral cuatro de la Ley de Prenda sin Desplazamiento, las Partes reconocen que la presente prenda sin desplazamiento garantiza el cumplimiento de la totalidad de las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento, y en especial a lo establecido en el Contrato entre Acreedores. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda sin desplazamiento que por el presente instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de los Créditos Prendados.

**<u>CLÁUSULA CUARTA</u>: PROHIBICIÓN.** Por este acto y debidamente representados de la manera indicada en la comparecencia de este instrumento, el Constituyente se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la prenda y las Obligaciones Garantizadas de que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre sobre los Créditos Prendados, sin la autorización

previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras la prenda y las Obligaciones Garantizadas de que da cuenta el presente instrumento se encuentren vigentes, se obliga a no alterar, modificar o transformar los Créditos Prendados o los Documentos del Proyecto, ni celebrar acto o contrato alguno, especialmente contratos de factoring o securitización, y en general cualquier otra figura contractual nominada o innominada que suponga o implique el cambio del Deudor como titular de los Créditos Prendados, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento. Finalmente, el Deudor se obliga a cumplir con todas sus obligaciones bajo los Créditos Prendados, de manera de no perjudicarlos por acto u omisión suyos.

**<u>CLÁUSULA QUINTA</u>: AUSENCIA DE GRAVÁMENES.** El Deudor se obliga a velar y responder por el hecho de que los Créditos Prendados que por el presente instrumento se prendan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Créditos Prendados, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo dueño, estarán con sus impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a esta prenda o a Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Créditos Prendados o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la prenda y prohibiciones constituidas por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento.

**<u>CLÁUSULA SEXTA</u>: EJERCICIO DE DERECHOS. /A/** En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, el Deudor conservará el pleno ejercicio de los derechos que le correspondan bajo los Créditos Prendados. **/B/** Si ocurriere y se mantuviere vigente un Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, o en caso de incumplimiento de cualquier estipulación contemplada en esta escritura, y sin que deba acreditar a persona alguna el Evento de Incumplimiento o incumplimiento de este contrato de que se trate, el Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, previa notificación escrita a la respectiva contraparte bajo cada Documento del Proyecto /cada una, una "**Contraparte**"/, con copia al Deudor, por medio de Notario Público o judicialmente, conforme lo dispone artículo séptimo de la Ley de Prenda sin Desplazamiento, y a contar de la fecha de dicha notificación, prohibirá a cada Contraparte que pague los Créditos Prendados en otras manos que no sean las del Agente de Garantías Local y podrá declarar la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas y, por ende, de esta prenda, como también de todo interés y gastos a que ella diere lugar, pudiendo iniciarse en contra del Deudor todas y cada una de las acciones de cobro y/o de cualquier naturaleza derivadas de este Contrato de Prenda sobre Derechos Futuros, al amparo del título sexto de la Ley de Prenda sin

Desplazamiento, para obtener el cumplimiento de las Obligaciones Garantizadas. **/C/** A partir de la notificación establecida en la letra **/B/** precedente de esta cláusula, le estará prohibido a cada Contraparte pagar los *Créditos Prendados* en manos distintas del Agente de Garantías Local, conforme a lo dispuesto en el artículo séptimo de la Ley de Prenda sin Desplazamiento, debiendo consignar dichos montos en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad al artículo treinta y uno de la Ley de Prenda sin Desplazamiento.

**CLÁUSULA SÉPTIMA: ENTREGA DE TÍTULOS. INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. /Uno/** El Deudor se obliga en este acto a hacer entrega al Agente de Garantías Local de los títulos que den cuenta de los *Créditos Prendados*, tan pronto estos lleguen a existir, consistentes en una copia autorizada de cada uno de los *Documentos del Proyecto*. **/Dos/** Se deja constancia que de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento, la prenda de que da cuenta este instrumento fue debidamente inscrita en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil treinta y uno guion trece. La prenda de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los *Documentos del Proyecto* y de los *Créditos Prendados*. **/Tres/** El Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar los *Créditos Prendados* que se prendan de la forma establecida en esta escritura, dentro de los quince días siguientes a que suscriba cada uno de los respectivos *Documentos del Proyecto*. Asimismo, el Deudor estará obligado a protocolizar una copia de los *Documentos del Proyecto* en que consten los *Créditos Prendados*, en los términos del artículo séptimo de la Ley de Prenda sin Desplazamiento, debiendo además hacer referencia a dicha protocolización en la respectiva escritura de declaración. **/Cuatro/** Para efectos de dar cumplimiento a lo dispuesto en el artículo tercero, numeral dos, de la Ley de Prenda Sin Desplazamiento, el Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como Anexo Dos se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar tanto los *Pagarés y Reconocimientos* como los demás documentos en que consten *Obligaciones Garantizadas* y que no estén incluidos en un registro público, tan pronto éstos lleguen a ser suscritos por el Deudor, y en todo caso dentro de los quince días siguientes a la suscripción de los *Pagarés y Reconocimientos*, o los demás documentos en que consten *Obligaciones Garantizadas* y que no estén incluidos en un registro público. La referida escritura deberá incluir como anexo protocolizado bajo el mismo número de repertorio de dicha escritura, una copia de los *Pagarés y Reconocimientos* o los demás documentos en que consten *Obligaciones Garantizadas* y que no estén incluidos en un registro público, que en ella se individualicen. **/Cinco/** Por el presente acto, y para el evento en que el Deudor no dé cumplimiento a lo establecido en los numerales **/Tres/** y **/Cuatro/** precedentes, el Deudor confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y por sí y en representación de las Partes

Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refieren los numerales /Tres/ y /Cuatro/ precedentes, e individualizar ya sea los Créditos Prendados una vez que lleguen a existir, o los Pagarés y Reconocimientos y/o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público una vez que éstos sean suscritos por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**CLÁUSULA OCTAVA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor, y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA NOVENA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda sin desplazamiento de primer grado y las prohibiciones constituidas por el Constituyente en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMA: MANTENCIÓN DEL DOMINIO.** Mientras subsista esta prenda el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, o carga de cualquier especie establecida o que pueda establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Prendados. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Prendados y para defenderlos de acciones de terceros.

**CLÁUSULA DÉCIMO PRIMERA: ACEPTACIÓN DE LAS CONTRAPARTES.** Conforme a lo dispuesto en el artículo séptimo de la Ley de Prenda sin Desplazamiento, por el presente instrumento, a contar de la fecha en que se efectúe la notificación de que da cuenta el literal /B/ de la cláusula sexta precedente, el Deudor y el Agente de Garantías Local prohíben en virtud de esta escritura a cada uno de los deudores del Deudor bajo los Documentos del Proyecto, pagar todo o parte de los Créditos Prendados en otras manos diversas del Agente de Garantías Local, debiendo proceder a su consignación en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad con los términos de este instrumento y el artículo treinta y uno de la Ley de Prenda sin Desplazamiento. Asimismo, el Deudor se obliga a emplear la mayor diligencia en causar que los deudores de cada uno de los Documentos del Proyecto, debidamente representados, declaren dentro del plazo de treinta días de firmados los respectivos Documentos del Proyecto: /i/ tomen conocimiento y aceptan, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones que constan en el presente instrumento, y autorizan y aceptan la prenda sin desplazamiento sobre los Créditos Prendados bajo los Documentos del Proyecto de que sean parte y que aquí se evidencia, en los términos y condiciones expuestos en el presente instrumento; /ii/ que, en consecuencia, en forma incondicional, irrevocable y sin reservas, acepten la prohibición de pagar en manos que no sean las del Agente de Garantías Local todo o parte de los Créditos Prendados, así como la obligación de consignar los pagos debidos al Deudor en virtud de los Documentos del Proyecto, en la cuenta corriente del tribunal

que conozca de la ejecución de esta prenda, cuando corresponda de acuerdo a lo establecido en el presente contrato y en los artículos séptimo y trigésimo primero de la Ley de Prenda sin Desplazamiento, y **/iii/** que otorguen expresamente, desde la fecha de su declaración, su aceptación a cualquier extensión o modificación del presente contrato de prenda sin desplazamiento que el Deudor y el Agente de Garantías Local puedan acordar de tiempo en tiempo, con el objeto de hacer extensivas las disposiciones del presente contrato a futuras modificaciones que acuerden las Partes a los Documentos del Financiamiento y/o las Obligaciones Garantizadas, sin que sea necesario en cada oportunidad reiterar la autorización de que da cuenta esta cláusula.

**<u>CLÁUSULA DÉCIMO SEGUNDA</u>: EJECUCIÓN.** Por este acto, el Constituyente, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento, lo que será acreditado con el solo mérito de la notificación a que se refiere la letra /C/ de la cláusula sexta precedente, podrá producir a su respecto la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Constituyente y/o el Deudor todas y cada una de las acciones derivadas de este contrato de prenda, para obtener tanto el cumplimiento de las Obligaciones Garantizadas como el cobro de los Pagarés y Reconocimientos.

**<u>CLÁUSULA DÉCIMO TERCERA</u>: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Constituyente declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan o puedan investir la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Constituyente los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que, en virtud de lo señalado en el artículo treinta y ocho de la Ley de Prenda sin Desplazamiento, la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda sin desplazamiento y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda sin desplazamiento la preferencia que gozaba en virtud del crédito cedido.

**<u>CLÁUSULA DÉCIMO CUARTA</u>: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

<u>**CLÁUSULA DÉCIMO QUINTA**</u>: **PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ <u>**Parte integral.**</u> Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ <u>**Interpretación.**</u> Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

<u>**TERCERO:**</u> <u>**ANEXOS DEL CONTRATO DE PRENDA DE DERECHOS FUTUROS MODIFICADO Y REFUNDIDO.**</u> Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Prenda de Derechos Futuros.

<u>**CUARTO:**</u> <u>**ACEPTACIÓN.**</u> Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda de Derechos Futuros Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Prenda de Derechos Futuros.

<u>**QUINTO:**</u> <u>**INSCRIPCIÓN DEL CONTRATO DE PRENDA DE DERECHOS FUTUROS.**</u> La modificación del Contrato de Prenda de Derechos Futuros Alto Maipo, que consta en el texto aprobado del Contrato de Prenda de Derechos Futuros que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en el Registro de Prenda sin Desplazamiento del Servicio de Registro Civil e Identificación y demás registros pertinentes, de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento.

<u>**SEXTO:**</u> <u>**FACULTAD AL PORTADOR.**</u> Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda de Derechos Futuros Alto Maipo.

<u>**SÉPTIMO:**</u> <u>**PODER ESPECIAL.**</u> Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda de Derechos Futuros Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO**: **PARTE INTEGRAL E INTERPRETACIÓN**.

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

**<u>Exhibit AA</u>**

**Amendment to Pledge of Framework Agreement**

**REPERTORIO N°**

## MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA COMERCIAL

## SOBRE DERECHOS

## ALTO MAIPO SpA

## E

## ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, [•], abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen:

**PRIMERO: ANTECEDENTES**.

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran

interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías Local /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda sobre Derechos Modificado.** Mediante escritura pública otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel con fecha diecisiete de marzo de dos mil diecisiete, repertorio número dos mil doscientos nueve guion dos mil diecisiete, Itaú Corpbanca como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de prenda comercial sobre derechos /el "**Contrato de Prenda sobre Derechos Original**"/. El Contrato de Prenda sobre Derechos Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y ocho guion dos mil dieciocho /en adelante, dicho contrato, complementado en la forma dicha, el "**Contrato de Prenda sobre Derechos Modificado**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos setenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo.** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Prenda sobre Derechos Modificado, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda comercial sobre los derechos del Deudor en el "*Framework Agreement*" /definido más adelante/. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda comercial de que da cuenta este instrumento, las Partes acuerdan modificar el Contrato de Prenda sobre Derechos Modificado en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda Comercial sobre Derechos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA SOBRE DERECHOS MODIFICADO.** Las Partes declaran que el texto del Contrato de Prenda sobre Derechos Modificado, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

**"PRENDA COMERCIAL SOBRE DERECHOS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato de prenda comercial sobre derechos /el "**Contrato de Prenda Comercial sobre Derechos**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales.** Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se

3

entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda comercial sobre derechos, es un texto modificado y refundido del contrato de prenda comercial sobre derechos celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel con fecha diecisiete de marzo de dos mil diecisiete, repertorio número dos mil doscientos nueve guion dos mil diecisiete, y posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y ocho guion dos mil dieciocho; y modificado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de cesión condicional de derechos, y modificado en la forma antedicha, el "**Contrato de Prenda Comercial sobre Derechos Modificado**"/.

<u>**CLÁUSULA SEGUNDA**</u>: **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**/Dos/** Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

<u>**CLÁUSULA TERCERA**</u>: **DOCUMENTO DEL PROYECTO.** El Deudor es parte del contrato denominado *Framework Agreement between Alto Maipo SpA and AES Gener Foundation*, suscrito por instrumento privado de fecha diecisiete de marzo de dos mil diecisiete, entre el Deudor y Fundación AES Gener /hoy Fundación AES Chile/, en adelante, incluyendo todas las renovaciones, ampliaciones y/o modificaciones que pudiere sufrir, se denominará, para efectos de este instrumento como el "**Documento del Proyecto**". Para los efectos de esta escritura, todos y cada uno de los derechos del Deudor bajo el Documento del Proyecto, sin exclusión alguna, e incluyendo a mayor abundamiento, créditos por multas, indemnizaciones y cantidades pagaderas en virtud de boletas de garantía, pólizas de seguros, fianzas u otras cauciones otorgadas bajo los mismos, se denominarán los "**Créditos Prendados**".

<u>**CLÁUSULA CUARTA**</u>: **PRENDA COMERCIAL. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, prenda comercial de primer grado sobre los Créditos Prendados, de conformidad a los artículos ochocientos trece y siguientes del Código de Comercio y a los términos y condiciones del presente instrumento, hasta por el monto de las Obligaciones Garantizadas. **/Dos/ Extensión de la Prenda. /A/** La prenda de que da cuenta este contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea

4

exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda, y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a la presente prenda. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente prenda es indivisible. **/C/** Para los efectos de lo dispuesto en el número dos del artículo ochocientos quince del Código de Comercio, las Partes declaran que el monto de las Obligaciones Garantizadas asciende a la suma de /más el monto de los intereses, incluso penales, reajustes y costos/: /i/ hasta [•] Dólares por concepto de capital del Secured OneL Indenture, Secured TwoL Agreement y Secured TwoL Indenture; /ii/ hasta [•] Dólares por concepto de capital del Crédito de Capital de Trabajo; /iii/ hasta [•] Dólares por concepto de capital del Financiamiento de Salida; y /iv/ hasta [•] Dólares por concepto de capital del Contrato de Crédito IVA. **/D/** El Deudor se obliga en este acto a ampliar la prenda de que da cuenta este instrumento, de tiempo en tiempo, en términos sustancialmente similares a los contenidos en el mismo, para garantizar cualquier otro acto o contrato que dé cuenta de Obligaciones Garantizadas y que, por lo mismo, que deba ser caucionado con el presente instrumento.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Créditos Prendados, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras la prenda y las Obligaciones Garantizadas de que da cuenta el presente instrumento se encuentren vigentes, se obliga a no alterar, modificar o transformar los Créditos Prendados o el Documento del Proyecto, ni celebrar acto o contrato alguno, especialmente contratos de factoring o securitización, y en general cualquier otra figura contractual nominada o innominada que suponga o implique el cambio del Deudor como titular de los Créditos Prendados, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento. Finalmente, el Deudor se obliga a cumplir con todas sus obligaciones bajo el Documento del Proyecto, de manera de no perjudicar los Créditos Prendados por acto u omisión suyos.

**CLÁUSULA SEXTA: TÍTULO Y AUSENCIA DE GRAVÁMENES.** El Deudor, a través de su representante, declara que los Créditos Prendados **/i/** le pertenecen como único y exclusivo titular, y que han sido legalmente adquiridos, **/ii/** salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, se encuentran libres de gravámenes, cargos, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias, derechos preferentes en favor de terceros y prendas de ningún tipo, y **/iii/** salvo por los Gravámenes Permitidos y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no están sujetos a opciones, promesas de venta, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir su dominio o darlos en garantía de otras obligaciones, y que no existe impedimento alguno que pueda afectar su libre disposición o la constitución de la prenda comercial y prohibición de gravar y enajenar de que da cuenta esta escritura. Del mismo modo, el Deudor

5

declara que no existe impedimento alguno, tanto respecto de los Créditos Prendados como respecto de sí mismo, para celebrar la prenda y prohibición de que da cuenta este instrumento.

**CLÁUSULA SÉPTIMA: EJERCICIO DE DERECHOS. EJECUCIÓN. /A/** En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, el Deudor conservará el pleno ejercicio de los derechos que le correspondan bajo los Créditos Prendados. **/B/** Si ocurriere y se mantuviere vigente un Evento de Incumplimiento /*"Event of Default",* según este término se define en el Contrato de Términos Comunes/, el Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, previa notificación escrita a Fundación AES Chile /en adelante la **"Contraparte"**/, con copia al Deudor, por medio de Notario Público, y a contar de la fecha de dicha notificación, con el solo mérito de la misma, de conformidad con lo previsto en el artículo dos mil trescientos ochenta y nueve del Código Civil, podrá cobrar de la Contraparte las sumas de dinero correspondientes a los Créditos Prendados en la medida que se vayan devengando y se hagan exigibles conforme al Documento del Proyecto, para cuyo efecto se entenderá representante legal del Deudor, de conformidad al artículo doce del Decreto Ley número setecientos setenta y seis del año mil novecientos veinticinco. El Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, podrá solicitar a la Contraparte que los pagos de los Créditos Prendados se efectúen directamente a su nombre y ésta deberá así hacerlo, y estará autorizado para retirar cheques de pago y cualquier otro documento extendido con dicho objeto por la Contraparte, a la orden o a nombre del Deudor y, en este último caso, podrá endosar en dominio o en comisión de cobranza aquellos cheques y cualquier otro documento y disponer de ellos, cobrarlos y, en caso necesario, abrir una cuenta corriente bancaria y depositarlos en ella, pudiendo además girar en contra de ésta y ejercer todos y cada uno de los demás derechos propios de su titular con la finalidad de percibir efectivamente el valor de aquellos cheques y cualquier otro documento extendido para el pago de todo o parte de los Créditos Prendados. Además, el Agente de Garantías Local deberá otorgar los recibos que le sean solicitados por las cantidades que cobre y perciba y deberá suscribir los documentos públicos o privados que le fueren exigidos en relación con lo anterior por el Deudor. Las cantidades que el Agente de Garantías Local, por cuenta de las Partes Garantizadas, perciba de la Contraparte serán aplicadas por el Agente de Garantías Local sin más trámite y sin sujeción a formalidad alguna, a extinguir las Obligaciones Garantizadas. Para todos los efectos legales, se entenderá que cualquier pago realizado al Agente de Garantías Local bajo el Documento del Proyecto, tendrá el mismo poder liberatorio y extintivo de obligaciones que un pago realizado directamente al Deudor. **/C/** A partir de la notificación establecida en la letra /B/ de esta cláusula, le estará prohibido a la Contraparte pagar los Créditos Prendados en manos distintas que las del Agente de Garantías Local, conforme a lo dispuesto en el artículo dos mil trescientos ochenta y nueve del Código Civil, en relación al artículo ochocientos dieciséis del Código de Comercio, debiendo efectuar dichos pagos al Agente de Garantías Local, en las cuentas que el Agente de Garantías Local determine previamente.

**CLÁUSULA OCTAVA: ENTREGA DE TÍTULOS.** Para efectos de lo prescrito en los artículos dos mil trescientos ochenta y nueve del Código Civil y ochocientos diecisiete del Código de Comercio, se deja constancia que, en el acto del otorgamiento del Contrato de Prenda sobre Derechos Original, el Deudor hizo entrega al Agente de Garantías Local, actuando en representación de las Partes Garantizadas, de los títulos en que constan los Créditos Prendados, constituidos por una copia original del Documento del Proyecto habiéndose entregado a dicho agente además, copia de las respectivas modificaciones introducidas al Documento del Proyecto. Esta entrega constituyó la forma de perfeccionar entre las Partes la prenda y la forma de efectuar la tradición del derecho real de prenda que surge en favor del Agente de Garantías Local, actuando en representación de las Partes Garantizadas, declarando el Agente de Garantías Local haber recibido dichos títulos a su entera satisfacción.

**CLÁUSULA NOVENA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA DÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda comercial de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA UNDÉCIMA: MANTENCIÓN DEL DOMINIO.** Mientras subsista esta prenda el Deudor deberá pagar íntegra y oportunamente cualquier impuesto o carga de cualquier especie establecida o que puedan establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Prendados. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Prendados y para defenderlos de acciones de terceros.

**CLÁUSULA DÉCIMO SEGUNDA: ACEPTACIÓN DE LA CONTRAPARTE. /A/** Conforme a lo dispuesto en el artículo dos mil trescientos ochenta y nueve del Código Civil, por el presente instrumento, a contar de la fecha en que se efectúe la notificación de que da cuenta el literal /B/ de la Cláusula Séptima precedente, el Deudor y el Agente de Garantías Local prohíben en virtud de esta escritura al deudor bajo el Documento del Proyecto, pagar todo o parte de los Créditos Prendados en manos diversas del Agente de Garantías Local. Se deja constancia que en el Contrato de Prenda sobre Derechos Original, **FUNDACIÓN AES CHILE**, debidamente representada en la forma que se indica en el Contrato de Prenda sobre Derechos Original: /i/ tomó conocimiento y aceptó, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones que constan en el presente instrumento, y autorizó y aceptó la prenda comercial sobre los Créditos Prendados bajo el Documento del Proyecto de que es Contraparte y que aquí se evidencia, en los términos y condiciones expuestos en el presente instrumento, /ii/ que, en consecuencia, en forma incondicional, irrevocable y sin reservas, aceptó la obligación de pagar los Créditos Prendados al Agente de Garantías Local, desde la fecha de la notificación de que da cuenta el literal /B/ de la Cláusula Séptima precedente, y de acuerdo a lo establecido en el presente instrumento y en el artículo doce del Decreto Ley número setecientos setenta y seis, de mil novecientos veinticinco, y /iii/ que otorgó expresamente su aceptación a cualquier extensión o modificación del Contrato de Prenda sobre Derechos Original /lo que incluye el presente contrato/ que el Deudor y el Agente de Garantías Local puedan acordar de tiempo en tiempo, con el objeto de hacer extensivas las disposiciones del presente contrato a futuras modificaciones que acuerden las Partes a los Documentos del Financiamiento y/o las Obligaciones Garantizadas, sin que sea necesario en cada oportunidad reiterar la autorización de que da cuenta esta cláusula. [**/B/** Presente en dicho acto don [●], mayor de edad, quien acreditó su identidad con la cédula que se indica, en representación de **FUNDACIÓN AES CHILE** otorgó las aceptaciones y demás declaraciones referidas en el párrafo /A/ anterior.][1]

**CLÁUSULA DÉCIMO TERCERA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos, sin restricción alguna. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas

---

[1] A ser incorporado en caso de que se requiera.

hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO CUARTA: PARTE INTEGRAL E INTERPRETACIÓN. /Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento"

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda sobre Derechos Modificado y el nuevo texto modificado y refundido que consta en el Contrato de Prenda sobre Derechos Modificado y Refundido.

**QUINTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda sobre Derechos Modificado.

**SEXTO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda sobre Derechos Modificado y prohibiciones de que da cuenta este instrumento, según corresponda.

**SÉPTIMO: PARTE INTEGRAL E INTERPRETACIÓN. /Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____

[•]

**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

**<u>Exhibit BB</u>**

**Amendment to Onshore Share Pledge Agreement**

REPERTORIO N°


**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA SIN DESPLAZAMIENTO**

**SOBRE ACCIONES**

**[AES CHILE SpA [Y AES ANDES S.A.]] A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**


**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES CHILE SpA** /antes Norgener Renovables SpA/, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones setecientos ochenta y seis mil trescientos cincuenta y cinco guion uno, ambos con domicilio para estos efectos en [•] /en adelante "**AES Chile**"/; **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con AES Chile, los "**Accionistas**"/; y **/Cuatro/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor y los Accionistas, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para

la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías Local, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Acciones.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y nueve guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, Alto Maipo SpA como deudor, Antofagasta Minerals S.A., una sociedad anónima, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y tres millones novecientos veinte mil guion dos y Norgener S.A. /después Norgener Foreign Investment SpA/, estos dos últimos en su calidad de únicos y exclusivos accionistas de Alto Maipo SpA, celebraron, como parte del Financiamiento Alto Maipo, un contrato de prenda sin desplazamiento sobre acciones, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil veintiocho /en adelante, el "**Contrato de Prenda de Acciones Original**"/. El Contrato de Prenda de Acciones Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos / dos mil diecisiete, y complementado mediante diversos instrumentos en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Acciones Modificado**"/. El Contrato de Prenda de Acciones Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta / dos

mil dieciocho, y complementado mediante diversas escrituras públicas, en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Acciones AES Chile**"/.

/**Cuatro**/ **Reorganización corporativa de AES Chile.** Por Junta Extraordinaria de Accionistas de Norgener S.A. celebrada con fecha veintinueve de mayo de dos mil catorce, cuya acta se redujo a escritura pública con esa misma fecha en la Notaría de Santiago de don Eduardo Javier Díez Morello, bajo el repertorio número doce mil cuatrocientos dos guion dos mil catorce, se acordó transformar Norgener S.A. en una sociedad por acciones, pasando ésta a llamarse "Norgener SpA". Posteriormente, Norgener SpA modificó su razón social pasando a denominarse Norgener Foreign Investment SpA, y se dividió en tres sociedades, manteniéndose Norgener Foreign Investment SpA como su continuadora legal. Las otras dos nuevas sociedades por acciones resultantes de la división se constituyeron con los nombres Norgener Renovables SpA y Norgener Inversiones SpA. Como consecuencia de la división de Norgener Foreign Investment SpA, le fue asignada en dominio a AES Chile SpA /antes Norgener Renovables SpA/ la totalidad de las acciones que poseía la primera en el Deudor, esto es, la cantidad de setenta y un millones doscientas treinta y ocho mil seiscientas cincuenta y seis acciones nominativas, ordinarias, de una misma y única serie y sin valor nominal, como consta en el Contrato de Prenda de Acciones AES Chile, y dejando Norgener Foreign Investment SpA de ser parte de dicho contrato de prenda.

/**Cinco**/ **Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/**Seis**/ **Accionista[s] Actual[es].** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, /a/ [con fecha [●]/con esta misma fecha], mediante instrumento privado en idioma español, Strabag SpA, con el consentimiento del Agente de Garantías Local, vendió, cedió y transfirió a [AES Chile/AES Andes] la cantidad de cinco millones doscientos sesenta y tres mil setecientos dieciocho acciones del Deudor, correspondientes a la totalidad de las acciones de que Strabag SpA era titular en el Deudor /en adelante, las "Acciones Strabag"/; y /b/ [con fecha [●]/con esta misma fecha] mediante escritura pública otorgada en la Notaría de [●], bajo el repertorio número [●], [AES Chile][AES Chile y AES Andes], en su calidad de único[s] accionista[s] del Deudor [resolvió][acordaron], con el expreso consentimiento del Agente de Garantías Local, /y/ disminuir el número de acciones en que se divide el capital del Deudor, de la cantidad de setenta y seis millones quinientas dos mil trescientas setenta y cuatro acciones nominativas, ordinarias, de una única serie y sin valor nominal, a [●][1] acciones nominativas, ordinarias, de una única serie y sin valor nominal; y /z/ aumentar el capital del Deudor, de la cantidad de quinientos cincuenta millones doscientos cuarenta y tres mil setecientos treinta y siete coma ocho Dólares, dividido en [●] acciones nominativas, ordinarias, de una única serie y sin valor nominal, a la cantidad de [quinientos cincuenta millones quinientos cuarenta y tres mil setecientos treinta y siete coma ocho] Dólares, dividido en [●] acciones nominativas, ordinarias, de una única serie y sin valor nominal, las cuales fueron íntegramente suscritas [y pagadas] en dicho acto [y deberán ser pagadas dentro del plazo de [●] a contar de la fecha de dicha escritura] por [AES Chile][AES Andes]. Como consecuencia de lo anterior, a esta fecha [el/los] actual[es]

---

1 NTD: El número de acciones en que se disminuye el capital de la Sociedad se encuentra pendiente de confirmación.

[y único] accionista[s] del Deudor [es/son] [/i/] AES Chile, titular de [•] acciones emitidas por el Deudor, de las cuales [•] acciones se encuentran suscritas y pagadas, y [•] acciones se encuentran suscritas y pendientes de pago[, y /ii/ AES Andes, titular de [•] acciones emitidas por el Deudor. según da cuenta el artículo primero transitorio de los estatutos del Deudor, de las cuales [•] acciones se encuentran suscritas y pagadas, y [•] acciones se encuentran suscritas y pendientes de pago]. Todas las acciones anteriores se encuentran inscritas a nombre de [AES Chile/los Accionistas] en el folio número [•] [para AES Chile y en el folio [•] para AES Andes,] del Registro de Accionistas del Deudor, y constan en los títulos de acciones número [•] y [•][, respectivamente].

**/Siete/ Alzamiento.** Se deja constancia de que, producto de lo señalado en la letra /a/ del número /Seis/ anterior, mediante escritura pública de fecha [•], otorgada en la Notaría de Santiago de [•] bajo el repertorio número [•], Strabag SpA y el Agente de Garantías Local alzaron la prenda sin desplazamiento constituida sobre las Acciones Strabag.

**/Ocho/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el **"Contrato de Agencia de Garantías Local Modificado y Refundido"**/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el, en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el **"Contrato de Agencia de Garantías Local"**/.

**/Nueve/ Reestructuración del Financiamiento Alto Maipo.** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías Local, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre las acciones emitidas por el Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Diez/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda sin desplazamiento de acciones de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda de

Acciones AES Chile, las Partes acuerdan modificar el Contrato de Prenda de Acciones AES Chile en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segunda siguiente /en adelante, el "**Contrato de Prenda de Acciones**"/ y ampliarlo asimismo para constituir prenda y prohibiciones de gravar y enajenar, sobre las acciones presentes y futuras que emita el Deudor y que sean de propiedad de AES Andes.

**SEGUNDO:** **TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE ACCIONES AES CHILE.** Las Partes declaran que el texto del Contrato de Prenda de Acciones AES Chile, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA SIN DESPLAZAMIENTO SOBRE ACCIONES AES CHILE SpA Y AES ANDES SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.[2]**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES Chile SpA** /antes, Norgener Renovables SpA/, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones setecientos ochenta y seis mil trescientos cincuenta y cinco guion uno, todos con domicilio para estos efectos en [•] /en adelante "**AES Chile**"/; **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion nueve, todos con domicilio para estos efectos en [•] /en adelante "**AES Andes**" y conjuntamente con AES Chile, los "**Accionistas**"/; y **/Cuatro/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor y los Accionistas, las "**Partes**"/; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de acciones /el "**Contrato de Prenda de Acciones**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha

---

[2] **NTD**: En caso de que las acciones de Strabag sean traspasadas a una entidad diferente de AES Chile, se modificará esta escritura en lo pertinente.

cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•], en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda sin desplazamiento sobre acciones, es un texto modificado y refundido del contrato de prenda sin desplazamiento sobre acciones celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y nueve guion dos mil trece, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil veintiocho, y posteriormente /i/ modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil doscientos / dos mil diecisiete; /ii/ complementado mediante diversas escrituras públicas; y /iii/ nuevamente modificado por escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta / dos mil dieciocho, y /iv/ complementado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de prenda sin desplazamiento sobre acciones, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Acciones AES Chile**"/.

/**Cinco**/ **Documentos del Financiamiento.** Para efectos del artículo tercero, numeral dos, del artículo catorce de la Ley de Prenda sin Desplazamiento /según dicho término se define más adelante/, se deja constancia de que los Documentos del Financiamiento en que, a

esta fecha, constan las Obligaciones Garantizadas /según dichos términos se definen en el Contrato de Agencia de Garantías Local/ cuyo cumplimiento se garantiza mediante el presente Contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA SEGUNDA:** **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**CLÁUSULA TERCERA: CAPITAL SOCIAL Y ACCIONES.** /**Uno**/ Por escritura pública de fecha primero de agosto de dos mil once, otorgada en la Notaría de Santiago de don Osvaldo Pereira González bajo el repertorio número dieciséis mil novecientos cuarenta y uno guion dos mil once, se constituyó el Deudor como una sociedad por acciones bajo la razón social Alto Maipo SpA. Un extracto de dicha escritura fue inscrito a fojas cuarenta y cinco mil once, número treinta y tres mil doscientos setenta y nueve del Registro de Comercio del Conservador de Bienes Raíces y Comercio de Santiago correspondiente al año dos mil once y fue publicado en el Diario Oficial de fecha dieciséis de agosto del mismo año. A la fecha, los estatutos del Deudor han sido modificados en diversas oportunidades, siendo la última de ellas la que consta por escritura pública de fecha [•], otorgada en la Notaría de Santiago de [•], bajo el repertorio número [•]. Se deja constancia que al [•] de dos mil veintidós, el capital actual del Deudor asciende a la cantidad de [•], dividido en [•] acciones nominativas, ordinarias, de una misma y única serie y sin valor nominal.

/**Dos**/ Las acciones emitidas por el Deudor se encuentran a esta fecha suscritas y pagadas, o suscritas y pendientes de pago, según se detalla a continuación: [/**A/**] AES Chile es titular de [•] acciones ordinarias, nominativas, de una sola serie, sin valor nominal, emitidas por el Deudor, de las cuales [•] acciones se encuentran suscritas y pagadas /en adelante, las "**Acciones Pagadas AES Chile**"/, y [•] acciones se encuentran suscritas y pendientes de pago /en adelante, las "**Acciones no Pagadas AES Chile**" y conjuntamente con las Acciones Pagadas AES Chile, las "**Acciones [AES Chile]**"/, según da cuenta el artículo primero transitorio de los estatutos del Deudor, inscritas a su nombre en el folio número [•] del Registro de Accionistas del Deudor y que constan en los títulos de acciones número [•] y [•]; [y /**B/** AES Andes es titular de [•] acciones ordinarias, nominativas, de una sola serie, sin valor nominal, emitidas por el Deudor, íntegramente suscritas y pagadas, inscritas a su nombre en el folio número [•] del Registro de Accionistas del Deudor y que constan en el título de acciones número [•] /en adelante, las "**Acciones AES**" y conjuntamente con las Acciones AES Chile, las "**Acciones**"/].

**CLÁUSULA CUARTA: PRENDAS SIN DESPLAZAMIENTO.** /**Uno**/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, los Accionistas, debidamente representados, han constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas: /**A/** prendas sin desplazamiento de primer grado de conformidad al artículo catorce de la Ley veinte mil ciento noventa /en adelante, la "**Ley de Prenda sin Desplazamiento**"/, el Reglamento del Registro de Prendas sin Desplazamiento, contenido en el Decreto Supremo número setecientos veintidós, conjunto del Ministerio de Justicia y

del Ministerio de Hacienda, publicado en el Diario Oficial de veintitrés de octubre de dos mil diez /el "**Reglamento de Prenda sin Desplazamiento**"/ y a los términos y condiciones del presente instrumento, sobre las Acciones de su propiedad; y **/B/** prendas sin desplazamiento de primer grado de conformidad al artículo noveno de la Ley de Prenda sin Desplazamiento, el Reglamento de Prenda sin Desplazamiento, y a los términos y condiciones del presente instrumento, sobre todas las acciones que se emitan por el Deudor y que los Accionistas suscriban o adquieran por cualquier causa en el futuro, en adelante también las "**Acciones Futuras**", y conjuntamente con las Acciones, las "**Acciones Prendadas**". Conforme a lo establecido en el artículo noveno de la Ley de Prenda sin Desplazamiento, el derecho real de prenda sobre las Acciones Futuras se adquirirá una vez que éstas sean adquiridas por el Accionista respectivo, y se entenderá constituido el derecho real de prenda desde la fecha de la inscripción del presente instrumento en el Registro de Prendas sin Desplazamiento, que respecto de AES Chile se realizó con fecha dieciséis de diciembre de dos mil trece, bajo el Repertorio número doscientos veinte mil veintiocho. **/Dos/ Extensión de las Prendas. /A/** Las prendas sin desplazamiento de que da cuenta este contrato se extienden y garantizan el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a la presente prenda. Se deja constancia que para efectos de lo dispuesto en el artículo Tercero numeral cuatro de la Ley de Prenda sin Desplazamiento, las Partes reconocen que la presente prenda sin desplazamiento garantiza el cumplimiento de la totalidad de las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento, y en especial a lo establecido en el Contrato entre Acreedores. Se conviene expresamente que las presentes prendas son indivisibles.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representados de la manera indicada en la comparecencia de este instrumento, los Accionistas se obligan, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras las prendas y las Obligaciones Garantizadas de que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre las Acciones Prendadas, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento.

**CLÁUSULA SEXTA: ENTREGA DE TÍTULOS.** Se deja constancia que los Accionistas han hecho entrega al Agente de Garantías Local de los títulos en que constan las Acciones, declarando el Agente de Garantías Local haberlo recibido a su entera satisfacción. Para el

caso de las Acciones Futuras, queda expresamente convenido que los títulos en que consten las mismas deberán ser entregados al Agente de Garantías Local dentro de los quince días siguientes a que dichas acciones hayan sido suscritas por el Accionista respectivo, encontrándose facultado el Agente de Garantías Local para solicitar su emisión y entrega al mismo. Atendido el carácter de prenda sin desplazamiento de las prendas otorgadas, se deja constancia que la no entrega de los títulos de acciones antes señalados, no afecta la validez de las prendas de que da cuenta este instrumento.

**CLÁUSULA SÉPTIMA: TÍTULO Y VALOR. MANTENCIÓN DEL DOMINIO.** Cada Accionista declara y garantiza que las Acciones que aquí se señalan son de su propiedad: /i/ le pertenecen como único y exclusivo titular, y que han sido legalmente adquiridas, /ii/ salvo por las Garantías Permitidas /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes, en adelante las "**Garantías Permitidas**"/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, se encuentran libres de gravámenes, cargos, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias, derechos preferentes en favor de terceros y prendas de ningún tipo, y /iii/ [salvo por las Acciones No Pagadas AES Chile,] están totalmente pagadas y, salvo por las Garantías Permitidas y por lo dispuesto en el Contrato de Conversión, en este instrumento u otro Documento del Financiamiento, no están sujetas a opciones, promesas de venta, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir su dominio o darlas en garantía de otras obligaciones, y que no existe impedimento alguno que pueda afectar su libre disposición o la constitución de la prenda sin desplazamiento y prohibición de gravar y enajenar de que da cuenta esta escritura. Del mismo modo, cada Accionista declara que no existe impedimento alguno, tanto respecto de las Acciones Prendadas como respecto de sí mismo, para celebrar la prenda y prohibición de que da cuenta este instrumento. Cada Accionista declara y garantiza de igual forma que las Acciones que aquí se señalan son de su propiedad le confieren, como titular y dueño de las mismas, el derecho a percibir las utilidades y cualquier otro beneficio económico a ser distribuido por el Deudor a sus accionistas, de conformidad con los estatutos del Deudor. Finalmente, cada Accionista se obliga, a menos que los demás Documentos del Financiamiento permitan lo contrario, a velar y responder por el hecho que las Acciones Futuras estarán a la fecha de su adquisición libres de todo tipo de gravámenes, cargos, litigios, prohibiciones de gravar y enajenar u otras limitaciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias y derechos preferentes de terceros; y estarán totalmente pagadas y no sujetas a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir el dominio de las Acciones Futuras o darlas en garantía de otras obligaciones, ni otros impedimentos que afecten su libre disposición o el alcance de esta prenda sobre las Acciones Futuras.

**CLÁUSULA OCTAVA: ALCANCE DE LA PRENDA Y PROHIBICIÓN. /A/ Aumentos de valor y acciones liberadas de pago.** Sin perjuicio de los derechos que a los Accionistas se les reconoce sobre los repartos que a cualquier título pueda distribuir el Deudor de acuerdo al Contrato de Términos Comunes y las demás disposiciones de este instrumento, las prendas de las Acciones Prendadas de que da cuenta este instrumento, comprenderán y se extenderán a todos los aumentos de valor que ellas reciban y a los frutos y beneficios que produzcan para su titular. En consecuencia, los aumentos de valor, beneficios y las acciones que se repartan liberadas de pago y correspondan a las Acciones Prendadas, quedarán comprendidas en las prendas que por el presente instrumento se constituyen. El Agente de Garantías Local, para el beneficio de las Partes Garantizadas, queda autorizado para recibir las devoluciones de capital que pudieren acordarse y para abonar estos valores

a las Obligaciones Garantizadas, si estuvieren vencidas. En el caso de emisión de nuevas acciones liberadas de pago o de emisión de nuevos títulos por aumentos de valor de las Acciones Prendadas, se entenderán afectos los nuevos valores que se emitan a las prendas que en el presente instrumento se constituyen, quedando facultado el Agente de Garantías Local, en forma exclusiva, para retirar el Deudor los títulos correspondientes, sin que puedan ser entregados por el Deudor a un Accionista u otras personas, debiendo anotarse la prenda sobre estos nuevos títulos en el Registro de Accionistas del Deudor, a sola petición del Agente de Garantías Local o del Notario Público que lo solicite en su nombre, renunciando en consecuencia los Accionistas a realizar dichas gestiones. En el caso de emisión de nuevos títulos por aumento de valor de las Acciones Prendadas, dichos nuevos títulos sustituirán a los anteriores, quedando el Agente de Garantías Local facultado para efectuar el canje correspondiente con el Deudor.

**/B/ Alcance de la prenda en caso de división o fusión del Deudor.** Para el caso de división o fusión del Deudor, en su calidad de sociedad emisora de las Acciones Prendadas, queda expresamente convenido que la prenda sobre las Acciones Prendadas se extiende asimismo a todas las acciones de las nuevas sociedades que se formen en virtud de la división o fusión o que subsistan luego de ella, que correspondan o corresponderían a los Accionistas como propietarios de las Acciones o Acciones Futuras respectivas, las cuales quedarán automáticamente gravadas con las prendas aquí pactadas. Queda autorizado el Agente de Garantías Local, en forma exclusiva, en todos los casos precedentes, para retirar los títulos correspondientes, quedándole prohibido al Deudor entregarlos a los Accionistas u otra persona. En tales casos deberá anotarse la prenda en los correspondientes Registros de Accionistas a sola petición del Agente de Garantías Local o del Notario Público que los solicite en su nombre, renunciando en consecuencia los Accionistas a realizar dichas gestiones.

**CLÁUSULA NOVENA: EJERCICIO DE DERECHOS.** /A/ En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, los Accionistas conservarán el pleno ejercicio de los derechos que como legítimo titular de las Acciones Prendadas les corresponden, incluidos el ejercicio del derecho a participar en las juntas generales de accionistas con derecho a voz y voto, el derecho de cobrar y percibir dividendos, y el ejercicio de aquellos otros derechos que pudieren corresponderles. Sin perjuicio de lo expresado, será necesaria la autorización escrita del Agente de Garantías Local para ejercer el derecho de retiro que los artículos sesenta y nueve y siguientes de la Ley número dieciocho mil cuarenta y seis sobre Sociedades Anónimas reconocen a los accionistas. /B/ Sin que implique limitación de lo establecido en la letra /A/ anterior, el ejercicio de los derechos que correspondan a los Accionistas como legítimos titulares de las Acciones Prendadas se efectuará en estricto cumplimiento con lo establecido en los Documentos del Financiamiento en los cuales sean parte. /C/ Si ocurriere y se mantuviere vigente un Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes, en adelante el "**Evento de Incumplimiento**"/, el Agente de Garantías Local, en beneficio de las Partes Garantizadas, previa notificación escrita al Deudor y a los Accionistas por medio de Notario Público y a contar de la fecha de dicha notificación, con el sólo mérito de la misma y sin que deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá adquirir el pleno y exclusivo ejercicio de todos los derechos, tanto económicos como de otra índole, que legalmente los Accionistas tendrían de otra forma derecho a ejercer como legítimos titulares de las Acciones Prendadas, incluyendo, especialmente, el derecho a cobrar y percibir dividendos, debiendo los Accionistas, en este caso, abstenerse de ejercer dichos derechos así como cualquier otro derecho que les hubiere correspondido en razón de su

participación accionaria. **/D/** Para estos efectos, los Accionistas facultan desde ya al Agente de Garantías Local en forma irrevocable, por cuenta de quien acepta su representante, para que ejerza el derecho a voz y voto que corresponda a las Acciones Prendadas, así como para que cobre y perciba los dividendos y ganancias y demás beneficios antes referidos a los cuales se extienden automáticamente estas prendas, incluyendo devoluciones de capital. Los beneficios que así sean percibidos por el Agente de Garantías Local deberán ser aplicados al pago de las Obligaciones Garantizadas. Los Accionistas, en virtud del presente instrumento, prohíben al Deudor pagar todo o parte de los dividendos y demás beneficios a que se refiere esta cláusula, a los que se extiende automáticamente esta prenda, en otras manos diversas de las del Agente de Garantías Local, a contar de la fecha en que se le practique la notificación por un Notario Público a que se ha hecho referencia con anterioridad.

**CLÁUSULA DÉCIMA: INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. ACEPTACIÓN DEL DEUDOR. /Uno/** El Deudor, debidamente representado, queda expresamente notificado de la prenda y prohibición constituidas en virtud del presente instrumento, comprometiéndose a dar pleno cumplimiento a sus disposiciones en todo aquello que le atañe. Sin perjuicio de lo anterior y de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento, la prenda de que da cuenta este instrumento fue debidamente inscrita en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintiocho guion trece, y en el Registro de Accionistas del Deudor, por un Notario Público, conforme al artículo veintitrés de la Ley sobre Sociedades Anónimas. **/Dos/** Los Accionistas estarán obligados a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar las Acciones Futuras que se prenden en la forma establecida en esta escritura, dentro de los quince días siguientes a que dichas Acciones Futuras hayan sido suscritas por el Accionista respectivo. **/Tres/** Asimismo, para efectos de dar cumplimiento a lo dispuesto en el artículo Tercero, numeral dos, de la Ley de Prenda Sin Desplazamiento, los Accionistas estarán obligados a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Dos** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar tanto los Pagarés y Reconocimientos como los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, tan pronto éstos lleguen a ser suscritos por el Deudor, y en todo caso dentro de los quince días siguientes a la suscripción de los Pagarés y Reconocimientos o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público. La referida escritura deberá incluir como anexo protocolizado bajo el mismo número de repertorio de dicha escritura, una copia de los Pagarés y Reconocimientos o de los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, que en ella se individualicen. **/Cuatro/** Por el presente acto, y para el evento en que los Accionistas no den cumplimiento a lo establecido en los numerales /Dos/ y /Tres/ precedentes, cada Accionista confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación de tal Accionista, según corresponda, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo

facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refieren los numerales /Dos/ y /Tres/ precedentes, e individualizar ya sea las Acciones Futuras, o los Pagarés y Reconocimientos, y/o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, en los plazos señalados en dichos numerales, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local. **/Cinco/** Presente en este acto, don [•], ya individualizado, en representación del Deudor, declara que, estando debidamente autorizado para recibir notificaciones en nombre del Deudor, por el presente instrumento, declara que el Deudor queda expresamente notificado del Contrato de Prenda de Acciones, comprometiéndose, en representación del Deudor, a dar pleno cumplimiento a sus disposiciones en todo aquello que le atañe. Sin perjuicio de lo anterior, la prenda y prohibición constituidas, y las escrituras de declaración que se firmen de tiempo en tiempo para individualizar las Acciones Futuras en virtud de esta escritura pública, serán notificadas, registradas e inscritas en el Registro de Accionistas del Deudor, por un Notario Público, conforme al artículo veintitrés de la Ley sobre Sociedades Anónimas.

**CLÁUSULA UNDÉCIMA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor, de los Accionistas y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA DUODÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta las prendas sin desplazamiento de primer grado y las prohibiciones constituidas por los Accionistas en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMO TERCERA: DEBERES ADICIONALES DEL ACCIONISTA.** Mientras las presentes prendas y prohibiciones se encuentren vigentes, cada Accionista **/i/** defenderá las Acciones Prendadas de cualquier reclamo o demanda de terceros, **/ii/** suscribirá todos aquellos instrumentos y realizará todos aquellos actos que sea necesario ejecutar con el objeto de dar cumplimiento a las obligaciones indicadas en las cláusulas octava y novena anteriores, incluyendo, sin que importe limitación, los instrumentos que sea necesario celebrar para hacer extensivas las prendas y prohibiciones que por este acto se constituyen a nuevas acciones de pago o liberadas de pago a las que tengan derecho, y **/iii/** sujeto a lo indicado en la letra /A/ de la cláusula octava de este instrumento, entregará al Agente de Garantías Local todos los títulos, certificados y demás documentos que den cuenta del dominio de ese Accionista sobre cualesquiera derechos patrimoniales sobre las Acciones Prendadas, incluyendo, sin limitación, dividendos y ganancias, acciones liberadas de pago, derechos preferentes u opciones de cualquier naturaleza, ya sean de suscripción preferente de acciones, de bonos convertibles en acciones o de cualesquiera otros valores que confieran derechos futuros sobre el Deudor.

**CLÁUSULA DÉCIMO CUARTA: EJECUCIÓN.** Por este acto, cada Accionista, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que: la ocurrencia de cualquier Evento de Incumplimiento, lo que será acreditado con el solo mérito de la notificación a que se refiere la letra /C/ de la cláusula décima precedente; podrá producir a su respecto la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones

Garantizadas, pudiendo seguirse en contra de ese Accionista y/o el Deudor todas y cada una de las acciones derivadas de este contrato de prendas, para obtener tanto el cumplimiento de las Obligaciones Garantizadas como el cobro de los Pagarés y Reconocimientos.

**CLÁUSULA DÉCIMO QUINTA: DECLARACIONES ADICIONALES DE LOS ACCIONISTAS.** Los Accionistas, a través de sus representantes individualizados en la comparecencia de esta escritura, declaran en beneficio del Agente de Garantías Local, que tienen plena capacidad para hacer las declaraciones que esta escritura contiene y para otorgar el presente contrato de prenda. Asimismo, los Accionistas declaran que esta escritura ha sido debidamente suscrita por sus representantes autorizados y que de ella emanan obligaciones legales, válidas y exigibles, y que la suscripción de este instrumento y el cumplimiento de cualquiera de sus términos o estipulaciones no contraviene ninguna ley, regla, regulación, juicio, orden o decreto obligatorio para éstos, ni provoca ningún incumplimiento de, ni constituye ninguna falta a sus respectivos estatutos o a cualquier contrato, garantía, préstamo u otro convenio o instrumento del que el Accionista respectivo sea parte o por el cual éste o sus bienes puedan estar obligados. A mayor abundamiento, cada Accionista declara que cuenta con todas las autorizaciones corporativas, gubernamentales, de terceros o de cualquier otra índole, que sean necesarias para la celebración y cumplimiento del presente contrato. Finalmente, cada Accionista declara que es una "contraparte apta" /*eligible contract participant,* según este término se define en la ley de los Estados Unidos de América denominada Commodity Exchange Act /Seven U.S.C. Section One et seq.//.

**CLÁUSULA DÉCIMO SEXTA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Accionista declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan o puedan revestir la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Accionista los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que, en virtud de lo señalado en el artículo treinta y ocho de la Ley de Prenda sin Desplazamiento, la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda sin desplazamiento y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda sin desplazamiento la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO SÉPTIMA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para

realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de estas prendas y prohibiciones.

**CLÁUSULA DÉCIMO OCTAVA: PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**TERCERO: ANEXOS DEL CONTRATO DE PRENDA DE ACCIONES MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Prenda de Acciones.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda de Acciones AES Chile y el nuevo texto modificado y refundido que consta en el Contrato de Prenda de Acciones.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE PRENDA DE ACCIONES.** La modificación del Contrato de Prenda de Acciones AES Chile, que consta en el texto aprobado del Contrato de Prenda de Acciones que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en el Registro de Prenda sin Desplazamiento del Servicio de Registro Civil e Identificación y demás registros pertinentes, de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda de Acciones AES Chile.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda de Acciones AES Chile y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO**: **PARTE INTEGRAL E INTERPRETACIÓN**.

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-


_____
[•]
**C.I.N°** _____
**p.p. AES CHILE SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. AES ANDES S.A.**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

## **Exhibit CC**

**Amendment to Conditional Assignment of Rights and Contracts**

**REPERTORIO**


**MODIFICACIÓN Y TEXTO REFUNDIDO DE CESIÓN CONDICIONAL Y PROMESA**

**DE CESIÓN CONDICIONAL DE DERECHOS**

**ALTO MAIPO SpA**

**E**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**


**EN SANTIAGO DE CHILE, a** [•] de dos mil veintidós, ante mí, [•], abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el **"Deudor"**/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de ITAÚ CORPBANCA /antes, Corpbanca, y en adelante "Itaú Corpbanca"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **"Agente de Garantías Local"**/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las **"Partes"**; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el **"Contrato de Modificación"**/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las **"Centrales de Generación"** o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el **"Proyecto"**, el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central

Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Cesión Condicional de Derechos, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el **"Capítulo Once"**/.

**/Cuatro/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Cinco/ Reestructuración del Financiamiento Alto Maipo.** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en

2

Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Cesión Condicional de Derechos. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Seis/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Cesión Condicional de Derechos, las Partes acuerdan modificar el Contrato de Cesión Condicional de Derechos en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Cesión Condicional de Derechos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE CESIÓN CONDICIONAL DE DERECHOS.** Las Partes declaran que el texto del Contrato de Cesión Condicional de Derechos, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**CESIÓN CONDICIONAL DE DERECHOS ALTO MAIPO SpA E ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de cesión condicional de derechos /el "**Contrato de Cesión Condicional de Derechos**" o el "**Contrato**"/:

**ANTECEDENTES.**

<u>**CLÁUSULA PRIMERA:**</u> **/Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto

3

modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales.** Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de cesión condicional de derechos y promesa de cesión, es un texto modificado y refundido del contrato de cesión condicional de derechos y promesa de cesión celebrado mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y cinco guion dos mil trece /el "**Contrato de Cesión de Derechos Original**"/, el cual fue posteriormente modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos ocho  de dos mil diecisiete y posteriormente modificado y refundido mediante escritura pública, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel con fecha ocho de mayo de dos mil dieciocho, repertorio número tres mil novecientos ochenta y uno guion dos mil dieciocho /en adelante, el "**Contrato de Cesión Derechos**"/.

**CLÁUSULA  SEGUNDA:  PARTES  GARANTIZADAS  Y  OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA TERCERA: DOCUMENTOS DEL PROYECTO. [**El Deudor es parte o beneficiario de los siguientes contratos: **/i/** contrato denominado *Lump Sum, Turnkey, Engineering, Procurement and Construction Contract*, de fecha diez de agosto de dos mil doce, suscrito entre el Deudor, Voith Hydro Ltda., y Voith Hydro, S.A., según ha sido modificado con fechas doce de septiembre de dos mil trece, dos de diciembre de dos mil trece, cinco de diciembre de dos mil trece y siete de febrero de dos mil catorce; **/ii/** el EPC Strabag, según dicho término se define en el Contrato de Agencia de Garantías Local; **/iii/** contrato denominado *Co-Obligor Undertaking Agreement*, de fecha seis de noviembre de dos mil doce, suscrito entre HOCHTIEF Solutions AG, Cooperativa Muratori & Cementisti – C.M.C. di Ravenna y el Deudor; **/iv/** contrato denominado *Operation and Maintenance Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; **/v/** contrato denominado *Construction Management Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, según fue modificado con fecha nueve de diciembre de dos mil trece; **/vi/** contrato denominado *Facilities Construction Management and Lease Agreement*, de fecha nueve de diciembre de dos mil trece entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; **/vii/** contrato denominado *Shared Facilities Lease Agreement*, de fecha nueve de diciembre de dos mil trece, entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; **/viii/** contrato denominado *Technical Support and Services Agreement*, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./; **/ix/** contrato denominado Contrato de Conexión y Peajes, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, según fue modificado con fecha nueve de diciembre de dos mil trece, diecisiete de marzo de dos mil diecisiete, y ocho de mayo de dos mil dieciocho; **/x/** contrato denominado Contrato de Pagos por Pérdidas de Energía y Capacidad, de fecha primero de julio de dos mil trece, suscrito entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./ y modificado con fecha diecisiete de marzo de dos mil diecisiete y ocho de mayo de dos mil dieciocho; **/xi/** contrato denominado *Engineering, Supply, Construction, Assembly, Testing and Entry into Service of the Expansion to the Transmission System*, de fecha nueve de diciembre de dos mil trece, suscrito entre el Deudor, Isolux Ingeniería Agencia Chile y AES Gener S.A. /hoy AES Andes S.A./, y modificado con fechas treinta y uno de julio de dos mil catorce, treinta y uno de agosto de dos mil catorce, treinta de junio de dos mil quince, treinta de octubre de dos mil quince, quince de abril de dos mil dieciséis y veintinueve de noviembre de dos mil dieciséis; **/xii/** contrato denominado Contrato de Suministro de Electricidad, de fecha nueve de diciembre de dos mil trece, entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, y modificado con fecha ocho de mayo de dos mil dieciocho; y **/xiii/** contrato denominado Contrato de Suministro de Electricidad, de fecha veintiocho de junio de dos mil trece, suscrito entre el Deudor y Antofagasta Minerals S.A., modificado y cedido a Minera Los Pelambres con fecha veinte de junio de dos mil catorce; y modificado con fecha diecisiete de marzo de dos mil dieciséis][1].

En adelante todos los contratos anteriores, incluyendo sus renovaciones, ampliaciones y/o modificaciones que pudieren sufrir de tiempo en tiempo, se denominarán conjuntamente para efectos de este instrumento como los "**Documentos del Proyecto**" y cada una de las partes o emisores bajo los mismos, distinta al Deudor, una "**Contraparte**". En virtud de los Documentos del Proyecto, el Deudor es titular de créditos contra las Contrapartes /en adelante, los "**Créditos Cedidos**"/, consistentes fundamentalmente, y sin que la siguiente enunciación tenga

---

[1] Modificaciones a contratos a ser incorporadas en caso de existir hasta la fecha de firma. Project Documents adicionales a ser incorporados en caso de existir.

un carácter taxativo sino sólo enunciativo, en créditos por concepto de multas, indemnizaciones y cantidades pagaderas en virtud de boletas de garantía, de cartas de crédito /*letters of credit*, incluyendo pero no limitado a las cartas de crédito definidas como "*Performance Security*" y "*Completion Security*" en el EPC Strabag/, de pólizas de seguros, fianzas u otras cauciones /incluyendo pero no limitado a la denominada *Contractor Parent Guaranty* bajo el EPC Strabag/, otorgadas bajo los mismos.

**CLÁUSULA CUARTA: CESIÓN CONDICIONAL.** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, y sujeto al cumplimiento de las condiciones suspensivas indicadas en la cláusula quinta del presente instrumento, ha cedido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, o a las personas que éste designe, en los términos que se indican a continuación, su posición contractual en los Documentos del Proyecto, y todos los derechos y obligaciones que de ellos emanen.

**CLÁUSULA QUINTA: CONDICIONES SUSPENSIVAS.** El perfeccionamiento de la cesión de derechos y obligaciones de que da cuenta este instrumento queda sujeto al cumplimiento de las siguientes condiciones suspensivas copulativas: /*a*/ que la respectiva Contraparte reciba por medio de Notario Público el aviso escrito del Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, informándole /*i*/ de haberse verificado y mantenerse vigente un Evento de Incumplimiento /*Event of Default*, según este término se define en el Contrato de Términos Comunes, según dicho término se define a su vez en el Contrato de Agencia de Garantías Local/, y /*ii*/ de su voluntad de aceptar esta cesión y de asumir a su vez la totalidad de las obligaciones contraídas por el Deudor bajo los Documentos del Proyecto y que se devenguen a partir de la fecha en que se cumplan las condiciones suspensivas de que pende esta cesión condicional; y /*b*/ que el Deudor reciba una copia de la comunicación referida en la letra /*a*/ anterior. Sujeta a las condiciones establecidas en los literales /*a*/ y /*b*/ de esta cláusula quinta, la presente cesión producirá todos sus efectos desde la fecha de la notificación practicada conforme a lo establecido en el literal /*a*/ anterior. El cumplimiento de las condiciones suspensivas de las cuales pende la cesión condicional de que da cuenta el presente instrumento, podrá establecerse exclusivamente mediante la declaración por escrito, otorgada por escritura pública, que en tal sentido efectúe el Agente de Garantías Local. Las Partes declaran que la presente escritura se otorga en consideración a que las Partes Garantizadas han otorgado y/u otorgarán créditos o tendrán el carácter de acreedoras financieras bajo los Documentos del Financiamiento, respecto del Deudor, por lo cual el Deudor declara además que la suscripción del presente contrato se ha otorgado en su beneficio y que no tiene derecho a exigir compensación o indemnización alguna a las Partes Garantizadas por la cesión aquí contenida.

**CLÁUSULA SEXTA: ENTREGA DE TÍTULOS.** Para efectos de lo prescrito en el artículo mil novecientos uno del Código Civil, se deja constancia que en el acto del otorgamiento del Contrato de Cesión de Derechos Original, [el Deudor ha hecho entrega al Agente de Garantías Local, actuando en representación de las Partes Garantizadas], de los títulos en que constan los derechos cedidos y las obligaciones asumidas condicionalmente en virtud de este instrumento, constituidos por una copia autorizada de cada uno de los Documentos del Proyecto [salvo por las siguientes modificaciones, copias autorizadas de las cuales se entregan en este acto: [●]][2]

**CLÁUSULA SÉPTIMA: AUSENCIA DE GRAVÁMENES.** El Deudor se obliga a

---

[2] Ídem.

6

responder por el hecho de que los Documentos del Proyecto, cuyos derechos se han cedido condicionalmente al Agente de Garantías Local, en su beneficio y en beneficio de las Partes Garantizadas, y cuyas correspondientes obligaciones fueron asumidas condicionalmente por este último, se encuentran y, en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, se encontrarán en la fecha en que se haga efectiva la cesión, con excepción de /i/ las garantías o gravámenes que se constituyan a favor del Agente de Garantías Local en virtud de los Documentos del Financiamiento, y /ii/ las preferencias, gravámenes, prohibiciones, restricciones y derechos a favor de terceros impuestas por la ley, reglamento, autoridad gubernamental, o que sean consideradas como "**Gravámenes Permitidos**" /*Permitted Liens*, según dicho término se define en el **Contrato de Términos Comunes** /, libres de todo tipo de gravámenes, cargas, litigios, deudas, prohibiciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias, derechos preferentes en favor de terceros, opciones, promesas de venta, condicionales o a plazo, ni a ningún otro acto o contrato que tienda o tenga por objeto transferir el dominio de los Documentos del Proyecto o darlos en garantía de otras obligaciones, y que, sujeto a las mismas condiciones y excepciones antes indicadas, no existirá respecto de sus derechos bajo los Documentos del Proyecto ningún gravamen que pueda impedir, trabar, dilatar o menoscabar su libre disposición ni la efectividad de las cesiones condicionales que se han efectuado por este instrumento.

**CLÁUSULA OCTAVA: MANTENCIÓN DE PROPIEDAD.** Mientras se encuentre vigente este contrato y sigan pendientes las condiciones a las que se sujetan las cesiones condicionales efectuadas por este instrumento, el Deudor deberá pagar íntegra y oportunamente, en relación a sus obligaciones bajo cualquiera de los Documentos del Proyecto, cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por cualquier circunstancia relativa a los Documentos del Proyecto. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de sus derechos bajo los Documentos del Proyecto y para defenderlos de acciones de terceros.

**CLÁUSULA NOVENA: ACEPTACIÓN DE LAS CONTRAPARTES.** /A/ Se deja constancia que conforme a lo dispuesto en el artículo mil novecientos dos del Código Civil, en la modificación al Contrato de Cesión de Derechos suscrita por escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos ocho guion dos mil diecisiete /así modificado, AES Gener S.A. /ahora AES Andes S.A./, debidamente representada en la forma indicada en dicho instrumento: /i/ tomó conocimiento y aceptó, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones del presente instrumento, y autorizó y aceptó la presente cesión condicional de derechos del Deudor bajo los Documentos del Proyecto de que es parte, y la asunción por parte de las Partes Garantizadas de los deberes, responsabilidades y obligaciones del Deudor bajo el respectivo Documento del Proyecto Existente, en los términos y condiciones expuestos en el presente instrumento; /ii/ que, en consecuencia, una vez recibida la notificación de que da cuenta el literal /a/ de la Cláusula Quinta precedente, no aceptará ninguna instrucción por parte del Deudor en relación con los Documentos del Proyecto y sólo aceptará las instrucciones emitidas por el Agente de Garantías Local por sí y en representación de las Partes Garantizadas, según sea aplicable, y /iii/ otorgó expresamente su aceptación a cualquier extensión o modificación del presente contrato de cesión condicional de derechos y obligaciones que el Deudor y el Agente de Garantías Local puedan acordar de tiempo en tiempo, con el objeto de hacer extensivas las disposiciones del presente contrato a futuras modificaciones que

acuerden las Partes a los Documentos del Financiamiento y/o las Obligaciones Garantizadas, sin que sea necesario en cada oportunidad reiterar la autorización de que da cuenta esta cláusula; /B/ Sin perjuicio de las autorizaciones existentes referidas en el literal /A/ anterior, **AES Gener S.A. /hoy AES Andes S.A./**, debidamente representada por [•], [nacionalidad], [estado civil], [profesión u oficio], cédula de identidad número [•], domiciliado para estos efectos en [•], viene asimismo en ratificar por medio de este acto las aceptaciones y autorizaciones referidas en los numerales /i/, /ii/ y /iii/ de la letra /A/ anterior. /C/ **Strabag SpA**, debidamente representada por [•] y [•], todos domiciliados para estos efectos en [Avenida Los Militares cinco mil uno, oficina novecientos tres, comuna de Las Condes], viene asimismo en ratificar por medio de este acto que ha tomado conocimiento y aceptado la presente cesión condicional sobre derechos del Deudor bajo los Documentos del Proyecto respecto de los cuales es parte. /D/ Las Partes dejan constancia que cada una de las Contrapartes distintas a AES Gener S.A./hoy AES Andes S.A./, Strabag SpA, ha tomado conocimiento y aceptado la presente cesión condicional de derechos del Deudor bajo los Documentos del Proyecto respecto de los cuales son parte, en los siguientes documentos: [**a/** instrumento privado suscrito por Voith Hydro Ltda. y Voith Hydro S.A. con fecha diecisiete de marzo de dos mil diecisiete, en idioma inglés, denominado "Estoppel Certificate (EPC Contract)"; **b/** instrumento privado suscrito por Minera Los Pelambres, en idioma inglés, denominado "Estoppel Certificate (AMSA PPA)"; y **c/** instrumento privado suscrito por Hochtief Solutions AG con fecha cinco de mayo de dos mil diecisiete, en idioma inglés, denominado "Consent".

<u>**CLÁUSULA DÉCIMA: PROHIBICIÓN.**</u> Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la cesión condicional, la promesa de cesión condicional y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Documentos del Proyecto o sobre los derechos que para el Deudor emanen de tales contratos, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en los Contratos de Crédito y el Contrato de Términos Comunes, salvo que dicha enajenación, gravamen, acto o contrato se encuentre permitida conforme a los Documentos del Financiamiento. Asimismo, el Deudor se obliga a no alterar, modificar o transformar los Documentos del Proyecto, sin la previa autorización escrita del Agente de Garantías Local, salvo que dicha alteración, modificación o transformación se encuentre permitida conforme a los Documentos del Financiamiento.

<u>**CLÁUSULA UNDÉCIMA: PROMESA DE CESIÓN CONDICIONAL DE DERECHOS.**</u>
**/Uno/ Promesa.** Sin perjuicio de la cesión condicional y prohibiciones constituidas por el presente instrumento, y con el mismo fin de garantizar el total, íntegro y oportuno cumplimiento de todas y cada una de las Obligaciones Garantizadas, el Deudor, conforme al Contrato de Términos Comunes, promete ceder en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, en los términos que se indicarán en la cesión condicional prometida, la totalidad de los derechos que correspondan al Deudor en todos los contratos que éste celebre en el futuro, hasta la completa extinción de las Obligaciones Garantizadas, siempre que y mientras **/a/** sean calificados como Documentos del Proyecto /"*Project Documents*", según este término se define en el Contrato de Términos Comunes/, y **/b/** estén sujetos a la ley chilena, incluyendo, pero no limitado a el contrato suscrito con fecha

seis de junio de dos mil once entre Aguas Andinas S.A. y AES Gener S.A. /hoy AES Andes S.A./, una vez que el mismo (i) sea cedido a favor del Deudor y (ii) califique como Documento del Proyecto /*Project Document*/ bajo el Contrato de Términos Comunes, en adelante, conjunta e indistintamente, los "**Nuevos Documentos del Proyecto**", el Agente de Garantías Local, actuando por sí y por las Partes Garantizadas, o a las personas que éste designe, quien promete aceptar y asumir a su vez todas las obligaciones del Deudor bajo tales Nuevos Documentos del Proyecto. En las cesiones condicionales prometidas se establecerán como condiciones suspensivas copulativas para que dicha cesión se haga efectiva, las siguientes: /*a*/ que la contraparte respectiva bajo el Nuevo Documento del Proyecto correspondiente reciba por medio de Notario Público el aviso escrito del Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, informándole /*i*/ de haberse verificado y mantenerse vigente un Evento de Incumplimiento, y /*ii*/ de su voluntad de aceptar la respectiva cesión y de asumir a su vez la totalidad de las obligaciones contraídas por el Deudor bajo los Nuevos Documentos del Proyecto y que se devenguen a partir de la fecha en que se cumpla la condición suspensiva de que penda la cesión condicional prometida; y /*b*/ que el Deudor reciba una copia de la comunicación referida en la letra /*a*/ anterior. /**Dos**/ En las cesiones condicionales prometidas, el Deudor aceptará que el Agente de Garantías Local pueda asumir para sí su posición contractual bajo los Nuevos Documentos del Proyecto, o que pueda ceder sus derechos bajo los contratos cuya cesión se promete a uno o más terceros que cumplan con los requisitos, de existir, establecidos por las contrapartes del Deudor bajos los Nuevos Documentos del Proyecto al momento de aceptar dichas contrapartes la cesión prometida en virtud de este instrumento. De esa manera, cumplidas las condiciones suspensivas indicadas en la cláusula anterior, y cedidos los derechos del Agente de Garantías Local bajo el contrato prometido al o los terceros antes mencionados, cada tercero asumirá la posición contractual de Deudor bajo el respectivo Nuevo Documento del Proyecto, en los términos y condiciones de que dará cuenta el contrato prometido. /**Tres**/ El Deudor, en conformidad al artículo mil novecientos uno del Código Civil, entregará al Agente de Garantías Local al momento de celebrar las cesiones condicionales prometidas, el título en que consta cada uno de los Nuevos Documentos del Proyecto cuyos derechos sean cedidos condicionalmente por el Deudor al Agente de Garantías Local y cuyas obligaciones serán asumidas condicionalmente por este último, consistente en copia original o autorizada, según si los mismos contratos fueron otorgados por instrumento privado o escritura pública, de cada uno de los Nuevos Documentos del Proyecto. /**Cuatro**/ Las cesiones condicionales prometidas serán otorgadas por escritura pública en términos sustancialmente similares a los de la cesión condicional contenida en este instrumento, dentro de los quince días siguientes a la recepción de la comunicación establecida en el número /Seis/ siguiente. /**Cinco**/ Para efectos de asegurar el cumplimiento de la obligación señalada en el numeral /Cuatro/ anterior, por el presente acto, el Deudor confiere al Agente de Garantías Local un mandato especial gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y para el caso de que el Deudor no dé cumplimiento en tiempo y forma a las disposiciones establecidas en el numeral /Cuatro/ precedente, lo que no será necesario acreditar a terceros, suscriba la cesión condicional que por este acto se promete constituir. /**Seis**/ Para los efectos de los establecido en los numerales /Cuatro/ y /Cinco/ que preceden, el Deudor deberá comunicar por escrito al Agente de Garantías Local la celebración de cualquier Nuevo Documento del Proyecto, dentro del plazo de quince días contados desde la fecha en que se celebre cada uno de los mismos. Juntamente con la obligación de comunicación establecida precedentemente, el Deudor deberá, dentro del mismo plazo, entregar al Agente de Garantías Local, copia simple de cada

uno de los Nuevos Documentos del Proyecto.

**CLÁUSULA DUODÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la presente cesión condicional y promesa de cesión condicional de derechos y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMO TERCERA: IMPUESTOS Y SUCESORES.** El Deudor declara que este contrato de cesión condicional, promesa de cesión condicional y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta cesión condicional, promesa de cesión condicional y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**CLÁUSULA DÉCIMO CUARTA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir todas las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta cesión condicional, promesa de cesión condicional y prohibiciones.

**CLÁUSULA DÉCIMO QUINTA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Cesión Condicional y el nuevo texto modificado y refundido que consta en el Cesión Condicional.

**CUARTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e

inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Cesión Condicional.

**QUINTO**: **PODER ESPECIAL**. Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Cesión Condicional y prohibiciones de que da cuenta este instrumento, según corresponda.

**SEXTO**: **PARTE INTEGRAL E INTERPRETACIÓN**.

**/Uno/** **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/** **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. En comprobante y previa lectura firman los comparecientes con el Notario que autoriza.- **Doy fe.-**

11

**<u>Exhibit DD</u>**

**Amendment to Conditional Assignment of Framework**

**REPERTORIO N°**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE CESIÓN CONDICIONAL DE**

**DERECHOS**

**ALTO MAIPO SpA**

**E**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para

1

almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías Local /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Cesión Condicional sobre Derechos en** *Framework Agreement*. Mediante escritura pública otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel con fecha diecisiete de marzo de dos mil diecisiete, repertorio número dos mil doscientos diez guion dos mil diecisiete, Itaú Corpbanca como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de cesión condicional de derechos /el "**Contrato de Cesión de Derechos Original**"/. El Contrato de Cesión de Derechos Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos ochenta y dos guion dos mil dieciocho, y modificado mediante diversos instrumentos /en adelante, dicho contrato, modificado en la forma dicha, el "**Contrato de Cesión de Derechos Modificado**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Cesión de Derechos Modificado, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta cesión condicional sobre los derechos del Deudor en el "*Framework Agreement*" /definido más adelante/. Los detalles adicionales respecto de las

2

modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la cesión condicional de que da cuenta este instrumento, las Partes acuerdan modificar el Contrato de Cesión de Derechos Modificado en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Cesión Condicional de Derechos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE CESIÓN DE DERECHOS MODIFICADO.** Las Partes declaran que el texto del Contrato de Cesión de Derechos Modificado, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**CESIÓN CONDICIONAL DE DERECHOS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la **[•]** Notaría de Santiago, con oficio en **[•]**, Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato de cesión condicional de derechos /el "**Contrato de Cesión Condicional de Derechos**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

3

**/Dos/ Antecedentes Adicionales.** Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de cesión condicional de derechos, es un texto modificado y refundido del contrato de cesión condicional de derechos celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel con fecha diecisiete de marzo de dos mil diecisiete, repertorio número dos mil doscientos diez guion dos mil diecisiete, y posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos ochenta y dos guion dos mil dieciocho; y complementado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de cesión condicional de derechos, modificado y complementado en la forma antedicha, el "**Contrato de Cesión de Derechos Modificado**"/.

<u>**CLÁUSULA SEGUNDA:**</u> **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**/Dos/** Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

<u>**CLÁUSULA TERCERA:**</u> **DOCUMENTO DEL PROYECTO.** El Deudor es parte del contrato denominado *Framework Agreement between Alto Maipo SpA and AES Gener Foundation*, suscrito por instrumento privado de fecha diecisiete de marzo de dos mil diecisiete, entre el Deudor y Fundación AES Gener /hoy, Fundación AES Chile/ en adelante /la "**Contraparte**"/, en adelante, incluyendo todas las renovaciones, ampliaciones y/o modificaciones que pudiere sufrir, se denominará, para efectos de este instrumento como el "**Documento del Proyecto**".

<u>**CLÁUSULA CUARTA:**</u> **CESIÓN CONDICIONAL.** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, y sujeto al cumplimiento de las condiciones suspensivas indicadas en la cláusula quinta del presente instrumento, ha cedido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, o a las personas que éste designe, en los términos que se indican a continuación, su posición contractual en el Documento del Proyecto, y todos los derechos y obligaciones que de ella emanen.

<u>**CLÁUSULA QUINTA:**</u> **CONDICIONES SUSPENSIVAS.** El perfeccionamiento de la cesión de derechos y obligaciones de que da cuenta este instrumento queda sujeto al cumplimiento de las siguientes condiciones suspensivas copulativas: **/a/** que la respectiva Contraparte reciba por medio de Notario Público un aviso escrito del Agente

de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, informándole /i/ de haberse verificado y mantenerse vigente un Evento de Incumplimiento /*Event of Default*, según este término se define en el Contrato de Términos Comunes/, y /ii/ de su voluntad de aceptar esta cesión y de asumir a su vez la totalidad de las obligaciones contraídas por el Deudor bajo el Documento del Proyecto y que se devenguen a partir de la fecha en que se cumplan las condiciones suspensivas de que pende esta cesión condicional; y /b/ que el Deudor reciba una copia de la comunicación referida en la letra /a/ anterior. Sujeto a las condiciones establecidas en los literales /a/ y /b/ de esta cláusula quinta, la presente cesión producirá todos sus efectos desde la fecha de la notificación practicada conforme a lo establecido en el literal /a/ anterior. Las Partes declaran que la presente escritura se otorga en consideración a que las Partes Garantizadas han otorgado y otorgarán créditos o tendrán el carácter de acreedoras bajo los Documentos del Financiamiento respecto del Deudor, por lo cual el Deudor declara además que la suscripción del presente contrato se ha otorgado en su beneficio y que no tiene derecho a exigir compensación o indemnización alguna a las Partes Garantizadas por la cesión aquí contenida.

<u>**CLÁUSULA SEXTA**</u>: **ENTREGA DE TÍTULOS.** Para efectos de lo prescrito en el artículo mil novecientos uno del Código Civil, se deja constancia que en el acto del otorgamiento del Contrato de Cesión de Derechos Original, el Deudor hizo entrega al Agente de Garantías Local, actuando en representación de las Partes Garantizadas, de los títulos en que constan los derechos cedidos y obligaciones asumidas condicionalmente en virtud de este instrumento, constituidos por una copia original del Documento del Proyecto, habiéndose entregado a dicho agente además, copia de las respectivas modificaciones introducidas al Documento del Proyecto, declarando el Agente de Garantías Local haber recibido dichos títulos a su entera satisfacción.

<u>**CLÁUSULA SÉPTIMA**</u>: **AUSENCIA DE GRAVÁMENES.** El Deudor se obliga a responder por el hecho de que el Documento del Proyecto, cuyos derechos se han cedido condicionalmente al Agente de Garantías Local, en su beneficio y en beneficio de las Partes Garantizadas, y cuyas correspondientes obligaciones fueron asumidas condicionalmente por este último, se encuentran y, en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, se encontrarán en la fecha en que se haga efectiva la cesión, con excepción de /i/ las garantías o gravámenes que se constituyan a favor del Agente de Garantías Local en virtud de los Documentos del Financiamiento, y /ii/ las preferencias, gravámenes, prohibiciones, restricciones y derechos a favor de terceros impuestas por la ley, reglamento, autoridad gubernamental, o que sean consideradas como "**Gravámenes Permitidos**" /*Permitted Liens*, según dicho término se define en el Contrato de Términos Comunes /, libres de todo tipo de gravámenes, cargas, litigios, deudas, prohibiciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias, derechos preferentes en favor de terceros, opciones, promesas de venta, condicionales o a plazo, ni a ningún otro acto o contrato que tienda o tenga por objeto transferir el dominio del Documento del Proyecto o darlo en garantía de otras obligaciones, y que, sujeto a las mismas condiciones y excepciones antes indicadas, no existirá respecto de sus derechos bajo el Documento del Proyecto ningún gravamen que pueda impedir, trabar, dilatar o menoscabar su libre disposición ni la efectividad de las cesiones condicionales que se han efectuado por este instrumento.

<u>**CLÁUSULA OCTAVA**</u>: **MANTENCIÓN DE PROPIEDAD.** Mientras se encuentre vigente este contrato y sigan pendientes las condiciones a las que se sujetan las cesiones condicionales efectuadas por este instrumento, el Deudor deberá pagar íntegra y oportunamente, en relación a sus obligaciones bajo el Documento del Proyecto, cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por cualquier circunstancia relativa al Documento del Proyecto. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de sus derechos bajo el Documento del Proyecto y para defenderlos de acciones de terceros.

<u>**CLÁUSULA NOVENA**</u>: **ACEPTACIÓN DE LA CONTRAPARTE.** Se deja constancia que conforme a lo dispuesto en el artículo mil novecientos dos del Código Civil, en el

Contrato de Cesión de Derechos Original, la Contraparte, debidamente representada como se indica en el Contrato de Cesión de Derechos Original: /i/ tomó conocimiento y aceptó, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones que constan en el presente instrumento, y autorizó y aceptó la cesión condicional de derechos del Deudor bajo el Documento del Proyecto de que es parte y que aquí se evidencia, y la asunción por parte de las Partes Garantizadas de los deberes, responsabilidades y obligaciones del Deudor bajo el Documento del Proyecto, en los términos y condiciones expuestos en el presente instrumento /ii/ que, en consecuencia, una vez recibida la notificación de que su cuenta el literal /a/ de la Cláusula Quinta precedente, no aceptará ninguna instrucción por parte del Deudor en relación con el Documento del Proyecto y sólo aceptará las instrucciones emitidas por el Agente de Garantías Local por sí y en representación de las Partes Garantizadas, según sea aplicable y /iii/ otorgó expresamente su aceptación a cualquier modificación del mismo que el Deudor y el Agente de Garantías Local puedan acordar de tiempo en tiempo en el futuro, con el objeto de hacer extensivas las disposiciones del presente contrato a futuras modificaciones que acuerden las Partes a los Documentos del Financiamiento y/o las Obligaciones Garantizadas, sin que sea necesario en cada oportunidad reiterar la autorización de que da cuenta esta cláusula.

**CLÁUSULA DÉCIMA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la cesión condicional y las Obligaciones Garantizadas que dan cuenta del presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre el Documento del Proyecto o sobre los derechos que para el Deudor emanen de tal contrato, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en los Contratos de Crédito y el Contrato de Términos Comunes, salvo que dicha enajenación, gravamen, acto o contrato se encuentre permitida conforme a los Documentos del Financiamiento. Asimismo, el Deudor se obliga a no alterar, modificar o transformar el Documento del Proyecto, sin la previa autorización escrita del Agente de Garantías Local, salvo que dicha alteración, modificación o transformación se encuentre permitida conforme a los Documentos del Financiamiento.

**CLÁUSULA UNDÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la presente cesión condicional de derechos y obligaciones.

**CLÁUSULA DÉCIMO SEGUNDA: IMPUESTOS Y SUCESORES.** El Deudor declara que este contrato de cesión condicional y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta cesión condicional y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**CLÁUSULA DÉCIMO TERCERA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta cesión condicional.

**CLÁUSULA DÉCIMO CUARTA**: PARTE INTEGRAL E INTERPRETACIÓN.

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Cesión de Derechos Modificado y el nuevo texto modificado y refundido que consta en el Contrato de Cesión de Derechos Modificado y Refundido.

**QUINTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Cesión de Derechos Modificado.

**SEXTO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Cesión de Derechos Modificado y prohibiciones de que da cuenta este instrumento, según corresponda.

**SÉPTIMO: PARTE INTEGRAL E INTERPRETACIÓN. /Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

[•]
**C.I.N° _____**

**p.p. ALTO MAIPO SpA**

_____

[•]
**C.I.N° _____**

**p.p. ITAÚ CORPBANCA**

_____

[•]
**C.I.N° _____**

**p.p. ITAÚ CORPBANCA**

**Exhibit FF**

**Amendment to Insurance Designation**

29299009.2

REPERTORIO N°

OT

MODIFICACIÓN Y TEXTO REFUNDIDO DE

DESIGNACIÓN DE BENEFICIARIO Y ASEGURADOS ADICIONALES

DE PÓLIZAS DE SEGURO

ALTO MAIPO SpA

A

ITAÚ CORPBANCA, NEW YORK BRANCH, EN SU CALIDAD DE AGENTE DE

GARANTÍAS EXTRANJERO

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, [•], abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA NEW YORK BRANCH**, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, todos domiciliados para estos efectos en Rosario Norte número seiscientos sesenta, Las Condes, Santiago, actuando en su calidad de agente de garantías extranjero, /en adelante el "**Agente de Garantías Extranjero**" o "**Itaú NY**"/, comparece por sí y en representación en su calidad de Agente de Garantías Extranjero, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Garantías Extranjero, sin perjuicio del domicilio indicado para cada una de ellas: **/a/ CERBERUS GLOBAL NPL FUND**, [•], con domicilio en [•] /en adelante "**Cerberus Global**"/; **/b/ CERBERUS FSBA Corporate,** [•], con domicilio en [•] /en adelante "**Cerberus FSBA**"/; **/c/** [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; **/d/** [**FIDERA**] /en adelante "**Fidera**"/ **/e/** [**FINEPOINT**] /en adelante "**Finepoint**"/; **/f/ KfW IPEX-BANK GMBH**, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraβe cinco guion nueve, seis cero tres dos cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; **/g/** [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; **/h/** [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; **/i/** [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; **/j/** [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; **/k/** [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; **/l/** [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; **/m/** [**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; **/n/** [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; **/o/** [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; **/p/** [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; **/q/** [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF V**"/; **/r/** [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; **/s/** [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; **/t/ U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W.,

1

Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /u/ **ITAÚ CORPBANCA** /antes, Corpbanca/, una entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile rol único tributario número noventa y siete millones veintitrés mil guion nueve /en adelante "**Agente de Garantías Local**" o "**Agente Administrativo**"/; y /v/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /**Tres**/ [•] y [•], ambos domiciliados para estos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES,** un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con las partes comparecientes anteriores distintas a Alto Maipo SpA, y aquellas partes que en el futuro se adhieran al Contrato de Agencia de Garantías Local /según se define más adelante/ como acreedores, las "**Partes Garantizadas**"/; todos los anteriores en adelante también conjuntamente denominados como los "**Partes**". Los comparecientes mayores de edad, quienes acreditan sus identidades con las cédulas indicadas y exponen:

**PRIMERO:** **ANTECEDENTES.** Contrato de Designación de Beneficiario y Asegurados Adicionales Original

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil once a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal

Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado, que a su vez se define más adelante /en adelante el **"Financiamiento Alto Maipo"**/.

**/Tres/ Contrato de Designación de Beneficiario y Asegurados Adicionales Original.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y seis guion dos mil trece, Deutsche Bank Trust Company Americas, como agente de garantías extranjero, y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como deudor, celebraron un contrato de designación de beneficiario y asegurados adicionales de pólizas de seguros /el **"Contrato de Designación de Beneficiario y Asegurados Adicionales Original"**/. El Contrato de Designación de Beneficiario y Asegurados Adicionales Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos ochenta y siete guion dos mil dieciocho, y complementado mediante diversos instrumentos /en adelante, dicho contrato, complementado en la forma dicha, el **"Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado"**/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el **"Capítulo Once"**/.

**/Cinco/ Contrato de Agencia de Garantías Extranjero.** Con fecha ocho de mayo de dos mil dieciocho, el Agente Administrativo /i/ removió a Deutsche Bank Trust Company Americas como agente de garantías extranjero /*offshore collateral agent*/ y banco de cuentas extranjero /*offshore accounts bank*/ bajo el denominado Contrato de Cuentas y de Agencia de Garantías Extranjero Modificado y Refundido /*Amended and Restated Offshore Accounts and Collateral Agency Agreement*/ celebrado por instrumento privado de fecha diecisiete de marzo de dos mil diecisiete, en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, Deutsche Bank Trust Company Americas y el Agente Administrativo y /ii/ designó a Itaú NY como agente de garantías extranjero /*offshore collateral agent*/ y banco de cuentas extranjero /*offshore accounts bank*/ bajo el referido contrato y bajo el Segundo Contrato de Cuentas y de Agencia de Garantías Extranjero Modificado y Refundido /*Second Amended and Restated Offshore Accounts and Collateral Agency Agreement*/ celebrado por instrumento privado de fecha ocho de mayo de dos mil dieciocho, en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, Itaú NY y el Agente Administrativo.

**/Seis/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se

3

suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Siete/ Reestructuración del Financiamiento Alto Maipo.** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con cesiones condicionales sobre los derechos del Deudor en el "*Framework Agreement*" /definido más adelante/. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Ocho/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, las Partes acuerdan modificar el Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado y Refundido**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE DESIGNACIÓN DE BENEFICIARIO Y ASEGURADOS ADICIONALES MODIFICADO.** Las Partes declaran que el texto del Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, [•], abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y

**/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA NEW YORK BRANCH**, una sucursal en Nueva York, Nueva York, Estados Unidos de América, de Itaú Corpbanca, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, todos domiciliados para estos efectos en Rosario Norte número seiscientos sesenta, Las Condes, Santiago, actuando en su calidad de agente de garantías extranjero, /en adelante el "**Agente de Garantías Extranjero**" o "**Itaú NY**"/, comparece por sí y en representación en su calidad

4

de Agente de Garantías Extranjero, de las siguientes entidades, las cuales para efectos de esta escritura se entienden tener el mismo domicilio que el Agente de Garantías Extranjero, sin perjuicio del domicilio indicado para cada una de ellas: /a/ **CERBERUS GLOBAL NPL FUND,** [•], con domicilio en [•] /en adelante "**Cerberus Global**"/; /b/ **CERBERUS FSBA Corporate,** [•], con domicilio en [•] /en adelante "**Cerberus FSBA**"/; /c/ [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; /d/ [**FIDERA**] /en adelante "**Fidera**"/ /e/ [**FINEPOINT**] /en adelante "**Finepoint**"/; /f/ **KfW IPEX-BANK GMBH,** un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraβe cinco guion nueve, seis cero tres cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; /g/ [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; /h/ [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; /i/ [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; /j/ [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; /k/ [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; /l/ [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; /m/ [**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; /n/ [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; /o/ [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; /p/ [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; /q/ [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF V**"/; /r/ [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; /s/ [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; /t/ **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,** sucesor en interés de OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /u/ **ITAÚ CORPBANCA** /antes, Corpbanca/, una entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile rol único tributario número noventa y siete millones veintitrés mil guion nueve /en adelante "**Agente de Garantías Local**" o "**Agente Administrativo**"/; y /v/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /**Tres**/ [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES,** un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA S.A.,** una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA,** una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**" y conjuntamente con los Acreedores Preferentes, el Banco Emisor de Cartas de

5

Crédito, los Agentes, el Banco de Cuentas Extranjero, el Banco de Cuentas Chilenas y las Contrapartes de los Contratos de Cobertura, las "**Partes Garantizadas**" y las Partes Garantizadas conjuntamente con las demás partes comparecientes a este instrumento, las "**Partes**"/; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato de designación adicional y asegurados adicionales de pólizas de seguro /el "**Contrato de Designación de Beneficiario y Asegurados Adicionales**"/:

<u>**CLÁUSULA PRIMERA: ANTECEDENTES.**</u> **/Uno/ Contrato de Agencia de Garantías Extranjero.** Con fecha ocho de mayo de dos mil dieciocho, el Agente Administrativo /i/ removió a Deutsche Bank Trust Company Americas como agente de garantías extranjero /*offshore collateral agent*/ y banco de cuentas extranjero /*offshore accounts bank*/ bajo el denominado Contrato de Cuentas y de Agencia de Garantías Extranjero Modificado y Refundido /*Amended and Restated Offshore Accounts and Collateral Agency Agreement*/ celebrado por instrumento privado de fecha diecisiete de marzo de dos mil diecisiete, en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, Deutsche Bank Trust Company Americas y el Agente Administrativo y /ii/ designó a Itaú NY como agente de garantías extranjero /*offshore collateral agent*/ y banco de cuentas extranjero /*offshore accounts bank*/ bajo el referido contrato y bajo el Segundo Contrato de Cuentas y de Agencia de Garantías Extranjero Modificado y Refundido /*Second Amended and Restated Offshore Accounts and Collateral Agency Agreement*/ celebrado por instrumento privado de fecha ocho de mayo de dos mil dieciocho, en el extranjero y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, entre el Deudor, Itaú NY y el Agente Administrativo /en adelante el "**Agente de Garantías Extranjero**"/.

**/Dos/** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**".

[**/Tres/**[1] En relación con el Capítulo Once y en virtud de varios instrumentos de esta misma fecha, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los contratos, pagarés y reconocimientos de deuda en que constan las obligaciones garantizadas por las Garantías /según se define más adelante/, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas por las Garantías. Entre otras materias objeto de esta reestructuración, se acordó:

**/i/** Modificar el Contrato de Crédito IDB Modificado y Refundido, el Contrato de Crédito OPIC Modificado y Refundido, el Contrato de Crédito Dos Mil Dieciocho, y el Contrato de Bancos Comerciales Modificado y Refundido, para efectos de que los términos y condiciones de los préstamos adeudados por el Deudor bajo dichos contratos de crédito sean regulados en un contrato de emisión de bonos /*indenture*/, en idioma inglés y regido por las leyes del Estado de Nueva York y en un contrato denominado *Secured TwoL Loan Agreement and Accounts Payable* suscrito por el Deudor en idioma inglés y regido por las leyes del Estado de Nueva York /; así como también otorgar el derecho a los acreedores del Secured TwoL Agreement para que todo o parte de sus créditos bajo dicho contrato puedan ser reestructurados en, o canjeados por, un bono emitido por el Deudor en los Estados Unidos de América; todo según lo establecido en los siguientes instrumentos:

**/a/** un contrato en idioma inglés suscrito con esta misma fecha entre el Deudor, DFC y Strabag, entre otros, y regido por las leyes del Estado de Nueva York y denominado *Secured TwoL Loan Agreement and Accounts Payable* /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Agreement**"/; y

---

[1] Sujeto a revisión, al igual que en agencia de garantías.

/b/ un contrato de emisión de bonos /*indenture*/ suscrito con esta misma fecha entre el Deudor y Wilmington Trust, National Association, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured OneL Indenture**"/.

/ii/ Modificar el Contrato de Términos Comunes Modificado y Refundido y establecer un nuevo texto modificado y refundido del mismo /en adelante dicho texto modificado y refundido, y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Términos Comunes**"/.

/iii/ Reflejar la reprogramación de parte de los préstamos adeudados bajo los diversos Documentos del Financiamiento, como parte del Secured TwoL Agreement bajo la denominación de "*Secured TwoL Loans*" /en adelante el "**Tramo Subordinado**".

/iv/ Reflejar la reprogramación o canje de los préstamos adeudados bajo los diversos Documentos del Financiamiento, según la asignación efectuada por cada acreedor, en bonos emitidos por el Deudor con cargo al Secured OneL Indenture y denominados "*Secured OneL Notes*" /en adelante los "**Bonos Preferentes**"/.

/v/ Reflejar la reprogramación o canje de parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, según la asignación efectuada por Strabag, en Bonos Preferentes.

/vi/ Considerar parte de la cantidad adeudada por el Deudor a Strabag bajo el Contrato de Pago Diferido del Proveedor /según dicho término se define más adelante/, como parte del Tramo Subordinado, de manera que los términos y condiciones de pago de dicha cuenta por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de Strabag en Bonos Subordinados /según dicho término se define más adelante/.

/vii/ Diferir el pago de los siguientes montos que sean adeudados a Strabag /*Strabag Construction Deferral* según dicho término se define en el Contrato de Términos Comunes/ de conformidad con el EPC Strabag /según se define más adelante/: /**uno**/ pago de un millón ciento cuarenta y un mil noventa y siete Dólares como consecuencia de las órdenes de cambio número uno, dos y cuatro bajo el EPC Strabag, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /*Strabag Change Order Deferral* según dicho término se define en el Contrato de Términos Comunes/; /**dos**/ pago de diez millones de Dólares por haber alcanzado la Terminación Sustancial del Hito F /*Substantial Completion of Milestone F* según dichos términos se definen en el EPC Strabag/, pago que se aplazará hasta que se pague el barrido de exceso de flujo de caja /*excess cash flow sweep*/ de acuerdo a las condiciones del Contrato de Términos Comunes ; y /**tres**/ pagos por los montos que sean efectivamente recibidos por el Deudor bajo su póliza de seguros de todo riesgo construcción /*Construction All Risks*/ contratada con Seguros Generales Suramericana S.A. y Chilena Consolidada S.A. en virtud de los reclamos uno uno ocho cuatro nueve cinco cero tres dos, uno uno nueve cuatro ocho ocho ocho seis, uno nueve cuatro cuatro ocho cero uno cuatro y uno uno nueve cuatro cuatro ocho cero cero dos uno, pago que se aplazará hasta el treinta y uno de diciembre de dos mil veintidós /conjuntamente, los "**Pagos Diferidos Strabag**"/.

/viii/ Considerar como parte del Tramo Subordinado, parte de las deudas del Deudor con cada uno de Itaú Corpbanca, BCI, DNB y KfW /conjuntamente las "**Contrapartes de Derivados**"/ producto de la terminación de los Contratos Requeridos de Derivados efectuada con fecha veintitrés de noviembre de dos mil veintiuno, de manera que los términos y condiciones de pago de dichas cuentas por cobrar sean los establecidos para el Tramo Subordinado, incluyendo con respecto a la posibilidad de canjear todo o parte del Tramo Subordinado de las Contrapartes de Derivados en Bonos Subordinados /según dicho término se define más adelante/.

/ix/ Contemplar la opción para los demás acreedores bajo el Tramo Subordinado, de canjear todo o parte de los créditos adeudados bajo el Tramo Subordinado, en bonos emitidos por el Deudor /denominados "*Secured TwoL Notes*", en adelante los "**Bonos**

**Subordinados**" y conjuntamente con los Bonos Preferentes los "**Bonos**" y cada uno de ellos un "**Bono**"/ con cargo a un contrato de emisión de bonos /*indenture*/ a ser suscrito entre el Deudor y Wilmington Trust, National Association, en marzo de dos mil veintitrés, en idioma inglés y regido por las leyes del Estado de Nueva York /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Secured TwoL Indenture**"/.

/**x**/ Que los VAT Lenders /según dicho término se define en el Contrato de Términos Comunes/ otorguen al Deudor una línea de crédito a corto plazo dividido en dos tramos, por un monto de hasta [•] Unidades de Fomento y por un monto de hasta [•] Dólares, para el financiamiento o refinanciamiento del impuesto al valor agregado asociado al "*Supplier Deferred Payment*" /según dicho termino se define en el Contrato de Términos Comunes/ que genere para el Deudor créditos fiscales respecto de los cuáles pueda solicitar su devolución de conformidad a lo dispuesto en el Artículo veintisiete bis del decreto ley ochocientos veinticinco sobre impuestos a las ventas y servicios /en adelante y según sea modificado o modificado y refundido en el futuro, el "**Contrato de Crédito IVA**"/.

/**xi**/ Que AES Andes otorgue al Deudor una línea de crédito de capital de trabajo de hasta quince millones de Dólares con vencimiento el quince de enero de dos mil veinticuatro, a ser documentada en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Working Capital Facility,* en adelante y según sea modificado o modificado y refundido en el futuro, el "**Crédito de Capital de Trabajo**"/.

/**xii**/ Que AES Andes, Alto Maipo Delaware, LLC y el Deudor modifiquen, mediante una novación por cambio de deudor, los términos y condiciones del crédito súper-preferente otorgado por AES Andes a Alto Maipo Delaware, LLC durante el Capítulo Once por un capital de hasta cincuenta millones de Dólares /*DIP Financing Facility*/, de manera tal que el Deudor asuma la calidad de deudor bajo dicho financiamiento, conjuntamente con determinadas cuentas por cobrar que AES Andes irá devengando en contra del Deudor conforme a determinados contratos celebrados con el Deudor con fecha primero de julio de dos mil trece /específicamente, un Contrato de Operación y Mantenimiento /*O&M Agreement*/, un Contrato de Instalaciones Compartidas /*Technical Support and Services Agreement*/ y un Contrato de Conexión y Peajes /*Connection and Toll Agreement*//, se paguen por el Deudor de acuerdo con los términos y condiciones establecidos en un instrumento privado en idioma inglés y regido por las leyes del Estado de Nueva York, Estados Unidos de América /*Secured Exit Loans*, en adelante y según sea modificado o modificado y refundido en el futuro, el "**Financiamiento de Salida**"/.

/**xiii**/ El eventual pago de los créditos del Tramo Subordinado que no se hayan extinguido a más tardar el quince de octubre del año dos mil cincuenta y dos, con acciones del Deudor, conforme a lo establecido en el Secured TwoL Agreement, en el Contrato de Conversión /según dicho término se define más adelante/ y según se establezca en el Secured TwoL Indenture, en caso de ser otorgado.

/**xiv**/ modificar y otorgar las Garantías, según corresponda, de manera tal que las obligaciones del Deudor bajo los Bonos Preferentes, el Tramo Subordinado, los Bonos Subordinados /una vez emitidos/, el Contrato de Crédito IVA, el Crédito de Capital de Trabajo y el Financiamiento de Salida, así como las obligaciones de AES Andes, entre otros a favor de los acreedores del Tramo Dos bajo el Contrato de Conversión, sean garantizadas por las Garantías en el mismo grado o prioridad actualmente existente, exceptuando aquellas Garantías que sean otorgadas exclusivamente en favor de los Acreedores de IVA y de los Acreedores bajo el Tramo Subordinado, y sin perjuicio de que el Agente de Garantías Local, para su ejecución y para distribuir los fondos derivados de esa ejecución, deberá observar las reglas establecidas en el Contrato entre Acreedores a que se refiere el Contrato de Agencia de Garantías Local contenido en este instrumento, en que se establecen las siguientes prioridades de pago entre las distintas clases de acreedores del Deudor y cuyos créditos se encuentran garantizados por las Garantías: /**a**/ primera prioridad para las obligaciones del Deudor bajo el Crédito de Capital de Trabajo y el Financiamiento de Salida, a prorrata y hasta su total satisfacción; /**b**/ segunda prioridad para las obligaciones del Deudor bajo los Bonos Preferentes, los Pagos Diferidos Strabag-

y los Préstamos IVA, a prorrata y hasta su total satisfacción; y /c/ tercera prioridad para las obligaciones del Deudor bajo el Tramo Subordinado, los Bonos Subordinados y bajo el Contrato de Conversión, a prorrata y hasta su total satisfacción.

/xv/ Modificar los pagarés y reconocimientos de deuda suscritos por el Deudor, o que el Deudor suscriba nuevos pagarés o reconocimientos de deuda bajo ley chilena, para reflejar los términos y condiciones que les correspondan según el Secured TwoL Agreement.

/xvi/ La suscripción por parte del Deudor de reconocimientos de deuda bajo ley chilena a favor del representante de los tenedores de Bonos, para efectos de reflejar el monto total adeudado por el Deudor al momento de la emisión de los Bonos respectivos.][2]

**/Cuatro/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes.

**/Quinto/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de designación adicional y asegurados adicionales de pólizas de seguro, es un texto modificado y refundido del contrato de designación adicional y asegurados adicionales de pólizas de seguro celebrado mediante escritura pública, otorgada en la Notaría de Santiago José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y seis guion dos mil trece, y posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos ochenta y siete guion dos mil dieciocho /en adelante, dicho contrato de designación adicional y asegurados adicionales de pólizas de seguro, modificado y complementado en la forma antedicha, el "**Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado**"/.

[**CLÁUSULA SEGUNDA**: **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /Uno/ Para todos los efectos de este Contrato, serán "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", las siguientes: /a/ **CERBERUS GLOBAL NPL FUND**, [•], con domicilio en [•] /en adelante "**Cerberus Global**"/; /b/ **CERBERUS FSBA Corporate,** [•], con domicilio en [•] /en adelante "**Cerberus FSBA**"/; /c/ [**DEUTSCHE BANK**], [•], con domicilio en [•] /en adelante "**Deutsche Bank**"/; /d/ [**FIDERA**] /en adelante "**Fidera**"/ /e/ [**FINEPOINT**] /en adelante "**Finepoint**"/; /f/ **KfW IPEX-BANK GMBH**, un banco organizado y existente conforme a las leyes de Alemania, con oficinas principales en Palmengartenstraße cinco guion nueve, seis cero tres cinco, Frankfurt am Main, Alemania /en adelante "**KfW**"/; /g/ [**CLOVER**], [•], con domicilio en [•] /en adelante "**Clover**"/; /h/ [**CLOVER LEVERED**], [•], domiciliado en [•] /en adelante "**Clover Levered**"/; /i/ [**NINETEEN77**], [•], domiciliado en [•] /en adelante "**Nineteen**"/; /j/ [**CVI AA CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AA**"/; /k/ [**CVI AV CAYMAN SECURITIES LP**], [•], domiciliado en [•] /en adelante "**Carval AV**"/; /l/ [**CARVAL CCF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CCF**"/; /m/ [**CVI CVF IV CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF**"/; /n/ [**CVIC CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval VIC**"/; /o/ [**CVI EMCOF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval EMCOF**"/; /p/ [**CARVAL CGF CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CGF**"/; /q/ [**CVI CVF V CAYMAN SECURITIES LTD**], [•], domiciliado en [•] /en adelante "**Carval CVF V**"/; /r/ [**KING STREET CAPITAL MANAGEMENT, L.P.**], [•], domiciliado en [•] /en adelante "**King Street**"/; /s/ [**SC III-FLEX MASTER LUX S.A.R.L.**], [•], domiciliado en [•] /en adelante "**SC III**"/; /t/ **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION**, sucesor en interés de

---

[2] Cláusula será actualizada conforme a versión final de la agencia de garantías.

OVERSEAS PRIVATE INVESTMENT CORPORATION, una agencia de los Estados Unidos de América, con oficinas principales en New York Avenue número mil cien, N.W., Washington, D.C., dos cero cinco dos siete, Estados Unidos de América /en adelante, "**DFC**"/; /u/ **ITAÚ CORPBANCA** /antes, Corpbanca/, una entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile rol único tributario número noventa y siete millones veintitrés mil guion nueve /en adelante "**Agente de Garantías Local**" o "**Agente Administrativo**"/; y /v/ **DNB BANK ASA**, un banco organizado y existente conforme a las leyes de Noruega, con oficinas principales en Dronning Eufemias gate número treinta, cero uno nueve uno, Oslo, Noruega /en adelante "**DNB**"/; /Tres/ [•] y [•], ambos domiciliados para esos efectos en El Golf ciento veinticinco, Las Condes, en representación, según se acreditará, de **BANCO DE CRÉDITO E INVERSIONES**, un banco organizado y existente conforme a las leyes de la República de Chile, rol único tributario número noventa y siete millones seis mil guion seis, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**BCI**"/; /**Cuatro**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **SANTANA S.A.**, una sociedad anónima abierta, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa millones ochocientos cincuenta y seis mil guion cero, y para estos efectos, del mismo domicilio de sus representantes /en adelante "**Santana**"/; /**Cinco**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA DEUDA LAT**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Deuda**"/; /**Seis**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de [**MONEDA ALTURAS II**], una [•], debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**Moneda Alturas**"/; /**Siete**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•], y para estos efectos del mismo domicilio de su representante /en adelante "**Strabag**"/; y /**Ocho**/ [•], domiciliado para estos efectos en [•], en representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número [•] /en adelante "**AES Andes**".

/**Dos**/. Para todos los efectos de este contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", todas y cada una de las obligaciones que tenga en cualquier tiempo el Deudor, sean presentes o futuras, civiles o naturales, puras y simples o sujetas a modalidad, con las respectivas Partes Garantizadas o aquellas entidades que tengan o adquieran la calidad de Partes Garantizadas de conformidad a lo establecido en los Documentos del Financiamiento /según dicho término se define más adelante/, bajo cualquiera del Secured TwoL Agreement, los Indentures, el Contrato de Crédito IVA, los Pagos Diferidos Strabag, el Crédito de Capital de Trabajo, el Financiamiento de Salida, los Préstamos, los Bonos, el Contrato de Términos Comunes, los Pagarés y Reconocimientos, el Contrato de Conversión o alguno de los otros Documentos del Financiamiento /"*Financing Documents*", según dicho término se define en el Contrato de Términos Comunes, en adelante los "**Documentos del Financiamiento**"/. Las Obligaciones Garantizadas incluyen las obligaciones de pagar el capital y los intereses de todo tipo devengados con motivo de los actos y contratos antes indicados, así como las comisiones y demás montos adeudados bajo los mismos o cualquier instrumento que los reemplace o complemente. Las Obligaciones Garantizadas incluyen cualquier prórroga, renovación y/o modificación de que puedan ser objeto las obligaciones del Deudor contenidas a esta fecha en los contratos antes señalados, así como cualquier obligación derivada de las Obligaciones Garantizadas. Las Obligaciones Garantizadas también incluyen cualquier pago directo o reembolso a las Partes Garantizadas que de acuerdo a los documentos antes señalados sean de cargo del Deudor con motivo de impuestos, tributos, contribuciones, derechos,

cargas, retenciones, honorarios, remuneraciones, cargos financieros, indemnizaciones de perjuicios, aumentos de costos y desembolsos relacionados a los mismos][3]

<u>**CLÁUSULA TERCERA**</u>: **PÓLIZAS DE SEGURO.** **/Uno/** El Deudor declara que ha contratado una serie de pólizas de seguros con compañías de seguros constituidas en Chile que se detallan en el **Anexo Uno** de esta escritura, el cual se protocoliza en esta Notaría con esta misma fecha y bajo este mismo número de repertorio. Tales pólizas de seguros, según sean modificadas o complementadas de tiempo en tiempo, serán conjuntamente denominadas en adelante como las "**Pólizas de Seguros**". **/Dos/** Se deja constancia de que, aquellas Pólizas de Seguro, se encuentran actualmente todas endosadas a favor de Itaú NY, en su calidad de Agente de Garantías Extranjero, actuando por sí y en representación de las Partes Garantizadas, como beneficiario exclusivo de las Pólizas de Seguro, designando a las Partes Garantizadas /según dicho término se define en la cláusula segunda precedente/ como aseguradas adicionales y sus disposiciones se encuentran actualizadas acorde a lo establecido en el [Anexo C del Contrato de Términos Comunes Modificado y Refundido]. **/Tres/** Todas las renovaciones o pólizas que reemplacen a las Pólizas de Seguros, según sean modificadas o complementadas de tiempo en tiempo, se denominarán en adelante las "**Nuevas Pólizas de Seguros**". Las Nuevas Pólizas de Seguros deberán contener las estipulaciones establecidas en el [Anexo C del Contrato de Términos Comunes Modificado y Refundido], según corresponda, y en especial, pero sin limitación alguna, la designación del Agente de Garantías Extranjero, actuando por sí y en representación de las Partes Garantizadas, como único beneficiario de las Nuevas Pólizas de Seguros, y de todas las Partes Garantizadas como aseguradas adicionales bajo las mismas.

<u>**CLÁUSULA CUARTA**</u>: **DESIGNACIÓN DE BENEFICIARIO Y ASEGURADOS ADICIONALES.** Por el presente instrumento, el Deudor se obliga a designar al Agente de Garantías Extranjero, actuando por sí y en representación de las Partes Garantizadas, como único beneficiario de las Nuevas Pólizas de Seguros, y a todas las Partes Garantizadas como aseguradas adicionales de las mismas. En virtud de dicha designación, el Agente de Garantías Extranjero, actuando por sí y en representación de las Partes Garantizadas, tendrá derecho a percibir, cuando corresponda, el pago de cualquier indemnización que sea consecuencia de un siniestro sobre los riesgos asegurados en virtud de dichas Nuevas Pólizas de Seguros.

<u>**CLÁUSULA QUINTA**</u>: **ACEPTACIÓN DE AGENTE DE GARANTÍAS EXTRANJERO.** **/Uno/** El Agente de Garantías Extranjero, por sí y en nombre y representación de las Partes Garantizadas, acepta desde ya la designación de beneficiario y asegurados adicionales de las Pólizas de Seguros que se haga, según corresponda, a su entera satisfacción. El Deudor estará obligado a entregar una copia de las Nuevas Pólizas de Seguros al Agente de Garantías Extranjero. **/Dos/** Asimismo, en virtud de lo establecido en el artículo mil cuatrocientos cuarenta y nueve del Código Civil, el Agente de Garantías Extranjero, por sí y en nombre y representación de las Partes Garantizadas, acepta expresamente todas y cada una de las estipulaciones hechas a su favor y a favor de las Partes Garantizadas en las Pólizas de Seguros, y en especial, pero sin que implique limitación alguna, su designación, en representación de las Partes Garantizadas, como único beneficiario de las Pólizas de Seguros, y la designación de todas las Partes Garantizadas como aseguradas adicionales bajo las mismas, y la necesidad de contar con su consentimiento para efectos de realizar cualquier modificación a las Pólizas de Seguros.

<u>**CLÁUSULA SEXTA**</u>: **IRREVOCABILIDAD.** Salvo en cuanto ello estuviere permitido por los Documentos del Financiamiento, el Deudor se obliga a no revocar la designación de beneficiario y asegurados adicionales ya efectuada o que haga en cumplimiento de lo señalado en la cláusula Cuarta precedente, hasta la completa extinción de las Obligaciones Garantizadas. Asimismo, el Deudor se obliga, mientras no se extingan completamente las Obligaciones Garantizadas, a no cancelar, alterar o enmendar las

---

[3] Cláusula será actualizada conforme a versión final de la agencia de garantías.

Pólizas de Seguros o las Nuevas Pólizas de Seguros en modo alguno que afecte a las Partes Garantizadas sin la autorización previa y por escrito del Agente de Garantías Extranjero, o quien lo suceda o reemplace, y a cumplir con todas las obligaciones emanadas de las Pólizas de Seguros o las Nuevas Pólizas de Seguros, incluyendo, pero no limitado a, la obligación de pagar las primas correspondientes y la obligación de emitir avisos de siniestros dentro de plazo.

**CLÁUSULA SÉPTIMA: FACULTAD DE NOTIFICACIÓN.** Con el objeto de asegurar el correcto ejercicio y operación de la designación como beneficiario exclusivo o asegurado adicional que el Deudor se obliga a efectuar, las Partes declaran que el Agente de Garantías Extranjero, por sí y en nombre y representación de las Partes Garantizadas, se encuentra facultado para notificar a las compañías de seguros emisoras de las Nuevas Pólizas de Seguros, la designación de beneficiario y asegurados adicionales a que se refiere esta escritura, en el evento que las Pólizas de Seguro y/o Nuevas Pólizas de Seguros una vez emitidas no incluyan las designaciones antes indicadas, según corresponda, de conformidad a los términos establecidos en el [Anexo C del Contrato de Términos Comunes Modificado y Refundido]. Asimismo, el Agente de Garantías Extranjero, por sí y en nombre y representación de las Partes Garantizadas, se encuentra facultado para cobrar y percibir de cada una de las compañías de seguros antes referidas todas las indemnizaciones que se devenguen con ocasión del acaecimiento de los siniestros sobre los riesgos asegurados o reasegurados. El Agente de Garantías Extranjero se encuentra facultado también para cancelar los cheques y otros documentos de pago que se le entreguen y para acusar recibo de los mismos en el cumplimiento de este poder. Asimismo, el Agente de Garantías Extranjero, a través de las personas que designe, podrá, mas no estará obligado a, representar a las Partes Garantizadas, ante los Tribunales de Justicia de la República de Chile a fin de solicitar el cobro de las indemnizaciones que procedan en virtud de las Nuevas Pólizas de Seguros. En el orden judicial, el Agente de Garantías Extranjero estará facultado para representar a las Partes Garantizadas, en todos los juicios y gestiones necesarios para el cumplimiento del mandato de que da cuenta esta escritura, ante cualquier tribunal, ordinario, especial, arbitral, administrativo o de otra naturaleza, pudiendo ejercer toda clase de acciones, sean ellas ordinarias, ejecutivas, especiales, de jurisdicción contenciosa o de cualquiera otra naturaleza. Para este efecto, el Agente de Garantías Extranjero tendrá todas las facultades ordinarias y extraordinarias del mandato judicial, incluyendo las facultades de ambos incisos del artículo séptimo del Código de Procedimiento Civil, pudiendo desistirse en primera instancia de la acción deducida, aceptar la demanda contraria, absolver posiciones, renunciar a los recursos y a los términos legales, aprobar convenios de acreedores, cobrar y percibir, y otorgar quitas y esperas.

**CLÁUSULA OCTAVA: USO DE INDEMNIZACIONES.** Los fondos recibidos por el Agente de Garantías Extranjero con ocasión de las Pólizas de Seguros y las Nuevas Pólizas de Seguros serán /i/ depositados, salvo instrucción en contrario de las Partes Garantizadas, en la denominada Cuenta de Ingresos de Seguros e Indemnizaciones /*Insurance Proceeds and Compensation Account*/, según dicho término se define en el Contrato de Cuentas Extranjeras /*Offshore Accounts and Collateral Agency Agreement*/, suscrito entre el Deudor, el Banco de Cuentas Extranjeras, el Agente de Garantías Extranjero y el Agente Administrativo por instrumento privado en idioma inglés con fecha nueve de diciembre de dos mil trece, y /ii/ destinados de conformidad a lo establecido en los Documentos del Financiamiento.

**CLÁUSULA NOVENA: MANTENCIÓN DE PÓLIZAS DE SEGUROS.** Mientras se mantengan vigentes las designaciones de beneficiario y asegurados adicionales a que se refiere este instrumento, el Deudor deberá pagar íntegra y oportunamente las primas de seguros, de corresponder, y cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse por cualquier circunstancia relativa a las Pólizas de Seguros o a las Nuevas Pólizas de Seguros. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para conservar sus derechos conforme a las Pólizas de Seguros y a las Nuevas Pólizas de Seguros, y para defenderlos de acciones de terceros.

**CLÁUSULA DÉCIMA: AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** Lo dispuesto en este instrumento no se considerará bajo ninguna circunstancia como modificación, o

limitación de los derechos que tengan el Agente de Garantías Extranjero, las Partes Garantizadas, o el Deudor en virtud de la ley, [del Secured TwoL Agreement, los Indentures, el Contrato de Crédito IVA, los Pagos Diferidos Strabag, el Crédito de Capital de Trabajo, el Financiamiento de Salida, los Préstamos, los Bonos, el Contrato de Términos Comunes, los Pagarés y Reconocimientos, el Contrato de Conversión o alguno de los otros Documentos del Financiamiento, o de cualquier otro instrumento suscrito en relación con los anteriores, ni constituye bajo ningún concepto una novación][4].

**CLÁUSULA DÉCIMO PRIMERA: MANDATO PARA NOTIFICACIONES.** Sin perjuicio de cualquier designación de mandatarios para recibir notificaciones judiciales que se haya hecho o que se haga en el futuro, adicionalmente el Deudor, confiere poder especial e irrevocable a [•] y a [•], para que, actuando cualquiera de ellos individualmente, puedan recibir, por y en representación del Deudor, notificaciones y requerimientos judiciales o extrajudiciales, en cualquier gestión, procedimiento o juicio, cualquiera que fuese el procedimiento aplicable o el tribunal o autoridad que tuviere encomendado su conocimiento y que diga relación con este instrumento, con los Documentos del Financiamiento, con las Obligaciones Garantizadas o con cualquier otro instrumento otorgado para garantizarlas. Consecuentemente, si cualquier notificación o requerimiento se realiza a los mandatarios anteriormente mencionados, el Deudor se considerarán válidamente notificado o requerido con respecto al acto, procedimiento o demanda en cuestión. En el ejercicio del poder especial e irrevocable que por este acto se otorga, los mandatarios estarán ampliamente facultados para representar al Deudor en el orden judicial, incluyendo las facultades de recibir notificaciones, contestar demandas y actuar con las atribuciones señaladas en ambos incisos del artículo séptimo del Código de Procedimiento Civil de la República de Chile, las cuales se dan por íntegramente reproducidas, una por una. Presentes a este acto [•] y [•], ambos ya individualizados, domiciliados para estos efectos en [•], Santiago; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y declaran que aceptan el poder especial e irrevocable que se otorga en esta cláusula y se obligan a no renunciar al mismo sin el consentimiento escrito del Agente de Garantías Extranjero, el cual no podrá ser denegado sin causa razonable, para lo cual el Deudor, deberá, en forma previa, designar un nuevo mandatario judicial con las mismas facultades y en los mismos términos de esta cláusula, nuevo mandatario que deberá comparecer y aceptar el mandato otorgado en el mismo instrumento de renuncia, ser una persona natural residente permanente en Chile y ser aprobado previamente por el Agente de Garantías Extranjero. Asimismo, el Deudor se obliga a mantener en todo momento dos o más apoderados con las mismas facultades y en los mismos términos de esta cláusula en caso de que el mandato irrevocable otorgado en esta cláusula terminare por fallecimiento de cualquiera de los apoderados, o en caso de que cualquiera de ellos dejare de ser residente permanente en Chile. El poder otorgado por este acto por el Deudor, no revoca ningún poder otorgado con anterioridad a esta fecha y, en el evento de otorgar otro poder en el futuro, no se entenderá por ese hecho revocado el poder otorgado en el presente instrumento.

**CLÁUSULA DÉCIMO SEGUNDA: TÍTULO SUFICIENTE.** El Deudor declara en favor del Agente de Garantías Extranjero que reconocerá copia autorizada de esta escritura, conjuntamente con una copia autorizada de los respectivos Documentos del Financiamiento, como buen y suficiente título para iniciar todas las acciones que respecto de este contrato en derecho correspondan en relación con las Obligaciones Garantizadas. Lo dispuesto en este instrumento no se considerará bajo ninguna circunstancia como limitación de los derechos que correspondan al Agente de Garantías Extranjero actuando por sí y en nombre y representación de las Partes Garantizadas, en virtud de la ley, ni como una modificación, sustitución o limitación de los derechos otorgados al Agente de Garantías Extranjero, actuando por sí y en nombre y representación de las Partes Garantizadas, en virtud de respectivos Documentos del Financiamiento.

---

[4] Cláusula sujeta a revisión.

**CLÁUSULA DÉCIMO TERCERA: CARÁCTER NO LIMITATIVO.** Lo dispuesto en este instrumento no se considerará bajo ninguna circunstancia como limitación de los derechos que correspondan al Agente de Garantías Extranjero, actuando por sí y en nombre y representación de las Partes Garantizadas en virtud de la ley, ni como una modificación, sustitución o limitación de los derechos otorgados al Agente de Garantías Extranjero, actuando por sí y en nombre y representación de las Partes Garantizadas, en virtud de los Documentos del Financiamiento. Asimismo, se deja expresa constancia que la designación realizada por esta escritura es sin perjuicio de cualesquiera otra garantía y prohibición que, de conformidad al Contrato de Términos Comunes Modificado y Refundido y los demás Documentos del Financiamiento, se hubiere constituido por el Deudor y/o por terceros, sea real o personal, para caucionar las Obligaciones Garantizadas.

**CLÁUSULA DÉCIMO CUARTA: IMPUESTOS Y SUCESORES.** El Deudor declara que este contrato y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Extranjero puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta designación de beneficiario y asegurados adicionales beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Extranjero o por quienes, de conformidad al Contrato de Términos Comunes Modificado y Refundido y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Extranjero, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**CLÁUSULA DÉCIMO QUINTA: NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará la validez de las demás estipulaciones de este instrumento, ni de los demás Documentos del Financiamiento, ni de cualquier otro documento relacionado con los mismos.

**CLÁUSULA DÉCIMO SEXTA: DOMICILIO Y COMPETENCIA.** Para todos los efectos legales derivados del presente contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se somete a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Esta designación de beneficiario adicional se rige por la ley chilena.

**CLÁUSULA DÉCIMO SÉPTIMA: GASTOS.** Los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de esta escritura, los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este instrumento; y aquellos correspondientes a las cancelaciones de las mismas, serán de exclusivo cargo del Deudor.

**CLÁUSULA DÉCIMO OCTAVA: FACULTAD ESPECIAL.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir de los registros competentes las inscripciones, subinscripciones, notificaciones, publicaciones y anotaciones que correspondan, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta designación de beneficiario adicional.

**CLÁUSULA DÉCIMO NOVENA: PODER DE RECTIFICACIÓN.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potoncjack y Loreto Ribera Concha; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Jaime Salinas Müller, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones o aclaraciones que sean necesarias realizar al presente contrato, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera."

**CLÁUSULA VIGÉSIMA: DENOMINACIÓN DE LAS CLÁUSULAS.** Las denominaciones asignadas por las Partes a las distintas estipulaciones de este contrato han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación."

**CUARTO: ANEXOS DEL CONTRATO DE DESIGNACIÓN DE BENEFICIARIO Y ASEGURADOS ADICIONALES MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que el Anexo Uno que se adjunta a esta escritura y se protocoliza conjuntamente con la misma bajo el mismo número de repertorio, corresponde al Anexo Uno a que hace referencia el Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado y Refundido.

**QUINTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Extranjero, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado y el nuevo texto modificado y refundido que consta en el Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado y Refundido.

**SEXTO: GASTOS.** Los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquiera naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo del Deudor.

**SÉPTIMO: NULIDAD E INEFICACIA.** Si por cualquier causa, una o más de las estipulaciones de este instrumento fueren declaradas nulas o ineficaces, total o parcialmente, dicha declaración no afectará a la validez de las demás estipulaciones de este instrumento, ni de los demás Documentos del Financiamiento, ni de cualquier otro documento relacionado con los mismos.

**OCTAVO: DOMICILIO Y COMPETENCIA.** Para todos los efectos legales derivados del otorgamiento de este contrato, las Partes fijan su domicilio en la ciudad y comuna de Santiago y se somete a la competencia de los tribunales ordinarios de justicia con asiento en dicha comuna. Esta designación de beneficiario adicional se rige por la ley chilena.

**NOVENO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Designación de Beneficiario y Asegurados Adicionales Modificado.

**DÉCIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Loreto Ribera Concha; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Jaime Salinas Müller, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Designación de Beneficiario y Asegurados Adicionales Modificado y prohibiciones de que da cuenta este instrumento, según corresponda.

**DÉCIMO PRIMERO: AUSENCIA DE MODIFICACIÓN Y NOVACIÓN.** Se deja constancia que el presente instrumento se otorga sin perjuicio de cualquier otra garantía y prohibición que se hubiere constituido por el Deudor, sus socios o accionistas, cualquier otro obligado y/o por terceros, sea real o personal, para caucionar las obligaciones que por dichas cauciones se garantizan en favor del Agente de Garantías Extranjero, por sí y en representación de las Partes Garantizadas. El presente instrumento no se considerará bajo ninguna circunstancia como una modificación, sustitución o limitación de los derechos otorgados al Agente de Garantías Extranjero, en

virtud de los Documentos del Financiamiento.

**DÉCIMO SEGUNDO**: **DENOMINACIÓN DE LAS CLÁUSULAS**. Las denominaciones asignadas por las Partes a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____

[•]

**C.I.N°** _____

**p.p. ALTO MAIPO SpA**

_____

[•]

**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

_____

[•]

**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

**<u>Exhibit HH</u>**

**Release and Cancellation to Amendment to Strabag Share Pledge Agreement**

<u>**REPERTORIO N°**</u>

<u>**ALZAMIENTO**</u>

<u>**DE PRENDA SIN DESPLAZAMIENTO SOBRE ACCIONES**</u>

<u>**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS**</u>

<u>**LOCAL**</u>

<u>**A**</u>

<u>**STRABAG SpA**</u>

En Santiago de Chile, a [·] del año dos mil veintidós, ante mí, [·], **COMPARECEN:** [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [·], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **"Agente de Garantías Local"**/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el texto refundido del contrato de agencia de garantías local suscrito por escritura pública de [esta misma fecha], otorgada en [esta misma notaría] bajo el repertorio número [·] /en adelante, la **"Agencia de**

1

**Garantías Local**"/; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen: __PRIMERO: ANTECEDENTES.-__ **/Uno/** Mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y cuatro guion dos mil diecisiete, Itaú Corpbanca, como agente de garantías local y en representación de las partes indicadas en la referida escritura, Alto Maipo SpA, como deudor, y Strabag SpA, como constituyente, celebraron un contrato de prenda sin desplazamiento sobre acciones, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha veintiséis de abril de dos mil diecisiete, bajo el repertorio número ciento doce mil setenta y uno guion diecisiete /el "**Contrato de Prenda Original**"/. **/Dos/** El Contrato de Prenda Original fue modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y uno guion dos mil dieciocho /el "**Contrato de Prenda Modificado y Refundido**"/. Según consta en el Contrato de Prenda Modificado y Refundido, Strabag SpA, en su calidad de accionista de Alto Maipo SpA, constituyó: /i/ prenda sin desplazamiento de primer grado y prohibición de gravar y enajenar sobre las Acciones Strabag /según dicho término se define en el Contrato de Prenda Modificado y Refundido/, de

2

conformidad al artículo catorce de la ley veinte mil ciento noventa /la **"Ley de Prenda sin Desplazamiento"**/ y su reglamento, y /ii/ prenda sin desplazamiento de primer grado y prohibición de gravar y enajenar sobre las Acciones Futuras /según dicho término se define en el Contrato de Prenda Modificado y Refundido/, de conformidad con el artículo noveno de la Ley de Prenda sin Desplazamiento y su reglamento. **/Tres/** A la fecha, el Contrato de Prenda Modificado y Refundido ha sido complementado, entre otras, por las siguientes escrituras de declaración complementarias al Contrato de Prenda Modificado y Refundido /en adelante, las **"Escrituras de Declaración"**/: **/a/** escritura pública de fecha veintisiete de abril de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil novecientos cuarenta y cuatro guion dos mil diecisiete; **/b/** escritura pública de fecha ocho de agosto de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil ochocientos once guion dos mil diecisiete; **/c/** escritura pública de fecha treinta y uno de octubre de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número diez mil novecientos cuarenta guion dos mil diecisiete; **/d/** escritura pública de fecha treinta y uno de enero de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número mil ciento tres guion dos mil dieciocho; **/e/** escritura pública de fecha veintiuno de junio de dos mil

3

dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil ciento cuarenta guion dos mil dieciocho; **/f/** escritura pública de fecha veintinueve de agosto de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil setecientos cuarenta y nueve guion dos mil dieciocho; **/g/** escritura pública de fecha trece de noviembre de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número once mil trescientos veintiséis guion dos mil dieciocho; **/h/** escritura pública de fecha treinta de enero de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número novecientos cincuenta y seis guion dos mil diecinueve; **/i/** escritura pública de fecha veintitrés de abril de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil cuatrocientos ochenta y ocho guion dos mil diecinueve; **/j/** escritura pública de fecha treinta de agosto de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil quinientos sesenta y ocho guion dos mil diecinueve; **/k/** escritura pública de fecha cuatro de diciembre de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número doce mil quinientos veintinueve guion dos mil diecinueve; **/l/** escritura pública de fecha veintisiete de febrero de dos mil veinte, otorgada en la Notaría de

4

Santiago de don Patricio Raby Benavente bajo el repertorio número mil novecientos sesenta y tres guion dos mil veinte; **/m/** escritura pública de fecha quince de mayo de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil seiscientos sesenta y nueve guion dos mil veinte; **/n/** escritura pública de fecha veintitrés de julio de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cinco mil cincuenta y dos guion dos mil veinte; **/ñ/** escritura pública de fecha tres de noviembre de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número nueve mil ciento seis guion dos mil veinte; **/o/** escritura pública de fecha veintiuno de enero de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número setecientos treinta y seis guion dos mil veintiuno; **/p/** escritura pública de fecha veinticuatro de mayo de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cinco mil trescientos treinta y siete guion dos mil veintiuno; **/q/** escritura pública de fecha cuatro de agosto de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil quinientos veintiséis guion dos mil veintiuno; y **/r/** escritura pública de fecha veintinueve de octubre de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número doce mil trescientos

5

ochenta y seis guion dos mil veintiuno. **/Cuatro/** Los términos en mayúscula que no estén definidos en el presente instrumento, tendrán el significado que a ellos se les asigna en el Contrato de Prenda Modificado y Refundido. **/Cuatro/** Se deja constancia que con fecha [·] de dos mil veintidós, y con el consentimiento del Agente de Garantías Local, Strabag SpA enajenó la totalidad de sus acciones de Alto Maipo SpA, esto es, cinco millones doscientos sesenta y tres mil setecientos dieciocho acciones emitidas por Alto Maipo SpA, inscritas en el registro de accionistas de Alto Maipo SpA bajo el folio número seis y el folio número ocho, a [AES Chile SpA. Como consecuencia de lo anterior, a esta fecha, el único accionista de Alto Maipo SpA es AES Chile SpA][1].- **SEGUNDO: ALZAMIENTO.-** Por este acto, el Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia, actuando por sí y en representación de las Partes Garantizadas, viene en alzar y cancelar la prenda sin desplazamiento y prohibiciones constituidas en virtud del Contrato de Prenda Modificado y Refundido, complementado mediante las Escrituras de Declaración.- **TERCERO: PODER AL PORTADOR.-** Se faculta al portador de copia autorizada de la presente escritura para requerir las inscripciones, subinscripciones, anotaciones o cancelaciones que fueren procedentes, especialmente en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación, pudiendo para ello firmar todos los documentos que sean necesarios, y

---

[1] **NTD:** Por confirmar si las acciones de propiedad de Strabag S.A. serán transferidas a AES Chile SpA u otra entidad.

6

requerir y realizar todo y cualquier otro trámite en los registros públicos correspondientes que fuere procedente.- **CUARTO: PODER DE RECTIFICACIÓN.-** Sin perjuicio de lo anterior, el Agente de Garantías Local otorga un mandato especial, pero tan amplio como en derecho sea necesario, a Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela, para que, actuando individualmente cualquiera de ellos tres, pueda realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.- **QUINTO: ESTIPULACIONES VARIAS.-** /Uno/ **Gastos.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo de Alto Maipo SpA. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquier naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo de Alto Maipo SpA.- **/Dos/ Denominación de las Cláusulas.** Las denominaciones asignadas por el Agente de Garantías Local a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.- **PERSONERÍAS.** La personería de los representantes de **ITAÚ CORPBANCA,** consta de [·]. Las

7

personerías indicadas no se insertan por ser conocidas de los comparecientes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes. Doy fe.-

PP. ITAÚ CORPBANCA

PP. ITAÚ CORPBANCA

NOTARIO

8

**<u>Exhibit II</u>**

**Release and Cancellation of Pledge of Hedging Agreements**

<u>REPERTORIO N°</u>

<u>ALZAMIENTO</u>

<u>DE PRENDA SIN DESPLAZAMIENTO SOBRE DERECHOS</u>

<u>ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS</u>

<u>LOCAL</u>

<u>A</u>

<u>ALTO MAIPO SpA</u>

En Santiago de Chile, a [·] del año dos mil veintidós, ante mí, [·], **COMPARECEN:** [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [·], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **"Agente de Garantías Local"**/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el texto refundido del contrato de agencia de garantías local suscrito por escritura pública de [esta misma fecha], otorgada en [esta misma notaría] bajo el repertorio número [·] /en adelante, la **"Agencia de**

1

**Garantías Local**"/; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen: <u>**PRIMERO: ANTECEDENTES.-**</u> /**Uno**/ Mediante escritura pública de fecha nueve de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don José Musalem Saffie bajo el repertorio número quince mil cuatrocientos ochenta y dos guion dos mil trece, Corpbanca /hoy, Itaú Corpbanca/, como agente de garantías local y en representación de las partes indicadas en la referida escritura, y Alto Maipo SpA, como constituyente, celebraron un contrato de prenda sin desplazamiento sobre derechos, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintisiete guion trece /el "**Contrato de Prenda Original**"/. /**Dos**/ El Contrato de Prenda Original fue: /**a**/ modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y siete guion dos mil diecisiete, y /**b**/ modificado y refundido mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y cuatro guion dos mil dieciocho /en adelante, el Contrato de Prenda Original, así modificado y refundido, el "**Contrato de Prenda Modificado y Refundido**"/. /**Tres**/ A

2

la fecha, el Deudor ha suscrito, entre otras, las siguientes escrituras de declaración complementarias al Contrato de Prenda Modificado y Refundido /en adelante, las **"Escrituras de Declaración"**/: **/a/** escritura pública de fecha once de marzo de dos mil catorce, otorgada en la Notaría de Santiago de don José Musalem Saffie bajo el repertorio número tres mil ciento sesenta y seis guion dos mil catorce; **/b/** escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trece mil cuarenta y seis guion dos mil quince; **/c/** escritura pública de fecha treinta de octubre de dos mil quince, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trece mil cincuenta guion dos mil quince; **/d/** escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil trescientos sesenta y seis guion dos mil dieciséis; **/e/** escritura pública de fecha treinta de mayo de dos mil dieciséis, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil trescientos sesenta y ocho guion dos mil dieciséis; **/f/** escritura pública de fecha diez de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número dos mil doscientos sesenta y dos guion dos mil diecisiete; **/g/** escritura pública de fecha veintisiete de abril de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente

3

bajo el repertorio número tres mil novecientos cuarenta y cuatro guion dos mil diecisiete; **/h/** escritura pública de fecha ocho de agosto de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil ochocientos once guion dos mil diecisiete; **/i/** escritura pública de fecha treinta y uno de octubre de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número diez mil novecientos cuarenta guion dos mil diecisiete; **/j/** escritura pública de fecha treinta y uno de enero de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número mil ciento tres guion dos mil dieciocho; **/k/** escritura pública de fecha veintiuno de junio de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil ciento cuarenta guion dos mil dieciocho; **/l/** escritura pública de fecha veintinueve de agosto de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil setecientos cuarenta y nueve guion dos mil dieciocho; **/m/** escritura pública de fecha trece de noviembre de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número once mil trescientos veintiséis guion dos mil dieciocho; **/n/** escritura pública de fecha treinta de enero de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número novecientos cincuenta y seis guion dos mil diecinueve; **/ñ/** escritura

4

pública de fecha treinta de agosto de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil quinientos sesenta y ocho guion dos mil diecinueve; /o/ escritura pública de fecha cuatro de diciembre de dos mil diecinueve, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número doce mil quinientos veintinueve guion dos mil diecinueve; /p/ escritura pública de fecha veintisiete de febrero de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número mil novecientos sesenta y tres guion dos mil veinte; /q/ escritura pública de fecha quince de mayo de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil seiscientos sesenta y nueve guion dos mil veinte; /r/ escritura pública de fecha veintitrés de julio de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cinco mil cincuenta y dos guion dos mil veinte; /s/ escritura pública de fecha tres de noviembre de dos mil veinte, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número nueve mil ciento seis guion dos mil veinte; /t/ escritura pública de fecha veintiuno de enero de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número setecientos treinta y seis guion dos mil veintiuno; /u/ escritura pública de fecha veinticuatro de mayo de dos mil veintiuno, otorgada en

5

la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cinco mil trescientos treinta y siete guion dos mil veintiuno; y **/v/** escritura pública de fecha cuatro de agosto de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número ocho mil quinientos veintiséis guion dos mil veintiuno. **/Cuatro/** Los términos en mayúscula que no estén definidos en el presente instrumento, tendrán el significado que a ellos se les asigna en el Contrato de Prenda Modificado y Refundido. **SEGUNDO: ALZAMIENTO.-** Por este acto, el Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia, actuando por sí y en representación de las Partes Garantizadas, viene en alzar y cancelar la prenda sin desplazamiento y prohibiciones constituidas en virtud del Contrato de Prenda Modificado y Refundido, complementado mediante las Escrituras de Declaración. - **TERCERO: PODER AL PORTADOR.-** Se faculta al portador de copia autorizada de la presente escritura para requerir las inscripciones, subinscripciones, anotaciones o cancelaciones que fueren procedentes, especialmente en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación, pudiendo para ello firmar todos los documentos que sean necesarios, y requerir y realizar todo y cualquier otro trámite en los registros públicos correspondientes que fuere procedente.- **CUARTO: PODER DE RECTIFICACIÓN.-** Sin perjuicio de lo anterior, el Agente de Garantías Local otorga un mandato especial, pero tan amplio como en

6

derecho sea necesario, a Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela, para que, actuando individualmente cualquiera de ellos tres pueda realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.-
**QUINTO**: **ESTIPULACIONES VARIAS.- /Uno/ Gastos.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo de Alto Maipo SpA. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquier naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo de Alto Maipo SpA.- **/Dos/ Denominación de las Cláusulas.** Las denominaciones asignadas por el Agente de Garantías Local a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.- **PERSONERÍAS.** La personería de los representantes de **ITAÚ CORPBANCA,** consta de [·]. Las personerías indicadas no se insertan por ser conocidas de los comparecientes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes. Doy fe.-

PP. ITAÚ CORPBANCA


PP. ITAÚ CORPBANCA


NOTARIO

## **Exhibit JJ**

**Amendment to Real Estate Mortgage, Present and Future**

**REPERTORIO**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE HIPOTECA SOBRE BIENES RAÍCES**

**PRESENTES Y FUTUROS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

<u>**PRIMERO: ANTECEDENTES.**</u>

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Hipoteca sobre Bienes Raíces.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y siete guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron, como parte del Financiamiento Alto Maipo, un contrato de hipoteca sobre bienes raíces presentes y futuros, el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes del Conservador de Bienes Raíces de Puente Alto con fecha veintitrés de diciembre de dos mil trece, a fojas cinco mil setecientos cincuenta y ocho, número cinco mil ochocientos treinta y nueve y, en el Registro de Interdicciones y Prohibiciones de Enajenar del Conservador de Bienes Raíces de Puente Alto, a fojas cinco mil quinientos siete vuelta, número ocho mil setecientos veintinueve; ambas correspondientes al año dos mil trece /en adelante, el "**Contrato de Hipoteca sobre Bienes Raíces Original**"/. El Contrato de Hipoteca sobre Bienes Raíces Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos seis guion dos mil diecisiete /así modificado, el "**Contrato de Hipoteca sobre Bienes Raíces Modificado**"/. El Contrato de Hipoteca sobre Bienes Raíces Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y tres guion dos mil dieciocho /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Bienes Raíces Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados

de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta hipoteca sobre bienes raíces emitidas por el Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Siete**/ **Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la hipoteca sobre bienes raíces de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Hipoteca sobre Bienes Raíces Alto Maipo, las Partes acuerdan modificar el Contrato de Hipoteca sobre Bienes Raíces Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Hipoteca sobre Bienes Raíces**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE HIPOTECA SOBRE BIENES RAÍCES ALTO MAIPO.** Las Partes declaran que el texto del Contrato de Hipoteca sobre Bienes Raíces Alto Maipo ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**HIPOTECA SOBRE BIENES RAÍCES ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: /**Uno**/ [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y /**Dos**/ [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de hipoteca sobre bienes raíces /el "**Contrato de Hipoteca sobre Bienes Raíces**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES.** /**Uno**/ **Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser

modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de hipoteca sobre bienes raíces, es un texto modificado y refundido del contrato de hipoteca sobre bienes raíces presentes y futuros celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y siete guion dos mil trece, el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes del Conservador de Bienes Raíces de Puente Alto con fecha veintitrés de diciembre de dos mil trece, a fojas cinco mil setecientos cincuenta y ocho, número cinco mil ochocientos treinta y nueve y, en el Registro de Interdicciones y Prohibiciones de Enajenar del Conservador de Bienes Raíces de Puente Alto, a fojas cinco mil quinientos siete vuelta, número ocho mil setecientos veintinueve, ambas correspondientes al año dos mil trece; y modificado mediante escrituras públicas de fechas: /**i**/ diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos seis guion dos mil diecisiete; /**ii**/ ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y tres guion dos mil dieciocho; y modificado mediante diversas escrituras públicas /en adelante, dicho contrato de hipoteca sobre bienes raíces, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Bienes Raíces Alto Maipo**"/.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA TERCERA: BIENES INMUEBLES PRESENTES DEL DEUDOR.** El Deudor es dueño de los bienes inmuebles que se detallan a continuación, en adelante los "**Bienes Inmuebles Presentes**": /**a**/ Inmueble ubicado en la comuna de San José de Maipo, Provincia Cordillera, consistente en un terreno situado en Camino a El Volcán número siete mil setecientos cincuenta y uno, ubicado en el extremo poniente del predio denominado La Laja, que forma parte del predio El Toro de Puente Alto, y que deslinda: NORTE: con frente de treinta y cuatro metros, con Camino Público a San José de Maipo; AL SUR, en treinta y cuatro metros, con el río Maipo; AL ORIENTE, en treinta y nueve metros, con propiedad de don Rafael Silva Lastra; y al PONIENTE, en treinta y nueve metros con propiedad de don Emilio Puyó León. Adquirió el inmueble por aporte en dominio que le hizo AES GENER S.A. /hoy AES Andes S.A./ según consta en escrituras públicas otorgadas en la Notaría de

Santiago de don Eduardo Avello Concha el primero de julio y el doce de agosto de dos mil trece, inscritas a fojas cuatro mil cuatrocientos sesenta y nueve número siete mil doscientos ochenta y tres del Registro de Propiedad del Conservador de Bienes Raíces de Puente Alto correspondiente al año dos mil trece. /b/ Inmueble ubicado en la comuna de San José de Maipo, Provincia Cordillera, Camino Al Volcán número ocho mil uno, localidad El Canelo, que corresponde al lote Uno, de la división del inmueble ubicado en el lugar denominado La Laja que formaba parte del predio El Toro y que deslinda: NORTE, con camino a San José, en quinientos diecisiete metros; AL ESTE, con Hacienda El Manzano, en sesenta metros; AL SUR, con Río Maipo, en cuatrocientos veinte metros; AL PONIENTE, en treinta metros con el lote dos y con el camino de entrada de por medio con el lote dos, en ciento dos metros. Adquirió el inmueble por aporte en dominio que le hizo AES GENER S.A. /hoy AES Andes S.A./ según consta en escrituras públicas otorgadas en la Notaría de Santiago de don Eduardo Avello Concha el primero de julio y el doce de agosto de dos mil trece, inscritas a fojas ciento mil cuatrocientos sesenta y seis vuelta número siete mil doscientos setenta y nueve del Registro de Propiedad del Conservador de Bienes Raíces de Puente Alto correspondiente al año dos mil trece. /c/ Inmueble ubicado en la comuna de San José de Maipo, Provincia Cordillera, consistente en el Lote Dos, de la división del lugar denominado La Laja que formaba parte del predio El Toro, que según el plano archivado bajo el número ciento diecisiete al final de este Registro en el novecientos ochenta y cinco, deslinda: NORESTE, en ciento tres metros, con frente al camino de ingreso al lote uno; AL ESTE, en treinta metros frente al Lote Uno; AL SUR, con ciento treinta metros frente al Río Maipo; AL PONIENTE, en sesenta metros con lote del señor Pedro Oyarce. Adquirió el inmueble por aporte en dominio que le hizo AES GENER S.A. /hoy AES Andes S.A./ según consta en escrituras públicas otorgadas en la Notaría de Santiago de don Eduardo Avello Concha el primero de julio y el doce de agosto de dos mil trece, inscritas a fojas cuatro mil cuatrocientos sesenta y ocho número siete mil doscientos ochenta y uno del Registro de Propiedad del Conservador de Bienes Raíces de Puente Alto correspondiente al año dos mil trece.

**CLÁUSULA CUARTA**: **HIPOTECA**. /Uno/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, /A/ hipoteca de primer grado sobre los Bienes Inmuebles Presentes, y /B/ hipoteca de primer grado sobre todos los bienes inmuebles que el Deudor adquiera por cualquier causa en el futuro, de conformidad a lo establecido en el artículo dos mil cuatrocientos diecinueve del Código Civil, en la medida que los referidos bienes inmuebles /i/ se encuentren ubicados en la Provincia de Cordillera, Región Metropolitana de Santiago, y su inscripción conste en el Conservador de Bienes Raíces de Puente Alto, o en aquel que lo suceda o reemplace y tenga jurisdicción en las comunas que componen dicha provincia, y/o /ii/ independiente del lugar en que se encuentren dichos bienes inmuebles, digan relación con la operación, funcionamiento, mantención o desarrollo del Proyecto, o sean destinados al uso de oficinas, bodegas, o almacenes, que digan relación con el Proyecto /en adelante, todos estos bienes inmuebles serán denominados, conjunta e indistintamente los "**Bienes Inmuebles Futuros**", y conjuntamente con los Bienes Inmuebles Presentes, los "**Bienes Inmuebles**"/. El derecho real de hipoteca sobre los Bienes Inmuebles Futuros se adquirirá una vez que éstos sean adquiridos por el Deudor, y se entenderá constituido el derecho real de hipoteca desde la fecha de la inscripción del presente instrumento en los respectivos registros de los Conservadores de Bienes Raíces competentes. /Dos/ **Extensión de la Hipoteca**. /A/ La hipoteca de que da cuenta este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente hipoteca. /B/ Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas,

de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente hipoteca es indivisible. /C/ El privilegio otorgado por esta hipoteca incluye y se extiende a las construcciones, instalaciones y demás objetos destinados por el Deudor a la explotación de los Bienes Inmuebles, y a las indemnizaciones que paguen los seguros descritos en la cláusula undécima de este documento y a cualquier indemnización que corresponda por la expropiación de los Bienes Inmuebles o que terceros deban pagar por daños efectivamente causados a los Bienes Inmuebles. Asimismo, la hipoteca se extiende de pleno derecho a todos los demás bienes actuales o futuros o que por adherencia o destinación se reputen formar parte de los Bienes Inmuebles, en conformidad a la ley.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la hipoteca y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Bienes Inmuebles, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento. Sin embargo, el Deudor podrá realizar todos aquellos actos permitidos de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento, o comprendidos dentro del manejo ordinario de los Bienes Inmuebles.

**CLÁUSULA SEXTA: INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. /Uno/** Se deja constancia que la hipoteca y prohibición de que da cuenta este instrumento fue debidamente inscrita en el Registro de Hipotecas y Gravámenes del Conservador de Bienes Raíces de Puente Alto con fecha veintitrés de diciembre de dos mil trece, a fojas cinco mil setecientos cincuenta y ocho, número cinco mil ochocientos treinta y nueve, correspondiente al año dos mil trece, y en el Registro de Interdicciones y Prohibiciones de Enajenar del Conservador de Bienes Raíces de Puente Alto, a fojas cinco mil quinientos siete vuelta, número ocho mil setecientos veintinueve correspondiente al año dos mil trece. La hipoteca de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los Bienes Inmuebles. /Dos/ El Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar los Bienes Inmuebles Futuros que se hipotecan conforme a lo establecido en esta escritura, una vez que ellos sean inscritos a nombre del Deudor en el o los Registros de Propiedad de el o los Conservadores de Bienes Raíces correspondientes, dentro del plazo de quince días contados desde dicha inscripción. /Tres/ Por el presente acto, y para el evento en que el Deudor no dé cumplimiento a lo establecido en el numeral /Dos/ precedente, el Deudor confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refiere el numeral /Dos/ precedente, e individualizar los Bienes Inmuebles Futuros adquiridos por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**CLÁUSULA SÉPTIMA: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al

Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas y, por ende, de esta hipoteca, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta hipoteca, para obtener el cumplimiento de las Obligaciones Garantizadas.

<u>**CLÁUSULA OCTAVA**</u>**: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores hipotecarios.

<u>**CLÁUSULA NOVENA**</u>**: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la hipoteca de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

<u>**CLÁUSULA DÉCIMA**</u>**: MANTENCIÓN DEL DOMINIO. INSPECCIONES. /Uno/** El Deudor declara y garantiza que los Bienes Inmuebles Presentes sobre los cuales se constituye esta hipoteca se encuentran debidamente inscritos y vigentes, que le pertenecen como único y exclusivo dueño, el pago de sus contribuciones de bienes raíces, impuestos y/o patentes se encuentra al día, respecto de aquéllos cuya propiedad genere la obligación de pago de impuestos y/o patentes, fueron legalmente adquiridos, y que, salvo por los Gravámenes Permitidos /*"Permitted Liens"*, según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no les afectan legítimos derechos de terceros, se encuentran libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros; y que no están sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Bienes Inmuebles Presentes o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de estas hipotecas, con excepción de los permitidos por los demás Documentos del Financiamiento y los constituidos mediante este instrumento. Adicionalmente, el Deudor se obliga a velar y responder por el hecho de que los Bienes Inmuebles Futuros que por el presente instrumento se hipotecan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Bienes Inmuebles Futuros, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo dueño, estarán con sus contribuciones de bienes raíces, impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a estas hipotecas o a Gravámenes Permitidos; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Bienes Inmuebles Futuros o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o las hipotecas y prohibiciones constituidas por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento. **/Dos/** Mientras subsista esta hipoteca el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa a los Bienes Inmuebles. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión de los Bienes Inmuebles y para defenderlos de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar los Bienes Inmuebles, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA UNDÉCIMA: SEGUROS.** El Deudor se obliga a mantener pólizas de seguro respecto de los Bienes Inmuebles y de las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio de los Bienes Inmuebles y a los cuales se extiende esta hipoteca, contra los riesgos, por las cantidades y en la forma y condiciones que corresponda en cumplimiento de las estipulaciones del Contrato de Términos Comunes y en los demás Documentos del Financiamiento, y sólo en la medida en que estos documentos así lo exijan. De la misma manera, el Deudor se obliga a designar al Agente de Garantías Local, para su beneficio y el de las Partes Garantizadas, como beneficiario o asegurado adicional, según corresponda, en las pólizas respectivas, debiendo entregar copia del endoso o designación correspondiente dentro del plazo establecido para ello en los Documentos del Financiamiento.

**CLÁUSULA DUODÉCIMA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de hipoteca y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta hipoteca y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y al Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de hipoteca que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente hipoteca y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente hipoteca la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO TERCERA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta hipoteca y prohibiciones.

**CLÁUSULA DÉCIMO CUARTA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE HIPOTECA SOBRE BIENES RAÍCES MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Hipoteca sobre Bienes Raíces.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Hipoteca sobre Bienes Raíces Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Hipoteca sobre Bienes Raíces.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE HIPOTECA SOBRE BIENES RAÍCES.** La modificación del Contrato de Hipoteca sobre Bienes Raíces Alto Maipo, que consta en el texto aprobado del Contrato de Hipoteca sobre Bienes Raíces que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en los respectivos registros de los Conservadores de Bienes Raíces competentes. El Deudor se obliga a hacer entrega al Agente de Garantías Local de copia de las inscripciones referidas.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Hipoteca sobre Bienes Raíces Alto Maipo.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Hipoteca sobre Bienes Raíces Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____

[•]
**C.I.N° _____**
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N° _____**
**p.p. ITAÚ CORPBANCA**

**<u>Exhibit KK</u>**

**Amendment to Mining Concessions Mortgages, Present and Future**

**REPERTORIO**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE HIPOTECA SOBRE**

**CONCESIONES MINERAS PRESENTES Y FUTURAS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías , que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Hipoteca sobre Concesiones Mineras.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y ocho guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente celebraron, como parte del Financiamiento Alto Maipo, un contrato de hipoteca sobre concesiones mineras presentes y futuras, el cual fue debidamente inscrito en el Registro de Hipotecas de Minas del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto con fecha veinticuatro de diciembre de dos mil trece, a fojas veinte vuelta, número nueve y, en el Registro de Prohibiciones de Minas del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto, a fojas once vuelta, número veintiuno; ambas correspondientes al año dos mil trece /en adelante, el "**Contrato de Hipoteca sobre Concesiones Mineras Original**"/. El Contrato de Hipoteca sobre Concesiones Mineras Original fue complementado mediante escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha veintiocho de marzo de dos mil catorce, repertorio número tres mil novecientos seis guion dos mil catorce y escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha primero de marzo de dos mil diecisiete, repertorio número mil novecientos cuatro guion dos mil diecisiete; y fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos cinco guion dos mil diecisiete, complementada mediante escritura pública de fecha veintiuno de julio de dos mil diecisiete otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número siete mil ciento ochenta y ocho guion dos mil diecisiete /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Concesiones Mineras Modificado**"/. El Contrato de Hipoteca sobre Concesiones Mineras Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y cuatro guion dos mil dieciocho /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la

Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con hipotecas sobre concesiones mineras emitidas por el Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la hipoteca sobre concesiones mineras de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo, las Partes acuerdan modificar el Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Hipoteca sobre Concesiones Mineras**"/.

<u>**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE HIPOTECA SOBRE CONCESIONES MINERAS ALTO MAIPO.**</u> Las Partes declaran que el texto del Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**HIPOTECA SOBRE CONCESIONES MINERAS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de hipoteca sobre concesiones mineras /el "**Contrato de Hipoteca sobre Concesiones Mineras**" o el "**Contrato**"/:

<u>**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.**</u> Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de

don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de hipoteca sobre concesiones mineras, es un texto modificado y refundido del contrato de hipoteca sobre concesiones mineras presentes y futuras celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y ocho guion dos mil trece, mediante el cual Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de hipoteca sobre concesiones mineras, el cual fue debidamente inscrito en el Registro de Hipotecas de Minas del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto con fecha veinticuatro de diciembre de dos mil trece, a fojas veinte vuelta, número nueve y, en el Registro de Prohibiciones de Minas del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto, a fojas once vuelta, número veintiuno; ambas correspondientes al año dos mil trece, el que fue complementado mediante /i/ escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha veintiocho de marzo de dos mil catorce, repertorio número tres mil novecientos seis guion dos mil catorce y /ii/ escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha primero de marzo de dos mil diecisiete, repertorio número mil novecientos cuatro guion dos mil diecisiete; y fue modificado mediante escrituras públicas de fechas: /i/ diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos cinco guion dos mil diecisiete, complementada por escritura pública de fecha veintiuno de julio de dos mil diecisiete, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número siete mil ciento ochenta y ocho guion dos mil diecisiete; y /ii/ ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y cuatro guion dos mil dieciocho /en adelante, dicho contrato de hipoteca sobre concesiones mineras, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo**"/.

**CLÁUSULA SEGUNDA**: **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**/Dos/** Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLAÚSULA TERCERA: CONCESIONES MINERAS PRESENTES DEL DEUDOR.** El Deudor es titular y dueño de las concesiones mineras de explotación que se detallan a continuación, todas ubicadas en la Provincia Cordillera, en adelante las "**Concesiones Mineras Presentes**": **/Uno/ Tomás Uno al Once**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas setenta y uno número catorce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos sesenta y nueve vuelta número noventa y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Dos/ Tomás Dos Uno al Veinte**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos sesenta y tres vuelta número sesenta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas setenta número noventa y siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Tres/ Tomás Tres Uno al Veinte**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas trescientos once número cincuenta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta vuelta número noventa y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuatro/ Tomás Cuatro Uno al Doce**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas trescientos dos número cincuenta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y uno número nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cinco/ Tomás Cinco Uno al Doce**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos noventa y tres número cincuenta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y uno vuelta número cien del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Seis/ Tomás Seis Uno al Doce**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas noventa número trece del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y dos número ciento uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Siete/ Tomás Siete Uno al Veinticuatro**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas noventa y nueve número catorce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y dos vuelta número ciento dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Ocho/ Tomás Ocho Uno al Ocho**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos ochenta y cuatro número cuarenta y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y tres número ciento tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Nueve/ Tomás Nueve Uno al Ocho**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos setenta y cinco número cuarenta y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y tres vuelta número ciento cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Diez/ Tomás Diez Uno al Ocho**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos sesenta y seis número cuarenta y siete

del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y cuatro número ciento cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Once/ Tomás Once Uno al Cuarenta y Dos**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas sesenta y nueve número veintiocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil diez. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y cuatro número ciento seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Doce/ Tomás Doce Uno al Veintiséis**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cincuenta y dos número cincuenta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y cinco número cientos siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Trece/ Tomás Trece Uno al Ocho**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento setenta y ocho vuelta número veintisiete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y cinco vuelta número ciento ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Catorce/ Tomás Catorce Uno al Cuarenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas setenta y nueve número quince del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y seis número ciento nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Quince/ Tomás Quince Uno al Once**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cien número dieciocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y seis vuelta número ciento diez del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Dieciséis/ Tomás Dieciséis Uno al Nueve**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas tres vuelta número cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y siete número ciento once del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Diecisiete/ Tomás Diecisiete Uno al Treinta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas diez vuelta número seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y siete vuelta número ciento doce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Dieciocho/ Tomás Dieciocho Uno al Quince**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas dieiciocho vuelta número siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y ocho número ciento trece del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Diecinueve/ Tomás Diecinueve Uno al Veintiséis**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos cuarenta y ocho número sesenta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y ocho vuelta número ciento catorce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veinte/ Tomás Veintiséis Siete al Diez**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos cuarenta vuelta número sesenta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y nueve número ciento quince del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintiuno/ Tomás Veintisiete Uno al Treinta y Cinco**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas veinticinco vuelta número ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio

actual a favor del Deudor se encuentra inscrito a fojas doscientos setenta y nueve vuelta número ciento dieciséis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintidós/ Tomás Veintinueve Uno al Veintidós,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento ochenta y cuatro número cincuenta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y uno vuelta número ciento cuarenta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintitrés/ Tomás Treinta Uno al Veinte,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos diecisiete número cincuenta y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta número ciento diecisiete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veinticuatro/ Tomás Treinta y Uno Uno al Veinte,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cuarenta y cuatro número cuarenta y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta vuelta número ciento dieciocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veinticinco/ Tomás Treinta y Dos Uno al Treinta y Tres,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos cincuenta y cinco vuelta número sesenta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y uno número ciento diecinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintiséis/ Tomás Treinta y Tres Uno al Diecisiete,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ochenta y cuatro vuelta número treinta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil diez. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y uno vuelta número ciento veinte del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintisiete/ Tomás Treinta y Cuatro Uno al Trece,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento setenta y cinco vuelta número cincuenta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y dos número ciento veintiuno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintiocho/ Tomás Treinta y Seis Uno al Veintitrés,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento noventa y uno vuelta número cincuenta y cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y dos vuelta número ciento veintidós del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Veintinueve/ Tomás Treinta y Siete Uno al Catorce,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos uno número cincuenta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil siete. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y tres número veintitrés del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta/ Tomás Treinta y Ocho Uno al Dieciséis,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas treinta y tres vuelta número nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y tres vuelta número ciento veinticuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Uno/ Tomás Treinta y Nueve Uno al Veintidós,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cuarenta y uno número diez del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y cuatro número veinticinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Dos/ Tomás Cuarenta Uno al Quince,** cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cuarenta y nueve número once del Registro de Propiedad del

Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y cuatro vuelta número ciento veintiséis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Tres/ Tomás Cuarenta y Uno Uno al Veintidós**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cincuenta y cinco vuelta número doce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y cinco número ciento veintisiete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Cuatro/ Tomás Cuarenta y Dos Uno al Treinta y Nueve**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento ochenta y cuatro número treinta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y cinco vuelta número ciento veintiocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Cinco/ Tomás Cuarenta y Tres Uno al Veinticinco**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento treinta y seis vuelta número veititrés del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y seis número ciento veintinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Seis/ Tomás Cuarenta y Cinco Uno al Cuarenta y Cinco**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento nueve número quince del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y seis vuelta número ciento treinta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Siete/ Tomás Cuarenta y Seis Uno al Treinta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos dos número treinta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y siete número ciento treinta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Ocho/ Tomás Cuarenta y Siete Uno al Trece**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento setenta y seis número veintinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y siete vuelta número ciento treinta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Treinta y Nueve/ Tomás Cuarenta y Ocho Uno al Trece**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento treinta y tres número diecinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ocho número ciento treinta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta/ Tomás Cincuenta Uno al Diez**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos veintiuno número treinta y cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y ocho vuelta número ciento treinta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Uno/ Tomás Cincuenta y Uno al Cincuenta y Seis**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento sesenta y seis número veinticinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y uno número ciento cuarenta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Dos/ Tomás Cincuenta y Dos Uno al Trece**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos dos vuelta número treinta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil ocho. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y nueve número ciento treinta cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Tres/ Tomás Cincuenta y Tres Uno al Ocho**, cuya

sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento noventa y cuatro número veintinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y dos número ciento cuarenta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Cuatro/ Tomás Cincuenta y Cuatro Uno al Seis**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento treinta y nueve número veinte del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos ochenta y nueve vuelta número ciento treinta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Cinco/ Tomás Cincuenta y Cinco Uno al Trece**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos veinte siete número treinta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa número ciento treinta y siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Seis/ Tomás Cincuenta y Seis Uno al Veinte**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas doscientos quince número treinta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y dos vuelta número ciento cuarenta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Siete/ Tomás Cincuenta y Nueve Uno al Veinte**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento ochenta y seis vuelta número veintiocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil nueve. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa vuelta número ciento treinta y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Ocho/ Tomás Setenta y Dos Uno al Diecinueve**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas veintinueve número cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil once. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y uno número ciento treinta y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cuarenta y Nueve/ Tomás Setenta y Cuatro Uno al Treinta y Tres**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas setenta y siete número veintinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil diez. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y tres vuelta número ciento cuarenta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta/ Manzano Dos Uno al Cien**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas veintiocho número seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos cuatro vuelta número ciento sesenta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Uno/ Manzano Tres Uno al Cincuenta y Siete**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas treinta y cinco número siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos cinco número ciento sesenta y siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Dos/ José Tres Uno al Cuarenta y Cuatro**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento veinte número dieciséis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y nueve vuelta número ciento cincuenta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Tres/ José Cuatro Uno al Treinta y Dos**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento ochenta y cuatro vuelta número veinticinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos número ciento cincuenta y siete del Registro de Propiedad del

Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Cuatro/ José Seis Uno al Cincuenta y Cuatro**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento treinta y cuatro número dieciocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos vuelta número ciento cincuenta y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Cinco/ José Siete Uno al Setenta y Dos**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cincuenta y seis número veintiuno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos uno número ciento cincuenta y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Seis/ José Nueve Uno al Cuarenta y Cuatro**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento sesenta y tres número veintidós del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos uno vuelta número ciento sesenta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Siete/ José Diez Uno al Sesenta y Nueve**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cuarenta y uno número diecinueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos dos número ciento sesenta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Ocho/ José Once Uno al Veintidós**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento veintisiete vuelta número diecisiete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos dos vuelta número ciento sesenta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Cincuenta y Nueve/ José Trece Uno al Treinta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento setenta y siete número veinticuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos tres número ciento sesenta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta/ José Catorce Uno al Cincuenta y Siete**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas sesenta y nueve vuelta número veintitrés del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos tres vuelta número ciento sesenta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Uno/ José Quince Uno al Cuarenta y Uno**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cuarenta y ocho número veinte del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas trescientos cuatro número ciento sesenta y cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Dos/ Saya Uno Uno al Cuarenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas veinticinco número cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y ocho número ciento cincuenta y tres del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Tres/ Saya Tres Uno al Sesenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ciento cinco número catorce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y ocho vuelta número ciento cincuenta y cuatro del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Cuatro/ Saya Cuatro Uno al Sesenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas setenta y tres número diez del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y cuatro número ciento cuarenta y cinco del Registro de Propiedad del Conservador de

Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Cinco/ Saya Seis Uno al Sesenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas nueve número dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y nueve número ciento cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Seis/ Saya Nueve Uno al Cuarenta y Ocho**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas ochenta y nueve número doce del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y cuatro vuelta número ciento cuarenta y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Siete/ Saya Doce Uno al Veintiséis**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas noventa y siete número trece del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y cinco número ciento cuarenta y siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Ocho/ Saya Trece Uno al Diecinueve**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas sesenta y cinco número nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y cinco vuelta número ciento cuarenta y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Sesenta y Nueve/ Saya Catorce Uno al Treinta y Dos**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cincuenta y siete número ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y seis número ciento cuarenta y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Setenta/ Saya Quince Uno al Veintiuno**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cuarenta y uno número seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y seis vuelta número ciento cincuenta del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Setenta y Uno/ Saya Dieciséis Uno al Sesenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas treinta y tres número cinco del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y siete número ciento cincuenta y uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Setenta y Dos/ Saya Diecisiete Uno al Cuarenta**, cuya sentencia constitutiva y acta de mensura se encuentran inscritas a fojas cuarenta y nueve número siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. El dominio actual a favor del Deudor se encuentra inscrito a fojas doscientos noventa y siete vuelta número ciento cincuenta y dos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece. **/Setenta y Tres/ José Uno Uno al Treinta y Uno**, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas cuarenta y dos número seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil catorce, y cuya propiedad se encuentra inscrita a fojas ciento noventa y cuatro vuelta, número treinta y uno del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. **/Setenta y Cuatro/ José Dos Uno al Dieciocho**, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas quinientos noventa y uno número ciento noventa y ocho del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y ocho, número treinta y ocho del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. **/Setenta y Cinco/ José Ocho Uno al Ochenta y Ocho**, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas quinientos noventa y nueve vuelta número ciento noventa y nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y siete vuelta, número treinta y siete del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. **/Setenta y Seis/ José Doce Uno al Veintidós**, cuya sentencia constitutiva y acta

de mensura fueron inscritas a fojas quinientos ochenta y tres vuelta número ciento noventa y siete del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y siete, número treinta y seis del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. /Setenta y Siete/ Saya Dos Uno al Veinte, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas seiscientos ocho vuelta número doscientos del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y seis vuelta, número treinta y cinco del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. /Setenta y Ocho/ Saya Cinco Uno al Sesenta, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas quinientos setenta y cinco número ciento noventa y seis del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y cinco vuelta número treinta y tres del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. /Setenta y Nueve/ Saya Siete Uno al Sesenta, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas seiscientos diecisiete vuelta número doscientos uno del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y cinco número treinta y dos del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. /Ochenta/ Saya Once Uno al Dieciséis, cuya sentencia constitutiva y acta de mensura fueron inscritas a fojas seiscientos cuarenta y dos número doscientos nueve del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil trece, y cuya propiedad se encuentra inscrita a fojas ciento noventa y seis número treinta y cuatro del Registro de Propiedad del mismo Conservador, correspondiente al año dos mil catorce. /Ochenta y Uno/ José Cinco Uno al Ciento Catorce, cuya sentencia constitutiva, acta de mensura y dominio actual se encuentran inscritos a fojas cincuenta y uno número diez del Registro de Propiedad del Conservador de Minas de Puente Alto, correspondiente al año dos mil dieciséis. [Individualización de otras Concesiones Mineras Presentes, en caso de existir.][1] Las Concesiones Mineras Presentes señaladas en los números /Uno/ a /Setenta y Dos/ anteriores fueron adquiridas por el Deudor por aporte en dominio que le hizo AES GENER S.A. /hoy AES Andes S.A./, según consta en escrituras públicas otorgadas en la Notaría de Santiago de don Eduardo Avello Concha, los días primero de julio y doce de agosto, ambos de dos mil trece. Las Concesiones Mineras Presentes señaladas en los números /Setenta y Tres/ a /Ochenta/ anteriores fueron adquiridas por el Deudor con fecha diecinueve de marzo de dos mil catorce. La Concesión Minera Presente señalada en el número /Ochenta y Uno/ anterior fue constituida a favor del Deudor con fecha veinte de octubre de dos mil quince.

**CLÁUSULA CUARTA: HIPOTECA. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, **/A/** hipoteca de primer grado sobre las Concesiones Mineras Presentes, y **/B/** hipoteca de primer grado sobre todas las concesiones mineras, ya sean de exploración o de explotación, que el Deudor adquiera por cualquier causa en el futuro, de conformidad a lo establecido en el artículo dos mil cuatrocientos diecinueve del Código Civil, en la medida que las referidas concesiones mineras /i/ se encuentren ubicadas en la Provincia de Cordillera, Región Metropolitana de Santiago, y su inscripción conste en el Conservador de Minas de Puente Alto, o en aquel que lo suceda o reemplace y tenga jurisdicción en las comunas que componen dicha provincia, y/o /ii/ independiente del lugar en que se encuentren dichas concesiones mineras, digan relación con la operación, funcionamiento, mantención o desarrollo del Proyecto, /en adelante, todas estas concesiones mineras serán denominadas, conjunta e indistintamente las "**Concesiones Mineras Futuras**", y conjuntamente con las Concesiones Mineras Presentes, las "**Concesiones Mineras**"/. El derecho real de hipoteca sobre las Concesiones Mineras Futuras se adquirirá una vez que éstas sean inscritas a nombre del Deudor en el correspondiente registro del Conservador de Minas competente, y se entenderá constituido el derecho real de hipoteca desde la fecha de la inscripción del presente instrumento en los respectivos registros de los Conservadores de Minas competentes. **/Dos/ Extensión de la Hipoteca. /A/** La hipoteca de que da cuenta

---

[1] Sujeto a la existencia de nuevas concesiones mineras hasta la fecha de firma.

este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente hipoteca y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a la presente hipoteca. /B/ Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente hipoteca es indivisible. /C/ El privilegio otorgado por esta hipoteca incluye y se extiende a las construcciones, instalaciones y demás objetos destinados por el Deudor a la explotación y ejercicio de las Concesiones Mineras y a las indemnizaciones que paguen los seguros descritos en la cláusula undécima de este documento y a cualquier indemnización que corresponda por la expropiación de las Concesiones Mineras o que terceros deban pagar por daños efectivamente causados a las Concesiones Mineras. Asimismo, la hipoteca se extiende de pleno derecho a todos los demás bienes actuales o futuros que por adherencia o destinación se reputen formar parte de las Concesiones Mineras, en conformidad a la ley.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la hipoteca y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre las Concesiones Mineras, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento. Sin embargo, el Deudor podrá realizar todos aquellos actos permitidos de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento, o comprendidos dentro del manejo ordinario de las Concesiones Mineras.

**CLÁUSULA SEXTA: INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. /Uno/** Se deja constancia que la hipoteca y prohibición de que da cuenta este instrumento fue debidamente inscrita en el Registro de Hipotecas del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto con fecha veinticuatro de diciembre de dos mil trece, a fojas veinte vuelta, número nueve, correspondiente al año dos mil trece, y en el Registro de Prohibiciones del Conservador de Bienes Raíces, Comercio y Minas de Puente Alto, con fecha veinticuatro de diciembre de dos mil trece, a fojas once vuelta, número veintiuno correspondiente al año dos mil trece. La hipoteca de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de las Concesiones Mineras. **/Dos/** El Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar las Concesiones Mineras Futuras que se hipotecan conforme a lo establecido en esta escritura, una vez que ellas sean inscritas a nombre del Deudor en el o los Registros de Propiedad de el o los Conservadores de Minas correspondientes, dentro del plazo de quince días contados desde dicha inscripción. **/Tres/** Por el presente acto, y para el evento en que el Deudor no dé cumplimiento a lo establecido en el numeral /Dos/ precedente, el Deudor confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de

autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refiere el numeral /Dos/ precedente, e individualizar las Concesiones Mineras Futuras adquiridas por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**<u>CLÁUSULA SÉPTIMA</u>: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta hipoteca, para obtener el cumplimiento de las Obligaciones Garantizadas.

**<u>CLÁUSULA OCTAVA</u>: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores hipotecarios.

**<u>CLÁUSULA NOVENA</u>: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la hipoteca de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**<u>CLÁUSULA DÉCIMA</u>: MANTENCIÓN DEL DOMINIO. INSPECCIONES. /Uno/** El Deudor declara y garantiza que las Concesiones Mineras Presentes sobre las cuales se constituye esta hipoteca se encuentran debidamente inscritas y vigentes, que le pertenecen como único y exclusivo titular, el pago de sus impuestos o patentes se encuentra al día, respecto de aquéllos cuya propiedad genere la obligación de pago de impuestos y/o patentes, fueron legalmente adquiridos, y que, salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no les afectan legítimos derechos de terceros, se encuentran libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros; y que no están sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichas Concesiones Mineras Presentes o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de estas hipotecas, con excepción de los permitidos por los demás Documentos del Financiamiento y los constituidos mediante este instrumento. Adicionalmente, el Deudor se obliga a velar y responder por el hecho de que las Concesiones Mineras Futuras que por el presente instrumento se hipotecan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustado a derecho, y asimismo, que dichas Concesiones Mineras Futuras, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo titular, estarán con sus impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a estas hipotecas o a Gravámenes Permitidos; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el

dominio de dichas Concesiones Mineras Futuras o a darlas en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o las hipotecas y prohibiciones constituidas por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento. **/Dos/** Mientras subsista esta hipoteca el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa a las Concesiones Mineras. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión de las Concesiones Mineras y para defenderlas de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar las Concesiones Mineras, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA UNDÉCIMA: SEGUROS.** El Deudor se obliga a mantener pólizas de seguro respecto de las Concesiones Mineras y de las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio de las Concesiones Mineras y a los cuales se extiende esta hipoteca, contra los riesgos, por las cantidades y en la forma y condiciones que corresponda en cumplimiento de las estipulaciones del Contrato de Términos Comunes y en los demás Documentos del Financiamiento, y sólo en la medida en que estos documentos así lo exijan. De la misma manera, el Deudor se obliga a designar al Agente de Garantías Local, para su beneficio y el de las Partes Garantizadas, como beneficiario o asegurado adicional, según corresponda, en las pólizas respectivas, debiendo entregar copia del endoso o designación correspondiente dentro del plazo establecido para ello en los Documentos del Financiamiento.

**CLÁUSULA DUODÉCIMA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de hipoteca y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta hipoteca y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de hipoteca que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente hipoteca y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente hipoteca la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO TERCERA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta hipoteca y prohibiciones.

**CLÁUSULA DÉCIMO CUARTA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales y contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del

Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE HIPOTECA SOBRE CONCESIONES MINERAS MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Hipoteca sobre Concesiones Mineras.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Hipoteca sobre Concesiones Mineras.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE HIPOTECA SOBRE CONCESIONES MINERAS MODIFICADO Y REFUNDIDO.** La modificación del Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo, que consta en el texto aprobado del Contrato de Hipoteca sobre Concesiones Mineras que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en los respectivos registros de los Conservadores de Minas competentes. El Deudor se obliga a hacer entrega al Agente de Garantías Local de copia de las inscripciones referidas.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Hipoteca sobre Concesiones Mineras Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

## __Exhibit LL__

**Amendment to Water Rights Mortgage**

REPERTORIO
OT

## MODIFICACIÓN Y TEXTO REFUNDIDO DE HIPOTECA SOBRE DERECHOS DE

## APROVECHAMIENTO DE AGUAS

## ALTO MAIPO SpA

## A

## ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el **"Deudor"**/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante **"Itaú Corpbanca"**/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **"Agente de Garantías Local"**/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las **"Partes"**; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el **"Contrato de Modificación"**/:

## PRIMERO: ANTECEDENTES.

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las **"Centrales de Generación"** o *"Power Stations"*, según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el **"Proyecto"**, el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Hipoteca sobre Derechos de Aprovechamiento de Aguas.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y nueve guion dos mil trece, complementada mediante /i/ escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha cuatro de febrero de dos mil catorce, repertorio número mil seiscientos cincuenta y cuatro guion dos mil catorce y /ii/ escritura pública otorgada en la Notaría de Santiago de don Osvaldo Pereira González con fecha seis de junio de dos mil catorce, repertorio número nueve mil novecientos treinta y cuatro guion dos mil catorce, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron, como parte del Financiamiento Alto Maipo, un contrato de hipoteca sobre derechos de aprovechamiento de aguas futuros, el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto a fojas cincuenta y cuatro vuelta, número cincuenta y tres y a fojas ciento diecisiete vuelta, número ciento nueve, ambos del año dos mil catorce, y en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, a fojas treinta y cuatro, número sesenta, y a fojas setenta y cinco, número ciento dieciséis, ambos del año dos mil catorce /en adelante, el "**Contrato de Hipoteca sobre Derechos de Aguas Original**"/. El Contrato de Hipoteca sobre Derechos de Aguas Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos cuatro guion dos mil diecisiete /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Derechos de Aguas Modificado**"/. El Contrato de Hipoteca sobre Derechos de Aguas Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y cinco guion dos mil dieciocho /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa y dos, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado

y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo estar garantizadas con hipotecas sobre bienes raíces emitidas por el Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la hipoteca sobre derechos de aguas de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo, las Partes acuerdan modificar el Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Hipoteca sobre Derechos de Aguas**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE HIPOTECA SOBRE DERECHOS DE AGUAS ALTO MAIPO.** Las Partes declaran que el texto del Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**HIPOTECA SOBRE DERECHOS DE APROVECHAMIENTO DE AGUAS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de hipoteca sobre derechos de aprovechamiento de aguas /el "**Contrato de Hipoteca sobre Derechos de Aguas**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta

y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales.** Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de hipoteca sobre derechos de aprovechamiento de aguas, es un texto modificado y refundido del contrato de hipoteca sobre derechos de aprovechamiento de aguas futuros celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y nueve guion dos mil trece; el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto a fojas cincuenta y cuatro vuelta, número cincuenta y tres y a fojas ciento diecisiete vuelta, número ciento nueve, ambos del año dos mil catorce, y en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, a fojas treinta y cuatro, número sesenta, y a fojas setenta y cinco, número ciento dieciséis, ambos del año dos mil catorce, y complementado mediante: /i/ escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha cuatro de febrero de dos mil catorce, repertorio número mil seiscientos cincuenta y cuatro guion dos mil catorce y /ii/ escritura pública otorgada en la Notaría de Santiago de don Osvaldo Pereira González con fecha dos de junio de dos mil catorce, repertorio número nueve mil novecientos treinta y cuatro guion dos mil catorce; y modificado mediante escrituras públicas de fechas: /i/ diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos cuatro guion dos mil diecisiete; /ii/ ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y cinco guion dos mil dieciocho; /en adelante, dicho contrato de hipoteca sobre derechos de aprovechamiento de aguas, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo**"/.

<u>**CLÁUSULA SEGUNDA:**</u> **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido

protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLAÚSULA TERCERA: DERECHOS DE APROVECHAMIENTO DE AGUAS.** El Deudor es titular y dueño de los derechos de aprovechamiento de aguas que se detallan a continuación, en adelante conjuntamente los "**Derechos de Aprovechamiento de Aguas Presentes**": **/A/ Del veinticinco por ciento** del derecho de aprovechamiento de aguas no consuntivo de aguas superficiales y corrientes, en la forma y por los caudales expresados en metros cúbicos por segundo que a continuación se individualiza, en el Río Maipo, ubicado en la Provincia de Cordillera, Región Metropolitana: metros cúbicos por segundo. Permanente: Abril diecinueve coma veinte, Mayo catorce, Junio doce coma noventa y tres, Julio doce coma treinta y seis, Agosto once coma setenta y cinco, Septiembre trece coma sesenta y siete, Octubre veinticuatro coma once, Noviembre cuarenta, Diciembre cuarenta, Enero cuarenta, Febrero cuarenta, Marzo treinta coma sesenta y cuatro. Eventuales: Abril veinte coma ochenta, Mayo veintiséis, Junio veintisiete coma cero siete, Julio veintisiete coma sesenta y cuatro, Agosto veintiocho coma veinticinco, Septiembre veintiséis coma treinta y tres, Octubre quince coma ochenta y nueve, Noviembre cero. Diciembre cero, Enero cero, Febrero cero, Marzo nueve coma treinta y seis.- El agua se captará en forma gravitacional desde la ribera derecha, en un punto ubicado en las siguientes coordenadas UTM (Kilómetros): Norte: Seis mil doscientos cincuenta y nueve coma cero sesenta y Este: Trescientos setenta y siete coma trescientos cincuenta. La restitución de las aguas se efectuará en un punto definido por las siguientes coordenadas UTM (Kilómetros): Norte: Seis mil doscientos setenta y dos coma cero cero cero Este: Trescientos setenta y seis coma doscientos cincuenta. La distancia entre el punto de captación y el de restitución es de veinte kilómetros y su desnivel es de doscientos cuarenta y tres metros.- El porcentaje adquirido corresponde a la siguiente distribución mensual -en metros cúbicos por segundo-: Permanente: Abril cuatro coma ocho. Mayo tres coma cinco. Junio tres coma veintitrés. Julio tres coma cero nueve. Agosto dos coma noventa y cuatro. Septiembre tres coma cuarenta y dos. Octubre seis coma cero tres. Noviembre diez. Diciembre diez. Enero diez. Febrero diez. Marzo siete coma sesenta y seis. Eventuales: Abril cinco coma dos. Mayo seis coma cinco. Junio seis coma setenta y siete. Julio seis coma noventa y uno. Agosto siete coma cero seis. Septiembre seis coma cincuenta y ocho. Octubre tres coma noventa y siete. Noviembre cero. Diciembre cero. Enero cero. Febrero cero. Marzo dos coma treinta y cuatro.- LOS CAUDALES del derecho de aprovechamiento de aguas, sufrió modificaciones por motivo de renuncias que a continuación se detalla: RENUNCIA: AES GENER S.A. /hoy AES Andes S.A./, en virtud de lo establecido en el inciso tercero del artículo sexto del Código de AGUAS, renunció parcialmente al derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes, en la forma, ejercicio y por los caudales expresados en metros cúbicos por segundo en el RÍO Maipo ubicado en la Provincia Cordillera, Región Metropolitana, que se individualizan a continuación: PERMANENTES: Abril dos coma veinte; Mayo: uno coma setenta y siete; Junio: dos coma veintisiete; Julio Uno coma cincuenta y seis; Agosto: uno coma cincuenta y tres; Septiembre: uno coma sesenta y tres; Octubre: tres coma ochenta y seis; Noviembre: siete coma veintiuno; Diciembre: diez; Enero: cuatro coma cincuenta y dos; Febrero: dos coma veinte; Marzo: tres coma cincuenta y cinco; EVENTUALES: Mayo cinco coma treinta y cinco. CON ELLO, EL DERECHO, LUEGO DE LA RENUNCIA EFECTUADA QUEDA REDUCIDO A LOS SIGUIENTES CAUDALES, EXPRESADOS EN METROS CÚBICOS POR SEGUNDO: PERMANENTES: Abril: dos coma sesenta; Mayo: uno coma setenta y tres; Junio: cero coma noventa y seis; Julio: uno coma cincuenta y tres; Agosto: uno coma cuarenta y uno; Septiembre: uno coma setenta y nueve; Octubre: dos coma dieciséis; Noviembre: dos coma setenta y nueve; Diciembre: cero; Enero: cinco coma cuarenta y ocho; Febrero: siete coma ochenta; Marzo: cuatro coma once, Eventuales: Abril: cinco coma dos; Mayo: uno coma quince; Junio: seis coma setenta y siete; Julio: seis coma noventa y uno; Agosto: siete coma cero seis; Septiembre: seis coma cincuenta y ocho; Octubre: tres coma noventa y siete; Noviembre: cero; Diciembre: cero; Enero: cero; Febrero: cero; Marzo: dos coma treinta y cuatro. El derecho previamente individualizado fue adquirido por el Deudor mediante Aporte efectuado por AES GENER S.A. /hoy AES Andes S.A./ según consta de escritura pública de fecha tres de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número dieciséis mil ciento dieciocho guion dos mil trece, e inscrito a fojas doscientos catorce, número trescientos treinta y nueve, correspondiente al Registro de Propiedad de Aguas del año dos mil catorce, del Conservador de Bienes Raíces de Puente Alto. **/B/** Derecho de aprovechamiento no

consuntivo de aguas superficiales y corrientes por el ejercicio y caudales en metros cúbicos por segundo en el río **Volcán**, primera sección del río Maipo, en la Provincia Cordillera, Región Metropolitana, que consisten en metros cúbicos por segundo. Enero. Permanente Continuo: cuatro coma tres; Eventual Discontinuo: cero metros cúbicos por segundo. Febrero. Permanente Continuo: cuatro coma tres; Eventual Discontinuo: cero metros cúbicos por segundo. Marzo. Permanente Continuo: tres coma noventa y cinco; Eventual Discontinuo: cero coma treinta y cinco metros cúbicos por segundo. Abril. Permanente Continuo: dos coma cincuenta y cinco; Eventual Discontinuo: uno coma setenta y cinco metros cúbicos por segundo. mayo. Permanente Continuo: dos coma dieciséis; Eventual Discontinuo: dos coma catorce metros cúbicos por segundo. Junio. Permanente Continuo: dos coma diez; Eventual Discontinuo: dos coma cero cuatro metros cúbicos por segundo. Julio. Permanente Continuo: uno coma noventa y uno; Eventual Discontinuo: dos coma treinta y nueve metros cúbicos por segundo. Agosto. Permanente Continuo: uno coma ochenta y nueve; Eventual Discontinuo: uno coma ochenta y cinco metros cúbicos por segundo. Septiembre. Permanente Continuo: dos coma cero cero; Eventual Discontinuo: dos coma veinticuatro metros cúbicos por segundo. Octubre. Permanente Continuo: dos coma ochenta y cuatro; Eventual Discontinuo: uno coma cuarenta y seis metros cúbicos por segundo. Noviembre. Permanente Continuo: cuatro coma tres; Eventual Discontinuo: cero metros cúbicos por segundo. Diciembre. Permanente Continuo cuatro coma tres; Eventual Discontinuo: cero metros cúbicos por segundo. Las aguas se captarán en forma gravitacional en una bocatoma ubicada en la ribera derecha, en el punto definido por las coordenadas U.T.M (m) que se indican Norte: seis millones doscientos cincuenta y siete mil cuatrocientos diez. Este: cuatrocientos ocho mil trescientos. La restitución de las aguas se efectuará en el río Volcán, por la ribera izquierda en un punto definido por las siguientes coordenadas U.T.M (m): Norte: seis millones doscientos cincuenta y ocho mil seiscientos noventa Este: cuatrocientos cinco mil setecientos cincuenta. La distancia entre el punto de captación y el de restitución es de dos mil ochocientos cincuenta y tres metros y el desnivel es de doscientos cinco metros. Las coordenadas U.T.M están referidas a la carta I.G.M uno: cincuenta mil, Datum Provisorio Sudamericano mil novecientos cincuenta y seis. El titular del derecho de aprovechamiento deberá dejar pasar aguas abajo del punto de captación, un caudal no inferior a uno coma cero cuatro metros cúbicos por segundo, para preservar el equilibrio ecológico del sector. El derecho previamente individualizado fue adquirido por el Deudor de la siguiente manera: (i) la nuda propiedad, por Aporte efectuado por AES GENER S.A. /hoy AES Andes S.A./ mediante escritura pública de fecha tres de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número dieciséis mil ciento diecisiete guion dos mil trece y (ii) mediante usufructo, otorgado en la Notaría de Santiago de don Eduardo Avello Concha, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece e inscrito a fojas ciento sesenta y nueve número ciento ochenta y seis del Registro de Hipotecas y Gravámenes del año dos mil trece, reuniendo así la propiedad plena, e inscrito con fecha veintiuno de enero de dos mil catorce, a fojas treinta, número cuarenta y uno, correspondiente al Registro de Propiedad de Aguas del año dos mil catorce, del Conservador de Bienes Raíces de Puente Alto. **/C/** Derecho de aprovechamiento de aguas no consuntivo, de ejercicio permanente y continuo sobre las aguas corrientes y superficiales que se captan gravitacionalmente, a la cota un mil cuatrocientos diez aproximadamente, mediante una barrera móvil frontal y una cámara de toma lateral desde el estero **Aucayes**, afluente del río Colorado, ubicado en la comuna de San José de Maipo, Provincia Cordillera, Región Metropolitana, que consisten en dos metros cúbicos por segundo, restituyendo las aguas al río Colorado, aproximadamente un kilómetro aguas arriba de la junta del estero Aucayes con dicho río, el desnivel y distancia entre el punto de captación y el punto de restitución es de doscientos setenta metros y dos kilómetros, respectivamente.. El derecho previamente individualizado fue adquirido por el Deudor de la siguiente manera: (i) la nuda propiedad, por Aporte efectuado por AES GENER S.A. /hoy AES Andes S.A./ mediante escritura pública de fecha tres de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número dieciséis mil ciento diecisiete guion dos mil trece y (ii) mediante usufructo, otorgado en la Notaría de Santiago de don Eduardo Avello Concha, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece inscrito a fojas ciento setenta, número ciento ochenta y siete del Registro de Hipotecas y Gravámenes del año dos mil trece, reuniendo así la propiedad plena, e inscrito con fecha veintiuno de enero de dos mil catorce, a fojas treinta y uno vuelta, número cuarenta y dos, correspondiente al Registro de Propiedad de Aguas del año dos mil catorce, del Conservador de Bienes Raíces de Puente Alto. **/D/** Derecho de aprovechamiento no consuntivo de aguas superficiales y

corrientes del río **Colorado**, en la primera sección del río Maipo, provincia Cordillera, Región Metropolitana, por un caudal de veinte metros cúbicos por segundo, conforme al siguiente detalle: Q- m tres/s. ABR Permanentes cero coma cero cuarenta y cuatro. Eventuales cero coma doscientos once Total cero coma doscientos cincuenta y cinco. MAY Permanentes cero coma ciento cincuenta y dos. Eventuales cero coma doscientos cincuenta y uno Total cero coma cuatrocientos tres. JUN Permanentes cero coma ciento sesenta y nueve. EVENTUALES uno coma cuatrocientos setenta. Total uno coma seiscientos treinta y ocho. JUL Permanentes cero coma ciento noventa y cinco. EVENTUALES cinco coma doscientos cuarenta y ocho. Total cinco coma cuatrocientos cuarenta y dos. AGO Permanentes cero coma doscientos veintisiete. Eventuales dos coma setecientos cuarenta y siete. Total dos coma novecientos setenta y cuatro SEP Permanentes cero coma trescientos setenta y uno. Eventuales dos coma trescientos ochenta y cuatro. Total dos coma setecientos cincuenta y cinco. OCT Permanentes cero coma cuatrocientos. EVENTUALES seis coma ochocientos setenta y uno. Total siete coma doscientos setenta y uno. NOV Permanentes nueve coma novecientos noventa y cuatro. EVENTUALES diez coma cero cero siete. Total veinte. DIC Permanentes dieciocho coma ciento veintiséis. Eventuales uno coma ochocientos setenta y cuatro. Total Veinte. ENE Permanentes dieciocho coma novecientos noventa y nueve. Eventuales uno coma cero cero uno. Total veinte. FEB Permanente diecisiete coma quinientos quince. Eventuales dos coma cuatrocientos ochenta y cinco. Total veinte. MAR Permanentes dieciséis coma doscientos cincuenta y cinco. Eventuales tres coma quinientos cuarenta. Total diecinueve coma setecientos noventa y seis. Las aguas se captarán gravitacionalmente desde el río Colorado, inmediatamente aguas abajo de la descarga de la Central Hidroeléctrica Maitenes, en el punto definido por las coordenadas UTM Norte seis millones doscientos ochenta y nueve mil quinientos cincuenta y siete metros y Este trescientos ochenta y dos mil quinientos cuarenta y cinco metros, y a restituirse en el río Maipo, inmediatamente aguas arriba de la bocatoma del Canal Sirena, en un punto definido por las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, ambas referidas en el Datum provisorio Sudamericano de mil novecientos cincuenta y seis. El desnivel entre el punto de captación y de restitución es de trescientos dieciocho metros y la distancia entre ambos puntos medida en línea recta, es de dieciséis mil seiscientos sesenta y siete metros. La titular de los derechos de aprovechamiento, deberá dejar pasar aguas debajo de cada punto de captación los caudales que a continuación se presentan, y que corresponden a los caudales ecológicos para preservar la naturaleza y proteger el medio ambiente, de acuerdo a los dispuesto en el Inciso primero del artículo ciento veintinueve bis uno, del Código de Aguas: Q-m tres/s – Ecológico ABR cinco coma quinientos sesenta y cinco. MAY cuatro coma ochocientos veinticuatro. JUN cuatro coma doscientos cuarenta y siete. JUL tres como novecientos cincuenta y dos. AGO cuatro coma ciento catorce. SEP cuatro coma doscientos veintitrés. OCT cinco coma trescientos setenta y seis. NOV cinco coma quinientos sesenta y cinco. DIC cinco coma quinientos sesenta y cinco. ENE cinco coma quinientos sesenta y cinco. FEB cinco coma quinientos sesenta y cinco. MAR cinco coma quinientos sesenta y cinco. El derecho previamente individualizado fue adquirido por el Deudor mediante Aporte efectuado por AES GENER S.A. /hoy AES Andes S.A./ mediante escritura pública de fecha tres de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número dieciséis mil ciento diecisiete guion dos mil trece e inscrito con fecha veintiuno de enero de dos mil catorce, a fojas treinta y dos, número cuarenta y tres, correspondiente al Registro de Propiedad de Aguas del año dos mil catorce, del Conservador de Bienes Raíces de Puente Alto. [Individualización de otros Derechos de Aprovechamiento de Aguas Presentes, en caso de existir][1]

**CLÁUSULA CUARTA: HIPOTECA.** **/Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, hipoteca de primer grado sobre **/A/** los Derechos de Aprovechamiento de Aguas Presentes, y **/B/** todos los derechos de aprovechamiento de aguas que el Deudor adquiera por cualquier causa en el futuro, de conformidad a lo establecido en el artículo dos mil cuatrocientos diecinueve del Código Civil, en la medida que los referidos derechos de aprovechamiento de aguas digan relación con la operación, funcionamiento, mantención o desarrollo del

---

[1] Sujeto a la existencia de nuevos derechos hasta la fecha de firma.

Proyecto, /en adelante, los "**Derechos de Aprovechamiento de Aguas Futuros**" y conjuntamente con los Derechos de Aprovechamiento de Aguas Presentes, los "**Derechos de Aprovechamiento de Aguas**"/ y en especial, pero sin limitación alguna, sobre los siguientes derechos de aprovechamiento de aguas, inscritos actualmente a nombre de AES Gener S.A. /hoy AES Andes S.A./, cuya inscripción a nombre del Deudor en el Registro de Propiedad de Aguas del Conservador de Bienes Raíces de Puente Alto se encuentra sujeta al cumplimiento de determinadas condiciones y plazos suspensivos según da cuenta un contrato suscrito por escritura pública de fecha tres de diciembre de dos mil trece entre el Deudor y AES Gener S.A. /hoy AES Andes S.A./, otorgado en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número dieciséis mil ciento diecinueve /la "**Escritura de Aporte Condicional**"/, y la escritura pública de fecha tres de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número dieciséis mil ciento diecisiete guion dos mil trece /la "**Escritura de Aumento de Capital**"/ /en adelante, los "**Derechos de Aprovechamiento de Aguas Sujetos a Condición**"/: /A/ /i/ Derecho de aprovechamiento no consuntivo sobre aguas del río Colorado, afluente del río Maipo, de ejercicio permanente y continuo, de veinticinco metros cúbicos por segundo, que se captará gravitacionalmente en la ribera derecha del río Colorado, aproximadamente a seiscientos cincuenta metros aguas abajo de la descarga de la Central Hidroeléctrica Los Maitenes y se restituirá al río Maipo, Primera Sección, inmediatamente aguas arriba de la bocatoma del Canal Sirena, con un desnivel de trescientos treinta y cinco metros entre la captación y la restitución, otorgado mediante Resolución número trescientos noventa y tres, dictada por la Dirección General de Aguas de la Región Metropolitana, en adelante la "**DGA**", con fecha catorce de septiembre de mil novecientos ochenta y dos, en favor de Compañía Manufacturera de Papeles y Cartones S.A. y reducido a escritura pública en la Notaría de Santiago de don Raúl Iván Perry Pefaur, con fecha veinticinco de octubre de mil novecientos ochenta y dos. /ii/ Con posterioridad, Compañía Manufacturera de Papeles y Cartones S.A. -hoy Colbún S.A.- vendió, cedió y transfirió estos derechos de aprovechamiento de aguas a favor de AES Gener S.A. /hoy AES Andes S.A./ por compraventa que consta en escritura pública otorgada con fecha veintitrés de mayo de dos mil siete, en la Notaría de Santiago de don Raúl Undurraga Laso, repertorio número tres mil trescientos uno guion dos mil siete, y que se inscribió a fojas ciento cuarenta y uno, número doscientos cincuenta y tres del Registro de Propiedad de Aguas del año dos mil siete, del Conservador de Bienes Raíces de Puente Alto. /iii/ Luego, mediante resolución número ciento doce y resolución número trescientos veinte, dictadas por la DGA, con fecha veintiocho de enero de dos mil diez y fecha dieciséis de marzo de dos mil diez respectivamente, se autorizó trasladar el punto de captación del ejercicio de derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes en el río Colorado, de ejercicio permanente y continuo, captados aproximadamente a seiscientos cincuenta metros aguas abajo de la descarga de la Central Hidroeléctrica Los Maitenes. La restitución en el río Maipo, inmediatamente aguas arriba de la bocatoma del canal Sirena, con un desnivel de trescientos treinta y cinco metros entre ambos puntos. Hasta un nuevo punto de captación, ubicado en el mismo río Colorado, inmediatamente aguas abajo de la descarga de la Central Hidroeléctrica Alfalfal, en las coordenadas UTM Norte seis millones doscientos noventa y dos mil quinientos cuarenta y uno metros y Este trescientos ochenta y nueve mil setenta y nueve metros, Datum mil novecientos cincuenta y seis. Siendo el nuevo desnivel y nueva distancia entre el nuevo punto de captación y el punto de restitución de cuatrocientos noventa y siete metros y veintitrés coma ochenta y tres kilómetros respectivamente, Provincia de Cordillera, Región Metropolitana. Los caudales máximos (metros cúbicos por segundo) que podrá captar en el nuevo punto de captación en el río Colorado y que deberá restituir en el río Maipo, son los siguientes: Ejercicio. Permanente. ABR: diez coma cincuenta y tres; MAY: siete coma sesenta y seis: JUN seis coma cuarenta y seis; JUL: cinco coma setenta y uno; AGO: cinco coma ochenta y cuatro; SEP: seis coma cero cuatro; OCT: nueve coma diecisiete; NOV: cinco coma catorce; DIC: seis coma ochenta y siete; ENE: diez coma noventa y tres; FEB: ocho coma setenta y dos; y MAR cero coma ochenta y cinco. Eventual. ABR: catorce coma cuarenta y siete; MAY: diez coma sesenta y uno; JUN: diez coma veinte; JUL: ocho coma ochenta y seis; AGO: siete coma noventa y siete; SEP trece coma veintisiete; OCT quince coma ochenta y tres; NOV diecinueve coma ochenta y seis; DIC: dieciocho coma trece; ENE: catorce coma cero siete; FEB: dieciséis coma veintiocho; y MAR: veinticuatro coma quince. Total. ABR: veinticinco coma cero cero; MAY: dieciocho coma treinta y dos; JUN: dieciséis coma sesenta y seis; JUL: catorce coma cincuenta y siete; AGO: trece coma ochenta y dos; SEP: diecinueve coma treinta; OCT: veinticinco coma cero cero; NOV: veinticinco coma cero cero; DIC:

veinticinco coma cero cero; ENE: veinticinco coma cero cero; FEB: veinticinco coma cero cero; y MAR: veinticinco coma cero cero. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos noventa y dos/dos mil diez, y se inscribieron a fojas treinta y tres, número catorce del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. El derecho previamente individualizado fue otorgado en usufructo por AES Gener S.A. /hoy AES Andes S.A./ al Deudor mediante escritura pública de fecha primero de Julio de dos mil trece, otorgada en la Notaría de Santiago de don Eduardo Avello Concha, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece e inscrito con fecha ocho de Agosto de dos mil trece, a fojas ciento sesenta y cuatro, número ciento ochenta y tres, correspondiente al Registro de Hipotecas de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. /B/ Derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, otorgado mediante resolución de la DGA número ciento setenta y nueve de fecha diez de junio de dos mil cinco, que consta en escritura pública otorgada con fecha quince de marzo de dos mil seis, en la Notaría de Santiago de don Enrique Tornero Figueroa, repertorio número ochocientos cincuenta y dos, y que se inscribió a fojas noventa y dos vuelta, número ciento setenta y cinco del Registro de Propiedad de Aguas del año dos mil seis, del Conservador de Bienes Raíces de Puente Alto. Posteriormente la DGA autorizó el traslado parcial del punto de captación del referido derecho de aprovechamiento, en el siguiente sentido: /i/ Cajón del Morado. Mediante resolución número ciento tres y resolución número trescientos veinticuatro, dictadas por la DGA, con fechas veintiséis de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual continuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM Norte seis millones doscientos setenta y dos mil ciento cincuenta metros y Este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en el Cajón del Morado, afluente aguas arriba del río Maipo, en las coordenadas UTM Norte seis millones doscientos sesenta y dos mil metros y Este cuatrocientos cuatro mil setecientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo, en un punto ubicado inmediatamente aguas arribas de la bocatoma canal Sirena, en las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el cajón el Morado y el punto de restitución original en el río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y tres coma ocho kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Los caudales que se trasladan son los siguientes: MORADO. Permanente. ABR: cero coma cincuenta y nueve; MAY: cero coma cincuenta; JUN: cero coma cuarenta y nueve; JUL: cero coma cuarenta y cuatro; AGO: cero coma cuarenta y cuatro; SEP: cero coma cuarenta y siete; OCT: cero coma sesenta y seis; NOV: uno coma veintiocho; DIC: uno coma noventa y uno; ENE: uno coma sesenta y seis; FEB: uno coma treinta y cuatro; y MAR: cero coma noventa y dos. Eventual. ABR: cero coma ochenta y uno; MAY: cero coma cincuenta y siete; JUN: cero coma cuarenta y ocho; JUL: cero coma cincuenta y ocho; AGO: cero coma cuarenta y tres; SEP: cero coma cincuenta y dos; OCT: cero coma ochenta y tres; NOV: uno coma cuarenta y ocho; DIC: uno coma setenta y nueve; ENE: dos coma cero cuatro; FEB: dos coma once; y MAR: uno coma treinta y nueve. Total. ABR: uno coma cuarenta; MAY: uno coma cero siete; JUN: cero coma noventa y siete; JUL: uno coma cero dos; AGO: cero coma ochenta y siete; SEP: cero coma noventa y nueve; OCT: uno coma cuarenta y nueve; NOV: dos coma setenta y seis; DIC: tres coma setenta; ENE: tres coma setenta; FEB: tres coma cuarenta y cinco; y MAR: dos coma treinta y uno. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y ocho/dos mil diez, y se inscribieron a fojas cincuenta y siete vuelta, número dieciséis del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. /ii/ Estero Colina. Mediante resolución número ciento cinco y resolución número trescientos veintidós, dictadas por la DGA, con fechas veintiséis de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no

consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual continuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM Norte seis millones doscientos setenta y dos mil ciento cincuenta metros y Este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en el estero Colina, afluente aguas arriba del río Maipo, en las coordenadas UTM Norte seis millones doscientos sesenta mil trescientos cincuenta metros y Este cuatrocientos ocho mil cuatrocientos metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo, en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, en las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el estero en Colina y el punto de restitución original en el río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y siete coma setenta y ocho kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Los caudales que se trasladan son los siguientes: ESTERO COLINA. Permanente. ABR: cero coma sesenta y cinco; MAY: cero coma cincuenta y cuatro; JUN: cero coma cincuenta y dos; JUL: cero coma cuarenta y siete; AGO: cero coma cuarenta y seis; SEP: cero coma cuarenta y nueve; OCT: cero coma setenta y tres; NOV: uno coma cuarenta y ocho; DIC: dos coma veintiséis; ENE: uno coma noventa y seis; FEB: uno coma cincuenta y seis; y MAR: uno coma cero cinco. Eventual. ABR: cero coma noventa y nueve; MAY: cero coma setenta; JUN: cero coma cincuenta y ocho; JUL: cero coma setenta; AGO: cero coma cincuenta y tres; SEP: cero coma sesenta y cuatro; OCT: uno coma cero dos; NOV: uno coma ochenta y uno; DIC: tres coma veintiuno; ENE: tres coma noventa y siete; FEB: dos coma cincuenta y ocho; y MAR: uno coma setenta. Total. ABR: uno coma sesenta y cuatro; MAY: uno coma veinticuatro; JUN: uno coma diez; JUL: uno coma diecisiete; AGO: cero coma noventa y nueve; SEP: uno coma trece; OCT: uno coma setenta y cinco; NOV: tres coma veintinueve; DIC: cinco coma cuarenta y siete; ENE: cinco coma noventa y tres; FEB: cuatro coma catorce; y MAR: dos coma setenta y cinco. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos noventa/dos mil diez, y se inscribieron a fojas diecinueve vuelta, número trece del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. /iii/ Estero La Engorda. Mediante resolución número ciento dos y resolución número trescientos veintitrés, dictadas por la DGA, con fechas veintiséis de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual continuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM Norte seis millones doscientos setenta y dos mil ciento cincuenta metros y Este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en el estero La Engorda, afluentes aguas arriba del río Maipo, en las coordenadas UTM Norte seis millones doscientos cincuenta y nueve mil seiscientos metros y Este cuatrocientos ocho mil quinientos metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo, en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, en las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el estero La Engorda y el punto de restitución original en el río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y ocho coma veinticinco kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Los caudales que se trasladan son los siguientes: LA ENGORDA. Permanente. ABR: cero coma cincuenta; MAY: cero coma cuarenta y tres; JUN: cero coma cuarenta y uno; JUL: cero coma treinta y ocho; AGO: cero coma treinta y siete; SEP: cero coma treinta y nueve; OCT: cero coma cincuenta y seis; NOV: uno coma cero ocho; DIC: uno coma sesenta y dos; ENE: uno coma cuarenta y uno; FEB: uno coma trece; y MAR: cero coma setenta y ocho. Eventual. ABR: cero coma sesenta y ocho; MAY: cero coma cuarenta y ocho; JUN: cero coma cuarenta; JUL: cero coma cuarenta y nueve; AGO: cero coma treinta y seis; SEP: cero coma cuarenta y cuatro; OCT: cero coma setenta; NOV: uno coma cero dos; DIC: cero coma cuarenta y ocho; ENE: cero

coma sesenta y nueve; FEB: cero coma noventa y siete; MAR: uno coma dieciocho; Total. ABR: uno coma dieciocho; MAY: cero coma noventa y uno; JUN: cero coma ochenta y uno; JUL: cero coma ochenta y siete; AGO: cero coma setenta y tres; SEP; cero coma ochenta y tres; OCT: uno coma veintiséis; NOV: dos coma diez; DIC: dos coma diez; ENE: dos coma diez; FEB: dos coma diez; y MAR: uno coma noventa seis. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y uno/dos mil diez, y se inscribieron a fojas seis vuelta, número doce del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. /iv/ Quebrada Las Placas. Mediante resolución número ciento cuatro y resolución número trescientos veinticinco, dictadas por la DGA, con fechas veintiséis de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual discontinuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM Norte seis millones doscientos setenta y dos mil ciento cincuenta metros y Este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en la Quebrada Las Placas, afluente aguas arribas del río Maipo, en las coordenadas UTM Norte seis millones doscientos sesenta mil novecientos cincuenta metros y Este cuatrocientos seis mil novecientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo, en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, en las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en la Quebrada Las Placas y el punto de restitución original del río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y seis coma veintitrés kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Los caudales que se trasladan son los siguientes: LAS PLACAS. Permanente. ABR. cero coma treinta y seis; MAY: cero coma treinta; JUN: cero coma veintinueve; JUL: cero coma veintisiete; AGO: cero coma veintiséis; SEP: cero coma veintiocho; OCT: cero coma cuarenta; NOV: cero coma setenta y seis; DIC: uno coma cero cero; ENE cero coma noventa y nueve; FEB: cero coma ochenta; y MAR: cero coma cincuenta y cinco. Eventual. ABR: cero coma cuarenta y ocho; MAY: cero coma treinta y cuatro; JUN: cero coma veintiocho; JUL: cero coma treinta; AGO: cero coma veinte; SEP: cero coma treinta y uno; OCT: cero coma cincuenta; NOV: cero coma veinticuatro; DIC: cero coma cero cero; ENE: cero coma cero uno; FEB: cero coma veinte; MAR: cero coma cuarenta y cinco. Total. ABR: cero coma ochenta y cuatro; MAY: cero coma sesenta y cuatro; JUN: cero coma cincuenta y siete; JUL: cero coma cincuenta y siete; AGO: cero coma cuarenta y uno; SEP: cero coma cincuenta y nueve; OCT: cero coma noventa; NOV: uno coma cero cero; DIC: uno coma cero cero; ENE: uno coma cero cero; FEB: uno coma cero cero; y MAR: uno coma cero cero. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y nueve/dos mil diez, y se inscribió a fojas setenta y uno, número diecisiete del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. Los derechos previamente individualizados fueron otorgados en usufructo por AES Gener /hoy AES Andes S.A./ al Deudor, mediante escritura pública de fecha primero de Julio de dos mil trece, otorgada en la Notaría de Santiago de don Eduardo Avello Concha, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece e inscrito con fecha ocho de Agosto de dos mil trece, a fojas ciento sesenta y ocho, número ciento ochenta y cinco, correspondiente al Registro de Hipotecas de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. /C/ Derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes en el río Yeso, afluente del río Maipo, ubicado en la comuna de San José de Maipo, Provincia Cordillera, derecho de ejercicio permanente y continuo, consistente en quince metros cúbicos por segundo, cuya bocatoma estará en la ribera izquierda del río Yeso, aguas abajo del embalse del mismo nombre, a la cota aproximada de dos mil quinientos metros sobre el nivel del mar. La restitución se hará al mismo río antes de la confluencia con el río Maipo, a la cota mil cuatrocientos metros sobre el nivel del mar, siendo el desnivel entre ambos puntos de mil cien metros. El derecho fue otorgado mediante Resolución número ciento siete, dictada por la DGA, con fecha veinticinco de abril de mil novecientos ochenta y tres,

en favor de Compañía Chilena de Electricidad S.A., reducida a escritura pública en la Notaría de Santiago de don Patricio Zaldívar Mackenna, con fecha veintitrés de mayo de mil novecientos ochenta y tres e inscrita a fojas ciento cincuenta y uno número ciento ochenta y tres del Registro de Propiedad de Aguas de mil novecientos ochenta y tres del Conservador de Bienes Raíces de Puente Alto. /ii/ Con posterioridad, Compañía Chilena de Generación Eléctrica -hoy AES Andes S.A.- adquirió estos derechos de aprovechamiento de aguas, mediante compraventa hecha a la Compañía Chilena de Electricidad S.A., por escritura pública de fecha treinta de abril de mil novecientos ochenta y seis, suscrita en la Notaría de Santiago de don Mario Barros González, y que se inscribió a fojas ciento ochenta y tres, número doscientos dieciocho del Registro de Propiedad de Aguas del año mil novecientos ochenta y seis, del Conservador de Bienes Raíces de Puente Alto. /iii/ Luego, mediante resolución número ciento once y resolución número trescientos veintiuno, dictadas por la DGA, con fechas veintiocho de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar el punto de restitución del ejercicio de derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes desde el río Yeso, de ejercicio permanente y continuo de metros cúbicos por segundo, captados gravitacionalmente en la ribera izquierda del río Yeso, aguas abajo del muro del embalse El Yeso, a la cota aproximada de dos mil quinientos m.s.n.m. y restituidas en el mismo río Yeso, antes de su confluencia con el río Maipo, a la cota un mil cuatrocientos m.s.n.m., hasta un nuevo punto de restitución ubicado en el río Maipo, inmediatamente aguas arriba de la bocatoma del canal Sirena, con las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Siendo el nuevo desnivel y nueva distancia entre el punto de captación original y el nuevo punto de restitución de un mil seiscientos setenta y nueve metros y treinta y cuatro coma uno kilómetros, respectivamente, en la provincia Cordillera, Región Metropolitana. Los caudales máximos que podrá captar en el río Yeso y que deberá restituir al río Maipo, en el nuevo punto de restitución, son los siguientes: Permanente. ABR: quince coma cero cero; MAY: quince coma cero cero; JUN: trece coma cincuenta y cinco; JUL: quince coma cero cero; AGO: quince coma cero cero; SEP: quince coma cero cero; OCT: quince coma cero cero; NOV: quince coma cero cero DIC: quince coma cero cero; ENE: quince coma cero cero; FEB: quince coma cero cero; y MAR quince coma cero cero. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos noventa y uno/dos mil diez, y se inscribieron a fojas cuarenta y ocho, número quince del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. El derecho previamente individualizado fue otorgado en usufructo por AES Gener S.A. /hoy AES Andes S.A./ al Deudor mediante escritura pública de fecha primero de Julio de dos mil trece, otorgada en la Notaría de Santiago de don Eduardo Avello Concha, Abogado, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece e inscrito con fecha ocho de Agosto de dos mil trece, a fojas ciento sesenta y ocho, número ciento ochenta y cinco, correspondiente al Registro de Hipotecas de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. El derecho real de hipoteca sobre los Derechos de Aprovechamiento de Aguas Futuros se adquirirá una vez que estos sean adquiridos por el Deudor, y se entenderá constituido el derecho real de hipoteca desde la fecha de la inscripción del presente instrumento en los respectivos registros del Conservador de Bienes Raíces competente. AES Gener S.A. /hoy AES Andes S.A./ transfirió el usufructo de los derechos de aprovechamiento de aguas a favor de Alto Maipo SpA mediante escritura pública otorgada con fecha primero de julio de dos mil trece, en la Notaría de Santiago de don Eduardo Avello Concha, bajo el repertorio número quince mil cincuenta y uno guion dos mil trece y se inscribió a fojas ciento sesenta y ocho número ciento ochenta y cinco del Registro de Hipotecas de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. /Dos/ Extensión de la Hipoteca. /A/ La hipoteca de que da cuenta este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente hipoteca. /B/

Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente hipoteca es indivisible. /C/ El privilegio otorgado por esta hipoteca incluye y se extiende a las construcciones, instalaciones y demás objetos destinados por el Deudor a la explotación y ejercicio de los Derechos de Aprovechamiento de Aguas, a las indemnizaciones que paguen los seguros descritos en la cláusula undécima de este documento y a cualquier indemnización que corresponda por la expropiación de los Derechos de Aprovechamiento de Aguas o que terceros deban pagar por daños efectivamente causados a las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio de los Derechos de Aprovechamiento de Aguas. Asimismo, la hipoteca se extiende de pleno derecho a todos los demás bienes actuales o futuros o que por adherencia o destinación se reputen formar parte de los Derechos de Aprovechamiento de Aguas, de conformidad a la ley.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la hipoteca y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Derechos de Aprovechamiento de Aguas, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento. Sin embargo, el Deudor podrá realizar todos aquellos actos permitidos de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento, o comprendidos dentro del manejo ordinario de los Derechos de Aprovechamiento de Aguas.

**CLÁUSULA SEXTA: INSCRIPCIÓN Y ANOTACIÓN. /Uno/** Se deja constancia que la hipoteca y prohibición de que da cuenta este instrumento fue debidamente inscrita en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto con fecha diecisiete de marzo de dos mil catorce, a fojas cincuenta y cuatro vuelta, número cincuenta y tres, correspondiente al año dos mil catorce, y en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, con fecha diecisiete de marzo de dos mil catorce, a fojas treinta y cuatro, número sesenta, correspondiente al año dos mil catorce. La hipoteca de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los Derechos de Aprovechamiento de Aguas. **/Dos/** El Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar los Derechos de Aprovechamiento de Aguas Futuros que se hipotecan de la forma establecida en esta escritura, una vez que ellos sean inscritos a nombre del Deudor en el o los Registros de Propiedad de Aguas de el o los Conservadores de Bienes Raíces correspondientes, dentro del plazo de quince días contados desde dicha inscripción. **/Tres/** Por el presente acto, las Partes reconocen la existencia y eficacia de la hipoteca sobre los Derechos de Aprovechamiento de Aguas Futuros que por este acto se constituye, teniendo el Agente de Garantías Local el derecho de inscribirla en el Conservador de Bienes Raíces competente, a costa del Deudor, tan pronto dichos Derechos de Aprovechamiento de Aguas Futuros sean inscritos a nombre del Deudor. Para el evento en que el Deudor no dé cumplimiento a lo establecido en el numeral /Dos/ precedente, el Deudor confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al

respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refiere el numeral /Dos/ precedente, e individualizar los Derechos de Aprovechamiento de Aguas Futuros, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local, para efectos de permitir la correcta y oportuna inscripción de la hipoteca que por este acto recae sobre los Derechos de Aprovechamiento de Aguas Futuros en el o los competentes registros.

**CLÁUSULA SÉPTIMA: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas y, por ende, de esta hipoteca, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta hipoteca, para obtener el cumplimiento de las Obligaciones Garantizadas.

**CLÁUSULA OCTAVA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores hipotecarios.

**CLÁUSULA NOVENA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la hipoteca de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMA: MANTENCIÓN DEL DOMINIO. INSPECCIONES. /Uno/** El Deudor declara y garantiza que los Derechos de Aprovechamiento de Aguas Presentes sobre los cuales se constituye esta hipoteca se encuentran debidamente inscritos, que le pertenecen como único y exclusivo titular, fueron legalmente adquiridos, y que, salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no les afectan legítimos derechos de terceros, se encuentran libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros; y que no están sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Derechos de Aprovechamiento de Aguas Presentes o Derechos de Aprovechamiento de Aguas Sujetos a Condición o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de esta hipoteca, con excepción de los permitidos por los demás Documentos del Financiamiento y los constituidos mediante este instrumento. Adicionalmente, el Deudor se obliga a velar y responder por el hecho de que los Derechos de Aprovechamiento de Aguas Futuros que por el presente instrumento se hipotecan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Derechos de Aprovechamiento de Aguas Futuros, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo titular, estarán con sus impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a esta hipoteca o a Gravámenes Permitidos; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Derechos de Aprovechamiento de Aguas Futuros o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre

enajenación o la hipoteca y prohibiciones constituidas por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento. **/Dos/** Mientras subsista esta hipoteca el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa a los Derechos de Aprovechamiento de Aguas. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión de los Derechos de Aprovechamiento de Aguas y para defenderlos de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio de los Derechos de Aprovechamiento de Aguas, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA UNDÉCIMA: SEGUROS.** El Deudor se obliga a mantener pólizas de seguro respecto de las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio de los Derechos de Aprovechamiento de Aguas contra los riesgos, por las cantidades y en la forma y condiciones que corresponda en cumplimiento de las estipulaciones del Contrato de Términos Comunes y en los demás Documentos del Financiamiento, y sólo en la medida en que estos documentos así lo exijan. De la misma manera, el Deudor se obliga a designar al Agente de Garantías Local, para su beneficio y el de las Partes Garantizadas, como beneficiario o asegurado adicional, según corresponda, en las pólizas respectivas, debiendo entregar copia del endoso o designación correspondiente dentro del plazo establecido para ello en los Documentos del Financiamiento.

**CLÁUSULA DUODÉCIMA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de hipoteca y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta hipoteca y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y al Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de hipoteca que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente hipoteca y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente hipoteca la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO TERCERA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta hipoteca y prohibiciones.

**CLÁUSULA DÉCIMO CUARTA: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/** **Parte integral**. Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/** **Interpretación**. Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del

Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE HIPOTECA SOBRE DERECHOS DE APROVECHAMIENTO DE AGUAS MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Hipoteca sobre Derechos de Aguas.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Hipoteca sobre Derechos de Aguas.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE HIPOTECA SOBRE DERECHOS DE APROVECHAMIENTO DE AGUAS.** La modificación del Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo, que consta en el texto aprobado del Contrato de Hipoteca sobre Derechos de Aguas que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en los respectivos registros de los Conservadores de Bienes Raíces competentes. El Deudor se obliga a hacer entrega al Agente de Garantías Local de copia de las inscripciones referidas.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Hipoteca sobre Derechos de Aguas Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO: PARTE INTEGRAL E INTERPRETACIÓN.**

/Uno/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/Dos/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

## Exhibit MM

**Amendment to Usufruct of Water Rights Mortgage**
**(Hipoteca sobre Usufructo de Derechos de Aprovechamiento de Aguas)**

**REPERTORIO**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE HIPOTECA SOBRE USUFRUCTO DE**

**DERECHOS DE APROVECHAMIENTO DE AGUAS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES ANDES S.A.** /antes AES GENER S.A./, una sociedad anónima, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion cero, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**AES Andes**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

<u>**PRIMERO:** <u>ANTECEDENTES</u>.</u>

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para

almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Hipoteca sobre Usufructo de Derechos de Aguas.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos noventa guion dos mil trece, modificada mediante escritura pública otorgada en la Notaría de Santiago de doña Elena Torres Seguel con fecha veinte de marzo de dos mil catorce, repertorio número seiscientos cuarenta y dos guion dos mil catorce; Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron un contrato de hipoteca sobre usufructo de derechos de aprovechamiento de aguas, el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto con fecha veintidós de mayo de dos mil catorce, a fojas noventa y siete vuelta, número noventa y uno y, en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, a fojas sesenta y uno, número noventa y nueve; ambas correspondientes al año dos mil catorce /así modificado, el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Original**"/. El Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Original fue modificado mediante escritura pública de fecha dieciséis de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos siete guion dos mil diecisiete, la cual fue rectificada mediante escritura pública de fecha veintitrés de mayo de dos mil diecisiete otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cuatro mil ochocientos noventa y tres guion dos mil diecisiete /así modificado, el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Modificado**"/. El Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y seis guion dos mil dieciocho, la cual fue rectificada mediante escritura pública de fecha nueve de julio de dos mil dieciocho otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil ochocientos treinta y cinco guion dos mil dieciocho /en adelante, dicho contrato, modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y

refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta hipoteca sobre usufructos de derechos de aguas emitidas por el Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la hipoteca sobre usufructo de derechos de aguas de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo, las Partes acuerdan modificar el Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE HIPOTECA SOBRE USUFRUCTO DE DERECHOS DE AGUAS ALTO MAIPO.** Las Partes declaran que el texto del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**HIPOTECA SOBRE USUFRUCTO DE DERECHOS DE AGUAS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES ANDES S.A.** /antes AES GENER S.A./, una sociedad anónima, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion cero, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**AES Andes**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de hipoteca sobre usufructo de derechos de aguas /el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho guion dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales.** Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de hipoteca sobre usufructo de derechos de aprovechamiento de aguas, es un texto modificado y refundido del contrato de hipoteca sobre usufructo de derechos de aprovechamiento de aguas celebrado mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos noventa guion dos mil trece, el cual fue debidamente inscrito en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto con fecha veintidós de mayo de dos mil catorce, a fojas noventa y siete vuelta, número noventa y uno y, en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, a fojas sesenta y uno, número noventa y nueve, ambas correspondientes al año dos mil catorce; y modificado mediante **/i/** escritura pública de fecha veinte de marzo de dos mil catorce, otorgada en la Notaría de Santiago de doña Elena Torres Seguel, repertorio número seiscientos cuarenta y dos guion dos mil catorce; **/ii/** escritura pública de fecha dieciséis de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos siete guion dos mil diecisiete; **/iii/** la anterior fue rectificada por escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha veintitrés de mayo de dos mil diecisiete, repertorio número cuatro mil ochocientos noventa y tres guion dos mil diecisiete; y **/iv/** escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos ochenta y seis guion dos mil dieciocho; **/v/** la anterior fue rectificada por escritura pública de fecha nueve de julio de dos mil dieciocho otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil ochocientos treinta y cinco guion dos mil dieciocho /en adelante, dicho contrato de hipoteca sobre usufructo de derechos de aguas,

modificado en la forma antedicha, el "**Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo**"/.

**CLÁUSULA SEGUNDA:** **PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA TERCERA: USUFRUCTO DE DERECHOS DE APROVECHAMIENTO DE AGUAS.** El Deudor es titular y dueño de los siguientes derechos reales de usufructo sobre derechos de aprovechamiento de aguas, cuyo título consta en el contrato de usufructo de derechos de aprovechamiento de aguas suscrito entre el Deudor y AES Andes S.A., otorgado en la Notaría de Santiago de don Eduardo Avello Concha el día primero de julio de dos mil trece, repertorio número quince mil cincuenta y uno guion dos mil trece /en adelante conjuntamente el "**Usufructo de Derechos de Aprovechamiento de Aguas**"/: /**A**/ /**i**/ Derecho de aprovechamiento no constitutivo sobre aguas del río Colorado, afluente del río Maipo, de ejercicio permanente y continuo, de veinticinco metros cúbicos por segundo, que se captará gravitacionalmente en la ribera derecha del río Colorado, aproximadamente a seiscientos cincuenta metros aguas abajo de la descarga de la Central Hidroeléctrica Los Maitenes y se restituirá al río Maipo, Primera Sección, inmediatamente aguas arriba de la bocatoma del Canal Sirena, con un desnivel de trescientos treinta y cinco metros entre la captación y la restitución, otorgado mediante Resolución número trescientos noventa y tres, dictada por la Dirección General de Aguas de la Región Metropolitana, en adelante la "DGA", con fecha catorce de septiembre de mil novecientos ochenta y dos, en favor de Compañía Manufacturera de Papeles y Cartones S.A. y reducido a escritura pública en la Notaría de Santiago de don Raúl Iván Perry Pefaur, con fecha veinticinco de octubre de mil novecientos ochenta y dos. /**ii**/ Con posterioridad, Compañía Manufacturera de Papeles y Cartones S.A. –hoy Colbún S.A.- vendió, cedió y transfirió estos derechos de aprovechamiento de aguas a favor de AES Andes por compraventa que consta en escritura pública otorgada con fecha veintitrés de mayo de dos mil siete, en la Notaría de Santiago de don Raúl Undurraga Laso, repertorio número tres mil trescientos uno guion dos mil siete, y que se inscribió a fojas ciento cuarenta y uno, número doscientos cincuenta y tres del Registro de Propiedad de Aguas del año dos mil siete, del Conservador de Bienes Raíces de Puente Alto. /**iii**/ Luego, mediante resolución número ciento doce y resolución número trescientos veinte, dictadas por la DGA, con fecha veintiocho de enero de dos mil diez y fecha dieciséis de marzo de dos mil diez respectivamente, se autorizó trasladar el punto de captación del ejercicio de derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes en el río Colorado, de ejercicio permanente y continuo, captados aproximadamente a seiscientos cincuenta metros aguas abajo de la descarga de la Central Hidroeléctrica Los Maitenes. La restitución es en el río Maipo, inmediatamente aguas arriba de la bocatoma del canal Sirena, con un desnivel de trescientos treinta y cinco metros entre ambos puntos. Hasta un nuevo punto de captación, ubicado en el mismo río Colorado, inmediatamente aguas abajo de la descarga de la Central Hidroeléctrica Alfalfal, en las coordenadas UTM Norte seis millones doscientos noventa y dos mil quinientos cuarenta y uno metros y Este trescientos ochenta y nueve mil setenta y nueve metros, Datum mil novecientos cincuenta y seis. Siendo el nuevo desnivel y nueva distancia entre el nuevo punto de captación y el punto de restitución de cuatrocientos noventa y siete metros y veintitrés coma ochenta y tres kilómetros respectivamente, provincia de Cordillera, Región Metropolitana. Los caudales máximos (metros cúbicos por segundo) que podrá captar en el nuevo punto de captación en el río Colorado y que deberá restituir en el río Maipo, son los siguientes: Ejercicio. Permanente. ABR: diez coma cincuenta y tres; MAY: siete coma sesenta y seis; JUN seis coma cuarenta y seis; JUL: cinco coma setenta y uno; AGO: cinco coma ochenta y cuatro; SEP: seis coma cero cuatro; OCT: nueve coma diecisiete; NOV: cinco coma catorce; DIC: seis coma ochenta y siete; ENE: diez coma noventa y tres; FEB:

ocho coma setenta y dos; y MAR cero coma ochenta y cinco. Eventual. ABR: catorce coma cuarenta y siete; MAY: diez coma sesenta y seis; JUN: diez coma veinte; JUL: ocho coma ochenta y seis; AGO: siete coma noventa y siete; SEP trece coma veintisiete; OCT quince coma ochenta y tres; NOV diecinueve coma ochenta y seis; DIC: dieciocho coma trece; ENE: catorce coma cero siete; FEB: dieciséis coma veintiocho; y MAR: veinticuatro coma quince. Total. ABR: veinticinco coma cero cero; MAY: dieciocho coma treinta y dos; JUN: dieciséis coma sesenta y seis; JUL: catorce coma cincuenta y siete; AGO: trece coma ochenta y dos; SEP: diecinueve coma treinta; OCT: veinticinco coma cero cero; NOV: veinticinco coma cero cero; DIC: veinticinco coma cero cero; ENE: veinticinco coma cero cero; FEB: veinticinco coma cero cero; y MAR: veinticinco coma cero cero. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos noventa y dos del año dos mil diez, y se inscribieron a fojas treinta y tres, número catorce del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. AES Andes constituyó un derecho real de usufructo en favor del Deudor sobre los derechos de aprovechamiento de aguas individualizados en esta letra /A/, mediante escritura pública otorgada con fecha primero de julio de dos mil trece, en la Notaría de Santiago de don Eduardo Avello Concha, repertorio número quince mil cincuenta y uno guion dos mil trece, la cual fue inscrita a fojas ciento sesenta y cuatro número ciento ochenta y tres del Registro de Hipotecas y Gravámenes de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. **/B/** Derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, otorgado mediante resolución de la DGA número ciento setenta y nueve de fecha diez de junio de dos mil cinco, que consta en escritura pública otorgada con fecha quince de marzo de dos mil seis, en la Notaría de Santiago de don Enrique Tornero Figueroa, repertorio número ochocientos cincuenta y dos, y que se inscribió a fojas noventa y dos vuelta, número ciento setenta y cinco del Registro de Propiedad de Aguas del año dos mil seis, del Conservador de Bienes Raíces de Puente Alto. El citado derecho de aprovechamiento de aguas, fue modificado por motivo de renuncias y traslados parciales de caudales, que se detallan a continuación. RENUNCIAS. AES Andes, mediante escritura pública de fecha veintiocho de septiembre de dos mil nueve, otorgada en la Notaría de doña Antonieta Mendoza Escalas, repertorio número seis mil novecientos setenta y tres guion dos mil nueve, y rectificada mediante escritura pública de fecha doce de noviembre de dos mil nueve, repertorio número ocho mil doscientos guion dos mil nueve, y por la escritura pública de fecha uno de diciembre de dos mil nueve, repertorio número ocho mil setecientos once guion dos mil nueve, renunció parcialmente en dos oportunidades a parte de estos derechos, pero sujeto a condición suspensiva, de lo cual se dio cumplimiento mediante la escritura pública de fecha uno de diciembre de dos mil diez, repertorio número nueve mil cuarenta y cuatro guion dos mil diez, las renuncias inscribieron a fojas trescientos nueve número quinientos dos y a fojas trescientos setenta y dos número seiscientos cuatro del Registro de Propiedad de Aguas del año dos mil nueve del Conservador de Bienes Raíces de Puente Alto, según se detalla a continuación: Caudal Renunciado, según Repertorio número seis mil novecientos setenta y tres. Permanente. ABR: cero coma diez; MAY: cero coma; JUN: cero coma cincuenta y seis; JUL: cero; AGO: cero; SEP: cero; OCT: uno coma cincuenta y uno; NOV: dos coma sesenta y uno; DIC: once coma cero nueve; ENE: cero; FEB: cero; MAR: cero coma veinticinco. Eventual. ABR: cero; MAY: tres coma veintiséis; JUN: cero; JUL: cero; AGO: cero; SEP: cero; OCT: cero; NOV: cero; DIC: cero; ENE: cero; FEB: cero; MAR: cero. Caudal Renunciado, según Repertorio número ocho mil doscientos y número ocho mil setecientos once. Permanente. ABR: quince coma cero cero; MAY: quince coma cero cero; JUN: trece coma cincuenta y cinco; JUL: quince coma cero cero; AGO: quince coma cero cero; SEP: quince coma cero cero; OCT: quince coma cero cero; NOV: quince coma cero cero; DIC: veintidós coma ochenta y ocho; ENE: quince coma cero cero; FEB: quince coma cero cero; MAR: quince coma cero cero. Total caudal renunciado Permanente. ABR: quince coma diez; MAY: quince coma cero cero; JUN: catorce coma once; JUL: quince coma cero cero; AGO: quince coma cero cero; SEP: quince coma cero cero; OCT: dieciséis coma cincuenta y uno; NOV: diecisiete coma sesenta y uno; DIC: treinta y tres coma noventa y siete; ENE: quince coma cero cero; FEB: quince coma cero cero; MAR: quince coma veinticinco. Total caudal renunciado Eventual. ABR: cero; MAY: tres coma veintiséis; JUN: cero; JUL: cero; AGO: cero; SEP: cero; OCT: cero; NOV: cero; DIC: cero; ENE: cero; FEB: cero; MAR: cero. En consideración a dichas renuncias, los caudales restantes que quedaron en poder de AES Andes S.A. son los siguientes: Derechos de Aguas Permanentes; ABR: cuatro coma cuarenta y ocho; MAY: dos coma setenta y seis; JUN: uno

coma setenta y uno; JUL: dos coma cero uno; AGO: dos coma veintidós; SEP: cinco coma cero tres; OCT: dieciséis coma noventa y nueve; NOV: cincuenta coma cero cinco; DIC: cuarenta y uno coma veintitrés; ENE: cuarenta y nueve coma cuarenta y tres; FEB: treinta y cuatro coma sesenta y siete; MAR: dieciséis coma cincuenta y cinco. Derechos de Aguas Eventuales; ABR: cuarenta coma cincuenta y dos, MAY: treinta y tres coma sesenta y cinco; JUN: cuarenta y seis coma cuarenta y tres; JUL: cuarenta y dos coma treinta y ocho; AGO: cuarenta y dos coma noventa y nueve; SEP: cuarenta y cinco coma sesenta y siete; OCT: cuarenta y uno coma cincuenta y cuatro; NOV: siete coma treinta y cuatro; DIC: cero; ENE: diez coma cincuenta y siete; FEB: veinticinco coma treinta y tres; MARZO: cuarenta y tres coma veinte. TRASLADOS. Posteriormente, se autorizó el traslado del punto de captación de los referidos derechos de aprovechamiento en el siguiente sentido: /i/ Cajón del Morado. Mediante resolución número ciento tres de fecha veintiséis de enero de dos mil diez, rectificada por resolución número trescientos veinticuatro de fecha dieciséis de marzo de dos mil diez, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del Río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual continuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM norte seis millones doscientos setenta y dos mil ciento cincuenta metros y este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en el Cajón del Morado, afluente aguas arriba del río Maipo en las coordenadas UTM norte seis millones doscientos sesenta y dos mil metros y este cuatrocientos cuatro mil setecientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo en un punto ubicado inmediatamente aguas arriba de la bocatoma canal Sirena, en las coordenadas UTM norte seis millones doscientos ochenta y tres mil novecientos cincuenta y tres metros y este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el Cajón El Morado y el punto de restitución original en el río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y tres coma ocho kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y ocho guion dos mil diez, y se inscribieron a fojas cincuenta y siete vuelta, número dieciséis del Registro de Propiedad de Aguas del año dos mil once del Conservador de Bienes Raíces de Puente Alto. /ii/ Estero Colina. Mediante resolución número ciento cinco, de fecha veintiséis de enero de dos mil diez, rectificada por resolución número trescientos veintidós de fecha dieciséis de marzo de dos mil diez, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual continuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM norte seis millones doscientos setenta y dos mil ciento cincuenta metros y este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial, ubicado en el estero Colina, afluente aguas arriba del río Maipo, en las coordenadas UTM norte seis millones doscientos sesenta mil trescientos cincuenta y nueve metros y este cuatrocientos ocho mil cuatrocientos metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo, en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, en las coordenadas UTM norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el estero Colina y el punto de restitución original en el río Maipo es de mil setecientos treinta y nueve metros y cuarenta y siete coma setenta y ocho kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y dos guion dos mil diez, y se inscribieron a fojas diecinueve vuelta, número trece del Registro de Propiedad de Aguas del año dos mil once del Conservador de Bienes Raíces de Puente Alto. /iii/ Estero La Engorda. Mediante resolución número ciento dos, de fecha veintiséis de enero de dos mil diez, rectificada por resolución número trescientos veintitrés de fecha dieciséis de marzo de dos mil diez, se autorizó trasladar parcialmente el punto de captación del ejercicio del derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio

eventual continuo de metros cúbicos por segundo captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM norte seis millones doscientos setenta y dos mil ciento cincuenta metros y este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en el estero La Engorda, afluente aguas arriba del río Maipo, en las coordenadas UTM norte seis millones doscientos cincuenta y nueve mil seiscientos metros y este cuatrocientos ocho mil quinientos metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original del agua en el mismo río Maipo, en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, las coordenadas UTM norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en el estero La Engorda y el punto de restitución original en el río Maipo, es de un mil setecientos treinta y nueve metros, y cuarenta y ocho coma veinticinco kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y uno guion dos mil diez, y se inscribieron a fojas seis vuelta, número doce del Registro de Propiedad de Aguas del año dos mil once del Conservador de Bienes Raíces de Puente Alto. **/iv/** Quebrada Las Placas. Mediante resolución número ciento cuatro, de fecha veintiséis de enero de dos mil diez, rectificada por resolución número trescientos veinticinco de fecha dieciséis de marzo de dos mil diez, se autorizó trasladar parcialmente el punto de captación del ejercicio del Derecho de Aprovechamiento no consuntivo de aguas superficiales y corrientes del río Maipo, de ejercicio permanente y continuo, y de ejercicio eventual discontinuo de metros cúbicos por segundo, captados gravitacionalmente frente a la localidad de El Melocotón, en las coordenadas UTM norte seis millones doscientos setenta y dos mil ciento cincuenta metros y este trescientos setenta y seis mil doscientos veinticinco metros, hasta un nuevo punto de captación parcial ubicado en la Quebrada Las Placas, afluente aguas arriba del río Maipo, en las coordenadas UTM norte seis millones doscientos sesenta y nueve mil seiscientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Se mantiene la restitución original de las aguas en el mismo río Maipo en un punto ubicado inmediatamente aguas arriba de la bocatoma del canal Sirena, en las coordenadas UTM norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. El nuevo desnivel y la nueva distancia entre el nuevo punto de captación parcial en la Quebrada Las Placas y el punto de restitución original del río Maipo, es de un mil setecientos treinta y nueve metros y cuarenta y seis coma veintitrés kilómetros respectivamente, en la provincia Cordillera, Región Metropolitana. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez, en la Notaría de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos ochenta y nueve guion dos mil diez, y se inscribieron a fojas setenta y uno, número diecisiete del Registro de Propiedad de Aguas del año dos mil once del Conservador de Bienes Raíces de Puente Alto.- AES Andes constituyó un derecho real de usufructo en favor del Deudor sobre los derechos de aprovechamiento de aguas individualizados en esta letra /B/, mediante escritura pública otorgada con fecha primero de julio de dos mil trece, en la Notaría de Santiago de don Eduardo Avello Concha, repertorio número quince mil cincuenta y uno guion dos mil trece, la cual fue inscrita a fojas ciento sesenta y cinco vuelta número ciento ochenta y cuatro en el Registro de Hipotecas y Gravámenes de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. **/C/ /i/** Derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes en el río Yeso, afluente del río Maipo, ubicado en la comuna de San José de Maipo, provincia de Cordillera, derecho de ejercicio permanente y continuo, consistente en quince metros cúbicos por segundo, cuya bocatoma estará en la ribera izquierda del río Yeso, aguas abajo del embalse del mismo nombre, a la cota aproximada de dos mil quinientos metros sobre el nivel del mar. La restitución se hará al mismo río antes de la confluencia con el río Maipo, a la cota mil cuatrocientos metros sobre el nivel del mar, siendo el desnivel entre ambos puntos de mil cien metros. El derecho fue otorgado mediante Resolución número ciento siete, dictada por la DGA, con fecha veinticinco de abril de mil novecientos ochenta y tres, en favor de Compañía Chilena de Electricidad S.A., reducida a escritura pública en la Notaría de Santiago de don Patricio Zaldívar Mackenna, con fecha veintitrés de mayo de mil novecientos ochenta y tres e inscrita a fojas ciento cincuenta y uno número ciento ochenta y tres del Registro de Propiedad de Aguas de mil novecientos ochenta y tres del Conservador de Bienes Raíces de Puente Alto. **/ii/** Con posterioridad,

Compañía Chilena de Generación Eléctrica -hoy AES Andes- adquirió estos derechos de aprovechamiento de aguas, mediante compraventa hecha a la Compañía Chilena de Electricidad S.A., por escritura pública de fecha treinta de abril de mil novecientos ochenta y seis, suscrita en la Notaría de Santiago de don Mario Barros González, y que se inscribió a fojas ciento ochenta y tres, número doscientos dieciocho del Registro de Propiedad de Aguas del año mil novecientos ochenta y seis, del Conservador de Bienes Raíces de Puente Alto. /iii/ Luego, mediante resolución número ciento once y resolución número trescientos veintiuno, dictadas por la DGA, con fechas veintiocho de enero de dos mil diez y dieciséis de marzo de dos mil diez, respectivamente, se autorizó trasladar el punto de restitución del ejercicio de derecho de aprovechamiento no consuntivo de aguas superficiales y corrientes desde el río Yeso, de ejercicio permanente y continuo de metros cúbicos por segundo, captados gravitacionalmente en la ribera izquierda del río Yeso, aguas abajo del muro del embalse El Yeso, a la cota aproximada de dos mil quinientos m.s.n.m. y restituidas en el mismo río Yeso, antes de su confluencia con el río Maipo, a la cota un mil cuatrocientos m.s.n.m., hasta un nuevo punto de restitución ubicado en el río Maipo, inmediatamente aguas arriba de la bocatoma del canal Sirena, con las coordenadas UTM Norte seis millones doscientos ochenta y tres mil novecientos cincuenta metros y Este trescientos sesenta y seis mil ochocientos cincuenta metros, Datum un mil novecientos cincuenta y seis. Siendo el nuevo desnivel y nueva distancia entre el punto de captación original y el nuevo punto de restitución de un mil seiscientos setenta y nueve metros y treinta y cuatro coma uno kilómetros, respectivamente, en la provincia de Cordillera, Región Metropolitana. Los caudales máximos que podrá captar en el río Yeso y que deberá restituir al río Maipo, en el nuevo punto de restitución, son los siguientes: Permanente. ABR: quince coma cero cero; MAY: quince coma cero cero; JUN: trece coma cincuenta y cinco; JUL: quince coma cero cero; AGO: quince coma cero cero; SEP: quince coma cero cero; OCT: quince coma cero cero; NOV: quince coma cero cero; DIC: quince coma cero cero; ENE: quince coma cero cero; FEB: quince coma cero cero; y MAR: quince coma cero cero. Dichas resoluciones se redujeron a escritura pública con fecha treinta de diciembre de dos mil diez en la Notaría de Santiago de doña Antonieta Mendoza Escalas, repertorio número nueve mil ochocientos noventa y uno/dos mil diez, y se inscribieron a fojas cuarenta y ocho, número quince del Registro de Propiedad de Aguas del año dos mil once, del Conservador de Bienes Raíces de Puente Alto. AES Andes constituyó un derecho real de usufructo en favor del Deudor sobre los derechos de aprovechamiento de aguas individualizados en esta letra /C/, mediante escritura pública otorgada con fecha primero de julio de dos mil trece, en la Notaría de Santiago de don Eduardo Avello Concha, repertorio número quince mil cincuenta y uno guion dos mil trece, la cual fue inscrita a fojas ciento sesenta y ocho, número ciento ochenta y cinco del Registro de Hipotecas y Gravámenes de Aguas del año dos mil trece, del Conservador de Bienes Raíces de Puente Alto. [Individualización de otros Usufructos de Derechos de Aprovechamiento de Aguas, en caso de existir][1]

**CLÁUSULA CUARTA: HIPOTECA. /Uno/** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, hipoteca de primer grado sobre el Usufructo de Derechos de Aprovechamiento de Aguas. **/Dos/ Extensión de la Hipoteca. /A/** La hipoteca de que da cuenta este Contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantizan, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente hipoteca. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento. Se conviene expresamente que la presente hipoteca es indivisible. **/C/** El

---

[1] Sujeto a la existencia de nuevos usufructos hasta la fecha de firma.

privilegio otorgado por esta hipoteca incluye y se extiende a las construcciones, instalaciones y demás objetos destinados por el Deudor a la explotación y ejercicio del Usufructo de Derechos de Aprovechamiento de Aguas, y a las indemnizaciones que paguen los seguros descritos en la cláusula undécima de este documento y a cualquier indemnización que corresponda por la expropiación del Usufructo de Derechos de Aprovechamiento de Aguas. Asimismo, la hipoteca se extiende de pleno derecho a todos los demás bienes actuales o futuros o que por adherencia o destinación se reputen formar parte del Usufructo de Derechos de Aprovechamiento de Aguas, en conformidad a la ley.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la hipoteca y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre el Usufructo de Derechos de Aprovechamiento de Aguas, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento. Sin embargo, el Deudor podrá realizar todos aquellos actos permitidos de conformidad con lo establecido en el Contrato de Términos Comunes y en los demás Documentos del Financiamiento, o comprendidos dentro del manejo ordinario del Usufructo de Derechos de Aprovechamiento de Aguas.

**CLÁUSULA SEXTA: INSCRIPCIÓN Y ANOTACIÓN.** Se deja constancia que la hipoteca y prohibición de que da cuenta este instrumento fue debidamente inscrita en el Registro de Hipotecas y Gravámenes de Aguas del Conservador de Bienes Raíces de Puente Alto con fecha veintidós de mayo de dos mil catorce, a fojas noventa y siete vuelta, número noventa y uno, correspondiente al año dos mil catorce, y en el Registro de Interdicciones y Prohibiciones de Aguas del Conservador de Bienes Raíces de Puente Alto, con fecha veintidós de mayo de dos mil catorce, a fojas sesenta y uno, número noventa y nueve, correspondiente al año dos mil catorce. La hipoteca de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza del Usufructo de Derechos de Aprovechamiento de Aguas.

**CLÁUSULA SÉPTIMA: EJECUCIÓN.** Por este acto, el Deudor, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento /"Event of Default", según dicho término se define en el Contrato de Términos Comunes/, lo que será acreditado mediante el envío por parte del Agente de Garantías Local de una notificación escrita al Deudor por medio de Notario Público, con el sólo mérito de la misma y sin que se deba acreditar a persona alguna el Evento de Incumplimiento de que se trate, podrá producir la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Deudor todas y cada una de las acciones derivadas de esta hipoteca, para obtener el cumplimiento de las Obligaciones Garantizadas.

**CLÁUSULA OCTAVA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores hipotecarios.

**CLÁUSULA NOVENA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la hipoteca de primer grado y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMA: MANTENCIÓN DEL DOMINIO. INSPECCIONES. /Uno/** El Deudor declara y garantiza que el Usufructo de Derechos de Aprovechamiento de Aguas sobre el cual se constituye esta hipoteca se encuentra debidamente inscrito, que le pertenece como

único y exclusivo titular, fue legalmente adquirido, y que, salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no le afectan legítimos derechos de terceros, se encuentra libre de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros y que el pago de las patentes aplicables sobre los derechos de aprovechamiento de aguas a que se refiere el Usufructo de Derechos de Aprovechamiento de Aguas se encuentra al día; y que no está sujeto a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dicho Usufructo de Derechos de Aprovechamiento de Aguas o a darlo en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de esta hipoteca y prohibiciones, con excepción de /i/ los establecidos bajo el contrato denominado Contrato de Arrendamiento del Usufructo de los Derechos de Aprovechamiento de Aguas entre el Deudor y AES Andes celebrado por escritura pública de fecha primero de julio de dos mil trece otorgada en la Notaría de Santiago de don Eduardo Avello Concha; /ii/ los establecidos bajo el contrato denominado Contrato de Promesa de Uso sobre Derechos de Aprovechamiento de Aguas entre el Deudor y AES Andes, celebrado por escritura pública de fecha primero de julio de dos mil trece otorgada en la Notaría de Santiago de don Eduardo Avello Concha; y /iii/ los permitidos por los demás Documentos del Financiamiento. **/Dos/** AES Andes declara y garantiza que los derechos de aprovechamiento de aguas sobre los cuales recae el Usufructo de Derechos de Aprovechamiento de Aguas se encuentran debidamente inscritos y vigentes, le pertenecen como único y exclusivo titular, el pago de sus patentes se encuentra al día, fueron legalmente adquiridos, y que salvo por lo dispuesto en /i/ el Usufructo de Derechos de Aprovechamiento de Aguas; /ii/ el contrato denominado Contrato de Permuta de Derechos de Agua y Otros Acuerdos celebrado por escritura pública de fecha veintinueve de julio del año dos mil once otorgada en la Notaría de Santiago de doña Antonieta Mendoza Escalas; /iii/ el Contrato de Suscripción y Pago de Acciones y Aporte Condicional de Nuda Propiedad de Derechos de Aprovechamiento de Aguas y Constitución Condicional de Derecho de Uso celebrado por escritura pública de fecha tres de diciembre de dos mil trece otorgada en la Notaría de Santiago de don Patricio Raby Benavente /*Conditional Contribution and Assignment of Bare Ownership of Water Rights Agreement*, según se define en el Contrato de Términos Comunes/; /iv/ el contrato denominado Compraventa y Convenio de Derechos de Aprovechamiento de Aguas en Río San Pedro y Río Colorado celebrado por escritura pública de fecha veintitrés de mayo de dos mil siete en la Notaría de Santiago de don Raúl Undurraga Laso, modificado mediante escrituras públicas de fechas veinticinco de junio de dos mil siete y siete de abril de dos mil ocho, respectivamente, otorgadas en las Notarías de Santiago de doña Antonieta Mendoza Escalas y don Osvaldo Pereira González, respectivamente; y /v/ los Documentos del Financiamiento: /a/ no les afectan legítimos derechos de terceros, y se encuentran libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros; y /b/ no están sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos derechos de aprovechamiento de aguas o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación. **/Tres/** Mientras subsista esta hipoteca el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por el dominio, uso, goce o por cualquier otra circunstancia relativa al Usufructo de Derechos de Aprovechamiento de Aguas. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener el dominio y la libre posesión del Usufructo de Derechos de Aprovechamiento de Aguas y para defenderlo de acciones de terceros. El Agente de Garantías Local queda expresamente facultado para inspeccionar las construcciones, instalaciones y demás objetos destinados a la explotación y el ejercicio del Usufructo de Derechos de Aprovechamiento de Aguas, a través de sus mandatarios o empleados designados al efecto, en los días y horarios hábiles acordados previamente con el Deudor. El Deudor se obliga a facilitar las inspecciones requeridas por el Agente de Garantías Local.

**CLÁUSULA UNDÉCIMA: SEGUROS.** El Deudor se obliga a mantener pólizas de seguro respecto del Usufructo de los Derechos de Aprovechamiento de Aguas contra los riesgos, por las cantidades y en la forma y condiciones que corresponda en cumplimiento de las

estipulaciones del Contrato de Términos Comunes y en los demás Documentos del Financiamiento, y sólo en la medida en que estos documentos así lo exijan. De la misma manera, el Deudor se obliga a designar al Agente de Garantías Local, para su beneficio y el de las Partes Garantizadas, como beneficiario o asegurado adicional, según corresponda, en las pólizas respectivas, debiendo entregar copia del endoso o designación correspondiente dentro del plazo establecido para ello en los Documentos del Financiamiento.

**CLÁUSULA DUODÉCIMA: ACEPTACIÓN Y OBLIGACIONES DE AES ANDES.** AES Andes, debidamente representado como se indica en la comparecencia, declara por este acto que ratifica todas y cada una de las declaraciones efectuadas en la cláusula décimo quinta de la escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos noventa guion dos mil trece /las que a mayor abundamiento se reproducen más adelante/ y las hace extensiva, asimismo, a la modificación de este contrato de hipoteca acordada por escritura pública otorgada en la Notaría de Santiago de don [•] con fecha [•]. En consecuencia, AES Andes, debidamente representado como se indica en la comparecencia, declara a mayor abundamiento: /i/ que toma conocimiento y acepta, para todos los efectos legales y contractuales a que pudiere haber lugar, todas y cada una de las disposiciones del presente instrumento, y autoriza y acepta la presente hipoteca sobre Usufructo de Derechos de Aprovechamiento de Aguas respecto de los cuales es nudo propietario, en los términos y condiciones expuestos en el presente instrumento,; /ii/ que, en consecuencia, en forma incondicional, irrevocable y sin reservas, una vez ejecutada la presente hipoteca, y vendido o adjudicado el Usufructo de Derechos de Aprovechamiento de Aguas, aceptará y reconocerá al comprador o adjudicatario respectivo del Usufructo de Derechos de Aprovechamiento de Aguas, como el usufructuario de los derechos de aprovechamiento de aguas individualizados en cláusula tercera anterior, siempre y cuando ello resultare procedente de conformidad con los Documentos del Financiamiento; /iii/ que una vez ejecutada la presente hipoteca, y vendido o adjudicado el Usufructo de Derechos de Aprovechamiento de Aguas, por ese solo hecho se entenderá liberado el Deudor de todas y cualesquier responsabilidad que pudiera tener con AES Andes en virtud de, o en relación con, el Usufructo de Derechos de Aprovechamiento de Aguas, incluyendo pero no limitado a la responsabilidad establecida en el inciso segundo del artículo setecientos noventa y tres del Código Civil, para lo cual renuncia en este acto a cualquier acción que pudiera ejercer en contra del Deudor por tal concepto; y /iv/ que a mayor abundamiento, y de conformidad con lo dispuesto por los incisos tercero y siguientes del artículo dos mil cuatrocientos ochenta y nueve del Código Civil, AES Andes declara que viene en posponer y subordinar totalmente el pago de cualquier crédito que se adeude por el Deudor en virtud del Usufructo de Derechos de Aprovechamiento de Aguas, en beneficio del pago o cumplimiento oportuno, íntegro y completo de todas y cada una de las Obligaciones Garantizadas en la medida que ellas correspondan a créditos de la quinta clase a que se refiere el artículo dos mil cuatrocientos ochenta y nueve del Código Civil. Se deja expresa constancia que esta subordinación es irrevocable en los términos de los referidos incisos del artículo dos mil cuatrocientos ochenta y nueve del Código Civil, y es sin perjuicio de cualquier otro acuerdo de subordinación que haya sido otorgado por AES Andes o el Deudor o cualquier parte relacionada a las mismas, a favor del Agente de Garantías o cualquier otra Parte Garantizada. Por el presente instrumento, el Agente de Garantías, por sí y en nombre y representación de las Partes Garantizadas, acepta la subordinación de créditos establecida en esta cláusula duodécima.

**CLÁUSULA DÉCIMO TERCERA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Deudor declara que este contrato de hipoteca y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta hipoteca y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local,

considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de hipoteca que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente hipoteca y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente hipoteca la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO CUARTA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta hipoteca y prohibiciones."

**TERCERO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo y el nuevo texto modificado y refundido que consta en el Contrato de Hipoteca sobre Usufructo de Derechos de Aguas.

**CUARTO: INSCRIPCIÓN DEL CONTRATO DE HIPOTECA SOBRE USUFRUCTO DE DERECHOS DE AGUAS.** La modificación del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo, que consta en el texto aprobado del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en los respectivos registros de los Conservadores de Bienes Raíces competentes. El Deudor se obliga a hacer entrega al Agente de Garantías Local de copia de las inscripciones referidas.

**QUINTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo.

**SEXTO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Hipoteca sobre Usufructo de Derechos de Aguas Alto Maipo y prohibiciones de que da cuenta este instrumento, según corresponda.

**SÉPTIMO: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

**<u>Exhibit NN</u>**

**Amendment to Promise of Commercial Pledge of Approved PPA's**

**REPERTORIO N°**

**MODIFICACIÓN Y TEXTO REFUNDIDO DE PROMESA DE PRENDA COMERCIAL**

**SOBRE DERECHOS**

**ALTO MAIPO SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda,

1

en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

/**Dos**/ **Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

/**Tres**/ **Contrato de Promesa de Prenda sobre Derechos.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y cuatro guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, y Alto Maipo SpA como constituyente, celebraron, como parte del Financiamiento Alto Maipo, un contrato de promesa de prenda comercial sobre derechos /en adelante, el "**Contrato de Promesa de Prenda sobre Derechos Original**"/. El Contrato de Promesa de Prenda sobre Derechos Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil doscientos tres / dos mil diecisiete /en adelante, el "**Contrato de Promesa de Prenda sobre Derechos Modificado**"/.

/**Cuatro**/ **Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/**Cinco**/ **Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta

y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencia de Garantías, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta promesa de prenda sobre derechos. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda de derechos de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Promesa de Prenda sobre Derechos Modificado, las Partes acuerdan modificar el Contrato de Promesa de Prenda sobre Derechos Modificado en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el "**Contrato de Prenda de Derechos**"/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE DERECHOS.** Las Partes declaran que el texto del Contrato de Promesa de Prenda sobre Derechos Modificado, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PROMESA DE PRENDA COMERCIAL SOBRE DERECHOS ALTO MAIPO SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según

dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de derechos /el "**Contrato de Promesa de Prenda sobre Derechos**" o el "**Contrato**"/:

<u>**CLÁUSULA PRIMERA**</u>: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local. Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de promesa de prenda comercial sobre derechos, es un texto modificado y refundido del contrato de promesa de prenda comercial sobre derechos celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta y cuatro guion dos mil trece, y modificado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de promesa de prenda comercial sobre derechos, modificado en la forma antedicha, el "**Contrato de Promesa de Prenda de Derechos**"/.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLAÚSULA TERCERA: PROMESA DE PRENDA COMERCIAL.** /**Uno**/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, ha prometido constituir en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, una o más prendas comerciales de primer grado, en conformidad con los artículos ochocientos trece y siguientes del Código de Comercio y a los términos y condiciones del presente instrumento, sobre todos y cada uno de los derechos de cobro del Deudor, incluyendo, a mayor abundamiento, créditos por multas, indemnizaciones y cantidades pagaderas en virtud de boletas de garantía, pólizas de seguros, fianzas u otras cauciones en conformidad a las disposiciones legales o contractuales vigentes /en adelante los "**Créditos Prendables**"/, bajo los contratos que suscriba en el futuro y que califiquen como "*Approved PPAs*" según dicho término se define en el Contrato de Términos Comunes /en adelante cada uno un "**PPA**" y conjuntamente "**PPAs**"/.

/**Dos**/ Los contratos de prenda de primer grado prometidos en virtud de esta cláusula serán otorgados por escritura pública en términos sustancialmente similares a las contenidos en el modelo de prenda comercial que, como **Anexo Uno**, se protocoliza con esta fecha y en esta misma Notaría bajo el mismo número de repertorio de la presente escritura, y que se entiende formar parte de este instrumento para todos los efectos legales, dentro de los quince días siguientes a la fecha de entrega de la comunicación a que se refiere el número /Tres/ siguiente de esta cláusula.

/**Tres**/ Para los efectos de lo establecido en el número /Dos/ anterior de esta cláusula, el Deudor deberá comunicar periódicamente y por escrito al Agente de Garantías Local la suscripción de cualquier PPA del que deriven Créditos Prendables, dentro del plazo de quince días contados desde la fecha en que se perfeccione cada una de dichas suscripciones. Conjuntamente con la obligación de comunicación establecida precedentemente, el Deudor deberá, dentro del mismo plazo, entregar al Agente de Garantías Local copia de la totalidad de los títulos en que consten los Créditos Prendables sobre los que corresponda constituir las respectivas prendas, consistentes en una copia autorizada ante notario del PPA respectivo.

/**Cuatro**/ **Mandato.** Para efectos de asegurar el cumplimiento de la obligación señalada en el numeral /Dos/ anterior, por el presente acto, el Deudor confiere al Agente de Garantías Local un mandato gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, con el solo fin de que el Agente de Garantías Local, actuando en nombre y representación del Deudor, y para el caso que

el Deudor no dé cumplimiento en tiempo y forma a las disposiciones establecidas en el numeral /Dos/ precedente, lo que no será necesario acreditar a terceros, suscriba los contratos de prendas comerciales sobre los Créditos Prendables que por este acto se promete constituir.

**CLÁUSULA CUARTA: EXTENSION.** Las Partes acuerdan que las prendas que se prometen constituir por el presente instrumento tendrán por objeto garantizar al Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, el íntegro, efectivo y oportuno cumplimiento de todas y cada una de las Obligaciones Garantizadas, incluyendo pero no limitado a, la obligación de pagar el capital de los Préstamos, los Pagarés y Reconocimientos y los demás documentos en que consten Obligaciones Garantizadas, sus intereses, comisiones, como asimismo cualquier otra suma que se adeude en virtud de los mismos, incluyendo pero no limitado a, impuestos, tributos, contribuciones, derechos, cargas, retenciones, honorarios, remuneraciones, cargos financieros, gastos reembolsables, indemnizaciones de perjuicios, aumentos de costos, desembolsos y cualquier otra suma debida por el Deudor a las Partes Garantizadas bajo los Documentos del Financiamiento, y garantizarán asimismo las prórrogas y renovaciones que puedan ser acordadas en relación a las Obligaciones Garantizadas; y en general, garantizarán el íntegro, efectivo y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquéllas derivadas de las mismas por disposición de la ley; y sea que dichas Obligaciones Garantizadas sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos que emanen y sea que su cumplimiento sea exigible a las épocas convenidas o anticipadamente, en el evento de su aceleración. Las prendas prometidas constituir por el presente instrumento garantizarán, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que se incurra con ocasión de gestiones o demandas de cobro o ejecución de las prendas prometidas y de los Pagarés y Reconocimientos; y se extenderán además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a, los Documentos del Financiamiento, aquellos que hayan sido suscritos entre el Deudor y el Agente de Garantías Local o las Partes Garantizadas, o por quienes los sucedan o reemplacen, y que digan relación con las Obligaciones Garantizadas.

**CLÁUSULA QUINTA: PROMESA DE PROHIBICIÓN.** Por este acto y debidamente representado en la manera indicada en la comparecencia de este instrumento, el Deudor promete, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras las prendas prometidas y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Créditos Prendables, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras las prendas prometidas y las Obligaciones Garantizadas de que da cuenta el presente instrumento se encuentren vigentes, se obligará a no alterar, modificar o transformar los Créditos Prendables o los PPAs, ni celebrar acto o contrato alguno, especialmente contratos de factoring o securitización, y en general cualquier otra figura contractual nominada o innominada que suponga o implique el cambio del Deudor como titular de los Créditos Prendables, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento. Finalmente, el Deudor se obligará a cumplir con

todas sus obligaciones bajo los Créditos Prendables, de manera de no perjudicarlos por acto u omisión suyos.

**CLÁUSULA SEXTA: TÍTULO Y AUSENCIA DE GRAVÁMENES.** El Deudor se obliga a velar y responder por el hecho de que los Créditos Prendables que por el presente instrumento se prometen prendar, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Créditos Prendables, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo dueño, estarán con sus impuestos y/o patentes al día, y en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, no le afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a la prendas prometidas o a Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Créditos Prendables o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o las de prendas y prohibiciones prometidas constituir por este instrumento, con excepción de aquéllos permitidos por los Documentos del Financiamiento.

**CLÁUSULA SÉPTIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la promesa de prendas comerciales de primer grado y las prohibiciones, así como las prendas y prohibiciones prometidas constituir por el Deudor en su favor en virtud del presente instrumento.

**CLÁUSULA OCTAVA: MANTENCIÓN DEL DOMINIO.** Mientras subsistan las prendas prometidas constituir, el Deudor deberá pagar íntegra y oportunamente cualquier impuesto, patente o carga de cualquier especie establecida o que puedan establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Prendables. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Prendables y para defenderlos de acciones de terceros.

**CLÁUSULA NOVENA: IMPUESTOS Y SUCESORES.** El Deudor declara que este contrato de promesa de prendas y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos, sin restricción alguna. Asimismo, las Partes acuerdan que las prendas y prohibiciones prometidas beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

**CLÁUSULA DÉCIMA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta promesa de prenda y prohibiciones.

**CLÁUSULA DÉCIMO PRIMERA: PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Promesa de Prenda sobre Derechos Modificado y el nuevo texto modificado y refundido que consta en el Contrato de Promesa de Prenda sobre Derechos.

**CUARTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Promesa de Prenda sobre Derechos Modificado.

**QUINTO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Promesa de Prenda sobre Derechos Modificado y prohibiciones de que da cuenta este instrumento, según corresponda.

**SEXTO: PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

**<u>Exhibit OO</u>**

**Amendment to Conditional Assignment Over Rights in Andritz Agreement**

**REPERTORIO N°**

<div align="center">

**MODIFICACIÓN Y TEXTO REFUNDIDO DE CESIÓN CONDICIONAL**

**DE DERECHOS**

**ALTO MAIPO SpA**

**E**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

</div>

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el **"Deudor"**/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante **"Itaú Corpbanca"**/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el **"Agente de Garantías Local"**/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las **"Partes"**; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el **"Contrato de Modificación"**/:

<u>**CLÁUSULA PRIMERA:**</u> <u>**ANTEDENTES.**</u>

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las **"Centrales de Generación"** o *"Power Stations"*, según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el **"Proyecto"**, el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

<div align="center">1</div>

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Cesión Condicional de Derechos, que a su vez se define más adelante /en adelante el **"Financiamiento Alto Maipo"**/.

**/Tres/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el **"Capítulo Once"**/.

**/Cuatro/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el **"Contrato de Agencia de Garantías Local Modificado y Refundido"**/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el **"Contrato de Modificación de Contrato de Agencia"**, en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el **"Contrato de Agencia de Garantías Local"**/.

**/Cinco/ Reestructuración del Financiamiento Alto Maipo.** Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Cesión Condicional de Derechos y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta cesión condicional de derechos. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Seis/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Cesión Condicional de Derechos, las Partes acuerdan modificar el Contrato de Cesión Condicional de Derechos en los términos que da cuenta el texto refundido que se aprueba en la cláusula Segundo siguiente /el **"Contrato de Cesión Condicional de Derechos"**/.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE CESIÓN CONDICIONAL DE DERECHOS.** Las Partes declaran que el texto del Contrato de Cesión Condicional de Derechos, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

**"CESIÓN CONDICIONAL DE DERECHOS ALTO MAIPO SpA E ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, rol único tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, ambos con domicilio para estos efectos en [•], Santiago /en adelante el "**Deudor**"/; y **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de acciones /el "**Contrato de Cesión Condicional de Derechos**" o el "**Contrato**"/:

**ANTECEDENTES.**

**CLÁUSULA PRIMERA: /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•] /el "**Contrato de Modificación de Contrato de Agencia**", en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Dos/ Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Tres/ Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

**/Cuatro/ Texto Modificado y Refundido.** Se deja constancia que el presente contrato de cesión condicional de derechos, es un texto modificado y refundido del contrato de cesión condicional de derechos otorgado en la Notaría de Santiago de don Eduardo Diez Morello

3

con fecha diecisiete de marzo de dos mil veinte, repertorio número cuatro mil cuatrocientos ochenta y ocho guion dos mil veinte, el **Contrato de Cesión Condicional de Derechos**"/.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS. /Uno/** Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local. Asimismo, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas cuyo cumplimiento se garantiza mediante el presente contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA TERCERA: DOCUMENTO DEL PROYECTO.** El Deudor es parte del contrato en idioma inglés denominado "*Lump Sum Fixed Price Design, Fabrication, Supply, Transportation, Installation & Commissioning of Penstock Valves Contract*" celebrado con Andritz Hydro GmbH y Andritz Chile Ltda., copia del cual se protocolizó en la Notaría de Santiago de don Eduardo Diez Morello bajo el repertorio número cuatro mil cuatrocientos ochenta y siete guion dos mil veinte. En adelante este contrato y todas las renovaciones, ampliaciones y/o modificaciones que pudiere sufrir de tiempo en tiempo, se denominará para efectos de este instrumento como un "**Documento del Proyecto**" y cada una de las partes bajo el mismo, distinta al Deudor, una "**Contraparte**".

**CLÁUSULA CUARTA: CESIÓN CONDICIONAL.** Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Deudor, debidamente representado, y sujeto al cumplimiento de las condiciones suspensivas indicadas en la cláusula quinta del presente instrumento, cede en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, o a las personas que éste designe, en los términos que se indican a continuación, su posición contractual en el Documento del Proyecto, y todos los derechos y obligaciones que de él emanen.

**CLÁUSULA QUINTA: CONDICIONES SUSPENSIVAS.** El perfeccionamiento de la cesión de derechos y obligaciones de que da cuenta este instrumento queda sujeto al cumplimiento de las siguientes condiciones suspensivas copulativas: /**a**/ que la respectiva Contraparte reciba por medio de Notario Público un aviso escrito del Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, informándole /**i**/ de haberse verificado y mantenerse vigente un Evento de Incumplimiento /*Event of Default*/, según este término se define en el Contrato de Términos Comunes, según dicho término se define a su vez en el Contrato de Agencia de Garantías Local/, y /**ii**/ de su voluntad de aceptar esta cesión y de asumir a su vez la totalidad de las obligaciones contraídas por el Deudor bajo el Documento del Proyecto y que se devenguen a partir de la fecha en que se cumplan las condiciones suspensivas de que pende esta cesión condicional; y /**b**/ que el Deudor reciba una copia de la comunicación referida en la letra /**a**/ anterior. Sujeta a las condiciones establecidas en los literales /**a**/ y /**b**/ de esta cláusula quinta, la presente cesión producirá todos sus efectos desde la fecha de la notificación practicada conforme a lo establecido en el literal /**a**/ anterior. Las Partes declaran que la presente escritura se otorga en consideración a que las Partes Garantizadas han otorgado y/u otorgarán créditos o tendrán el carácter de acreedoras bajo los Documentos del Financiamiento respecto del Deudor, por lo cual el Deudor declara además que la suscripción del presente contrato se ha otorgado en su beneficio y que no tiene derecho a exigir compensación o indemnización alguna a las Partes Garantizadas por la cesión aquí contenida.

**CLÁUSULA SEXTA: ENTREGA DE TÍTULOS.** [Para efectos de lo prescrito en el artículo mil novecientos uno del Código Civil, el Deudor declara que hizo entrega al Agente de Garantías Local, con fecha diecisete de marzo de dos mil veinte, quien recibió a su entera

4

satisfacción, del título en que consta cada uno de los derechos que se ceden y obligaciones que se asumen condicionalmente en virtud de este instrumento, consistente en copia autorizada del Documento del Proyecto. En este acto se entrega a dicho agente además, copia de las respectivas modificaciones introducidas al Documento del Proyecto, declarando el Agente de Garantías Local haber recibido dichos títulos a su entera satisfacción.] [Texto final dependerá de si se protocoliza nuevamente o no, o en caso de que hubiese habido modificaciones al contrato. En caso de que no sea necesario protocolizar nuevamente, y/o de que no se deba hacer entrega del mismo, se deberá especificar que se entregó anteriormente].

**CLÁUSULA SÉPTIMA: AUSENCIA DE GRAVÁMENES.** El Deudor se obliga a responder por el hecho de que el Documento del Proyecto, cuyos derechos se ceden condicionalmente al Agente de Garantías Local, en su beneficio y en beneficio de las Partes Garantizadas, y cuyas correspondientes obligaciones se asumen condicionalmente, se encuentran y, en la medida que pueda razonablemente considerarse dentro de la esfera de control del Deudor, se encontrarán en la fecha en que se haga efectiva la cesión, con excepción de /i/ las garantías o gravámenes que se constituyan a favor del Agente de Garantías Local en virtud de los Documentos del Financiamiento, y /ii/ las preferencias, gravámenes, prohibiciones, restricciones y derechos a favor de terceros impuestas por la ley, reglamento, autoridad gubernamental, o que sean consideradas como "**Gravámenes Permitidos**" /*Permitted Liens*, según dicho término se define en el Contrato de Términos Comunes/, libres de todo tipo de gravámenes, cargas, litigios, deudas, prohibiciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias, derechos preferentes en favor de terceros, opciones, promesas de venta, condicionales o a plazo, ni a ningún otro acto o contrato que tienda o tenga por objeto transferir el dominio del Documento del Proyecto o darlos en garantía de otras obligaciones, y que, sujeto a las mismas condiciones y excepciones antes indicadas, no existirá respecto de sus derechos bajo el Documento del Proyecto ningún gravamen que pueda impedir, trabar, dilatar o menoscabar su libre disposición ni la efectividad de las cesiones condicionales que se han efectuado por este instrumento.

**CLÁUSULA OCTAVA: MANTENCIÓN DE PROPIEDAD.** Mientras se encuentre vigente este contrato y sigan pendientes las condiciones a las que se sujetan las cesiones condicionales efectuadas por este instrumento, el Deudor deberá pagar íntegra y oportunamente, en relación a sus obligaciones bajo el Documento del Proyecto, cualquier impuesto, patente, contribución o carga de cualquier especie establecida o que puedan establecerse en el futuro por cualquier circunstancia relativa al Documento del Proyecto. El Deudor llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de sus derechos bajo el Documento del Proyecto y para defenderlos de acciones de terceros.

**CLÁUSULA NOVENA: ACEPTACIÓN DE LAS CONTRAPARTES.** [Las Partes dejan constancia que **Andritz Hydro GmbH** y **Andritz Chile Ltda.** han tomado conocimiento y aceptado la presente cesión condicional de derechos del Deudor bajo el Documento del Proyecto respecto del cual son parte, en el documento [●].]

**CLÁUSULA DÉCIMA: PROHIBICIÓN.** Por este acto y debidamente representado de la manera indicada en la comparecencia de este instrumento, el Deudor se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario /incluyendo lo dispuesto en la Cláusula Cuarta del presente instrumento/, y mientras la cesión condicional, y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre el Documento del Proyecto o sobre los derechos que para el Deudor emanan de tal contrato, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en los Contratos de Crédito y el Contrato de Términos Comunes, salvo que dicha enajenación, gravamen, acto o contrato se encuentre permitida conforme a los Documentos del Financiamiento. Asimismo, el Deudor se obliga a no alterar, modificar o transformar el Documento del Proyecto, sin la previa autorización escrita del Agente de Garantías Local, salvo que dicha alteración,

modificación o transformación se encuentre permitida conforme a los Documentos del Financiamiento.

<u>**CLÁUSULA UNDÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.**</u> Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la presente cesión condicional y las prohibiciones constituidas por el Deudor en su favor en virtud del presente instrumento.

<u>**CLÁUSULA DÉCIMO SEGUNDA: IMPUESTOS Y SUCESORES.**</u> El Deudor declara que este contrato de cesión condicional y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta cesión condicional y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Deudor los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar.

<u>**CLÁUSULA DÉCIMO TERCERA: PODER DE INSCRIPCIÓN.**</u> Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir todas las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta cesión condicional y prohibiciones.

<u>**CLÁUSULA DÉCIMO CUARTA: <u>PARTE INTEGRAL E INTERPRETACIÓN.</u>**</u>

/Uno/ <u>**Parte integral.**</u> Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas. /Dos/ <u>**Interpretación.**</u> Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

<u>**TERCERO: <u>ACEPTACIÓN.</u>**</u> Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Cesión Condicional y el nuevo texto modificado y refundido que consta en el Cesión Condicional.

<u>**CUARTO: <u>FACULTAD AL PORTADOR.</u>**</u> Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Cesión Condicional.

<u>**QUINTO: <u>PODER ESPECIAL.</u>**</u> Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la

6

plena inscripción y subinscripción de las modificaciones del Contrato de Cesión Condicional y prohibiciones de que da cuenta este instrumento, según corresponda.

**SEXTO: PARTE INTEGRAL E INTERPRETACIÓN.**

**/Uno/ Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

**/Dos/ Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. En comprobante y previa lectura firman los comparecientes con el Notario que autoriza.- **Doy fe.-**

_____

[•]

**C.I.N°** _____

**p.p. ALTO MAIPO SpA**

_____

[•]

**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

_____

[•]

**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

## Exhibit PP

**Amendment to Pledge over Credits**

29299009.2

REPERTORIO N°

**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA SIN DESPLAZAMIENTO**

**SOBRE CRÉDITOS**

**AES ANDES S.A.**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago, Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará de **AES ANDES S.A.** /antes, AES GENER S.A./, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion nueve, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante "**AES Andes**" o el "**Constituyente**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor y el Constituyente, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión, incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para

la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías Local, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Créditos AES Andes.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta guion dos mil trece, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, Alto Maipo SpA como deudor, y Norgener S.A. /hoy, AES Chile SpA y en adelante, "**AES Chile**"/, AES Andes, Antofagasta plc, Antofagasta Minerals S.A., como los constituyentes, celebraron, como parte del Financiamiento Alto Maipo, un contrato de prenda sin desplazamiento sobre créditos subordinados, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintinueve guion dos mil trece /en adelante, el "**Contrato de Prenda de Créditos Original**"/. El Contrato de Prenda de Créditos Original fue modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número dos mil ciento noventa y ocho / dos mil diecisiete, y complementado mediante diversos instrumentos /en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos Modificado**"/. Asimismo, Antofagasta plc y Antofagasta Minerals S.A. dejaron de ser parte del Contrato de Prenda de Créditos AES Andes mediante una modificación al Contrato de Prenda de Créditos Original, quedando como partes del mismo AES Chile y AES Andes, en calidad de únicos constituyentes, y eliminándose toda referencia a Antofagasta plc y Antofagasta Minerals S.A. El Contrato de Prenda de Créditos Modificado fue nuevamente modificado mediante escritura pública de

fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y tres / dos mil dieciocho, y complementado mediante diversas escrituras públicas /en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos AES Andes**"/.

/**Cuatro**/ **Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

/**Cinco**/ **Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•], en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Seis**/ **Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato Agencia de Garantías Local, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre los créditos subordinados que AES Andes tenga en contra del Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Siete**/ **Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda sin desplazamiento de créditos de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda de Créditos AES Andes , las Partes acuerdan modificar el Contrato de Prenda de Créditos AES Andes en los términos que da cuenta el texto refundido que se aprueba en la cláusula

segunda siguiente /en adelante, el **Contrato de Prenda de Créditos AES Andes**"/ y ampliarlo asimismo para constituir prenda y prohibiciones de gravar y enajenar, sobre todos y cada uno de los derechos de cobro de sumas de dinero presentes y futuros que AES Andes tenga en contra del Deudor.

**SEGUNDO: TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE CRÉDITOS AES ANDES.** Las Partes declaran que el texto del Contrato de Prenda de Créditos AES Andes, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA SIN DESPLAZAMIENTO SOBRE CRÉDITOS AES ANDES S.A. A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós,** ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones siete ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES ANDES S.A.**, una sociedad anónima debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion nueve, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante "**AES Andes**" o el "**Constituyente**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante, y conjuntamente con el Deudor y el Constituyente, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de créditos /el "**Contrato de Prenda de Créditos AES Andes**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado**

**y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•], en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda sin desplazamiento sobre créditos, es un texto modificado y refundido del contrato de prenda sin desplazamiento sobre créditos celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos ochenta guion dos mil trece, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintinueve guion trece, y posteriormente /**i**/ modificado mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número dos mil ciento noventa y ocho / dos mil diecisiete; /**ii**/ complementado mediante diversas escrituras públicas; /**iii**/ nuevamente modificado por escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y tres / dos mil dieciocho, y /**iv**/ complementado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de prenda sin desplazamiento sobre créditos, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos AES Andes**"/.

/**Cinco**/ **Alzamiento.** Se deja constancia que por escritura pública de fecha [•], otorgada en la Notaría de Santiago de [•] bajo el repertorio número [•], AES Andes S.A., Strabag S.A., el Deudor y el Agente de Garantías Local declararon la extinción de pleno derecho de los Créditos Subordinados AES Andes /según dicho término se define en la referida escritura pública/ y alzaron parcialmente el Contrato de Prenda de Créditos AES Andes respecto de los referidos Créditos Subordinados AES Andes, dejándose constancia que el Contrato de Prenda de Créditos AES Chile permanece vigente respecto de los Créditos Subordinados Futuros /según dicho término se define más adelante/.

/**Seis**/ **Documentos del Financiamiento.** Para efectos del artículo tercero, numeral dos, de la Ley de Prenda sin Desplazamiento /según dicho término se define más adelante/, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas /según dichos términos se definen en el Contrato de Agencia de Garantías Local/ cuyo cumplimiento se garantiza mediante el presente Contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**CLÁUSULA TERCERA: CRÉDITOS SUBORDINADOS.** Para los efectos del presente instrumento, todos y cada uno de los derechos de cobro de sumas de dinero que el Constituyente tenga en contra del Deudor bajo los reconocimientos de deuda que el Deudor pueda suscribir en el futuro que sean calificados como Créditos Subordinados /*Subordinated Loans*/ bajo el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local /en adelante los "**Créditos Subordinados Futuros**"/ se denominan los "**Créditos Subordinados**".

**CLÁUSULA CUARTA: PRENDA SIN DESPLAZAMIENTO.** /**Uno**/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Constituyente, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas: prenda sin desplazamiento de primer grado de conformidad al artículo noveno y al artículo catorce de la Ley veinte mil ciento noventa /en adelante, la "**Ley de Prenda sin Desplazamiento**"/, el Reglamento del Registro de Prendas sin Desplazamiento, contenido en el Decreto Supremo número setecientos veintidós, conjunto del Ministerio de Justicia y del Ministerio de Hacienda, publicado en el Diario Oficial de veintitrés de octubre de dos mil diez /el "**Reglamento de Prenda sin Desplazamiento**"/ y a los términos y condiciones del presente instrumento, sobre los Créditos Subordinados, según sean modificados, ampliados y/o prorrogados de tiempo en tiempo. Conforme a lo establecido en el artículo noveno de la Ley de Prenda sin Desplazamiento, el derecho real de prenda sobre los Créditos Subordinados Futuros se adquirirá una vez que éstos lleguen a existir, y se entenderá constituido el derecho real de prenda desde la fecha de la inscripción del presente instrumento en el Registro de Prendas sin Desplazamiento, que se realizó con fecha con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintinueve. /**Dos**/ **Extensión de la Prenda.** /**A**/ La prenda sin desplazamiento de que da cuenta este contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantiza, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en

que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a la presente prenda. Se deja constancia que para efectos de lo dispuesto en el artículo tercero numeral cuatro de la Ley de Prenda sin Desplazamiento, las Partes reconocen que la presente prenda sin desplazamiento garantiza el cumplimiento de la totalidad de las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento, y en especial a lo establecido en el Contrato entre Acreedores. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda sin desplazamiento que por el presente instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de los Créditos Subordinados.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representados de la manera indicada en la comparecencia de este instrumento, el Constituyente se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la prenda y las Obligaciones Garantizadas de que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Créditos Subordinados, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, el Constituyente se obliga a no alterar, modificar o transformar los Créditos Subordinados, ni celebrar acto o contrato alguno, especialmente contratos de factoring o securitización, y en general cualquier otra figura contractual nominada o innominada que suponga o implique el cambio del Constituyente como titular de los Créditos Subordinados, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento.

**CLÁUSULA SEXTA: TÍTULO Y AUSENCIA DE GRAVÁMENES.** El Constituyente, a través de sus representantes ya individualizados, declara que los Créditos Subordinados /i/ le pertenecen como único y exclusivo titular, y que han sido legalmente adquiridos, /ii/ salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, se encuentran libres de gravámenes, cargos, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias, derechos preferentes en favor de terceros y prendas de ningún tipo, y /iii/ salvo por los Gravámenes Permitidos y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no están sujetos a opciones, promesas de venta, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir su dominio o darlos en garantía de otras obligaciones, y que no existe impedimento alguno que pueda afectar su libre disposición o la constitución de la prenda sin desplazamiento y prohibición de gravar y enajenar de que da cuenta esta escritura. Del mismo modo, el Constituyente declara que no existe impedimento alguno, tanto respecto de los Créditos Subordinados

como respecto de sí mismo, para celebrar la prenda y prohibición de que da cuenta este instrumento.

<u>CLÁUSULA SÉPTIMA</u>: **EJERCICIO DE DERECHOS. /A/** En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, el Constituyente conservará el pleno ejercicio de los derechos que le correspondan bajo los Créditos Subordinados. **/B/** Si ocurriere y se mantuviere vigente cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, o en caso de incumplimiento de cualquier estipulación contemplada en esta escritura, y sin que deba acreditar a persona alguna el Evento de Incumplimiento o incumplimiento de este contrato de que se trate, el Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, previa notificación escrita al Deudor, con copia al Constituyente, por medio de Notario Público o judicialmente, conforme lo dispone el artículo séptimo de la Ley de Prenda sin Desplazamiento y a contar de la fecha de dicha notificación, prohibirá al Deudor que pague los Créditos Subordinados en otras manos que no sean las del Agente de Garantías Local y podrá declarar la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas y, por ende, de esta prenda, pudiendo seguirse en contra del Constituyente todas y cada una de las acciones de cobro y/o de cualquier naturaleza derivadas de este contrato de prenda, al amparo del título sexto de la Ley de Prenda sin Desplazamiento, para obtener el cumplimiento de las Obligaciones Garantizadas. **/C/** A partir de la notificación establecida en la letra **/B/** precedente de esta cláusula, le estará prohibido al Deudor pagar los Créditos Subordinados y cualquiera de los intereses que se devenguen en adelante o los que se hubieren devengado y no se hubiesen pagado, en manos distintas del Agente de Garantías Local, conforme a lo dispuesto en el artículo séptimo de la Ley de Prenda sin Desplazamiento, debiendo consignar dichos montos en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad al artículo treinta y uno de la Ley de Prenda sin Desplazamiento. **/D/** Por el presente acto, y sin perjuicio de las facultades del Agente de Garantías Local de prohibir el pago de los Créditos Subordinados en manos distintas a las suyas y de ejecutar la presente prenda sin desplazamiento, conforme a lo dispuesto en la letra **/B/** precedente, el Constituyente confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Constituyente, y por sí y en representación de las Partes Garantizadas, en el evento que ocurriere y se mantuviere vigente un Evento de Incumplimiento bajo el Contrato de Términos Comunes, y sin que deba acreditar a persona alguna el Evento de Incumplimiento, lo represente ampliamente en el ejercicio de los derechos que le correspondan en su calidad de acreedor de los Créditos Subordinados, incluyendo pero no limitado a, el ejercicio de los derechos de voz y voto a que el Constituyente tenga derecho en las juntas de acreedores a que haya lugar en caso de reorganización o liquidación del Deudor, de manera que se cumplan por el Constituyente todos los acuerdos de subordinación suscritos por éste respecto de las Obligaciones Garantizadas[, incluyendo pero no limitado a los establecidos en el convenio de subordinación suscrito en idioma inglés denominado *Third Amended and Restated Subordination Agreement* entre el Deudor, [•], [•], el Agente de Garantías Local y el Agente Administrativo, con fecha [•].]

<u>CLÁUSULA OCTAVA</u>: **INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. ACEPTACIÓN DEL DEUDOR. /Uno/** Se deja constancia que de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento, la prenda de que da cuenta este instrumento fue debidamente inscrita en el Registro de Prendas sin

Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintinueve. La prenda de que da cuenta este instrumento deberá ser registrada, a costa del Deudor, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los Créditos Subordinados. **/Dos/** El Constituyente estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos, sea por instrumento público o privado, destinados a individualizar los Créditos Subordinados Futuros que por este acto se prendan una vez que ellos lleguen a existir, dentro de los quince días siguientes a la suscripción del título en que conste el Crédito Subordinado Futuro por parte del Deudor. **/Tres/** Asimismo, para efectos de dar cumplimiento a lo dispuesto en el artículo tercero, numeral dos, de la Ley de Prenda Sin Desplazamiento, el Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Dos** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar tanto los Pagarés y Reconocimientos como los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, tan pronto éstos lleguen a ser suscritos por el Deudor, y en todo caso dentro de los quince días siguientes a la suscripción de los Pagarés y Reconocimientos, o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público. La referida escritura deberá incluir como anexo protocolizado bajo el mismo número de repertorio de dicha escritura, una copia de los Pagarés y Reconocimientos o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, que en ella se individualicen. **/Cuatro/** Por el presente acto, y para el evento en que el Constituyente no dé cumplimiento a lo establecido en los numerales /Dos/ y /Tres/ precedentes, el Constituyente confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Constituyente, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refieren los numerales /Dos/ y /Tres/ precedentes, e individualizar ya sea los Créditos Subordinados Futuros respectivos una vez que lleguen a existir, o los Pagarés y Reconocimientos y/o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público una vez que éstos sean suscritos por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**<u>CLÁUSULA NOVENA</u>: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor, del Constituyente y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**<u>CLÁUSULA DÉCIMA</u>: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda sin desplazamiento de primer grado y las prohibiciones constituidas por el Constituyente en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMO PRIMERA: ACEPTACIÓN DEL DEUDOR.** Conforme a lo dispuesto en artículo séptimo de la Ley de Prenda sin Desplazamiento, a contar de la fecha en que se le practique la notificación establecida en la cláusula séptima precedente, el Agente de Garantías Local prohíbe en virtud de esta escritura al Deudor, pagar todo o parte de los Créditos Subordinados, o los correspondiente intereses devengados o que se devenguen de los mismos, en otras manos diversas del Agente de Garantías Local, y se obliga a proceder a su consignación en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad al artículo treinta y uno de la Ley de Prenda sin Desplazamiento. Presente en este acto, don [•], [ya individualizado], en representación del Deudor y estando expresamente autorizado para recibir notificaciones, quien declara que se da por notificado y acepta en nombre de su representada la prenda sin desplazamiento que se constituye en virtud de esta escritura y, en consecuencia, en forma incondicional, irrevocable y sin reservas, acepta la prohibición de pagar en manos que no sean las del Agente de Garantías Local todo o parte de los Créditos Subordinados, así como la obligación de consignar los pagos debidos en virtud de los Créditos Subordinados en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, cuando corresponda de acuerdo a lo establecido en el presente contrato y en los artículos séptimo y trigésimo primero de la Ley de Prenda sin Desplazamiento.

**CLÁUSULA DÉCIMO SEGUNDA: SUBORDINACIÓN. /A/** Por el presente acto y de conformidad con lo dispuesto por los incisos tercero y siguientes del artículo dos mil cuatrocientos ochenta y nueve del Código Civil y a lo dispuesto en el documento suscrito con [esta misma] fecha mediante instrumento privado en idioma inglés, sujeto a las leyes del Estado de Nueva York, denominado *Third Amended and Restated Subordination Agreeement* /el "Acuerdo de Subordinación"/, el cual se entiende incorporado a la presente escritura para todos los efectos legales a que haya lugar, y que se protocoliza con esta misma fecha y en esta Notaría bajo el repertorio número [•], el Constituyente declara que viene en posponer y subordinar totalmente el pago de los Créditos Subordinados en beneficio del pago o cumplimiento oportuno, íntegro y completo de todas y cada una de las Obligaciones Garantizadas en la medida que ellas correspondan a créditos de la quinta clase a que se refiere el artículo dos mil cuatrocientos ochenta y nueve del Código Civil. Se deja expresa constancia que esta subordinación es irrevocable en los términos de los referidos incisos del artículo dos mil cuatrocientos ochenta y nueve del Código Civil. Asimismo, y en forma adicional a la subordinación antes pactada, el Constituyente declara que viene en posponer y subordinar totalmente el pago de los Créditos Subordinados en beneficio del pago íntegro y oportuno de todas y cada una de las Obligaciones Garantizadas que no tuvieren el carácter de valistas o créditos de la quinta clase. **/B/** Por el presente instrumento, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, acepta la subordinación de créditos establecida en la letra /A/ de esta cláusula. **/C/** Asimismo, por el presente instrumento el Deudor acepta la subordinación establecida en la letra /A/ de esta cláusula, tanto en los términos del inciso sexto del artículo dos mil cuatrocientos ochenta y nueve del Código Civil como en los del presente instrumento, quedando obligado a respetarla.

**CLÁUSULA DÉCIMO TERCERA: MANTENCIÓN DEL DOMINIO. /Uno/** El Constituyente se obliga a velar y responder por el hecho de que los Créditos Subordinados Futuros que por el presente instrumento se prendan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Créditos Subordinados Futuros, a dicha fecha, y a menos que los demás Documentos del Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo titular, estarán

con sus impuestos al día, y en la medida que puedan razonablemente considerarse dentro de la esfera de control del Constituyente, no les afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a esta prenda; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Créditos Subordinados o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de la prenda y prohibiciones que por este acto se constituyen. **/Dos/** Mientras subsista esta prenda, el Constituyente deberán pagar íntegra y oportunamente cualquier impuesto, o carga de cualquier especie establecida o que puedan establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Subordinados. El Constituyente llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Subordinados y para defenderlos de acciones de terceros.

**CLÁUSULA DÉCIMO CUARTA: EJECUCIÓN.** Por este acto, el Constituyente, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento, lo que será acreditado con el solo mérito de la notificación a que se refiere la letra /C/ de la cláusula séptima precedente, podrá producir a su respecto la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Constituyente y/o el Deudor todas y cada una de las acciones derivadas de este contrato de prenda, para obtener tanto el cumplimiento de las Obligaciones Garantizadas como el cobro de los Pagarés y Reconocimientos.

**CLÁUSULA DÉCIMO QUINTA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Constituyente declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan o puedan revestir la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Constituyente los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que, en virtud de lo señalado en el artículo treinta y ocho de la Ley de Prenda sin Desplazamiento, la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda sin desplazamiento y de todas las acciones y derechos que emanen o puedan emanar de ella, manteniendo la presente prenda sin desplazamiento la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO SEXTA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

**CLÁUSULA DÉCIMO SÉPTIMA: PARTE INTEGRAL E INTERPRETACIÓN.**

/Uno/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/Dos/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE PRENDA DE CRÉDITOS MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Prenda de Créditos AES Andes.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda de Créditos AES Andes y el nuevo texto modificado y refundido que consta en el Contrato de Prenda de Créditos AES Andes.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE PRENDA DE CRÉDITOS AES ANDES.** La modificación del Contrato de Prenda de Créditos AES Andes, que consta en el texto aprobado del Contrato de Prenda de Créditos AES Andes que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en el Registro de Prenda sin Desplazamiento del Servicio de Registro Civil e Identificación y demás registros pertinentes, de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda de Créditos AES Andes.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y a Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o

complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda de Créditos AES Andes y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO:** **PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-

_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**

_____
[•]
**C.I.N°** _____
**p.p. AES ANDES S.A.**

_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**

**Exhibit QQ**

**Amendment to Pledge over Credits**

REPERTORIO N°

**MODIFICACIÓN Y TEXTO REFUNDIDO DE PRENDA SIN DESPLAZAMIENTO**

**SOBRE CRÉDITOS**

**AES CHILE SpA**

**A**

**ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL**

**EN SANTIAGO DE CHILE, a [•] de dos mil veintidós**, ante mí, **[•]**, abogado, Notario Público, Titular de la [•] Notaría de Santiago, con oficio en [•], Región Metropolitana, comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES CHILE SpA** /antes, Norgener Renovables SpA/, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones setecientos ochenta y seis mil trescientos cincuenta y cinco guion uno, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante "**AES Chile**" o el "**Constituyente**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en  Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago , actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante y conjuntamente con el Deudor y el Constituyente, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el presente contrato /el "**Contrato de Modificación**"/:

**PRIMERO: ANTECEDENTES.**

**/Uno/ Proyecto.** El Deudor es dueño de un complejo de generación de energía hidroeléctrica de quinientos treinta y un MW, consistente en las centrales de generación hidroeléctrica Alfalfal II y Las Lajas /las "**Centrales de Generación**" o "*Power Stations*", según este término se define en el Contrato de Términos Comunes a que se hace referencia más adelante/ y los activos relacionados con su interconexión al Sistema Eléctrico Nacional. Las Centrales de Generación, junto con las respectivas instalaciones de conexión,

1

incluyendo subestaciones, líneas de transmisión y las demás instalaciones necesarias para la operación y explotación de las Centrales de Generación se denominarán, en adelante y conjuntamente, el "**Proyecto**", el cual fue aprobado mediante la resolución de calificación ambiental dictada con fecha treinta de marzo de dos mil nueve a través de la resolución exenta número doscientos cincuenta y seis de la Comisión Regional del Medio Ambiente de la Región Metropolitana. El Proyecto se encuentra ubicado en San José de Maipo, a aproximadamente cincuenta kilómetros al este de Santiago, Chile, en la cuenca alta del río Maipo. La central Alfalfal II se localiza en la subcuenca del río Colorado, ribera izquierda, en el sector del estero Aucayes, y la central Las Lajas en la ribera izquierda del río Colorado, en el sector El Sauce. La central Alfalfal II contempla la captación y conducción de aguas de los esteros La Engorda, Colina, Las Placas y El Morado, ubicados en la parte alta de la hoya del río El Volcán, y las aguas del río Yeso. La central Las Lajas contempla la captación y conducción de los recursos del río Colorado hasta la cámara de carga Las Lajas, y captación de recursos desde el canal Aucayes. La cámara de carga Las Lajas tiene como objetivos dar estabilidad a la altura de generación de la central y mantener disponible un volumen de regulación que permita compensar en los cauces naturales alzas o disminuciones bruscas de caudal. La referida cámara se encuentra diseñada para almacenar trescientos mil metros cúbicos de agua sobre una superficie de setenta y cinco mil metros cuadrados. A esta fecha, todas las Centrales de Generación se encuentran interconectadas al Sistema Eléctrico Nacional, pudiendo inyectar la energía producida por ellas de conformidad con la normativa aplicable.

**/Dos/ Financiamiento del Proyecto.** Con el objeto de financiar la construcción, operación y ciertos costos y gastos asociados con el desarrollo y financiamiento del Proyecto, el Deudor suscribió diversos contratos, unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, y que se definen como Documentos del Financiamiento en el Contrato de Agencia de Garantías Local, que a su vez se define más adelante /en adelante el "**Financiamiento Alto Maipo**"/.

**/Tres/ Contrato de Prenda de Créditos.** Mediante escritura pública otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha dos de abril de dos mil dieciocho, repertorio número tres mil sesenta y nueve guion dos mil dieciocho, Corpbanca /hoy Itaú Corpbanca/ como Agente de Garantías Local y en representación de las partes indicadas en dicha escritura, Alto Maipo SpA, como deudor, y AES Chile SpA /antes, Norgener Renovables SpA/, como constituyente, celebraron, como parte del Financiamiento Alto Maipo, un contrato de prenda sin desplazamiento sobre créditos, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha diez de abril de dos mil dieciocho, bajo el repertorio número ciento veintiún mil ciento cuarenta y cinco /en adelante, el "**Contrato de Prenda de Créditos Original**"/. El Contrato de Prenda de Créditos Original fue complementado mediante escritura pública de fecha trece de abril de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil cuatrocientos noventa y cinco guion dos mil dieciocho, y complementado mediante diversos instrumentos /en adelante, dicho contrato, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos Modificado**"/. El Contrato de Prenda de Créditos Modificado fue nuevamente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y dos / dos mil dieciocho, y complementado mediante diversas escrituras públicas /en adelante, dicho contrato,

modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos AES Chile**"/.

**/Cuatro/ Capítulo Once.** Con fecha diecisiete de noviembre de dos mil veintiuno, tanto el Deudor como su filial Alto Maipo Delaware LLC iniciaron un procedimiento de reestructuración de pasivos conforme al capítulo once del Código de Quiebras de los Estados Unidos de América ante el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware /en adelante, el "**Capítulo Once**"/.

**/Cinco/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y los acreedores bajo el Financiamiento Alto Maipo, entre otros, y como parte de dicho financiamiento, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once, el Contrato de Agencia de Garantías Local Modificado y Refundido fue nuevamente modificado con [esta misma fecha], mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•], en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

**/Seis/ Reestructuración del Financiamiento Alto Maipo**. Como parte de los compromisos asumidos por el Deudor bajo el Capítulo Once y en virtud de varios instrumentos privados de [esta misma fecha], unos celebrados en el extranjero y sujetos a las leyes del Estado de Nueva York, Estados Unidos de América, y otros otorgados en Chile y sujetos a las leyes de la República de Chile, se introdujeron diversas modificaciones a los Documentos del Financiamiento, según dicho término se define en el Contrato de Agencias de Garantía Local, y se celebraron nuevos contratos cuyas obligaciones deberán asimismo ser garantizadas con esta prenda sobre los créditos subordinados que AES Chile tenga en contra del Deudor. Los detalles adicionales respecto de las modificaciones introducidas al Financiamiento Alto Maipo se encuentran descritos en la Cláusula Primera del Contrato de Agencia de Garantías Local.

**/Siete/ Modificación y Texto Refundido.** Para efectos de dejar constancia de todo lo anterior, en especial los documentos en los cuales constan las obligaciones garantizadas por la prenda sin desplazamiento de créditos de que da cuenta este instrumento, las partes garantizadas respectivas, y demás modificaciones respecto del Contrato de Prenda de Créditos AES Chile, las Partes acuerdan modificar el Contrato de Prenda de Créditos AES Chile en los términos que da cuenta el texto refundido que se aprueba en la cláusula segunda siguiente /en adelante, el "**Contrato de Prenda de Créditos AES Chile**"/ y ampliarlo asimismo para constituir prenda y prohibiciones de gravar y enajenar, sobre todos

y cada uno de los derechos de cobro de sumas de dinero presentes y futuros que AES Chile tenga en contra del Deudor.

**SEGUNDO:** **TEXTO MODIFICADO Y REFUNDIDO DEL CONTRATO DE PRENDA DE CRÉDITOS AES CHILE.** Las Partes declaran que el texto del Contrato de Prenda de Créditos AES Chile, ha sido modificado y refundido en los términos de que da cuenta el texto siguiente, y por lo tanto las disposiciones vigentes del mismo son aquellas establecidas a continuación:

"**PRENDA SIN DESPLAZAMIENTO SOBRE CRÉDITOS AES CHILE SpA A ITAÚ CORPBANCA, EN SU CALIDAD DE AGENTE DE GARANTÍAS LOCAL.**

**EN SANTIAGO DE CHILE, a** [•] **de dos mil veintidós**, ante mí, [•], comparecen: **/Uno/** [•] y [•], en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante el "**Deudor**"/; **/Dos/** [•] y [•], en nombre y representación, según se acreditará, de **AES CHILE SpA** /antes, Norgener Renovables SpA/, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones setecientos ochenta y seis mil trescientos cincuenta y cinco guion uno, todos con domicilio para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante "**AES Chile**" o el "**Constituyente**"/; y **/Tres/** [•] y [•], en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca, y en adelante "**Itaú Corpbanca**"/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [•], actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el Contrato de Agencia de Garantías Local a que se hace referencia más adelante, y conjuntamente con el Deudor y el Constituyente, las "**Partes**"; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen que vienen en celebrar el siguiente contrato de prenda de créditos /el "**Contrato de Prenda de Créditos AES Chile**" o el "**Contrato**"/:

**CLÁUSULA PRIMERA: ANTECEDENTES. /Uno/ Contrato de Agencia de Garantías Local.** Mediante escritura pública otorgada en la Notaría de Santiago de don José Musalem Saffie con fecha nueve de diciembre de dos mil trece, repertorio número quince mil cuatrocientos setenta y seis guion dos mil trece, se suscribió entre el Deudor y Corpbanca /hoy Itaú Corpbanca/, entre otros, un contrato de agencia de garantías de conformidad a lo establecido en el artículo dieciocho de la Ley número veinte mil ciento noventa, de fecha cinco de junio de dos mil siete, designándose a Corpbanca /hoy Itaú Corpbanca/ como agente de garantías local. Dicho contrato fue posteriormente modificado mediante escritura pública de fecha ocho de mayo de dos mil dieciocho otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel, bajo el repertorio número tres mil novecientos sesenta y ocho / dos mil dieciocho, en virtud de la cual se estableció un texto modificado y refundido de dicho contrato /en adelante, el "**Contrato de Agencia de Garantías Local Modificado y Refundido**"/. El Contrato de Agencia de Garantías Local Modificado y Refundido fue

4

nuevamente modificado con fecha [•] de dos mil veintidós, mediante escritura pública otorgada en la Notaría de Santiago de [•], repertorio número [•], en virtud de la cual se estableció en su artículo Segundo un texto modificado y refundido del Contrato de Agencia de Garantías Local Modificado y Refundido /en adelante, dicho texto modificado y refundido, según pueda ser modificado, o modificado y refundido en el futuro, el "**Contrato de Agencia de Garantías Local**"/.

/**Dos**/ **Antecedentes Adicionales**. Los antecedentes aplicables a este Contrato se encuentran detallados en la Cláusula Primera del Contrato de Agencia de Garantías Local, cláusula que se entiende íntegramente reproducida en este instrumento y que, además, se entiende formar parte integral del mismo para todos los efectos contractuales o legales a que haya efecto. En consecuencia, los términos en mayúscula que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en dicha Cláusula Primera del Contrato de Agencia de Garantías Local.

/**Tres**/ **Interpretación.** A menos que se disponga lo contrario, cualquier referencia en el presente instrumento a cualquier persona incluirá a sus respectivos sucesores legales y cesionarios permitidos. Todos los términos definidos en su forma singular tendrán el mismo significado cuando sean usados en su forma plural y viceversa. Los términos en idioma inglés que no se encuentren expresamente definidos en este instrumento, tendrán la definición que se les asigna en el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local.

/**Cuatro**/ **Texto Modificado y Refundido.** Se deja constancia que el presente contrato de prenda sin desplazamiento sobre créditos, es un texto modificado y refundido del contrato de prenda sin desplazamiento sobre créditos celebrado mediante escritura pública, otorgada en la Notaría de Santiago de don Patricio Raby Benavente con fecha dos de abril de dos mil dieciocho, repertorio número tres mil sesenta y nueve guion dos mil dieciocho, el cual fue debidamente inscrito en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha diez de abril de dos mil dieciocho, bajo el repertorio número ciento veintiún mil ciento cuarenta y cinco, y posteriormente /i/ complementado mediante escritura pública de fecha trece de abril de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número tres mil cuatrocientos noventa y cinco guion dos mil dieciocho; /ii/ complementado a su vez mediante diversas escrituras públicas; /iii/ nuevamente modificado por escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Antonio Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y dos / dos mil dieciocho, y /iv/ complementado posteriormente mediante diversas escrituras públicas /en adelante, dicho contrato de prenda sin desplazamiento sobre créditos, modificado y complementado en la forma antedicha, el "**Contrato de Prenda de Créditos AES Chile**"/.

/**Cinco**/ **Alzamiento.** Se deja constancia que por escritura pública de fecha [•], otorgada en la Notaría de Santiago de [•] bajo el repertorio número [•], AES Andes S.A., Strabag S.A., el Deudor y el Agente de Garantías Local declararon la extinción de pleno derecho de los Créditos Subordinados Norgener /según dicho término se define en la referida escritura pública/ y alzaron parcialmente el Contrato de Prenda de Créditos AES Chile respecto de los referidos Créditos Subordinados Norgener, dejándose constancia que el Contrato de Prenda de Créditos AES Chile permanece vigente respecto de los Créditos Subordinados Futuros /según dicho término se define más adelante/.

/**Seis**/ **Documentos del Financiamiento.** Para efectos del artículo tercero, numeral dos, de la Ley de Prenda sin Desplazamiento /según dicho término se define más adelante/, se deja constancia de que los Documentos del Financiamiento en que, a esta fecha, constan las Obligaciones Garantizadas /según dichos términos se definen en el Contrato de Agencia de Garantías Local/ cuyo cumplimiento se garantiza mediante el presente Contrato, han sido protocolizados con [esta misma fecha] y en esta misma Notaría bajo el repertorio número [•] guion dos mil veintidós.

**CLÁUSULA SEGUNDA: PARTES GARANTIZADAS Y OBLIGACIONES GARANTIZADAS.** /**Uno**/ Para todos los efectos de este Contrato, se entenderá por "**Parte Garantizada**" y conjuntamente las "**Partes Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

/**Dos**/ Para todos los efectos de este Contrato, se entenderá por "**Obligación Garantizada**" y conjuntamente las "**Obligaciones Garantizadas**", el significado asignado a dichos términos en el Contrato de Agencia de Garantías Local.

**CLÁUSULA TERCERA: CRÉDITOS SUBORDINADOS.** Para efectos del presente instrumento, todos y cada uno de los derechos de cobro de sumas de dinero que el Constituyente tenga en contra del Deudor bajo los reconocimientos de deuda que el Deudor pueda suscribir en el futuro que sean calificados como Créditos Subordinados /*Subordinated Loans*/ bajo el Contrato de Términos Comunes, según dicho término se define en el Contrato de Agencia de Garantías Local /en adelante los "**Créditos Subordinados Futuros**" se denominan los "**Créditos Subordinados**"/.

**CLÁUSULA CUARTA: PRENDA SIN DESPLAZAMIENTO.** /**Uno**/ Con el objeto de garantizar el cumplimiento íntegro, efectivo y oportuno por parte del Deudor de todas y cada una de las Obligaciones Garantizadas, el Constituyente, debidamente representado, ha constituido en favor del Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas: prenda sin desplazamiento de primer grado de conformidad al artículo noveno y al artículo catorce de la Ley veinte mil ciento noventa /en adelante, la "**Ley de Prenda sin Desplazamiento**"/, el Reglamento del Registro de Prendas sin Desplazamiento, contenido en el Decreto Supremo número setecientos veintidós, conjunto del Ministerio de Justicia y del Ministerio de Hacienda, publicado en el Diario Oficial de veintitrés de octubre de dos mil diez /el "**Reglamento de Prenda sin Desplazamiento**"/ y a los términos y condiciones del presente instrumento, sobre los Créditos Subordinados, según sean modificados, ampliados y/o prorrogados de tiempo en tiempo. Conforme a lo establecido en el artículo noveno de la Ley de Prenda sin Desplazamiento, el derecho real de prenda sobre los Créditos Subordinados Futuros se adquirirá una vez que éstos lleguen a existir, y se entenderá constituido el derecho real de prenda desde la fecha de la inscripción del presente instrumento en el Registro de Prendas sin Desplazamiento, que se realizó con fecha diez de abril de dos mil dieciocho, bajo el repertorio número ciento veintiún mil ciento cuarenta y cinco. /**Dos**/ **Extensión de la Prenda.** /**A**/ La prenda sin desplazamiento de que da cuenta este contrato se extiende y garantiza el íntegro y oportuno cumplimiento de todas las Obligaciones Garantizadas y aquellas derivadas de las mismas por disposición de la ley; ya sea que dichas obligaciones sean de la esencia, de la naturaleza o meramente accidentales de los actos y contratos de que emanen; y sea que su cumplimiento sea exigible en las épocas convenidas o anticipadamente, en el evento de su aceleración. Garantiza, asimismo, el reembolso de las costas y gastos de cobranza, judiciales o extrajudiciales, incluidos honorarios razonables de abogados, si existieren, en que las Partes Garantizadas o el Agente de Garantías Local, en su representación, incurran

con ocasión de gestiones o demandas de cobro o ejecución de la presente prenda y se extiende además a toda obligación que contraiga el Deudor en instrumentos que pueda otorgar o aceptar en el futuro, en sustitución o reemplazo de, o bien en forma adicional a la presente prenda. Se deja constancia que para efectos de lo dispuesto en el artículo tercero numeral cuatro de la Ley de Prenda sin Desplazamiento, las Partes reconocen que la presente prenda sin desplazamiento garantiza el cumplimiento de la totalidad de las Obligaciones Garantizadas. **/B/** Todas las cantidades que se obtengan judicial o extrajudicialmente en abono o pago de las Obligaciones Garantizadas, lo serán por cuenta y en beneficio del Agente de Garantías Local, actuando en representación y beneficio de las Partes Garantizadas y, deducidos los gastos y costos de cobranza, se les pagarán respectivamente a las Partes Garantizadas, de conformidad con los Documentos del Financiamiento, y en especial a lo establecido en el Contrato entre Acreedores. Se conviene expresamente que la presente prenda es indivisible. **/C/** La prenda sin desplazamiento que por el presente instrumento se constituye incluye y cubre todas las indemnizaciones de compañías de seguros respecto de los Créditos Subordinados.

**CLÁUSULA QUINTA: PROHIBICIÓN.** Por este acto y debidamente representados de la manera indicada en la comparecencia de este instrumento, el Constituyente se obliga, a menos que alguno de los Documentos del Financiamiento permita lo contrario, y mientras la prenda y las Obligaciones Garantizadas de que dan cuenta el presente instrumento se encuentren vigentes, a no gravar, enajenar, disponer, constituir garantías reales o cualquier carga, gravamen, prohibición o derechos en favor de ninguna persona, ni impedimento o restricción alguna que pudiere afectar o embarazar el libre uso, goce o disposición de, ni celebrar acto o contrato alguno sobre los Créditos Subordinados, sin la autorización previa y escrita del Agente de Garantías Local, dada de conformidad con lo establecido en el Contrato entre Acreedores y los demás Documentos del Financiamiento. Asimismo, mientras la prenda y las Obligaciones Garantizadas que dan cuenta el presente instrumento se encuentren vigentes, el Constituyente se obliga a no alterar, modificar o transformar los Créditos Subordinados, ni celebrar acto o contrato alguno, especialmente contratos de factoring o securitización, y en general cualquier otra figura contractual nominada o innominada que suponga o implique el cambio del Constituyente como titular de los Créditos Subordinados, sin la previa autorización escrita del Agente de Garantías Local, en los mismos términos antes señalados, salvo que se encuentre permitida conforme a los Documentos del Financiamiento.

**CLÁUSULA SEXTA: TÍTULO Y AUSENCIA DE GRAVÁMENES.** El Constituyente, a través de sus representantes ya individualizados, declara que los Créditos Subordinados **/i/** le pertenecen como único y exclusivo titular, y que han sido legalmente adquiridos, **/ii/** salvo por los Gravámenes Permitidos /"*Permitted Liens*", según este término se define en el Contrato de Términos Comunes/ y por lo dispuesto en este instrumento u otro Documento del Financiamiento, se encuentran libres de gravámenes, cargos, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas precautorias o prejudiciales, acciones resolutorias, derechos preferentes en favor de terceros y prendas de ningún tipo, y **/iii/** salvo por los Gravámenes Permitidos y por lo dispuesto en este instrumento u otro Documento del Financiamiento, no están sujetos a opciones, promesas de venta, ventas condicionales o a plazo, ni a ningún otro acto o contrato destinado a transferir su dominio o darlos en garantía de otras obligaciones, y que no existe impedimento alguno que pueda afectar su libre disposición o la constitución de la prenda sin desplazamiento y prohibición de gravar y enajenar de que da cuenta esta escritura. Del mismo modo, el Constituyente declara que no existe impedimento alguno, tanto respecto de los Créditos Subordinados

como respecto de sí mismo, para celebrar la prenda y prohibición de que da cuenta este instrumento.

**CLÁUSULA SÉPTIMA: EJERCICIO DE DERECHOS.** /A/ En la medida que el Deudor se encuentre cumpliendo de manera íntegra, efectiva y oportuna todas y cada una de las Obligaciones Garantizadas, el Constituyente conservará el pleno ejercicio de los derechos que le correspondan bajo los Créditos Subordinados. /B/ Si ocurriere y se mantuviere vigente cualquier Evento de Incumplimiento /"*Event of Default*", según dicho término se define en el Contrato de Términos Comunes/, o en caso de incumplimiento de cualquier estipulación contemplada en esta escritura, y sin que deba acreditar a persona alguna el Evento de Incumplimiento o incumplimiento de este instrumento de que se trate, el Agente de Garantías Local, por sí y en beneficio de las Partes Garantizadas, previa notificación escrita al Deudor, con copia al Constituyente, por medio de Notario Público o judicialmente, conforme lo dispone el artículo séptimo de la Ley de Prenda sin Desplazamiento y a contar de la fecha de dicha notificación, prohibirá al Deudor que pague los Créditos Subordinados en otras manos que no sean las del Agente de Garantías Local y podrá declarar la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Constituyente todas y cada una de las acciones de cobro y/o de cualquier naturaleza derivadas de este contrato de prenda, al amparo del título sexto de la Ley de Prenda sin Desplazamiento, para obtener el cumplimiento de las Obligaciones Garantizadas. /C/ A partir de la notificación establecida en la letra /B/ precedente de esta cláusula, le estará prohibido al Deudor pagar los Créditos Subordinados y cualquiera de los intereses que se devenguen en adelante o los que se hubieren devengado y no se hubiesen pagado, en manos distintas del Agente de Garantías Local, conforme a lo dispuesto en el artículo séptimo de la Ley de Prenda sin Desplazamiento, debiendo consignar dichos montos en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad al artículo treinta y uno de la Ley de Prenda sin Desplazamiento. /D/ Por el presente acto, y sin perjuicio de las facultades del Agente de Garantías Local de prohibir el pago de los Créditos Subordinados en manos distintas a las suyas y de ejecutar la presente prenda sin desplazamiento, conforme a lo dispuesto en la letra /B/ precedente, el Constituyente confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Constituyente, y por sí y en representación de las Partes Garantizadas, en el evento que ocurriere y se mantuviere vigente un Evento de Incumplimiento bajo el Contrato de Términos Comunes, y sin que deba acreditar a persona alguna el Evento de Incumplimiento, lo represente ampliamente en el ejercicio de los derechos que le correspondan en su calidad de acreedor de los Créditos Subordinados, incluyendo pero no limitado a, el ejercicio de los derechos de voz y voto a que el Constituyente tenga derecho en las juntas de acreedores a que haya lugar en caso de reorganización o liquidación del Deudor, de manera que se cumplan por el Constituyente todos los acuerdos de subordinación suscritos por éste en lo relativo a los Créditos Subordinados[, incluyendo, pero no limitado a los establecidos en el convenio de subordinación suscrito en idioma inglés denominado *Third Amended and Restated Subordination Agreement* entre el Deudor, [•], [•], el Agente de Garantías Local y el Agente Administrativo, con fecha [•].]

**CLÁUSULA OCTAVA: INSCRIPCIÓN Y ANOTACIÓN. COMPLEMENTACIONES. ACEPTACIÓN DEL DEUDOR.** /Uno/ Se deja constancia que de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento, la prenda de que da cuenta este instrumento fue debidamente inscrita en el Registro de Prendas sin

Desplazamiento del Servicio de Registro Civil e Identificación con fecha diez de abril de dos mil dieciocho, bajo el repertorio número ciento veintiún mil ciento cuarenta y cinco. La prenda de que da cuenta este instrumento deberá ser registrada, a costa del Constituyente, en cualquier otro registro que corresponda de acuerdo a la naturaleza de los Créditos Subordinados. **/Dos/** El Constituyente estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Uno** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos, sea por instrumento público o privado, destinados a individualizar los Créditos Subordinados Futuros que por este acto se prenden una vez que ellos lleguen a existir, dentro de los quince días siguientes a la suscripción del título en que conste el Crédito Subordinado Futuro por parte del Deudor. **/Tres/** Asimismo, para efectos de dar cumplimiento a lo dispuesto en el artículo tercero, numeral dos, de la Ley de Prenda Sin Desplazamiento, el Deudor estará obligado a llevar a cabo y suscribir una escritura de declaración, en términos sustancialmente similares a la escritura de declaración que como **Anexo Dos** se protocoliza conjuntamente al presente instrumento, bajo el mismo número de repertorio, y todos aquellos actos o contratos que resulten necesarios, sea por instrumento público o privado, para individualizar tanto los Pagarés y Reconocimientos como los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, tan pronto éstos lleguen a ser suscritos por el Deudor, y en todo caso dentro de los quince días siguientes a la suscripción de los Pagarés y Reconocimientos, o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público. La referida escritura deberá incluir como anexo protocolizado bajo el mismo número de repertorio de dicha escritura, una copia de los Pagarés y Reconocimientos o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público, que en ella se individualicen. **/Cuatro/** Por el presente acto, y para el evento en que el Constituyente no dé cumplimiento a lo establecido en los numerales /Dos/ y /Tres/ precedentes, el Constituyente confiere al Agente de Garantías Local un mandato especial, gratuito e irrevocable, en los términos del artículo doscientos cuarenta y uno del Código de Comercio, con facultad de autocontratar, para el solo efecto de que el Agente de Garantías Local, actuando en nombre y representación del Constituyente, y por sí y en representación de las Partes Garantizadas, pueda llevar a cabo y suscribir, siendo facultativo de su parte y sin asumir ninguna obligación al respecto, todos aquellos actos o contratos, sea por instrumento público o privado, destinados a efectuar las declaraciones a que se refieren los numerales /Dos/ y /Tres/ precedentes, e individualizar ya sea los Créditos Subordinados Futuros respectivos una vez que lleguen a existir, o los Pagarés y Reconocimientos, y/o los demás documentos en que consten Obligaciones Garantizadas y que no estén incluidos en un registro público una vez que éstos sean suscritos por el Deudor, pudiendo asimismo proporcionar dicha información a los registros competentes, según estime apropiado el Agente de Garantías Local.

**CLÁUSULA NOVENA: DERECHOS DEL AGENTE DE GARANTÍAS LOCAL.** El Agente de Garantías Local, actuando por sí y en representación de las Partes Garantizadas, gozará respecto del Deudor, del Constituyente y de terceros, de los beneficios, privilegios y preferencias que otorga la ley a los acreedores prendarios.

**CLÁUSULA DÉCIMA: ACEPTACIÓN DEL AGENTE DE GARANTÍAS LOCAL.** Por el presente acto, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, representado en la forma señalada en la comparecencia, acepta la prenda sin desplazamiento de primer grado y las prohibiciones constituidas por el Constituyente en su favor en virtud del presente instrumento.

**CLÁUSULA DÉCIMO PRIMERA: ACEPTACIÓN DEL DEUDOR.** Conforme a lo dispuesto en artículo séptimo de la Ley de Prenda sin Desplazamiento, a contar de la fecha en que se le practique la notificación establecida en la cláusula séptima precedente, el Agente de Garantías Local prohíbe en virtud de esta escritura al Deudor, pagar todo o parte de los Créditos Subordinados, o los correspondiente intereses devengados o que se devenguen de los mismos, en otras manos diversas del Agente de Garantías Local, y se obliga a proceder a su consignación en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, una vez que ésta se haya iniciado de conformidad al artículo treinta y uno de la Ley de Prenda sin Desplazamiento. Presente en este acto, don [•], [ya individualizado], en representación del Deudor y estando expresamente autorizado para recibir notificaciones, quien declara que se da por notificado y acepta en nombre de su representada la prenda sin desplazamiento que se constituye en virtud de esta escritura y, en consecuencia, en forma incondicional, irrevocable y sin reservas, acepta la prohibición de pagar en manos que no sean las del Agente de Garantías Local todo o parte de los Créditos Subordinados, así como la obligación de consignar los pagos debidos en virtud de los Créditos Subordinados en la cuenta corriente del tribunal que conozca de la ejecución de esta prenda, cuando corresponda de acuerdo a lo establecido en el presente contrato y en los artículos séptimo y trigésimo primero de la Ley de Prenda sin Desplazamiento**.**

**CLÁUSULA DÉCIMO SEGUNDA: SUBORDINACIÓN. /A/** Por el presente acto y de conformidad con lo dispuesto por los incisos tercero y siguientes del artículo dos mil cuatrocientos ochenta y nueve del Código Civil y a lo dispuesto en el documento suscrito [con esta misma] fecha mediante instrumento privado en idioma inglés, sujeto a las leyes del Estado de Nueva York, denominado *Third Amended and Restated Subordination Agreement* /el "Acuerdo de Subordinación"/, el cual se entiende incorporado a la presente escritura para todos los efectos legales a que haya lugar, y que se protocoliza con esta misma fecha y en esta Notaría bajo el repertorio número [•], el Constituyente declara que viene en posponer y subordinar totalmente el pago de los Créditos Subordinados en beneficio del pago o cumplimiento oportuno, íntegro y completo de todas y cada una de las Obligaciones Garantizadas en la medida que ellas correspondan a créditos de la quinta clase a que se refiere el artículo dos mil cuatrocientos ochenta y nueve del Código Civil. Se deja expresa constancia que esta subordinación es irrevocable en los términos de los referidos incisos del artículo dos mil cuatrocientos ochenta y nueve del Código Civil. Asimismo, y en forma adicional a la subordinación antes pactada, el Constituyente declara que viene en posponer y subordinar totalmente el pago de los Créditos Subordinados en beneficio del pago íntegro y oportuno de todas y cada una de las Obligaciones Garantizadas que no tuvieren el carácter de valistas o créditos de la quinta clase. **/B/** Por el presente instrumento, el Agente de Garantías Local, por sí y en nombre y representación de las Partes Garantizadas, acepta la subordinación de créditos establecida en la letra /A/ de esta cláusula. **/C/** Asimismo, por el presente instrumento el Deudor acepta la subordinación establecida en la letra /A/ de esta cláusula, tanto en los términos del inciso sexto del artículo dos mil cuatrocientos ochenta y nueve del Código Civil como en los del presente instrumento, quedando obligado a respetarla.

**CLÁUSULA DÉCIMO TERCERA: MANTENCIÓN DEL DOMINIO. /Uno/** El Constituyente se obliga a velar y responder por el hecho de que los Créditos Subordinados Futuros que por el presente instrumento se prendan, se encontrarán a la fecha de su adquisición, con sus títulos legales y antecedentes ajustados a derecho, y asimismo, que dichos Créditos Subordinados Futuros, a dicha fecha, y a menos que los demás Documentos del

Financiamiento permitan lo contrario, le pertenecerán como único y exclusivo titular, estarán con sus impuestos al día, y en la medida que puedan razonablemente considerarse dentro de la esfera de control del Constituyente, no les afectarán legítimos derechos de terceros, y se encontrarán libres de gravámenes, cargas, litigios, prohibiciones de gravar y enajenar u otras restricciones, embargos, medidas prejudiciales o precautorias, acciones resolutorias y derechos preferentes de terceros, distintos a esta prenda o a Gravámenes Permitidos; y que no estarán sujetos a promesas de venta, opciones, ventas condicionales o a plazo, ni a ningún otro acto o convención destinado a transferir el dominio de dichos Créditos Subordinados o a darlos en garantía de otras obligaciones, ni a otros impedimentos que puedan afectar su libre enajenación o la constitución de la prenda y prohibiciones constituidas por este instrumento, con excepción de aquellos permitidos por los Documentos del Financiamiento. **/Dos/** Mientras subsista esta prenda, el Constituyente deberán pagar íntegra y oportunamente cualquier impuesto, o carga de cualquier especie establecida o que puedan establecerse en el futuro por su titularidad o por cualquier otra circunstancia relativa a los Créditos Subordinados. El Constituyente llevará a cabo, asimismo, a su costo exclusivo, todas las acciones judiciales y extrajudiciales que sean necesarias para mantener la titularidad de los Créditos Subordinados y para defenderlos de acciones de terceros.

**CLÁUSULA DÉCIMO CUARTA: EJECUCIÓN.** Por este acto, el Constituyente, debidamente representado del modo indicado en la comparecencia de este instrumento, declara en beneficio del Agente de Garantías Local, actuando por sí y en nombre y representación de las Partes Garantizadas, que la ocurrencia de cualquier Evento de Incumplimiento, lo que será acreditado con el solo mérito de la notificación a que se refiere la letra /C/ de la cláusula séptima precedente, podrá producir a su respecto la exigibilidad inmediata y anticipada, y como si fueran de plazo vencido, de las Obligaciones Garantizadas, pudiendo seguirse en contra del Constituyente y/o el Deudor todas y cada una de las acciones derivadas de este contrato de prenda, para obtener tanto el cumplimiento de las Obligaciones Garantizadas como el cobro de los Pagarés y Reconocimientos.

**CLÁUSULA DÉCIMO QUINTA: IMPUESTOS Y SUCESORES. CESIÓN. /Uno/** El Constituyente declara que este contrato de prenda y prohibiciones y los poderes que se otorgan por este instrumento, así como el ejercicio de los derechos que puedan derivar de ellos, no se encuentran sujetos a impuestos ni a cargos de ninguna naturaleza y en consecuencia, el Agente de Garantías Local puede libremente ejercer sus derechos. Asimismo, las Partes acuerdan que esta prenda y prohibiciones beneficiarán a, y los derechos que otorgan podrán ser ejercidos por el Agente de Garantías Local o por quienes, de conformidad al Contrato de Términos Comunes y el Contrato de Agencia de Garantías Local revistan o puedan revestir la calidad de sucesores o cesionarios de éste, y quienes se subroguen legal o convencionalmente en sus derechos. Tales sucesores o cesionarios, y quienes se subroguen legal o convencionalmente en los derechos, tendrán en contra del Constituyente los mismos derechos y beneficios que esta escritura otorga al Agente de Garantías Local, considerándose como tales para todos los efectos legales y contractuales a que haya lugar. **/Dos/** Las Partes Garantizadas quedan facultadas para ceder a terceros en todo o parte las Obligaciones Garantizadas y, especialmente, el derecho real de prenda que las cauciona. A mayor abundamiento, las Partes dejan expresa constancia que, en virtud de lo señalado en el artículo treinta y ocho de la Ley de Prenda sin Desplazamiento, la cesión de las Obligaciones Garantizadas hecha de conformidad a los términos indicados en los Documentos del Financiamiento, comprenderá la cesión de la presente prenda sin desplazamiento y de todas las acciones y derechos que emanen o puedan emanar de ella,

manteniendo la presente prenda sin desplazamiento la preferencia que gozaba en virtud del crédito cedido.

**CLÁUSULA DÉCIMO SEXTA: PODER DE INSCRIPCIÓN.** Se faculta al portador de copia autorizada de esta escritura pública para llevar a cabo y requerir las inscripciones, anotaciones y subinscripciones que correspondan en los competentes registros, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta prenda y prohibiciones.

**CLÁUSULA DÉCIMO SÉPTIMA: PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento."

**TERCERO: ANEXOS DEL CONTRATO DE PRENDA DE CRÉDITOS MODIFICADO Y REFUNDIDO.** Las Partes dejan constancia que los Anexos que se adjuntan a esta escritura y se protocolizan conjuntamente con la misma bajo el mismo número de repertorio, corresponden a los Anexos a que hace referencia el Contrato de Prenda de Créditos AES Chile.

**CUARTO: ACEPTACIÓN.** Por el presente acto, el Agente de Garantías Local, actuando por sí y en beneficio de las Partes Garantizadas, acepta la modificación del Contrato de Prenda de Créditos AES Chile y el nuevo texto modificado y refundido que consta en el Contrato de Prenda de Créditos AES Chile.

**QUINTO: INSCRIPCIÓN DEL CONTRATO DE PRENDA DE CRÉDITOS AES CHILE.** La modificación del Contrato de Prenda de Créditos AES Chile, que consta en el texto aprobado del Contrato de Prenda de Créditos AES Chile que por este instrumento se otorga, deberá ser inscrita, con cargo y costo del Deudor, en el Registro de Prenda sin Desplazamiento del Servicio de Registro Civil e Identificación y demás registros pertinentes, de acuerdo a lo establecido en el artículo veinticuatro de la Ley de Prenda sin Desplazamiento.

**SEXTO: FACULTAD AL PORTADOR.** Se faculta al portador de una copia autorizada de esta escritura para requerir de quien corresponda las notificaciones, anotaciones e inscripciones que fueren pertinentes, especialmente en el Registro de Prendas sin Desplazamiento, y para realizar todos aquellos actos que sean necesarios o convenientes para el perfeccionamiento de esta modificación al Contrato de Prenda de Créditos AES Chile.

**SÉPTIMO: PODER ESPECIAL.** Los comparecientes de esta escritura otorgan poder irrevocable a los señores Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta

12

Valenzuela; y a los señores Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que, actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera, a fin de lograr la plena inscripción y subinscripción de las modificaciones del Contrato de Prenda de Créditos AES Chile y prohibiciones de que da cuenta este instrumento, según corresponda.

**OCTAVO:** **PARTE INTEGRAL E INTERPRETACIÓN.**

/**Uno**/ **Parte integral.** Las estipulaciones contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local, serán plenamente aplicables al presente Contrato de Modificación y se entenderán formar parte integral del mismo, para todos los efectos legales o contractuales a que pudiere haber lugar, dándose íntegramente por reproducidas.

/**Dos**/ **Interpretación.** Las Partes dejan expresa constancia de que su intención y voluntad es que las cláusulas contenidas en la Cláusula Primera y en la Cláusula Séptima del Contrato de Agencia de Garantías Local formen parte integrante del presente Contrato de Modificación, en los términos indicados en la sección precedente, debiendo interpretarse el presente Contrato de Modificación conjuntamente con aquellas cláusulas, y bajo el entendido de que estas forman parte del presente instrumento.

**PERSONERÍAS.** [•]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes.- Doy fe.-


_____
[•]
**C.I.N°** _____
**p.p. AES CHILE SpA**


_____
[•]
**C.I.N°** _____
**p.p. ALTO MAIPO SpA**


_____
[•]
**C.I.N°** _____
**p.p. ITAÚ CORPBANCA**


_____
[•]
**C.I.N°** _____

**p.p. ITAÚ CORPBANCA**

**<u>Exhibit RR</u>**

**Deed of Declaration of Extinction of Subordinated Loans**

**REPERTORIO N°**

**DECLARACIÓN DE EXTINCIÓN DE CRÉDITOS SUBORDINADOS**

**AES ANDES S.A. Y OTROS**

En Santiago de Chile, a [·] del año dos mil veintidós, ante mí, [·], **COMPARECEN: /Uno/** [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **AES ANDES S.A.**, antes AES GENER S.A., una sociedad anónima, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número noventa y cuatro millones doscientos setenta y dos mil guion nueve, todos domiciliados para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante, **"AES Andes"**/; **/Dos/** [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **STRABAG SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta

1

y seis millones doscientos treinta y seis mil novecientos dieciocho guion cuatro, todos domiciliados para estos efectos en [·] /en adelante, **"Strabag"** y conjuntamente con AES Andes, los **"Acreedores Subordinados"**/; /**Tres**/ [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **ALTO MAIPO SpA**, una sociedad por acciones, debidamente constituida y válidamente existente de conformidad a las leyes de la República de Chile, Rol Único Tributario número setenta y seis millones ciento setenta mil setecientos sesenta y uno guion dos, todos domiciliados para estos efectos en Los Conquistadores número mil setecientos treinta, piso diez, comuna de Providencia, Santiago /en adelante, **"Alto Maipo"**/; y /**Cuatro**/ [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·] y [don/doña] [nombre completo], [estado civil], [nacionalidad], [profesión u oficio], cédula de identidad [para extranjeros] número [·], ambos en nombre y representación, según se acreditará, de **ITAÚ CORPBANCA** /antes, Corpbanca/, entidad bancaria debidamente constituida y válidamente existente de conformidad con las leyes de la República de Chile, Rol Único Tributario número noventa y siete millones veintitrés mil guion nueve, todos domiciliados para estos efectos en [·],

2

actuando en su calidad de agente de garantías chileno /en adelante, en dicha condición, el "**Agente de Garantías Local**" y conjuntamente con los Acreedores Subordinados y Alto Maipo, las "**Partes**"/, actuando por sí y en representación de las Partes Garantizadas, según dicho término se define en el texto refundido del contrato de agencia de garantías local suscrito por escritura pública de [esta misma fecha], otorgada en [esta misma notaría] bajo el repertorio número [·]; los comparecientes mayores de edad, quienes acreditan su identidad con las cédulas mencionadas y exponen:

**PRIMERO: ANTECEDENTES.-** /<u>Uno</u>/ <u>Proyecto</u>. Alto Maipo es dueña de un complejo de generación de energía hidroeléctrica de quinientos treinta y un megavatios, consistente en dos centrales de generación hidroeléctrica y los activos relacionados con su interconexión al Sistema Eléctrico Nacional; todo ubicado en la comuna de San José de Maipo, a cincuenta kilómetros aproximadamente de la ciudad de Santiago /en adelante, el "**Proyecto**"/.- /<u>Dos</u>/ <u>**Créditos Subordinados**</u>. /i/ <u>**Créditos Subordinados AES Andes Originales**</u>. Con el objeto de financiar la construcción, operación y desarrollo del Proyecto, AES Andes otorgó créditos a Alto Maipo por un monto total de capital de [·][1], pendiente de pago, y cuyos intereses a esta fecha ascienden a la suma de [·][2], también pendientes de pago /los "**Créditos Subordinados AES Andes Originales**"/. Los Créditos Subordinados AES Andes Originales constan en los

---

[1] **NTD:** Por favor indicar el monto de capital adeudado bajo los Créditos Subordinados AES Andes.
[2] **NTD:** Por favor indicar el monto de intereses adeudados bajo los Créditos Subordinados AES Andes.

siguientes instrumentos: /a/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de diciembre de dos mil trece en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número diecisiete mil quinientos noventa y nueve guion dos mil trece, en virtud del cual Alto Maipo reconoció adeudar a Norgener S.A. la suma por concepto de capital de dieciocho millones de Dólares; /b/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de diciembre de dos mil trece en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número diecisiete mil seiscientos, en virtud el cual Alto Maipo reconoció adeudar a Norgener S.A. la suma por concepto de capital de cincuenta y dos millones quinientos veintiocho mil trescientos treinta y nueve Dólares con ochenta centavos de Dólar; /c/ reconocimiento de deuda otorgado por escritura pública de fecha siete de enero de dos mil catorce en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número trescientos treinta y nueve guion dos mil catorce, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de treinta y nueve millones seiscientos mil Dólares; /d/ reconocimiento de deuda otorgado por escritura pública de fecha siete de febrero de dos mil catorce en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número mil ochocientos cincuenta y seis guion dos mil catorce, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de veintisiete millones de Dólares; /e/ reconocimiento de

4

deuda otorgado por escritura pública de fecha quince de abril de dos mil catorce en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número cuatro mil ochocientos diecinueve guion dos mil diecinueve, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de veintidós millones quinientos mil Dólares; /f/ reconocimiento de deuda otorgado por escritura pública de fecha treinta de junio de dos mil catorce en la Notaría de Santiago de don Eduardo Diez Morello bajo el repertorio número catorce mil ochocientos seis guion dos mil catorce, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de veintisiete millones de Dólares; /g/ reconocimiento de deuda otorgado por escritura pública de fecha catorce de octubre de dos mil catorce en la Notaría de Santiago de don Patricio Raby Benavente, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de cuarenta y dos millones de Dólares; /h/ reconocimiento de deuda otorgado por escritura pública de fecha doce de junio de dos mil quince en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seis mil ochocientos setenta y nueve guion dos mil quince, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de dieciocho millones de Dólares; /i/ reconocimiento de deuda otorgado por escritura pública de fecha veintiséis de agosto de dos mil quince en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número

5

diez mil doscientos veintitrés guion dos mil quince, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de veinticuatro millones de Dólares; /j/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de octubre de dos mil quince en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número doce mil ochocientos cincuenta y siete guion dos mil quince, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de cincuenta y tres millones ochocientos cincuenta y tres mil ochocientos cincuenta y cinco Dólares con ochenta y un centavos de Dólar; /k/ reconocimiento de deuda otorgado por escritura pública de fecha diecinueve de enero de dos mil diecisiete en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número seiscientos doce guion dos mil diecisiete, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de veinticinco millones cincuenta y ocho mil quinientos treinta coma dos Dólares; /l/ reconocimiento de deuda otorgado por escritura pública de fecha cinco de abril de dos mil diecisiete en la Notaria de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil ciento veinticuatro guion dos mil diecisiete, en virtud del cual Alto Maipo reconoció adeudar a AES Gener S.A. /hoy, AES Andes/ la suma por concepto de capital de treinta y tres millones setecientos doce mil cuatrocientos sesenta y dos Dólares; /m/ reconocimiento de deuda otorgado por escritura de

6

fecha doce de octubre de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número once mil trescientos veintiocho guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a AES Andes la suma por concepto de capital de veinte millones de Dólares; y /n/ reconocimiento de deuda otorgado por escritura de fecha veintiocho de octubre de dos mil veintiuno en la Notaría de Santiago de don Patricio Ray Benavente bajo el repertorio número doce mil trescientos doce guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a AES Andes la suma por concepto de capital de veinticuatro millones trescientos ochenta mil setenta y seis Dólares con cincuenta y cuatro centavos de Dólar.[3] **/ii/** **Créditos Subordinados Norgener.** Con el objeto de financiar la construcción, operación y desarrollo del Proyecto, Norgener Renovables SpA /hoy, AES Chile SpA y en adelante, **"Norgener"**/ otorgó créditos a Alto Maipo por un monto total de capital de [cuatrocientos treinta y siete millones setecientos ochenta y siete mil quinientos treinta y ocho Dólares], pendiente de pago, y cuyos intereses a esta fecha ascienden a la suma de [·][4] /los **"Créditos Subordinados Norgener"**/. Los Créditos Subordinados Norgener constaban en los siguientes instrumentos: /a/ reconocimiento de deuda otorgado por escritura pública de fecha veinte de febrero de dos mil dieciocho en la Notaría de Santiago

---

[3] **NTD:** Por favor confirmar si faltase agregar otros instrumentos. En el informe de Deloitte se menciona el monto de USD 14.584.442 por concepto de *"Other Liabilities"*.
[4] **NTD:** Por favor indicar el monto de intereses adeudados bajo los Créditos Subordinados Norgener.

de don Patricio Raby Benavente, bajo el repertorio número
mil seiscientos sesenta y dos guion dos mil dieciocho,
en virtud del cual Alto Maipo reconoció adeudar a Norgener
la suma por concepto de capital de veinticinco millones
de Dólares; /b/ reconocimiento de deuda otorgado por
escritura pública de fecha veintisiete de febrero de dos
mil dieciocho en la Notaría de Santiago de don Patricio
Raby Benavente, bajo el repertorio número mil ochocientos
cuarenta y ocho guion dos mil dieciocho, en virtud del
cual Alto Maipo reconoció adeudar a Norgener la suma por
concepto de capital de treinta y tres millones de Dólares;
/c/ reconocimiento de deuda otorgado por escritura
pública de fecha catorce de marzo de dos mil dieciocho
en la Notaría de Santiago de don Patricio Raby Benavente,
bajo el repertorio número dos mil trescientos treinta y
tres guion dos mil dieciocho, en virtud del cual Alto
Maipo reconoció adeudar a Norgener la suma por concepto
de capital de diez millones de Dólares; /d/
reconocimiento de deuda otorgado por escritura pública de
fecha trece de abril de dos mil dieciocho en la Notaría
de Santiago de don Patricio Raby Benavente, bajo el
repertorio número tres mil cuatrocientos noventa y cuatro
guion dos mil dieciocho, en virtud del cual Alto Maipo
reconoció adeudar a Norgener la suma por concepto de
capital de quince millones doscientos ochenta y siete mil
quinientos treinta y ocho Dólares; /e/ reconocimiento de
deuda otorgado por escritura pública de fecha diecisiete
de mayo de dos mil dieciocho en la Notaría de Santiago
de don Patricio Raby Benavente, bajo el repertorio número
cuatro mil setecientos noventa y ocho guion dos mil

8

dieciocho, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de ciento cuatro millones cuatrocientos sesenta y tres mil ciento cincuenta y siete Dólares; /f/ reconocimiento de deuda otorgado por escritura pública de fecha treinta de julio de dos mil dieciocho en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número siete mil seiscientos cuarenta y siete guion dos mil dieciocho, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de cuarenta y ocho millones nueve mil quinientos sesenta Dólares; /g/ reconocimiento de deuda otorgado por escritura pública de fecha veintiséis de diciembre de dos mil dieciocho en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número doce mil novecientos sesenta y cuatro guion dos mil dieciocho, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de veintisiete millones quinientos veintisiete mil doscientos ochenta y tres Dólares; /h/ reconocimiento de deuda otorgado por escritura pública de fecha cuatro de enero de dos mil diecinueve en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número ciento treinta y seis guion dos mil diecinueve, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de veinte millones de Dólares; /i/ reconocimiento de deuda otorgado por escritura pública de fecha veinticinco de septiembre de dos mil veinte en la

9

Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número siete mil seiscientos treinta y tres guion dos mil veinte, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de veinticinco millones de Dólares; /j/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de octubre de dos mil veinte en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número ocho mil setecientos noventa y nueve guion dos mil veinte, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de dieciocho millones de Dólares; /k/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de noviembre de dos mil veinte en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio diez mil doscientos guion dos mil veinte, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de veintiséis millones quinientos mil Dólares; /l/ reconocimiento de deuda otorgado por escritura pública de fecha veinticuatro de febrero de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número mil ochocientos cinco guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de diez millones de Dólares; /m/ reconocimiento de deuda otorgado por escritura pública de fecha veinticinco de marzo de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente,

10

bajo el repertorio número tres mil veintiséis guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de veinticinco millones de Dólares; /n/ reconocimiento de deuda otorgado por escritura pública de fecha veintiséis de abril de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número cuatro mil ciento treinta y cinco guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de quince millones de Dólares; /o/ reconocimiento de deuda otorgado por escritura pública de fecha veintisiete de mayo de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número cinco mil quinientos veintitrés guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de diez millones de Dólares; /p/ reconocimiento de deuda otorgado por escritura pública de fecha nueve de julio de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio siete mil cuatrocientos treinta y cinco guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de diez millones de Dólares; y /q/ reconocimiento de deuda otorgado por escritura pública de doce de agosto de dos mil veintiuno en la Notaría de Santiago de don Patricio Raby Benavente, bajo el repertorio número ocho mil novecientos treinta guion dos mil veintiuno,

11

en virtud del cual Alto Maipo reconoció adeudar a Norgener la suma por concepto de capital de quince millones de Dólares. Se deja constancia que, por escritura pública de fecha veintinueve de octubre de dos mil veintiuno, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número doce mil trescientos ochenta y tres guion dos mil veintiuno, Norgener, AES Andes y Alto Maipo acordaron la novación de la totalidad de los derechos emanados bajo los Créditos Subordinados Norgener, sustituyéndose a Norgener por AES Andes como nuevo acreedor de los Créditos Subordinados Norgener /la **"Novación por Cambio de Acreedor"**/. Como consecuencia de la Novación por Cambio de Acreedor, Alto Maipo quedó obligado respecto de AES Andes, en los mismos montos, términos y condiciones en que se encontraba obligado respecto de Norgener, por un monto total de capital de cuatrocientos treinta y siete millones setecientos ochenta y siete mil quinientos treinta y ocho Dólares. El crédito de AES Andes producto de la Novación por Cambio de Acreedor se documentó en reconocimiento de deuda otorgado por escritura de fecha veintinueve de octubre de dos mil veintiuno en la Notaría de Santiago de don Patricio Ray Benavente bajo el repertorio número doce mil trescientos ochenta y cuatro guion dos mil veintiuno, en virtud del cual Alto Maipo reconoció adeudar a AES Andes la suma por concepto de capital cuatrocientos treinta y siete millones setecientos ochenta y siete mil quinientos treinta y ocho Dólares. **/iii/** En adelante, los

12

Créditos Subordinados AES Andes Originales, conjuntamente con los Créditos Subordinados Norgener, se denominarán, los **"Créditos Subordinados AES Andes"**. Se deja constancia que el monto total de capital adeudado por Alto Maipo en virtud de los Créditos Subordinados AES Andes /entiéndase, la suma de los montos adeudados por concepto de capital bajo los Créditos Subordinados AES Andes Originales y los Créditos Subordinados Norgener/ corresponde a la cantidad de [·][5] Dólares, y que el monto total de los intereses devengados a esta fecha en virtud de los Créditos Subordinados AES Andes /entiéndase, la suma de los intereses devengados a esta fecha bajo los Créditos Subordinados AES Andes Originales y los Créditos Subordinados Norgener/ corresponde a la cantidad de [·][6] Dólares.- **/iv/ Créditos Subordinados Strabag.** Con el objeto de financiar la construcción, operación y desarrollo del Proyecto, Alto Maipo adeuda a Strabag un monto total de capital de [·][7], pendiente de pago, y cuyos intereses a esta fecha ascienden a la suma de [·][8], también pendientes de pago /los **"Créditos Subordinados Strabag"** y conjuntamente con los Créditos Subordinados AES Andes, los **"Créditos Subordinados"**/. Los Créditos Subordinados Strabag constan

---

[5] **NTD:** Incorporar la cifra que resulte de sumar el monto total de capital adeudado por los Créditos Subordinados AES Andes Originales y el monto total de capital adeudado por los Créditos Subordinados Norgener.

[6] **NTD:** Incorporar la cifra que resulte de sumar el monto total de intereses devengados a esta fecha por los Créditos Subordinados AES Andes Originales y el monto total de capital adeudado por los Créditos Subordinados Norgener.

[7] **NTD:** Por favor indicar monto de capital adeudado bajo los Créditos Subordinados Strabag.

[8] **NTD:** Por favor indicar el monto de intereses adeudados bajo los Créditos Subordinados Strabag.

13

en los instrumentos que se indican a continuación: /a/ cuarenta y un millones setecientos noventa y seis mil Dólares, conforme a lo establecido en la sección Seis.Uno.Uno.Cuatro del EPC Strabag /según este término se define más adelante/, correspondiente a las cantidades adeudadas por Alto Maipo a Strabag establecidas en la sección Seis/b//ii/ del EPC Strabag Original /según este término se define más adelante/; /b/ veintisiete millones ochocientos sesenta y cuatro mil Dólares, correspondientes al pago en dinero efectivo equivalente al sesenta y nueve coma sesenta y seis por ciento de la cantidad de cuarenta millones de Dólares, a ser pagadera a Strabag sujeto a los términos y condiciones establecidos en la sección Seis.Uno.Uno.Cuatro del EPC Strabag; /c/ treinta y cuatro millones ochocientos treinta mil Dólares, correspondientes al pago en dinero efectivo equivalente al sesenta y nueve coma sesena y seis por ciento de la cantidad de cincuenta millones de Dólares, a ser pagadera a Strabag sujeto a los términos y condiciones establecidos en la sección Seis.Uno.Uno.Cinco del EPC Strabag; /d/ trece millones novecientos treinta y dos mil Dólares, correspondientes al pago en dinero efectivo equivalente al sesenta y nueve coma sesenta y seis por ciento de la cantidad de veinte millones de Dólares, a ser pagadera a Strabag sujeto a los términos y condiciones establecidos en la sección Seis.Uno.Uno.Seis del EPC Strabag; y /e/ factura de fecha dieciocho de abril de dos mil diecinueve,

14

emitida por Strabag, por el monto neto de cuatro mil seiscientos diecisiete millones novecientos mil setecientos veinte pesos, moneda de curso legal en Chile /"**Pesos**"/, equivalentes a seis millones novecientos sesenta y seis mil Dólares, conforme al tipo de cambio que en ella se expresa, esto es, seiscientos sesenta y dos coma noventa Pesos por Dólar, copia de la cual fue protocolizada con fecha veintitrés de abril de dos mil diecinueve, en la Notaría de Santiago de don Eduardo Diez Morello, bajo el repertorio número siete mil cuatrocientos ochenta y nueve guion dos mil diecinueve. Para efectos del presente instrumento, se entiende por "**EPC Strabag**" el contrato en idioma inglés y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Amended and Restated Lump Sum Fixed Price Tunnel Complex Construction Contract*", el cual consta en instrumento privado de fecha diecinueve de febrero de dos mil dieciocho, modificado por instrumento privado de fecha ocho de mayo de dos mil dieciocho, y que sustituyó al contrato en idioma inglés y sujeto a las leyes del Estado de Nueva York, Estados Unidos de América, denominado "*Tunnel Complex Construction Contract*", suscrito con fecha once de octubre de dos mil doce /este último, el "**EPC Strabag Original**"/. **/v/** Se deja constancia que el monto total de capital adeudado por Alto Maipo en virtud de los Créditos Subordinados /entiéndase, la suma de los montos adeudados por concepto de capital bajo los Créditos Subordinados AES Andes Originales, los Créditos

15

Subordinados Norgener y los Créditos Subordinados Strabag/ corresponde a la cantidad de [·][9] Dólares, y que el monto total de los intereses devengados a esta fecha en virtud de los Créditos Subordinados /entiéndase, la suma de los intereses devengados a esta fecha bajo los Créditos Subordinados AES Andes Originales, los Créditos Subordinados Norgener y los Créditos Subordinados Strabag/ corresponde a la cantidad de [·][10] Dólares.- **/Tres/ Prendas sin Desplazamiento sobre Créditos Subordinados. /i/ Prenda sin desplazamiento sobre Créditos Subordinados AES Andes.** Se deja constancia que, mediante escritura pública de fecha nueve de diciembre de dos mil trece, otorgada en la Notaría de Santiago de don José Musalem Saffie bajo el repertorio número quince mil cuatrocientos ochenta guion dos mil trece, AES Gener S.A. /hoy, AES Andes/ otorgó prenda sin desplazamiento sobre créditos subordinados presentes y futuros /la **"Prenda Sobre Créditos Subordinados AES Andes"**/. La Prenda Sobre Créditos Subordinados AES Andes fue modificada mediante /a/ escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel bajo el repertorio número dos mil ciento noventa

---

[9] **NTD:** Incorporar la cifra que resulte de sumar el monto total de capital adeudado por los Créditos Subordinados AES Andes Originales, el monto total de capital adeudado por los Créditos Subordinados Norgener, y el monto total de capital adeudado por los Créditos Subordinados Strabag.
[10] **NTD:** Incorporar la cifra que resulte de sumar el monto total de intereses devengados a esta fecha por los Créditos Subordinados AES Andes Originales, el monto total de capital adeudado por los Créditos Subordinados Norgener, y el monto total de capital adeudado por los Créditos Subordinados Strabag.

16

y ocho guion dos mil diecisiete y /b/ escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y tres guion dos mil dieciocho. La Prenda Sobre Créditos Subordinados AES Andes fue debidamente inscrita en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha dieciséis de diciembre de dos mil trece, bajo el repertorio número doscientos veinte mil veintinueve guion trece. **/ii/ Prenda sin desplazamiento sobre Créditos Subordinados Norgener.** Se deja constancia que, mediante escritura pública de fecha dos de abril de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil sesenta y nueve guion dos mil dieciocho, Norgener Renovables SpA /hoy, AES Chile SpA/ otorgó prenda sin desplazamiento sobre créditos subordinados presentes y futuros /la **"Prenda Sobre Créditos Subordinados Norgener"** y conjuntamente con la Prenda Sobre Créditos Subordinados AES Andes, las **"Prendas sin Desplazamiento sobre Créditos Subordinados"**/. La Prenda Sobre Créditos Subordinados Norgener fue modificada mediante /a/ escritura pública de fecha trece de abril de dos mil dieciocho, otorgada en la Notaría de Santiago de don Patricio Raby Benavente bajo el repertorio número tres mil cuatrocientos noventa y cinco guion dos mil dieciocho; y /b/ escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de

17

don Roberto Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y dos guion dos mil dieciocho. La Prenda Sobre Créditos Subordinados Norgener fue debidamente inscrita en el Registro de Prendas sin Desplazamiento del Servicio de Registro Civil e Identificación con fecha diez de abril de dos mil dieciocho, bajo el repertorio número veintiún mil ciento cuarenta y cinco.- /**Cuatro**/ **Prenda Comercial sobre Créditos Subordinados Strabag**. Se deja constancia que, mediante escritura pública de fecha diecisiete de marzo de dos mil diecisiete, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel bajo el repertorio número dos mil ciento noventa y cinco guion dos mil diecisiete, Strabag otorgó prenda comercial sobre créditos subordinados /la "**Prenda Sobre Créditos Subordinados Strabag**"/. La Prenda Sobre Créditos Subordinados Strabag fue modificada mediante escritura pública de fecha ocho de mayo de dos mil dieciocho, otorgada en la Notaría de Santiago de don Roberto Cifuentes Allel bajo el repertorio número tres mil novecientos setenta y seis guion dos mil dieciocho.- **SEGUNDO**: **DECLARACIÓN DE EXTINCIÓN DE PLENO DERECHO DE LOS CRÉDITOS SUBORDINADOS.-** Por el presente instrumento, cada uno de los Acreedores Subordinados y Alto Maipo, debidamente representados en la forma indicada en la comparecencia, declaran lo siguiente: /**i**/ que como consecuencia de la sentencia dictada por el Tribunal de Quiebras de los Estados Unidos de América para el Distrito de Delaware que aceptó el plan de reorganización conforme al

capítulo once del Código de Quiebras de los Estados Unidos de América /*Chapter Eleven* del *Bankruptcy Code* de los Estados Unidos de América/ presentado por Alto Maipo y Alto Maipo Delaware LLC, se han extinguido por el solo ministerio de la ley todos los Créditos Subordinados AES Andes y los Créditos Subordinados Strabag; y **/ii/** que, atendido lo anterior, y para todos los efectos legales que corresponda, reconocen y aceptan por este acto que los Créditos Subordinados AES Andes y los Créditos Subordinados Strabag, según corresponda, han sido terminados y dejados sin efecto, y dejan constancia que se ha extinguido toda obligación y/o derecho entre Alto Maipo y AES Andes, tratándose de los Créditos Subordinados AES Andes, y entre Alto Maipo y Strabag, tratándose de los Créditos Subordinados Strabag, de manera que los Acreedores Subordinados declaran que Alto Maipo se ha liberado de todas las obligaciones que pudieran resultar de los Créditos Subordinados. Los Acreedores Subordinados dejan constancia expresa de que toda deuda subordinada que tenía Alto Maipo en virtud de los Créditos Subordinados fue liberada por el solo ministerio de la ley y, por esa razón, reconocen y aceptan que han quedado canceladas, resciliadas, sin fuerza ni efecto, y sin acción o vía de cobro, todas y cada una de las obligaciones que tenía Alto Maipo, constaren en cualquiera clase de instrumento que demostrare, directa o indirectamente, los Créditos Subordinados.- **TERCERO: FINIQUITO.-** Como consecuencia de la extinción de pleno derecho de los Créditos Subordinados referida en la

19

cláusula segunda precedente, **/i/** AES Andes y Alto Maipo se otorgan en este acto el más amplio, completo, total y definitivo finiquito por los Créditos Subordinados AES Andes, declarando que nada se adeudan por dicho concepto; y **/ii/** Strabag y Alto Maipo se otorgan en este acto el más amplio, completo, total y definitivo finiquito por los Créditos Subordinados Strabag, declarando que nada se adeudan por dicho concepto. Adicionalmente, las Partes acuerdan que se realice una anotación marginal en las distintas escrituras públicas de reconocimiento unilaterales de deuda u otros instrumentos en que se hayan documentado los Créditos Subordinados AES Andes y los Créditos Subordinados Strabag, para dejar constancia de la presente escritura pública de declaración. Tales anotaciones marginales serán tan solo una medida de publicidad de simple noticia.- **CUARTO: ALZAMIENTOS.**[11]**-** **/Uno/ Alzamiento parcial de Prendas sin Desplazamiento sobre Créditos Subordinados.** Por este acto el Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia, actuando por sí y en representación de las Partes Garantizadas, viene en alzar y cancelar la Prenda Sobre Créditos Subordinados AES Andes y la Prenda Sobre Créditos Subordinados Norgener, sobre todos y cada uno de los Créditos Subordinados AES Andes y Créditos Subordinados Norgener, respectivamente, por haberse cancelado, rescindido y extinguido de pleno derecho todas las obligaciones de Alto Maipo bajo los instrumentos en que constan los Créditos Subordinados,

---

[11] **NTD:** Por confirmar si Agente de Garantías firmará este instrumento o bien un instrumento separado.

razón por la cual, a esta fecha, Alto Maipo no tiene ninguna obligación bajo los mismos. Se deja constancia que la Prenda Sobre Créditos Subordinados AES Andes y la Prenda Sobre Créditos Subordinados Norgener permanecen vigentes respecto de Créditos Subordinados Futuros /según dicho término se define en las Prendas sin Desplazamiento Sobre Créditos Subordinados/. **/Dos/ Alzamiento de Prenda Sobre Créditos Subordinados Strabag.** Por este acto el Agente de Garantías Local, debidamente representado en la forma indicada en la comparecencia, actuando por sí y en representación de las Partes Garantizadas, viene en alzar y cancelar la Prenda Sobre Créditos Subordinados Strabag, por haberse cancelado, rescindido y extinguido de pleno derecho todas las obligaciones de Alto Maipo bajo los instrumentos en que constan los Créditos Subordinados, razón por la cual, a esta fecha, Alto Maipo no tiene ninguna obligación bajo los mismos.- **QUINTO: FACULTAD ESPECIAL.- /Uno/** Se faculta al portador de copia autorizada de la presente escritura para requerir las inscripciones, subinscripciones, anotaciones o cancelaciones que fueren procedentes, pudiendo para ello firmar todos los documentos que sean necesarios, y actuar ante cualquier entidad pública o privada.- **/Dos/** Sin perjuicio de lo anterior, las Partes otorgan un mandato especial, pero tan amplio como en derecho sea necesario, a los señores /a/ Felipe Moro Vargas, Fernando Noriega Potocnjak y Diego Peralta Valenzuela; y /b/ Rodrigo Ochagavía Ruiz-Tagle, Ariel Mihovilovic Bonardi y Carmen Luz Chavarría González, para que,

21

actuando uno cualquiera de los tres primeros con uno cualquiera de los tres segundos, puedan realizar las rectificaciones, aclaraciones o complementaciones que sean necesarias realizar al presente instrumento, pudiendo suscribir las escrituras públicas o instrumentos privados que se requiera.- **SEXTO**: **ESTIPULACIONES VARIAS.- /Uno/ Gastos.** Los gastos derivados de la suscripción de este instrumento serán de cargo exclusivo de Alto Maipo. Asimismo, los gastos, impuestos, si los hubiere, derechos notariales y de inscripciones, así como los desembolsos de cualquier naturaleza para el perfeccionamiento de este instrumento, y los derivados de las escrituras públicas complementarias que pueda ser necesario otorgar para clarificar, rectificar o introducir adiciones a este documento, serán de exclusivo cargo de Alto Maipo.- **/Dos/ Denominación de las Cláusulas.** Las denominaciones asignadas por las Partes a las distintas estipulaciones de este instrumento han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener distintos que dicha denominación.- **/Tres/ Domicilio y Competencia.** El presente instrumento se rige por las leyes de la República de Chile. Las Partes fijan su domicilio en la ciudad y comuna de Santiago para todos los efectos del presente Contrato y y se someten a los tribunales ordinarios de justicia con asiento y competencia en la comuna de Santiago.- **PERSONERÍAS.** La personería de los representantes de **AES ANDES S.A.,** consta de [·]. La personería de los representantes de

22

**STRABAG SpA,** consta de [·]. La personería de los representantes de **ALTO MAIPO SpA,** consta de [·]. La personería de los representantes de **ITAÚ CORPBANCA,** consta de [·]. Las personerías indicadas no se insertan por ser conocidas de las Partes y del Notario que autoriza. En comprobante y previa lectura firman los comparecientes. Doy fe.-

PP. AES ANDES S.A.

PP. AES ANDES S.A.

PP. STRABAG SpA

PP. STRABAG SpA

23

pp. ALTO MAIPO SpA

PP. ALTO MAIPO SpA

PP. ITAÚ CORPBANCA

PP. ITAÚ CORPBANCA

NOTARIO

## <u>Exhibit SS</u>

**List of Directors and Officers of the Reorganized Debtors**

## List of Directors of Reorganized Debtors[1]

Pursuant to Article 4.14 of the Plan, and in accordance with section 1129(a)(5) of the Bankruptcy Code, as of the date of this Plan Supplement, the Debtors currently expect the current members of the board of Alto Maipo SpA to remain directors of the reorganized Alto Maipo SpA entity (the "Reorganized Alto Maipo").

Accordingly, as of the date of this Plan Supplement, the Debtors expect the board of the Reorganized Alto Maipo to consist of the following directors on the Effective Date:

- Alfredo Del Carril
- Javier Dib
- Roberto Salazar

Alto Maipo Delaware LLC is a member-managed LLC managed by Alto Maipo SpA. As of the filing of this Plan Supplement, the Debtors expect the reorganized Alto Maipo Delaware LLC entity (the "Reorganized Alto Maipo Delaware") to be managed by the Reorganized Alto Maipo.

## List of Officers of Reorganized Debtors

Pursuant to Article 4.14 of the Plan, and in accordance with section 1129(a)(5) of the Bankruptcy Code, as of the date of this Plan Supplement, the Debtors currently expect the existing named executive officers of the Debtors to continue to serve in their capacities on and after the Effective Date in accordance with the applicable governing documents and employment arrangements, which, to the extent such applicable employment agreements were executed prior to the Effective Date, shall be applicable solely to the extent assumed under the Plan or by Court order.

Accordingly, as of the date of this Plan Supplement, the Debtors expect the executive officers of the Reorganized Alto Maipo to consist of the following executive officers on and after the Effective Date:

- Alfredo Del Carril (Legal Director)
- Javier Dib (Chairman)
- Roberto Salazar (Financial Controller Manager)
- Peter Gferrer (Project Director)

As of the filing of this Plan Supplement, the Debtors expect the Reorganized Alto Maipo Delaware to have the following executive officer on and after the Effective Date:

- Javier Dib (Chief Restructuring Officer)

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan of Reorganization of Alto Maipo SpA and Alto Maipo Delaware LLC Pursuant to Chapter 11 of the Bankruptcy Code, which was last filed on April 6, 2022 (ECF No. 464) (as further amended and supplemented from time to time).